THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

\* \* \* \* \*

UNITED STATES OF AMERICA      \*      4:22-MJ-0011-KPJ-1
                              \*      Plano, Texas
VS.                           \*      10:53 a.m. - 12:42 p.m.
                              \*      03:14 p.m. - 03:34 p.m.
ELMER STEWART RHODES, III     \*      January 24, 2022

\* \* \* \* \*

**DETENTION HEARING**

BEFORE THE HONORABLE KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

\* \* \* \* \*

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 \* 409-330-1610

2

**APPEARANCES:**

For the United States:

    MS. KATHRYN L. RAKOCZY
    **U.S. Attorney's Office**
    555 Fourth Street NW
    Washington, DC 20530

    MR. JUSTIN SHER
    **United States Department of Justice**
    950 Pennsylvania Avenue NW
    Washington, DC 20530

For the Defendant:

    MR. PHILLIP A. LINDER
    **The Linder Firm**
    3300 Oak Lawn Ave., Suite 700
    Dallas, TX 75219

    MR. JAMES L. BRIGHT
    **James Lee Bright, Attorney At Law**
    2926 Maple Avenue, Suite 200
    Dallas, TX 75201

Courtroom Deputy:

    JANE AMERSON

1                    **WITNESS INDEX**

2    GOVERNMENT'S EVIDENCE:

3        Special Agent Michael Palian

4            Direct Examination by Ms. Rakoczy.......   6

5            Cross-Examination by Mr. Linder.........  49

6            Redirect Examination by Ms. Rakoczy.....  66

7            Recross-Examination by Mr. Linder.......  70

8            Examination by the Court...............  71

9    DEFENDANT'S EVIDENCE:

10        Brian Bodine

11            Direct Examination by Mr. Linder........  76

12            Examination by the Court...............  78

13    Argument by counsel............................  84

14    FURTHER EVIDENCE BY DEFENDANT:

15        Benjamin (LNU)

16            Direct Examination by Mr. Linder........ 103

17            Cross-Examination by Ms. Rakoczy........ 106

18            Redirect Examination by Mr. Linder...... 107

19            Examination by the Court............... 107

20    EVIDENCE REOPENED BY THE COURT:

21        Tasha Vonn Adams Rhodes

22            Opening Statement by Ms. Adams.......... 110

23            Examination by the Court............... 111

24            Cross-Examination by Mr. Bright........ 113

25    Argument by counsel............................ 118

1              **P R O C E E D I N G S**

2              **10:53 A.M. - JANUARY 24, 2022**

3              THE COURT:  No. 4:22-mj-11, United States vs.

4    Elmer Stewart Rhodes, III.

5              MS. RAKOCZY:  Good afternoon, Your Honor.

6    Kate Rakoczy and Justin Sher on behalf of the United

7    States.

8              THE COURT:  Good afternoon.

9              *[Pause]*

10             COURTROOM DEPUTY:  Would you raise your right

11   hand, please.  Do you solemnly swear the testimony you

12   are about to give in the case before the Court will be

13   the truth, the whole truth, and nothing but the truth,

14   so help you God?

15             DEFENDANT RHODES:  I do.

16             THE COURT:  We're here today for your

17   Detention Hearing.  Before we begin with testimony,

18   have both counsel received a copy of the Pretrial

19   Services Report?

20             MS. RAKOCZY:  Yes, Your Honor.

21             THE COURT:  Mr. Linder, have you received a

22   copy of the Pretrial Services Report?

23             MR. LINDER:  We received the one last week,

24   Your Honor.  And as you may be aware, we updated some

25   information today, but I don't know if Ms. Ruth made an

1  updated report or not, but we do have the original.

2           THE COURT:  I am not aware of that.  Can you

3  tell me which information that needs to be modified?

4           MR. LINDER:  We had entered information for a

5  third party custodian and things like that, but yeah,

6  no biographical information.

7           THE COURT:  Okay.  What about from the

8  Government?  Any information contained in this report

9  you'd request to be modified?

10          MS. RAKOCZY:  No, Your Honor.

11          THE COURT:  All right.  Mr. Rhodes, you may

12 have a seat at counsel table with your counsel.

13          MS. RAKOCZY:  Thank you, Your Honor.  If I

14 may, before we call our witness, we'd just like to put

15 on the record that we have provided to defense counsel

16 a copy of the discovery materials in this case that

17 have been available up to this point.  As the Court may

18 be aware, there is a related matter out of the District

19 of Columbia and we provided a copy in the form of

20 several -- two multiple terabyte hard drives to defense

21 counsel.  We also provided them with a letter that

22 highlighted some of the information that might be most

23 pertinent for this hearing today.

24          And, Your Honor, with that, the United

25 States calls Special Agent Michael Palian.

6

```
 1            COURTROOM DEPUTY:  Would you raise your right
 2  hand, please.  Do you solemnly swear the testimony you
 3  are about to give in the case before the Court shall be
 4  the truth, the whole truth, and nothing but the truth,
 5  so help you God?
 6            THE WITNESS:  I do.
 7            COURTROOM DEPUTY:  You may have a seat, please.
 8  And if you would state your name and spell it for the
 9  record.
10            THE WITNESS:  May I remove my mask?
11            THE COURT:  You may remove your mask.
12            THE WITNESS:  My name is Michael Palian.
13  That's spelled P-a-l-i-a-n.
14            THE COURT:  You may proceed, counsel.
15            MS. RAKOCZY:  Thank you, Your Honor.
16    SPECIAL AGENT MICHAEL PALIAN, CALLED BY THE GOVERNMENT
17                     DIRECT EXAMINATION
18  BY MS. RAKOCZY:
19  Q.   Sir, where are you employed?
20  A.   I'm employed with the FBI in Washington, DC.
21  Q.   How long have you been employed with the FBI?
22  A.   Just under 19 years.
23  Q.   And what is your current position or title?
24  A.   I'm a Special Agent with the FBI.
25  Q.   Have you been a Special Agent with the FBI your
```

1    entire time there?

2    A.   I have.

3    Q.   Special Agent Palian, did you participate in an

4    investigation into the attack on the United States

5    Capitol that occurred on January 6th of 2021?

6    A.   Yes.

7    Q.   And specifically, have you participated in an

8    investigation into the role of certain members and

9    affiliates of a group called the Oath Keepers in that

10   attack?

11   A.   I have.

12   Q.   Could you describe for the Court generally what you

13   have learned about the role played by certain members

14   and affiliates of the Oath Keepers in that attack?

15   A.   Sure.  Generally speaking, the Oath Keepers

16   planned, funded, recruited for, and executed a plan to

17   stop the transition of Presidential power.

18   Q.   With respect to January 6th, did certain members

19   and affiliates of the Oath Keepers actually breach the

20   Capitol building?

21   A.   They did breach the Capitol building, yes.

22   Q.   Could you describe for the Court generally what

23   that consisted of?

24   A.   Generally speaking, there were two groups of Oath

25   Keepers that breached the Capitol that day.  We've

1  labeled them Stack 1 and Stack 2.  Stack 1 consisted of

2  approximately 14 individuals that entered the Capitol

3  around 2:40 p.m.  Stack 2 consisted of five individuals

4  and a K-9 that breached the Capitol around 3:15.

5  Q.  With respect to that group that you've referred to

6  as Stack 1, was there an individual who was a

7  co-defendant in this matter who somewhat was in

8  leadership of that role as they breached the building?

9  A.  Yes, there was.

10  Q.  What's that individual's name?

11  A.  That individual's name is Kelly Meggs.

12  Q.  And is he a leader or was he at he time a leader of

13  the Florida Chapter of Oath keepers?

14  A.  Yes, he was the leader of the Florida Chapter of

15  the Oath Keepers.

16  Q.  With respect to that group you've referred to as

17  Stack 2, was there someone who took something of a

18  leadership role in leading that group into the building

19  on January 6th?

20  A.  Yes, there was.

21  Q.  What's that person's name?

22  A.  Joshua James.

23  Q.  And was he the leader of a chapter of Oath Keepers?

24  A.  He was the leader of the Alabama Chapter of Oath

25  Keepers.

1  Q.   Special Agent Palian, were there members and

2  affiliates of the Oath Keepers who supported those who

3  breached the building on January 6th, but did not

4  actually go inside the building?

5  A.   Yes, there were.

6  Q.   Were some of those individuals present on the

7  Capitol grounds outside of the building?

8  A.   They were present on the Capitol grounds, yes.

9  Q.   Were there also individuals who supported those who

10 breached the building who were not present on the

11 Capitol grounds?

12 A.   Correct, there were.

13 Q.   Where were those individuals stationed?

14 A.   Those individuals were stationed at a hotel in

15 Arlington, Virginia.

16 Q.   And what role were they playing?

17 A.   They played the role of the Quick Reaction Force or

18 QRF, as it's been called.

19 Q.   Is that your term or their term?

20 A.   That is their term.

21 Q.   Based on what you have learned through reading

22 messages that individuals who participated in that or

23 planned that Quick Reaction Force send among each

24 other, what was the purpose of that Quick Reaction

25 Force?

1  A.    The purpose of the Quick Reaction Force that day

2  was to prepare to bring weapons in support to the Oath

3  Keepers that were in Washington, DC should, as they put

4  it, the shit hit the fan.

5  Q.    Are you familiar with an individual named Elmer

6  Stewart Rhodes, III?

7  A.    I am.

8  Q.    And have you ever -- who is Mr. Rhodes?

9  A.    Mr. Rhodes is the founder and leader of the Oath

10 Keepers, the national Oath Keepers.

11 Q.    Have you met Mr. Rhodes in person?

12 A.    I have.

13 Q.    If you could, sir, I'd like for you to look around

14 the courtroom and let us know if you see Mr. Rhodes in

15 the courtroom here today.

16 A.    I see him sitting with his defense counsel.

17 Q.    Could you describe what he's wearing?

18 A.    Mr. Rhodes appears to be wearing, I guess it would

19 be a black and light blue jumpsuit.

20        MS. RAKOCZY:  May the record reflect, Your

21 Honor, the in-court identification of the defendant?

22        THE COURT:  Yes.

23        MS. RAKOCZY:  Thank you, Your Honor.

24 BY MS. RAKOCZY:

25 Q.    Special Agent Palian, have you investigation

1  whether the defendant played a role in the attack on

2  the Capitol?

3  A.   I have.

4  Q.   Could you describe for the Court in general terms

5  what that role was?

6  A.   Sure.  In general terms, Mr. Rhodes coordinated,

7  offered to fund, and facilitated the attack on the

8  Capitol.

9  Q.   Special Agent Palian, I'd like to direct your

10 attention to the days and weeks following the 2020

11 United States Presidential election.  Did Mr. Rhodes

12 around that time disseminate messages that your

13 investigation has deemed to have been relevant to the

14 conspiracy alleged in the Indictment?

15 A.   Yes, messages were disseminated.

16 Q.   Could you describe for the Court some of those

17 messages?

18 A.   Sure.  Those messages took various forms.  They

19 took the form of signal messages or text messages or

20 phone calls.  But the messages' content revolved around

21 planning for the event and discussed some of the intent

22 of the operation.

23 Q.   We're going to bring up on the screen right now,

24 with the Court's permission, what's been marked as

25 Government's Exhibit No. 1.

 1        MS. RAKOCZY:  May I do that, Your Honor?

 2        THE COURT:  Any objection?

 3        MR. LINDER:  No, Your Honor.  As counsel has

 4 explained, she provided this to us already.

 5        THE COURT:  All right, you may publish.

 6        MS. RAKOCZY:  Thank you, Your Honor.

 7 BY MS. RAKOCZY:

 8 Q.  Special Agent Palian, I've placed up on the screen

 9 what has been labeled as Government's Exhibit No. 1 for

10 the purposes of this Detention Hearing.

11        MS. RAKOCZY:  And I apologize to the Court

12 because of the PowerPoint.  It actually says

13 Government's Exhibit No. 2, but it is labeled as

14 Government's Exhibit 1 on the hard copy that we

15 provided to the Court and counsel.

16 BY MS. RAKOCZY:

17 Q.  Special Agent Palian, do you recognize what we're

18 seeing on the screen?

19 A.  Yes, I do recognize it.

20 Q.  Can you describe in general terms what it is?

21 A.  Sure.  This is a Signal message from a Signal chat

22 group that was named The Old Leadership Chat and the

23 message was sent by Mr. Rhodes on November 7th.

24 Q.  Is this a copy of the message that you obtained

25 from a search of the defendant's phone?

 1  A.   I did obtain this from this defendant's phone, yes.

 2  Q.   And did you conduct that search pursuit to a

 3  warrant?

 4  A.   Yes, I did.

 5  Q.   Does this appear to be a fair and accurate copy of

 6  the message that we're about to talk about?

 7  A.   Yes, it's fair and accurate.

 8        MS. RAKOCZY:  Your Honor, for the purposes of

 9  this hearing, we would seek to move Government's

10  Exhibit No. 1 into evidence.

11        THE COURT:  Any objection?

12        MR. LINDER:  No objection.

13        THE COURT:  All right, it's admitted as

14  Government's Exhibit 1.

15  BY MS. RAKOCZY:

16  Q.   Special Agent Palian, this group chat that's called

17  Old Leadership Chat, you said it was taken from an

18  application called Signal; is that right?

19  A.   Yes.

20  Q.   What is Signal?

21  A.   Signal is an encrypted text messaging application.

22  Q.   Okay.  And you mentioned that this was a group

23  chat.  What does that mean?

24  A.   A group chat means there's more than two

25  participants in the message.

1   Q.   Was the defendant, Mr. Rhodes, a participant in

2   this chat?

3   A.   He was and he was the author of this message.

4   Q.   Okay.  Were there other co-defendants who were

5   charged in this conspiracy as participants in this chat?

6   A.   Yes.

7   Q.   For example, was co-defendant Kelly Meggs a

8   participant in this chat?

9   A.   Kelly Meggs was a participant, yes.

10  Q.   And perhaps not at this time, but later in time

11  relevant to this conspiracy, were Jessica Watkins and

12  Joshua James participants in this chat?

13  A.   Yes, both those defendants were also participants.

14  Q.   The chat, when was this message that we have up on

15  the screen now sent by Mr. Rhodes?

16  A.   November 7, 2020.  I can't tell the time because it

17  appears to be covered up by the --

18  Q.   Okay.  On your screen it's --

19  A.   On my screen it's covered, but I think it's

20  12:25 p.m. Eastern Standard Time, if I can see it

21  correctly.  I think that says 11:25 UTC minus six.

22  Q.   Special Agent Palian, when the message begins, it

23  begins, "I am in direct context with the Serbian author

24  of that video."  Based on reading the full contents of

25  this chat, do you know what video Mr. Rhodes is

1  referring to?

2  A.   Yes, I do.

3  Q.   Can you explain for the Court?

4  A.   Sure.  The video Mr. Rhodes is referring to comes

5  from Serbia and it was steps taken by Serbian citizens

6  after the election of Slobodan Milosevic.

7  Q.   And did that video describe those steps?

8  A.   It did.

9  Q.   Could you then just read us then what Mr. Rhodes

10  goes on to say about that video?

11  A.   Sure.  "His videos are excellent.  Here is his

12  written advice to us:

13          "What we have done and what you probably need

14  to do.  Peaceful protests good, well played, round one.

15  A complete civil disobedience.  They are not your

16  representatives.  They are a foreign puppet government.

17  Connect with the local police and start organize by

18  neighborhoods to stay safe (we didn't need this step).

19  We swarmed the streets and started confronting the

20  opponents.  I know, not nice, but it must be done if

21  the institutions stop to exist.  Millions gathering in

22  our Capitol.  There were no barricades strong enough to

23  stop them nor police determined enough to stop them.

24  Police and military align with the people after a few

25  hours of fist fight.  We swarmed the Parliament and

1   burned down the fake state television.  We won.

2   However, we made a mistake.  We have not removed all of

3   his people from their positions.  That was the one

4   mistake.  They are going  to fight to the end.  You

5   must do the same."

6   Q.   Thank you.  That's sufficient, Special Agent Palian.

7         MS. RAKOCZY:  We can advance now and take that

8   down from the screen.

9   BY MS. RAKOCZY;

10  Q.   Special Agent Palian, did the defendant also

11  organize virtual meetings to discuss plans for this

12  plan that he was setting forth?

13  A.   He did organize virtual meetings, yes.

14  Q.   Did they use a particular site for those meetings?

15  A.   Yes, they did.

16  Q.   Could you tell the Court what that site was?

17  A.   Sure.  The site was GoToMeeting, which is a

18  web-based application which multiple participants can

19  log in.  There's a video component to it.  It's akin to

20  Zoom, which I think most people are familiar with.

21  Q.   And did Mr. Rhodes host meetings shortly after the

22  Presidential election to discuss similar plans to what

23  he described in that message that you just read to the

24  Court?

25  A.   He did.

1   Q.   Did he send similar messages to what we just read --

2   what you just read for the Court to other Signal group

3   chats?

