**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | )    **No.**     **1:22-cr-15-11 (APM)** |
| **v.** | ) |
| | ) |
| **EDWARD VALLEJO,** | ) |
| | ) |
| **Defendant.** | ) |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
<u>FOR RECONSIDERATION OF DETENTION</u>**

Edward Vallejo is charged by indictment with seditious conspiracy and related offenses for participating in a plot to oppose by force the execution of the laws governing the transfer of presidential power following the 2020 United States Presidential Election, including an attack on the United States Capitol on January 6, 2021. He should be detained pending trial.

Vallejo played a central role in the planned use of force in this plot, agreeing and preparing to usher firearms and other related equipment into Washington, D.C., to his co-conspirators. Afterward, many co-conspirators destroyed evidence of their actions, deleting key communications and warning of "turn-coat snitches." Based on the compelling evidence of Vallejo's role in the charged offenses, there are no conditions of release that can reasonably assure the safety of the community or the defendant's appearance in court. And based on the inherent obstructive nature of Vallejo's actions and the widespread evidence in this conspiracy of evidence destruction, Vallejo poses a risk obstruction of justice should he be released. Continued pretrial detention is warranted and necessary.

**I. <u>Procedural Background</u>**

Vallejo is charged with seditious conspiracy, in violation of 18 U.S.C. § 2384; conspiracy to obstruct Congress, in violation of 18 U.S.C. § 1512(k); obstruction of an official proceeding, in

violation of 18 U.S.C. § 1512(c)(2); and conspiracy to prevent an officer from discharging any duties, in violation of 18 U.S.C. § 372. Upon return of the indictment, a United States Magistrate Judge for the District of Columbia issued a warrant for Vallejo's arrest. Vallejo was arrested on January 13, 2022, and he had his initial appearance on Friday, January 14. The United States moved for Vallejo's pretrial detention pursuant to 18 U.S.C. §§ 3142(f)(1)(E) (case that involves a felony "that involves the possession or use of a firearm, destructive device … or any other dangerous weapon"), 3142(f)(2)(A) (case that involves "a serious risk that [the defendant] will flee"), and 3142(f)(2)(B) (case that involves "a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror").

Following a detention hearing on January 20, 2022, District of Arizona Magistrate Judge John Boyle ordered the defendant held pending trial. *Vallejo*, 2:22-mj-05032-DMF (D.Ariz); ECF 9. Judge Boyle found that the government established that Vallejo posed a danger to the community by clear and convincing evidence and that no condition or combination of conditions could ensure the safety of the community. Specifically, Judge Boyle found that the facts as alleged in the indictment "threaten[ed] the very fabric of democracy." Exhibit 1 at 31. In describing the dangerousness of Vallejo, who was a leader of the "Quick Reaction Force" under the command of Oath Keeper President Stewart Rhodes, Judge Boyle stated:

> I go back to what happened back in January 6th, and I've already stated it, I think that if Mr. Rhodes had given that order, you would have complied. And that means there is the potential that as, I believe you used the word soldier, but certainly that's how you described yourself, that you would take orders, if necessary, to fulfill what you believe is important to you, and, therefore, you are a serious danger at this time. Exhibit 1 at 36.

On April 18, 2022, defense moved for pretrial release. ECF 102. Judge Boyle's original findings regarding the danger posed by the defendant were well reasoned and supported by the

evidence, and there have been no change in conditions and or new evidence presented by the defense sufficient to warrant release. Vallejo should remain detained pending trial.

## II.    **Legal Standard**

"If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court[,] the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order."  18 U.S.C. § 3145(b).  "Neither § 3142 nor § 3145 specifies the standard of review to be applied by a district court reviewing a magistrate judge's release or detention order, and the 'D.C. Circuit has not yet addressed the issue.'"  *United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *5 (D.D.C. Feb. 26, 2021) (quoting *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017)).  "Nonetheless, both the [Bail Reform Act] and the Federal Magistrates Act, 28 U.S.C. § 636, support the conclusion, reached by every circuit to have considered the question, that a district court reviews a magistrate judge's release or detention order *de novo*."  *Id* (citing cases); *see also Cua*, 2021 WL 918225, at *3.

## III.    **Factual Background**

Vallejo participated in a plot to oppose by force the execution of the laws governing the transfer of presidential power in the United States.  In November 2020, days after the Presidential Election, co-defendant Elmer Stewart Rhodes III, the leader of the conspiracy, began recruiting co-conspirators to join him in traveling to Washington, D.C., for operations aimed at stopping the transfer of power with the support of an armed "quick reaction force," or "QRF," stationed just across the river in Arlington, Virginia.  Vallejo and others joined and implemented this plan by, among other means, using social media and encrypted messaging to communicate; amassing weaponry and tactical gear; organizing into regional teams to transport these items to the D.C.

area; and staging Vallejo nearby to be prepared to assist his co-conspirators at his commander's orders.

In December 2020, after the Electoral College cast ballots confirming Joseph Biden as the President-Elect, the defendants' criminal plan focused on delaying or stopping Congress's Certification of the Electoral College vote ("Certification proceeding"). This plan materialized on January 6, 2021, the day of the Certification proceeding, when two military-style stacks of co-conspirators, along with other rioters, forcibly breached the Capitol while Vallejo and others staged as armed QRF teams across the Potomac River, awaiting potential deployment and empowering the co-conspirators. The breach succeeded in delaying the Certification proceeding for several hours, and the proceeding ultimately concluded in the early morning hours of January 7. That same morning, Vallejo performed "Recon" in the area near the Capitol to see if he and his co-conspirators' could "probe their defense line." In the days that followed, Vallejo's team reached out to Rhodes for next steps while his co-conspirators continued to make plans to stop the presidential power transfer, amass additional weaponry and tactical gear, and prepare themselves to deploy their arms, if necessary, to stop the inauguration of a new president.

