**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 22-cr-15-APM** |
| | : | |
| **v.** | : | |
| | : | |
| **ELMER STEWART RHODES III,** | : | |
| | : | |
| **KELLY MEGGS,** | : | |
| | : | |
| **KENNETH HARRELSON,** | : | |
| | : | |
| **JESSICA WATKINS,** | : | |
| | : | |
| **ROBERTO MINUTA,** | : | |
| | : | |
| **JOSEPH HACKETT,** | : | |
| | : | |
| **DAVID MOERSCHEL,** | : | |
| | : | |
| **THOMAS CALDWELL, and** | : | |
| | : | |
| **EDWARD VALLEJO,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |
| | : | |

**UNITED STATES' RESPONSE TO DEFENDANTS' MOTIONS**
**TO DISMISS COUNTS ONE THROUGH FOUR OF THE INDICTMENT**

The United States respectfully opposes the defendants' motions to dismiss Counts One

through Four of the Indictment (ECF Nos. 82, 84, 89, 95). The Indictment alleges that the

defendants joined and took acts in furtherance of a plot to use force to prevent, hinder, or delay the

execution of specific laws and provisions of the Constitution of the United States governing the

transfer of presidential power, including an attack on the United States Capitol on January 6, 2021.

The Indictment pleads facts and allegations that are specific enough to provide notice and that are

sufficient to state an offense.  Accordingly, the defendants' motions to dismiss should be denied.

## I.    **Factual Background**

As described in the opening paragraph of the Indictment, the United States Constitution and federal statutes codify the procedures and dates governing the transfer of presidential power in the United States.  ECF No. 1 at ¶ 1.  The Twelfth Amendment requires presidential electors to meet in their respective states and certify "distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each."  *Id.*  It further requires that the President of the Senate (that is, the Vice President of the United States, *see* U.S. Const. art. I, § 3, cl. 4) "shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."  ECF No. 1 at ¶ 1.  Federal law provides that the United States Congress must convene during a joint session proceeding ("the Joint Session") at 1:00 p.m. "on the sixth day of January succeeding every meeting of the electors," with the President of the Senate presiding, to count the electoral votes, resolve any objections, certify their validity, and announce the result ("Certification of the Electoral College vote").  *Id.* (citing 3 U.S.C. § 15).  The Twentieth Amendment provides that the terms of the President and Vice President shall end at noon on the 20th day of January, "and the terms of their successors shall then begin."  *Id.*

The conspiracy charged in Count One of the Indictment alleges a plot to oppose by force the execution of the laws and provisions of the Constitution governing the transfer of presidential power in the United States.  The Indictment alleges that days after the 2020 U.S. Presidential Election, Stewart Rhodes began disseminating messages to Oath Keepers members and affiliates delegitimizing the results of the election and encouraging members and affiliates of his organization to forcibly oppose the lawful transfer of presidential power from former President Trump to President Biden.  *See* ECF No. 1 at ¶ 18(a) (telling those on the "Leadership intel sharing

secured" chat ("Leadership Intel Chat"), on November 5, 2020, that they "MUST refuse to accept Biden as a legitimate winner" and warning, "We aren't getting through this without a civil war. Too late for that.  Prepare your mind, body, spirit."); *id.* ¶ 18(b) (posting to the Oath Keepers' website a document that described a plan for violent regime change in Serbia that included "[m]illions gather[ing] in our capital," breaking through barricades, and storming the legislature). At Rhodes's direction, several co-conspirators who served as regional leaders of the Oath Keepers began recruiting others into the conspiracy, *id.* at ¶ 20, and preparing for operations inside Washington, D.C., *id.* at ¶ 21.  Those plans included preparing multiple ways to deploy force to achieve their aim of stopping the transfer of presidential power, including the organization of armed "quick reaction force" or "QRF" teams to support those on the ground.  *Id.* at ¶¶ 4, 42-45.

In December 2020, Rhodes focused his co-conspirators on the Certification proceeding set to take place on January 6, 2021.  During a December 22 interview with a regional Oath Keepers leader, Rhodes described January 6 as "a hard constitutional deadline" for stopping the transfer of presidential power and warned that if President-Elect Biden were to assume the presidency, "We will have to do a bloody, massively bloody revolution against them."  ECF No. 1 at ¶ 30.  On December 23, Rhodes published an open letter on the Oath Keepers website in which he noted that, on January 6, 2021, "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C."  *Id.* at ¶ 31.  Rhodes warned in the open letter that he and others may have to "take to arms in defense of our God given liberty."  *Id.*

Rhodes and his co-conspirators created and administered chats on the Signal platform with titles like "DC OP: Jan 6 21" and "OK FL DC OP Jan 6" for coordinating their plans for January 6.  ECF No. 1 at ¶¶ 38-40.  On these chats, they discussed, among other topics, what weapons they

would bring and plans for the QRF. *Id.* at ¶¶ 41-56, 58-60. They used encrypted messaging applications for these planning chats and stressed the need for operational security. *See, e.g.*, *id.* at ¶ 27. On December 25, Kelly Meggs messaged an encrypted Signal group chat titled "OKFL Hangout," in reference to the January 6 Joint Session, "We need to make those senators very uncomfortable with all of us being a few hundred feet away." *Id.* at ¶ 34. Rhodes wrote in the same chat, "I think Congress will screw him [President Trump] over. The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing. But I don't think they will listen." *Id.*

When the co-conspirators arrived in the Washington, D.C., metropolitan area on January 5, 2021, most of the defendants dropped off firearms, ammunition, and tactical equipment with members of the QRF at a hotel in northern Virginia that Thomas Caldwell had identified. ECF No. 1 at ¶¶ 45, 68-69. Caldwell explored the idea of using boats to surreptitiously transport members of the QRF across the Potomac River into D.C. *Id.* at ¶ 53. On the morning of January 6, Rhodes messaged a Signal chat of co-conspirators, "We will have several well equipped QRFs outside DC. And there are many, many others, from other groups, who will be watching and waiting on the outside in case of worst case scenarios." *Id.* at ¶ 70. Around that same time, Edward Vallejo and another QRF member spoke on a podcast in which they discussed the possibility of "armed conflict" and "guerilla war" and explained that "there are people who are prepared, have the will, have the facilities to do more than taunt." *Id.* at ¶ 71.

On January 6, as a large crowd gathered on the Capitol grounds and converged on the building, an Oath Keeper affiliate on the "Leadership Intel Chat" claimed that "Antifa" had breached the Capitol. ECF No. 1 at ¶ 77. Rhodes replied: "Nope. I'm right here. These are Patriots." *Id.* He elaborated on a different chat that Vice President Pence—who was presiding

over the counting of electoral votes in Congress in his capacity as President of the Senate—was "doing nothing. As I predicted. . . . All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough." *Id.* Meanwhile, on yet another encrypted, invitation-only group chat titled "Jan 5/6 DC Op Intel team," which included Rhodes, co-conspirator Joshua James, and others, a participant posted a link to a video titled "live stream of patriots storming capital," and another participant asked, "Are they actually Patriots - not those who were going to go in disguise as Patriots and cause trouble[?]" *Id.* at ¶ 79. Rhodes responded, "Actual Patriots. Pissed off patriots[.] Like the Sons of Liberty were pissed off patriots[.]" *Id.* James and several co-conspirators (including Roberto Minuta and Brian Ulrich) then headed toward the Capitol. *Id.*

Around 2:30 p.m. on January 6, Rhodes explicitly directed his co-conspirators to go to the Capitol. ECF No. 1 at ¶¶ 88-89. Rhodes then spoke with Meggs. *Id.* at ¶ 92. Moments later, a group of the defendants in stack formation ("Stack One") marched up the east steps of the Capitol, joined the mob that was trying to force the doors open, and breached the building. *Id.* at ¶¶ 93-95, 97-99. Once inside, half of Stack One was rebuffed as they tried to force their way past riot police to the Senate Chamber; the other half went in search of Speaker of the House Nancy Pelosi. *Id.* at ¶¶ 100-106. Meanwhile, another group of the defendants ("Stack Two"), led by James and Minuta, arrived at the Capitol grounds shortly after 2:30 p.m. *Id.* at ¶ 111. Stack Two then penetrated the restricted Capitol grounds, marched to the east side doors through which Stack One had entered, and breached the Capitol at approximately 3:15 p.m. *Id.* at ¶¶ 113-118. Members of Stack Two tried to force their way into the Rotunda but were expelled by riot police officers who had begun clearing the building. *Id.* at ¶¶ 119-121. After they left the Capitol, members of both Stack One

and Stack Two met up with Rhodes and other Oath Keeper members and affiliates just outside the Capitol. *Id.* at ¶ 124.

On the evening of January 6, Rhodes gathered some of his co-conspirators at a restaurant to celebrate their attack on the Capitol and discuss next steps. ECF No. 1 at ¶ 125.  Rhodes also sent messages to the "DC OP: Jan 6 21" Signal chat, including: "Thousands of ticked off patriots spontaneously marched on the Capitol. . . .  You ain't seen nothing yet," and, "Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming." *Id.* at ¶ 126.

In the weeks after January 6, Rhodes purchased a large arsenal of firearms and tactical equipment.  ECF No. 1 at ¶ 129.  In total, during the two-week period from the January 6 attack to the January 20 Inauguration, Rhodes spent more than $17,000 on firearms and related equipment. *Id.*  Rhodes also summoned co-conspirators to join him in Texas.  *Id.* at ¶ 130.  James collected what he referred to as "all available firearms" and traveled to Texas where he stayed with Rhodes and others.  *Id.*  On January 10, James sent Meggs a message asking if Meggs and other Florida Oath Keepers were coming to Texas to join him and Rhodes, and Meggs responded, "Fl stays home until shots fired !"  *Id.* at ¶ 131.

