**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES                                        *

vs.                                                  *     Case No.: 22-15 APM

THOMAS E. CALDWELL                                   *
(U.S. v. Elmer Stewart Rhodes)
      *      *      *      *      *      *      *      *      *      *      *

**CALDWELL'S REPLY IN SUPPORT OF**
**MOTION TO DISMISS COUNTS 1, 2, 3 & 4**

I.     **The Government has not alleged a seditious conspiracy.**

A.  **Where relevant, the cases cited by the Government support Caldwell's position**.

Emphasizing quantity over quality, the Government's filing cites five cases that

involve inapposite portions of the seditious conspiracy statute which, accordingly, have

absolutely no relevance to the issue at hand.  For example, one case involved a plot to

"overthrow, put down, and destroy by force the government of the United States and to levy

war against them."  *Bryant v. United States*, 257 F. 378, 380-82 (5th Cir. 1919).  *See also*

*Phipps v. United States*, 251 F. 879, 880 (4th Cir. 1918) (defendants indicted under the

property seizure portion of the seditious conspiracy statute); *United States v. Lebron*, 222

F.2d 531, 532 (2d Cir. 1955) (defendants indicted for conspiring to gain Puerto Rican

independence by "force, violence, and armed revolt"); *United States v. Rahman*, 854 F.

Supp. 254, 254-55 (S.D.N.Y. 1994) (indictment alleged that defendants engaged in "a

seditious conspiracy to levy war of urban terrorism against the United States").

1

The cases cited by the Government that *actually relate to* the portion of Section 2384 that the *Rhodes* defendants are charged with support Caldwell's position that an essential element of the crime is that force is intended to be used against executive branch personnel attempting to enforce the law. *See Reeder v. United States*, 262 F. 36, 37 (8th Cir. 1919) ("The indictment further alleged that the defendants . . . opposed by force . . . the authority of the United States, *its agents and officers, in the enforcement of said act*.") (emphasis added); *Orear v. United States*, 261 F. 257 (5th Cir. 1919) (indictment alleging a "conspiracy to resist *the enforcement of a law* of the United States, viz. the Selective Service Act, . . . by resisting by force . . . *officers* who might *attempt to arrest* [draft evaders].") (emphasis added); *Wells v. United States*, 257 F. 605, 614 (9th Cir. 1919) (defendants conspired "to oppose by force *the President in putting into execution the law* respecting the militia") (emphasis added).

Additionally, the Government cited an 1861 grand jury instruction given by Judge Peleg Sprague regarding seditious conspiracy. (ECF 123 at 25-26). Judge Sprague's 1861 grand jury charge, however, sheds no light on what Congress meant by the phrase "execution of any law of the United States." By contrast, a grand jury charge given by Judge Sprague *two years later* supports Caldwell's reading of the seditious conspiracy statute. Judge Sprague, in explaining the reasons behind Congress's enactment of the seditious conspiracy statute, advised the grand jury:

> Until the year 1861, [treason and concealing treason] were the only provisions of the criminal law for the suppression of acts *directly tending to the destruction of the government*.
>    There were indeed statutes making it criminal to obstruct, resist, or impede *the execution of legal process*, or to assault, beat, or wound any officer or other person duly authorized, *in serving such process*[.] . . . But these were regarded as minor offences[.] . . .

Under these laws, a marshal of the United States *might be forcibly resisted*, and he and his aids actually murdered, *while in the execution of lawful process* within a state, and yet the courts of the United States could sentence the offenders to no higher punishment than imprisonment for one year, and . . . state law might or might not prohibit such acts . . .[.]

Such was the condition of our criminal jurisprudence for the protection of the life of the government, and *to secure the enforcement of the laws*, up to the time of the breaking out of this Rebellion.

*Charge to Grand Jury—Treason*, 30 F. Cas. 1042, 1043 (D. Mass. 1863) (emphasis added).

In short, the authorities cited by the Government, ironically, vindicate Caldwell's position (as does the Government's proffer of legislative history).[1]

**B.  *Baldwin v. Franks* supports Caldwell's position.**

The Government attempts to minimize the Supreme Court's holding in *Baldwin v. Franks*, asserting that this decision "simply illustrate[s] the uncontested principle that for an individual to violate Section 2384, he or she must plan to use force in service of resistance against the government."  (ECF 123 at 24).  The Government, respectfully, misreads *Baldwin*, which held that, to constitute a seditious conspiracy, the target of the conspiracy's force must be government officials who are "endeavoring to carry the laws into execution":

---

[1] The Government cited the sponsor of the seditious conspiracy statute, Senator Trumbull, who gave, as an example of a violation of the statute, a congregation of settlers who, by threats and intimidation, deter a federal land officer from selling public lands. (ECF 123 at 11).  This example, tellingly, is of a conspiracy aimed at an executive branch officer attempting to execute federal law.

Interestingly, Senator Trumbull, as the Government noted, explained that the bill's purpose was "to punish persons who conspire together to commit offenses against the United States *not analogous to treason*."  (ECF 123 at 10) (*citing* 31 Cong. Rec. 277 (Jul. 26, 1861)) (emphasis added).  By contrast, the Government has taken the strong-arm position in recent plea agreements that the "most analogous" offense to seditious conspiracy under federal sentencing guidelines *is treason*.

