UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No.   22-cr-15-APM |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **THOMAS CALDWELL** | ) | |
| (US vs. Rhodes, III *et. al*) | ) | |

### DEFENDANTS' JOINT MOTION
### TO TRANSFER VENUE OR CONTINUE TRIAL DATE

Defendants Stewart Rhodes, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, and Thomas Caldwell hereby move this Court to transfer venue of this matter to another federal district or to continue the trial date, currently set for September 26, 2022, on the grounds set forth *infra*:

1. The trial date for the *Rhodes* defendants Group 1 ("*Rhodes* defendants") is currently set for September 26, 2022. (ECF 133). The Court has indicated, however, that jury selection may begin prior to the scheduled trial date.

2. The *Rhodes* defendants renew their request for a change of venue in this matter or, in the alternative, to continue the current trial date until 2023 based upon the undeniable prejudice that exists in this District's jury pool following recent congressional hearings. The *Rhodes* defendants consent to exclude all time pursuant to the Speedy Trial Act if the instant motion is granted.

1

3. On June 9, 2022 the January 6 Select Committee of the House of Representatives ("the Committee") began conducting a series of highly publicized hearings regarding its investigation of the events leading up to and on January 6, 2021 ("J6"). Although the Committee refers to these publicized proceedings as "hearings," the reality is that they are not hearings at all. The Committee presents its information through a combination of carefully edited excerpts of recorded depositions, videos, documents, prepared speeches, and live witnesses. The Committee's witnesses are asked leading questions or questions to which the answer is clearly already known; however, the Committee does not subject the witnesses to cross-examination, nor does it even attempt to provide mitigation, context, or other information that might produce a neutralized or mitigated version.

4. As of July 12, 2022 the Committee has conducted six hearings where dozens of witnesses testified about various aspects of J6. Prior to Tuesday's hearing, the Committee hearings produced only a handful of references to the instant pending criminal matter and some of the *Rhodes* defendants; however, Tuesday's hearing significantly focused on presenting evidence regarding the Oathkeepers as an organization and some of the *Rhodes* defendants specifically. At no point has the Committee or various media publications providing coverage of the public hearings stated or reinforced that the *Rhodes* defendants are constitutionally presumed innocent. These hearings – particularly the most recent one -- have caused irreparable harm to the ability of the *Rhodes* defendants to obtain a fair trial in the District.

5. Members of the Committee and witnesses have repeatedly referred to the Oath Keepers as "racists," "domestic terrorists," "white supremacists," "extremists," and

other false slurs. The Committee has falsely connected the Oath Keepers with the "Proud Boys," a group highly unpopular in the District. The *Rhodes* defendants should not have to prove that they are not "white supremacists," "racists," "domestic terrorists," etc. They should not have to prove that they did not coordinate with the Proud Boys defendants to "attack" the Capitol. In fact, they can't "disprove" these accusations because they are *unfalsifiable*. The "government" extends to more than just the "prosecutors." The "government," through Congress, has been publicly prejudicing the *Rhodes* defendants for weeks, culminating in Tuesday's hearing with Representative Jamie Raskin (D-Md.) claiming that the Oath Keepers are "extremists who promote a wide range of conspiracy theories and sought to act as a private paramilitary force for Donald Trump." *See* Exhibit A.

6. The Committee hearings were publicly aired on nearly all major television networks and media outlets. Full versions of each hearing are available for around-the-clock consumption through a variety of online sources. Attached to this motion are the transcript for the July 12, 2022 hearing (Exhibit A), and press coverage as it appears from screenshots on an iPhone (Exhibit B), articles in the *Washington Post* (Exhibit C), and local D.C. news coverage (Exhibits D & E). Notably, the District, through print and television news, and WTOP radio, was saturated with the prejudicial assertions related to the *Rhodes* defendants coming out of the Committee hearings.

7. Members of the Committee and Attorney General Garland have freely admitted that the committee and the DOJ are following the actions of each other. On June 29th Rep. Adam Kinzinger (R-Il.) said on *The Late Show* that the Committee's investigation "feeds together" with the DOJ's investigation: "[W]e have these two

investigations—and again, I don't know what Justice is doing or not doing, but assuming they're investigating, we have our investigation that's very public. This all kind of feeds together."[1] On June 13, 2021 Attorney General Merrick Garland told NPR: "I can assure you that the January 6 prosecutors are watching all the hearings[.]" (https://www.npr.org/2022/06/13/1104659339/the-attorney-general-and-federal-prosecutors-are-watching-all-of-the-jan-6-hearings).

