## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES                                 *

vs.                                           *    Case No.: 22-15 APM

THOMAS E. CALDWELL                            *
(U.S. v. Elmer Stewart Rhodes)
        *    *    *    *    *    *    *    *    *    *    *

**<u>Caldwell's Opposition to the Introduction of Certain Trial Evidence</u>**

COMES NOW, the Defendant, Thomas E. Caldwell ("Caldwell"), by and through his attorney, David W. Fischer, Esq., and respectfully moves that the Court exclude from evidence statements and tangible evidence set forth in the Government's Motion Regarding Anticipated Trial Evidence and Notice Pursuant to Federal Rule of Evidence 404(b). (ECF No. 187). Specifically, Caldwell requests that the Court exclude from evidence:

1) A doodle pad—characterized by the Government as a "death list"—recovered from Caldwell's residence on January 19, 2021.

2) Any evidence regarding Caldwell's attempt to purchase a .380 caliber handgun that was designed to look like a "smartphone."

3) Any evidence regarding Caldwell's alleged attempt to have another person build Caldwell firearms.

4) Any evidence involving firearms, firearm accessories, ammunition, or similar items that were purchased, or attempted to be purchased, by co-defendant Stewart Rhodes or other defendants after January 6, 2021.

5) Any evidence of alleged firearms and explosives possessed by unindicted co-conspirator Jeremy Brown on January 6, 2021.

6) Evidence of sawed-off shotguns and grenades allegedly recovered from Jeremy Brown's residence and RV on or about September 30, 2021.

7) Any evidence regarding alleged bomb-making instructions that were located in the residence of Jessica Watkins on or about January 17, 2021.

8) Any evidence regarding Quick Reaction Forces (QRFs) and guns that were located outside the District of Columbia at any time during the alleged conspiracy.

## **Legal Standard**

Under Federal Rules of Evidence 404(b) and 403, evidence of other crimes, wrongs or acts is admissible if it is relevant to any issue at trial other than defendant's character and if its probative value is not substantially outweighed by the risk of unfair prejudice. *Huddleston v. United States*, 485 U.S. 681 (1988). Proffered evidence that is "intrinsic" is "indeed part of the crime charged[] [and] by definition, [will] always satisfy Rule 404(b)." *United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000). By contrast, evidence that is "extrinsic" of the charged crime is subject to the dictates of Rule 404(b). *Id*. In *Bowie*, the D.C. Circuit set for the analytical blueprint for trial courts to follow under Rule 404(b) in relation to extrinsic evidence:

> A proper analysis under Rule 404(b) begins with the question of relevance: is the other crime or act relevant and, if so, relevant to something other than the defendant's character or propensity? If yes, the evidence is admissible unless excluded under other rules of evidence such as Rule 403. Stated more formally, a Rule 404(b) objection will not be sustained if: 1) the evidence of other crimes or acts is relevant in that it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," FED. R. EVID. 401; 2) the fact of consequence to which the evidence is directed relates to a matter in issue other than the defendant's character or propensity to commit crime; and 3) the evidence is sufficient to support a jury finding that the defendant committed the other crime or act.

*Id*. at 930.  Finally, even relevant and probative evidence screened through Rule 404(b) may be barred under Rule 403 if the probative value of the evidence does not outweigh its potential for unfair prejudice to the defendants.  *Id*. at 931.

### Caldwell's alleged "DEATH LIST"

The Government seeks to introduce into evidence a document recovered from Caldwell's residence on January 19, 2021 "that included the words 'DEATH LIST' hand-written across the top with the name of a Georgia election official, a purported family member of that official, and the county and state associated with that official all hand-written underneath."  (ECF No. 187 at 24).  Across the top of this document "is written[] '40+ from N.C.' and on the next page[] '[Person Three] is in Room 252' next to a phone number known to be associated with Person Three."  *Id*.  According to the Government, this evidence is "intrinsic to the charged conspiracy" and demonstrated Caldwell's "intent to perpetuate the charged conspiracy of opposing by force the lawful transfer of power."  *Id*.  The Court should either exclude this document *in toto* from evidence or, in the

3

alternative, redact the portions related to the words "death list" and the Georgia election workers.

