UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD VALLEJO,<br>                    *Defendant*. | No. 22-cr-15 (APM) |

**MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY**

Pursuant to Fed. R. Evid. 702, 401, and 403, Defendant Edward Vallejo respectfully moves to exclude the proposed expert testimony of Dr. Sam Jackson, Ph.D., and states as follows.

**BACKGROUND**

This case involves a collection of defendants accused of seditious conspiracy, conspiracy to obstruct an official proceeding, and other charges stemming from the events of January 6, 2022. One of the defendants, E. Stewart Rhodes, is the founder of the Oath Keepers organization. Other defendants, such as Kelly Meggs, were allegedly leaders of state chapters of the Oath Keepers. Still other defendants, such as Edward Vallejo, were associated with the Oath Keepers at one point but had ceased being members. Other defendants, such as Thomas Caldwell, do not appear to have ever been an Oath Keeper. And hundreds of other defendants charged in different cases came to Washington, D.C. at the same time as these defendants, attended the same events, and went onto the Capitol grounds, without any connection to the Oath Keepers.

The government intends to call Dr. Sam Jackson as a kind of expert on the Oath Keepers. Dr. Jackson is the author of *Oath Keepers, Patriotism and the Edge of Violence in a Right-Wing Antigovernment Movement*, a book adapted from his 2018 dissertation. *See* S. Jackson, *The Oath Keepers: Patriotism, Dissent, and the Edge of Violence* (2018), available at

https://surface.syr.edu/etd/896 ("Dissertation"). The government has provided notice that it intends to elicit the following from Dr. Jackson:

> Dr. Jackson will describe antigovernment extremism and how the patriot/militia movement is a subcategory of that movement. He will explain how the Oath Keepers fits within the patriot/militia movement. He will provide background on the Oath Keepers organization, to include its founding in Lexington, Massachusetts, in 2009 by Stewart Rhodes. He will explain the significance of the founding of the organization at Lexington: the parallel to the United States' opposition to the British at the outset of the Revolutionary War. Dr. Jackson will describe what his scholarship has revealed about Oath Keepers' leadership structure, namely that Rhodes is the "president for life" of the organization. Dr. Jackson will detail how the Oath Keepers have described their ideology, and that central to this ideology is the concept that the government in America is tyrannical, violating the rights of everyday Americans in dramatic and systematic ways. He will explain that the Oath Keepers have consistently urged its members and Americans to prepare for conflict with the federal government by gathering supplies and engaging in training. Dr. Jackson will address how the election of President Donald Trump changed the Oath Keepers' focus. Following President Trump's election, Dr. Jackson will describe that Rhodes articulated the most urgent threat to be not the government, but those entities and individuals, within or outside the government, that would oppose President Trump. Finally, Dr. Jackson will address how Rhodes adapted his messages and his articulation of the Oath Keeper mission, tempering his message depending on the audience and likely reception to his message.

According to the government, "Dr. Jackson will base his opinions on his research into textual, audio, and video material posted by the Oath Keepers online…." *Id*. In other words, the government proposes to have Dr. Jackson opine on his interpretation of Oath Keeper public statements. Notably, Dr. Jackson's research for his dissertation and book did not involve speaking with or interviewing any members of the Oath Keepers. As noted in his book, his methodology was intentionally entirely based on interpreting public statements: "The data used in this project is all publicly available: none of it requires an Oath Keepers membership or special permission to view…. [M]y data exclusively consist of material posted by the Oath Keepers or by Stewart Rhodes, the group's founder and president." Dissertation at 77.

## LEGAL STANDARDS

Federal Rule of Evidence 702 authorizes expert testimony if (a) the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." As the Advisory Committee notes to Rule 702 explain:

> Rule 702 requires expert testimony to be "the product of reliable principles and methods that are reliably applied to the facts of the case. . . . For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Adv. Comm. Notes. (2000) (emphasis added). Thus, the trial court must scrutinize not only the principles and methods used by the purported expert, but also whether those principles and methods have been properly applied to the facts of the case. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."). The proponent of expert testimony has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171 (1987).

To be "helpful," the subject of expert testimony must be beyond the ken of a juror, i.e., not "within the juror's common knowledge and experience." *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006). *Compare United States v. Long*, 328 F.3d 655, 666 (D.C. Cir. 2003) (concluding that "experts may testify regarding the modus operandi of a certain category of criminals where those criminals' behavior is not ordinarily familiar to the average layperson")

and *United States v. Moore,* 104 F.3d 377, 384 (D.C. Cir. 1997) (holding that expert testimony concerning practices of persons involved in drug dealing in using duct tape assisted jury in determining whether the defendant intended to distribute drugs), *with Stromback v. New Line Cinema*, 384 F.3d 283, 295 (6th Cir. 2004) (holding that expert testimony was not necessary in a copyright infringement case, as a jury could compare two works to determine if they were substantially similar) and *United States v. Mitchell*, 49 F.3d 769, 780 (D.C. Cir. 1995) (concluding that the district court did not err in preventing a linguistics expert from testifying about taped conversations, as the tapes were before the jury and they could be properly evaluated by the jury).

