**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES                                    *

vs.                                              *    Case No.: 22-15 APM

THOMAS E. CALDWELL                               *
(U.S. v. Elmer Stewart Rhodes)
            *    *    *    *    *    *    *    *    *    *    *

**Caldwell's Reply to the Government's Opposition to Defendants' Motions in _Limine_**
**(ECF No. 251)**

      COMES NOW, the Defendant, Thomas E. Caldwell ("Caldwell"), by and through

his attorney, David W. Fischer, Esq., and files this reply in response to the Government's

Opposition to Defendants' Motions in _Limine_ to Exclude Anticipated Trial Evidence

Noticed Pursuant to Federal Rule of Evidence 404(b).  (ECF No. 251).

I.      **The Government concedes that the alleged "death list" was written with**
        **different pens**.

      In its filing, the Government opined:  "That different pens were used to draft the

[alleged death] list does not change those facts (and Caldwell's focus on the different

color inks ignores the much more likely possibility, given the scribbles in the middle of

the pad, that Caldwell switched pens because the first one was running out of ink).  (ECF

251, at 3).  The Government's concession that the words "death list" and the names of the

Georgia election workers were written with different pens is significant and backs up

Caldwell's claim that the document in question is from a doodle pad used to jot down

random notes and pieces of information.

The Government's educated guess that Caldwell switched pens "because the first [pen] was running out of ink" is belied by the document itself.  Thanks to the Government including a copy of the alleged "death list" in its non-sealed, public filing,[1] the Court can see that the first pen was *not* "running out of ink" when the words "death list" were written.  The chances of a pen running out of ink at the very instant Caldwell allegedly finished writing "death list" are probably a million to one.  Accordingly, the most logical explanation for "death list" and the names of election workers being written with different pens (and being separated by squiggly lines) is that they are unconnected writings that were penned at separate times.  As such, this evidence is insufficient "to support a jury finding that the defendant committed the other crime or act."  *United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000).[2]

---

[1] The Government consistently includes incendiary and prejudicial information in filings against Caldwell and his co-defendants.  The Government knows full well that media outlets unfavorable to the defendants will reprint their prejudicial filings without skepticism.  There was absolutely no need for the Government to file a copy of the disputed document in the instant matter on the public record.  A sealed filing would have provided the Court with a copy of the document, which the Court already examined at Caldwell's initial detention hearing.  Additionally, in a recent filing regarding co-defendant Kelly Meggs, defense counsel for Meggs filed a motion in *limine* to exclude from evidence certain statements Meggs allegedly made regarding a prominent elected official.  Meggs' counsel filed the contested statements under seal.  The Government, in its opposition, reprinted the statements on the public record.  Respectfully, the Government's actions appear to be a thinly-veiled attempt to prejudice the *venire*.

[2] It should also be emphasized that there is no corroborative evidence to back up the Government's claim that the doodle pad was a death list.  Caldwell never made plans to go to Georgia, never communicated to others regarding the election workers, and no other similar writings of any type were recovered during an FBI search of his farm.

Regrettably, the Government again conflates the doodle pad with a completely unrelated Facebook message wherein, after being told that prominent elected officials might be outed as being on a *client list* possessed by child-predator Jeffery Epstein, Caldwell responded:  "The socialists say they have 'lists' well me, too!"  To suggest that this (humorous) message has anything to do with Caldwell's doodle pad is absurd. Caldwell did not have a "list" of anything.

The Government's ever-morphing conspiracy apparently covers every action, statement, text message, etc. related to Caldwell from Election Day 2020 until his arrest. It seems like, just yesterday, that the Government alleged that Caldwell was the leader of a plot to specifically and forcibly take over the Capitol Building.  Additionally, the Government previously suggested that Caldwell was the "Commander" of Oath Keepers who led a "stack" into the Capitol.  Respectfully, the Government's assertions as to how a doodle pad fits into the charged conspiracy would be much more convincing if their prior claims weren't so spectacularly inaccurate.  The jury should not be side-tracked and prejudiced by a collateral document with writings created with different pens at (presumably) different times.

## II.    Caldwell's firearms

Neither Caldwell, nor any person in America, could have prepared for a riot at the Capitol until on or around December 19, 2020 when former President Trump tweeted about a rally on J6 ("It's going to be wild!").  Despite this inconvenient fact, the Government asserts that a gun purchase made by Caldwell in late November 2020 is

somehow connected to a plot to stop Joe Biden from becoming President.  The Government's position is without merit.

First, the attempt by the Government to suggest that the instant case is about anything other than the events of J6 is absurd.  The Capitol Riot is the *sine qua non* of the charged conspiracy.  There could not have been a conspiracy to stop the lawful transfer of presidential power without an attempt to stop the Electoral College certification. Caldwell's purchase of a firearm designed specifically for elderly concealed-carry permit holders like himself has zero connection to J6.  This firearm, moreover, is a defensive gun that holds two bullets.  It is not a firearm designed for offensive purposes but, rather, a gun designed to fend off an attacker at close range.  The Government has cited no corroborative evidence to back up its speculation that Caldwell intended to use this firearm on J6.  The fact that he ordered it before the J6 protest was announced strongly reifies that Caldwell's purpose in buying the gun was for self-defense, which is what the product's advertised use is.

Additionally, as noted previously, Caldwell literally owned an arsenal of firearms prior to J6.  Firearms ownership in rural Virginia is ubiquitous and a cultural tradition.  In fact, Caldwell's wife is an avid shooter.  To suggest that Caldwell was surreptitiously trying to build firearms for J6 is patently absurd.  If Caldwell wanted to supply "the QRF" as the Government alleges, he could have done so by walking to his gun safe. Moreover, Caldwell could have made unlimited firearm purchases from gun stores or private sellers because he held a concealed carry permit.

