IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>v. )<br>)<br>**KENNETH HARRELSON** )<br>)<br>**Defendant** ) | ) )<br>) **Criminal No. 1:22-cr-00015-APM**<br>)<br>) *USA v. Stewart Rhodes, et al.*<br>)<br>)<br>)<br>) |

**EXHIBIT D – Specific Discovery Requests by Harrelson Expert Witnesses**

## Discovery Requests

January 6 Incident Command Timeline

It is important to our defense to understand the incident command decision-making criteria and the timeline for those decisions primarily for the USCP response inside the Capitol but also for the MPD and other agencies to the extent that those organizations took part in clearing and securing the Capitol building and its interior. Of key interest to our case are the following decisions:

1. Who ultimately reached the decisions to lock down the Senate and then to evacuate it, what were their criteria for reaching those decisions, and when did they reach those decisions?
2. Who ultimately reached the decisions to lock down the House and then to evacuate it, what were their criteria for reaching those decisions, and when did they reach those decisions?
3. The security operations channels appear to show that USCP officers mistakenly concluded, sometime around 14:43, that shots had been fired on the House floor and that this message was transmitted over one of the channels, a full minute or two before Ashli Babbitt was shot. Is that true? If it is true, how was this information used from an incident management perspective, in terms of the need to search and clear the building and search and clear the grounds of the Capitol on the one hand, and what types of units could perform the different necessary search and/or clearing operations (e.g., such as an requirement to use of skilled HRTs/SWAT teams to search the building as opposed to normal USCP or MPD officers, M4 teams, or Civil Disturbance Units)?
4. Who ultimately reached the decision, from a security perspective, that the Capitol was secure enough to start scheduling resumption of the Certification process? And when was this decision made?

To be clear, there is no need to report on or document political decisions made by Members of Congress, to include the leadership; where that decision making may have entered into these questions it is adequate to state that the decision was reached by the Sargent-at-Arms of either the House or the Senate or both. Further, the documentation need not be unnecessarily detailed: it is our expectation that most of this information can be documented at the same level of detail that was used in creating the timelines for the Senate Staff Report or the January 6 timeline created by the Department of Defense.

USCP and MPD Standard Operating Procedures
We need SOPs to ensure that all parties were operating within the law and within their operating procedures. We need to understand if their operation on Jan 6th was conducted within approved policy, within the law, and within current and reasonable training relevant to the events on Jan 6th. Where was the USCP's jurisdiction and areas of security responsibility? Why was the USCP running the incident command on both the bomb calls that were located within MPD jurisdiction?

We need any policy or procedure that spells out "concurrent jurisdiction" or memorandums allowing USCP authority to operate within, conduct traffic interdiction, conduct command operations within Capitol Police areas of jurisdiction and responsibility.

The USCP appeared to have set up perimeters, stopped pedestrian and vehicle traffic, requested civilian evacuation of what appears outside of their areas of lawful responsibility during 2 suspicious explosive operations (DNC/RNC)

Suspicious Explosive Operations at the DNC and RNC

In 2021 the FBI released some statements regarding these two operations and an alleged route the bomber took the night before when placing the bombs; has any of this information changed and what are the changes? Who found the bomb near the DNC and when? What is the explanation for why that bomb was not discovered earlier in the day, during rush hour, for instance?

Security System
How can we tell who accessed the system, how it was accessed, was the access authorized or unauthorized

Security Hardware and Alarms
Our observations that we need to have validated: There appear to be magnetic locks on most if not all exterior doors. (Dynalock maglock with Panic Series 90? door handle). We watched the Sergeant with our tour group access two doors one of which was the East Door to the Rotunda, the so-called Columbus doors. Access required communications to a command center where he notified them the door number he was accessing. Then he used a key in his possession, turning a keyed lock on the wall. This initiated an alarm that was turned off shortly and the

door was opened. Under each doorframe, pointed in a downward direction is a thin metal "box" that appears to have "recording, alarming or other security purposes.

We need door and window access and alarm system control manuals, technical specifications as well as door hardware manufacturer makes and models.

Regarding the Columbus doors, where does the alarm report, where do the cameras on that door and in the area report and can the central alarm station (CAS) turn deactivate and activate the alarm siren and can the CAS lock and unlock the door from that location. If the door is allowed to close, will it resecure and rearm?

Further, without being able to see the central alarm station (or wherever the USCP may call it) and without be allowed to speak with alarm and radio controllers, we will not be able to answer these questions.

We would like to know the answers to such questions as: Who opened the doors? Were the doors accessed by officers, CAS operators? If opened by anyone other than a trespasser/public? Can the doors be left unlocked by operators, officers, anyone related to capitol security?

Audio and Video Systems
There are numerous audio and video systems under control of the MPD, USCP, House security and senate security. This included pan/tilt and fixed cameras with zoom, infra-red and other lenses used in the security of the Capitol. Who controls the cameras outside of the capitol (MPD?). Who controls the doors outside the gallery doors, 3rd floor outside the House and Senate?

We heard loudspeakers on the exterior of the Capitol. There is a PA/speaker system inside the Capitol. Where are the loudspeakers controlled and where are they located as related to the crowds? Were they in working order Jan 6th?

Was the crowd given clear and lawful orders to disperse? Where did these commands come from, were they clear and understandable to the crowd? Did the communicator read an approved "script" or just wing it?

Audio/Visual Evidence
We need to see all the audio and video evidence where our clients are located and to see if the officers and other capitol personnel are compliant with their procedures, training, lawful actions, etc.

Miscellaneous
Given we were not allowed to take laser measurements allowed during the tour, we still need to be able to measure certain distances. This information will be used to determine how long did it take for personnel (USCP or protestors) to move from point a to point b and how many people could fit through a door, into the tunnel entryway, etc., at one time.

Security operations channels seem to indicate that an officer was reassigned to retrieve Senator Klobuchar's purse at one point. Why did retrieving Senator Klobuchar's purse become a higher priority that stopped securing the Capitol? This is relevant because stopping officers who are securing the Senate (for safety and crime scene preservation), the officers are interfered with. Were the officers also removing "potential Evidence" or removing articles from a crime scene before investigation, whether this is unintentional or not?