**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Case No. 22-cr-15-APM** |
| | § | |
| **ELMER STEWART RHODES, III,** | § | |
| **KELLY MEGGS,** | § | |
| **KENNETH HARRELSON,** | § | |
| **JESSICA WATKINS,** | § | |
| **ROBERTO MINUTA,** | § | |
| **JOSEPH HACKETT,** | § | |
| **DAVID MOERSCHEL,** | § | |
| **THOMAS CALDWELL, and** | § | |
| **EDWARD VALLEJO,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM IN SUPPORT OF DEFENSE ARGUMENTS AT TRIAL RELATING TO THE INSURRECTION ACT

COMES NOW the Defendant, Elmer Stewart Rhodes III, by and through undersigned Counsel, and pursuant to this Honorable Court's request during September 14, 2022's pretrial conference, and hereby files this Memorandum in Support of Defense Arguments at Trial Relating to the Insurrection Act. On that date, during pretrial hearings, the Honorable Judge Amit Mehta requested comments from the Government regarding the proposed "Government Exhibit 3002: Stipulation Regarding the 'Insurrection Act'". The Government proffered to the Court that it was important to give the jury the language of the Act, as the evidence that will be presented in this case is saturated with references to such. In response to the Honorable Judge's questions to the defense regarding the importance and applicability of the Insurrection Act to the alleged charge of Seditious Conspiracy, the Court charged James Lee Bright with briefing the

Presidential authority and admissibility at trial of this defensive theory. Pursuant to discussions on the record during the pretrial conference on September 14, 2022, Rhodes submits this memorandum to: (1) brief the history and limited case law related to the Insurrection Act and militias; (2) contextualize the evidence of Defendants' statements regarding the Insurrection Act; (3) clarify that the defense's anticipated trial argument related to the Insurrection Act is *not* a public authority or entrapment-by-estoppel defense; and (4) explain the argument's application specifically to the count of Seditious Conspiracy.

<u>**ARGUMENT**</u>

**I.** **Though Trump never actually invoked the Insurrection Act, the Act *does* confer broad authority to presidents to use the militia to quell "unlawful obstructions, combinations, or assemblages" or "any insurrection, domestic violence . . . or conspiracy."**

What is commonly referred to as the "Insurrection Act" is in fact a collection of individual statutes enacted and amended by Congress at separate times between 1792 and 1871.[1] These statutes, now codified at 10 U.S.C. §§ 251–255, together concern the use of militia and military force within the United States—but each authorizes different actions by the President in response to particular circumstances. Collectively, the statutes have been lawfully invoked thirty times by seventeen different presidents—most recently in 1992 by President H.W. Bush.[2] This section of the argument proceeds by outlining the early legislative history of the Insurrection Act, including its constitutional underpinnings. It then proceeds by outlining the relevant legislative history, limited case law, legal interpretations, and historical events surrounding each

---

[1] Calling Forth Act of 1792, ch. 28, 1 Stat. 264 (repealed 1795); Militia Act of 1795, ch. 36, 1 Stat. 424 (repealed in part 1861 and current version at 10 U.S.C. §§ 251–255 (2016)); Insurrection Act of 1807, ch. 39, 2 Stat. 443 (current version at 10 U.S.C. § 251–255 (2016)); Suppression of Rebellion Act of 1861, ch. 25, 12 Stat. 281 (current version at 10 U.S.C. § 251–255 (2016)); Ku Klux Klan (Civil Rights) Act of 1871, ch. 22, sec. 3–4, 17 Stat. 13, 14–15 (1871) (expired in part 1873 and current version at 10 U.S.C. § 253).

[2] Joseph Nunn & Elizabeth Goitein, *Guide to Invocations of the Insurrection Act*, Brennan Center for Justice (Apr. 25, 2022), https://www.brennancenter.org/our-work/research-reports/guide-invocations-insurrection-act.

section of the Insurrection Act.

### A.  OVERVIEW: THE CONSTITUTION & THE INSURRECTION ACT'S FOUNDATIONS

#### 1.  The Constitution

The foundation of the modern Insurrection Act dates back to the Constitutional Convention, where delegates aimed to rectify the "untenable" decentralized militia system under the Articles of Confederation.[3] The framers largely "accepted the premise that the new national government must possess a coercive power" to "use military force in domestic disorders."[4] While the President was to be the "Commander in Chief . . . of the Militia of the several States," U.S. Const. art. II, § 2, cl. 1, the consensus was that Congress should have the authority to call upon the militias to respond to both internal and external threats.[5] The First Militia Clause of the Constitution thus conferred on Congress the power "to provide for calling for the Militia" to (1) execute the laws of the Union, (2) suppress insurrections, and (3) repel invasions. U.S. Const. art. I, § 8, cl. 15. Still, there were lingering concerns that there would be emergencies Congress itself could not fully delineate or anticipate.[6] Early Congresses therefore sought to delegate their broad authority, resulting in the Calling Forth Act of 1792 just three years into the new government.[7]

#### 2.  The Calling Forth Act of 1792

The Calling Forth Act, passed by the Second Congress, addressed each of the circumstances under the First Militia Clause. Regarding the use of the militia to suppress insurrections and repel invasions, it delegated Congress's authority to "call forth such of number

---

[3] See Stephen I. Vladeck, *Emergency Power and the Militia Acts*, 114 Yale L.J. 149, 156–57 (2004).
[4] *Id.* at 157 & 157 n.22 (2004) (citing Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders, 1789-1878,* 20 (1988)).
[5] *Id.* at 158.
[6] Vladeck, *supra*, at 157.
[7] *Id*.

of the militia of any other state or states" to the President alone.[8] Regarding the use of the militia

to <u>execute the laws of the Union</u>, the Act required that an "associate justice or the district judge"

first notify the President that the forces opposing the laws could not be "suppressed by the

ordinary course of judicial proceedings" before militias could be utilized.[9] It also implicitly

required the President, when Congress was in session, to seek congressional authorization if he

wished to use the militia of one state to suppress the unlawful "combinations" in another state.[10]

And before taking action under any of the Act's provisions, the President was required to order

the insurgents to disperse.[11]

---

[8] Calling Forth Act of 1792, ch. 28, §1, 1 Stat. 264, 264. The full Section 1 of the Act reads as follows:

> [W]henever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States, to call forth such number of the militia of the state or states most convenient to the place of danger or scene of action, as he may judge necessary to repel such invasion, and to issue his orders for that purpose, to such officer or officers of the militia as he shall think proper; and in case of an insurrection in any state, against the government thereof, it shall be lawful for the President of the United States, on the application of the legislature of such state, or of the executive (when the legislature cannot be convened) to call forth such number of the militia of any other state or states, as may be applied for, or as he may judge sufficient to suppress such insurrection.

*Id.*

[9] *Id.* § 2, 1 Stat. at 264. The first part of Section 2 of the Act read:

> [W]henever the laws of the United States shall be opposed, or the execution thereof obstructed, in any state, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by this act, the same being notified to the President of the United States, by an associate justice or the district judge, it shall be lawful for the President of the United States to call forth the militia of such state to suppress such combinations, and to cause the laws to be duly executed.

*Id.*

[10] *See* Vladeck, *supra*, at 160 (quoting Calling Forth Act of 1792 § 2, 1 Stat. at 264). Specifically, the second part of Section 2 stated:

> And if the militia of a state, where such combinations may happen, shall refuse, or be insufficient to suppress the same, it shall be lawful for the President, if the legislature of the United States be not in session, to call forth and employ such numbers of the militia of any other state or states most convenient thereto, as may be necessary, and the use of militia, so to be called forth, may be continued, if necessary, until the expiration of thirty days after the commencement of the ensuing session.

*Id.*

[11] Calling Forth Act of 1792, § 3, 1 Stat. at 264. Section 3 of the Act provided:

---

### 3. *The Militia Act of 1795*

These additional checks on the President's authority were removed when, just three years later, Congress passed the Militia Act of 1795.[12] First, the new statute removed the judicial approval requirement—making the President "sole arbiter of when circumstances necessitated the calling forth of the militia."[13] The 1795 Act also removed the requirement that the President could only use militiamen from other states when Congress was not in session.[14] Lastly, it removed the requirement that the dispersal proclamation be issued *before* calling out the militia; all the new Act required was the President to give contemporaneous notice that the militia had been activated.[15] The President therefore had the authority to act "decisively, expeditiously, and . . . unilaterally" in calling forth the state militias.

### 4. *The Insurrection Act of 1807*

Twelve years later, Congress permanently supplemented the Militia Act of 1795 by authorizing the President to call upon federal troops in addition to the militias:

> [i]n all cases of insurrection, or obstruction to the laws, either of the United States, or of any individual state or territory, where it is lawful for the President of the United States to call forth the militia for the purpose of suppressing such insurrection, or of causing the laws to be duly executed, it shall be lawful for him to employ, for the same purposes, such part of the land or naval force of the United States, as shall be judged necessary, having first observed all the pre-requisites of the law in that respect.[16]

---

That whenever it may be necessary, in the judgment of the President to use the military force hereby directed to be called forth, the President shall forthwith, and previous thereto, by proclamation, command such insurgents to disperse, and retire peaceably to their respective abodes, within a limited time.

*Id.*

[12] Militia Act of 1795, ch. 36, 1 Stat. 424; Vladek, *supra*, at 161. The Calling Forth Act of 1792 had a three-year expiration date, so a reauthorization or reenactment was required in 1795 if the Act were to remain in force. *See* Vladek, *supra*, at 160. The Militia Act of 1795 replaced the original statute and did not have a sunset provision. *Id.* at 162.

[13] Vladek, *supra*, at 162 (citing Militia Act of 1795 § 2, 1 Stat. at 424).

