IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 22-cr-15 (APM) |
| : | |
| ELMER STEWART RHODES III, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT RHODES'S MEMORANDUM IN SUPPORT OF DEFENSE ARGUMENTS RELATING TO THE INSURRECTION ACT**

The United States respectfully submits this response to Defendant Elmer Stewart Rhodes III's memorandum regarding his anticipated use of the Insurrection Act to support his defense at trial.[1] ECF No. 324. Rhodes proposes injecting into the trial a complicated and confusing theoretical debate about whether the Insurrection Act would permit the President of the United States to authorize groups like the Oath Keepers to use force through the Insurrection Act to enable the President to stay in power and contest an election result that the President claimed was fraudulent, but that other branches of government had found lawful. More importantly, Rhodes fails to demonstrate that the evidence he seeks to have admitted is relevant. This Court should limit the introduction of this evidence at trial—particularly with respect to what Rhodes and other defendants may say about the Insurrection Act during opening statements and on cross-examination of government witnesses.

---

[1] No other defendant has proffered any evidence establishing a link between his or her own plans and the Insurrection Act. Rhodes is the sole movant of the memorandum in support of the introduction of Insurrection Act evidence and arguments that he filed at ECF No. 324.

I. **Background**

A. **Factual background**

Since its enactment in 1792, *see* Act of May 2, 1792, ch. 28, 1 Stat. 264, the Insurrection Act, 10 U.S.C. §§ 251 *et seq.*, has permitted a "unilateral presidential decision to deploy federal military forces in a state under the circumstances that were sanctioned in the Constitution—general insurrection or invasion—and to execute federal laws, subject to a number of pre-deployment conditions." William C. Banks, *Providing "Supplemental Security"—the Insurrection Act and the Military Role in Responding to Domestic Crises*, 3 J. Nat'l Security L. & Pol'y 39, 41 (2009). The Insurrection Act thus allows the President to call into service "the militia of any state" and "the armed forces" when the President "considers that unlawful obstructions, combinations, or assemblages, or rebellion against the United States, make it impractical to enforce" federal law. 10 U.S.C. § 252. Before invoking the Act, the President must "by proclamation, immediately order the insurgents to disperse and retire peaceably to their abodes within a limited time." § 254.

During the charged conspiracy, Rhodes and his co-conspirators repeatedly made statements that demonstrated an agreement to oppose the lawful transfer of presidential power by force. As early as November 5, 2020, Rhodes stated, "We MUST refuse to accept Biden as a legitimate winner," and told co-conspirators, "We aren't getting through this without a civil war. Too late for that. Prepare your mind, body, spirit." Gov. Exh. 1.S.696.12107. By November 7, Rhodes was already suggesting that "storming" Congress should be part of that plan. Gov. Exh. 1.S.696.12977 (endorsing Serbian author's advice of "What we have done, and what you probably need to do," which included, "We stormed the Parliament").

As part of, but by no means a condition precedent of this agreement, Defendant Rhodes told co-conspirators that he hoped President Trump would "[d]eclare an insurrection and invoke

2

the Insurrection Act and call up the National Guard into federal service AND all us veterans and we will suppress the communist/deep state domestic enemies." Gov. Exh. 1.S.696.12358. The reason for that, Rhodes explained, was for "legal cover." As he stated in the recorded GoToMeeting on November 9, 2020:

> That QRF will be awaiting the president's orders. That's our official position. And the reason why we have to do it that way is because that gives you legal cover. We're in an era now where everything you said is being monitored. Like now this phone call is being recorded by the NSA and the FBI and the CIA, I'm sure, and everything you say can and will be used against you, so that's why you guys have gotta have discipline. Don't make it easy for them to pop you with a conspiracy charge and do you like they did to those guys in Michigan because they got them hot in the collar, probably after a few beers, and got them talking smack. So, be disciplined.

Gov. Exh. 1000.7.

