## IN THE UNITED STATES DISTRICT COURT
## FOR THEDISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **v.** | ) **Criminal No. 1:22-cr-00015-APM** |
| | ) |
| **ELMER STEWART RHODES, III,** | ) |
| **KELLY MEGGS,** | ) |
| **KENNETH HARRELSON,** | ) |
| **JESSICA WATKINS, and** | ) |
| **THOMAS CALDWELL** | ) |
| | ) |
| **Defendants** | ) |
| **.** | ) |

## MOTION FOR A NEW TRIAL

COMES NOW, Defendants Elmer Stewart Rhodes, III, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, and Thomas Caldwell, by and through undersigned counsel, and respectively formally moves this Court for a new trial pursuant to Federal Rule of Criminal Procedure 33(b)(2).

On October 3, 2022, a trial by jury was initiated against Mr. Meggs and his codefendants Rhodes, Watkins, Caldwell, and Harrelson.  On November 29, 2022, the jury found Mr. Meggs guilty of Seditious Conspiracy (Count 1), Conspiracy to Obstruct an Official Proceeding (Count 2), Obstruction of an Official Proceeding (Count 3), Conspiracy to Prevent Members of Congress from Discharging their Duties (Count 4), and Tampering with Documents or Proceedings (Count 8).  At the parties' request and within 14 days of the jury's verdict, on December 11, 2022, the Court issued an order extending the deadline for submission of briefing pursuant to Rules 29 and 33 until December 23, 2022.

Pursuant to Federal Rule of Criminal Procedure 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." When granting a new trial, "the evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand" and "[t]his power should be . . . invoked only in those exceptional cases in which the evidence weighs heavily against the verdict." *United States v. Howard*, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (quoting *United States v. Edmonds*, 765 F. Supp. 1112, 1118 (D.D.C. 1991)). Moreover, a new trial should be allowed "only if the defendant has shown that the error . . . affected the defendant's substantial rights." *United States v. Williams*, 825 F. Supp. 2d 128, 132 (D.D.C. 2011). Finally, "by contrast to a motion for a judgment of acquittal under Rule 29 due to the insufficiency of the evidence, a defendant 'seeking to obtain a new trial' under Rule 33 is asking the court to determine that the state of the evidence is only 'marginally sufficient' such that it 'calls for a new trial in the interest of justice." *United States v. Young*, 2013 U.S. Dist. LEXIS 204453, *12 (D.D.C. 2013) (quoting *United States v. Wiley*, 517 F.2d 1212, 1217, n.24, 170 U.S. App. D.C. 382 (D.C. Cir. 1975). Thus, "by contrast to the evaluation of the evidence required under Rule 29 [for a motion for a judgment of acquittal], the court's discretion whether to grant a motion for a new trial . . . is "much broader," since the court need not accept the evidence in the light most favorable to the government, and may weigh the testimony and consider the credibility of the witnesses." *Young*, 2013 U.S. Dist. LEXIS at *12-13.

The Jury's verdict in this case was nothing if not unique. The jury convicted Defendants Rhodes and Meggs of Seditious conspiracy with the object of "oppos[ing] by force the authority of the Government of the United States," *but not* with the object of, "us[ing] force to prevent, hinder, or delay the execution of any law of the United States." This conclusion completely

contradicts the government's theory of the case. To whit, the only purpose of the "scheme" with which Defendants Rhodes and Meggs were charged was to illegally oppose the lawful transition of presidential power leading up to and on January 6, 2021. Superseding Indictment at 3 ¶ 3 (ECF No. 167). Thus, the only "conspiracy" to oppose the authority of the Government of the United States must necessarily have been unrelated to the transfer of presidential power, but no such "scheme" was ever alleged in the operative, or any other, indictment. Similarly as puzzling is the jury's conviction of Defendant Meggs for conspiring to obstruct an official proceeding while simultaneously finding Defendant Harrelson not guilty of the same offense despite their nearly identical conduct (including having moved together in and around the Capitol).

It is thus beyond dispute, that after weeks of evidence, the jury's verdict was a close call. As such, a few key events may very well have impacted the jury's verdict, affecting the defendants' substantial rights, and warranting a new trial. Those rulings include (i) the Court's admission of evidence of the government's "summary" exhibits; (ii) the court's precluding the testimony of Oath Keeper Michael Nichols; and (iii) the government's statements of fact to the jury during closing and rebuttal were not supported by evidence introduced during trial.

