UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD VALLEJO,<br><br>       *Defendant.* | No. 22-cr-15 (APM) |

MEMORANDUM IN SUPPORT OF MOTION
FOR JUDGMENT OF ACQUITTAL

Pursuant to Fed. R. Crim. P. 29, Defendant Edward Vallejo respectfully submits the following points and authorities in support of his motion for a judgment of acquittal.

## INTRODUCTION

As someone who was not on any Oath Keepers planning calls or Signal chats prior to the late afternoon of January 5, 2021, who made an independent decision to go to Washington, D.C. on his own, and who was nowhere near the Capitol during the events of January 6, 2021, Defendant Edward Vallejo stands in a unique position in this case. While he clearly supported election-related protests, evidence at trial copiously documented Vallejo's specific desire to see the outcome of the certification process up to the very *hour* it started, while disproving any notion that he knew about or supported any real-time decisions by others to use force to enter the Capitol or to hinder or delay the process. At the very least, any reasonable mind considering the evidence at trial must harbor doubts about Vallejo's knowledge of or agreement with any uncommunicated decision by others to interrupt the certification proceeding, and could not fairly exclude the hypothesis of innocence for Vallejo. Accordingly, a judgment of acquittal for the specific theory and counts returned by the jury is required. *Curley v. United States*, 160 F.2d 229, 233 (D.C. Cir. 1947).

1

**STATEMENT OF FACTS**

A.    **Oath Keepers and the 2020 Election**

Evidence at trial established that members of the Oath Keepers, including its founder, Stewart Rhodes, were dissatisfied with the November 2020 election. For some, this dissatisfaction included the belief that the election was unconstitutionally conducted due to Covid-related changes made by state executive or judicial officials; it was also widely believed that voter fraud impacted the outcome. Shortly after the election, Rhodes conducted a national call for Oath Keepers to discuss plans to gather in Washington, D.C. to protest the election results. Gov. Ex. 1000. Participants on the call included Rhodes, Kelly Meggs, Terry Cummings, Michael Adams, and Jessica Watkins. Gov. Ex. 6857.

Some members of the Oath Keepers, including some on the call, gathered in Washington, D.C. on November 14, 2020 for an event dubbed the "Million Maga March." Tr. 1506. This group of Oath Keepers was hosted for the weekend by Thomas Caldwell, who provided space on his farm. Group members attended rallies and events that weekend and provided personal security details. In addition, as they had at numerous prior events throughout 2020, the Oath Keepers had a group acting as a "Quick Reaction Force" (QRF). Tr. 2331. In an open letter discussing plans for the event, Rhodes described one of the purposes of the QRF: "Oath Keepers will have some of our most skilled special warfare veterans standing by armed, just outside of D.C., as a an emergency QRF in the event of a worst-case scenario in D.C. (such as a Benghazi style assault on the White House by communist terrorists, in conjunction with stand down orders by traitor generals)." Gov. Ex. 1002; Tr. 1686–87.

Throughout the fall and winter of 2020, Rhodes discussed many times his desire to see President Trump take action to address what he saw as an unconstitutional and fraudulent election.

These discussions included multiple open letters published on the Oath Keeper website as well as discussions in Oath Keeper Signal chats. Gov. Ex. 1002; Gov. Ex. 1008. In general, Rhodes called upon President Trump to declassify documents he believed would reveal corruption in the U.S. government and to use the military to conduct new, clean, and constitutional elections. *Id.* He also called upon President Trump to invoke the Insurrection Act, deeming the supposed fraud and unconstitutional election as a kind of rebellion. Rhodes hoped that the Oath Keepers would be used by President Trump under the Insurrection Act as part of the general militia. Rhodes continued imploring President Trump to invoke the act through January 10, 2021, when he tried to deliver a message to that effect to President Trump through Jason Alpers. Tr. 4068.

Rhodes also expressed what he believed to be the necessary course of action if President Trump did not invoke the Insurrection Act and President-elect Biden assumed the office of President on January 20, 2021. Generally, Rhodes expressed the belief that if Biden took office, citizens should declare independence from his "regime," refuse to recognize unconstitutional acts, organize locally to resist unconstitutional laws, and even prepare for a civil war. At trial, the government introduced many of these sorts of statements as evidence of an intent to stop the transfer of power; however, on their face, they uniformly referred to how to respond to the post-inauguration "regime" of President Biden, not to any plan to violently stop Biden from assuming office. *See, e.g.*, Gov. Ex. 6748 (Msg. 1.T.2186.50) ("[E]ither Trump gets off his ass and uses the insurrection Act to defeat the ChiCom puppet coup, or we will have to rise up in insurrection (rebellion) against the ChiCom puppet Biden. Take your pick."); Gov. Ex. 6803.2 (Msg. 1.S.233.1513 (To GA OK General Chat: "If he doesn't use the Insurrection Act to keep a ChiCom puppet out of the White House, then we will have to fight a bloody revolution/ civil war to defeat the traitors.")); Gov. Ex. 9073.1 (Msg. 1.S.696.19133) ("Critical Message for Oath Keepers and

Patriots Part I," stating, "Now that it is regretfully becoming clear that President Trump will not be taking the decisive action we urged him to take, using the Insurrection Act and a declass/data dump, let's follow the Founders' game plan, using their strategies and methods, which focused first on declarations of illegitimacy, nullification (declaring unconstitutional acts to be null and void from inception, and refusing to obey them), unified mass non-compliance with unconstitutional and oppressive actions and then on self defense, mutual defense, and resistance when the domestic enemies of the Constitution come for us. That's how the Founders did it, and it worked. There is nothing new under the sun. Let us adapt their game plan to our current situation."); Gov. Ex. 1008 (December 23, 2020 Open Letter stating that if Trump fails to act and allows Biden to assume the presidency, there will there be a duty to "take up arms" and fight an "illegitimate regime," after "declaring independence" from that "regime").

During this same time period, the Oath Keepers took part in marches and rallies in Atlanta, Washington, D.C., and other locations. Generally, as they had done at the "Million Maga March," the Oath Keepers had QRFs at these events in case there was violence between protestors requiring intervention. Tr. 2331; Tr. 2337–41.

**B.    The January 5–6 Oath Keepers "Op" and the QRF**

In mid-December, the Oath Keepers announced that they would be participating in events and rallies in Washington, D.C. from January 5–6, 2020. Gov. Ex. 9514. Rhodes established a Signal chat group dedicated to planning the events and held several conference calls. On these calls and group chats, the Oath Keepers discussed D.C. weapons laws and the need for strict adherence to them. Tr. 3166. They also discussed providing personal security details to speakers and attendees at various rallies. EV 13. Dozens of members of the Oath Keepers traveled to Washington, D.C.

from several states to take part in these events, including Oath Keepers from states (such as Wisconsin) who have never been implicated by the government as part of any conspiracy.

