**UNITED STATES DISTRICT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-cr-00015-APM** |
| | ) | |
| **STEWART RHODES, et. al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

**DEFENDANT ROBERTO MINUTA'S MOTION FOR A NEW TRIAL PURSUANT TO FED.R.CRIM.PROC. Rule 33**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
*Attorney for Defendant*

NOW COMES Defendant Roberto Minuta by and through his counsel of record, William L. Shipley, Esp., and moves this Honorable Court for a new trial pursuant Federal Rules of Criminal Procedure 33.

## I.     INTRODUCTION

Defendant Roberto Minuta was convicted at the end of a fundamentally unfair prosecutorial endeavor by the United States Department of Justice, aided by procedural decisioning that placed him in a forum and trial where the obligations of the Government to prove his individualized guilt beyond a reasonable doubt were largely set aside.

The miscarriage of justice in this case began with the Government's tactical decision to charge Minuta with only felony offenses, notwithstanding the fact that he was certainly guilty beyond a reasonable doubt of being on restricted ground, and for having entered the Capitol building when it was closed to the public.  The Government elected to not charge Minuta with those crimes – as it has charged hundreds of other January 6 protesters – because it sought to deny the jury the opportunity to convict Minuta only on those misdemeanors while acquitting him on the felonies.  The purpose of this gambit was to give the jury only two stark options – convict Minuta of felonies on highly dubious legal and factual grounds, or acquit Minuta on all counts and convey the unacceptable public message that he had done nothing wrong on January 6.

The Government's tactical charging decision was then compounded by the Court's determination to 1) not grant a requested change of venue, and 2) dividing defendants into two groups for trial because of logistical issues.  The

fact that the District Court for the District of Columbia lacks a courtroom large enough for a joint trial of all defendants created an artificial joinder of some defendants and severance of other defendants in a way that worked a fundamental miscarriage of justice in the presentation of evidence in the two trials.

Minuta was joined for trial with three individuals he had never met prior to January 6, and with whom he never interacted on January 6. Yet, the presentation of the evidence forced Minuta to be subject to the jury's consideration of 1) firearms training of some members of the Florida chapter that predated the conspiracy; 2) hundreds of messages displayed from Florida-only Signal chats; 3) the bombastic, incendiary and prejudicial messaging of Kelly Meggs, the leader of the Florida chapter to other members of the Florida chapter; and the bombastic, incendiary, and prejudicial messaging and publicly broadcast commentary of Edward Vallejo – much of which would have been excludable under Rule 403 had they not been joined for trial.

In addition, the Government played video of the alleged QRF at the Comfort Inn hotel when there was no evidence that Minuta knew of the presence of any firearms in the vicinity of D.C. on or about January 6.

Minuta did not know his three co-defendants at trial. He had no contact with any of them until all were out of the Capitol, and the only "contact" at that point was when the entire group of 25 or so members met in one location before departing separately.

He expressed no support for their views as expressed by them over the period of the alleged conspiracy. He did not participate in any of the running

3

"commentary" on Signal or elsewhere with any of them.  Yet was made to sit
beside them during 5 weeks of trial while the jury heard this evidence, and
then had to rely upon the legal fiction that jurors would be able to
"compartmentalize" the evidence they heard and render verdicts with
particularity based only on the evidence as it applied to each defendant
individually.

The "fiction" in that legal fiction is revealed in the jury's verdicts against
Mr. Minuta.

The root cause of the problem was the inability of the District Court's
infrastructure in this District – not the Honorable Trial Judge – to provide a
physical forum where the evidence could be presented and considered in a
manner that did not introduce fundamental unfairness into the trial.  Chief
among the problems created was the fact that the jury in the first trial observed
and heard testimony from both Stewart Rhodes and Thomas Caldwell, giving
them an opportunity to consider the context of evidence presented by the
Government that was not afforded to the jury for Minuta and the co-defendants
joined with him in the second trial.

It certainly cannot escape the notice of this Court that Rhodes' testimony
revealed the "carnival barker" nature of his rhetoric and the financial
motivation he possessed to "feed" the membership with his apocalyptic
nonsense in order to attract new recruits and sell more Oath Keeper
merchandise.

