**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 22-cr-15 (APM)** |
| | : | |
| **ROBERTO MINUTA,** | : | |
| **JOSEPH HACKETT,** | : | |
| **DAVID MOERSCHEL, and** | : | |
| **EDWARD VALLEJO,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL**

The United States respectfully opposes the motions for judgment of acquittal filed by defendants Roberto Minuta, Joseph Hackett, David Moerschel, and Edward Vallejo (ECF 479, 474, 475, and 477) and the motion for new trial filed by defendant Minuta (ECF 478). The evidence presented in the government's case-in-chief established that in the days and weeks following the 2020 United States Presidential Election, the defendants entered into an agreement to stop the lawful transfer of presidential power by any means necessary, up to and including the use of force. On January 6, 2021, the defendants, along with hundreds of other rioters, attacked and supported the attack on the United States Capitol, delayed the certification of the Electoral College vote, prevented Members of Congress from discharging their duties, and caused more than $1,000 of damage to the building. In the weeks that followed, the defendants continued to plot ways to forcibly oppose the transfer of presidential power, and they destroyed evidence of their participation in the conspiracy and the attack on the Capitol. The evidence adduced at trial in the government's case-in-chief, viewed in the light most favorable to the government, is more than sufficient to permit a rational trier of fact to find the essential elements of the crimes charged in

the Indictment with respect to each defendant beyond a reasonable doubt. Accordingly, the defendants' motions for judgment of acquittal and new trial should be denied.

## I.  BACKGROUND

### A.  Procedural Background

The Indictment charged all four defendants with seditious conspiracy, in violation of 18 U.S.C. § 2384 (Count One); conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Two); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Three); and conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Four). ECF 167. Defendants Hackett and Moerschel were additionally charged with destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361 and 2 (Count Five), for damage to the East Rotunda Doors entrance area that they aided and abetted as they breached the building. *Id.* Finally, defendants Minuta, Hackett, and Moerschel were charged with tampering with documents or other objects, in violation of 18 U.S.C. § 1512(c)(1) (Counts Ten through Twelve), for destroying digital evidence of their participation in the attack on the Capitol. *Id.*

With respect to the conspiracy charges, the Indictment alleged that between November 2020 and January 2021, the defendants entered into an unlawful agreement "to oppose the lawful transfer of presidential power by force, by opposing by force the authority of the Government of the United States and by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth and Twentieth Amendments to the Constitution and Title 3, Section 15 of the United States Code." ECF 167 at ¶ 16. The Indictment further alleged that, between December 2020 through January 2021, the defendants agreed "to

corruptly obstruct, influence, and impede . . . the Certification of the Electoral College vote," *id.* at ¶ 136, and "[to] prevent by force, intimidation, and threat . . . . Members of Congress from discharging [their] duties . . . and to induce [them] by force, intimidation, and threat . . . to leave the place where their duties as officers were required to be performed," *id.* at ¶ 140.

The trial of these defendants began with jury selection on December 6, 2022. The government presented its evidence over the twelve-day period of December 13-20, 2022, and January 3-10, 2023. At the close of the government's case, all defendants moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and the Court deferred ruling pending further briefing. 01/10/23PM Tr. at 4151-57. In the defense case, defendant Vallejo presented one witness, and then all defendants rested. At the conclusion of the evidence, all defendants renewed their motions for judgment of acquittal, and the Court again deferred ruling. 01/17/23 Tr. at 4292-93.

On January 23, 2023, the jury returned its verdict. All four defendants were found guilty of seditious conspiracy (Count One), under the "using force to prevent, hinder, or delay the execution of any law of the United States" prong; conspiracy to obstruct an official proceeding (Count Two); obstruction of an official proceeding (Count Three); and conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties (Count Four), under the "preventing a member of Congress from discharging a duty as a member of Congress" prong. Defendant Hackett was additionally convicted of tampering with documents or proceedings (Count Eleven, listed on the verdict form as "Count Seven"). Defendants Hackett and Moerschel were acquitted of destruction of government property (Count Five). The jury further acquitted defendants Minuta and Moerschel of tampering with documents or proceedings (Counts

Ten and Twelve, listed on the verdict form as "Count Six" and "Count Eight," respectively).  The sentencing hearings are scheduled to occur on May 24, June 1, and June 2, 2023.  ECF 467.

### B.  Factual Background

The evidence presented by the government established that these defendants participated in a conspiracy by members and affiliates of a group known as the "Oath Keepers" to oppose by force the lawful transfer of presidential power by, among other means, preventing, hindering, or delaying Congress' certification of the 2020 Presidential Election on January 6, 2021, and by using force, intimidation, or threats to prevent members of Congress from discharging their duties that day.  Then, on the afternoon of January 6, they did prevent, hinder, and delay Congress' certification of the election by participating in and supporting an attack on the Capitol.  As the riot began to unfold at the Capitol, defendants Hackett and Moerschel, Oath Keepers members from Florida, joined with twelve other Oath Keepers members and affiliates—many of whom were wearing paramilitary clothing and patches with the Oath Keepers name, logo, and insignia—and marched in a line or column formation ("Line One") up the east steps of the Capitol and breached the building through the East Rotunda Doors.  Once inside the Capitol, Line One entered the Rotunda and then split up.  Half of the group tried to push their way through a line of law enforcement officers guarding a hallway that led to the Senate Chamber, but law enforcement officers forcibly repelled their advance; the other half of Line One—including defendants Hackett and Moerschel—headed toward the House of Representatives, in search of Speaker of the House Nancy Pelosi.  They did not find Speaker Pelosi and ultimately left the building.  Later, another group of Oath Keepers and associates, including defendant Minuta, an Oath Keepers leader from New York, formed a second military-style column formation ("Line Two") and breached the Capitol through the same East Rotunda Doors that Line One had entered about half an hour earlier.

Once inside, defendant Minuta and another member of the group forced their way past law enforcement officers trying to guard the Rotunda, shouting at the officers to "get out" of "my Capitol."  Meanwhile, defendant Vallejo and others remained stationed just outside of the city as the "quick reaction force," or QRF, prepared to rapidly transport firearms and other weapons into Washington, D.C., in support of this operation aimed at using force to stop the lawful transfer of presidential power.   Afterwards, all four defendants sought to destroy evidence of their participation in these crimes.

### a.  Evidence of the Conspiracy

The evidence presented by the government established that, in the days after the election in November, co-conspirator and Oath Keepers leader Elmer Stewart Rhodes III proposed that he and other Oath Keepers members and affiliates forcibly oppose the lawful transfer of presidential power from President Donald J. Trump to President Joseph R. Biden, Jr.  The defendants heeded this call.  As legal challenges to the election sputtered, and President Trump gave no indication that he would invoke the Insurrection Act to halt the certification of the election result, Rhodes, the defendants, and their co-conspirators explicitly discussed the need to use any means necessary, up to and including the use of force, to oppose the transfer of power, and they began to focus on January 6 as a day of action for their objective.  Defendants Minuta, Hackett, Moerschel, and Vallejo all joined in planning with the co-conspirators to accomplish this goal, and they traveled to Washington, D.C., in the days prior to January 6.  Then, on the afternoon of January 6, the defendants and their co-conspirators seized the opportunity to advance their conspiratorial goal by participating in and supporting the attack on the Capitol.

The statements and conduct of the defendants and their co-conspirators in November, into December, and through January 6 illustrate their agreement to oppose the lawful transfer of

presidential power by force and to do so on January 6 by participating in and supporting the attack on the Capitol. And their conduct after January 6 demonstrates continued efforts to oppose by force the lawful transfer of power, evidencing their criminal intent throughout the charged timeframe of the conspiracy. Finally, their coordinated campaign to delete certain relevant evidence—in addition to being independently criminal—highlights their consciousness of guilt.

### i. After the Election through Mid-December

In the days after the 2020 United States Presidential Election, Rhodes began disseminating messages to Oath Keepers members and affiliates delegitimizing the results of the election and encouraging message recipients to forcibly oppose the lawful transfer of presidential power from President Trump to President Biden. On November 5, 2020, Rhodes told those on the "Leadership intel sharing secured" chat (also known as the "OLD Leadership CHAT") that they "MUST refuse to accept Biden as a legitimate winner" and warned, "We aren't getting through this without a civil war. Too late for that. Prepare your mind, body, spirit." Gov. Exh. 6770 (Msg. 1.S.696.12491).

On November 9, 2020, Rhodes held a private call on GoToMeeting—an online meeting site that allows users to host conference calls and video conferences via the Internet—titled, "Oath Keepers National Call – Members Only," which was attended by defendant Hackett and other co-conspirators. 12/13/22PM Tr. at 1207-19; Gov. Exhs. 1000.1 through 1000.11, 1525, 6610. During the meeting, Rhodes outlined an objective to stop the lawful transfer of presidential power, including by preparing for the use of force, and urged those listening to participate. He told those on the call, "There's no such thing as another election in this country of any meaningful sense of the term if you let this stand," Gov. Exh. 1000.1; "You're from Oath Keepers - you've got a responsibility and duty," Gov. Exh. 1000.5; and "You've got to go there [to Washington, D.C.] and you've got to make sure he knows that you are willing to die to fight for this country," Gov.

Exh. 1000.7.  Rhodes stated his intent to organize an "armed QRF" outside the city to support operations inside.  Gov. Exh. 1000.7.  He stated, "We're very much in exactly the same spot that the founding fathers were in like March 1775.  Now—and Patrick Henry was right.  Nothing left but to fight.  And that's true for us, too.  We're not getting out of this without a fight."  *Id.*  Rhodes also continued to reference a need to follow the example of Serbians who engaged in a "color revolution" to oppose the transfer of power following an election perceived as fraudulent in their country.  Gov. Exh. 1000.8.  On November 10, Rhodes echoed that sentiment in a post to the Oath Keepers website in which he urged Oath Keepers to follow the example of Serbians who had achieved regime change in their country by "[m]illions gather[ing] in [the] capital," breaking through barricades, and storming the legislature.  Gov. Exh. 1002.

The defendants and their co-conspirators echoed Rhodes' call for force.  On November 7, the day most major media outlets called the election for President Biden, 12/19/22AM Tr. at 1833-34, defendant Minuta posted a livestream video to Facebook in which he stated, among other things, "The last line in the sand is the Second Amendment, which means . . . the ability to have firearms and be a well regulated militia, every f**king able-bodied American—it's not about hunting, it's not about protecting yourself, it's about oh, wow, we are f**king past midnight with the tyranny and it is just time to restore freedom."   Gov. Exh. 2004.V.4 (at 6:08-6:36).   He continued, "And you know what?  Millions will die.  So what?  Get your f**king soul ready.  Get right with God.  Because, you know what?  I'm not afraid!  I'm not.  I'm not afraid, and I'm ready to f**king go."  That same day, defendant Minuta also posted to Facebook, "We are already in civil war, choose a side."  Gov. Exh. 6773 (Msg. 2004.P.283.11).  The next day, defendant Minuta posted to the Oath Keepers' RocketChat forum:

> Fellow patriots, take this period of uncertainty to make sure provisions and gear is set up properly! If you were called to action on short notice, what would you be

scrambling to organize, what equipment would be questionable as far as functionality?

What items have you been procrastinating on purchasing that you would wish you had? Get that gear set up and ready to deploy on a moments notice. This calm before the storm is the perfect opportunity for us to finalize preparedness.

We must be ready to be in the streets in a controlled manor (Virginia 2A rally style).

We must OVERTAKE the streets in massive numbers. Gather your trusted patriots/ veterans /LE ...Oathkeepers or not, I believe we will need all hands on deck.

This is our country and the time is now or never to save the republic And preserve what is left of our liberties. On stand by in NY/NJ.  GOD BLESS.

*Id.* (Msg. 2200.2).

On November 7, defendant Hackett sent a message to an invitation-only Signal group chat titled, "OKFL Hangout" ("OKFL Hangout Chat"), which included co-defendants and other co-conspirators, in which he stated, "Just spoke to a marine at the gun shop young guy who just got back from Afghanistan.  Gave him my number and Oathkeepers.org website and hope to get him involved.  It's a great place to recruit.  Most people are pro gun and most of them are pissed off."  Gov. Exh. 6776 (Msg. 1.S.656.3904).   Immediately after the November 9 GoToMeeting, co-conspirator Kelly Meggs, a leader in the Florida chapter of the Oath Keepers, messaged the OKFL Hangout chat, "Anybody not on the call tonight.  We have been issued a call to action for DC. This is the moment we signed up for . . . ."  Gov. Exh. 6770 (Msg. 1.S.656.4143).  Two days later, defendant Hackett posted to the OKFL Hangout chat, "Phone call in a nutshell: Ops planning for DC.  If not going to dc go to your state capital and support our president.  Then odd details with no specifics regarding rally points, the importance of being low profile or where colors and be a target for unfriendlies.  Opening and closing prayers.  Discussed more f2f and thorough vetting." Gov. Exh. 6776 (Msg. 1.S.656.4389).

The weekend after the November 9 GoToMeeting, Rhodes and other Oath Keepers, including defendant Minuta and some members of the Florida Oath Keepers, traveled to the Washington, D.C., metropolitan area for an operation to coincide with the so-called "Million MAGA March." The day before the event, co-conspirator Thomas Caldwell wrote to an acquaintance:

> Sure wish you were coming along tomorrow. If we cannot get the President another term, we are well and truly fucked. If we don't start mowing down masses of these shitballs they will come for all of us. Its kill or be killed I am afraid. I don't want to live in a communist country. I kinda hope there is some shit tomorrow in some ways just so we can get ON with it!

Gov. Exh. 9522 (Msg. 2006.T.1.335). After the operation, defendant Minuta posted to Facebook, "Was a pleasure to be part of this security detail for Infowars. REVOLUTION time. I had the pleasure of being part of the security detail with the infamous PROUD BOYS, OATHKEEPERS, and INFOWARS!" Gov. Exh. 6773 (Msg. 2004.P.583.4).

Following the November event, Meggs stepped up efforts to recruit others to the cause. On the OKFL Hangout chat, Meggs applauded new, young members like co-conspirator Caleb Berry, calling him "Patriot" and saying things like, "Well thank you for stepping up !! That sir makes you a badass!" Gov. Exh. 5721 (Msg. 1.S.656.5363). Meggs also continued to seek out firearms training for his group. On November 27, Meggs purchased a firearms training class advertised as "private training for up to five people" from a company called Combat Art Training at which he, defendant Hackett, and other co-conspirators had previously taken classes, including a "Rifleman I" class that "teaches you how to gunfight at close distance with a rifle in a fast and effective manner." Gov. Exh. 4800, 4802, 4805.1, 4807.4. Around this same time, Meggs wrote to the "OKFL Hangout" Signal group chat, "Like we were told on the call the other night , training is coming if all kinds. Let's just all commit to get involved. Even as instructors like You Cape!!

