UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD VALLEJO,<br>                    *Defendant*. | No. 22-cr-15 (APM) |

**REPLY IN SUPPORT OF MOTIONS FOR JUDGMENT
OF ACQUITTAL AND FOR A NEW TRIAL**

Defendant Edward Vallejo respectfully submits the following points and authorities in support of his motions for a judgment of acquittal and for a new trial.

### INTRODUCTION

As expected, the government's opposition to Defendants' Rule 29 and 33 motions consciously misconstrues calls for protests, preparation, invocation of the Insurrection Act ("IA"), and longterm "resistance" and "nullification" of the Biden Administration as an operational, criminal plan to stop the transfer of power on January 6, despite copious evidence that the defendants were surprised and unprepared for what actually occurred that day. In so doing, the government ignores the message of *United States v. Stone*, No. 10–20123, 2012 WL 1034937, at *3 (E.D. Mich. Mar. 27, 2012)—the main precedent for analyzing the sufficiency of the evidence in the context of seditious conspiracy—that evidence of a criminal plan consisting of political speech must be clear and definite. To the extent that any of the many messages it cites were clear, they called for (1) sending a message to President Trump in hopes he would take action and use the Oath Keepers as a lawful anti-insurrection force; (2) preparing for security details and setting up a QRF to save lives and extract people; and (3) preparing to "declare independence" from a hypothetical

1

Biden Administration after January 20, 2021 if President Trump failed to act. None of these messages discussed or anticipated forcibly stopping the transfer of power, much less an attack on the Capitol on January 6.

Because there was no prior conspiracy to halt the transfer of power, and no evidence of such a conspiracy, there is no basis to conclude that Defendant Vallejo knew or joined in individual Oath Keepers' decisions to follow the crowd into the Capitol and stay there for 12 to 20 minutes. It remains the case that Defendant Edward Vallejo stands in a unique position in this case as someone who held a well-documented, repeatedly-expressed desire to see the outcome of the certification process up to the very *hour* it started, who was not at the Capitol or privy to any telephonic or in-person discussions regarding whether to follow the crowd into the building, and who expressed *opposition* to those who broke into the building. At the very least, any reasonable mind considering the evidence at trial must harbor doubts about Vallejo's knowledge of or agreement with any uncommunicated decision by others to interrupt the certification proceeding. In other words, the hypothesis of innocence for Vallejo cannot be ruled out. Accordingly, a judgment of acquittal for the specific theory and counts returned by the jury is required. *Curley v. United States*, 160 F.2d 229, 233 (D.C. Cir. 1947). At a minimum, given the acquittal Michael Greene of conspiracy, despite being the Oath Keepers' operational leader on January 6, the weight of the evidence supports a new trial for Defendant Vallejo, the lone defendant who never went anywhere near the Capitol.

## ARGUMENT

### I. There Was No Proof of a Prior Plan to Forcibly Resist the Transfer of Power, Much Less to Interfere with the Certification on January 6, 2021

The government appears to recognize the timing problem for its prosecution of Vallejo if the Oath Keepers' plan to enter the Capitol and interrupt the certification proceeding did not

"crystallize" until just before the conspirators entered the building. Opp. 35. To get around this problem, the government (1) argues that the entering of the Capitol was the manifestation of a prior "plan" to oppose the lawful transfer of power; and (2) falsely asserts that the evidence shows that there was a plan to enter the Capitol and interrupt the certification no later than December 2020. Neither contention can save the jury's verdicts, which required proof beyond a reasonable doubt that Vallejo knew about, and joined in, a conspiracy to interrupt the certification proceeding.

### A. The government confuses vague language with a criminal plan to interrupt Congress

The verdicts require the conclusion that Vallejo joined in a specific conspiracy to interrupt a specific proceeding occurring at a specific time. The government does not appear to accept this conclusion, arguing at times that "the defendants agreed to take whatever steps were necessary, up to and including using force, to stop the lawful transfer of presidential power following the 2020 election…." Op. 37. The government concedes, as it must, that there must be proof beyond a reasonable doubt that each conspirator "agreed on 'the essential nature of the plan.'" *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) (emphasis added) (quoting *United States v. Treadwell*, 760 F.2d 327, 336 (D.C. Cir. 1985)). Emphasizing that there need not be agreement on every detail, the government argues that "the 'essential nature of the plan' defendant Vallejo (and others) joined was to oppose by any means necessary, up to and including the use of force, the lawful transfer of power…." Opp. 37.

