IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                                    *

vs.                                              *   Case No.: 22-15 APM

THOMAS E. CALDWELL                               *
(U.S. v. Elmer Stewart Rhodes)
          *       *       *       *       *       *       *       *       *       *

MEMORANDUM IN AID OF SENTENCING

      Thomas E. Caldwell ("Caldwell") will appear before the Court for sentencing on May 24,

2023 after having been convicted by a jury of two counts of obstructing an official proceeding,

but acquitted of three conspiracy counts, including seditious conspiracy.  Caldwell spent 53

torturous days in Covid-era solitary confinement until released by the Court to home and

residential confinement for another 285 days.  (PSR, ¶39).  He has meticulously abided by every

pretrial condition that the Court has placed upon him.  (PSR, ¶42).  Caldwell has no prior or

subsequent criminal record.  He is a retired Lt. Commander with just under 20 years of active

service in the U.S. Navy under his belt.  (PSR, ¶168).

      Caldwell is a 100%, service-connected disabled veteran with a progressively debilitating

back injury caused by a mortar round while on a classified mission in the Philippines.[1]  For

nearly two decades, Caldwell has lived with agonizing pain in his back, neck, hips, knees,

shoulders and elsewhere.  To deaden this pain, Caldwell takes prescription opiates, which are

---

[1] While Caldwell is highly decorated, he testified that his most prized decoration was the Navy's
Humanitarian Service Award.  Despite his "war wounds," Caldwell was ineligible for a Purple
Heart, as his injuries occurred while on a classified mission and during an undeclared war.

somewhat effective.  In May 2022, Caldwell received a total hip replacement.  (PSR, ¶153).  He requires the use of special chairs, bedding and furniture.  Caldwell is a physical wreck.

Caldwell requests that the Court consider a time-served sentence with a period of supervised release.  Respectfully, Caldwell's medical ailments alone justify a non-incarceration sentence.  Additionally, the Court had the opportunity to observe the government's most serious allegations against Caldwell crumble when subjected to skepticism, context, contrary evidence, and cross-examination.  Caldwell's conduct and behavior were more akin to a loud-mouth Walter Mitty than the Rambo-type figure the government has portrayed him since his arrest.

## A.  The government's claims about Caldwell were inaccurate.

As the Court undoubtedly recalls, early on in its investigation, the government accused Caldwell of being "the Commander" of Oath Keepers who led a charge into the United States Capitol on January 6, 2021 ("J6"), who preplanned a sophisticated plot to lead an armed "QRF" into the Capitol to stop the Electoral College certification, and even suggested that Caldwell's "plan" included arresting Members of Congress.  The government, however, was forced to substantially retract these allegations as it became clear that Caldwell was 1) not a leader of the Oath Keepers; 2) not a member of the Oath Keepers; 3) did not go inside the Capitol on J6; 4) and the preplanned plot by Caldwell and the Oath Keepers to storm the Capitol with a QRF turned out to be pure fantasy.[2]

---

[2] Interestingly, media stories began dropping in mid-2021 that appeared calculated to prepare the public for an announcement that the Department of Justice would not seek seditious conspiracy charges against the Oath Keeper defendants.  *See, e.g*., Sara Lynch, *Reuters*, "FBI finds scant evidence US Capitol attack was coordinated," (August 20, 2021), https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/ ("The FBI has found scant evidence that the Jan. 6 attack on

As the government and PSR have again questioned Caldwell's credibility, it is important to document the multiple inaccurate, unsupported, and dubious claims that the government has made about Caldwell since January 2021:

1) The government claimed in court filings and at trial that a November 9, 2020 "pre-strike recce" undertaken by Caldwell was a plot by co-defendant Rhodes and Caldwell to engage in preparations for J6. This "recce," in fact, turned out to be Caldwell, who already planned to be in the D.C. area that day,[3] driving around BLM Plaza and ultimately past Camelot Gentleman's Club. Neither the Capitol nor any government building was pictured in the 38 photos taken by Caldwell that day. (Caldwell Ex. 5). In a sign of desperation, government counsel floated the preposterous theory that Caldwell's "recce" targeted a DOJ office.[4]

2) Likewise, the government's claim that Caldwell conducted a January 5, 2021 "pre-strike recce" for the purpose of doing a military-style surveillance of the Capitol building proved to be unfounded. Two contemporaneous messages sent by Caldwell proved that the purpose of the "recce" was to scope out bus parking spots and, most important, "porta potty" locations for incontinence-challenged senior citizens. *See* (Caldwell Exs. 10 & 11) ("You will be pleased to know that the President has provided us 80 fresh porta pottys").

3) The government's claim that Caldwell conspired with co-defendant Vallejo proved unfounded. As proof of their connection, the government played hotel video of Caldwell nodding his head after Vallejo passed him in a hotel lobby. When the defense played video showing Caldwell nodding his head in a similar fashion before Vallejo arrived at the hotel, the jury, ironically, nodded in frustration at the government's incomplete video

---

the U.S. Capitol was the result of an organized plot to overturn the presidential election result, according to four current and former law enforcement officials."). The *Reuters* article continued: "Though federal officials have arrested [hundreds], the FBI at this point believes the violence was not centrally coordinated by far-right groups or prominent supporters of [Trump], according to the [four] sources, *who have been either directly involved in or briefed regularly on the wide-ranging investigations*."). *Id.* (emphasis added).

[3] *See* (Caldwell Ex. 2) (text message from Caldwell stating his plans to be in D.C. on November 9, 2020, two days before he met Rhodes at a Virginia rally).