4   A.   Yes, he did.

5   Q.   And were co-defendants in the current Indictment

6   present and participating in some of those group chats?

7   A.   They were.

8   Q.   In these messages did the defendant discuss the

9   need for an armed force or the term Quick Reaction

10  Force that you used to support operations in

11  furtherance of this plan?

12  A.   He did.

13  Q.   And specifically, did he discuss the need for such

14  an armed force in any of the GoToMeetings?

15  A.   He did discuss it in the GoToMeetings, yes.

16  Q.   Can you describe for the Court any such

17  GoToMeetings that you remember?

18  A.   Yeah, I recall one from November 9th where

19  Mr. Rhodes discussed that they were in a similar

20  position to 1775, March of 1775, and their quote that

21  they would only await the President's orders.  However,

22  this was to give them official cover, I think was the

23  term used.  This is going to be our cover story or

24  official cover.

25  Q.   When comparing the position of themselves and his

1   followers to March of 1775, what is the significance of
2   that date, if you know?
3   A.   Yeah.  So March 1st of 1775 was exactly seven weeks
4   before the first shot in the Civil War was fired on
5   April 19, 1775 at Lexington.
6   Q.   You just said Civil War.  Is that --
7   A.   I'm sorry, Revolutionary War, I apologize.  Thank
8   you.
9   Q.   Special Agent Palian, at some point did the
10  defendant focus his co-conspirators on the date of
11  January 6, 2021 as a date where they might put their
12  plans into action?
13  A.   Yes, he did.
14  Q.   What is, if you know, the significance of January
15  6th?
16  A.   January 6th is when the certification of the
17  electoral votes in Congress was to occur.
18  Q.   Can you tell the Court in what context you saw the
19  defendant articulating January 6th as an important date?
20  A.   Sure.  There was an interview that Mr. Rhodes did
21  with an individual named Mike Adams in middle December,
22  and he referenced January 6th as a hard constitutional
23  deadline.
24  Q.   Did the defendant discuss during that interview
25  what he and his followers might do if Congress did not

1  step in or someone did not step in to stop the

2  certification of the electoral college vote?

3  A.   Mr. Rhodes, I believe it was in that interview,

4  talked about the bloody -- massively bloody -- I'm

5  paraphrasing, but I think that's what it was, massively

6  bloody civil war which would ensue.

7  Q.   Did the defendant also discuss the importance of

8  January 6th on some of the Signal group chats that

9  you've described?

10  A.   Yes.

11  Q.   Are you familiar with a Signal group chat called

12  Okay FL Hangout?

13  A.   Yes, I am familiar with that.

14  Q.   Did you obtain a copy of this group chat from the

15  defendant's cellular telephone when you searched it?

16  A.   Yeah, we did.

17  Q.   Who primarily was participating in that group chat?

18  A.   Primarily, that chat was for the Florida Chapter of

19  the Oath Keepers, but there were some national members

20  that were involved, too.

21  Q.   Were co-defendants from the Florida Chapter

22  participants -- co-defendants in this Indictment from

23  the Florida Chapter participants in that group chat?

24  A.   Yes, the co-defendants were participants.

25  Q.   Were Kelly Meggs, Kenneth Harrelson, Joseph

1  Hackett, and David Moerschel participants in that chat?

2  A.   They were.

3  Q.   Was the defendant a participant in that chat?

4  A.   He was.

5  Q.   On that chat did the defendant and others make

6  statements that mentioned the need to scare or

7  intimidate members of Congress on January 6th?

8  A.   Yes, that was referenced.

9        MS. RAKOCZY:  With the Court's permission, I'd

10  like to publish Government's Exhibit No. 2 at this time.

11        THE COURT:  Any objection?

12        MR. LINDER:  We've seen it, Your Honor.  No

13  objection.

14        THE COURT:  All right.  And Mr. Linder, I

15  wanted to go back to you.  No objection to it being

16  admitted into evidence?

17        MR. LINDER:  Correct.  I assume they're only

18  going to offer the ones they've given us.  We've seen

19  them.  No objection.

20        THE COURT:  All right, so Government Exhibit 2

21  is admitted and you may publish.

22        MS. RAKOCZY:  Thank you, Your Honor.

23  BY MS. RAKOCZY:

24  Q.   Special Agent Palian, I've brought Government's

25  Exhibit 2 up on the screen.  Do you recognize this?

1  A.   I do recognize it.

2  Q.   And is this -- are these two chats that were pulled

3  from that Okay FL Hangout that you recovered from the

4  defendant's phone?

5  A.   Yes, they were.

6  Q.   Were these chats sent in late December of 2020?

7  A.   Yes.

8  Q.   The first chat says that it is from a user called

9  [OkGator1].   Based on your investigation, do you know

10  who that person is?

11  A.   I do know who that person is.

12  Q.   Who utilized that moniker?

13  A.   Kelly Meggs, one of the co-defendants in this case.

14  Q.   And on December 23, 2020, could you read the Court

15  the message that Mr. Meggs sent to that chat.

16  A.   Sure.   December 23, 2020.   "We need to surround the

17  Capitol all the way around with patriots screaming so

18  that they hear us inside.   Scare the hell out of them

19  with about a million surrounding them should do the

20  trick."

21  Q.   Did Mr. Rhodes send a message on December 25th,

22  then, of 2020 to the same chat?

23  A.   He did.

24  Q.   Could you read the Court Mr. Rhodes' message.

25  A.   "I think Congress will screw him over.   The only

1  chance we/he has is if we scare the shit out of them

2  and convince them it will be torches and pitchforks

3  time is" -- and I think he meant if -- "is they don't

4  do the right thing.  But I don't think they will

5  listen."

6  Q.   Thank you, Special Agent Palian.  We can take that

7  off the screen.

8         Special Agent Palian, you read us at the

9  outset of your testimony a message that was from a chat

10  that was called Old Leadership Chat; do you recall that?

11 A.   Yes.

12 Q.   Did that chat, contemporaneously with this case in

13 around the time of November 2020 through January of

14 2021, did that chat operate under a different name?

15 A.   Yes, it did.

16 Q.   And was that chat called Leadership Intel Sharing

17 Secure, or words to that effect?

18 A.   Yes.

19 Q.   Did you uncover a message that Defendant Rhodes

20 sent to that Leadership Intel chat around the end of

21 December, December 31st of 2020?

22 A.   Yes, we did.

23 Q.   Do you recall that's just where the defendant said

24 to those on the chat, "There is no standard political

25 or legal way out of this"?

1    A.    Yes.

2    Q.    Based on the context of that conversation, are you

3    aware of what the "this" was that he was referring to?

4    A.    This meaning the general situation that surrounded

5    the election, I believe.

6    Q.    In reviewing the Signal chats on the defendant's

7    phone, did the defendant regularly use the words "civil

8    war" and "revolution" to refer to what he and his

9    co-conspirators may need to do?

10    A.    He regularly used those terms, yes.

11    Q.    Special Agent Palian, did the defendant facilitate

12    planning and coordination among his co-conspirators for

13    January 6th?

14    A.    He did.

15    Q.    Could you tell the Court a little bit about what he

16    did?

17    A.    Sure.  He was involved in QRF planning, he was

18    involved in bringing people to the Capitol.  He offered

19    to fund several parts of the operation.

20    Q.    Did the defendant participate in or administer

21    certain group chats that surrounded planning for the

22    6th?

23    A.    He did.

24    Q.    Did those chats -- was one of those chats entitled

25    DC OP: JAN 6 '21?

1  A.   Yes, that was one of them.

2  Q.   And with respect to that chat, were other

3  co-defendants in the Indictment present in that chat?

4  A.   Yes, other co-defendants were present.

5  Q.   And specifically, were any defendants who

6  participated in the Quick Reaction Force present in

7  that chat?

8  A.   Yes.

9  Q.   Who was present in that chat?

10  A.   It was Edward Vallejo.

11         MS. RAKOCZY:  I'm going to bring up on the

12  screen now, with the Court's permission, Government's

13  Exhibit No. 3.

14         MR. LINDER:  No objection.

15         THE COURT:  All right, government's Exhibit 3

16  is admitted and you may publish.

17         MS. RAKOCZY:  Thank you, Your Honor.

18  BY MS. RAKOCZY:

19  Q.   Special Agent Palian, do you recognize Government's

20  Exhibit No. 3?

21  A.   Yes.

22  Q.   Is this an excerpt of another group chat that you

23  recovered from the defendant's phone?

24  A.   Yes, it is.

25  Q.   What is the name of this group chat?

1  A.   DC OP: JAN 6 '21.

2  Q.   And can you describe for the Court what the

3  defendant is saying in these two messages?

4  A.   Sure.  "New Year's Eve 2020.  Annex and move the NC

5  leaders and experience prior op veterans from NC."  And

6  then about a minute later, "Let's make sure that anyone

7  in Oath Keepers" -- I think he meant Oath Keepers, not

8  Oath Keepera -- "who is a team leader who will be

9  bringing a team is on this chat."

10 Q.   And reviewing that group chat, Special Agent

11 Palian, were the "team leaders" from various regional

12 chapters of Oath Keepers all participants in that chat?

13 A.   Yes, they were.

14 Q.   And was this chat used to discuss plans for January

15 6th?

16 A.   It was.

17         MS. RAKOCZY:  Thank you.  You can take that

18 message down.

19 BY MS. RAKOCZY:

20 Q.   Special Agent Palian, you mentioned a minute ago

21 that the defendant offered to fund or did fund aspects

22 of planning and coordination for the 6th.  Could you

23 tell the Court exactly what you have learned?

24 A.   Sure.  Mr. Rhodes offered to pay for hotel rooms,

25 but they were already taken care of at that point.  He

1  also had an individual who he had put in charge of

2  several of the aspects who had an Oath Keepers credit

3  card, who could have paid for things, too.

4  Q.   Did Mr. Rhodes offer to reimburse for the cost of

5  supplies, like maps and communications devices?

6  A.   He did.

7  Q.   You mentioned a moment ago that the defendant

8  participated in planning for the Quick Reaction Force.

9  Did the defendant articulate the idea of having a Quick

10 Reaction Force for January 6th?

11 A.   He articulated a Quick Reaction Force, yes.

12 Q.   And where did you see such messages?

13 A.   In the Signal messages.

14 Q.   Did he also post messages about having a Quick

15 Reaction Force to the Oath Keepers website?

16 A.   He did.

17 Q.   And did he do so specifically in a call to action

18 for his members and affiliates coming to Washington, DC

19 for January 6th?

20 A.   Yes, several days beforehand.

21 Q.   Did the defendant also exchange messages with some

22 of his co-conspirators regarding the planning and

23 facilitation of the Quick Reaction Force?

24 A.   He did.

25 Q.   Did people who were planning and participating in

1 the Quick Reaction Force keep Mr. Rhodes updated on

2 their plans?

3 A.   They did keep him updated.

4 Q.   During the course of your investigation, have you

5 found evidence that there were firearms contributed to

6 this Quick Reaction Force?

7 A.   Firearms were contributed.

8 Q.   And what are you basing that on?

9 A.   We have statements from witnesses and we have

10 camera footage from the hotel itself.

11 Q.   Special Agent Palian, are you aware of whether the

12 defendant brought any firearms or firearms parts or

13 related equipment to the Washington, DC area for

14 January 6th?

15 A.   He did bring firearms parts and accessories to the

16 DC area.

17 Q.   How are you aware of that?

18 A.   We conducted a financial investigation into his

19 purchases, including those coming to the DC area.  We

20 found that the defendant purchased over $20,000 in

21 firearms and firearms related accessories on his way up

22 to DC.

23 Q.   And so the receipts that you've recovered show that

24 such purchases were made at stores along the route?

25 A.   Yes.

1  Q.   Special Agent Palian, on January 6th of 2021,

2  roughly when were the Capitol grounds first breached?

3  A.   On January 6th the grounds were breached at the

4  Peace Fountain at approximately 12:52, 12:53, just

5  before 1:00 p.m.

6  Q.   And approximately when was the Capitol building

7  itself breached for the first time?

8  A.   The doors to the Capitol itself, about 2:00 p.m.

9  or around.

10  Q.   Around that time that the Capitol building is being

11  breached around 2:00 p.m., are you aware where the

12  defendant was?

13  A.   Yes, the defendant was coming onto the Capitol

14  grounds at about that time, slightly later.

15  Q.   Have you reviewed surveillance footage that shows

16  the defendant entering the Capitol grounds around that

17  time?

18  A.   I have.

19  Q.   And have you reviewed Signal chat messages where

20  the defendant tells others that he's going to the

21  Capitol grounds around that time?

22  A.   Yes.

23  Q.   Special Agent Palian, did the defendant give any

24  directives to those on those group chats that we've

25  been talking about, about what they should do around

1  2:00 p.m. on January 6th?

2  A.   Yeah, he did give directives.

3  Q.   And what did he say?

4  A.   The defendant was telling the co-conspirators where

5  they needed to go to.  At one point he was telling them

6  the south side of the Capitol.  At another point it was

7  the northeast corner.

8          MS. RAKOCZY:  With the Court's permission now,

9  Your Honor, we would like to move into evidence and

10  publish Government's Exhibit No. 4.

11          MR. LINDER:  No objection.

12          THE COURT:  All right.  It's admitted and you

13  may publish.

14          MS. RAKOCZY:  Thank you, Your Honor.

15  BY MS. RAKOCZY:

16  Q.   Bringing up on the screen now Government's Exhibit

17  No. 4, Special Agent Palian, do you recognize the

18  messages that are on the screen now?

19  A.   Yes, I do.

20  Q.   And are these messages from a group chat that was

21  recovered from the defendant's phone?

22  A.   Yes.

23  Q.   What is the title of this message group chat?

24  A.   DC Jan 5/6 DC OP Intel Team.

25  Q.   Was the defendant a participant in this chat?

1    A.    He was.

2    Q.    Was co-defendant Joshua James a participant in this

3    chat?

4    A.    Mr. James was also a participant, yes.

5    Q.    Was a person who the defendant put in charge of

6    operations for the January 6th operation on this chat?

7    A.    Yes.

8    Q.    Special Agent Palian, at the start, can you tell

9    the Court roughly when these messages are being

10   exchanged?

11   A.    So these messages all are on January 6th.  The

12   first message occurs at about 1:36 p.m. Eastern

13   Standard Time.

14   Q.    And just to explain for the Court, these messages

15   were recovered from the defendant's phone; is that

16   right?

17   A.    Correct, they were.

18   Q.    And at the time of seizure, that phone was located

19   in a Central Time Zone; is that right?

20   A.    Which is why all the messages are in Central Time,

21   yes.

22   Q.    Thank you.

23          Special Agent Palian, this exchange begins

24   with someone posting, "Patriots have stormed the

25   Capitol according to Gateway."  Is that right?

1  A.   Yes.

2  Q.   So then the moniker or call sign *HydroAlStatePOC*

3  then responds, "That is correct;" is that right?

4  A.   That is correct.

5  Q.   And are you aware of who utilized the moniker

6  *HydroAlStatePOC*?

7  A.   I am.

8  Q.   Who is that?

9  A.   It was Joshua James, The Alabama state point of

10  contact.

11  Q.   Another participant then, two rows down, sends a

12  link to a YouTube video, and at least according to the

13  link title, it was a live stream of patriots storming

14  the Capitol; is that correct?

15  A.   Yes.

16  Q.   And then someone else writes, "Are they actually

17  patriots, not those who are going to go in disguised as

18  patriots and cause trouble?  Need to verify this."  Is

19  that what was sent next?

20  A.   Yes, that was sent next.

21  Q.   Did the defendant then respond towards the bottom

22  of what we see here?

23  A.   Towards the bottom he responded.

24  Q.   What did he say?

25  A.   January 6th at approximately 2:01 p.m. Eastern, the

1   defendant said, "Actual patriots, pissed off patriots."

2   Q.   What does he say next?

3   A.   20 seconds later, "Like the sons of Liberty were

4   pissed off patriots."

5   Q.   Does co-defendant Joshua James then respond?

6   A.   He does.

7   Q.   What does he say?

8   A.   Mr. James, about two and a half minutes later,

9   says, "We're coming to the Capitol, ETA" -- I'm sorry,

10  "We're coming to Capitol, ETA 30 minutes."

11  Q.   Does defendant Rhodes tell Mr. James not to come?

12  A.   No, not to our knowledge.

13          MS. RAKOCZY:  You can remove that exhibit from

14  the screen.