Vallejo played a central role in the plot to oppose by force American laws governing the transfer of presidential power. He volunteered to travel across the country to support this plot; stationed himself in a hotel full of firearms, ammunition, and equipment; affirmed his commitment to the mission during the Capitol attack; and expressed support for the plot in the immediate aftermath of the attack. Vallejo, in his own words and actions, was prepared to use force against the government of the United States of America and there is nothing to suggest that he has changed his views.

**A. Co-Conspirators Plan to Forcibly Oppose the Lawful Transfer of Presidential Power**

In November 2020, days after the election, Rhodes, the leader of the Oath Keepers, began disseminating messages to other Oath Keepers members and affiliates delegitimizing the results of the election and encouraging them to forcibly oppose the lawful transfer of presidential power. *See* Indictment at ¶¶ 18(a) (telling those on the "Leadership intel sharing secured" chat (hereafter "Leadership Intel Chat"), on November 5, that they "MUST refuse to accept Biden as a legitimate winner" and warning, "We aren't getting through this without a civil war.  Too late for that. Prepare your mind, body, spirit.").  Rhodes circulated and highlighted an eight-step plan, allegedly from a Serbian contact to overthrow the government, which included: (i) peaceful protest, (ii) complete civil disobedience, (iii) connecting with the police and organizing neighborhoods, (iv) swarming the streets and confronting opponents, (v) gathering in the capitol and discarding barricades, (vi) police joining with the protestors after initial violence, (vii) storming parliament, and (viii) destroying the state media.  *Id.* at ¶ 18.

Rhodes followed this plan in the months after the presidential election.  At his direction, certain members of his organization began preparing for operations inside of Washington, D.C. Indictment at ¶ 21.  He further organized deadly weapons to aid in the conspiracy.  Heavily armed QRF teams would be minutes away, just outside the Capitol, ready to support those on the ground. *Id.* at ¶¶ 42-45.  All contingency plans were considered.  The conspirators even sought to ferry lethal weapons from Virginia by boat into the Capitol, if the bridges were closed.  *Id.* at ¶ 52

In December 2020, Rhodes focused his co-conspirators on the Certification proceeding of January 6, 2021.  During a December 22 interview with a regional Oath Keepers leader, Rhodes described January 6 as "a hard constitutional deadline" for stopping the transfer of presidential power and warned that if President-Elect Biden were to assume the presidency, "We will have to do a bloody, massively bloody revolution against them."  Indictment at ¶ 30.  On December 23,

Rhodes published an open letter on the Oath Keepers website in which he noted that, on January 6, "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C." *Id*. at ¶ 31. Rhodes warned in the open letter that he and others may have to "take to arms in defense of our God given liberty." *Id*.

Rhodes and his co-conspirators created and administered Signal chats with titles like "DC OP: Jan 6 21" and "OKFL Hangout" for coordinating their plans for January 6. Indictment at ¶¶ 38-40. They utilized encrypted messaging applications for these planning chats and stressed the need for operational security. *See, e.g.*, *id.* at ¶ 27. The co-conspirators discussed being prepared to use violence to stop the "usurpers" from taking control and what weapons they would bring and plans for the QRF. *Id.* at ¶ 41-56, 58-60. On December 25, Rhodes wrote to the OKFL Hangout Chat, "I think Congress will screw him [President Trump] over. The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing. But I don't think they will listen." Indictment at ¶ 34. Rhodes went on to say, "And he [President Trump] needs to know that if he fails to act, then we will. He needs to understand that we will have no choice." *Id*. On December 31, one week before the Capitol attack, Rhodes wrote to the Leadership Intel Chat, "There is no standard political or legal way out of this."

### B. Vallejo and His Co-Conspirators Prepared an Armed QRF To Support the Plot to Stop the Transfer of Power

Vallejo and his co-conspirators coordinated at least three regional QRF teams stationed at a Comfort Inn in Arlington, Virginia, to support the co-conspirators' plot and the January 6 Capitol attack. Indictment at ¶¶ 45-49. The QRF teams guarded an arsenal of firearms and related equipment and were prepared to speed those weapons into the hands of co-conspirators on the

ground in Washington, D.C., when directed by Rhodes or other conspiracy leaders. *Id.* Vallejo served on one of those QRF teams.

On December 31, 2020, Vallejo's fellow Arizona QRF team member, PERSON 13, messaged Rhodes on Signal that Vallejo and others were coming to Washington, D.C., and that "everyone has their own technical equipment and knows how to use it," adding a "winky face" emoji. Indictment at ¶ 44. Rhodes responded, "awesome!" *Id*. PERSON 13 also said that Vallejo and the group would have "rifles" and "man power." *Id.*

On January 3, 2021, Rhodes informed a co-conspirator on Signal, "We WILL have a QRF. this situation calls for it." Indictment at ¶ 50. In the following days, co-conspirators communicated and implemented plans to bring weapons to the Comfort Inn. *Id.* at ¶¶ 58-59, 63-65, 68-69. Vallejo messaged co-conspirator and Florida team lead Kelly Meggs, "Sir, Ed Vallejo of Arizona in Tenn. With cadre requesting coordinates to Allied encampment outside DC boundaries to rendezvous. Please respond ASAP. For the Republic." On January 5, Vallejo messaged Meggs again, "Please text location so we will know where to begin in the morning." Meggs responded with the address of the Comfort Inn Ballston, where the co-conspirators staged their multiple QRF teams.

The day before the attack on the Capitol, on January 5, Meggs and his Florida team dropped off at least three luggage carts' worth of gun boxes, rifle cases, and suitcases filled with ammunition with their QRF team. A second QRF team from North Carolina consisted of four men who kept their rifles ready to go in a vehicle parked in the hotel lot. Later, Vallejo and PERSON 13 wheeled in bags and large bins—as seen in the QRF hotel surveillance stills below, showing Vallejo on the left and PERSON 13 on the right:

 

Throughout, Vallejo and other QRF team leaders updated Rhodes on the extent of their weapons stock and apprised him of their readiness to support the operation on January 6.