## II.   **Procedural Background**

On January 12, 2022, the grand jury returned an indictment charging all defendants with seditious conspiracy, in violation of 18 U.S.C. § 2384 (Count One); conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Two); obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Three); and conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Four).  ECF No. 1.  Some defendants were additionally

charged with destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361 and 2; civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2; assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1); and tampering with documents or other objects and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(1) and 2. *Id.* The Indictment alleges that the purpose of the seditious conspiracy charged in Count One was "to oppose the lawful transfer of presidential power by force, by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code*." Id.* at ¶ 16. Referencing the acts in furtherance of the seditious conspiracy charged in Count One, the Indictment further alleges that the defendants and their co-conspirators conspired to and did obstruct, influence, and impede the Certification of the Electoral College vote (Counts Two and Three) and prevent by force, intimidation, and threat the Members of the United States Congress from discharging their duties on January 6, 2021 (Count Four). *Id.* at ¶¶ 136, 138, 140.

All defendants except Rhodes and Vallejo were previously charged in the related case of *United States v. Thomas Caldwell*, *et al.*, 21-cr-28. There, the parties litigated several motions to dismiss, which this Court denied (*Caldwell* ECF No. 558). When this case was indicted, the Court adopted its substantive rulings in the *Caldwell* case as the law of this case. ECF No. 8.

On April 12, 2022, Caldwell moved to dismiss Counts One through Four of the Indictment in this case. ECF No. 84. All defendants have joined Caldwell's motion. *See* ECF Nos. 81 (Meggs), 83 (Minuta), 87 (Moerschel), 89/96 (Hackett), 92 (Watkins), 97 (Rhodes), 103 (Harrelson), and 115 (Vallejo). In particular, Caldwell argues that (1) Count One, seditious conspiracy, fails to allege that the defendants conspired to forcibly obstruct a person duly

authorized to execute the laws of the United States; (2) Counts Two and Three, which charge conspiracy and obstruction of an official proceeding, do not state offenses because they do not allege obstructive acts related to the spoliation of tangible evidence; and (3) Count Four alleges a conspiracy to prevent members of Congress from discharging their duties on January 6, but members of Congress are not "officers" and do not discharge the duties of any "office, trust, or place of confidence under the United States" for purposes of 18 U.S.C. § 372.  ECF No. 84.

Three defendants filed additional motions that supplement Caldwell's motion to dismiss Counts One through Four, and these supplemental motions were joined by a variety of defendants:

1.     Meggs filed his own motion to dismiss Count One, in which he appears to argue that it is impossible to oppose the transfer of presidential power because the transfer occurs under the Constitution automatically.  ECF No. 82-1 at 6-11.  Meggs also contends that to the extent the Indictment alleges that part or all of the plan to oppose by force the execution of the laws involved requesting and then responding to an invocation of the Insurrection Act by President Trump, such an allegation would fail to state an offense because it would allege an agreement to commit a lawful act.  *Id.* at 12-15.  Finally, Meggs seeks to strike as surplusage what he deems "immaterial" allegations in the Indictment .  *Id.* at 11-12.  Caldwell, Watkins, Rhodes, and Vallejo have joined Meggs's motion.  ECF Nos. 86, 92, 99, 115.

2.     Hackett filed his own motion to dismiss Counts One through Four, in which he contends that the Indictment must be dismissed because it lacks specificity and fails to adequately inform Hackett of the nature and cause of the accusation as required by the Sixth Amendment of the U.S. Constitution.  ECF No. 89.  Defendant Vallejo joined this motion.  ECF No. 115.

3.      Vallejo filed his own motion to dismiss Count One and to strike surplusage, in which he (1) appears to join and supplement Caldwell's arguments that Count One fails to sufficiently allege a conspiracy to interfere with the execution of the laws, and (2) argues that, to the extent Count One charges a conspiracy to oppose by force the execution of the "laws governing the transfer of power," Count One fails to provide sufficient notice under Federal Rule of Criminal Procedure 7.  ECF No. 95.  Defendants Hackett, Rhodes, Watkins, Ulrich, and Minuta joined this motion.  ECF No. 96, 97, 98, 100, 101.

A hearing on these motions is scheduled for May 17, 2022, at 1:00 p.m.

### III.    <u>**Legal Analysis**</u>

None of the defendants' various challenges to the first four Counts in the Indictment has merit.  This Court should deny the defendants' motions to dismiss.

### A. Legal Standard

A defendant may move before trial to dismiss an indictment in whole or in part for, among other things, "lack of specificity" and "failure to state an offense."  *See* Fed. R. Crim. P. 12(b)(3)(B)(iii), (v).  An indictment's main purpose is to inform the defendant of the nature of the charged offense.  *United States v. Ballestas*, 795 F.3d 138, 148-149 (D.C. Cir. 2015).  Thus, an indictment need "only contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"  *Id.* at 149 (quoting Fed. R. Crim. P. 7(c)).  "When testing the sufficiency of the charges in an indictment, 'the indictment must be viewed as a whole and the allegations [therein] must be accepted as true.'"  *United States v. Hillie*, 227 F. Supp. 3d 57, 71 (D.D.C. 2017) (quoting *United States v. Bowdoin*, 770 F. Supp. 2d 142, 145 (D.D.C. 2011)).  The "key question" is whether "the allegations in the indictment, if proven, are sufficient to permit a petit jury to conclude that the defendant committed the criminal offense as charged."  *Id.*

**B. Count One properly charges a seditious conspiracy.**

Count One of the Indictment charges the defendants with conspiring by force to prevent, hinder, or delay the execution of any federal law.  ECF No. 1 at ¶ 15.  Caldwell argues (ECF No. 84 at 5-19) that, although the Indictment alleges "a conspiratorial agreement to use force intended to disrupt" the Certification proceeding (*id.* at 6-7), it fails to allege that the defendants targeted the "execution" of any laws because Congress was not executing any law during the Certification proceeding.   That argument both fails on the merits and misapprehends the Indictment's allegations.

**1. Background**

Congress passed what became the seditious conspiracy statute in July 1861, approximately three months after the beginning of the Civil War.  *See* Act of July 31, 1861, ch. 33, 12 Stat. 284. The Conspiracies Act of 1861 made it a crime, punishable by up to six years of imprisonment, for

> two or more persons within any State or Territory of the United States [to] conspire together to overthrow, or to put down, or to destroy by force, the Government of the United States, or to levy war against the United States, or to oppose by force the authority of the Government of the United States; or by force to prevent, hinder, or delay the execution of any law of the United States; or by force to seize, take, or possess any property of the United States against the will or contrary to the authority of the United States; or by force, or intimidation, or threat to prevent any person from accepting or holding any office, or trust, or place of confidence, under the United States.

*Id.*  The bill's sponsor, Senator Trumbull, explained that the bill's purpose was "to punish persons who conspire together to commit offenses against the United States not analogous to treason."  31 Cong. Rec. 277 (July 26, 1861); *see id.* (explaining that the offense would apply to circumstances where a group of people "conspired together to seize an article of property belonging to the United States"; where "settlers meet together, and, by threats and intimidation, deter" a federal land officer from arranging "any sale of . . . public lands"; or where "a number of persons, by threats of violence

and intimidation, prevent[] a postmaster from performing the duties of his office," even though none of those circumstances would "constitute treason").

The Conspiracies Act was intended to fill a "lacuna" in federal law. Leslie Friedman Goldstein, *Legal Histories of America's Second Revolutionary War (1860-1876)*, 52 Tulsa L. Rev. 495, 504 (2017). Before the Conspiracies Act, no general federal felony existed to punish efforts to obstruct or subvert the government by force: the only tools at prosecutors' disposal were "the crime of treason (which carried a statutory death penalty)" and the misdemeanor offense of obstructing a federal officer. *Id.* at 504 & nn. 73-74 (citing William A. Blair, *With Malice Toward Some: Treason and Loyalty in the Civil War Era* 16-17 (2014)); *see also* U.S. Const. art. III, § 3, cl. 1 (defining treason as "only in levying War against" or "adhering to" and "giving . . . Aid and Comfort" to the country's "Enemies," and providing that a treason conviction required the "Testimony of two Witnesses to the same overt Act"). The Conspiracies Act provided a middle option to address serious criminal conduct that did not rise to the level of a capital offense, including conspiracies to commit acts of treason, insurrection, or obstruction of government functions that failed to achieve their purpose. *See* Goldstein, *Legal Histories of America's Second Revolutionary War (1860-1876)*, 52 Tulsa L. Rev. at 504.

Ten years later, Congress enacted a nearly identical conspiracy provision in the Enforcement Act of 1871 (also known as the Ku Klux Klan Act), which otherwise included a broad range of civil and criminal provisions to enforce the guarantees of the Fourteenth Amendment. *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13 (codified at Rev. Stat. title 70, ch. 2, § 5336 (1878)). In *Baldwin v. Franks*, 120 U.S. 678 (1887), the Supreme Court held that, despite its presence in

11

the Enforcement Act, the seditious conspiracy statute[1] focuses on resistance to the government itself and could not be used to prosecute a conspiracy that seeks solely to deprive private individuals of rights guaranteed by federal law.  The defendants in *Baldwin* had conspired to forcibly remove Chinese laborers who were lawfully present in the United States pursuant to a treaty between the United States and China.  *Id.* at 693.  Rejecting the government's contention that the conspirators had "'oppos[ed]' by force the authority of the United States" by seeking to drive away persons who were protected by treaty, the Supreme Court held that the seditious conspiracy statute "implies force against the government *as a government*," and thus requires that a defendant use force "to resist some positive assertion of authority by the government.  A mere violation of law is not enough."  *Id.* (emphasis added); *see id.* (explaining that the defendants conspired to use force "in opposition to a class of persons who had the right to look to the government for protection against such wrongs, not in opposition to the government while actually engaged in an attempt to afford that protection").  The Supreme Court similarly rejected the government's assertion that the conspirators violated the prohibition on "preventing, hindering or delaying the 'execution' of any law of the United States," holding that this provision likewise "means something more than setting the laws themselves at defiance.  There must be a forcible resistance of the authority of the United States while endeavoring to carry the laws into execution." *Id.*

In 1909, Congress adopted a new criminal code that included essentially the same seditious conspiracy provision that exists under current law.  *See* Act of Mar. 4, 1909, ch. 1, § 6, 35 Stat. 1089 (codified at 18 U.S.C. § 6 (1940)).  Courts generally upheld convictions under the statute