[T]he offence consists in preventing, hindering, or delaying the government of the United States in the execution of its laws. This . . . *means something more than setting the laws themselves at defiance*. There must be a forcible resistance of the authority of the United States *while endeavoring to carry the laws into execution*. . . .  But that is not what Baldwin has done. His conspiracy is . . . not for hindering or delaying the United States *in the execution of their measures to prevent [Chinese mistreatment under the treaty]*.  His force was exerted against the Chinese people, and not against the government *in its efforts to protect them*.

*Baldwin v. Franks*, 120 U.S. 678, 693-94 (1887) (emphasis added).  The seditious conspiracy statute "is intended to reach conspiracies . . . against the enforcement of [federal law]."  *Id*. at 705 (J. Field, dissenting).  Under *Baldwin*, the Government must prove that "the purpose of the [seditious] conspiracy was the exertion of force *against those charged with the duty of executing the law of the United States*[.]"  *Anderson v. United States*, 273 F. 20, 22-23 (8th Cir. 1921) (emphasis added).  Section 2384's "*prima facie meaning* condemns force only when a conspiracy exists to use it against *some person who has authority to execute and who is immediately engaged in executing a law of the United States*."  *Haywood v. United States*, 268 F. 795, 800 (7th Cir. 1920) (emphasis added).

To counter Caldwell's reliance on the holdings in *Baldwin*, *Anderson*, and *Haywood*, the Government cites a handful of dictionaries to support its claim that the word "execution" as used in Section 2384 means "to bring a law into effect."  (ECF 123 at 15-16).  The Government's attempt to split hairs as to the word "execution" misses the point:  the historical evidence is overwhelming that the phrase "execution of the law"—even if it means "to bring a law into effect"-- is inextricably tied to the actions of *the executive branch*:

If the Executive Power Clause vests anything [in the President] beyond the authorities listed in Article II, *it surely vests the power to execute the laws*. The

4

power to execute the laws is the quintessential executive power. In fact, "executive" comes from the verb "to execute," which means to perform, to put into action. Samuel Johnson's Dictionary, a dictionary from the founding era, recorded the meaning of "executive" as "active; not deliberative; *not legislative*; having the power to put in act the laws." The Oxford English Dictionary (of more recent vintage) confirms that the definition has not changed as it defines "executive" as a "distinctive epithet of *that branch of the government which is concerned or charged with carrying out the laws*, decrees, and judicial sentences." Though dictionaries do not always precisely capture how a particular word is actually used in common parlance, in this case, *history confirms that the founding generation used the phrase "executive power" precisely as did the founding-era dictionary. . . . [T]he founders clearly understood that the executive power was the power to execute the laws.*

Saikrishna Prakash, *Article II: The Essential Meaning of Executive Power*, 2003 U. Ill. Rev. 701, 716 (2003) (internal citations omitted) (emphasis added).  Respectfully, there can be no doubt that the phrase "execution of any law of the United States," as used in Section 2384, refers to executive branch personnel enforcing federal laws.

The Government complains that Caldwell's assertion that "only executive officials can execute the laws" implausibly means "that the relevant provisions of the Twelfth Amendment and the 3 U.S.C. §15 are not 'executed' at all."  (ECF 123 at 18).  Actually, this position is not radical:  "The structure of the Constitution does not permit Congress to execute the laws[.]"  *Bowsher v. Synar*, 478 U.S. 714, 726-27 (1986).  In conducting the Electoral College certification, Congress is not "executing a law"; rather, it fulfills a "judicial in character" constitutional duty.  *Buckley v. Valeo*, 424 U.S. 1, 133-34 (1976).

## C. *Buckely v. Valeo* rejected the Government's position in the instant case.

The Government, recognizing that *Buckley* creates an insuperable roadblock to its seditious conspiracy case, urges the Court to effectively overlook *Buckley* and, instead,

create a new category of constitutional law, i.e., the "special purposes" doctrine, whereby the

12th Amendment is exempted from the traditional separation of powers analysis:

> Recognizing that the President of the Senate and the House of Representatives execute the Twelfth Amendment and the Electoral Count Act is entirely consistent with the Constitution's system of separated powers, which allows—indeed, mandates—a "partial intermixture" of legislative, executive, and judicial branches *for certain 'special purposes'* such as impeachment, ratification of treaties, and administration of the presidential election.

(ECF 123 at 17) (emphasis added).[2]  Averring that the Electoral College process is a "special

context," the Government views *Buckley* as not controlling the instant case.  *Id*.

The Court should reject the Government's proposed "special purposes" doctrine for

two reasons.  First, *Buckley* rejected it.  *Buckley,* 424 U.S. 1, 132 (1976) (per curiam) ("We

see no reason to believe that the authority of Congress over federal election practices is of

such a wholly different nature from the other grants of authority to Congress that it may be

employed in such a manner as to offend well-established constitutional restrictions stemming

from the separation of powers.").  Second, *Buckley* thoroughly rejected the Government's

position that the Electoral College process was the "execution" of law.

---

[2] The Government cited Congress's treaty authority and Alexander Hamilton to support its "special purposes" argument.  (ECF 123 at 17-18).  The Government's characterization of Hamilton's beliefs is, unfortunately, contrary to the historical record.  Hamilton, in defending President Washington's famous "Neutrality Proclamation," wrote that "the executive power is vested in the president; *subject only to exceptions and qualifications* which are expressed *in the [Constitution]*."  4 THE WORKS OF ALEXANDER HAMILTON 439 (Lodge ed., 1904).  President Washington, according to Hamilton, was "charged with the execution of the laws, *of which treaties form a part*."  *Id*. at 437 (emphasis added).  "The executive," Hamilton bluntly wrote, "is charged with the execution of *all* laws[.]"  *Id*. at 440 (emphasis added).