8. As noted above, on July 12, 2022 the Committee held a hearing that highlighted the Oath Keepers. According to WTOP News, during his opening remarks, Rep. Raskin claimed that J6 was perpetrated by "the dangerous extremists in the Oath Keepers, the Proud Boys and other far-right racist and white nationalist groups spoiling for a fight." (https://wtop.com/social-media/2022/07/jan-6-takeaways-extremists-and-screaming-in-trump-meet/). Raskin claimed that the Oath Keepers had an "alliance" with the Proud Boys organization in relation to an "attack" on the Capitol on J6. *See* Exhibit A. Raskin compared the actions of the Oath Keepers on J6 *with the murder of an Abolitionist's newspaper editor* in 1837. *Id.* Additionally, Raskin stated: "[W]e have only shown a small fraction of what we have found. Our investigation is ongoing. *All of which we will disclose at a later date*." *Id.* Referring to the Oath Keepers in his closing remarks, Raskin claimed: "[N]o one mobilized more quickly than *the dangerous extremists* that we've looked at today." *Id.* Notably, the Indictment in the instant case makes no claim that the Oath Keepers are "white supremacists," "racists," or "domestic extremists." Raskin also claimed that

---

[1] S. Jones, "Kinzinger: Investigation by January 6 Committee and DOJ 'All Kind of Feeds Together,'" CNS News (June 30, 2022), https://www.cnsnews.com/article/national/susan-jones/kinzinger-investigation-january-6-committee-and-doj-all-kind-feeds

the Oath Keepers and other groups were "assembl[ing] their followers for an insurrectionary showdown with Congress and the Vice-President." *Id*. To be clear, the *Rhodes* defendants dispute Raskin's outrageous claims. They dispute that they are "racists," "white supremacists," or "domestic extremists." They dispute that they had an alliance with the Proud Boys to attack the Capitol. They dispute that there was a plan to attack the Capitol. They dispute that there was an "insurrection" on J6.

9. Rep. Elizabeth Cheney (R-Wy.), claimed that former President Trump "directed" an "armed mob," including the Oath Keepers, to the Capitol on J6. *See* Exhibit A. Members of the Committee clearly suggested that the Oath Keepers were acting upon orders of President Trump, a claim not supported by discoverable evidence. At the first Committee hearing, Cheney suggested that the Oath Keepers were working under orders from former President Trump to engage in violence on J6. Alluding to the Oath Keepers and Proud Boys, Cheney falsely claimed: *"Intelligence available before January 6th identified plans to "invade" the Capitol."* (https://www.politico.com/news/2022/06/09/liz-cheney-jan-6-committee-full-statement-00038730). Discovery has revealed no "plan" to "invade the Capitol."

10. One witness at Tuesday's hearing, Jason Van Tatenhove, a former spokesman for the Oath Keepers, made several false and incendiary claims regarding the organization. Van Tatenhove claimed that Stewart Rhodes wanted to conduct "armed revolution" and "spark a new civil war" on J6. *See* Exh. A. Further, he testified that Stewart Rhodes asked him to create a "deck of cards" identifying elected officials the Oath Keepers should "take out," such as Hillary Clinton. *Id*. "They may not like to call themselves a militia, but they are . . . a violent militia," Van Tatenhove warned. *Id*.

He continued: "Stewart Rhodes has drifted further . . . into the alt-right world of *white nationalists and straight up racists*." *Id*. He further opined that "the Oath Keepers are a very dangerous organization" and that they oppose "the rule of law." *Id*. When asked by the Committee if he ever heard Rhodes discuss committing acts of violence against "political leaders," Van Tatenhove stated: "Yeah, I mean that went back to the beginning of my tenure." *Id.* Finally, Van Tatenhove claimed that President Trump was "communicating, whether directly or indirectly" with Stewart Rhodes, suggesting that Trump and Rhodes were *in simpatico* on J6. *Id*.