First, as the Government tacitly concedes, it has other evidence that proves that Caldwell had contacted Person Three and was made aware that 40-plus North Carolina Oath Keepers were travelling to the District around J6. *Id.* (citing a message between Caldwell and co-defendant Watkins regarding Person Three advising Caldwell about the 40 North Carolina Oath Keepers taking a bus to the District). Additionally, Person Three has given a lengthy, videotaped interview to the FBI wherein he acknowledged a phone call between himself and Caldwell where he relayed the information regarding 40-plus North Carolina Oath Keepers coming to the District as well as Caldwell's knowledge as to Person Three's hotel room. Accordingly, Person Three is available to the Government to call as a witness to provide the same "intrinsic" evidence as is written on Caldwell's doodle pad. Moreover, Caldwell is willing to stipulate that he indeed had a phone call with Person Three and was advised by that individual that 40-plus North Carolina Oath Keepers planned on coming to the District on J6 and that Caldwell knew that Person Three would be staying in room 252 of the Comfort Inn Ballston. In short, there is simply no need to introduce this document for the purpose of proving that Caldwell had a phone call with Person Three, knew that the Person Three's group, the North Carolina

Oath Keepers, intended on bring 40-plus members up to the District for J6, and that Person Three was staying in Room 252.[1]

The alleged "death list" as it relates to Georgia election workers, moreover, has no evidentiary value as to the issue of whether Caldwell sought to stop Joe Biden from becoming President. Unfortunately, the "death list" has been mischaracterized by the Government. This document is *not* a "list" but, rather, a doodle pad. The words "death list" are written in all caps, whereas the balance of writing on the doodle pad is written in upper and lower case letters. Moreover, the words "death list" are separated from the names of the election workers by scribbled writing, *and were clearly written with a different pen*. There are no other names on the "list," because it is not a list. Importantly, the names written on the doodle pad were not, as the Government claims, election "officials" but, rather, *temporary election workers*.[2]

In addition to different pens being used in the writings on the doodle pad, historical context suggests that the writings scribbled on the pad were done on separate dates. The Georgia temporary election workers, for example, were publicly accused of election fraud on December 3, 2020, when numerous sources ran with the story.[3] The

---

[1] Additionally, there are other witnesses that the Government has interviewed who are connected with the North Carolina Oath Keepers that, if called by the Government, can provide similar testimony.

[2] https://www.wabe.org/georgia-election-workers-reach-settlement-terms-with-right-wing-channel-oan/

[3] *See, e.g.*, https://www.thegatewaypundit.com/2020/12/ruby-breaking-crooked-democrat-filmed-pulling-suitcases-ballots-georgia-identified/ (Dec. 3, 2020).

*New York Times* debunked the story on December 7, 2020.[4]  By contrast, the writing on the doodle pad regarding "40+ N.C. Oathkeepers" must have taken place on or after December 30, 2020, which is when Caldwell messaged co-defendant Jessica Watkins: "Talked to [a N.C. Oath Keeper].  At least one bus 40+ people coming from NC."  (ECF No. 187 at 24).  In short, "the evidence is [in]sufficient to support a jury finding that the defendant committed the other crime or act," i.e., that the doodle pad was a "death list." *Bowie*, 232 F.3d at 930.

The alleged "death list," moreover, does not contain intrinsic evidence to prove a conspiracy to stop the lawful transfer of presidential power.  Even if the Government's fantastical claim is true that Caldwell authored a death list, such an action could not have furthered the alleged conspiracy of stopping Joe Biden from becoming President.  The target of the "death list" would have been two temporary election workers who had absolutely no control over the certification of Joe Biden as president.  In fact, the State of Georgia certified its presidential election results on November 20, 2022, a full two weeks (at least) before the production of the alleged "death list."[5]

Even if the Court were to find that the "death list" is relevant evidence, it should be excluded under Rule 403, as the document's unfair prejudice far outweighs any probative value.  Rule 403 provides that "[t]he court may exclude relevant evidence if its