Likewise, "evidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible." *Kostelecky v. NL Acme Tool/NL Indus., Inc.*, 837 F.2d 828, 830 (8th Cir. 1987) (citations omitted); *Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 624 (1st Cir. 1988) ("An opinion that 'will do little more than tell the jury what result to reach ... will be inadmissible.'") (quoting 11 J. Moore & H. Bendix, *Moore's Federal Practice* § 704.02 (1985)). *See also United States v. Libby*, 461 F. Supp. 2d 3, 7 (D.D.C. 2006) ("[e]xpert testimony will also be precluded if would usurp the jury's role as the final arbiter of the facts, such as testimony on witness credibility and state of mind.").

Finally, like all evidence, expert testimony is subject to Rule 403. Thus, "even if this *Daubert [v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993]) test is satisfied, expert testimony can still be precluded under Rule 403 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *Libby*, 461 F. Supp. 2d at 8 (quoting *United States v. Gatling,* 96 F.3d 1511, 1523 (D.C. Cir. 1996) (quoting Rule 403)). Notably, in discussing the interplay between Rule 403 and Rule 702, the Supreme Court has recognized that "'[e]xpert evidence can be both powerful and quite

4

misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" *Daubert*, 509 U.S. at 595.

## ARGUMENT

### I. Dr. Jackson's Testimony Would Not Be Relevant or Helpful to the Jury

Dr. Jackson's testimony fails Rule 702's requirement that it be helpful to the jury. The government appears to want Dr. Jackson to opine that the Oath Keepers are an "antigovernment extrem[ist]" group that it instructs "Americans to prepare for conflict with the federal government." However, this testimony would be based on reading and interpreting the Oath Keepers' public statements. Since there is no indication that the Oath Keepers used codewords or otherwise spoke indecipherably in public statements, the meaning of the Oath Keepers' statements is "within the juror's common knowledge and experience," *Rodriguez-Felix,* 450 F.3d at 1123, and expert testimony telling the jury what these statements mean is inadmissible. *See Mitchell*, 49 F.3d at 780 (linguistics expert could not testify about taped conversations that could be evaluated by the jury). And to the extent that such statements themselves are not admissible, the government should not be able to get them in front of the jury through an expert.

Moreover, although it is not very detailed, the proffered testimony by Dr. Jackson appears to approach an "opinion that will do little more than tell the jury what result to reach." *Willco Kuwait*, 843 F.2d at 624 (internal citations and quotations omitted). Describing the Oath Keepers as purveyors of "antigovernment extremism" who were prepared for "conflict with the federal government" basically instructs the jury that they "opposed the authority of the United States," an express element of 18 U.S.C. § 2384. This testimony would thus impermissibly "usurp the jury's role as the final arbiter of the facts." *Libby*, 461 F. Supp. 2d at 7 (excluding expert testimony regarding witness memory).

5

Finally, the proposed testimony by Dr. Jackson, to the extent it does not impermissibly invade the province of the jury, is largely irrelevant. Information like whether Rhodes is "president for life" of the organization is immaterial to the disputed issues at trial, which revolve around the defendants' intent regarding the activities of a discrete period of time surrounding January 6th. The same is true for Dr. Jackson's taxonomy of the "antigovernment extremism" movement and "the patriot/militia…subcategory of that movement." Such dissections of the American political spectrum do not indicate whether these defendants had a specific plan to interrupt the certification process or otherwise oppose the authority of the United States.

## II.     Dr. Jackson's Testimony Would Be Unfairly Prejudicial

Dr. Jackson's testimony should also be excluded under Rule 403. The government would not even be able to get through Dr. Jackson's credentials before improperly prejudicing the jury, since the titles of his dissertation and book both characterize the Oath Keepers as existing at "the Edge of Violence." Moreover, the substance of his testimony would compound this prejudice. He will purportedly testify that the Oath Keepers organization falls within the "antigovernment extremism" movement and believes that "the government in America is tyrannical." These sweeping characterizations would prejudice all defendants who did not make or even hear of the pronouncements on which they are based, and who do not adhere to these positions. It would promote guilt by association, rather than an individualized determination of the specific intent of each defendant, who were part of a movement of tens of thousands of people who came to Washington, D.C. on January 5–6, 2021, and thousands who went to the Capitol following President Trump's speech at the Ellipse. And it would foster this prejudice for no great probative purpose, since Dr. Jackson would simply be testifying about historic public statements on Oath Keeper websites with no insight into the events of January 6th.

## CONCLUSION

For the foregoing reasons, Defendant Vallejo respectfully requests that the Court exclude the testimony of Dr. Jackson from his trial.

July 29, 2022                                   Respectfully submitted,

                                                /s/ Matthew J. Peed
                                                Matthew J. Peed (D.C. Bar No. 503328)
                                                CLINTON & PEED
                                                1775 I St. NW, Suite 1150
                                                Washington, D.C. 20006
                                                (202) 919-9491 (tel)
                                                (202) 587-5610 (fax)

                                                *Counsel for Defendant Edward Vallejo*