The Government finds suspicion in Caldwell's Facebook message indicating that it was about to "get hairy."  In context, Caldwell's statement is referring to the product shortage of guns and ammos, including replacement parts like "uppers," not some nefarious plot to stop Joe Biden from becoming President.  Again, the Government's track record of interpreting Caldwell's social media messages should be considered.  As the Court undoubtedly recalls, the Government cited Caldwell's messages from J6 that stated "doors breached" and "inside" to make the claim that Caldwell forced his way inside the Capitol Building, a claim that has been completely disproven.  Additionally, the Government cited texts between Caldwell and co-defendants, wherein he was referred to as "the Commander," to inaccurately assert to this Court that he held a "leadership role in the Oath Keepers."  The Government also made pearl-clutching allusions to Caldwell being involved in trying to "gas" members of Congress based up Facebook messages, another claim that the defense debunked.

Evidence regarding Caldwell's gun and accessories purchases should be excluded from evidence as it irrelevant to the charged conspiracy and would likely prejudice an urban jury that is unfamiliar with guns and rural culture.

## III.    Jeremy Brown's explosives

The Government claims that grenades found in Mr. Brown's RV nine months after J6 are "intrinsic evidence" of the charged conspiracy.  (ECF 251 at 7-8).  Not so.  The Government's "intrinsic evidence" claim presupposes that the grenades found by law enforcement in Brown's RV were *the same* "explosives" allegedly referred to by

cooperator Caleb Berry.  The Government can't prove this similarity and, ironically, has argued a somewhat opposite position, i.e., that Brown, *at some time after J6*, moved the grenades that were recovered by law enforcement from his house to his RV to facilitate the sale of the former property.  As the Government tacitly concedes, the U.S. District Court in Florida accepted the Government's position that the grenades were likely moved from Brown's house to his RV after J6.  (ECF No. 251 at 8, fn. 3).

As the Government can't prove the connection between grenades found in Brown's RV and J6, such evidence should be excluded for that reason and for others stated by Caldwell in his initial filing on this issue.

IV.    **Watkins bomb-making recipe**.

In its opposition, the Government utilized two pages of argument without providing the Court with corroborative evidence that connects the bomb-making recipe to J6.  (ECF 251, at 9-10).  The only "bombs" that were used on J6 were pipe bombs planted outside the RNC and DNC the night before by some unknown male (according to publicly released law enforcement video).  Fortunately, the Government's discovery productions prove that Watkins wasn't in the District at the time these pipe bombs were planted.  Additionally, not one witness out of hundreds interviewed by the Government has suggested that Watkins or any of the co-defendants possessed or intended to use bombs on J6.  The Government has failed to show the relevance of this recipe to J6.

For that reason, and others set forth in Caldwell's initial filing, evidence of a bomb-making recipe should be excluded from evidence.

V.     <u>**Evidence of a QRF**</u>

Citing ambiguous (and at times exculpatory) social media posts and statements of Rhodes, Caldwell, and others, the Government avers that "[t]here could not be clearer evidence that the purpose of the QRF was to support the co-conspirators' plans to forcibly oppose the lawful transfer of power." (ECF 251, at 14). What could be clearer evidence of an intent to attack the Capitol, the Government never claims, than Caldwell's statement: "It begins for real on Jan 5 and 6 . . . when we mobilize *in the streets*[.]"? Or Meggs's statement encouraging others to "*surround* the Capitol all the way around with Patriots *screaming* so they *hear us inside*! Scare the hell out of them with about a million surrounding them[!]"? Or Caldwell's statement—*made 7 days before anybody knew that a J6 rally would take place*—about planning a bigger "op" for "like when we have to roll into town to actually save the Republic"? Respectfully, to suggest that these statements support in any way a criminal conspiracy is, quite frankly, beyond the pale.

The Government's pertinacity has blinded it to some obvious facts. First, nobody attacked the Capitol with firearms. Second, the QRF never entered Washington, D.C. which, notably, is bizarre since the purpose of this group, per the Government, was to supply gun-toting muscle for the Oath Keepers to stop the certification. Third, the Oath Keepers were honey-combed with individuals in, or connected to, federal law enforcement in the months leading up to J6, but apparently nobody was aware of the seditious conspiracy. Fourth, the Government has interviewed at least two dozen Oath

Keepers who were in, or were familiar with, the QRFs and not one person has stated that attacking the Capitol or stopping the J6 certification was the goal of these units.

Evidence of the QRFs should be excluded as the Government has not shown their relevance to a plot to stop Joe Biden from becoming President. The Government has not cited "clear" evidence that the QRFs were intended to be used to stop the lawful transfer of power.

## **Conclusion**

For the foregoing reasons, Caldwell requests that the evidence set forth in his motion in *limine* be excluded from trial.

Respectfully Submitted,

_____/s/_____
David W. Fischer, Esq.
Federal Bar No. 023787
Law Offices of Fischer & Putzi, P.A.
7310 Ritchie Highway, #300
Glen Burnie, MD 21061
(410) 787-0826
Attorney for Defendant

## CERTFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of August, 2022, a copy of the foregoing Reply to the Government's Opposition to Caldwell's Motions in *Limine* (ECF No. 251) was electronically filed with the Clerk of the United States District Court using CM/ECF, with a notice of said filing to the following:

Counsel for the Government:    Office of the United States Attorney
Kathryn Rakoczy, AUSA
Jeffrey Nestler, AUSA
Ahmed Baset, AUSA
Louis Manzo, AUSA
Troy Edwards, Jr. AUSA
Alexandra Hughes, AUSA
Justin Sher, AUSA
555 4th Street, NW
Washington, DC 20001

_____/s/_____
David W. Fischer, Esq.