[14] *Id.* (comparing Militia Act of 1795 § 2, 1 Stat. at 424, with Calling Forth Act of 1792 § 2, 1 Stat. at 264).

[15] *Id.* (comparing Militia Act of 1795 § 3, 1 Stat. at 424, with Calling Forth Act of 1792 § 3, 1 Stat. at 264).

[16] Insurrection Act of 1807, ch. 39, 2 Stat. 443, 443.

---

While there is no legislative history on the Insurrection Act of 1807, legal historians have posited that Congress sought to bolster the President's power in the wake of border incursions by Spanish troops and the Aaron Burr conspiracy.[17] Because the First Militia Clause said nothing about the use of federal troops, this Act also drew upon Congress's Article I, Section 8 war powers.[18]

### 5. *Suppression of the Rebellion Act of 1861*

At the beginning of the Civil War, Congress once again sought to strengthen the President's ability to federalize the militia.[19] The Suppression of the Rebellion Act of 1861 amended the Militia Act of 1795 in three critical ways. First, it expanded the time period during which the President was authorized to call forth the militia or federal armed forces from thirty days to sixty days.[20] Second, the Act expressly provided that the President had sole discretion to determine when it was "impracticable" to enforce the laws.[21] Third, the Act added "rebellion against the authority of the Government of the United States" to the list of instances where the militia could be mobilized to execute the laws.[22] Thus, throughout the Civil War, the President enjoyed broad power under the 1861 Act to use both militia and armed forces to combat the Confederacy.[23]

### 6. *Ku Klux Klan (Civil Rights) Act of 1871*

To address the ongoing racial violence during the Reconstruction Era, Congress once

---

[17] *See* Vladeck, *supra*, at 164; *see also* George M. Dennison, *Martial Law: The Development of a Theory of Emergency Powers*, 1776-1861, 18 Am. J. Legal Hist. 52, 56-58 (1974).
[18] *See* Vladeck, *supra*, at 165–66.
[19] *See id.* at 166.
[20] Suppression of the Rebellion Act of 1861, ch. 25, § 3, 12 Stat. 281, 282.
[21] *See id.* § 1, 12 Stat. at 281 ("[W]henever . . . it shall become impracticable, in the judgment of the President of the United States to enforce, by the ordinary course of judicial proceedings, the laws . . . it shall be lawful for the President of the United States to call forth the militia . . . .").
[22] *Id.*
[23] Coakley, *supra*, at 228.

again expanded the President's power to invoke militias in the Ku Klux Klan (Civil Rights) Act of 1871.[24] Section 3 of the Act broadened both the *circumstances* under which the President could invoke the militia and the *means* by which he could act. Any "insurrection, domestic violence, unlawful combination, or <u>conspiracy</u>" obstructing the execution of laws protecting the "rights, privileges, or immunities" of "any portion or class of the people" could be suppressed by calling forth the militia or armed forces, or "<u>by other means as he may deem necessary</u>."[25] The statutory framework did not set any limits on what level of force could be used to address the various triggers. It also did not further define the triggering circumstances; the President alone had largely unreviewable discretion to decide when the Insurrection Act could be invoked.[26]

Since the 1871 Act, the statutes constituting the Insurrection Act have undergone only minor revisions—mostly for clarity.[27] The remaining discussion in this Part delineates the exact language of the current statutes as well as related case law.

**B.  SECTION 251. FEDERAL AID FOR STATE GOVERNMENTS**

Section 251 allows the President to deploy troops and neighboring states' militias to a state that has requested federal aid to suppress an internal insurrection. Specifically, it provides:

> Whenever there is an insurrection in any State against its government, the President may, upon the request of its legislature or of its governor if the legislature cannot be convened, call into Federal service such of the militia of the other States, in the number requested by that State, and use such of the armed forces, as he considers necessary to suppress the insurrection.

10 U.S.C. § 251.

1.  <u>Statutory Derivation & Amendments</u>

This section is the oldest part of the Insurrection Act; it largely tracks the language from

---

[24] Vladeck, *supra*, at 167.
[25] Ku Klux Klan (Civil Rights) Act of 1871, ch. 22, §3, 17 Stat. 13, 14.
[26] *See infra* Part I.B.2., I.C.2, I.D.2; Vladeck, *supra*, at 169.
[27] *See* Vladeck, *supra*, at 167 n.76.

the latter part of section 1 of the Calling Forth Act of 1792.[28] Its only substantive revision since 1792 was the 1807 addition of the President's authority to call upon the armed forces in addition to the militias of other states.[29] Section 251 thus fundamentally stands as it did in the early nineteenth century, when the Supreme Court began to interpret its provisions.

  2.  Case Law

The power of the President under this specific statute was first addressed by the Supreme Court in *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849). The plaintiff, Martin Luther, had been part of the Dorr Rebellion, which sought to overthrow the charter government of Rhode Island. To help put down the rebellion, the governor of the charter government had requested that the President call out the militia; President John Tyler took the initial measures to do so, which prompted "an end to the armed opposition." *See id.* at 44. The Court explained the latitude of the President's power under this statute in response to a potential insurrection in a state:

> By this act, **the power of deciding whether the exigency had arisen upon which the government of the United States is bound to interfere, is given to the President**. He is to act upon the application of the legislature or of the executive, and consequently he must determine what body of men constitute the legislature, and who is the governor, before he can act . . . . If there is an armed conflict, like the one of which we are speaking, it is a case of domestic violence, and one of the parties must be in insurrection against the lawful government. And **the President must, of necessity, decide which is the government,** and which party is unlawfully arrayed against it, before he can perform the duty imposed upon him by the act of Congress.

*Id.* at 43 (emphasis added). The President's power under this section, the Court concluded, could not be reviewed by the courts. *See id.* at 43–44. The Court acknowledged concerns that "this

---

[28] *See* Calling Forth Act of 1792, ch. 28, §1, 1 Stat. 264, 264; *supra* note 8. This language was left unchanged and made permanent with the enactment of the Militia Act of 1795.

[29] Insurrection Act of 1807, ch. 39, 2 Stat. 443, 443. The words "armed forces" substituted the original words "land or naval forces of the United States" during a 1956 revision of the section. *See* Act of Aug. 10, 1956, ch. 1041, 70A Stat. 15, §331. This section was renumbered in 2016. Pub. L. 114–328, div. A, title XII, §1241(a)(2), Dec. 23, 2016, 130 Stat. 2497.

power in the President is dangerous to liberty, and may be abused," but opined that "it would be difficult . . . to point out any other hands in which this power would be more safe and . . . effectual." *Id.* at 44. Ultimately, if this great power was abused, "it would be in the power of Congress to apply the proper remedy." *Id.* at 45.

This holding in *Luther* has never received negative treatment in the courts. When faced with questions regarding the actions or inactions of the militia or federal troops within a state, courts—including this one—have reiterated their inability to review the actions of the President. *See, e.g.*, *Monarch Ins. Co. v. District of Columbia*, 353 F. Supp. 1249, 1254–55 (D.C. 1973) ("[I]t is clear from the constitutional and statutory framework . . . that the decision whether to use troops or the militia . . . in quelling a civil disorder is exclusively within the province of the President. The Courts have also made it clear that presidential discretion in exercising those powers . . . is not subject to judicial review."); *see also Laird v. Tatum*. 408 U.S. 1, 3–4 (1972) ("The President is authorized by 10 U.S.C. [§ 251] to make use of the armed forces to quell insurrection and other domestic violence if and when the conditions described in that section obtain within one of the States.").

3. Invocations

Section 251 is the part of the Insurrection Act that has been invoked the most times.[30] The first instance where a President attempted to invoke this section was in 1834, when Andrew Jackson deployed troops to aid Maryland authorities in suppressing a violent labor dispute.[31] Although the Maryland legislature had petitioned Jackson for military aid, Jackson failed to issue

---

[30] Joseph Nunn, *The Insurrection Act Explained*, Brennan Center for Justice (Apr. 21, 2022), https://www.brennancenter.org/our-work/research-reports/insurrection-act-explained.
[31] Nunn & Goitein, *supra*.

the required proclamation under the Insurrection Act.[32] For purposes of clarity and brevity, the lawful invocations of § 251 and its statutory predecessors are listed below:[33]

1) **May 22, 1873 – Ulysses S. Grant**[34]
   **Louisiana Gubernatorial Election.** "The results of the 1872 gubernatorial election in Louisiana were contested between white supremacist Democrats and pro-Reconstruction Republicans, which threw the state's politics into turmoil and led to widespread violence, especially in rural areas. The violence reached its apogee on April 13, 1873 in Colfax, Louisiana, when a heavily armed white mob massacred between 60 and 150 black militiamen after they surrendered (sources differ as to the number of victims). A month after the Colfax massacre, President Grant issued a proclamation under the Insurrection Act, calling on the belligerents in Louisiana to disperse."[35] In his proclamation, Grant cited the language of the original § 251 and stated that the governor had requested the assistance in lieu of the Louisiana legislature, which was not in session at the time.[36]

2) **May 15, 1874 – Ulysses S. Grant**[37]
   **The Brooks-Baxter War**. "The 1872 Arkansas gubernatorial election was disputed between two Republican candidates, Elisha Baxter and Joseph Brooks. In 1874, Brooks, who had narrowly lost the election, attempted to overthrow Baxter's government. Both parties gathered their own militia forces and engaged in an extended stand-off, punctuated by occasional incidents of violence. All the while, federal troops stationed in the area as part of Reconstruction interposed themselves between the two forces in order to forestall the outbreak of full war. In May, after the state assembly was finally able to meet and declare Baxter the winner, President Grant ratified their decision and invoked the Insurrection Act, ordering the supporters of Brooks to disperse, who did so without the need for additional federal troops."[38] In his proclamation, President Grant explicitly stated that Governor Baxter had requested the military aid.[39]

3) **September 15, 1874 – Ulysses S. Grant**[40]

---

[32] *Id.*

[33] This list was compiled by Joseph Nunn & Elizabeth Goiten of the Brennan Center for Justice in a report accessible at https://www.brennancenter.org/our-work/research-reports/guide-invocations-insurrection-act. *Id.* Where appropriate, the report's language has been quoted extensively, with some revisions, and supplemented by additional sources.