On the encrypted Signal chats, however, Rhodes stated time and again that his co-conspirators would act with or without the President's bidding. For example, on December 25, 2020, Rhodes wrote to the "OKFL Hangout" Signal chat that President Trump "needs to know that if he fails to act, then we will. He needs to understand that we will have no choice." Gov. Exh. 1.S.656.10102. On December 31, 2020, Rhodes wrote to the "Leadership Intel Sharing Secured" chat: "On the 6th, they are going to put the final nail in the coffin of this Republic, unless we fight our way out. With Trump (preferably) or without him, we have no choice." Gov. Exh. 1.S.696.17678. He added, "Be prepared for a major let down on the 6-8th. And get ready to do it OURSELVES." Gov. Exh. 1.S.696.17710. Then on January 6, as rioters breached the Capitol, Rhodes told co-conspirators on the "DC OP: Jan 6 21" chat, "Pence is doing nothing. As I predicted." 1.S.159.1038. He continued, "All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough."

Gov. Exh. 1.S.159.1043. Rhodes then called his co-conspirators to the Capitol. *See, e.g.*, Gov. Exh. 1.S.159.1059 (At 2:26 p.m.: "Come to South Side of Capitol. On steps.").

On the evening of January 6, after President Trump had not invoked the Insurrection Act but, rather, had told the rioters to go home, Rhodes urged his co-conspirators to continue the fight, writing to the "DC OP: Jan 6 21" Signal chat: "Thousands of ticked off patriots spontaneously marched on the Capitol . . . You can't handle that, hit the door. You ain't seen nothing yet." Gov. Exh. 1.S.159.1322. And Rhodes did so *knowing* President Trump had not invoked the Insurrection Act. That evening, he sent a draft message to the "Leadership Intel Sharing Secured" Signal chat that read, "President Trump, honor your oath. . . . Do what we recommended you do. . . . Act. Now." Gov. Exh. 1.S.696.18434. With that knowledge, Rhodes ordered his co-conspirators to act anyway: "Patriots, it was a long day but a day when patriots began to stand. Stand now or kneel forever. Honor your oaths. Remember your legacy." Gov. Exh. 1.S.696.18428. Rhodes then fled Washington, D.C.

Once back in Texas, Rhodes called co-conspirators such as Michael Greene and Joshua James to his side, made thousands of dollars of purchases of firearms and related equipment, and continued to encourage his co-conspirators to oppose the government by force. Notably, on January 10, 2021, Rhodes wrote to the "Leadership Intel Sharing Secured" Signal chat: "President Trump still can and should use the Insurrection Act, but it's unlikely." Gov. Exh. 1.S.696.19133. "Regardless," Rhodes continued, "patriots" should prepare to take several steps, including: "Prepare to walk the same path as the Founding Fathers of condemnation of an illegitimate regime, nullification/mass non-compliance, defiance, mutual defense, and resistance." *Id.*

### B. Procedural background

During the Pretrial Conference held on September 14, 2022, the Court asked the government why it had included among its exhibits a proposed stipulation that included the text of the Insurrection Act. Government counsel explained that evidence in the government's case-in-chief included statements by defendants referring to the Insurrection Act and that the proposed stipulation provided background and context about the Act. The Court then inquired whether it would need to rule at any point during the trial whether the Insurrection Act would provide a defense to the charges in the Indictment. The government observed that it had filed a motion *in limine* to preclude a public authority or entrapment by estoppel defense involving the Insurrection Act, which Defendant Rhodes did not oppose. At the hearing and again in a subsequently filed memorandum, *see* ECF 324, Rhodes has indicated that he intends to introduce evidence of the Insurrection Act in his defense to attack the sufficiency of the government's *mens rea* evidence, not to assert a defense of public authority or entrapment by estoppel.

## II.    Argument

Rhodes argues that he should be permitted to introduce evidence to negate his criminal intent by explaining that he was acting in reasonable reliance on President Trump's own statements and his authority under the Insurrection Act (ECF No. 324 at 32). The legal question of whether the President could have invoked the Insurrection Act in response to a perceived conspiracy to deprive a class of persons in several states of their voting rights is not relevant to the charges in this case. To the extent that Rhodes seeks (ECF No. 324 at 31-35) to introduce what he describes as the "historical and legal predicate" for his and his co-defendants' conduct "in light of the Insurrection Act" (*id.* at 31), Rhodes has failed to demonstrate the relevance of this evidence. Nor should the Court permit Rhodes to debut a novel "anticipated" public authority defense here,

particularly where Rhodes would be otherwise barred from introducing an actual public authority defense. . Moreover, the Court should limit evidence concerning the Insurrection Act under Rule 403 of the Federal Rules of Evidence to avoid confusing the issues in this case and misleading the jury.