## I.    ADMISSION OF SUMMARY EXHIBITS

Throughout the trial in this case the government relied upon so-called "montage" exhibits, which it utilized to manipulate the evidence and intentionally depict certain events to reflect its theory of the case rather than actually reflect any summary of evidence, let alone the actual evidence collected throughout its investigation. Rule 1006 of the Federal Rules of Evidence provides, in relevant part, that a "proponent may use a summary, chart, or calculation to prove the contents of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Summaries of voluminous records are only admissible

pursuant to this rule if they are "accurate and nonprejudicial." *See United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983). There are strict limits on the role of summary witnesses and documents. The trial must ensure that the witness or document does not "usurp the jury's fact-finding function by summarizing or describing not only what is in evidence but also what inferences should be drawn from that evidence." *United States v. Cooper*, 949 F.3d 744, 750 (D.C. 2020). "Another danger to be guarded against is that the jury will treat summary testimony as 'additional evidence or as corroborative of the truth,' rather than just a compilation of existing evidence.'" *Id.* at 750 (quoting *Lemire*, 720 F.2d at 1348). For a summary of documents to be admissible, "the documents must be so voluminous as to make comprehension by the jury difficult and inconvenient; the documents themselves must be admissible; the documents must be made reasonably available for inspection and copying; the summary must be accurate and nonprejudicial; and the witness who prepared the summary should introduce it." *United States v. Fahnbulleh*, 752 F.3d 470 (D.C.Cir. 2014) (citing *United States v. Hemphill*, 514 F.3d 1350, 1358 (D.C. Cir. 2008)).

There can be no question that the government's proposed compilation exhibits go far beyond accurately summarizing voluminous content and instead are designed to instruct the jury what inferences to make about the underlying content. *See Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir. 1985) (no error to exclude summary when it does not "fairly represent the underlying documents"). Additionally, with much of the video evidence, the government cannot meet the prong of FRE 1006 which requires a finding that the underlying content is so voluminous that it "cannot be conveniently examined in court." The government can easily play the relevant portion of a source video or audio recording without presenting it through a compilation exhibit. "If a summary, chart, or calculation is offered merely for illustrative or

pedagogical purposes to organize or aid the presentation of a party's case, FRE 1006 is inapplicable."  Christopher B. Mueller and Laird C. Kirkpatrick, Evidence 1103 (3d Ed. 2003). *See also White Indus., Inc. v. Cessna Aircraft Co.*, 611 F. Supp. 1049, 1069 (W.D. Mo. 1985) (recognizing "distinction between a Rule 1006 summary and so-called 'pedagogical' summary," with former being admitted as "substantive evidence" while latter "is simply a demonstrative aid which undertakes to summarize or organize other evidence already admitted").  The same goes for Signal messages and statements or writings from other sources; which the government had compiled into an excel spreadsheet with no additional commentary, markings, or other argumentative elements.

Finally, the government failed to lay a proper foundation for the admission of its summary exhibits.  "To establish such a foundation, it is usually necessary to call the person who prepared the summary, and some decisions suggest that the preparer must be available and subject to cross-examination."  Mueller and Kirkpatrick, *infra*, at 1107.  To some extent, the court recognized that summary testimony and summary exhibits needed a general Instruction in a last bid attempt to rectify the lack of data and/or agent knowledge provided for those exhibits to include those identified as 1500, 1501, 1540, 6925, 1555, 1502 and 1530.1.  Tr. 10473 -10479 (Nov. 28, 2022).[1]

---

[1] "The reason I've brought all of you back is that last week when I give gave you your final instructions, I neglected to include an instruction on summary exhibits and testimony about summary exhibits.  The government introduced summary exhibits during the case that were a summary of voluminous records. You may consider the summary exhibits as you would any other evidence admitted during the trial and give them such weight or importance, if any, as you feel they deserve.  In addition, certain law enforcement agents provided testimony about summary exhibits. This included testimony from FBI Special Agent Whitney Drew about Exhibits 1500, 1502, 1530.1, and 1555; testimony from FBI Special Agent Sylvia Hilgeman about Exhibits 1501 and 6925; and testimony from FBI Special Agent John Moore about Exhibits 1540 and 1555.  Insofar as these agents testified about the contents of a summary exhibit, you should consider such testimony only as an aid in evaluating the summary exhibit.