As they had at previous rallies, Oath Keeper members discussed having a QRF where members would store personal firearms. Rhodes stated that "this situation calls for" a QRF (EV 400),[1] and Thomas Caldwell, Doug Smith, and Paul Stamey separately discussed logistics regarding a QRF hotel (Tr. 2479).[2] At trial, the government did not introduce any evidence discussing any illegal or offensive purposes for the QRF, much less that it was part of a plan to forcibly interfere with the certification of the election. On the contrary, testimony and documentary evidence established that the QRF was understood by the Oath Keepers as (1) people that could help in an emergency to save lives; (2) people that could help transport people out of D.C. and/or out of harms' way; and (3) people that could bring firearms to their owners in D.C. if lawfully authorized by President Trump to do so under the Insurrection Act. *See, e.g.*, EV 143 (Caldwell describing the "QRF vehicle" as a way to "save lives" and to "get folks out" and "get them home"); Tr. 2478–79 (reviewing messages stating, "Do not bring weapons into DC unless you are LEO with LEOSA creds unless and until shit truly hits the fan. This is the exact same thing we did in both prior DC Ops. We come armed to VA and stow our weapons there someplace safe and we go into DC without guns (except for our LEOSA credentialed cops). Our firearms can be in the hands of a dedicated QRF team who can link up with us if the shit truly hits the fan but otherwise they stay out of DC. Understand?"); *id.* ("I am worried about pepper spray mainly because lately the Antifa types have

---

[1] There was testimony that clashes had occurred among protestors at a December 14, 2020 rally in Washington, D.C., and that a Trump-supporter had been stabbed. Tr. 2329.

[2] Testimony in Trial 1 established that Stamey and Caldwell were part of a North Carolina schism with the national Oath Keepers.

started using that right out of the gate on people"); Tr. 2665–66 (Berry) (Q. You planned to be there for security detail, correct? A. That was the original intent, yes, ma'am…. Q. And to be -- and the QRF, if there needed to be an emergency response, right? A. Yes, ma'am…. Q. It's a counter-offensive, it's for defense if something really bad happens, right? A. Or if something fails, yes, ma'am."); Tr. 2668–69 (Berry) (Q. Do you recall that you spoke about the possibility that firearms might be necessary? A. I do recall that. Q. When you spoke about that with those others, the discussion was centered around if there was a major emergency that needed to be responded to, correct? A. Correct."); Tr. 3577–78 (Herrington) (Q. And there was no discussion about using weapons to attack the Capitol, right, that you heard? A. Not that I heard, no, sir….Q. And you understood that from what Mr. Rhodes was saying, he was saying that the militias, if called upon under the Insurrection Act, would support whatever the government needed? A. Yes, sir. Q. They wouldn't be against the government, right? A. No, sir…. Q. Mr. Rhodes said that the Insurrection Act could be used to call people up to support the President, correct? A. Yes, sir. Q. And to suppress an insurrection of people trying to stop the President from enforcing the act? A. Yes, sir.").

Likewise, while some messages from individuals such as Meggs discussed January 5–6 as a period that was "going to be wild" (Gov. Ex. 9514 (Msg. 1.S.656.9328)), the government did not introduce any evidence at trial indicating that Oath Keepers had any plan to interrupt the certification process or otherwise act unlawfully or with force on January 6. Indeed, out of *tens* of *thousands* of *pages* of Signal chat messages, and countless additional Facebook and SMS messages, the government could not find, and did not introduce, a single message discussing the prospect of interrupting the certification, by force or otherwise. Rather, all concrete references to the use of weapons prior to the inauguration occurred in the context of calls for President Trump to invoke the Insurrection Act or to potential life-threatening clashes among protestors. *See, e.g.*, Gov. Ex.

9514 (Msg. 192.T.1415, 19); *id.* (Msg. 1.S.159.197); *id.* (Msg. 1.S.656.9846 9514); *id.* (Msg. 1.S.656.10101); *id.* (Msg. 2000.T.289); EV 143.

Witness testimony further corroborated that there was no prior Oath Keeper plan to interrupt the certification process as part of the January 5–6 "Op." Government witness Joe Herrington, who was with the Oath Keepers' *operational leader* (Michael Greene) for the January 5–6, described in detail the process of Greene and others learning and reacting spontaneously to the events of January 6:

> A.   We heard explosions, and naturally it's what – I don't know if it's what normal people do, that's what soldiers do, they look toward the direction of the sound, and we saw smoke so we started moving toward that area, sir.
> Q.   And at that point, no one had told you that it was the plan for you to go to the Capitol, right?
> A.   No, sir. It was more or less, There's something bad happening over there, we need to get there over and see what's happening….there was no discussion about going in, it was more or less just like, What in the world's happening right here….
> Q.   Do you recall there being a discussion with Whip about whether to go into the Capitol at some point after you heard the explosions?
> A.   Yes, sir, we were -- when we were standing – it was after -- it was quite a bit into the incident there. It was quite a bit of time into it.
> Q.   So it was when you got to the Capitol but not right when you got to the Capitol?
> A.   Correct.

Tr. 3581–82. Government witness Brian Ulrich also confirmed multiple times that there was no prior plan to go to the Capitol and described how he decided to enter the Capitol in real time:

> Q.   How long did you pause there before entering [the Capitol] yourself?
> A.   Probably four or five minutes.
> Q.   And in those four or five minutes, what were you doing? What were you thinking?
> A.   Kind of the same. I just -- I was battling out the fact that I knew going in there was wrong with, this is a moment that, you know, I feel like I've got to do something.
> …
> Q.   When you left the Mayflower, you told the FBI you didn't know why you were going to the Capitol, right?
> A.   Correct.

Q.    There was no plan that you were aware of, right?

A.    Yeah. There was no -- no specific discussion….

Q.    Along the way, Mark Grods said to you, "We're just going to meet up with some other Oath Keepers"?

A.    Correct.

Q.    And that's all you knew?

A.    At that time, yeah.

Q.    Now, at some point…you walked through -- you had a -- you made a decision to walk through the doors….

A.    Yes….

Q.    And you had a brief exchange with Jackson, and he made it clear he wasn't going inside, right?

A.    Correct.

Q.    So then just you and Grods went inside together?

A.    Yes.

…

Q.    But at no point did you think you were there to link up with those other Oath Keepers for the purpose of attacking the building, right?

A.    No one had -- no one had mentioned attacking the building.

…

Q.    And at no point on the 5th or the 6th did you have any conversation with anybody about using force to interfere with whatever proceeding Congress was going to conduct that day, did you?

A.    Correct.

Q.    And you didn't hear anybody else talk about that did you?

A.    Correct….

Q.    There had been no conversations about using force among the Oath Keepers that you were with?

A.    On the 5th and the 6th?

Q.    Correct.

A.    No.

Q.    When you came to Washington, D.C., you had no plan to try to stop the certification, correct?

A.    No.

Q.    And you had no plan to try to violently or forcibly keep Joe Biden out of the White House, right?

A.    No.

Q.    You did hope that somehow, in a legal way, Trump would be able to reveal fraud and in your view the election would be vindicated, correct?

A.    Yes.

Q.    But you only wanted to do that through legal means, right?

A.    Yeah, I was wanting him to use whatever legal means he had at his disposal.

Q.    And that included, your understanding was he might use the Insurrection Act, right?

A.    Yes.

Q. And you believed that he could use the Insurrection Act to legally, under his authority as President, to do things like recount the votes, right?

A. That's what I was hoping for, yeah.

Q. And if called upon under the Insurrection Act, you believe the Oath Keepers might be able to provide services to the President of the United States, right?

A. That was the -- that was the consensus.

Q. And you had no plan -- if Mr. Trump did not use the Insurrection Act and bowed out, you had no plan to stop Joe Biden from taking the oath of office, correct?

A. Yeah, nothing was discussed beyond that…for a specific action on the 6th.

Q. So no Oath Keeper that you ever spoke with discussed with you a plan to forcibly stop Joe Biden from becoming President, correct?