From Mr. Caldwell's testimony the first jury was able to understand the
fundamental "unseriousness" of Mr. Caldwell's bombast and the "Walter Mitty-

esque" nature of his personality.  Nothing evidences the importance of that evidence more than the fact that the jury in the first trial acquitted Caldwell of the conspiracy charges against him notwithstanding the mountain of inflammatory messages sent by him and his bombastic rhetoric captured on audio on January 6.

## RELEVANT PROCEDURAL BACKGROUND

On January 23, 2023, Defendant Minuta was found guilty by a jury of Count One (Seditious Conspiracy), Count Two (Conspiracy to Obstruct an Official Proceeding), Count Three (Obstruction of an Official Proceeding), and Count Four (Conspiracy to Prevent Members of Congress from Discharging Their Duties).  *See* EFC No.450.

On February 3, 2023, Defendant Minuta filed a *proforma* motion for an acquittal pursuant to Fed. R. Crim Proc. 29 or, in the alternative a motion for a new trial pursuant to Fed. R. Crim Proc. 33.  *See* EFC No. 469.  Such motion was filed with 14 days as required by each rule, and detailed Defendant Minuta's plan to further brief the matter within the time frame set by this Court.

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Interest of justice" has been interpreted in the D.C. Cricuit to mean that "granting a new trial

motion is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" United States v. Thompson, 275 F. Supp. 3d 107, 111 (D.D.C. 2017). Whether to grant a new trial is "committed to the sound discretion of the trial judge..." United States v. Reese, 561 F.2d 894, 902 (D.C.Cir.1977).

Under Rule 33, a district court is authorized to scrutinize and set aside a jury verdict much broader than the Rule 29 power to grant a motion for judgment of acquittal. United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 2000). While the burden of demonstrating that a new trial would be "in the interest of justice" rests with the defendant (United States v. Mangieri, 694 F.2d 1270, 1285 (D.C.Cir.1982)), unlike under Rule 29, when deciding a Rule 33 motion the Court is not "obliged to view the evidence in the light most favorable to the verdict, and it may weigh the evidence and evaluate for itself the credibility of the witness[s]." Kellington, at 1097. A motion under Rule 33 involves a determination by the trial court as to whether the state of the evidence is only 'marginally sufficient' such that it 'calls for a new trial in the interest of justice." United States v. Young, 2013 U.S. Dist. LEXIS 204453, *12 (D.D.C. 2013) (quoting United States v. Wiley, 517 F.2d 1212, 1217, n.24, 170 U.S. App. D.C. 382 (D.C. Cir. 1975). Thus, "by contrast to the evaluation of the evidence required under Rule 29 [for a motion for a judgment of acquittal], the court's discretion whether to grant a motion for a new trial . . . is "much broader," since the court need not accept the evidence in the light most favorable to the government, and may weigh the testimony and consider the credibility of the witnesses." Young, 2013 U.S. Dist. LEXIS at *12- 13.

### III.   LEGAL ARGUMENT AND THE EVIDENCE AT TRIAL

Specifically as to Roberto Minuta, the Government introduced the evidence of the following types:

1.  Messaging to/from/about Minuta from the various sources about which the Court is well versed.

2.  Telephone records showing call data, but not content or speakers.

3.  Relative movements of various parties over the relevant period(s) of time.

4.  Limited evidence of the historical relationship between Minuta and Rhodes.

5.  Minuta's own comments at various points in time from his self-recorded videos posted to Facebook on or after November 8, 2020, through videos of his conduct/comments on January 6, 2021.

Beyond that particular evidence, the Government introduced a significant quantum of evidence from and/or about "co-conspirators" without a particularized effort to establish when Minuta was alleged to have joined the specific conspiracies set forth in the indictment.   These various issues are dealt with individually below.

A.     There Was No Evidence of "Knowledge" in the Government's Case

The Government's case was built on the predicate that Minuta knowingly joined the conspiratorial agreements formed by others to use force to prevent the transition of power on January 6, 2021, as well as to obstruct Congress' certification of the electoral vote, and to interfere with Officers – members of Congress – in the performance of their official duties.  *See* EFC. No. 167. Superseding Indictment at 3.