Get involved in it and help train people locally.  We need everyone to work together and train each other."  Gov. Exh. 6777 (Msg. 1.S.656.5132).

### ii.  Mid-December through Early January

Beginning in mid-December 2020, Rhodes, the defendants, and their co-conspirators began to call more directly for the use of force to oppose the transfer of power—regardless of the President's direction—and to focus on the Certification proceeding set to take place on January 6, 2021, as a day of action to advance their criminal objective.

### 1.  Focus on Force to Oppose the Government and January 6, 2021

As early as December 10, Rhodes began expressing in private circles his skepticism that the President would invoke the Insurrection Act and his belief that he and other Oath Keepers members and affiliates would need to take matters into their own hands.  In a message to co-conspirator Kellye SoRelle and two other acquaintances, Rhodes wrote, "[E]ither Trump gets off his ass and uses the insurrection Act to defeat the ChiCom puppet coup, or we will have to rise up in insurrection (rebellion) Against the ChiCom puppet Biden. Take your pick."  Gov. Exh. 6778 (Msg. 1.T.2186.50).

On December 14, the day that the Electors of the Electoral College met in their respective states and cast votes that resulted in the necessary number for President-Elect Biden to be declared the winner of the election, Rhodes told co-conspirators on the "GA OK General Chat" on Signal, "If he doesn't use the Insurrection Act to keep a ChiCom puppet out of the White House, then we will have to fight a bloody revolution/ civil war to defeat the traitors."  Gov. Exh. 4761 (Msg. 1.S.233.1513).  He later continued:

> [A]t moment I have to try to get Trump the message on the necessity of him waging war on the enemy NOW while still President and Commander in Chief.  But once I finish that, I'm going to sit down and write out my thoughts on what we can and must do, across the country, to organize effectively and to wage it and win it

> ourselves if he doesn't.  Many, many hard learned lessons from the Founders that
> modern Americans need to remember (or learn for the first time).

*Id.* (Msg. 1.S.233.1598).  Brian Ulrich, a co-conspirator from Georgia who has pleaded guilty to

seditious conspiracy for his role in the attack on the Capitol, testified that he understood Rhodes

to be talking about "civil war."  01/10/23AM Tr. at 3838-39.  He later explained that, because of

these chats, "I'm anticipating a force.  If it comes to force, then I'm prepared."  *Id.* at 3926.

Against this backdrop, the co-conspirators began to make plans for January 6.  On

December 20, Joshua James, a co-conspirator from Alabama who has pleaded guilty to seditious

conspiracy and who later helped defendant Minuta lead other co-conspirators into the Capitol on

January 6, messaged the OLD Leadership CHAT, "SE Region is creating a NATIONAL CALL

TO ACTION FOR DC JAN 6TH.... 4 states are mobilizing."  Gov. Exh. 9514 (Msg.

1.S.696.16531).  That same day, defendant Moerschel posted to the OKFL Hangout chat, "I am

going to ask off work, so I am a tentative yes to Jan 6 rally."  *Id.* (Msg. 1.S.656.8746).

By the end of December, President Trump still had not invoked the Insurrection Act, and

Rhodes began to prime his co-conspirators to act—with or without the President's orders.  On

December 21, Rhodes wrote to the OKFL Hangout chat:

> We need to push Tump to do his duty.  If he doesn't, we will do ours.
> Declare Independence.
> Defy
> Resist
> Defend
> Conquer or Die
> This needs to be our attitude.

Gov. Exh. 6778 (Msg. 1.S.656.9254).

Co-conspirators who read and heard these words in real time made clear this was not mere

rhetoric.  According to Caleb Berry, a co-conspirator from Florida who has pleaded guilty to

conspiracy and obstruction of Congress and testified pursuant to a cooperation plea agreement,

when Rhodes wrote that if Trump did not do his duty, "we will do ours," he understood this to mean that Oath Keepers including himself would need to be prepared to "fight against the federal government"; and when Rhodes wrote words like, "conquer or die," Berry said he took that to mean, "We needed to act or we would die." 01/03/23PM Tr. at 2556-57. Similarly, on December 18, 2020, defendant Minuta wrote to an acquaintance, "Oathkeepers president is pretty disheartened. He feels like it's go time, the time for peaceful protest is over in his eyes. I was talking with him last night." Gov. Exh. 6773 (Msg. 245.T.1.1). In response to a conversation on the OKFL Hangout chat about President Trump's advisors "talking him down from taking offensive action," defendant Moerschel wrote, "Lawyers always think the answer is legal. Warriors always think the answer is a gun battle." Gov. Exh. 9514 (Msg. 1.S.656.9854). In the same chat, on December 22, defendant Hackett wrote, "He sounds pissed! That's good, now just fucking do it [invoke the Insurrection Act]. We are ready." Gov. Exh. 9514 (Msgs. 1.S.656.9569-70).

On December 22, Meggs told those on the OKFL Hangout chat: "It's easy to chat here. The real question is who's willing to DIE, that's what the Patriots did by the thousands. We are worried about getting the day off." Gov. Exh. 6778 (Msg. 1.656.9322). The following day, Meggs continued, "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside! Scare the hell out of them with about a million surrounding them should do the trick!" Gov. Exh. 9514 (Msg. 1.S.656.9619). He then posted a photograph of Oath Keepers flags and wrote, "These will be flying Jan 6th in front of the Capitol!!" *Id.* (Msg. 1.S.656.9620). On December 24, Meggs wrote to the same chat, "We have 10-12 staying there. So it's gonna be a WILD time in DC we gotta get the crowd going during the day. I think we get everyone up good

and close to the Capitol bldg so they can here is inside.  Then at night well whatever happens happens." *Id.* (Msg. 1.S.656.9990).

On December 23, Rhodes published an open letter on the Oath Keepers website in which he noted that, on January 6, 2021, "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C."  Gov. Exh. 1008.  Rhodes warned in the open letter that if the President failed to take action to stop the election results from being certified, Rhodes and others may have to "take to arms in defense of our God given liberty." *Id.*

These words prompted Michael Adams, the leader of the Florida chapter of Oath Keepers, to resign his position.  Rhodes then named Meggs the "State lead" of Florida for the Oath Keepers. Gov. Exh. 6868 (Msg. 2000.T.1070).  Adams testified he stepped down because he took this letter as Rhodes "telling the President of the United States in this letter, in the text of this letter and in the previous letter, that if he didn't do this, we were."  12/16/22 AM Tr. at 1618-19.  When asked who was included in the "we" Rhodes referenced, Adams responded, "It's not me, and that was my concern."  *Id.*

Unlike Adams, other members of the Oath Keepers, including these four defendants, actively chose to be part of the group Rhodes was recruiting to "fight for our liberty."  Defendant Vallejo forwarded Rhodes' open letter to Kandaris.  Gov. Exh. 9514 (Msg. 210.T.13.19).  A few days later, Kandaris reached out to Rhodes asking how he and defendant Vallejo could get involved "as supplemental personnel" for Rhodes' January 6 operation.  *Id.* (Msgs. 1.S.859.3, 5-6, 16).  In Kandaris' words, "Everyone coming has their own technical equipment and knows how to use it 😊," and "We are rifles, man power, warm bodies there to support the process and the President." *Id.* (Msg. 1.S.859.7, 18).

13

On December 25, Rhodes wrote to the OKFL Hangout chat:

> [President Trump] is being advised to wait till the 6th in reliance on Congress.  His "legal advisors" are NOT actually advising him (not laying out all his actual options like a real staff member should, and then let him decide).  They are instead acting ags if his only option is to hope Congress does the right thing - which is extremely unlikely.  I'm working to get him to see other options and put them on the table.
>
> I think Congress will screw him over. The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing.  But I don't think they will listen.

Gov. Exh. 9514 (Msgs. 1.S.656.10094, 10096). In response, co-conspirator Graydon Young wrote to the OKFL Hangout chat, "That's what i would have guessed... one damned week left ... I'm going to DC but it feels like a fool's errand based on current events." *Id.* (Msg. 1.S.656.10095). Rhodes answered:

> It's not a fools errand.  It has benefits regardless of outcome and regardless of what we then do.  Trump needs to know we support him in using the Insurrection Act. And that needs to be the message – If Congress rubber stamps an unconstitutional fraud, President Trump must defend the Constitution and we URGE him to use the Insurrection Act to do so.  And we will support him with our boots on the ground nationwide and we will protect him, and assist him.  He needs to know that to his bones.  We need to make it clear.  And we need to have that message echoing off every roof top from now till that day.  Focus like a laser on it.  And he needs to know that if he fails to act, then we will.  He needs to understand that we will have no choice.

*Id*. (Msg. 1.S.656.10101-02).  Over the course of the next week, Rhodes and his co-defendants made their arrangements to carry out this objective.

### 2.  Logistical Plans for January 6, 2021

In late December, Rhodes, the defendants, and their co-conspirators created and administered encrypted chats on Signal with titles like "DC OP: Jan 6 21," "OK FL DC OP Jan 6," and "1776ˆ2" for coordinating their plans for January 6.  Rhodes described DC OP: Jan 6 21 as "THE DC op thread for all leadership coming in, from multiple states, and together with the overall DC op leadership."  Gov. Exh. 9514 (Msg. 1.S.159.108).  On December 30, Rhodes told

the DC OP: Jan 6 21 chat that he was "putting Don Siekerman in overall command of this op.  And then Whip [Michael Greene], Josh [James] and Kelly [Meggs] as his seconds because they have been to DC prior." *Id.* (Msg. 1.S.159.83).  On these chats, they coordinated plans for lodging and transportation and had extensive conversations about what weapons and gear they would bring, among other details. Gov. Exhs. 9514, 9557.   They also held a series of "DC planning" GoToMeetings in the week leading up to January 6.  Gov. Exhs. 1525, 1526.

As these plans grew more concrete and more violent, the group discussed the need for operational security and used encrypted communications applications, such as Signal and Proton Mail.  In the Florida group, defendant Hackett encouraged handwriting sensitive messages in cursive and attaching them to digital communications.   Gov. Exh. 4653.   Defendant Hackett explained, "I believe we only need to do this when important info is at hand like locations, identities, Ops planning."  *Id.*  Rhodes expressed the need to discuss more sensitive matters in a phone call as opposed to Signal.  Gov. Exh. 4761 (Msg. 1.S.233.1598 ("Good topic for a phone call.")).  Kandaris told defendant Vallejo he thought they should move their communications to Signal. Gov. Exh. 9514 (Msg. 210.T.4.4).

The defendants and their co-conspirators also participated in planning the logistics for the QRF that would support the operation inside D.C. with firepower.  On December 30, Caldwell updated Watkins:

> Talked to Paul [Stamey].  At least one full bus 40+ people coming from N.C. Another group (unclear if Mississippi guys) also a bus.  Busses have their own lane on the 14th street bridge so they will be able to get in and out.  Paul is driving plus 1 and arriving nite before. As we speak he is trying to book a room at Comfort Inn Ballston/Arlington because of its close-in location and easy access to downtown because he feels 1) he's too broken down to be on the ground all day and 2) he is committed to being the quick reaction force and bringing the tools if something goes to hell.  That way the boys don't have to try to schlep weps on the bus.  He'll bring them in his truck day before.  Just got a text from him he WAS able to book

a room in that hotel I recommended which is on Glebe Road in Arlington.  However it goes  it will be great to see you again!  I sure hope your arm is getting better!

Gov. Exh. 9514 (Msg. 192.T.1415-19).  As Caldwell sent those messages, he received a message from Stamey stating, "Booked Rm 252 5 an 6th . . . Same Comfort Inn." *Id.* (Msgs. 22.S.487.A, C). Records from the hotel show that Stamey ultimately booked three rooms at that hotel (one for his North Carolina team, one for the Florida QRF led by Kenneth Bittner, and one for the Arizona QRF team led by defendant Vallejo and Kandaris).  12/19/22PM Tr. at 2051-52.  Two days later, on January 1, Kandaris messaged Rhodes, "We need to [k]now where staging is going to be for technical equipment and 'supplies.'"  Gov. Exh. 9514 (Msg. 1.S.859.19).  That same day, co-conspirator James messaged co-conspirator Ulrich, "Were working on a Farm location.  Some are bringing long rifles some firearms…I'm bringing sidearm."  Gov. Exh. 4761 (Msg. 111.S.731.B).

On the morning of January 2, Kelly Meggs messaged Rhodes, "Last night call … we discussed a QRF RP so we may do that.  As well as the NC team has a hotel room close by." Gov. Exh. 9514 (Msg. 1.S.613.173).  There had, in fact, been a GoToMeeting call the night before, titled "conference call for dc leadership/team leaders only," which had been attended by Meggs, operational leader Siekerman, and Southeast team leader James, among others.  Gov. Exh. 6900. As discussed above, the hotel room reserved by the NC team that Meggs referenced was the room Caldwell directed him to book.  12/19/22PM Tr. at 2051-52.  Rhodes responded to Meggs' messages about the QRF planning to say, "Ok.  We WILL have a QRF.  this situation calls for it." Gov. Exh. 9514 (Msg. 1.S.613.175).  Meggs went on to elaborate the plan for the QRF: "Yes we have the overlay maps of street closures and it looks like Lincoln is our RP of SHTF .  Lots of access roads on the edge of main area." *Id.* (Msg. 1.S.613.176).  Rhodes answered, "That's good. Both in and out is very useful." *Id.* (Msg. 1.S.613.177).

16

Later in the morning of January 2, Meggs messaged the DC OP: Jan 6 21 Signal chat, "Good call last night. Lots covered, I'll get with NC team today and find out QRF location[.]" *Id.* (Msg. 1.S.159.450.) By that evening, Stamey knew Meggs' plans for the Florida co-conspirators, as he informed Caldwell: "FLA. 2 Men left back [presumably for the QRF]. 12 to 15 going in DC." *Id.* (Msg. 22.S.508.A). Meggs also wrote to the DC OP: Jan 6 21 Signal chat to inform the co-conspirators of the "QRF Rally Points," sending a map showing locations near the Lincoln Memorial and West Potomac Park, explaining, "1 if by Land, North side of Lincoln Memorial, 2 if by Sea, Corner of west basin and Ohio is a water transport landing!!" *Id.* (Msgs. 1.S.159.524-25). Meggs explained that the water transport landing would be used if "the bridges get closed." *Id.* Stamey chimed in to say, "My sources DC working on procuring boat transport as we speak." *Id.* (Msg. 1.S.159.526). At almost the exact same time, Caldwell was reaching out to acquaintances to ask them if they had a boat to contribute for the QRF. *Id.* (Msgs. 22.T.15.26, 22.S.517.A). In Caldwell's words, he was looking for a boat so that, "If we had someone standing by at a dock ramp (one near the Pentagon for sure) we could have our Quick Response Team with the heavy weapons standing by, quickly load them and ferry them across the river to our waiting arms." *Id.*

On the way to D.C., various co-conspirators reached out to Rhodes and Meggs to confirm the location of the QRF drop-off point. On the afternoon of January 4, Watkins messaged the OK FL DC OP Jan 6 chat, "We will be in VA @ 8pm. Where can we drop off weapons to the QRF team? I'd like to have the weapons secured prior to the Op tomorrow." Gov. Exh. 9514 (Msg. 85.S.193808.C). That night, defendant Vallejo messaged Rhodes, "Sir, We must not have gotten Kelly's number wrong as we never received response from the text we sent requesting location. We didn't make it to Roanoke anyways and have gotten a motel room. Please send my number to Kelly [Meggs] so he can tell us where campground is." *Id.* (Msg. 1.S.139.6); *see also id.* (Msg.