But an agreement to oppose "by any means necessary" something as general as the "the lawful transfer of power" is not a "plan." Defendants may agree to enter a drug conspiracy without discussing every detail of how the drugs will be purchased, financed, and sold; but there is still a "plan" to buy and sell illegal drugs—the mechanism of illegal action is understood. Similarly,

defendants may enter an agreement to rob a bank without finalizing the details of which weapons, points of entry, and get-away vehicles will be used—the plan is still to take money from a bank with weapons and then escape. But opposing a general process ("the transfer of power") "by any means necessary" does not begin to establish a "plan." What part of the transfer will be opposed? What means are necessary? Does it involve attacking the Capitol, or is the certification just a symbolic irrelevancy? Would force be used only after President Trump is out of office?[1] These are basic questions forming the contours of anything that could conceivably be called a prosecutable "plan." Perhaps, if a defendant supports a criminal organization without knowing or entering into any specific criminal plans, a RICO prosecution could be maintained; but for units of prosecution based on specific statutes requiring specific violations, like opposing the execution of a law (§ 2384) or interrupting a proceeding (§ 1512(c)), those violations must be part of a sufficiently-detailed and agreed-upon plan.

Moreover, the evidence did not even support the government's broad notion of a "plan." The testimony of witness Brian Ulrich could not have been clearer:

> Q. When you came to Washington, D.C., you had no plan to try to stop the certification, correct?
> A. No.

---

[1] As the evidence showed, many defendants, including Vallejo, initially anticipated that President Trump might invoke the Insurrection Act, that any force prior to the transfer of power would be used only under his edicts. *See, e.g.*, ECF 477-1 at 8–9 (discussing Ulrich testimony that his initial understanding and plan was to act lawfully under President Trump) (citing Tr. 3862; 3887–88; 3891; 3892–93; 3921–22); Gov't Ex. 1008 (Dec. 23, 2020 Open Letter); Tr. 3577–78 (Herrington) (Q. And there was no discussion about using weapons to attack the Capitol, right, that you heard? A. Not that I heard, no, sir….Q. And you understood that from what Mr. Rhodes was saying, he was saying that the militias, if called upon under the Insurrection Act, would support whatever the government needed? A. Yes, sir. Q. They wouldn't be against the government, right? A. No, sir…. Q. Mr. Rhodes said that the Insurrection Act could be used to call people up to support the President, correct? A. Yes, sir. Q. And to suppress an insurrection of people trying to stop the President from enforcing the act? A. Yes, sir.").

4

> Q. And you had no plan to try to violently or forcibly keep Joe Biden out of the White House, right?
> A. No.
> …
> Q. And you had no plan -- if Mr. Trump did not use the Insurrection Act and bowed out, you had no plan to stop Joe Biden from taking the oath of office, correct?
> A. Yeah, nothing was discussed beyond that…for a specific action on the 6th.
> Q. So no Oath Keeper that you ever spoke with discussed with you a plan to forcibly stop Joe Biden from becoming President, correct?
> A. Correct.

Tr. 3892–93; 3921–22. Likewise, all of the "resistance" and "civil war" references discussed at length by the government make clear that the original "plan" in Rhodes's mind, as expressed in extensive and meticulous detail, was to gather in Washington, show President Trump that he has popular support for invoking the IA and other measures, hope that he does so, and begin to "organize effectively and to wage [war] and win it ourselves [after the transfer of power] if he doesn't," Gov. Exh. 4761 (Msg. 1.S.233.1598), by, *inter alia*, "declar[ing] independence" from President Biden and "nullify[ing]" acts of the Biden Administration if Trump doesn't do his "duty," Gov. Exh. 6778 (Msg. 1.S.656.9254). *See* Gov. Exh. 6778 (Msg. 1.T.2186.50) (stating that either Trump acts to stop a "coup" or we "rise up" against the Biden Administration if the "coup" goes through); Gov. Exh. 4761 (Msg. 1.S.233.1513) (same); Gov. Exh. 1008, EV 106 (12/23/20 Open Letter calling for IA and new election and for resisting President Biden with "arms" after the transfer of power).

### B. The evidence did not establish a prior plan to interrupt the certification proceeding

Perhaps recognizing that it cannot rest on such a vague "plan," the government asserts that "by January 6, that agreement had crystalized into forcibly preventing, hindering, or delaying the execution of any law of the United States—namely, laws governing the congressional proceeding and the congressmembers' duties on January 6 related to the transfer of presidential power." Opp.