[4] Caldwell's "recce" occurred on November 9, 2020, a full two weeks *before* Attorney General William Barr issued his finding that no widespread election fraud occurred during the 2020 election. *See* Ryan Lucas, NPR, *Barr says no Election Fraud has been Found by Federal Authorities* (Dec. 1, 2020), (https://www.npr.org/2020/12/01/940819896/barr-says-no-election-fraud-has-been-found-by-federal-authorities). Hence, Caldwell's alleged motive for targeting an obscure DOJ office suite, i.e., that he was upset that the DOJ was not addressing the issue of voter fraud, is beyond dubious.

evidence.  Mrs. Caldwell testified that her husband, who has fused vertebrae in his neck, routinely bobs and stretches his neck.  (Tr., 8487-90).  Despite engaging in the most thorough investigation since 9/11, the government produced absolutely no evidence that Caldwell and Vallejo ever communicated with one another.

4)  Through Captain Ortega, the government introduced a CCTV video showing the Peace Fountain walkway being blocked by bike racks and multiple police officers, suggesting to the jury that Caldwell knew that Capitol grounds, which are traditionally wide-open to the public, were restricted.  *See* (Govt. Ex. 1515.1).  Caldwell was forced to show the jury the full video, which proved that Caldwell and his wife did not arrive at the Peace Fountain until at least 15 minutes after the bike racks and police were vanquished.  *See* (Caldwell Ex. 80).

5)  In early court filings, the government averred that the "January 6th operation" or "J6 op plan" was a preplanned plot to attack Capitol Hill, stop the certification, and arrest members of Congress.  Caldwell was the alleged leader of this plot—"the coach of the team"--according to the government.  Incredibly, Grand Jury testimony of FBI Special Agent David Lochner proved that the FBI, *despite personally interviewing Caldwell for three hours upon his arrest*, mistakenly believed that Caldwell was on Zello giving out orders to arrest Members of Congress.  *See* (Caldwell Ex. 127).  The voice on Zello actually belonged to "1% Watchdog," who was a thousand miles from the District on J6.  S/A Lochner's testimony is notable not only for its stunning deafness—no objective person could mistake 1% Watchdog's Ozark-twang with Caldwell's voice—but because it was *the final piece of testimony the Grand Jury heard before originally indicting Caldwell* on January 27, 2021.

6)  The government strenuously argued that Caldwell originated the idea of securing a boat as part of his alleged QRF leadership.  During closing argument, the government cited Caldwell's testimony that Stamey solicited a boat from Caldwell, and not vice-versa, as proof that Caldwell lied to the jury.  (Tr., 9934-35).  The government got it wrong.  The government's own exhibit, ironically, strongly corroborated Caldwell's claim.  (Govt. Closing Slide 68).  And phone records proved that Caldwell's discussion about boats began after receiving a phone call from Stamey.  *See* (Caldwell Ex. 102).  Finally, as noted *infra*, Stamey told the FBI during a September 9, 2021 proffer session that it, indeed, *was Stamey who solicited the boat from Caldwell*.

7)  The government sandbagged the defense in its rebuttal case by introducing an exhibit to suggest that Caldwell was a Life360™ user and part of the North Carolina Oath Keepers' Life360™ circle on J6.  *See* (Govt. Ex. 9338).  The government's exhibit, however, was a Cellebrite printout of an automatic download to Caldwell's phone that was captured because Stamey had invited Caldwell to join his Life360™ circle via Signal, an invitation

that Caldwell *did not accept*.  S/A Palian testified that he authored a lengthy search warrant to obtain Life360™ records regarding Caldwell's use of this app but the company had no such records.  (Tr., 1692-93).

8) In an attempt to tie Caldwell and Jessica Watkins together as co-conspirators, the government introduced Government Exhibit 6740, which purported to show three phone calls between Caldwell and Watkins in the brunch-time hours of J6.  However, FBI C.A.R.T Examiner Kate Cain was forced to acknowledge that these calls did not actually happen.  (Tr., 9252-9258; Watkins Ex. 13).

9) Government Exhibit 1500 displayed orange and yellow lines purporting to show Caldwell and Watkins meeting up at the Peace Fountain.  This evidence of a conspiracy crumbled when, under cross-examination, Special Agent Whitney Drew agreed with the undersigned that Exhibit 1500 was inaccurate as Watkins passed north of Caldwell's location at the Peace Fountain.  (Tr., 4812-13).  In other words, the orange and yellow lines in Government Exhibit 1500 should not have crossed paths, *as Caldwell and Watkins never crossed paths at the Peace Fountain*.  Watkins, moreover, testified that she never saw Caldwell after the predawn hours of J6.  (Tr., 8505).

10) The government has repeatedly claimed that Caldwell "chose" the Comfort Inn Ballston as the QRF hotel.  In its opening statement, the government averred that this hotel was picked because it was the quickest way for the QRF to get to Capitol Hill.  (Tr., 1106-07).  And during dramatic testimony, Special Agent Sylvia Hilgeman drew a straight west-to-east line from Arlington to the Capitol, demonstrating the QRF's potential quick access to Capitol Hill.  S/A Hilgeman, however, was obviously unaware that road closures in effect on J6 made the "as the crow flies" Arlington to Capitol Hill route impossible to traverse, *a fact that Caldwell obviously was aware of*.  In probably the most cringe-worthy testimony of the trial, S/A Hilgeman, on cross-examination, had to acknowledge that the directions supplied by Caldwell to Stamey in maps and emails would have sent the QRF from Arlington north towards the Maryland line, over a notoriously congested bridge, through Georgetown(!), and finally to a spot northwest of DuPont Circle, i.e., almost three linear miles from the Capitol.  Bizarrely, S/A Hilgeman opined:  "I think the QRF was meant to occupy D.C."  (Tr., 3689).  Finally, the government had S/A Hilgeman draw a circle around M Street to demonstrate that M Street "run[s] lengthwise across the city," suggesting to the jury that the QRF had a clear path to Capitol Hill.  (Tr., 3891).  District residents, however, are aware that M Street is actually two one-way streets that converge by the Four Seasons Hotel in Georgetown at 29th Street, N.W.