15  BY MS. RAKOCZY:

16  Q.   Did the defendant also exchange messages with

17  co-defendant Kelly Meggs around this time?

18  A.   He did.

19          MS. RAKOCZY:  With the Court's permission, we

20  would like to move into evidence and publish

21  Government's Exhibit No. 5.

22          MR. LINDER:  No objection.

23          THE COURT:  All right, it's admitted and you

24  may publish.

25          MS. RAKOCZY:  Thank you, Your Honor.

```
 1  BY MS. RAKOCZY:
 2  Q.   Special Agent Palian, I've brought up on the screen
 3  Government's Exhibit No. 5.  Do you recognize these
 4  messages?
 5  A.   I do.
 6  Q.   And were these also recovered from either
 7  Mr. Rhodes' phone or Mr. Kelly Meggs' phone?
 8  A.   Yes, they were.
 9  Q.   Was defendant Kelly Meggs' phone also searched
10  pursuant to a warrant?
11  A.   It was.
12  Q.   These are in a slightly different format than the
13  other messages.  Is this another way that the data
14  looks when you review it from a cell phone extraction?
15  A.   Yes.
16  Q.   Special Agent Palian, if you could focus on the two
17  bottom messages in this exchange.  Are they messages
18  from Defendant Rhodes to Defendant Kelly Meggs?
19  A.   Yes, they are.
20  Q.   And from roughly when?
21  A.   These messages were sent Jan 6 at about 2:24 p.m.
22  Eastern.
23  Q.   And what did Mr. Rhodes tell Kelly Meggs?
24  A.   Mr. Rhodes said, "Go to south (emphasized) side of
25  U.S. Capitol."
```

1   Q.   And what did he say next?

2   A.   "That's where I am going to link up with redacted."

3   Q.   And are you aware of what's underneath that

4   redaction?

5   A.   Yes.

6   Q.   Without giving a name, what was the position of the

7   person who Mr. Rhodes said he was going to meet up with?

8   A.   That was the operations leader.

9        MS. RAKOCZY:  We can take that off the screen

10  now.  Thank you.

11  BY MS. RAKOCZY:

12  Q.   Special Agent Palian, are you aware of what Kelly

13  Meggs did after receiving that message from defendant

14  Rhodes?

15  A.   Yeah.  Mr. Meggs turned his group.  They were on

16  the north side of the Capitol around when that was sent

17  and they turned their group and headed southbound on

18  the east side of the Capitol at that point.

19  Q.   At around 2:30 p.m. then did Kelly Meggs and his

20  group pause on the east front plaza in front of the

21  Capitol building?

22  A.   They did, they paused for several minutes.

23  Q.   And at around 2:32 p.m. did defendant Kelly Meggs

24  call defendant Rhodes?

25  A.   He did.

1  Q.   And have you looked at the cell phone records for

2  that phone call?

3  A.   I have.

4  Q.   Does it appear from the cell phone records that the

5  call connected?

6  A.   It did.

7  Q.   Was Mr. Rhodes -- could you tell whether Mr. Rhodes

8  was on any other calls at that time?

9  A.   Yeah, Mr. Rhodes was on a call with the operations

10 leader at that point.

11 Q.   And based on what the records seem to show, what

12 did Mr. Rhodes then do with the Kelly Meggs incoming

13 phone call?

14 A.   The records indicate that there was a three-way

15 call that was initiated at that point.

16 Q.   Did that call last about a minute, minute and a

17 half?

18 A.   Approximately.

19 Q.   After that phone call, what did defendant Kelly

20 Meggs do next?

21 A.   After that phone call, Mr. Meggs took the Stack 1

22 and they went up the east side steps and entered the

23 Capitol.

24 Q.   And about when did they breach the building?

25 A.   About 2:40 p.m.

1          MS. RAKOCZY:  With the Court's permission,

2    we'd like to move into evidence and publish

3    Government's Exhibit 6.

4          THE COURT:  It looks like 6, 7 and 8 are

5    photographs.  Any objection to those exhibits?

6          MR. LINDER:  No, Your Honor.

7          THE COURT:  All right.  Government's Exhibits

8    6, 7 and 8 are admitted and you may publish those.

9          MS. RAKOCZY:  Thank you, Your Honor.

10   BY MS. RAKOCZY:

11   Q.  Showing you now Government's Exhibit No. 6, Special

12   Agent Palian, do you recognize these two photographs?

13   A.  Yes, I do.

14   Q.  With respect to the photograph on the left, can you

15   tell us what that shows?

16   A.  The photograph on the left shows Stack 1 in their

17   formation, with hands on each others' shoulders, going

18   up the east side Capitol stairs.

19   Q.  And did this occur around that, say, 2:34 or 2:35

20   time frame after Mr. Meggs had that phone call with

21   Mr. Rhodes?

22   A.  It took the Stack about five minutes to go up the

23   stairs -- five, six minutes.  So, yes, that was about

24   that time right after the phone call.

25   Q.  Special Agent Palian, with respect to the

1  photograph on the right, can you describe for the Court
2  what that shows?
3  A.   The right shows the interior of the Capitol just
4  before the rotunda, and this is the defendants after
5  they breached and they were inside the Capitol, the
6  Capitol structure.
7  Q.   There are little circles drawn around certain
8  individuals' heads and then boxes that give names
9  pointing to those circles.  Can you explain that for
10  the Court?
11  A.   Sure.  We were able to identify each of the members
12  of the Stack, where they were, and where they were
13  within the rotunda.  We circled it and put it on the --
14  Q.   And is this photograph on the right of Government's
15  Exhibit No. 6 a fair and accurate depiction, based on
16  your investigation of who these individuals were?
17  A.   Yes, it's fair and accurate.
18  Q.   And this photograph that we're seeing, Government's
19  Exhibit No. 6 on the right, does this show the members
20  of Stack 1 just after they breached the Capitol doors?
21  A.   I'm sorry, could you repeat the question?
22  Q.   Does this photograph on the right show the members
23  of Stack 1 right after they've breached the Capitol
24  doors?
25  A.   Yes, it shows them right after they breached.

1  Q.   Okay.

2          MS. RAKOCZY:   You can take that photograph off

3  the screen.

4  BY MS. RAKOCZY:

5  Q.   You mentioned a moment ago, Special Agent Palian --

6  we discussed the message where defendant James said on

7  a message that he and his group were headed to the

8  Capitol, ETA 30 minutes.  Do you recall that message?

9  A.   I do.

10 Q.   During the course of your investigation, did you

11 learn whether defendant James and other members of his

12 group did, in fact, go to the Capitol grounds?

13 A.   They did, in fact, go to the Capitol grounds, yes.

14 Q.   And did they then ultimately breach the building?

15 A.   They did.

16 Q.   Roughly when?

17 A.   Approximately 3:14, 3:15 p.m.

18 Q.   If we could bring up onto the screen now

19 Government's Exhibit No. 7, do you recognize these two

20 photographs?

21 A.   Yes, I do.

22 Q.   With respect to the photograph on the left, what

23 does that show?

24 A.   That shows members of Stack 2, including

25 Mr. Walden, Mr. Minuta, Mr. James, entering through the

1  east side doors.

2  Q.   Are those the same doors that Stack 1 breached?

3  A.   It is.

4  Q.   And then with respect to the photograph on the

5  right, does that show two other members of Stack 2

6  entering through the same doors about seven minutes

7  later?

8  A.   Yes, that photograph shows that.

9        MS. RAKOCZY:   I think you can take that

10 photograph off of the screen.

11 BY MS. RAKOCZY:

12 Q.   Special Agent Palian, after Stack 1 and Stack 2

13 left the Capitol building, what did they do?

14 A.   After Stack 1 and Stack 2 left the building, they

15 met up together with Mr. Rhodes outside the Capitol.

16 Q.   I'm showing you now -- we'll bring up on the screen

17 what's been marked as Government's Exhibit No. 8.   Do

18 you recognize this photograph?

19 A.   Yes, I do.

20 Q.   And can you tell the Court what this shows?

21 A.   Sure.   This is the photograph of Stack 1 and

22 Stack 2 outside the Capitol meeting up with Mr. Rhodes.

23 Q.   Where on the Capitol grounds are they, roughly?   Or

24 let me ask you this:   Are they in that sort of east

25 plaza --

1  A.   Yeah.  Yes, they are.

2  Q.   Do you see Mr. Rhodes in this photograph?

3  A.   I do.

4  Q.   Could you describe for the Court where he is?

5  A.   Sure.  Mr. Rhodes is almost dead in the middle of

6  the photograph.  It's hard to see, but he's wearing a

7  cowboy hat.  If you look at the largest American flag

8  at the top of the photograph and go directly down from

9  that --

10 Q.   Special Agent Palian --

11 A.   -- from the tip, he's there.

12 Q.   I'm sorry for interrupting you.  I think you're

13 going to have to put your finger on the screen and

14 circle.  Thank you.

15      MS. RAKOCZY:  And may the record reflect the

16 witness has drawn a blue circle around the area where

17 the defendant is.

18      THE COURT:  I can't tell that it is

19 Mr. Rhodes, but according to his testimony, yes.

20      MS. RAKOCZY:  Thank you, Your Honor.

21      THE WITNESS:  From that day, we have other

22 photographs of him wearing the cowboy hat and the dark

23 greenish jacket.

24      MS. RAKOCZY:  Thank you.  We can take that off

25 the screen.

1  BY MS. RAKOCZY:

2  Q.   And Special Agent Palian, I think to remove the

3  circle, you have to click that off the top.  Thank you.

4           Special Agent Palian, what was -- if you know,

5  what was the Quick Reaction Force doing at this time?

6  A.   Quick Reaction Force was stationed in Arlington at

7  the Comfort Inn in Ballston.

8  Q.   Did any members of the Quick Reaction Force send

9  messages to any of the group chats saying anything

10 relevant to what they were doing?

11 A.   Yeah.  At approximately 2:38, which was between the

12 phone call between Kelly Meggs and Mr. Rhodes, and

13 between the time when they breached the Capitol,

14 Mr. Vallejo sent a message to the group.

15 Q.   And roughly, what did he say?

16 A.   Approximately, it was "QRF standing by.  Just say

17 the word."  And that was about two minutes before

18 Stack 1 entered.

19 Q.   Special Agent Palian, during the late afternoon and

20 evening of January 6th, did the defendant make any

21 comments on these group Signal chats about what had

22 occurred at the Capitol that day?

23 A.   He did.

24 Q.   And what generally did he say?

25 A.   Generally, it was likened to the American

1   Revolution.  It was also approving, and it talked about

2   pissed off patriots.  And I remember one specific

3   message where the defendant said that they would now

4   walk the same path as the founding fathers.

5   Q.   Special Agent Palian, are you aware of when and

6   under what circumstances the defendant left the

7   Washington, DC area after the attack on the Capitol?

8   A.   Yes, I am.

9   Q.   Could you tell the Court about that?

10  A.   Sure.  After the events at the Capitol, certain

11  members of the group went to the Olive Garden for

12  dinner.  They stayed for dinner, during which time one

13  of the members of the group received a message from

14  someone in their "Intel Team," who said that federal

15  authorities were arresting patriots and that it was

16  time to leave.  So Mr. Rhodes -- so they left the Olive

17  Garden at that point.

18  Q.   And based on your investigation, did Mr. Rhodes

19  then leave the area?

20  A.   He did.  They went back to the Hilton, got their

21  effects, met up at a gas station, and then from there

22  left the DC area.

23  Q.   After January 6th, did the defendant continue to

24  take steps to encourage his co-conspirators to oppose

25  the lawful transfer of Presidential power?

1  A.   He did.

2  Q.   Did he send messages to some of these group chats

3  encouraging people to continue to take such steps?

4  A.   He did.

5  Q.   Are you aware of a message that he sent on January

6  11th of 2021 where he told his co-conspirators words to

7  the effect of "Get ready to rock and roll, shit's about

8  to go down"?

9  A.   Yes.

10  Q.   Did he also, in that same message, tell

11  co=conspirators that those in this community who were

12  fit enough to move, shoot, and communicate should be

13  organized and prepared to do so?

14  A.   Yes.

15  Q.   Did the defendant call some of his co-conspirators

16  to join him in Texas where he was residing at that time?

17  A.   He did.

18  Q.   Can you describe that for the Court?

19  A.   Sure.  There were Signal messages that went back

20  and forth.  The Florida team was asked to come out.

21  Their response was Florida is not -- "We're not leaving

22  the state of Florida until the first shot is fired."

23  The co-conspirators from Arizona actually came to

24  Texas, but didn't end up meeting with Mr. Rhodes for

25  some reason.  I'm sure there were several groups that

1  came to Texas, including Mr. James who went with

2  Mr. Rhodes to Texas.

3  Q.   Did defendant Joshua James send a message to

4  another co-conspirator in which he told that

5  co-conspirator he was bringing "all available firearms"

6  to join Mr. Rhodes in Texas?

7  A.   Yes, he did.

8  Q.   Did Mr. Rhodes continue to make purchases of

9  firearms, firearms parts, and related equipment after

10 January 6th --

11 A.   He did.

12 Q.   -- and before January 20th?

13 A.   Pardon me, I'm sorry, I didn't mean to interrupt

14 you.  He did.

15 Q.   Can you describe for the Court the amount of money

16 that you saw in the financial records being spent on

17 firearms and related equipment?

18 A.   Sure.  After January 6th, finishing out the month

19 of January, it was over $15,000, closer to $17,000, we

20 think.

21 Q.   After the inauguration, after January 20th of 2021,

22 in the months since, has the defendant continued to

23 refer to the current Presidential Administration as an

24 illegitimate regime?

25 A.   Yes.

1  Q.   Has he encouraged opposition to that regime amongst

2  his followers?

3  A.   He has.

4  Q.   Special Agent Palian, are you aware of whether the

5  defendant has a permanent address currently?

6  A.   I'm not aware of a permanent address.

7  Q.   Did the defendant previously have a permanent

8  address in the state of Montana?

9  A.   Yes.

10  Q.   And are you aware of him leaving that permanent

11  address in the middle of 2020?

12  A.   Approximately, yes.

13  Q.   And then during the latter part of 2020 and most of

14  2021, was the defendant primarily residing in Texas?

15  A.   Yes.

16  Q.   At the time of his arrest, had he -- was he still

17  residing in Texas, but at a different associate's

18  residence?

19  A.   Yes, he was.

20  Q.   And was he somewhat a guest at that residence?

21  A.   That's our understanding, yes.

22  Q.   Where does the defendant have important mail like

23  bank statements sent?

24  A.   Those are sent to a P.O. Box.

25  Q.   Does the defendant also maintain storage units,

1  based on your investigation?

2  A.   He does.

3  Q.   When the defendant was arrested, was his vehicle

4  searched pursuant to a warrant?

5  A.   His vehicle was searched, yes.

6  Q.   And in that vehicle did law enforcement recover a

7  receipt for a storage unit?

8  A.   Yes, we did recover that.

9  Q.   Was that storage unit also searched pursuant to a

10  warrant?

11  A.   It was.

12  Q.   Were there firearms and firearms related equipment

13  located in that storage unit?

14  A.   Yes.

15  Q.   At the time of his arrest, was the room in which

16  the defendant was staying searched pursuant to a

17  warrant?

18  A.   It was.

19  Q.   And were there also firearms and firearms related

20  parts recovered from that room?

21  A.   Yes.

22  Q.   Special Agent Palian, you've discussed how you

23  searched the defendant's phone pursuant to a search

24  warrant; is that right?

25  A.   That's correct.

1  Q.   In searching that phone, did law enforcement see

2  evidence that certain Signal messages had been deleted

3  from the phone?

4  A.   Yes, we did see that evidence.

5  Q.   And were some of these deleted messages on some of

6  the planning and coordination Signal chats that we've

7  discussed?

8  A.   Yes.

9  Q.   And were these apparently deleted messages from

10 time frames relevant to the conspiracy, that is,

11 November of 2020 through January of 2021?

12 A.   Yeah, they were from that time frame.

13 Q.   Are you an expert in forensically examining

14 cellular telephones?

15 A.   I am not.

16 Q.   Did you speak with forensic analysts from the FBI

17 about what you had been seeing in the phone?

18 A.   Yes, we did.

19 Q.   Based on what you were seeing in the phone, did the

20 FBI Analyst have a sense or a conclusion about whether

21 those messages were deleted by the user of the phone or

22 by someone else?

23 A.   Yeah, the conclusion was that they were deleted by

24 the user of the phone, Mr. Rhodes.

25 Q.   Have you found evidence during your investigation

1   that the defendant was mindful of the fact that law

2   enforcement might look to those Signal messages as

3   evidence in this case?