### C. Co-Conspirators Attack the Capitol with Vallejo and Others Staged Nearby with Firearms as Part of their Plot to Stop the Lawful Transfer of Power

At around 6:30 a.m., on January 6, the day of the attack, Rhodes messaged his co-conspirators before departing from his hotel for Washington, "We will have several well equipped QRFs outside DC.  And there are many, many others, from other groups, who will be watching and waiting on the outside in case of worst case scenarios."  Indictment at ¶ 70.

Around that same time, PERSON 13 and Vallejo spoke on a podcast about their intentions that day.  PERSON 13 stated that he and Vallejo arrived in Washington around noon the prior day, "hooked up with the Oath Keepers and we've bivouacked with them in Arlington."  When asked why they were there, PERSON 13 explained that he and Vallejo "have a little bit of inside information with the powers that would oppose the powers that be."  He continued, "The idea is we're here.  We are applying as much pressure as we can.  The only and obvious next step is to go into armed conflict but hoping very much that that doesn't happen."  When the host asked if that was a credible threat, PERSON 13 explained, "Anything is on the table … the fact is there are

people who are prepared, have the will, have the facilities to do more than taunt.  The question is: Is there a shot heard round the world moment?  The possibility definitely exists."

Vallejo elaborated: "The situation we've got here is … it's a do or die situation.  Because if we walk away from this, and we don't have any effectual change as a result, then we might as well just give up.  We're done.  We're done.  If we don't do something now, we're done.  Because we'll basically have illustrated that we'll do nothing in a tinder box situation, and that's it."  Vallejo added, "The American people are going to be told today that we have liberty and justice for all, or they're going to be told, 'Fuck you.'  Okay?  And if they're told, 'Fuck you,' that's going to be the declaration of a guerilla war."  Vallejo continued, "I'm just praying to God that Trump has his head on fucking straight, he has got the machinations behind him, he's got all the proof in the world, and he's going to bring the fucking hammer down!  That's the only hope, the only chance. If that doesn't happen, then this shit is on."

When the interviewer commented on what he perceived as a broken election system, Vallejo announced his intention to use violence to fix it:

> No that's fine … Because I'm the motherfucker that's gonna fix it for them if they tell me today it's broken … You know what I've been telling people?  I've been telling people for years I'm the guy that everybody said, 'no Ed, you can't shoot them yet, it's too soon.  No Ed, you can't shoot the bastards yet, it's too soon.'  Well I've been telling them for about five, six months ago.  They quit telling me."

Later, Vallejo received word from Rhodes that the Electoral College Certification was going to proceed as required by law, which, in Vallejo's previous own words, was a declaration of "guerilla war."  As a large crowd gathered on the Capitol grounds and converged on the building, Rhodes messaged Vallejo and others on the "DC OP: Jan 6 21" Signal chat: "Pence is doing nothing.  As I predicted. . . .  All I see Trump doing is complaining.  I see no intent by him to do anything.  So the patriots are taking it into their own hands.  They've had enough."  Indictment at

¶ 77.  Around 2:30 p.m., Rhodes explicitly directed his co-conspirators to go to the Capitol.  *Id.* at ¶¶ 88-89.  Moments later, Stack One marched up the east steps of the Capitol, joined the mob that was trying to force the doors open, and breached the building.  *Id.* at ¶¶ 93-95, 97-99.  At that moment, Vallejo stood ready to arm his co-conspirators.  At 2:24 p.m., Vallejo messaged the "DC OP: Jan 6 21" Signal chat, "Vallejo back at hotel and outfitted.  Have 2 trucks available.  Let me know how I can assist."  *Id.* at ¶¶ 86.  Eager to bring weapons into Washington, D.C., Vallejo messaged again at 2:38 p.m., "QRF standing by at hotel.  Just say the word…"  *Id.* at ¶ 96.

Inside the Capitol, half of Stack One tried to force past riot police to the Senate Chamber, but were rebuffed, and the other half went in search of Speaker of the House Nancy Pelosi, but did not find her.  Indictment at ¶¶ 100-106.  Meanwhile, Stack Two, arrived at the Capitol grounds shortly after 2:30 p.m.  *Id.* at ¶ 111.  Stack Two then penetrated the Capitol grounds, marched to the east side doors through which Stack One had entered, and breached the Capitol at approximately 3:15 p.m.  *Id.* at ¶¶ 113-118.  Members of Stack Two tried to force their way into the Rotunda but were expelled by law enforcement officers who had begun clearing the building.  *Id.* at ¶¶ 119-121.  By 3:57 p.m., Vallejo declared "We are at WAR."  He then attempted, but failed, to launch what he had earlier described in the "DC OP: Jan 6 21" Signal chat as a "drone with a 720p cam for recon use."  After they exited the Capitol, members of both Stack One and Stack Two met up with Rhodes and other Oath Keepers members and affiliates just outside the Capitol.  *Id.* at ¶ 124.

Because of the breach of the Capitol, members of the House and Senate were evacuated from their respective chambers at approximately 2:20 p.m.  The Joint Session and the entire official proceeding of the Congress was halted while Capitol Police and other law-enforcement officers worked to restore order and clear the Capitol of the unlawful occupants—including Vallejo's co-

conspirators.  The Joint Session was not able to reconvene until approximately 8:00 p.m.  In the course of the attack, over 100 members of law enforcement were assaulted, and one Capitol Police officer died shortly after being hospitalized in connection with injuries sustained in the attack. Additionally, four citizens died; many media members were assaulted and had cameras and other news-gathering equipment destroyed; and the Capitol suffered millions of dollars in damage— including broken windows and doors, graffiti, and residue of various pepper sprays, tear gas, and fire extinguishers deployed both by crowd members who stormed the Capitol and by law enforcement officers trying to restore order.