---

[1] Although Congress did not identify the conspiracy prohibition currently in Section 2384 as "seditious conspiracy" until 1948, *see infra* at 13, this brief refers to Section 2384's materially identical predecessors as the "seditious conspiracy" statute or provision.

where the defendants had agreed to use force against the government itself. *See, e.g.*, *Reeder v. United States*, 262 F. 36, 38-39 (8th Cir. 1919) (conspiracy to commit armed insurrection against federal officers in order to prevent enforcement of military conscription laws); *Orear v. United States*, 261 F. 257, 258-260 (5th Cir. 1919) (same); *Wells v. United States*, 257 F. 605, 612-614 (9th Cir. 1919) (same); *Bryant v. United States*, 257 F. 378, 380-382 (5th Cir. 1919) (same); *Isenhouer v. United States*, 256 F. 842, 842-843 (8th Cir. 1919) (conspiracy to prevent enforcement of military conscription laws by threatening to kill police officers); *Phipps v. United States*, 251 F. 879, 880 (4th Cir. 1918) (conspiracy to forcibly disarm federal troops and steal their weapons). Consistent with the Supreme Court's decision in *Baldwin*, however, courts reversed seditious conspiracy convictions where the defendants agreed to use force against private businesses or individuals, and not the government itself. *See, e.g.*, *Anderson v. United States*, 273 F. 20, 26-27 (8th Cir. 1921) (overturning seditious conspiracy convictions where defendants conspired to use force against "industrial and commercial activities and interests," not "those charged with the duty of executing the laws of the United States," even though the defendants' goal was to impede the government's ability to fight World War I); *Haywood v. United States*, 268 F. 795, 800 (7th Cir. 1920) (same).

In 1948, Congress reorganized Title 18 and moved the seditious conspiracy provision to 18 U.S.C. § 2384, where it remains today. *See* Act of June 25, 1948, ch. 645, § 2384, 62 Stat. 683, 808. The 1948 Act was the first time Congress used the term "seditious conspiracy" as a statutory heading for that provision. *See* Rev. Stat. title 70, ch. 2, § 5336 (1878) (margin). Congress's decision to use the term "seditious conspiracy" in the 1948 Act does not appear to have reflected any change in the underlying offense. *See* H.R. Rep. No. 80-304, at A148 (1947) (stating that the new Section 2384 was "[u]nchanged" from the 1909 statute); *United States v. Rahman*, 189 F.3d

88, 116 (2d Cir. 1999) (noting that "sedition" appears in Section 2384's title, but not its terms, which are "far more precise").

Following a 1954 attack on the United States Capitol by Puerto Rican nationalists, in which several armed intruders entered the gallery of the House of Representatives, opened fire, and wounded five congressmen, Congress amended the seditious conspiracy statute to increase its maximum penalty from six to 20 years of imprisonment. *See* Pub. L. No. 84-766, ch. 678, 70 Stat. 623 (1956); H.R. Rep. No. 84-922, at 2 (1955) (the "grave nature" of the attack "clearly demonstrated" the need for "much more severe penalties than the law provides for [seditious conspiracy] at the present time"); *see also United States v. Lebron*, 222 F.2d 531, 533-534 (2d Cir. 1955) (affirming convictions for seditious conspiracy).

> ### 2. A conspiracy to use force to prevent, hinder, or delay laws governing the transfer of presidential power violates Section 2384.

Section 2384 prohibits a conspiracy to "overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof." 18 U.S.C. § 2384. The defendants are alleged to have violated Section 2384 by conspiring "by force to prevent, hinder, and delay the execution of any law of the United States" by the government, ECF no. 1 at ¶ 15, namely, the "laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code." *Id.* at ¶ 16. That allegation, if proven, establishes a violation of Section 2384.

a. That commonsense conclusion follows from the ordinary meaning of the terms "execution" and "law" as used in Section 2384. *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012) (a term undefined in a statute is given its "ordinary meaning"). "Execution"

refers to the "carrying out or putting into effect (as a court order or a securities transaction),"
*Execution*, Black's Law Dictionary (11th ed. 2019); "[t]he action of carrying into effect (a plan,
design, purpose, command, decree, task, etc.)," *Execution*, Oxford English Dictionary, *available
at* https://www.oed.com; or simply the "act or process of executing," *Execution*, Merriam-Webster
Online, *available at* https://www.merriam-webster.com/dictionary/execution.   The term carried
the same meaning in the mid-nineteenth century for the legislators who enacted the first seditious
conspiracy prohibition, *see Execution*, Webster's American Dictionary of the English Language
(1828) ("1828 Webster's") (defining execution to include the "last act of the law in completing
the process by which justice is to be done" and as "something done or accomplished"), *available
at* https://webstersdictionary1828.com/Dictionary/execution.   And it carried the same meaning for
the lawmakers in the early twentieth century when they codified the materially identical seditious
conspiracy prohibition that remains in place today.   *See Execution*, Webster's American Dictionary
of the English Language (1913) (execution is "[t]he act of executing; a carrying into effect or to
completion; performance; achievement; consummation"), *available at* http://www.webster-
dictionary.org/definition/execution.

Further, the term "law" plainly includes the Constitution and amendments to the
Constitution, in addition to statutes enacted by Congress.   *See* U.S. Const. art. VI (describing
"[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof"
as "the supreme Law of the Land"); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)
("[c]ertainly all those who have framed written constitutions contemplate them as formulating the
fundamental and paramount law of the nation"); *id.* at 180 ("in declaring what shall be the *supreme*
law of the land, the *constitution* itself is first mentioned") (emphases in original); *Law*, Black's
Law Dictionary, *supra* ("[t]he regime that orders human activities and relations through systematic

application of the force of politically organized society"); *Federal Law*, *id.* ("[t]he body of law consisting of the U.S. Constitution, federal statutes and regulations, U.S. treaties, and federal common law").

To execute a law, therefore, means to carry out a law or to bring a law into effect. As such, Congress and the Vice President, serving as President of the Senate, quite literally "execute" the Twelfth Amendment—a "law"—when carrying out that provision's specific directives that the "President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates [of the Electors] and the votes shall then be counted." Likewise, Congress and the President of the Senate execute (*i.e.*, carry out or bring into effect) the Electoral Count Act of 1887 when they meet in a Joint Session at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors," with the President of the Senate presiding, where Members of Congress may submit written objections and debate may ensue. 3 U.S.C. § 15. This process, in turn, facilitates the execution of the Twentieth Amendment, which requires the President and Vice President to end their terms "at noon on the 20th day of January . . . of the years in which such terms would have ended," so that the "terms of their successors" can then "begin." U.S. Const. amend. XX. The Indictment's allegations that the defendants conspired to use force to stop the transfer of presidential power as set out in those provisions therefore properly charges that the defendants conspired to "prevent, hinder, or delay the execution of any law of the United States." 18 U.S.C. § 2384.

b. Caldwell resists that straightforward reading by contending (ECF No. 84 at 12-19) that liability under Section 2384 attaches only to defendants who conspire to use force against the Executive Branch because the Executive Branch alone is responsible for the "execution of any law of the United States." 18 U.S.C. § 2384. The statute, however, requires only "forcible resistance

of the authority of *the United States* while carrying the laws into execution." *Baldwin*, 120 U.S. at 693 (emphasis added). It is not limited to forcible resistance to the actions of any particular class or category of government officials. And in the context of the laws governing the presidential election, a plan to forcibly prevent the certification of the results is a plan to forcibly resist the authority of the United States in executing its laws.

It is of course true that, in many contexts, the "execution" of the laws is the responsibility of the Executive Branch. Congress cannot, for example, assign to itself any role in prosecuting crimes, collecting taxes, or executing other ordinary statutes regulating the public. But even if Caldwell is correct that Section 2384's reference to the "execution" of the laws should be read to incorporate those separation-of-powers principles, the constitutional and statutory provisions governing the certification of election results are different. In that special context, the Constitution unambiguously makes the "President of the Senate," the "Senate," and "the House of Representatives" responsible for executing the Twelfth Amendment by opening and counting the electoral votes—and, if no candidate has a majority, by choosing the next President. U.S. Const. Amend. XII. Consistent with that direction, the Electoral Count Act prescribes further procedures by which the President of the Senate, the Senate, and the House are to carry out—that is, execute—those responsibilities. 3 U.S.C. § 15.

Recognizing that the President of the Senate and the House of Representatives execute the Twelfth Amendment and the Electoral Count Act is entirely consistent with the Constitution's system of separated powers, which allows—indeed, mandates—a "partial intermixture" of legislative, executive, and judicial powers for certain "special purposes" such as impeachment, ratification of treaties, and administration of the presidential election. *The Federalist No. 66*, at 401 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *see id.* No. 47, at 304-06 (James Madison);

*see also Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2046 (2020) (Thomas, J., dissenting). Caldwell's contrary view is untenable: He insists that only executive officials can execute the laws, but the Executive Branch obviously could not supplant the House of Representatives in implementing the Twelfth Amendment and the Electoral Count Act. As a result, Caldwell's argument reduces to the implausible assertion that the relevant provisions of the Twelfth Amendment and the Electoral Count Act are not "executed" at all.

Caldwell's argument thus fails even if one accepts his assumption that Congress intended to limit Section 2384's reference to "execution of the laws" to exercises of what would be regarded as executive power in a separation-of-powers sense. The argument also fails because Caldwell provides no basis in the statute's text, structure, or history to support that assumption. And although Congress generally does not execute ordinary statutes, it is perfectly sensible to speak of Congress "executing" laws of other sorts. Indeed, the Constitution explicitly provides Congress the power to "make all Laws which shall be necessary and proper for carrying into *Execution*" the powers vested by the Constitution in "the Government of the United States." U.S. Const. art. I, § 8, cl. 18 (emphasis added). Likewise, the Supreme Court has described the power of "the legislature" to "execute" treaties by enacting legislation to bring their terms into effect. *Medellin v. Texas*, 552 U.S. 491, 514 (2008) (quoting *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829), *overruled on other grounds*, *United States v. Percheman*, 32 U.S. (7 Pet.) 51 (1833)). Similarly, the President's power to execute the laws obviously does not extend to the Constitution's requirements that the Senate and House of Representatives maintain and "from time to time" publish "a Journal of [their] proceedings," U.S. Const. art. I, § 5. So too here. The constitutional and statutory provisions underpinning the transfer of presidential power involve the "execution" of the law by Congress and the President of the Senate. U.S. Const. amend. XII.