The Government insists that *Buckley* "said nothing about whether the performance of Twelfth Amendment functions constitutes the United States' 'execution of [a] law.'" (ECF 123 at 22). Not so. In fact, in its briefing before the Supreme Court, the FEC (Appellee-FEC Commissioner Francis Valeo) asserted, front and center, the following argument:

## III.

**Congress' Fundamental Constitutional Role in the Conduct of the Federal Electoral Process Embraces, in Addition to Its Legislative Power, the Performance of Quasi-Judicial *and Quasi-Executive Functions*.**

Brief of Appellee at 20, *Buckley*, 424 U.S. 1 (1976) (emphasis added). In pursuance of this argument, the FEC's brief quoted the 12th Amendment, noting that it was an enumerated power of Congress relating to presidential elections. *Id*. at 21. Immediately after quoting the 12th Amendment, the FEC's brief, tellingly, asserted:

> It was *in execution* of this responsibility[, i.e., the 12th Amendment,] to judge the *bona fides* of returns that Congress devised the procedures[, i.e., 19 Stat. 227], utilized in adjudicating the disputed Hayes-Tilden contest of 1876.

*Id*. at 22 (emphasis added). The FEC's argument in *Buckley* was clear: congressional appointees to the FEC could execute law just like Congress had previously engaged in the "execution" of the 12th Amendment by "devis[ing] the procedures"—including passing what is now 3 U.S.C. § 15 -- to carry out its Electoral College responsibilities.[3]

The *Buckley* Court rejected the FEC's argument, which is the same argument the Government makes before this Court:

> Appellees also *rely on the Twelfth Amendment* to the Constitution insofar as the *authority* of the Commission *to regulate practices in connection with the*

---

[3] The FEC's brief summarized its argument thusly: "[T]hat the Constitution confers upon the Congress broad and pervasive responsibilities in relation to the federal electoral process and that these embrace, in addition to Congress' legislative role, auxiliary powers of a quasi-judicial and *quasi-executive character*." *Id*. at 6-7 (emphasis added).

> *Presidential election is concerned.* This Amendment provides that certificates of the votes of the electors be "sealed [and] directed to the President of the Senate," and that the "President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." The method by which Congress resolved the celebrated disputed Hayes-Tilden election of 1876, reflected in 19 Stat. 227, supports the conclusion *that Congress viewed this Amendment as conferring upon its two Houses the same sort of power "judicial in character*[.]"  . . .

*Buckley*, 424 U.S. at 133-34 (emphasis added) (internal citation omitted).  In short, *Buckley* rejected the FEC's argument that Congress's Electoral College procedures under the 12th Amendment set a precedent whereby Congress was executing a law.  Accordingly, the *Buckley* Court struck down the portion of the Elections Act of 1971 that authorized congressional appointees to, *inter alia*, execute laws as part of the FEC.  *Id*. at 135.

As noted previously, the 19th century statute, cited by *Buckley,* that "supports the conclusion that Congress viewed [the 12th Amendment] as conferring [to it] . . . 'judicial in character' [power]," is now codified as 3 U.S.C. § 15, i.e., *the very statute that the Rhodes defendants allegedly stopped the "execution" of*.  Per *Buckley*, Congress was not engaged in the "execution of any law of the United States" when it was conducting its "judicial in character" function of certifying the Electoral College.  This conclusion is not surprising because, as the D.C. Circuit opined, "the Constitution clearly places the responsibility for executing the laws in the executive branch rather than in Congress."  *Buckley v. Valeo*, 519 F.2d 821, 926 (D.C. Cir. 1975) (*aff'd* in part, *rev'd* in part on other grounds, 424 U.S. 1 (1976)).  In short, *Buckley* slams the door on any argument that Congress, *including the Vice-President*,[4] was engaged in the "execution of any law of the United States" on J6.

---

[4] Contrary to the Government's insinuation, (ECF 123 at 23), Vice-President Pence possessed no executive authority during his tenure, even when not serving as a purely legislative officer during the Electoral College certification.  *See* Glen H. Reynolds*, Is Dick Cheney Unconstitutional?,*

**D.  The Indictment, per *Baldwin* and *Buckley*, does not state an offense.**

Count 1 of the Indictment alleges that the *Rhodes* defendants conspired to forcibly "prevent, hinder, and delay the execution of any law of the United States."  (ECF No. 1, ¶15).  The Indictment then lays out the "purpose" of the seditious conspiracy:

> 16.  The purpose of the conspiracy was to oppose the lawful transfer of presidential power by force, by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code.

(ECF 1, ¶16).

Count 1 is very clear that the *Rhodes* defendants attempted to stop the lawful transfer of presidential power "by force, by preventing, hindering or delaying by force the execution of" the 12th and 20th Amendments, and 3 U.S.C. § 15.  (ECF 1, ¶16).  These provisions are prominently mentioned in the very first paragraph of the Indictment, and incorporated by reference in Count 1.  (ECF 1, ¶¶1,14).  Count 1 alleges a conspiracy with force aimed at the laws themselves (the "election laws") and not at those who are authorized to execute the law.  Accordingly, the Indictment fails because *Baldwin* held that "setting the laws themselves at defiance" does not constitute a seditious conspiracy. *Baldwin*, 120 U.S. at 693.  As *Baldwin* makes clear, a seditious conspiracy requires that the "force" used by the conspirators be targeted at a *human being* authorized to execute the federal law being carried out, not at intangible concepts like the law.  How, exactly, does one apply "force" against a law?[5]

---

102 Northwestern L. J. 110, 111 (2007) ("The Constitution gives the Vice President no executive powers[.]").

[5] Applying force against a "law" is like applying force against calculus formulas or philosophical doctrines.