11. Van Tatenhove, however, is hardly the dispassionate, unbiased and knowledgeable witness the Committee portrayed him as. First, Van Tatenhove has not had contact with Stewart Rhodes *in almost five years*. Accordingly, his testimony was incredibly misleading as he suggested that he had personal knowledge as to what Rhodes was thinking and planning *on or about J6*. Clearly inadmissible in the instant trial, Van Tatenhove's claim that the Oath Keepers intended to start a "bloody revolution" on J6 is now seared into the minds of the District's jury pool as fact. Additionally, a two-minute search of his Twitter account reveals that Van Tatenhove is a staunch left-wing activist tied to causes such as gun control, feminism, and climate change, and who regularly does a "counter-culture" podcast. *See* https://mobile.twitter.com/jasontatenhove. He has freely admitted, moreover, that he joined the Oath Keepers as an "embedded" author *to write a book about the organization. See The Hill*, Briefing Blog (July 13, 2022) https://thehill.com/blogs/blog-briefing-room/3553468-who-is-oath-keepers-spokesperson-jason-van-tatenhove/amp/). Additionally, Van Tatenhove is currently

6

hawking an audio book he wrote about the Oath Keepers. Yet the D.C. jury pool knows none of this discrediting information, or even that Van Tatenhove has publicly claimed to have had multiple encounters with U.F.O.s. https://www.coloradoswitchblade.com/p/mostly-true-stories-my-own-personal#detail.

12. In addition to the highly inflammatory and prejudicial Committee hearings, other actions by the Government have contributed to prejudicing the jury pool. On June 22, 2022 the Government, in a *public* filing, requested that defense counsel disclose their clients' fundraising efforts in relation to a group called Defending the Republic. The Government certainly new that this filing would be cat-nip for politically-obsessed media, which ran stories suggesting that defense lawyers *were preventing their clients from pleading guilty* to protect high-profile attorney Sidney Powell and President Trump. "Prosecutors expressed concern that support from Powell's group could give Oath Keepers attorneys a reason to oppose clients' cooperation that could be damaging to Trump's interests[,]" the *Washington Post* reported. (https://www.washingtonpost.com/dc-md-va/2022/06/24/oathkeepers-defense-funding-powell/). Accordingly, the false media narrative fueled by the Government's public filing is that defense lawyers know their clients are guilty but are financially incentivized to protect Donald Trump's interests.

13. Additionally, on July 8, 2022 the Government opted to *publicly* file their Rule 404(b) disclosures, (ECF 187), setting forth their incendiary, dubious spin on likely inadmissible evidence regarding alleged bomb recipes, grenades, and a "death list." Undersigned counsel, for example, has reviewed Caldwell's purported "death list," which is *not* a "list" but, rather, a doodle pad where the words "death list" are written

*separate and apart from*, and in *different ink* than, the names of Georgia election workers. Rule 404(b) did not require a *public* filing of this information, which the Government apparently does not consider "highly sensitive." Not surprisingly, the *Washington Post* ran a banner headline trumpeting the Government's filing: "Alleged Oath Keeper accused of bringing explosives to D.C. on Jan. 6." (S. Hsu, Wash. Post (July 8, 2022)). The public filing of 404(b) materials has added gasoline to the prejudicial fire coming from the Committee hearings.

14. In addition to their blatantly prejudicial hearings, the Committee has stated publicly that it intends to release more than a thousand transcripts of recorded interviews and depositions taken from witnesses during the course of its investigation. On June 21, 2022, in *United States v. Nordean*, 21-cr-175 (TMK) (Proud Boys case), the Government agreed to a defense continuance request, stating that "[t]he release of these transcripts after jeopardy has attached in this case would be detrimental to all parties and the public interest." (*Nordean*, ECF 414 at 3). While a portion of the transcripts to be released by the Committee will have no relevance to the *Rhodes* defendants, defense counsel predict that many transcripts will be highly relevant and potentially exculpatory in nature.

15. In *Nordean*, the Government's filing distinguished other J6 cases by noting that the Proud Boys "have been uniquely featured in the hearings of the Committee." *Id*. The Government conceded that the current atmosphere vis-à-vis the actions of the Committee has, to some extent, infected the jury pool: "The timing and prominence of the Committee's hearings and conclusions . . . *heighten the need* for a rigorous *voir dire* process." *Id*. (emphasis added). Without a continuance, the Government wrote,

8

"this case could find [the parties] in the unprecedented position of litigating a criminal trial simultaneous to the release of a Congressional report that is likely to include robust descriptions of the criminal conduct of the defendants." *Id*. This "situation poses," the Government wrote, "an even more acute problem than [*Delaney v. United States*]." *Id*. at 4. The Court in *Nordean* granted the continuance request.