---

[4] https://www.nytimes.com/2020/12/07/technology/suitcases-ballots-georgia-election.html
[5] https://www.npr.org/sections/biden-transition-updates/2020/11/20/937050597/georgia-election-results-certified-election-official-says-the-numbers-dont-lie

probative value is substantially outweighed by [potential] unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The doodle pad has little to no relevance as to the issue of whether Caldwell entered into a conspiracy to unlawfully stop Joe Biden from becoming president. In fact, at the (likely) time the election workers' names were written on the pad (the first week of December 2020), the J6 Trump protest in the District *had not even been planned*. It wasn't until December 19, 2020 that President Trump sent out a tweet announcing the J6 rally in the District.[6]

### Caldwell's attempt to purchase the "smartphone gun" and obtain firearms

The Government seeks to introduce evidence that Caldwell attempted to purchase a "Double Barreled .380 Caliber" firearm that, according to the manufacturer's website, was "ingeniously designed to resemble a smartphone." (ECF No. 187 at 26). According to the Government, Caldwell made the purchase in late November 2020 and, after not receiving his purchase, followed up on December 23rd with the company noting his eagerness to receive the firearm. *Id*. The Government noted that this weapon never shipped prior to Caldwell's arrest, and the order was ultimately cancelled by "someone utilizing Caldwell's email account." *Id*. The Court should exclude this evidence for multiple reasons.

---

[6] https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/

First, at the time of the order, Caldwell held a valid Virginia concealed-carry permit.  Accordingly, it is hardly an unusual circumstance for concealed-carry permit holders to purchase firearms specifically designed for concealed carry.  Second, the "smartphone gun" is designed by the manufacturer not for nefarious purposes but, rather, as an "anti-Karen" gun to prevent unnecessary (and potentially dangerous) 911 calls to police by those who are unaccustomed to seeing law-abiding citizens carrying firearms,[7] a practice which is quite routine in the rural portion of Virginia where Caldwell resides.[8] Third, when Caldwell ordered the gun in late November 2020, nobody in America was aware of a plan for a J6 march in Washington, D.C., because *there was no J6 march planned*.  As noted above, President Trump announced the J6 rally via Twitter on December 19, 2020.  Accordingly, the Government's claim that Caldwell's intention in purchasing the "smartphone gun" was to surreptitiously carry it to the J6 protest is demonstrably incorrect.

Caldwell's online purchase of the "smartphone gun" should be excluded from evidence.  There simply is no relevant link between this purchase and Caldwell attempting to stop Joe Biden from lawfully becoming President.  The Government's proffered reason for admissibility, i.e., that Caldwell desired to carry the gun to the

---

[7] https://www.azcentral.com/story/news/nation/2016/03/30/gun-fold-look-cell-phone-ideal-conceal/82423610/

[8] Undersigned counsel has twice visited Caldwell's farm in the Shenandoah Valley.  Cell phone service in that area of the country is inconsistent and, even if a 911 call to police went through, it might take law enforcement 30-plus minutes to respond to the call.  Not surprisingly, gun ownership and carriage is ubiquitous in rural Virginia.

District on J6, is belied by the fact that he purchased the gun at least three weeks before a J6 rally was planned and announced.  Accordingly, the act of purchasing the smartphone gun is not "intrinsic" evidence of Caldwell seeking to stop Joe Biden from being certified as President-elect of the United States.  Caldwell's purchase, moreover, under Rule 404(b) is not a "fact of consequence" which "relates to a matter in issue."  *Bowie*, 232 F.3d at 930.  There simply is no logical nexus between Caldwell, a concealed carry permit holder, purchasing a gun designed for concealed carry permit holders, and doing so three weeks before the J6 protest was announced, and stopping the Electoral College certification process on J6.  Finally, this evidence should also be excluded under Rule 403 as it would cause unfair prejudice with non-rural jurors who are unfamiliar with firearms, whereas it would provide no probative value as to whether Caldwell conspired to stop the lawful transfer of power.