[34] Proclamation No. 213 (May 22, 1873), *available at* Gerhard Peters and John T. Woolley, *Proclamation 213—Law and Order in the State of Louisiana, The American Presidency Project*, https://www.presidency.ucsb.edu/documents/proclamation-213-law-and-order-the-state-louisiana.

[35] Nunn & Goitein, *supra*.

[36] Proclamation No. 213, Peters & Woolley, *supra*.

[37] Proclamation No. 218 (May 15, 1874), *available at* Gerhard Peters and John T. Woolley, *Proclamation 218—Law and Order in the State of Arkansas,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-218-law-and-order-the-state-arkansas.

[38] Nunn & Goitein, *supra*.

[39] Proclamation No. 218, Peters & Woolley, *supra*.

[40] Proclamation No. 220 (Sept. 15, 1874), *available at* Gerhard Peters and John T. Woolley, *Proclamation 220—Law and Order in the State of Louisiana,* The American Presidency Project,

**Louisiana Gubernatorial Election**. "Continued disputes over the 1872 gubernatorial election in Louisiana culminated in a violent white supremacist coup d'état in New Orleans - then the state capital - in 1874. President Grant invoked the Insurrection Act and deployed troops, who drove the insurrectionists out of the city and reinstated the ousted governor. However, the insurgents established their own competing government, which effectively controlled much of Louisiana outside of New Orleans for the next three years. This situation persisted until the federal troops protecting New Orleans were withdrawn as part of the Compromise of 1877, and white supremacist "Redeemers" fully took control of the state."[41] In the proclamation, President Grant stated that the Louisiana governor had requested federal troops while the state legislature was not in session.[42]

4) **December 21, 1874 – Ulysses S. Grant**[43]
**The Vicksburg Massacre**. "In early December 1874, the newly elected black sheriff of Vicksburg, Mississippi, Peter Crosby, was indicted on fabricated charges and deposed by a white mob. When black citizens organized an effort to reinstate Crosby, white mobs attacked and killed dozens of them. After the massacre, President Grant invoked the Insurrection Act and deployed troops to Vicksburg to prevent further violence and reinstate Crosby."[44] In the proclamation, President Grant stated that the Mississippi legislature had requested the President's use of military force.[45]

5) **October 17, 1876 – Ulysses S. Grant**[46]
**South Carolina Gubernatorial Election.** "In advance of the 1876 South Carolina gubernatorial election, thousands of white supremacists in South Carolina who opposed Reconstruction organized into heavily armed paramilitary groups known as "rifle clubs." Worried that these groups would interfere with the election and were too large to be controlled with the state militia, the governor appealed to President Grant for military aid. Grant issued a proclamation under the Insurrection Act ordering the clubs to disperse, and sent additional federal troops to South Carolina to reinforce those already stationed there. These troops kept the peace after the election, remaining until all federal forces were withdrawn from the former Confederacy as part of the Compromise of 1877."[47] In the proclamation, President Grant stated that the Louisiana governor had requested federal troops while the state legislature was not in session.[48]

---

https://www.presidency.ucsb.edu/documents/proclamation-220-law-and-order-the-state-louisiana.
[41] Nunn & Goitein, *supra*.
[42] Proclamation No. 220, Peters & Woolley, *supra*.
[43] Proclamation No. 223 (Dec. 21, 1874), *available at* Gerhard Peters and John T. Woolley, *Proclamation 223—Law and Order in the State of Mississippi*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-223-law-and-order-the-state-mississippi.
[44] Nunn & Goitein, *supra*.
[45] Proclamation No. 223, Peters & Woolley, *supra*.
[46] Proclamation No. 232 (Oct. 17, 1876), *available at* Gerhard Peters and John T. Woolley, *Proclamation 232—Law and Order in the State of South Carolina*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-232-law-and-order-the-state-south-carolina.
[47] Nunn & Goitein, *supra*.
[48] Proclamation No. 232, Peters & Woolley, *supra*.

6) **July 18–23, 1877 – Rutherford B. Hayes**[49]
**Great Railroad Strike of 1877.** "On July 16, 1877, railroad workers in Martinsburg, West Virginia went on strike after their wages were cut for the second time in eight months. The strike quickly spread from city to city, bringing most rail traffic in the United States to a complete halt. At the request of railroad owners, many state governors called out their National Guard forces and deployed them to force the strikers to return to work. Several governors also appealed to President Rutherford B. Hayes for federal military assistance. On July 18, Hayes invoked the Insurrection Act and deployed troops to Martinsburg. He invoked the Act again on July 21 and July 23, deploying troops to Maryland and Pennsylvania, respectively." [50] In the nearly identical proclamations, President Hayes stated that the governors of the three states had requested federal troops.[51]

7) **April 28, 1914 – Woodrow Wilson**[52]
**Colorado Coalfield War.** "In late summer 1913, coal miners in Colorado began a strike that would ultimately last until December 1914. On April 20, 1914 - almost a year into the strike - a company of Colorado National Guardsmen massacred a group of miners at their campsite in the Ludlow area. In the following days, the strike devolved into open warfare between miners and the Colorado National Guard. On April 25, a sit-in by over a thousand members of the Women's Peace Association compelled the state governor to petition President Woodrow Wilson for federal aid to stop the violence. Wilson invoked the Insurrection Act on April 28, and deployed federal troops to replace the Colorado Guardsmen - who were demobilized at Wilson's request - and restore order."[53]

8) **August 30, 1921 – Warren G. Harding**[54]
**Battle of Blair Mountain.** "In August 1921, several thousand armed coal miners fought a battle against an opposing force of state police, volunteer militia, and coal company employees on Blair Mountain in West Virginia. At the request of the state governor, President Warren Harding invoked the Insurrection Act on August 30 and deployed federal troops - including a bomber squadron - who intervened on the side of the state

---

[49] Proclamation No. 274 (Nov. 7, 1885), *available at* Gerhard Peters and John T. Woolley, *Proclamation 274—Law and Order in the State of West Virginia,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-236-law-and-order-the-state-west-virginia; Proclamation No. 237 (July 21, 1877), *available at* Gerhard Peters and John T. Woolley, *Proclamation 237—Law and Order in the State of Maryland,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-237-law-and-order-the-state-maryland; Proclamation No. 238 (July 23, 1877), *available at* Gerhard Peters and John T. Woolley, *Proclamation 238—Law and Order in the State of Pennsylvania,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-238-law-and-order-the-state-pennsylvania.
[50] Nunn & Goitein, *supra.*
[51] Proclamation No. 236, Peters & Woolley, *supra*; Proclamation No. 237, Peters & Woolley, *supra*; Proclamation No. 238, Peters & Woolley, *supra.*
[52] Proclamation No. 1265 (Apr. 28, 1914).
[53] Nunn & Goitein, *supra.*
[54] Proclamation No. 1606 (Aug. 30, 1921), *available at* Gerhard Peters and John T. Woolley, *Proclamation— Protection Against Domestic Violence in West Virginia,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-protection-against-domestic-violence-west-virginia.

---

forces and brought an end to the conflict."[55] In the proclamation, President Harding stated that the West Virginia governor had requested military forces.[56]

### 9)  June 21, 1943 – Franklin D. Roosevelt[57]

**1943 Detroit Riot.** "President Franklin Roosevelt invoked the Insurrection Act and deployed troops to Detroit, Michigan, where long-simmering racial tensions exacerbated by wartime shortages had boiled over into widespread rioting."[58] In the proclamation, President Roosevelt stated that the Michigan governor had requested military forces.[59]

### 10) July 24, 1967 – Lyndon B. Johnson[60]

**1967 Detroit Riots**. "Anger over systemic oppression of Black residents in Detroit, Michigan boiled over into five days of rioting, looting, and arson, which was exacerbated by the excessively violent response of Detroit Police and the Michigan National Guard. At the request of Michigan's governor, President Johnson invoked the Insurrection Act on the third day of unrest and deployed federal troops to assist the Michigan National Guard. More than three quarters of the 43 people who died during the riot were African-American. Two thirds were killed by police or National Guardsmen, including one Guardsman who was killed by friendly fire, while one person was shot by a federal soldier."[61] In the proclamation, President Johnson stated that the Michigan governor had requested military forces.[62]

### 11) April 7, 1968 – Lyndon B. Johnson[63]

**Riots After Assassination of MLK.** "Following the assassination of Dr. Martin Luther King, Jr. on April 4, 1968, a wave of civil unrest swept across the United States. On April 5, President Johnson invoked the Insurrection Act and deployed troops to quell rioting in Washington, D.C. On April 7, Johnson invoked the Act twice more and deployed troops to suppress riots in Chicago, Illinois, and Baltimore, Maryland."[64] The proclamations as to Illinois and Maryland each stated that the respective governors had requested help

---

[55] Nunn & Goitein, *supra*.

[56] Proclamation No. 1606, Peters & Woolley, *supra*.

[57] Proclamation No. 2588 (June 21, 1943), *available at* Gerhard Peters and John T. Woolley, *Proclamation 2588—Directing Detroit Race Rioters to Disperse,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-2588-directing-detroit-race-rioters-disperse.