### A. Rhodes's proffered evidence concerning the Insurrection Act is not relevant.

Under the Federal Rules of Evidence, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "[T]here is no such thing as 'highly relevant' evidence or . . . 'marginally relevant' evidence. Evidence is either relevant or it is not." *United States v. Foster,* 986 F.2d 541, 545 (D.C. Cir. 1993). The history of the Insurrection Act's enactment, amendment, interpretation in the courts, and invocation, as well as the interpretation of who may qualify as a member of the militia for purposes of the Insurrection Act, *see* ECF No. 324 at 3-28, is not relevant.

As an initial matter, Rhodes's reliance on the Insurrection Act fails for two factual reasons. First, Rhodes suggests (ECF No. 324 at 33) that he has "maintained" since being charged that "the QRFs were not to be engaged unless Trump did, in fact, invoke the Insurrection Act." But Rhodes's self-serving statements made a year or more after the end of the charged conspiracy bear no relevance to his state of mind during the time period covering the charged conspiracy. In fact, the evidence (some of which is noted above) will show that Rhodes viewed the Insurrection Act as "legal cover" and not a prerequisite for his and his co-conspirators' plans to use force against the government. As Rhodes made clear when speaking through an encrypted chat, if the President "fail[ed] to act, then we will." And on January 6, absent any invocation of the Insurrection Act,

Rhodes ordered his co-conspirators to the Capitol, where they forcibly occupied the building and delayed the Certification of the Electoral College vote.

Rhodes's argument fails for a second factual reason. Even assuming *arguendo* that some evidence supported Rhodes's contention that any use of the QRFs was contingent only on the President's invocation of the Insurrection Act, Rhodes acknowledges (ECF No. 324 at 33) that the President never in fact invoked the Insurrection Act. Nonetheless, Rhodes and the other defendants amassed firearms just aside the District of Columbia and launched an attack on the Capitol on January 6 in the full knowledge that the President had not called them (or anyone) into service under the Insurrection Act. As the attack on the Capitol occurred, Rhodes did not urge others to exercise caution or restraint because the President had not invoked the Insurrection Act; instead, he lauded "patriots" for "taking it into their own hands" while the President "complain[ed]" and ordered his co-conspirators to the Capitol. In the days after January 6, moreover, Rhodes communicated that the President could still invoke the Insurrection Act— thereby showing he knew no such invocation had taken place—but that it was "unlikely." That the President never issued the statutorily required "[p]roclamation to disperse," *see* 10 U.S.C. § 254, nor ever appeared to refer to the Insurrection Act following the November 2020 presidential election, *see* ECF No. 324 at 29-31 (listing dates that the President or other administration officials referred to the Insurrection Act, but providing no date later than August 28, 2020), reinforces the implausibility of Rhodes's factual claim. In short, Rhodes cannot conceivably claim that he and his co-conspirators intended to act only if the President invoked the Insurrection Act, because there is no evidence they can point to that they had any reason to believe the president would invoke the Act or that conditions (such as rioting, natural disaster) even approached its necessity. The fact

that they used force to attack the Capitol on January 6 even though the President never invoked the Act further undermines that claim.

Rhodes's relevance arguments are also legally deficient in several respects. First, despite forswearing that he is pressing a public authority defense, that is in fact precisely what Rhodes asks this Court to permit him to make. Specifically, he contends (ECF No. 324 at 32) that he should be permitted to adduce evidence in support of the claim that he and the other defendants were "acting in reasonable reliance upon Trump's own statements and his broad authority under the Insurrection Act." That argument is materially indistinguishable from a public authority defense, which arises where the defendant "seeks exoneration based on his objectively reasonable reliance on the authority of a government official." *United States v. Fulcher*, 250 F.3d 244, 253 (4th Cir. 2001) (emphasis omitted). As noted in a prior government filing that went unopposed by Rhodes, that defense requires a defendant to establish that he relied on a government official with actual authority to authorize the conduct in question, and that the defendant's reliance on that official was objectively reasonable. *See* ECF No. 213 at 3. Neither condition applies here because no government official, including the President, has authority to authorize an attack on the Capitol or the government more generally, and any reliance on that purported authorization would be unreasonable. *Id.* at 3-6.[2] Rhodes does not argue to the contrary. *See* ECF No. 324 at 33.