Here, each of the FBI Special Agents who testified concerning the government's summary exhibits confirmed that they had not prepared the exhibits, but that the prosecution team had done so.  Indeed, cross-examination of the Special Agents revealed an inherent unreliability of the so-called summary exhibits insofar as the exhibits contained a number of errors, to include but is not limited to, the government introducing Summary Exhibit 1555 which shows Kelly Meggs as a participant in the leadership chat as of January 6,[th] while FBI agent Cain testified Kelly Meggs exited that chat on December 18th.  (See also KM-79, Entry and Exits from Chats by the government's FBI Agent Cain).

Or errors in evidence such as the government showing text messages in Government Exhibit 6731, sent by Stewart Rhodes to Kelly Meggs on the afternoon of January 6th conflated to show coordination by Rhodes and Meggs at both the Grand Jury on 6/22/2022, and at trial, despite FBI Agent Drew's testimony that those messages did not get delivered to Kelly Meggs' phone until a few hours later at or about 6:50PM on 1/6.  Tr. 4641:6- 21 (Oct. 10, 2022).

## II.    THE TESTIMONY OF MIKE NICHOLS

Defendant Meggs proffered the testimony of Michael Nichols, an Oath Keeper present on the grounds of the Capitol who would have testified, and for which video would have corroborated, that a member of the Capitol Police approached him to request his assistance in evacuating a dozen members of the Capitol Police from inside the Rotunda.  This testimony would have served to rebut the testimony of several officers who claimed that the Oath Keepers, including Defendants Meggs, Harrelson, and Watkins, could not have done anything to assist the

---

Any other testimony of these agents should be evaluated consistent with the instructions I've already given you about evaluating witness testimony." Tr. 10480-10481 (Nov. 28, 2022).

officers protecting the Capitol that day.  To the contrary, one member of the group escorted

dozens of officers out of the Rotunda where they had been trapped.

Ultimately, the Court concluded that the testimony would not have been relevant, that

Mr. Nichols, "his conduct that day cannot say – provide *any* relevant information to the conduct

of those who entered the building 50 minutes earlier"; and there was, "very little probative value

of his testimony" and any such value was "substantially outweighed by the risk of juror

confusion."  Tr. at 8382 l. 4-25-8383 l. 1-14 (Nov. 15, 2022).

Further, as proffered Mr. Nichols would have testified to certain exhibits including what

drew him to attend the event, the postings on the Oath Keepers website about security.  He was

expected to testify that those postings made him feel more secure about attending.  The court

instead required that counsel seek to admit those two exhibits with agreement by the government

-- but without the benefit of testimony for the jury.  (KM Exs. 87 and 88)  Mr. Nichols was

further going to testify about the police "Back the Blue" program on the website, which talks

about how to approach officers to offer assistance in times of need, which he was going to

explain was exactly what he did on January 6th.  Tr. 8884 l. 3-8898 l.1-6 (Nov. 15, 2022).

With respect to the Court, given how close the jury verdict in this case was, the exclusion

of Mr. Nichols's testimony would unquestionably have made a difference as and "it would be a

miscarriage of justice to let the verdict stand" given the circumstances.  *Howard*, 245 F. Supp. 2d

at 30.

### III.    THE GOVERNMENT'S CLOSING ARGUMENT.

This Circuit has recognized that "a prosecutor is obliged 'to avoid making statements of

fact to the jury not supported by proper evidence introduced during trial.'"  *United States v.*

*Williams-Davis*, 90 F.3d 490, 507 (D.C. Cir. 1996) (*quoting Gaither v. United States*, 413 F.2d