A. Correct.

Tr. 3862; 3887–88; 3891; 3892–93; 3921–22.

Finally, Caleb Berry also confirmed that his first awareness of any intent to interfere with the certification process occurred immediately before Line 1 ascended the stairs at the Capitol around 2:35 p.m.:

Q. You planned to be there for security detail, correct?

A. That was the original intent, yes, ma'am.

…

Q. When you got close to the Capitol building, did there come a time when you were in a huddle with other members of your Oath Keepers group?

A. Yes, sir….

Q. And what was Kelly saying?

A. Kelly was saying that two of our guys had got separated -- two of the Oath Keepers got separated from the group and had walked up the stairs. And he also said that we were going to try to stop the vote count….

Q. And after the huddle broke up, did you all walk in a certain direction?

A. We did.

Q. Towards what?

A. The stairs up to the entrance.

Tr. 2665; 2618. And these denials were consistent with other denials by witnesses in the first trial, who uniformly denied that there was any Oath Keeper plan to disrupt the certification process. See ECF 435-1 at 13–16 (describing testimony of Mike Adams, Terry Cummings, Jason Dolan, and Graydon Young).

Trial evidence from the events of January 6 also documented facts inconsistent with any prior Oath Keeper plan to interrupt the certification that day. For example, messages established that Rhodes did not know where other Oath Keepers were during the key time-period, including his operational leader. Gov. Ex. 9552 (Msg. 1.S.159.1046) ("Whip, what's your location? I'm trying to get to you."). Indeed, Rhodes did not even know where *he* was during these events, wrongly telling people that he was on the south side of the Capitol when he was actually on the northeast side. Tr. 2918. Rhodes also was caught flat-footed without his helmet or other gear, which he had left behind the stage at a rally. EV 142. And other members, including Caleb Berry, did not even have their gear, having been instructed to leave it behind so they could attend a rally without any foresight of what was to follow at the Capitol. Tr. 2615. Video evidence from Defendant Minuta of his golf cart ride to the Capitol documented in real-time the spontaneous nature of Line 2's response to reports of the events at the Capitol and its lack of any planned coordination with Oath Keepers from Line 1. Gov. Ex. 1508. And messages between Rhodes and other Oath Keepers between 1:45 p.m. and 2:24 p.m. documented the Oath Keepers' real-time confusion regarding what was happening at the Capitol, as well as the fact that Congress had called a recess before any Oath Keepers even arrived at the scene. *See* EV 109 at 2 ("Are we SURE that they are actually Patriots and not those bad actors who are dressed as patriots from word we had been getting that was a possibility?"); *id*. at 4 ("Who's storming what building??"); *id*. at 5 ("SUpposedly Patriots - watching the live feed right now - and at the Capitol. It is in lock down right now and apparently Congress has called a recess............"); *id*. at 7 ("ANTIFA infiltrating as MAGA with backwards red hats").

In sum, the documentary and testimonial evidence at trial demonstrated conclusively that any possible agreement to enter the Capitol was formed, if at all, between individual Oath Keeper members as they marched to the Capitol, huddled near the Capitol, or on the way up the steps of

the Capitol. Indeed, the government's theory at trial appeared to be that a 2:32 p.m. to 2:33 p.m. three-way call between Rhodes, Meggs, and Greene was the key moment when an agreement to interrupt the certification was solidified, with Meggs moving up the Capitol steps immediately afterward. Gov. Ex. 1500.2; Gov't Ex. 1503.1; Tr. 2939. *See also* Trial 1 Tr. 9911:8–11 (Nov. 18, 2022) ("The defendants are not charged with entering into an agreement ahead of time, ahead of January 6th, to storm the United States Capitol. That is not the allegation in this case."); Trial 1 Tr. 10296: 5–8 (Nov. 21, 2022) ("Let me be clear on behalf of the United States of America, we do not allege a specific plan to storm the United States Capitol. We never have and we are not now. We do not have to prove a plan.").

### C. Evidence Regarding Mr. Vallejo

Defendant Vallejo had a different path to Washington, D.C. than all other defendants. The trial evidence established that Vallejo was not part of any Oath Keepers conference calls or discussion groups prior to arriving in the D.C. area on January 5, 2021. Rather, he independently made plans in December to go to Washington with three friends without knowing that Rhodes planned to be there. The evidence established that during this timeframe, Vallejo viewed a podcast interview with Sam Andrews calling for ordinary Americans to join an armed march in Washington on January 4, 2021 to demand accountability for election fraud and for the lawful arrest and indictment of supposedly corrupt officials. EV 127; EV 709; Tr. 1962–63, 2342–49, 2353; EV 139 at 2 ("Sam Andrews unveils plans to appear in Washington, DC on January 4, 2021 to demand government accountability"); *id.* at 3 ("Sam Andrews…announces the plan to assemble a large group of armed patriots on January 4, 2021, in Washington, DC to lawfully and legally petition the US government to take action against the treason and sedition of elected and appointed of public officials."). In the interview, Andrews and the host repeatedly stated that that the intent was to

march peacefully while armed as an expression of the marchers' exercise of their "First and Second Amendment rights at the same time." EV 709. Andrews also discussed the possibility that Trump might invoke the Insurrection Act, and discussed high-ranking former military officials who supported that option. *Id.* Nowhere in the two-hour interview did Andrews discuss January 6th or the certification process. Tr. 1957–58, 1960–63, 2341–49, 2353, 2355–56, 2469–74, 2514–16. Vallejo sent a link to the interview to Kelly Carter, a longtime friend in Arizona, and Carter responded with a text agreeing to go to Washington.

Prior to setting out for D.C., Vallejo and his three friends made a Signal chat group to discuss their trip amongst themselves. In this group, as well as in text messages sent to others, Vallejo discussed the certification process with eager anticipation. *See, e.g.*, EV 122; EV 123. There was no evidence introduced at trial that could give rise to an inference that Vallejo had any intent to interrupt the certification process or otherwise act unlawfully when he set out for D.C. On the contrary, Vallejo identified with great excitement specific senators and representatives that planned to lodge formal objections during the process, EV 122; EV 123, and expressly stated that his purpose in going to D.C. was to hold Congress's "feet to the fire" during the certification process, EV 183. *See also* Tr. 2356.

After they made plans to go to Washington, one of Vallejo's companions, Todd Kandaris, reached out to Rhodes to ask if he would be in D.C. at the same time. EV 101. Rhodes did not recognize Kandaris's number and did not remember him at first. *Id.* Rhodes asked Kandaris how many people were coming with him and whether they would be "attendees or speakers or security volu[n]teers?" *Id.* Kandaris replied: "Just as volunteers, as far as I know noone is anticipating speaking. We are rifles, man power, warm bodies there to support the process and the President." *Id.* While the government made much of this "rifles" comment by Kandaris at trial, he used that

12

word in the context of stating that Vallejo's group would be available as "security volun[t]eers"—a role that usually involved being armed where lawful. And Vallejo had already approvingly forwarded the podcast calling for lawful "First and Second Amendment" activity. EV 709. Nothing in the comment suggested that Kandaris planned to interrupt the certification, and in fact he expressly stated that he was coming to "support the process." *Id.*

The next day, Kandaris asked Rhodes where "staging" would be for "technical equipment and 'supplies.'" *Id.* Rhodes did not respond. Three days later, after getting to western Virginia, Kandaris asked Rhodes whether there is a "rally point." *Id.* Vallejo also asked Rhodes via text message for the location of the "encampment." EV 102. Rhodes directed Vallejo to contact Meggs, and Vallejo texted Meggs asking for the "campground address." Meggs responded with the address for the Comfort Inn in Ballston, Virginia. This single text from Meggs was the first time that Vallejo learned that he would not be going to a campground and the only time he had any contact with Meggs.