But the evidence presented by the Government relied upon speculation and conjecture to find "knowledge" by Minuta specifically with regard to the alleged conspiratorial purposes.  But the Government's case lacked any evidence from which even an inference of knowledge could be argued with respect to Minuta.

Government witnesses admitted that Minuta was added as a participant in only one of the Signal chats that were relied upon by the Government – the "DC OP Jan 6 21" chat (hereinafter "DC OP chat").  The Government acknowledged that because it did not have Minuta's phone, it could not determine whether he read actually read any messages in that chat.  The only method by which the Government could offer evidence that he read messages was if he had responded to messages in the DC OP chat.

There are no Signal messages to or from Minuta in the DC OP chat so there was no evidence in the record from which an inference could be drawn that he knew of any of the messages sent by others in the DC OP chat.

Without Minuta's phone, or responses by him to messages from others, it is pure speculation rather than inference he had any knowledge of the content of the communications being sent and received by other alleged co-conspirators about the criminal objective of the alleged conspiracies.

Second, there was no testimony from any witness who was in communication with Minuta about statements made to or by Minuta from which any inference could have been drawn about Minuta's knowledge of the alleged conspiracies.  The only live witness who testified about personal interactions with Minuta during the course of the alleged conspiracies was

Brian Ulrich. Ulrich offered no testimony about comments made by or to
Minuta. But Ulrich did offer testimony which was exculpatory to the extent
that he testified there was no discussion among the second group as to why
they were going from the Mayflower Hotel to the Capitol sometime around 2:00
p.m.

Third, there was no evidence from which any inference could be drawn
from the cellular telephone call data put into evidence. It is pure speculation to
claim knowledge of the content of a phone call merely by virtue of its timing.
The Government suggested in its questioning that it could draw conclusions
from the fact that there were calls exchanged between Minuta's cell phone
number and Rhodes cell phone number just minutes before 1:00 p.m. on
January 6, and just minutes after 1:00 p.m. To encourage juror speculation
the next question asked by the prosecutor of Agent Abrams – paraphrasing –
"And what was happening at 1:00 pm on January 6?" with her obvious answer
being the start of the Congressional certification proceeding. But she admitted
she couldn't even say who was on the call much less what the actual content of
the call involved. "Inferences" drawn as to either is pure speculation.

Fourth, the physical movement of Minuta relative to others during the
course of the day on January 6 is not in dispute. He arrived from New Jersey
late in the evening on January 5. Notwithstanding the fact that he had
reserved three rooms at the Mayflower hotel – all of which were taken by
members of the "Southeast" contingent earlier in the day on the 5th – Minuta
ended up staying at the Hilton in Vienna, Virginia. According to Ulrich he met
with the second group early in the morning on the January 6 along with Josh

James, and spent the entire morning with that group prior to returning to the Mayflower Hotel with them.  He then traveled from the Mayflower Hotel to the Capitol beginning sometime after 2:00, arriving at 2:45.  The balance of his movements are largely captured on video at various points in time.

Nothing in these movements – distinct from his words or acts at particular points in time which are dealt with below -- infers "knowledge" of a conspiratorial objectives based on the movements of others.  There was no evidence that the second group even knew of the presence of the first group or their actions/movements at any time on January 6. The second group was not with them during the rally at the Ellipse.  The second group did not join them – or even the crowd – in marching to the Capitol after the rally.  The second group was not present when the first group entered the Capitol. There was no evidence that the second group was ever aware that another group of Oath Keepers had entered the Capitol until after all were outside and gathered together.

Fifth, nothing in Minuta's own words or actions evidence knowledge of the alleged conspiratorial objectives.  Without question Minuta expressed his opinions at various points in time about the electoral process and the state of politics in the country.  In evidence were his self-recorded videos following the election and posted to Facebook, and the audio of his comments at various points in time beginning around 2:30 pm as reflected in Government Exhibit 1508.