1.S.859.21 (Kandaris to Rhodes: "Hey Stewart must have wrong phone for Kelly please send to this number, thanks.")).  Defendant Vallejo messaged Meggs and obtained the location of the Comfort Inn Hotel where, as noted above, defendant Vallejo and Kandaris stayed in a room reserved by Stamey and paid for by Meggs.  *Id.* (Msgs. 210.T.3.1-2).  The morning of January 5, co-conspirator Harrelson messaged the same chat, "We get that QRF hotel address yet?"  *Id.*  (Msg. 85.S.194617.D).    Meggs responded by directing Harrelson to "Dm" him.  *Id.*  (Msg. 85.S.194617.E).  That same morning, Rhodes messaged the DC OP: Jan 6 21 chat, "Do NOT enter DC with ANYTHING that would be deemed illegal in DC.  Or even questionable.  The DC police have arrested multiple people for items they cannot bring into DC, including Enrique Tarrio, president of Proud Boys.  But he's not the only one.  Three others have also been arrested.  They are setting traps.  Do NOT even cross over into DC at all, for any reason, with anything on you or in your vehicle that could get you into trouble."  *Id.* (Msg. 1.S.159.817).  Meggs responded, "We are ready!!  Should be in DC by noon."  And then shared a link to a dropbox site containing a video set to rock music that depicted Meggs, defendant Hackett, Harrelson, and other co-conspirators receiving rifle training and firing weapons at targets shaped like humans at a September 2020 training they had attended.  *Id.* (Msg. 1.S.159.818); *see also* 1.S.159.818.V.

When the co-conspirators arrived in the D.C. area on January 5, 2021, the defendants and their co-conspirators dropped off firearms, ammunition, and tactical equipment with members of the QRF at the Comfort Inn hotel. Gov. Exh. 1518; 12/19/22PM Tr. at 2048-63; 01/03/23PM Tr. at 2607-14.  Shortly after noon on January 5, Meggs wrote to Rhodes, "[W]e are just outside of town unloading at QRF on our way in.  Left Rangers place at 4:30am." Gov. Exh. 9514 (Msg. 1.T.2315.10).  Rhodes responded, "Good to go. See you soon." *Id.* (Msg. 1.T.2315.11).

As the defendants and their co-conspirators descended upon D.C. in the days before January 6, their intent was clear. On December 16, defendant Hackett told those on the OKFL Hangout chat, "We need to demand the arrest of corrupt politicians for colluding with foreign enemies and blatantly ignoring the legal process and an unconstitutional election," and advocated for "show[ing] up on their doorsteps to make citizens arrests." Gov. Exh. 6776 (Msg. 1.S.656.7992). On December 24, defendant Moerschel wrote to the OKFL Hangout chat, "I think [President Trump] will wait until the constitution completely fails before he invokes insurrection act. That means, if all legislative options fail on Jan 6, he will invoke the act - probably the same day. IMO, any members in DC should absolutely have firearms somewhere (legally) nearby." Gov. Exh. 9514 (Msg. 1.S.656.9846). On December 31, Rhodes wrote to the OLD Leadership CHAT, "On the 6th, they are going to put the final nail in the coffin of this Republic, unless we fight our way out. With Trump (preferably) or without him, we have no choice." *Id.* (Msg. 1.S.696.17678). That same day, defendant Minuta replied to a Parler post by Proud Boys leader Enrique Tarrio (@NobleLead), which featured the text "Lords of War" and "#J6 #J20" alongside a photograph of Minuta and several Proud Boys in D.C. on December 12 surrounded by flames, with, "Bad ass! Thanks @NobleLead for the picture! Honor to stand with you guys. See you Jan 6." *Id.* (Msgs. 2055.P.1-2). On January 1, defendant Vallejo messaged his traveling companions, "Gentleman, May The Living God bless us this day and grant us Victory in this historic mission we undertake against all forms of tyranny over the minds of men. WE are the constitution of America, not some paper with mere words...ACTION! Amen." *Id.* (Msgs. 240.S.1.21.5 / 240.S.1.22.1). And on January 3, Meggs told one acquaintance on Facebook, "The natives are very restless. Tell your friend this isn't a Rally." *Id.* (Msg. 2000.T.289).

### iii.  January 6, 2021

On the morning of January 6, as they watched and waited from the QRF staging location with the weapons, defendant Vallejo and Kandaris discussed the possibility of "armed conflict" if President Trump or Vice President Mike Pence did not stop the Certification Proceeding that day. Gov. Exh. 1054.  Kandaris explained that "there are people who are prepared, have the will, have the facilities to do more than taunt."  *Id.*  Vallejo was more blunt: "The American people are going to be told today that we have liberty and justice for all, or they're gonna be told, 'F**k you," okay?  And if they're told f***k you, that's going to be the declaration of a guerilla war."  *Id.*

Later that day, around 1:25 p.m., when it became clear that President Trump and Vice President Pence were not going to intercede to stop the Certification of the Electoral College vote, and as a large crowd gathered on the Capitol grounds and converged on the building, Rhodes messaged the DC OP: Jan 6 21 chat: "Pence is doing nothing. As I predicted."  Gov. Exh. 1500.2.  At 1:38 p.m., Rhodes sent another message to the chat stating, "All I see Trump doing is complaining.  I see no intent by him to do anything.  So the patriots are taking it into their own hands.  They've had enough."  *Id.*  Similarly, at 1:41 p.m., Rhodes sent a message to the OLD Leadership CHAT stating, "Hey, the founding generation stormed the governors mansion in MA . . . . They didn't fire on them, but they street fought.  That's where we are now.  Next comes our 'Lexington.'"  *Id.*  In the context of all the messages Rhodes and his co-defendants had exchanged in the lead-up to January 6, these words were a call to action.

Indeed, shortly thereafter, as video recovered from Watkins' phone shows, members of Line One, to include defendants Hackett and Moerschel, started moving from the Ellipse towards the Capitol.  *Id.*; 192.V.1.  As she marched with Line One down Pennsylvania Avenue at approximately 1:50 p.m., Watkins announced over the "Stop the Steal J6" Zello channel, "We

have a good group. We've got about 30, 40 of us. We're sticking together and sticking to the plan." Gov. Exh. 1500.2, 1502. She elaborated, "It has spread like wildfire that Pence has betrayed us, and everybody's marching on the Capitol." *Id.* She continued, "Trump's been trying to drain the swamp with a straw. We just brought a shop vac." *Id.* Then, at about 2:00 p.m., Watkins told those on the Zello channel, "We're one block away from the Capitol now. I'm probably gonna go silent when I get there because I'm gonna be a little busy." *Id.*

Meanwhile, on yet another encrypted, invitation-only group chat titled "Jan 5/6 DC Op Intel team," which included co-conspirators Rhodes, Michael Greene, James, and others, a participant posted a link to a video titled "live stream of patriots storming capital," and another participant asked, "Are they actually Patriots - not those who were going to go in disguise as Patriots and cause trouble[?]" Gov. Exh. 1500.2 Rhodes responded, "Actual Patriots. Pissed off patriots[.] Like the Sons of Liberty were pissed off patriots[.]" *Id.* James responded, "We're coming to the Capitol ETA 30 MIN." *Id.* James and several co-conspirators (including defendant Minuta and Ulrich) then headed toward the Capitol. *Id.*

By 2:30 p.m., Rhodes had entered the Capitol grounds himself and had begun explicitly directing his co-conspirators to come to the Capitol to join him. Gov. Exh. 1500.2. Co-conspirator Berry testified that Line 1 huddled as they entered the Capitol grounds for about five to ten minutes. 01/03/23PM Tr. at 2618. According to Berry, Meggs was doing most of the talking and "was saying that two of our guys had got separated—two of the Oath Keepers got separated from the group and had walked up the stairs. And he also said that we were going to try to stop the vote count." *Id.* Meggs told the group that the certification proceeding unfolding inside the Capitol "was illegitimate, it was unconstitutional, and we had to try and stop it." 01/04/23AM Tr. at 2762.

After Meggs' comments, the huddle broke up and, in Berry's words, "We stacked up in a single file line and walked up the stairs."  01/03/23PM Tr. at 2620.

Phone records introduced at trial showed that at about 2:32 p.m., Meggs engaged in a phone conversation with Rhodes, who was already on the phone with Greene, the operational leader for January 6.  Rhodes merged them into a three-way call.  Gov. Exhs. 1500.2, 2409.1.  Moments later, Meggs led Line One up the east steps of the Capitol to the area outside the East Rotunda doors, where rioters were using their hands, flags, and chemical spray to assault the officers guarding the doors, and violently trying to force entry.  Gov. Exh. 1500.2.  For minutes, the crowd—including defendants Hackett and Moerschel and other co-conspirators—attempted to break into the Capitol.  *Id.*  When the doors eventually opened, Meggs motioned for Line One to enter, and they did.  *Id.*

Once inside, half of Line One, led by Watkins, tried to force their way past riot police to the Senate Chamber.  Gov. Exhs. 1500.2, 1505.  The government introduced video of Watkins yelling, "Push! Push! Push!" and "Get in there!" and "They can't hold us!" as she and six of her co-conspirators joined the mob attempting to push down the hallway towards the Senate Chamber.  Gov. Exh. 1505.  District of Columbia Metropolitan Police Department ("MPD") Officer Anthony Jackson, who was deployed to that hallway with other officers to form a line to try to block the mob from getting to the Senate Chamber, described the size and force of the mob and how it continued to push back the police line.  01/06/23AM Tr. at 3363-75.  Only by deploying chemical spray were the officers finally able to repel the rioters and hold their line.  Gov. Exh. 1505; 01/06/23AM Tr. at 3374-75.  Watkins later described her conduct in that hallway: "We were in the thick of it.  Stormed the Capitol.  Forced our way into the Senate and House.  Got tear gassed and muscled the cops back like Spartans."  Gov. Exh. 9651 (Msg. 192.T.1521).

Meanwhile, the other half of Line One—including defendants Hackett and Moerschel, and Meggs—pushed into the House side of the building in search of Speaker of the House Nancy Pelosi. Gov. Exhs. 1500.2, 1505, 1506, 9553 (Msgs. 7.T.570.9758, 9760-61); 01/05/23AM Tr. at 3119-29. They stopped in the area of the Small House Rotunda, just outside Speaker Pelosi's suite of offices. 01/05/23AM Tr. at 3119-29. Members of Speaker Pelosi's staff were still hiding in one of those offices. 01/05/23AM Tr. at 3306-55. Fortunately, the sign designating the suite as belonging to Speaker Pelosi had already been torn down by other rioters, and the defendants did not enter it. 01/06/23AM Tr. at 3122-25. On the night of January 6, in response to a friend's message that he "was hoping to see Nancy's head rolling down the front steps," Meggs stated, "We looked forward her." Gov Exh. 9553(Msgs. 7.T.570.9758, 9760-61).

While the members of Line One breached the east side of the Capitol and split into teams pushing toward the House and Senate, Line Two were on their way to the Capitol. As the group swerved around police barricades on a golf cart, defendant Minuta stated in a "livestream" video posted to Facebook that the group was "headed to the Capitol" because "patriots storm[ed] the Capitol building." Gov. Exh. 1508. Members of the group, including defendant Minuta, were wearing protective vests and goggles. *Id.* Defendant Minuta described the situation as "f\*\*king war in the streets right now." *Id.* As the group parked their golf carts just outside the entrance to the Capitol grounds, defendant Minuta stated, "Word is that they got in the building. Let's go." As the group marched onto the Capitol grounds, onlookers shouted, "Good job guys" and "Go fight some Congressmen"; defendant Minuta responded, "Thank you." *Id.*

As they crossed into the restricted area and joined the mob outside the Capitol, defendant Minuta and the other members of Line Two started marching hands-on-shoulder in the same manner as Line One. *Id.* The group maneuvered their way through the throngs from the west side

to the east side of the Capitol.  *Id.*  At about 3:15 p.m., Line Two, led by defendant Minuta and James, breached the Capitol through the same East Rotunda doors utilized by Line One half an hour earlier.  *Id.*

Once inside the building, defendant Minuta and James tried to force their way into the Rotunda and assaulted law enforcement officers with a stolen law enforcement riot shield while screaming that this was "our f**king building."  *Id.*  They were eventually expelled by riot police officers who had begun clearing the building.  *Id.*  While exiting the building, defendant Minuta held up two fingers and turned toward Capitol Police officers, yelling, "All that's left is the second f**king amendment," Gov. Exh. 1508, harkening back to the constitutional amendment he previously described as integral to combatting government tyranny.  After they exited the building, members of both Line One and Line Two met up with Rhodes and other Oath Keepers members and affiliates on the restricted area of the Capitol grounds, just outside the building.  Gov. Exh. 1081.1A.

As his co-conspirators on the ground attacked the building, defendant Vallejo repeatedly checked in to offer his support as the "QRF."  At 2:24 p.m., as Rhodes entered the Capitol grounds and tried to coordinate with Greene and Kelly Meggs, defendant Vallejo messaged the "DC OP: Jan 6 21" Signal chat, "Vallejo back at hotel and outfitted.   Have 2 trucks available.  Let me know how I can assist."  Gov. Exh. 1500.2.  At 2:38 p.m., as the first member of Line One burst through the East Rotunda Doors, defendant Vallejo messaged the chat again: "QRF standing by at hotel. Just say the word . . . ."  *Id.*

Co-conspirators Berry and Ulrich both testified that their actions on January 6 were directly linked to the implicit agreement they had entered into with Rhodes and other Oath Keepers members and affiliates—including the defendants—to stop the lawful transfer of presidential

power by any means necessary.  Berry told the jury that he took all of Rhodes' messages about fighting the government to be an immediate call to fight the government, and when the group went to the Capitol on January 6, it was to fight the government that day.  01/04/23AM Tr. at 2766. Ulrich testified that while the group did not explicitly discuss plans to use force to stop the certification proceeding in advance of January 6, "there was a lot of talk about wanting something to take place, wanting—we wanted something to happen[,] [w]e wanted the ballots to be recounted," and "there was a lot of talk in the text chats leading up" to January 6 about "force with Civil War." 01/10/23AM Tr. at 3924.  According to Ulrich, arriving at the steps of the Capitol on January 6 was the culmination of this feeling.  *Id.* at 3926.  "Now that the people are in and out of the building now, it kind of felt like that moment was coming together for us to do something." *Id.*  Ulrich testified that he understood that he and the other members of his group were working together towards one common goal: "To stop the vote count."  *Id.* at 3929.