5

37. According to the government, "[i]n late December 2020, the[ defendants] agreed to focus the[ir] efforts on stopping Congress' certification of the Electoral College vote." Opp. 37; *id.* at 38 (asserting that "there was ample evidence that in advance of January 6 the defendants and their co-conspirators agreed to stop the Certification"). There is zero evidence for this contention, however.

Again, the undisputed testimony by cooperating witnesses across multiple trials was that there was no prior plan to attack the Capitol, and that such a plan only "crystallized" on the afternoon of January 6. *See, e.g.*, Trial 2 Tr. 3892–93 (Ulrich) (Q. When you came to Washington, D.C., you had no plan to try to stop the certification, correct? A. No."); Trial 2 Tr. 2665 (Berry) ("Q. You planned to be there for security detail, correct? A. That was the original intent, yes, ma'am."); Trial 2 Tr. 2618 (Berry) (describing first hearing of a plan to stop the certification upon entering the Capitol grounds); ECF 435-1 at 13–16 (describing testimony of Terry Cummings, Jason Dolan, and Graydon Young denying any prior plan). This testimony was corroborated by the complete documentary record both by the positive discussions of when force might be used (i.e., pursuant to the Insurrect Act or after declaring "independence" from the Biden Administration) and the complete absence of any reference to using violence to interrupt the certification in tens of thousands of pages of Signal, SMS, and Facebook messages. Although the government appears to have abandoned this concession, even it was forced to concede at the first trial that "we do not allege a specific plan to storm the United States Capitol. We never have and we are not now. We do not have to prove a plan." Trial 1 Tr. 10296: 5–8 (Nov. 21, 2022); Trial 1 Tr. 9911:8–11 (Nov. 18, 2022) ("The defendants are not charged with entering into an agreement ahead of time, ahead of January 6th, to storm the United States Capitol. That is not the allegation in this case.").

The only support the government now offers for its claim that "in advance of January 6 the defendants and their co-conspirators agreed to stop the Certification," Opp. 38, are messages

6

showing that "co-conspirators zeroed in on the Capitol and the congressional proceeding taking place on January 6 as early as December 2020, as legal avenues to overturn the election results repeatedly failed and dwindled," *id*. But it is unsurprising, and there is no dispute, that Vallejo and the Oath Keepers "zeroed in" on the certification as legal options "dwindled." *Id*. The certification proceeding was the next *legal* option. Thus, the Oath Keepers naturally discussed the certification on January 6 as the next logical time for legal protests and action, without any hint of interfering with it. And that is what the messages cited by the government show.

Specifically, the government cites (1) a message on 12/22/2020 from Meggs stating, "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside! Scare the hell out of them with about a million surrounding them should do the trick!" Gov. Exh. 9514 (Msg. 1.S.656.9619); (2) a message the same day from Meggs with a photograph of Oath Keepers flags stating, "These will be flying Jan 6th in front of the Capitol!!" Gov. Exh. 9514 (Msg. 1.S.656.9620); (3) a message on 12/24/2020 from Meggs stating, "[I]t's gonna be a WILD time in DC we gotta get the crowd going during the day. I think we get everyone up good and close to the Capitol bldg so they can here is inside. Then at night well whatever happens happens," Gov. Exh. 9514 (Msg. 1.S.656.9990); and (4) a 12/25/2020 message from Rhodes stating, "I think Congress will screw [Trump] over. The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing. But I don't think they will listen." Gov. Exh. 9514 (Msg. 1.S.656.10094-95). These four messages, which all call for surrounding the Capitol with protestors during the certification process in hopes of getting Congress to sustain legal objections, are evidence of the *lack* of intent by Meggs and Rhodes to interrupt the certification process and their hope—however jaded—that Congress might come

7

through with a legal path to overturning what they saw as an unconstitutional election if they applied enough pressure.

The rest of the government's argument consists of examples of Vallejo and Oath Keepers discussing action related to the certification, January 6, or "war" as if they reflect an intent to interfere with the proceeding. None do. First, the government argues that Vallejo "focused on coming to Washington, D.C., armed, around the time of January 6." Opp. 38. But as the government concedes, Vallejo had viewed and forwarded a podcast called "The Hagmann Report" discussing "armed patriots" gathering in Washington, D.C. on January 4, 2021 for lawful, peaceful protests. *Id.* at 39. The government cynically misconstrues this podcast as about January 6 and "people act[ing] against the election," *id.* at 38, using language like "around the time of January 6," *id.* In fact, the podcast never mentions January 6 or the certification; calls for protestors to gather on January 4; states that arms are necessary to protect First Amendment rights from unlawful deprivations by illegal actors acting under color of law; calls for arrests and indictments—lawful processes; and calls for protestors to stay peaceful. This is strong, affirmative evidence that Vallejo did not come to Washington, D.C. as part of a conspiracy to interfere with the certification process.