11) Likewise, the government's claim that Caldwell was organizing Oath Keepers to stay at the Comfort Inn Ballston was debunked at trial.  Notably, Caldwell introduced an "instant

message" between Caldwell and Watkins dated December 30, 2020, wherein Caldwell suggested that Watkins and Crowl consider staying *at a hotel in Manassas* and *use the Metro* to travel into D.C.  *See* (Caldwell Ex. 48).  As noted *infra*, in his proffer with the government, Stamey advised that his reason for choosing Caldwell's hotel was two-fold: 1) he wanted to "catch up" with his "friend" Caldwell; and 2) he wanted Caldwell to take him into the D.C. prior to J6 to check out whether Antifa or BLM posed a danger to protestors.  Stamey described Caldwell as a J6 "tour guide."

12) Despite claims in court filings that the QRF was a force aimed at the Capitol on J6, S/A Palian admitted that of the hundreds of witnesses interviewed by the FBI, not one backed up the claims that 1) "Caldwell planned to breach or attack the United States Capitol on January 6th"; or 2) "the purpose of the QRFs with the Oath Keepers around D.C. on January 6th was to attack the United States Capitol."  (Tr., 1625-26).

13) During cross-examination of Jessica Watkins, the government suggested that Meggs was at Caldwell's farm.  (Tr., 9550).  The government knew there was a dearth of evidence that Meggs was ever at Caldwell's farm.  The FBI seized multitudes of phones, computers, social media messages, and photos, and interviewed hundreds of witnesses, yet uncovered no contacts between Caldwell and Meggs.[5]  Caldwell, Mrs. Caldwell, and cooperator John Zimmerman testified that Meggs was not at Caldwell's farm.  As explained *infra*, during his FBI interview, Stamey advised that he was at Caldwell's farm from November 13 thru the 15th, but that the first time he met Meggs in-person was on January 4, 2021 at Doug Smith's farm in North Carolina.

14) The government has repeatedly claimed that Watkins and Crowl traveled to Caldwell's farm after J6 to hide from law enforcement.  Caldwell, Crowl and Watkins have separately and vehemently denied this claim in detention-related filings.  As to Caldwell's belief, an accidentally recorded conversation between Caldwell and his wife, which occurred while Crowl was on the phone with Caldwell, corroborated Caldwell's testimony that he was told by Crowl that the purpose of the pair coming to the farm was to avoid the media.  *See* (Caldwell Ex. 78) (On the recording, Caldwell advised his wife: "They are being harassed by the media and Antifa, so because of that they want to come and stay with us for a few days.").

---

[5] Meggs and Harrelson advised the undersigned at trial that they had never met or communicated with Caldwell prior to court proceedings, and had never been to his farm in Virginia.

In short, the government's claims that Caldwell perjured himself and engaged in certain relevant criminal conduct, which the PSR parroted, should be given the limited weight they deserve.

**B. Paul Stamey's FBI interview is exculpatory in relation to Caldwell.**

Paul Stamey, a disabled Marine Corps veteran approaching 70 years of age, was prominently put forth by the government as a central cog in a conspiracy web that included Caldwell. During trial, the government refused Caldwell's request to immunize Stamey on the grounds of an "ongoing investigation." Consequently, the jury was deprived of fairly compelling exculpatory evidence favoring Caldwell. The government was fully aware of the exculpatory nature of Stamey's potential testimony, as Stamey voluntarily interviewed with the FBI on September 9, 2021. The Court should strongly consider Stamey's FBI proffer statements at sentencing in assessing Caldwell's relevant conduct.

*1. Caldwell told the truth about the QRF boat.*

The government argued during its closing that Caldwell came up with the idea for a QRF boat. In fact, the government *called Caldwell a liar* for denying that he originated the boat idea. (Tr., 9933-35). Stamey told the FBI *that he requested that Caldwell find a boat*:

> **Stamey**: Regarding boats, somebody had . . . floated the idea . . . if things got bad in D.C. with counter-protestors . . . and the bridges got blocked, somebody said something about, you know, does anybody know somebody with a boat, that . . . we could extract them out. But that came up and it—and it got pretty much passed over pretty quick. By me anyway, because, you know, I said something to Caldwell about it. And *I asked him* because he was [local]. I said, *you know anybody there that has a boat* and works something, either a fishing charter or whatever. And . . . nothing ever came of that[.]"

(FBI Tr., Part II at 20) (emphasis added). When asked by the FBI if the boat had "anything to do with weapons," Stamey answered "no." *Id*. Stamey clearly corroborated Caldwell's testimony that it was Stamey who solicited the boat from Caldwell, not vice-versa. Additionally, Stamey's

statement backs up Caldwell's assertion that the "heavy weapons" for the boat was an ad-lib

rhetorical flourish or, in the words of Mrs. Caldwell, "Tom being Tom."  In short, Caldwell did

not lie about the genesis of the boat idea.

2.   *The QRF was never intended to enter D.C.*

Stamey, like retired FBI Special Agent John Roeper, repeatedly insisted to the FBI that

the QRF "was never going into D.C., never."  *Id*.  Interestingly, Stamey also insisted that "the

QRF was activated" on J6, i.e., he contacted his North Carolina contingent and encouraged them

to head for their charter bus when things got out of hand at the Capitol:  "I talked to Roeper on

the bus . . . [a]nd had the bus move to wherever they were picking up."  *Id*. (Part II at 122-124).