4   A.   Yes, we developed some evidence of that.

5   Q.   Could you describe that for the Court?

6   A.   Mr. Rhodes engaged in some text messages with

7   Mr. Vallejo after the fact, where he informed

8   Mr. Vallejo to be careful speaking on Signal because

9   the FBI had Jessica Watkins' phone and was probably

10  looking in it, and that he was aware of -- I forget the

11  specific term, but it was a pejorative term for an FBI

12  informant.  He was aware that one of them was in the

13  messages.

14  Q.   Special Agent Palian -- and that was Mr. Rhodes who

15  was hypothesizing; is that right?

16  A.   Yes.

17  Q.   Special Agent Palian, were these messages that

18  you've just described sent in late January of 2021?

19  A.   Yes.

20  Q.   Was that after co-defendant Jessica Watkins was

21  arrested?

22  A.   Correct.

23  Q.   When, roughly, was co-defendant Watkins arrested?

24  A.   Ms. Watkins, we believe, was arrested, if my memory

25  serves, January 17th late in the evening.

```
 1            MS. RAKOCZY:  Thank you, Your Honor.  No
 2   further questions.
 3            THE COURT:  All right.  Cross-examination.
 4            MR. LINDER:  One second, Your Honor.
 5                      CROSS-EXAMINATION
 6   BY MR. LINDER:
 7       (Counsel's microphone off during questioning)
 8   Q.  Good morning, Agent.  How are you?
 9   A.  Good morning, sir.
10   Q.  Good.  The -- let me go a little bit into your
11   direct examination first.  All the firearms were found
12   either in a storage unit or in a car or wherever he was
13   staying at; correct?
14   A.  Yes, that's right.
15   Q.  It's not illegal to own a firearm in Texas, is it?
16   A.  It is not, no.
17   Q.  There were no illegal firearms found, i.e., machine
18   guns or anything like that; correct?
19   A.  Not to my knowledge.
20   Q.  The guns that you found, did you determine later
21   that they were all legally purchased from various
22   places?
23   A.  I don't know that we went back and found out where
24   those weapons were purchased, but I will say that we
25   have no information that says they were illegally
```

1  purchased.

2  Q.   And no serial numbers filed off, nothing like that?

3  A.   Not to my knowledge.

4  Q.   So there wasn't anything done by my client,

5  Mr. Rhodes, to conceal the fact that he owned firearms

6  or purchased firearms?

7  A.   No, there was no concealment.

8  Q.   And do understand at the Montana address he was

9  married and had six children that still live in

10 Montana; do you understand that?

11 A.   Yes.

12 Q.   Since early 2020, just before COVID, it's our

13 understanding he's lived in Granbury, Texas.  Is that

14 kind of consistent with what you have?

15 A.   That's my understanding, too.

16 Q.   In fact, his current driver's license still shows

17 that address?

18 A.   I believe that's correct.

19 Q.   And the P.O. Box you referred to that Oath Keepers

20 gets their mail in, that is also in Granbury, Texas

21 near that address?

22 A.   Yes, it is.

23 Q.   Is the storage unit also there?

24 A.   The storage unit is in Granbury.  I'm not sure

25 where in Granbury.

1  Q.   Granbury is a small town; would you agree with me?

2  A.   It is.  I've never been there.

3  Q.   Okay, just south of Fort Worth.  He's got a

4  driver's license and address there, P.O. box there, and

5  a storage unit; correct?

6  A.   Yes.

7  Q.   Okay.  And for all practical purposes, he's been

8  there for almost two years?

9  A.   If we're considering the middle of 2020 to now,

10 yeah.

11 Q.   Okay.

12 A.   I guess that would be fair.

13 Q.   Okay.  Now, this conduct that we've talked about

14 that happened on January 6th leading into that.

15 A.   Sure.

16 Q.   You showed the pictures of them in the Capitol,

17 circles around those guys.  There's mobs of people

18 there that day?

19 A.   There were mobs of people.

20 Q.   In fact, y'all indicted approximately 800 people so

21 far and probably more coming; would you agree?

22 A.   I'm not sure of the exact number, but it's large.

23 It's around that.

24 Q.   Hundreds?

25 A.   It's hundreds, for sure.

1  Q.   And these people aren't all Oath Keepers, are they?

2  A.   No.

3  Q.   It's all different groups, independent people, just

4  people trying to make a statement?

5  A.   I don't know if I'd go as far as saying just trying

6  to make a statement, but yes.  I mean, there are

7  large --

8  Q.   There's a real estate lady from Texas who videoed

9  herself in the rotunda.  I mean, she's just there;

10 correct?

11 A.   Sure.  Yeah, I mean, I'm not familiar with those

12 cases as much, but yes.

13 Q.   But the Oath Keepers were not the first people that

14 broke down the doors or breached the doors or anything

15 like that; were they?

16 A.   They were not the first ones in the Capitol, no.

17 Q.   They were just kinda in the mob, or some of them

18 were just in the mob; is that right?

19 A.   They were part of the mob, yes.  I don't mean to

20 quibble words with you, by the way, either.  I'm not

21 trying to be.

22 Q.   I'm not trying to trick you with any questions.  I

23 just wanted to make sure the judge understood they

24 weren't the ones who physically breached the doors or

25 breached the gates; they were just there with the other

1  people that did it?

2  A.   They were there with the mob, yes.

3  Q.   Yes.  And there were other people that actually did

4  that before they got there?

5  A.   Uh-huh

6  Q.   Now, all this happens January 6th, y'all do your

7  investigation.  And so the judge is aware, there was

8  the initial Indictment, the Caldwell Indictment?

9  A.   Yes.

10  Q.   And that happened two weeks after this incident, I

11  think, and there's 17 defendants on that Indictment.

12         MR. LINDER:  And I believe I've given counsel

13  for the Government a copy of that Indictment.

14         MS. RAKOCZY:  Yes, Your Honor, that's right.

15  A.   Just to be clear, though, sir, I think the -- and

16  correct me if I'm wrong on this.  I think the first

17  indictment, the Caldwell Indictment, which came down

18  Jan 19 or 20 only had three defendants on it.

19  BY MR. LINDER:

20  Q.   Okay.  But it's since been added to and there's 17

21  defendants on it?

22  A.   Yes, I think that's the number.

23  Q.   This new Indictment that just came down this month

24  with the new people, it's the same and similar conduct

25  that's discussed in the Caldwell Indictment all the way

1  back to January; right?  Would you agree with me?

2  A.  Yeah, the conduct is similar.

3  Q.  There's no -- other than the Government saying my

4  client obstructed justice by committing some instant

5  messaging potentially, there's no remaining conduct in

6  any of this after the January 20th stuff of the alleged

7  instant messaging going on about saying there's going

8  to be a civil war.

9         MS. RAKOCZY:  Objection, Your Honor, to having

10  this witness characterize the Indictment.

11         MR. LINDER:  Your Honor, the Indictment -- the

12  only allegation in the Indictment includes -- the only

13  manner and means in the Indictment after January was

14  the alleged instant messaging.

15         THE COURT:  Why don't you rephrase your

16  question, counsel.

17  BY MR. LINDER:

18  Q.  Are you aware of any new things that he's done

19  since January or February of last year, since he's been

20  indicted?

21  A.  We're aware of conduct, but I don't think that's

22  included in the --

23  Q.  Correct.  And the manner and means, very specific,

24  none of that's included in there?

25  A.  I don't believe so.  I mean, I'd like to refer to

1  the Indictment before I give a final answer on that.

2  But no, I think that's correct.

3  Q.   And would you agree with me that back in January

4  when y'all did this investigation and did the Caldwell

5  Indictment, you were aware of Stewart Rhodes at that

6  time, were you not?

7  A.   We were aware of him, but we were just beginning

8  the investigation at that point.  We didn't have a lot

9  of information on activity.

10  Q.   And he's cooperated, he's talked to you guys since

11  then, has he not.

12  A.   He has.

13  Q.   Okay.  The -- so that we're clear, there are 17 now

14  on the Caldwell Indictment and there are about 11 on

15  this new Indictment with all the same, substantially

16  similar conduct that led to the [U/I]?

17  A.   Substantially.

18  Q.   Okay.  So can you tell the Court, other than the

19  speech that my client made through instant messaging to

20  his followers or whoever else got the Government people

21  [U/I], can you tell us any illegal acts he's done since

22  January, a year ago, other than the speech you were

23  talking about?

24  A.   No, nothing is coming to me right now.

25  Q.   Okay.  So, other than the speech that we're talking

1  about, most of the stuff that we're talking about here

2  today that the Government has presented in this

3  Detention Hearing occurred between November of '20 and

4  January of 2021?

5  A.   That's the time period of the Indictment and the

6  conspiracy, yes.

7  Q.   Thank you.  Now, since then, my client has met with

8  you guys two times in May, I believe?

9  A.   I participated in the one.  I'm not familiar with

10  the other one in May.

11  Q.   The one you participated in was May 3rd?

12  A.   It was early May.  It was early May in Lubbock.

13  Q.   Okay.  And that's when y'all retrieved his phone?

14  A.   Yes.

15  Q.   And when you approached him, did you bring another

16  FBI Agent with you from Montana to that meeting?

17  A.   Yes, I did.

18  Q.   And which agent was that?

19  A.   That was Special Agent Mark Saylor.

20  Q.   And why did you bring Mark Saylor?

21  A.   Mark had met Mr. Rhodes before and had spoken to

22  him several times over the phone.

23  Q.   They actually had a friendly relationship?

24  A.   They had a friendly relationship over the phone --

25  I mean cordial.  I don't know if I'd say friendly, but

1  cordial.

2  Q.   They didn't get together, but they did call each

3  other.

4  A.   Right, they would speak over the phone.

5  Q.   And that goes back to 2014?

6  A.   I'm not sure of the specific date, but that sounds

7  right.  I know it went back awhile.

8  Q.   Sure.  And so that's why y'all called him and said,

9  hey, we're going to do a meeting with Mr. Rhodes and

10  we'd like you to be there, and he came to this meeting?

11  A.   Yes.

12  Q.   And Mr. Rhodes -- when y'all approached Mr. Rhodes,

13  was he friendly?

14  A.   He was.

15  Q.   Was he armed?

16  A.   I believe he was, but he informed us of that and

17  the firearm was in his backpack.  I don't think it was

18  on his person.

19  Q.   And this was in Texas and he was legally carrying

20  his gun at the time?

21  A.   I believe so.

22  Q.   He informed you and y'all didn't do a patdown

23  search or anything?

24  A.   No, we did not.

25  Q.   Okay.  And did he voluntarily hand over the phone?

1  A.   We had a search warrant, but he physically handed

2  me the phone.

3  Q.   Didn't try to run from you?

4  A.   No.

5  Q.   Didn't try to fight you, gave you the phone?

6  A.   Correct.

7  Q.   And did he also give you the passcode to log into

8  the phone?

9  A.   He did provide us with the passcode, yes.

10 Q.   And he didn't have to do that pursuant to the

11 search warrant, he just had to provide you the phone?

12 A.   He had to provide us biometrics and the phone, but

13 he did not have to provide us the passcode.

14 Q.   But he did?

15 A.   He did.

16 Q.   And that simplified the investigation of the phone,

17 the download of the phone?

18 A.   It did.

19 Q.   It could take months to do it without the code;

20 correct?

21 A.   With biometrics it's much quicker, but yes, it

22 would have slowed us down; that's a fair statement.

23 Q.   In fact, y'all returned his phone two or three

24 weeks later.  You may not have been in that meeting --

25 A.   I was not.

1  Q.   -- but you were aware of it?

2  A.   Is that the second meeting you are talking about?

3  Q.   Yes.

4  A.   Yeah.  Yes, I was not a part of that.

5  Q.   Okay.  So the FBI met him again a few weeks later

6  and returned his phone?

7  A.   Right.

8  Q.   Have you reached out to him at any time since?

9  A.   The FBI has.  I have not.

10          MR. LINDER:  May I have a minute, Your Honor?

11          THE COURT:  Yes.

12          *[Pause]*

13 BY MR. LINDER:

14 Q.   Y'all met with him on May 3rd in Lubbock or

15 Amarillo -- Lubbock, Texas.  Y'all met with him for

16 two, two and a half hours?

17 A.   About, yes.

18 Q.   Have you seen the transcript of that interview?

19 A.   Yes, I have.

20 Q.   The Government has provided it to us.  I appreciate

21 it.  Are you aware or can you tell the Court that he

22 did tell you that if y'all are going to indict him, to

23 let him know and he would go to DC and turn himself in?

24 A.   I believe he said that.

25 Q.   And I can show it to you --

1  A.   If it's in the transcript, then yes, it happened.

2  I'm just not recalling it right now.

3  Q.   Okay.  And that was a very cordial conversation?

4  A.   It was.

5  Q.   And he said, "Hey, if you're going to indict me,

6  let me know and I'll go turn myself in"?

7  A.   Yes.

8  Q.   But y'all didn't let him turn himself in?

9  A.   No, we did not.

10  Q.   And in fact, this past week, I guess, when y'all

11  arrested him, did y'all call Agent Saylor back?

12  A.   No.

13  Q.   From Montana?

14  A.   No, we did not.

15  Q.   Did y'all let Saylor know that y'all were going to

16  arrest him?

17  A.   I think I had general conversations with Agent

18  Saylor prior, but I don't know if I gave a specific

19  date or an operation time.  I'm not positive about that.

20  Q.   Agent Moore, was he there?

21  A.   Yes, Agent Moore was there.

22  Q.   And did Agent Moore -- before y'all went in and

23  arrested him, when y'all went to Chad Roberts' house,

24  where he was, did Agent Moore call him on his phone and

25  say, "Hey, we're here to arrest you"?

1  A.   Yes, he did.

2  Q.   And he said, "I'm coming out"?

3  A.   Mr. Rhodes did say, "I'm coming out," yes.

4  Q.   He's cooperated with everything, hasn't he?

5  A.   He cooperated.

6  Q.   Yeah.

7  A.   Yeah.

8  Q.   Since January of last year, when most of this

9  offensive conduct was alleged to have happened, has my

10 client -- are you aware of my client obtaining a

11 passport?

12 A.   No, I'm not aware of that.

13 Q.   Are you aware of him changing his driver's license?

14 A.   No.

15 Q.   Are you aware of him obtaining a new residence

16 address?

17 A.   No.

18 Q.   Are you aware of him having any foreign contacts or

19 bank accounts in other countries?

20 A.   No.

21 Q.   In fact, are you aware of him ever traveling

22 outside the country?

23 A.   No.

24 Q.   When did you first become aware of Mr. Rhodes?  You

25 said it wasn't in January of last year.  When did you

1    first --

2    A.   It was middle January of 2020.

3    Q.   Okay.

4    A.   I don't know if I have a specific date.

5    Q.   Okay.  And at that time you were aware of all this

6    offense conduct that y'all testified to?

7    A.   Yes.

8    Q.   And you wouldn't say he's dangerous because all of

9    this offense conduct that you testified to?

10          MS. RAKOCZY:  Objection.

11          THE COURT:  What's the objection?

12          MS. RAKOCZY:  Objection calls -- argumentative.

13          THE COURT:  Overruled.

14   BY MR. LINDER:

15   Q.   The purpose of this hearing -- I know you're aware,

16   this is not a guilt/innocence hearing, this is a

17   Detention Hearing, and the Government has got to show

18   that he's a danger.

19   A.   Right.

20   Q.   I believe the Government's purpose in all these

21   messages and the guns is to show that he's potentially

22   a danger, and the information you provided about the

23   address, that he might be a problem; am I correct?

24   A.   I would assume so.

25   Q.   So all of this dangerousness occurred, most of it,

1  between November 2020 and January of 2021, aside from

2  this speech stuff?

3  A.   Again, that's the time period of the Indictment,

4  yes.

5  Q.   And you knew about all of this behavior a year ago?

6  A.   A year ago, yes.

7  Q.   Yet you chose not to arrest him until a year later?

8  A.   Correct.  Well, I -- let me -- I guess I should --

9  the word "chosen," I guess, is -- I don't know if I

10 agree with the word "chosen."

11 Q.   I'll ask another question.  If he were a danger,

12 based on the conduct that you described today, he would

13 have been a danger January a year ago, wouldn't he?

14 A.   Correct.

15 Q.   You could have issued a complaint -- the Government

16 could have issued a complaint and had him arrested

17 within days?

18 A.   We could have issued that, yes.

19 Q.   But they chose not to?  And I know that's not your

20 job.

21 A.   Right, yes.  I see where you're going with

22 "chosen," yes.

23 Q.   So, if you think someone is dangerous, you could

24 issue a complaint in 24 hours?