### D.  After January 6, Vallejo and his Co-Conspirators Continued Efforts to Forcibly Oppose the Lawful Transfer of Presidential Power

While law enforcement was still securing the perimeter of the Capitol grounds and building, Vallejo and his co-conspirators plotted next steps to ensure they stopped the transfer of presidential power.  At around 4:45 p.m., another individual messaged the "DC OP: Jan 6 21" Signal chat, "so why are we leaving???  It does NO good to go show up and say your there to defend and then just leave."  Vallejo responded, "Leaving?!?  I ain't goin nowhere … My statement was to assure you Arizona won't let anyone walk."  Displaying a disregard for legal orders, Vallejo added, "we will monitor all night and transport anyone that meets us on the perimeter curfew be damned."

Later that evening, at around 7:30 p.m., Rhodes messaged the "DC OP: Jan 6 21" Signal chat, "Thousands of ticked off patriots spontaneously marched on the Capitol .. . .  You ain't seen nothing yet," and, "Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming."  Indictment at ¶ 126(a).  Vallejo pledged, "We'll be back to 6am to *do it again*.  We got food for 30 days."  *Id.* at ¶ 126(b) (emphasis added).  He added, "We have only [begun] to fight! … 'After Action Reports' will be dated 1/21/21," referring to the

day after the Inauguration—identified in the 20th Amendment to the Constitution as the day the President's term ends.  *Id.*  Although law enforcement at the Capitol had successfully repelled the efforts of the conspiracy to take the Capitol on January 6, Vallejo's words make clear that the conspiracy would continue up and through the Presidential inauguration.  Undeterred by the unprecedented violence at the Capitol, Vallejo planned for next steps.

On January 7, at 5:46 a.m.—mere hours after Congress completed the Electoral College Certification vote and the Capitol had been attacked—Vallejo messaged the "DC OP: Jan 6 21" Signal chat, "We are going to probe their defense line right now 6 am they should let us in.  We'll see."  Indictment at ¶ 127.  At 5:54 a.m., he stated, "Departing for Recon now.  Stewart [Rhodes] call me when you're up."  *Id.*  About ten minutes later, Vallejo continued, "I'll depart when cleared by my Commander Sir."  *Id.*  Vallejo then messaged Rhodes personally on Signal, "Status report posted in Ops[,] room extended 1 day[.]  Standing by awaiting orders, Sir."

Later that morning, Vallejo and PERSON 13 reappeared on the same podcast they spoke on the previous day.  Vallejo explained that he and others "got up before dawn, and we went to the Capitol … we did what we needed to do, did our check in, and then we got back here to take care of business."  PERSON 13 added, "We are here, prepared in all aspects, to support the Constitution and honor our Oaths that we took … It's not really plausible to non-violently protest anymore, because the entire area is closed, and cordoned, and curfewed.  So the question becomes, when we realize that this wrong has been done, what are the next steps?  I mean is this the shot heard 'round the world moment?"  When asked on the podcast if he was returning to Arizona, Vallejo remained ready to act explaining, "I don't know.  We've got to figure out what happens on the 20th."  Ultimately, Vallejo noted, "I'm never done … I'm waiting for orders from Stewart Rhodes."

Rhodes and the other co-conspirators were not done either. Rhodes purchased thousands of dollars' worth of firearms, ammunition, and equipment and summoned co-conspirators like Joshua James to his side in Texas. Indictment at ¶¶ 129-130. James collected what he referred to as "all available firearms," and traveled to Texas where he stayed with Rhodes and others. *Id.* On January 10, James sent Meggs a message asking if Meggs and other Florida Oath Keepers were coming to Texas to join him and Rhodes, and Meggs responded, "Fl stays home until shots fired !" *Id.* at ¶ 131.

Vallejo *did* try to join Rhodes in Texas. On January 11, Rhodes messaged Vallejo on Signal, "Ed, what's your 20? You in TX?" Vallejo responded that he had been delayed, and Rhodes noted that he was "up in Ft Worth area." Vallejo replied, "C U there[.] Godspeed Sir." On January 12, Vallejo messaged Rhodes, "We have arrived at the Courthouse." PERSON 13 messaged Rhodes, "Hi Stewart. I'm sure you're busy[] but wanted to let you know that [Vallejo] and I are here … We are excited to learn next steps and would like to know what we should be doing right now." *Id.* at ¶ 132. On January 20, Inauguration Day, James messaged another individual, "After this…if nothing happens…its war…Civil War 2.0." *Id.* at ¶ 133. Around this time, Rhodes messaged others to organize local militias to prepare to forcibly oppose the new administration. *Id.* at ¶ 134.

### E. Co-Conspirators Conceal Evidence of the Conspiracy

Many of Vallejo's co-conspirators also took steps to destroy evidence of their involvement in this conspiracy and discussed securing their communications. In the weeks after January 6, an associate of Rhodes's encouraged various co-conspirators to delete incriminating messages from their phones. The investigation has revealed that numerous co-conspirators deleted evidence from their phones in the weeks after January 6. Rhodes—Vallejo's perceived commander, from whom

he took orders throughout the conspiracy—also messaged with Vallejo about securing his communications from the government. On January 24, less than a week after the first co-conspirators were arrested, Rhodes messaged Vallejo on Signal, "Ed, keep in mind that is NOT a secure chat. Contains at least one turn-coat snitch. Keep that in mind. Please confirm you got this." Vallejo responded that he had received Rhodes's message, expressed that he was innocent, and reminded Rhodes, "[i]f you ever need me for ANYTHING I am on call and am at your service, Sir!"

### F. Vallejo's Continued Threat

One year later, Vallejo continues to believe his and others' actions at the Capitol on January 6 were not unlawful or dangerous. On December 30, 2021, Vallejo retweeted a message stating in part, "There was NO INSURRECTION on J6 just a peaceful protest."[1] And, as recently as January 8, 2022, Vallejo continued to sanitize the Capitol attack and specifically focus on the 2020 Presidential Election, retweeting, "The real insurrection happened in the wee hours of Nov. 4, 2020."[2] Further, Vallejo continues to endorse violence against authorities when he disagrees with actions those authorities take. In December 2021, commenting on vaccine efforts related to the ongoing pandemic, Vallejo threatened: "I HAVE NEWS FOR YOU … you will NEVER achieve 'vaccine equality' as long as I, and others like me, are alive! … I will DIE first, and that's only when I run out of AMMUNITION!"[3]

---

[1] *See* https://twitter.com/Starryder10/status/1476647037491769344.
[2] *See* https://twitter.com/beachlvr21399/status/1479832036160548866.
[3] *See* https://twitter.com/Psychictaxi/status/1476565450150449153.