18

That conclusion is consistent with Section 2384's broader context. The statute's other prohibitions—against conspiracies "to overthrow, put down, or to destroy by force the Government of the United States"; "to levy war against them"; "to oppose by force the authority thereof"; or "by force to seize, take, or possess any property of the United States contrary to the authority thereof"—are plainly not restricted to conduct directed against any particular branch of government, and it would be arbitrary and anomalous for Congress to have included among that group a type of conspiracy that could be directed only against the Executive Branch. Nowhere in the legislative history of Section 2384 or its predecessors did lawmakers suggest that a plot to attack the government violates the seditious conspiracy provision regarding the execution of the laws only where that plot takes aim at Executive Branch officials. *See supra* at 10-14. Indeed, when Section 2384 was used to prosecute Puerto Rican nationalists for a shooting that took place at the U.S. Capitol in 1954, *see Lebron*, 222 F.2d at 533-534, Congress responded not by curtailing the statute's reach to emphasize that it covered only plans that targeted the Executive Branch, but instead by *increasing* Section 2384's statutory maximum sentence, *see supra* at 14. *Lebron*—as well as Congress's subsequent decision to raise the statutory maximum sentence for Section 2384—demonstrates that an attack against Congress is precisely the sort of conduct that Congress sought to target in Section 2384.[2] That history illustrates that Section 2384 "protects basic societal interests" and is properly "read to cover a wide spectrum of activities." *United States v. Rahman*, 854 F. Supp. 254, 259 (S.D.N.Y. 1994).

---

[2] The Second Circuit's opinion in *Lebron* does not specify which provision or provisions of Section 2384 was used to prosecute the conspirators. The court's synopsis, however, describes the case as a "[p]rosecution for conspiring to overthrow government of United States by force and to oppose by force the authority of the United States government." *See Lebron*, 222 F.2d at 531.

Furthermore, other provisions of the criminal code demonstrate that when Congress intends a prohibition to apply to particular employees or officers of a specific branch of government, Congress says so clearly. *See, e.g.*, 18 U.S.C. § 207(a)(1) (imposing certain restrictions on, among others, "[a]ny person who is an officer or employee . . . of the executive branch of the United States"); 18 U.S.C. § 227 (prohibition on wrongfully influencing a private entity's employment decision by certain government officials, including members of Congress, congressional employees, and "executive branch employee[s]"); 18 U.S.C. § 351(a) (prohibition on murder of, among others, "Member[s] of Congress," certain "member[s] of the executive branch of the Government," and "Justice[s]" of the Supreme Court); 18 U.S.C. § 1001(a) (prohibition on false statements "within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States"). No such specification is found in Section 2384. *Cf. Russello v. United States,* 464 U.S. 16, 23 (1983) (presumption that Congress "acts intentionally and purposely" where it adopts language in one statute but omits it elsewhere) (internal quotation marks omitted).

Caldwell relies principally (ECF No. 84 at 15-19) on three cases, *Bowsher v. Synar*, 478 U.S. 714 (1986), *Myers v. United States*, 272 U.S. 52 (1926), and *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), that shed no light on the question in this case. In *Bowsher*, the Supreme Court considered whether Congress's assignment of certain powers to the Comptroller General of the United States and Congress's ability to remove that officer ran afoul of the "doctrine of separation of powers," 478 U.S. at 717, ultimately concluding that the Constitution did not authorize Congress to "reserve for itself the power" to remove an executive officer because to "permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws," *id.* at 726. Similarly, in *Myers*, the Supreme

Court addressed whether the separation-of-powers doctrine permitted the President the exclusive power to remove an Executive Branch officer (there, a postmaster), holding that a law that "denied" the President the "unrestricted power of removal" was unconstitutional. 272 U.S. at 176. Those cases stand for the straightforward principle that Congress may not play "a role in the removal of executive officials other than [through] its established powers of impeachment and conviction." *Morrison v. Olson*, 487 U.S. 654, 686 (1988). Understood in that context, language from those cases—on which Caldwell heavily relies, *see* ECF No. 84 at 15-16—observing that the Constitution's "structure . . . does not permit Congress to execute the laws," *Bowsher*, 478 U.S. at 726, simply makes clear that Congress may not "infringe the constitutional principle of the separation of governmental powers," *Myers*, 272 U.S. at 161, by enacting legislation that affords the Legislative Branch control over power properly vested in the Executive Branch. But as demonstrated above, the Constitution unambiguously makes the House of Representatives and the President of the Senate—not the Executive Branch—responsible for executing the relevant provisions of the Twelfth Amendment and the Electoral Count Act. Indeed, defendants do not and could not contend that any of the individuals who execute the laws involved in the transfer of presidential power—including the Vice President (as President of the Senate) and Members of Congress—lack the constitutional or statutory authority to carry out those duties.

Caldwell's reliance (ECF No. 84 at 17-19) on *Buckley v. Valeo*, 424 U.S. 1 (1976), for the proposition that Congress does not "execute the law" when it certifies the votes of the Electoral College, is equally unavailing. The Supreme Court in that case addressed a challenge to the structure of the newly established Federal Election Commission and concluded that the appointment of four of its six voting members by members of Congress violated the Appointments Clause of the Constitution. *See id.* at 109-143; U.S. Const. art. II, § 2, cl. 2. The Commission

argued that notwithstanding the Appointments Clause's requirement that all "Officers of the United States" be appointed by the President and, in the case of non-inferior officers, confirmed by the Senate, Congress's constitutional authorities to regulate federal elections—including its authorities under the Twelfth Amendment—permitted it to appoint the Commission's members. *See Buckley*, 424 U.S. at 131-134.  In rejecting that argument, the Supreme Court said nothing about whether the performance of Twelfth Amendment functions constitutes the United States' "execution of [a] law," 18 U.S.C. § 2384.  The Supreme Court simply declined to infer that Congress's authority to certify the votes of the Electoral College provides a source of power to appoint members of a commission responsible for exercising a vast array of rulemaking, adjudicative, and enforcement functions.  It was in this context of rejecting a generalized authority "to regulate practices in connection with the Presidential election" that the Court observed that "Congress viewed [the Twelfth] Amendment as conferring upon its two Houses the same sort of power 'judicial in character' as was conferred upon each House by Art. I, § 5, with respect to elections of its own members." *Buckley*, 424 U.S. at 133-134 (quoting *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 613 (1929)).

The Supreme Court's characterization of Congress's Twelfth Amendment power as "judicial in character" is unsurprising and does nothing to advance the defendants' argument.  As described above, the Twelfth Amendment sets out a process whereby the President of the Senate presides over the counting of the votes of the Electoral College for the President and Vice President in the presence of the House and Senate.  Congress has prescribed further procedures for carrying out this function, including procedures to resolve disputes, and the Court observed that those procedures suggest that Congress viewed that Twelfth Amendment as conferring power that is "judicial in character." *Buckley*, 424 U.S. at 134 (citing "[t]he method by which Congress resolved

the celebrated disputed Hayes-Tilden election of 1876"); *see* 3 U.S.C. § 15.  But that observation about Congress's dispute-resolution function is entirely consistent with the commonsense notion that when the House of Representatives, the Senate, and the President of the Senate perform the functions assigned to them by the Twelfth Amendment and the Electoral Count Act—including opening, counting, and certifying the electoral votes—they are *executing* the law.

      c.  Caldwell's argument also fails because it rests on a further misconception.  Caldwell's claim—that Congress cannot execute laws—focuses only on the role that Congress plays and only on the Certification of the Electoral College vote.  But, as noted above, Congress is not the sole entity executing the laws that undergird the transfer of presidential power.  The relevant constitutional and federal statutory provisions facilitating a peaceful transfer from one presidential administration to the next also require the participation of the President and Vice President. *See* U.S. Const. amend. XX.  The Indictment encompasses both that constitutional provision, *see* ECF No. 1 at ¶ 1, and a timeframe that is broader than the attack on January 6, 2021, *see id.* at ¶ 15 (alleging a conspiracy from "in and around November 2020 through in and around January 2021"). For example, in the days following the November 2020 Presidential Election, the defendants began training their attention on the inauguration. *See id.* at ¶ 20 (Jessica Watkins expressed a need for recruits to be "fighting fit by innaugeration").  Nor did the alleged conspiracy terminate with the events of January 6, 2021; the co-conspirators amassed weaponry and continued to plot violence even after the attack on the Capitol. *See id.* at ¶¶ 125-134.  In short, the defendants' conspiracy encompassed using violence to stop the Inauguration in addition to the January 6 Certification proceeding.

      d.  Caldwell's remaining arguments also lack merit.  Caldwell suggests (ECF No. 84 at 12-14) that the Supreme Court's decision in *Baldwin*, *supra*, and the court of appeals' decisions in

*Anderson*, *supra*, and *Haywood*, *supra*, support his argument.  But those decisions simply illustrate the uncontested principle that for an individual to violate Section 2384, he or she must plan to use force in service of resistance against the government.  *See Baldwin*, 120 U.S. at 693 (to violate the predecessor of the seditious conspiracy provision, the defendant must intend the use of "force against the government as a government," including "a forcible resistance of the authority of the United States while endeavoring to carry the laws into execution").  No Section 2384 violation therefore occurs where the defendant exerts force against private parties committing acts that the government would "prevent," *id.* at 694; or against "industrial and commercial activities and interests," *Anderson*, 273 F. at 26-27; like "the operations of producers from whom the government was expecting to buy or had contracted to buy war munitions and supplies," *Haywood*, 268 F. at 799-800; instead of against the government's own assertion of authority.  By contrast, Section 2384 is validly charged here, where the defendants planned to use force directly against the government to preclude it from executing the laws involved in the transfer of presidential power.  !