Alternatively, if the Court believes that the Indictment can be broadly read as alleging that Members of Congress were "executing" the election laws, Count 1 still must be dismissed. The Indictment's clear allegation is that the *Rhodes* defendants forcibly targeted "the execution of . . . the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code." (ECF 1, ¶16). These constitutional and statutory duties relate exclusively to Congress. Congress, however, is constitutionally prohibited from engaging in the "execution of any law of the United States." *See Bowsher*, 478 U.S. at 726-27. Even if Congress could theoretically execute the law, *Buckley v. Valeo* emphatically held that the Electoral College certification process via the 12th Amendment and 3 U.S.C. § 15 is a judicial-like function, not Congress engaging in law-execution. Count 1, despite setting forth a detailed purpose of the conspiracy, fails to name as the target of the conspiracy's force a person authorized to execute a law that the *Rhodes* defendants opposed. Accordingly, Count 1 fails to state an offense.

### E.  The Twentieth Amendment cannot be "executed."

The Government's claim that the 20th Amendment saves Count 1 is meritless. The 20th Amendment provides, in pertinent part:

> Sec. 1: The terms of the President and Vice President *shall end at noon on the 20th day of January*, and the terms of Senators and Representatives at noon on the 3d day of January, of the years in which such terms would have ended if this article had not been ratified; *and the terms of their successors shall then begin*.

U.S. Const. Amend. XX, § 1. No person "executes" the 20th Amendment, which automatically, *by operation of law*, ended the presidency of President Trump on January 20, 2021 at noon. *Cf. EDS Corp., Iran v. Soc. Sec. Org.*, 508 F. Supp. 1350, 1359 (N.D. Tex. 1981) (finding that an executive order signed by President Carter on January 18, 1981, but

not published in compliance with federal law until after President Reagan took office, was

likely void under the 20th Amendment).  Joseph R. Biden became President by operation of

law on January 20, 2021 at noon.  Count 1 fails to state an offense for the obvious reason that

nobody "executes" the 20th Amendment.[6]


II.    **Counts 2 & 3 must be dismissed**.

As Caldwell has fully briefed his respectful disagreements with the Court's prior

ruling vis-à-vis 18 U.S.C. § 1512, and the Government has not responded to Caldwell's plain

language arguments, no additional argument is presented as to Counts 2 & 3.


III.    **Count 4 must be dismissed, as 18 U.S.C. § 372 does not apply to Congress**.


A.  **The plain language of 18 U.S.C. § 372 confirms Caldwell's position.**

The plain language of 18 U.S.C. § 372 clearly excludes Members of Congress.

Section 372 makes it a crime for two or more persons to

> conspire to prevent, by force, intimidation, or threat, any person from
> *accepting or holding any office, trust, or place of confidence under the United
> States*, or from discharging any duties thereof, or to induce by like means any
> *officer of the United States* to leave the *place*, where his duties as an officer are
> required to be performed, or to injure him in his person or property on account

---

[6] The Government claims that the *Rhodes* defendants' conspiracy "encompassed using
violence to stop the Inauguration[.]"  (ECF 123 at 23).  This wild claim gets the Government
nowhere.  First, putting a melodramatic spin on private social media communications is not
"proof" that any defendant intended violence "to stop the Inauguration."  Second, the
Inauguration is not a constitutionally-mandated function but, instead, a ceremony akin to a
wedding reception, which occurs after the couple is married.  By the 20th Amendment,
Donald Trump's presidency automatically ended at the same time President Biden's
presidency began.

> of his lawful discharge of the duties of his *office*, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties . . .

18 U.S.C. § 372. This statute protects "officer[s] of the United States" and "person[s] . . . accepting or holding "office[s], trust[s], and place[s] of confidence." *Id.* Section 372's language, however, strongly suggests that an office, trust, and place of confidence are stations *occupied* by an "officer of the United States." After the term "officer of the United States," for example, Congress used the nouns "place" and "office" to describe venues occupied by an "officer of the United States." A fair reading of Section 372 is that "officer[s] of the United States" are equivalent to those "holding any office, trust, or place of confidence under the United States."[7]

Binding precedent holds that the term "officer of the United States," absent unambiguous language to the contrary, means "officer" as that term is used in the Appointments Clause. *United States v. Hartwell*, 73 U.S. 385, 393- 394 n.9 (1868) ("an office is a public station, or employment, conferred by the appointment of government"); *United States v. Germaine*, 99 U.S. 508, 509-10 (1878) (holding that the statutory term "officer of the United States" is "defined by the Constitution" in the Appointments Clause); *United States v. Mouat*, 124 U.S. 303, 307 (1888) (same).