## ARGUMENT

In *Delaney v. United States*, the First Circuit held that it was an abuse of discretion for a trial court to not grant a continuance request under similar circumstances as the instant case:

> Here the United States, through its legislative department, by means of an open committee hearing held shortly before the trial of a pending indictment, *caused and stimulated this massive pre-trial publicity[.]* . . . Some of the damaging evidence would not be admissible at the forthcoming trial[.] . . . None of the testimony of witnesses heard at the committee hearing ran the gauntlet of defense cross-examination.. . .
>
> If all this material had been fed to the press by the prosecuting officials of the Department of Justice, we think that an appellate court would have had to say that the denial of a longer continuance was an abuse of discretion.. . .
>
> But the prejudicial effect upon Delaney, in being brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, *whether such publicity were generated by the prosecuting officials or by a congressional committee hearing*.

*Delaney v. United States*, 199 F.2d 107, 113-14 (1st Cir. 1952) (emphasis added). Defense counsel previously indicated their preparedness to proceed to trial in September.[2] However, in light of the Court's ruling denying the *Rhodes* defendants' request for a change of venue, defense counsel are unanimous that a trial in Washington, D.C. in the shadow of highly one-sided,

---

[2] Counsel for Kelly Meggs, Julia Haller, Esq. and Stanley Woodward, Esq., again note their unavailability for a trial in September given a previously scheduled multi-defendant trial set to begin October 3, 2022 in *United States v. McCaughey*, No. 21-cr-40.

politicized Committee hearings would deprive their clients of a chance for a fair and impartial jury.³ In particular, Tuesday's hearing generated a mountain of prejudicial press coverage that has served to prejudice further an already heavily-biased jury pool.⁴ Moreover, the Committee will be holding an additional hearing and intends to issue a detailed report in September which, again, will thrust J6 and the prejudicial assertions about the Oath Keepers back into the spotlight, just before a jury is to be picked.⁵ Additionally, the Government's gratuitous public filings, which generated negative, prejudicial coverage in the *Washington Post*, local D.C. news, and social media, have added to the prejudicial atmosphere.

A trial in September, in addition to being patently unfair in light of the slandering of the Oath Keepers as racists, white supremacists, etc., carries other risks. First, the Committee and its findings will be heavily debated in relation to midterm elections, which practically guarantees

---

³ Defense counsel disagree that the "nationally" televised J6 Committee hearings have produced prejudice all across the country. While those who live "inside the Beltway" have been glued to their television sets, Americans outside of D.C. have barely paid attention to the J6 hearings. Just like the nationally televised Westminster Dog Show attracted mostly viewers who are dog aficionados, the Committee's hearings have been largely consumed by left-leaning, politically-obsessed viewers who dislike former President Trump. See, e.g., Daniel Chaitan, Washington Exam. *Reporter says Democrats in Congress told her that 'nobody gives a bleep about Jan. 6'* (Jun. 22, 2022) https://www.washingtonexaminer.com/news/reporter-congressional-democrats-nobody-gives-bleep-jan-6 (noting that voters are not paying attention to J6 hearings).

⁴ *See, e.g.*, B. Sprunt, NPR, "Jan. 6 panel shows evidence of coordination between far-right groups and Trump allies," (Jul. 12, 2022) https://www.npr.org/2022/07/12/1111132464/jan-6-hearing-recap-oath-keepers-proud-boys (repeating false claim that Oath Keepers coordinated J6 with Proud Boys); M. Pengelly, *The Guardian*, "Trump sought to mount 'armed revolution', militia ex-spokesman says," (Jul. 12, 2022), https://www.theguardian.com/us-news/2022/jul/12/jan-6-hearings-trump-capitol-attack-oath-keepers-ex-spokesperson-witness; S. Patterson & A. Corse, WSJ, "Trump spurred right-wing groups to violence on Jan. 6, committee says," (July 13, 2022), https://www.wsj.com/articles/tuesdays-jan-6-hearing-to-focus-on-proud-boys-oath-keepers-11657618200.