The Government next desires to introduce into evidence statements that Caldwell "was looking to acquire fully functioning firearms."  (ECF No. 187 at 26-27).  This evidence should be excluded from trial.  The Government, likely because of unfamiliarity with firearms, has mischaracterized Caldwell's intentions.  Caldwell absolutely did not seek out a third party to "build him rifles between January 6 and January 20."  Caldwell's full text message read:

> Hey, brother!"  Tom here in Virginia.  Don't know how hard it is for you to get those uppers.  Do you think you could build me one or two fully working[?]  I have what you need and would gladly bring to you.  We had talked about a trade.  Maybe you could use something else I have or just more.  Let me know if it's doable on your end first.  Looks like things will get hairy.

In this text, Caldwell was clearly referencing a prior conversation with an individual (named "Rob") wherein they discussed a trade of "uppers" in exchange for Caldwell providing this person with firearm-related materials. Contrary to the Government's suggestion, an "upper" is not a "fully-functioning firearm" but, rather, one of multiple components that make up a single firearm. An "upper" can be bought and sold by anyone as it is not a "firearm" under federal law. A "fully working" upper means an upper receiver that is milled, grooved, and otherwise ready to swap out for an existing "upper" on a firearm. In other words, Caldwell was seeking replacement "uppers" for a firearm he already possessed. He was not attempting to purchase "fully functioning firearm[s]" from "Rob."

The Government's suggestion that Caldwell was engaged in nefarious activity is incorrect. If Caldwell wanted to acquire "fully functioning firearm[s]," he could have driven to a local Virginia gun store and bought as many rifles or shotguns as his heart desired. Caldwell, as a concealed-carry permit holder in Virginia, was also exempt from Virginia's "one handgun per month" law. *See* Va. Code Ann. § 308.2:2(R). There are no waiting periods for gun purchases in Virginia.[9] Private sales of firearms in Virginia are also perfectly legal.[10] In short, Caldwell could have bought 500 rifles, shotguns, and handguns from a gun store or private citizen with no waiting period at the time he was communicating with "Rob."

---

[9] https://giffords.org/lawcenter/state-laws/waiting-periods-in-virginia/
[10] https://giffords.org/lawcenter/state-laws/universal-background-checks-in-virginia/

Caldwell, however, was obviously not attempting to obtain *firearms* from "Rob." He was attempting to acquire replacement upper receivers for firearms he already owned.[11]  Anyone with firearms experience understands that avid target shooters routinely replace gun accessories like upper receivers with after-market parts.  Just like new car owners replace their mats and tire rims, or computer buyers swap out the factory mouse with a different mouse, gun owners routinely customize their firearms with after-market accessories.

Accordingly, evidence that Caldwell was attempting to purchase after-market uppers to replace uppers on existing firearms in his gun collection has no relevance to whether Caldwell was trying to stop Joe Biden from becoming President.  In fact, as the Court has already ruled, Joe Biden's ascendency to the presidency was sealed on J6 when he was certified as the winner of the election by the Electoral College.  Accordingly, after J6, it was impossible, in light of the 20th Amendment, for Caldwell or his co-defendants to have stopped the "lawful transfer of presidential power."  Caldwell seeking out replacement gun parts is not relevant as to the conspiracy charged and, even it was, the

---

[11] Caldwell's firearms collection was sold (legally) shortly after his arrest to pay the legal fees of his first attorney.  Caldwell, at the time of his arrest, owned several dozen firearms, including antiques, historically-notable firearms, firearms carried by his ancestors in the Spanish-American War, WWI, WWII, and the Korean War, hunting rifles, target rifles, high-powered rifles, handguns, and BB guns.  The FBI was certainly aware that Caldwell possessed firearms at the time of his arrest.  *A fortiori*:  Why would Caldwell need to seek out "fully functioning firearm[s]" when he already possessed a large collection of various types of weapons?

potential prejudice before a non-rural jury far outweighs any negligible probative value this evidence may provide.

## Evidence related to explosives and Jeremy Brown

The Government seeks to introduce into evidence various items of evidence related to Jeremy Brown, a Florida Oath Keeper characterized by the Government as an unindicted co-conspirator.  (ECF No. 187 at 16-17).  This evidence includes text messages and evidence recovered from Brown's Florida residence and RV.  *Id*.  The Court, as argued *infra*, should exclude this evidence.