[58] Nunn & Goitein, *supra*.

[59] Proclamation No. 2588, Peters & Woolley, *supra*.

[60] Proclamation No. 3795 (July 24, 1967), *available at* Gerhard Peters and John T. Woolley, *Proclamation 3795—Law and Order in the State of Michigan,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-3795-law-and-order-the-state-michigan.

[61] Nunn & Goitein, *supra*.

[62] Proclamation No. 3795, Peters & Woolley, *supra*.

[63] Proclamation No. 3841 (Apr. 7, 1968), *available at* Gerhard Peters and John T. Woolley, *Proclamation 3841—Law and Order in the State of Illinois,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-3841-law-and-order-the-state-illinois; Proclamation No. 3842 (Apr. 7, 1968), *available at* Gerhard Peters and John T. Woolley, *Proclamation 3842—Law and Order in the State of Maryland,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-3842-law-and-order-the-state-maryland.

[64] Nunn & Goitein, *supra*.

---

from federal forces.[65]

12) **May 1, 1992 – George H.W. Bush**[66]
   **Rodney King LA Riots**. "Large-scale civil unrest erupted in Los Angeles after four white Los Angeles police officers were acquitted in their trial for beating Black motorist Rodney King. At the request of the governor of California, President Bush invoked the Insurrection Act and deployed federal troops, although the unrest had already been mostly quelled by state-controlled National Guard troops before they arrived."[67] In the proclamation, President H.W. Bush stated that the California governor had requested the federal assistance.[68]

C. <span>SECTION 252. USE OF MILITIA AND ARMED FORCES TO ENFORCE FEDERAL AUTHORITY</span>

Section 252 permits the President to employ the militia and armed forces domestically without any request from the state. Specifically, it provides:

> Whenever the President considers that unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce the laws of the United States in any State by the ordinary course of judicial proceedings, he may call into Federal service such of the militia of any State, and use such of the armed forces, as he considers necessary to enforce those laws or to suppress the rebellion

10 U.S.C. § 252.

1. <u>Statutory Derivation & Amendments</u>

The language of this section originated in the first part of section 2 of the Calling Forth Act of 1792.[69] It was then amended to remove the antecedent court order requirement and made permanent in the Militia Act of 1795.[70] The language was amended again in the Suppression of

---

[65] Proclamation No. 3841, Peters & Woolley, *supra*; Proclamation No. 3842, Peters & Woolley, *supra*.
[66] Proclamation No. 6427 (May 1, 1992), *available at* Gerhard Peters and John T. Woolley, *Law and Order in the City and County of Los Angeles, and Other Districts of California,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-6427-law-and-order-the-city-and-county-los-angeles-and-other-districts.
[67] Nunn & Goitein, *supra*.
[68] Proclamation No. 6487, Peters & Woolley, *supra*.
[69] *See* Calling Forth Act of 1792 §2, 1 Stat. at 264; *supra* note 9. Recall that, originally, this part of the Act required judicial approval before the President could invoke it. *See supra* note 9 and accompanying text.
[70] *See* Militia Act of 1795 § 2, 1 Stat. at 424; *supra* note 12 and accompanying text.

Rebellion Act of 1861 to clarify that the decision to employ the militia was "in the judgment of the President" and to add "rebellion" to the list of triggering circumstances.[71] Then, in the 1956 revision of the Insurrection Act, much of the section's language was removed as surplusage or substituted for clarity and uniformity.[72] Accordingly, this section has remained unchanged—at least substantively--since the beginning of the Civil War.[73]

2. <u>Case Law</u>

This part of the Insurrection Act was meaningfully addressed by the Supreme Court for the first time in *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827). The plaintiff, Jacob E. Mott, was court-martialed after refusing the join the New York militia when President Madison called it out during the War of 1812. *See id.* at 21–23. Mott challenged the court martial, arguing that the President did not have the authority to mandate the service of citizens in their state militias and that—even if he did—the circumstances did not justify calling forth the military. In rejecting both arguments, the Court drew on the broad language of the part of the Militia Act of 1795 now codified as amended in § 252. First, it held that the President has the ultimate authority to call forth the militia:

> We are all of opinion, that **the authority to decide whether the exigency has arisen, belongs exclusively to the President**, and that his decision is conclusive upon all other persons. We think that this construction necessarily results from the nature of the power itself, and from the manifest object contemplated by the [1795 Militia Act]. The power itself is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union.

*Id.* at 30 (emphasis added). It then concluded that the President's decision to call forth the militia is extremely broad and entirely unreviewable:

---

[71] *See* Suppression of the Rebellion Act of 1861 § 1, 12 Stat. at 281.
[72] Act of Aug. 10, 1956, ch. 1041, 70A Stat. 15, §332.
[73] This section was renumbered from § 332 to § 252 in 2016. Pub. L. 114–328, div. A, title XII, §1241(a)(2), Dec. 23, 2016, 130 Stat. 2497.

> If we look at the language of the act of 1795, every conclusion drawn from the nature of the power itself, is strongly fortified. . . . [The President] is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts. . . . The law does not provide for any appeal from the judgment of the President, or for any right in subordinate officers to review his decision, and in effect defeat it. . . . [W]e are all of opinion that such is the true construction of the act of 1795.

*Id.* at 31–32. This holding underscored the Court's later decision in *Luther v. Borden*, which applied the same reasoning to the part of the 1795 Act that is now codified in § 251.[74]

The President's power under this section was again called into question before the Supreme Court in *In re Debs*, 158 U.S. 564 (1895). President Cleveland had called in federal troops under this section of the Insurrection Act to help "restore order in Chicago during the Pullman strike of 1894."[75] Cleveland's stated justification for the invocation of § 252 was to "remov[e] obstructions to the United States mails."[76] Even with such a dubious justification, the Court upheld the use of federal troops:

> The strong arm of the national government may be put forth to brush away all obstructions to the freedom of interstate commerce or the transportation of the mails. If the emergency arises, the army of the Nation, and all its militia, are at the service of the Nation, to compel obedience to its laws.

*In re Debs*, 158 U.S. at 582.

The remaining case law related to this statute addresses its construction with the 1878 Posse Comitatus Act, which normally prevents federal troops from taking part in civilian law enforcement.[77] As numerous opinions have made clear, the President's authority to use federal troops under this section (and the rest of the Insurrection Act) is not impaired by the Posse

---

[74] *See supra*, Part I.B.2.

[75] Vladeck, *supra*, at 185.

[76] Proclamation No. 366 (Jul. 8, 1894), *available at* Gerhard Peters and John T. Woolley, *Proclamation 366—Law and Order in the State of Illinois*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-366-law-and-order-the-state-illinois.

[77] *See* 18 U.S.C. § 1385.

---

Comitatus Act. *See, e.g.* 17 Op. Atty's Gen. 242 (1881); 19 Op. Atty's Gen. 293 (1889); 19 Op.

Atty's Gen. 570 (1890); 41 Op. Atty's Gen. Nov. 7 (1957).[78]

     3.  <u>Invocations</u>

     Although not as frequently invoked as § 251, this section has been invoked several times

throughout our nation's history—including within the first few years of the Act's passage:

1) **September 25, 1794 – George Washington**[79]
   **The Whiskey Rebellion.** "President George Washington personally led state militia forces into western Pennsylvania to suppress a large revolt sparked by a new federal tax on liquor production."[80]

2) **March 12, 1799 – John Adams**[81]
   **Fries's Rebellion. "**President John Adams deployed federal troops and militia forces to suppress a rebellion in eastern Pennsylvania that had been sparked by a new federal tax on real property."[82]

3) **April 19, 1808 – Thomas Jefferson**[83]
   **Embargo Act Violations.** "President Thomas Jefferson invoked the Insurrection Act in an ultimately futile effort to stop pervasive violations of the Embargo Act of 1807 in the area around Lake Champlain in Vermont, where many residents' livelihoods depended on trade with Canada."[84]

4) **February 10, 1831 – Andrew Jackson**[85]

---

[78] *See also* Vladeck, *supra*, at 168 ("Although the Posse Comitatus Act, enacted in 1878, created clear limits on the domestic use of the federal military for crisis management (largely to respond to Reconstruction-era excesses), the [Insurrection Act was] among the few statutory and constitutional provisions exempted from its coverage.").

[79] Proclamation of Sept. 25, 1794, *available at* Gerhard Peters and John T. Woolley, *Proclamation—Authorizing Military Intervention to End Violence and Obstruction of Justice in Protest of Liquor Laws in Pennsylvania*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-authorizing-military-intervention-end-violence-and-obstruction-justice.

[80] Nunn & Goitein, *supra*.

[81] Proclamation No. 9 (Mar. 12, 1799), *available at* Gerhard Peters and John T. Woolley, *Proclamation 9—Law and Order in the Counties of Northampton, Montgomery, and Bucks, in the State of Pennsylvania*, https://www.presidency.ucsb.edu/documents/proclamation-9-law-and-order-the-counties-northampton-montgomery-and-bucks-the-state.

[82] Nunn & Goitein, *supra*.

[83] Proclamation No. 15 (Apr. 19, 1808), *available at* Gerhard Peters and John T. Woolley, *Proclamation 15—Warning All Persons on Lake Champlain and Adjacent County to Cease Violence and Disperse*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-15-warning-all-persons-lake-champlain-and-adjacent-county-cease-violence-and.

[84] Nunn & Goitein, *supra*.