---

[2] No president, through a legally unfounded use of the Insurrection Act or any other means, would have the authority to permit or authorize a conspiracy to forcibly oppose the authority of the government or the execution of the laws of the United States, nor could he have lawfully sanctioned the attack on the United States Capitol on January 6 or any of the other criminal conduct allegedly perpetrated by defendants. As Chief Judge Howell wrote last year in rejecting the idea of an entrapment-by-estoppel defense for January 6 defendants:

> [A President] cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution. Thus, a President cannot, within the confines of his constitutional authority, prevent the constitutionally mandated certification of the results of a Presidential Election or encourage others to do so on his behalf, nor can he direct

In addition to seeking to smuggle in a public authority defense by repackaging it a *mens rea* challenge, Rhodes also asks the Court to create an affirmative (public authority) defense never recognized: an anticipatory (public authority) defense. In Rhodes's view, so long as he and the other defendants were "simply acting in *anticipation* of what *would have been* lawfully given orders under the Insurrection Act," they could not have conspired to use force to oppose the authority of the government or the execution of federal laws. ECF No. 324 at 33-34 (emphasis in original). That novel claim finds no support in the law. For one thing, Rhodes and the other defendants are charged with the inchoate offense of conspiracy, "the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975); *see United States v. Jimenez Recio,* 537 U.S. 270, 274 (2003). The existence of a conspiratorial agreement "may be shown by circumstances indicating that criminal defendants acted in concert to achieve a common goal." *Hamling v. United States*, 418 U.S. 87, 124 (1974). Concerted planning, moreover, "poses distinct dangers" from a substantive offense because it "increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Iannelli*, 420 U.S. at 778 (second quotation quoting *Callanan v. United States*, 364 U.S. 587, 593 (1961)); *see also Dennis v. United States*, 341 U.S. 494, 573 (1951) ("The basic rationale of the law of conspiracy is that a conspiracy may be an evil in itself, independently of any other evil it seeks to accomplish.")

---

an assault on the coequal Legislative branch of government. Were a President to attempt to condone such conduct, he would act *ultra vires* and thus without the force of his constitutional authority. . . . Put simply, even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 32-33 (D.D.C. 2021).

9

(Jackson, J., concurring).  In other words, under conspiracy law, the defendants' agreement to use force to oppose the government or stop the execution of federal election laws violates the law even if those plans incorporated contingencies or triggering conditions.  It is no defense to claim that some future anticipated event would render that otherwise criminal agreement lawful.

Rhodes's novel anticipatory affirmative defense also raises expansive troubling implications.  Any time a defendant "simply . . . anticipat[es]" (ECF No. 324 at 33) that some "lawfully given order[]" could at some undefined point in the future excuse or immunize his otherwise unlawful conduct, that anticipation would provide an affirmative defense.  Under that rationale, if individual A anticipates that a president or governor will lawfully pardon him or later authorize him in anyway in the future for committing fraud or bribery, individual A could claim that he lacked the necessary *mens rea* to commit those offenses because he was acting in anticipation of a lawfully issued pardon.  Or, to take Rhodes's apparent example, roving militias could have patrolled polling places and intimidated voters during the 2020 presidential election because those militias could have anticipated that the President might have "invoked" them or "taken such measures as" the President "consider[ed] necessary."  ECF No. 324 at 32 (citing 10 U.S.C. § 253(1)).  Whether conceptualized as a public authority or a *mens rea* claim, no case to the government's knowledge has permitted such an anticipatory affirmative defense.  Indeed, such a theory would abrogate centuries of criminal law.