1061, 1079 (D.C. Cir. 1969).  Thus, "[i]t is settled law that 'a prosecutor may not use the bully-pulpit of a closing argument to inflame the passions or prejudices of the jury or to argue facts not in evidence.'"  *United States v. Abukhatallah*, 41 F.4th 608, 636 (D.C. Cir. 2022) (quoting *United States v. Childress*, 58 F.3d 693, 715 (D.C. Cir. 1995).  Specifically, the government's closing argument and rebuttal "must be confined to 'facts which are in evidence and the reasonable inferences therefrom.'"  *United States v. McGill*, 815 F.3d 846, 916 (D.C. Cir. 2016) (quoting *United States v. Jones*, 482 F.2d 747, 753 (D.C. Cir. 1973).  However, while the government may "draw inferences from evidence that support the government's theory of the case," it cannot "intentionally misrepresent the evidence."  *United States v. Moore*, 651 F.3d 30, 53 (D.C. Cir. 2011).  Finally, "during closing arguments, prosecutors may not sensationalize the facts or seek to turn jurors' perceived prejudices or favoritism against a defendant.  *Abukhatallah*, 41 F.4th at 636 (citing *Moore*, 651 F.3d at 51-52).

At several points during the government's closing argument and rebuttal, it made assertions that were unsupported by the facts in evidence and that were intended to inflame the passions or prejudices of the jury towards the defendants.

Of most consequence, the government argued:

Stephen Brown came in here as a defense witness.  He admitted Oath Keepers are not real security.  He knows real security agencies.  They're not it.  He admitted that permit he got for Ali Alexander was for only 50 people max and that that was never realistic.  *That speaker, that rally, whatever that was that was going to happen, that was never actually going to happen.  That was not realistic, that was not real."*

Tr. at 10325:7-14 (Nov. 21, 2022).  Despite eighteen (18) months of investigation there is literally *zero* evidence that Stephen Brown's efforts to coordinate an event at the Capitol on January 6, 2021, weren't real.  Indeed, Mr. Brown testified that the government had not even contacted him until August of this year, just a month before the trial was to begin.  Put simply,

the government had no basis to assert to the jury that Mr. Brown's efforts were in furtherance of any "legal cover." Tr. at 10323:25. This assertion is particularly problematic given that, as the government knows, Mr. Meggs's defense was largely that he had come to Washington, DC on January 6, 2021, to provide security. Absent any basis to make this assertion, it is beyond dispute that such argument affected the defendants' "substantial rights." *Williams*, 825 F. Supp. 2d at 132.

The government, in its rebuttal argument, also asserted:

> "And Mr. Dolan wrote to the Florida Oath Keepers that he was prepared to die. His words, and he told you right here, he meant it. He was prepared to die and he was prepared to be charged with treason for what he was prepared to do. And what was that, ladies and gentlemen? Oppose the United States Government. He told that to Kelly Meggs on the Signal chat, that he was prepared to die or be charged with treason. What was Kelly Meggs' response? "Let's do it.""

Tr. At 10301 l. 17-25

In making this assertion, the government misrepresented the evidence and thus poisoned the jury's ability to view the evidence in the correct context. In fact, the messages sent by Mr. Meggs following Mr. Dolan's statements were "They have to be able to provide defense for their families," "They have to be able to provide medical care to their families," and "[There]'s so much we say that doesn't sound sexy and good. But what's more valiant than helping . . . save the lives in your community." Tr. 4091 l.5-20 (Oct. 19, 2022). In characterizing Mr. Meggs's messaging, the government clearly sought to avoid showing his clear intent to act in a protective manner, as opposed to offensively. Regardless of the intent that could or would have been understood, the government improperly misrepresented these messages and thus the facts in evidence in its rebuttal by asserting that Mr. Meggs's response to dying or being charged with treason was "let's do it."

And the government argued that:

9

> As Judge Mehta instructed you yesterday, and you'll have in the written
> instructions, there is absolutely no requirement that the government prove a
> formal or written agreement. No requirement for even an express oral agreement.
> "No requirement of the government prove that the conspirators agreed to the
> details of the plan or even that the plan -- sorry, of the agreement or even that the
> agreement even had any details. It is not a requirement. There is no requirement
> that the conspirators all met or even all discussed their agreement.  There is no
> requirement that they agreed to the details."

Tr. 10297 l.6-17.  Such argument was necessary, of course, because their cooperating witness

had testified in a way that was completely contradictory:  Mr. Dolan testified that, "*No, we never*

*talked about forcing our way into the Capitol or overthrowing the government*." Tr. 4321 l.16-

17, (Oct. 19, 2022).