Vallejo arrived at the hotel on January 5, 2021. Unlike Stamey and Kenneth Bittner, who stayed at the Comfort Inn with firearms from their respective Oath Keepers groups, Tr. 1548, Vallejo and Kandaris immediately left the hotel and joined Oath Keepers providing security at an event at the Supreme Court, Tr. 2490–91. Around 4:30 p.m., Vallejo was added to the "DC OP: Jan 6 21" Signal chat group for the first time. EV 124. Vallejo provided rides to Oath Keeper from South Carolina to Freedom Plaza and parked his truck. *Id.* He later could not find his truck and had to take an Uber back to the Comfort Inn. *Id.*

The government's opening statement claimed that the next day, January 6, 2021, Vallejo "was staged at a Virginia hotel just across the river," Tr. 889, and "had…those rifles ready to rush them into D.C.…to attack the United States Capitol building," Tr. 888. However, the trial evidence

established that on the morning of January 6, Rhodes assumed that Vallejo would be going into D.C.—not staged in Virginia—and that Vallejo also had that as his plan. This was established through messages on the morning of January 6 showing that (1) Rhodes asked Vallejo if he needed a ride into the city; (2) Vallejo stated that he had a ride when his team members woke up; (3) Vallejo asked about bringing his boarding cutlass; (4) Vallejo asked about bringing a drone; and (5) Rhodes said to bring the drone. EV 125. And indeed, Vallejo did go into D.C., leaving the hotel around 11:50 (EV 250)—the worst possible time to be leaving for D.C. to look for a lost truck if the truck were part of a plan to interrupt a 1:00 p.m. certification proceeding with "staged" weapons from the Comfort Inn. There is thus no evidence from which to draw a reasonable inference that Vallejo was "staged" at the hotel in order to bring weapons in support of any forcible or unlawful activity on January 6.

Vallejo's late departure to D.C. on January 6 followed his participation in the podcast, "Declare Your Independence" with Ernest Hancock. Gov. Ex. 1054. At trial, the government relied heavily on four comments by Vallejo during this podcast:

(1) "The American people are going to be told today that we have liberty and justice for all or they're gonna be told fuck you...okay...and if, and if they're told fuck you, that's going to be the declaration of a guerrilla war."

(2) "I'm just praying to God that Trump has his head on fucking straight and he knows what he's doing. He's got the machinations behind him, he's got all the proof in the world and he's gonna bring the fucking hammer down....[T]hat's our only, only hope. Thats it. If that doesn't happen, then shit is on."

(3) "I am the motherfucker that's gonna fix it for them. If they tell me today it's broken."

(4) "I've been telling people this for years. I'm the guy that everybody said no, Ed, you can't shoot 'em yet, it's too soon. No, Ed, you can't shoot the bastard yet, it's too soon. Well...about five six months ago...they quit telling me."

*Id.* Despite the martial nature of this rhetoric, however, none of Vallejo's comments—made on the very morning of January 6, 2021—evidenced any desire to hinder or delay the certification process. On the contrary, they *explicitly* expressed hope in the president and the process and spoke only in conditional terms about what might follow "if" the president failed to present enough evidence to convince Congress to uphold the anticipated objections that Vallejo had been discussing for weeks.

Immediately after expressing his hopes for the outcome of the certification process, Vallejo headed into D.C., away from any "staged" weapons at the Comfort Inn. Vallejo did not find his lost truck until 1:19 p.m., well after the certification process had begun. When he found it, he wrote, "Eureka! Truck found 😊," and then made his way back to the hotel, arriving around 2:25 p.m. In between finding his truck and arriving at the hotel, several messages were posted onto the "DC Op: Jan 6 21" Signal chat group discussing violence and chaos at the Capitol. *See* EV 104 ("American blood in the Capitol steps. Officers down."); *id.* ("An activist just got in this van. Not sure what side he is on…"); *id.* ("Flash grenades / explosions going off now at Capitol Grounds."); ("Tear gas at the capital. Several officers hurt"); ("I think the Police are going to be overwhelmed…more will join into the frey"). In the context of these messages, Vallejo posted to the Signal group at 2:24 p.m.: "Vallejo back at hotel and outfitted. Have 2 trucks available. Let me know how I can assist." He then texted a friend, "The People have taken the Capital and Congress is in bedlam & locked down." Gov. Ex. 9552 (Msg. 210.T.6.2). And he sent another message to the Signal group stating: "QRF standing by at hotel. Just say the word…" EV 104.

The government argued at trial that these messages reflected "an offering to come to D.C. …outfitted with guns." Tr. 4425; Tr. 4408 ("Outfitted with what? Guns."). However, the evidence at trial foreclosed any reasonable inference that Vallejo's offers of assistance reflected a conspiratorial agreement to forcibly interrupt the certification process, much less to bring weapons

for that purpose. First, testimony and video evidence established that Vallejo never put any "guns" in his truck on January 6. Tr. 3181–84. Second, documentary and testimonial evidence established that there was no Oath Keeper plan to interrupt the certification prior to January 6, *supra*, and Vallejo could not have known that there were any in-person or telephone communications where entering the Capitol may have been discussed. Indeed, Vallejo's 2:24 p.m. offer of assistance was made ten minutes before the three-way telephone call where Meggs, Greene, and Rhodes allegedly discussed entering the Capitol just prior to Line 1 ascending the stairs. Gov. Ex. 1500.2; Gov't Ex. 1503.1; Tr. 2939. Thus, there is no basis to reasonably infer that Vallejo knew that Oath Keeper members planned to enter the Capitol by 2:24 p.m. Third, the general nature of Vallejo's initial message ("Let me know how I can assist") is inconsistent with any plan or agreement to bring weapons for offensive purposes. Finally, even if being personally armed was part of Vallejo being "outfitted," the evidence at trial established that the avowed purpose of the QRF for the Oath Keepers was to help save lives and extricate people from dangerous situations, with arms if necessary. EV 143; *See also* EV 100 (discussing use of QRF boats to "exfill, Escape and Evade"); EV 172 (discussing "a QRF that will be specifically trained for hot extract"). Except as part of a presidential response under the Insurrection Act, no document or testimony at trial suggested that "QRF" (whether as a general term or as its January 6 embodiment) would have been understood as part of any offensive, violent plan. Thus, the only reasonable interpretation of Vallejo's messages—and certainly *a* reasonable one—was as an offer of help in the context of "bedlam" and "SHTF"—the explicit purpose of the QRF. EV 400 at 4.

At trial, the government also argued that the fact that Vallejo returned to the hotel instead of remaining near the Capitol supports an inference that he had planned to be a conveyer of weapons in support of unlawful force and violence on January 6. Tr. 4409. This too is not a reasonable

inference in light of facts established at trial. First, trial evidence established that there were road closures that would have prevented Vallejo from getting near the Capitol. EV 13. Indeed, in an unintroduced portion of the January 7th "Declare Your Independence" podcast, Kandaris explained that he and Vallejo were routed out of the city by *police*:

> [W]e could only observe from afar because we were not allowed to go past the barriers of the spokes to the wheel of the center city at that point...the center of the Capitol itself, and then basically we were relegated to driving out of the city because the police and everyone were directing all that traffic out of the city and there was really nowhere to turn because they had blocked off all turns left or right and you basically had one path out of the city.