The videos posted on Facebook in the aftermath of the November 3 election are dealt with separately below.

As for the video and audio recorded on January 6, there were three components – comments while riding in the golf cards; comments made between leaving the golf carts and walking up the stairs to the Columbus Doors; and comments made once inside the Capitol.

Golf Cart Ride:

FBI Agent Abrams acknowledged that much of Minuta's commentary while riding in the golf cart was about things that had not actually happened, or things he had not actually seen at the time of his comments, i.e., he was simply repeating what he had learned from others.  The transcription attached to the Government summary exhibit reads as follows, picking up with the first Minuta commentary:

> "Headed to the Capitol building, patriost storm the Capitol Buidling.  There's violence agaist patriots by the DC police so we're en route in a grand theft auto golf cart to the Capitol Building right now."

> "What's up guys.  In DC, patriots are attempting to storm the Capitol building right now.  We're headed there in a golf cart.  Be there in about 30 seconds or so.  Stand by."

> "James: Hey, pull the Capitol up o n your phone.  That way if we can try to cross cut, I can't see, we've taken so many back roads, can you pull it up on your GPS?
> Minuta:  Yeah
> James: I know, it's fine.
> MInuta:  It's going down guys.  It's literally going down right now. Patriots storm the Capitol building."

As acknowledged by Government witnesses, in none of those first three audio segments was Minuta in sight of the Capitol building.  He could not actually see anyone "storming the Capitol."  Ulrich testified that while they were in the hotel room, they watched some of the live feed on television of the

events unfolding at the Capitol, including scenes of violence between police and

protesters.  The Summary Exhibit continued:

> "Minuta:   Fucking war in the streets right now.  Oh my god.  Oh my god.
> James: Don't you fucking do it.
> Minuta:  Oh. Here we are. Capitol baby. It's going down.  Parking?
> James:  Yeah.
> Minuta:  I'm just gonna stick this in my pocket and livestream, alright?"

As Special Agent Abrams testified, there was no "war in the streets"

where Minuta was – or anywhere else in D.C – and he still wasn't insight of the

Capitol building to see what was actually taking place.  It's just hyperbolic

commentary about non-events and things he can't even see.

> "James: Okay, we need to go, where the fuck are we going? Hey we're at
> 3rd, we gotta remember our location, we're at 3rd and what?
> Unknown:  They said they got in.
> Minuta:  They said, word is that they got in the building. Let's go."
> The suggestion by the Government – or the urging of the inference that

"they" was a reference to the first group of Oath Keepers -- is betrayed by the

fact that it's a stranger who first gives that information to Minuta, and Minuta

immediately repeats it into his livestreaming video.  It's nothing more than

crowd-sourced information.

If "they" is only a generic reference to protesters, then it is not evidence of

any knowledge by Minuta of what was happening with first group in this time

frame – which the Government places around 2:35, just prior to the first group

entering through the Columbus Doors.

> "Unknown:  Good job guys.
> Unknown: Go fight some congressmen.
> Minuta:  Thank you."

In context and in sequence it is unreasonable to draw the conclusion

that Minuta was responding "Thank you" to the comment "Go fight some

congressman." The audio is unclear whether the "Unknown" is two different speakers or only one. In context, "Good job" – whatever the speaker's reference might have been – is politely responded to with a "Thank you" regardless of whether Minuta understands the speaker's reference.

To respond "Thank you" to an unsolicited comment "Go fight some congressman" is inapposite.

Minuta's Comments Outside the Capitol.

After abandoning the golf carts and walking to the east side of the Capitol, Minuta was captured on video and audio while he berated Officers maintaining a perimeter on the east side.

> "James: Right now we're we're on an elevated position, so we can kinda see a little bit of everthing...
>
> Minuta:  Here, I'll just show you the front lines of America where everybody's been bought and paid for and wanna keep their jobs, don't give a fuck about the people that they swore an oath to, and they stand here and they know their government is completely criminal, completely corrupt, and they fuck us over when they wanna keep their fucking paycheck when the won't even have a country. They won't even be able to feed their families pretty soon.  Will not even be able to feed your families.  It's not a joke.  It's not a joke."