### iv.    After January 6

In the messages they sent on the evening of January 6, the defendants and their co-conspirators struck a tone of defiance and showed an intent to continue opposing the lawful transfer of power by force.  "You ain't seen nothing yet," Rhodes wrote to the DC OP: Jan 6 21 Signal chat.  Gov. Exh. 9554 (Msg 1.S.159.1322).  Meggs echoed Rhodes, adding to that same Signal chat a message stating, "We aren't quitting!!  We are reloading!!"  *Id.* (Msg. 1.S.159.1326).  So too did defendant Vallejo, messaging, "We have only yet begun to fight!" and "'After Action Reports' will be dated 1/21/21 [Devil emoji]."  *Id.* (Msgs. 1.S.159.1331-32, 1337).

That night, defendant Vallejo and Kandaris joined Rhodes, Greene, James, and other leaders of the conspiracy for a celebratory dinner at a restaurant in Northern Virginia.  01/09/23AM Tr. at 3530-46.  According to witness Joe Herrington, defendant Vallejo and Kandaris discussed

the role they played earlier that day: "If anything had happened and they were needed, that they were going to be called and they were going to come in to the Capitol area as a Quick Reaction Force." *Id.* at 3546.  They acknowledged that part of the QRF plan involved using the "waterways" if the roads were closed.  *Id.* at 3548.  They also discussed their understanding that "groups of people [were] being bussed in from other locations across the country" to continue the fight the next day.  *Id.* at 3546-47.

The next morning, defendant Vallejo messaged the "DC OP: Jan 6 21" chat, "We are going to probe their defense line right now. 6 am they should let us in. We'll see."  Gov. Exh. 9653 (Msg. 1.S.159.1407).  He later posted, "STATUS REPORT: NG has cordoned off the Capital grounds and no foot traffic allowed.  40 Virginia State Police cars lined up.  Outer perimeter stopping vehicle traffic but a dozen or so walkers/joggers inside it, but not allowed on the building grounds. No signs or flags supporting Trump visible anywhere."  *Id.* (Msg. 1.S.159.1424).  Defendant Vallejo then checked in with Rhodes: "Status report posted in Ops.  Room extended 1 day. Standing by awaiting orders, Sir."  *Id.* (Msg. 1.S.139.15).  Then, as they traveled back to Arizona, defendant Vallejo and Kandaris continued to check in with Rhodes to try to meet up, 1/10/23PM Tr. at 4065-68, and, in Kandaris' words, "to learn next steps and . . . what we should be doing right now," Gov. Exh. 9653 (Msg. 1.S.859.24).

### b.  Evidence of Obstruction of an Official Proceeding

As discussed above, the defendants and their co-conspirators joined with thousands of other rioters in breaching the Capitol building and grounds on January 6.  United States Capitol Police Captain Ronald Ortega presented testimony and video evidence demonstrating the way in which the rioters swarmed the building and overwhelmed law enforcement—including on both the west and east sides of the Capitol, where the defendants and their co-conspirators were engaged in their

criminal acts in and around the building. Gov. Exh. 1515; 12/19/22AM Tr. at 1765-1827. Through the testimony and video admitted through Thomas Wickham, the former Parliamentarian of the United States House of Representatives who was present at the Capitol in a consulting capacity on January 6, and United States Secret Service Inspector Lanelle Hawa, who was tasked with protecting the vice president on January 6, the government established that the conduct of the defendants and the other rioters caused Congress to recess the Certification proceeding and prevented Congress from being able to reconvene until late in the evening on January 6. Gov. Exh. 1516; 12/19/22AM Tr. at 1828-84; 01/04/23AM Tr. at 2768-86.

### c. Evidence of Obstruction / Tampering with Evidence

In the days and weeks after January 6, all the defendants and their co-conspirators deleted digital evidence of these crimes. On January 7, on the drive back to Florida, defendant Hackett told Berry he was deleting incriminating evidence off of his phone. 01/03/23PM Tr. at 2630-32; 01/04/23AM Tr. at 2754-58. Berry testified that he decided to "follow in suit and delete stuff off of my phone." *Id.* On the evening of January 7, defendant Minuta posted to the "DC OP: Jan 6 21" a message stating, "Couple faces exposed in the last video that didn't want to be shown. Sorry, had to delete footage from inside," suggesting he had deleted a video he had previously posted to the chat to avoid incriminating others. Gov. Exh. 9652 (Msg. 1.S.159.1494).

Such conduct was in keeping with the directives from the leadership of the conspiracy. On January 8, Rhodes, using co-conspirator Kellye SoRelle's phone, sent a message to the OLD Leadership CHAT that stated:

> DO NOT chat about Oath Keepers members allegedly doing anything at capitol. Go dark on that. Do not discuss. That's what I would advise any criminal defense client to to anyone who is at risk of being accused and indicted. Let me put it in infantry speak: SHUT THE FUCK UP! Do not discuss who did what. Go silent. Comms discipline. Don't write AARs, don't do verbal AARs, don't chat with your buddies. Or your team. Clam up.

Gov. Exh. 9652 (Msg. 54.S.125.2874).   And six minutes later, Rhodes, again using SoRelle's

phone, put a final point on the matter:

> YOU ALL NEED TO DELETE ANY OF YOUR COMMENTS REGARDING
> WHO DID WHAT.  You are under zero obligation to leave them up.  You/we have
> not yet gotten a preservation order instructing us to retain those chat comments.  So
> DELETE THEM.  I can't delete them because this is a legacy Signal chat that
> doesn't let me delete comments.  Only the comment author can delete a comment.
> So GET BUSY. DELETE your self-incriminating comments or those that can
> incriminate others.  Start now.  Each of you Go back to before the event and scroll
> forward and hunt down any comment you made that can be used against you, other
> Oath Keepers, or the org and delete them.  And especially AARs and war stories.
> Kill em. Do it now.

*Id.* (Msg. 54.S.125.2878-79).

Rhodes' co-conspirators, including the defendants in this case, complied with Rhodes'

directives and deleted evidence from their phones in the weeks that followed.   When their phones

were seized at the time of their arrest, neither defendant Hackett nor defendant Moerschel had the

message Meggs sent to the "Vetted OKFL Hangout" chat on the evening of January 6 with the

caption "Florida OK takes the Capitol" and the video of Line 1 breaching the building that was

originally filmed by Harrelson.   01/10/23PM Tr. at 3988-95.   Defendant Moerschel had also

deleted all of his text messages from November 2020 through January 2021—the *exact* timeframe

of the charged conspiracy in Count One.   01/09/23 PM Tr. at 3733-34.   In fact, neither defendant

Hackett nor defendant Moerschel had the Signal application on their phone at all.  *Id*. at 3721,

3723, 3732.  Defendant Vallejo had also deleted the Signal application entirely.  *Id*. at 3721, 3735-

38.   And he did so after sending an article to the DC OP: Jan 6 21 group chat about an indictment

charging co-conspirators Jessica Watkins, Donovan Crowl, and Thomas Caldwell, Gov. Exh. 9652

(Msg. 1.S.159.1639), *see also* Gov. Exh. 9652.1, and another article about the FBI supposedly

gaining access to people's Signal messages, *Id*. (Msg. 1.S.159.1643); *see also* Gov. Exh. 9652.2.

Finally, at the time defendant Minuta was arrested, he had replaced his phone altogether, 01/05/23

PM Tr. at 3239, and his new phone did not have the video he sent to the "DC OP: Jan 6 21" chat that showed himself inside the Capitol near the Rotunda. *Id.* at 4030-33.

The parties stipulated that a grand jury for the United States District Court for the District of Columbia opened its investigation into the attack on the Capitol on or about January 8, 2021. Gov. Exh. 3012.  The nature of the deleted evidence, combined with messages sent by the defendants discussing the need to delete incriminating digital evidence, satisfies the government's burden to circumstantially prove that this conduct was undertaken with the intent to impair these items' integrity or availability for use in an official proceeding.

### C.  Legal Background

#### a.  Rule 29

Federal Rule of Criminal Procedure 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  When ruling on a motion for judgment of acquittal, the Court must "consider[ ] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt."  *United States v. Kayode*, 254 F.3d 204, 212-13 (D.C. Cir. 2001) (quoting *United States v. Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997)).

A defendant "seeking to overturn a jury verdict for insufficient evidence bears an exceedingly heavy burden."  *United States v. Salamanca*, 990 F.2d 629, 637 (D.C. Cir. 1993). Sufficiency review "is highly deferential: [the Court] must accept the jury's verdict if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt."  *United States v. Williams*, 836 F.3d 1, 6 (D.C. Cir. 2016) (quotation marks omitted).  The Court "view[s] the

evidence in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *Id.* (quotation marks omitted). The Court must "accord[ ] the government the benefit of all legitimate inferences," *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983), and deny the motion if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Put another way, the Court may grant a motion for judgment of acquittal only when "a reasonable juror must necessarily have had a reasonable doubt as to the defendant[']s guilt." *Weisz*, 718 F.2d at 437 (citing *United States v. Singleton*, 702 F.2d 1159, 1162-63 (D.C. Cir. 1983)); s*ee also United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir. 1977); *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir. 1947) ("[I]f there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion [for judgment of acquittal] must be granted.").

Rule 29(a)'s well-understood and often-applied standard is especially important here because the defendants' motions repeatedly reference the jury's verdicts on some counts to argue erroneously that the "theory of conviction reflected in the jury's verdict" is limited, consequently rendering certain evidence "tangential" and irrelevant. ECF 477-1 at 20. In addition to the longstanding rule that a defendant may not upset an "inconsistent verdict," *United States v. Powell*, 469 U.S. 57, 65 (1984), the jury's verdict simply has no bearing on the adjudication of motions for acquittal under Rule 29. *See, e.g.*, *United States v. Dykes*, 406 F.3d 717, 722 (D.C. Cir. 2005) ("We do not know what went through the jurors' minds. . . . But even if the [verdicts were inconsistent], a 'criminal defendant convicted by a jury on one count [cannot] attack that

conviction because it was inconsistent with the jury's verdict of acquittal on another count.'")
(quoting *Powell*, 469 U.S. at 58). The question before the Court is focused exclusively on the
sufficiency of the evidence and whether it could establish for a rational juror the elements of each
offense.

Here, there was sufficient evidence to support the jury's finding all four defendants guilty
of Counts One through Four.

### b. Count One: Seditious Conspiracy

Count One charged all the defendants with seditious conspiracy, in violation of 18 U.S.C
§ 2384. Section 2384 makes it a crime for two or more persons to conspire or agree to, as charged
here, (a) oppose by force the authority of the United States or (b) by force prevent, hinder, or delay
the execution of any law of the United States.

As this Court has already found in resolving the motions to dismiss filed earlier in this case,
"resistance to the authority of the United States" is what must be proven to establish a seditious
conspiracy. *See* June 28, 2022 Mem. Op., ECF 176 at 11-13. It is difficult to imagine a greater
"resistance to the authority of the United States" than one aimed at undermining the lawful transfer
of power following a presidential election. *See United States v. Rahman*, 854 F. Supp. 254, 259
(S.D.N.Y. 1994) (observing that Section 2384 "protects basic societal interests and must be read
to cover a wide spectrum of activities").

A violation of Section 2384 under either of the two prongs charged in this case requires
proof that a defendant agreed to use force against the "government *as a government*," and thus
requires that a defendant planned to use force "to resist some positive assertion of authority by the
government" or to resist "the authority of the United States while endeavoring to carry the laws
into execution." *Baldwin v. Franks*, 120 U.S. 678, 693 (1887) (emphasis added).

An agreement to oppose by force the lawful transfer of power constitutes such "forcible resistance of the authority of the United States while endeavoring to carry the laws into execution." *Id.* The lawful transfer of power is a critical underpinning of our democratic system of government and a central aspect of our government's obligations under the Constitution. More to the point, as this Court has found, the transfer of power requires governmental actors to take many actions and steps in exercise of their statutory and Constitutional authority:

> The Twelfth Amendment directs that the "President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates [of the Electors] and the votes shall then be counted." U.S. CONST. amend. XII. The Electoral Count Act of 1887 provides additional, precise instructions. *See* Electoral Count Act of 1887, Pub. L. No. 49-90, 24 Stat. 373 (1887). Before a Joint Session of Congress, the President of the Senate serves as the presiding officer, opens the certificates of the electoral votes, and hands them to tellers appointed by each House who make a list of the votes. 3 U.S.C. § 15. When announcing each certificate, the President of the Senate calls for objections, which if made must be in writing and signed by one Senator and one member of the House of Representatives. *Id.* Thereafter, the Senate and the House withdraw to their respective chambers to consider each objection, and "each Senator and Representative may speak to such objection or question five minutes, and not more than once[.]" *Id.* § 17. The President of the Senate is empowered to cut off debate after two hours, *id.*, and he also has the "power to preserve order" during the session, *id.* § 18. The Electoral Count Act even details where the presiding officer, the Speaker, the Senators, the Representatives, the tellers, and others are to sit in the chamber. *Id.* § 16. And it commands that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." *Id.*

June 28, 2022 Mem. Op., ECF 176 at 13-14. In other words, the lawful transfer of power requires the government to exercise its authority by carrying laws into execution. *Id.*

For the purposes of Section 2384, force is understood in its ordinary sense to mean an act or acts "that threaten[] or result[] in violence" or "threaten[] or result[] in harming or destroying property or harming or killing people." *Final Jury Instructions*, at 24.[1] The defendants need not,

---

[1] That understanding of force draws on the common-law linkage between force and violence, *see Stokeling v. United States*, 139 S. Ct. 544, 550 (2019) ("common-law authorities frequently used the terms 'violence' and 'force' interchangeably"), and reflects mid-nineteenth-century legal definitions of force that would have informed the legislators who drafted and enacted the original

however, actually use force to violate Section 2384. *Id.* at 18-19; *see Bryant v. United States*, 257 F. 378, 385-86 (5th Cir. 1919); *see also Dennis v. United States*, 341 U.S. 494, 573 (1951) (Jackson, J., concurring) ("The basic rationale of the law of conspiracy is that a conspiracy may be an evil in itself, independently of any other evil it seeks to accomplish.").