After misconstruing the Hagmann Report podcast, the government grossly misconstrues Rhodes's Open Letter from December 23, 2020 as "words and calls to action about the Certification on January 6." Opp. 40. The government claims that "[i]n an open letter on December 23, Rhodes wrote that if President Trump did not act before or on January 6 to stop the election results from being certified, Rhodes and others may have to 'take to arms in defense of our God given liberty.'" Opp. 40 (quoting Gov. Ex. 1008). But *nothing* in this letter calls for President Trump to act "before or on January 6 to stop the election results from being certified," or threatens an armed response to the certification proceeding or a unilateral attempt to stop the transfer of power.

On the contrary, the letter calls for Trump to take certain actions *regardless* of whether they occur before or after January 6. It generally regards the certification as a *fait accompli* and simply calls for Trump to take actions before the end of his term of office. Gov. Ex. 1008. Indeed, it *expressly* refers to the fear that Trump will "***leave office on January 20, 2021***, leaving We the People to fight a desperate revolution/civil war against an illegitimate usurper and his Chicom puppet regime." Gov. EV 106 (emphasis added); *see also id.* ("It's better to wage [war] with you as Commander-in-Chief than to have you comply with a fraudulent election, ***leave office***, and ***leave the White House*** in the hands of illegitimate usurpers and Chinese puppets") (emphasis added). Contrary to the government's characterization, the letter does not state that Rhodes would "take up arms" in response to stop the certification in order to stop the transfer of power, but would "take up arms" *after* the transfer of power, and, indeed, only after "declaring the [Biden] regime illegitimate, incapable of representing us," and "declaring independence from that puppet regime."[2] As the government notes, Vallejo sent Rhodes' letter to Kelly Carter, Gov. Exh. 9514 (Msg. 210.T.13.9), again reflecting affirmative evidence that Vallejo (and the Oath Keepers) had no intent to interfere with the certification proceeding when they came to D.C. and anticipated that President Trump might invoke the IA and use them as anti-insurrection forces.[3]

---

[2] Although Rhodes could not have been more clear that he declaring independence and taking up arms were steps to take after President Trump "leave[s] office" on "January 20, 2021," Gov. Ex. 1008, the government nevertheless argues that this conclusion "ignores that Rhodes' and his co-conspirators' made clear they believed they were already in a war and needed to act, including by taking matters (and rifles) into their own hands," Opp. 40. But in context, Rhodes's statement that "'War isn't coming—war is already here,'" *id.* (quoting Gov. Ex. 1008), referred to war with *China*. Rhodes calls for Trump to lead the war against China while he is Commander-in-Chief, EV 106, which lasted until January 20, 2021.

[3] The government misguidedly describes Vallejo's straightforward reading of Oath Keeper letters and messages as a "bold confession" "that he and his co-conspirators may have been conspiring to commit sedition, but only after January 20." Opp. 40. As pointed out at trial when the government

Next, the government suggests Vallejo showed "seditious intent" because he acquiesced when his techie friend, Todd Kandaris, asked to switch their communications for the trip to Signal. Opp. 41 (citing Gov. Exh. 9514 (Msg. 210.T.4.4)). But although the government states that they used Signal "[m]oving forward," Vallejo continued using SMS to communicate with Kandaris, Phranq Tamburri, and other friends about his activities and the events of January 6, and nothing in the Signal group was incriminating. Indeed, as argued at trial and in Vallejo's motion, this group's messages show Vallejo "discuss[ing] the certification process with eager anticipation." ECF 477-1 at 12 (citing examples).