In other words, the "QRF" for North Carolina, which was activated on J6, was a phone-tree, not

an invasion force.[6]

3.   *The North Carolina Oath Keepers broke off from Rhodes before J6.*

Next, Stamey confirmed to the FBI that the North Carolina Oath Keepers broke off from

Rhodes following a meeting on Caldwell's farm.  Stamey generally parroted the testimony of

John Zimmerman, who advised that a rift occurred between Rhodes and Doug Smith at the

November 15th meeting.  As to Caldwell's participation in this meeting, Stamey stated:

---

[6]Another accurate description of the QRF from North Carolina from Stamey's interview:

> S/A PALIAN:  Let me ask you something.  The QRF is actually—this is
> something Caldwell put out through his attorney.  The QRF is actually one guy
> who's in his late 60s, obese, with cardiopulmonary issues, a bad back, a bum
> knee, and is in need of a hip replacement.  Was he talking about you?
>
> STAMEY:  I'm afraid so[.]

(FBI Tr., Part II at 37).

"Caldwell?  I don't think Caldwell was actually in the room, because he wasn't, he wasn't an Oath Keeper."  (FBI Tr., Part I at 133-38).

Stamey noted that while the North Carolina contingent broke off from Rhodes, they still participated in Signal and GoToMeeting chats with the national group.  *Id.*  Why?  Because Doug Smith, the North Carolina leader, was attempting to poach other state memberships away from Rhodes:  "[Smith wanted] to pull some other groups away from Rhodes, . . . especially Georgia and Florida."  *Id.*  Essentially, the North Carolina group was attempting to raid Rhodes's membership rolls by encouraging state-level organizations to align with North Carolina.

### 4.  Caldwell did not organize the "QRF hotel"—he was a "tour guide."

The government has repeatedly claimed that Caldwell "chose" the Comfort Inn Ballston as the "QRF hotel."  This allegation is false.  As noted *supra*, Caldwell suggested that Watkins and Crowl stay in Manassas, Virginia on January 5th and take the Metro into the District.  According to Stamey, his reason for picking the Comfort Inn was to "catch up" with his friend, Caldwell, who, as a local, could provide directions:

> STAMEY: "But we -- when I talked to [Caldwell], he said he had secured a room in Ballston at the Comfort Inn. And I -- and I asked him. I said -- because here again, me and him was friendly with each other. I said, well, maybe I'll try to get a room there and we can, you know, catch up. And plus, we wanted him to take us through D.C. the day before and just check out, see if we can spot any (indiscernible) Antifa, BLM, whatever[.]"

(FBI Tr., Part II at 14).  The government and PSR labelled Caldwell the "coordinator" of a QRF; by contrast, Stamey advised the FBI that Caldwell, as a non-member, had no actual authority or responsibilities in relation to the Oath Keepers on J6:  "[Caldwell] was a tour guide for us,

period." *Id*. (Part II at 10).[7]  Besides Meggs, who he did not meet in-person until January 4, 2021, *id*. at 29-30, Stamey denied knowing *any* Florida or Arizona Oath Keepers, including Vallejo and others at the Comfort Inn.  *Id*. at 10.[8]  If Stamey, a North Carolina *leader*, was unfamiliar with Florida and Arizona QRF members, how would Caldwell know them?

> 5. *Paul Stamey and the FBI laughed at Caldwell's .22 caliber rifle*.

As noted, Stamey's description of the North Carolina QRF was more akin to a telephone tree than a commando unit.  Additionally, according to Stamey, his hotel room contained only his personal pistols, which he routinely travelled with as a concealed carry permit holder, and Caldwell's .22 caliber rifle.  As to Caldwell's rifle, Stamey indicated that he examined it and determined that it was unloaded.  (FBI Tr., Part II at 57).  After Stamey giggled about how "proud" Caldwell was of this .22 caliber rifle, S/A Palian, who conducted the interview, also laughed, which can be heard on the audio recording.  How seriously did S/A Palian take Caldwell's .22 caliber rifle?

> **STAMEY**:  There was no weapons in the room except for [my] pistols and Caldwell's bird g-- .22 rifle.  It was a .22 caliber weapon.
>
> **S/A PALIAN**:  Which, let's face it, is that really (even a weapon)?
>
> **STAMEY**:  Nah, that's – you call it what you want to.

---

[7] According to Stamey, the two additional rooms he booked at the Comfort Inn were intended *for North Carolina members*.  When no takers from his group could be found to pay for the rooms, Stamey offered the rooms to Meggs, who was inquiring about extra rooms.  (FBI Tr. at Part II, 29-30).  In other words, contrary to the government's claim, there was no coordination between Stamey and Meggs vis-à-vis a "QRF hotel."  Stamey was trying to off-load extra rooms he had booked for North Carolina, and Meggs and his contingent were in need of rooms.

[8] According to Stamey:  "We wasn't involved with the Florida QRF or any of the rest of them. And I never seen none of them guys there and if I passed them in the hallways, I wouldn't know them."  (FBI Tr., Part II at 101).

**S/A PALIAN**:  (Not impressed).  Pardon me that's [my] commentary. (FBI Tr., Part II at 61-62).  S/A Palian's words contained in parentheses above--which show him mocking Caldwell's .22 caliber rifle--were labelled as "indiscernible" in the transcript, but were easily deciphered by the undersigned.  *See* (video recording of Stamey interview, 11:20 mark). In short, the North Carolina QRF was a telephone tree, it was independent from Florida and Arizona, and Caldwell brought his father's antique, inoperable, unloaded .22 rifle caliber as a show-and-tell piece to show his friend Stamey, just as he testified.

C.  **The PSR incorrectly applied U.S.S.G. §2J1.2.**

Caldwell objects to a proposed 8-level enhancement based upon "causing or threatening physical injury to a person, or property damage in order to obstruct the administration of justice," and a proposed 3-level enhancement based upon "substantial interference with the administration of justice" pursuant to U.S.S.G. §2J1.2.  (PSR, ¶¶127, 128).

1.  *The Electoral College certification was not the "administration of justice."*

Section 2J1.2(b) does not apply to Caldwell because Congress's certification proceeding was not the "administration of justice" as that term is used in the U.S.S.G. §2J1.2(b). Caldwell adopts and incorporates the legal analysis set forth in the Honorable Judge McFadden's November 28, 2022 opinion[9] on this issue.  Accordingly, as a matter of law, the application of both §2J1.2(b) enhancements is error.