25 A.   Right.  Yes, that's correct.

1  Q.   And since that time, there's really been no conduct

2  that's a danger that they've alleged or what happened

3  today, other than the language of instant messaging?

4  A.   That's the only conduct we've put out today, yes.

5          MR. LINDER:  One minute, Your Honor.

6  BY MR. LINDER:

7  Q.   I guess we can go back to the actual messaging.

8  When they're messaging each other around the Capitol,

9  there's a response to meet up, and James and some

10  others that say, "Hey, we're on our way, we'll be there

11  in 30 minutes"?

12  A.   Right.

13  Q.   Were they coming from a QRF?

14  A.   No, they were not coming from the QRF.

15  Q.   When they say they're coming, they're going to be

16  there in 30 minutes, did they bring weapons with them?

17  A.   They had some non-lethal weapons, but they didn't

18  have firearms.

19  Q.   Nothing that was illegal in DC?

20  A.   Correct.

21  Q.   In fact, they were following the laws of DC at that

22  time, were they not?

23  A.   Except for the traffic laws, yes.

24  Q.   Correct.  But the weapons, whether it was knives,

25  guns or whatever that in DC was illegal, they were all

1  legally in a hotel, whatever, they didn't bring any of

2  them into DC?

3  A.    Right.

4  Q.    There's no evidence that when all this was going on

5  that they ever even brought any into the Capitol?

6  A.    Could you ask that question again for me, sir?

7  Q.    There's no evidence that they brought any weapon

8  into the Capitol other than the non-lethal ones?

9  A.    Into the Capitol, yes, that's correct.

10 Q.    And so they could have.  If they had all this stuff

11 out there 4.9 miles away by Google maps, they didn't do

12 that, did they?

13 A.    They did not.

14 Q.    Okay.  Are you familiar with LEOSA, the law to

15 carry weapons -- other officers being able to carry

16 weapons in certain places?

17 A.    Very, very vaguely.

18 Q.    Did y'all talk about it at that meeting that you

19 had on May 3rd?

20 A.    Yeah, I believe it was brought up.

21 Q.    Okay.  And did Mr. Rhodes appear very educated on,

22 hey, what we can bring and what we can't bring.  We

23 weren't going to break a law.  The law allows us to go

24 here, but not there, and y'all discussed it in that

25 interview?

1    A.   Yeah, those things were discussed.

2    Q.   And did it seem very apparent he did not want to

3    break the law?

4    A.   I mean, I wouldn't want to characterize his

5    mindset, but yes, he said those things.

6    Q.   And again, the FBI, when they wanted to call him,

7    they can call him, people that know his phone number,

8    and he responds, does he not?

9    A.   He always has.

10             MR. LINDER:  No further questions.

11             THE COURT:  All right, redirect?

12             MS. RAKOCZY:  Briefly, Your Honor.

13                    **REDIRECT EXAMINATION**

14   **BY MS. RAKOCZY:**

15   Q.   Special Agent Palian, did the defendant also send

16   messages on the Signal chat discussing the fact that if

17   people brought guns to the district, they were aware

18   that some law officers were stopping people and might

19   search them?

20   A.   Yes.

21   Q.   And had members of the QRF gone into the district

22   and had their weapons and been arrested, would they

23   have been able to continue serving as the QRF?

24   A.   No, they would not have been.

25   Q.   You were asked some questions about Stack 1 and

1  whether they breached the building, and you said that

2  they did not; is that right?  They were not the first

3  to -- I'm sorry, they were not the first to break the

4  doors open?

5  A.   Correct.

6  Q.   When Kelly Meggs with Stack 1 go up the stairs to

7  the area outside the doors to the building, were the

8  doors open at that time?

9  A.   No, they were not.

10  Q.   Have you watched some public source video about

11  what happened outside those doors around 2:38 p.m.?

12  A.   Yes.

13  Q.   Did the mob, with some help of rioters inside the

14  building, force the doors open?

15  A.   They did at about 90 seconds before Stack 1

16  entered, yes.

17  Q.   Was Stack 1 present in that mob a few rows back

18  from the door around that time?

19  A.   Yeah, they were 10 to 20 feet back.

20  Q.   Special Agent Palian, you were asked about

21  co-defendant Joshua James' group and how they told

22  Mr. Rhodes they were on their way to the Capitol at

23  around 2:00 p.m. and would be there in about 30

24  minutes.  Do you do you recall that questioning?

25  A.   Yes.

1  Q.   Have you obtained during the course of your

2  investigation a video that an individual with

3  Mr. James, co-defendant Roberto Minuta, made as the

4  group went to the Capitol?

5  A.   Yes.

6  Q.   And during that travel to the Capitol, did

7  Mr. Minuta state that there's war on the streets right

8  now?

9  A.   Yes.

10  Q.   Did he say that they were on their way to the

11  Capitol?

12  A.   Yes.

13  Q.   Special Agent Palian, you were asked some questions

14  about whether you could have arrested Defendant Rhodes

15  last January.  Do you recall those questions?

16  A.   Yes, I do.

17  Q.   As of last January, had you obtained a search

18  warrant for Defendant Rhodes' phone?

19  A.   No, we did not have a search warrant in January.

20  Q.   After you obtained that search warrant, did that

21  phone have to go through an extensive filter process to

22  review and take out any [U/I] messages, that the

23  investigation and trial team did not see those messages?

24  A.   It did.

25  Q.   Have you recovered a number of significant messages

 1  with respect to the defendant's mental state and

 2  culpability in this case from that phone?

 3  A.   Yes.

 4  Q.   Have you recovered other aspects of evidence

 5  against Mr. Rhodes during the course of this

 6  investigation in the months since January of 2021?

 7  A.   Yes.

 8  Q.   And did those form the allegations in the

 9  Indictment in this case?

10  A.   They do.  They have.

11  Q.   Special Agent Palian, you were asked some questions

12  about the weapons that those Oath Keeper members and

13  affiliates who breached the Capitol brought into the

14  building.  You were aware that there were some

15  non-lethal weapons on those individuals' persons;

16  correct?

17  A.   There were.

18  Q.   At least one or two brought pepper spray or bear

19  spray; is that right?

20  A.   Yes.

21  Q.   And at least one member carried a large stick into

22  the building; is that right?

23  A.   Yes.

24  Q.   Were all of those or most of those members also

25  wearing military style protective gear?

1   A.   Yes.

2   Q.   Did that include helmets?

3   A.   Hard knuckle gloves, helmets, goggles.

4   Q.   And did some -- did at least one member, an

5   affiliate -- did Defendant Joshua -- have you seen

6   video of Defendant Joshua James assaulting at least one

7   member of law enforcement in the rotunda area of the

8   Capitol?

9   A.   Yes.

10       MS. RAKOCZY:   Thank you, Your Honor.   I have

11   no further questions.

12       THE COURT:   Any other questions, Mr. Linder?

13       MR. LINDER:   Just briefly.

14                **RECROSS-EXAMINATION**

15   **BY MR. LINDER:**

16   **(Counsel's microphone off during questioning)**

17   Q.   Agent, in regards to Joshua James, which counsel

18   has talked about assaulting a law enforcement officer.

19   A.   Yes, sir.

20   Q.   He's actually on release, is he not?

21   A.   Mr. James is out on release, yes.

22   Q.   Okay.   And in fact, Roberto Minuta, who went into

23   the Capitol, is also on release?

24   A.   He is.

25   Q.   Donovan Crowl, who went into the Capitol, is on

 1  release?

 2  A.   Yes.

 3  Q.   And my client never went in the Capitol, did he?

 4  A.   Your client never went into the Capitol.

 5  Q.   And you said there were some Oath Keepers in that

 6  crowd behind the doors that got breached.  They weren't

 7  coordinating that breach with the mob, were they?  They

 8  were in that crowd behind the front people, but they

 9  weren't the ones that coordinated it, were they?

10  A.   No, that's correct.

11  Q.   It was other people that coordinated it?

12  A.   Yes.  I'm sorry, I wasn't clear.

13  Q.   They were in kind of -- some of them were in a

14  group behind?

15  A.   Yes.

16  Q.   Thank you.

17                **EXAMINATION BY THE COURT**

18  Q.   Special Agent, I have a few questions for you.

19           The Government is moving to detain on several

20  different bases.  One is a serious risk of flight.

21  What evidence do you have that Mr. Rhodes is a risk of

22  flight?

23  A.   Isn't a risk of flight?

24  Q.   Is.

25  A.   Oh, is a risk of flight.  Mr. Rhodes doesn't seem

1  to -- he's seems to be very mobile, he seems to only

2  have limited personal effects, which would allow him to

3  move quickly from an area.  He doesn't seem to have

4  ties to a lot of areas, other than what I discussed.

5  Q.   But he's been here for almost two years, correct,

6  in Texas?

7  A.   Yeah, to my knowledge, he's been in Texas for about

8  two years, yes.

9  Q.   Okay.  Anything else?

10  A.   No, I can't think of anything else.

11  Q.   The Government is also moving -- alleging a risk of

12  obstruction of evidence.

13  A.   Yes.

14  Q.   I wanted to make sure I'm clear, the deleting of

15  messages, what time frame did that occur?

16  A.   We can't tell when the messages themselves were

17  deleted, but the messaging were from the pertinent time

18  period.  But our forensics can't determine when the

19  message was deleted.

20  Q.   Okay.  In addition to the deletion of messages, is

21  there any other evidence of attempts to obstruct

22  justice by Mr. Rhodes?

23  A.   The deletion of the messages is what's coming to

24  mind right now.

25  Q.   And do you know, was that on one -- was that on one

1  certain date or was it a continued pattern of deleting

2  messages?

3  A.   I'm not sure.

4  Q.   You don't know?

5  A.   I'm not sure.

6  Q.   And that happened shortly after the January 6th --

7  A.   We don't know.  I can't say a time frame.  It

8  happened between January 6th and when  we recovered the

9  phone, which was May.

10 Q.   Since the January 6th event, have -- you testified

11 regarding --

12 A.   Oh, ma'am, I'm sorry, can I --

13 Q.   Yeah.

14 A.   One other thing.  We are aware of individuals close

15 to Mr. Rhodes saying, per Stewart Rhodes, delete all

16 your evidence, delete all your messages.  We are aware

17 of that.

18 Q.   And that was shortly after the January 6th event?

19 A.   Yes.

20 Q.   You testified to conversations shortly after the

21 January 6th event that Mr. Rhodes had in chats of

22 various sorts about continuing the war or however he --

23 I'm paraphrasing.  But has his phone been monitored?

24 Have you monitored his communications at all?  I don't

25 know what time frame.  I'm guessing that was sort in

1   the January/February months after the incident.

2   Throughout this last year, have you observed any

3   communications?

4   A.   So our -- we seized the phone in May.  That's when

5   the communications with Mr. Rhodes -- that's our time

6   frame that we have communications from him is up to May

7   for the most part.

8           We also have public statements that he's made

9   during that time period which referred to the incoming

10  administration as a foreign and illegal occupying force

11  or an enemy occupying force.  Those are public

12  statements that he made in various forms.

13  Q.   So no communications have been monitored since May

14  of 2021?

15  A.   Do you mean like a Title III or something?

16  Q.   Uh-huh.

17  A.   No.

18          THE COURT:  All right, thank you.  You may

19  step down.

20          Does the Government have any other

21  witnesses?

22          MS. RAKOCZY:  No, Your Honor.

23          THE COURT:  Mr. Linder?

24          MR. LINDER:  Your Honor, do you want to hear --

25  the only witness I was going to call is my third party

 1  custodian.  I've got family here that I would just

 2  proffer, and a friend, but I didn't want to hold them

 3  all to the stand.

 4          THE COURT:  Well, I've read the letters that --

 5  I'm assuming you're going to offer those into evidence

 6  at some point?

 7          MR. LINDER:  Yes, Your Honor.

 8          THE COURT:  But I had some time and I went

 9  ahead and read them before the hearing.  I don't think

10  it's necessary to have any character evidence from

11  family, but I would like to hear from your proffered

12  third party custodian.

13          MR. LINDER:  I did provide those letters to

14  counsel for the Government.

15          MS. RAKOCZY:  Yes, Your Honor.

16          THE COURT:  All right, sir, you will need to

17  come up to the witness stand, please.

18          COURTROOM DEPUTY:  If you'd please raise your

19  right hand.  Do you solemnly swear the testimony you

20  are about to give in the case before the Court shall be

21  the truth, the whole truth, and nothing but the truth,

22  so help you God?

23          THE WITNESS:  Yes.

24          COURTROOM DEPUTY:  Have a seat, please, and if

25  you could state your name and spell it for the record.

1    THE WITNESS:  I'm Brian, B-r-i-a-n.

2    COURTROOM DEPUTY:  And your last name?

3    THE WITNESS:  Bodine, B-o-d-i-n-e.

4    COURTROOM DEPUTY:  B-o-d-i-n-e.

5    THE COURT:  You may proceed, Mr. Linder.

6    MR. LINDER:  Your Honor, I would like to keep

7  out some of the biographical information due to the

8  press that's in here.  I mean, he's a Dallas resident.

9  I think Probation has his information.

10    THE COURT:  Okay.

11    **BRIAN BODINE, CALLED BY THE DEFENSE**

12    **DIRECT EXAMINATION**

13  **BY MR. LINDER:**

14  Q.   Brian, how long have you known Mr. Rhodes?

15  A.   Since about late March, early April 2020.

16  Q.   You've known him almost two years?

17  A.   Yeah.

18  Q.   And are you a member of Oath Keepers?

19  A.   No.

20  Q.   Do you live here in the Dallas County area?

21  A.   Yes.

22  Q.   And do you have any criminal history?

23  A.   No.

24  Q.   The address that you've given to Probation, is that

25  an address that he can live at with you?

```
 1   A.   Yes.

 2   Q.   Are there any weapons in that home?

 3   A.   No.

 4   Q.   Do you have any alcohol or drug issues?

 5   A.   No.

 6   Q.   Do you have a job?

 7   A.   Yes.

 8   Q.   Have I explained to you what the duties of a third

 9   party custodian are?

10   A.   Yes.

11   Q.   If the judge releases him, I would anticipate he

12   will be on some kind of GPS monitor.  And that you

13   would be required to be informed of the Court date, the

14   meetings he has, and to make sure he got there, but

15   also to inform the Court if you thought he was doing

16   anything illegal, if he was purchasing guns or around

17   other co-defendants he's not supposed to be around.

18   Could you promise the Court that you can do that?

19   A.   Yes.

20   Q.   And do you know Chad Roberts, the person whose

21   house he was at when he was arrested; is that correct?

22   A.   Yes, I do.

23   Q.   And is Chad also willing to be a third party

24   custodian, but he just can't live there because of his

25   children?
```

1  A.   He's told me that, yes.

2  Q.   So, between the two of you, acting as a third party

3  custodian, he's a lawyer and a Rabbi, they can go off

4  and communicate daily in regards to Mr. Rhodes; is that

5  correct?

6  A.   Correct.

7  Q.   And Mr. Rhodes had been living with him?

8  A.   Correct.

9  Q.   And you weren't there in DC on the 6th, were you?

10  A.   No.

11  Q.   You're not in any of these cases, are you?

12  A.   No.

13          MR. LINDER:  I'll pass the witness.

14          THE COURT:  Cross-examination?

15          MS. RAKOCZY:  No, Your Honor, thank you.

16          THE COURT:  All right.  I have some questions.

17                      **EXAMINATION**

18  **BY THE COURT:**

19  Q.   All right, sir, you said that you met Mr. Rhodes

20  late March, early April of 2020; correct?

21  A.   Yes, that's correct.

22  Q.   How did you meet him?

23  A.   He was in front of Shelley Luther's salon in North

24  Dallas and I can't remember the exact day, but it was

25  right in that time frame, shortly after the COVID

1  lockdown, shutdowns had started, and a group of people

2  gathered there just to see what was going on.

3  Q.  Was that a staged protest?

4  A.  I wouldn't say staged.  I would say that it was

5  just citizens that were concerned and she opened up her

6  business, as you may recall, and people went down there

7  to show support for her.  So it was a show of support.

8  Q.  Okay.  So at the show of support, that's how you

9  met Mr. Rhodes?

10  A.  Yes.

11  Q.  And tell me about your relationship since that day

12  that you met him.

13  A.  I mean, I met him, I shook his hand, I can't

14  remember the exact day it was.  And then, you know,

15  I've talked to him a number of times since then.  I've

16  hung out with him, played pool with him, watched

17  Cowboys games with him and other friends, you know.

18  It's just I've -- basically, he's a friend.

19  Q.  Okay.  How often would you say  that you see him?

20  A.  Shortly before Christmas, it was like a couple of

21  days before Christmas.  Again, the most recent time

22  would have been the last football game of the regular

23  season we watched Cowboys and Eagles.  So twice a

24  month, once a month, twice a month, three times a

25  month.  I mean, it just depends on the month here.