IV.    **Argument**

Pursuant to 18 U.S.C. § 3142(a), when a defendant is arrested, the Court, in relevant part, "shall issue an order that, pending trial, the person be (1) released on personal recognizance . . . ; (2) released on a condition or a combination of conditions . . . ; or (4) detained under subsection (e)." Detaining a defendant under Section 3142(e) requires a hearing "pursuant to the provisions of subsection (f)." *Id.* at § 3142(e). The evidence outlined above makes plain that Vallejo should be detained pending trial.

A.  **Bases for Detention Request**

According to Section 3142(f), there are limited circumstances in which the Court "shall hold a hearing to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f); *see also United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003). Here, three of those circumstances apply: Subsection (f)(1)(E) (case that involves a felony "that involves the possession or use of a firearm, destructive device … or any other dangerous weapon"), 3142(f)(2)(A) (case that involves "a serious risk that [the defendant] will flee"), and 3142(f)(2)(B) (case that involves "a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror"). All three bases for a detention hearing are supported by the evidence outlined above.

First, this case involves the possession and use of firearms. Section 3142(f)(1)(E) mandates a detention hearing in connection with "any felony" if the Government proves by a preponderance of the evidence that the charged felony "involves the possession or use of a firearm or destructive device[.]" In determining whether the charged felony "involves the possession or use of a

firearm," the Court "may consider the actual conduct at issue in the specific case," and not just whether the elements of the charged offenses required the possession or use of a firearm. *United States v. Watkins*, 940 F.3d 152, 166 (2d Cir. 2019).[4] Here, the conspiracy involved the planning and coordination of QRF teams armed with an arsenal of firearms that Vallejo and others would bring to co-conspirators on the ground at the direction of Rhodes or other leaders of the conspiracy. Accordingly, this case involves the possession and use of firearms, and Section 3142(f)(1)(E) is an appropriate basis for a detention hearing.

Second, this case also involves a serious risk of flight as defined in 18 U.S.C. § 3142(f)(2)(A). Vallejo is facing potential conviction on numerous felony offenses that each carry statutory maximum penalties of up to twenty years of incarceration. He is alleged to have participated in a conspiracy to oppose the lawful transfer of presidential power by force, making it inherently unlikely that he will be willing to comply with conditions of release set by this

_____

[4] In an analogous context interpreting Section 3142(f)(1)(A), the Fifth Circuit held that "it is not necessary that the *charged offense* be a crime of violence; only that the *case involve* a crime of violence or any one or more of the § 3142(f) factors." *United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992) (emphasis in original). In *Byrd*, the court held that the government could have met (but did not) its burden under Section 3142(f) by showing that the nonviolent charged offense—receiving a videotape depicting minors engaged in sexually explicit activity—was accompanied by actual violent criminal activity such as child molestation.

In *United States v. Singleton*, 182 F.3d 7 (D.C. Cir. 1999), this Circuit took a different, categorial approach to the question of whether an offense is a "crime of violence" under Section 3142(f)(1)(A), holding that it is "a question of law to which the underlying facts of a particular case are irrelevant." 182 F.3d at 12. But the *Singleton* court reached this conclusion by focusing on the definition of "crime of violence" in 3156(4), in which that term means in the first instance "an offense." *Id.* *Singleton* was statutorily overruled by the Adam Walsh Child Protection and Safety Act of 2006, PL 109-248, 120 Stat 587, at sec. 216 (July 27, 2006), which added subsection (E) to 3142(f)(1). In adding subsection (E), Congress opted to not use the term "offense," which is the triggering mechanism in subsections 3142(f)(1)(A) through (D), but rather opted for the more expansive term "involves." The Second Circuit relied on this legislative history in *Watkins* in finding that "Congress clearly intended for courts to pierce the veil of the charged offense and consider the conduct underlying the offense, including who was harmed and whether any firearms were used in the course of committing the offense," to establish a basis for detention. 940 F.3d 166.

government.  Additionally, Vallejo resides in a compound-like structure surrounded by barbed-wire fences and demonstrated in January 2021 that he is willing and capable of preparing and storing months' worth of food at a time.  If Vallejo repudiates the Court's authority and his conditions of release the way he forcibly repudiated the laws of the United States, he has the means and capability of bunkering down and refusing to appear for court-ordered hearings.  These factors all combine to give Vallejo the incentive and means to flee and attempt to evade prosecution.

Finally, this case also involves a risk of tampering with witnesses and evidence and obstructing justice.  As described above, Vallejo's co-conspirators went to great efforts to delete key communications regarding this conspiracy and to convince others to do the same—to include Rhodes, for whom Vallejo would do "ANYTHING."   Further, Vallejo is alleged to have participated in arguably one of the most consequential obstruction efforts in the history of the United States.  He is charged in part with plotting to oppose the government's laws by force and with obstructing, influencing, or impeding any official proceeding—here, the congressional proceedings to certify the 2020 United States Presidential Election.  A defendant willing to take these extraordinary steps to obstruct the certification of a presidential election surely poses a serious risk of obstructing justice or intimidating witnesses involved in his own criminal case.

Under any of those three bases—firearms, flight, and obstruction—a detention hearing is warranted.  And together, those three features illustrate the need to detain Vallejo pending trial to protect the community, ensure his return to court, and safeguard the integrity of evidence and the proceedings in this case.