Finally, Caldwell contends (ECF No. 84 at 11) that the seditious conspiracy provision's Civil War origins, and what Caldwell claims was its purpose to "silence dissenters," should subject Section 2384 to "particular[] scrutin[y]."  But as noted above, Congress first enacted the seditious conspiracy prohibition in the Conspiracies Act of 1861 to provide a criminal penalty against certain seditious conspiratorial conduct less severe than treason, and thus with a penalty less severe than the death penalty.  *See supra* at 10-11.  Moreover, a conspiracy offense permitted prosecution of the inchoate offense without requiring authorities to wait for an attack to occur.  As Judge Peleg Sprague explained to the grand jury the same year the first seditious conspiracy prohibition became law, "[l]evying war against the United States, and resisting or obstructing the execution of the laws of the United States, have, from the origin of the government, been criminal offences; but

heretofore the criminal law has waited until treason or resistance has been consummated by an overt act.  Conventions, associations, combinations, or conspiracies, however atrocious even for the purpose of levying war and subverting the government, were not subject to criminal prosecutions."  *In re Charge to Grand Jury—Treason*, 30 F. Cas. 1049, 1051 (D. Mass. 1861). The innovation of the Conspiracies Act, as Judge Sprague explained, was that it was "a statute of prevention which reaches one of the initiatory steps" of treason: "[n]ot only combinations to overthrow the government, but conspiracies of mutual agreements, whether by few or many, public or private, forcibly to resist or even to delay the execution of any law." *Id.*  Applying Section 2384 in this case, where the defendants are alleged not only to have planned an attack on the government but in fact to have carried one out, is fully consistent not only with the text of Section 2384 but also with the statute's history.

e. Meggs's challenges (ECF No. 82-1) to the seditious conspiracy charged in Count One are meritless.  First, Meggs appears to argue (*id.* at 6-11) that the defendants could not have conspired to stop the transfer of presidential power because "nothing in heaven or Earth" or "the universe . . . can add 1 minute to a President's term of office."  *Id.* at 9; *see also* ECF No. 95 at 3 (Vallejo's argument that the Twentieth Amendment "is simply a statement of legal status that neither requires nor is capable of being 'executed'").  But the transfer of presidential power is no foreordained process; indeed, it is impossible to carry out without a certified election result and other steps that the government must undertake pursuant to the Constitution and various federal statutory provisions.  The Constitution's words are not self-executing, and the defendants' plan to forcibly stop the transfer of presidential power and their acts on January 6 violated Section 2384.[3]

---

[3] Even if it were true that the defendants could not have stopped the transfer of presidential power, "impossibility is not a defense to an inchoate crime" such as seditious conspiracy.  *United States v. Shi*, 991 F.3d 198, 210 (D.C. Cir. 2021).

*See* ECF No. 1 at ¶ 23 (on December 11, 2020, Rhodes described the need for a "bloody and desperate fight" to stop the transfer of presidential power); *id.* at ¶ 30 (on December 22, 2020, Rhodes said in an interview that "a bloody, massively bloody revolution" was needed to stop the transfer of presidential power).

Second, Meggs claims (ECF No. 82-1 at 12-15) that merely making a "constitutionally-protected request" (*id.* at 12)—namely, that former President Trump invoke the Insurrection Act[4]—cannot form the basis for a seditious conspiracy charge.  As an initial matter, that factual claim—that the only relevant conduct in which the defendants engaged was to make a "request" of President Trump—is premature because Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a full proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-247 (D.C. Cir. 2005), neither of which has occurred here.  Moreover, the claim ignores the Indictment's allegations, which do not once refer to the Insurrection Act. Instead, the defendants are alleged to have recruited others; organized trainings, assembled firearms and ammunition; organized a quick reaction force; brought paramilitary gear, weapons, and other supplies to the Capitol grounds; used encrypted communications; breached the U.S. Capitol building on January 6, 2021, as Congress was meeting to certify the results of the 2020 Presidential Election; used force against law enforcement officers; and continued to plot ways to oppose the lawful transfer of presidential power after January 6.  *See generally* ECF No. 1.  In

---

[4] The Insurrection Act permits the president to call into service "the militia of any State" and "the armed forces" whenever the President "considers that unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce" federal law.  10 U.S.C. § 252. It is conditioned on an assessment by the President that it is "impracticable to enforce the laws of the United States in any State by the ordinary course of judicial proceedings."  *Id.*

short, the defendants are not charged with "urging" the President to "lawfully invoke an actual

law." ECF No. 82-1 at 15. Instead, they are charged with plotting to use force to stop the transfer

or presidential power from one administration to the next.

Third, Meggs (ECF No. 82-1 at 11-12) and Vallejo (ECF No. 95 at 6) briefly suggest that

Count One contains "surplusage." A court, upon a defendant's motion, may "strike surplusage

from the indictment." Fed. R. Crim. P. 7(d). But a surplusage motion is "highly disfavored,"

*United States v. Singhal*, 876 F. Supp. 2d 82, 102 (D.D.C. 2012) (internal quotation marks

omitted), and "should be granted only if it is clear that the allegations are not relevant to the charge

and are inflammatory and prejudicial," *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir.

1998) (internal quotation marks omitted); *see also United States v. Oakar*, 111 F.3d 146, 157 (D.C.

Cir. 1997) ("Material that can fairly be described as 'surplus' may only be stricken [from an

indictment] if it is irrelevant and prejudicial."). Meggs and Vallejo make no meaningful effort to

satisfy that standard. Instead of identifying specific portions of Count One as improper, they make

blanket claims (ECF No. 82-1 at 11) that Count One is "flooded with irrelevant and immaterial

allegations." Because Count One "describe[s] essential facts relevant to the offense," *United

States v. Apodaca*, 275 F. Supp. 3d 123, 156 (D.D.C. 2017), this Court should not strike any

allegations under Rule 7(d).

f. Hackett (ECF No. 89 at 3-13) and Vallejo (ECF No. 95 at 4-6) raise two additional

challenges to the seditious conspiracy charge. First, both contend (ECF No. 89 at 11-13 (Hackett);

ECF No. 95 at 4-5 (Vallejo)) that the 31 pages and 134 paragraphs of allegations in Count One do

not provide adequate notice of the crime with which they are charged. That is incorrect.

An indictment is sufficient under the Constitution and Federal Rule of Criminal Procedure

7 if it "contains the elements of the offense charged and fairly informs a defendant of the charge

27

against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished by "echo[ing] the operative statutory text while also specifying the time and place of the offense," *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). And an indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (per curiam).

Count One's detailed allegations easily "clear[] th[e] low bar," *see United States v. Sargent*, No. 21-cr-258, 2022 WL 1124817, at *1 (D.D.C. Apr. 14, 2022) (Hogan, J.), to sufficiently plead a violation of Section 2384. First, Count One includes the elements of Section 2384: it alleges that the defendants "did knowingly conspire, confederate, and agree, with other persons known and unknown to the Grand Jury, by force to prevent, hinder, and delay the execution of any law of the United States." ECF No. 1 at ¶ 15; *cf.* 18 U.S.C. § 2384 (criminalizing a conspiracy "by force to prevent, hinder, or delay the execution of any law of the United States"). It further specifies that the laws in question are "the laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code." ECF No. 1 at ¶ 16. Finally, it includes a detailed recitation of allegations encompassing conduct and statements undertaken by all the alleged co-conspirators, including both the alleged manner and means of carrying out the conspiracy, s*ee id.* at ¶ 17, and acts undertaken that are alleged to have furthered the conspiracy, *see id.* at ¶¶ 18-134.

Neither of the cases on which Hackett relies supports his claim that these extensive allegations are insufficient. He principally invokes (ECF No. 89 at 11-12) *Russell v. United States*,

369 U.S. 749 (1962), where the defendant was charged under a statute that makes it a crime for a witness called before a congressional committee to refuse to answer any question "pertinent to the question under inquiry." 2 U.S.C. § 192. The indictment's failure in *Russell* to identify the subject of the congressional hearing rendered it insufficient because "guilt" under that statute "depend[ed] so crucially upon such a specific identification of fact." *Russell*, 369 U.S. at 764. That feature is not present here because guilt under Section 2384 does not depend on any such "specific identification of fact." *See United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (not applying *Russell* to the illegal re-entry statute at issue in that case because guilt did not turn upon "a specific identification of fact") (internal quotation marks omitted); *Williamson*, 903 F.3d at 131 (not applying *Russell* to statute criminalizing threats against federal officers); *see also Apodaca*, 275 F. Supp. 3d at 153 n.17, 154-156 (not applying *Russell* to statute criminalizing use of firearms in connection with drug trafficking crimes). And, in any event, the Indictment contains abundant factual allegations describing the basis of the charges against the defendants.

Similarly unhelpful to Hackett's claim is *United States v. Murphy*, 762 F.2d 1151 (1st Cir. 1985). *Murphy* involved an indictment that charged the defendants with threatening a witness to influence that witness's testimony in an official proceeding without indicating what the official proceeding "was, or was to be," *id.* at 1153, and where the government sought to "ke[ep] its options open," *id.* at 1155, by relying on one of two potential proceedings without specifying the official proceeding either in the indictment or during the opening statement at trial. The First Circuit concluded that the indictment was "defective" in that it "did not adequately apprise the defendants of the charges against them." *Id.* Hackett acknowledges that what occurred in *Murphy* is a far cry from the situation here, *see* ECF No. 89 at 13 (noting that the Indictment in this case, unlike in *Murphy*, "allege[s] a great deal of factually specific conduct"), but he suggests (*id.*) that Count

One is nonetheless flawed because it does not identify the law the defendants violated. As noted above, however, Count One specifically identifies the constitutional and federal statutory provisions governing the transfer of presidential power that the defendants allegedly targeted through their conspiracy.