---

[7] Section 372 uses the broader term "person" ("any person from accepting or holding any office, trust, or place of confidence") in describing the occupants of offices, trusts, and places of confidence. The term "person" was likely used for two reasons. First, Section 372 covered not only officers "holding" their positions, but also those on the cusp of accepting offices and, as such, were not yet "officers of the United States." The term "person," accordingly, covered both current and future officers. Second, as discussed *infra*, Section 372's language mirrors that used in the Constitution's Ineligibility Clause, which also used the term "person." In short, a "person" under Section 372 clearly means an "officer of the United States" or someone on a path to becoming an "officer of the United States."

The Government does not dispute that *Hartwell*, *Germaine*, and *Mouat* are binding precedent or that Appointments Clause officers do not include Members of Congress. Instead, the Government cites Section 372's reference to "any office, trust, or place of confidence under the United States" as proof that Congress included itself within the statute. The Government's argument is flawed for several reasons, most notably because of Section 372's use of the word "accepting."

The first portion of Section 372 disjunctively creates *two* separate crimes: one aimed at victims on the cusp of "accepting . . . any office, trust, or place of confidence," the other at victims contemporaneously "holding any office, trust, or place of confidence." The Government argues that under Section 372's "alternative phrasing," Members of Congress "hold" offices even if they do not "accept" their offices. (ECF 123 at 44). To the contrary, while the verbs "accepting" and "holding" create two separate *methods* of violating Section 372, they nonetheless relate to the *same nouns*, i.e., "office[s], trust[s], and place[s] of confidence." Accordingly, one attains a position at an "office, trust, or place of confidence" by "accepting" that position. Logically, for one to "accept" an "office, trust or place of confidence" presupposes that the person was offered or given such a position.[8] Members of Congress are not offered their positions; rather, they campaign for office and are elected by the voters, after which they "assume" or "take" office. The Government labels Caldwell's

---

[8] "Accepting" is a transitive verb that means "to take something that someone gives you." https://www.macmillandictionary.com/us/dictionary/american/accept.

straight-forward interpretation "a speculative linguistic claim." (ECF 123 at 44). Caldwell

has a different label: a commonsense reading of Section 372.[9]

As Congress did not include itself[10] in Section 372 by using the word "accepting,"

there really is no need to analyze the word "holding" (i.e., "accepting or *holding* any office,

trust, or place of confidence[.]"). Nonetheless, Caldwell demonstrated that the term

"holding," as used in Section 372, excludes Members of Congress by citing the Ineligibility

Clause of the Constitution, which contains identical language. *Compare* 18 U.S.C. § 372

("***any person . . . holding any office . . . under the United States***") *with* U.S. Const., Art. I,

§ 6, cl. 2 ("[N]o **Person holding any Office under the United States**, shall be a Member of

either House during his Continuance in Office."). Using language identical to that used in

*the Ineligibility Clause* would seem to be an odd way for Congress to unambiguously include

itself as "holding" an "office" under Section 372.

Additionally, Caldwell cited numerous federal and state constitutional provisions that

clearly illustrated that offices of "trust," in the eyes of the Founding generation, excluded

---

[9] The Government cited eight Section 372 cases, all of which clearly involved attacks on
Appointments Clause officers. (ECF 123 at 42).

[10] The Government finds it unthinkable that Members of Congress would have excluded
themselves from the protections of Section 372. Caldwell's answer: Why *would* Congress have
included itself? The first section of the statute was passed on July 1, 1861 at a time when dozens
of federal forts, outposts, docks, shipyards and other facilities maintained by "officers of the
United States" throughout the South were being overrun. Capitol Hill was not being threatened.
In fact, the congressmen who remained loyal to the Union largely viewed the secession
movement as a farce, with many traveling to Manassas, Va. to watch the Battle of the First Bull
Run on July 21, 1861, three weeks *after* the first portion of Section 372 was passed.
 Likewise, the second portion of Section 372, which added the term "officer of the United
States," was passed as part of the Enforcement Act, which addressed Klan violence in the South.
The "officers" who were being chased from their posts were not Members of Congress but,
rather, officers of the Freedmen's Bureau and the military.

elected officials.  (ECF 84 at 39-40).  The Office of Legal Counsel, after exhaustive

historical research, also concluded that the term "office of trust" is an equal or lesser

included entity than an "office under the United States."  In examining the Emoluments

Clause, for example, the OLC opined:

> The text of the Emoluments Clause suggests that an "Office of Profit or Trust
> under [the United States]" must be an "Office under the United States." As
> discussed below, to the extent that the phrase "of Profit or Trust" is relevant, *it
> may serve to narrow* an "Office . . . under [the United States]" to those that are
> "of Profit or Trust," or an "Office of Profit or Trust" may be synonymous with
> an "Office . . . under [the United States]," but it is clear that the words "of
> Profit or Trust" *do not expand coverage* of the Emoluments Clause beyond
> what would otherwise qualify as an "Office . . . under [the United States]."

*See Application of the Emoluments Clause to a Member of the President's Council on*

*Bioethics*, 29 Op. O.L.C. 55, 56-57 (2005) (emphasis added).

### B.  **The Court's holding in *Thompson v. Trump* is, respectfully, flawed.**

The Government heavily relies on the Court's holding in *Thompson v. Trump*, a J6-

related civil suit involving Section 1985.  *Thompson v. Trump*, 2022 U.S. Dist. LEXIS 30049

\* (APM).  Unfortunately, President Trump's briefing in that case did not include the much

stronger arguments set forth by Caldwell, which resulted in, respectfully, flaws in the Court's

opinion.  Most notably, Trump did not assert the plain language argument based on the word

"accepting" in Section 372, which shuts the door on any notion that Members of Congress

are included in the statute.