⁵ *Cf.* Devlin Barrett & Spencer Hsu, *How the Jan. 6 Hearings could complicate the upcoming Proud Boys trial*, https://www.washingtonpost.com/national-security/2022/06/21/proud-boys-trial-hearing-trump/ (June 21, 2022).

10

that the month of September will be saturated with prejudicial news coverage of the *Rhodes* defendants. Second, the Committee's final report will be released in September just before jury selection, guaranteeing maximum prejudice toward the defendants. Third, unlike typical cases, juror questionnaires will be mailed to potential jurors, which in turn will lead the summoned jurors, knowing that they will sit in the instant case, to pay closer attention to news coverage and the Committee's report. Fourth, as the Court has no control over members of Congress, further Committee or other related hearings may take place *during* the present trial date or Congress may selectively "leak" transcripts harmful to the *Rhodes* defendants during trial.

As it currently stands, the D.C. jury pool has been fed a non-stop, steady stream of misinformation regarding the *Rhodes* defendants and their character. The instant Indictment makes no allegation that the *Rhodes* defendants are "racists" and "white supremacists," yet the "government," through the Committee, has branded these prejudicial labels upon the defendants by conducting biased, one-sided hearings all the while knowing that D.C. press outlets will uncritically amplify these allegations.[6] Additionally, the Committee has falsely suggested that the *Rhodes* defendants intended to engage in a civil war, assassinate elected officials, and other downright false claims.

The tar-and-feathering of the *Rhodes* defendants as "racists" and "white supremacists" in publicized hearings before Congress *alone* requires relief, including a venue change. While the Committee hearings are "nationally" televised, this coverage is not affecting all Americans in the same way. Just like statements from the Pope have much more effect on devout Catholics than

---

[6] The Government has charged more than 700 defendants in relation to J6 on various charges. Incredibly, the Washington press corps hasn't written *one story favorable* in relation to *any* J6 defendant, including Caldwell and others who have been screaming that they are innocent from the start. Thanks to a biased press, practically everyone in D.C., without knowing any of the facts, is convinced that the *Rhodes* defendants are guilty.

11

non-Catholics, assertions made by an anti-Trump Committee are having a tremendous impact on the overwhelmingly anti-Trump residents of the District. Prior polling submitted in the *Rhodes* defendants' motion to change venue demonstrates that the District's jury pool is substantially predisposed against the defendants. By contrast, outside of the Beltway, where politics is not all-consuming, the hearings are having very little impact. For that reason, the *Rhodes* defendants renew their request to change venue. The "government," whether it's "the prosecutors" or "the Congress," cannot affirmatively trample over the rights of the accused to a fair trial by publicly branding the *Rhodes* defendants as "racists," "white supremacists," and other slurs, while simultaneously making outlandish claims about the danger that this organization allegedly poses to the District and elected officials. It is impossible for the Court to screen for this type of bias through *voir dire*. Moreover, the Committee's branding as "racists" and "white supremacists" the defendants will result in peer-pressure on the jurors to convict. After all, what juror would want to return to work or their family and take credit for acquitting the "white supremacists"?

In sum, the 12 potential District jurors sitting in judgment of the *Rhodes* defendants will believe, based upon the Committee hearings, government filings, and the non-stop biased press coverage, that the defendants are racists, white supremacists, and domestic terrorists who their lawyers are making go to trial to protect Donald Trump. The jurors will also believe that these defendants are *per se* dangerous even though none of them engaged in any violent acts on J6.

Based on the foregoing, the Defendants request that the Court grant a change of venue or, in the alternative, grant a continuance for up to six (6) months from the current trial date, or both.

Date: July 14, 2022                    Respectfully Submitted,


                                       /s/David W. Fischer, Esq.
                                       David W. Fischer, Esq.
                                       Federal Bar ID No. 023787
                                       7310 Ritchie Highway
                                       Suite 300, Empire Towers
                                       Glen Burnie, MD 21061
                                       (410)787-0826
                                       fischerandputzi@hotmail.com
                                       Attorney for Defendant Caldwell

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that a copy of the foregoing Defendants' Joint Motion to Continue Transfer Venue or Continue the Trial Date was electronically filed on this 14th day of July, 2022 via ECF, with copies electronically served on counsel for the Government, Kathryn Rakoczy, Assistant U.S. Attorney and Jeffery Nestler, Assistant U.S. Attorney.

                                                                _____/s/_____
                                                                David W. Fischer, Esq.