In its filing, the Government alleges that evidence of Brown's possession of sawed-off shotguns and grenades is "intrinsic to the co-conspirator's charged offense as contemporaneous, direct evidence of the manner and means used by the co-conspirators to advance the goals of the charged conspiracy."  (ECF No. 187 at 17).  The Government's claim that guns and grenades recovered *nine months* after President Biden's inauguration are "intrinsic" to the charged conspiracy is belied by the cases it cited:

> In *Bowie* . . . the defendant was charged with possession of counterfeit bills on May 16, 1997. The seizure of counterfeit bills in Bowie's possession on April 17, 1997, was not an act charged in the indictment, and did not occur contemporaneously with the charged offense. *Accordingly, evidence of the April 1997 seizure was not intrinsic to the May 1997 offense, and had to be analyzed under the rubric of Rule 404(b).*

*United States v. Edwards*, 889 F. Supp. 2d 47, 49 (D.D.C. 2012) (citing *Bowie*, 232 F.3d at 929 (D.C. Cir. 2000) (emphasis added).  Brown's possession of sawed-off shotguns

and grenades nine months after the alleged conspiracy ended was not "intrinsic" evidence
because it did not occur "contemporaneously with the charged crime[.]" *Bowie*, 232 F.3d
at 929 (D.C. Cir. 2000). Accordingly, as "extrinsic" evidence, the Court must evaluate
this evidence under Rule 404(b) and 403. *Id*.

In *Bowie*, the D.C. Circuit set forth a three-part Rule 404(b) analysis for trial
courts to follow:

> Stated more formally, a Rule 404(b) objection will not be sustained if: 1)
> the evidence of other crimes or acts is relevant in that it has "any tendency
> to make the existence of any fact that is of consequence to the
> determination of the action more probable or less probable than it would be
> without the evidence," FED. R. EVID. 401; 2) the fact of consequence to
> which the evidence is directed relates to a matter in issue other than the
> defendant's character or propensity to commit crime; and 3) the evidence is
> sufficient to support a jury finding that the defendant committed the other
> crime or act[.]

*Id*. at 930. The evidence recovered from Brown's residence and RV does not pass the
three-part test.

First, the Government has no proof that the specific items recovered from Brown's
Florida property were ever brought to the Washington, D.C. area. Ironically, the
Government recently suggested in a court filing that the grenades and weapons recovered
from Brown's RV were placed there by Brown *after J6*. In response to Brown's motion
to suppress evidence recovered from the RV, the Government emphasized that "the
[search warrant] affidavit alleged that, because the Defendant was in the process of
moving and had recently purchased the trailer, it was 'probable that many of [his]
possessions, including electronics, guns, ammunition, *and explosives*, which constitute

potential evidence in the investigation, *have been moved to the RV* or the Trailer.'"
*United States v. Jeremy Brown*, 8:21-cr-00348-SCB-SPF, (U.S. Dist. Court, M.D. of
Fla.), (ECF No. 193 at 15) (Govt. Opp. To Mot. To Supp.) (July 11, 2022) (*citing* search
warrant affidavit) (emphasis added).  Further, in denying Brown's motion to suppress, the
Honorable Susan C. Bucklew ruled:  "Therefore, *it was likely that the guns and
explosives would have been moved to Defendant's R.V*. or trailer because it is unlikely
someone would market a house with guns and explosives inside the house."  *Id*., ECF No.
196 at 11 (order denying motion to suppress filed July 28, 2022) (emphasis added).
Notably, the recovered grenades were found in a vest located within the RV, not in any
compartments of the vehicle.  *Id*., ECF No. 1, ¶15.  Accordingly, it is *pure speculation* as
to whether the grenades and other items found in Brown's RV were present in the RV on
or about J6, making such evidence incompetent and irrelevant.