[85] Proclamation No. 42 (Feb. 10, 1831), *available at* Gerhard Peters and John T. Woolley, *Proclamation 42—Ordering Persons to Remove From Public Lands in Arkansas*, The American Presidency Project,

**Mexican Border Dispute.** "President Andrew Jackson invoked the Insurrection Act in response to a border dispute between the United States and Mexico involving an area along what is today the Arkansas-Texas border. The dispute was resolved peacefully before troops were deployed."[86]

5) **April 15, 1861 – Abraham Lincoln**[87]
   **Civil War.** "President Abraham Lincoln invoked the Insurrection Act in response to the secession of seven southern states at the outbreak of the Civil War."[88]

6) **October 7, 1878 – Rutherford B. Hayes**[89]
   **Lincoln County War.** "At the request of the governor of the New Mexico Territory, President Hayes invoked the Insurrection Act and authorized troops who were already stationed in New Mexico to intervene in the Lincoln County War, a violent conflict between two rival factions in New Mexico, both of which included outlaws, business owners, and local authorities."[90]

7) **May 3, 1882 – Chester A. Arthur**[91]
   **Chiricahua Apache Raids.** "In response to an uptick in both cattle theft by gangs of outlaws and raids carried out by the Chiricahua Apache in the Arizona Territory, President Chester A. Arthur issued a proclamation under the Insurrection Act, under which federal troops already in the territory helped to suppress both groups."[92]

8) **November 7, 1885 – Grover Cleveland**[93]
   **Tacoma Riot of 1885.** "At the request of the governor of Washington Territory, President Grover Cleveland invoked the Insurrection Act in response to the Tacoma Riot of 1885 and similar events in Seattle, during which Chinese immigrant residents of the two cities were forcibly driven out by armed white mobs. Cleveland took no direct action with respect to Tacoma, where the city's entire Chinese immigrant population had already been expelled and their homes and business razed, but deployed troops to Seattle to quell

---

https://www.presidency.ucsb.edu/documents/proclamation-42-ordering-persons-remove-from-public-lands-arkansas.

[86] Nunn & Goitein, *supra*.

[87] Proclamation No. 80 (Apr. 15, 1861), *available at* Gerhard Peters and John T. Woolley, *Proclamation 80—Calling Forth the Militia and Convening an Extra Session of Congress,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-80-calling-forth-the-militia-and-convening-extra-session-congress.

[88] Nunn & Goitein, *supra*.

[89] Proclamation No. 240 (Oct. 7, 1878), *available at* Gerhard Peters and John T. Woolley, *Proclamation 240—Law and Order in the Territory of New Mexico,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-240-law-and-order-the-territory-new-mexico.

[90] Nunn & Goitein, *supra*.

[91] Proclamation No. 253 (May 3, 1882), *available at* Gerhard Peters and John T. Woolley, *Proclamation 253—Law and Order in the Territory of Arizona,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-253-law-and-order-the-territory-arizona.

[92] Nunn & Goitein, *supra*.

[93] Proclamation No. 274 (Nov. 7, 1885), *available at* Gerhard Peters and John T. Woolley, *Proclamation 274—Law and Order in the Territory of Washington,* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-274-law-and-order-the-territory-washington.

---

the rioters and protect the remaining Chinese residents."[94]

9) **February 9, 1886 – Grover Cleveland**[95]
**Seattle Riot of 1886.** "In response to the Seattle Riot of 1886, President Cleveland again deployed troops to Seattle to protect Chinese immigrants from violent white mobs attempting to expel them from the city."[96]

10) **July 8–9, 1894 – Grover Cleveland**[97]
**Pullman Strike.** "On July 3, 1894, President Cleveland deployed federal troops to break the Pullman Strike in Chicago, Illinois. He belatedly invoked the Insurrection Act on July 8 with respect to Chicago, and on July 9 invoked the Act with respect to eight states and territories to which the strike had spread."[98]

11) **April 5, 1968 – Lyndon B. Johnson**[99]
**D.C. Riots After Assassination of MLK.** "Following the assassination of Dr. Martin Luther King, Jr. on April 4, 1968, a wave of civil unrest swept across the United States. On April 5, President Johnson invoked the Insurrection Act and deployed troops to quel rioting in Washington, D.C."[100]

12) **Nov. 24, 1987 – Ronald Reagan**[101]
**Atlanta Prison Riot.** "On November 23, 1987, following the federal government's announcement that it would deport 2,500 Cuban detainees, approximately 1,400 of these detainees who were being held in the U.S. Penitentiary in Atlanta, Georgia took over the prison and held a number of hostages. President Ronald Reagan invoked the Insurrection Act, but did not deploy troops. Instead, the riot response was managed by federal law enforcement officers, with the advice of a handful of U.S. Army special forces

---

[94] Nunn & Goitein, *supra*.
[95] Proclamation No. 275 (Feb. 9, 1866), *available at* Gerhard Peters and John T. Woolley, *Proclamation 275—Intent to use Force Against Unlawful Assemblages in the Territory of Washington*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-275-intent-use-force-against-unlawful-assemblages-the-territory-washington.
[96] Nunn & Goitein, *supra*.
[97] Proclamation No. 366 (July 8, 1894), *available at* Gerhard Peters and John T. Woolley, *Proclamation 366—Law and Order in the State of Illinois*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-366-law-and-order-the-state-illinois; Proclamation No. 367 (July 9, 1894), *available at* Gerhard Peters and John T. Woolley, *Proclamation 367—Law and Order in Parts of the States of North Dakota, Montana, Idaho, Washington, Wyoming, Colorado, and California and the Territories of Utah and New Mexico*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-367-law-and-order-parts-the-states-north-dakota-montana-idaho-washington.
[98] Nunn & Goitein, *supra*.
[99] Proclamation No. 3840 (Apr. 5, 1968), *available at* Gerhard Peters and John T. Woolley, *Proclamation 3840—Law and Order in the Washington Metropolitan Area*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-3840-law-and-order-the-washington-metropolitan-area.
[100] Nunn & Goitein, *supra*.
[101] Proclamation No. 5748 (Nov. 24, 1987), *available at* Gerhard Peters and John T. Woolley, *Proclamation 5748—Law and Order in the State of Georgia*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-5748-law-and-order-the-state-georgia.

soldiers."[102]

**13) September 20, 1989 – George H.W. Bush**[103]
   **Hurricane Hugo.** Nominally at the request of the U.S. Virgin Islands' territorial governor
   - though whether the governor actually made that request was subsequently disputed -
   President George H.W. Bush invoked the Insurrection Act and deployed troops to the
   Virgin Islands to suppress lawlessness and looting following Hurricane Hugo.[104]

   D. <span style="font-variant: small-caps">Section 253. Interference with State and Federal Law</span>

Section 253 of the Insurrection Act has two parts:

The President, by using the militia or the armed forces, or both, or by any other means,
shall take such measures as he considers necessary to suppress, in a State, any
insurrection, domestic violence, unlawful combination, or conspiracy, if it--
   **(1)** so hinders the execution of the laws of that State, and of the United States
   within the State, that any part or class of its people is deprived of a right,
   privilege, immunity, or protection named in the Constitution and secured by law,
   and the constituted authorities of that State are unable, fail, or refuse to protect
   that right, privilege, or immunity, or to give that protection; or
   **(2)** opposes or obstructs the execution of the laws of the United States or impedes
   the course of justice under those laws.

10 U.S.C. § 253.

   1. <u>Statutory Derivation & Amendments</u>

This statute is the newest of the Insurrection Act framework, having been first adopted in

the Ku Klux Klan (Civil Rights) Act of 1871.[105] The section then underwent minor revisions in

1956, along with the remainder of the Act.[106] In the aftermath of Hurricane Katrina, Congress

amended this section to allow for the President to:

   employ the armed forces, including the National Guard . . . to restore order and
   enforce the laws of the United States when, as a result of a natural disaster,

---

[102] Nunn & Goitein, *supra*.
[103] Proclamation No. 6023 (Sept. 20, 1989), *available at* Gerhard Peters and John T. Woolley, *Proclamation 6023—
Law and Order in the Virgin Islands*, The American Presidency Project,
https://www.presidency.ucsb.edu/documents/proclamation-6023-law-and-order-the-virgin-islands.
[104] Nunn & Goitein, *supra*.
[105] Ku Klux Klan (Civil Rights) Act of 1871 § 3-4 , 17 Stat. at 14–15.
[106] Aug. 10, 1956, ch. 1041, 70A Stat. 15, §333.

epidemic, or other serious public health emergency, terrorist attack or incident . . . domestic violence has occurred . . . .[107]

Just two years later, Congress removed that new provision entirely.[108] Thus, the language of the current § 253 substantively reflects the language enacted by Congress in 1871.

    2.  <u>Case Law</u>

Because this section of the Insurrection Act is relatively recent compared to the other sections, it has been invoked the fewest times and—correspondingly—been interpreted by the courts just a handful of times. In 1922, an Ohio federal court was asked by a corporation to issue a certificate to the President that a "state of insurrection" existed in its mining district. *Consolidated Coal & Coke Co. v. Beale*, 282 F. 934 (S.D. Ohio 1922). The court declined, holding that the question whether such an insurrection exists is left solely to the determination of the President. *Id.* at 936 (citing *Mott*, 25 U.S. (12 Wheat.) at 30–32). Thus, there was no doubt that the broad authority imparted to the President under §§ 251 and 252 extended to the new § 253. *See id.*

In 1963, the Supreme Court issued a two-sentence *per curiam* opinion denying Alabama's request seeking relief against the United States for the President's actions in "alerting and stationing military personnel in the Birmingham area" under the authority of this section. *Alabama v. United States*, 373 U.S. 545 (1963). The Court stated that "purely preparatory measures and their alleged adverse general effects upon" the state of Alabama "afford no basis for the granting of any relief." *Id.* at 545.