None of the authorities on which Rhodes relies support his claim.  For example, in *United States v. Juan*, 776 F.2d 256, 258 (11th Cir. 1985), the defendant claimed he lacked the criminal intent to commit the drug offenses with which he was charged because he "reasonably thought he was doing those things in cooperation" with the government.  *Id.* at 258.  The defendant there acknowledged that that belief "would appear incredulous" but for classified materials showing that

10

he had engaged in such a relationship with government agencies in the past, which in turn rendered that belief "reasonable and genuine." *Id.* The Eleventh Circuit concluded that "under the peculiar circumstances" that that case presented, the district court's exclusion of the classified materials was erroneous. *Id.* That conclusion resembles the D.C. Circuit's treatment of the public authority defense in *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976), where the defendants could point to a past relationship with a high-level government official as the basis for their claim that they lacked criminal intent because they could reasonably have believed they had government authorization for their conduct. *See United States v. North*, 910 F.2d 843, 881 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990) (discussing *Barker*); *see also* ECF No. 213 at 5-6 (noting that what occurred in *Barker* has "no analogue" in this case). But Rhodes does not suggest that the facts here remotely resemble those in *Juan* or *Barker*.

Rhodes's reliance on *United States v. Baptista-Rodriguez*, 17 F.3d 1354 (11th Cir. 1994), and *United States v. Anderson*, 872 F.2d 1508 (11th Cir. 1989), is similarly unavailing. Like in *Juan*, both cases also involved claims by defendants that their past relationships with government actors negated their criminal intent and that the district court had improperly precluded them from adducing the nature of those relationships by excluding certain classified materials from trial. *See Baptista-Rodriguez*, 17 F.3d at 1363-76; *Anderson*, 872 F.2d at 1517-18. In both cases, however the Eleventh Circuit found no error because, in *Baptista-Rodriguez*, the defendant could inform the jury he had worked as an FBI operative, 17 F.3d at 1365, and in *Anderson*, the defendants alerted the jury that they had "relationships with civilian and military intelligence agencies," 872 F.2d at 1517. By contrast, Rhodes and the other defendants have never claimed that they possessed "relationships" with government actors or that certain documents (classified or otherwise)

demonstrate that they reasonably believed they were acting as government operatives. Indeed, Rhodes has proffered no evidence at all that any government actor told him the President would invoke the Insurrection Act and call Rhodes and his co-conspirators into action.

Although Rhodes does not explicitly press the point, his heavy reliance on cases from the Eleventh Circuit suggests that he is advancing the argument that reference to the Insurrection Act would rebut evidence that he intended to conspire to use force to oppose the government by showing that he possessed a "good-faith belief that he was acting with government authorization." *United States v. Giffen*, 473 F.3d 30, 43 (2d Cir. 2006). That "negation of intent" legal theory, recognized only in the Eleventh Circuit, would "swallow the actual public authority and entrapment-by-estoppel defenses." *Id.* "Such an unwarranted extension of the good faith defense would grant any criminal *carte blanche* to violate the law should he subjectively decide that he serves the government's interests thereby. Law-breakers would become their own judges and juries." *United States v. Wilson*, 721 F.2d 967, 975 (4th Cir. 1983). This Court should accordingly decline Rhodes's invitation to permit him to argue that he is entitled to argue that the jury could find him not guilty if it had a reasonable doubt whether Rhodes acted in good faith under the sincere belief that his conduct was exempt from the law.

Rhodes also cites (ECF No. 324 at 31) *United States v. Rahman*, 854 F. Supp. 254 (S.D.N.Y. 1995), but that case has no relevance to the claim that Rhodes advances. As pertinent here, the district court concluded that the defendants' alleged plan to assassinate an Israeli citizen in the United States did not further the goals of a seditious conspiracy, *id.* at 259-260, but that their alleged plan to assassinate the Egyptian president while he was visiting the United States did because it would oppose the authority of the United States "to conduct it foreign relations." *Id.* at 261. Rhodes describes the issue in that case as whether the aim of these plans was "unlawful,"

ECF No. 324 at 31, but the district court in *Rahman* was not considering whether either assassination plot was "lawful"; instead, the court analyzed whether the alleged conspiratorial objectives sufficiently described a plot that targeted an interest of the United States that the seditious conspiracy provision protected. *See Rahman*, 854 F. Supp. at 259-61. That question is not implicated here because the alleged plot focused on actions and laws indubitably carried out by the United States government.