Instead, the government predicated the defendants' "agreement" on a "commander's

intent."   The government failed to put forward any expert to explain military standards and

protocols, especially something as vague as a "commander's intent" and even if it has some basis

in the Marines, there was no evidence as whether it applied across military departments and

agencies; such as to the U.S. Army, where Mr. Rhodes served.  The government further ignored

the fact that Mr. Meggs has no military background.  Instead the government argued that,

> "Mr. Dolan explained to you the concept of the commanders' intent, which he
> learned during his 19 years as a United States Marine. The commanders' intent
> explains the reasons why the group wants to achieve the common goal."

Tr. 10302 l.22-25.

However, the government read a stipulation that makes clear Mr. Meggs has no military

background.  (Gov't Stipulation, 3004).    So how can the government argue that Seditious

Conspiracy or Conspiracy to attack the ECA was predicated on a Commander's Intent, and that

Mr. Meggs would have had this understanding?  As for the vague allegation of some kind of

alleged military operation, there was no evidence put on by the government that the Defendants

had any maps of the inside of Congress to know which was the Speaker's office or the Senate or

the House Chamber, or that anyone besides Mr. Rhodes, (who did not go inside) had ever been

inside the Capitol to even have a preliminary understanding of that huge building.  Further, the

government put forth no evidence that there were signs inside of Congress to guide people either

to the Speakers' Office, or to the Senate side.

The government also asserted the following in its rebuttal argument:

"Now, starting with respect to firearms, the members of the conspiracy told you about
their agreement to use firearms. Graydon Young explained that Kelly Meggs told him
there would be an AR-15 with his name on it. And Jason Dolan sat on the witness stand
and told you he was prepared to take up arms against the government, and he understood
that his fellow conspirators were prepared to do the same."

Tr. At 1304 l. 18-25

Whilst the government made this argument, it had one of the agents who testified in the

case holding an AR-15 gun in front of the jury.  This was documented on the record by the

government: "Agent Palian is holding right now in his hands Exhibit 37, the AR-15 that Mr.

Dolan brought with him to the Comfort Inn in Virginia."  Tr. At 1305 l. 1-3.

This was not the only time that the jury was presented with weapons during the course of

the trial.  In fact, the government had previously shown the jury the same weapon among a

number of other weapons.  While it is true that the weapon was an exhibit admitted into evidence

and that the jury would be able to examine it during deliberations, the government's use of the

weapon in its closing argument was not for the purpose of aiding the jury's understanding of the

weapon or even to remind the jury of the weapon's alleged purpose in the trial.  The

government's intended purpose for exhibiting the weapon during its rebuttal was to inflame the

passions and prejudices of the jury.  Indeed, that the government had the weapon displayed while

it discussed the defendants' alleged intent to "take up arms against the government" was also

misleading in targeting the passions and prejudices of the jury, as there was no evidence in this

case that any individual used these weapons against any government official, nor were they

present during any of the defendants' entry to the capitol building.  The government displayed a

semi-automatic rifle for the jury multiple times in order to put them on edge and to cause them to

form opinions about the defendants based on weapons, specifically guns, that they owned

legally.

The government made several other assertions that were specifically intended to inflame

the passions and prejudices of the jury.  First, the government made the following assertion in

response to defense counsel's argument that there was not any physical altercation between the

defendants and capitol police officers that led to their entry into the capitol:

> "It is disgusting, frankly, ladies and gentlemen, to hear these defendants and these
> defense counsel argue that the Capitol police officers didn't do anything, just let the
> defendants into the building like they strolled in, or to hear Defendant Watkins talk about
> how it felt like Black Friday at a Target, everyone was racing to get the next toy for
> Christmas.  Look at what was actually happening.  It really was a life or death scenario
> for many of these police officers."

Tr. At 10318 l. 16-24.