ECF 102-1 at 23 (Ex. 4). Second, evidence established that Vallejo was driving between roughly 1:20 p.m. and 2:20 p.m., and there was no evidence that Vallejo was aware of the extent of the "bedlam" at the Capitol prior to his 2:24 p.m. message. EV 104; Gov. Ex. 9552 (Msg. 210.T.6.2). Third, video evidence showed that Vallejo was not wearing any Oath Keeper insignia when he went into the city, EV 250, so he would have needed to get "outfitted" to have been recognizable as an Oath Keeper in the midst of any "bedlam." Finally, because of known "street closures" expressly discussed by the Oath Keepers, the established QRF rally points were on "the edge" of D.C. near the Lincoln memorial, not near the Capitol. EV 104 at 4. Thus, returning to the hotel and offering assistance from there would have been consistent with prior expectations of where to meet and transport people out of the city. Indeed, after his first two offers of assistance, Vallejo continued to send messages that explicitly referred to evacuation and exfil. EV 104 at 9 ("I have 2 pickups and 1 hour 11 minutes to exfil whomever needs it."); *id.* at 11 ("Evacuation of the Capitol Grounds by the NG & LEO has been ordered by the Mayor."); *id.* at 12 ("will monitor all night and transport anyone that meets us on the perimeter").[3]

---

[3] Someone named "Nick" also offered to "exfil" people. EV 104 at 10 ("I can seat 5 and exfil").

After being routed out of the city by police, there was no evidence at trial that Vallejo learned that individual Oath Keepers made decisions between 2:00 p.m. and 3:30 p.m. to interrupt the certification process—which had already been halted before any Oath Keeper entered the Capitol—much less that Vallejo agreed with such a plan. On the contrary, the only evidence at trial concerning Vallejo's knowledge of Oath Keeper activities near the Capitol prior to 4:00 p.m. consisted of (1) Rhodes asking the whereabouts of Greene and others and calling for any Oath Keepers "not on mission" to try to find him outside the Capitol; (2) debates and confusion regarding who was attacking the Capitol; and (3) references to Oath Keepers providing assistance. All other references to what was occurring at the Capitol in the Signal chat group—the only basis in evidence for determining what Vallejo knew about other Oath Keepers' actions—described the crowd generally as "patriots" or "ANTIFA" without indicating that individual Oath Keepers joined with the "patriots" to try to stop the certification process.

To be sure, there was evidence that Vallejo sympathized with the viewpoint of protesters on January 6. When Rhodes stated that "[t]housands of ticked off patriots spontaneously marched on the Capitol and sent the message that they will not live under an illegitimate ChiCom puppet regime"—spontaneously, not as part of an Oath Keeper plan—Vallejo responded that "We'll be back at 6 am TO DO IT AGAIN." EV 105. However, there was no evidence at trial supporting any reasonable inference that Vallejo agreed with or supported any forcible action to break into the Capitol or to halt or hinder the certification process. The "DO IT AGAIN" comment referred to "march[ing]" and "sen[ding] a message"—protected First Amendment activity. Moreover, it referred to repeating such First Amendment activity the next day, *after* Vallejo was known to have anticipated that the certification process was going to be over. EV 105; Tr. 4135 (quoting Vallejo's prediction that Biden would be certified that night). And evidence at trial established that Vallejo,

who was not at Capitol, (1) spent considerable energy trying to figure out whether "patriots" or "ANTIFA" forcibly breached the Capitol, and (2) believed that ANTIFA was responsible. EV 124.1B; EV 178; EV 150B. Even Vallejo's 2:32 p.m. statement early on in the events that "The People have taken the Capital," Gov. Ex. 9552 (Msg. 210.T.6.2)—which occurred before he had begun reviewing videos to determine who was responsible—did not express support for any violence or force, and used a term ("taken") that trial evidence established referred in Vallejo's mind to nonviolent "surround[ing] the Capitol building" as a means of sending a message to Congress to "do the right thing" *during* the certification process. EV 150B.

The only other relevant evidence of Vallejo's knowledge or state of mind during this timeframe in the government's case was a joke Vallejo made to Ernest Hancock at 3:47 p.m. stating, "So have you secured the Arizona capital yet, slacker? Waitin' on you now 😆." EV 124.1B at 5. But this joke was preceded *and* followed by statements reflecting Vallejo's belief that ANTIFA was responsible for the violence at the Capitol, *id*. at 2–4, 6; it referred to a building having nothing to do with the certification process; and trial evidence included multiple statements by Vallejo to Hancock referring to violence at the Capitol as "domestic terrorism" that he did not support (Tr. 4157) and approving of a video of Trump supporters stopping violence at the Capitol and opposing lawlessness with chants of "WE ARE NOT TIFA" (EV 150B, EV 903). Thus, this insensitive joke aside, there was no evidence at trial establishing beyond a reasonable doubt that Vallejo agreed with any forcible conduct by protestors seeking to hinder or delay the certification process, much less proof that he knew that *Oath Keepers*—his alleged co-conspirators—had made individual decisions to join protestors entering the Capitol in the 2:35 p.m. to 3:30 p.m. time-period with that purpose in mind.

After the events at the Capitol on January 6, discussions began on the main Signal chat group regarding what to make of the event and how to respond. In its case, the government relied on statements by Vallejo from this time period that in his view, it was not "over"; that Trump had not yet conceded; that people should continue "march[ing] and that he "had food for 30 days"; that "After action reports will be dated 1/21" (EV 175); that after the certification, "We are AT WAR"; that after the certification, Vallejo expected millions to come to D.C. and continue protesting; that after the certification, Vallejo "probe[d] their defense line"; and that after the certification, Vallejo traveled to Texas, where he expected Rhodes would be. However, the trial evidence established that from January 6 until he returned home to Arizona, Vallejo continuously sought to follow what he understood as the lawful directives of President Trump, as "Commander-in-Chief," Gov. Ex. 9554 (Msg. 1.S.159.1215), and to determine whether he had in fact conceded, EV 176.2; *see also* EV 176 (stating that there was a "POTUS directive" to go to Texas and sending articles discussing Trump's legal options); *id.* (expressing belief that President Trump was in Texas); EV 176.1 ("Situation Update" discussing Trump's legal options); Tr. 4062 (stating that Vallejo would "depart when cleared by my Commander"); *id* Tr. 4157 (establishing that Rhodes claimed to be in direct discussions with President Trump).

Moreover, even after the certification, while using "WAR" rhetoric, Vallejo was circulating the "WE ARE NOT TIFA" video castigating violent actors and calling on protestors not to act like ANTIFA. EV 178. He also condemned those who attacked the Capitol as "domestic terroris[ts]" who "hijacked" the scene by "beating on…windows" and using pre-stashed instruments like bricks and propane tanks. EV 150B. In any event, these post-certification comments and actions are ultimately tangential to Vallejo's counts of conviction, since the theory of conviction reflected in the jury's verdict is limited to a conspiracy to hinder or delay the certification process on January 6.