Setting aside for a moment the question of Minuta's pausing to engage in this diatribe outside the Capitol while – according to the Government -- being en route to assist the first group in their efforts inside the Capitol and how that is consistent with the Government's theory, the more significant issue is to whom is this diatribe aimed?  If it is not aimed at the Congress – and the language makes clear that the target of his outburst is the Officers -- how is it evidence of knowledge of conspiratorial agreements to interfere with the

transfer of power, execution of any law, an official proceeding, or members of Congress engaged in their official duties?

He did nothing other than yell mean words.  Mean words directed at the police officers standing outside.  The audience and target of the diatribe are the police officers, not members of Congress inside the Capitol.  These officers are maintaining a static perimeter near the northeast corner of the Capitol building.  There is no physical violence or confrontation between these officers and any members of the crowd, including the Oath Keepers shown in the video.

Not only was there no violence seen or engaged in by the second group outside the Capitol, the CCTV video showing the second group's entrance into the Capitol through the Columbus Doors shows not only did they NOT push past the Officers at the door, they were actually "nodded" in through the doors by the Officer in the bicycle helmet standing less than five feet from Officers Carrion and Salke, and directly facing them.  Minuta, James and Walden walked BETWEEN the two sets of officers as they entered without any effort being made to obstruct their way.  In fact, Officer Carrion testified that he was "scanning" the room looking for possible weapons, and in the video you can see him putting his hand on Minuta's chest causing Minuta to show him his iPhone, at which point Officer Carrion takes his hand off Minuta and allows him to pass into the Capitol.

Up to this point in time – approximately 3:15 pm -- there no evidence from which a reasonable inference could be drawn that Minuta had knowledge of any of the three alleged conspiratorial agreements as charged in the indictment.

The next significant event in the time sequence is Josh James' violent outburst directed at Officer Mendoza. This came after a short period of time during which James was engaging in conversation with Officers Mendoza and Jackson as testified to by Officer Jackson, including James asking both officers if they wanted to get out. The video clearly shows that James ONLY because agitated and aggressive after Officer Mendoza used his left hand to strike James on the left side of his face. Whether Officer Mendoza was justified is not the issue. The simple fact is that James' reaction was spontaneous and came only in response to Officer Mendoza's hand making contact with James' face.

What is not in dispute is that at the moment this happened, Minuta was separated from James by approximately 10 feet and a few protesters in between them. Minuta was standing behind James near the doorway entrance to the Rotunda, holding his hand up to record events on his cellphone. The incident involving James and Officer Mendoza set off a serious of scuffles across the line between protesters and Officers, causing protesters behind James to push forward into the police line. Several videos show Minuta being pushed forward at this point by the crowd behind him —including the only video exhibit introduced by Minuta – the CCTV camera view looking inside from above the Columbus Doors in the direction of the Rotunda Doors. Minuta kept his iPhone in his right hand trying to capture events – he's certainly not "pushing" anyone with that hand. For only a moment he put his left hand on the shield being wielded by an unknown person who had taken it away from an officer standing next to Officer Mendoza by the side of the doorway. Minuta's

left hand is not on the handle of the shield and he is not pushing on the shield in the moment that video shows him touching the shield.

Video evidence showed that as soon as Minuta was able to extricate himself from the position in the crowd he did so and he headed for the Columbus doors and exited the Capitol building.

Nothing about that sequence of events could reasonably "infer" knowledge by Minuta of the three conspiratorial objectives as alleged. He was an observer of what James did – not a participant in it. He was momentarily caught between the press of the two sides and exited as soon as he was able.

The FACTS are that he was "merely present" when James was drawn into an encounter with the police, over-reacted to the actions of Officer Mendoza, lost his temper and engaged in violence directed at the Metropolitan Police Officers in front of him.

Mr. Minuta did none of those things. Even while still in the building, afte his diatribe outside, he didn't make contact with any Officer and worked to exit the building as fast as he could when able to do so.

B.    Lack of Evidence of Knowledge of that "Force" was to be Used.

Count One charging seditious conspiracy has as part of its conspiratorial objective the requirement that the conspirators knew of and agreed that "force" would be used as part of the achieving the object of the conspiratorial agreement.