### c. Counts Two and Three: Conspiracy to Obstruct and Substantive Obstruction of an Official Proceeding

Counts Two and Three charge all the defendants with conspiracy and substantive violations of 18 U.S.C. § 1512(c)(2). Section 1512(c)(2) makes it a crime to corruptly obstruct or impede an official proceeding, which includes the Certification of the Electoral College vote. *See United States v. Caldwell*, 581 F. Supp. 3d 1, 11-15 (D.D.C. 2021). The same general conspiracy principles described above apply here. *See Final Jury Instructions*, at 24 (incorporating conspiracy principles for Count Two). A violation of Section 1512(c)(2) requires proof that the defendant (1) obstructed or impeded an official proceeding; (2) intended to obstruct or impede that proceeding; (3) acted knowingly, with awareness that the natural and probable effect of the defendant's conduct would be to obstruct or impede the official proceeding; and (4) acted corruptly. *Id*. at 20.

To prove that a defendant acted corruptly for purposes of Section 1512(c)(2), the government must establish that the defendant acted either "with a corrupt purpose" or through "independently corrupt means," or both, see *United States v. Sandlin*, 575 F. Supp. 3d 16, 31 (D.D.C. 2021) (quoting *United States v. North*, 910 F.2d 843, 942-43 (D.C. Cir. 1990) (Silberman, J., concurring in part and dissenting in part), withdrawn and superseded in part by *United States v.*

---

seditious conspiracy provision. *See Webster's American Dictionary of the English Language* (1828) (force defined as "any unlawful violence to person or property"); *see also Stokeling*, 139 S. Ct. at 550 (defining "force" as either "power, violence, or pressure directed against a person or thing," or "unlawful violence threatened or committed against persons or property") (citing dictionaries).

*North*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam); *see also Final Jury Instructions*, at 26-27.  The government must also prove that the defendant acted "with consciousness of wrongdoing," namely with "an understanding or awareness that what the person is doing is wrong." *Final Jury Instructions*, at 26; *see also United States v. Reffitt*, No. 21-cr-32, ECF 119 at 26 (D.D.C. Mar. 7, 2022); *see Arthur Andersen LLP v. United States*, 544 U.S. 696, 706 (2005) (faulting jury instructions in Section 1512 case for "fail[ing] to convey the requisite consciousness of wrongdoing").

### d. Count Four: Conspiracy to Prevent Members of Congress from Discharging Their Duties or Being Where They Are Required To Be by Force, Intimidation, or Threat

Count Four charges the defendants with conspiracy to prevent Members of Congress by force, intimidation, or threat from discharging the duties of an office, trust, or place of confidence under the United States, and with conspiracy to induce Members of Congress by force, intimidation, and threat to leave the place where their duties as officers were required to be performed, in violation of 18 U.S.C. § 372.  To prove a violation of Section 372, the government must prove (1) a conspiracy, (2) that the defendants voluntarily joined the conspiracy, and (3) that the conspirators agreed to prevent an officer of the United States from discharging his or her duties "by force, intimidation or threat," *United States v. Beale*, 620 F.3d 856, 864 (8th Cir. 2010), or to leave the place where the officer's duties are required to be performed, *Final Jury Instructions*, at 32.

## II.  ARGUMENT

Taking the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crimes charged in the Indictment beyond a reasonable doubt.  The evidence adduced in the government's case-in-chief is more than sufficient

to establish the elements as to each of the defendants on every charge in the Indictment. The defendants' motions for judgment of acquittal should be denied.

Both defendant Joseph Hackett (ECF 474) and defendant David Moerschel (ECF 475) joined and adopted co-defendant Thomas Caldwell's legal arguments as to Count One (ECF 384). All four defendants—Roberto Minuta (ECF 479), Joseph Hackett (ECF 474), David Moerschel (ECF 475), and Edward Vallejo (ECF 477-1)—joined and adopted co-defendants Stewart Rhodes, Kelly Meggs, Jessica Watkins, Kenneth Harrelson, and Thomas Caldwell's legal arguments as to certain counts, including Counts One, Two, Three, Four, and Seven (ECF 432). Neither defendant Hackett nor defendant Moerschel supplemented their motions for acquittal with new factual or legal arguments. All four defendants' motions for judgment of acquittal, to the extent they rely on their co-defendants' motions in ECF 384 and ECF 432, should be denied for the same reasons in the government's oppositions filed on November 3, 2022 (ECF 383) and January 13, 2023 (ECF 440).

Unlike defendants Hackett and Moerschel, defendants Minuta and Vallejo supplemented their motions with additional arguments based on sufficiency of the evidence.[2] Each of these additional arguments should similarly fail.

### A. The Government's Evidence Was More Than Sufficient To Prove That Edward Vallejo Was Guilty Of Counts One, Two, and Four.

Defendant Vallejo's arguments focus on the conspiracies charged in Counts One, Two, and Four and boil down to: (1) the Oath Keepers' plan was to commit seditious conspiracy after January 20, 2021, and there was no plan to interrupt the congressional certification process by force on January 6 until "moments before Oath Keepers ascended the Capitol steps," ECF 477-1

---

[2] On April 1, 2023, defendant Hackett joined and adopted both defendant Vallejo's and defendant Minuta's motions. ECF 508. On April 2, 2023, defendant Vallejo joined and adopted defendant Minuta's motions. ECF 511.

at 30, *see also id*. at 23-30, and (2) there was no basis for the jury to conclude Vallejo joined that late-forming agreement from his hotel. *Id*. at 30-33. His arguments do not square with the evidence presented at trial, which he attempts to explain away as simply "rhetoric," *id*. at 15, 20, 32, "joke[s]," *id*. at 19, 'heated," *id*. at 23, 32, and "expressions of support for the protestors who surrounded the Capitol," *id*. at 32. Reviewing the evidence and all legitimate inferences in the light most favorable to the government, the evidence was "sufficient to permit a rational trier of fact to find all of the essential elements of the crime[s] beyond a reasonable doubt." *Kayode*, 254 F.3d at 212-13.

Defendant Vallejo essentially contends that the government failed to establish a seditious agreement regarding the Capitol before January 6, because it failed to establish *a plan* in advance of the attack on the Capitol to interfere with Congress' Certification of the Electoral College vote. ECF 477-1 at 23-24. However, he acknowledges, as he must, that the government need not show that "the conspirators . . . agree[d] on all the details of their criminal scheme." *Id.* at 25 (quoting *United States v. Treadwell,* 760 F.2d 327, 336 (D.C. Cir. 1985)). Indeed, to prove a conspiratorial agreement, "the government need only show that the conspirators agreed on 'the essential nature of the plan,' *not* that they 'agreed on the details of their criminal scheme.'" *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) (emphasis added) (quoting *Treadwell*, 760 F.2d at 336 (citation and quotation marks omitted)); *see also United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001) (citing *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977)). As the Supreme Court in *Blumenthal v. United States*, 332 U.S. 539 (1947), explained, "the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Id.* at 557 (footnote omitted). "Otherwise," the Supreme

Court observed, "the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity." *Id.* It follows, therefore, that the evidence need not establish that the defendants settled on every detail of an intricately developed plan. Nor does it matter whether the persons who formed the agreement actually carried out their plans or whether the agreement ultimately was successful; though, proof concerning the accomplishment of the object of the conspiracy may certainly be evidence of the existence of the conspiracy itself. *See, generally, Court's Final Jury Instructions*, at 17-19 (describing what is required to establish the existence of a conspiratorial agreement).

The evidence, when viewed in the light most favorable to the government, amply establishes beyond a reasonable doubt that the "essential nature of the plan" defendant Vallejo (and others) joined was to oppose by any means necessary, up to and including the use of force, the lawful transfer of power following the 2020 presidential election. And, by January 6, that agreement had crystalized into forcibly preventing, hindering, or delaying the execution of any law of the United States—namely, laws governing the congressional proceeding and the congressmembers' duties on January 6 related to the transfer of presidential power. The evidence demonstrating the defendants' conspiratorial agreements to stop the Certification and prevent members of Congress from discharging their duties in connection with that proceeding, and their corrupt intent in participating in the attack on the Capitol, consists of the many statements and actions detailed above. In short: the defendants agreed to take whatever steps were necessary, up to and including using force, to stop the lawful transfer of presidential power following the 2020 election, and they conspired together, in person, over calls, and through Signal chats to halt that transfer. In late December 2020, they agreed to focus these efforts on stopping Congress'

certification of the Electoral College vote.  On January 6, they carried out this agreement by participating in the attack on the Capitol.

Defendant Vallejo's claim that "there was no plan to do anything relating to the Capitol until right up to the moment people went there," ECF 477-1 at 24, ignores the evidence that he and his co-conspirators zeroed in on the Capitol and the congressional proceeding taking place on January 6 as early as December 2020, as legal avenues to overturn the election results repeatedly failed and dwindled.  Regardless of how the defendants may have conceived of achieving the conspiracy's objectives back in November 2020, there was ample evidence that in advance of January 6 the defendants and their co-conspirators agreed to stop the Certification, they believed an opportunity to do so might present itself on January 6, and they seized the opportunity presented on January 6 to attack the Capitol in furtherance of this agreement.  Contrary to defendant Vallejo's claim that this agreement is "too vague," ECF 477-1 at 25, the "essential nature of the plan" as it evolved included the actors (the Oath Keepers members and affiliates who joined the agreement), the objective (to stop the transfer of power by any means necessary, including using force), and the manner and means (traveling across the country to the Capitol and being prepared to use force). That is exactly what defendant Vallejo and his co-conspirators did, and it is sufficient to find defendant Vallejo and his co-defendants guilty.

As early as December 15, 2020, for example, defendant Vallejo focused on coming to Washington, D.C., armed, around the time of January 6.  He shared with Kelly Carter, who would eventually travel with defendant Vallejo and Todd Kandaris to Washington, D.C., an interview from a show called the "Hagmann Report."  In it, the speaker calls on people to act against the election: "We're gonna start moving around the country on January 2nd and 3rd to D.C., armed, in large groups," he explained.  Gov. Exh. 9514.1.1.  "Get with your local militia, get your large

group together, and start moving to D.C., armed.  Because on January 4, we need to be en masse in D.C., armed, demanding, not asking, demanding that we get a peaceful resolution to these voter corruption issues, these election corruption issues." *Id.*  The speaker warned: "Police don't want a fair fight.  If you travel in groups of four, they'll surround you with fifteen, twenty policemen at gunpoint and take your guns and arrest you . . . that's how the police operate. . . . the only way to prevent your own personal manipulation is to travel in large enough groups armed that the policemen don't want to fight." *Id.*  When defendant Vallejo sent a link to this interview to Carter, he added, "Listen to the second hour.  It's ON."  Gov. Exh. 9514 (Msg. 210.T.2.2).  And defendant Vallejo meant it.  In the interview, the speaker specified when people should act: "We need a coordinated effort . . . if you're out west, you probably want to start moving on the first."  Gov. Exh. 9514.1.1.  On January 1, 2021, defendant Vallejo and his contingent left from Arizona headed east towards the nation's capital.  Gov. Exh. 9514 (Msg. 1.S.859.10).

As December continued, defendant Vallejo's co-conspirators also started focusing on traveling to Washington, D.C., for January 6, and they specifically targeted the Capitol.  On December 22, for example, Meggs messaged Rhodes, defendants Hackett and Moerschel, and other co-conspirators, "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside!  Scare the hell out of them with about a million surrounding them should do the trick!"  Gov. Exh. 9514 (Msg. 1.S.656.9619).  He then posted a photograph of Oath Keepers flags and wrote, "These will be flying Jan 6th in front of the Capitol!!" *Id.* (Msg. 1.S.656.9620). On December 24, Meggs wrote to the same chat, "We have 10-12 staying there.  So it's gonna be a WILD time in DC we gotta get the crowd going during the day.  I think we get everyone up good and close to the Capitol bldg so they can here is inside.  Then at night well whatever happens happens." *Id.* (Msg. 1.S.656.9990).  On December 25, Rhodes wrote to the same Florida co-

conspirators: "I think Congress will screw [Trump] over.  The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing.  But I don't think they will listen.  *Id.* (Msg. 1.S.656.10094-95).  On December 29, Rhodes privately messaged SoRelle: "This will be DC rally number three.  Getting kinda old.  They don't give a shit how many show up and wave a sign, pray, or yell.  They won't fear us till we come with rifles in hand."  Gov. Exh. 6749 (Msg. 1.S.737.2820).  On January 3, Kelly Meggs told one acquaintance on Facebook, "The natives are very restless.  Tell your friend this isn't a Rally."  Gov. Exh. 9514 (Msg. 2000.T.289).  Notably, each of these messages (and many others) were evidence of the co-conspirators' intent to act *on January 6*, and not only after President-Elect Biden was inaugurated on January 20.

Defendant Vallejo was following Rhodes' words and calls to action about the Certification on January 6.  In an open letter on December 23, Rhodes wrote that if President Trump did not act before or on January 6 to stop the election results from being certified, Rhodes and others may have to "take to arms in defense of our God given liberty."  Gov. Exh. 1008.  "War isn't coming— war is already here," Rhodes warned.  *Id.*  One day later, defendant Vallejo sent Rhodes' letter to Kelly Carter.  Gov. Exh. 9514 (Msg. 210.T.13.9).  Defendant Vallejo's contention that he and his co-conspirators may have been conspiring to commit sedition, but only after January 20, ignores that Rhodes' and his co-conspirators' made clear they believed they were *already* in a war and needed to act, including by taking matters (and rifles) into their own hands.  Moreover, this bold confession essentially admits that these statements and actions are evidence of defendant Vallejo's and his co-conspirators' seditious *intent* while traveling to Washington, D.C., for the Certification on January 6.

That seditious intent only sharpened as defendant Vallejo and his co-conspirators converged on D.C. in the days leading up to the Certification on January 6.  On December 27, Kandaris told defendant Vallejo to switch their communications from text to the encrypted application, Signal.  Gov. Exh. 9514 (Msg. 210.T.4.4).  Moving forward, defendant Vallejo and Kandaris both used Signal to communicate with each other on the way to Washington, D.C. Defendant Vallejo erroneously claims in his motion that defendant Vallejo simply "discussed the certification process with eager anticipation," and that "[t]here was no evidence introduced at trial that could give rise to an inference that Vallejo had any intent to interrupt the certification process or otherwise act unlawfully."  ECF 477-1 at 12.  On January 1, 2021, defendant Vallejo messaged Kandaris and Kelly Carter, using the group chat titled, "1776^2"—a relevant and direct reference to a second revolution against an allegedly repressive government.  Far from highlighting his excitement for Congress to fulfill its constitutional duty, he bluntly told his comrades that *they* would have the responsibility to act: "Gentlemen, May The Living God bless us this day and grant us Victory in this historic mission we undertake against all forms of tyranny over the minds of men.  WE are the constitution of America, not some paper with mere words…ACTION!"  Gov. Exh. 9514 (Msg. 240.S.1.21.5 / 240.S.1.22.1).  Defendant Vallejo made it clear he intended to act with force: "Woe onto the fucker that GETS IN MY WAY!  Antifa is DOOMED.  Democrats DOOMED!"  *Id*. (Msg. 240.S.1.23.2 / 240.S.1.23.3).  As defendant Vallejo's group neared D.C. on January 3, defendant Vallejo sent around a link to a "NewsBusters" article titled, "CBS Claims Trump Supporters Plan to 'Storm the Capitol' with 'Weapons.'"  *Id*. (Msg. 240.S.1.47.1 / 240.S.1.48.1), *see also* Gov. Exh. 9514.4.  The article itself expressed skepticism of the plan, but defendant Vallejo, actively traveling across the country with rifles and a "historic mission … against all forms of tyranny" in mind, sent it around with no context or caveats.