The government disputes this characterization because Vallejo made a vague lofty exhortation before his long road trip ("Gentlemen, May The Living God bless us this day and grant us Victory in this historic mission we undertake against all forms of tyranny over the minds of men. WE are the constitution of America, not some paper with mere words…ACTION!"), followed by the less lofty, "'Woe onto the fucker that GETS IN MY WAY! Antifa is DOOMED. Democrats DOOMED!'" Opp. 41 (quoting Exh. 9514 (Msg. 240.S.1.21.5 /240.S.1.22.1), *id.* (Msg. 240.S.1.23.2 / 240.S.1.23.3). But as the government conceded, the evidence shows that Vallejo was moved to come to D.C. based on the Hagmann Report's call for protests demanding indictments on January 4 and/or Rhodes's call for President Trump to invoke the IA. Either way, there is no evidence that Vallejo had an intent to interfere with the certification, and these statements do not suggest

---

made this inappropriate argument in rebuttal, Vallejo has never argued that *he* shared Rhodes' intent to "declar[e] independence" from, or "take up arms" against, a hypothetical Biden Administration. Vallejo expressly stated in the Signal chat that he viewed after action reports as appropriate on January 21, 2021, which is inconsistent with a longterm struggle against the Biden "regime." And his actions reflect this: Vallejo went home to Arizona as soon as it became clear that President Trump was not contemplating invoking the IA or taking any other legal actions to avoid leaving office on January 20, 2021.

10

otherwise. Nor does an article Vallejo circulated that would have been of interest to anyone traveling to D.C. suggesting that armed Trump supporters might storm the Capitol. Opp. Gov. Ex. 9514 (Msg. 240.S.1.47.1 / 240.S.1.48.1); Gov. Exh. 9514.4. As the government concedes, Vallejo did not express support, inspiration, or approval of this article, and the specter it discusses is inconsistent with the avowed intentions of Kandaris and Vallejo as expressed on the January 6, 2021 "Declare Your Independence" ("DYI") podcast on the morning of the event. Gov. Ex. 1054.

Next, the government argues that a jury could have inferred that Vallejo agreed to a plan to stop the transfer of power by any means necessary (without claiming an intent to forcibly interrupt the certification process) because of interactions between the Arizona group and Rhodes on the way to Washington, D.C. On December 31, Kandaris informed Rhodes that "[e]veryone coming has their own technical equipment and knows how to use it," Gov. Ex. 9514 (Msg. 1.S.859.7), and later stated his group was coming as "volunteers" and "We are rifles, man power, warm bodies there to support the process and the President," *id.* (Msg. 1.S.859.18). Rhodes later directed Kandaris and Vallejo to Meggs for the Comfort Inn address, where they arrived and unloaded their supplies. The government dismisses Vallejo's literal reading of Kandaris's message of supporting the process as "gloss," and states that a jury could infer Vallejo's agreement with a conspiracy to stop the transfer of power because of the context of (1) the Hagmann Report's call for protests and (2) Vallejo's "interest in Rhodes's call to be prepared to 'take up arms' if President Trump or Congress failed to act." Opp. 42 (referring to EV 106). Again, however, the government's defense of the verdicts faulters because neither of those documents discuss forcibly interfering with the transfer of power, much less with the certification process. As discussed above, the Hagmann Report called for arms to protect First Amendment rights (which is also consistent with the security details the Oath Keepers had planned), and the Rhodes article discussed President Trump using the Oath Keepers

11

under the IA and only mentioned "taking up arms" on their own after January 20, 2021. EV 106; Gov. Ex. 1008.[4]

The government next contends that witnesses Berry and Ulrich directly linked Rhodes's statements to a pre-January 6 conspiracy by Oath Keepers to stop the transfer of power on their own—and thus that one could infer (without speculation) that Vallejo did too. This claim does not reflect the record. First, Vallejo was not on any of the discussion groups that Berry and Ulrich participated in; the only statement by Rhodes he is known to have seen was the December open letter (EV 106), which is crystal clear in not proposing a unilateral plan to oppose the transfer of power. Second, while Berry testified that he understood Rhodes's and Meggs's statements as referring to the possibility of lethal fighting against corrupt government elements during his time in Washington, D.C., the messages he discussed all referred to the possibility of fighting in the context (explicit or implicit) of the Insurrection Act on behalf of the chief executive of the government. And third, the government's attempt to transform Ulrich's testimony about wanting ballots recounted and wanting "action" into evidence of a pre-January 6 conspiracy, Opp. 43, flies in the face of his crystal-clear testimony that he neither joined nor heard any Oath Keepers discuss a plan to halt the transfer of power by force or interrupt the certification (by force or otherwise) prior to the afternoon of January 6. *See* ECF 477-1 at 7–9 (quoting Ulrich testimony at Tr. 3862; 3887–88; 3891; 3892–93; 3921–22).