1.  *Alternatively, U.S.S.G. §2J1.2(b) does not apply to Caldwell's relevant conduct.*

---

[9] *United States v. Hunter Seefried*, Crim. No. 21-CR-287, ECF No. 36-4 (Nov. 28, 2022) (Memorandum Opinion).

Alternatively, Caldwell's "relevant conduct" does not qualify him for §2J1.2(b) enhancements. Caldwell's *personal* conduct on J6 obviously did not cause "substantial interference" with the certification and was not violent or threatening in nature. Caldwell entered restricted Capitol grounds after Congress was ordered to be evacuated and recessed. He spent a few minutes on a balcony where video evidence proved that he witnessed no violence. The evidence at trial was overwhelming that the QRF was not intended to harm Congress; in fact, the Oath Keepers had used QRFs on multiple previous occasions as a "rescue team" in the event that its members were attacked. In short, Caldwell's personal conduct on J6 merits no §2J1.2(b) upward enhancements.

   2.   *Caldwell's relevant conduct was not part of jointly undertaken criminal activity.*

The PSR asserts that Caldwell should be held liable for "jointly undertaken criminal activity." (PSR, *passim*). Pursuant to U.S.S.G. §1B1.3, "relevant conduct" includes "all acts and omissions of others" that were 1) "within the scope"; and 2) "in furtherance of"; and 3) "reasonably foreseeable in connection with" a "jointly undertaken criminal activity." Respectfully, the government's closing argument and the jury's verdict forecloses the argument that Caldwell is on the hook for the actions of his co-defendants

In closing argument, the government's slide presentation stressed that the defendants were "[n]ot charged with planning in *advance* of January 6 to 'storm the Capitol'" and that "the attack on the Capitol was an opportunity the defendants seized." *See* (Govt. closing slides) (emphasis original). The government effectively *conceded that the Capitol riot was not preplanned by the Rhodes defendants*. Accordingly, if the *Rhodes* defendants did not plot to start a riot at the Capitol, did not foresee the Capitol riot occurring, and did not engage in "acts or omissions" *that actually led to the evacuation of the Capitol*, they cannot be assessed upward

12

enhancements for conduct that preceded their seizure of the opportunity. In other words, the Capitol riot—specifically the part that occurred *before* Caldwell and his co-defendants entered restricted grounds—was not "within the scope," "in furtherance of," or "reasonably foreseeable in connection with" the PSR's alleged "jointly undertaken criminal activity." Caldwell cannot be held responsible for conduct by rioters, e.g., threats, property damage, and the evacuation of the Capitol that led to the postponement of the certification, that the government admitted was not anticipated or caused by him or the *Rhodes* defendants.

3. *The jury determined that the "conspiracy" started after Congress evacuated.*

Additionally, the jury accepted the government's argument about a lack of preplanning by the *Rhodes* defendants. A logical interpretation of the jury's verdict supports a finding that Caldwell (and his co-defendants) did not premeditate the Capitol riot and that *no conspiracy existed* until Oath Keeper members Watkins, Meggs, and Harrelson entered the Capitol. The jury acquitted Rhodes, the alleged kingpin, of conspiracy to obstruct Congress pursuant to 18 U.S.C. §1512(k), (Count 2), and conspiracy to intimidate Members of Congress away from their Capitol Hill duties pursuant to 18 U.S.C. § 372 (Count 4). Watkins and Meggs, unlike Rhodes, were convicted of Counts 2 & 4. Harrelson was acquitted of Count 1 (seditious conspiracy) and Count 2, but convicted of Count 4. Caldwell was acquitted of all conspiracy counts, but, like all defendants, convicted of the substantive 18 U.S.C. § 1512(c)(2) count.

The jury's verdict demonstrated that it rejected any notion that the Capitol riot on J6 was preplanned, that the QRF had a nefarious purpose on J6, and that Rhodes and Caldwell engaged in "jointly undertaken criminal activity" *during the Capitol riot*. The verdict as to Rhodes is most striking on this point. The jury found beyond a reasonable doubt that Rhodes entered a "seditious conspiracy," i.e., a conspiracy to use force to stop the transfer of presidential power,

13

but acquitted him of conspiracies that specifically alleged that Rhodes's aim was to stop

Congress's certification on J6 (Count 2), and to do so *by force or intimidation* (Count 4).  Just as

telling, the jury acquitted Rhodes (and all defendants) of seditious conspiracy to forcibly stop

"the execution of [the] law," specifically laws relating to Congress's certification of the Electoral

College.  Accordingly, the jury specifically found that Rhodes's force-wielding "seditious

conspiracy" against the "authority" of the government did *not* include the use of force against the

most obvious vehicle of "the transfer of presidential power" presented to the jury—Congress's

certification proceeding.

A logical translation of the jury verdict is as follows.  The jury found that Rhodes's

seditious conspiracy to use "force" to stop the transfer of presidential power was not aimed at

Members of Congress *on J6* or was a forcible attempt to stop "the execution" of the J6

certification proceeding.  *See* ECF No. 400 (Count 4 and Count 1 jury instructions).  The jury

agreed with the government's argument, however, that Rhodes and Meggs engaged in bombastic

language and seditious conduct *after* J6, finding that the seditious conspiracy, which does not

require an overt act, occurred *after* J6, not before *and definitely not on J6*.  Next, Watkins and

Meggs were part of the "stack" that entered the Capitol in an arguably organized fashion, which

explains why the jury convicted them of conspiracy under Count 2, (18 U.S.C. § 1512(k)), while

non-"stack" defendant Harrelson was acquitted of that charge.  In short, the jury accepted the

government's argument that the defendants acted *spontaneously* to an *unanticipated* riot on

Capitol Hill, and rendered their verdicts based upon each defendant's individual conduct after the

"opportunity" was "seized."  Caldwell's "relevant conduct" must be assessed in light of the

government's closing argument and the jury's verdict.