1  Q.  I know you testified you are not a member of the
2  Oath Keepers.
3  A.  Correct.
4  Q.  Do you follow the statements that he makes online
5  in that regard?
6  A.  I don't follow any feeds by the Oath Keepers
7  actively on anything.  In fact, I think that group has
8  been de-platformed.  So I don't follow that actively,
9  but I do follow the news -- everything  in the news.
10 Q.  You mentioned that you were also friends with Chad
11 Roberts.
12 A.  I know Chad, yes.
13 Q.  And how do you know him?
14 A.  Kind of the same way.  He was also there in front
15 of Shelley Luther's Salon around that time period and I
16 met him then and, you know, just struck up
17 conversations with him.
18 Q.  Okay.  Did you participate in any way in the
19 January 6th event?
20 A.  No.
21 Q.  Did you know about Mr. Rhodes' involvement in the
22 January 6th event?
23 A.  Well, I watched things on TV, so I know what
24 everybody else knows, which is through public open
25 source information, you know.  I read the articles.

1  Q.   So he didn't tell you anything about his plans

2  beforehand?

3  A.   No, no.

4  Q.   You mentioned that you're employed.  What do you

5  do?

6  A.   I drive for ride share companies. I do some

7  consulting as well.  I don't want to give the name of

8  which company, if that's okay, but -- or which

9  companies --

10  Q.   What kind of consulting work?

11  A.   Political.

12  Q.   I'm sorry?

13  A.   Political, like campaigns.  I help with campaigns.

14  I've been doing that for years.

15  Q.   Tell me a little bit more about what you do.

16  A.   So, you know, there's block walking that's involved

17  with campaigns.  There's social media that's involved.

18  There's just all the different aspects of a grass roots

19  campaign.  And so I've been involved in that for years.

20  And I also do a lot of ride share, though, late at

21  night.  So it's between those two things that would

22  constitute my employment.

23  Q.   And what's your typical job schedule?

24  A.   I drive pretty late when I do the driving.  As far

25  as the campaigns is concerned, that could be going to

1  meeting and events in the evening.  So it's more of an
2  evening type of thing.  It's an evening late type of
3  thing as opposed to a morning thing with me in terms of
4  my daily schedule.
5  Q.   Okay.  I know you testified you have no firearms in
6  your house.
7  A.   Right.
8  Q.   Do you have any drugs in your house?
9  A.   No.
10 Q.   If the Court were to release Mr. Rhodes into your
11 custody, you would be required to notify the Court if
12 he violates any conditions of his release.  Do you
13 understand that?
14 A.   I do.
15 Q.   And no other person lives with you; is that correct?
16 A.   That's correct.
17 Q.   Is my understanding correct that right now you're
18 in a one-bedroom apartment, but I guess you're willing
19 to move to a two-bedroom --
20 A.   Right.
21 Q.   -- if Mr. Rhodes can come live with you?
22 A.   Right.
23 Q.   And that would take a couple of days?
24 A.   Yeah, it's going to take a few days, yeah.
25 Q.   You've never had Mr. Rhodes stay with you before,

1  though; correct?

2  A.   No.

3        THE COURT:  All right, thank you, sir.  You

4  may step down.

5        MR. LINDER:  Yes, Your Honor, just to make the

6  Court aware, I've got my client's sister who is in

7  Minnesota, and his cousin who lives in California,

8  friends from Houston.  There are several people here

9  that I won't name that are all here in support of

10  Mr. Rhodes.

11        And as I told you, there are two people

12  that would be third party custodian connections, if you

13  need that, in addition to the ones stated, and I've

14  provided that to the probation officer also.

15        THE COURT:  All right, thank you.

16        So no other witnesses, Mr. Linder; correct?

17        MR. LINDER:  Correct, Your Honor.

18        THE COURT:  Did you want to move the letters

19  that you submitted to the Court as an exhibit?

20        MR. LINDER:  Yes, Your Honor.

21        THE COURT:  Any objection?

22        MS. RAKOCZY:  No objection.

23        THE COURT:  All right.  All of the letters

24  that were submitted to the Court on behalf of

25  Mr. Rhodes are admitted as Defendant's Exhibit 1.

1          MR. LINDER:  Your Honor, I will note, you

2    probably saw in the letter, but one of those letters

3    stands out without saying his name.  You've got it in

4    front of you.  He is a senior partner of a large

5    national firm and he's willing to stake his reputation

6    on Mr. Rhodes.  He wrote a very nice letter that you've

7    got before you.

8          THE COURT:  All right, thank you.

9               I'll hear closing statements at this time.

10         MS. RAKOCZY:  Thank you, Your Honor.

11         **(*Counsel's microphone off during argument*)**

12              Your Honor, with respect to the nature and

13   circumstances of the offenses in which the defendant is

14   charged, he's not charged with a crime of violence, but

15   he is charged with orchestrating a plot to [U/I] mobs

16   surrounding the Government for the transfer of

17   Presidential power in this country.

18              The Government [U/I] that is difficult to

19   [U/I].  And the courts have recognized that a harm to

20   the union is a harm to the society, if not to the

21   nation, that can be considered as part of the danger

22   the defendant is posing to the community.

23              You've heard testimony here today [U/I]

24   he put forth a plan to include co-conspirators.  He

25   offered reimbursement and financial incentives to

```
 1   encourage people to participate.  And he was one of the
 2   architects of this plan how to arm Quick Reaction Force
 3   available on standby to ready weapons, ready firearms,
 4   and transfer those firearms into the hands of
 5   co-conspirators on the grounds at a moment's notice.
 6   The Government submits to this Court that shows an
 7   extreme disregard for the danger and safety of the
 8   community and also for the laws of the United States,
 9   which made it very difficult for this Court to trust
10   that the defendant can comply with conditions of
11   release.
12              The Court has heard evidence that the
13   defendant and his co-conspirators then took this plan
14   and utilized it to engage in an attack on the United
15   States Capitol.  The Government has mentioned during
16   this hearing and in his papers words of the defendant
17   in orchestrating this conspiracy, and the defense made
18   reference to the Government saying just words.  But we
19   are not saying just words here.  We base those words on
20   import.  It's the conduct of the defendant and his
21   co-conspirators they engaged in on January 6th and
22   thereafter, continuing to purchase firearms, continuing
23   to gather themselves together and to ready themselves
24   for conduct to forcibly oppose the peaceful transfer of
25   power in this country.
```

1          The statements that the defendant made did

2   not stop during the time period of this conspiracy.  We

3   heard testimony that the defendant continued to make

4   statements regarding the regime, the current

5   Presidential administration being illegitimate, and

6   that the Court [U/I].  He has utilized his military

7   background, his legal training, and his position as the

8   leader of this nationwide organization to further the

9   goals of this conspiracy.  We think the Court needs to

10  consider that, the threat that the defendant continues

11  to pose to our community.

12          THE COURT:  Counsel, let me ask you a question

13  about that because I don't disagree with what you just

14  said.  I don't agree with Mr. Linder's characterization

15  that they're just words.  Yes, we have a right to free

16  speech, but when your speech is intended to essentially

17  cause violence, then, you know, that's you're here

18  today.

19          But there are conditions that the Court

20  could implement regarding the use of social media and

21  electronic devices.  And so my question for you in

22  terms of monitoring any electronic device that

23  Mr. Rhodes had access to.  So my question is, why

24  would that not -- why would that condition, along with

25  others, not be sufficient in this case?

1            MS. RAKOCZY:  Your Honor, our conversations

2    with Pretrial Services were with the District of

3    Columbia and not with your office here.  In our

4    conversation with Pretrial Services, we've learned it

5    is difficult to monitor a defendant's electronic

6    communications.  They can take the extreme step of

7    installing tracking software on cell phones and

8    computers, but they can't be present in the home at all

9    times.  And we heard that the custodian who was

10   proffered here today is someone who is a very busy

11   person who works, it sounds like many hours.  He's an

12   industrious person, but unfortunately that means he's

13   not going to be around all the time and he can't say

14   that someone is not going to drop by the house and

15   provide a device or something that the defendant could

16   use to access the Internet.

17            And so we do have a concern that with all

18   of those contentions, Pretrial and this Court could

19   try to keep the defendant from having access to those

20   platforms, but he knows how to use encrypted messaging

21   applications and could have access to such devices if

22   someone should make it available and help him out.  He

23   can be sincere when he says he would do his best, but

24   he's one person and he's not going to be with the

25   defendant all the time.

1          THE COURT:  One of the questions that I asked

2    the agent that is still a question in my mind:  This

3    occurred over a year ago, the January 6th incident, and

4    we've heard about conversations that Mr. Rhodes has had

5    shortly after the January 6th event.  But in the last

6    year there doesn't seem to be any evidence, at least

7    that was presented here today to support that he's a

8    continuing danger or a flight risk or could potentially

9    obstruct justice.

10          MS. RAKOCZY:  We would [U/I] with that, Your

11    Honor.  But the witness did proffer today and it has

12    been alleged in the Indictment that Mr. Rhodes, number

13    one, engaged in obstruction with respect to his own

14    phone.  The Special Agent did mention that an associate

15    of the defendant did put forth a recommendation that

16    other co-conspirators took the evidence from their

17    phones.

18             In addition to that, the defendant does

19    continue -- did continue to remain in touch with

20    co-conspirators on his phone.  The witness proffered

21    that he does continue to make statements suggesting

22    that the regime is illegitimate.

23             For all that he said, we would also note

24    that some of his efforts have been hampered by the

25    fact that there have been arrests of a number of his

1  co-defendants in this case.  [U/I] think that the

2  defendant himself is not a danger because he does still

3  have his platform, he does still have his influence,

4  and he does still have members and affiliates involved

5  in who are willing to continue to follow him and to

6  raise [U/I].

7          THE COURT:  Okay.  You may continue if you

8  have anything else.

9          MS. RAKOCZY:  Thank you, Your Honor.  Just

10  briefly.  The defense pointed out to your question to

11  Special Agent Palian, who is detained, who is not

12  detained in this case.  We know this Court has to make

13  its own decision on the basis of the evidence to the

14  Court, but in the event that [U/I] in this Court's

15  determination, the District Court Judge in the District

16  of Columbia [U/I] had the opportunity to reveal appeals

17  of some of the detention orders.  And they make

18  decisions about who would remain detained or who would

19  be released.  As noted repeatedly, the decision-making

20  process that for him was one of the most significant

21  factors whether defendant played a leadership role in

22  this conspiracy.

23          So the defendants who are currently

24  detained -- Kelly Meggs, Jessica Watkins, and Kenneth

25  Harrelson -- are all alleged to have played roles.

1            Kelly Meggs was a leader of Stack 1 and a

2  leader of the Florida Chapter of the Oath Keepers.

3            Kenneth Harrelson was [U/I] and a deputy

4  to him in the leadership of both Stack 1 and that

5  Florida group.

6            Jessica Watkins was also a member of that

7  Stack 1 and a leader of the Ohio contingent that

8  participated in that Stack 1.

9        THE COURT:  Wasn't Joshua James also a leader

10  of the Alabama Oath Keepers and it looks like he was

11  released?

12        MS. RAKOCZY:  Yes, Your Honor, he was

13  released.  He was initially detained, but then released

14  upon appeal.  I don't want to speak for the judge, but

15  it sounded during that hearing as though some of the

16  major factors in that particular case were the

17  defendant's ties to his community and his employment.

18  He also had an outstanding military record, including

19  receiving a couple of [U/I].  Those are some of the

20  factors that appear to have influenced [U/I] with

21  respect to Joshua James.  But he did play a leadership

22  role with respect to Stack 2.

23            I would also note, Your Honor, that the

24  Defendant Edward Vallejo has just been arrested and

25  detained by the judge in Arizona.  Our judge in the

1  District of Columbia has not reviewed any appeals of

2  that decision at this point, but [U/I] in the District

3  of Arizona did make the decision to detain Mr. Vallejo

4  when he was arrested.  He is also someone, like

5  Mr. Rhodes, who did not breach the Capitol, yet he was

6  in the District of Columbia because he was serving in a

7  role as a Quick Reaction Force member.  A plan that we

8  had submitted to the Court and was shown today was the

9  plan that Mr. Rhodes put into place and then he

10  orchestrated.

11             And so [U/I] the use of weapons for this

12  conspiracy and the readiness of Mr. Rhodes and his

13  co-conspirators to have those weapons on hand and to

14  bring them in, if necessary, is part of this

15  dangerousness that concerns the Government currently.

16             We would just also note that with respect

17  to the risk of flight issue, I know the Court asked the

18  witness a couple of questions.  We would point out in

19  the summary the witness didn't mention this, but he did

20  testify to the fact that on January 6th, when the

21  defendant learned that law enforcement was potentially

22  coming for him and for others who participated in the

23  attack on the Capitol, he did flee at that time.  And

24  [U/I] didn't come out and tell us, but those were some

25  of the circumstances where he [U/I] opportunity at that

1 | point to be [U/I] home.  So there is some evidence
2 | before Your Honor that the defendant had in the past
3 | engaged in flight and who could potentially do it again.
4 | We've also proffered the evidence that the
5 | defendant and his organization has contacts throughout
6 | the United States.  We don't think he's necessarily an
7 | international flight risk.  He doesn't have a passport
8 | as far as we know.  But it would not be impossible for
9 | him to find an associate anywhere in this country to
10 | take his stuff, which as the witness said was very
11 | mobile and go underground and somewhat difficult to
12 | find if we wanted to.
13 | For all these reasons, Your Honor, the
14 | fact that a Grand Jury has found probable cause to find
15 | the defendant engaged in this plot to forcibly oppose
16 | the peaceful transfer of power in this country, and
17 | then deleted evidence of these crimes, we submit that
18 | there just aren't conditions or a combination of
19 | conditions that can ensure the safety of the community
20 | and [U/I].
21 | THE COURT:  Thank you.
22 | MS. RAKOCZY:  Thank you.
23 | THE COURT:  Mr. Linder?
24 | MR. LINDER:  Yes, Your Honor.
25 | *(Counsel's microphone off during argument)*

1          The Arizona Court, to touch on something

2    that the prosecutor just mentioned, the Arizona Court

3    in the Vallejo hearing actually did their hearing via --

4    we were able to listen to it.  It wasn't on Zoom, but

5    we were able to listen to it.  And the reason the Judge

6    detained Mr. Vallejo in that case, who didn't go in the

7    Capitol, the emphasis he put was that he was sitting on

8    a cache of guns at the QRF.  He was the guy that was

9    there that could have brought the guns had he wanted to.

10   That's what the judge [U/I].

11          Our client was never at the QRF and wasn't

12   at the Capitol.  So that was --

13          THE COURT:  Right, Mr. Linder, but just

14   because he wasn't physically present, he was

15   responsible, at least based on the evidence that was

16   shown today, for facilitating others and himself in

17   terms of bringing ammunition to have on hand if and

18   when they wanted to use it; right?

19          MR. LINDER:  He was one of the people.  There

20   were different chat rooms from different groups and

21   there were different QFRs that he wasn't involved in.

22          THE COURT:  So how is he any different is my

23   question?

24          MR. LINDER:  Well, he didn't breach the

25   Capitol.  He didn't assault a police officer.  He

1  didn't have a weapon.  He didn't do anything illegal

2  other than just [U/I] on trespasses and those things,

3  and speech, and that's not in today's hearing.  But he

4  didn't -- anything that they want to say that he did

5  was dangerous [U/I] anybody hear of.  And [U/I].  The

6  agent wasn't able to offer any information today, and

7  neither has opposing counsel, that he's done anything

8  to incite any of this violence or do anything for the

9  last six months.

10          If he wanted to come under the radar, he

11  could have done so.  The FBI had his phone number and

12  they called him and they meet with them, he gives them

13  his phone and gives them the code.  And when he told

14  them that I'll surrender and go to DC if you're going

15  to indict me, just call and I'll go to DC and turn

16  myself in.  And when they were going to arrest him here

17  at Chad Roberts' house, they call him.  They were

18  outside and he walks out.  He's not anybody who's

19  trying to do anything.  He's never broken the law.  He

20  doesn't have any criminal record.  He was honorably

21  discharged.  He's a Yale Law Graduate.  He has no

22  criminal history.

23          THE COURT:  Well, I actually have a question

24  about -- I do know he graduated from Yale Law School

25  and practiced law for a period of time.  The

1  information I have in the Pretrial Services Report

2  states that he was disbarred in 2007.  Do you know why?