### B.  Analysis

The Court must consider four factors to determine whether pretrial detention is warranted and necessary: (1) the nature and circumstances of the offense charged, including whether, for

example, the offense is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).  The burden of persuasion rests with the government.  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).  A judicial officer's finding of dangerousness must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f); *Stone*, 608 F.3d at 945.  When "risk of flight" is the basis for detention, however, the government must only satisfy a preponderance of the evidence standard.  *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996); *United States v. Chimurenga*, 760 F.2d 400, 405-06 (2d Cir. 1985); *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985); *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985); *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  An analysis of these four factors weighs heavily in favor of Vallejo's detention given the clear and convincing evidence that he presents a particular danger to the community as well as the preponderance of evidence that he poses a serious risk of flight and of obstructing justice.

### 1.  Vallejo's Criminal Activity was Extreme and Serious

A grand jury has found probable cause to charge Vallejo with participating in a conspiracy to forcibly oppose the lawful transfer of presidential power in the United States.  It is difficult to imagine conduct that poses a graver risk to our society than one targeted at undermining the laws and procedures at the heart of our democratic process—and doing so with force.  *See United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021) ("[T]o order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community.  The threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'") (quoting *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir.

1988)).  As described in greater detail above and in the indictment, Vallejo volunteered to participate; he drove thousands of miles across the country with firearms, ammunition, and equipment; he participated in planning meetings and chats on encrypted messaging applications; he made clear on the morning of January 6 that he was willing and prepared to do more than "taunt" and engage in a "guerilla war"; he prepared to quickly transport firearms and gear to co-conspirators on the ground who were, at that time, attacking the Capitol; and he continued the mission before the dust had even settled by "probing" the Capitol and conducting "Recon" on January 7.  This factor weighs in favor of detention.

The defense argues that the defendants' participation in the attack on the Capitol was a one-time, spontaneous act and that Vallejo's role was minimal. ECF 102 at 22. Neither assertion is true. Following the January 6 riots, Vallejo and his co-defendants continued to plot to oppose the execution of the laws governing the transfer of presidential power.  In the weeks after January 6, Rhodes purchased tens of thousands of dollars in weapons and ammunition. Indictment at ¶¶ 129-130. On January 11, Rhodes told his co-conspirators to "Get ready to rock and roll, shit's about to go down," and called upon those who were fit enough to move, shoot, and communicate to get organized and be prepared to do so. ECF No. 40 at 11, Ex. 1 (page 43). That same day, Rhodes messaged Vallejo on Signal, "Ed, what's your 20?  You in TX?"  Vallejo responded that he had been delayed, and Rhodes noted that he was "up in Ft Worth area."  Vallejo replied, "C U there[.]  Godspeed Sir."

With respect to Vallejo's role, it was far from minor.  He took responsibility for speeding firearms and related equipment into the hands of co-conspirators on the ground, if needed to achieve the goals of the conspiracy. Indictment at ¶ 12. When it became clear that the Capitol was under attack, Vallejo sought to be activated, sending messages to the "DC OP: Jan 6 21" Signal

chat stating, "Vallejo back at hotel and outfitted.  Have 2 trucks available.  Let me know how I can assist." And "QRF standing by at hotel.  Just say the word…." *Id.* at ¶¶ 86, 96.

Finally, the defense compares Vallejo's actions against those who breached the Capitol and received probationary sentences, and defendant Thomas Caldwell, who plotted to transport weapons by boat into the Capitol but was released by this Court. ECF 102 at 23. Again, the defense wholly minimizes Vallejo's conduct. Vallejo offered to provide armed support to dozens of conspirators who had trained together. His conduct is far more severe than a single individual entering the Capitol. With respect to defendant Caldwell, the government sought his detention and believed his role in organizing the QRF, participating in the conspiracy, and breaching the Capitol grounds during the January 6 attack demonstrated a danger to the community and to our democratic system of government that could not be protected against by any conditions of release. The government's evidence regarding the QRF was less well developed at the time this Court considered Defendant's Caldwell's detention, however. Since that time, the government has confirmed, through cooperating witness and defendant testimony that the QRF teams staffed by Defendant Vallejo and others contained multiple luggage carts' worth of firearms, ammunition, and related equipment. These same witnesses and cooperating defendants confirmed that the conspirators' plan was for the QRF members to transport this arsenal into Washington, D.C., if called to do so by Stewart Rhodes or other leaders of the conspiracy. That Vallejo signed up for a role in this QRF and sought to fulfill this role while knowing the Capitol was under attack cast him in a very different light than that in which co-defendant Caldwell was placed when this Court considered his detention.

The defense's remaining arguments can be dismissed easily. They argue that the circumstances of the seditious conspiracy are "time bound" because the presidential transition of

power went forth in January 2021. ECF 102 at 23. However, the defense points to no evidence citing that the conspirators have renounced their overarching goals of overturning the 2020 election. Indeed, Vallejo has continued to claim on Twitter that the real insurrection occurred on election day. *See supra* at 13. Although it would be impossible for the defendants to engage in the same conspiracy because the presidential transfer of power is complete, there is absolutely no evidence that Vallejo and his co-conspirators would not participate in a different seditious conspiracy to achieve their continued overarching goals.

### 2.  The Weight of the Evidence Against Vallejo is Strong[5]

Vallejo's dangerousness is chronicled in his written and recorded communications; corroborated by his conduct before, during, and after January 6; buttressed by his obstruction efforts; and reinforced by the indisputable success of his and his co-conspirators' plot where, most alarmingly, dozens of Oath Keepers gathered in the Washington area on January 6 to participate in an attack on the Capitol featuring two military-style stacks and an armed QRF that he participated in, which forced the Certification of a Presidential Election to be delayed.

Vallejo's actions and words speak for themselves.  His electronic and recorded communications show he was an active participant in the seditious conspiracy, willing and able to penetrate Washington, D.C., with an arsenal of firepower and equipment to arm his fellow co-conspirators to stop the transfer of power.  Casting the struggle for control of the White House in existential terms—repeatedly using terms like "WAR" and "guerilla war" to describe the path forward—Vallejo emphasized that he and his co-conspirators may have no choice but to take up arms to stop the next administration from taking power.  Then he traveled across the country to the Washington, D.C., metropolitan area, with firearms and ammunition and wheeled multiple

---

[5] "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948 (citation omitted).

large bins of equipment into the QRF hotel, ready to take matters into his own hands.  And, on January 6, Vallejo actively sought to join his co-conspirators' attack on the Capitol and did in fact support it: when his co-conspirators breached the Capitol, pivotal moments in the January 6 attack, they did so knowing they had Vallejo and other QRF teams supporting them just across the river with an arsenal.