Hackett's (ECF No. 89 at 4-5) and Vallejo's (ECF No. 95 at 5-6) second claim—that the seditious conspiracy charge impermissibly alleges multiple conspiracies in a single count—fares no better. That claim is premature. Where, as here, an indictment "sufficiently alleges a single conspiracy, the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury." *United States v. Rajaratnam*, 736 F. Supp. 2d 683, 688 (S.D.N.Y. 2010) (internal quotation marks omitted). The claim also misunderstands conspiracy law and the Indictment. "Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975); *see United States v. Jimenez Recio,* 537 U.S. 270, 274 (2003). A conspiracy statute therefore "punishes" the agreement, "[w]hether the object of a single agreement is to commit one or many crimes." *Braverman v. United States*, 317 U.S. 49, 53 (1942); *accord United States v. Broce*, 488 U.S. 563, 570-571 (1989) ("A single agreement to commit several crimes constitutes one conspiracy."). Here, Count One charges the defendants with a single overarching conspiracy to use force to prevent, hinder, or delay the execution of federal laws that facilitate the transfer of presidential power. In other words, Count One alleges a single conspiracy—a plan to use force to stop the transfer of presidential power—that the defendants sought to accomplish by targeting different laws that underlay that transfer. Neither Hackett nor Vallejo cites any case or other legal authority that supports their claim that such an allegation embodies multiple conspiracies.

The cases the defendants do cite do not aid their argument.  For example, the Supreme

Court's decisions in *Yates v. United States*, 354 U.S. 298 (1957), and *Griffin v. United States*, 502

U.S. 46 (1991), *see* ECF No. 95 at 5, address the circumstances under which a conviction must be

vacated when a jury's verdict rests on alternative grounds and one ground does not support the

verdict.  *See United States v. Moore*, 651 F.3d 30, 93 n.22 (D.C. Cir. 2011) (per curiam) (describing

how *Griffin* narrowed the broader rule in *Yates*—that a jury verdict that is "'supportable on one

ground, but not on another'" must be set aside—"to situations in which one of the grounds upon

which the jury could have reached its verdict was legally, as opposed to factually, inadequate")

(quoting *Yates*, 354 U.S. at 312); *see also Skilling v. United States*, 561 U.S. 358, 414 (2010)

("constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a

general verdict that may rest on a legally invalid theory").  But those cases have nothing to say

about multiple conspiracies.  Neither does *Bank of Nova Scotia v. United States*, 487 U.S. 250

(1988), which addressed the standard that district courts exercising their supervisory powers must

apply in deciding whether to dismiss an indictment "prior to the conclusion of the trial."  *Id.* at 256

(holding that "dismissal of the indictment is appropriate only 'if it is established that the violation

substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the

decision to indict was free from the substantial influence of such violations") (quoting *United

States v. Mechanik*, 475 U.S. 66, 78 (1986) (O'Connor, J., concurring in the judgment)).

### C. Counts Two and Three validly charge conspiracy and substantive violations of obstructing a Congressional proceeding.

Counts Two and Three of the Indictment charge the defendants with conspiring to corruptly

obstruct, influence, and impede, and with corruptly obstructing, influencing, or impeding, an

"official proceeding"—*i.e.*, Congress's certification of the Electoral College vote on January 6,

2021—in violation of 18 U.S.C. § 1512(k) (Count Two) and § 1512(c)(2) (Count Three).  Caldwell

31

argues (ECF No. 84 at 19-30) that a conspiracy or substantive violation of Section 1512(c)(2) requires the government to allege and prove that the "defendants' actions were targeted at tangible evidence spoliation." *Id.* at 20. Because this Court has already considered and rejected that argument in *Caldwell*, it is not properly raised again in this case. The argument also fails on the merits.

## 1.  Background

In 2002, Congress enacted Section 1512(c)'s prohibition on "Tampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807. Section 1512(c)'s prohibition applies to

> [w]hoever corruptly--
>
> > (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
> >
> > (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.*

18 U.S.C. § 1512(c) (emphasis added). Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). And Section 1512(k) makes it a crime to conspire to violate any offense in Section 1512, including Section 1512(c)(2).

As this Court has concluded, a person violates Section 1512(c)(2) when, acting with the requisite *mens rea*, he conspires to engage, or does engage, in any conduct that obstructs a specific congressional proceeding—including, as here, Congress's certification of the Electoral College vote. *United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718, at *11-*19 (D.D.C. Dec. 20, 2021). At least eight other judges on this Court have reached the same conclusion. *See United*

*Sates v. Sandlin*, No. 21-cr-88, 2021 WL 5865006, at *5-*6 (D.D.C. Dec. 10, 2021) (Friedrich, J.);

*United States v. Mostofsky*, No. 21-cr-138, 2021 WL 6049891, at *11 (D.D.C. Dec. 21, 2021)

(Boasberg, J.); *United States v. Montgomery*, No. 21-cr-46, 2021 WL 6134591, at *10-*18 (D.D.C.

Dec. 28, 2021) (Moss, J.); *United States v. Nordean*, No. 21-cr-175, 2021 WL 6134595, at *6-*9

(D.D.C. Dec. 28, 2021) (Kelly, J.); *United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5

(D.D.C. Feb. 16, 2022) (Bates, J.); *United States v. Grider*, No. 21-cr-22, 2022 WL 392307, at *5-

*6 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.); *United States v. Puma*, No. 21-cr-454, 2022 WL

823079, at *12 & n.4 (D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. McHugh*, No. 21-cr-

453, 2022 WL 1302880, at *2-*13 (D.D.C. May 2, 2022) (Bates, J); *but see United States v. Miller*,

No. 21-cr-119, 2022 WL 823070, at *15 (D.D.C. Mar. 7, 2022) (Nichols, J.) (interpreting Section

1512(c)(2) to mean that a defendant violates the statute only when he or she "take[s] some action

with respect to a document, record, or other object in order to corruptly obstruct, impede or

influence an official proceeding").

Following this Court's decision in *Caldwell* denying the defendants' motions to dismiss,

Caldwell filed a motion to reconsider in which he made materially identical arguments to those

pressed in his current motion to dismiss. *Compare Caldwell*, ECF No. 566 at 1-13, *with* ECF No.

84 at 19-30. This Court denied that motion for two reasons. *See Caldwell* ECF No. 596. First,

the reconsideration motion reargued "'facts and theories upon which'" the Court "'ha[d] already

ruled,'" which was not a "proper basis on which to seek reconsideration." *Id.* at 2. Second, the

reconsideration motion failed on the merits because it misconstrued the term "otherwise" in

Section 1512(c)(2). *Id.* at 2-5.

> **2. The defendants' challenge to Section 1512 is foreclosed by this Court's decision in *Caldwell*.**

This Court should not reach the merits of the defendants' challenge to Counts Two and Three.  As noted above, this Court rejected the defendants' view that Section 1512(c)(2) requires proof that the defendants targeted tangible evidence and instead concluded that a defendant violates Section 1512(c)(2) if that defendant "'"obstructs, influences, or impedes any official proceeding" *without regard* to whether the action relates to documents or records.'"  *Caldwell*, 2021 WL 6062718, at *12 (quoting *United States v. Petruk*, 781 F.3d 438, 446-447 (8th Cir. 2015)).  That conclusion forecloses Caldwell's nearly identical argument here, particularly because this Court has adopted as the law of this case its substantive rulings from *Caldwell*.  *See* ECF No. 8.

### 3.   The defendant's Section 1512 challenge in any event lacks merit.

Caldwell's challenge to the scope of Section 1512(c)(2) also fails on the merits.  In addition to the grounds that this Court rejected in *Caldwell*, Caldwell in essence urges this Court (ECF No. 84 at 20 n.12) to adopt the reasoning of *United States v. Miller*, 2022 WL 823070, the sole decision in which a judge of this Court has construed Section 1512(c)(2) to require proof that "the defendant ha[s] taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding."  *Id.* at *15.[5]  *Miller*'s outlier reasoning is unpersuasive for several reasons.  *See McHugh*, 2022 WL 1302280, at *2-*13 (describing disagreement with *Miller*).

a.   Focusing on the word "otherwise" in Section 1512(c)(2), Judge Nichols in *Miller* identified "three possible readings" of Section 1512(c)(2).  2022 WL 823070, at *6.  First, Section 1512(c)(2) could serve as a "clean break" from Section 1512(c)(1), *id.*, a reading that "certain courts of appeals have adopted," *id.* at *7.  Second,  Section 1512(c)(1) could "provide[] examples

---

[5]        The government has moved for reconsideration in *Miller*.  That motion remains pending.

of conduct that violates" Section 1512(c)(2*). Id.* at *8.  And third, Section 1512(c)(2) could be interpreted as a "residual clause" for Section 1512(c)(1), such that both provisions are linked by the document-destruction and evidence-tampering "conduct pr[o]scribed by" Section 1512(c)(1*). Id*. at *9.    Judge Nichols rejected the first interpretation on the ground that reading "otherwise" in Section 1512(c)(2) to mean "in a different way or manner" would be "inconsistent" with *Begay v. United States*, 553 U.S. 137 (2008), which considered whether driving under the influence qualified as a "violent felony" under the now-defunct residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1).  2022 WL 823070, at *6-*7.  As for the second and third interpretations, Judge Nichols found "serious ambiguity" as to which reading Congress intended. *Id.* at *15.  Applying the rule of lenity and what it described as principles of "'restraint,'" *Miller* adopted the third reading and interpreted Section 1512(c)(2) to mean that a defendant violates the statute only when he or she "take[s] some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *Id.*

      b.   *Miller*'s reasoning is unpersuasive.  *Miller* ultimately turned on the court's determination that no "single obvious interpretation of the statute" controlled and that the rule of lenity was applicable and dispositive.  2022 WL 823070, at *12.  The rule of lenity, however, "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended."  *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-139 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019).  "Properly applied," then, "the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to

complex rules, can often be solved.'"  *Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring).