Additionally, Trump did not bring to the Court's attention binding Supreme Court

precedent laid out in Caldwell's papers as to the terms "office" and "officer of the United

States."  This led the Court to discern the meaning of the word "office" from 19th century

dictionaries, finding that "Reconsturction-Era dictionaries defined that term to include

legislators." *Id*. at 84-85. The Court's analysis in *Thompson*, however, is in direct conflict with *United States v. Hartwell*, where the Supreme Court, referencing the Appointments Clause, held that "an office is a public station, or employment, *conferred by the appointment of government*." *Hartwell*, 73 U.S. at 393-94 n.9 (1868) (emphasis added). *Hartwell*, *Germain*, and their progeny stand for the proposition that an "office" refers to a station held by officers appointed via the Appointments Clause, which excludes Members of Congress.

The Court also, as a result of inadequate briefing, erroneously concluded that the Reconstruction-Era Congress also would have understood the terms "trust" and "place of confidence" to include members of Congress. *Thompson* at 86. The Court opined:

> In fact, the term ["trust"] had a meaning broader than the term "office." It included *"a confidence reposed in one person for the benefit of another."* BURRILL, *supra*, at 549. And, though the term "place of confidence" does not appear in the legal dictionaries of the day, its natural meaning must be as all-encompassing as "trust." There can be little doubt that the plain text of § 1985(1) reaches members of Congress.

*Id.* (citing 2 Alexander M. Burrill, A LAW DICTIONARY AND GLOSSARY 257 (2d ed. 1867)) (emphasis added). Ironically, the definition of "trust" cited by the Court includes "a *confidence reposed* in one person for the benefit of another," which is *strikingly similar to language used in presidential commissions*. *See*, *e.g.*, *Embry v. United States*, 100 U.S. 680 (1879) (reprinting language for a Postmaster commission: "Know ye, that *reposing special trust and confidence* in the integrity . . . of Bowling Embry, I [President Grant] have . . . appoint[ed] him deputy postmaster at Nashville . . . to execute . . . the duties of that office[.]") (emphasis added). In other words, the Court's definition of "trust" cited in *Thompson* supports Caldwell's position that a "trust" and "place of confidence" were

references to Appointments Clause positions, i.e., federal judges and Article II appointees, whom the President "reposes trust and confidence" in to carry out their offices.

In *Thompson*, moreover, the Court acknowledged that it could not find a contemporaneous definition for "place of confidence," but determined that it was an "all-encompassing term" which included members of Congress. *Thompson* at 86. Likewise, the Government's filing provides no explanation for the term "place of confidence." By contrast, Caldwell is the only litigant to bring forth a plausible meaning as to this term, citing the ubiquitous presidential commissions issued to Appointments Clause officers that have been issued since the founding, which use the words "trust and confidence." Respectfully: Is it just a coincidence that the terms "office," "officer of the United States," "trust," "confidence," and "discharge the duties thereof" appear in both Section 372 *and* presidential commissions issued via the Appointments Clause?

### C. The Court and Government, respectfully, misconstrued *Lamar v. United States*.

In *Thompson*, the Court relied on *Lamar v. United States* in support of its position that the term "officer of the United States" in Section 372 includes Members of Congress:

> Moreover, the Supreme Court has not reflexively imported constitutional meanings into federal statutes, as President Trump urges the court to do. *Lamar v. United States*, 240 U.S. 60, 36 S. Ct. 255, 60 L. Ed. 526 (1916), is illustrative. There, a defendant who presented himself as a member of the House of Representatives was convicted of impersonating "an officer of the United States." *Lamar*, 240 U.S. at 64. On appeal, the defendant asserted, much like President Trump does here, "that the interpretation of the Constitution was involved in the decision that a Congressman is an officer of the United States." *Id.* The Court soundly rejected that argument, saying "[a]s to the construction of the Constitution being involved, it obviously is not." *Id.* at 65. "[W]ords may be used in a statute in a different sense from that in which they are used in the Constitution." *Id.* The pertinent question, the

Court said, was what "officer" meant not in the Constitution but in the criminal code. *Id.* The same is true here.

*Thompson* at 84-85 (*citing Lamar v United States*, 240 U.S. 60 (1916)).  Respectfully, the Court and Government have completely misconstrued the holding in *Lamar* which, ironically, backs up Caldwell's position.

Actually, the Supreme Court issued two separate opinions regarding the prosecution of David Lamar.  This Court in *Thompson* cited the first Supreme Court opinion, *United States v. Lamar*, 240 U.S. 60 (1916), which included a barebones recitation of facts and virtually no legal analysis.  The Court, apparently, was unaware of the second *Lamar* opinion, which has an extensive factual and legal analysis that emphatically buttresses Caldwell's position and undermines the Court's *Thompson* decision.

In *Lamar* (II), the defendant was charged with impersonating a Member of Congress for the purpose of defrauding a creditor under Penal Code Section 32, which punished anyone who

> with intent to defraud either the United States or any person, shall falsely assume or pretend to be *an officer or employee acting under the authority of the United States, or any Department, or any officer of the Government thereof*, . . .[.]