Moreover, as the Government concedes, on J6 Brown's RV was parked in College
Park, Maryland while Brown *was on foot* in the District of Columbia, almost 15 miles
away.  It would have taken Brown, assuming perfect traffic conditions and access to a
car, more than one hour to drive to his RV in College Park and back to the District on J6.
Accordingly, the proffered "other crimes" evidence does not, as the Government claims,
make it more likely that Brown was "executing the QRF" on J6.  There is nothing
"quick" about a 30-mile round-trip drive in D.C. area traffic.

Nevertheless, even if the Government's proffered evidence is considered relevant
and survives 404(b) scrutiny, it is inadmissible under Rule 403.  The nexus between guns

and grenades recovered in Florida nine months after a conspiracy ended to the charged

crime is tenuous.  Moreover, the Government's proffered evidence is targeted at co-

defendant Kelly Meggs, who was apparently connected to Brown through the Florida

branch of the Oath Keepers.  Caldwell, however, has never been a member of any Oath

Keepers organization and has never, to his knowledge, had contact with Meggs, Brown,

or any Florida Oath Keepers.  Introduction of the proffered evidence would be highly

prejudicial to Caldwell:

> In assessing the risk to a co-defendant of prejudice created by
> evidence admitted in a joint trial solely against another defendant, the trial
> court *must balance interests somewhat differently* than when it makes this
> assessment in the trial of one defendant. The trial judge must weigh not
> only the probative value and the risk of unfair prejudice to the defendant
> against whom the evidence is offered, *but also the appropriateness of
> permitting the prosecution to introduce the evidence in a joint trial*.

*United States. Figueroa*, 618 F.2d 934, 945 (2d Cir. 1980).  Notably, Brown will not be

on trial and will have no opportunity to testify as to whether the proffered evidence was

ever brought to College Park, Maryland.  The tiny probative value to the Government's

case is far outweighed by the unfair prejudice to all of the defendants, but especially to

Caldwell.

### Watkins bomb-making recipe

The Government seeks to introduce alleged bomb-making "recipes" recovered

during a search warrant execution on January 17, 2021 from the residence of Jessica

Watkins.  This evidence should be excluded from trial in this matter for several reasons.

First, as the Government notes, it has "not established when Watkins came into

possession of these instructions."  (ECF No. 187 at 21).  Second, discovery has revealed

that an occupant of Watkins' residence, M.S., told law enforcement that the bomb-

making recipes were nearly a decade old.  Third, investigators recovered no bomb-

making ingredients in the residence or any residence connected to Watkins.  Fourth, there

is no evidence in discovery that even minimally suggests that Watkins or any of her co-

defendants planned to use bombs in the District (or elsewhere) during the period of the

alleged conspiracy.

The Government's proffered evidence regarding a bomb-making recipe is not

relevant to the instant case as neither Ms. Watkins nor her co-defendants possessed or

used any bombs on or about J6.  Additionally, there is absolutely no evidence in

discovery that suggests that bombs were part of any plan involving a QRF.  The

Government cannot provide one shred of evidence to connect a 10-year old bomb-making

recipe to the events of J6 and beyond.  Moreover, in addition to being extremely

prejudicial to Watkins, introduction of this proffered evidence before a jury will greatly

prejudice Caldwell and other co-defendants, who have nothing to do with the recipe.

## **Evidence of QRFs**

The Government intends on introducing evidence of "Quick Reaction Forces" in

evidence at trial.  The Court should exclude evidence of QRFs, as the Government has

failed to present a nexus between any QRF and a plan to stop the certification of Joe

Biden as President.  The Government has produced *zero evidence* of a specific plan, prior

to J6, by Caldwell and the *Rhodes* defendants to attack, invade, or enter the U.S. Capitol

Building on J6.  Defense counsel have reviewed thousands of text messages, Signal messages, emails, Facebook Messenger messages, social media posts, etc. and have found no evidence that the *Rhodes* defendants planned any specific acts of civil disobedience or violence on J6.  Additionally, defense counsel have reviewed law enforcement interviews of dozens of witnesses connected with the Oath Keepers organization and who were knowledgeable of that group's intentions vis-à-vis J6.  Again, not one witness has claimed:  "Yeah, the Oath Keepers were going to D.C. to stop the Electoral College Certification by committing acts of violence."  If Caldwell or the Oath Keepers or both had a plan to forcibly, corruptly, illegally, or violently stop the Electoral College certification on J6, it was the best kept secret in the annals of American history.[12]