Twenty years later, a federal court in Michigan clarified that the right to interstate travel fell within the "ambit of protection offered by" this section and § 252 because it is a "basic

---

[107] Pub. L. 109–364, div. A, title X, §1076(a)(1), Oct. 17, 2006, 120 Stat. 2404.
[108] Pub. L. 110–181, div. A, title X, §1068(a)(1), Jan. 28, 2008, 122 Stat. 325; renumbered §253.

fundamental right of national citizenship." *Bergman v. U.S.*, 565 F. Supp. 1353, 1401 (1983). The court referenced in approval President Eisenhower's use of § 253 to protect the right of students attending public schools, and noted that each of the previous presidents to invoke this section were presented with "sufficient evidence of specific facts sufficient to sustain the judgment by the President that the condition described in [§ 253] exists." *Id.* at 1401–02 (internal citation omitted).

     3.  Invocations

     Section 253 has been invoked to respond to six different events––all in the South in the immediate aftermath of the Civil War or desegregation:

1) **Oct. 17 – Nov. 10, 1871 – Ulysses S. Grant**[109]
   **KKK Violence.** "After the Civil War, the first Ku Klux Klan and other white supremacist groups carried out a terrorist insurgency across much of the former Confederacy. The federal government initially struggled to respond to this campaign of violence due to limited post-war resources and the inability or unwillingness of local authorities to bring the perpetrators to justice. In April 1871, Congress amended the Insurrection Act to grant the president new, expansive powers designed specifically to combat the KKK––including the power to suspend the writ of habeas corpus, allowing federal authorities to arrest individuals under the Act and hold them without charge. (The legislative grant of authority to suspend habeas expired after one year and is no longer in the Insurrection Act.) Mindful of still limited federal resources, President Ulysses Grant chose to make an example of the Klan in one of their strongholds, South Carolina. On October 17, after issuing multiple warning proclamations under the revised Insurrection Act, Grant

---

[109] Proclamation No. 197 (Oct. 17, 1871), *available at* Gerhard Peters and John T. Woolley, *Proclamation 197—Law and Order in the State of South Carolina* The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-197-law-and-order-the-state-south-carolina;
Proclamation No. 199 (May 3, 1871), *available at* Gerhard Peters and John T. Woolley, *Proclamation 199—Enforcement of the Fourteenth Amendment to the United States Constitution*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-199-enforcement-the-fourteenth-amendment-the-united-states-constitution; Proclamation No. 200 (Oct. 12, 1871), *available at* Gerhard Peters and John T. Woolley, *Proclamation 200—Law and Order in the State of South Carolina*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-200-law-and-order-the-state-south-carolina;
Proclamation No. 201 (Oct. 17, 1871), *available at* Gerhard Peters and John T. Woolley, *Proclamation 201—Suspending the Writ of Habeas Corpus in Certain Counties of South Carolina*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-201-suspending-the-writ-habeas-corpus-certain-counties-south-carolina; Proclamation No. 204 (Nov. 10, 1871), *available at* Gerhard Peters and John T. Woolley, *Proclamation 204—Suspending the Writ of Habeas Corpus in the County of Union, South Carolina*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-204-suspending-the-writ-habeas-corpus-the-county-union-south-carolina.

---

invoked his new authorities and both deployed troops to South Carolina and suspended the writ of habeas corpus. The initial suspension of habeas targeted nine South Carolina counties. In November, Grant extended this suspension to cover Union County as well."[110]

2) **September 23, 1957 – Dwight D. Eisenhower**[111]
**Little Rock Crisis.** "Three years after the Supreme Court, in Brown v. Board of Education, struck down the "separate but equal" doctrine that underpinned racial segregation, the governor of Arkansas deployed the Arkansas National Guard to stop nine African-American students from enrolling at Central High School in the state capital of Little Rock. President Dwight Eisenhower invoked the Insurrection Act, federalized the Arkansas National Guard and ordered it to stand down, and deployed the Army's 101st Airborne Division to protect the students as they attended class." [112] Eisenhower's proclamation also invoked § 252.[113]

3) **September 30, 1962 – John F. Kennedy**[114]
**Ole Miss Riot.** "In the fall of 1962, James Meredith became the first African-American student to be admitted to the University of Mississippi. At the end of September, President John F. Kennedy staged several hundred U.S. Marshals, Bureau of Prisons guards, and Border Patrol agents to protect Meredith as he enrolled. On September 30, a violent, heavily armed mob of white students, residents of Oxford, and others - incited by the governor of Mississippi - besieged Meredith, the federal agents, and multiple officials inside campus buildings. The siege continued through the night, with two people murdered and more than 300 injured, until several thousand federal troops deployed by President Kennedy under the Insurrection Act arrived to suppress the riot."[115] Kennedy's proclamation also invoked § 252.[116]

4) **June 11, 1963 – John F. Kennedy**[117]
**Stand in the Schoolhouse Door.** "The governor of Alabama, with an escort of state police, sought to physically block two African-American students, James Hood and Vivian Malone, from enrolling at the University of Alabama. At the request of the U.S.

---

[110] Nunn & Goitein, *supra*.
[111] Proclamation No. 3204 (Sept. 23, 1957), *available at* Gerhard Peters and John T. Woolley, *Proclamation 3204— Obstruction of Justice in the State of Arkansas*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-3204-obstruction-justice-the-state-arkansas.
[112] Nunn & Goitein, *supra*.
[113] Proclamation No. 3204, Peters & Woolley, *supra.*
[114] Proclamation No. 3497 (Sept. 30, 1962), *available at* Gerhard Peters and John T. Woolley, *Proclamation 3497— Obstructions of Justice in the State of Mississippi*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-3497-obstructions-justice-the-state-mississippi.
[115] Nunn & Goitein, *supra*.
[116] Proclamation No. 3497, Peters & Woolley, *supra.*
[117] Proclamation No. 3542 (June 11, 1963), *available at* Gerhard Peters and John T. Woolley, *Proclamation 3542— Unlawful Obstructions of Justice and Combinations in the State of Alabama*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-3542-unlawful-obstructions-justice-and-combinations-the-state-alabama.

Marshals escorting Hood and Malone, President Kennedy invoked the Insurrection Act, federalized the Alabama National Guard, and deployed it to protect the students. Confronted by the commander of the Guardsmen, the governor finally backed down and allowed Hood and Malone to register."[118] Kennedy's proclamation also invoked § 252.[119]

5) **September 10, 1963 – John F. Kennedy**[120]
**Federalization of the Alabama National Guard.** "The governor of Alabama had deployed the Alabama National Guard to stop African-American students from attending all-white public schools across many cities in Alabama. President Kennedy invoked the Insurrection Act, federalized the Alabama Guard, and ordered it stand down." [121] Kennedy's proclamation also invoked § 252.[122]

6) **March 20, 1965 – Lyndon B. Johnson**[123]
**Stand in the Schoolhouse Door.** "The governor of Alabama, with an escort of state police, sought to physically block two African-American students, James Hood and Vivian Malone, from enrolling at the University of Alabama. At the request of the U.S. Marshals escorting Hood and Malone, President Kennedy invoked the Insurrection Act, federalized the Alabama National Guard, and deployed it to protect the students. Confronted by the commander of the Guardsmen, the governor finally backed down and allowed Hood and Malone to register."[124] Johnson's proclamation also invoked § 252.[125]

II. **The "militia of the United States" consists not just of those in the National Guard, but also of all "able-bodied" male citizens of a certain age. The Defendants as** *individual citizens*—**not as Oathkeepers—were "militia" members who could technically be called upon by Trump if the conditions of the Insurrection Act were otherwise met.**

Having noted the broad authority of the President to call forth the militia under the

Insurrection Act, the question remains as to what constitutes a "militia."

The United States Code currently provides that:

---

[118] Nunn & Goitein, *supra.*
[119] Proclamation No. 3497, Peters & Woolley, *supra.*
[120] Proclamation No. 3554 (Sept. 10, 1963), *available at* Gerhard Peters and John T. Woolley, *Proclamation 3554—Obstructions of Justice in the State of Alabama*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-3554-obstructions-justice-the-state-alabama.
[121] Nunn & Goitein, *supra.*
[122] Proclamation No. 3554, Peters & Woolley, *supra.*
[123] Proclamation No. 3645 (Mar. 20, 1965), *available at* Gerhard Peters and John T. Woolley, *Proclamation 3645—Providing Federal Assistance in the State of Alabama*, The American Presidency Project, https://www.presidency.ucsb.edu/documents/proclamation-3645-providing-federal-assistance-the-state-alabama.
[124] Nunn & Goitein, *supra.*
[125] Proclamation No. 3645, Peters & Woolley, *supra.*

(a) The militia of the United States consists of all able-bodied males at least 17 years of age and, except as provided in section 313 of title 32, under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States and of female citizens of the United States who are members of the National Guard.

(b) The classes of the militia are--

(1) the organized militia, which consists of the National Guard and the Naval Militia; and

(2) the unorganized militia, which consists of the members of the militia who are not members of the National Guard or the Naval Militia.

10 U.S.C. § 246. And Section 313 of title 32, referenced therein, reads:

(a) To be eligible for original enlistment in the National Guard, a person must be at least 17 years of age and under 45, or **under 64 years of age and a former member of the Regular Army, Regular Navy, Regular Air Force, or Regular Marine Corps**. To be eligible for reenlistment, a person must be under 64 years of age.

(b) To be eligible for appointment as an officer of the National Guard, a person must--

(1) be a citizen of the United States; and

(2) be at least 18 years of age and under 64.