To be sure, Rhodes and the other defendants are fully entitled to contest whether the government proves beyond a reasonable doubt that they acted with the required *mens rea*—namely, that they knowingly and intentionally agreed to use force against the government—to violate the seditious conspiracy provision in 18 U.S.C. § 2384. But the history and legal theory regarding the Insurrection Act should play no role in that analysis.

### B. Further, this Court should preclude or limit Rhodes's proffered evidence concerning the Insurrection Act.

Additionally, this Court should exclude Rhodes's proposed evidence about whether President Trump hypothetically could have authorized his and his co-defendants' conduct under the Insurrection Act, as this evidence's "probative value is substantially outweighed" by, among other things, "confusing the issues," "misleading the jury," or "wasting time." Fed. R. Evid. 403; *see United States v. Ausby*, 436 F.3d 134, 153 (D.C. Cir. 2019).

Some evidence of the Insurrection Act will be introduced at trial. The government's case-in-chief will include references by Rhodes to the Insurrection Act, including statements that Rhodes believed the President could or should invoke the Act. But the government's evidence will not show that Rhodes's (or any other defendant's) plans to oppose the lawful transfer of presidential power by force were contingent upon President Trump invoking the Act. To the extent

13

Rhodes (or another defendant) seeks to have evidence along those lines admitted, he would have to do so through his own case.

It does not follow from the fact that the government will introduce some statements referring to the Insurrection Act that any evidence about the Act would properly be admitted. At minimum, Rhodes should not be permitted to introduce the extensive factual and legal background that he provides in his memorandum. *See* ECF No. 324 at 3-28  Rhodes does not contend (let alone demonstrate) that he or any other defendant had that extensive background in mind during the relevant time period—or, if they did, why it would be relevant. Furthermore, there is no sound reason to spend time at trial explaining the legislative history or interpretation of the Insurrection Act, a process that would likely confuse issues and mislead the jury into thinking that the Insurrection Act is relevant to the offenses charged in this case.

The Court should carefully limit evidence as to whether the President had the authority to invoke the Insurrection Act in connection with the November 2020 presidential election. As Rhodes himself acknowledges, President Trump never invoked the Insurrection Act, ECF No. 324 at 33. The jury should not be asked to consider—let alone decide—a collateral issue.[3]

### III.    Conclusion

Nothing in the government's case in chief, the defense's pretrial proffers, reciprocal discovery, or Rhodes's memorandum has come anywhere near establishing the relevance of

---

[3] For this reason, the government no longer intends to introduce the full text of the Insurrection Act in its case in chief. Rather, the government suggests that the first time the Act is mentioned, this Court should take judicial notice of the following definition of the Act: "Originally enacted in 1807, the Insurrection Act is the primary law defining when the president may deploy regular military and National Guard forces to suppress domestic unrest. It is now codified at 10 U.S.C. §§ 251-255." *See* Fed. R. Ev. 201(b)(1), (2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

President Trump's hypothetical authority to invoke the Insurrection Act to direct Rhodes and his co-conspirators to use force to stop the transfer of presidential power following the 2020 presidential election. Until Rhodes provides such a basis, the Court should preclude him from advancing propositions in opening statement or through cross-examination that the Insurrection Act would have authorized his alleged conduct in this case.

        Respectfully submitted,

        MATTHEW M. GRAVES
        UNITED STATES ATTORNEY
        D.C. Bar No. 481052

By:     /s/
        Kathryn L. Rakoczy
        Assistant United States Attorney
        D.C. Bar No. 994559
        Ahmed M. Baset
        Troy A. Edwards, Jr.
        Jeffrey S. Nestler
        Assistant United States Attorneys
        Louis Manzo
        Special Assistant United States Attorney
        U.S. Attorney's Office for the District of Columbia
        555 4th Street, N.W.
        Washington, D.C. 20530

        /s/
        Alexandra Hughes
        Justin Sher
        Trial Attorneys
        National Security Division
        United States Department of Justice
        950 Pennsylvania Avenue
        NW Washington, D.C. 20004

        /s/ James I. Pearce
        James I. Pearce
        N.C. Bar No. 44691
        Appellate Counsel, Capitol Siege Section

United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
james.pearce@usdoj.gov