This language not only directly attacks the defendants and their right to present a defense,

but attacks defense counsel.  Not only this, but it also misled the jury and painted the defendants'

actions in a light such that they were directly putting Capitol police officers lives at risk.  While

defense counsel concedes that the events of January 6 were not peaceful overall, and that

violence did occur at the Capitol building, it is improper for the government to depict the

defendant's actions as violence to the level of potentially resulting in death.  In fact, only one

defendant in this case was charged with even interfering with a federal officer.  None of these

defendants were charged with assaulting an officer or other individual, and in making this

assertion the government's only intent could have been to inflame the jury's passions and

prejudices by exacerbating the defendants actions on that day.  This was clear "sensationalizing"

of the facts to turn jurors against the defendants.

The government went on to further sensationalize the facts by asserting the following:

"And they ignored the will of the people because they hated the outcome of the 2020 Presidential election.  It was to them "an existential threat" so they *took matters out of the hands of the people and put rifles into their own hands*.

They drove across the country and *took aim at this city we're in* right now, Washington, D.C."

Tr. 10348 l. 1-7.  The government also asserted:

"[The witness] never mentioned that he and Rhodes and the rest of the conspirators wanted to start a Civil War.

Make no mistake, ladies and gentlemen, that is what Rhodes wanted.  He wanted to start a Civil War.  They wanted to attack what they saw as an illegitimate government . . . ladies and gentlemen, you know what Rhodes though, that January 6th was *the first shot* in a war."

Tr. At 10346-10347 ll. 9-12, 1-2.

This repeated mentioning of the Defendants taking up arms and specifically the assertions that there was a "shot" that began a war on January 6 and that the defendants took aim at the city that the "we," meaning the jury, is in was improper and prejudicial towards these Defendants. These assertions were again intended to inflame the passions and prejudices of the jury, and clearly sensationalize the facts in evidence so as to prevent the jury from considering the facts fairly.  First, *none of the defendants ever brought a single weapon into Washington, D.C.* while they were visiting the area in early January.  That the government then asserts that a "shot" went off on January 6, metaphorical or not, is misleading and sensationalizes the facts.  Second, the facts in evidence show that the Defendants specifically intended to *not* bring weapons into Washington D.C.[2]  Finally, the government's assertions clearly crossed a line when it characterized the defendants' actions as against the members of the jury: "They drove across the country and took aim at this city *we're* in."

---

[2] The evidence shows that the Defendants brought weapons to the Virginia area in order to form a QRF that would only be used in the event that the President invoked the insurrection act.

The government also argued that:

> "[t]hey stopped the lawful transfer of presidential power.  They physically drove members of Congress from the Capitol Building, and they halted Congress's joint session."

Tr. 10294 l.12-15 (Nov. 21, 2022).

But the evidence in the trial brought by the government's witness Thomas Wickam who set forth that Congress was in recess first at 2:18 PM on January 6th, and again at 2:29 PM.  Tr. 4441:21-25 -Tr. 4443:1-10 (Oct. 19, 2022).  Defendants could not have "halted" the Congressional session, when it was already in recess before Mr. Meggs and others such as Graydon Young, undisputedly reached the steps of the Capitol at 2:35pm as argued by the government.  Tr. 9950:6-7 (Nov. 18, 2022); and then undisputedly only entered the Capitol at 2:41 PM, well after Congress was already in recess the second time.  Therefore, the government misrepresented the evidence.

Further, there was no evidence put on by the government that the purpose of the conspiracy was to [t]o oppose by force the authority of the government of the United States after January 6th.  Mr. Nestler then argued without legal foundation for seditious conspiracy:

> "[t]hese defendants used force and violence to breach the building, pushing past Officer Salke. Then they used force and violence to penetrate further into the building, trying to push past that line of MPD riot officers, including Officer Owens."

Tr. At 10307 l.11-15.

However, "the use of force" is missing in the evidence for seditious conspiracy.   Neither Mr. Meggs nor Stewart Rhodes were even alleged to have brought guns or lethal weapons or any weapons to the Capitol, or told others to bring any.  And even assuming arguendo that the government's reliance on "pushing past officers" is true  (-- despite CCTV showing otherwise, see KM-86), "pushing past law enforcement" is not the "use of force" contemplated by the

statute on Seditious Conspiracy, and especially where no defendant in the Rhodes trial was found

even guilty of destruction of property.