## LEGAL STANDARDS

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In reviewing a Rule 29 motion, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). As the D.C. Circuit has explained, "if, upon the whole of the evidence, a reasonable mind must be in balance as between guilt and innocence, a verdict of guilt cannot be sustained." *Curley*, 160 F.2d at 233. Put differently, a Court "cannot let a case go to the jury unless there is evidence of some fact which to a reasonable mind fairly excludes the hypothesis of innocence." *Id.*

When conducting this inquiry, the Court must "accord[] the government the benefit of all legitimate inferences." *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983). However, "charges of conspiracy are not to be made out by piling inference upon inference." *Ingram v. United States*, 360 U.S. 672, 680 (1959); *cf. United States v. Griffith*, 867 F.3d 1265, 1273, 1278 (D.C. Cir. 2017) (holding that a search warrant affidavit requiring three "layer[s] of inference" was insufficient even under the forgiving standard of "probable cause"). Likewise, "'[c]onjecture and surmise regarding what a defendant may have intended or known is insufficient to support a conviction' in a conspiracy case." *United States v. Stone*, No. 10-20123, 2012 WL 1034937, at *10 (E.D. Mich. Mar. 27, 2012) (quoting *United States v. Coppin,* 1 F. App'x 283, 291 (6th Cir. 2001). Rather, [t]he government is required to present evidence of the defendant's intent, knowledge of and agreement to join a conspiracy. Absent such evidence, the government's case will not succeed

merely because there is something 'fishy' about the defendant's conduct." *Coppin*, 1 F. App'x at 291.

"The elements of a conspiracy may be proven entirely by circumstantial evidence, but each element of the offense must be proved beyond a reasonable doubt." *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir.1988) (citations omitted). "One of the requisite elements the government must show in a conspiracy case is that the alleged conspirators shared a 'unity of purpose', the intent to achieve a common goal, and an agreement to work together toward the goal." *United States v. Lee*, 991 F.2d 343, 348 (6th Cir. 1993) (citation omitted). "In the absence of evidence of these essential factors, a guilty verdict on a conspiracy charge cannot be sustained." *Id.*

The issue of guilt or innocence in a conspiracy is always an individualized inquiry. *Kotteakos v. United States*, 328 U.S. 750, 772 (1946) ("Guilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application."). The government must prove the intent of each individual conspirator to enter into the conspiracy, knowing of its objectives, and agreeing to further its goals. *Stone*, 2012 WL 1034937 at *2. Moreover, when an alleged conspiracy implicates First Amendment protections such as freedom of speech and freedom of association, the court must make a "specially meticulous inquiry" into the government's evidence so there is not "an unfair imputation of the intent or acts of some participants to all others." *United States v. Dellinger*, 472 F.2d 340, 392 (7th Cir. 1972). Because the government's proofs in this case consist overwhelmingly of speech and association, the Court must take "particular care to analyze the evidence against each defendant to determine whether it is capable of convincing beyond a reasonable doubt." *Stone*, 2012 WL 1034937 at *3.

**ARGUMENT**

I.    **No Reasonable Jury Could Conclude Beyond a Reasonable Doubt that Vallejo Conspired to Forcibly Hinder or Delay the Certification Process on January 6**

The evidence at trial demonstrated that up until the very hour it started, Vallejo had no intent to stop the certification and passionately wanted to see its outcome. Then, when thousands of protestors and some Oath Keepers began traveling east toward the Capitol grounds, Vallejo was traveling west with no ability to know what individual Oath Keepers were thinking or deciding. The trial record showed that throughout the afternoon of January 6, Vallejo tried to figure out who was responsible for forcibly entering the Capitol, and there is no evidence he supported those who did. Rather, the government's case against Vallejo consisted of (1) a guilt-assuming, evidence-eschewing interpretation of offers of *help* that were entirely consistent with the hypothesis of innocence; and (2) Vallejo's statements and actions concerning how to respond to the post-certification environment that, while heated, bore no relationship to the certification process, were accompanied by condemnation of those who acted violently on January 6, and occurred in the context of seeking direction from the President. On this record, the jury's conviction of Vallejo for allegedly conspiring with those who entered the Capitol without his knowledge or approval cannot survive the "specially meticulous inquiry" the Court must make to ensure there is no "unfair imputation of the intent or acts of some participants to all others." *Dellinger*, 472 F.2d at 392.

A.    **The evidence established that there was no Oath Keeper plan to disrupt the certification—by force or otherwise—prior to the afternoon of January 6**

There does not appear to be a dispute that there was no Oath Keeper plan to interrupt the certification process by force prior to January 6. The government did not introduce any witnesses or documentary evidence indicating that interrupting the certification process was something the Oath Keepers considered prior to January 6. On the contrary, all of the government's fact witnesses

confirmed that there was no plan to do anything relating to the Capitol until right up to the moment people went there, and no plan to enter the Capitol by those who entered until moments before they did. *See* Tr. 3581–82 (Herrington) ("A. We heard explosions, and naturally it's what – I don't know if it's what normal people do, that's what soldiers do, they look toward the direction of the sound, and we saw smoke so we started moving toward that area, sir. Q. And at that point, no one had told you that it was the plan for you to go to the Capitol, right? A. No, sir. It was more or less, There's something bad happening over there, we need to get there over and see what's happening."); Tr. 3892–93 (Ulrich) ("Q. And at no point on the 5th or the 6th did you have any conversation with anybody about using force to interfere with whatever proceeding Congress was going to conduct that day, did you? A. Correct."); Tr. 3921–22 (Ulrich) ("Q. When you came to Washington, D.C., you had no plan to try to stop the certification, correct? A. No. Q. And you had no plan to try to violently or forcibly keep Joe Biden out of the White House, right? A. No….Q. So no Oath Keeper that you ever spoke with discussed with you a plan to forcibly stop Joe Biden from becoming President, correct? A. Correct."); Tr. 2665 (Berry) ("Q. You planned to be there for security detail, correct? A. That was the original intent, yes, ma'am."). Indeed, in the first trial, the government conceded that there was no prior Oath Keeper plan to enter the Capitol or interrupt the certification process. *See* Trial 1 Tr. Tr. 9911:8–11 (Nov. 18, 2022) ("The defendants are not charged with entering into an agreement ahead of time, ahead of January 6th, to storm the United States Capitol. That is not the allegation in this case."); Trial 1 Tr. 10296:5–8 (Nov. 21, 2022) ("Let me be clear on behalf of the United States of America, we do not allege a specific plan to storm the United States Capitol. We never have and we are not now. We do not have to prove a plan.").

Forced to concede that there was no plan to interrupt the certification process until moments before Oath Keepers ascended the Capitol steps—or in the case of Ulrich, moments

before he crossed the threshold into the Capitol—the government attempted at trial to argue that the "plan" agreed to by the conspirators was to *generally* "use any means necessary including using force to stop the transfer of power from President Donald Trump to President-Elect Joe Biden." Tr. 888; Tr. 4426 ("[T]he conspiracy began with the broad goal of stopping the transfer of power by any means necessary up to and including the use of force…."). There are three problems with this argument, however.

First, even this "broad" conspiracy claim was contradicted by witness testimony. Brian Ulrich was asked whether he had or was aware prior to walking up the Capitol steps of a "plan to try to violently or forcibly keep Joe Biden out of the White House." Tr. 3921. He denied any such plan. *Id.*; *id.* at 3922 ("Q. So no Oath Keeper that you ever spoke with discussed with you a plan to forcibly stop Joe Biden from becoming President, correct? A. Correct.").