There was no evidence introduced from any witness that Minuta had any knowledge of or involvement with the armed "QRF" – whatever the purpose of that unit might have been.

Unlike other alleged co-conspirators, there was no evidence of Minuta bringing a firearm to Washington D.C. or suburban Virginia (hereinafter "DC/VA") with regard to January 6 or any other time.  There was no evidence he discussed bringing firearms or that others might bring firearms to DC/VA.

As noted above, because there was no evidence that he read any of the "DC OP chat" messages, there was no basis to infer his knowledge regarding "use of force" from the exchange of messages by others about the QRF with firearms in Virginia.

The jury was instructed that in order to find a defendant guilty of conspiracy as to Count One, they need to find:

> "the defendant conspired or agreed with at least one other person with the goal of opposing <u>by force</u> the authority of the Government of the United States, or preventing, hindering, or delaying the execution of any law of the United States <u>by force</u>.

The Government's theory to satisfy the "by force" aspect of the conspiratorial agreement hinged on the claim that the Oath Keeper groups had a prepositioned an armed QRF in suburban Virginia, and that at least one function of the QRF was to be able to project force into the District of Columbia if that was necessary and the opportunity presented itself.

In order for a conviction of Minuta to stand, it was necessary for the Government to prove that Minuta had actual knowledge of each of the aspects of the conspiracy, and central to the "seditious conspiracy" is the planned use of force as part of the agreement.

There was <u>no evidence</u> that Minuta had any actual knowledge of anyone bringing firearms to DC/VA.  He arrived late at night of January 5 and

departed on the afternoon of January 6. The Government established the timing and route of his travel with records showing his flight from Dallas-Ft. Worth Airport to Newark Airport on the afternoon of January 5, and placing him at various locations while driving from New Jersey to D.C. that same night. He stayed at the Hilton Garden Inn in Vienna, Virginia but there was no evidence offered about what – if anything – took place there.

The <u>only</u> witness called by the Government who interacted with Minuta at any time during the entirety of the alleged conspiracies was Ulrich. Ulrich first met Minuta on the morning of January 6, and said Minuta was not with the second group during the afternoon and evening of January 5. Ulrich offered no testimony about discussions with Minuta regarding the events of January 6. He expressly testified that there was no discussion in the second group about why they were going from the Mayflower Hotel to the Capitol after 2:00 p.m. on January 6.

No other Government witness testified about speaking to Minuta – or even knowing him -- at any point during the period of the alleged conspiracies.

No witness testimony, no messaging with others, and no evidence at the substance of any telephone communications leaves the Government with no evidentiary basis from which the jury could infer "knowledge" about the critical aspects of the "seditious conspiracy" charge, i.e., that Minuta knew of and agreed to the planned use of "force" to accomplish the conspiratorial objectives of Count One.

C.    No Evidence of Knowledge by Minuta that the Congressional <u>Certification Proceeding was Ongoing or Suspended</u>.

Defendant Minuta was convicted of both conspiring to obstruct with the Congressional certification of the Electoral College vote (Count Two) and actually obstructing that certification (Count Three).

The Government's case included no evidence – direct or indirect – that Minuta knew the Congressional certification proceeding was still underway when he approached and entered the Capitol building at approximately 3:14 p.m. on January 6 – more than two hours after the proceeding was schooled to begin, and almost one hour after the proceeding had been abandoned due to protesters having entered the Capitol.

The jury was instructed that in order to convict a defendant on the conspiracy to obstruct the Congressional proceeding they had to find beyond a reasonable doubt that:

> [T]he defendant conspired or agreed with at least one other person with the goal of committing the crime of obstructing an official proceeding.