As detailed above, defendant Vallejo and Kandaris also reached out to Rhodes directly while traveling across the country to D.C.  On December 31, Kandaris informed Rhodes that "[e]veryone coming has their own technical equipment and knows how to use it.  😊"  *Id.* (Msg. 1.S.859.7).  He later added, "We are rifles, man power, warm bodies there to support the process and the President."  *Id.* (Msg. 1.S.859.18).  Rhodes then connected Kandaris and defendant Vallejo with co-conspirator Kelly Meggs, who provided them the address to the QRF hotel and helped reserve their room.  Defendant Vallejo's argument that these messages illustrate defendant Vallejo's intent to "support" the congressional proceeding, ECF 477-1 at 13, ignores the standard of review and amounts to nothing more than his own gloss on the evidence.  Reviewing these messages in the light most favorable to the government, and in the context of both defendant Vallejo's focus on coming to the D.C. area armed to protest the election and his interest in Rhodes' call to be prepared to "take up arms" if President Trump or Congress failed to act, a reasonable jury could conclude that defendant Vallejo was traveling across the country with rifles as part of an agreement with Rhodes and others to prepare to stop the transfer of power by any means necessary, including by force.

That is certainly how other co-conspirators understood Rhodes' words and their own actions.  As detailed above, co-conspirators Berry and Ulrich both explained to the jury that their actions at the Capitol on January 6 were directly linked to Rhodes' and others' messages and the agreement they joined with Rhodes and others—including the defendants—*prior to January 6* to stop the lawful transfer of presidential power by any means necessary.  Berry told the jury that he took all of Rhodes' messages about fighting the government to be an immediate call to fight the government, and when the group went to the Capitol on January 6, it was to fight the government that day.  01/04/23AM Tr. at 2766.  Ulrich testified that "there was a lot of talk about wanting

something to take place, wanting—we wanted something to happen[,] [w]e wanted the ballots to be recounted," and "there was a lot of talk in the text chats leading up" to January 6 about "force with Civil War."  01/10/23AM Tr. at 3924.  To Ulrich, arriving at the steps of the Capitol on January 6 was the culmination of this feeling and everyone's communications.  *Id.* at 3926.  Arriving at the Capitol with some of his co-conspirators, including Minuta, became the moment that came "together for us to do something."  *Id.*  Ulrich testified that he understood that he and the other members of his group were working together towards one common goal: "To stop the vote count."  *Id.* at 3929.

Indeed, defendant Vallejo's own statements on January 6 *before* the proceeding began illustrate that he shared the same goal of being prepared to act with force against the transfer of power if President Trump or Congress did not act that day.  At around 6:30 a.m., Rhodes messaged defendant Vallejo and other co-conspirators on the DC OP: Jan 6 21 group chat before departing from his hotel for Washington, D.C.: "We will have several well equipped QRFs outside DC.  And there are many, many others, from other groups, who will be watching and waiting on the outside in case of worst case scenarios."  Gov. Exh. 9551 (Msg. 1.S.159.955).  Soon after that message, defendant Vallejo and Kandaris took to a podcast and explained exactly what he and the other Oath Keepers intended to do that day.  Gov. Exh. 1054.Tr.  Kandaris stated that he and defendant Vallejo arrived in Washington around noon the prior day, "hooked up with the Oath Keepers and we've bivouacked with them in Arlington.  Then we unloaded what we could."  When asked what they were doing now, Kandaris explained:

> It's about having eyes on the process.  It's about showing that the nation is watching and aware that fraud has been committed and thay they can't do this under cover of darkenss. . . . There are people here who are experienced, they're veterans, they're patriots and they want to be sure that that potential threat, and I do say threat with a little consternation but it's true, of further action is there.  I think had to be because that is the only, we are the final check and balance to this process.

*Id.*

Kandaris added, "We're applying as much pressure as we can.  The only and obvious next step is to go into armed conflict but hoping very much that that doesn't happen."  *Id.*  When asked whether that was a possibility, Kandaris responded, "Everything's on the table."  *Id.*  "The fact is," Kandaris elaborated, "there are people here who are prepared have the will, have the facilities, to do more than taunt.  The question is, you know, is there a shot heard 'round the world moment? The possibility definitely exists."  *Id.*  Before defendant Vallejo made his own statements in agreement, Kandaris concluded: "It's a do or die situation because if we walk away from this and we don't have any effectual change as a result, then we might as well just give up.  We're done. If we don't do something now we're done because we basically illustrated that we will do nothing, in a tinderbox situation, and you know, that's it, it's over."  *Id.*

Then defendant Vallejo clarified: "We're going to be told, the American people are going to be told today that we have liberty and justice for all, or they're going to be told, 'Fuck you.' Okay?  And if they're told, 'Fuck you,' that's going to be the declaration of a guerilla war."  *Id.* Defendant Vallejo continued, "I'm just praying to God that Trump has his head on fucking straight, he has got the machinations behind him, he's got all the proof in the world, and he's going to bring the fucking hammer down!  That's the only hope, the only chance.  If that doesn't happen, then this shit is on."  *Id.*  When the interviewer commented on what he perceived as a broken election system, defendant Vallejo announced their intention to use violence to fix it: "No that's fine … Because I'm the motherf**er that's gonna fix it for them if they tell me today it's broken … You know what I've been telling people?  I've been telling people for years I'm the guy that everybody said, 'no Ed, you can't shoot them yet, it's too soon.  No Ed, you can't shoot the bastards yet, it's too soon.'  Well I've been telling them for about five, six months ago.  They quit telling me."  *Id.*

These statements not only show that defendant Vallejo had fully joined the conspiracies Rhodes laid out by January 6, but they also demonstrate that defendant Vallejo's (now confessed) seditious intent was not limited to January 21, 2021, or later. He was ready to "fix it" *that day* if he was told it was broken and Congress or President Trump did not act. Defendant Vallejo's assertion that these statements amount to mere "rhetoric" that shows his "hope in the president and the process" is again nothing more than his interpretation of defendant Vallejo's true meaning behind the words. Defendant Vallejo's argument ignores the Rule 29 standard and fails to counter the point at issue, which is that a reasonable jury could rely on defendant Vallejo's words before and on January 6 to find he joined the charged conspiracies and that he did so corruptly. And defendant Vallejo's position is incredible: these words were not mere rhetoric, as evidenced by the fact that defendant Vallejo was saying them on the date of the Certification itself, sitting in a hotel room a short drive from the Capitol after driving across the country with rifles. The guilty verdict did not "necessarily" rely on "mere conjecture and speculation." It relied on the evidence.

Defendant Vallejo's actions and those of his co-conspirators throughout the day on January 6 only further cement that reasonable conclusion. At about 1:25 p.m., when it became clear that President Trump and Vice President Pence were not going to intercede to stop the Certification of the Electoral College vote, and as a large crowd gathered on the Capitol grounds and converged on the building, Rhodes sent messages described above, lauding the "patriots" who were taking matters into their own hands. Gov. Exh. 1500.2. Similarly, at 1:41 p.m., Rhodes sent a message to the OLD Leadership CHAT stating, "Hey, the founding generation stormed the governors mansion in MA . . . . They didn't fire on them, but they street fought. That's where we are now. Next comes our 'Lexington;'" the location of the "shot heard 'round the world" that Kandaris had referenced on the podcast with defendant Vallejo just hours earlier. *Id.* In the context of Rhodes'

letters and all the messages Rhodes and his co-conspirators had exchanged in the lead-up to January 6, these words were a call to action. As described in detail above, defendant Vallejo and his co-conspirators answered.

As the boots on the ground attacked the building, defendant Vallejo repeatedly checked in to offer his support as the "QRF." At 2:24 p.m., defendant Vallejo messaged the "DC OP: Jan 6 21" Signal chat, "Vallejo back at hotel and outfitted. Have 2 trucks available. Let me know how I can assist." Gov. Exh. 1500.2. At 2:38 p.m., as the first member of Line One, William Isaacs, burst through the East Rotunda Doors, defendant Vallejo messaged the chat again: "QRF standing by at hotel. Just say the word . . . ." *Id.* In his motion, defendant Vallejo interprets these messages as offers to remove people from Washington, D.C., because of what was happening at the Capitol. ECF 477-1 at 15-16. This again ignores the standard of review and ignores the surrounding evidence of defendant Vallejo's criminal intent. Only hours earlier, defendant Vallejo made it clear *he* was the one that was going to "fix it" if the government showed the electoral process was broken on January 6. *He* was the one that was ready for "guerilla war." *He* was the one others had to tell to not shoot those government actors responsible for corruption. And now defendant Vallejo was at the hotel "outfitted" while his co-conspirators were forcing themselves into the very building where Members of Congress had failed to act the way the members of the conspiracy wanted. Defendant Vallejo's argument that "outfitted" simply meant putting on Oath Keepers clothing, *id.* at 17, is not supported by any evidence, unlike the fact that defendant Vallejo had rifles at the ready, as supported by his messages and hotel surveillance. And defendant Vallejo knew how to say "exfiltrate" and "evacuate," because he, in fact, used those words *after* his co-conspirators attacked the Capitol and after the curfew was put in place.

Defendant Vallejo likewise makes much of the fact that he was in D.C. looking for his lost

46

truck when the congressional proceeding began at 1:00 p.m., arguing that this fact proves he did not intend to stage at the QRF hotel as part of the charged conspiracies. ECF 477-1 at 16-18, 31-32. Of course, losing his truck may not have been part of the agreement, and the evidence made clear that defendant Vallejo returned directly to the QRF hotel upon finding the truck, as opposed to waiting near the Capitol to allegedly help his co-conspirators. He notes that there were road closures keeping him from getting to the Capitol and inappropriately relies on "unintroduced portion[s]" of evidence, *id*. at 17, neither of which counters the legitimate inference that he returned to the hotel because that is where he had the rifles, especially when viewed in the light most favorable to the government. The evidence made it clear that defendant Vallejo knew "that the People have taken the Capital and Congress is in bedlam & locked down," Gov. Exh. 9552 (Msg. 210.T.6.2), and a reasonable jury could conclude that he was repeatedly offering to help his co-conspirators make that happen.

Defendant Vallejo's statements to his co-conspirators on the evening of January 6 only bolster the conclusion that he had joined the charged conspiracies. From asking whether others had secured the "Arizona Capital" at 3:47 p.m., Gov. Exh. 9554 (Msg. 210.T.7.7); to attempting to fly a drone into Washington, D.C., at 6:40 p.m., *id*. (Msg. 1.S.159.1307); to announcing "we have only yet begun to fight!" and dating "After Action Reports" for one day after the scheduled transfer of presidential power, *id*. (Msgs. 1.S.159.1331, 1332, and 1337); to announcing they would "DO IT AGAIN" the next day *id*. (Msgs. 1.S.159.1323)—the evidence illustrated defendant Vallejo's understanding of their overall agreement and actions that day as well as his support for it afterward.

Defendant Vallejo contends these statements were about the protestors and not about what any co-conspirators had done. Testimony from witness Joe Herrington about defendant Vallejo's

Olive Garden dinner with Rhodes and other co-conspirators on the night of January 6 rebuts that notion. According to Herrington, they needed to leave their cell phones in the car and were "happy" and "excited," 01/09/23 AM Tr. at 3532-33, 3549. He remembered that defendant Vallejo and Kandaris described having served as a QRF ready for the call to enter D.C. on January 6, *id.* at 3546, and had plans to go back to the Capitol on January 7 via "waterways," *id.* at 3547-48. Near the end of the dinner, Herrington explained that everyone left the restaurant "scared" after SoRelle received information that law enforcement may be after Rhodes, *id* at 3549-50. Despite knowing law enforcement may be after Rhodes for what happened at the Capitol on January 6, defendant Vallejo continued to message his co-conspirators about their actions and intentions. Gov. Exh. 9653. At 5:46 a.m. on January 7, for example, defendant Vallejo messaged the DC OP: Jan 6 21 group chat, "We are going to probe their defense line right now," *id.* (Msg. 1.S.159.1407), and, soon after, "We are at WAR," *id.* (Msg. 1.S.159.1416). Notably, he continued to communicate with Rhodes, issuing a "status report" to his co-conspirators and notifying Rhodes directly, "Status report posted in Ops. Room extended 1 day. Standing by awaiting orders, Sir." *Id.* (Msg. 1.S.139.15). Despite defendant Vallejo's position to the contrary that defendant Vallejo "sought to follow what he understood as lawful directives of President Trump as Commander-in-Chief," ECF 477-1 at 20, the evidence established that defendant Vallejo was following *Rhodes'* orders and awaited further orders from him after January 6.

Finally, the jury was presented evidence of defendant Vallejo's consciousness of guilt after his and his co-conspirators' actions on January 6. On January 28, defendant Vallejo sent to his co-conspirators on the DC OP: Jan 6 21 group chat an article that highlighted the arrest of three of his co-conspirators—Jessica Watkins, Donovan Crowl, and Thomas Caldwell—for their actions on January 6. Gov. Exh. 9652 (Msg. 1.S.159.1639); *see also* Gov. Exh. 9652.1. On February 12,

defendant Vallejo sent the same group an article about the FBI's supposed ability to break into and read people's Signal messages. *Id*. (Msg. 1.S.159.1643); *see also* Gov. Exh. 9652.2. Finally, sometime after sending that article about Signal's vulnerabilities to law enforcement methods, defendant Vallejo deleted the Signal application from his phone entirely, according to FBI CART Examiner Kathryn Cain. 01/09/23 PM Tr. at 3721, 3735-38.

In sum, there was more than sufficient evidence to establish each of the elements of defendant Vallejo's charged conspiracies in Counts One, Two, and Four. Defendant Vallejo's contention that there was no evidence of any agreement to forcibly oppose the congressional proceeding until the moment the Oath Keepers conspirators were marching up the Capitol steps does not comport with the evidence the jury received for over five weeks. And, because there was sufficient evidence to support such an agreement ahead of his purported "late" moment— especially when viewed through the light most favorable to the government—his argument that he was too far away from the group in the hotel misses the mark. He joined the agreement laid out by his co-conspirators, he acted on that agreement, and he is guilty of the charged conspiracies.