Next, the government argues that "Vallejo's own statements on January 6 before the proceeding began illustrate that he shared the same goal of being prepared to act with force against the transfer of power if President Trump or Congress did not act that day." Opp. 43. Tellingly, the

---

[4] There is no evidence Vallejo ever saw the version of the letter in Gov. Ex. 1008; the version in EV 106 is the version he forwarded to Carter.

12

government again seeks refuge in the generalized language of "transfer of power" rather than seek to defend any inference from Vallejo's or Kandaris's comments on the podcast that Vallejo had joined a conspiracy to interfere with the certification. Indeed, their comments, which the government quotes at length, Opp. 43–45, not only provide nothing the government could use to argue for a plan to interrupt the certification, they repeatedly contradict any inference that Vallejo intended to interfere with the certification process that day, describing how Kandaris and Vallejo intended to "hav[e] eyes on the process" and were waiting to see what would happen in the certification proceeding.

The government quotes sections of the podcast where Kandaris discusses the "possibility" of "armed conflict" or a "shot heard round the world" if Congress certifies the election and Vallejo states that an outcome that looks like a "Fuck you" to America would "be the declaration of a guerilla war." Opp. 44. The government argues that these statements show that Vallejo "had fully joined the conspiracies Rhodes laid out by January 6" and "demonstrate that defendant Vallejo's (now confessed) seditious intent was not limited to January 21, 2021, or later," because he "was ready to 'fix it' that day if he was told it was broken…." Opp. 45. But there was no conspiracy to join on the morning of January 6—Berry, Ulrich, and others testified that decisions about plans of action were made at or near the time the Oath Keepers entered the Capitol. All Rhodes had offered in speeches and messages was a blueprint for waiting for President Trump or declaring independence from a Biden Administration, and that was all that Ulrich testified he had heard. Tr. 3892–93; 3921–22. And whether Vallejo's statements were rhetorical or not is of no moment: even if taken literally, Vallejo repeatedly affirms his intent to see what Congress is going to tell "the American people" on January 6. Gov. Ex. 1054.

Next, the government argues that Vallejo's and the Oath Keepers' actions on January 6 support the conclusion that one could reasonably infer that Vallejo joined a conspiracy to stop the transfer of power by any means necessary. But the facts listed by the government do nothing of the sort. The government notes that Rhodes sent messages at 1:25 p.m. to the main Signal chat group stating that "patriots" were taking things into their own hands and moving to the Capitol, not Oath Keepers. Gov. Ex. 1500.2. Then at 1:41 p.m., he sent a message to the "OLD Leadership Chat," about "the founding generation storming the governors mansion in MA….Next comes our 'Lexington'" *id.*; but again, he did not state that Oath Keepers were doing anything, and in any event, Vallejo was not on this chat. *Id.* Thus, the government's claim that these messages "were a call to action" that "Vallejo and his co-conspirators answered," Opp. 45, is at best speculation for those that saw the messages, and non-sensical for Vallejo.

Continuing its speculative narrative, the government argues that "[a]s the boots on the ground attacked the building, Vallejo repeatedly checked in to offer his support as the 'QRF.'" Opp. 46. The government offers nothing from which a reasonable juror could infer—not speculate—that Vallejo had any idea that there were Oath Keeper "boots on the ground" preparing to "attack[] the building." *Id.* It notes that "[a]t 2:24 p.m., defendant Vallejo messaged the 'DC OP: Jan 6 21' Signal chat, 'Vallejo back at hotel and outfitted. Have 2 trucks available. Let me know how I can assist.'" *Id.* (quoting Gov. Exh. 1500.2). But the documentary and testimonial evidence established that the Oath Keeper team leaders had not yet decided to try stop the certification by 2:24 p.m., much less entered the Capitol to do so. It was thus impossible for Vallejo to know about and have joined a conspiracy to stop the certification at this point. And when he stated "QRF standing by at hotel. Just say the word…" at 2:38 p.m., he could not have possibly known that the doors to the Capitol had at that moment been opened from the inside allowing Line One to enter,

14

or even that Line One had decided to enter. It would be pure speculation to find that Vallejo was offering to drive through D.C.'s traffic and roadblocks at that moment to help arm an assault on the Capitol—which no one had ever discussed doing (Tr. 3892–93; 3921–22)—as opposed to offering to help protect people in an emergency, as the QRF had always been viewed as doing.