4.   *The jury cleared Rhodes and the Oath Keepers organization of responsibility for J6.*

By acquitting Rhodes of three separate conspiracies tied *specifically* to the Capitol riot, acquitting all Rhodes defendants of the "execution of [the] law" portion of 18 U.S.C. § 2384, and acquitting Caldwell of all conspiracies, the jury's verdict creates an inconvenient truth. That is, the jury concluded that the Oath Keepers *organization* and its President, Rhodes, did not orchestrate or conspire to engage in illegal conduct aimed specifically *at stopping the certification on J6*.[10] Obviously, the jury also rejected the government's claim in closing that Rhodes was "the architect for the plans for a QRF" that Caldwell coordinated "to have firepower to support a plan to stop" the certification. (Tr., 9935). If the jury believed for a second that Rhodes or his Oath Keepers management team were responsible for the actions of Meggs, Watkins, and Harrelson—or for any rioting--they would have convicted him in a heartbeat on Count 2, Count 4, and the "execution of [the] law" prong of Count 1.

Logically, the jury's verdict reflects a finding that the actions of Meggs, Watkins, and Harrelson in entering the Capitol were *ultra vires* of the Oath Keepers *organization* and Rhodes. In other words, Meggs, Watkins, and Harrelson were acting as wildcat operators on J6 when Meggs and Watkins joined a "stack," and Harrelson teamed up with Jason Dolan, to enter the Capitol. If the jury did not hold Rhodes criminally responsible either personally or through *respondeat superior* for the wildcat actions of Meggs, Watkins, and Harrelson on J6, how can Caldwell, who was not an Oath Keeper, be held responsible for their actions?

The "conspiracy clock" vis-à-vis the *Rhodes* defendants, in other words, did not start ticking until Meggs, Watkins, and Harrelson *independently* "seized" the "opportunity" on J6.

---

[10] Interestingly, Michael Greene (a.k.a. "Whip"), the alleged "on the ground leader of the Oath Keepers on J6," was recently acquitted of the same conspiracy counts as Rhodes, confirming that both juries did not believe that Rhodes or his organization had conspired to stop the certification.

Caldwell, however, was not even "on the clock" as he was on the opposite side of the Capitol and incommunicado with the wildcat Oath Keepers who entered the Capitol.  Trial evidence proved that Caldwell was not in contact with the wildcat Oath Keepers on J6 as the riot unfolded. Caldwell had no contacts with Rhodes since mid-November 2020, had never met Meggs or Harrelson and was not on Oath Keeper Signal or GoToMeeting chats.  Caldwell's text to Watkins ("Where are you?") was never answered, tacitly proving that he was not acting in concert with her.  *See* (Govt. Ex. 6731, 192.T.1517).

Respectfully, the Court cannot ignore the jury's striking finding that neither Rhodes nor his organization were criminally responsible for any conspiratorial conduct that *specifically* occurred on J6.  The argument that enhancements based upon joint criminal activity do not apply to Caldwell, a non-member who was acquitted of all conspiracy counts, is strong.  Accordingly, even if the Court disagrees with Judge McFadden's opinion as to the definition of "administration of justice," the §2J1.1(b) enhancements should not apply to Caldwell.

### D.  The PSR incorrectly applied U.S.S.G. §2J1.2(b)(3).

Caldwell objects to the PSR's finding that a 2-level enhancement applies based upon his offense being "extensive in scope, planning, or preparation" pursuant to U.S.S.G. §2J1.2(b)(3). Again, the government argued in closing that the Capitol riot was an "opportunity" that the defendants "seized" upon, not a preplanned happening.  Caldwell was the only defendant acquitted of all conspiracy counts lodged against him.  As noted *supra*, the jury's verdict logically reflects a determination that Rhodes and his organization did not conspire to stop the certification process on J6 and, by logical extension, Caldwell obviously did not either.  Instead, the jury concluded that Meggs, Watkins, and Harrelson acted *ultra vires* from Rhodes and his organization and "seized" and "opportunity" to enter the Capitol during an unanticipated riot.

Caldwell's traipsing up to a temporary balcony was a spontaneous decision, not the product of planning and preparation.

As to the QRF, the FBI could not track down one non-DOJ witness to back up its claim that Caldwell plotted an attack on the Capitol or that the QRF was an offensive unit.  (Tr., 1625-26).  Incredibly, nine months after Caldwell was accused of leading a preplanned attack on the Capitol with a QRF, the FBI was asking these questions:  1) "Who was in charge of the op on January 6?"; 2) "What was the overall plan for the Oath Keepers at the Capitol?"; and 3) "What was the purpose for the guns at the QRF hotel?" (Tr., 3140-42) (questions forwarded to FBI branch office in Oregon by S/A Harris).  Even the Government's cooperators admitted that the QRF was not intended to be used as an offensive force.  Finally, Caldwell was "aligned with" the North Carolina Oath Keepers, a group that broke off from Rhodes's in November 2020.  Accordingly, Caldwell should not receive a 2-level enhancement pursuant to U.S.S.G. §2J1.2(b)(3).

### E.  The PSR misapplied U.S.S.G. §3B1.1(b).

Caldwell objects to the PSR's finding that a 3-level enhancement applies for being a "manager or supervisor of a criminal activity that involved five or more participants or was otherwise extensive" pursuant to U.S.S.G. §3B1.1(b).  This finding is completely at odds with trial testimony, the jury's verdict, and proffer information provided by Stamey to the FBI.