3       MR. LINDER:  I'll speak in generalities.  He

4  had a personal family matter going on and they

5  allegedly brought the case before the court and

6  grievance committee and they disbarred him.  It wasn't

7  anything where he stole clients' funds or anything

8  [U/I] or anything like that.  But [U/I].

9       THE COURT:  The Pretrial Services Report also

10  states that his employment is essentially the founder

11  of Oath Keepers and that he, you know, gets all of his

12  salary from that job.  If he were to be released,

13  what's the intent going forward, at least until his

14  trial, in terms of his role with the Oath Keepers?

15       MR. LINDER:  Very good question.  As you know,

16  the one witness who's a senior partner in the law firm

17  can vouch for him.  And we anticipated he would be a

18  work [U/I].  He has a job writing appellate briefs and

19  could do that and assist on different levels at

20  different law firms.  He's done that in the past and he

21  could do it again.

22       THE COURT:  With who?  With the lawyer that

23  wrote the letter?

24       MR. LINDER:  Yes.  And other law firms, but

25  he's done that in the past and lawyers have hired him

1   to do constitutional issues and briefs and they could

2   put him to work.  We've already [U/I].

3              And as far as to respond to what the

4   Government said about my client, monitoring his

5   electronic communication, the Oath Keepers is a public

6   organization.  Even if he was communicating

7   surreptitiously, it's a public platform, it's going to

8   get out.  They're monitoring all these people.  He

9   hasn't talked to any of the co-defendants that have

10  been indicted.  They've been indicted and he can't do

11  that.  He hasn't tried to do that.

12       THE COURT:  I don't think the public platform

13  is what the Government is worried about.  I mean,

14  there's evidence that he was messaging, sending

15  encrypted messages.

16              And, you know, this Court has imposed the

17  condition before to have software monitored.  But the

18  Government does raise a fair point, which is the

19  proffered third party custodian will not be there all

20  the time.  Mr. Rhodes does appear to have a number of

21  associates, as they've been referenced, other members

22  of Oath Keepers.  And even members -- maybe people that

23  are not members of Oath Keepers, but that agree in his

24  beliefs that would possibly be willing to give him.  I

25  mean, obviously at some point it's just not possible to

1    monitor.  And so I think that's a fair point.

2                   The other -- and you know this,

3    Mr. Linder.  Really, in a case of involving child

4    pornography, that's the easiest way to really be able

5    to monitor a phone because you can monitor for a

6    specific type of search.  With encrypted messaging and

7    things like that, it's just it's more difficult.

8                   MR. LINDER:  I understand.  And I understand

9    what the Court is saying.  I agree, but it's not

10   impossible.  There could be restrictions put on him

11   where he doesn't have a phone, or has a certain phone

12   that belongs to somebody else.  And I don't think with

13   the nature of this case and the publicity this case has

14   gotten, I don't think anybody is going to risk doing

15   that.  If he's the number one guy on this Indictment, I

16   don't think people are going to go slipping him cell

17   phones and risk getting arrested by the FBI.  I don't

18   think anybody would want to risk that.  I don't think

19   he would want to risk that.

20                   THE COURT:  Well, I don't think I'm with you

21   on that.  But your proffered third party custodian, I

22   know that his mother is deceased, he does not have

23   contact with his father.  He does have a sister.  But

24   the relationship between the proffered third party

25   custodian and Mr. Rhodes does not necessarily seem

1  sufficient to me for him to be a suitable third party

2  custodian.

3          MR. LINDER:  Which is why I offered backups to

4  kind of assist in that.

5          THE COURT:  Right, but they're backups just

6  saying they would check in on him.

7          MR. LINDER:  Right.  And I know one of them

8  would have -- or two of them would have daily

9  communication, not just once a week.  They talk daily.

10          THE COURT:  Okay.  All right, thank you.

11                Anything else?

12          MS. RAKOCZY:  No, Your Honor.  Thank you.

13          THE COURT:  Mr. Linder?

14          MR. LINDER:  Are we just closing or are we

15  just --

16          THE COURT:  Well, yeah, this is closing.

17  Would you like to say anything else?

18          MR. LINDER:  We got into a question and answer.

19          THE COURT:  Okay, I'm sorry, go ahead.

20          MR. LINDER:  I don't know if the Court's

21  aware.  Your coordinator said you might be aware.  He

22  was actually cooperating with a Congressional subpoena.

23  He has a lawyer in DC.  He's supposed to testify on

24  February 2nd before Congress.  If DOJ had waited a month

25  for this Indictment, they could have got his testimony

1  in front of Congress and used that, but they avoided

2  that.  And so there are people in DC that are not very

3  happy about this Indictment because now he can't

4  testify.  He was cooperating with a Congressional

5  subpoena in addition.

6                    And I also provided the Court with the

7  U.S. vs. [U/I], which I gave to counsel for the

8  Government, that basically says what I elicited on

9  cross-examination of the agent.  The Government can

10  indict whoever they want within [U/I].  We know that.

11  They can do it this year, next year, whatever.  But

12  it's very disingenuous to sit on something for a year

13  and say:  Oh, this guy's dangerous for all this stuff

14  he did in January, but we're going to sit on for a year

15  and indict him later.

16                    And they call him dangerous.  If they

17  knew he was dangerous, they should have sworn out a

18  complaint.  Saying he's a danger now is disingenuous

19  when they can't bring any activity that he's done,

20  anything other than deleted messages before May of last

21  year [U/I].  But other than some deleted messages, they

22  can't bring anything to show that he's a danger.  And

23  so I kinda find that --

24                    In additional, the last thing, counsel

25  wrote a brief -- counsel for the Government wrote a

1   brief, and on page 15, bottom of page 15, the last

2   sentence and it runs over on the top of page 16.  It

3   said, "It's difficult to imagine conduct that poses a

4   greater risk to our society that ones targeted at

5   undermining the laws and procedures at the heart of our

6   democratic process."

7                  If there's nothing greater, then why are

8   they [U/I].  That's -- to me, that's the most

9   disingenuous part of this.  And I know it's not their

10   call.  There are obviously people above them and they

11   all submit that call.  But to me that speaks volumes

12   that they don't really think he's a danger.

13                  And one other thing on flight risk, Your

14   Honor.

15          THE COURT:  Well, but they're not just moving

16   on danger.

17          MR. LINDER:  They moved on both, danger and

18   flight risk.  They brought out evidence of both.

19          THE COURT:  Well, right.  But under

20   3142(f)(2), they are moving under flight and

21   obstruction.

22          MR. LINDER:  Correct.  But one other thing on

23   flight, Your Honor, and I'll wrap it up.

24                  This is not the [U/I] we have on our case

25   where someone is trying to do everything in secret, get

1  out of jail, run to Mexico, get out and go wherever

2  they want to.  Mr. Rhodes, whether you like it or not,

3  had a platform.  And even if he's not allowed to

4  participate in that platform going forward if he's on

5  release -- and I assume he would not be able to

6  participate in that -- him running and hiding and not

7  standing in trial avoids the very purpose of everything

8  he stands for.  I don't think he just wants a public

9  trial.  I think he wants a speedy public trial.  And

10  he's going to do everything he can to make that happen.

11           And I just think this is not the typical

12  case we see and hear where some people tend to run.

13  It's not an event with him where people that [U/I] him

14  in the past or people that he wants to maybe hurt in the

15  future running and fleeing from the court, all of that.

16  So that's what makes it different.

17           THE COURT:  Let me ask you one question before

18  you sit down.  I'm going to take a little bit of time

19  today to think about this.  But do you have anyone else

20  to offer as a third party custodian?

21           MR. LINDER:  We can talk -- there's lots of

22  people in court.  Great question.  Would the Court

23  allow him to move to another district with a family

24  member?

25           THE COURT:  Are you talking about the sister

1  in Montana?

2        MR. LINDER:  Well, we've got Minnesota, we've

3  got California, we've got different people that, if the

4  Court would allow him, we just didn't know if he would

5  be able to leave this district, which is why Brian has

6  an apartment in Dallas, which is the Northern District,

7  as you know; and Carrollton, which is the Eastern

8  District, which is here.  That's what we made

9  provisions for in the last few days.

10        But if the Court is flexible and will

11  allow him to be monitored in a different district,

12  we've got a lot of people.

13        THE COURT:  Well, I don't want to commit to

14  anything before I hear the testimony, but yes, I would

15  consider it.  In this particular case, the casual

16  relationship between the proffered third party

17  custodian and Mr. Rhodes is not sufficient.  And so

18  while I would consider another third party custodian, I

19  think it needs to be a more significant relationship

20  outside of the context of some of the conversations and

21  beliefs that is alleged in this Indictment.

22        MR. LINDER:  Correct.  That's why I made sure

23  before we were talking he wasn't there on the 6th, he's

24  not a member of Oath Keepers.

25        I've just been informed that the family

 1  members, both a cousin and a sister, would be willing

 2  to be third party custodians.

 3          THE COURT:  All right.  If you're prepared to

 4  put them up on the stand, then let's do that.

 5          MR. LINDER:  May I have a moment, Your Honor?

 6          THE COURT:  Yes.

 7          *[Pause]*

 8          MR. LINDER:  Your Honor, if I could avoid

 9  using the last name, we can provide that information to

10  Probation.

11          THE COURT:  Is there any objection?

12          MS. RAKOCZY:  No, Your Honor.

13          THE COURT:  Okay.

14          COURTROOM DEPUTY:  Do you solemnly swear the

15  testimony you are about to give in the case before the

16  Court shall be the truth, the whole truth, and nothing

17  but the truth, so help you God?

18          THE WITNESS:  Yes, ma'am.

19          COURTROOM DEPUTY:  Have a seat, please.

20          THE COURT:  Mr. Linder, you may proceed.

21          **BENJAMIN [LNU], CALLED BY THE DEFENSE**

22                  **DIRECT EXAMINATION**

23  BY MR. LINDER:

24  Q.  Sir, would you please state your first name -- you

25  can take off your mask.  Please state your first name

1  for the Court.

2  A.   Benjamin.

3  Q.   And are you married to one of Stewart's cousins?

4  A.   Yep.

5  Q.   And have you had a lot of interaction with Stewart

6  over the years?

7  A.   Yes, because of his cousin, but also because of his

8  uncle who lives on my property.

9  Q.   Okay.  And what state do you live in?

10  A.   California.

11  Q.   Okay.  And we can provide that information to

12  Probation, the specifics of it.

13          Do you have any criminal history?

14  A.   No.

15  Q.   Does your wife have any criminal history?

16  A.   No.  We're boring.

17  Q.   Sometimes that's better.  Do you have kids in the

18  home?

19  A.   We have four kids.

20  Q.   Okay.  And do you work outside in a regular kind of

21  job?

22  A.   I'm a C27 landscape contractor.  I do landscape

23  design and installations

24  Q.   And does your wife stay at home or does she work

25  outside the home?

1  A.    She's a stay at home mom.

2  Q.    Okay.  Do you have a room in the house?

3  A.    Actually, we have a whole separate house on our

4  property where my father and mother-in-law live.  And

5  that would be Stewart's uncle, and they're very close.

6  And they actually have an extra bedroom, bathroom, the

7  whole setup.  And actually, it's pretty regular that he

8  would go and stay there when he does come.

9  Q.    Okay, so he's been there several times anyway?

10  A.    Oh, yes, sir.

11  Q.    And do your kids think of him as an uncle?

12  A.    Yes.

13  Q.    Okay.

14  A.    Yeah, he's good with kids.

15  Q.    All right.  So you heard me ask the other

16  custodian these same questions.  Any weapons in the

17  house?

18  A.    No, not that house.

19  Q.    Okay.  And do you understand if there's weapons on

20  the property, that that be removed and taken somewhere

21  else; you understand that?

22  A.    That's fine.

23  Q.    Okay.  And I assume, based on the nature of the

24  judge's questions to me, and I know this Court, there

25  will be limitations on his electronic communications to

 1   be able to have.  Are y'all able to comply with that if

 2   he has to wear a leg monitor or not give him access to

 3   a computer, things like that?

 4   A.   Yeah, it would be easy, because actually in that

 5   guesthouse there is no Internet access.  We live in the

 6   mountains.

 7   Q.   Okay.  And any alcohol or drug use in the house?

 8   A.   Actually, no.  My wife is a recovered alcoholic, so

 9   we don't have any alcohol at all or anything.

10   Q.   Like you said, you're pretty boring?

11   A.   Say what?

12   Q.   Like you said, pretty boring.

13   A.   Yeah.  I live with four kids.

14   Q.   I understand.

15           MR. LINDER:  I'll pass the witness.

16           THE COURT:  Cross-examination?

17           MS. RAKOCZY:  Briefly, Your Honor.

18                   **CROSS-EXAMINATION**

19   **BY MS. RAKOCZY:**

20   Q.   Sir, you said that if Mr. Rhodes were to stay with

21   your family, he will stay in the guesthouse?

22   A.   Yeah, that would be correct with my -- his uncle

23   and aunt, yeah.

24   Q.   Where is the guesthouse in relation to your house?

25   A.   It's about 600 feet.  It's on the same property.

1  We have about four acres and it's about 600 feet away.

2  It's a three-bedroom, two-bathroom granny house.

3  Q.   And the other two people who live in that

4  guesthouse are Mr. Rhodes' uncle and Mr. Rhodes'

5  uncle's wife?

6  A.   Yeah.  And actually, my mother-in-law works

7  fulltime for a law firm, but my father-in-law doesn't --

8  he's a writer, and so -- and he's older, so he actually

9  never leaves.  He's always home.

10       MS. RAKOCZY:  I have no further questions.

11  Thank you, Your Honor.

12                **REDIRECT EXAMINATION**

13  **BY MR. LINDER:**

14  Q.   And if the Probation needed to talk to them here

15  with some specifics in a few minutes, could you get

16  them on the phone?

17  A.   Yeah, I mean, this is very spur of the moment,

18  obviously, Your Honor.  But yeah, do whatever we can do.

19  Q.   Okay, thank you very much.

20       MR. LINDER:  Thank you, Your Honor.

21                    **EXAMINATION**

22  **BY THE COURT:**

23  Q.   Sir, before you step down, did you have any

24  knowledge of Mr. Rhodes' involvement in the January 6th

25  event, other than what you've heard publicly?

1  A.   Not until after.

2  Q.   Okay.  And what did you learn after?

3  A.   I mean, pretty much the big stuff, whatever the

4  news told me or that kinda thing.  There wasn't any

5  contact about that incident in his family.  So we

6  talked, but I didn't know anything about that incident

7  beforehand.  And afterwards, it was quite some time

8  before there was some communication, and it has been

9  very little since then.

10 Q.   Are you a member of the Oath Keepers?

11 A.   No.

12 Q.   Is your uncle that lives on the property?

13 A.   Most definitely not.  Nobody that lives on that

14 property is an Oath Keeper.

15 Q.   All right.  Do you understand that if you were to

16 act as a third party custodian, you  would be required

17 to notify the Court if Mr. Rhodes violated any of the

18 conditions that the Court set?

19 A.   I am now, yes, ma'am.

20 Q.   And you think you could do that?

21 A.   Yeah, I personally work a lot, and so but I come

22 home every day.  That's part of my job.  But I know

23 that his uncle, my father-in-law, never leaves.  And so

24 I think that, yeah, it would be very easy to have

25 somebody with him at all times.  Is that what you're

1 | alluding to?

2 | Q.  Right, not just be with him at all times, but also

3 | willing to notify the Court if he was in violation of a

4 | condition.

5 | A.  Yes, ma'am.

6 |          THE COURT:  All right, thank you.  You may

7 | step down.

8 |               All right.  We'll stand adjourned.  I will

9 | issue an opinion in the next 24 to 48 hours.

10 |          MS. RAKOCZY:  Your Honor, would the Court --

11 | the Government would request that if the Court should

12 | issue a decision to release the defendant, you will let

13 | us know?

14 |          THE COURT:  Yes, I will do that.

15 |               All right.  We'll stand adjourned.

16 |          *[12:42 p.m. - Proceedings adjourned]*

17 |          *[3:14 p.m. - Proceedings re-opened]*

18 |          THE COURT:  Good afternoon.  We're here on

19 | the record.  4:22-mj-11, United States vs. Elmer

20 | Stewart Rhodes, III.

21 |               For the record, this morning the Court

22 | held a Detention Hearing.  Testimony was presented by

23 | both the Government and the defendant.  After the

24 | hearing, Mr. Rhodes', I believe, soon-to-be ex-spouse,

25 | Ms. Tasha Adams, contacted the Court to communicate

1    concerns for her, as well as her children's safety, if

2    he were to be released.