Vallejo did not stop there.  On the night of the attack, Vallejo was not deterred by the law enforcement presence or violence that marred the day, but rather he told his co-conspirators he was ready "to *do it again*."  Shortly after the Congressional proceedings finally concluded in the early morning hours of January 7, Vallejo was already probing defenses and conducting reconnaissance around the Capitol to report back to Rhodes and his co-conspirators.  Indeed, Vallejo was prepared for a prolonged attack with a months' worth of food and was already targeting the next constitutional benchmark of January 20, Inauguration Day: "We have only [begun] to fight! … After Action Reports' will be dated 1/21/21."  Vallejo was prepared to use force to stop this country's presidential transfer.  There is no reasonable basis to believe this defendant would abide by any conditions of release.

Vallejo displayed a willingness to continue his criminal activity and loyalty to Rhodes after January 6.  Within a week of the attack, Vallejo was already trying to learn next steps and to reconnect with Rhodes in Texas, where Rhodes had begun amassing other co-conspirators and thousands of dollars of firearms and tactical equipment.  Vallejo told his commander and the leader of the co-conspirators' attack on the Capitol that he was on call and at Rhodes's service if he needed "ANYTHING," displaying a continued willingness to engage in dangerous, illegal behavior.  Meanwhile, Rhodes continued to encourage his followers to forcibly oppose the government—on January 28, for example, Rhodes appeared on the "Infowars" program and told

listeners they need to treat the Biden Administration as an "occupying enemy force." Far from disavowing Rhodes or any intentions to forcefully oppose the United States, Vallejo messaged Rhodes as late as March 2021 agreeing to join a new Signal group chat and confirming to Rhodes that he understood the importance of secure communications.

The defense has creatively sought to provide alternative, improbable explanations for Vallejo's inculpatory statements. These arguments are weak. For example, when Vallejo identified himself as the QRF and "outfitted" with two trucks, the defense claims that Vallejo was literally speaking about his outfit at the time. ECF 102 at 26. It remains wholly unclear why the remainder of the conspirators, who were present and actively breaching the Capitol at the time, would care what attire Vallejo was wearing. Instead, the much more probable explanation, is that Vallejo's use of "outfitted" pertained to the cache of weapons that he, as part of the QRF, guarded. This explanation is consistent with Vallejo's statement earlier in the day concerning guerilla war. Vallejo conditioned war on the certification of the electoral college vote, which became a forgone conclusion with Vice President Pence's declaration on the afternoon of January 6 that he had no lawful means to intervene. *See* supra at 9 (Rhodes: "Pence is doing nothing"). The court can find further confirmation in Vallejo's "We are at WAR" declaration on the evening of January 6. Wars demand guns, not clothes.

When it becomes impossible to find alternative meanings for Vallejo's violent statements, the defense claims that Vallejo is merely being "humorous," "overly jargoned,"[6] or speaking "jokingly." ECF 102 at 28, 13. The court should, however, take Vallejo at his words. Vallejo drove thousands of miles across the country. He guarded a cache of weapons just a few miles from the Capitol. He attempted to launch a drone as the military resecured the Capitol on January 6. There

---

[6] Vallejo served in the military for 13 months in 1977-1978 before receiving an honorable discharge.

is simply no evidence that Vallejo's words were overly bombastic. They were consistent with his actions.

The defense also relies on the statements of Vallejo's Arizona travel companion and fellow Arizona QRF member, PERSON 13, as a "credible" witness who claims Vallejo had no contact with the weapons. ECF 102 at 29. PERSON 13's statements are consistently incredible. For example, while caravanning across the country with Vallejo, PERSON 13, in addition to messaging Rhodes that the Arizona contingent were "rifles" for the President also messaged Rhodes, "Hi Stewart, Ed Vallejo wants to be a speaker. We are requesting a slot for him. We need to now (sic) where staging is going to be for technical equipment and 'supplies.'" Exhibit 3 at 4. Initially, when questioned by law enforcement in the months after the riots, PERSON 13 lied and stated that he did not know Vallejo's name, before later admitting that he knew Vallejo for many years. Exhibit 2 at 1. Despite both the overt and barely disguised references to weapons, PERSON 13 also told investigators that he never saw any weapons, had no knowledge what was inside the bags and totes that he was guarding at the hotel, and was wholly unaware the meaning of "QRF." Exhibit 2 at 2. PERSON 13 then revised his statements again. In an additional follow up interview, PERSON 13 stated that he had previously had a stroke and now remembered transporting at least one personal weapon with him. Exhibit 3 at 1. When asked about his message to Rhodes concerning "supplies," Person 13 stated that he may have been talking about a "six pack" of beer.[7] Exhibit 3 at 4-5. PERSON 13 also admitted to being in a signal group titled "QRF" but stated that he thought the group was for making "dinner plans." Exhibit 3 at 2. Given PERSON 13's wildly inconsistent statements and alleged stroke affecting his memory, the Court should not rely on him.[8]

---

[7] Unexplained, of course, is why PRESON 13 would place quotation marks around "supplies" if he truly referred to a six pack of beer, which is legal.