Under these standards, the rule of lenity is "inapplicable" here.  *Puma*, 2022 WL 823079, at *12 n.4; *McHugh*, 2022 WL 1302880, at *12.  Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings—regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself.  Any other reading would produce the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens to use force against the officers to impede their ability to consider the document escapes criminal liability under the statute.  Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted.  *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring in the judgment) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws.").  It would strain credulity for any defendant who was focused on stopping an official proceeding from taking place to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] any official proceeding or attempt[] to do so."  18 U.S.C. § 1512(c)(2).  Confirming the absence of ambiguity—serious, grievous, or otherwise—is that despite Section 1512(c)(2)'s nearly 20-year existence, no other judge has found ambiguity in Section 1512(c)(2), including numerous judges on this Court considering the same law and materially identical facts.  *See supra* at 33.

c.    None of the grounds identified by Judge Nichols in *Miller* for finding "serious ambiguity," 2022 WL 823070, at *15, withstands scrutiny.  *Miller* stated that the government's

reading either "ignores" that the word "otherwise" is defined with reference to "something else" (namely Section 1512(c)(1)) or fails to "give meaning" to the term "otherwise." *Id.* at *6-*7. That is incorrect. Far from suggesting that Section 1512(c)(2) is "wholly untethered to" Section 1512(c)(1), *id.* at *7, under the government's reading, the word "otherwise" in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1). That understanding of "otherwise" is both fully consistent with the definitions of the term surveyed in *Miller*, *see id.* at *6 (noting that "otherwise" in Section 1512(c)(2) may be read as "in a different way or manner: differently"; "in different circumstances: under other conditions"; or "in other respects") (internal quotation marks omitted), and ensures that the term is not rendered "pure surplusage," *id.* at *7. In other words, "otherwise" makes clear that Section 1512(c)(1)'s scope encompasses document destruction or evidence tampering that corruptly obstructs an official proceeding, while Section 1512(c)(2)'s ambit includes "other" conduct that corruptly obstructs an official proceeding.

*Miller* also stated that, without a nexus to a document, record, or other object, Section 1512(c)(2) "would have the same scope and effect as if Congress had instead omitted the word 'otherwise.'" 2022 WL 823070, at *7. But overlap is "not uncommon in criminal statutes," *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014), and Section 1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause … serves as a catchall for matters not specifically contemplated," *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009). And, in any event, interpreting the interplay of Sections 1512(c)(1) and 1512(c)(2) in this way does not foreclose a defendant from arguing that his conduct falls outside Section 1512(c)(2)'s scope because his document destruction or evidence concealment is prohibited and punishable only under Section 1512(c)(1). A defendant prevailing on such a theory

may be securing a Pyrrhic victory – where success leads to reindictment under Section 1512(c)(1) – but those practical considerations provide no reason to depart from the plain meaning of Section 1512(c). Moreover, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005).

The *Miller* court also posits that the government's reading is inconsistent with *Begay*. That conclusion is flawed in several respects. First, in considering whether driving under the influence was a "violent felony" for purposes of the ACCA's residual clause—which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury*," 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added)—the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure from Section 1512(c)(2). *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *6 (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"); *United States v. Ring*, 628 F. Supp. 2d 195, 224 n.17 (D.D.C. 2009). Unlike the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting examples." *Ring*, 628 F. Supp. 2d at 224 n.17. In other words, the "key feature" in Section 924(e)(2)(B)(ii) at issue in *Begay*—"namely, the four example crimes" in the enumerated offenses clause that immediately preceded the residual clause, 553 U.S. at 147—is "absent" in Section 1512(c)(2). *Caldwell*, 2021 WL 6062718, at *14.

Second, *Miller*'s assertion that the meaning of "otherwise" was "[c]rucial" to the Supreme Court's decision in *Begay* misapprehends *Begay*'s analysis. The majority in *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii)—burglary, arson, extortion, or crimes involving explosives—indicated that the ACCA residual clause covered only similar crimes. *Begay*, 553

U.S. at 142.  The majority next drew support from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples. *Id.* at 143-144.  Only in the final paragraph of that section of the opinion did the majority address the word "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "sufficient to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' can (we do not say must, cf. post at [150-52] (Scalia, J. concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others."  *Id.* at 144 (emphasis omitted).  A tertiary rationale responding to a party's argument where the majority refrains from adopting a definitive view of "otherwise" cannot plausibly be described as "crucial."  Rather, the majority's "remarkably agnostic" discussion of "otherwise" in *Begay* explicitly noted that the word may carry a different meaning where (as here) the statutory text and context suggests that such a meaning was intended.  *Montgomery*, 2021 WL 6134591, at *11; *see also Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" as "'in a different way or manner'" based on the discussion in *Begay*); *see also McHugh*, 2022 WL 1302880, at *5 ("*Begay* cannot bear the weight that Judge Nichols [in *Miller*] assigns to it.").  In short, the majority in *Begay* actually "placed little or no weight on the word 'otherwise' in resolving the case."  *Montgomery*, 2021 WL 6134591, at *11.

Third, whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s ultimate holding demonstrates why this Court should not embark on imposing an extra-textual requirement within Section 1512(c)(2).  The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompassed only crimes that, similar to the listed examples, involve "purposeful, violent, and aggressive conduct."  553 U.S. at 144-145 (internal quotation marks omitted).  But

"*Begay* did not succeed in bringing clarity to the meaning of the [ACCA's] residual clause." *Johnson v. United States*, 576 U.S. 591, 600 (2015).  Whatever the merits of grafting an atextual (and ultimately unsuccessful) requirement in the context of the ACCA, that approach is unwarranted in the context of Section 1512(c)(2).  In the nearly 20 years between Congress's enactment of Section 1512(c)(2) and *Miller*, no reported cases adopted the document-only requirement urged by Caldwell, and for good reason.  That interpretation would give rise to unnecessarily complex questions about what sort of conduct qualifies as "taking some action with respect to a document" in order to obstruct an official proceeding.  *Cf. United States v. Singleton*, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished) (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceedings [*sic*] through his conduct in relation to a tangible object").[6]  In brief, *Miller*'s interpretation would likely give rise to the very ambiguity it purports to avoid.

> **D.  Count Four validly charges a conspiracy to prevent Members of Congress from discharging their duties or to induce them to leave the place where those duties were to be performed.**

---

[6] *Miller*'s interpretation of Section 1512(c)(2) resembles the reading given in *Singleton* and *Hutcherson*, both of which are unpublished and neither of which *Miller* cites.  No other court, at least in a reported opinion, appears to have adopted the nexus-to-tangible-evidence-or-a-tangible-object standard articulated in *Singleton* and *Hutcherson*.  *See United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 250-251 (S.D. Tex. 2020) (identifying *Singleton* and *Hutcherson* as outliers from the "most popular—and increasingly prevalent—interpretation of § 1512(c)(2) [as] an unlimited prohibition on obstructive behavior that extends beyond merely tampering with tangible items"); *Ring*, 628 F. Supp. 2d at 225 n.18 (disagreeing with *Singleton* and *Hutcherson* but finding that the alleged conduct at issue in that case involved "some nexus to documents").  No court of appeals has cited either case.

Caldwell's final challenge (ECF No. 84 at 31-40) is to Count Four, which charges the defendants with conspiracy to prevent Members of Congress by force, intimidation, or threat from discharging the duties of an office, trust, or place of confidence under the United States, and with conspiracy to induce Members of Congress by force, intimidation, and threat to leave the place where their duties as officers were required to be performed, in violation of 18 U.S.C. § 372. Caldwell argues (ECF No. 84 at 32) that Members of Congress are not "officer[s] of the United States" for purposes of Section 372, and that Members of Congress do not discharge the duties of any "office, trust, or place of confidence under the United States." He is incorrect on both scores.

### 1. Background

Section 372 makes it a crime, punishable by up to six years in prison, for two or more persons to

> conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, or to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties . . .

18 U.S.C. § 372. As relevant here, to prove a violation of Section 372, the government must prove (1) a conspiracy, (2) that the defendants voluntarily joined the conspiracy, and (3) that conspirators agreed to prevent an officer of the United States from discharging his or her duties "by force, intimidation or threat." *United States v. Beale*, 620 F.3d 856, 864 (8th Cir. 2010).

Congress first enacted an abbreviated form of the conspiracy provision that became Section 372 in the same legislation in which it adopted the seditious conspiracy provision discussed above. *See* Act of July 31, 1861, ch. 33, 12 Stat. 284 (making unlawful a conspiracy "by force, or intimidation, or threat to prevent any person from accepting or holding any office, or trust, or place

of confidence, under the United States"). Section 372's current language first appeared in full ten years later in the Enforcement Act of 1871. *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13 (codified at Rev. Stat. title 70, ch. 2, § 5336 (1878)). That broader language sought "to protect Federal officers by providing for Federal prosecution whenever they were injured because of or in the course of their duties." 1 Op. O.L.C. 274, 276, 1977 WL 18071, at *2 (1977). Like its counterpart in civil law, 42 U.S.C. § 1985(1), Section 372 "safeguards federal officials and employees against conspiratorial acts directed at preventing them from performing their duties." *Thompson v. Trump*, No. 21-cv-400, 2022 WL 503384, at *2 (D.D.C. Feb. 18, 2022).

Most reported prosecutions under Section 372 involve threats made to federal officials. *See, e.g., Beale*, 620 F.3d at 864-865 (multiple threatening emails and calls to federal district court judge); *United States v. Rakes*, 510 F.3d 1280, 1285 (10th Cir. 2007) (threatening letter to federal prosecutor); *United States v. Fulbright*, 105 F.3d 443, 446 (9th Cir. 1997) (threatening notices seeking to arrest federal bankruptcy judge), *overruled on other grounds by United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007); *United States v. Bridges*, 551 F.2d 651, 653 (5th Cir. 1977) (per curiam) ("threats and physical and verbal abuse" directed at agents from U.S. Department of the Interior in connection with dispute about hunting season); *United States v. Barber*, 442 F.2d 517, 521 (3d Cir. 1971) (threats and violence toward FBI agents arresting an deserter from the Army). At least one prosecution involved an armed confrontation between defendants and federal authorities; the defendants had refused to return to the courthouse where they had been on trial for tax-related charges. *See United States v. Gerhard*, 615 F.3d 7, 13 (1st Cir. 2010). Section 372 was also successfully prosecuted in a case involving an effort by defendants to conduct a warrantless arrest of a United States Attorney, who submitted to the arrest without resisting. *See Finn v. United States*, 219 F.2d 894, 897 (9th Cir. 1955).