*Lamar v. United States*, 241 U.S. 103, 111 (1916) (*citing* Penal Code § 32) (emphasis added).  The criminal statute at issue prohibited impersonating three separate categories of officers.  The indictment lodged against the defendant charged the *last category* of "officers," i.e., an "officer of the Government":

> The indictment charged that at a stated time the petitioner "unlawfully, knowingly and feloniously did falsely assume and pretend to be *an officer of*

> *the Government of the United States*, to-wit, a member of the House of
> Representatives of the Congress of the United States of America[.]

*Id*. at 111 (emphasis added).  In short, the issue before the Supreme Court was whether a

Member of Congress was an "officer of the Government" within the meaning of the statute

not, as the Court believed in *Thompson*, an "officer of the United States."

> The *Lamar* Court opined:

> It is insisted that no offense under the statute was stated in the indictment
> because a member of [Congress] is not an officer acting under the authority of
> the United States within the meaning of the provision of the Penal Code *upon*
> *which the indictment was based*. This contention is supported by reference to
> what is assumed to be the significance in one or more provisions of the
> Constitution. . . .  But . . . the issue here is not a constitutional one, but who is
> an officer acting under the authority of the United States *within the provisions*
> *of the section of the Penal Code under consideration*? And that question must
> be solved by the text of the provision, *not shutting out as an instrument of*
> *interpretation proper light which may be afforded by the Constitution* and not
> forgetting that a penal statute is not to be enlarged by interpretation[.]  *United*
> *States* v. *Hartwell*, 6 Wall. 385, 395[.]

*Id.* at 112 (emphasis added).  The above-quoted language, respectfully, is at odds with

*Thompson,* where this Court expressed "doubts that Congress intended to use the

Constitution as a dictionary for interpreting the words found in [the Enforcement Act]."

*Thompson* at 83.

> The *Lamar* Court then analyzed the relationship between Members of Congress and

the *government* to determine whether the statutory term "officer of the Government"

extended beyond the traditional "officer of the United States" definition stated in *Hartwell*:

> Guided by these rules, when the relations of members of the House of
> Representatives *to the Government* of the United States are borne in mind and
> the nature and character of their duties and responsibilities are considered, we

> are clearly of the opinion that such members are embraced *by the*
> *comprehensive terms of the statute.*

*Lamar*, 241 U.S. at 112 (emphasis added).  Respectfully, the second *Lamar* opinion conflicts

with this Court's opinion in *Thompson* in two significant respects:  1) *Lamar* involved the

definition of officer of "the Government," not "officer of the United States"; and 2) *Lamar*

followed *Hartwell* for the proposition that courts, in construing the term "officer," should

look to the Constitution for definitional guidance.[11]

A fair reading of *Lamar* II is that it followed the *Hartwell* and *Germaine* line of cases,

but found that "the comprehensive terms of the statute," i.e., "officer of the Government,"

evinced a clear intent by Congress to reach beyond Appointments Clause officers.  The term

"officer of the United States," under binding precedent, is presumed to mean Appointments

Clause officers.  The language surrounding "officer of the United States" in Section 372,

unlike the statute in *Lamar*, does not clearly and unambiguously demonstrate that Congress

intended to include themselves in that provision.  In fact, the plain language proves

otherwise.

### D.  Obviously Members of Congress are "officers."

Caldwell does not dispute that Members of Congress are constitutional officers.

Likewise, Caldwell does not dispute that both a Sherman tank and a Prius are "automobiles."

All "officers" and "offices" under the Constitution, in other words, are not the same,

especially as used in 19th century statutes.  The Civil War to Reconstruction-era Congresses

---

[11] Nine years after *Lamar*, the Supreme Court reasserted:  "It is quite true that the words 'officer of the United States,' when employed in the statutes of the United States, is to be taken usually to have the limited constitutional meaning."  *Steele v. United States*, 267 U.S. 505, 507 (1925).

that drafted Section 372 also drafted and passed the 14th Amendment's "Rebel

Disqualification Clause," which provided:

> **Sec. 3.** No person shall be a Senator or Representative in Congress, or elector
> of President and Vice-President, *or hold any office*, civil or military, under the
> United States, or under any State, who, having previously taken an oath, as a
> member of Congress, *or as an officer of the United States*, or as a member of
> any State legislature, or as an executive or judicial officer of any State, to
> support the Constitution of the United States, shall have engaged in
> insurrection or rebellion against the same[.]

U.S. Const. Amend. XIV, sec. 3 (emphasis added).  Clearly, the postbellum Congress did not

view themselves as "officer[s] of the United States."  The second half of Section 372, as the

Government noted, was added during Reconstruction, including the term "officer of the

United States."  (ECF 123 at 42).  Respectfully, it is beyond belief that the same Congress

that distinguished between their Members and "officer[s] of the United States" in the 14th

Amendment intended, three years later, a different meaning in Section 372.

### E. Legislative history does not support the Government's position.

The Government claims that "legislative history further confirms that Members of

Congress fall within Section 372's ambit."  (ECF 123 at 43).  To buttress its claim, the

Government quotes snippets from the Congressional Record during debates on the

Enforcement Act.  Caldwell has reviewed these statements—in context—and has found that

none of them support the Government's position.  For example, the Government citied

remarks by Senator Trumbull that "suggested" that Section 372 would cover Members of

Congress.  (ECF 123 at 44).  A review of the context of Senator Trumbull's remarks,

however, *actually supports Caldwell's position* that "officer of the United States" refers to

"commissioned officers" under the Appointments Clause.