Lacking any solid evidence to back up their indictment, the Government's trial strategy appears to center around putting a nefarious spin on every private communication that Caldwell and his co-defendants ever made, and then holding up a bunch of pictures of guns to the jury.  The Government, for example, cited as "evidence" Caldwell's obvious joke where he messaged a female friend, who is not a suspect in J6:

---

[12] Caldwell and the other *Rhodes* defendants, if the Government's case is to be taken seriously, engaged in an unprecedented cover-up of their secret plan to forcibly stop the lawful transfer of presidential power.  That is, the defendants, in the days and weeks leading up to J6, literally exchanged hundreds of messages discussing the dangers of Antifa and similar groups with histories of violence and, in many messages, expressed the need for a QRF as a rescue force in the event that Antifa attacked Trump supporters or Oath Keepers.  Caldwell, again, challenges the Government to publicly set forth the evidence, e.g., witness statements, texts, Signal chats, emails, or Facebook messages, showing that Caldwell or any member of the Oath Keepers specifically suggested, planned, plotted, or encouraged the breaching of the U.S. Capitol Building prior to January 6, 2021.

"Yeah, but what are we supposed to do?  Tell me who to shoot first and I'm all in!"  This joke had nothing to do with Congress or J6.  In fact, in a text to this same friend three days later, Caldwell complained about Dr. Anthony Fauci, U.K. Prime Minister Boris Johnson, and other "globalists" stating:  "There are just not enough bullets to properly thin out the herd!"  To suggest that these private messages, which end in tell-tale exclamation points, are anything other than private, political humor is absurd.

Another example of the Government's mischaracterization of Caldwell's messages:  "The socialists say they have 'lists,' well me too."  In fact, Caldwell was engaged in banter with a friend who brought up child-predator Jeffery Epstein's client "list" which, according to the internet, was being used to blackmail some on the political Right.  Again, Caldwell was making an obvious joke about something that had absolutely nothing to do with Congress or J6.

Respectfully, before the Government is allowed to introduce evidence regarding QRFs or weapons that were not brought into the District, it should be required to demonstrate to this Court solid proof that somebody connected to the Oath Keepers specifically planned to attack the Capitol or to engage in some type of violent, civil disorder aimed at stopping the Electoral College certification.  The *Rhodes* defendants broke no laws by bringing firearms to Virginia—in fact, the evidence is overwhelming that the Oath Keepers sought to obey the gun laws.

## Evidence of weapons possession and purchases after J6

The Government intends to introduce evidence that Stewart Rhodes and other defendants purchased or possessed firearms and related equipment after J6. The Court should exclude this evidence as irrelevant to the charged conspiracy. As noted above, the Court has ruled that, as a result of the 20th Amendment, the defendants were powerless to stop the "lawful transfer of power" after J6. Accordingly, Rhodes' prolific gun-shopping habits post-J6 are simply irrelevant.

## Conclusion

For the foregoing reasons, Caldwell requests that the evidence proffered by the Government intended to be introduced at trial as outlined in ECF No. 187 be excluded from evidence at trial.

Respectfully Submitted,

_____/s/_____
David W. Fischer, Esq.
Federal Bar No. 023787
Law Offices of Fischer & Putzi, P.A.
7310 Ritchie Highway, #300
Glen Burnie, MD 21061
(410) 787-0826
Attorney for Defendant

## <u>CERTFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 29th day of July, 2022, a copy of the foregoing Opposition to the Introduction of Certain Trial Evidence was electronically filed with the Clerk of the United States District Court using CM/ECF, with a notice of said filing to the following:

Counsel for the Government:     Office of the United States Attorney
Kathryn Rakoczy, AUSA
Jeffrey Nestler, AUSA
555 4th Street, NW
Washington, DC 20001


_____/s/_____
David W. Fischer, Esq.