32 U.S.C. § 313 (emphasis added). According to the Supreme Court, the "traditional understanding of the militia" is that it is "a part-time, nonprofessional fighting force." *Perpich v. Department of Defense*, 496 U.S. 334, 348 (1990) ("[T]he Illinois Supreme Court expressed its understanding of the term 'militia' as . . . a body of citizens trained to military duty, who may be called out in certain cases, but may not be kept on service like standing armies, in times of peace. . . . [W]hen not engaged at stated periods . . . they return to their usual avocations . . . and are subject to call when public exigencies demand it."). In 1939, the Court explained that "the Militia comprised all males physically capable of acting in concert for the common defense." *United States v. Miller*, 307 U.S. 174, 179 (1939). Yet the precise definition under the law has changed over time.

## A. HISTORY OF "MILITIA" DEFINITION

The Militia of 1792 stated that "each and every free able-bodied white male citizen of the respective States, resident therein, who is or shall be of age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia, by the Captain or Commanding Officer of the company, within whose bounds such citizen shall reside."[126] The Militia Act of 1795 mostly mirrored the provisions of the 1792 Act, which had expired, but made the president's authority to call out the militias permanent.[127] The Militia Act of 1808 introduced provided $200,000 to state militias for arming and equipping the United States militia, enacted by the 10th United States Congress.[128] The Militia Act of 1862 authorized a militia draft within a state when the state could not a satisfactory number of volunteers and, for the first time, allowed African-Americans to serve in the militias as soldiers and war laborers.[129] Finally, the Militia Act of 1903 repealed the Militia Acts of 1792 and divided the militia into two classes: the Reserve (Unorganized) Militia, which included all able-bodied men between ages 17 and 45, and the Organized Militia, comprising state militia units receiving federal support—showing the deliberate intent to distinguish between the organized and unorganized militia.[130] The following section discusses a relatively recent Supreme Court decision weighing in on who precisely constitutes a member of the "militia" under federal law.

### B.  DISTRICT OF COLUMBIA V. HELLER

#### 1.  Well-Regulated Militia

In the 2008 *Heller* decision, the Supreme Court reiterated that the *Miller* definition of a militia—"all males physically capable of acting in concert for the common defense"—persists.

---

[126] Act of May 8, 1792, 1 Stat. 271.
[127] Militia Act of 1795, ch. 36, 1 Stat. 424.
[128] Militia Act of 1808, Pub.L. 10–52.
[129] Militia Act of 1862, 12 Stat. 597.
[130] Militia Act of 1903, 32 Stat. 775.

*See District of Columbia v. Heller*, 554 U.S. 570, 595 (quoting *Miller*, 307 U.S. at 179). In doing so, it disagreed with the District of Columbia's narrower definition of militias as "the state and congressionally-regulated military forces described in the Militia Clauses [of] art. I, § 8, cls. 15-16." *See id.* at 596. The Court explained that that the government focused only on the "organized militia," ignoring the unorganized militia:

> Unlike armies and navies, which Congress is given the power to create ("to raise ... Armies"; "to provide ... a Navy,"), the militia is assumed by Article I *already to be in existence*. Congress is given the power to "provide for calling forth the Militia,"; and the power not to create, but to "organiz[e]" it—and not to organize "a" militia, which is what one would expect if the militia were to be a federal creation, but to organize "the" militia, connoting a body already in existence. **This is fully consistent with the ordinary definition of the militia as all able-bodied men**.

*Id.* at 596 (internal citations omitted) (emphasis added).

From the pool of all able-bodied men, Congress has absolute power to organize the units to make up an effective fighting force. *Id.* As the Court noted, this is exactly what Congress did in the Calling Forth Act of 1792, which specified that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted shall severally and respectively be enrolled in the militia." *Id.* (citing Act of May 8, 1792, 1 Stat. 271). The Court went on to note that Congress need not conscript every able-bodied man into the militia, because nothing in Article I suggests that in exercising its power to organize, discipline, and arm the militia, Congress must focus on the entire body. *Id.* "Although the militia consists of all able-bodied men, the federally organized militia may consist of a subset of them." *Id.* The Court also noted that the term "'well-regulated' . . . implies nothing more than the imposition of proper discipline and training." *Id.* at 597.

2. <u>Unorganized Militia and the Second Amendment</u>

With regard to an unorganized militia, the *Heller* Court stated that the Founders were well aware that the way tyrants had historically eliminated militias consisting of all able-bodied men historically was not by banning the militia, but by taking away their arms—thus allowing a select (organized) militia or standing army to suppress political opponents. *Id.* at 594–96. Further, it was understood across the political spectrum that the right to bear arms also helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down. *See id.* at 598–99; *see also Firearms Policy Coalition, Inc. v. McCraw*, __ F. Supp. 3d __, 2022 WL 3656996, at *6 (N.D. Tex. 2022) (invalidating a Texas gun regulation in part because it applied to18-20 year olds, who were part of the militia under the Second Amendment). Thus, the interplay of the Second Amendment, the Militia Clauses of the Constitution, and 10 U.S.C. § 245 makes clear that an unorganized militia does not need recognition or charter from a court or Congress—it simply *is.*

**III. Trump himself had repeatedly threatened to invoke the Insurrection Act in various situations, and—in the weeks leading up to January 6, 2021—there were "hundreds of thousands" of social media posts repeating the claim that Trump had invoked the Insurrection Act or was planning to do so.**

The Insurrection Act was first floated in 2019 by Trump administration officials as a possible remedy to the rise in illegal immigration at the southern border.[131] During the 2020 protests across the country in response to the death of George Floyd, Trump's aides prepared an Insurrection Act proclamation for him in case a city's mayor resisted taking his proposed measures.[132] According to "a former senior administration official," Trump knew the document

---

[131] *See* Zack Ford, *White House Confirms Trump Is Considering Using the Military to Remove Immigrants*, Think Progress (May 17, 2019), https://archive.thinkprogress.org/white-house-trump-insurrection-act-military-force-remove-undocumented-immigrants-241807ab2572/.

[132] Charles Tiefer, *An Insurrection Act Proclamation Was Prepared For Trump By His Aides During D.C. Protests*,

had been prepared.[133] Ultimately, he chose not to use it, but continued to bring up the idea of deploying active-duty troops in major cities.[134] Likewise, before and during the 2020 presidential election, Trump threatened to command law enforcement to patrol the polls to prevent voter fraud; he told a Fox News anchor that he would use the Insurrection Act to "put down" election night unrest if he won.[135] For clarity and brevity, each known instance where invocation of the Insurrection Act was floated to the public is listed below:

1) **May 16, 2019:** Trump announced a new immigration plan. Several hours later, The Daily Caller reported that Trump planned to invoke the Insurrection Act "to remove undocumented immigrants from the country using military force. The report cited 'multiple senior administration officials' who said the White House was 'doing the Insurrection Act.'"[136]

2) **May 17, 2019:** "White House deputy press secretary Hogan Gidley downplayed reports Friday that the Trump administration was considering invoking the Insurrection Act to remove immigrants from the country — but he didn't rule out that it was still on the table. 'There are lots of tools at [President Donald Trump's] disposal,' Gidley said, speaking with *Fox & Friends*. 'We haven't used them all and we're looking at ways to protect the American people.'"[137]

3) **June 1, 2020:** Trump announced he was "considering measures to put down the 'riots and lawlessness' after the death of George Floyd. 'My first duty is to defend our great country,' Trump said in a Rose Garden speech. 'All Americans were rightly sickened and revolted by the death of George Floyd. I will fight to keep them safe. [Floyd] will not have died in vain. But we cannot allow the righteous cries of peaceful protesters to be drowned out by an angry mob.'"[138] This was the first public statement made by Trump that alluded to the Insurrection Act.

---

Forbes (Jun. 25, 2021), https://www.forbes.com/sites/charlestiefer/2021/06/25/an-insurrection-act-proclamation-was-prepare-for-trump-by-his-aides-during-dc-protests/?sh=68815a5c4d77.

[133] *Id.*

[134] *Id.*

[135] Deana El-Mallawany, Christine Kwon & Rachel Homer, *Trump Can't Lawfully Use Armed Forces to Sway the Election: Understanding the Legal Boundaries*, Just Security (Sept. 23 2020), https://www.justsecurity.org/72500/trump-cant-lawfully-use-armed-forces-to-sway-the-election-understanding-the-legal-boundaries/.

[136] Tiefer, *supra*.

[137] *Id.*

[138] Tim Darnell, *UPDATE: Trump Threatens to Invoke Insurrection Act to Suppress National Unrest*, American Journal Constitution (June 2, 2020), https://www.ajc.com/news/fires-burn-capital-another-round-violent-george-floyd-protests/wOD3akX8YQEyBCCqcLkhNK/.