> The discussions of seditious conspiracy in Baldwin and Anderson are important to
> this case; while the Government presented evidence of vile and often hateful
> speech, and may have even shown that certain Defendants conspired to commit
> some crime - perhaps to murder local law enforcement — offensive speech and a
> conspiracy to do something other than forcibly resist a positive show of authority
> by the Federal Government is not enough to sustain a charge of seditious
> conspiracy. A conspiracy to murder law enforcement is a far cry from a conspiracy
> to forcibly oppose the authority of the Government of the United States.

*United States v. Stone*, 2012 U.S. Dist. LEXIS 41434, *13-14

The *Stone* court explained that in *Anderson v. United States*, the Eighth Circuit applied

Baldwin and dismissed a seditious conspiracy charge where the force sought to be exerted was

"not against those whose duty it should be to execute the laws." *Id*. at 12. (*citing Anderson*, 273

F. 20, 26 (8th Cir. 1921).  (*See also United States v. Rahman*, 854 F. Supp. 254 (S.D.N.Y.

1994)).

Further, there was no other evidence of any use of force submitted by the government to

showing "use of force" after January 6th.   For example, the government alleged that MEGGS

added on the Leadership Signal Chat, "We aren't quitting!! We are reloading!!"  However,

Special Agent Kelsey Harris testified that he was unaware of any evidence that Mr. Meggs ever

went back to the Capitol after he left on January 6th.  TR.6244: 7-10 (Nov. 1, 2022).   And

Special Agent Kelsey Harris testified that this message was not to be taken literally and that it

was rhetoric.   Tr. At 6244 l.17-25 –6245 l.1-5.

And a text message was introduced by the government that 'On January 10, 2021, James

sent MEGGS a message asking if MEGGS and other Florida Oath Keepers were coming to

Texas, and MEGGS responded, "Fl stays home until shots fired !"   Mr. Meggs not only said no,

but the government has made clear they have no evidence that Mr. Meggs made any specific

travel plans, or any evidence to suggest that he did something other than remain at home in Florida after the 6th. Agent John Moore testified on cross on 11-2-22 that while they made much of a text by Kelly Meggs after 1/6, Nope. "Florida stays home until shots fired." John Moore further testified he was unaware of any specific plans by Mr. Meggs to travel after that, and that Mr. Meggs did not travel. TR. 6596 l. 14-25 – 6597 l.1-7 (Nov. 2, 2022).

While undisputedly, Mr. Meggs is saying "no" in that message, "I'm staying home unless… more context was provided at trial by a government agent:

> "[Q.] When are these messages from? A January 10th of 2021 at 10:15 p.m. Eastern Time…And how does Mr. Meggs respond to this request? A "Nope. Florida stays home until shots fired."

Tr. At 6484 – Tr. 6485 (citing Exhibit 9072)).

Nor did the government set forth evidence that Mr. Meggs even remained in the organization after the 7th.

When considering a motion for a new trial based on opening statements or closing arguments, "the Court considers 'the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks.'" *United States v. Hale-Cusanelli*, 2022 U.S. Dist. LEXIS 168862 at *12 (D.D.C. 2022) (quoting *United States v. Monaghan*, 741 F.2d 1434, 1443 (D.C. Cir. 1984). Mr. Meggs argues that not only did the assertions made by the government amount to severe misconduct, but that the measures taken to cure the misconduct were insufficient and resulted in Mr. Meggs's conviction on most of the counts with which he was charged.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request the Court grant a new trial.

### [SIGNATURE ON NEXT PAGE]

Dated: December 23, 2022        Respectfully submitted,

        */s/ Stanley E. Woodward, Jr.*

Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD LAW, LP
1808 Park Road NW
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

        */s/ Juli Z. Haller*

Juli Z. Haller, (DC 466921)
THE LAW OFFICES OF JULIA HALLER
601 Pennsylvania Avenue, N.W., Suite 900
Washington, DC  20004
202-729-2201 (telephone)
HallerJulia@outlook.com

*Counsel for Defendant Kelly Meggs*

## Certificate of Electronic Service

I hereby certify that on December 23, 2022, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF System, with consequent service on all parties of record.

Respectfully submitted,

_____/s/ Stanley E. Woodward, Jr._____
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD LAW, LP
1808 Park Road NW
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel for Defendant Kelly Meggs*