Second, the government's formulation of an agreement to stop the transfer of power "by any means necessary, up to and including the use of force," Tr. 4426, is too vague to qualify as a well-pled conspiratorial agreement. Although an "agreement" does not require the conspirators to agree on all the details of their criminal scheme, the government is required to show the "essential nature of the plan." *United States v. Treadwell*, 760 F.2d 327, 336 (D.C. Cir. 1985) (citing *Blumenthal v. United States*, 332 U.S. 539, 557 (1947)). This is because it is "essential to determine what kind of agreement or understanding existed as to each defendant." *Id.* This means that the government must show that the co-conspirators "agreed to the same *type* of conduct." *Id.* at 337 (emphasis in original). And, as charged and convicted, this means the government was required to prove beyond a reasonable doubt that each conspirator agreed to specifically hinder or delay the *certification* by force.

Finally, the government's dozens and dozens of blue bubbles discussing the use of force, upon which it relies for its claim that there was a general agreement to stop the transfer of power by force, *uniformly* refer to resistance to a perceived unconstitutional "regime" *after* the transfer of power. In example after example, at trial and in its opposition to the Trial 1 defendants' Rule 29 motion, the government pretended that calls for resistance to the Biden administration after January 20th reflected calls to use violence to stop the certification on January 6th or to somehow stop his inauguration. As discussed above, Rhodes repeatedly and publicly made comments such as, "either Trump gets off his ass and uses the insurrection Act to defeat the ChiCom puppet coup, or we will have to rise up in insurrection (rebellion) Against the ChiCom puppet Biden. Take your pick." Gov. Ex. 6778 (Msg. 1.T.2186.50); *see also id.* (Msg. 1.S.233.1513) (To GA OK General Chat: "If he doesn't use the Insurrection Act to keep a ChiCom puppet out of the White House, then we will have to fight a bloody revolution/ civil war to defeat the traitors.")) But these calls for rebellion against the Biden Administration, on their face, simply did not contemplate taking violent action prior to January 20th, or even in the days or weeks afterwards, except as part of a President-sanctioned call under the Insurrection Act. Prior to inauguration, until the last day, Rhodes continued to pin his hopes on President Trump taking action. Tr. 4068.

In a prominent example relied upon by the government at trial, Rhodes wrote on December 21, 2020:

> We need to push Tump to do his duty. If he doesn't, we will do ours.
> Declare Independence.
> Defy
> Resist
> Defend
> Conquer or Die
> This needs to be our attitude.

Gov. Ex. 5310 (Msg. 1.S.656.9254). Immediately after writing this, however, Rhodes made clear that his calls for violence did not relate to the transfer of power or even its immediate aftermath. He wrote:

> That's what we need.
> Delegitimize them.
> Mock them.
> Make fun of them.
> Thumb your nose at "Gropy Joe, the Pretender-in-Chief" and "Heels Up" Harris, his Vice (Ridden) Pretender.
> Tar and feather them and hang them in effigy.
> Make it fun.
> But also make it deadly serious that we won't comply. We will nullify.

EV 141. Asked about this message, Caleb Berry was forced to admit that Rhodes' call to action was about resisting the Biden Administration down the road, not about resisting the transfer of power *to* Biden. *See* Tr. 2737 (Berry) ("Q. But nullify in American history has happened when people thought the U.S. Government was doing things that was unconstitutional, correct? A. Correct. Q. And what he anticipated being unconstitutional by the U.S. Government was President Biden doing things as President when he wasn't constitutionally elected, right? A. Correct. Q. Okay. So he's saying he will resist President Biden, right? A. Correct. Q. And nullify acts of President Biden, right? A. Correct…. Q. And President Biden became President on January 20th, right? A. Correct.").

The government's trial presentation and Rule 29 opposition even relied upon messages *expressly* discussing allowing the certification to proceed without any intent to use force to hinder or delay it. *See, e.g.*, Gov. Ex. 9514 (Msg. 1.S.656.9619) ("We need to surround the Capitol all the way around with Patriots screaming so they hear us inside! Scare the hell out of them with about a million surrounding them should do the trick!"); *Id.* (Rhodes: "I think Congress will screw him over. The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing. But I don't think they will listen."); *id.* (Msg.

1.S.656.10094-95) ("If Congress rubber stamps an unconstitutional fraud President Trump must defend the Constitution and we URGE him to use the Insurrection Act to do so."); Gov. Ex. 6923 (Msg. 2001.C.2 ) ("It begins for real Jan 5 and 6 on Washington D.C. when we mobilize in the streets. Let them try to certify some crud on capitol hill with a million or more patriots in the streets. This kettle is set to boil….").

Likewise, the government relied heavily on Rhodes's December open letter stating that if the President failed to take action to stop the fraudulent election results from being certified, Rhodes and others may have to "take to arms in defense of our God given liberty." Gov. Ex. 1008. But it ignores that this open letter provided instructions for Trump for a "post-Jan 6" scenario where Congress certified the electon, showing that there was no intent to disrupt it. Specifically, it discussed Trump calling forth the militia as part of a plan to hold a new, constitutional election, and states that if Trump fails to take these steps and allows Biden to assume the presidency, only then will they "take up arms" and fight an "illegitimate regime," after "declaring independence" from that "regime." *Id.*

Similarly, the government's Trial 1 Rule 29 opposition relied on Rhodes's "Critical Message for Oath Keepers and Patriots Part I," which he posted to the OLD Leadership CHAT on January 14. Gov. Ex. 9073.1 (Msg. 1.S.696.19133). In that document, Rhodes wrote:

> Now that it is regretfully becoming clear that President Trump will not be taking the decisive action we urged him to take, using the Insurrection Act and a declass/data dump, let's follow the Founders' game plan, using their strategies and methods, which focused first on declarations of illegitimacy, nullification (declaring unconstitutional acts to be null and void from inception, and refusing to obey them), unified mass non-compliance with unconstitutional and oppressive actions and then on self defense, mutual defense, and resistance when the domestic enemies of the Constitution come for us. That's how the Founders did it, and it worked. There is nothing new under the sun. Let us adapt their game plan to our current situation.

*Id.* But in focusing on the revolutionary nature of the message, the government ignores that Rhodes is clearly talking about a plan of longterm resistance to a post-inauguration, post-transfer of power administration, after formal declarations of independence and illegitimacy.

It may be true, as the government argued in Trial 1 and in rebuttal in Trial 2, that these messages by Rhodes and others amounted to prospective calls for sedition down the road against the Biden administration should it take office. But they do nothing to demonstrate that the Oath Keepers had reached a criminal agreement *prior* to January 6 to stop the transfer of power "by any means necessary, up to and including the use of force." Tr. 4426. There was simply nothing in the government's trial presentation to support the conclusion, much less beyond a reasonable doubt, that one of the agreed-upon purposes of the Oath Keepers' January 5–6 "Op" was to forcibly resist the transfer of power on their own if President Trump failed to persuade Congress or failed to invoke the Insurrection Act.