As with the "by force" aspect of Count One, the Government presented no evidence that Minuta had knowledge of the Congressional certification proceeding taking place on January 6, or that he was in D.C. on January 6 for any reason connected to the scheduled proceedings at the Capitol – as opposed to the rally at the Ellipse, which was a separate event.  Minuta was not involved in Signal/text message exchanges with other Oath Keeper members, he had no social media presence describing his plans for attending anything happening, he had no contact with Kelly Meggs or Steward Rhodes in advance of January 6 from which knowledge of their alleged plans in that regard might have been made known to him.  The only witness who testified to such a plan

19

was cooperating defendant Caleb Berry – attributing to Kelly Meggs the announcement of a plan to interfere with the vote certification.

The Government presented no evidence that Minuta knew of Meggs' plan at any time on or before January 6.  Ulrich's testified that there was no discussion about why the second group was going to the Capitol on after 2:00 p.m., other than co-conspirator Grods telling him they were going to "meet other Oath Keepers."

At the time the second group reached the east side of the Capitol and approached the steps to the Columbus Doors there was no violence taking place between the protesters and officers.  The Columbus Doors were open and people were entering and exiting the building.

The second group followed a line of approximately 8 U.S. Capitol Police Officer up the steps to the plaza area outside the doors where both remained for approximately 3 minutes.  At 3:14, three members of the second group – James, Minuta and Walden – walking through the Columbus Doors and into the building directly behind the group of officers they had followed up the stairs. There was no violence between protesters and Officers on either side of the door.  Immediately <u>after</u> the three entered, there was a push from protesters behind them to enter the building, causing Officer Carrion to put his hand on Walden's back and pull him and his dog into the building and out of the way.

That push through the police at the door did NOT involve any Oath Keeper members – they were already inside when it occurred as is shown clearly on the Exh. 1508 introduced by the Government.

20

As for the substantive violation of Sec. 1512(c)(2) there was no evidence presented at trial that when Minuta entered the Captiol building at 3:14 p.m., as established by CCTV video, that he knew there was a proceeding taking place, or that the earlier proceedings had been suspended/delayed while protesters were inside the Capitol.

The undisputed record is that the Congressional certification proceeding began at 1:00 p.m., and was suspended at approximately 2:20 due to the security risk posed by unauthorized persons having entered the Capitol.

The jury was instructed on the alleged substantive violation of Sec. 1512(c) as follows:

> Second, the defendant intended to obstruct or impede the official proceeding.
>
> Third, the defendant acted knowingly, with awareness that the natural and probable effect of the defendant's conduct would be to obstruct or impede the official proceeding.

There was <u>no evidence</u> presented that Minuta knew the Congressional certification proceeding was ongoing/suspended as of 3:14 p.m. on January 6. If the proceeding had been concluded, ipso facto there would have been no "proceeding" to obstruct.

The only commentary on the election by Minuta that was offered by the Government were the self-recorded videos that he posted on Facebook, which he recorded on November 8 and 9, 2020. When viewed in full, those videos conclusively show that Minuta was not a supporter of either major party candidate following the election. There was no evidence offered by the Government that Minuta favored former President Trump over President Biden

with regard to the "objection/certification" process under the Electoral Vote

Act. There was no evidence offered by the Government that Minuta intended to

interfere in the proceeding for the purpose of keeping President Trump in office

beyond January 20, 2021 – the very foundation of the Government's

underlying theory supporting its entire investigation/prosecution of Oath

Keeper members.

The same "lack of knowledge" problem infects the conviction on Count

Four, conspiracy to prevent members of Congress from discharging their

official duties. There is no evidence of actual knowledge by Minuta that others

had entered into agreement to accomplish that conspiratorial objective. For all

the same reasons as stated above with regard to the evidence presented, there

was no basis from that evidence to draw a reasonable inference that Minuta

had such knowledge based on the words or actions of other about which he

was aware.

    D.    Minuta's Facebook Videos Were Not Evidence of His <u>Knowledge or Intent to Join the Alleged Conspiracies</u>

The Government introduced two videos recorded by Minuta and posted

by him to Facebook posted on or after November 8, 2020. In those videos he

engaged in an extended voluble and profane commentary about his views on

the election process and the state of political affairs in the country.

There was NO evidence linking Minuta's comments in the videos to any

conspiratorial activities or planning by Stewart Rhodes or other Oath Keeper

members following the November 3 election and the controversy in the

following days/weeks.