### B. The Government's Evidence Was More Than Sufficient To Prove That Roberto Minuta was Guilty of Counts One, Two, Three, and Four.

Defendant Minuta similarly argues that "the government's case lacked any evidence from which even an inference of knowledge could be argued with respect to Minuta" and the conspiracies the jury convicted him of in Counts One, Two, and Four. ECF 479 at 5. Relatedly, he argues that there was "no evidence" that defendant Minuta knew "force" would be used as part of achieving the conspiratorial agreement in Count One, *id*. at 15-16, or that there was a congressional proceeding taking place on January 6, *id*. at 17-19. In essence, defendant Minuta concludes that "[t]he government's evidence" that defendant Minuta knowingly joined the charged

conspiratorial agreements and obstructed the official proceeding and members of Congress by force "relied upon speculation and conjecture." *Id*. at 5. Not so.

This argument ignores the wealth of evidence of defendant Minuta's statements and actions with co-conspirators, including Rhodes, throughout November, December, and January focused on stopping the transfer of presidential power by any means necessary, and, by January 6, doing so by obstructing what was happening at the Capitol by force. His argument that "there was no testimony from any witness who was in communication with Minuta about statements made to or by Minuta," ECF 479 at 6, is irrelevant. Defendant Minuta's statements and actions spoke for themselves and provided far more than "speculation" for the jury to conclude defendant Minuta was guilty of Counts One through Four.

Shortly after the election in mid-November, Rhodes was calling for action in response to the election. Posting to the Oath Keepers website, Rhodes urged others to follow the example of Serbians who had achieved regime change in their country by "[m]illions gather[ing] in [the] capital," breaking through barricades, and storming the legislature. Gov. Exh. 1002. Minuta used the Oath Keepers website's internal Rocketchat forum the same week and echoed the same sentiment: "If you were called to action on short notice, what would you be scrambling to organize . . . Get that gear set up and ready to deploy on a moments notice. This calm before the storm is the perfect opportunity for us to finalize preparedness. We must be ready to be in the streets in a controlled manor (Virginia 2A rally style). We must OVERTAKE the streets in massive numbers. Gather your trusted patriots/ veterans /LE ...Oathkeepers or not, I believe we will need all hands on deck. This is our country and the time is now or never to save the republic And preserve what is left of our liberties." Gov. Exh. 6773 (Msg. 2200.2).

Rhodes then called defendant Minuta into action, as he had predicted, and Defendant Minuta answered.  The weekend after Rhodes and defendant Minuta posted these messages, they both, along with other co-conspirators, traveled to the Washington, D.C. metropolitan area for a November operation to coincide with the so-called "Million MAGA March."  After the operation, defendant Minuta posted to Facebook, "REVOLUTION time.  I had the pleasure of being part of the security detail with the infamous PROUD BOYS, OATHKEEPERS, and INFOWARS!"  Gov. Exh. 6773 (Msg. 2004.P.583.4).  He elaborated on his experience in D.C. with the Oath Keepers, warning on Facebook, "If you have never been in a literal mob of violent demonic communist protected by the crooked ass police, then you can't accurately talk about what is REALLY going on in this country.  We are already in civil war, choose a side."  *Id.* (Msg. 2004.P.283.11).

That same month, defendant Minuta made clear that, to him, like his co-conspirators, this "war" was about the presidential election and the "tyrannical government" responsible.  Gov. Exh. 2004.V.4.  In a Facebook video, defendant Minuta explained:

> We went to war for so much less . . . in this fucking country and around the world to stop tyranny.  Now we just let them push the envelope . . . The integrity of our democratic system is fucking dead.  I don't care what camp you reside in or how you identify, you should be appalled. . . . It's the same shit over and over and nothing will change, no president will change this until you wake up.  Until you do something. . . . Today is "Stop the Steal." . . . The founding fathers laid out these freedoms, and so many people died to give us those freedoms. . . . They are contingent on how much fucking tyranny you will take. . . . Boot of the government on your fucking face for eternity, that's what's coming. . . .

*Id.* Defendant Minuta claims this evidence "worked a fundamental miscarriage of justice given their protection under the First Amendment as political speech and advocacy."  ECF 479 at 21.  "He cannot be punished through this prosecution by the government," he asserts, "for having expressed those views when there was no basis in the evidence that they had any relationship to the alleged conspiratorial planning by others."  *Id.* at 22.  Under the guise of a motion for judgment

of acquittal, defendant Minuta is effectively arguing how the evidence should be weighed and that certain evidence should be excluded.  These are impermissible arguments at this juncture.  The core of the inquiry is whether sufficient evidence exists to support the conviction.  Aside from the fact that this evidence reflected his own intent about the election and what to do about it, which is relevant to Counts One through Four, it also echoes the same words and calls to action that defendant Minuta was receiving from Rhodes on the Oath Keepers website and pushing out himself on the Oath Keepers Rocketchat server.  In other words, this evidence reflects his agreement with his co-conspirators that lays the foundation for his and their actions at the Capitol on January 6.

Consistent with controlling law, moreover, the jury instructions ensured that the jury did not improperly convict the defendants for protected First Amendment conduct.  The Supreme Court has explicitly held that courts may consider otherwise-protected speech to establish a defendant's motive or intent during the commission of some other unlawful conduct.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (holding that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent").  Accordingly, the Court instructed the jury, "You may not find that a defendant committed a crime, or that a conspiracy existed, simply because you find that a defendant, or other individuals, engaged in speech you find to be offensive. You may, however, consider the statements made by defendants and other individuals as evidence that, for example, a conspiracy existed, a defendant entered into a conspiracy, or a defendant had a certain motive, intent, or knowledge."  *Final Jury Instructions*, at 12-13.  This was an accurate statement of law and no doubt ensured that the jury did not convict defendant Minuta or any of his co-defendants solely on the basis of protected speech or protest activity.

As another example of the relevance of defendant Minuta's Facebook evidence, he made it clear that he viewed firearms an integral part of combatting the "tyranny" he viewed as underlying the presidential election:

> The last line in the sand is the second amendment, which means the ability to have firearms and be a well-regulated militia, every fucking able-bodied American. . . . It's not about hunting, it's not about protecting yourself. It's about, we are past midnight with the tyranny and it is time to restore freedom . . . and millions will die, millions will die . . . so what, get your fucking soul ready, get right with God. . . . I'm not afraid, and I'm ready to fucking go. And I know that I will be with my family for eternity and in the righteous fucking place. . . . Jesus fucking said sell your cloak and buy a sword, and that's what the fuck is going on. . . . Wake up, do something, don't just sit there and bitch. Do something about it.

*Id*. Again, this and other evidence contradicts defendant Minuta's argument that there was "no evidence" that he was prepared to use force or knew of any calls to use force to stop the transfer of power, ECF 479 at 16.

Moving into December, as detailed above, Rhodes and his co-conspirators also began to call more directly for the use of force to oppose the transfer of power—regardless of whatever action the President would or would not take—and to focus on the Certification proceeding set to take place on January 6 as a day of action to advance their criminal objective. As early as December 10, Rhodes began expressing in private circles his skepticism that the President would invoke the Insurrection Act and his belief that he and other Oath Keepers members and affiliates would need to take matters into their own hands. In a message to Kellye SoRelle and two other acquaintances, for example, Rhodes wrote, "[E]ither Trump gets off his ass and uses the insurrection Act to defeat the ChiCom puppet coup, or we will have to rise up in insurrection (rebellion) Against the ChiCom puppet Biden. Take your pick." Gov. Exh. 6748 (Msg. 1.T.2186.50). On December 14, the day that the Electors of the Electoral College met in their respective states and cast votes that resulted in the necessary number for President Biden to be

elected, Rhodes told co-conspirators on the OLD Leadership CHAT, "Trump has one last chance to act. He must use the insurrection act. Unless we fight a bloody civil war/revolution." Gov. Exh. 6701 (Msgs. 1.S.696.15779, 15784). In the open letter on December 23—the same letter Vallejo and other co-conspirators read and circulated to other Oath Keepers—Rhodes wrote that if the President did not act before or on January 6 to stop the election results from being certified, Rhodes and others may have to "take to arms in defense of our God given liberty." Gov. Exh. 1008. In other words, Rhodes and defendant Minuta were advocating the same manner of force in the same timeframe. Defendant Minuta's social media activity in late December further illustrated his conspiratorial and corrupt focus entering January: when Proud Boys leader Enrique Tarrio, posted "Lords of War" and "#J6 #J20"—clear references to the constitutional dates governing the transfer of power—along with a photograph of defendant Minuta and others surrounded by flames, defendant Minuta responded, "Bad ass! . . . Honor to stand with you guys. See you Jan 6." Gov. Exh. 9514 (Msgs. 2055.P.1-2).

Contrary to defendant Minuta's general contention that the government presented disconnected tracks of evidence regarding him and his co-conspirators, the evidence illustrated that defendant Minuta continued communicating with Rhodes during this timeframe in December and was privy to Rhodes' intentions to take forceful action. Defendant Minuta attended another Oath Keepers operation in D.C. with Rhodes in December and, beforehand, Rhodes added defendant Minuta to a Signal group chat noting, "Added Robert Minuta, our NY Oath Keepers leader. . . . He is one of my most trusted men." Gov. Exh. 6773 (Msg. 1.S.209.29). On December 19, 2020, defendant Minuta wrote to an acquaintance, "Oathkeepers president is pretty disheartened. He feels like it's go time, the time for peaceful protest is over in his eyes. I was talking with him last night." Gov. Exh. 6773 (Msg. 245.T.1.1). Then, on December 30, Rhodes

and other co-conspirators created and administered a group chat called "DC OP: Jan 6 21." Rhodes described DC OP: Jan 6 21 as "THE DC op thread for all leadership coming in, from multiple states, and together with the overall DC op leadership." Gov. Exh. 9514 (Msg. 1.S.159.108). Rhodes then added defendant Minuta to this chat.

Defendant Minuta contends that "[t]here are no Signal messages to or from Minuta in the DC OP chat so there was no evidence in the record from which an inference could be drawn that he knew of any of the messages sent by others in the DC OP chat." ECF 479 at 6. As a result, defendant Minuta continues, "there was no basis to infer his knowledge regarding 'use of force' from the exchange of messages by others about the armed QRF," *id*. at 15, or about "the Congressional certification proceeding taking place on January 6," *id*. at 17. That is patently false. Leading up to January 6, for example, defendant Minuta messaged with co-conspirators on the DC OP: Jan 6 21 chat about hotel arrangements at the Mayflower Hotel where he would eventually reserve three rooms that most of the Line Two co-conspirators in fact used before and after storming inside the Capitol. Gov. Exhs. 2603, 2607. And on January 7, defendant Minuta sent at least one video of his co-conspirators' actions inside the Capitol on January 6, adding, "In side the front entrance." Gov. Exh. 9652 (Msg. 1.S.159.1433). Soon after sending that message, defendant Vallejo noted that he could not share the video, and defendant Minuta later responded that he removed the video, stating, "Couple faces exposed in the last video that didn't want to be shown. Sorry, had to delete footage from inside." *Id*. (Msg. 1.S.159.1494). So, not only did defendant Minuta in fact send messages to the DC OP: Jan 6 21 chat, he interacted directly with co-defendants on that chat and messaged before and after January 6 about topics that are directly related to their actions at the Capitol. The jury was not left with mere speculation, but direct evidence and legitimate inference that defendant Minuta was engaging with co-conspirators on the operational

group chat about the certification proceeding ahead of time, the less-than-lethal weapons and force they may use while in D.C., and the need to act against the transfer of power.

Then, on January 6, defendant Minuta continued to interact with Rhodes and other co-conspirators. His statements and actions that day make clear defendant Minuta knowingly agreed with Rhodes and his other co-conspirators to stop the transfer of power that day by any means necessary, including by obstructing the congressional proceeding and members of Congress by force. Upon arriving to the Washington, D.C. area late on January 5, defendant Minuta went to the Hilton Garden Inn, Vienna—the same hotel patronized by Rhodes and other co-conspirators, including Michael Greene, Kellye SoRelle, and Joshua James. 12/20/22 AM Tr. at 2167. And, throughout the day on January 6, defendant Minuta directly called Rhodes both before and after storming inside the Capitol and stayed with co-conspirator Joshua James, who repeatedly called Michael Greene and Stewart Rhodes. Gov. Exhs. 6740A, 6742A.

When Rhodes announced on Signal group chats, which included defendant Minuta and James, that "patriots" were taking matters into their own hands, both defendant Minuta and James rushed to the Capitol. The jury watched defendant Minuta's words and actions from that moment, around 2:00 p.m., through to the moment defendant Minuta exited the Capitol and remained on the steps at 3:41 p.m. Gov. Exh. 1508. Far more than leaving the jury with mere "speculation and conjecture," the evidence showed defendant Minuta taking their criminal agreements and putting them to action. On the way to the Capitol, defendant Minuta announced, "[h]eaded to the Capitol building, patriots storm the Capitol Building. There's violence against patriots by the DC police so we're en route. . . . F**king war in the streets right now." *Id*. Defendant Minuta's argument that these are just his words and are not actually describing his surroundings, ECF 479 at 8-10, is exactly the point: these are *Minuta's* words, showing the jury exactly what he is thinking on the

way to the Capitol and what he understands is going on from his communications with his co-conspirators.

Defendant Minuta eventually arrived on the west side of the Capitol, and, at nearly the exact time his Line One co-conspirators were entering the building on the east side, defendant Minuta stated, "They said, word is that they got in the building. Let's go." *Id.* Defendant Minuta then marched, with hands on shoulders, with the Line Two group of co-conspirators to the east side where the Line One co-conspirators had breached the building. After breaching the Capitol grounds, defendant Minuta yelled at officers securing the perimeter: "[T]hey stand here and they know their government is completely criminal, completely corrupt, and they f**k us over when they just want to keep their f**king paycheck when they won't even have a country." *Id*. Defendant Minuta asserts that this is not evidence of his "knowledge (or intent)," ECF 479 at 12, because it is directed at officers and not members of Congress inside the Capitol. Of course, law enforcement officers were the barrier between him and the Members of Congress, and he eventually used physical force to try to get past those officers inside the building. But, more importantly, his argument views the evidence too narrowly; at this stage, there is "no distinction between direct and circumstantial evidence," and the Court must give "full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *Williams*, 836 F.3d at 6. That defendant Minuta is screaming at officers during a riot outside of the Capitol about the "corrupt" government on January 6, just before he stormed inside the building, is certainly all evidence the jury could reasonably consider in determining that defendant Minuta had joined the charged conspiracies to stop the transfer of power, obstruct the proceeding, and impede the Members of Congress.