The government argues that Vallejo "returned directly to the QRF hotel upon finding his truck, as opposed to waiting near the Capitol to allegedly help his co-conspirators," Opp. 47, and that this supports "the legitimate inference that he returned to the hotel because that is where he had the rifles…," *id*. But there was no evidence that Vallejo "returned directly to the QRF hotel," *id*.; the timestamps for Vallejo's location, portions of which were introduced by the defense, show that he was in the area for several minutes after finding his truck and took a slow route that went toward the Capitol. And video evidence proved that Vallejo did not arm his truck at any point on January 6, before or after he declared himself "outfitted." And in any event, there was no evidence that the QRF was intended for or expected to be part of any offensive action to stop the transfer of power or interrupt the certification; on the contrary, it was always discussed as something that would bring weapons to situations where they would help protect people or extract people from dangerous situations. *E.g.*, EV 143. The government never confronts this complete lack of incriminating references regarding the QRF's purpose. Since the QRF, even if armed, was always conceived as a protective force that could save lives, there is nothing incriminating about Vallejo going back to the hotel in the midst of "bedlam"—even if it were because it was "where he had the rifles," Opp. 47. So while that "inference" would simply be speculation (speculation that contradicts the known facts about the effect of road closures in routing Kandaris and Vallejo out of the city, ECF 102-1 at 23 (Ex. 4)), it is not an inference from which one could reasonably conclude beyond a reasonable doubt that Vallejo had ascertained (somehow) that Oath Keepers had decided

15

and were preparing to enter the Capitol, and that Vallejo intended (contrary to the purpose of the QRF) to offer them armed assistance.

Nor does the testimony of witness Joe Herrington make any incriminating inferences less speculative. Herrington testified that Kandaris and Vallejo stated that "[i]f anything had happened and they were needed, that they were going to be called and they were going to come in to the Capitol area as a Quick Reaction Force." Tr. 3546. This testimony regarding "[i]f anything had happened," *id.*, comports perfectly with other descriptions of the QRF as a protective force to be called upon "if something goes to hell," Gov. Exh. 9514 (Msg. 192.T.1415-19), or "if SHTF," Gov. Exh. 9514 (Msg. 1.S.613.176). There was simply no evidence anywhere that the QRF might be used in an offensive attack on a government asset as part of a plan to stop the transfer of power, much less as part of a specific plan to interrupt the certification proceeding. No reasonable juror could have found beyond a reasonable doubt that Vallejo's offer of help at 2:24 p.m. or reference to a protective/extractive force at 2:38 p.m. reflected the knowing joining of a not-yet-formed or just-formed intention to follow a surging crowd that happened to breach the Columbus doors from the *inside* at 2:38 p.m.

The government also dismisses the weight of the evidence, including literal interpretations of Vallejo's messages, indicating that Vallejo generally expected and supported peaceful protests, opposed and criticized those who violently attacked the Capitol, intended with his post-January 6 comments to continue peaceful marches, and was generally always trying to follow the directives of the President. Opp. 47–48. To rebut this, the government notes Herrington's testimony that Rhodes learned law enforcement was seeking him, causing him to leave the Olive Garden dinner "scared" and flee the area via backroads. Opp. 48. Despite knowing police were looking for Rhodes, the government argues, Vallejo continued to message Rhodes and kept him abreast of his "status

16

reports," *id.*, showing his criminal intent. But the record reflects that Vallejo thought Rhodes was around the next morning to coordinate a plan and did not even know that Rhodes had left the area; this shows that Vallejo was not privy to the same information as Rhodes and Herrington, who left the area with Rhodes. *See* Opp. 26 (describing messages by Vallejo showing him extending his hotel and expecting Rhodes to provide direction). In any event, even if Vallejo learned that Oath Keepers had joined the attack on the Capitol and was energized and supportive of continuing similar attacks the following days, these cannot support a finding beyond a reasonable doubt that he knew about the initial, unplanned decision to enter the building and try to stop the certification.

Finally, the government's repeated claim that Vallejo exhibited "consciousness of guilt," Opp. 48, is wholly specious. As the government notes, Vallejo knew as early as January 28 that the FBI had arrested Jessica Watkins, Donovan Crowl, and Thomas Caldwell for their actions on January 6, and that through that arrest had gained access to the Signal chat. Opp. 48 (citing Gov. Exh. 9652 (Msg. 1.S.159.1639)); EV 300.2 (Rhodes warning that the FBI had Watkins' phone). He also knew by February 12, 2020, that the FBI could potentially break into and read Signal messages. Opp. 49 (citing Gov. Ex. 9652 (Msg. 1.S.159.1643)). And he was expressly warned by Rhodes that a Signal chat he was using was "not a secure chat." EV 300.2. Yet despite this, Vallejo continued using the main Signal chat for months, and told Rhodes that he "stayed in the dc op chat because running and hiding is what GUILTY people do." *Id*. He is known to have used Signal until at least March 2021, long after others had attempted to destroy evidence in the immediate aftermath of January 6. And he is known to have kept his text messages, photos, and videos from this time period, including many used against him by the government. Indeed, he voluntarily met with the FBI and provided his phone password. On this record, the notion that he exhibited "consciousness of guilt"

17

because he showed an interest in the January 6 cases or eventually deleted a Signal app that he had no purpose for three to six months after January 6, is absurd.