Caldwell was not a member of the Oath Keepers and spent the entire day on J6 with his wife, an indisputable fact proven by hundreds of photographs and several videos introduced at trial.  He had no contact with the QRF on January 6, and the QRF did not attempt to contact Caldwell.  Caldwell was not on leadership Signal chats or Zello with the Oath Keepers, and had

17

never met or interacted with any Florida or Arizona Oath Keepers.  To receive an aggravating role enhancement under §3B1.1, "the defendant must have been the organizer, leader, manager, or supervisor of *one or more participants*."  *Id.*, App. Note 2 (emphasis added).  Caldwell did not organize, lead, manage, or supervise *anybody*.

As noted *supra*, Stamey proffered that he was *the* QRF, which was a telephone tree intended to organize the extraction of middle-aged and elderly men out of D.C. in case they were attacked by Antifa.  A "tour guide" for a North Carolina group that split off from Rhodes weeks before J6 is not a leader or organizer or anything.  The jury acquitted Caldwell of all conspiracy counts.  Additionally, contrary to the PSR's finding, (PSR at ¶131), Caldwell did not coordinate "the depositing and guarding of the weapons at the QRF hotel," an allegation unsupported by the evidence at trial and Stamey's proffer.  Finally, contrary to the PSR's finding, (PSR at ¶131), Caldwell did not "choose" the hotel for the QRF to use.

F.  **Caldwell is eligible for a "minimal role" reduction**.

Caldwell requests a 4-level *decrease* in his guideline level based up on his "minimal" participation in the offense.  *See* U.S.S.G. §3B1.2(a).  This section applies to Caldwell because he was "substantially less culpable than the average participant in the criminal activity" and was "plainly among the least culpable of those involved in the conduct of the group."  *Id.*, n. 3(A) & 4.  The "average" participant in relation to the obstruction of Congress:  1) obstructed Congress while it was in session; 2) participated in, or witnessed violence against, police officers; 3) or actually entered the Capitol Building.  Caldwell's conduct was far below that of the "average participant."

Caldwell participated in a peaceful protest for most of J6.  Caldwell's alleged "obstruction" occurred *after* Congress was already ordered to evacuate Capitol Hill.  Caldwell walked up a sidewalk to a flight of stairs, spent a few minutes on a balcony, destroyed no property, assaulted nobody, and *voluntarily* left the balcony and grounds.  Caldwell never entered, or attempted to enter, the Capitol Building, and wore non-military clothing.  He traversed Capitol grounds that are traditionally open to the public.  As the certification had already been stopped, Caldwell's presence on Capitol grounds *did not delay the certification for one second*.  Caldwell is "plainly among the least culpable of those involved in the conduct" engaged in by protestors on J6.  In fact, to date no other non-violent, unarmed protestor who did not enter the Capitol has been *charged* with violating 18 U.S.C. § 1512(c)(2).  Accordingly, Caldwell should receive a 4-level role reduction.

### G.  **The PSR misapplied U.S.S.G. §3C1.1**.

Caldwell objects to the PSR's finding that a 2-level enhancement applies based on obstruction of the administration of justice pursuant to U.S.S.G. §3C1.1.  This section does not apply "[i]f the defendant is convicted of an offense covered by . . . §2J1.2 (Obstruction of Justice) . . . except if a *significant* further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g., the defendant threatened a witness during the course of the prosecution for the obstruction offense)."  *Id*., n. 7 (emphasis added).  Caldwell's alleged "further obstruction" can hardly be characterized as "significant."

1. *Caldwell retained the originals and multiple copies of photos*.

Trial testimony and exhibits proved that Caldwell *retained multiple copies of the deleted photos on his phone, computer, and external hard drives, which were all located in his home on*

19

*the date of his arrest*.  In fact, the FBI, during its search of Caldwell's residence, easily recovered every photo that was "deleted" from the Caldwell-Crowl Facebook thread, and the government provided these photos in discovery.  Caldwell always possessed at least three sets, including the originals on his phone, of the "deleted" photos.  Second, the undisputed testimony of two FBI agents established that the contents of Caldwell's "unsent" Facebook messages are "unknown." Accordingly, it is pure speculation as to the content of these messages.  In fact, an "unsent" message that the FBI speculated was a Caldwell selfie video turned out to be a hyperlink to a publicly sourced News2Share article.

Next, Caldwell did not suggest to defendant Watkins that she "falsely claim that she was with him the whole time" on J6.  The Government's claim assumes the worst and ignores the context of the message and the personality of the sender.  Watkins messaged Caldwell complaining about an internet post that falsely suggested that she was responsible for *the deaths of police officers*:  "G**dammit.  Why is my face associated with dead cops?"  Caldwell, responding to the false suggestion that Watkins *murdered police officers*, joked:  "If any sh** should ever come down, you were with me all the time and I'll swear to it."  Caldwell was making an obvious joke to Watkins, who "laughed out loud":  "There's too much evidence to the contrary.  Perjury bad, *lol*."  The "you were with me all the time and I'll swear to it" and similar lines were oft-repeated staples of Hollywood "noir" films of the 40s in 50s involving murder mysteries.  Caldwell, an amateur screenwriter, was not offering to Watkins, whose presence inside the CCTV-saturated Capitol was *indisputable and all over the internet*, an alibi for her whereabouts on J6.  He was channeling Edward G. Robinson and Humphrey Bogart, i.e., "if they *wrongly* accuse you of murder, you were with me all the time, and I'll swear to it."

Finally, Caldwell did not "perjure" himself.  Caldwell truthfully testified that he did not personally see, *in real time*, any acts of violence.  A retired FBI agent, John Roeper, testified that, from a virtually identical vantage point and time as Caldwell, he witnessed no violence on the west side Capitol grounds and balcony.  Finally, the Government's and defense's CCTV video, cell phone videos, and photographic exhibits all proved that while Caldwell was on the balcony, there was *no violence or property damage* that would have been visible to Caldwell. Next, Caldwell did not perjure himself when he testified that he believed the certification of the Electoral College had been completed before he entered the Capitol grounds.  First, Caldwell's testimony was backed up by his wife, who likewise testified that the couple assumed the certification process was completed.  Second, Caldwell's wife can be heard on a video, within earshot of Caldwell, stating that "Congress has left" the Capitol.  It was perfectly reasonable for Caldwell, who was not at home watching the events unfold on television, to assume that, since Congress left the Capitol, the certification had been completed.