3                    Ms. Adams, I made a request that you be

4    asked if you'd be willing to provide those statements

5    on the record.  It's my understanding that you said

6    yes.  So I then contacted counsel for the Government

7    and counsel for defendant so that your statements could

8    be made on the record with both counsel present.

9                    So, typically, we have you testifying in

10   response to questions.  I think we'll start off,

11   Ms. Adams, if you wouldn't mind, just stating your full

12   name for the record and spell it.  And then I'll just

13   allow you to speak, to communicate to the Court what

14   you want to communicate regarding Mr. Rhodes.

15                    **TASHA VONN ADAMS RHODES**

16                    **OPENING STATEMENT**

17          MS. ADAMS:  Okay.  My name is Tasha Vonn Adams

18   Rhodes.  T-a-s-h-a V-o-n-n A-d-a-m-s, and then Rhodes,

19   R-h-o-d-e-s.

20                    I was married to Stewart in 1994 and filed

21   for divorce in February 2018.  We are still not legally

22   divorced.  We have six kids together.  Just wanted to

23   just express that he was extraordinarily violent during

24   our marriage and often used firearms to control us.

25   Not always necessarily pointing them right at us, but

waving them around the room, screaming, yelling,

pointing them at his own head.  Even if someone just

wanted to step outside or go to the store, he kept us

very isolated.

In addition to that, I still wanted to let

the Court know that his lifestyle was very much about

eventually escaping if he were ever what he called

picked up by the Feds, that he rented backhoes and dug

elaborate escape tunnels in our back yard, had

unregistered cars waiting out in the woods to escape,

purchased hundreds of dollars in razor wire that he

needed to string up around the property and hide in

bushes in case the Feds ever came to his door.

And I just think he's a huge danger and a

flight risk.

**EXAMINATION**

**BY THE COURT:**

Q.   When you say that he pointed -- he oftentimes used

firearms to threaten and isolate you, are you talking

about you alone or you and your children?

A.   Mostly me.  With the kids, the threat was -- it

was -- it was more physical, just hands-on physical

violence.  But he would excuse and say, "Oh, I didn't

mean to do that."  But, I mean, sometimes he would

just, if he was angry, he would suddenly want to

1  practice martial arts and, you know, he would punch the

2  kids or, "Oh, you know, I didn't mean to do that.  But

3  it was always in direct -- directly involved, you know,

4  if he was really angry or not.

5          But then there were times when he did just

6  completely lose it.  And at one point he just, I don't

7  know, just choked my daughter and had to be removed by

8  my son.  And these fits became things that used to

9  happen every so many years when he'd just sort of

10  mentally break down.  It started happening every few

11  weeks in the last couple of years from like 2016 on.

12  Just started happening more and more.  And it took us

13  about -- it was really my adult kids saving money and

14  helping us, helping me and the other kids get out with

15  an attorney, that we would not have gotten out.

16          And we were actually afraid that though he's

17  very, very afraid of going to prison, my biggest fear

18  with him was like a murder-suicide type thing.  It's

19  just he'd just go all out.  And the gun waving was

20  happening more and more until one of the last events.

21  You know, my kids actually saw a bit of it.  And most

22  of that was done more in private, but he was getting

23  more and more blatant with it.

24  Q.   Did you ever obtain a restraining order or anything

25  like that against him?

1  A.   I'm sorry.  I applied for one.  It was denied.

2  Q.   And when was that?

3  A.   That was 2018.

4  Q.   Okay.

5            THE COURT:  All right, does either counsel

6  have any questions of Ms. Adams?

7            MR. BRIGHT:  Kate, I'll let you go first.

8            MS. RAKOCZY:  No questions for the Government,

9  Your Honor.  Thank you.

10            MR. BRIGHT:  Your Honor, I have a few

11  extremely brief questions.

12            THE COURT:  Okay.

13            MR. BRIGHT:  This is James Lee Bright, by the

14  way, Your Honor.

15            THE COURT:  Go ahead, Mr. Bright.

16            MR. BRIGHT:  Thank you, Judge.

17                    **CROSS-EXAMINATION**

18  **BY MR. BRIGHT:**

19  Q.   Do you prefer to be referred to you now as

20  Ms. Adams out of respect for you, ma'am?

21  A.   Yes, I'm legally Adams now.

22  Q.   Okay, I'm happy to do that.  My name is James Lee

23  Bright.  I'm one of the co-counsel defense attorneys

24  your still pending husband, Stewart Rhodes.

25            What would you say that the time frame of

1   these behavioral patterns was, Ms. Adams?

2   A.   Well, he had always been controlling and violent,

3   but it went from it would be a couple times a year to,

4   you know, drawing his handgun at the bar over his own

5   head or, you know, waving it around a lot.  After Bundy

6   Ranch, he had a pretty serious mental deterioration

7   until --

8   Q.   Ms. Adams, if I may, can you just keep it within

9   the scope of the question.

10  A.   Okay.

11  Q.   What was the time frame?

12  A.   When you're saying time frame, do you mean how

13  often was he --

14  Q.   No, ma'am.  Like what -- in years, when did the

15  last time that these events happen?

16  A.   Well, we left in 2018, February 2018.  So I would

17  say his last -- I'm going to say it was January of that

18  year, 2018.

19  Q.   2018?

20  A.   Yes.

21  Q.   Okay.

22  A.   That's the last time we saw him.

23  Q.   Did you include this in the divorce proceedings, in

24  your petition?

25  A.   Umm --

1  Q.   You didn't, did you?

2  A.   I included a lot of it.  There's really limited

3  space.  We didn't really get that far in the divorce.

4  We only got as far as the kids exclusively, not with me.

5  Q.   All right.  So it's my understanding your family

6  law attorney has reached out to me as of last week

7  asking that we help with the settlement of the final

8  orders.  Are you aware of that, ma'am?

9  A.   Yes.

10  Q.   Okay.  You're aware that I returned saying that

11  that is not an area of law that I practice?

12  A.   Okay.  Yeah, I don't know.

13  Q.   You're aware that the allegations that you're

14  making were not included in the divorce proceedings, in

15  the original petition, ma'am; is that correct?

16  A.   Honestly, I don't know what was included.  We --

17  Q.   Okay, these are pretty serious allegations --

18  A.   Yes, they are.

19  Q.   -- when you make them --

20  A.   But they were included in my restraining order

21  application.

22  Q.   They do not.

23  A.   Yes.

24  Q.   Okay.  Now, were any police reports at any given

25  time filed in these matters?

1   A.   No.

2   Q.   Okay.  So, just to clarify, there's never been any

3   police reports of -- respectfully, very serious

4   allegations.

5   A.   Yes.

6   Q.   And they were also not included in the divorce

7   proceedings; correct?

8   A.   I don't know if I can say they were or not included

9   in my divorce proceedings because, honestly, we filled

10  out so much stuff and I've just kinda lost track and it

11  was four years ago.  But I definitely included this

12  in -- his gun waving was included in the restraining

13  order and we just never got that far.  All I did was

14  apply.  We filed for divorce and then we had one

15  hearing about the kids only and that's as far as it got.

16  Q.   Understood.  So you've had no contact with him in

17  three, four years?

18  A.   Yeah, no, only just one line, you know, statements

19  like I want to talk to the kids.  And then I would tell

20  him the time and he would agree.

21  Q.   Not a problem.  And so during the period of time

22  that all those series of actions that you've alleged

23  today that were occurring, could you detail for me the

24  adult witnesses that would have been privy to that?

25  A.   That was me.

1  Q.   So no witnesses?

2  A.   No, of course not.  This is a domestic violence

3  incident that occurred in the middle of the woods.

4  This is not the kind of thing that happens publicly.

5  Q.   Did you ever have the opportunity to report these

6  to a good friend or somebody that we could contact to

7  verify them?

8  A.   No, I had no friends.

9  Q.   Okay.

10 A.   Or really, I was not in contact with any of my

11 family at that time.

12 Q.   Understood.  Did you have the opportunity to

13 memorialize any of this in photographs or anything

14 else?

15 A.   No.

16         MR. BRIGHT:  Your Honor, l pass the witness.

17         THE COURT:  All right.  Any other questions?

18 Government's counsel?

19         MS. RAKOCZY:  Not from the Government.  No,

20 Your Honor, thank you.

21         THE COURT:  All right.  Ms. Adams, I don't

22 have any questions for you.  Thank you for reaching out

23 and providing the information.  And you are dismissed

24 at this time, so you can leave the phone call.

25         MS. ADAMS:  Okay.  Thank you very much for

1  your time.

2          THE COURT:  You're welcome.  Thank you.

3          MR. BRIGHT:  Thank you, Ms. Adams.  Have a

4  good day, ma'am.

5          MS. ADAMS:  Thank you.

6          THE COURT:  All right.  Counsel, before we go,

7  I wanted to give each of you an opportunity to make any

8  statements about the testimony that was just provided,

9  if you would like to.

10          MS. RAKOCZY:  Your Honor, this is Kate

11  Rakoczy --

12          MR. BRIGHT:  Your Honor -- yeah, I'll let you

13  go first, Kate, please.

14          MS. RAKOCZY:  That's fine, thank you.

15          *(Counsel's microphone off during argument)*

16              Your Honor, Kate Rakoczy on behalf of the

17  United States.  I did want to make sure I let the Court

18  know out of candor and let counsel know that the FBI

19  interviewed Ms. Adams at her residence, I believe,

20  early last week or the previous week, shortly after

21  Mr. Rhodes' arrest.  I will provide a copy of that 302

22  to defense counsel and can provide a copy to the Court

23  as well, if the Court would like.  I say that only just

24  so the Court is aware of it, that we did interview

25  Ms. Adams.

1        We do find the information that she has

2   to share very concerning with respect to Mr. Rhodes as

3   dangerous and his stability.  The only reason we did

4   not proffer the evidence at the hearing is that we

5   learned this information very recently and have not had

6   the opportunity to corroborate the information,

7   although I think as the witness points out, it would be

8   difficult to corroborate, as are many domestic violence

9   allegations of that nature.

10        And I don't think that's a reason to

11   discredit the information.  I think the Court has had

12   an opportunity to hear from her and can choose to

13   assess her credibility on the basis of having heard

14   from her and heard her information.  So we do think

15   this is additional evidence of the defendant's

16   dangerousness that the Court should seriously consider

17   in making its decision.

18        THE COURT:  All right, thank you.

19            Mr. Bright.

20        MR. BRIGHT:  At your convenience, Your Honor.

21        *(Counsel's microphone off during argument)*

22        You know, Your Honor, I think it's

23   difficult, I think, to assess how to address this

24   properly.  I respectfully understand the point that the

25   Government is making, and if I was them, I would do the

1 | same thing.

2 |         That being said, we should never, out of

3 | hand, dismiss domestic violence allegations.  That's a

4 | given.  But we have a situation whereby there is an

5 | exceptionally acrimonious relationship between a to-be

6 | ex-husband and a to-be ex-wife.  We have a history

7 | here, according to Ms. Adams, of completely unreported,

8 | completely uncorroborated, completely unrecorded

9 | incidents of what, if true, would indeed be completely

10 | inappropriate conduct on behalf of any given

11 | individual, much less an individual that's a pending

12 | defendant before the District Court.

13 |         But the fact that she, by her own

14 | admission, says that the protective order was denied

15 | speaks volumes.  I'm not a practitioner of law in the

16 | state of Montana.  I don't know what their standards

17 | are.  But if we extrapolate the standards in Texas law,

18 | I can tell the Court, and the Court is well aware, as

19 | I'm sure the prosecutors from DC are aware, that the

20 | standard to get one at minimum for what would be in

21 | Texas a 60-day window is incredibly low.

22 |         It's merely a probable cause standard.

23 | More likely, would a reasonable person believe on the

24 | facts at hand a crime of criminal activities occurred

25 | and they happened within 60 days prior.  That's all you

1  have to establish to get a protective order initially

2  issued prior to a continuance order.

3              If she was denied in Montana -- and

4  further, it was never included in the divorce

5  petitions, which would give any party in family court a

6  disproportionate share of the estate, and also greater

7  ability to control the children.

8              I would have to say, Your Honor, that in

9  reviewing her Twitter account, looking at the [U/I]

10 that's going on the Internet with her, I don't mean to

11 disrespect somebody that claims what is otherwise awful

12 conduct towards a woman, but I have to in this case

13 look at the motivations behind them.

14             We get back to a question like we

15 presented in court today.  If it's a danger, why did we

16 wait a year?  If he's a danger, why did she wait four

17 years to bring this up to a court when it's the

18 opportunity while she's trying to use me to serve final

19 orders on her husband in jail?

20             I'm sorry, Your Honor, I think this is a

21 disreputable claim that she's making.  The timing reeks

22 of an attempt to abuse what he's already going through.

23 And I don't -- I hate saying this with such serious

24 allegations, but when I wrap all of that together and I

25 look at the manner in which it can be used and, boom,

1   all of the sudden here we go today after she doesn't

2   say a word to any human being on earth, including in

3   her divorce petition for four years.  I hate to say it,

4   but to some extent these allegations should be

5   dismissed out of hand.

6               The Court, obviously, this is just

7   argument on my behalf and the Court will take into

8   account as they wish the allegations that she's made.

9   But I think that on behalf of Mr. Linder and I, that's

10  going to be our formal argument and stance on this

11  matter.

12        THE COURT:  I know that you had asked her

13  about the petition.  Have you seen a copy of the

14  petition?

15        MR. BRIGHT:  Your Honor, when her lawyer --

16  well, she just said that she didn't believe that it was

17  in it.  And so I'm going to take Ms. Adams at her word

18  when she tells us about her petition and then --

19        THE COURT:  Well, I think she came back around

20  to saying she couldn't say that, that she didn't know.

21  So I don't know if you're asking or because you really

22  don't know, or you're asking her, but you already know

23  the answer.

24        MR. BRIGHT:  No, Your Honor, I asked that

25  question of her initially.  She said at first she

 1  didn't remember.  Then she said she doesn't know.  And
 2  so I'm going to accept her at face value.  And when I
 3  get those kinds of answers from a divorce petition, I'm
 4  going to trust that she didn't have it in there.

 5          I've been through a divorce.  I remember
 6  damn well everything in my petition.  That's not
 7  something people forget.  Those situations can be
 8  emotionally scarring.  And I find it extremely
 9  difficult to believe that for such significant
10  allegations you wouldn't even be able to remember
11  whether it was in your petition or not.

12          I just don't find that credible, Your
13  Honor.  I apologize.

14          THE COURT:  All right.  Let me ask you this,
15  Mr. Bright.  Do you know -- I know that there's been
16  about a four-year separation between Ms. Adams and
17  Mr. Rhodes.  It's my recollection from the Pretrial
18  Services Report that although Mr. Rhodes contributes
19  money for support of the children, he does not see
20  them.  Is that accurate?

21          MR. BRIGHT:  That is my understanding, yes,
22  Your Honor.  I believe that is part of the acrimonious
23  nature.  I have spoken with Mr. Rhodes about this.  And
24  again, I'm not -- none of us are privy to the
25  interworkings of these two.  But it has been relayed to

1  me that kind of in your -- that there has been some

2  withholding of visitation with the children.  I believe

3  some of that has to do with politics.  I think some of

4  that has to do with, as I understand it, she used to be

5  a Jehovah's Witness and has converted to -- and I will

6  plead ignorance as to the exact details of the nature

7  of what it means to be a Wiccan.  But I believe, if I

8  understand correctly, it's some form of pagan witch

9  type practice.  And obviously, Mr. Rhodes is Messianic

10  Jewish, Christian tradition.  Again, but I plead

11  ignorance as to the details of what all that means.

12  But the wedge between these two, to my understanding,

13  is such that he has not seen his children in years.

14          THE COURT:  Okay.

15          MR. BRIGHT:  And has been -- by her own words

16  just now, they don't communicate or have any contact

17  with each other, which is why I would say I'm a bit

18  confused why she's so concerned about her safety when

19  she hadn't seen him in four years.

20          THE COURT:  Okay.  All right.  Well, thank you

21  both for being available on such short notice for this.

22  I appreciate it.

23          MS. RAKOCZY:  Thank you very much, Your Honor.

24          MR. BRIGHT:  Thank you for your time, Your

25  Honor.  Please let us know if you need anything further.

1          THE COURT:  Thank you.  We'll stand adjourned.`

2          *[3:34 p.m. - Proceedings adjourned]*

3

4               C E R T I F I C A T I O N

5

6     I certify that the foregoing is a correct

7   transcript of the electronic sound recording of the

8   proceedings in the above-entitled matter.

9

10

11  /s/ Gwen Reed

12  1-28-22

13

14

15

16

17

18

19

20

21

22

23

24

25