[8] Defense also relies on a published news article where various members of multiple QRFs provided interviews. *See* Defense Exhibit 12. The government can outline prior statements and messages for many of the individuals quoted

Finally, the defense claims that Vallejo was unaware of who was actually attacking the Capitol when he offered via Signal to transport the "outfitted" pickup trucks into the city and that it may have been Antifa. ECF 102 at 12. However, the messages sent by Rhodes (i.e. Vallejo's commander) to the chats in which Vallejo participated were clear: Antifa was uninvolved. Between 1:25 and 1:36 PM, Rhodes stated, "Pence is doing nothing. As I predicted….All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough." *See* Defense Exhibit 8 at 76. At 2:41 p.m., Rhodes sent a photograph to the chat showing riots at the Capitol with the message, "South side of US Capitol.  Patriots pounding on doors[.]" When another member of the chat stated, "We own that fucking building and keep charging," Rhodes added, "Pissed off patriots.  Come  to the South side.  Just left of dome." Later, at 6:24 PM, after the Capitol had been re-secured, Rhodes declared, "Look, I WAS THERE. I WAS RIGHT OUTSIDE. Patriots stormed in. Not Antifa. And I don't blame them. They were justifiably pissed off." *Id.* at 90. Kelly Meggs stated at 6:36 PM, "We are now the enemy of the state." *Id.* In reply, four minutes later, Vallejo stated that he had attempted to launch a drone, presumably to spy on the state that Meggs said he was now an enemy of (i.e. the United States government). *Id.* at 91. Any post facto Antifa confusion defense is inconsistent with the actual communications Vallejo received from Rhodes and Meggs on January 6.

There is overwhelming evidence that Vallejo participated in a plot to oppose by force the execution of the laws of the United States and that he possesses the willingness and capacity to continue to engage in criminal conduct.  Under these circumstances, only pretrial detention can protect the community from the danger Vallejo poses.

### 3.  History and Characteristics of Vallejo

---

in the article to rebut their public statements. However, these issues, at this stage of the proceeding, do not pertain directly to Vallejo's dangerousness.

Vallejo's history and characteristics animate the conclusions drawn from the facts above. Vallejo, who previously served in the United States Army, used his military training to participate in an attack on our core democratic traditions. Nothing in his post-January 6 statements or conduct suggest he would refrain from doing it again if he felt his vision of what is necessary was threatened. In fact, he said so himself on the night of January 6, in the hopes his co-conspirators would join him through the Inauguration. There is every reason to credit Vallejo's own words and deeds and fear that he would plan additional violence if not detained.

Vallejo's social media posts up to just this week only accentuate that concern. He continues to threaten to use firearms against authority when he disagrees with that authority, recently messaging that he would "DIE first" before accepting any vaccines related to the ongoing pandemic and "only when I run out of AMMUNITION!" And, as recently as this week, Vallejo continued to operate as if what he and his co-conspirators did was not unlawful or dangerous, calling the Capitol attack a "peaceful protest" and referring to the 2020 Presidential Election as the "real insurrection." Vallejo's ongoing willingness and capacity to use firearms on authorities with which he disagrees establishes that no release condition can ensure the safety of the community.

The defense presents numerous anecdotal comments from individuals who state that they have known Vallejo for years and can speak to his peaceful loving character. ECF 102 at 4 (e.g. "I've never seen him get angry, act violent..."). These testimonials should be dismissed. According to Vallejo himself, he had been advocating for political violence well prior to January 6. *See* supra at 8 ("I've been telling people for years I'm the guy that everybody said, 'no Ed, you can't shoot them yet, it's too soon. No Ed, you can't shoot the bastards yet, it's too soon.' Well I've been telling them for about five, six months ago. They quit telling me."). None of the individuals cited by defense address Vallejo's self-declared long running continued interest in

violent political action. Further, Vallejo admits that his community no longer implores him to restrain his violent aspirations. Indeed, once the community stopped telling Vallejo to refrain from violence, he drove across the country, guarded an arsenal of weapons just miles from the Capitol, and then offered to transport those weapons into the Capitol during an unprecedented riot. Vallejo, unshackled by whatever community guardrails that once existed, remains a violent danger. The court need not look further than his own words.

### 4. Vallejo's Danger to the Community and Risk of Flight and Obstruction if Released

Finally, Vallejo is a danger to the community and presents a risk of flight and obstruction of justice.  He participated in a conspiracy to oppose by force the lawful transfer of presidential power and an attack on the United States Capitol in furtherance of this plot.  Moreover, Vallejo supported his co-conspirators' attack on the Capitol by serving as an armed QRF standing ready at a moment's notice to ferry an arsenal of firearms into their hands.  That Vallejo's co-conspirators did not activate him on January 6 does not mitigate his dangerousness.  Vallejo traveled across the country and staged himself near the congressional proceedings ready to transport firearms and equipment into the nation's capital.  That is what makes him a danger.  And there is no evidence that he has renounced violence or that he no longer believes in the necessity of guerilla warfare after January 6 ("We'll be back to 6am to do it again," and retweeting this month, "The real Insurrection happened in the wee hours of January 4, 2020").  That is what makes him a danger *today*.

Similarly, the evidence and seriousness of the charged offenses give Vallejo every incentive to flee and avoid prosecution.  And inherent in his alleged actions is his willingness to obstruct formal proceedings that he opposes, including a presidential election, so there is no reason

to believe the defendant will treat his criminal case differently.  His words were deliberate, his deeds were calculated, and his intent was criminal, dangerous, and obstructive.

## V.    <u>Conclusion</u>

A grand jury has found probable cause to believe that Vallejo participated in a plot to oppose by force the execution of the laws governing the transfer of presidential power—including an attack on the Congress while it reviewed the election results.  In so doing, Vallejo showed a contempt for the laws and Constitution of this country that make it impossible to trust that he would comply with any conditions fashioned by this Court for his release.  Vallejo must continue to be detained pending trial to protect the safety of the community, ensure his return to court, and safeguard the integrity of the evidence and proceedings in this case.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


*/s/ Louis Manzo*
By:   Louis Manzo
Special Assistant United States Attorney
Massachusetts Bar No. 688337
Ahmed M. Baset
Troy Edwards
Jeffrey S. Nestler
Kathryn Rakoczy
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

*/s/ Alexandra Hughes*
Alexandra Hughes
Justin Sher
Trial Attorneys

National Security Division
United States Department of Justice
950 Pennsylvania Avenue
NW Washington, D.C. 20004


Dated:  April 25, 2022