**2.  Members of Congress discharge duties under an "office, trust, or place of confidence" and are "officers of the United States" for purposes of Section 372.**

The defendants are alleged to have violated Section 372 in two alternative respects, each involving a conspiracy by "force, intimidation, and threat."  ECF No. 1 at ¶ 140.  First, the Indictment alleges that they conspired to prevent "any person, that is, Members of the United States Congress, from discharging any duties of any office, trust, and place of confidence under the United States."  *Id.*  Second, the Indictment alleges that the defendants conspired to induce "any officer of the United States, that is, Members of the United States Congress, to leave the place where their duties as officers were required to be performed."  *Id.*  Each of those independent bases for conviction is sound.

a.  Members of Congress discharge duties under an "office, trust, or place of confidence under the United States."  18 U.S.C. § 372.  Given that Congress enacted these "decidedly expansive" words in the Enforcement Act of 1871, it would "strain[] credulity to think that Reconstruction-Era members of Congress meant to protect low-level Executive Branch employees but not themselves."  *Thompson*, 2022 WL 503384, at *25.  As this Court has already concluded, Reconstruction-Era dictionaries defined the terms "office" and "trust" in a manner that readily encompasses Members of Congress.  *Id.* at *26.  For example, a leading mid-nineteenth century dictionary defined "office" to include "members of the legislature."  *Id.* (citing John Bouvier, Law Dictionary, Adapted to the Constitution and Laws of the United States, and of the Several States of the Union 259 (5th ed. 1855)).  And the broader terms "trust" and "place of confidence" would also have included federal legislators.  *Id.* at *27.  In short, "[t]here can be little doubt" that Section 372's plain text "reaches members of Congress."  *Id.*

While the Enforcement Act's plain terms are decisive, its legislative history further confirms that Members of Congress fall within Section 372's ambit.  *See Bostock v. Clayton Cnty.*,

140 S. Ct. 1731, 1750 (2020) (noting that although "the law's ordinary meaning at the time of enactment usually governs," courts may also consult the legislative history at the time of a statute's enactment to determine "the understandings of the law's drafters as . . . evidence" of how terms in the statute were "ordinarily understood").  While the Senate was debating the statute that ultimately became Section 372 and its civil analogue, Senator Trumbull suggested that the statute would reach, for example, "the *Senator who sits before me* [Mr. Hamilton of Maryland] . . . while he is *here in the discharge of the duties of his office*."  44 Cong. Rec. 580 (Apr. 11, 1871) (emphasis added; brackets in original); *see also* 44 Cong. Rec. 486 (Apr. 5, 1871) (Rep. Cook: "A citizen of the United States, in any State of the Union, has a right to *vote for any officer of the United States Government*.") (emphasis added); 44 Cong. Rec. 492 (Apr. 5, 1871) (Rep. Butler: "I never held any *office of profit or salary* until I held the office of brigadier general. . . . I never held any other except that of *Representative* of the people.") (emphasis added).  Additionally, one member of the House noted that "*officers are elected by the people*."  44 Cong. Rec. 484 (Apr. 5, 1871) (Rep. Leach) (emphasis added) (discussing "States with republican forms of government").

Caldwell's counterarguments (ECF No. 84 at 35-38) lack merit.  First, he asserts that the word "accept" in Section 372 "shuts the door on any suggestion" that Section 372 covers Members of Congress because lawmakers "assume" or "take" but do not "accept" office.  *Id.* at 35 (emphasis omitted).  That assertion fails in several respects.  It is grounded on a speculative linguistic claim—that Members of Congress do not "accept" office—for which Caldwell offers no support.  Moreover, not only are the defendants not charged under the prong of Section 372 that involves preventing a person from "accepting or holding any office, trust, or place of confidence," but the alternative phrasing in that prong—that is, "accepting" *or* "holding"—encompasses both the acts of coming into the position and continuing to serve in it.

Relatedly, Caldwell claims support from Congress's decision in the Enforcement Act to "lift[]" (ECF No. 84 at 35-36 (emphasis omitted)) the phrase "holding any office . . . under the United States" from similar language in the Constitution's Ineligibility Clause, which states that "no Person holding any Office under the United States[] shall be a Member [of Congress]." U.S. Const. art. I, § 6, cl. 2. That argument is historically flawed, however, as Caldwell identifies no evidence demonstrating that Congress used the Ineligibility Clause as a template when it crafted Section 372.[7] Instead, the historical evidence, discussed in part above, shows that Congress sought to broaden protections for federal officers threatened by "Ku Klux Klan terrorism" by "providing for Federal prosecution whenever they were injured because of or in the course of their duties." 1 Op. O.L.C. at 276. The absence of historical evidence for Caldwell's claim underscores the Supreme Court's caution that "words may be used in a statute in a different sense from that in which they are used in the Constitution." *Lamar v. United States*, 240 U.S. 60, 64-65 (1916). Finally, Caldwell's argument focusing on the term "office" fails entirely to address the fact that Congress included in Section 372 the "broader" terms "trust" and "place of confidence." *See Thompson*, 2022 WL 503384, at *27. !!

Caldwell urges (ECF No. 84 at 37-38) the Court to consider the wording of commissions issued to presidential appointees such as military officers and federal judges. But he provides no explanation as to how or why those commissions illuminate Section 372's statutory text. Nothing in the relevant legislative or statutory history indicates that Congress considered those commissions in enacting Section 372 or its statutory predecessors. And Caldwell identifies no

---

[7] Similarly lacking in historical support is Caldwell's suggestion (ECF No. 84 at 37) that Congress in Section 372 had only in mind "military and civilian officers" who were "being ambushed away from their posts by Confederate forces and sympathizers." And whatever the merits of that (dubious) historical claim, it does not consider the full context in which Congress broadened Section 372's language ten years later in the Enforcement Act.

court that has looked to those commissions to construe the criminal or civil provisions in the Enforcement Act.  This Court should decline Caldwell's invitation to become the first to do so.

b.  For many of the reasons that Members of Congress discharge duties under an "office, trust, or place of confidence under the United States," Members of Congress are also "officer[s] of the United States" for purposes of Section 372.  *See Thompson*, 2022 WL 503384, at *25-*26. Caldwell argues otherwise by relying principally on a series of cases involving low-level Executive Branch officials where Section 372 was not at issue.  *See* ECF No. 84 at 32-34 (citing *United States v. Hartwell*, 73 U.S. 385 (1867) (clerk in the office of the assistant treasurer of the United States); *United States v. Germaine*, 99 U.S. 508 (1878) (surgeon appointed by the Commissioner of Pensions); *United States v. Smith*, 124 U.S. 525 (1888) (clerk in the office of the collector of customs); *United States v. Mouat*, 124 U.S. 303 (1888) (pay-master's clerk)).  Caldwell draws from those decisions the principle that the term "officer" as used in Section 372 must correspond to the term as used in the Constitution's Appointments Clause, U.S. Const. art. II, § 2, cl. 2, or another constitutional provision prohibiting certain persons from serving as Electors, U.S. Const. art. II, § 1, cl. 2.[8]

But courts have "not reflexively imported constitutional meanings into federal statutes." *Thompson*, 2022 WL 503384, at *26.  In *Lamar*, for example, a defendant prosecuted for impersonating a Member of Congress made an argument similar to Caldwell's, and the Supreme Court concluded that the relevant consideration was "obviously . . . not" the Constitution's definition of the term "officer," but instead how the term is used in the "Criminal Code."  240 U.S.

---

[8] Caldwell's argument overlooks the Constitution's reference to Members of Congress as "Officers" in other provisions.  *See, e.g.*, U.S. Const. art. I, § 2, cl. 5 ("The House of Representatives shall chuse their Speaker and other Officers."); U.S. Const. art. I, § 3, cl. 5 ("The Senate shall chuse their other Officers, and also a President pro tempore, in the Absence of the Vice President.")

at 65.  And in *Steele v. United States*, 267 U.S. 505 (1925), the Supreme Court declined to interpret the term "civil officer of the United States" to "mean an officer in the constitutional sense" but instead found that "in consideration of context," the term is "sometimes given . . . an enlarged meaning." *Id.* at 507; *see Buckley*, 424 U.S. at 269 (White, J., concurring) ("The Appointments Clause applies only to officers of the United States whose appointment is not 'otherwise provided for' in the Constitution. Senators and Congressmen are officers of the United States, but the Constitution expressly provides the mode of their selection."); *cf. Williams v. Brooks*, 945 F.2d 1322, 1325 n.2 (5th Cir. 1991) ("removal is proper under section 1442(a)(1), however, as a congressman is an 'officer of the United States' within the meaning of that subsection"); *Hill Parents Ass'n v. Giaimo*, 287 F. Supp. 98, 99-100 (D. Conn. 1968)  ("A member of Congress is unquestionably an officer of the United States as this term is commonly used and must be considered as such pursuant to Section 1442(a)(1).").

A definition of "officer of the United States" for purposes of Section 372 that omits a Member of Congress would "leave an omission so wide and important" in Section 372 that Congress "ought not to be presumed to have intended" such an interpretation. *Hartwell*, 73 U.S. at 395-396.  That is particularly the case where the Enforcement Act's legislative history suggests that Members of Congress were personally affected by the violence that prompted them to draft the Enforcement Act.  For instance, a House member testified, "I am reliably informed that not three days ago a member of this House was urged by an official, who is charged with the important duties in connection with the enforcement of the criminal law, not to vote for this bill, for the reason that he could not safely return to his home if he did."  44 Cong. Rec. 484 (Apr. 5, 1871) (Rep. Wilson).

### IV.    <u>Conclusion</u>

For the foregoing reasons, this Court should deny the defendants' motions to dismiss.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:    _____
       Kathryn L. Rakoczy
       Assistant United States Attorney
       D.C. Bar No. 994559
       Ahmed M. Baset
       Troy A. Edwards, Jr.
       Jeffrey S. Nestler
       Assistant United States Attorneys
       Louis Manzo
       Special Assistant United States Attorney
       U.S. Attorney's Office for the District of
       Columbia
       555 4th Street, N.W.
       Washington, D.C. 20530

       _____
       Justin Sher
       Alexandra Hughes
       Trial Attorneys
       National Security Division
       United States Department of Justice
       950 Pennsylvania Avenue, NW
       Washington, D.C. 20004

       */s/ James I. Pearce*
       James I. Pearce

Appellate Counsel, Capitol Siege Section
United States Attorney's Office
NC Bar No. 44691
555 Fourth Street, N.W.
Washington, DC 20530
James.Pearce@usdoj.gov