During debate on the Enforcement Act, Trumbull opposed one aspect of the proposed statute, which he viewed as overbroad.  Trumbull called for "the attention of Senators . . . and especially of *the lawyers of the body*" for assistance to address his concern and then hypothetically mused:  "the Senator who sits before me . . . has a very valuable farm over in Maryland . . . [and] suppose while he is here in the discharge of his duties of his office somebody trespasses upon his farm[.]"  44 Cong. Rec. 580 (Apr. 11, 1871).  Trumbull obviously was not addressing the issue before the Court but, rather, was expressing concern about expansive language in the bill in relation to what criminal acts it covered.

In response, Vermont Senator George Edmunds, a member of the Senate Judiciary Committee, reminded Trumbull about the Illinois senator's previous support two years earlier for a similarly-worded bill:

> Mr. EDMUNDS:  [The Enforcement Act], [Senator Trumbull] will see, applies to *officers of the United States*.  Let me ask him if within the period of two years he has not united with the Senate . . . in passing a bill which punished everybody for assaulting or beating *an officer of the United States*, marshal or collector, or anybody engaged in the performing the duties of his office, and even while [going back and forth to work]?
> 
> I am not certain in my recollection about this last inquiry; but let me ask [Senator Trumbull] if he and I did not vote for a bill two years ago which provided . . . for punishing everybody who undertook to assault  . . . an *officer* while he was engaged in performing the duties of the office *which his commission under the United States* authorized him to perform?

*Id*. (emphasis added).  Senator Edmunds, confirming Caldwell's position, clearly viewed the term "officer of the United States" as used in the Enforcement Act as applying to *commissioned* officers.  Finally, a review of the Government's other cited legislative history

reveals that Congress engaged in absolutely *no debate* as to whether Members of Congress were covered by Section 372.[12]

### F.  The correct legal standard supports Caldwell's interpretation of § 372.

Section 372 applies to any "officer of the United States."  Under binding precedent, this term is presumed to mean Appointments Clause officers.  This presumption is especially iron-clad given that the full statute was passed between the decisions in *Hartwell* (1868) and *Germaine* (1878) and three years after Congress passed the 14th Amendment (1868), which distinguished between congressmen and "officers of the United States."  The issue is whether other language in Section 372 clearly and unambiguously expands this term beyond Appointments Clause officers.  The answer is clearly to the negative.

As noted *supra*, the phrase "office, trust, or place of confidence under the United States" are stations occupied by "officers of the United States."  Even if offices, trusts, and places of confidence is a broader category than "officer[s] of the United States," Members of Congress, who are neither offered their jobs nor accept their offices, cannot possibly hold these positions.  Congress, moreover, parroted language from the Constitution's Ineligibility Clause ("holding . . . any office under the United States") in Section 372, which buttresses

---

[12] The Government also cited Rep. Wilson, who advised that:  "I am reliably informed that not three days ago a member of this House was [threatened] . . . not to vote for this bill, for the reason that he could not safely return to his home if he did."  (ECF 123 at 47).  Again, however, the suggestion that this statement supports the notion that Congress was including itself in what is now Section 372 is inaccurate.  In fact, two paragraphs down from the Government's quoted language, Wilson stated:  "What is the purpose of driving officers from their places?  Is it for gain or the 'base aims of individual offenders'?  No.  It is to get rid of votes, to get possession of local and State governments."  44 Cong. Rec. 484 (Apr. 5, 1871).  Wilson's quote suggests that Section 372's purpose was to protect federal authorities located within the South who were charged with protecting the integrity of elections, not Members of Congress.

Caldwell's position that Members of Congress were not included in this language. The words "office," "trust," "confidence," and "discharging any duties thereof," additionally, all appear in the ubiquitous commissions issued to Appointments Clause officers, but not issued to Members of Congress.

In Section 372, the Court is presented with an antiquated statute filled with antediluvian syntax that was passed at a time when Members of Congress strictly adhered to language in the Constitution. The statute has never been used in the context of Congress. Caldwell, respectfully, has presented overwhelming proof that Section 372 does not include Members of Congress.

**G. Count 4 must be dismissed, as it fails to state an offense.**

Count 4 of the Indictment alleges that "Members of the United States Congress" were the targeted victims of the *Rhodes* defendants' actions. As Members of Congress are not "officers of the United States" under Section 372, Count 4 fails to state an offense and, accordingly, must be dismissed.

<u>Conclusion</u>

WHEREFORE, the defendant, Thomas E. Caldwell, respectfully requests that this Honorable Court dismiss Counts 1-4 of the Indictment in this matter with prejudice.

Respectfully Submitted,

_____/s/_____

David W. Fischer, Esq.
Federal Bar No. 023787
Law Offices of Fischer & Putzi, P.A.
7310 Ritchie Highway
Glen Burnie, MD 21061
(410) 787-0826
Attorney for Defendant

## **CERTFICATE OF SERVICE**

     I HEREBY CERTIFY that on this 11th day of May, 2022, a copy of the foregoing Reply In Support of Motion to Dismiss Counts 1, 2, 3, & 4 was electronically filed with the Clerk of the United States District Court using CM/ECF, with a notice of said filing to the following:

     Counsel for the Government:     Office of the United States Attorney
                                           Kathryn Rakoczy, AUSA
                                          Jeffrey Nestler, AUSA
                                          555 4th Street, NW
                                          Washington, DC 20001

                                                          /s/
                                            David W. Fischer, Esq.