---

4) **June 1, 2020:** In a press briefing, White House press secretary, Kayleigh McEnany, was asked if Trump planned to invoke the Act. She stated, ""The Insurrection Act, it's one of the tools available, whether the president decides to pursue that, that's his prerogative."[139]

5) **June 3, 2020:** Sen. Tom Cotton (R-Ark.) wrote an op-ed in the New York Times, urging Trump to use military force to deal with looting and rioting following the death of George Floyd in Minneapolis police custody. Cotton wrote, "one thing above all else will restore order to our streets: an overwhelming show of force to disperse, detain and ultimately deter lawbreakers," calling on Trump to invoke the Insurrection Act.[140]

6) **June 3, 2020:** Secretary of Defense, Mark Esper, stated during a Pentagon briefing: "I say this not only as secretary of defense, but also as a former soldier and a former member of the National Guard, the option to use active-duty forces in a law enforcement role should only be used as a matter of last resort, and only in the most urgent and dire situations. We are not in one of those situations now.  I do not support invoking the Insurrection Act."  Notably, Esper did not question or dispute the President's legal right to invoke the Act, He simple stated that he personally did not believe circumstances at that time should lead Trump to invoke the Act. After the briefing, Esper and Gen. Mark Milley, the Chairman of the Joint Chiefs of Staff, met with Trump and other White House Officials, including White House Chief-of-Staff Mark Meadows, in the White House Situation Room. During that meeting, it is alleged that Trump said, "I'm the president not you! I'm the president.  It's my prerogative.  [It's] my call, not yours."[141]

7) **June 3, 2020:**  Speaking specifically about New York City, where there was widespread rioting and looting in the wake of George Floyd's death, Trump said, "If they don't get their act straightened out, I will solve it. I'll solve it fast."[142]

8) **August 28, 2020**: In a speech given in Manchester, New Hampshire, Trump denounced the violence directed towards attendees leaving the Republican National Convention at the Andrew W. Mellon Auditorium in Washington, D.C. "These incredible people from all over the country, all over the world last night, they walked out to a bunch of thugs. And that wasn't friendly protesters, they were thugs. They were thugs," Trump said. Regarding the Insurrection Act, Trump said, "We're going to have to look at it because we're not going to let that happen to people who go to the White House to celebrate our country.  You know what I say? Protesters your ass. I don't talk about my ass. They're

---

[139] Courtney Kube & Carol E. Lee, *Trump Considering a Move to Invoke Insurrection Act*, CNBC (June 1, 2020), https://www.cnbc.com/2020/06/01/trump-considering-a-move-to-invoke-insurrection-act.html.

[140] Libby Cathey, *Backlash After Arkansas Sen. Tom Cotton Pushes Trump to Invoke Insurrection Act in NYT Op-ed: 'Send in the Troops'*, ABC News (June 4, 2020), https://abcnews.go.com/Politics/backlash-arkansas-sen-tom-cotton-pushes-trump-invoke/story?id=71069575.

[141] Mike Brest, *Trump Blamed Esper for Blocking Use of Insurrection Act to Stop George Floyd Protests: Book*, Washington Examiner (May 8, 2022), https://www.washingtonexaminer.com/policy/defense-national-security/trump-blamed-esper-for-blocking-use-of-insurrection-act-to-stop-george-floyd-protests-book.

[142] Steve Herman, *White House Says Trump Prepared to Invoke Insurrection Act*, VOA News (June 4, 2020), https://www.voanews.com/a/usa_white-house-says-trump-prepared-invoke-insurrection-act/6190468.html.

not protesters, those aren't protesters. Those are anarchists, they're agitators, they're rioters, they're looters."[143]

**IV. The Defense anticipates that it is essential at trial—in defending against the charge of Seditious Conspiracy—to clarify the historical and legal predicate for the Defendants' actions leading up to January 6, 2021, in light of the Insurrection Act.**

The Indictment in this case (ECF 1) charges the Defendants with conspiring to "oppose the lawful transfer of presidential power by force, by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the U.S. Code." ECF 1 at 8. The Government has indicated, through the allegations in the Indictment and various motions, that the charge of seditious conspiracy rests largely upon the Defendants staging of "QRFs" outside of Washington, D.C. and the group's extensive communications in anticipation of January 6, 2021. Under the Government's theory, many of these various overt acts—which were otherwise entirely lawful—were made to be unlawful because they were intended to further a conspiracy to obstruct the execution of United States laws. The *mens rea* element of this charge, therefore, hinges upon the Government proving that the actions the Defendants were preparing to take would have been unlawful. *See United States v. Rahman*, 854 F. Supp. 254 (S.D.N.Y. 1995), *affirmed* 189 F.3d 88, *certiorari denied* 528 U.S. 982, *certiorari denied* 528 U.S. 1094 (holding that alleged plan to assassinate Egyptian president during his visit to the United Nations could only be proved as step in furtherance of seditious conspiracy if the plot was accompanied by proof of animus against the United States, because—without such animus—defendants would be shown merely to have engaged in conduct that conflicted incidentally with some policy of the United States).

---

[143] Morgan Chalfant, *Trump Decries DC Protestors as "Thugs"*, The Hill (Aug. 28, 2020), https://thehill.com/homenews/administration/514229-trump-decries-dc-protesters-as-thugs/.

For the reasons discussed previously in this Memorandum and those set forth below, the Defendants therefore should be entitled to respond to the *mens rea* element by explaining that they were acting in reasonable reliance upon Trump's own statements and his broad authority under the Insurrection Act. *See United States v. Juan*, 776 F.2d 256, 258 (11th Cir. 1985) (holding that defendant must be allowed to offer evidence that negates his or her criminal intent).

First, though some may disagree with the expansive and unilateral power granted to all Presidents to invoke the Insurrection Act, Trump *did* have the authority on January 6, 2021—and every other day of his presidency—to invoke the Act. This authority has existed and been imbued to every U.S. President, up to and including Joe Biden.  The Supreme Court has been clear that the President alone has the discretion to decide when the circumstances of the Act have been triggered by an exigency. *See Mott*, 25 U.S. (Wheat. 12) at 30; *Luther*, 48 U.S. (7 How.) at 43. Neither the courts nor Congress (absent an amendment to the Act) could have prevented him from calling forth the militia or armed forces.[144] In response to the civil unrest and riots in Washington, D.C., Trump had the power to call "into Federal service such of the militia of any State . . . as he consider[ed] necessary to enforce" the laws of the United States. 10 U.S.C. § 252. President Johnson had previously invoked the same section to quell riots in Washington, D.C. following the assassination of Dr. Martin Luther King, Jr. in 1968. Likewise, in response to what he perceived as a conspiracy to deprive a class of persons in several states of their voting rights, Trump could have invoked the militia or taken any "such measures as he consider[ed] necessary." *Id.* § 253(1).

Second, because Rhodes was an able-bodied male and former member of the "Regular

---

[144] In fact, Congress tacitly acknowledged Trump's sweeping powers under the Act when it voted add limits to the statute in the wake of Trump's threats to invoke it in the summer of 2020. *See* Rebecca Kheel, *House Votes to Curtail Insurrection Act Powers*, The Hill (July 20, 2020), https://thehill.com/policy/defense/508197-house-votes-to-curtail-insurrection-act-powers/.

Army" between the ages of 17 and 65, he was a member of the militia capable of being called forth by Trump through the Insurrection Act, as were an overwhelming number of the Oath Keepers and the nations male population as a whole, as detailed in section II of this memorandum.

Third, the Government's own evidence shows that Rhodes was actively lobbying and preparing for the President to invoke the Insurrection Act. Since his indictment, Rhodes has maintained that the QRFs were not to be engaged unless Trump did, in fact, invoke the Insurrection Act—either to suppress a voting "conspiracy" under § 253(1) or an "unlawful obstruction, combination, or assemblage" under § 252. Each of the overt acts that the Government alleges to be in furtherance of *sedition* were, in fact, in reliance and preparation for Trump *lawfully exercising* his unequivocally broad power under the Insurrection Act.

Finally, the defense proposed above is *not* a public authority or entrapment-by-estoppel defense. Trump never invoked the Insurrection Act. The public authority defense is only appropriate where the defendant honestly, albeit mistakenly, believed he or she was performing the crimes charged in the indictment in cooperation with the government. This is a defense strategy intended to undermine the *mens rea* element of the crime. *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1363–68 (11th Cir. 1994); *United States v. Anderson*, 872 F.2d 1508, 1517–18 & n.4 (11th Cir.), *cert. denied*, 493 U.S. 1004 (1989); *United States v. Juan*, 776 F.2d 256, 258 (11th Cir. 1985). Rhodes and the other Defendants are not claiming to have acted under actual or apparent public authority. In fact, doing so would represent a legal impossibility. Trump never invoked the Insurrection Act, so the condition precedent for a public authority defense (government authorization of the defendant's actions) was not met. The Defendants were simply acting in *anticipation* of what *would have been* lawfully given orders under the

Insurrection Act. What the Government contends was a conspiracy to *oppose* United States laws was actually lobbying and preparation for the President to *utilize* a United States law, 10 U.S.C. § 252–54, to take *lawful* action.

This case represents the intersection of two vague, broad, centuries-old laws that ironically share similar characteristics. Seditious conspiracy proscribes conspiring to oppose the execution of federal laws, and the Insurrection Act can be used to quell such a conspiracy. But, here, in its theory of prosecution, the Government potentially argues, via several filings and various motions, that asking a President to invoke the Insurrection Act to suppress a seditious conspiracy is itself a seditious conspiracy. Whether that theory holds ought to be a question submitted to the jury; Defendants should be entitled to argue that the *mens rea* was negated by their reasonable reliance on Trump's real but unexercised authority under the Insurrection Act and that the Act itself, along with the proposed stipulation of the language of the Insurrection Act itself, is admissible.

RESPECTFULLY SUBMITTED,


    /S/ JAMES LEE BRIGHT
JAMES LEE BRIGHT

3300 OAK LAWN AVENUE, SUITE 700
DALLAS, TEXAS 75219
TEL: (214) 720-7777
FAX: (214) 720-7778
JLBRIGHTLAW@GMAIL.COM
TEXAS BAR NO : 24001786


    /S/ PHILLIP A. LINDER
PHILLIP A. LINDER

3300 OAK LAWN AVENUE, SUITE 700
DALLAS, TEXAS 75219

(214) 252- 9900 OFFICE
(214) 252-9902 FAX
PHILLIP@THELINDERFIRM.COM
TEXAS BAR NO. 12363560

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above foregoing Memorandum was

served upon all counsel of record by electronic filing on the 19th day of September 2022.

/S/ PHILLIP A. LINDER
*ATTORNEY FOR DEFENDANT*