Rather, the trial evidence abundantly established that the anger and frustration reflected in these sorts of messages caused *some* of the Oath Keepers to react to a spontaneous and unplanned situation on January 6 by joining the crowd of protestors and entering the Capitol building. While there was evidence that there were discussions and agreements reached by at least some who entered the Capitol that day, the trial evidence abundantly established that any such discussions took place immediately before Oath Keeper members ascended the stairs of the Capitol—and no sooner. And the evidence established that there were separate decision points reached by Line 1 and Line 2, with neither group making a joint decision with the other, *and* that even *within* each line there were separate individual decision points, with members of each group staying back while other members went into the Capitol (*e.g.*, Cummings in Line 1 and Jackson in Line 2, Tr. 3887–88).

**B.    There was no basis to conclude beyond a reasonable doubt that Vallejo knew about, much less joined, any late-formed agreement to stop the certification**

Since no reasonable juror could conclude that any Oath Keepers planned to forcibly interfere with the certification process any sooner than *moments* before Oath Keepers ascended the Capitol steps around 2:35 p.m., no reasonable juror could find beyond a reasonable doubt that Vallejo joined in such an uncommunicated plan. Indeed, Vallejo's 2:24 p.m. offer of help—which stated simply, in a time of chaos, "Let me know how I can assist," EV 104 at 7—was sent *before* any of the alleged conspiratorial decision points were even *reached*: before the Meggs-Greene-Rhodes telephone call, before the Line 1 "huddle," before the Line 2 golf cart ride, and before Ulrich's hesitation on the stairs. No reasonable juror could conclude that Vallejo's offer was part of a conspiracy to forcibly interfere with the certification that had not even been formed yet.

Nor was there any evidence at trial that Vallejo was ever made aware during the afternoon of January 6 that Oath Keepers from Line 1 and Line 2 had decided to join protesters in an attempt to hinder the certification process. He was seven miles away, and there were no messages in the "DC Op: Jan 6 21" Signal chat that would have clued him into such a conspiratorial agreement; indeed, Oath Keepers were generally posting self-serving descriptions of assistance. The fact that Vallejo had been planning to go into D.C. that morning (as he had the previous day) rebuts any inference that he was part of an agreed-upon plan to serve as a conveyor of weapons that day, particularly since he left the hotel at the worst possible time if that was his intent. And while Vallejo referenced "QRF" in his 2:38 p.m. message, evidence at trial established that the QRF was expected to be an emergency response force that would "save lives" "if things went really bad" and could "get folks OUT, sick, hurt, just too cold" and "get them home." EV 143; Tr. 2478–79; Tr. 2665–66.

On this record, any conclusions about what Vallejo knew or intended from seven miles away would simply reflect impermissible "'conjecture and surmise,'" *Stone*, 2012 WL 1034937 at *10 (quoting *Coppin,* 1 F. App'x at 291), rather than proof beyond a reasonable doubt of his "intent, knowledge of and agreement to join a conspiracy," *Coppin*, 1 F. App'x at 291. *See also Wexler*, 838 F.2d at 91 ("In a series of cases, this court has been obliged to overturn conspiracy convictions because the defendant was not proven to have knowledge of the illegal objective contemplated by the conspiracy. The inferences rising from 'keeping bad company' are not enough to convict a defendant for conspiracy.").

While Vallejo's many real-time condemnations of those who broke into the Capitol or acted violently could *conceivably* have been a self-serving form of covering of his tracks, as the government argued, and while Vallejo could *conceivably* have abandoned his oft-repeated desire to see the outcome of the certification process, the opposite is equally if not more plausible. As a defendant who never expressed any desire to interrupt the certification; expressed excitement about anticipated objections, EV 122; EV 123; EV 130; talked about waiting and watching its outcome on the very morning of January 6, Gov. Ex. 1054; was not on any prior Oath Keeper chats or conference calls; came to Washington independently to "support the process and the president," EV 101, and to hold Congress's "feet to the fire," EV 101.1, after watching a podcast calling for lawful, peaceful protests, EV 139; was wandering around downtown D.C. truck-less when the certification started, EV 801; condemned violence at the Capitol as "domestic terrorism," Tr. 4157; was seven miles removed from the events at the Capitol; never communicated with any other Oath Keepers by phone or text during the events at the Capitol; was never given any weapons to store by any other Oath Keepers; had never been seen and was not known by any of the Oath Keepers who entered the Capitol, Tr. 2738–39; was limited to reading messages describing positive Oath Keeper conduct

on the "D.C. Op: Jan 6 21" Signal chat on January 6; viewed videos of Trump supporters stopping violence at the Capitol and opposing lawlessness on January 6, EV 150B, EV 903; and offered his trucks and assistance well before there was even any conspiratorial agreement by those who entered the Capitol, EV 104, it simply cannot be contested that "the hypothesis of innocence" regarding any conspiracy to interrupt the certification cannot been ruled out, *Curley*, 160 F.2d at 233, and that no reasonable juror adhering to the requirement of avoiding assumptions and conjecture could have failed to harbor reasonable doubts.

That is not to say that the record is void of violent rhetoric by Vallejo or expressions of support for the protestors who surrounded the Capitol. Regardless of how upset Vallejo was at the certification outcome, however, or how literal his references to "war" may have been, the evidence at trial was uniform in establishing that Vallejo was eagerly awaiting the outcome of the certification all the way up to January 6 and that all of his heated rhetoric referred to a post-certification scenario that he was waiting to see unfold. Since the jury's verdict was based solely on hindering or delaying the certification process, and not any general opposition to the authority of the United States in the post-certification context, Vallejo's statement on January 7 that we are "AT WAR" and other post-certification activity cannot support a conclusion beyond a reasonable doubt that he knew about and joined in a criminal conspiracy with those who entered the Capitol that afternoon. *See Stone*, 2012 WL 1034937, at *13 ("It stands to reason that most, if not all, of these Defendants had a strong dislike—perhaps hatred—of the Federal Government and law enforcement at every level….The evidence certainly suggests that Stone strongly believed in the idea of a need to go to war with certain enemies….But, the Court would need to engage in conjecture and surmise to find sufficient evidence that Defendants 'shared a 'unity of purpose', the intent to achieve a common goal, and an agreement to work together toward the goal.'") (quoting *Wexler*, 838 F.2d at 90).

Any contrary conclusion would simply be impermissible and insufficient "conjecture and surmise" about what was in Vallejo's mind on the afternoon of January 6, *Stone*, 2012 WL 1034937 at *10, based at most upon "layer[s] of inference," regarding how he felt about how to respond on January 7th and beyond, *Griffith*, 867 F.3d at 1278. That is especially true if the Court undertakes, as it must, a "specially meticulous inquiry" into the government's speech-based evidence to ensure there is no "unfair imputation of the intent or acts of some participants to all others." *Dellinger*, 472 F.2d at 392.

## II.    Co-Defendants' Memorandum

In addition to the above points and authorities, Defendant Vallejo respectfully adopts the points and authorities in the Trial 1 defendants' Amended Memorandum of Points and Authorities in further Support of their Rule 29 Motion (ECF 435-1).

CONCLUSION

For the foregoing reasons, Defendant Vallejo respectfully requests that the Court enter a judgment of acquittal on all counts.


February 28, 2023                                   Respectfully submitted,

                                                   /s/ Matthew J. Peed
                                                   Matthew J. Peed (D.C. Bar No. 503328)
                                                   CLINTON & PEED
                                                   1775 I St. NW, Suite 1150
                                                   Washington, D.C. 20006
                                                   (202) 919-9491 (tel)
                                                   (202) 587-5610 (fax)

                                                   *Counsel for Defendant Edward Vallejo*