Rhodes and other Oath Keepers participated in the national "GoToMeeting" conference call on the evening of November 9. Minuta was not on that call.

There was no evidence of contact between Minuta and Rhodes – or any other Oath Keeper – between November 3 and November 9, 2020. There is nothing – other than the timing – that links the episodes and content of the two respective recordings to each other.

The coincidental timing – and it is merely coincidental without evidence suggesting otherwise -- is not evidence of Minuta's knowledge or intention regarding Rhodes' plans if he was unaware of the discussions/plans of Rhodes and others in the same time frame.

The use by the government of these videos to show "state of mind" is particularly pernicious and a miscarriage of justice given their fundamental protection under the First Amendment as political speech and advocacy. His Facebook videos were seen by friends and family. He is expressing purely political views regarding his view of the election and faith in government officials. He had no obligation to withhold those views, and he cannot be punished through this prosecution by the Government for having expressed those views when there was no basis in the evidence that at the time they had any relationship to the alleged conspiratorial planning by others.

Presented as they were -- untethered to any alleged conspiracy that he was aware of or intended to involve himself in -- was a violation of his right to possess and express his political views in whatever colorful or vulgar language he chose to do so.

E.    <u>Admission of Summary Exhibits 1500 and 1508</u>.

Rule 1006 of the Federal Rules of Evidence provides, in relevant part, that a "proponent may use a summary, chart, or calculation to prove the contents of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Summaries of voluminous records are only admissible pursuant to this rule if they are "accurate and nonprejudicial." *See* <u>United States v. Lemire</u>, 720 F.2d 1327, 1348 (D.C. Cir. 1983). There are strict limits on the role of summary witnesses and documents. The trial must ensure that the witness or document does not "usurp the jury's fact- finding function by summarizing or describing not only what is in evidence but also what inferences should be drawn from that evidence." <u>United States v. Cooper</u>, 949 F.3d 744, 750 (D.C. 2020). "Another danger to be guarded against is that the jury will treat summary testimony as 'additional evidence or as corroborative of the truth,' rather than just a compilation of existing evidence.'" <u>Id</u>. at 750 (quoting <u>Lemire</u>, 720 F.2d at 1348). For a summary of documents to be admissible, "the documents must be so voluminous as to make comprehension by the jury difficult and inconvenient; the documents themselves must be admissible; the documents must be made reasonably available for inspection and copying; the summary must be accurate and nonprejudicial; and the witness who prepared the summary should introduce it." <u>United States v. Fahnbulleh</u>, 752 F.3d 470 (D.C.Cir. 2014) (citing <u>United States v. Hemphill</u>, 514 F.3d 1350, 1358 (D.C. Cir. 2008)).

<u>Davis & Cox v. Summa Corp</u>., 751 F.2d 1507, 1516 (9th Cir. 1985) (no error to exclude summary when it does not "fairly represent the underlying documents").

"If a summary, chart, or calculation is offered merely for illustrative or pedagogical purposes to organize or aid the presentation of a party's case, FRE 1006 is inapplicable." Christopher B. Mueller and Laird C. Kirkpatrick, Evidence 1103 (3d Ed. 2003). *See also* <u>White Indus., Inc. v. Cessna Aircraft Co</u>., 611 F. Supp. 1049, 1069 (W.D. Mo. 1985) (recognizing "distinction between a Rule 1006 summary and so-called 'pedagogical' summary," with former being admitted as "substantive evidence" while latter "is simply a demonstrative aid which undertakes to summarize or organize other evidence already admitted"). The same goes for Signal messages and statements or writings from other sources; which the government had compiled into an excel spreadsheet with no additional commentary, markings, or other argumentative elements.

<u>CONCLUSION</u>

Based on the foregoing, and pursuant to Federal Rule of Criminal Procedure 33, Roberto Minuta moves this Court to vacate the jury's verdicts of guilty, and to order a new trial on Counts One, Two, Three and Four of the indictment.

Dated: March 3, 2023                    Respectfully submitted,

/s/ William L. Shipley
William L. Shipley, Jr., Esq.
PO BOX 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*