Defendant Minuta, James, and his other co-conspirators then breached the Capitol themselves through the same doors as their Line One co-conspirators. Inside, he and James forcibly pushed past a perimeter of law enforcement officers, including MPD Officers Anthony Jackson and Jose Mendoza, who were trying to secure the building and remove the rioters. While doing so, defendant Minuta and James both yelled at the officers that this was "their f**king building." Gov. Exh. 1508; *see also* Gov. Exhs. 111.V.1, 1089.1. Defendant Minuta's argument that James's actions were only a reaction to Officer Mendoza and that defendant Minuta "was an observer of what James did—not a participant in it," ECF 479 at 14, is belied by the video evidence the jury watched in the form of multiple body-worn cameras, Gov. Exhs. 9601, 9602;CCTV; open-source news video; and defendant Minuta's *own* cell phone recording of the incident, Gov. Exh. 111.V.1, 1508. Defendant Minuta did not observe James push his way further into the Capitol toward the Members of Congress; he joined and helped James do that. Defendant Minuta did not observe Officer Mendoza getting crushed by the rioters; he and James caused that, and the jury listened to Officer Mendoza repeatedly plead for them to leave, panting, "I can't breathe." *Id.*

These actions directly demonstrate defendant Minuta's corrupt intent and actions toward obstructing what was going on inside the Capitol on January 6, and they evidence his agreement with his co-conspirators to do so. *Final Jury Instructions*, at 14 ("You may infer . . .that a person intends the natural and probable consequence of acts they intentionally did."). Regardless, as co-conspirators, defendant Minuta is culpable for James' statements and actions that were reasonably in furtherance of the conspiracy, even if, as defendant Minuta now claims, he did not actively assist James in that endeavor. *See Final Jury Instructions,* at 19 ("You have heard evidence of certain acts and conversations that are alleged to have taken place with a defendant or while a defendant was listening to, watching, or reading the conversations or observing the acts. You may, but are

not required to, consider this evidence in determining whether these acts and conversations show beyond a reasonable doubt a defendant's knowledge of the unlawful purposes of the conspiracy. You may consider this evidence along with other evidence in the case and give it as much weight as you think it deserves.").

Defendant Minuta's and James' actions also constituted force, as defined in the jury instructions and required by Section 2384.  Defendant Minuta narrowly argues that he must have known specifically about the QRF and firearms at the hotel and the related QRF personnel for the jury to find he knew about the "force" element.  ECF 479 at 14-16.  That is untrue.  In fact, as the Court instructed the jury, "[i]t is not necessary for the government to show that the defendant was fully informed as to all the details of the conspiracy for you to infer knowledge on his part.  To have guilty knowledge, the defendant need not know the full extent of the conspiracy or all of the activities of all of its participants.  It is not necessary for the defendant to know every other member of the conspiracy. In fact, the defendant may know only one other member of the conspiracy and still be a co-conspirator.  It is enough if he or she participated as a conspirator unlawfully, intentionally, and knowingly." *Final Jury Instructions*, at 19.

Of course, the government *did* present evidence of plans and actions involving force as to both defendant Minuta's co-conspirators and himself.  Most obviously, defendants Vallejo, Hackett, Moerschel and their co-conspirators transported scores of firearms to the QRF hotel in Virginia, ultimately amassing an arsenal.  Gov. Exh. 1518.  And at least Rhodes continued to amass firearms after January 6, when he purchased over $17,000 in new weapons and related equipment before the Presidential Inauguration.  Gov. Exh. 1540.  Defendant Minuta need only know the "essential nature of the plan" and not the "specific details," and there was sufficient evidence that he was ready to use force to act as early as November 7 in Facebook videos, he knew Rhodes was

done with peaceful protests as early as December 19, and he, in fact, did use force on January 6. And defendant Minuta's co-conspirators extensively discussed what kind of weapons, including those less lethal than firearms, they could and did bring with them to the District of Columbia on the DC OP: Jan 6 21 group chat. Additionally, many of the defendants' actions on January 6— aligning in military-style stack formation, marching up the steps of the Capitol building and damaging property as they forced their way inside, dividing up once inside, and pushing against police lines—offered proof that the defendants intended to use, and did use, force in service of their unlawful objectives. In any event, after law enforcement officers repelled defendant Minuta using chemical spray, he marched his way back through the doors he entered and, on the way out, he referenced the need to use firearms against the government, yelling at a Capitol Police officer, "All that's left is the second f**king amendment." Gov. Exh. 1508. A clear reference to same instrument of force his co-conspirators planned to, and did, equip themselves with as part of their efforts to stop the transfer of power by force on January 6.

## C. Government's Exhibits 1500.2, 1508, And Its Message Compilations Were All Appropriately Admitted.

Finally, defendant Minuta again impermissibly argues at this stage that certain evidence should not have been admitted, rather than focusing on the sole inquiry at hand of whether there was sufficient evidence to support his convictions. He appears to contend that two of the government's summary exhibits—1500.2 and 1508—and all of the "Signal messages and statements or writings from other sources" were not appropriately admitted. ECF 479 at 23. To be clear, there does not appear to be an argument in defendant Minuta's "Section E," *id*. at 22-23, so much as a string of case law regarding Federal Rule of Evidence 1006. Regardless, the Court appropriately ruled that these exhibits, and the statements compilations, were all admissible.

The Court addressed these arguments and denied them during the first trial with defendant

Minuta's co-conspirators.  ECF 392 at 4-6.  And then the Court denied them again before this trial

when defendant Minuta and his co-defendants, including defendant Hackett, raised the same issue

pretrial, ECF 386-388.  On December 9, 2022, the Court correctly ruled that these exhibits and

others were admissible under Federal Rule of Evidence 1006:

> The Federal Rule of Evidence 1006 . . . permits the admission of summary chart—
> summary charts or calculations to prove the content of voluminous writings,
> records or photographs that cannot be conveniently examined in court.  The
> voluminous underlying records must themselves be admissible and must be made
> reasonably available for inspection and copying.  As long as the summaries of those
> voluminous records are accurate and nonprejudicial, the summaries can help the
> jury organize and evaluate evidence which is factually complex and fragmentally
> revealed in the testimony of a multitude of witnesses or documents throughout the
> trial. . . .

12/09/22 AM Tr. at 777 (citing *United States v. Abou-Khatwa*, 40 F.4th 666, 684-85 (D.C. Cir.

2022).  Additionally, the Court found the exhibits admissible as "pedagogical devices" under Rule

611(a), in the event they fall short of summary exhibits under Rule 1006:

> [E]ven if I'm wrong about these exhibits being admissible under Rule 1006, I think
> they are admissible under Rule 611(a).  Rule 611(a) permits the "Court to exercise
> reasonable control over the mode and order of examining witnesses and presenting
> evidence so as to make those procedures effective for determining the truth, avoid
> wasting time, and protect witnesses from harassment or undue embarrassment." . .
> . So even if I'm wrong about the 1006 summary, I do find them to be admissible
> under 611(a). I do find these exhibits, having seen them, to be accurate and reliable.
> Again, they're subject to cross-examination in terms of additional facts that the
> defense may wish to bring out during the course of the timeline that's illustrated in
> the exhibits, and that they are the kind of evidence that will assist the fact-finder in
> understanding the evidence that's otherwise complex and varied and otherwise
> difficult to manage to present.

*Id*. at 782-86 (citing *United States v. Bray*, 139 F.3d 1104 (6th Cir. 1998); *United States v.*

*Milkiewicz*, 470 F.3d 390 (1st Cir. 2006); *United States v. Hawkins*, 796 F.3d 843 (8th Cir. 2015);

*United States v. Oyakhrie*, 431 Fed. App'x 126 (3rd Cir. 2011)).

Under Rule 1006, these exhibits are substantive evidence and need no limiting instruction. *See id*. at 688 (citing *United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008); *United States v. Weaver*, 281 F.3d 228, 233 (D.C. Cir. 2002); 2 MCCORMICK ON EVIDENCE § 241 (8th ed. 2020) ("Federal Rule 1006 is clear that summaries admitted under its terms are evidence themselves, substituting for the voluminous documents that are not admitted into evidence.  And because such summaries are substantive evidence, no limiting instruction is given to the jury as to its use and it may be taken into the jury room during deliberations.")).  *Id*.  Yet, the Court provide such an instruction, further diminishing the defendants' arguments raised here.  The Court repeatedly instructed the jury, both in real time throughout trial and in the final jury instructions, how it should treat summary exhibits and the testimony of the witnesses testifying about them:

> You may consider the summary exhibits as you would any other evidence admitted during the trial and give them such weight or importance, if any, as you feel they deserve.  In addition, certain law enforcement agents provided testimony about summary exhibits.  Insofar as these agents testified about the contents of a summary exhibit, you should consider such testimony only as an aid in evaluating the summary exhibit.

*Final Jury Instructions*, at 11.  These exhibits were all appropriately admitted, and they do not warrant an acquittal under Rule 29.

Defendant Minuta's reference to the "Signal message" compilations is even less developed and should meet the same fate.  The Court repeatedly addressed the objection that the "statements compilations" the government admitted—i.e., Exhibits 9551, 9552, and 9554 for January 6—compiled statements from different sources, and the Court rightly rejected it.  On December 13, 2022, for example, defendant Vallejo raised the objection, and the Court ruled:

> The government gets to present the evidence it wishes to present in the manner it wishes to present it, unless there is something unduly prejudicial and unfair about it.  You get the opportunity to then cross-examine the witness with other messages you may wish to have the jury see or take apart the actual exhibit that's in front of you.  All this is, is showing messages from the early periods of post election.  It

identifies who the speaker is, it's identifying what the source is. . . . It's under one exhibit number. . . . So if there are other chats or other messages you want to have brought in, you can then make a completeness objection before the evidence is presented, or you can use it to cross-examine . . . a witness. There's nothing improper about sequencing evidence from different sources at all. . . . It's not coming in as summary. These are separate individualized communications that are coming in under one exhibit number. This is not a summary exhibit. Every slide in this exhibit identifies the date, the time, who the speaker is, and the source of the comment. So I don't know that the jury would be confused . . . but if you want to disabuse of any potential confusion, you're welcome to do so through cross-examination.

12/13/22 PM at 1202-03. This is true for all of the statements compilations the government admitted, and they are not grounds for acquittal under Rule 29.

### D.  No New Trial Is Warranted Pursuant To Federal Rule Of Criminal Procedure 33.

Defendant Minuta also moved for a new trial pursuant to Federal Rule of Criminal Procedure 33. ECF 478. Rule 33(a) states, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. While "[t]rial courts enjoy broad discretion in ruling on a motion for a new trial," the D.C. Circuit has "held that granting a new trial motion is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" *United States v. Wheeler*, 753 F.3d 200, 208 (quoting *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990)).

Defendant Minuta fails to identify any miscarriage of justice let alone a serious one. His motion appears to be identical to his motion for judgment of acquittal under Rule 29, ECF 479, except for two new arguments in the "Introduction," unsupported by any caselaw. He first asserts a new trial is warranted, because the government charged "Minuta with only felony offenses, notwithstanding the fact that he was certainly guilty beyond a reasonable doubt of being on restricted ground, and for having entered the Capitol building when it was closed to the public." ECF 478 at 2. This "tactical decision," defendant Minuta claims, "was to give the jury only two

stark options—convict Minuta of felonies on highly dubious legal and factual grounds, or acquit Minuta on all counts and convey the unacceptable public message that he had done nothing wrong on January 6." *Id*. Second, defendant Minuta claims the Court's error in not granting a motion for a change of venue and dividing the defendants into two trial groups created a "fundamental unfairness," because he was tried with co-defendants "he had never met prior to January 6" and *not* tried with people like Rhodes and Caldwell. *Id*. at 3-4. What follows these arguments is a recitation of the same facts and arguments in his Rule 29 motion that do not bear on either of these two positions.

Defendant Minuta's motion should be denied. As to his argument about the charges he faced, it is well-established that "the Constitution allocates primacy in criminal charging decisions to the Executive Branch." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 737 (D.C. Cir. 2016). Indeed, "[t]he Executive's charging authority embraces decisions about whether to initiate charges, whom to prosecute, *which charges to bring*, and whether to dismiss charges once brought." *Id*. (emphasis added). "It has long been settled that the Judiciary generally lacks authority to second-guess those Executive determinations, much less to impose its own charging preferences. The courts instead take the prosecution's charging decisions largely as a given, and assume a more active role in administering adjudication of a defendant's guilt and determining the appropriate sentence." *Id*. Defendant Minuta's conclusory allegation that the government's charging decisions in this case were "tactical" falls far short of surmounting this "constitutionally rooted" principle of law and certainly do not warrant a new trial under Rule 33. *Id*. at 738.

His second argument should meet the same fate. The Court has repeatedly rejected the defendants' motions for a change of venue based on both case law, the verdicts rendered in these and other trials, and the statistics stemming from the jury selection process. Defendant Minuta

raises nothing that would call those rulings or the support for those rulings into question. And the makeup of defendant Minuta's trial has no bearing on the "fundamental fairness" of his trial when he was tried with co-defendants from the same indictment, charged in the same conspiracies, and who all ultimately acted together on January 6. That defendant Minuta may not have known defendants Hackett, Moerschel, or Vallejo ahead of January 6 is of no moment; the Court appropriately instructed the jury that "the defendant need not know the full extent of the conspiracy or all of the activities of all of its participants" and "[i]t is not necessary for the defendant to know every other member of the conspiracy." *Final Jury Instructions*, at 19. And defendant Minuta's argument that he unfairly confronted evidence related to his co-defendants at trial does not square with his request for a trial with all of the defendants in the case—should the Court have done what he requests, he would simply have confronted the same evidence he complains of *and more*, related to the other defendants he proposes should have been added. In any event, he and the other counsel had the opportunity to, and did, argue for limiting instructions as to evidence that only pertained to particular defendants and not all of the co-conspirators. *See Final Jury Instructions*, at 10 (limiting the jury's consideration of certain evidence to only Joseph Hackett, and *not* Roberto Minuta). And he does not point to one piece of evidence he objected to and for which he inappropriately or unlawfully failed to receive a limiting instruction.

Nothing defendant Minuta raises warrants a new trial under Rule 33.

### III.    <u>Conclusion</u>

The Court should deny defendants Roberto Minuta, Joseph Hackett, David Moerchel, and Edward Vallejo's motions for judgment of acquittal under Rule 29.  Likewise, the Court should deny defendant Roberto Minuta's motion for new trial under Rule 33.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    _____
Troy A. Edwards, Jr.
Assistant United States Attorney
NY Bar No. 5453741
Alexandra Hughes
Jeffrey S. Nestler
Kathryn L. Rakoczy
Assistant United States Attorneys
Louis Manzo
Trial Attorney, U.S. Department of Justice