In sum, the jury's verdict was not that Vallejo joined a conspiracy to oppose the transfer of power by any means necessary—a jumble of government-speak far removed from any concrete plan—but that he joined in the conspiracy to oppose the execution of election laws governing the certification and to interrupt the certification itself by force. And the evidence overwhelmingly demonstrated that there was no such conspiracy until separate groups of Oath Keepers made the decision to follow the surging crowd at or around the 2:30 p.m. time period, only to leave 12 to 20 minutes later. Vallejo could not reasonably have known of those decisions when he made his offer of help during "bedlam," and no reasonable juror could find beyond a reasonable doubt that he did so with the specific intent to halt the certification process he had so eagerly followed. Certainly, with the level of scrutiny this kind of speech-based case demands, the record compels the conclusion that the jury verdicts do not rest on sufficient evidence.

## II. The Weight of the Evidence Supports a New Trial for Defendant Vallejo

Although the evidence fails to support the jury verdicts even after giving the government the benefit of all reasonable inferences under Rule 29, the Court need not go so far. Under Rule 33, "the Court has greater discretion to make its own judgment about whether the verdict is just in light of the evidence adduced at trial." *United States v. Wilkerson*, 656 F. Supp. 2d 22, 28 (D.D.C. 2009). As the Supreme Court explained:

> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different…. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a

> serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Tibbs v. Florida*, 457 U.S. 31, 38, n.11 (1982). "A reversal on this ground, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Instead, the [reviewing] court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Id*. at 42.

Here, even if a reasonable juror could conclude that Vallejo joined in a conspiracy to interfere with the certification, the weight of the evidence does not support that conclusion. Notably, another jury found that the government failed to prove that Michael Greene, the operational leader for the January 5-6 operations, conspired to interrupt the certification proceeding. This comports with testimony by Joe Herrington, who was with Greene that day, that the Oath Keepers were generally confused and reacting to the events of January 6 right up until they went to the Capitol grounds and saw the events for themselves. Herrington stated:

> A. We heard explosions, and naturally it's what – I don't know if it's what normal people do, that's what soldiers do, they look toward the direction of the sound, and we saw smoke so we started moving toward that area, sir.
> Q. And at that point, no one had told you that it was the plan for you to go to the Capitol, right?
> A. No, sir. It was more or less, There's something bad happening over there, we need to get there over and see what's happening….there was no discussion about going in, it was more or less just like, What in the world's happening right here….
> Q. Do you recall there being a discussion with Whip about whether to go into the Capitol at some point after you heard the explosions?
> A. Yes, sir, we were -- when we were standing – it was after -- it was quite a bit into the incident there. It was quite a bit of time into it.
> Q. So it was when you got to the Capitol but not right when you got to the Capitol?
> A. Correct.

Tr. 3581–82. If Greene—the Oath Keepers' operational leader—had not planned to interrupt the certification and had no discussions about entering the Capitol until he was at the scene with

19

Herrington, the reasonable conclusion is that Vallejo, who was looking for a lost truck at 1:19 p.m. and never went to the Capitol, could not have known what Oath Keepers were doing or deciding, and thus did not join in any conspiracy to interfere with the certification occurring at a location seven miles away. Given Greene's acquittal and the other weaknesses in the government's case, the Court should respectfully step in as a "thirteenth juror" and give Mr. Vallejo the opportunity to have a new trial focused directly on the nuances of his individual innocence or guilt unchained by codefendants who undeniably entered the Capitol, with the ability to call Greene unconcerned about impeachment from a pending criminal case.

April 18, 2023

Respectfully submitted,

/s/ Matthew J. Peed
Matthew J. Peed (D.C. Bar No. 503328)
CLINTON & PEED
1775 I St. NW, Suite 1150
Washington, D.C. 20006
(202) 919-9491 (tel)
(202) 587-5610 (fax)

*Counsel for Defendant Edward Vallejo*