2.  *Caldwell's alleged obstruction occurred before he was under investigation.*

Additionally, U.S.S.G. §3C1.1 does not apply to certain obstructive conduct that occurs before an "investigation" into "the defendant's instant offense":

> Obstructive conduct that occurred *prior to the start of the investigation of the instant offense of conviction* may be covered by this guideline *if the conduct was purposefully calculated, and likely to thwart the investigation or prosecution* of the offense of conviction

U.S.S.G. §3C1.1, App. Note 1 (emphasis added).  The "investigation" into Caldwell's "instant offense of conviction" did not begin until *after* Caldwell's alleged obstructive acts occurred. Caldwell did not become a suspect in the instant case until *after* the FBI raided the home of Jessica Watkins on January 17, 2021, when agents were told by Montana Siniff about

"Commander Tom." Caldwell's Facebook deletions and unsent messages occurred on or before January 15, 2021. Accordingly, for §3C1.1 to apply, the Court must find that Caldwell's pre-investigation obstructive conduct was "purposefully calculated, and likely to thwart the investigation or prosecution of the offense of conviction." That did not happen.

First, Capitol Hill was literally saturated with CCTV and other surveillance tools, making Caldwell's deletion of photographs a minor obstructive act at best. Second, as noted *supra*, Caldwell retained multiple copies of the deleted photographs, which were also contained in Crowl's Facebook records and phone. Third, the "video"—which turned out to be a hyperlink—was an open-sourced News2Share segment, which was already in the possession before Caldwell's arrest. Caldwell, moreover, fully cooperated with the FBI investigation, including participating in a 3-hour interview with agents, where he provided truthful information. Instead of "thwarting" the FBI investigation, Caldwell actually assisted it.

H. **Caldwell should receive a 2-level reduction for acceptance of responsibility**.

Caldwell objects to the PSR's finding that he is not entitled to a 2-level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1(a). (PSR at ¶¶119-20). First, Caldwell testified truthfully at trial regarding his conduct on J6 at the Capitol. He testified that when he entered restricted Capitol grounds, there were no barriers blocking his egress, a fact that was confirmed by CCTV. Caldwell testified truthfully that he and his wife believed that Congress had already completed the certification process. Ironically, the "Congress are p-----s" video cited in the PSR corroborates that Caldwell and his wife were under the impression that the congressional proceeding was over because Congress had left the building. Caldwell takes full responsibility for his genuine actions on J6.

1. *Caldwell qualifies for "acceptance" despite going to trial*.

As the Court knows, Caldwell filed a Motion to Dismiss the Indictment wherein he argued that 18 U.S.C. § 1512(c)(2) & (k) (Counts 2 & 4) do not apply as the Electoral College certification was not an "official proceeding" and that § 1512(c)(2) applies only to tangible evidence obstruction. Caldwell's motion was denied by the Court, but was characterized as a "substantive" challenge, and was partly validated recently by a dissenting Judge on the D.C. Circuit. Caldwell also moved to dismiss Count 1 (seditious conspiracy) and Count 4 (preventing Congress from discharging duties) based upon non-frivolous statutory construction arguments. Caldwell has also argued that his conduct vis-à-vis Count 13 (evidence tampering) does not, as a matter of law, meet the statutory criteria to be convicted of that count.

Caldwell, in other words, went to trial to "assert and preserve issues that do not relate to factual guilt . . . [such as] a challenge to the applicability of a statute to his conduct." U.S.S.G. §3E1.1, n. 2. Caldwell truthfully stated his actions on J6, and video evidence proved that his factual recitation was quite accurate. While Caldwell respects the Court's ruling on his Motion to Dismiss, he still honestly believes that his conduct on J6 and thereafter, as a matter of law, did not constitute a violation of the statutes set forth in Counts 1-4 and Count 13. Accordingly, Caldwell should receive a 2-level reduction for acceptance of responsibility.

**I.   Section 3553(e) sentencing factors.**

Unfortunately, Caldwell was required to address a multitude of Guidelines issues and factual disputes in the instant memorandum at the expense of discussing 18 U.S.C. § 3553(e) factors, which will be argued more fully at sentencing. Caldwell is an incredible human being. He is an amateur writer, screen play novelist, animal lover, and one of the kindest

individuals one could ever meet.  Every single day of his life, Caldwell, because of selfless service to his country, writhes in pain from an explosion that has gradually wreaked havoc on his back, hips, shoulders, and knees, etc.  He testified from a special, orthopedic chair. Caldwell went to D.C. on J6 to protest an election with no intention of doing anything illegal. He asks for the Court's leniency.

The Court made the correct decision in releasing Caldwell on March 12, 2021. Respectfully, the Court will make the correct decision by not incarcerating Caldwell at sentencing.

Respectfully submitted:

_____/s/_____
David W. Fischer, Esq.
Federal Bar No. 023787
Law Offices of Fischer & Putzi, P.A.
Empire Towers, Suite 300
7310 Ritchie Highway
Glen Burnie, MD 21061
(410) 787-0826
Attorney for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of May, 2023, a copy of the foregoing Memorandum in Aid of Sentencing was electronically filed with the Clerk of the United States District Court using CM/ECF, with a notice of said filing to the following:

Counsel for the Government:      Office of the United States Attorney
Kathryn Rakoczy, AUSA
Jeffrey Nestler, AUSA
Troy Edwards, AUSA
Alexandra Hughes, AUSA
Louis Manzo, AUSA
555 4th Street, NW
Washington, DC 20001

_____/s/_____
David W. Fischer, Esq.