## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**ELMER STEWART RHODES III,**<br>**KELLY MEGGS,**<br>**KENNETH HARRELSON,**<br>**JESSICA WATKINS,**<br>**ROBERTO MINUTA,**<br>**JOSEPH HACKETT,**<br>**DAVID MOERSCHEL,**<br>**THOMAS CALDWELL, and**<br>**EDWARD VALLEJO,**<br><br>     **Defendants.** | **Case No. 22-cr-15-APM** |

## GOVERNMENT'S OMNIBUS SENTENCING MEMORANDUM AND MOTION FOR UPWARD DEPARTURE

These defendants were prepared to fight. Not for their country, but against it. In their own words, they were "willing to die" in a "guerilla war" to achieve their goal of halting the transfer of power after the 2020 Presidential Election. As a co-conspirator recognized, their actions made these defendants "traitors."[1]

Using their positions of prominence within, and in affiliation with, the Oath Keepers organization, these defendants played a central and damning role in opposing by force the government of the United States, breaking the solemn oath many of them swore as members of the United States Armed Forces. To support their operation, they amassed an arsenal of firearms across the Potomac River and led a conspiracy that culminated in a mob's attack on the United

---

[1] Gov. Ex. 1054.Tr (Edward Vallejo: "guerilla war"); Gov. Ex. 6860 (Msg. 1.S.656.9322) (Kelly Meggs: "willing to DIE"); Gov. Ex. 1000.7 (Stewart Rhodes: "willing to die"); 10/19/22PM Tr. at 4418 (Jason Dolan: "treason"); 1/3/23AM Tr. at 2541 (Caleb Berry: "fight and die"); 10/31/22PM Tr. at 5866 (Graydon Young: "traitor").

States Capitol while our elected representatives met in a Joint Session of Congress.   Two juries found all nine defendants guilty of participating in this grave conduct.   These defendants are unlike any of the hundreds of others who have been sentenced for their roles in the attack on the Capitol.   Each defendant therefore deserves a significant sentence of incarceration.

After adopting the PSRs' factual findings, Chapter Two specific offense characteristics, and Chapter Three adjustments, and then departing upwards from the Sentencing Guidelines range based on the defendants' terroristic conduct under Section 3A1.4, Note 4, the Court should impose the following terms of incarceration:

| Defendant | Chapter Two adjusted offense level | Obstruction adjustment (§ 3C1.1) | Role adjustment (§ 3B1.1) | Adjusted offense level (pre-departure) | Note 4 departure levels (§ 3A1.4, cmt. n.4) | Total offense level (post-departure) | Requested sentence in years (and months) |
|---|---|---|---|---|---|---|---|
| Rhodes | 27 | 2 | 4 | 33 | 6 | 39 | 25 (300) |
| Meggs | 27 | 2 | 4 | 33 | 4 | 37 | 21 (252) |
| Watkins | 27 | 2 | 4 | 33 | 3 | 36 | 18 (216) |
| Minuta | 27 | 2 | 3 | 32 | 3 | 35 | 17 (204) |
| Vallejo | 27 | 2 | 3 | 32 | 3 | 35 | 17 (204) |
| Harrelson | 27 | 2 | 3 | 32 | 3 | 35 | 15 (180) |
| Caldwell | 27 | 2 | 3 | 32 | 3 | 35 | 14 (168) |
| Hackett | 27 | 2 | 3 | 32 | 1 | 33 | 12 (144) |
| Moerschel | 27 | 2 | 0 | 29 | 1 | 30 | 10 (120) |

**Table of Contents**

I.     FACTUAL BACKGROUND ..................................................................................... 5

  A.   Summary of Evidence ...................................................................................... 5

  B.   Victims .......................................................................................................... 10

  C.   Scope of the Conspiracy ................................................................................ 17

II.    CHARGES AND STATUTORY PENALTIES ..................................................... 18

III.   SENTENCING GUIDELINES .............................................................................. 20

  A.   Legal Standards ............................................................................................. 21

    1.   Preponderance of the evidence ................................................................. 21

    2.   Relevant conduct and definition of "offense" .......................................... 21

  B.   Chapter Two: Offense Conduct ..................................................................... 24

    1.   Section 2J1.2 (Obstruction of Justice) ...................................................... 24

    2.   "Administration of justice" specific offense characteristics ..................... 26

      a)   Legal applicability ................................................................................ 27

      b)   Section 2J1.2(b)(1)(B) (causing or threatening injury or damage) ......... 33

      c)   Section 2J1.2(b)(2) (substantial interference with administration of justice) ......... 36

    3.   "Extensive scope, planning, or preparation" specific offense characteristic .............. 40

  C.   Chapter Three: Adjustments .......................................................................... 43

    1.   Section 3B1.1 (aggravating role) ............................................................... 43

    2.   Section 3C1.1 (obstruction of justice) ...................................................... 49

    3.   Section 3E1.1 (no acceptance of responsibility) ....................................... 53

  D.   Grouping Analysis ......................................................................................... 54

  E.   Upward Departures ........................................................................................ 56

    1.   Section 3A1.4, Note 4 (terrorism) ............................................................. 56

    2.   Alternative bases ....................................................................................... 71

IV.    SECTION 3553(a) FACTORS APPLICABLE TO ALL DEFENDANTS .................. 73

  A.   Nature and Circumstances of the Offense and Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law ................... 73

  B.   Need for the Sentence to Afford Adequate General Deterrence ....................... 75

  C.   Need to Avoid Unwarranted Sentencing Disparities ...................................... 76

    1.   Defendants sentenced for role in attack on Capitol .................................. 77

    2.   Defendants sentenced for seditious conspiracy in other contexts ............. 79

V.     SENTENCING ANALYSIS FOR EACH DEFENDANT ............................... 81

    A.  Stewart Rhodes ....................................................................................... 81

    B.  Kelly Meggs .......................................................................................... 101

    C.  Kenneth Harrelson ................................................................................ 112

    D.  Jessica Watkins ..................................................................................... 120

    E.  Roberto Minuta ..................................................................................... 131

    F.  Joseph Hackett ...................................................................................... 142

    G.  David Moerschel ................................................................................... 148

    H.  Thomas Caldwell ................................................................................. 153

    I.  Edward Vallejo ..................................................................................... 164

VI.    OTHER SENTENCING CONDITIONS .................................................... 171

    A.  Restitution ............................................................................................. 171

    B.  Fine ....................................................................................................... 176

    C.  Supervised Release ............................................................................... 177

    D.  Special Conditions ............................................................................... 177

VII.   CONCLUSION ........................................................................................ 180

I.      **FACTUAL BACKGROUND**

    **A. Summary of Evidence**

These defendants led and participated in a conspiracy by members and affiliates of a group known as the "Oath Keepers" to oppose by force the lawful transfer of presidential power from President Donald J. Trump to President-Elect Joseph R. Biden, Jr.   They each agreed to do so by, among other things, preventing, hindering, or delaying Congress' certification of the 2020 Presidential Election on January 6, 2021, and by using force, intimidation, or threats to prevent members of Congress from discharging their duties that day.

In the days after the election, Elmer Stewart Rhodes III, the founder and president of the Oath Keepers, proposed that he and other Oath Keepers members and affiliates forcibly oppose the lawful transfer of power.   Over time, leaders and affiliates from Oath Keepers chapters across the country joined together under Rhodes to accomplish this criminal goal—including, among many others, Florida Oath Keepers Kelly Meggs, Kenneth Harrelson, Joseph Hackett, and David Moerschel; Ohio Oath Keeper Jessica Watkins; Virginia Oath Keeper affiliate Thomas Caldwell; New York Oath Keeper Roberto Minuta; and Arizona Oath Keeper Edward Vallejo.

As legal challenges to the election sputtered, and President Trump gave no indication that he would invoke the Insurrection Act to halt the certification of the election, these defendants explicitly discussed the need to use any means necessary, up to and including the use of force, to oppose the transfer of power, and they began to focus on January 6 as a day of action for their objective.   Then, on January 6, the defendants seized the opportunity to advance their conspiratorial goal by participating in the attack on the Capitol.

On January 6, 2021, hundreds of rioters unlawfully entered the U.S. Capitol grounds in an effort to disrupt a Joint Session of Congress that was meeting to ensure the peaceful transfer of

power after the election.   Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.   Members of the House of Representatives and the Senate, including the President of the Senate, Vice President Michael R. Pence, were forced to evacuate their chambers, and the Joint Session was suspended.

The defendants' actions precipitated that violent riot and attack on the Capitol.   These defendants, led primarily by Rhodes, Meggs, and Watkins, pushed the idea among Oath Keepers members and others that with a large enough mob, they could intimidate Congress and its Members and impose the conspirators' will rather than the American people's:   to stop the certification of the next President of the United States.

As the riot began to unfold at the Capitol, Meggs, Harrelson, Watkins, Hackett, and Moerschel joined with nine other Oath Keepers members and affiliates—many of whom were wearing paramilitary clothing and patches with the Oath Keepers name, logo, and insignia—and marched in a line formation ("Stack One" or "Line One") up the east steps of the Capitol.   As they marched, some of the mob parted, cheering for the stack and chanting, "Oath Keepers!   Oath Keepers!"   To fellow rioters, the Oath Keepers' coordination, tactical attire, and reputation provided an imprimatur of legitimacy to the attack.   A small army was marching up the steps of the United States Capitol.



Soon after reaching the top of the steps, just outside the East Rotunda Doors, rioters engaged in a sustained and vicious assault on the final line of law enforcement officers protecting the Capitol.    Chemical spray, projectiles, and the sheer force of the mob overwhelmed the officers and forced them out of the way.    Only two Capitol Police Officers—Marc Carrion and Ryan Salke—remained, securing the East Rotunda doors with a broken flagpole.    The doors did not

hold.   As they opened, Meggs waved Stack One forward, and the Oath Keepers breached the Capitol.

Inside, the defendants and their co-conspirators entered the Rotunda and split up. Watkins led half of the group in trying to push their way through a line of law enforcement officers guarding a hallway that led to the Senate Chamber, but law enforcement officers forcibly repelled their advance.   Meggs led the other half—including Hackett and Moerschel—toward the House of Representatives, in search of Speaker of the House Nancy P. Pelosi.

Soon after, a second wave of Oath Keepers, led by Minuta and co-conspirator Joshua James, formed another military-style column formation ("Stack Two" or "Line Two") and breached the Capitol through the same East Rotunda doors that Stack One had entered about half an hour earlier.   Once inside, Minuta and James forced their way past law enforcement officers trying to guard the Rotunda, shouting at the officers to "get out" because this was "our fucking building."

Meanwhile, Caldwell stormed the west side of the Capitol and coordinated with his co-defendants, including Watkins.   Caldwell followed other rioters past the barricades, up through the scaffolding around the inaugural stage, and onto the lower west terrace.   Once on the parapet, he and his wife celebrated driving Members of Congress from the building.

This attack was the culmination of weeks if not months of planning by the co-conspirators to use any means necessary, up to and including force, to stop the transfer of power.   In their encrypted chat groups and meetings, they fumed about the election result and government overreach, and plotted to achieve their goals.   Rhodes, Harrelson, Watkins, Caldwell, Vallejo, and many co-conspirators exploited their military training and experience to help lend legitimacy to the cause and hone the group's tactics, to include using military-style gear, marching in "stack"

formations, and preparing an armed Quick Reaction Force ("QRF") staged outside D.C. to support the mission.

In the weeks leading up to January 6, Caldwell helped to plan the QRF and Vallejo volunteered to lead it.   Many of the defendants—including Rhodes,[2] Meggs, Harrelson, Hackett, Moerschel, Caldwell, and Vallejo—and their co-conspirators traveled across the country and surrounded the nation's capital with rifles, handguns, ammunition, and other weapons in preparation for their operation:



---

[2] From January 1 through 5, 2021, alone, including on his way to D.C., Rhodes purchased or arranged to purchase tens of thousands of dollars' worth of firearms and related tactical equipment, including 2 rifles, 15 magazines, 4 cases of ammunition, 10 sights, 2 optics, optic plates, 2 bipods, 1 scope leveling kit, 2 scope mounts, 1 sling, 2 mounts, 1 gun maintenance kit, 2 uppers for rifles, 2 triggers, a ladder rail panel, charging handles, 2 night vision devices, 1 night vision weapon compatible sight, and other related equipment.   *See* Gov. Ex. 6925.

Vallejo and others were prepared to rapidly deploy these weapons to their co-conspirators inside D.C.   These actions were wholly consistent with Rhodes' calls for a "bloody civil war" and his stated belief that Congress would not listen until they, his "Oath Keepers," entered the nation's capital with "rifles in hand."

"[T]he violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   "The chaos wrought by the mob forced members of Congress to stop the certification and flee for safety."   *United States v. Fischer*, 64 F.4th 329, 332 (D.C. Cir. 2023).   As this Court has explained:

> January 6, 2021 was supposed to mark the peaceful transition of power.   It had been that way for over two centuries, one presidential administration handing off peacefully to the next.   President Ronald Reagan in his first inaugural address described "the orderly transfer of authority" as "nothing less than a miracle." Violence and disruption happened in other countries, but not here.   This is the United States of America, and it could never happen to our democracy.

*Thompson v. Trump*, 590 F. Supp. 3d 46, 61 (D.D.C. 2022) (footnote omitted).

But, because of *these* defendants' actions, it did happen to our democracy.   Rioters injured more than a hundred members of law enforcement and inflicted significant emotional injuries on law enforcement officers and Capitol employees alike.   The attack caused substantial damage to the Capitol, resulting in millions of dollars of financial losses.   But the cost to our democracy and system of government was incalculable.   *See United States v. Gardner*, No. 21-cr-622 (Mar. 16, 2023), Sent. Tr. at 68 (identifying one of the "victims" on January 6 as "democracy itself").

## B.  Victims

In addition to attacking our democracy itself, the defendants' crimes harmed institutions and individuals alike: the government, Congress, legislators, the staffers working inside the Capitol building, and the hundreds of law enforcement officers from across the region valiantly trying to

protect the building, the people, and the constitutional process.

By law, Members of Congress were required to be at the Capitol on January 6, resolving by Joint Session the certification of the presidential election.  They were the public face of the peaceful transfer of presidential power and, in these defendants' eyes, the enemy.  These defendants conspired to oppose the transfer of power by force, to impede the Members of Congress by intimidation and force, and/or to obstruct Congress' proceeding that day by leading the charge into the building.   Apart from being elected officials with constitutional and statutory duties, these individual American citizens were also targets of the defendants' crimes.  Public accounts by many of these Members of Congress illustrate some of the emotional and physical toll these people suffered, and continue to suffer, at the hands of these defendants.

Some Members of Congress, for example, serving in the House of Representatives—down the hall that Defendants Meggs, Hackett, and Moerschel stalked—were left behind on the chamber balcony when other Members were evacuated.  One Representative stated, "I really thought, we're not going to be evacuated.  We're going to die here," and because of the slim political majority, the rioters "could at any point take any three members either hostage or kill any three members, and that would have prevented us from certifying the election."[3]   Another Representative expressed that, "[i]t was terrifying," because they "didn't know if the doors could be locked.   And so I was focused on planning my escape if I had to get out."   "That's what I was concerned about," she added, "were we going to get out?   Were we going to survive?   Were they

---

[3]   apnews.com/article/joe-biden-donald-trump-peter-welch-congress-a308bf2a296018e08a3ed5b27b00dbf9   (Jan.   5,   2022);   apnews.com/article/jan-6-capitol-siege-lawmakers-trauma-04e29724aa6017180259385642c1b990 (Jan. 5, 2022).

going to come after us?"[4]   A Representative who had served as a federal law enforcement officer remembered the "echo of this buzzing going on," continuing that "[i]t's a sound that none of us will ever forget."   "It sounded like a battering ram trying to beat down the doors."[5]   For one Representative, it "felt like I was having a heart attack."   She explained, "I hung up with [my kids] fairly quickly, because I wanted to make sure that I was ready to move as soon as the police said we could move.   And as soon as I hung up with them, I just got this sheer panic.   And it was about my kids."[6]   *See* Gov. Ex. 1129 (photo of this Representative in chamber).

Many of the Members of Congress began planning how to fight back to save their lives. Indeed, Jamie Fleet, a senior advisor to then-Speaker of the House Nancy Pelosi, testified to watching a Member of Congress inside the House chamber "creat[e] like a sword-style weapon" with a hand-sanitizer stand, prepared to fight back against the incoming horde.   1/6/23AM Tr. at 3321.   One Representative noted that he hadn't "felt that way in over 15 years, since I was a Ranger in Iraq and Afghanistan." [7]   "I had this realization that we were trapped," the Representative said, so he "started to kind of view this in a tactical way," explaining the "need to get everyone together, need to get in a defensive position.   You don't want people spread out. You don't want people to be able to be pulled away from a mob—you need to get in a tight group."[8]

---

[4] *Id.*

[5] lohud.com/in-depth/news/2022/01/04/january-6-capitol-protest-congress-members-recall-escape/6493506001 (Jan. 4, 2022).

[6] *Id.*

[7] lohud.com/in-depth/news/2022/01/04/january-6-capitol-protest-congress-members-recall-escape/6493506001 (Jan. 4, 2022).

[8] apnews.com/article/joe-biden-donald-trump-peter-welch-congress-a308bf2a296018e08a3ed5b27b00dbf9 (Jan. 5, 2022); apnews.com/article/jan-6-capitol-siege-lawmakers-trauma-04e

Another Representative noted that her "police career flashed through my mind because I came from a job where I went to work every day thinking I might not make it back home."  She continued, "to be there in that moment and thinking—really in the midst of complete chaos—I reserved myself to the fact that, yeah, I could die today.  But I'm just like a cop.  I'm here doing the right thing, protecting and serving my nation by being here for this process, a peaceful transfer of power."[9]

The threat these defendants and other rioters presented to the Members of Congress continued long after the rioters breached the building.  Even when they were finally found and later evacuated, they still feared for their lives.  One Representative noted, "Honestly, we thought we were being chased (as we were evacuating).  And my son called right in the middle of it as we're running through the tunnels, and he says, 'Mom!  Mom!'—he's watching on television.  And I said, 'I'm alive, honey, I can't talk right now, we're running for our lives.  I'll call you right back.  But I'm gonna be OK.'"[10]  Another Representative who had served in the military explained that during the evacuation, "I remember the hallways were quiet (when we were evacuating).  I was listening so carefully because I was so afraid that we would turn a corner and there would be the rioters."[11]

A Senator expressed the same shock of fear when he was evacuated from the hall that Defendant Watkins and her co-conspirators pushed through, detailing, "A police officer in a

---

29724aa6017180259385642c1b990 (Jan. 5, 2022).

[9] *Id.*

[10] *Id.*

[11] *Id.*

bulletproof vest with a submachine gun strapped across his grabs me by the collar."   "I'll never forget it: 'Senator, you're in danger.   We have to get out of here.'   I didn't know what the danger was."   As he was evacuated, he "was within 20 feet of these insurrectionists," and "[h]ad one of them had a gun, had two of them blocked off the door, who knows what would have happened."[12]

Our elected legislators were not the only individuals harmed by the defendants' conduct. Sworn law enforcement officers risked their lives to protect not only the Capitol building and the legislators inside, but also the constitutional process itself.   *See* 12/13/22AM Tr. 1000-01 (Officer Carrion explaining that in guarding the Capitol's doors, he was performing the Capitol Police's mission to protect Congress and its process).   Enclosed are written victim impact statements from MPD Officer Christopher Owens and USCP Officer Harry Dunn.   *See* 18 U.S.C. § 3771(e) (defining "victim" broadly as a person or entity "directly and proximately harmed as a result of the commission" of the offense); *see also Gardner*, No. 21-cr-622, Sent. Tr. at 68 (identifying the "victims" on January 6 as including "police officers and people who were inside the Capitol").

USCP Special Agent Lazarus—whom Meggs, Harrelson, Hackett, and Moerschel encountered near Officer Dunn in the Small House Rotunda—explained at trial how he made it his mission to find and save Members of Congress and their staffers.   10/31/22AM Tr. at 5646-52, 5656-62.   Agent Lazarus chillingly described his motive to move as quickly as possible, because he feared that "the building [was] probably going to end up in smoke or it was going to be a fire or something, it was going to be really bad."   *Id.* at 5652.   Those staffers whom Agent Lazarus rescued were similarly terrorized by the rioters' conduct, exclaiming, "Oh, my God, thank God, we're here," when Lazarus found them.   *Id.* at 5654.   At sentencing, Agent Lazarus will tell

---

[12]  lohud.com/in-depth/news/2022/01/04/january-6-capitol-protest-congress-members-recall-escape/6493506001 (Jan. 4, 2022).

the Court how this dark day haunts him still.

MPD Officer Christopher Owens—whom Watkins, her co-conspirators, and other rioters forcibly pushed against in the Senate hallway, 10/26/22AM Tr. at 5435-38, 41—shared the same sentiment.   "[H]undreds of my fellow officers experienced traumas.   We experienced physical traumas, emotional traumas and mental traumas."   He explained that his "physical traumas, bruises and scars have healed but the emotional and mental traumas from that day stay with me to this day."   And the defendants' actions did not just harm Officer Owens, but also his family: "the decisions and illegal actions Mr. Rhodes . . . and [his] fellow Oath Keepers made of their own free will traumatized my wife and daughter and I cannot forgive them for this."

MPD Officer Anthony Jackson—who encountered both waves of Oath Keepers, first Watkins and her group in the Senate hallway and then Minuta and his group in the Rotunda— testified that he was terrified when Minuta and James were screaming and lunging forward. 1/6/22AM Tr. at 3386.   "At this point, my daughter was maybe 10 months," he explained, "[a]nd I had never been a part of anything like this in my life.   So it kind of took me a moment to realize, like, you may not make it out of here today."   *Id*.   "If they were successful in pulling us into the crowd, we don't know what would have happened, honestly."   *Id*.   As Minuta and other members of the mob used a stolen riot shield against the officers to penetrate farther into the Capitol, Officer Jackson's partner, Officer Mendoza, struggled, saying, "I can't breathe."   *Id*. at 3402.

Officer Dunn shared that his "pain did not end that day," and he feels as though he is "at a never-ending crime scene, rather than the citadel of American democracy."   He described the "nightmare of January 6 replaying on a constant loop which never stops."   "I now dread going to work each day," he explained, "and when I am there I count down the hours, the minutes, and the seconds until I can leave."   His personal relationships have also suffered, and he now cannot

muster the desire to participate in activities he once loved.   Officer Dunn continues to seek counseling and treatment for PTSD, because, according to him, he has "gone from being an extroverted person to an introverted, depressed shell of my former self."

The defendants' actions also harmed the hundreds of staffers who do the work to keep our democracy functioning.   Near Officer Dunn, for example, many of Speaker Pelosi's staffers sprinted into hiding and locked themselves in a conference room just feet from Defendants Meggs, Harrelson, Hackett, and Moerschel.   *See* Gov. Ex. 1056.0263.0215FF.   "We turned off all of the lights," one staffer later recounted, "and we hid under the table and no talking, we just said 'Do not speak.'"   Ex. Sent-Omnibus-1.1 ("Pelosi In The House" Documentary).   As Jamie Fleet testified, "I was told, Absolutely don't [call the staffers].   They are hiding.   They are trying to keep their phones quiet.   We don't want any phone calls.   We don't want any texts going off. We don't want to identify that there are people—you know, that they are right on the other side of the door."   2/21/23PM Tr. at 3278.   From their hiding place, a staffer made one phone call, whispering to law enforcement, "We need Capitol Police to come into the hallway.   They're pounding the doors trying to find her now."   Ex. Sent-Omnibus-1.2; *see also* Gov. Ex. 1130C (photos of broken door).   The staffers hid, silent and in the dark, for over an hour, terrified of what people like these defendants might do to them.   Ex. Sent-Omnibus-1.2.

A Senate chamber assistant, Virginia Brown, described the same chaos.   As one of the teenage staffers responsible for carrying the paper electoral ballots, she explained, "they got everyone around the floor and told us we were sheltering in place on the Senate floor.   At that point, they thought it was the safest place to be, because it's pretty hard to get up to."   Then, "[a]fter about 10 minutes, Capitol Police came in and they were like, 'You need to get out immediately.'   So we all—Senators, staff, everyone who was on the floor, which was probably

16

200-something people—rushed down the stairs and into the basement."   Evacuating felt to Ms.

Brown like a "school shooter drill," because "[y]ou don't know if you're gonna turn around a

corner and there's gonna be someone there with an assault rifle or weapon."   After over "five

hours," she and other staffers returned to the Capitol, "clean[ed]" and "resume[d] the electoral

process."[13]

The government anticipates that additional victims, both law enforcement and

congressional workers, will provide oral statements during the omnibus hearing on May 24, 2023.

### C.  Scope of the Conspiracy

This conspiracy was extensive in both its objective and size.   A total of 22 individuals

have been convicted for their roles in this conspiracy: the nine defendants here, the six defendants

convicted in March 2023 in *United States v. Sandra Parker, et al.*, 21-cr-28, and the seven

cooperating defendants[14]:

| Defendant Name | Case Number | Conviction Date (plea agreement or verdict) and docket number |
|---|---|---|
| Graydon Young | 21-cr-28-6 | 6/23/21 (ECF 249) |
| Mark Grods | 21-cr-437 | 6/30/21 (ECF 7) |
| Caleb Berry | 21-cr-460 | 7/20/21 (ECF 7) |
| Jason Dolan | 21-cr-28-15 | 9/15/21 (ECF 427) |
| Joshua James | 22-cr-15-5 | 3/2/22 (ECF 59) |
| Brian Ulrich | 22-cr-15-9 | 4/29/22 (ECF 116) |
| William Wilson | 22-cr-152 | 5/4/22 (ECF 3) |
| Elmer Stewart Rhodes III | 22-cr-15-1 | 11/29/22 (ECF 410) |

---

[13]  washingtonian.com/2021/01/07/virginia-brown-viral-photo-identified-vote-rescuing-hero-capitol-insurrection-19-year-olds-account/ (Jan. 7, 2021).

[14]  All but two of these defendants were convicted of at least one conspiracy charge.   The exceptions are Caldwell and Greene, who, as explained below, were proven to be members of the conspiracy by preponderance of the evidence.   There are also five additional members of the conspiracy still pending trial (Kellye SoRelle, Donovan Crowl, James Beeks, Jonathan Walden, and Jeremy Brown), not to mention the unindicted co-conspirators, including those who managed the arsenals of weapons at the QRF hotel.

| Kelly Meggs | 22-cr-15-2 | 11/29/22 (ECF 410) |
|---|---|---|
| Kenneth Harrelson | 22-cr-15-3 | 11/29/22 (ECF 410) |
| Jessica Watkins | 22-cr-15-4 | 11/29/22 (ECF 410) |
| Thomas Caldwell | 22-cr-15-10 | 11/29/22 (ECF 410) |
| Roberto Minuta | 22-cr-15-6 | 1/23/23 (ECF 450) |
| Joseph Hackett | 22-cr-15-7 | 1/23/23 (ECF 450) |
| David Moerschel | 22-cr-15-8 | 1/23/23 (ECF 450) |
| Edward Vallejo | 22-cr-15-11 | 1/23/23 (ECF 450) |
| Sandra Parker | 21-cr-28-4 | 3/20/23 (ECF 904) |
| Bennie Parker | 21-cr-28-5 | 3/21/23 (ECF 910) |
| Laura Steele | 21-cr-28-7 | 3/20/23 (ECF 904) |
| Connie Meggs | 21-cr-28-9 | 3/20/23 (ECF 904) |
| William Isaacs | 21-cr-28-16 | 3/20/23 (ECF 904) |
| Michael Greene | 21-cr-28-20 | 3/20/23 (ECF 904) |

The scope of the conspiracy impacts many aspects of sentencing, including each defendant's culpability for "relevant conduct," U.S.S.G. § 1B1.3, the Guidelines' specific offense characteristic for an offense that is extensive in scope, *id.* § 2J1.2(b)(3), the Guidelines' adjustment for aggravating roles in the offense, *id.* § 3B1.1, the Guidelines' recommended upward departure for "terrorism," *id.* § 3A1.4, cmt. n.4, and the need to avoid unwarranted sentence disparities, 18 U.S.C. § 3553(a)(6). As explained below, the scope of the conspiracy helps illustrate why the leaders and major participants must receive significant sentences of incarceration.

## II. CHARGES AND STATUTORY PENALTIES

On June 22, 2022, the grand jury returned a superseding indictment charging the defendants with (1) seditious conspiracy, in violation of 18 U.S.C. § 2384; (2) conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k); (3) obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); (4) conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372; (5) destruction of government property, in violation of 18 U.S.C. § 1361; (6) interference with law enforcement officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3); and (7) through

(13), tampering with documents or other objects, in violation of 18 U.S.C. § 1512(c)(1).

The Court presided over two trials, from September 27 through November 29, 2022 (Rhodes, Meggs, Harrelson, Watkins, and Caldwell) and from December 6, 2022 through January 23, 2023 (Minuta, Hackett, Moerschel, and Vallejo).

The juries found all nine defendants guilty of obstructing Congress, as well as additional charges.   The juries found eight of the nine defendants guilty of a conspiracy charge, including six of seditious conspiracy.   The PSRs correctly recount the statutory penalties for each count of conviction:

- **Count One**, seditious conspiracy: 20 years of incarceration

- **Count Two**, conspiracy to obstruct an official proceeding: 20 years of incarceration

- **Count Three**, obstruction of an official proceeding: 20 years of incarceration

- **Count Four**, conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties: 6 years of incarceration

- **Count Six**, interference with law enforcement officers during a civil disorder: 5 years of incarceration

- **Counts Seven**, **Eight, Nine, Eleven**, and **Thirteen**, tampering with documents or other objects: 20 years of incarceration

Each defendant was convicted of at least one count with a statutory maximum penalty of 20 years of incarceration and at least one additional felony count.

The government respectfully requests that the Court sentence Rhodes and Meggs to terms of incarceration greater than 20 years, meaning that the terms of incarceration for seditious conspiracy would run consecutively to their terms of incarceration for obstruction of an official proceeding and/or obstruction of justice.   The Court may sentence a defendant to a total term of incarceration greater than 20 years—i.e., run the terms consecutively—if the Court determines that

such a sentence is necessary to comply with the factors in 18 U.S.C. § 3553(a)(2), that, is, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.   18 U.S.C. § 3584(b); *see also United States v. Lafayette*, 337 F.3d 1043, 1050 & n.11 (D.C. Cir. 2003) (explaining that a court may impose consecutive or "stack[ed]" sentences to achieve a total sentence in excess of the statutory maximum on a single count).

In the Sentencing Reform Act, Congress noted the "appropriateness" of a sentencing regime in which a defendant convicted of multiple counts may be sentenced to consecutive terms of incarceration.   18 U.S.C. § 994(*l*)(1).[15]   The Sentencing Commission implemented this congressional directive, instructing that the Court shall determine the total punishment and then, "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, . . . the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."   U.S.S.G. § 5G1.2(b), (d).

## III.   SENTENCING GUIDELINES

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point" for determining a defendant's sentence.   *Id.*

---

[15] Congress noted that it is generally inappropriate to impose consecutive sentences on counts for conspiring to commit an offense and the "offense that was the sole object of the conspiracy."   18 U.S.C. § 994(*l*)(2).   The government is not seeking the imposition of consecutive sentences for convictions for conspiring to obstruct Congress, 18 U.S.C. § 1512(k), and obstruction of Congress, 18 U.S.C. § 1512(c)(2).

### A.  Legal Standards

#### 1.  Preponderance of the evidence

To apply a provision of the Guidelines that the jury did not necessarily already find beyond a reasonable doubt by virtue of its guilty verdict, the Court must make a finding by a preponderance of the evidence.  *United States v. Watts*, 519 U.S. 148, 154 (1997); *see United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997) ("[I]t is the Government's burden to demonstrate by a fair preponderance of the evidence that an enhancement is warranted."); U.S.S.G. § 6A1.3, cmt.

The Court may consider any relevant information, without regard to whether the information would be admissible at trial.  18 U.S.C. § 3661.  The Court may also consider acquitted conduct, *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008), including specifically an acquittal of a conspiracy charge, *United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014).   In other words, the court may find by a preponderance of the evidence that a defendant was a member of "the very conspiracy that the jury acquitted [him] of participating in," and then use that conduct to apply provisions of the Sentencing Guidelines to increase the defendant's sentence.  *Id.* at 1369.

#### 2.  Relevant conduct and definition of "offense"

In applying the Guidelines, the Court must consider all "relevant conduct."   And especially in a conspiracy case, "relevant conduct" is "broadly defined."   *United States v. Khatallah*, 41 F.4th 608, 645 n.23 (D.C. Cir. 2022).

Under Section 1B1.3(a)(1)(A), a defendant's "relevant conduct" encompasses both the defendant's own acts and those that the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused.   And under Section 1B1.3(a)(1)(B), in a "jointly undertaken criminal activity," such as a conspiracy, a defendant is responsible for all acts of others that were

"within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity."   Finally, a defendant's "relevant conduct" under the Guidelines includes "all harm that resulted" from the defendant's acts or the acts of others engaged in the jointly undertaken criminal activity.   U.S.S.G. § 1B1.3(a)(3).

Eight of the nine defendants were convicted of being participants in at least one conspiracy, and thus, by virtue of the juries' verdicts, they are responsible for actions of their conspirators that fall within the parameters of Section 1B1.3(a)(1)(B).   It is true that "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant."   U.S.S.G. § 1B1.3, cmt. n.3(B).   But given the nature of the conspiracies here and the conspiracy convictions for these eight defendants, each defendant's "relevant conduct" supports application of each of the Guidelines provisions discussed below.   *See United States v. Khatallah*, 314 F. Supp. 3d 179, 189 (D.D.C. 2018) (broadly applying Section 1B1.3 because, in part, "'[o]nce the conspiracy and the defendant's knowing participation in it have been established beyond a reasonable doubt, the defendant will be vicariously liable for the substantive acts committed in furtherance of the conspiracy by his coconspirators'") (quoting *United States v. Sampol*, 636 F.2d 621, 676 (D.C. Cir. 1980)).

While the ninth defendant (Caldwell) was acquitted of all the conspiracy counts, the Court can and should find that he was a member of the conspiracy and thus that his "relevant conduct" includes the actions of his co-conspirators.   Here, after hearing all the evidence (and the jury's verdict) at the first trial, the Court already found by a preponderance that Caldwell was a member of the conspiracy.   *See* 12/12/22 Tr. at 856-60 (holding, in the context of allowing Caldwell's

statements in furtherance of the conspiracy to be admitted against the defendants in the second trial, that there "certainly" was "at least a prima facie case" for Caldwell's participation in the conspiracy) (citing *United States v. Cravero*, 545 F.2d 406 (5th Cir. 1976); *United States v. Todd*, 920 F.2d 399 (6th Cir. 1990)).

The defendants press arguments similar to the ones made by the defense in *Khatallah*, 314 F. Supp. 3d at 188-89—that a court must give "true meaning" to an acquittal and provide the defendant with the benefit of subtracting parts of "relevant conduct" that a jury may or even must have rejected.  But Judge Cooper specifically rejected that contention: "the Court can find no support in the Guidelines or cases interpreting them for [the defense's] approach of systematically subtracting facts the jury 'necessarily rejected' from the scope of an offense of conviction for purposes of the Guidelines."  *Id.* at 189.  And the D.C. Circuit necessarily endorsed Judge Cooper's reasoning when it held that his "acquitted-conduct rationale" for a downward variance resulted in an unreasonably low sentence.  *Khatallah*, 41 F.4th at 648.  In other words, regardless of the jury's determination of whether a defendant was guilty or not guilty of conspiracy, the Court must consider, if proven by a preponderance of the evidence, the "relevant conduct" for which the defendant is criminally responsible.

The Guidelines' definition of "offense" is, with exceptions not applicable here, "the offense of conviction *and all relevant conduct under § 1B1.3*."  U.S.S.G. § 1B1.1, n.1 (emphasis added). Therefore, for each defendant, in addition to determining the specific offenses for which they were convicted, the Court must also determine the "relevant conduct" under Section 1B1.3 for which the defendant is criminally responsible under the Sentencing Guidelines.  In reaching this decision, the Court must look to the contours of the underlying scheme itself rather than the mere elements of the offense charged."  *United States v. Caballero*, 936 F.2d 1292, 1298-99 (D.C. Cir.

23

1991) (cleaned up).

The Court may consider a defendant's "role with respect to all crimes, charged or otherwise, 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'"   *Bapack*, 129 F.3d at 1326 (quoting U.S.S.G. § 1B1.3(a)(2)).

The "relevant conduct" constitutes "all crimes" that "were part of the same course of conduct or common scheme or plan."   Here, for these nine defendants, the seditious conspiracy conduct includes the two conspiracies of which eight of these defendants were convicted (conspiring to obstruct Congress and/or impede Members of Congress) and the substantive offense for which all nine defendants were convicted (obstructing Congress).

### B.  Chapter Two: Offense Conduct

The PSRs apply the appropriate Sentencing Guideline and specific offense characteristics, given all nine defendants' relevant conduct.

#### 1.   Section 2J1.2 (Obstruction of Justice)

The PSRs correctly determine that the appropriate Chapter Two offense guideline for Counts One, Two, Three, Four, Seven, Eight, Nine, Eleven, and Thirteen is Section 2J1.2 (Obstruction of Justice).[16]

---

[16] Watkins was also convicted of *Count Six (Interference with Law Enforcement Officers During a Civil Disorder)*.   Under Section 2X5.1, since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline."   Here, that is Section 2A2.4, "Obstructing or Impeding Officers."   Because this Guidelines' adjusted offense level of 13—*see* Section 2A2.4, base offense level of 10, plus 3 levels under Section 2A2.4(b)(1)(A) if "the offense involved physical contact"—is significantly lower than the adjusted offense level of 27 for the offenses scored under Section 2J1.2(a), this memorandum does not separately address the Guidelines analysis for Count Six.

*Count One (Seditious Conspiracy)*.   Under Section 2X1.1, cmt. n.3, for a conspiracy conviction for which the substantive offense is not covered by a specific guideline, use Section 2X5.1.   Under Section 2X5.1, since there is no applicable Chapter Two Guideline for an offense of sedition in the Statutory Appendix, use "the most analogous guideline."   Here, that is Section 2M1.1, "Treason."[17]   Under Section 2M1.1(a)(2), if a defendant's conduct was not "tantamount to waging war against the United States,"[18] use "the offense level applicable to the most analogous offense," which is Section 2J1.2, "Obstruction of Justice."[19]

*Count Two (Conspiracy to Obstruct an Official Proceeding)*.   Under Section 2X1.1, the base offense for a conspiracy conviction is the guideline for the substantive offense, which is 18 U.S.C. § 1512(c)(2).   The applicable Chapter Two Guideline for this offense is Section 2J1.2, "Obstruction of Justice."   U.S.S.G. Appendix A.

*Count Three (Obstruction of an Official Proceeding)*.   The applicable Chapter Two Guideline for this offense is Section 2J1.2, "Obstruction of Justice."   U.S.S.G. Appendix A.

---

[17] *See United States v. Rahman*, 189 F.3d 88, 150-54 (2d Cir. 1999) (affirming that the most analogous offense guideline for seditious conspiracy, in violation of 18 U.S.C. § 2384, is Section 2M1.1); *see also United States v. Ford*, 216 Fed. App'x 652, 652-53 (9th Cir. 2007) (rejecting a habeas claim that counsel was ineffective for agreeing to stipulate to the use of Section 2M1.1).

[18] As noted in Part IV.2, infra, for almost every seditious conspiracy conviction (on the "levying war" and "opposing the government by force" prongs) since the advent of the Sentencing Guidelines, the court appears to have applied the Treason Guideline and found that the defendants' conduct *was* "tantamount to waging war against the United States."   *See* U.S.S.G. § 2M1.1(a)(1).

[19] In the first trial, the jury found that Rhodes and Meggs violated Section 2384 by conspiring to oppose by force the authority of the Government of the United States.   In the second trial, the jury found that Minuta, Hackett, Moerschel, and Vallejo violated Section 2384 by conspiring to use force to prevent, hinder, or delay the execution of any law of the United States.   In light of the similar evidence presented at the trials, the most analogous guideline for both of these prongs is Section 2J1.2, "Obstruction of Justice."   This guideline "addresses offenses involving the obstruction of justice," consisting of conduct that may "range from a mere threat to an act of extreme violence."   U.S.S.G. § 2J1.2, bkgd. cmt.

*Count Four (Conspiracy to Prevent Officers of the United States from Discharging Their Duties).* Under Section 2X1.1, cmt. n.3, for a conspiracy conviction for which the substantive offense is not covered by a specific guideline, use Section 2X5.1. Under Section 2X5.1, since there is no applicable Chapter Two Guideline for an offense of preventing officers of the United States from discharging their duties in the Statutory Appendix, use "the most analogous guideline." The "officers" of the United States who were the victims of this count were the Members of Congress. *See* June 28, 2022 Mem. Op. (ECF 176) at 27-28 (finding that Members of Congress were proper victims for this charge under 18 U.S.C. § 372); Verdict Form (ECF 410) (listing "Members of Congress" as the victims). Because the object of the defendants' conspiracy— preventing Members of Congress from performing their constitutional duties at the Capitol on January 6—was designed to obstruct the administration of justice, the most analogous guideline is Section 2J1.2, "Obstruction of Justice."

*Counts Seven, Eight, Nine, Eleven, and Thirteen (Tampering with Documents or Other Objects).* The applicable Chapter Two Guideline for this offense is Section 2J1.2, "Obstruction of Justice." U.S.S.G. Appendix A.

### 2. "Administration of justice" specific offense characteristics

Both Sections 2J1.2(b)(1)(B) (causing or threatening injury or damage) and 2J1.2(b)(2) (substantial interference with administration of justice) apply because Congress's Joint Session on January 6 related to the "administration of justice." *See United States v. Matthew Wood*, 21-cr-223 (Nov. 28, 2022), Sent. Tr. at 35-38 (holding that the "administration of justice" in Section 2J1.2 is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), including a "proceeding before the Congress").

a)      Legal applicability

i.   The Electoral College vote involved the administration of justice as defined broadly in the Guidelines.

Section 2J1.2 applies to a variety of obstruction offenses, including all offenses under 18 U.S.C. § 1512 and eleven other statutes found in Chapter 73 of Title 18.   *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A.   The eight-level increase under Section 2J1.2(b)(1)(B) applies if the offense involved property destruction or its threat "in order to obstruct the administration of justice."   A separate three-level increase under Section 2J1.2(b)(2) applies "if the offense resulted in substantial interference with the administration of justice."

Section 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the electoral vote interferes with the "administration of justice" for purposes of the guideline.   Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government.   Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law").   When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added).   And courts have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts

27

required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is most commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings." *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013); *see In re McConnell*, 370 U.S. 230, 234, 236 (1962) (defining the term in the contempt context as relating to "the performance of judicial duty"); *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings"). But there are compelling reasons for concluding that "administration of justice" bears its broader (albeit less common) meaning in Section 2J1.2.

*First*, Section 2J1.2's context and purpose support the broader reading of "administration of justice" in both subsections (b)(2) and (b)(1)(B). Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (i.e., relating to judicial or quasi-judicial proceedings). *See* U.S.S.G. § 2J1.2, cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index). Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. § 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official proceedings, 18 U.S.C. § 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212. Yet under a narrow interpretation of the guideline, the enhancements under subsection (b) would not apply to those statutes. That is good

reason to reject such a reading.   *Cf. United States v. Castleman*, 572 U.S. 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Section 2J1.2's background indicates that the Sentencing Commission intended the enhancements to reach the type of violent and dangerous conduct at issue in this case.   The background notes that Section 2J1.2 broadly covers crimes "of varying seriousness," including offenses that involve intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence."   U.S.S.G. § 2J1.2, cmt. bkgd.   Within that range, the enhancements "reflect the more serious forms of obstruction."   *Id.* The Commission thus crafted the enhancements in Section 2J1.2 to cover the most egregious *conduct* knowing that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings.

Relatedly, limiting subsection (b)'s enhancements to obstruction of judicial proceedings would undermine the purpose of the Guidelines.   "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct."   *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018).   The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct."   *United States v. Booker*, 543 U.S. 220, 246 (2005).   The Sentencing Commission reasonably determined, for example, that "causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice" is more serious than obstruction not involving such injury or threats and should be punished more severely.   U.S.S.G. § 2J1.2(b)(1)(B).   And the seriousness of the threatening or injurious conduct does not depend on

whether the obstructed proceeding is judicial, legislative, or executive.   There is no sound basis for assigning a significantly higher offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding.   *See United States v. Rubenacker,* No. 21-cr-193 (May 26, 2022), Sent. Tr. at 69 ("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense.").

*Second*, Section 2J1.2's commentary provides a broad definition of "administration of justice."   It defines "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*."   U.S.S.G. § 2J1.2, cmt. n.1 (emphasis added).   This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources.   The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."   *Stinson v. United States*, 508 U.S. 36, 38 (1993). Because this commentary is consistent with the plain text of the Guideline, which uses the broad term "administration of justice," it is authoritative.

It is true that the commentary defines only the term "substantial interference with the administration of justice," which serves as the basis for the three-level enhancement in Section 2J1.2(b)(2) and does not specifically define the term "in order to obstruct the administration of

justice," which serves as the basis for the eight-level enhancement in Section 2J1.2(b)(1)(B).   But the relevant term "administration of justice" is identical and should be given the same interpretation in both enhancements.   The operative verbs "interfere[]" and "obstruct" carry the same meaning in this context.   And the adjective "substantial" in Section 2J1.2(b) does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of *substantial* governmental . . . resources."   U.S.S.G. § 2J1.2, cmt. n.1 (emphasis added).   Thus, the term "in order to obstruct the administration of justice" in Section 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities.   A different conclusion would lead to the incongruous result of giving two different meanings to the term "administration of justice" within the same guideline. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

The Electoral College certification vote on January 6 falls comfortably within the meaning of "administration of justice" as used in Section 2J1.2 because it involved Congress's performance of duties required by law.   Specifically, Congress's certification of the Electoral College vote was an official proceeding required by both the Constitution and federal statutes.   *See* Dec. 20, 2021, Mem. Op. (ECF 558), in 21-cr-28, at 8 ("Congress's Certification of the Electoral College vote qualifies as an 'Official Proceeding.'").   Application of both Sections 2J1.2(b)(1)(B) and (b)(2) is therefore appropriate here.

ii. Courts, including judges on this Court in January 6 cases, have correctly held that non-judicial proceedings can involve the administration of justice.

Other courts have appropriately applied the "administration of justice" enhancements in Section 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings that were not limited to judicial or grand jury proceedings.  *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (defendant obstructed proceeding by kidnapping children and transporting them internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (defendant withheld subpoenaed documents from a congressional subcommittee).

Moreover, thirteen judges in this District (including this Court in *Wood*, No. 21-cr-223) have applied at least one of Section 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6: then-Chief Judge Howell (*Rubenacker*, No. 21-cr-193); Judge Contreras (*Andries*, No. 21-cr-93); Judge Cooper (*Robertson*, No. 21-cr-34); Judge Chutkan (*Priola*, No. 22-cr-242); Judge Moss (*Miller*, No. 21-cr-75); Judge Kelly (*Pruitt*, No. 21-cr-23); Judge Friedrich (*Reffitt*, No. 21-cr-32); Judge Hogan (*Tenney*, No. 21-cr-640); Judge Lamberth (*Fairlamb*, No. 21-cr-120); Judge Friedman (*Puma*, No. 21-cr-454); Judge Bates (*Brock*, No. 21-cr-140); and Judge Kollar-Kotelly (*Allen*, No. 21-cr-64).[20]   And because this Court already held that Congress' certification of the election qualifies as "an 'adjudicatory' proceeding," Dec. 20, 2021, Mem. Op. (ECF 558), in 21-cr-28, at 15-16, it should give no weight to the reasoning of the two judges who, after concluding the certification proceeding was "ministerial" or was not "a

---

[20] Although some judges have handled multiple such cases, only one case is listed per judge.

proceeding that determines rights or obligations," found Section 2J1.2's "administration of justice" enhancements inapplicable.  *See Seefried*, No. 21-cr-287, ECF 123 (Oct. 29, 2022) (Judge McFadden); *Watson*, No. 21-cr-513 (March 9, 2023), Sent. Tr. at 23-25 (Judge Walton).

The Court should find that Section 2J1.2's "administration of justice" specific offense characteristics apply here as a matter of law.

> b)    Section 2J1.2(b)(1)(B) (causing or threatening injury or damage)

The PSRs correctly apply this eight-level enhancement to each of the nine defendants here because the defendants' relevant conduct "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."   U.S.S.G. § 2J1.2(b)(1)(B).   Indeed, each of the seven cooperating defendants who pled guilty to being a member of this conspiracy agreed to the applicability of the Section 2J1.2(b)(1)(B) characteristic.

*First*, the defendants who were members of Stack One, including Meggs, Harrelson, Watkins, Hackett, and Moerschel, in breaching the Capitol building, were part of a mob of rioters that caused injuries to Capitol Police officers guarding the doors to the building.   *See* 10/25/22PM Tr. at 5309 (testimony of Officer Salke that he had to bear hug another officer in "hard" riot gear to prevent that officer from being pushed to the ground and trampled to death during the rioters' violent entry through the East Rotunda doors); Govt. Ex. 7077.1 (video showing co-conspirator William Isaacs forcing his way through the East Rotunda Doors as other rioters attempt to remove the mask of a Capitol Police officer).   Indeed, the jury's verdict convicting Isaacs of interfering with Officer Carrion during Stack One's breach of the Capitol building, *see* No. 21-cr-28, ECF 910 at 6, shows that co-conspirators' offense involved causing or threatening to cause physical injury to a person, because Isaacs' offense is part of these defendants' "relevant conduct" under Section 1B1.3.

*Second*, the conspirators, in breaching the Capitol building, were part of a mob of rioters that caused damage to the Capitol Building's East Rotunda doors and Columbus doors.   Indeed, the jury's verdict convicting co-conspirators Isaacs, Connie Meggs, Steele, and Sandra Parker of destroying government property for their criminal culpability for the damage to the doors, *see* No. 21-cr-28, ECF 910 at 5, shows that these co-conspirators' offense involved causing property damage.   And again, these co-conspirators' actions are "relevant conduct" for these defendants under Section 1B1.3(a)(1)(B).

*Third*, the conspirators, including Watkins, pushed against a line of MPD riot officers in an effort to breach the Senate chamber to physically access the senators and staffers doing their jobs inside, causing physical injury to those officers.   Officer Owens and Officer Jackson both testified to the physical injuries they and their fellow officers suffered during this encounter. 10/26/22AM Tr. at 5441 (Officer Owens: "When the lines collided . . . the surge of us against the surge of the rioters coming at us lifted me up off my feet. . . . I was just literally lifted up off the ground."); *id.* at 5453 ("My arms and legs were bruised and bloodied and battered."); 1/6/23AM Tr. at 3384 ("So the biggest thing was like the weight of all of them, like just pushing down on you. . . . And for a moment, I thought we were going to lose this fight.").   Indeed, Watkins was convicted of violating 18 U.S.C. § 231 for interfering with law enforcement officers during this incident (and co-conspirators Steele, Isaacs, and Sandra Parker were as well, No. 21-cr-28, ECF 910 at 7), meaning a jury already necessarily found beyond a reasonable doubt that some members of the conspiracy "caus[ed] or threaten[ed] to cause physical injury to a person . . . in order to obstruct the administration of justice."

*Fourth*, some conspirators, including Minuta and James, assaulted and pushed against MPD riot officers in the Rotunda in an effort to further penetrate into the Capitol building in search

of the legislators inside, causing physical injury to those officers.   1/6/23AM Tr. at 3385 ("[T]he individuals in front of [MPD Officer Jose Mendoza] were trying to pull him into the crowd with them. . . . I knew I had to grab him so that he was not taken away."); *id*. at 3401 ("[T]hey seemed like they were very violent, they were intent on making their way into the Capitol by any means necessary, and I didn't want Officer Mendoza to be a victim in anything.").

*Fifth*, some conspirators, including Harrelson and Dolan, while breaching the building and marching through the Rotunda, chanted "Treason!" regarding those Members of Congress who were supposed to be inside the Capitol building performing their constitutional duties to meet to certify the election results.   Those chants were threatening and intimidating.   Indeed, in similar contexts related to the attack on the Capitol, other judges have applied this characteristic over a defendant's objection on the theory that a defendant's words and conduct were "threatening" even if the defendant did not "assault" an officer or staffer.   For instance, then-Chief Judge Howell held that while a defendant did not directly verbally threaten Capitol Police officers, his "physical movements . . . communicated threats to law enforcement." *Rubenacker*, No. 21-cr-193, Sent. Tr. at 56.   "[The defendant's] pursuit of [an officer], in blatant disregard for this officer's instructions to stand back and leave, as the crowd of angry, yelling rioters swelled around him, constituted a clear and direct threat to the safety of [the officer] and could have led to [the officer's] physical injury." *Id.* at 57.   "The defendant's yelling and taunting at the officers . . . in an agitated manner with his finger outstretched was threatening conduct, regardless of what he precisely said and whether those words contained threats of physical injury to those officers." *Id.* at 58.

*Sixth*, the conspirators, including Vallejo and Caldwell, managed an arsenal of firearms at a hotel in Virginia as part of an armed Quick Reaction Force to support the other conspirators on the ground at the Capitol building—a fact Vallejo made clear in his podcast comments on the

morning of January 6.   The threat to use firearms to accomplish the conspirators' unlawful ends of halting the certification proceeding and stopping the transfer of presidential power was a "threat" to cause harm to a person or property within the meaning of Section 2J1.2(b)(1)(B), even if the threat was not communicated directly to the legislators or officers.   *See United States v. Parr*, 545 F.3d 491, 497 (7th Cir. 2008) (in prosecution for interstate communications of threats, the "threat doesn't need to be communicated directly to its victim or specify when it will be carried out"); *United States v. Baker*, 514 F. Supp. 3d 1369, 1378 (N.D. Fla. 2021) ("[The] language of 18 U.S.C. § 875(c) does not require that the threat be made directly to the intended target; it simply prohibits 'any threat to injure the person of another' made in interstate commerce.") (quoting *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001)).   Indeed, Judge Friedrich relied on this theory to apply the eight-level enhancement under Section 2J1.2(b)(1)(B) for a defendant's threatening words about Speaker Pelosi and Senator McConnell that he uttered to others but not the legislators' themselves.   *See Reffitt*, No. 21-cr-32 (Aug. 1, 2022), Sent. Tr. at 20-21.

Each defendant's "relevant conduct" therefore "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," and thus, as the PSRs find, each is subject to the characteristic in Section 2J1.2(b)(1)(B).

> c)   Section 2J1.2(b)(2) (substantial interference with administration of justice)

This specific offense characteristic applies because the defendants' relevant conduct "*resulted in* substantial interference with the administration of justice."   U.S.S.G. § 2J1.2(b)(2) (emphasis added).   As an initial matter, it is hard to imagine a more substantial interference with the administration of justice.   The defendants' relevant conduct resulted in the evacuation of an entire branch of the federal government and the suspension of a congressional proceeding that was

36

required by the Constitution and federal statute to take place at a certain date, time, and location so that our country could peacefully transfer presidential power from one person to the next.

Moreover, the Guidelines define the term "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2, cmt. n.1 (emphasis added). The defendants' offenses "*resulted in*" substantial interference with the administration of justice because the offenses caused the unnecessary expenditure of substantial governmental resources.

That commonsense view finds support in the case law. *See, e.g.*, *Ali*, 864 F.3d at 574 (numerous federal agents "worked for several days around the clock"); *Atlantic States Cast Iron Pipe*, 627 F. Supp. 2d at 205-08 (defendant interfered with OSHA investigations into a workplace accident); *Weissman*, 22 F. Supp. 2d at 194-98 (defendant withheld subpoenaed documents from a congressional subcommittee). The Eleventh Circuit recently cited affirmatively to another case in which it found Section 2J1.2(b)(2) applicable where, as a result of the defendant's false grand jury testimony, the *government* was forced to identify and interview several other witnesses, review the defendant's records, and reconvene the grand jury. *See United States v. Pegg*, 812 F. App'x 851, 860 (11th Cir. 2020) (citing *United States v. Johnson*, 485 F.3d 1264, 1271-72 (11th Cir. 2007)). Indeed, many appellate courts have affirmed the application of the enhancement because significant "government" resources were invested to resolve an attempt to obstruct a judicial proceeding. *See, e.g.*, *United States v. Meredith*, 602 F. App'x 102, 103 (4th Cir. 2015); *United States v. Tankersley*, 296 F.3d 620, 623-24 (7th Cir. 2002); *United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996); *United States v. Voss*, 82 F.3d 1521, 1532 (10th Cir. 1996).

The events of January 6 indisputably resulted in the "unnecessary expenditure of substantial governmental . . . resources," with the latest estimate of damages from entities responsible for the United States Capitol[21] totaling more than $2.8 million.   And the conspirators' offenses contributed to that "unnecessary expenditure" of substantial governmental resources: the deployment of hundreds of law enforcement officers to defend and then clear the Capitol building and grounds of those—such as the defendants here—whose conduct caused the evacuation of hundreds of lawmakers and the suspension of the certification proceedings.   The repair and clean-up costs were similarly extensive, and certainly "substantial."

By the government's count, of the fifteen judges in this District who have handled a sentencing hearing for a January 6 defendant convicted of violating 18 U.S.C. § 1512, thirteen found that the specific offense characteristic in Section 2J1.2(b)(2) applied because the defendant's conduct "resulted in substantial interference with the administration of justice," that being disruption to Congress' certification of the Electoral College vote and the attendant government response to the riot.[22]   Moreover, each of the seven cooperating defendants who pled guilty to being a member of this conspiracy agreed to the application of Section 2J1.2(b)(2) based on their "relevant conduct."

The PSRs correctly reject several defendants' arguments that this specific offense characteristic could not apply to their conduct because Congress had already been evacuated and

---

[21] Including the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, the Office of the Secretary of the United States Senate, the Senate Sergeant at Arms, and the United States Capitol Police.

[22] *See* Part III.B.2.a.ii, *supra* (listing judges and cases).   And even the two judges who have declined to apply the characteristic based their reasoning on the phrase "administration of justice" rather than the substantiality of the interference with the proceeding.

the proceeding had been suspended before any conspirators arrived at the Capitol.   This argument

is factually and legally flawed.   Factually, Defendants Rhodes, Caldwell, and Harrelson (and co-

conspirators Greene and Dolan) were unlawfully on the Capitol grounds before the Senate went

into emergency recess at 2:13 p.m., and all members of Stack One (including Defendants Meggs,

Watkins, Hackett, and Moerschel) were unlawfully on the Capitol grounds before the House went

into emergency recess at 2:29 p.m.   The argument fails as a legal matter, too: according to U.S.

Secret Service Inspector Hawa, the proceeding could not resume until the Secret Service cleared

the building, which took nearly five hours because of the conduct of rioters including these

defendants and their co-conspirators.   10/26/22AM Tr. at 5428-29; 1/4/23AM Tr. at 2768-86; *see

also* 1/6/23AM Tr. at 3315-18, 3352-55 (testimony of Jamie Fleet describing how the presence of

rioters in the building caused the emergency recess of the official proceeding and prevented it from

resuming).   Indeed, in addressing the admissibility of certain evidence in the second trial, the

Court held that the jury could reasonably find that defendants who breached the building after the

House and Senate's emergency recess could have contributed to the need for evacuation and

suspension of the proceeding.   *See* 1/6/23AM at 3303-04 ("It's not unreasonable . . . for the

government to assert and for the jury to conclude that all of these individuals participated in

causing what happened inside and contributed to it in some way. . . . They were, at a minimum,

sort of in the East Plaza approaching the steps and then ultimately on the steps during the period

of time when the Chamber is being evacuated, and all of those circumstances led to the Chamber

being evacuated.   I don't think it's simply accurate to say that it was only those who entered at

2:11 or those who were within the building at 2:29 that created the circumstances that not only

required the evacuation but then that the evacuation continued after it began.").   Accordingly, the

fact that these conspirators were not the first to breach the building is of no consequence to the

applicability of this provision of the Guidelines.

The evidence established that the conspirators' conduct obstructed Congress's certification (delaying it by several hours, for example) and impeded the ability of the staff working for the Vice President (see the testimony of Secret Service Inspector Lanelle Hawa), the Speaker of the House (see the testimony of Jamie Fleet), and the House Parliamentarian (see the testimony of Thomas Wickham), among others, to complete their work related to that certification.   That delay caused the unnecessary expenditure of substantial governmental resources.   Therefore, the three-level enhancement under Section 2J1.2(b)(2) applies.

### 3.   "Extensive scope, planning, or preparation" specific offense characteristic

Section 2J1.2(b)(3) provides a two-level enhancement if the offense (A) involved the destruction of a substantial number of records; (B) involved the selection of an especially probative record to destroy; or (C) "was otherwise extensive in scope, planning, or preparation."   While all three components of subsection (C) apply here, based on the subsection's use of the disjunctive "or," the Court need only find that the defendants' relevant conduct was extensive in scope, planning, *or* preparation.   *See United States v. Petruk*, 836 F.3d 974, 977 (8th Cir. 2016).

The structure of this Guideline subsection is similar to the structure of 18 U.S.C. § 1512(c); both lay out a particular means of obstruction related to a tangible object or record and then include a "catchall" (or "residual" or "omnibus" clause) that begins with the phrase "or . . . otherwise." As the D.C. Circuit explained when interpreting 18 U.S.C. § 1512(c), the word "otherwise" should be "given its common meaning of "in a different manner.'"   *United States v. Fischer*, 64 F.4th 329, 336-37 n.2 (D.C. Cir. 2023).   In other words, Section 2J1.2(b)(3)(C) provides for a two-level enhancement if the defendant's relevant conduct, *in a manner other than* destroying a substantial number of records or a particularly probative record, was extensive in scope, extensive in planning,

and/or extensive in preparation.

Here, the PSRs correctly determine that the conspirators' relevant conduct was extensive in scope, planning, *and* preparation. The word "scope" essentially means "reach," "range," or "breadth." *See* Scope, *Oxford English Dictionary* ("The sphere or area over which any activity operates or is effective; range of application or of subjects embraced; the reach or tendency of an argument, etc.; the field covered by a branch of knowledge, an inquiry, concept, etc."). While the word is not defined in Black's Law Dictionary or in the Guidelines themselves, when the Sentencing Commission promulgated this enhancement in 2003 it used the word "scope" several times with this meaning. *See* Amendment 647 (Jan. 25, 2003) ("The amendment expands the *scope* of this enhancement . . . .") (emphasis added). Indeed, the D.C. Circuit uses the word "scope" the same way. *See, e.g., Fischer*, 64 F.4th at 342-43 (listing the areas that "cabin the *scope* of § 1512(c)(2)") (emphasis added).

While the phrase "otherwise extensive" is not defined in the Guidelines, "there are a number of factors relevant to the extensiveness determination, including the length and scope of the criminal activity as well as the number of persons involved." *United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994). And while the D.C. Circuit has not yet had occasion to rule on this enhancement, multiple courts of appeals have affirmed its application by district courts. In *United States v. Pegg*, 812 F. App'x 851, 860 (11th Cir. 2020) (per curiam), the Eleventh Circuit found that the defendant's conviction for conspiracy to obstruct justice, which was done in secret from prison, directing several people through numerous coded phone calls and emails, was "extensive in scope and planning" because it was part of a "scheme [that] involved an elaborate gathering together of lies and misrepresentations." Similarly, in *Petruk*, 836 F.3d at 977, the Eighth Circuit concluded that the obstructive conduct of the defendant—who, while incarcerated,

41

solicited his girlfriend to find someone else to falsely claim on a recorded line to be the perpetrator of the underlying crime—was extensive in planning and preparation (though not in scope).   In *United States v. Jensen*, 248 F. App'x 849, 851 (10th Cir. 2007), the Tenth Circuit agreed that a correctional officer's helping inmates avoid or pass urinalysis tests, which "was far from an isolated occurrence," was "extensive in scope."   In *United States v. Rodriguez*, 499 Fed. App'x 904, 907-09 (11th Cir. 2012), the Eleventh Circuit agreed that an incarcerated defendant's use of her boyfriend's semen to frame a correctional officer, which involved the "gathering together of lies and misrepresentations," was extensive in "scope, planning, *and* preparation."   Finally, in *United States v. Bakhtiari*, 714 F.3d 1057, 1062 (8th Cir. 2013), the Eighth Circuit agreed that a defendant-lawyer's efforts to intimidate an opposing lawyer and his family, including doctoring photographs and creating a fake email account, were crimes that were extensive in scope, planning, and preparation.

In addition to these appellate decisions affirming application of this enhancement, in two separate cases, Judge Friedrich applied the enhancement to defendants' crimes related to the attack on the Capitol.   In *Reffitt*, over the defendant's objection, Judge Friedrich found that the enhancement applied both because of the defendant's extensive efforts in "planning and preparation" *and* the extensive "scope" of what the defendant intended to accomplish.   No. 21-cr-32, Sent. Tr. at 46-47.   She found that there was "enough evidence of planning and preparation here in terms of organizing the trip, in terms of gathering together this wide range of sophisticated gear, not just firearms, but a helmet, bulletproof vest, flex cuffs, radios, and megaphones.   There was a lot of thought and planning that went into this offense."   *Id.*   And the defendant's "stated intentions" were "hugely extensive in scope": forcibly removing and then replacing legislators. *Id.* at 46.   In *Sandlin*, the defendant agreed to the application of the enhancement in his plea

agreement, and Judge Friedrich applied it during his sentencing.   No. 21-cr-88 (Dec. 9, 2022), Sent. Tr. at 36.   According to the agreed-upon statement of offense, Sandlin traveled to D.C. with two co-conspirators and multiple weapons, including two firearms.   ECF 85 at ¶ 15.

Here, each of the seven cooperating defendants who pled guilty to being a member of this conspiracy agreed to the application of Section 2J1.2(b)(3), because their relevant conduct was extensive in scope, planning, and preparation.

These nine defendants' relevant conduct shows that their offense was extensive in scope, planning, and preparation.   The seditious conspiracy and its attendant conduct was protracted, lasting from November 2020 through January 2021, and the conspiracies to obstruct an official proceeding and to prevent officers of the United States from discharging their duties and their attendant conduct similarly lasted from December 2020 through January 2021.   There were more than 20 members of the conspiracy who communicated with each other using sophisticated, encrypted messages.   They also coordinated with one another to travel across the country from Arizona, Texas, Alabama, Georgia, Florida, North Carolina, Virginia, and elsewhere into the D.C. area.   The presence of the armed Quick Reaction Force staged miles from the Capitol building at a hotel in Virginia, armed with firearms and other weapons collected from numerous persons, also shows the extensive scope of the offense.   Finally, the scope of the conspiracy's objective was itself enormous: to forcibly prevent an entire branch of the federal government from performing its constitutional and statutory duties.

## C.  Chapter Three: Adjustments

The PSRs apply the appropriate adjustments, given all nine defendants' relevant conduct.

### 1.  Section 3B1.1 (aggravating role)

The Guidelines provide for an increase in the offense level if the defendant played an

aggravated role in the offense, as an "organizer" or "leader" (four levels) or "manager" or "supervisor" (three levels) of a criminal activity that involved five or more participants.   U.S.S.G. § 3B1.1(a), (b).   The Court should consider the following non-exhaustive factors in determining whether to apply the adjustment and, if so, whether to add three or four levels:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (quoting U.S.S.G. § 3B1.1, cmt. n.4). "No single factor is dispositive." *Id.*   While the court must examine the degree of "control" the defendant exercised over other criminally culpable individuals, *id.*, this factor "alone does not determine whether the sentence can be increased" pursuant to Section 3B1.1, *United States v. Kelley*, 36 F.3d 1118, 1129 (D.C. Cir. 1994); *see also United States v. Brodie*, 524 F.3d 259, 270-71 (D.C. Cir. 2008) (noting the "several" factors that must be considered *in addition* to "control").

The Circuit has further explained that it understands "control" to "connote some sort of hierarchical relationship" among the participants in the criminal enterprise.   *Olejiya*, 754 F.3d at 990.   "When confronted with a heavily stratified conspiracy, a court must superimpose the § 3B1.1 framework over the organizational chart of the conspiracy and, using the factors [in the commentary in Note 4 to the Guideline], decide where to draw the two relevant lines that determine who qualifies for a § 3B1.1 enhancement."   *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998).   In this way, the three-point enhancement in Section 3B1.1(b) is a "middle-rung enhancement."   *United States v. Otunyo*, 63 F.4th 948, 958 (D.C. Cir. 2023).

The aggravating-role adjustment applies to a defendant who "managed" or "supervised" merely one other person, so long as the larger criminal activity that constituted the "relevant

conduct" involved five or more participants.   U.S.S.G. § 3B1.1(a), cmt. n.2.   Multiple defendants can qualify as a "leader" or "organizer" of the same criminal conspiracy, subjecting them to the same four-level adjustment.   *Id.*, cmt. n. 4.

The D.C. Circuit has "found the requisite hierarchical relationship" in several cases.   *See, e.g., Olejiya*, 754 F.3d at 991 (recruited some members and supervised others in check-cashing scheme); *Brodie*, 524 F.3d at 270-71 (recruited members and "coordinated the group's efforts"); *United States v. Wilson*, 240 F.3d 39, 46-47 (D.C. Cir. 2001) (recruited and directed others in bank fraud scheme); *United States v. Norman*, 926 F.3d 804, 812 (D.C. Cir. 2019) ("recruited, managed-supervised, and took a large share of proceeds").   And when the Circuit has found the "hierarchical relationship" lacking, it is often because the defendant had a different type of relationship with his accomplice.   *See, e.g., United States v. Johnson*, 64 F.4th 1348, 1352-53 (D.C. Cir. 2023) (finding that defendant did not have the requisite hierarchal relationship and control over his estranged wife, particularly given the spousal relationship and that she agreed to help him *despite* her anger with him).

Moreover, the Circuit has found that a defendant's leadership position in a workplace, even for a defendant who did not recruit others or "initiate[]" the scheme, can support this managerial-role adjustment if the crime is related to the work.   *See, e.g.*, *United States v. Bras*, 483 F.3d 103, 113-14 (D.C. Cir. 2007) (defendant was manager at construction company and part of conspiracy to bribe government inspectors); *United States v. Bikundi*, 926 F.3d 761, 801 (D.C. Cir. 2019) (per curiam) (defendant was owner of home health care company and part of conspiracy to alter employee and patient records related to fraudulently obtaining government reimbursements).

The Circuit has also found the adjustment applicable for a defendant's conviction for conspiring to violate 18 U.S.C. § 1512 based on his conduct, as a federal official, to solicit

kickbacks and then conceal his activities.   *Kelley*, 36 F.3d at 1129.   The defendant "sought out both knowing and unwitting accomplices," instructing them on what to do and how to do it.   *Id.*

Importantly, the Circuit recently reiterated that this Chapter 3 role adjustment is determined by looking broadly at all relevant conduct rather than simply the offense of conviction.   *Otunyo*, 63 F.4th at 958-59.; *see also United States v. Olibrices*, 979 F.2d 1557, 1560–61 (D.C. Cir. 1992) (holding that a sentencing judge should "take into account the contours of the entire conspiracy," rather than merely the offense of conviction, when determining whether a Chapter Three adjustment applies to a defendant's role in the criminal activity).   In other words, a defendant should receive the adjustment even if he is not at the top of the hierarchy, so long as he played a managerial or supervisory role anywhere within the criminal activity.

Notably, to qualify for the adjustment, the defendant must have managed or led one or more *participants* in the scheme, rather than simply controlled the scheme itself.[23]   *Bapack*, 129 F.3d at 1324.   However, there is no requirement that, to qualify as a "participant," a person be "culpable in the same crime of which the supervising defendant was convicted."   *Id.* at 1325. And indeed, the "participant" need not have been convicted, or even charged.   *Id.*   In *Bapack*, the Circuit affirmed the imposition of the role-adjustment under Section 3B1.1, explaining that the adjustment does *not* require a finding that a defendant "supervised 'participants' who were unindicted co-conspirators or accessories in the crimes of which she was convicted.   Rather, it is enough that the 'participants' she supervised were culpably involved in uncharged crimes 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'"

---

[23] Even if a defendant did *not* supervise a "participant," the Court may upwardly depart for a defendant who "exercised management responsibility over the property, assets, or activities" of the criminal activity.   U.S.S.G. § 3B1.1, cmt. n.2.

*Id.* (quoting U.S.S.G. § 1B1.3(a)(2)).   Thus, the adjustment was correctly applied to a defendant who supervised nurses in creating a false document, because those nurses violated 18 U.S.C. § 1001, and even though neither the nurses nor the defendant were charged with that crime, it was part of the defendant's "course of conduct or common scheme" of conspiring to defraud the government by submitting false Medicare and Medicaid claims.   *Id.*

Here, there *was* a hierarchical relationship among the participants in the conspiracy.   At the top of the conspiracy were leaders and organizers like Rhodes, Meggs, and Watkins, who actively recruited and controlled many of the other participants who were involved.   *See, e.g.,* 10/18/22PM Tr. at 4078, 4107 (Dolan explaining that he was part of a team that was managed by Harrelson, who reported to Meggs who reported to Rhodes); 10/31/22AM Tr. at 5706-07 (Young testifying that he was "immediately subordinate" to Hackett, who reported to Meggs who reported to Rhodes); 3/3/23AM Tr. (21-cr-28) at 5431, 5434-36, 5449 (Bennie Parker testifying that Watkins recruited him and his wife and then provided them with instructions and equipment).

Then lower-level leaders, like Harrelson, Minuta, Hackett, and Vallejo, managed or supervised other co-conspirators in title and in action on January 6.   The aggravating-role adjustment can and should also apply to a defendant, like Caldwell, who was not convicted of a conspiracy charge, yet, on a preponderance-of-the-evidence standard, was a member of the conspiracy.   He managed other participants in the "underlying scheme" of the conspiracy, even if he did not manage anyone with respect to the obstruction of Congress count on which he was convicted.   *See Olibrices*, 979 F.2d at 1560-61 (instructing courts to consider, for the application of a role adjustment, the full relevant conduct rather than the "mere elements of the offense charged"); *see also Jones*, 744 F.3d at 1368 (affirming a trial court's finding that a defendant was a member of a conspiracy, and thus culpable for the conspiracy's relevant conduct under the

47

Guidelines, even though the defendant was acquitted of the conspiracy charge).

Meanwhile, many members of the conspiracy played neither an aggravating nor mitigating role, including Moerschel. Finally, application of the aggravating adjustment based on a major role does not carry a commensurate requirement that any member of the conspiracy play a minor role that would justify a mitigating adjustment. *See United States v. Mejia*, 597 F.3d 1329, 1343 (D.C. Cir. 2010) (finding that the district court "permissibly and reasonably concluded that no one in the conspiracy played a 'minor' role," even though one conspirator played a leadership role). However, the government anticipates that certain defendants convicted of being part of this conspiracy, such as some convicted in *United States v. Sandra Parker, et al.*, 21-cr-28, may appropriately receive minor-role adjustments. This fact reinforces the stratification of the larger continuum of this conspiracy, with leaders, middle rung managers, participants with no appreciable aggravating or mitigating role, and finally contributors who played relatively minor roles.

This continuum is also reflected in the plea agreements entered by the government and seven other members of the conspiracy who were cooperating defendants. Joshua James agreed that he was a "manager or supervisor" in the offense, and thus received a three-level increase under Section 3B1.1(b). This mirrors the PSRs' correct analysis of the roles of Harrelson, Minuta, Hackett, Caldwell, and Vallejo. No role adjustment (either aggravating or mitigating) is appropriate for conspirators who were not in a leadership position but who likewise played more than minor role in conspiracy's planning and/or execution, such as Graydon Young, Jason Dolan, Brian Ulrich, and William Wilson. This lack of adjustment either upward or downward similarly applies to Moerschel. And finally, two of the cooperating defendants, Caleb Berry and Mark Grods, were "minor participant[s]" in the offense, so each received a two-level downward adjustment under Section 3B1.2(b).

48

The Court should therefore apply the PSR's suggested adjustments for an aggravating role.

**2. Section 3C1.1 (obstruction of justice)**

The PSRs correctly determine that this Court should apply Section 3C1.1's two-level enhancement for obstruction of justice to each of the nine defendants.   This enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."   U.S.S.G. § 3C1.1.

As an initial matter, the jury already found beyond a reasonable doubt that five of the nine defendants here—Rhodes, Meggs, Harrelson, Hackett, and Caldwell—were guilty of 18 U.S.C. § 1512(c)(1) for obstructing justice by concealing from the grand jury, or directing others to conceal from the grand jury, certain content about the underlying crimes.   The Sentencing Commission's commentary confirms that these jury verdicts necessarily mean that the adjustment applies.  *See* U.S.S.G. § 3C1.1, cmt. n.4 ("This adjustment also applies to any other obstructive conduct in respect to the official investigation, prosecution, or sentencing of the instant offense where there is a separate count of conviction for such conduct.").   Indeed, the Commission directed application of the two-level adjustment under the grouping rules "[i]f the defendant is convicted both of an obstruction offense"—here, that is 18 U.S.C. § 1512(c)(1)—"and an underlying offense (the offense with respect to which the obstructive conduct occurred)"—here, that is Section 1512(c)(2) for obstructing Congress as well as any of the conspiracy charges.  *Id.*, cmt. n.8; *see also United States v. Provenzano*, 1 F. App'x 43, 45 (2d Cir. 2001) (unpublished) (applying Note 8 where defendant pled guilty "both to obstruction offenses … and to the underlying offenses … 'with respect to which the obstructive conduct occurred'").

In addition to the clear-cut application of this adjustment for those five defendants convicted of an obstruction offense, each of the nine defendants obstructed justice by deleting or destroying evidence, encouraging others to do so, and/or lying while testifying.   The commentary to the Guidelines includes a non-exhaustive list of some of the ways that a defendant can obstruct justice.  *See, e.g.*, U.S.S.G. § 3C1.1, cmt. n.4(B) (committing perjury); cmt. n. 4(D) (deleting evidence or instructing others to do so, or attempting to do so); *see also United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993) (confirming that perjury merits the obstruction enhancement under Section 3C1.1); *United States v. Mellen*, 89 F. App'x 268, 270 (D.C. Cir. 2004) (affirming application of the enhancement for "advis[ing]" someone else to destroy property to avoid detection, and then destroying the evidence himself).   "Where conduct is directly and inherently obstructive—that is, where the defendant engages in behavior that a rational person would expect to obstruct justice—the court may infer an intent to obstruct justice and need not make a separate finding of specific intent."   *United States v. Reeves*, 586 F.3d 20, 23 (D.C. Cir. 2009) (citation and internal quotation marks omitted); *see also United States v. Khan*, 461 F.3d 477, 500-01 (4th Cir. 2006) (noting the trial court's imposition of the adjustment under Section 3C1.1 in a seditious conspiracy case where the defendant "gave false statements to investigators and destroyed evidence before trial, in addition to providing 'incredible' testimony at trial" and that "the Guidelines treat those who accept responsibility and those who obstruct justice differently").

There are two primary bases for applying this adjustment to each of the nine defendants:

*First*, under Note 4(D), all nine defendants are culpable for "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official

investigation or judicial proceeding . . . or attempting to do so."[24]   Meggs, Harrelson, Watkins, Hackett, Moerschel, Caldwell, and Vallejo each destroyed or concealed evidence—content from cell phones and/or digital accounts—that was material to the criminal investigation.   And Minuta discarded his entire cell phone, which contained content that was material to the criminal investigation.   Finally, Rhodes directed other people to destroy evidence—content from their cell phones and/or digital accounts—that was material to the criminal investigation.

Rhodes argued to the Probation Office that his comments about deleting evidence were suggestions rather than directives.   As a factual matter, he is wrong.   *See, e.g.,* 11/7/22 Tr. at 7468; Gov. Ex. 9061 (Msg. 54.S.125.2874) ("Let me put it in infantry speak: SHUT THE FUCK UP!  Do not discuss who did what.   Go silent."); (Msg. 54.S.125.2878) ("DELETE your self-incriminating comments or those that can incriminate others.").   As a legal matter, this point is immaterial.   The adjustment is warranted based on a defendant's comment to a co-conspirator to get rid of potential evidence of crimes the defendant and/or co-conspirator committed, regardless of whether the defendant's comment is characterized as a suggestion, advice, or directive.   *See, e.g.*, *United States v. Alston*, 899 F.3d 135, 151 (2d Cir. 2018) ("[M]erely alerting the subject of an investigation to the existence of that investigation constitutes 'obstruction of justice';

---

[24] Rhodes, Meggs, Harrelson, Hackett, and Caldwell were convicted of violating 18 U.S.C. § 1512(c)(1) for obstructing the grand jury's investigation, while Minuta and Moerschel were acquitted of this charge (and Watkins and Vallejo did not face this charge).   A Section 1512(c)(1) *conviction* requires the obstruction of justice adjustment.   But a Section 1512(c)(1) *acquittal* has no impact on the adjustment, for two reasons.   *First*, as described above, the government bears a far lower burden at sentencing (preponderance of the evidence) than at trial (reasonable doubt).   *Second*, Section 1512(c)(1) requires that a defendant "corruptly" intend to obstruct an "official proceeding" (here, a grand jury investigation).   ECF 400 at 41.   But a Section 3C1.1 adjustment requires that a defendant act with a different mental state ("willfully" rather than "corruptly") and with the intent merely to obstruct an "official investigation" (here, an FBI investigation) rather than an "official proceeding."

"therefore, . . . advising a drug dealer about the imminent risk of arrest—permitting him to evade capture—constitutes such obstruction."); *United States v. Mason*, 168 Fed. App'x 905, 908 (11th Cir. 2006) (defendant called co-conspirator "and warned him to 'clean his house,' which [the co-conspirator] understood to mean he should get rid of his guns"); *United States v. Mellen*, 89 Fed. App'x 268, 270 (D.C. Cir. 2004) (defendant told co-conspirator to lie to investigators and "advised" daughter to destroy evidence); *United States v. Waldon*, 206 F.3d 597, 608 (6th Cir. 2000) (defendant "unsuccessful[ly] attempt[ed] to persuade" owner of getaway car to report it as stolen).   Indeed, the D.C. Circuit recently affirmed the imposition of this adjustment based on a cooperating witness's testimony that the defendant told the witness—or "suggested" to the witness, according to the defense—to get rid of the witness's phone, which contained incriminating information.   *United States v. Bell*, 811 F. App'x 7, 9 (D.C. Cir. 2020) (unpublished).

*Second*, under Note 4(B), Rhodes, Harrelson, Watkins, and Caldwell each provided false testimony either at trial or earlier court proceedings that "reflect[ed] a willful attempt to obstruct justice," U.S.S.G. § 3C1.1, cmts. n.2, 4(B).   The Court should find by a preponderance of the evidence that each of these defendants committed perjury.[25]   *See United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004).   A defendant committed perjury if he or she gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."   *Dunnigan*, 507 U.S. at 94.   A "material" statement is one that concerns "information that, if believed, would tend to influence or affect the issue under determination."   U.S.S.G. § 3C1.1, cmt. n.6; *see also United States v. Hines*, 694 F.3d 112, 122 (D.C. Cir. 2012) (affirming the imposition of the two-point adjustment for obstruction of

---

[25] Note 4(F) adds that "providing materially false information to a judge" is another type of conduct that merits the two-level enhancement.

justice based on the defendant's "deliberate[] misrepresent[ion]" during a pretrial suppression hearing regarding a one-day discrepancy in the date he was first interviewed by government agents).

### 3.   Section 3E1.1 (no acceptance of responsibility)

The PSRs correctly reject the defendants' claims to an entitlement to a reduction in offense level based on their alleged acceptance of responsibility.

Such an adjustment, the Guidelines commentary makes clear, "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."   U.S.S.G. § 3E1.1, cmt. n.2.   It will be "rare" for a defendant who proceeds to trial to receive this adjustment. *Id.*   That "rare" situation is when a defendant proceeds to trial to "preserve issues that do not relate to factual guilt."   *Id.*

Regardless of any facts conceded by any defendant prior to or during trial, each defendant contested that the government proved the necessary *mens rea* for the defendant to commit the conspiracy or obstruction of justice offenses.   Each defendant, therefore, denied an essential factual element of guilt: his or her own intent.   Indeed, in a different Capitol riot case, Judge Walton rejected this precise argument, holding that a defendant who went to trial and testified about his conduct but denied possessing the necessary *mens rea* to corruptly obstruct the official proceeding would "absolutely" not be entitled to a reduction for acceptance of responsibility. *United States v. Thompson*, 21-cr-161 (Nov. 18, 2022), Sent. Tr. at 64.   Judge Walton's conclusion echoes that of circuit courts, which routinely find that district judges do not abuse their discretion or clearly err in denying the acceptance-of-responsibility adjustment for defendants who proceed to trial in obstruction cases contesting whether they possessed the requisite corrupt intent.

53

*See, e.g.¸ United States v. Marinello*, 839 F.3d 209, 226-27 (2d Cir. 2016), *reversed and remanded on other grounds*, 138 S. Ct. 1101 (2018); *United States v. Petruk*, 836 F.3d 974, 977-78 (8th Cir. 2016).   A defendant who admits his physical actions but denies his intent necessarily denies his "factual guilt" under Section 3E1.1.   *See United States v. Jaynes*, 75 F.3d 1493 (10th Cir. 1996) (affirming inapplicability of this adjustment for defendant who admitted conduct constituting forgeries but denied any intent to defraud government); *United States v. Burns*, 781 F.3d 688 (4th Cir. 2015) (affirming inapplicability of this adjustment for defendant who admitted to shooting into car but denied possessing intent to kill).

Indeed, even in their PSR interviews, not a single defendant acknowledged the full scope of his or her guilty conduct.   None of them has "accepted responsibility" for their criminal actions.

### D.  Grouping Analysis

As the PSRs correctly conclude, for each defendant, all counts of conviction should group. Under Section 3D1.2, "closely related counts" group.   All the counts of conviction for each defendant should be placed into one group:

*Counts One, Two, and Three*.   Under Section 3D1.2(b), the counts that "involve the same victim" and "two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan" group.   Counts One (seditious conspiracy), Two (conspiracy to obstruct an official proceeding), and Three (obstruction of an official proceeding) involve the same victim (Congress or the government itself) and are part of the same common criminal objective: to oppose by force the government of the United States by preventing Congress from meeting.   Counts One, Two, and Three therefore group under Section 3D1.2(b).

Under Section 3D1.2(c), a count that "embodies conduct that is treated as a specific offense characteristic in" another Guideline groups with the Guideline for that count.   Under Section

3D1.2(c), therefore, Counts Four (conspiracy to prevent officers of the United States from discharging their duties), Six (interference with law enforcement officers during a civil disorder), and Seven, Eight, Nine, Eleven, and Thirteen (tampering with documents or other objects) group with Counts One, Two, and Three.

*Count Four*.    Count Four (conspiracy to prevent officers of the United States from discharging their duties) embodies conduct that is treated as a specific offense characteristic in Section 2J1.2(b)(1)(B).    In Count Four, the jury found the defendants guilty of conspiring to use "force, intimidation, or threat" to prevent Members of Congress from discharging duties.    Those same elements—force, intimidation, or threat—support application of the specific offense characteristic in Section 2J1.2(b)(1)(B) of "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

*Count Six*.    In Count Six, the jury found Watkins guilty of interference with law enforcement officers during a civil disorder.    That conduct similarly supports application of the specific offense characteristic in Section 2J1.2(b)(1)(B) of "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

*Counts Seven, Eight, Nine, Eleven, and Thirteen*.    Counts Seven, Eight, Nine, Eleven, and Thirteen (tampering with documents or other objects) are obstruction counts that group with their underlying crimes under the principle embodied in Section 3C1.1, cmt. n.8, which provides that if a defendant is convicted of both an obstruction offense and an underlying offense, the "the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of §3D1.2 (Groups of Closely Related Counts)."    Therefore, Counts Four, Six, Seven, Eight, Nine, Eleven, and Thirteen group with Counts One, Two, and Three under Section 3D1.2(c).

If the Court determines that any of the specific offense characteristics or the adjustment for obstruction of justice do *not* apply to a particular defendant, then not all counts of conviction will group and the Court will have to adjust the offense level according to the analysis in Part D of Chapter 3.

### E.  Upward Departures

The Court should depart upward from the Guidelines range for each of the defendants' relevant conduct in this case for the bases explained below and in the sentencing allocution section for each defendant.

#### 1.  Section 3A1.4, Note 4 (terrorism)

An upward departure under Section 3A1.4, cmt. n.4(A) ("Note 4"), is warranted for all nine defendants, whose relevant conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."   All nine defendants were active participants in a sweeping conspiracy to oppose by force the lawful transfer of presidential power.

##### a.  *Legal Standard*

An adjustment for terrorism applies where the offense "involved, or was intended to promote, a federal crime of terrorism," which is defined by statute in 18 U.S.C. § 2332b(g)(5). *See* U.S.S.G. § 3A1.4, cmt. n.1.   If any of the defendants' offenses were intended to promote a federal crime of terrorism, the Section 3A1.4(a) adjustment would apply.   *See United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004); *see also United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2006) (applying adjustment where the offenses themselves were not enumerated but the underlying conduct was meant to promote an enumerated offense).   Here, the government is not seeking application of the Section 3A1.4(a) adjustment.

However, Note 4 to Section 3A1.4 provides that an upward departure is "warranted" if the defendants' "offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id.*, cmt. n.4. When it adopted Note 4, the Sentencing Commission explained that it is "an *encouraged, structured upward departure,*" the purpose of which is to provide courts with "a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis" and to "make[] it possible to impose punishment equal in severity to that which would have been imposed if the § 3A1.4 adjustment actually applied." Sentencing Guidelines, App. C, amend. 637 (2002) (emphasis added).

A defendant's offense is "calculated," as required by Section 3A1.4, if the offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force. *See, e.g., United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012) (defendant's narcoterrorism offense had requisite "calculation" where evidence showed defendant "specifically intend[ed] to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan"). While they are related, "calculation" for the Section 3A1.4 enhancement is distinct from a defendant's particular "motive" and a defendant need not be "personally motivated by a desire to influence or affect the conduct of government," so long as defendant's crime was "calculated to have such an effect." *Khatallah*, 314 F. Supp. 3d at 199. Although "calculation may often serve motive," the enhancement's "calculation" requirement is satisfied if a defendant's offense was "planned—for whatever reason or motive—to achieve the stated object." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (Section 3A1.4 applied to defendant motivated by "prestige and potential influence obtained by associating with" another terrorist, even if defendant did not share the specific political motivation

57

of that terrorist).  Moreover, a defendant's intent to influence government conduct or retaliate against the government need not have been his "sole" or "primary" purpose and the "calculation" requirement may be satisfied even if a defendant's relevant conduct sought to "accomplish other goals simultaneously."  *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018); *see also United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was defendant's "primary purpose").

Indeed, Section 3A1.4 is applicable regardless of the defendants' claimed magnanimous intent.  *See United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) (affirming application of the adjustment for defendants who professed to try to "sav[e] our earth," because "the purpose behind defendants' actions was to further [their] political agenda: the end to industrial society"). Like defendants who claim they were merely trying to stop the government from certifying an election they believed (even if genuinely) to be fraudulent, "it doesn't matter why the defendants oppose capitalism and the United States government—if they use violence and intimidation to further their views, they are terrorists."  *Id.*

b.  *The defendants' convictions and conduct*

The defendants' offenses of seditious conspiracy (Count One), conspiracy to obstruct an official proceeding (Count Two), obstruction of an official proceeding (Count Three), and/or conspiracy to prevent officers of the United States from discharging their duties (Count Four) are not enumerated under 18 U.S.C. § 2332b(g)(5), but these offenses were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  U.S.S.G. § 3A1.4, cmt. n.4(A).  As their convictions and the underlying evidence reflects, the defendants conspired to, attempted to, and temporarily did prevent Congress from

certifying the 2020 Electoral College vote and to physically prevent Members of Congress from performing their constitutional duties inside the Capitol building, all through the planned, threatened, and actual use of force.  Indeed, here, the defendants' conduct led directly to the breach of the Capitol and Congress's evacuation, but other courts have found that Note 4 was warranted even where the "influence" or "[e]ffect" on government conduct was indirect.  *See, e.g., United States v. Wright*, 747 F.3d 399, 410 (6th Cir. 2014) (finding "Occupy Cleveland" defendants' plot to bomb bridge carried requisite calculation to affect government "by prompting [government agencies] to take heightened security measures").

The juries' guilty verdicts with respect to Count One (seditious conspiracy) are accompanied by the specific finding that Rhodes, Meggs, Minuta, Hackett, Moerschel, and Vallejo agreed to oppose by force the authority of the United States government or to use force to prevent, hinder, or delay the execution of the laws governing the presidential transfer of power.  *See* Jury Instructions, ECF 400, at 23-25 (defining the potential goals of the seditious conspiracy charged in Count One and requiring that defendants "intended that force would be used"); Verdict Form #1, ECF 410 (specific finding that Rhodes and Meggs conspired "to oppose by force the authority of the Government of the United States"); Verdict Form #2, ECF 450 (specific finding that Minuta, Hackett, Moerschel, and Vallejo conspired "to use force to prevent, hinder, or delay the execution of any law of the United States"); *see also United States v. Dowell*, 430 F.3d 1100, 1110 (10th Cir. 2005) (holding that the jury made the factual finding that defendant had requisite intent to influence or affect the conduct of government by intimidation or coercion necessary for application of the Section 3A1.4 enhancement when the jury convicted defendant of attempting to interfere with IRS, having been instructed that an element of the offense was that defendant knowingly and intentionally "endeavored to obstruct or impede the due administration of the Internal Revenue

laws by the use of force").

Similarly, the juries' guilty verdicts with respect to Counts Two and Three (conspiracy to obstruct and obstruction of an official proceeding) carry with them the finding that all nine defendants intended to obstruct or impede the certification proceeding.  *See* Jury Instructions, ECF 400, at 25-27 (instructing jury that defendants must have "agreed with . . . the goal of" or "intended to" "obstruct or impede" Congress's Joint Session).

And the juries' guilty verdicts with respect to Count Four (conspiracy to prevent officers from discharging their duties) necessarily mean the juries found that Meggs, Harrelson, Watkins, Minuta, Hackett, Moerschel, and Vallejo knowingly agreed to use of "force" or "intimidation" to stop Members of Congress from discharging their duties, thereby inducing them to flee the House and Senate floors where the certification proceeding had been underway.  *See* Jury Instructions, ECF 400, at 32-33 (instructing jury that defendants must have agreed "to, by force, intimidation or threat, (1) prevent a Member of Congress from discharging a duty as a Member of Congress, or (2) induce a Member of Congress to leave the place where the member of Congress's duties are required to be performed").

For the following reasons, the juries' verdicts reflect the ample evidence that the defendants' offenses were "calculated to influence or affect the conduct of government, or to retaliate against government conduct."   U.S.S.G. § 3A1.4, cmt. n.4(A).

*First*, all nine defendants made extensive preparations to support the use of force in order to intimidate or coerce Congress and stop the certification proceeding.   Almost immediately after the November 2020 election, in encrypted communications platforms and elsewhere, Rhodes and his co-conspirators began recruiting other members of the Oath Keepers to travel to D.C. on January 6, 2021.  *See, e.g.*, 10/3/22PM Tr. 1331-39; Gov. Ex. 6615.B (Msg. 1.S.696.12971.W)

(distributing Serbian blueprint for intimidating Congress). Rhodes and his co-conspirators also began accumulating firearms and other weapons, and planning for their transport to the Capitol and the QRF staging location just across the river. *See also* Part III.B.3, *supra* (detailing extensive scope of the criminal activity).

*Second*, consistent with their plans, evidence of the defendants' conduct on January 6 itself demonstrates their intent to use force in order to impede Congress and stop the certification proceeding. Shortly after Rhodes issued the call to action that day, his co-conspirators marched to the Capitol and then toward the east side doors in stack formation. There, they breached a line of officers and advanced toward the House and Senate chambers. Separate from the conspirators in Stacks One and Two (which included Meggs, Harrelson, Watkins, Minuta, Hackett, and Moerschel), Caldwell joined with other rioters seeking to breach the west side of the Capitol building. In Caldwell's own words, he and other rioters "started stealing the cops [sic] riot shields and throwing fire extinguishers through the windows. It was a great time." Gov. Exs. 1500, 6734 (Msg. 22.T.27.2883). And while the breach of the Capitol unfolded and Members of Congress evacuated, Vallejo monitored events from the QRF staging location where the conspirators' weapons were stockpiled.[26] The defendants conspired to and did, in fact, cause significant injury and damage at the Capitol. *See* Section IV.B.b) (detailing evidence of injury and damage caused

---

[26] While there is direct evidence of each defendant's state of mind, their preparations for and engagement in an attack on Congress in and around the Capitol on January 6 also allows a "natural inference" that is sufficient to satisfy the "calculation" requirement of Section 3A1.4. *Wright*, 747 F.3d at 408-09 (citing *United States v. Dye*, 538 F. App'x 654, 666 (6th Cir. 2013)); *see also Mohammed*, 693 F.3d at 202 (court may draw "plausible inferences" to find requisite "calculation"); *United States v. Arcila Ramirez*, 16 F.4th 844, 854 (11th Cir. 2021) ("because a defendant often will not admit his full knowledge or intentions, the district court may find the requisite calculation or intent existed based on circumstantial evidence and reasonable inferences drawn from the facts").

by the conspirators' relevant conduct).

*Third*, the government introduced evidence of the defendants' numerous statements before, during, and after January 6 confirming that they intended for their coercive and intimidating actions to influence or affect government conduct.   For example, just days after the November 2020 election, Rhodes told Meggs and other Oath Keepers, "We aren't getting through this without a civil war."   Gov. Ex. 6615.A (Msg. 1.S.696.12491).   Similarly, Meggs confirmed that January 6 "isn't a Rally," Gov. Ex. 6868 (Msgs. 2000.T.289, 2000.T.1164), and stated, "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside!   Scare the hell out of them with about a million surrounding them should do the trick!"   10/18/22PM Tr. at 4099 (testimony of Jason Dolan).   Confirming the group's knowledge of Congress's process for certifying the election results, and improper purpose in later breaching the Capitol building, in an interview on December 23, 2020, Rhodes told his followers that January 6 was a "hard constitutional deadline."   Gov. Ex. 1007.3.

While breaching and inside the Capitol, the defendants made numerous statements indicating their coercive, intimidating intent.   Harrelson chanted "Treason!" as he stormed inside the Capitol.   Gov. Ex. 1503; 10/18/22PM Tr. at 4132 (testimony of Jason Dolan).   Watkins yelled, "Push! Push! Push" and "Get in there!" as she and other rioters sought to push past police officers down the hallway toward the Senate Chamber.   Gov. Ex. 1505.   Minuta, with co-conspirator James, tried to force past police officers into the Rotunda while shouting, "Get these cops out" because "this is our fucking building."   Gov. Exs. 111.V.1; 1089.1.

The defendants' statements after breaching the Capitol further indicate that their intent had been to coerce and intimidate the government—and that they sought to continue doing so.   For instance, on the evening of January 6:

- Rhodes wrote, "Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming."   Gov. Ex. 6732 (Msg. 1.S.159.1328).

- Meggs wrote, "We aren't quitting! We are reloading!!," and also posted a video of Stack One's breach of the Capitol along with the caption, "Florida OK takes the Capitol."   Gov. Ex. 9094 (Msg. 1.S.159.1326); Gov. Ex. 6732 (Msg. 50.P).

- Meggs' wife Connie Meggs—another convicted co-conspirator who also breached the Capitol building—wrote that she and the group heard about "mike pence being a faggot and everyone went to the capital to stop the vote."   Gov. Ex. 6734 (Msg. 2400.T.3.34).

- Watkins wrote that she and her group had "Stormed the Capitol" and "Forced" their way towards the Senate and House chambers.   Gov. Ex. 6734 (Msg. 192.T.1521).

- Caldwell wrote that that they had "storm[ed] the Capitol" and that "if we'd had guns I guarantee we would have killed 100 politicians."   Gov. Ex. 6734 (Msg. 22.T.27.2894).

- Vallejo wrote, "We have only [begun] to fight!"   The following morning, Vallejo told other conspirators that he was going back to the Capitol to perform "recon" and "probe their defense line," and that he and his group were now "at WAR."   Gov. Ex. 6733 (Msgs. 1.S.159.1407, 1413, 1416).

These are just a sample of the numerous statements made by the defendants indicating their coercive, intimidating intent.   These statements demonstrate that the defendants sought to affect— that is, obstruct—Congress by stopping the certification proceeding while also retaliating against Congress for what they perceived to be a fraudulent presidential election.   The defendants thus evinced an intent both to influence and affect government conduct through intimidation and coercion and to retaliate against government conduct.   That is so even if there is evidence that the defendants made other "inconsistent statements," held "many false beliefs," had "incoherent"

political motivations, or would characterize their statements as "mere venting." *Van Haften*, 881 F.3d at 544-45.   And the defendants' many statements expressing their intent fit "within a context of plans" that "implicate government interests" even if any one statement, alone, would be insufficient.   *Wright*, 747 F.3d at 410.

*Finally*, the defendants' choice of target itself further demonstrates their intent to intimidate and affect the government.   A defendant's specific intent to influence and retaliate against government conduct for purposes of Section 3A1.4 can often "be inferred from the defendant's choice of target."   *Khatallah*, 314 F. Supp. 3d at 198.   Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government."   *Id.* at 199.   That is why, "[u]nsurprisingly . . . , several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities."   *Id.* (citing cases).   Clearly, attacking the seat of our government while the entire complement of legislators and the Vice President of the United States were inside performing their constitutional and statutory duties is a strong indication of intent to influence or affect the government, or to retaliate against government conduct.

To be sure, while certain defendants (Rhodes and Vallejo) did not engage in violence themselves, violence is not required for the application of the enhancement.   Courts applying Section 3A1.4 have found that engaging in violent conduct may be relevant to a defendant's terroristic "calculation" to affect the conduct of government through "intimidation or coercion," but actual violence is not necessary.   *See, e.g.*, *United States v. Hammoud*, 381 F.3d 316, 325 (4th Cir. 2004) (affirming application of Section 3A1.4 enhancement for defendant convicted of providing money laundering services to Hezbollah); *United States v. Aref*, No. 04-cr-402, 2007 WL 804814, at *4–5 (N.D.N.Y. Mar. 14, 2007) (affirming application of Section 3A1.4

enhancement to defendant's conviction for money laundering); *United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008) (affirming application of Section 3A1.4 enhancement to defendant convicted of perjury and obstructing justice by lying to investigators and grand jury about terrorist associates); *United States v. Thurston, et al.*, No. 06-cr-60069-01-AA, 2007 WL 1500176, at *12 (D. Or. May 21, 2007) (holding that Section 3A1.4 does not require "substantial risk of injury"), *aff'd sub nom. United States v. Tubbs*, 290 F. App'x 66 (9th Cir. 2008); *see also United States v. Wells*, 163 F.3d 889, 899 (4th Cir. 1998) (rejecting argument by defendant convicted of mail fraud, bank fraud, interference with IRS officials, and transportation of stolen property that "terrorism" label did not apply for purposes of sentencing "[s]ince he did not commit any violent acts"). Indeed, when Congress directed the Sentencing Commission pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 to tether the Section 3A1.4 enhancement to the statutory definition of "federal crime of terrorism" and the accompanying "calculation" language in 18 U.S.C. § 2332b(g)(5)(A), rather than the separate statutory definitions of "international terrorism" or "domestic terrorism" in 18 U.S.C. § 2331, Congress deliberately omitted language from Section 2331 requiring "violent acts" or "acts dangerous to human life."   *See* 18 U.S.C. § 2331(1), (5) (defining "international terrorism" and "domestic terrorism," respectively).[27]

---

[27] Other provisions of the Guidelines also distinguish between "intimidation"—used in Section 3A1.4—and "violence," indicating that "intimidation" does not require violent conduct, even if violence or the threat of violence may demonstrate "intimidation."   *See, e.g.*, U.S.S.G. § 2A5.1, bkgd. (noting that "[s]eizure of control of an aircraft may be by force or violence, or threat of force or violence, *or by any other form of intimidation*") (emphasis added); § 2B3.1 (noting that "'[c]arjacking' means the taking or attempted taking of a motor vehicle from the person or presence of another by force and violence *or* by intimidation") (emphasis added).   Similarly, while not specifically defined for the purposes of Section 3A1.4, the Guidelines use "coercion" elsewhere to refer to persuasion or compulsion of another that need *not* include violence or the use of force.   *See, e.g.*, U.S.S.G. § 2G1.1, cmt. n.2 (describing an enhancement for "fraud or coercion that occurs as part of the offense and anticipates no bodily injury").

In short, the defendants' conduct displayed a clear, shared intent to stop Congress from certifying the results of the election, including through the organized use of force and the staging of weapons nearby.   That conduct—calculated to stop the peaceful transfer of Presidential power for the first time in the nation's history—is a quintessential example of an intent to influence government conduct through intimidation or coercion and warrants an upward departure pursuant to Note 4.   Indeed, the terrorism enhancement in Section 3A1.4 is meant to "punish[] more harshly than other criminals those whose wrongs served an end more terrible than other crimes." *Benkahla*, 530 F.3d at 313.

### c.   *Prior applications of Note 4*

Application of Note 4 to these defendants' conduct is consistent with the application of Note 4 by other courts around the country.   In *United States v. Doggart*, the sentencing court imposed a Note 4(A) upward departure where the defendant was convicted of soliciting the destruction of religious property in connection with his plan to burn down buildings in a Muslim community, seeking to "set[] in motion an armed insurrection against the government of the United States that would force the government of the United States either to respond to" the defendant's planned attacks, "or to give in and capitulate."   No. 15-cr-39-CLC-SKL (E.D. Tenn. Sep. 16, 2020), ECF 343 at 6.   The Sixth Circuit recently affirmed, agreeing that the defendant's offense was "calculated to influence or affect government conduct by intimidation or coercion."   *United States v. Doggart*, No. 20-6128, 2021 WL 5111912, at *2-4 (6th Cir. Nov. 3, 2021).   There, the sentencing court upwardly departed from an otherwise applicable guidelines range that called for 51 to 63 months of imprisonment (equivalent to offense level 24 at Criminal History Category I) to a range of 324 to 405 months of imprisonment (equivalent to offense level 41 at Criminal

History Category I).[28]   *Id.*   After departing upward, the court sentenced the defendant to the statutory maximum for his sole offense of conviction, ten years of imprisonment.   *Id.* at *1.

In a separate case in the District of Oregon, the sentencing court applied Note 4(A) when sentencing multiple co-conspirators convicted of violations under 18 U.S.C. § 372 and related offenses for their roles as part of Ammon Bundy's 2016 armed occupation of the Malheur National Wildlife Refuge, based on their disagreement with federal land management policies.[29]   These co-conspirators, some of whom were armed, formed a convoy, entered the Malheur refuge, and then set up a perimeter blocking the entrance of personnel from the Fish and Wildlife Service and other federal agencies.   As they indicated in public statements, the occupiers aimed to "adversely possess" the federal land at the Malheur refuge and to compel the release of two other ranchers who had been convicted of arson on federal land.   Although some defendants involved in the occupation claimed their actions were peaceful, certain defendants carried firearms as they patrolled the refuge, including in a fire watchtower where they stood guard, and one of the defendants was a member of the "Washington III%" militia.   The court applied a Note 4(A) upward departure to eleven of the thirteen defendants who had pled guilty (some of whom had agreed to the application of the departure in their plea agreements), departing upward two offense levels (one defendant), three offense levels (four defendants), five offense levels (three defendants), and ten offense levels (one defendant).   *See United States v. Patrick*, No. 16-cr-51-

---

[28] Since the Court may upwardly depart under Note 4 to impose a sentence that does not "exceed the top of the guideline range that would have resulted if the adjustment under this guideline at been applied," cmt. n.4, the Court is not limited to an offense level increase of 12 steps as contemplated in Section 3A1.4(a), but can depart higher because Section 3A1.4(b) also calls for an increase of the defendant's Criminal History Category to Level VI.

[29] Rhodes and other Oath Keepers conducted armed patrols in coordination with Ammon Bundy and his father, Cliven Bundy, during a different stand-off with federal agents, in 2014.   *See* Part V.2.b).

BR-9 (D. Or. Feb. 18, 2018), Sent. Tr. at 43-45.  The court then applied four- and two-level departures to two defendants convicted at trial.  *Id.* at 46; *United States v. Thorn*, No. 16-cr-51-BR (D. Or. Nov. 21, 2017), Sent. Tr. at 12.

Other sentencing courts have also upwardly departed under Note 4, although under a different subsection, Note 4(B), where defendants' convictions "involved, or were intended to promote" an enumerated offense under 18 U.S.C. § 2332b(g)(5)(B) but the "terrorist motive was to intimidate or coerce a civilian population" rather than to influence or retaliate against government conduct.  *See United States v. Harpham*, 11-cr-42 (E.D. Wash.), applied in *United States v. Harpham*, 2012 WL 220276 (E.D. Wash. Jan. 25, 2012) (three offense-level Note 4(B) departure applied to defendant who placed explosive device along the Martin Luther King, Jr. Day parade targeting parade participants); *United States v. Cottrell*, 04-cr-279 (C.D. Cal.), *aff'd*, *United States v. Cottrell*, 312 F. App'x 979, 981 (9th Cir. 2009) (per curiam), *superseded on other grounds in* 333 F. App'x 213 (9th Cir. 2009) (per curiam) (after application of Note 4(B), defendant sentenced to 100 months of imprisonment for participating in conspiracy to commit vandalism and arson of SUVs in connection with environmental extremist organization); *United States v. Jordi*, 03-cr-60259 (S.D. Fla.), *aff'd*, *United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005) (after application of Note 4(B), defendant sentenced to 10 years of imprisonment in connection with conviction for planned bombing of abortion clinics meant to dissuade doctors from performing abortions); *see also United States v. Holzer*, 19-cr-488 (D. Colo.), ECF 101 at 1-5 (finding that Note 4(B) applied to defendant convicted of attempted arson of a synagogue, but describing 235-month sentence of imprisonment as the result of an upward "variance").

One defendant who pled guilty to assault of a federal officer and other offenses in connection with his conduct on January 6 has agreed that a two-level departure under Note 4 is

appropriate as part of his plea agreement.   *United States v. Milstreed*, No. 22-cr-198, ECF 30, at 4-5 (Apr. 14, 2023).   Milstreed pled guilty to an assault with a dangerous weapon and has admitted to struggling with police officers over a metal barrier outside the Capitol building, as well as throwing a smoke grenade and a wooden pick handle at other officers seeking to maintain the perimeter against advancing rioters.   Like the defendants here, Milstreed did not bring any firearms to the Capitol, but he sent photos to others of firearms he kept at his Maryland home and suggested he would use his assault rifles to help ensure that President Trump remained in power. *Id.*, ECF 31, at 5-6.[30]

This court and three other judges in this District have previously exercised their discretion[31] to decline the government's request to apply Note 4 to defendants convicted of offenses in connection with the riot on January 6, but none of those defendants was associated with the Oath Keepers, and none was convicted of conspiracy to prevent officers of the United States from discharging their duties, let alone seditious conspiracy.   *See United States v. Gardner*, No. 21-cr-622; *United States v. Judd*, No. 21-cr-40; *United States v. Wright*, No. 21-cr-341; *United States v. Reffitt*, No. 21-cr-32.   The defendants in *Gardner* and *Judd* were involved in assaults of law enforcement officers on the lower west terrace "tunnel," where they coordinated with other rioters

---

[30] Milstreed is scheduled to be sentenced on July 20, 2023.

[31] Application of the departure in Note 4, like application of the departures in Park K of Chapter 5, is committed to the Court's sound discretion.   *United States v. Doggart*, No. 20-6128, 2021 WL 5111912, at *3 (6th Cir. Nov. 3, 2021); *see also* U.S.S.G. § 1B1.7 (noting that commentary to the Guidelines may be a "policy statement," such as a suggested circumstance that "may warrant departure from the guidelines"); 18 U.S.C. § 994(a)(2) (directing the Sentencing Commission to issue policy statements regarding sentencing that "further the purposes" of Section 3553(a)(2)). Indeed, pursuant to 18 U.S.C. § 3553(a)(5)(B), the Court, "in determining the particular sentence to be imposed, shall consider any pertinent policy statement" issued by the Sentencing Commission.

in an attempt to overcome the officers guarding the doors.   Gardner sprayed a bottle of OC spray at the guarding officers and Judd throw a lit firecracker into the tunnel, endangering the officers and others there.   The defendant in *Wright* pushed a metal barricade against officers at the east front of the Capitol grounds, before entering the building.   In *Reffitt*, the defendant was one of the first to storm up the west terrace steps, charging towards law enforcement with a holstered pistol, but he never unholstered his pistol and he did not enter the Capitol building itself.

This Court explained when declining to exercise its discretion to apply Note 4 in *Gardner* that it endeavored to avoid disparities, noting that "no other judge has applied it."   Sent. Tr. at 55-56.   But applying Note 4 here would not lead to any "*unwarranted* sentence disparities," 18 U.S.C. § 3553(a)(6) (emphasis added), because no court in the January 6 context has confronted any defendants "who have been found guilty of similar conduct," *id*.   While Section 3553(a)(6) "does not allow unwarranted sentencing disparities between codefendants, *warranted* disparities are allowed."   *United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) (internal citations omitted) (emphasis added); *see also Bras*, 483 F.3d at 114 (explaining some of the circumstances that warranted a disparity in sentencing defendants convicted of the same conduct, even among co-conspirators); *Mejia*, 597 F.3d at 1343 (same).   While the defendants in *Gardner*, *Wright*, *Judd*, and *Reffitt* made statements indicating their intent to disrupt and even overthrow Congress by force before and during the riot on January 6, they did not engage in the same level of organizational planning or action as any of these defendants and their Oath Keepers co-conspirators.

Here, as explained in detail below, the Court should depart upwards by six offense levels for Rhodes.   That is half of the 12-level increase called for by the adjustment itself, *see* U.S.S.G. § 3A1.4(a), and does not, as would be required by the adjustment, result in any increase to Rhodes' criminal history score.   To reflect the extent to which each defendant's offense was "calculated to

influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," the Note 4 upward departure for the other defendants should be lower than for Rhodes.   As detailed below for each defendant, Meggs deserves a four-level departure; Watkins, Minuta, Vallejo, Harrelson, and Caldwell three; and Hackett and Moerschel one.

### 2.   Alternative bases

Aside from Note 4, other provisions in the Sentencing Guidelines provide independent and further bases for the Court to depart upwards from each defendant's Guidelines range: Section 5K2.7 (Disruption of Governmental Function), Section 5K2.0(a)(3) (Circumstances Present to a Degree Not Adequately Taken Into Consideration); and Section 5K2.6 (Weapons).

"If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected."   U.S.S.G. § 5K2.7.   This departure "ordinarily would not be justified when the offense of conviction is . . . obstruction of justice . . . unless the circumstances are unusual."   *Id.; see also* § 3A1.2, cmt. n.5; § 2A2.4, cmt. n.3 (regarding additional relevant bases for applying Section 5K2.7).

Here, both the circumstances and the offense are unusual: the defendants sought to disrupt a government function that is integral to our democracy and is mandated by the Constitution itself—the Certification of the votes of the Electoral College.   *See* U.S. Const. amend. XII. Further, seditious conspiracy is an egregious offense for which defendants are rarely convicted and sentenced—and very few defendants have been sentenced since the advent of the Sentencing Guidelines.   But when defendants are sentenced for a seditious conspiracy conviction, they typically receive lengthy terms of incarceration.   *See* Part IV.2 (recounting other sentences for seditious conspiracy).

71

Similarly, an upward departure under Section 5K2.6 may be warranted "[i]f a weapon or dangerous instrumentality was used or possessed in the commission of the offense."  Here, the conspirators' staging of an arsenal of semi-automatic rifles and other firearms just across the Potomac River means they "used or possessed" weapons to obstruct Congress (and to commit sedition), yet the use and possession of those weapons is not reflected by any increase in the total offense level.

Courts of appeals have affirmed upward departures for firearms possession under Section 5K2.6 in fraud cases, premised on the idea that the fraud Guideline does not take into account the use of a weapon, and therefore does not adequately capture a defendant's dangerousness or the seriousness of the offense.  *United States v. Paslay*, 971 F.2d 667, 672 (11th Cir. 1992); *United States v. Gaddy*, 909 F.2d 196, 199-200 (7th Cir. 1990).[32]  The same premise holds true here: the conspirators' transportation and possession of firearms in furtherance of their obstruction of the congressional proceeding means that the Court should depart upward from the obstruction Guideline to account for the added dangerousness and seriousness of their criminal conduct, especially because under the grouping analysis there results an "inadequate scope for ensuring appropriate additional punishment for the additional [firearms] crimes."  U.S.S.G. § 3D1.4, bkgd. cmt.

Finally, an upward departure is equally appropriate under Section 5K2.0, which would account for the defendants' "intent to frighten, intimidate, and coerce" federal lawmakers in

---

[32] The courts in *Paslay* and *Gaddy* departed upward by four and two levels, respectively (though the *Paslay* court departed upward on multiple grounds).  Many Guidelines provide a two-level increase if a firearm was possessed.  *See, e.g.*, U.S.S.G. § 2B2.1(b)(4) (burglary); § 2B2.3(b)(2) (trespass); § 2B5.1(b)(4) (counterfeit bearer obligations); § 2B5.3(b)(6)(B) (criminal infringement of copyright).  Others provide a three-level increase for the same characteristic.  *See, e.g.*, U.S.S.G. § 2B3.1(b)(2)(E) (robbery); § 2B3.2(b)(3) (extortion by force).

manner that is not otherwise accounted for in the Guidelines.   *United States v. Tankersley*, 537 F.3d 1100, 1116 (9th Cir. 2008); *see id.* at 1112-14 (upholding 12-level upward departure under Section 5K2.0 after the district court concluded that Section 3A1.4 did not apply).

## IV.   SECTION 3553(a) FACTORS APPLICABLE TO ALL DEFENDANTS

The Court's sentence must be guided by the factors in 18 U.S.C. § 3553(a).   Below are the factors applicable to all nine defendants: the nature and circumstances of the offense, § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate general deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).[33]   These factors support the government's requested sentences, through the Guidelines analysis (including an upward departure) and/or an upward variance.

### A.   Nature and Circumstances of the Offense and Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

These defendants each played a role in an unprecedented conspiracy to oppose the transfer of presidential power.   As the Court noted after the second trial verdict, the seriousness of these offenses cannot be overstated.   1/23/23 Tr. at 4769.   For over two-hundred years, since President George Washington first voluntarily relinquished his executive power back to the people and set in motion a tradition that has formed the bedrock of our democracy, the American people have chosen their president through free and fair elections.   Not force.   To justify their actions, the conspirators called the outcome they disagreed with "tyranny" that would lead to an apocalyptic

---

[33] The next Part, which discusses each defendant's characteristics and role, addresses the individualized factors under § 3553(a).

end of the country.   They sowed doubt in others, riled up and recruited them to travel to D.C., and led them in an attack on the Capitol by giving the riot leaders, in the form of so-called Oath Keepers.   Their oaths of service were not to the country, but to themselves.

The attack on the U.S. Capitol on January 6 was a criminal offense unparalleled in American history.   It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile forces.   By its very nature, the attack defies comparison to other events.   Every defendant here joined a conspiracy that contributed to this unprecedented attack on our democracy.

Moreover, opposing the transfer of presidential power and attacking the U.S. Capitol building and grounds constitutes an attack on the rule of law.   Leading up to January 6, the defendants and their co-conspirators believed *their* view of the Constitution trumped all others and anointed themselves the "Guardians" of *their* "Republic."   These defendants attempted to silence millions of Americans who had placed their vote for a different candidate, to ignore the variety of legal and judicial mechanisms that lawfully scrutinized the electoral process leading up to and on January 6, and to shatter the democratic system of governance enshrined in our laws and in our Constitution.   And when they did not get what they wanted, they acted by together attacking the very people and place at the very time when those laws were in action.   At its essence, these defendants' crimes are the antithesis of respect for the law.   "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[34]   As with

---

[34] FBI Director Christopher Wray, Statement before House Oversight and Reform Committee (June 15, 2021), *available a*t oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray %20Testimony. pdf

the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration.   A lesser sentence could encourage further abuses not only by these defendants, but by others who disagree with the next elections in our country's local, state, and federal governments.   *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### B.  Need for the Sentence to Afford Adequate General Deterrence

Indeed, a significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C. § 3553(a)(2)(B).   Here, the need to deter others is especially strong because these defendants engaged in acts that were intended to influence the government through intimidation or coercion—in other words, terrorism.   And they were leaders of such efforts. Because these defendants not only contributed to the attack on the Capitol but helped to organize it, their sentences will be noted by those who would foment such political violence in the future.

The attack on the Capitol on January 6 was calculated to interfere with, and did interfere with, one of the most important democratic processes we have: the peaceful transfer of power.   As noted by Judge Moss during a different sentencing hearing,

> [D]emocracy requires the cooperation of the governed.   When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.   The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.   It is a damage that will persist in this country for decades.

*United States v. Hodgkins*, No. 21-cr-188, Sent. Tr. at. 69-70.   Indeed, the attack on the Capitol means "that it will be harder today than it was [before January 6] for the United States and our diplomats to convince other nations to pursue democracy.   It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable

foundation of this nation."   *Id.* at 70.

As this Court is well aware, the justice system's reaction to January 6 bears the weighty responsibility of impacting whether January 6 becomes an outlier or a watershed moment.   "By nearly every measure, political violence is seen as more acceptable today than it was five years ago."   Adrienne LaFrance, *The New Anarchy: America faces a type of extremist violence it does not know how to stop*, THE ATLANTIC, Mar. 6, 2023 (citing a 2022 UC Davis poll[35] that found one in five Americans believes political violence would be "at least sometimes" justified, and one in 10 believes it would be justified if it meant the return of President Trump).   Left unchecked, this impulse threatens our democracy.

The defendants in this case sought to capitalize on this undercurrent in our society to change the result of a presidential election.   They called for using force, intimidation, and violence to get political leaders to stop the certification of the election.   They recruited others to this mission.   They organized and participated in encrypted messaging groups and meetings to further their plans.   They amassed an arsenal of firearms on the outskirts of D.C. in support of this criminal objective.

Such conduct in leading and instigating an attack like January 6 demands deterrence.   It is critical that this Court impose significant sentences of incarceration on all the defendants in this case to convey to those who would mobilize such political violence in the future that their actions will have consequences.   There is possibly no greater factor that this Court must consider.

C. **Need to Avoid Unwarranted Sentencing Disparities**

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing

---

[35] health.ucdavis.edu/vprp/pdf/Political-Violence-Fact-Sheet%201_7-21-22.pdf

disparities—the crimes these defendants committed are unlike any others that this Court or other judges have addressed with respect to the attack on the Capitol on January 6.   Rather, these crimes align much more closely with the acts of terrorism for which other courts have imposed lengthy sentences in other seditious conspiracy cases.

### 1.   Defendants sentenced for role in attack on Capitol

These defendants stand out among January 6 defendants because they not only joined in this horrific attack on our democracy as it unfolded, but they all took steps, *in advance* of January 6, to call for and prepare for such an attack.   From participating in chats and meetings in which they advocated for the use of force to stop the certification of the election, to transporting weapons across the country to stage around our nation's capital in support of this objective, these defendants intentionally helped to set the stage for January 6.

This Court has previously explained that it "has been one of the great tragedies in the history of this country" to see "ordinary, hardworking Americans" turn into criminals on January 6 and "suffer[] the consequences."   *Gardner*, Sent. Tr. at 66; *see also United States v. Jeffrey Brown*, No. 21-cr-178 (Apr. 28, 2023), Sent. Tr. at 39 (noting "the power and sway that disinformation, untruths can have on people").   *These* defendants are in part responsible for that national tragedy; they played significant roles in spreading doubt about the presidential election and turning others against the government, and they are incomparable to the actions of single actors on January 6.   *See, e.g.*, Gov. Exs. 6778 (Msg. 1.S.656.6545) (Meggs to Rhodes, Harrelson, Hackett, Moerschel, and others on December 6: "100 guys go to prison.   1000 guys get in a battle.   10,000 guys get in a war.   72,000,000 is a massive patriotic movement."); 6778 (Msg. 1.S.656.9295) (Meggs on December 22: "Go one your a criminal.   Go dozens your a cell.   Go hundreds your a movement.   Go thousands your Patriots."); 9514 (Msg. 1.S.656.10096) (Rhodes

on December 25: "The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing."). Each of these nine defendants deserves significant punishment for what they helped cause.

Reviewing other January 6 cases reveals the extreme gap of culpability between these defendants and others who acted alone. This is so even in examples of the highest sentences courts have delivered in the January 6 context. In *United States v. Webster*, No. 21-cr-208, for example, Webster was convicted of 18 U.S.C. § 111, among other charges, and this Court sentenced Webster to 120 months for assaulting law enforcement officers with a dangerous weapon and doing so in body armor. Webster was not convicted of any conspiracy charges or of obstructing the congressional proceeding, and there was no evidence that Webster planned his attack ahead of time, recruited others to act with him prior to January 6, resorted to encrypted messaging to conceal his plans, transported and staged multiple firearms and ammunition outside D.C. as part of an armed QRF in support for his actions, or breached the Capitol and pushed down either chamber hall in search of Members of Congress.

The same goes for *United States v. Albuquerque Cosper Head*, No. 21-cr-291, in which Head was convicted of violating 18 U.S.C. § 1512(c)(2) among other charges, and the Court sentenced him to 90 months for assaulting multiple law enforcement officers and dragging one out of the lower west terrace tunnel and into the mob where the officer was further assaulted. Head was not convicted of any conspiracy charges, and there was no evidence that he committed any of the acts highlighted above.

Finally, the same applies to *United States v. Patrick McCaughey III*, No. 21-cr-40, in which McCaughey was convicted of 18 U.S.C. § 111 among other charges, and the Court sentenced him to 90 months for assaulting multiple officers with a dangerous weapon, noting certain mitigating

factors including that McCaughey did not come with any weapons or defensive gear and that he did not broadcast to the public about his crimes.   This defendant was also not convicted of any conspiracy charges and did not engage in any of the acts highlighted above.

No January 6 case sentenced to date is comparable to the scope and magnitude of these defendants' convictions and conduct.

### 2.   Defendants sentenced for seditious conspiracy in other contexts

Since the advent of the Sentencing Guidelines, there have only been a handful of cases in which defendants were sentenced for committing seditious conspiracy in violation of 18 U.S.C. § 2384.   In each of these cases, courts imposed lengthy sentences, often imposing the maximum sentence of 20 years of incarceration on this count and finding the conduct was tantamount to waging war against the United States under Section 2M1.1(a)(1).    For instance, in *United States v. Rahman*, ten defendants were found guilty of seditious conspiracy in connection with terror plots related to the 1993 World Trade Center bombing and additional plans to bomb other locations and murder the Egyptian president.   Each of the ten defendants, while receiving overall sentences ranging from 25 years to life imprisonment, was sentenced under the Treason guidelines to 20 years for their conviction of 18 U.S.C. § 2384.   *See* 189 F.3d 88 (2d Cir. 1999) (affirming these sentences).

In *United States v. Battle*, No. 02-cr-399 (D. Or. 2004), the court adopted the sentencing guidelines for Treason and sentenced two co-defendants to 18 years of incarceration after they pled guilty to seditious conspiracy and admitted that the purpose of their conspiracy was to travel to Afghanistan to fight alongside al Qaeda and the Taliban against American and allied forces. *See* No. 02-cr-399, ECF 373, 374, 537 at 2.

In *United States v. Batiste*, No. 06-cr-20373 (S.D. Fla. 2009), the defendant was convicted

of multiple charges, to include seditious conspiracy, for providing material support to the planning of attacks on federal and civilian targets in the United States. *See* No. 06-cr-20373, ECF 1451 (Gov. Sent. Memo). Despite never collecting any weapons or harming any victims, the court adopted the sentencing guidelines for Treason and sentenced Batiste to 13-and-a-half years for his conviction under Section 2384. *See* No. 06-cr-20373, Sent. Tr. at 46-47, 148.

In *United States v. Khan*, No. 03-cr-296-2 (E.D. Va. 2004), the defendant was originally sentenced to the statutory maximum of 20 years for violating Section 2384, and life imprisonment overall. In *Khan*, the defendant attended a terrorist training camp after September 11, 2001, with the intent to proceed to Afghanistan and fight for the Taliban and Al-Qaeda against United States troops. *See United States v. Khan*, 309 F. Supp. 2d 789, 801-18 (E.D. Va. 2004), *aff'd in part, remanded in part on other grounds*, 461 F.3d 477 (4th Cir. 2006); *see also Khan*, No. 03-cr-296-2, ECF 602 (explaining procedural history, including that the incarceration term for the Section 2384 count was later decreased on resentencing after *Booker* and *Dimaya*).

In *United States v. Al-Timimi*, No. 04-cr-385 (E.D. Va. 2004), the defendant was convicted of violating Section 2384 among other charges for encouraging individuals to travel to Pakistan to receive military training from Lashkar-e-Taibi, a designated foreign terrorist group, in order to fight U.S. troops in Afghanistan. The defendant was sentenced to life in prison, including 10 years for violating Section 2384. ECF 132.

These other seditious conspiracy cases show that courts have imposed decades-long sentences of incarceration even for planning and preparing for violence (but not using actual violence) against the United States government. Indeed, the seditious conspiracy statute was created to address such existential threats to our system of government. *See* June 28, 2022 Mem. Op. (ECF 176) at 6-7 (explaining that the seditious conspiracy statute was originally enacted to

address the government's then-"limited authority under federal criminal law to detain and punish those who supported the rebellion" that led to the Civil War); *see also United States v. Ali*, 528 F.3d 210, 265 (4th Cir. 2008) ("[T]hough the district court accurately noted that [the defendant] never 'injured any people' and 'no victim was injured in the United States[,]' this should not trivialize the severity of his offenses. . . . [W]e cannot wait until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism.").   Here, the defendants, in fact, acted on their seditious agreement—causing and threatening injury and harm on January 6, and damage to the country's faith in our electoral process.   To avoid unwarranted disparities with other seditious conspiracy cases under Section 3553(a)(6), the defendants' sentences should be lengthy.

## V.    SENTENCING ANALYSIS FOR EACH DEFENDANT

The analysis below details the facts specific to each defendant, including those facts that support the application of the Guidelines' Chapter Three adjustments and the terrorism departure under Note 4.   As explained above, the conspirators' "relevant conduct" supports application of each of the Chapter Two specific offense characteristics to each defendant, and therefore will not be repeated below.   Addressed below are the defendant-specific facts that support application of certain specific offense characteristics *in addition to* the generally applicable relevant conduct.

To the extent applicable, these individual analyses also address the factors under Section 3553(a), including: the history and characteristics of each defendant, § 3553(a)(1); the need for the sentence to provide just punishment, § 3553(a)(2)(A); and the need for the sentence to protect the public from further crimes, including specific deterrence, § 3553(a)(2)(B) and (C).

### A.  Stewart Rhodes

Rhodes led a conspiracy to oppose by force the lawful transfer of power following the 2020 U.S. Presidential Election.   He exploited his vast public influence as the leader of the Oath

Keepers and used his talents for manipulation to goad more than twenty other American citizens into using force, intimidation, and violence to seek to impose their preferred result on a U.S. presidential election.   This conduct created a grave risk to our democratic system of government and must be met with swift and severe punishment.   A 25-year (300-month) sentence is compliant with the Sentencing Guidelines and necessary to satisfy the factors this Court must consider under 18 U.S.C. § 3553(a) in imposing a sentence.

### 1.   Sentencing Guidelines Analysis

***Count One*** **(Seditious Conspiracy, 18 U.S.C. § 2384)**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury or property damage) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference due administration of justice) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 33 | |

***Count Three*** **(Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2))**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury or property damage) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference due administration of justice) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 33 | |

***Count Seven*** **(Tampering with Documents or Other Objects, 18 U.S.C. § 1512(c)(1))**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(B) (especially probative record) |
| Cross Reference | | §2J1.2(c) |

| Base Offense Level (adjusted) | 21 | §2X3.1(a)(1) (6 levels lower than underlying offense) |
| Total | 21 | |

All of these counts group.   Accordingly, the total adjusted offense level for Rhodes would be the highest of the offense levels for the three counts, which is 33.

The government also submits that an upward departure of six levels is warranted under Note 4 for the degree to which Rhodes' offense conduct "was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. n.4.   And Rhodes deserves no credit for "acceptance of responsibility." This would bring the defendant's offense level to 39, for a recommended sentence of 21.8 to 27.25 years (262 to 327 months) of incarceration.   The government's recommended sentence of 25 years (or 300 months) of incarceration is just above the mid-point of that range.

a)   Additional Factual Support for the Specific Offense Characteristics

The relevant conduct of Rhodes' co-conspirators caused and threatened to cause physical injury to the law enforcement officers protecting the Capitol on January 6 and substantial damage to the building.   It is appropriate to apply Section 2J1.2(b)(1)(B) simply for the relevant conduct of the conspirators he led.   But there is more.

The evidence at trial established, and the jury found through its guilty verdict, that Rhodes led a conspiracy to use any means necessary, up to and including the use of force, to oppose the lawful transfer of power from President Trump to President-Elect Biden.   Numerous co-conspirators testified that Rhodes' repeated messages urging forcible resistance to the election results are what caused them to join the attack on the Capitol on January 6.   *See, e.g.*, 10/18/22PM Tr. at 4099 (testimony of Jason Dolan that Rhodes' words constituted a call "to take up arms and fight back"); 10/31/22PM Tr. at 5765-66, 5866 (testimony of Graydon Young that Rhodes'

messages "regalvanized" him to "resist the fraud" and to come to D.C. on January 6 prepared to fight against "[t]he corrupt elements in the government that were allowing the election to proceed, and obviously leftists and extremists and whoever else was in the way"); 1/3/23PM Tr. at 2556-57 (testimony of Caleb Berry that he believed, based on the messages of Defendants Rhodes and Meggs, that he and his fellow Oath Keepers had a duty to "defend the Constitution" by "fight[ing] against the federal government if I had to," because "[w]e needed to act or we would die").   And a preponderance of the evidence shows that Rhodes ordered his co-conspirators to join in the attack on the Capitol, both directly and indirectly.   Indirectly, Rhodes sent his followers knowing words of approval of the riot, like his message that "the founding generation -stormed the governors mansion in MA . . . . They didn't fire on them, but they street fought.   That's where we are now. Next comes our 'Lexington."   Directly, Rhodes spoke on the phone with Meggs moments before Meggs led Stack One to breach the Capitol.   Gov. Ex. 1500.   Accordingly, this Court can and should find that Rhodes, through his offense conduct and that of his co-conspirators, caused and created a risk of injury to others and damage to property.

The three-level specific offense characteristic under Section 2J1.2(b)(2) applies for similar reasons.   As the leader of the seditious conspiracy, Rhodes should also be held liable for the substantial interference caused by his co-conspirators to the Certification.   Rhodes' co-conspirators' breach of the building, under his leadership and direction, contributed to the delay of a Congressional proceeding required by both the U.S. Constitution and federal law to review and certify the results of the U.S. presidential election.   Such conduct falls comfortably within the definition of "substantial interference with the administration of justice."   Application of Section 2J1.2(b)(2) is therefore appropriate here.

Finally, the Court should find Rhodes, like all the other conspirators, participated in an

offense that was extensive in scope, planning, or preparation because of the length of the conspiracy, its geographic scope, the number of participants, and the planning for an armed force component involving the transportation of firearms from across the country.   U.S.S.G. § 2J1.2(b)(3)(C).

> b) Factual Support for the Upward Adjustments for Role in the Offense and Obstructing Justice

The evidence at trial established that Rhodes' conduct warrants an upward departure both for serving as a leader and organizer, under Section 3B1.1(a), and for causing the destruction of evidence, under Section 3C1.1.

As the leader of a seditious conspiracy, joined by more than twenty people, to forcibly oppose the lawful transfer of power following the 2020 presidential election, Rhodes was a "leader/organizer" who deserves the highest, four-level upward adjustment for his aggravating role in the offense.   U.S.S.G. § 3B1.1(a).   Rhodes admitted in his trial testimony that he was the leader and founder of the Oath Keepers.[36]   11/4/22AM Tr. at 7053-54.   On a recorded conference call, Rhodes laid out the details of how his followers should forcibly oppose the transfer of presidential power.   Gov. Exs. 1000.1 - .11.   In these segments, Rhodes can be heard telling those on the call, "There's no such thing as another election in this country of any meaningful sense of the term if you let this stand," Gov. Ex. 1000.1; "You're from Oath Keepers—you've got a responsibility and duty," Gov. Ex. 1000.5; and "You've got to go there [to D.C.] and you've got to make sure he knows that you are willing to die to fight for this country," Gov. Ex. 1000.7.   Rhodes stated his intent to organize an "armed QRF" or "quick reaction force" outside D.C. to support operations

---

[36] As explained above, a defendant's managerial role in a non-criminal organization or workplace can support this role adjustment.   *See, e.g.*, *Bras*, 483 F.3d at 113-14; *Bikundi*, 926 F.3d at 801.

inside.  Gov. Ex. 1000.7.  He continued, "We're very much in exactly the same spot that the founding fathers were in like March 1775.  Now—and Patrick Henry was right.  Nothing left but to fight.  And that's true for us, too.  We're not getting out of this without a fight."  *Id.*  The government presented the testimony of the West Virginia Oath Keeper who recorded the call because, in his words, "the more I listened to the call, it sounded like we were going to war against the United States government, and I wasn't comfortable, so I started to record it."  10/6/22PM Tr. at 2024.

Rhodes provided instructions to other defendants and conspirators regarding preparations for January 6.  For example, on December 25, Rhodes sent a series of messages to the "OKFL Hangout" Signal group chat in which he stated,

> [President Trump] is being advised to wait till the 6th in reliance on Congress.  His 'legal advisors' are NOT actually advising him (not laying out all his actual options like a real staff member should, and then let him decide).  They are instead acting as if his only option is to hope Congress does the right thing - which is extremely unlikely.  I'm working to get him to see other options and put them on the table. I think Congress will screw him over.  The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing.

Gov. Ex. 6860 (Msgs. 1.S.656.10094, 10096).  And, as detailed above, co-conspirators testified that these words did in fact inspire them to forcibly oppose the authority of the government of the United States.

Financial evidence additionally showed how Rhodes procured numerous firearms and firearm accessories in the weeks before and after January 6.  *See, e.g.*, Gov. Ex. 1540.  And the evidence tied these weapons and weapons-related purchases to the conspirators' goal of forcibly opposing the lawful transfer of power.  *See, e.g.*, Gov. Ex. 6749 (Msg. 1.S.737.2818 (December 29: "This will be DC rally number three.  Getting kinda old. They don't give a shit how many

86

show up and wave a sign, pray, or yell.   They won't fear us till we come with rifles in hand.")).

And, *after* January 6, Rhodes purchased and provided thousands of dollars' worth of firearms and

related equipment for certain leaders and instructed them to prepare to distribute them to other

Oath Keepers for "civil war."   *See, e.g.*, 3/6/23PM Tr. at 5952-53 (Landon Bentley describing

how Rhodes provided him a black AR-15 pistol); ECF 60 at ¶51 (Joshua James Plea Statement of

Facts, stating that "At Rhodes's instruction, James took with him multiple firearms, thousands of

rounds of ammunition, multiple burner phones, scopes, magazines, night-vision equipment, and

other tactical gear" and that "Rhodes told James to be prepared to transport and distribute the

equipment to others upon Rhodes's instruction and to be prepared for violence in the event of a

civil war.").   With James's consent, the government obtained these items from storage sheds in

Alabama, to include:

| **Firearms**<br>• 1 AR pistol (300BO)<br>• 1 AR-15 (5.56)<br>• 2 AR Upper Receivers<br><br>**Firearms Attachments**<br>• 1 EOTech holographic weapons sight<br>• 1 EOTech 3x magnifier<br>• 1 Magpul bipod<br>• 11 back up iron sights<br>• 3 sling mounts<br>• 1 rifle foregrip<br>• 1 XD pistol grip<br>• 1 Digital/Night camera sight<br>• 1 weapons cleaning kit | **Ammunition**<br>• Approximately 2000 rounds of ammunition<br>• 1300 rounds of 300 Blackout<br>• 8 rounds of .270<br>• Various ammunition consisting of 12ga shotgun, 9mm, and 5.56<br>• 4 Magazines filled with 300BO rounds along with loose 300BO ammunition<br>• 11 rifle magazines for AR platform<br>• 3 Rifle Scopes, variable power |
| **Armor**<br>• 1 Plate Carrier with ballistic plates<br>• 1 Body armor with soft ballistic armor | **Other Gear**<br>• 2-3 prepaid phones<br>• Oath Keepers patches and hats<br>• 2 backpacks |

| • 2 Ballistic panels (1 set)<br>• 1 Ballistic Helmet | • CB radio package<br>• 3 bandages with quickclot<br>• 1 tourniquet |
| --- | --- |

On January 6, the evidence established that Defendant Rhodes was in command of his co-conspirators.  Moments after Rhodes messaged a leadership Signal chat, "Pence is doing nothing[,] [a]s I predicted," co-conspirators started moving towards the Capitol.  Gov. Exh, 1500. "Stack One," led by Meggs and Watkins, marched down Pennsylvania Avenue towards the Capitol, with Watkins stating over the Zello application, "We have a good group.  We've got about 30, 40 of us.  We're sticking together and sticking to the plan."  Gov. Exs. 1500, 1502. Rhodes then had a 90-second phone call with Meggs and co-conspirator Michael Greene before Meggs led Stack One to breach the Capitol; witnesses like Terry Cummings and Graydon Young testified that Meggs appeared to be receiving direction from whomever he was talking to on the phone.  10/12/22AM Tr. at 2732, 2739-41; 10/31/22PM Tr. at 5857.

Similarly, after Rhodes called the rioters attacking the Capitol "patriots," co-conspirator James messaged that he and "Stack Two" were on their way to the Capitol.  As the group drove towards the Capitol on golf carts, Minuta stated that the group was "[h]eaded to the Capitol" because "patriots storm[ed] the Capitol Building."  Gov. Ex. 1508.  He described the situation as "Fucking war in the streets right now."  *Id.*  When the group arrived at Third and Constitution, NW, Minuta stated, "Word is that they got in the building.  Let's go."  *Id.*  "Stack Two" then snaked their way through the crowds on the Capitol grounds to the east side of the Capitol, where they breached the building through the same doors as "Stack One" roughly 35 minutes earlier.  *Id*.

Finally, both his leadership role and his obstruction of justice under Section 3C1.1 are supported by messages sent from Rhodes' girlfriend's (Keylle SoRelle) account but explicitly on

88

behalf of or by Rhodes that encouraged his co-conspirators to delete incriminating evidence of their involvement in the attack on the Capitol.   Gov. Ex. 9061; *see, e.g.*, Gov. Ex. 9061 (Msg. 54.S.125.2878) ("DELETE your self-incriminating comments or those that can incriminate others.").   The PSR correctly rejects Rhodes' attempt to avoid this adjustment based on some sort of advice of counsel defense.   Rhodes did not timely notice or present an advice of counsel defense to this obstruction-of-justice charge at trial.   Furthermore, he admitted during his trial testimony to personally sending some of the messages in Government Exhibit 9061, including the one in which he stated, "Let me put it in infantry speak:   SHUT THE FUCK UP!   Do not discuss who did what. Go silent."   11/7/22PM Tr. at 7468.   Nothing in that message, in which Rhodes ordered his co-conspirators to avoid incriminating each other, claimed that this directive was based upon advice of counsel.

The PSRs correctly determined that Rhodes provided materially false testimony at trial. PSR ¶ 67 (providing one example).   Rhodes also made the following statements that were shown to be false through cross-examination:

- Rhodes testified that he founded the Oath Keepers on the date April 19 to honor a date when a group of veterans came together and stood on Lexington Green to "renew [their] oaths to the Constitution and make it clear to President Adams that we put the Constitution and the country first above political parties."   In fact, Rhodes repeatedly stated prior to the founding that he was choosing that date because it was the anniversary of the "Shot Heard 'Round the World" that started the American Revolutionary War.   Gov. Exs. 9108, 9109.

- Rhodes testified, "I don't know of any security event where any Oath Keeper ever had to use force," and, "No Oath Keeper that I know of has ever . . . pointed their weapon

at anybody, oh, except one exception in Ferguson."  11/4/22AM Tr. at 7070.  Upon cross-examination, Rhodes admitted that he was aware that North Carolina Oath Keeper leader Doug Smith pointed his firearm at others during an operation in Louisville.  11/7/22AM Tr. at 7303-13.

- Rhodes claimed he was unaware that there was a QRF for January 6.  *See* 11/7/22PM Tr. at 7406 ("I knew he had two hotel rooms outside of Virginia -- or in Virginia to leave his guns at. I did not know that there was anybody sitting on them to do anything with them.").  But he agreed with Kelly Meggs in a message introduced at trial, "Okay. We will have a QRF.  The situation calls for it."  Gov. Ex. 6923 (Msg. 1.S.613.175). And he told those on the "DC OP: Jan 6 21" chat on the morning of January 6, "We will have several well equipped QRFs outside DC."  Gov. Ex. 6923 (Msg. 1.S.159.955).  Rhodes also claimed he did not know that North Carolina Oath Keeper deputy leader Paul Stamey had anything to do with this QRF despite Stamey's responding to Kelly Meggs' messages about the QRF to say that his sources in DC were working on boat transport for the QRF.  11/7/22PM Tr. at 7409-10, 7420-21 (quoting Gov. Ex. 6923 (Msg. 1.S.159.526)).

Accordingly, the upward adjustments under Section 3B1.1(a) (aggravating role—organizer or leader) and Section 3C1.1 (obstruction of justice) are both factually supported for Rhodes.

Finally, the PSR correctly rejects Rhodes' claim that he should receive a downward adjustment for acceptance of responsibility.  In addition to the factors cited above for why a defendant who puts the government to its burden of proof at trial should not receive this adjustment, Rhodes' post-trial statements show a total lack of remorse for his offenses.  On a recorded jail call from December 18, 2022, Rhodes told an attorney representing David Eastman,

90

an Alaska state representative whose eligibility for office was legally challenged because of his affiliation with the Oath Keepers and on whose behalf Rhodes remotely testified in that proceeding, "I am a political prisoner; all I did was exercise my free speech and to advocate for what I concluded were the policies that were necessary to stop an unconstitutional coup."   Ex. Sent-Rhodes-1.1.   In another call that day with the same person, Rhodes discussed his December 14, 2020 Open Letter to President Trump:

> In a post-Constitution system, where you don't have fair elections anymore, then what is your recourse?   What are the people supposed to do?   I mean you do want to exhaust all your remedies, but eventually you do want to be in a place where you have no recourse but to throw off an illegitimate government that's been taken over. I'm not sure if I want to get into that but that's just where we are.

Ex. Sent-Rhodes-2.1.   Far from accepting responsibility, Rhodes still presents a threat to American democracy and lives and does not believe he has done anything wrong.

c) <u>Upward Departure for Terrorism</u>

Defendant Rhodes stands out among the conspirators for the frequency and vehemence with which he urged his followers to use intimidation and coercion to influence and affect the conduct of government (to stop the lawful transfer of power from President Trump to President Elect-Biden) and to retaliate against government conduct (for failing to intercede to change the election result to his desired outcome).   U.S.S.G. § 3A1.4, cmt. n.4.   Rhodes repeatedly broadcast such messages, and each time he did so, he would cut and paste these messages across numerous different group chats and sites, to ensure these messages achieved maximum reach.

For example, in the days after the election, Rhodes advocated for the "Serbian plan," which included storming the seat of government, in his "Leadership Intel Sharing Secured" chat (also known the "OLD Leadership CHAT"), Gov. Ex. 6615.B (Msg. 1.S.696.12977), then posted the same message in the more exclusive and powerful chat for the "Friends of [President Trump

confidante Roger] Stone," *id.* (Msg. 1.S.345.49), and then posted the same proposed plan to the Oath Keepers website for all Oath Keeper members and affiliates to see, Gov. Ex. 1002.   Other evidence demonstrates that Rhodes instructed his co-conspirators to be prepared, if necessary, to secure the White House and use force against any government actors attempting to remove President Trump as a result of the presidential election.   *See* James Statement of Offense, ECF 60, at ¶20 ("In the weeks leading up to January 6, 2021, Rhodes instructed James and other co-conspirators to be prepared, if called upon, to report to the White House grounds to secure the perimeter and use lethal force if necessary against anyone who tried to remove President Trump from the White House, including the National Guard or other government actors who might be sent to remove President Trump as a result of the Presidential Election."); *see also* 3/7/23AM Tr. at 6107 (Michael Greene testifying that Rhodes "wanted an armed QRF in Virginia because he heard people talking about they were going to forcefully storm the White House and remove Trump because Trump was refusing to leave the White House").

Similarly, two days before the Electors met throughout the country to cast their votes on December 14, Rhodes spoke at the Jericho March in D.C. and warned that if President Trump did not stop the election "fraud," he and his followers would have to fight a "much more desperate, much more bloody war" Gov. Ex. 1004.1.   When President Trump failed to intercede in the Electoral College votes, on the evening of December 14, Rhodes posted to the "Leadership Intel Sharing Secured Chat," "Trump has one last chance to act.  He must use the insurrection act. Unless we fight a bloody civil war/revolution."   Gov. Ex. 6701 (Msgs. 1.S.696.15779, 1.S.696.15784).   A couple of hours later, Rhodes told those on the "GA OK General Chat," "If he doesn't use the Insurrection Act to keep a ChiCom puppet out of the White House, then we will have to fight a bloody revolution/ civil war to defeat the traitors."   Gov. Ex. 6803.2 (Msg.

1.S.233.1514).   That same day, Rhodes published his first Open Letter to President Trump on the Oath Keepers website, in which he warned, "If you fail to act while you are still in office, we the people will have to fight a bloody civil war and revolution."   Gov. Ex. 1005.

These are just a few examples from many similar patterns of messages and orders calling for the use of intimidation and coercion to influence and affect the conduct of government and to retaliate against government conduct.   The scope and scale of Rhodes' conduct in calling for and conspiring to perpetrate violence against the U.S. government to change the results of a presidential election and retaliate against Congress for certifying those results merits a departure under Note 4.   The government submits that an upward departure of six levels is appropriate, as it constitutes half of the twelve-level upward adjustment for defendants convicted of an offense that "involved, or was intended to promote, a federal crime of terrorism," and does not, like the adjustment, increase his criminal history score.

### 2.      Section 3553(a) Factors

The government's specific recommendation for Rhodes of a sentence of 25 years of incarceration is further justified by the nature and circumstances of Rhodes' individualized conduct in this conspiracy (§ 3553(a)(1)), his personal history and characteristics (§ 3553(a)(1)), and the need to protect the public from further crimes by Rhodes, (§ 3553(a)(2)(C)).

### a)   Nature and Circumstances of Rhodes' Conduct

Rhodes led a conspiracy of more than 20 U.S. citizens to forcibly oppose the lawful transfer of power following a presidential election, culminating in the conspirators attacking the U.S. Capitol and delaying Congress' certification of the Electoral College vote on January 6, 2021, and he then directed the conspirators to destroy evidence of their involvement in these crimes.   Such a direct assault on our democracy and total disregard for the rule of law warrants a substantial

sentence.

                    b) <u>Rhodes' Personal History and Characteristics</u>

In both his personal life and his nearly 12-year tenure as the leader of the Oath Keepers, Rhodes repeatedly showed a lack of respect for the authority of the U.S. government and the rule of law.   This history provides important context for his criminal conduct that further demonstrates the appropriateness of a substantial sentence.

In 2020, an assistant professor in the College of Emergency Preparedness, Homeland Security, and Cybersecurity at the University at Albany who studied Rhodes and the Oath Keepers described the group as follows:

> Since its founding in 2009, the right-wing antigovernment group known as the Oath Keepers has perceived a number of threats to the American people, most coming from the government. . . .   For years, the group has warned that the federal government is preparing to attack its own citizens, and it urges Americans to prepare for that conflict by gathering supplies and engaging in paramilitary training. . . .   These Americans, who view themselves as patriots, believe that they may need to take up weapons to fight the government.   In addition, Oath Keepers claims that many of its members are current and former military and police, yet it advocates for a set of political beliefs and actions that may lead those members to point their guns and the police and maybe even the military.

SAM JACKSON, OATH KEEPERS: PATRIOTISM AND THE EDGE OF VIOLENCE IN A RIGHT-WING ANTIGOVERNMENT GROUP (1st ed. 2020) (Ex. Sent-Rhodes-6), at 3-4.   In justifying his decision to write about the Oath Keepers at that time, Professor Jackson presciently explained,

> [T]his group, whose size is negligible when compared with the population of the United States, has been involved in several tense situations where firearms were openly carried and violence between Oath Keepers and law enforcement was narrowly avoided (such as the Bundy Ranch standoff in 2014).   Since 2016, Oath Keepers has engaged in violent conflicts with left-leaning activists, including in Berkeley and Boston.   More broadly, Oath Keepers exemplifies a style of American politics that views violence as a legitimate means to achieve political goals, at least under certain conditions.

*Id.* at 7-8.

The evidence at trial showed this historic hostility to government and openness to using violence to achieve political objectives by Rhodes and the Oath Keepers.   For example:

- Rhodes chose to launch the Oath Keepers on April 19, 2009 because that was the anniversary of the "Shot Heard 'Round the World" that started the American Revolutionary War.   Gov. Ex. 9108.

- In April 2014, Rhodes traveled to Bunkerville, Nevada, along with other Oath Keepers, to participate in armed patrols at the Cliven Bundy's ranch as Bundy and his family engaged in a standoff with Bureau of Land Management agents conducting operations to remove Bundy's cattle from public land.   11/7/22AM Tr. at 7274-77.   After that operation, in September 2014, Rhodes gave a speech at the Lamp of Liberty National Press Club, in which he warned that the operation at the Bundy Ranch showed that Oath Keepers would fire upon federal officers if they enforced what Rhodes believed to be unconstitutional orders.   Gov. Ex. 9113.

- Also in 2014, Rhodes and the Oath Keepers appointed themselves responsible for protecting businesses in Ferguson, Missouri, and positioned themselves with rifles on the roofs of buildings despite being asked to leave by the sheriff.   11/7/22AM Tr. at 7283-84.   One of the Oath Keepers who stood guard on the rooftops with long guns was Sam Andrews.   Ex. Sent-Rhodes-6 at 48.   The same Sam Andrews was featured in the "Hagmann Report" video Meggs and Vallejo disseminated to co-conspirators. Gov. Exs. 6863.1.1, 9514.1.1.   In the video, Andrews advocated for "patriots" to "get with your local militia, get your large group together and start moving to D.C., armed, because on January 4 we need to be en masse in D.C., armed, demanding—not

95

asking—demanding that we get a peaceful resolution to these voter corruption issues, these election corruption issues."   *Id.*

- North Carolina Oath Keeper John Zimmerman testified that in November 2020, Rhodes encouraged Oath Keepers to "dress up as elderly or be like a single parent pushing a baby carriage with some weapons in the baby carriage" to entice Antifa and Black Lives Matters groups to attack the Oath Keepers so "we can just give them a beat-down."   10/6/22AM Tr. at 1922-24.   As Rhodes explained in the recorded November 9 GoToMeeting, "If the fight comes, let the fight come.   Let Antifa go – if they go kinetic on us, then we'll go kinetic back on them. . . .   Because that brings the President his reason and rationale for dropping the Insurrection Act."   Gov. Ex. 1000.4.

A disconcerting theme underlying Rhodes' and the Oath Keepers' history, as well as their conduct on January 6, is the notion that their interpretation of the law is the only one that matters. In an early piece on the Oath Keepers published by *Police Magazine* in 2013, the Oath Keepers was described as "an organization for peace officers and soldiers who adhere strictly to the letter of the Constitution and swear not to obey any orders that they believe to be unconstitutional."[37] During his testimony at trial, Rhodes acknowledged that he was advocating for the President to set aside the results of an election because he believed that election to have been unconstitutional, despite no court finding of such.   11/7/22AM Tr. at 7389-92.   If the president did not intervene, Rhodes told his followers, they would need to take matters into their own hands.   *See, e.g.*, Gov. Ex. 6701 (Msgs. 1.S.345.957, 1.S.696.15529) ("If he doesn't [invoke the Insurrection Act], then we will have to fight against an illegitimate Biden regime and all of the deep stage with him.   It

---

[37] Ex. Sent-Rhodes-10, Dean Scoville, *Who Are the Oath Keepers*, POLICE MAGAZINE, Apr. 3, 2013, *available at* policemag.com/patrol/article/15347825/who-are-the-oath-keepers.

will be a bloody and desperate fight."); Gov. Ex. 6860 (Msg. 1.S.656.10102 ("And [President Trump] needs to know that if he fails to act, then we will.   He needs to understand that we will have no choice.").   On January 6, that is exactly what happened.   Given this history and point of view, it is hard to have confidence Rhodes would not do the exact same thing in the future if he believed the government was acting contrary to his interpretation of the law.

Rhodes has also shown disrespect for the government and rule of law, as well as alarming paranoid and violent tendencies, in his personal life.   Rhodes failed to file personal income taxes from 2008 through 2020.   Gov. Ex. 9111.   Additionally, according to Rhodes' estranged wife, Tasha Adams, Rhodes was always an "extraordinarily paranoid" person but became much more "militant" and started discussing "revolutions" more frequently around the time he founded the Oath Keepers in 2009.   Ex. Sent-Rhodes-3.1 (Excerpt from Recording of 4/21/23 government interview with Tasha Adams).   At this juncture, Rhodes also started stockpiling food supplies, weapons, and military gear.   *Id.*   Rhodes also used a backhoe to dig "escape tunnels" in his backyard for his "escape from the Feds."   Ex. Sent-Rhodes-3.5.

In addition, per Ms. Adams, Rhodes has a history of violence, emotional abuse, and erratic behavior towards his family.   Ex. Sent-Rhodes-3.2, 3.6.   Ms. Adams described incidents where Rhodes would point handguns at himself, at her, and at their children, threatening to kill himself and menacing his family.   *Id.*   When angry at his family, Rhodes would force them to participate in "trainings" that allowed him to physically hurt them.   Ex. Sent-Rhodes-3.7.   On one occasion, according to Ms. Adams, Rhodes choked their 14-year-old daughter.   Ex. Sent-Rhodes-3.8.   This conduct, when coupled with his lack of respect for the authority of the government and the rule of law, demonstrates Rhodes' dangerousness and likely unwillingness to comply with the law upon his release.

c)   The Need to Protect the Public from Further Crimes by Rhodes

As discussed in greater detail above, Rhodes used his powers of persuasion and his platform as leader of the Oath Keepers to radicalize more than 20 other American citizens to oppose by force the authority of the government of the United States.   Those who have studied Rhodes and who know him best suggest that such behavior is completely in character and unlikely to change.

According to Professor Jackson, who wrote the book on Rhodes and the Oath Keepers and studied thousands of their public Internet postings, "Oath Keepers uses different rhetorical strategies to target different audiences."   Ex. Sent-Rhodes-6 at 113.   The group sometimes invokes widely held American ideals, in order to build widespread support, while other times it employs more apocalyptical warnings and language to appeal to certain extremists who already fear infringement upon their rights by a tyrannical government.   *Id.* at 111-18.   Ms. Adams similarly described Rhodes as a "chameleon" who excels at finding a connection with whomever he is speaking to at any given time.   Ex. Sent-Rhodes-3.10; *see also* Ex. Sent-Rhodes-3.9 (explaining that Rhodes has always been a charismatic public speaker).

The Court saw evidence at trial of Rhodes' talent at finding and exploiting potential followers' manipulation points.   Co-conspirators Jason Dolan, Graydon Young, and Caleb Berry all provided powerful testimony about how Rhodes' framing of that moment in time—as a critical turning point in an ongoing battle against a tyrannical government—gave them purpose and meaning that was lacking in their lives for different reasons.   Rhodes' messages and speeches are clearly designed to radicalize his followers.

Back in 2020, Professor Jackson warned that Rhodes' and the Oath Keepers' rhetorical skill and adaptability "poses two threats to contemporary America:" (1) "a physical security threat"

by persuasively encouraging violent conflict, and (2) a more existential threat of "contribut[ing] to a broader discourse in American politics that pits the people against the government and that views violence as a legitimate form of resistance to government."   Ex. Sent-Rhodes-6 at 118-22. January 6 showed that those threats are credible.

Ms. Adams, who has known Rhodes for over 30 years, has cautioned that he is a dangerous master manipulator who has always sought opportunities to create chaos and foment violence, so that he may emerge as a leader/savior figure, and that he will continue to do so in the future.   Ex. Sent-Rhodes-3.3; *see also id.* at Ex. Sent-Rhodes-3.11 (stating Rhodes "will never be someone who was radicalized but he *will* radicalize others and he will keep doing that").   According to Ms. Adams, during her nearly three decades with Rhodes, he always seemed to be "looking forward to this collapse that might happen one day."   Ex. Sent-Rhodes-3.1.   She elaborated that Rhodes was energized by incidents like the 2014 standoff at the Bundy ranch and the civil unrest in Ferguson, and deeply disappointed when those events did not lead to war or other armed conflict.   Ex. Sent-Rhodes-3.4.   This history should give the Court grave concern about the likelihood that Rhodes will return to the same type of conduct upon release from incarceration.

And he may well have the platform to do so if he is released anytime soon.   Rhodes' influence has only grown with the media spotlight surrounding his criminal case, and he has sought to take advantage of this soap box.   From jail, Rhodes has given numerous media interviews without prior permission, against U.S. Marshals policy,[38] showing a continued disrespect for the

---

[38] USMS Policy Directive 18.1 Public Affairs—Media regulates how in-custody prisoner interviews should be approved.   Rhodes has participated in these interviews by using family or friends to make three-way calls, which was a violation of the facility where he was detained at the time.   *See* Ex. Sent-Rhodes-8 (excerpt from the inmate handbook provided to inmates by the facility where Rhodes was housing pending, during, and immediately after trial).

law.   In them, he has portrayed himself as a victim of political persecution and warned that the government will come after other "innocent" American citizens to suppress political opposition. *See, e.g.*, Ex. Sent-Rhodes-4.1 and 4.2 (December 27, 2022, interview with *Washington Times* journalist in which Rhodes said, "I'm innocent," called his trial a "political show trial" and "a warm-up for what they're going to do to Trump," alleged the jury found him guilty based on his "free speech," and reiterated that he now considers himself to be "a victim of January 6"); Ex. Sent. 5.2 (March 25, 2023, interview describing his prosecution as "a big warning to all of you: they are not going to stop, they're going to keep on going. . . .   That's the reason why they're coming after me was to silence me, . . . and you're not going to get a fair trial in Washington, D.C., if you're a Trump supporter."); Ex. Sent-Rhodes-7 (clip of interview prior to trial in which Rhodes says being tried by a D.C. jury is like having a trial in China or Russia); Ex. Sent-Rhodes-9.1 (April 29, 2023 interview with the Gateway Pundit saying his trial occurred before a "kangaroo court").

More alarmingly, Rhodes continues to invoke the words and deeds of the Founding Fathers in not-so-veiled calls for violent opposition to the government.   *See, e.g.*, Ex. Sent-Rhodes-5.1 (March 25, 2023, interview with "Cowboy Logic" podcast: "The 2020 Election was not just stolen but also grossly unconstitutional . . . so that was a coup . . . so we had a legitimate grievance on January 6."); Ex. Sent-Rhodes-9.2 ("You're going to have to stop it either through finding some way of wrestling control of the executive branch back into sane hands, but how do you do that? . . . The Founders' answer was they had no way to fix the system within the system—they had to separate themselves.   At risk of another charge, I'm gonna just leave it at that.").

Rhodes' own testimony at trial demonstrates that he remains a danger to the United States and those who defend it.   Rhodes affirmed that he sent numerous messages preparing his

followers to "fight" a bloody civil war after President Trump left power.   11/7/22 PM Tr. at 7380. He tried to defend himself by claiming that this forcible resistance was targeted at some unspecified future date and not prior to January 20.   *Id.* at 7375.   That should be cold comfort to this Court.   On the recorded conversation on January 10, 2021, Rhodes admitted that his only regret from January 6 was that he did not bring in the "rifles" to the Capitol to start the revolution right then.   *Id.* at 7485.

For his role in leading and organizing a conspiracy to forcibly oppose the authority of the government of the United States and an attack on the Capitol and Congress during the certification of a presidential election, and for his unabashed lack of remorse for these crimes, Rhodes presents a current and unique danger to the community and to our democracy that demands a sentence of 25 years (300 months) of incarceration.

## B. Kelly Meggs

Defendant Kelly Meggs literally led a military-style stack of fourteen conspirators to breach the Capitol building.   In advance of his trip to D.C., he used his position of power as the leader of the Florida Oath Keepers to convince his subordinates that there was nothing in their lives more important than opposing by force the lawful transfer of power following the 2020 U.S. Presidential Election.   In his own words, he told the group that it was "easy to chat here" on Signal, but "[t]he real question is who's willing to DIE," because "that's what the Patriots did by the thousands" during the Revolutionary War when they fought against the government they considered tyrannical.   Gov. Ex. 6860 (Msg. 1.S.656.9322).   Defendant Meggs made it clear to his co-conspirators and followers that this was *their* war.   A sentence of 21 years (252 months) of incarceration is compliant with the Sentencing Guidelines and necessary to satisfy the factors this Court must consider under 18 U.S.C. § 3553(a).

1.      **Sentencing Guidelines Analysis**

*Count One* **(Seditious Conspiracy, 18 U.S.C. § 2384)**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury or property damage) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference due administration of justice) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 33 | |

*Count Two* **(Conspiracy to Obstruct an Official Proceeding, 18 U.S.C. § 1512(k))**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 33 | |

*Count Three* **(Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2))**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury or property damage) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference due administration of justice) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 33 | |

*Count Four* **(Conspiracy to Prevent U.S. Officers from Discharging Duties, 18 U.S.C. § 372)**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |

| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 33 | |

***Count Eight* (Tampering with Documents or Other Objects, 18 U.S.C. § 1512(c)(1))**

| Base Offense Level: | 14 | §2J1.2(a) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(B) (especially probative record) |
| Cross Reference | | §2J1.2(c) |
| Base Offense Level (adjusted) | 21 | §2X3.1(a)(1) (6 levels lower than underlying offense) |
| Total | 21 | |

All of these counts group.   Accordingly, the total adjusted offense level for Meggs would be the highest of the offense levels for the five counts, which is 33.

The government also submits that an upward departure of four levels is warranted under Note 4, which would bring Meggs' total offense level to 37, for a Sentencing Guidelines range of 17.5 to 21.8 years (or 210 to 262 months) of incarceration.

a)   Additional Factual Support for the Specific Offense Characteristics

As the man who led Stack One to ascend the steps of the Capitol and join the mob assaulting officers and forcing their way through the East Rotunda doors, Defendant Meggs clearly caused and threatened injury and damage and deserves the eight-level upward adjust under Section 2J1.2(b)(1)(B).   Meggs also spent weeks in advance of January 6 priming his co-conspirators to be ready for violence on January 6, and then directed half of Stack One into the House side of the Capitol in search of Speaker Pelosi.   This conduct substantially interfered with the administration of justice and merits the three-level adjustment under Section 2J1.2(b)(2).

The Court should also find Meggs, like the other co-conspirators, participated in an offense

that was extensive in scope, planning, or preparation because of the length of the conspiracy, its geographic scope, the number of participants, and the planning for an armed force component involving the transportation of firearms from across the country.   U.S.S.G. § 2J1.2(b)(3)(C).   The PSR correctly finds that Meggs coordinated with other militia groups related to the Oath Keepers' actions at the Capitol on January 6, including with the Proud Boys and Three Percenters.   He coordinated with Jeremy Liggett of the Three Percenters and informed him that "we have made Contact with PB [Proud Boys] and they always have a big group.   Force multiplier."   Gov. Ex. 9514 (Msg. 2000.T.421.2).   He also discussed with Liggett the "good plan" for the Oath Keepers to "splinter off the main group of PB and come up behind them.   Fucking crush them for good." 10/13/22AM Tr. at 3091-93 (discussing Gov. Ex. 6868).   And Meggs coordinated directly with Enrique Tarrio, the leader of the Proud Boys, including calling and speaking with him for three-and-a-half minutes on December 19, and later bragging about it.   *See* Ex. Sent-Meggs-1.1 (Meggs on Facebook on December 25: "I've been communicating with Enrique Tarrio the leader"); *see also* 10/31/22AM Tr. at 5614-15 (Young testifying that when he offered to connect Meggs with a lower-level Proud Boy member, Meggs responded that he had connections at a higher level).   By January 6, Meggs had notified his co-conspirators about his coordination for January 6: "When Trump said those words earlier this week.   He wasn't talking to the soccer moms, the rah rah trumpers, or the stop the steal people.   He was talking to US!!   The 3%, the PB, and most importantly the Oath Keepers!!!!"   Gov. Ex. 9514 (Msg. 1.S.656.10513).   The scope of the conspiracy was extensive in large part because Meggs made it so.

      b)   Factual Support for the Upward Adjustments for Role in the Offense and Obstructing Justice

As the leader of the Florida Oath Keepers, Defendant Meggs played a central and important

role in the conspiracy, warranting a four-level upward adjustment under Section 3B1.1(a)(1).   In advance of their trip to D.C., Meggs was indisputably in charge of all other members of the group, including co-defendants Harrelson, Hackett, and Moerschel.   He encouraged others under his command to attend; coordinated with leaders from other states, including co-defendants Rhodes, Watkins, and Vallejo; and directed his underlings on what to do and what to bring.

On Christmas Day, Meggs told his followers that when they were in the nation's capital on January 6, "Patriots are going to stand and we have to lead them!," and then, when there were enough like-minded people with them, his group should "wait patiently and then be the leaders." Gov. Ex. 6860 (Msgs. 1.S.656.10074 - 78).   Young thought the group that he had joined was "organized and trained and motivated," 10/31/22PM Tr. at 5758—and being led by Kelly Meggs, *id.* at 5773.   Indeed, before the election, Meggs organized firearms training for himself, Harrelson, Hackett, and others, focused on "how to gunfight at close distance with a rifle in a fast and effective manner."   Gov. Ex. 4805.1; *see also* 10/12/22PM Tr. at 2958 (testimony about trainer describing rifles as "very offensive weapons").   And, on the eve of January 6, Meggs reminded and hyped his co-conspirators with video recordings of their rifle training, adding, "We are ready!!"   Gov. Ex. 9514 (Msg. 1.S.159.818); Gov. Ex. 9514.3 (video); *see also* 12/12/22PM Tr. at 867 (Court admitting Meggs' "hype video").

Meggs was also the boots-on-the-ground's liaison with the QRF.   *See* 1/3/23PM Tr. at 2561 (Berry testimony).   Meggs told Young that Meggs would arrange for the QRF to have an extra AR-15 firearm for Young's use.   10/31/22PM Tr. at 5769-70.   And his leadership continued into January 6.   Testimony from Jason Dolan, Caleb Berry, and Graydon Young made clear that Meggs was the leader of this group of conspirators as they breached the Capitol building.   There is even video evidence of Meggs using his outstretched right hand to give a "move forward" signal

to the conspirators as they are on the landing outside the East Rotunda doors, just before the group surged forward.   10/20/22PM Tr. at 4756-57 (testimony of Whitney Drew regarding Gov. Ex. 1503).

The PSR correctly finds Meggs' leadership role, PSR at ¶ 102, rejecting his argument that it was not a crime to recruit people to join the Oath Keepers and that most of his Florida-based co-defendants were already members of the Oath Keepers at the time the conspiracy began.   But Meggs misses the point.   The evidence at trial showed that Meggs actively recruited others to join the *conspiracy*.   Co-conspirator Jason Dolan testified that he understood Meggs to be recruiting others and encouraging others to recruit even more to fight against the government.   10/18/22PM Tr. at 4092-96.   Then, on January 6, Meggs personally led a group of fourteen conspirators in breaching the Capitol.   *See, e.g.*, Gov. Ex. 1500; 10/31/22PM Tr. at 5860 (co-conspirator Young's testimony that when "[w]e went into the Capitol," Meggs was "in charge").

The PSR also correctly rejects Meggs' argument that he did not destroy evidence.   He did, both electronic and physical evidence.   He deleted all of his Signal messages from his cell phone, which necessarily included all of the messages he sent or received during the period of the conspiracy.   As for physical evidence, Meggs discarded or hid his numerous semi-automatic rifles and rifle cases—some of which he transported from Florida to the D.C. area—to prevent the government from accessing them.   This conclusion is drawn from the following pieces of evidence.

- Meggs sent messages to Andrew Smrecek of Combat Art Training showing that Meggs owned rifles.   Gov. Ex. 4807.3.

- Photos and videos from Combat Arts Training show that Meggs possessed rifles (presumably his own, as Smrecek instructed him to bring his own).   Gov. Ex. 4801.4,

4802.2.

- Caleb Berry testified that Meggs had numerous heavy rifle cases in the bed of his pickup truck as the group drove from North Carolina to the DC area.   1/3/23PM at 2605-06.

- Surveillance video from the Comfort Inn shows Meggs with a luggage cart with at least one firearms case.   Gov. Ex. 1510.12.

- On December 19, 2020, Meggs sent a Facebook message about his "spike tactical AR"—a "good solid weapon."   Ex. Sent-Meggs-1.2.

- On January 9, Meggs sent a Facebook message about buying ammunition for an AK rifle.   Ex. Sent-Meggs-1.3.

- FBI Special Agent Craig Arney testified that despite a thorough search of Meggs' property on February 17, 2021, there were no semi-automatic rifles located.   10/13/22PM Tr. at 3251, 3266.

The conclusion that Meggs discarded or hid his numerous semi-automatic rifles and rifle cases between January 6 and February 17 is corroborated by Meggs' statements during this time period.   On February 4, he had a message exchange with Harrelson about deleting "all the talk of hiding the tools and shit."   Gov. Ex. 9086 (Msg. 7.S.34.21).   On January 22, 2021, he joked with his family in a text message about having lost his "gear" in a boating accident, Ex. Sent-Meggs-2A, and on a recorded March 24, 2021 call from the jail, he told his son that his "guns" were lost in the fire, Ex. Sent-Meggs-2B.   Florida Fish and Wildlife Conservation Commission, which tracks boating accidents in the state, has no record of a boating accident involving Meggs in 2020 or 2021.   And Marion County has no record of a fire at Meggs' property in 2020 or 2021 (though there was one in 2017).

107

c) <u>Upward Departure for Terrorism</u>

With the exception of Rhodes, Meggs stands out among the conspirators for his rhetoric in convincing the group that they needed to take action against the government, or "DIE," and for his conduct in actually and physically leading the fourteen conspirators to breach the Capitol building as part of that mission.   Meggs plainly used intimidation and coercion to influence and affect the conduct of government—to stop the lawful transfer of power from President Trump to President-elect Biden—and to retaliate against Congress for its decision to certify the election.

Meggs sent numerous messages to the "OKFL Hangout" Signal group chat in which he encouraged forcible opposition to the lawful transfer of power, including:

- his December 22 message, "It's easy to chat here.   The real question is who's willing to DIE , that's what the Patriots did by the thousands.   We are worried about getting the day off ," Gov. Ex. 6860 (Msg. 1.S.656.9322);

- his December 24 message, "[I]t's gonna be a WILD time in DC we gotta get the crowd going during the day.   I think we get everyone up good and close to the Capitol bldg so they can here is inside.   Then at night well whatever happens happens," *id.* (Msg. 1.S.656.9990);

- his December 25 message, "We need to make those senators very uncomfortable with all of us being a few hundred feet away.   Our peaceful protests need to have a little more teeth. They aren't listening," *id.* (Msg. 1.S.656.10107); and

- his January 3 confirmation of what he and his group intended to do at the Capitol on January 6: it "isn't a Rally," Gov. Ex. 6868 (Msg. 2000.T.289).

Three separate witnesses testified that it was Meggs' words and encouragement, coupled with their knowledge of Meggs' leadership position within the organization, that helped convince

them that their active participation in their group's forcible opposition to the government was morally justified.   Jason Dolan described how Meggs' message "100 guys go to prison, 1000 guys get in a battle, 10,000 guys get in a war" convinced Dolan to join with the group in heading to D.C. to oppose the government, knowing that Dolan might get "tagged with treason" for his actions.   10/19/22PM Tr. at 4418.   Dolan was "prepared to take up arms to fight against the government."   10/18/22PM Tr. at 4100.   Caleb Berry testified that, after reading this message from Meggs, he had a similar thought: "The more our numbers were, the better our chances of succeeding" in opposing the government.   1/3/23PM Tr. at 2548.   According to Berry, if they did not succeed, they would "go to prison or worse"; they "would be branded as criminals."   *Id.* at 2548-49.   Graydon Young explained that he read Meggs' messages about the "millions" of people supporting them, so "[o]nce they see it start," Meggs and the group would "wait patiently and then be the leaders."   10/31/22PM Tr. at 5757-58.   According to Young, he knew the group could not go up against the "corrupt government" with only a few hundred people, so these messages from Meggs (and similar ones from Rhodes) convinced him that Meggs and Rhodes had the numbers to actually accomplish their goals—to come to D.C. to fight against the government.   *Id.* at 5758, 5866.   Young now recognizes that Meggs encouraged him to act "like a traitor, somebody against my own government."   *Id.* at 5866.

As Berry, Dolan, and Young testified, Meggs indisputably led the group of fourteen conspirators on the Capitol grounds and into the Capitol building.   As Berry explained, Meggs instructed the group that they were going to try to stop Congress' vote count—and everyone complied.   1/3/23PM Tr. at 2618-19.   As Young explained, Meggs was in charge, and it was "common sense" what the group was doing as they followed him up the stairs and into the building to try to stop Congress' vote count; "it was like a Bastille type moment in history."   *See*

10/31/22PM Tr. at 5773, 5775, 5858-59.

Meggs explicitly called for the group to gather in numbers to oppose the government, and then when he got the Capitol building, heard it had already been breached, and had thirteen members of the conspiracy under his command, he led the group to forcibly breach the building to intimidate and coerce Congress to forsake its constitutional and statutory duties—i.e., using terror to "affect the conduct of government."

The government submits that an upward departure of four levels is appropriate under Note 4, as it reflects Meggs' substantial efforts to promote terrorism but is just below the halfway departure of six levels appropriate for Rhodes.

### 2.   Section 3553(a) Factors

#### a)   Nature and Circumstances of Meggs' Conduct

With the exception of Rhodes, Meggs played the most substantial role in the conspiracy and the group's assault on our democracy.   His leadership prior to and on January 6, his rhetoric in convincing his followers that they needed to take violent action or "die," and his actions in physically leading the group at the Capitol all demonstrate that he deserves a substantial sentence of incarceration.

#### b)   Meggs' Personal History and Characteristics and the Need to Protect the Public from Further Crimes by Meggs

Meggs has shown no remorse for his conduct.   Since he has been incarcerated, he has given numerous media interviews claiming that he is innocent and that the justice system is rigged and unfair.   For instance, on January 6, 2022, Meggs provided a telephonic interview to a local

Fox television station in Orlando,[39] during which he claimed he and his group "were just sitting out there, and singing and just hanging out, and we heard a loud boom and the doors opened up and people just started pouring in."   On March 8, 2023—just two months ago—Meggs provided a telephonic interview to "Real America's Voice,"[40] during which he complained about the jury selection process and that the "reason" the government has not released the full CCTV footage to the public is because it would show "the real truth."   He claimed that there were "only" four deaths on January 6 because the rioters stopped additional police brutality, and that the government does not want the public to know "what the police were doing that day."   *Id.*   He claimed that while there was violence on the west side of the building, on the east side, where he was, "they were letting people in."   *Id.*   Finally, when the host asked Meggs what he wanted the "real Americans" watching the show to know, he responded: "What you are seeing is controlled by the government," and he wants the truth to come out.   *Id.*   He also plugged the website controlled by his son: BThePeople.com.   *Id.*

Through that website, Meggs continues to show his leadership, advocating on behalf of other inmates "currently suffering from the persecution of January 6th."   Ex. Sent-Meggs-5; *see also* Ex. Sent-Meggs-6 (instructing his son, via a jail text message, to operate the website and publicly state that other people in the crowd at the Capitol were "antifa" or were federal agents designed to be agitators).   The BThePeople website links to his Meggs' own GiveSendGo fundraising page, on which he had raised over $158,000 and proclaimed, "I AM INNOCENT."

---

[39] *See* Ex. Sent-Meggs-3, *available at* m.youtube.com/watch?v=fv8Coa-WhSE&feature=you tu.be.

[40] *See* Ex. Sent-Meggs-4, *available at* americasvoice.news/video/apis0XudvGkk5Db/.

Ex. Sent-Meggs-7.[41]

Moreover, Meggs continues to blame the justice system rather than himself for his criminal conduct.   For instance, on December 1, 2022, on a recorded call from the jail, Meggs told the host of a radio show called Cowboy Logic that he had a "bullshit trial" because the "District [was] tainted" and the "jury [was] tainted."[42]   And he told his wife on a recorded call from the jail on January 14, 2023, that he did not have good jurors in his case, "[b]ecause it's D.C. no one cares about the truth."[43]   He claimed in an interview with a reporter on January 29, 2023, that he was "convicted of a thought crime," and that his prosecution is "evil."[44]

Meggs also continues to falsely claim that he was "set up" by law enforcement and Democrats.   For instance, on December 21, 2022, he told the Cowboy Logic host, "Pelosi set it up so it could happen.   It's a set up."[45]   And on January 13, 2023, he told his wife that evidence was starting to come out about how the FBI and police were the true "agitators" in the crowd.[46]

A sentence of 21 years' imprisonment (252 months) is warranted for Kelly Meggs.

### C.  Kenneth Harrelson

The Court should sentence Defendant Kenneth Harrelson to 15 years (180 months) of incarceration.   Just under his co-defendant Kelly Meggs in the hierarchy of the conspiracy,

---

[41]  givesendgo.com/meggs.

[42]  Ex. Sent-Meggs-8.

[43]  Ex. Sent-Meggs-9.

[44]  Ex. Sent-Meggs-10.

[45]  Ex. Sent-Meggs-11.

[46]  Ex. Sent-Meggs-12.

Harrelson was an early member of the group who held a leadership role, arranged multiple planning calls, and served as the group's "ground team leader" on January 6.

### 1.    Sentencing Guidelines Analysis

***Count Two*** **(Conspiracy to Obstruct an Official Proceeding, 18 U.S.C. § 1512(k))**

| | | |
|---|---|---|
| Base Offense Level: | 14 | §2J1.2(a) |
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role—manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

***Count Three*** **(Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2))**

| | | |
|---|---|---|
| Base Offense Level: | 14 | §2J1.2(a) |
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role—manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

***Count Nine*** **(Tampering with Documents or Other Objects, 18 U.S.C. § 1512(c)(1))**

| | | |
|---|---|---|
| Base Offense Level: | 14 | §2J1.2(a) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(B) (especially probative record) |
| Cross Reference | | §2J1.2(c) |
| Base Offense Level (adjusted) | 21 | §2X3.1(a)(1) (6 levels lower than underlying offense) |
| Total | 21 | |

All of these counts group.   The total adjusted offense level for Harrelson is therefore 32.

The government also submits that an upward departure of three levels is warranted under

Note 4, as Harrelson's offense conduct constituted terrorism.   This would bring Harrelson's total offense level to 35, for a Sentencing Guidelines range of 14 to 17.5 years (or 168 to 210 months) of incarceration.   The government's recommended sentence of 15 years (or 180 months) of incarceration is in the lower part of that range.

a)    <u>Factual Support for the Upward Adjustments for Role in the</u>
<u>Offense and Obstructing Justice</u>

The PSR correctly determines that Harrelson was a manager or supervisor in the criminal activity and thus the three-level upward adjustment in Section 3B1.1(b) applies.   Harrelson was a leader in the conspiracy under Meggs, and above Dolan.   *See* 10/18/22PM Tr. at 4078, 4107 (Dolan describing that Harrelson was the head of a team that included Dolan, and that Harrelson reported to Meggs).   Dolan and Berry both testified that Meggs coordinated with Harrelson via phone on the morning of January 6, and then Harrelson told Dolan and Berry what equipment to wear and bring (and what not to).   10/18/22PM Tr. at 4121-22 (Dolan); 1/3/23PM Tr. at 2615-16 (Berry).   Indeed, Dolan and Berry had donned plate carriers on the morning of January 6 before Harrelson instructed them to take off the military-style equipment.   Harrelson had personally provided Berry with the ballistic helmet to wear.   1/3/23PM Tr. at 2615.

Harrelson's title of "ground team lead" further supports this leadership adjustment.   On January 3, 2021, Meggs told the national group "DC OP: Jan 6 21" that he added Harrelson to that group and that Harrelson would be the "Ground Team lead in Florida."   Gov. Ex. 6863 (Msg. 1.S.159.695).   The following day, Meggs told the "OK FL DC Op Jan 6" Signal Chat, "Other state leaders can be in direct contact with Gator 6 [Harrelson] and then you handle your team as he needs."   Gov. Ex. 6870 (Msg. 85.S.193536.A).

Following the 2020 presidential election, Harrelson, who was already a member of the

114

Florida Oath Keepers and close with Kelly Meggs, stepped into more of a leadership role.   Indeed, while he had only been an attendee prior to the election, afterwards he became an "organizer" of several of the conspirators' GoToMeeting planning calls (and also started logging in using a moniker rather than his true name).   10/12/22Tr. at 2906-07.

Finally, Harrelson's leadership role in the conspiracy is reinforced by his actions and communications following January 6—many of which were not introduced at trial.   On January 20, 2021 (Inauguration Day), Harrelson sent an email to Meggs purporting to resign from the Oath Keepers itself, as well as from being the "POC" for "EFL" (the "point of contact for east Florida"). Ex. Sent-Harrelson-1.   Two hours later, he sent a similar "resignation" message, apparently attempting to distance himself from the "national" organization whose beliefs allegedly did not align with his own and whose members had "malicious intent."   Ex. Sent-Harrelson-2.   But this attempt at distance was a farce.   On March 4, just two weeks after Meggs was publicly arrested and charged in this case, Harrelson exchanged phone calls with Rhodes through Signal and then he sent a direct Signal message to Rhodes, apologizing for not having done a better job of monitoring the job Kelly Meggs was doing.   Ex. Sent-Harrelson-3.

A week later, on March 6, Rhodes sent Harrelson a long message on Signal about reforming the organization, and asked Harrelson to transmit it to others.   *Id*.   Harrelson both "hearted" the message and agreed to pass it on, *id*., which he promptly did to co-conspirator Jeremy Brown. Ex. Sent-Harrelson-4.   In the exchange with Rhodes, Harrelson referenced an allegation about Proud Boys leader Enrique Tarrio being an "FBI informant," Ex. Sent-Harrelson-3, apparently warning Rhodes to be careful in communicating with Tarrio.

Three days later, on March 7, Harrelson and Rhodes exchanged Signal messages sharing PDFs of court filings in this case.   *Id.*   And the following day, Rhodes and Harrelson exchanged

115

Signal messages that show Harrelson's true power within the organization and his managerial role within the conspiracy:   when Rhodes started a chat on Rocket Chat in March 2021—two months after Harrelson purported to "resign" from the organization and tried to disassociate himself from the actions of national leadership and Meggs—it was Harrelson who received a notification to his encrypted email account as an administrator.  *Id.*

The PSR also correctly determines that Harrelson obstructed justice, and thus the two-level upward adjustment in Section 3C1.1 applies.  *First*, as the jury already found, Harrelson obstructed justice by deleting Signal messages among himself and other co-conspirators to prevent the grand jury from accessing the messages.   Harrelson himself recognized on the night of January 6 that his Signal messages were potentially incriminating:   in a Signal chat among co-conspirators, when someone else criticized Rhodes and members of the group who had breached the Capitol, calling Rhodes a "dumbass" and the Oath Keepers "a huge fuckin joke," Ex. Sent-Harrelson-5 (Msg. 1.S.159.1304), Harrelson said he was in an "unsecured chat" with "blue falcons"—a military slang term for backstabbing comrades, 11/1/22AM Tr. at 6016-17.   He then deleted his own messages from the "DC Op Jan 6 21," causing them to be deleted from other participants' phones; the government was not able to recover the content of these messages.   *Id.* Harrelson's corrupt intent in later deleting all his Signal messages was to prevent the government from using those messages against him in a prosecution.

*Second*, as the PSR correctly finds, Harrelson lied to the magistrate judge at his detention hearing on March 15, 2021, in case 6:21-mj-1221-EJ (M.D. Fla.).   Specifically, he claimed under oath that he did not take photos or videos while he was inside the Capitol on January 6:

   Q:  Did you take photos and videos when you were inside the Capitol on your
        telephone?

116

A:  No.

Q:  You did not?

A:  Well, there's - - it didn't - - nothing was recorded.

Q:  Did you take photographs?

A:  No.

Q:  Did you see the picture of yourself inside the Capitol holding the phone up?

A:  Yes, ma'am.

Q:  And it's your testimony that nothing recorded on your phone.

A:  It was - - it didn't record for some reason.   There was issues with the phone.

Ex. Sent-Harrelson-6 (3/15/21 Det. Hrg. Tr. at 25-26).   But Harrelson did in fact record a video on his phone of himself and other co-conspirators, including Meggs and Watkins, inside the Capitol on January 6.   *See* Govt. Ex. 73.V.3.   And contrary to his testimony, Harrelson *knew* that the video recorded.   The evidence is clear that he sent that very video to Meggs on the afternoon of January 6, because at 6:13 p.m. that evening Meggs sent the video to the other co-conspirators on Signal with the caption, "Florida OK takes the Capitol."   Gov. Ex. 9094 (Msg. 1.S.159.1326); Gov. Ex. 6732 (Msg. 50.P).   Meggs and Harrelson both deleted the Signal message through which Harrelson transmitted the video to Meggs.   11/1/22AM Tr. at 5996-6000.   At the time of his detention hearing, Harrelson was aware that this video—which showed the violent entry of him and his co-conspirators into the Capitol, including his yelling "treason!" while doing so—would be highly incriminating, and thus his lie to the magistrate judge that he recorded no such video was a material fact.   Appellate courts have routinely upheld the obstruction enhancement under Section 3C1.1 for lying to a magistrate judge during a detention hearing in an effort to escape detention, *see, e.g.*, *United States v. Harkness*, 305 F. App'x 578, 585-86 (11th Cir. 2008); *United*

117

*States v. Harrison*, 42 F.3d 427, 431 (7th Cir. 1994); *United States v. Mafanya*, 24 F.3d 412, 415 (2d Cir. 1994), and the Court should do so here.

*Third*, the evidence showed that Harrelson, like Meggs, hid or destroyed the semi-automatic rifle and case that he transported from Florida to the QRF hotel and back.   On February 4, 2021, after the news of other co-conspirators' arrests was made public, Harrelson asked Meggs, "Is there anyway we can clear out the messages in our chats, I don't think it would be a bad idea, clear out all the talk of hiding the tools and shit," and Meggs responded by suggesting they could delete old chats and start new ones.   Gov. Ex. 9086.   The AR-15 semi-automatic firearm that Harrelson is seen on video using during a training in September 2020, and the rifle case he was seen wheeling through the QRF hotel on January 7, 2021, were *not* located during a search of Harrelson's house in March 2021, leading to a reasonable inference that he "hid" his "tools" that he brought to the D.C. area—i.e., disposed of his firearm and firearm case.   10/13/22AM Tr. at 3106-07.   Indeed, while Dolan specifically testified that Harrelson brought with him on the trip from Florida a large dark green rifle case that could hold at least two rifles, 10/18/22PM Tr. at 4113-14, it was not located at his house.

b)   Upward Departure for Terrorism

Harrelson's conduct was calculated to use force to affect government.   Given his leadership role within the organization and the conspiracy and the extent of his advance planning, Harrelson's conduct warrants a three-level upward departure for terrorism under Note 4.

During his violent entry into the Capitol building, Harrelson screamed "treason!"—an epithet directed at the Members of Congress whom he believed to be inside the building, doing their constitutional duties.   *See* 10/18/22PM Tr. at 4132-35 (Dolan testimony that as he and Harrelson and others were chanting "treason," he "wanted them [Members of Congress] to be

118

afraid of me").

On his way out of the building, Harrelson used both of his hands to assess the level of body armor worn by Capitol Police officers.   11/1/22AM Tr. at 5931-33; Gov. Ex. 7083 (CCTV video of Harrelson touching Officer Salke).   Then he gathered with his co-conspirators, still on the Capitol grounds, and explained both what he had learned and what the implications were for his group.   He learned that the police's body armor was light and would not stop a rifle bullet.   And he told his subordinates and co-conspirators that they erred by not bringing their guns and gas masks so they could have pushed farther into the building, in search of Members of Congress. *See* 10/31/22PM Tr. at 5784-86 (testimony of Graydon Young); 1/3/23PM Tr. at 2628-29 (testimony of Caleb Berry).

### 2.   Section 3553(a) Factors

#### a)   Nature and Circumstances of Harrelson's Conduct

With co-conspirator Dolan, Harrelson went to the Capitol earlier than the rest of Stack One and was part of the mob that overran the barricades and the Capitol Police officers who tried to form a line to keep the rioters at bay.   Harrelson then waited on the steps of the Capitol for Meggs and the rest of Stack One; upon their arrival, Harrelson signaled to them to come to Harrelson's position.   They complied.

Harrelson then worked as Meggs' right-hand to lead Stack One violently into the Capitol, eventually looking for Speaker Pelosi.   The Capitol Police and MPD officers were able to successfully keep the conspirators and rioters at bay while they evacuated the Members of Congress.   But even though the group had succeeded in halting the certification proceeding, Harrelson was not satisfied.   Presaging Rhodes' lament on January 10 about not having called in the firearms from the QRF, Harrelson told the co-conspirators gathered around him on the Capitol

grounds that they needed to have planned better to use rifles on the Capitol Police's relatively weak body armor.

b)    <u>Harrelson's Personal History and Characteristics</u>

Despite Harrelson's lengthy service in the military, he has shown a disregard for the law and our constitutional order.   He has been arrested multiple times, some for violent conduct.   PSR ¶¶ 142-45; 3/15/21 Tr. (Det. Hrg.) at 24.

Moreover, Harrelson's current claims that he has accepted responsibility for his conduct, *see* PSR ¶ 52, are belied by his actions in the months after January 6, including continuing to work for Rhodes and the Oath Keepers after pretending to resign from the organization, as explained above.   Far from reformed or contrite, on March 5, 2021, just days before his arrest, after co-conspirator Jeremy Brown directly told Harrelson on Signal, "I hope the deep state feels this pain!," Harrelson "hearted" the message and responded, "we need a f2f I'll call you."   Ex. Sent-Harrelson-5.

There is no indication that Harrelson was intending to submit to law enforcement even after he saw that Meggs had been arrested.   He watched for FBI surveillance of him and his house, sending photos of supposed government vehicles to Brown and received instruction from Brown to "go outside" to "talk about any plans or movements" to avoid detection.   *Id*.   And at the time of his arrest, Harrelson had a "go bag" packed with a pistol, magazines, survival guides, and a burner cell phone inside of a sandwich bag.   10/13/22AM Tr. at 3104-05.

Fifteen years (180 months) of incarceration is warranted for Kenneth Harrelson.

**D. Jessica Watkins**

In the lead up to January 6, motivated by a desire to thwart the peaceful transition of power, Watkins recruited individuals to her Ohio-based militia and drove with those individuals to D.C.,

120

bringing with them multiple firearms to be used as part of a quick reaction force.   On January 6, Watkins joined with the other individuals comprising Stack One, forcing her way inside the Capitol, and disrupting the certification proceedings takings place.   Once inside, Watkins led the group that moved north toward the Senate Chamber.   Since January 6, Watkins has derided the charges against her and eschewed any responsibility for her actions.   An 18-year (218-month) sentence is commensurate with the seriousness of her conduct and satisfies the factors the Court must consider under Section 3553(a).

### 1.   Sentencing Guidelines Analysis

***Count Two* (Conspiracy to Obstruct an Official Proceeding, 18 U.S.C. § 1512(k))**

| | | |
|---|---|---|
| Base Offense Level: | 14 | §2J1.2(a) |
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 33 | |

***Count Three* (Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2))**

| | | |
|---|---|---|
| Base Offense Level: | 14 | §2J1.2(a) |
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 33 | |

***Count Four* (Conspiracy to Prevent Officers of the United States from Discharging Duties, 18 U.S.C. § 372)**

| | | |
|---|---|---|
| Base Offense Level: | 14 | §2J1.2(a) |
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |

| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
|---|---|---|
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 33 | |

*Count Six* **(Interference with Law Enforcement Officers During a Civil Disorder, 18 U.S.C. § 231)**

| Base Offense Level: | 10 | §2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | §2A2.4(b)(1)(A) (physical contact) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 19 | |

Because all of these counts group, the total adjusted offense level for Watkins is 33.   With a three-level upward departure under Note 4 for terrorism, her total offense level would be 36, for a recommended sentence of 15.6 to 19.5 years (or 188 to 235 months) of incarceration.   Eighteen years (218 months) of incarceration is just above the mid-point of that range.

a)   <u>Additional Factual Support for Special Offense Characteristics</u>

Watkins' statements broadcast over the Zello channel during Stack One's march to the Capitol, *see* Gov. Ex. 1502, provide further support for the application of the Chapter Two special offense characteristics.   Specifically, as the Court already held, Watkins' statements "exposed her to criminal liability insofar as they are evidence of concerted activity ('We're sticking together and sticking to the plan.') directed at the Capitol building and the Electoral College certification ('We're moving on the Capitol now,' after being told by 1%Watchdog that 'Pence is doing his traitorous bullshit, and the election stealing progress . . . .').   A reasonable person in Ms. Watkins's position would have made these statements only if she believed them to be true."   Sept. 19, 2022 Order (ECF 322) at 3.   Indeed, Watkins' comments on the Zello recording once she breached the

122

Capitol building demonstrate her own awareness of the risk of injury and damage to people and property—risk that she and her co-conspirators directly created.  *See* Gov. Ex. 1502 (Watkins: "We are in the mezzanine.  We are in the main dome right now.  We are rocking it.  They're throwing grenades, they're freaking shooting people with paintballs, but we're in here.").

The extensive scope of Watkins' criminal conduct is reinforced by Watkins' exchange with a co-conspirator at 2:46 p.m., while she was in the Rotunda just before she led a contingent down the Senate hallway.  The co-conspirator told her, "Get it, Jess. Do your shit.  This is what we fucking lived up for.  Everything we fucking trained for."  Gov. Ex. 1502; *see also* Sept. 19, 2022 Order (ECF 322) at 7 (admitting these co-conspirator statements).

        b)      <u>Factual Support for the Upward Adjustment for Role in the Offense and Obstruction of Justice</u>

The PSR correctly determines that Watkins' offense level should be increased by four levels because she was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1.   In particular, her leadership role is evidenced by her "recruitment of accomplices," her "degree of participation in planning or organizing the offense," and "the degree of control and authority exercised over others."  *Id.*, cmt. n.4.

Watkins was the leader and founder of a separate Ohio-based militia and the primary organizer of co-conspirators who departed Ohio for D.C. in advance of January 6.   On January 4, Watkins drove from Ohio with Donovan Crowl, her second in command, and Bennie and Sandra Parker, two individuals Watkins recruited to her militia and connected to other Oath Keepers.  Watkins' role as the leader of the Ohio contingent is not in dispute.   Within her militia she was known as "Cap," for Captain.   Crowl texted Watkins, "You[] are My Captain.   This will

ALWAYS stand."   Gov. Ex. 6825.7 (Msg. 200.T.2.4).   In planning to go on an Oath Keepers training with the North Carolina Oath Keepers, Crowl affirmed that he needed Watkins' "sponsorship" and "blessing."   *Id.*   Crowl described Wakins as "My Boss" and that together they were "building a Coalition."   *Id.*

The results of the 2020 Election spurred Watkins to recruit individuals to her militia and to organize training missions.   *See* Gov. Ex. 6825.9 (Msg. 2003.T.267) (Dec. 5: "I signed up for Parler.   Trying to recruit.").   These efforts were evident in her conversations with an individual entered in Watkins' phone as "Recruit Leah."   On November 16, 2020, Watkins texted Recruit Leah, "Well, if Biden get the steal none of us have a chance in my mind. We already have our neck in the noose. They just haven't kicked the chair in yet."   *See* Gov. Ex. 6825.8 (Msg. 192.T.984). That same day, Recruit Leah asked Watkins, "So should I get comfortable with the idea of death?" *Id.* (Msg. 192.T.987).   Watkins responded, "That's why I do what I do."   *Id.* (Msg. 192.T.988). Watkins perceived military-type training as part of her broader mission to prepare for conflict following her disappointment in the outcome of the 2020 Election.   Watkins wrote Michael Greene, the operation leader for the Oath Keepers on January 6, "we have a Basic Training class (mandatory for Ohio Regulars) from Jan 3rd-9th . . . . I want my guys on the same page before innauguration.   If you'd like to involve any of your men, the offer is on the table."   Gov. Ex. 6617.A (Msg. 192.T.286).

In the lead up to January 6, Watkins recruited members of the conspiracy and instructed them to bring weapons to the D.C. area.   Specifically, on November 7, 2020, Watkins met Sandra and Bennie Parker in Columbus, Ohio, at a rally protesting the outcome of the 2020 Election. 3/3/23AM Tr. (21-cr-28) at 5434 (testimony of Bennie Parker).   Like "Recruit Leah," Watkins would communicate with Bennie Parker via text and added him to her phone as "Recruit Ben –

OSRM."   In addition to bringing her own weapons for the January 6 operation, Watkins instructed Sandra and Bennie Parker to bring weapons as well.   On January 3, Bennie Parker texted Watkins, "So I can bring my gun?"   Gov. Ex. 6825.13 (Msg. 192.T.1494).   At his trial, Bennie Parker testified that he in fact brought three guns with him when he departed Ohio with Watkins. 3/3/23AM Tr. at 5449.   These weapons included an AR-15 rifle.   *Id.*   Bennie Parker confirmed that he brought these guns because Watkins told him to.   *Id.*   Although the record shows Watkins and those she recruited ultimately left their weapons in Winchester, Virginia, she did so only after writing the OK FL DC OP Jan 6 Signal group on January 4, "We will be in VA @ 8pm.   Where can we drop off weapons to the QRF team?   I'd like to have the weapons secured prior to the Op tomorrow."   Gov. Ex. 6923 (Msg. 85.S.193808.C).   The record suggests, then, that Watkins and those she traveled with left their firearms in Winchester only because they did not receive further instructions on where to deposit them alongside the rest of the conspirators' firearms.

On January 6, Watkins further evidenced her role as a leader within the conspiracy. Specifically, Watkins provided updates on Zello, a push-to-talk walk-talkie phone application. She gave real-time updates on her attack on the Capitol building and her actions once inside.   At 1:50 p.m. she reported that "We have a good group.   We've got about 30, 40 of us.   We're sticking together and sticking to the plan."   Gov. Ex. 1502.   After Stack One divided in the Rotunda, Watkins was at the front of the group that advanced toward the Senate chamber, with Crowl directly behind her, and Sandra Parker behind Crowl.   Gov. Ex. 1505.   Watkins instructed her co-conspirators to move forward and literally led the way for them, urging them to "Push! Push! Push!" and "Get in there!" and admonishing that the police "can't hold us!"   *Id.*

A two-level enhancement is also merited pursuant to Section 3C1.1 for destroying evidence and lying while testifying.   After January 6, Watkins drove eight or nine hours to Caldwell's

house.   11/17/22AM Tr. at 9588.   Prior to the drive, she left her cell phone in Ohio and instructed

Crowl to do the same, deleted the Signal applications off her phone, and left a ProtonMail email

address and password with Siniff in Ohio.   *Id.* at 9588-89.   Watkins explained that she left her

password so that she could communicate with Siniff via drafts in ProtonMail.   *Id.*

At trial Watkins claimed she took these measures to avoid media attention.   These efforts,

however, were clearly calculated to prevent law enforcement and the grand jury from accessing

and then using the evidence against her.   Indeed, by the time Watkins returned to Virginia after

January 6, she assumed law enforcement would be, or already was, looking for her.   11/16/22PM

Tr. at 9416.   Because of this, Watkins testified she "left all [her] gear" and provided instructions

that "If the FBI or the sheriffs, whoever comes through . . . [she] will turn myself in."   *Id.*

Watkins deleted evidence in anticipation the FBI would be looking for her.   Her assertion that she

deleted information off her cell phone and communicated in email drafts solely to thwart media

attention is not credible.   Watkins took deliberate steps to conceal evidence that was material to

ongoing investigation and lied about her motivation for undertaking those efforts under oath.

Watkins' lies at trial extended beyond her motivation to hide evidence.   On the stand,

Watkins testified that after pushing down the hallway toward the Senate Chamber she "stopped

smiling.   It wasn't a fun moment anymore."   11/17/22AM Tr. at 9582.   Putting aside her

admission that the rest of the day, which had included forcibly entering the Capitol, was a "fun

moment," Watkins' assertion that her demeanor changed is belied by the evidence.   Video

evidence showed that after pushing down the hallway, Watkins was jovial and jubilant, smoking

marijuana in the Capitol Rotunda.   Gov. Ex. 9383.

Also at trial, Watkins claimed that before she arrived at the Capitol, she believed that "the

certification was over."   11/16/22PM Tr. at 9394.   Accordingly, she claimed that when she went

up the steps of the Capitol she "had no intents."   *Id.* at 9395.   Watkins also confirmed that she

went down the Senate hallway twice.   The first time she went down just because she was

"wandering around."   *Id.* at 9402.   When asked why she went down the hallway a second time,

she responded, "I just kind of, like, Hey, come on.   Let's go.   Woo.   Like you know, followed

the protestors that way."   *Id.* at 9403.   But in light of her leading her co-conspirators and

encouraging them to "push" past law enforcement, her claim is not credible.

Watkins' lies at trial were unambiguously intended to minimize or negate her conduct and

"reflect[ed] a willful attempt to obstruct justice."   U.S.S.G. § 3C1.1, cmt. n.2.   Indeed, her

statements on the stand are contradicted by her own words following January 6.   While still

minimizing her motivation for going inside the Capitol, after January 6, Watkins described her

actions as intentional and took credit for targeting the Senate.   On January 8, Watkins also wrote

on Parler, "We made it into the Senate halls and were met with teargas and riot police.   We never

had a chance at getting into the chambers to speak (what we wanted)."   Gov. Ex. 9080 (Msg.

2050.C.246).   And on the night of January 6, Watkins similarly wrote on Parler, "Yeah.   We

stormed the Capitol today.   Teargassed, the whole, 9.   Pushed our way into the Rotunda.   Made

it into the Senate even."   Gov. Ex. 6734 (Msg. 2050.P.86).   In text messages, Parler comments,

and on video in the immediate aftermath of January 6, Watkins took full credit for her actions

going inside the Capitol and her efforts to enter the Senate Chamber.   Her lies on the stand were

inconsistent with this reality.

### 2.    Upward Departure for Terrorism and Section 3553(a) Factors

Watkins' conduct was clearly "calculated to influence or affect the conduct of government

by intimidation or coercion, or to retaliate against government."   U.S.S.G. § 3A1.4, cmt. n.4.

Entering the Rotunda was not sufficient for Watkins.   Her true target, as evidenced by her

statements after the fact, was Congress.   Whether to intimidate or retaliate, her purpose in entering the Capitol was to penetrate one of the sanctuaries of American democracy.   And after January 6, she took credit for her actions, writing to Siniff on January 6 at 5:54 p.m., "We were in the thick of it.   Stormed the Capitol.   Forced our way into the Senate and House.   Got tear gassed and muscled the cops back like Spartans."   Gov. Ex. 6734 (Msg. 192.T.1521).   The government submits that an upward departure of three levels is therefore warranted.

In particular, the government's proposed sentence is merited given Watkins celebrated her actions on January 6, made additional plans to thwart the authority of the United States, and since her arrest, has been defiant in her contempt for the proceedings before this Court and for any findings of guilt.

Watkins holds the same sentiments she held in January 2021.   The evidence establishes that Watkins' actions on January 6 were motivated by her fervent belief that President Trump should remain in power and that she was justified in deploying force to derail the election of President-Elect Biden.   For example, on November 6, 2020, Watkins wrote on Facebook, "Infowars/Alex Jones put out the call for all Conservatives to go to every Statehouse in the country tomorrow at noon."   Gov. Ex. 6617.A (Msg. 2003.T.113).   When the other individual responded that they could not attend, Watkins was incredulous, and asked, "Is this not more important? . . . We are literally going to lose America, our democracy, our way of life if we don't stand up."   *Id.* Watkins went on to say, "I feel we need to make sacrifices to stop this Coup.   If we don't, we lose this country forever."   *Id.*   On the stand, Watkins reaffirmed these same sentiments. 11/17/22AM Tr. at 9593 ("We didn't have a free and fair election and people are concerned about it.   And that is not rhetoric.").

In the immediate aftermath of January 6, Watkins took credit for the hostilities that

128

unfolded at the United States Capitol.   At 5:58 p.m. on January 6, Watkins texted her mother "stormed the Capitol.   That's inside the Rotunda."   Gov. Ex. 6734 (Msg. 192.T.1525).   At 9:46 p.m., Watkins further wrote on Parler, "We stormed the Capitol, personally.   Got tear gassed and everything.   We won't back down in fear.   We are.   AMERICANS!"   Gov. Ex. 6734 (Msg. 2050.C.176).   The next day she wrote on Parler, "Word that [Vice President Pence] turned on America spread through the million plus sized crowd like wildfire.   We as AMERICANS did that. Don't give Antifa fags that much credit.   I was there.   I did it.   We PATRIOTS took the Capitol." Gov. Ex. 9080 (Msg. 2050.C.207).   The violence of the day, which was abundantly evident as it transpired, was even clearer in the hours after the siege of the Capitol and in the days that followed. Watkins, rather than disavowing the actions that took place, which would be consistent with her claim on the stand that she was "swept up" in the moment, delighted in what had occurred—and what she had helped accomplish.

Beyond gloating, Watkins made preparations to evade government intervention and to respond with force if necessary.   On January 11, 2021, Watkins wrote Crowl on Facebook, "We've been organizing a bugout plan if the usurper is installed."   Gov. Ex. 9079 (Msg. 2003.T.280.C).   She went on to describe preparations for "Something like 20+ Oathkeepers going to Kentucky mountains on hundreds of acres apparently.   Solar power, clean mountain spring, the whole 9.   About 2 hours south of Ben and Sandi's place, which is convenient."   Ex. 9079 (Msg. 2003.T.280.E).   She also explained that this position "Gives us the high ground, and makes tunneling out fighting positions great (above water line).   Be like the NVA and network tunnels." Gov. Ex. 9079 (Msg. 2003.T.281.C).

In statements following her arrest and since the commencement of court proceedings, Watkins has continued to eschew any responsibility.   On December 7, 2021, Watkins provided a

statement to the Gateway Pundit in which she dismissed her charges and alleged the true perpetrators on January 6 were the police.[47]   In particular she wrote, "Having seen videos yet unavailable to the public, I can attest to the improper responses of Police that led to the spiral of events that culminated in a riot.   Indeed, January 6th amounts to little more than a riot that was ultimately incited by Police."   *Id.*   She went on to argue that she and her co-defendants were the real victims of January 6:

> As for me and my codefendants, we have suffered our own pains from the injustices levied against us for our attendance that fateful day for which we remain incarcerated wrongfully . . . I helped two injured individuals, stopped people damaging the Capitol building and a Police vehicle, and obeyed every lawful order given to me . . . Our charges are false, the truth manipulated, and we will one day be vindicated.

*Id.*

In her recorded calls from the jail, Watkins has similarly dismissed the severity of her actions.   In a call on November 28, 2022, Watkins decried that "they could have certified it from a fucking conference room at a Raddison."   Ex. Sent-Watkins-2.   In the same call she affirmed "the whole thing is a joke to me" and reaffirmed her belief "the police incited a riot by brutalizing innocent people."   *Id.*   Similarly, on January 15, 2023, she said in a different call, "I hate January 6, it's a joke to me I make fun of it."   Ex. Sent-Watkins-3.   In the same call she went on to say, "boo hoo the poor little police officers, got a little PTSD, waaaa, I had to stand there and hold a door open for people waaaaaa."   *Id.*   A few days later, she once again blamed law enforcement for the actions on January 6, stating, "The police are responsible for inciting January 6 and they're responsible for half of their own injuries."   Ex. Sent-Watkins-4.

---

[47] Ex. Sent-Watkins-1 (Jim Hoft, *Courageous Jan. 6 Political Prisoner Jessica Watkins Speaks Out Against the Regime*, GATEWAY PUNDIT (Dec. 7, 2021)).

Taken together, Watkins remains unbowed by her conduct, and continues to hold the same beliefs she acted upon. She is therefore a danger to the public and "just punishment for the offense" mandates a significant sentence of 18 years (218 months).

## E. Roberto Minuta

New York Oath Keeper Roberto Minuta joined a seditious conspiracy to oppose by force the transfer of presidential power, and he contributed to the force. In his own words, he was prepared to die for his cause, and on January 6, as part of Stack Two, he led other Oath Keepers in storming into the Capitol, pushing past law enforcement officers, and screaming that it was his "fucking building." Justifying his actions as a war against "tyranny," Minuta warped the words of the Founding Fathers to impose his preferred outcome in the election on the rest of the country. His actions deserve significant punishment. A 17-year sentence (204 months) is compliant with the Sentencing Guidelines and necessary to satisfy the factors this Court must consider under 18 U.S.C. § 3553(a) in imposing a sentence.

### 1. Sentencing Guidelines Analysis

***Count One* (Seditious Conspiracy, 18 U.S.C. § 2384)**

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

*Count Two* (**Conspiracy to Obstruct an Official Proceeding, 18 U.S.C. § 1512(k)**)

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

*Count Three* (**Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2)**)

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

*Count Four* (**Conspiracy to Prevent Officers of the United States from Discharging Duties, 18 U.S.C. § 372**)

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

Because all of these counts group, the total adjusted offense level for Minuta is 32.   With the additional three-level upward departure for terrorism under Note 4, the Guidelines recommend a sentence of 14 to 17.5 years (or 168 to 210 months) of incarceration.   The Court should sentence Minuta to 17 years (or 204 months) of incarceration.

132

a)  <u>Additional Factual Support for the Specific Offense Characteristics</u>

Minuta's conduct falls squarely within the eight-level upward adjustment under Section 2J1.2(b)(1)(B).   On January 6, when it became clear Members of Congress would not halt the certification of the presidential election, Rhodes called on the Oath Keepers to take matters into their own hands, and Minuta answered that call.   He and four other Oath Keepers swerved around police barricades as Minuta announced that they were "headed to the Capitol" because "patriots storm[ed] the Capitol building" and because there was "violence against patriots by the DC police."   Gov. Ex. 1508.   Minuta and his group were wearing tactical gear including protective vests, ballistic gloves, and goggles, and he was joining what he called the "fucking war in the streets."   *Id.*

As they crossed into the restricted area and joined the mob outside the Capitol, Minuta and James led other members through throngs of rioters from the west side to the east side where they breached the building through the same East Rotunda doors Minuta's co-conspirators had breached about thirty minutes earlier.   *Id.*   Inside, Minuta and James tried to force their way into the Rotunda and assaulted law enforcement officers with a stolen riot shield.   Minuta and James both screamed this is "our fucking building," as they pushed past officers and deeper toward the Members of Congress.   *Id.*; *see also* Gov. Exs. 111.V.1, 1089.   MPD Officer Jackson testified at trial that the conduct of rioters like Minuta in that moment made him fear he "may not make it out" of the Capitol alive, 1/6/23AM Tr. at 3386, and Minuta's forceful pushing directly caused Officer Jackson's fellow officers to struggle, panting, "I can't breathe!" as they tried to clear the Rotunda, *id.* at 3402.   Minuta and James were eventually expelled by riot police officers who had begun clearing the building with chemical spray.   *Id.*   While exiting the building, Minuta held up two fingers and turned toward Capitol Police officers, threatening, "All that's left is the second

fucking amendment."   Gov. Ex. 1508.

In his videos and messages leading up to January 6, Minuta stated that he was prepared to die and that others should be too.   *See* Gov. Exs. 6773, 2004.V.4.   His actions on January 6 are consistent with these sentiments, warranting the sentencing enhancements.

> b)   Factual Support for the Upward Adjustments for Role in the Offense and Obstructing Justice

As a manager or supervisor of other individuals across the conspiracy to oppose the transfer of presidential power by force, Minuta deserves a three-level upward adjustment for his aggravating role in the offense.   U.S.S.G. § 3B1.1(b).   The PSR correctly finds this role.

In Rhodes' own words, Minuta was "our NY Oath Keepers leader" and "one of my most trusted men."   Gov. Ex. 6773 (Msg. 1.S.209.29).   He repeatedly recruited others to prepare to act, turning to Facebook, *see, e.g.*, 2004.V.4, and the Oath Keepers' secure chat forum on Rocket Chat, *see, e.g.*, Gov. Ex. 6773, with messages like the following: "Fellow patriots . . . If you were called to action on short notice, what would you be scrambling to organize . . . Get that gear set up and ready to deploy on a moments notice. . . . We must OVERTAKE the streets in massive numbers. . . . This is our country and the time is now or never to save the republic And preserve what is left of our liberties."   Gov. Ex. 6773 (Msg. 2200.2).   Minuta meant every word of what he said, as evidenced by what he did next.

By mid-December 2020, Minuta was sharing with an acquaintance in the Proud Boys organization that the "Oathkeepers president is pretty disheartened.   He feels like it's go time, the time for peaceful protest is over in his eyes.   I was talking with him last night."   Gov. Ex. 6773 (Msg. 245.T.1.1).   On the "DC OP: Jan 6 21" Signal group chat, which Rhodes described as "THE DC op thread for all leadership coming in, from multiple states, and together with the overall DC

op leadership," Gov. Exs. 9514, 9557 (Msg. 1.S.159.108), Minuta organized members of the Oath Keepers to stay at the same hotel and reserved rooms for co-conspirators Mark Grods, Brian Ulrich, and Rick Jackson.   12/20/22AM Tr. at 2148.   Upon arriving to the D.C. area late on January 5, Minuta went to the Hilton Garden Inn in Vienna—the same hotel where Rhodes and other leaders of the conspiracy stayed, including James, Michael Greene, and Kellye SoRelle. 12/20/22AM Tr. at 2167.

On January 6, Minuta was a manager with James of the co-conspirators in Stack Two.   He led them to the Capitol in their golf carts, later with their hands on each other's shoulders on the west side, and then again as they stormed inside the Capitol.   Gov. Ex. 1508.   Throughout the day on January 6, Minuta was in direct communication with Rhodes and operated with James who repeatedly was in communication with Rhodes and Greene.   Gov. Exs. 6740A, 6742A.   Upon exiting the Capitol, Minuta remained at the top of the steps and returned to the entrance to regroup his co-conspirators including Ulrich and Walden and rendezvous with the rest of the Oath Keepers after calling Rhodes.   *Id.*

Likewise, a preponderance of the evidence demonstrates that Minuta deleted evidence warranting the adjustment under Section 3C1.1, cmt. n.4(D).   On January 7, Minuta sent a video of himself and other co-conspirators inside the Capitol lobby and Rotunda to the "DC OP: Jan 6 21" group chat.   Later that day, Minuta sent another message stating, "Couple faces exposed in the last video that didn't want to be shown.   Sorry, had to delete footage from inside," evidencing that he had deleted a video he had previously posted to the chat to avoid incriminating others by showing their faces inside.   Gov. Ex. 9652 (Msg. 1.S.159.1494).   The video still existed on other co-conspirators' phones, proving that the video Minuta sent was, in fact, the video he recorded while screaming that the Capitol was his "fucking building" and then assaulting officers to push

further into the building.   Gov. Ex. 111.V.1.   Minuta objects to this adjustment, admitting that he deleted a video but stating, without evidence, that he only did so at someone else's instruction. There is sufficient evidence to conclude that he, in fact, deleted this video, because it, in his own words, showed faces inside the building and showed him and his co-conspirators committing their crimes.   In any event, at the time Minuta was arrested, he had replaced his phone altogether, and his new phone did not have the video or the Signal application at all.   *Id.* at 4030-33.

Accordingly, the upward adjustments under U.S.S.G. § 3B1.1(b) (aggravating role— manager or supervisor) and U.S.S.G. § 3C1.1 (obstruction of justice) are both factually supported for Minuta.

### 2.   Upward Departure for Terrorism and Section 3553(a) Factors

An upward departure of three levels is warranted under Note 4 for terrorism.   As early as November 7, the day most major media outlets called the election, 12/19/22AM Tr. at 1833-34, Minuta announced that "the integrity of our democratic system is fucking dead."   Gov. Ex. 2004.V.4.   Standing by the election results was not an option, because doing so would lead to the "boot of the government on your fucking face for eternity."   *Id.*   "We are already in a civil war," he concluded, "choose a side."   Gov. Ex. 6773 (Msg. 2004.P.283.11).   In Minuta's own words, he was prepared to use force against the government, and he was prepared to die.   "The last line in the sand is the Second Amendment," he warned, "[and] we are fucking past midnight with the tyranny and it is just time to restore freedom."   Gov. Ex. 2004.V.4.   He continued, "Millions will die.   So what?   Get your fucking soul ready.   Get right with God. . . . I'm not afraid, and I'm ready to fucking go. . . . don't just sit there and bitch.   Do something about it."   *Id.*   In fact, Minuta purchased 5,500 rounds of ammunition in the lead up to January 6.   Gov. Ex. 9515.

Beyond calling for "revolution," Gov. Ex. 6773, and imploring others to prepare for death

against the government as detailed above, the evidence illustrated Minuta's focus on combatting the government directly.   By late December 2020, Minuta replied to a Parler post by Proud Boys leader Enrique Tarrio (@NobleLead), which featured the text "Lords of War" and "#J6 #J20" alongside a photograph of Minuta and several Proud Boys in D.C. on December 12, surrounded by flames, with, "Bad ass! . . . Honor to stand with you guys.  See you Jan 6." *Id.* (Msgs. 2055.P.1-2).   And, on January 6, Minuta repeatedly screamed that the corrupt government was the enemy that day.   While speeding to the Capitol, Minuta claimed that the police were committing violence against the "patriots" who were storming the building.   Gov. Ex. 1508.   And after breaching the Capitol grounds, Minuta yelled at officers securing the perimeter, "[T]hey stand here and they know their government is completely criminal, completely corrupt, and they fuck us over." *Id*.   According to co-conspirator Ulrich, Minuta screamed at officers to join him and the others rather than guarding their perimeters.   1/10/23AM Tr. at 3859.   And after Minuta assaulted officers inside the Capitol, Minuta marched back through the doors he entered and, on the way out, referenced the need to use firearms against the government, yelling at a Capitol Police officer, "All that's left is the second fucking amendment."   Gov. Ex. 1508.   The scope and scale of Minuta's conduct in calling for and conspiring to perpetrate violence against the U.S. government to change the results of a presidential election and retaliate against Congress for certifying those results merits a departure under Note 4.   An upward departure of three levels is appropriate.

Minuta's actions against the government on January 6 were consistent with his stated belief that government action he disagreed with was "tyranny," warranting violence.   In April 2020, for example, Minuta posted to Facebook his desire for violence and readiness for death in light of various government-implemented coronavirus pandemic restrictions:

I know that I have developed a moral obligation to continue to fight, preach, warn

others.   Make no mistake, this is a battle of the soul.   This is spiritual warfare, the most rudimentary form of Good VS Evil.   You must chose a side.   You must either fight for humanity, and a future of shared prosperity, or sell your soul to the prince of darkness, and a future of serfdom.   My soul is prepared.   Fear . . . only remains in the prospect of failing my children and humanity in this glorious, biblical battle.   I am aligned with the Prince of Peace, and have accepted that there is NO PEACE WITHOUT WAR. . . . Mount the fuck up.

Ex. Sent-Minuta-1.1.

Similarly, on April 12, 2020, Minuta posted: "Time to oppose tyranny.   This IS still America, land of the free.   It is our duty as able bodied Americans to resist and remove unconstitutional tyrants.   #SicSemperTyrannis."   Ex. Sent-Minuta-1.2.   (Later, on January 6, 2021, while Minuta breached the Capitol building, Rhodes would stand just outside the Capitol and repeat the same threat directed at the Members of Congress inside.)   "The power grab is so over the top, when do we put our foot down?," Minuta added, "this is some revolution provoking tyranny."   *Id.*

On May 6, 2020, Minuta directed his ire toward government regulation of firearms, posting on Facebook about his January 2020 actions to pressure elected officials that would nearly mirror what he and his co-conspirators concocted for January 6: "I was in Virginia with a literal army of militia, surrounding the Capitol building armed for a revolution."   Ex. Sent-Minuta-1.3.   While he claimed there was no violence at this event, he would only escalate when he focused on the presidential election a year later.   In fact, he warned at the time, "[w]e need this to continue or else we are done as a 'land of the FREE.'"   *Id.*

On May 30, 2020, Minuta focused again on government coronavirus restrictions he opposed.   According to a flier for an event he organized, he opened his tattoo shop "in direct defiance of Gov. Cuomo's Executive Orders; this is a display of defiance against a tyrannical dictator, and a reminder that our rights shall not be infringed."   Ex. Sent-Minuta-2.   In a podcast

advertising his planned crimes, Minuta implored law enforcement to join him rather than enforce the law: "We will be respectfully demanding law enforcement to uphold the oath they took to the constitution and to stand in solidarity with We the People in defiance of highly unconstitutional orders that directly violate their oath."   Ex. Sent-Minuta-3.   At the bottom of the flier, Minuta included the Oath Keepers logo with the phrase, "Guardians of the Republic."   Ex. Sent-Minuta-2.   In his podcast, Minuta stated, "I beg of the . . . [local] police, state police, sheriff's departments . . . FBI, swat team . . . You cannot enforce these supposed laws.   They're not laws.   We do have a constitution.   We do have a Bill of Rights.   And I implore you to recall the oath that you all took to defend and uphold that constitution against enemies foreign and domestic."   Ex. Sent-Minuta-3.   Just six months later, Minuta would make the same demand of law enforcement guarding the Capitol building before he resorted to violence and forcefully pushed past them inside the Rotunda to try to get to the Members of Congress.   Gov. Ex. 1508.

Rhodes also appeared on the podcast with Minuta.   Ex. Sent-Minuta-3.   Rhodes stated, "Roberto was in Virginia back in Jan 20, we ran into each other in the streets.   We were both there for the big, massive open carry protest against their tyrant governor, Governor Northam."   *Id*. "Robert, we're proud of him as a member of Oath Keepers," Rhodes added, "I'm going to designate him as a lifetime Oath Keeper. . . . [H]e earned it.   He's earning it right now.   We're honored to have him as a member of Oath Keepers."   *Id*.   Minuta concluded the interview by referencing his status as a "Three Percenter": "If you consider yourself a Three Percenter, you're labeling yourself as someone that's ready to take the ultimate stand when the time comes.   So if you're not willing to take the stand when we're here and this is the final peaceful battle, then you're

proving yourself to be not what you represent."[48]   *Id*.

On September 19, 2020, Minuta posted on Facebook about the continued need to fight: "If you will not fight for right when you can easily win without blood shed; if you will not fight when your victory is sure and not too costly; you may come to the moment when you will have to fight with all the odds against you and only a precarious chance of survival.   There may even be a worse case.   You may have to fight when there is no hope of victory, because it is better to perish than to live as slaves."   Ex. Sent-Minuta-1.4.   Minuta followed through with his warning of more violence, taking the fight to the nation's capital a few months later.

Minuta's March 2021 arrest did not temper his ire toward the government.   Rather than demonstrate remorse after being arrested, he repeatedly and publicly dismissed the investigation as simply "political."   One year after January 6 and nine months after his arrest, for example, Minuta appeared in a Newsmax "documentary" film titled "Day of Outrage," in which he espoused views about the fraudulent election and spread lies to the wider public, and then disseminated those lies later on Twitter.   Ex. Sent-Minuta-4.1.   He falsely claimed in the Newsmax film that January 6 "was supposed to be one of the most epic peaceful protests in recent history," Ex. Sent-Minuta-5.1, despite the evidence at trial revealing that he knew by December 19, 2020, that Rhodes had already announced the "time for peaceful protest [was] over," Gov. Ex. 6773 (Msg. 245.T.1.1). He falsely claimed that the there was no evidence of him being violent, Ex. Sent-Minuta-5.2,

---

[48] Minuta also has a tattoo of the roman numeral "III" on his chest, which he photographed and posted on Facebook.   Ex. Sent-Minuta-7.   A group of individuals, some of whom associate with militias, identify as "Three Percenters" (also known as "III%" or "3%"), based on their view that only three percent of American colonists took up arms against the British during the American Revolution.   Some Three Percenters liken the present-day United States Government to British authorities that infringed on civil liberties in the period leading up to and during the American Revolution.   Many independent or multi-state militia groups incorporate "III%" into their names.

despite the evidence at trial revealing that he assaulted officers while pushing deeper into the Rotunda, crushing one of the officers so that he could not breathe.   Gov. Exs. 111.V.1, 9601. Finally, he falsely claimed "we assisted law enforcement" to "lead [them] to safety," Ex. Sent-Minuta-5.3, despite the evidence at trial revealing that he watched the line of officers leave the building and said in a recording, "That's the police being escorted by the people . . . cause it's our fucking building."   Gov. Ex. 1508.

Minuta continued to spread lies and sow distrust in the criminal investigation into him and other Capitol riot defendants throughout 2022 and leading up to his trial.   On Twitter in April 2022, for example, Minuta referred to the investigation as a "malicious prosecution," Ex. Sent-Minuta-4.2, and to Capitol riot defendants as "J6 POLITICAL PRISONERS," Ex. Sent-Minuta-4.3.   In December 2022, while the trial was ongoing, Minuta posted to Twitter that he "never thought [he'd] see our country so fallen."   Ex. Sent-Minuta-4.4.

To this day, there remains a Give Send Go linked to his Twitter account.   Ex. Sent-Minuta-4.5.   The link pushes a false narrative surrounding his charges that it refers to as "absurd accusations":

> Roberto Minuta is one of 11 people in America charged with seditious conspiracy due to the events of Jan 6. . . . These new charges were vindictively added almost exactly on the one year anniversary of the J6 event. . . . The absurdity and extreme politicization of this case is incomprehensible, and will have dramatic and dire effects on the freedom of all Americans if not adequately fought in the courts. . . . This is the government setting the precedent to label patriots, or even people with dissenting views form the official narrative of the totalitarian regime, as domestic terrorists. . . . The Government has been weaponized to destroy dissidents, the J6 persecution and prosecution is how they will set the standard.

Ex. Sent-Minuta-6.   Over two years after his and his co-conspirators' actions on January 6, Minuta still harbors no remorse.   To him, this is a political hit job, and he is an innocent victim.

A period of incarceration of 17 years (204 months) is necessary to prevent Minuta from

continuing to forcibly oppose the authority of the U.S. government and execution of its laws simply because he disagrees with those laws.

### F. Joseph Hackett

A Florida Oath Keeper who supervised others in the weeks leading up to January 6, Hackett traveled to D.C. in a caravan with other Oath Keepers, including Kelly Meggs and Kenneth Harrelson.   1/3/23PM Tr. at 2602.   Once in D.C., Hackett, like his co-conspirators, donned military gear and forced his way inside the United States Capitol.   Hackett's conduct on January 6 was the manifestation of his dismay at the outcome of the 2020 Election, and his pledge to "demand the arrest of corrupt politicians," whom he perceived as participating in an "unconstitutional election."   Gov. Ex. 6776 (Msg. 1.S.656.7992).   A 12-year (144-month) sentence of incarceration is commensurate with the seriousness of his conduct and satisfies the factors the Court must consider under 18 U.S.C. § 3553(a).

#### 1.      Sentencing Guidelines Analysis

***Count One*** **(Seditious Conspiracy, 18 U.S.C. § 2384)**

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

***Count Two*** **(Conspiracy to Obstruct an Official Proceeding, 18 U.S.C. § 1512(k))**

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense | +2 | §2J1.2(b)(3)(C)   (extensive   in   scope,   planning,   or |

| characteristic | | preparation) |
|---|---|---|
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

### *Count Three* (Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2))

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

### *Count Four* (Conspiracy to Prevent Officers of the United States from Discharging Duties, 18 U.S.C. § 372)

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

### *Count Eleven* (Tampering with Documents or Other Objects, 18 U.S.C. § 1512(c)(1))

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(B) (especially probative record) |
| Cross Reference | | §2J1.2(c) |
| Base Offense Level (adjusted) | 21 | §2X3.1(a)(1) (6 levels lower than underlying offense) |
| Total | 21 | |

After grouping, the total adjusted offense level for Hackett is 32.   With the additional one-

level upward departure for terrorism under Note 4, Hackett's total offense level is 33, for a recommended sentence of 11.25 to 14 years (or 135 to 168 months) of incarceration. The government recommends a middle-of-the-Guidelines-range sentence.

a)   <u>Additional Factual Support for the Specific Offense Characteristics</u>

Hackett was aware force was a critical component of the conspiracy and prepared to participate in offensive violence against the government. He traveled from Florida surrounded by co-conspirators who brought multiple AR-15 semi-automatic rifles to the QRF hotel. And there is a reasonable inference Hackett brought his own. First, Hackett owned an AR-15 semi-automatic rifle and trained with it alongside these very co-conspirators. Gov. Ex. 4805.1 (record showing that Combat Art Training participants brought their own rifles); Gov. Ex. 9514.3 (video). Second, Caleb Berry testified at trial that he helped load ten "heavy" long-gun cases, which he assumed contained firearms, into and then out of the bed of Kelly Meggs' pickup truck. 1/3/23PM Tr. at 2606-07. When Berry first got into the truck at Ranger Doug Smith's compound the morning of January 5, there were four other individuals storing gear in the bed of the truck: Kelly Meggs, Connie Meggs, Hackett, and "WhipIt." *Id.* at 2607. Indeed, Berry testified that Hackett brought at least one firearm (a semi-automatic handgun) with him on the trip, 1/4/23AM Tr. at 2752, though he did not identify a specific rifle that belonged to Hackett. Hackett was present when the group then loaded these weapons and other equipment on a luggage cart at the QRF hotel, *id.*, and on January 7, he assisted in loading the multiple firearms cases back in the car prior to their return to Florida. *See* 1510.12; 1/3/23PM Tr. at 2611-12.

In May 2021, the FBI recovered an AR-15 semi-automatic rifle from Hackett's home. *See* Ex. Sent-Hackett-1 (photo). That firearm is consistent with the type of rifle that would be transported in the rifle cases observed on the luggage cart that Hackett was pushing on January 7.

Gov. Ex. 1510.12.   Hackett's Glock pistol and case, Gov. Exs. 63 and 69, were located in Hackett's attic, mingled with AR-15 rifle ammunition, 1/9/23PM Tr. at 3702-09—reinforcing the premise that Hackett brought his AR-15 rifle to the QRF hotel.

Hackett's involvement in the transportation of weapons is all the more concerning given his training alongside Meggs and Harrelson for "offensive" firearm deployment, *see* Gov. Ex. 9514.3, demonstrating his mindset heading into January 6.   On the night of January 5, alone in his hotel room with Berry, Hackett confessed that he had traveled to D.C. to "fight[] for his daughter," because "he was afraid that our country was going to the point of no return."   1/4/23AM Tr. at 2765; *see also* 10/18/22PM Tr. at 4087-89 (co-conspirator Dolan testifying that Hackett's messages convinced him to "fight" against the government).

b)    <u>Factual Support for the Upward Adjustment for Role in the Offense and Obstruction of Justice</u>

The PSR correctly determines that Hackett was a manager or supervisor.   First, Young explained where Hackett fell on the Oath Keepers hierarchy: Young was "immediately subordinate" to Hackett (Ahab), and Hackett was in turn subordinate to Kelly Meggs. 10/31/22AM Tr. at 5706-07.   Young also described how the Oath Keepers were organized into "CPT groups"—explained by other witnesses to be community preparedness teams—and that these teams were to train locally with firearms.   *Id.* at 5710.   Young testified that Hackett (Ahab) was "in charge" of his group.   *Id.*   Similarly, Berry testified at trial that Hackett was more experienced than Berry and closer to Meggs in describing why Hackett's statement that he was deleting evidence of January 6 from his phone caused Berry to "follow in suit."   1/4/23AM Tr. at 2758.   In his leadership role, Hackett provided instructions to his co-conspirators in the lead up to January 6, and thereafter.   Namely, on December 19, 2020, Hackett, using ProtonMail address

145

"johnwillow23," emailed Young a handwritten cursive note titled, "Comms Test."   Gov. Ex. 4653.   In the note, Hackett detailed the location of the rally point and specified they should write "messages in cursive to eliminate digital reads."   *Id.*   In the body of the email, Hackett wrote, "I believe we only need to do this when important info is at hand like locations, identities, Ops planning."   *Id.*   Hackett similarly posted to the OKFL Hangout chat, "Phone call in a nutshell: Ops planning for DC.   If not going to dc go to your state capital and support our president.   Then odd details with no specifics regarding rally points, the importance of being low profile or where colors and be a target for unfriendlies.   Opening and closing prayers.   Discussed more f2f and thorough vetting."   Gov. Ex. 6776 (Msg. 1.S.656.4389).   In sum, in advance of January 6, Hackett provided instructions to his co-conspirators on how to evade detection based on their communications and provided logistical updates and support.

Beyond organizing and directing co-conspirators, Hackett described his efforts to recruit others to the Oath Keepers following the November 2020 election.   On November 7, 2020, Hackett sent a message to the "OKFL Hangout Chat," which included co-defendants and other co-conspirators, in which he stated, "Just spoke to a marine at the gun shop young guy who just got back from Afghanistan.   Gave him my number and Oathkeepers.org website and hope to get him involved.   It's a great place to recruit.   Most people are pro gun and most of them are pissed off."   Gov. Ex. 6776 (Msg. 1.S.656.3904).   Hackett's reference to being "pissed off" as a favorable recruitment characteristic is notable.   The intended purpose of Hackett's recruitment effort was undoubtably tied to their shared anger at the outcome of the 2020 Election.

A two-level enhancement is merited pursuant to Section 3C1.1 for Hackett's efforts to destroy and conceal evidence.   First, on January 7, 2021, on the drive back to Florida, Hackett told Berry he was deleting incriminating evidence off of his phone, specifically, a picture from

inside the Capitol.   1/3/23PM Tr. at 2630-32; 1/4/23AM Tr. at 2754-58.   As mentioned above, Berry testified that he decided to "follow in suit and delete stuff off of my phone."   *Id.*   Second, despite Hackett's active presence in multiple Oath Keeper Signal groups, Signal was not present on his phone.   1/9/23PM Tr. at 3721.   However, examination of Hackett's phone revealed that it contained artifacts associated with Signal, indicating that Signal had previously been installed on the same device.   *See* 1/9/23PM Tr. at 3723; Gov. Ex. 9705.   This evidence established that Hackett deliberately deleted evidence related to January 6, to include all of his Signal conversations and incriminating photographs.

c)      Upward Departure for Terrorism

The government further recommends a one-level increase pursuant to Note 4.   After forcibly entering the Capitol building as part of Stack One, Hackett separated from the broader group and moved with other co-conspirators toward the House of Representatives, ultimately positioning himself directly outside House Speaker Nancy Pelosi's office.   Hackett's actions inside the Capitol were not random or spontaneous, they were intentional and foreshadowed.   On December 16, 2020, Hackett told those on the OKFL Hangout chat, "We need to demand the arrest of corrupt politicians for colluding with foreign enemies and blatantly ignoring the legal process and an unconstitutional election," and advocated for "show[ing] up on their doorsteps to make citizens arrests."   Gov. Ex. 6776 (Msg. 1.S.656.7992).   On January 6, Hackett acted on these precise sentiments, targeting not only Congress, but forcing his way toward the leader of the House of Representative's office.   The motivation animating Hackett's assaultive conduct is not in doubt, and a one-level increase pursuant to Note 4, is consistent with the departure's language, and compelled by the facts of his offense.

147

### 2.   Section 3553(a) Factors

Here, the need to "protect the public from further crimes of the defendant" is considerable given Hackett demonstrated, months before January 6, a consciousness of guilt and a seriousness of purpose.   Notably, Hackett took multiple steps to conceal his identity shortly after the November 2020 Election.   Prior to November 3, Hackett's GoToMeeting display name had been Joe Hackett, thereafter, he changed his name to J.W., and eventually to Ahab.   *See* Gov. Ex. 6858. Hackett also began using a virtual private network, which disguises one's IP address. 10/12/22PM Tr. at 2924.   On November 17, Hackett obtained a Text Me account so that when he communicated on Signal, he was not using his actual phone number.   Finally, in the immediate aftermath of January 6, Hackett changed his Signal moniker from Ahab to Faith, and eventually left the Signal groups altogether.   This pattern of obfuscation revealed Hackett's awareness that his actions exposed him to criminal liability and yet he proceeded unabated.   Indeed, more than almost any of his co-conspirators, Hackett attempted at every turn to hide his identity, and encouraged others to follow suit.   The nature of Hackett's offense combined with his deception and sophistication merits a significant sentence to serve as a deterrent and to promote respect for the law.

A 12-year (144-month) sentence is warranted for Joseph Hackett.

### G.  David Moerschel

Florida Oath Keeper David Moerschel agreed with Kelly Meggs and others that he must take whatever steps necessary, up to and including force, to stop the transfer of power.   He traveled to D.C. in a caravan with other Oath Keepers, including Kenneth Bittner, the individual tasked with serving as the Florida QRF on January 6.   12/20/22AM Tr. at 2099; Gov. Ex. 1531. Moerschel believed the Oath Keepers had a responsibility to go to D.C. on January 6 armed with

firearms, and he, in fact, staged an AR-15 rifle and a Glock .45 caliber semi-automatic handgun in the QRF hotel outside of D.C.   On January 6, like his co-conspirators, Moerschel donned military gear and forced his way inside the United States Capitol.   Afterward, Moerschel demonstrated a clear consciousness of guilt by deleting evidence.   A 10-year (120-month) sentence of incarceration is appropriate given the seriousness of his conduct and satisfies the statutory factors.

       **1.**      **Sentencing Guidelines Analysis**

*Count One* **(Seditious Conspiracy, 18 U.S.C. § 2384)**

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 29 | |

*Count Two* **(Conspiracy to Obstruct an Official Proceeding, 18 U.S.C. § 1512(k))**

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 29 | |

*Count Three* **(Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2))**

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 29 | |

***Count Four*** **(Conspiracy to Prevent Officers of the United States from Discharging Duties, 18 U.S.C. § 372)**

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 29 | |

These counts group. Accordingly, the total adjusted offense level for Moerschel is 29. After adding the one level for an upward departure for terrorism under Note 4 the total offense level is 30. The Guidelines therefore recommend a sentence of incarceration between 8 and 10 years (or 97 to 121 months).

a)      <u>Additional Factual Support for the Specific Offense Characteristics</u>

Ahead of January 6, Moerschel messaged other Florida Oath Keepers, "IMO [in my opinion], any members in DC should absolutely have firearms somewhere (legally) nearby." Gov. Ex. 9514 (Msg. 1.S.656.9846).   And he directly connected his plans to have firearms at the ready to his intent and effort to stop the certification of the presidential election from moving forward, adding in the same message, "if all legislative options fail on Jan. 6, [President Trump] will invoke the [Insurrection] act—probably the same day." *Id.*   Moerschel traveled to D.C. with Bittner, "Gator Kane," whom the co-conspirators had designated to serve as the Florida Oath Keepers' QRF leader on January 6, 12/20/22AM Tr. at 2099; Gov. Ex. 1531, and Moerschel armed the QRF with his own AR-15 rifle and Glock .45-caliber handgun, Gov. Exs. 122-26, 1518; 1/10/23PM Tr. at 4016-17.   To Moerschel, "[m]y battle pistol is a glock 21 in .45 caliber.   I want the extra knock down power."   Gov. Ex. 9514 (Msg. 1.S.656.10441).   Leading up to January 6, Moerschel's actions made it reasonably foreseeable that he and his co-conspirators' actions to

obstruct the congressional proceeding would lead to physical injury or property damage, making the Section 2J1.2(b)(1)(B) specific offense characteristic applicable.

b)   <u>Factual Support for the Upward Adjustment for Obstructing Justice</u>

A preponderance of the evidence shows that Moerschel deleted evidence after his and his co-conspirators' actions on January 6, and thus a two-level enhancement is merited pursuant to Section 3C1.1, cmt. n.4(D).

The evidence illustrated that Moerschel knew as soon as January 7 that he needed to disassociate from his co-conspirators.   At 9:35 a.m. that day, Moerschel messaged about the "QRF" and instead of answering questions about where his co-conspirators' gear was, Moerschel told Harrelson and other co-conspirators to "DM [direct message] Kane," the Florida QRF team lead.   Gov. Ex. 9652; 01/10/23PM Tr. at 4139-40.   That was his last message to any of the group chats with his co-conspirators.   *Id.*   As FBI CART Examiner Katherine Cain testified at trial, Moerschel was part of multiple Signal group chats with other Oath Keepers, but an examination of his phone demonstrated that he no longer had the Signal application at the time of his arrest. *See* Gov. Exs. 9701; *see also* 1/9/23PM Tr. at 3732-33.   More obviously, further examination of Moerschel's phone revealed that there were no messages of *any* kind from the time period of November 13, 2020 to January 16, 2021—mirroring the timeline of the charged seditious conspiracy.   *Id.*   This evidence established that Moerschel deliberately deleted evidence related to January 6, to include all his Signal conversations in which he and his co-conspirators discussed their criminal objectives and agreement.   For this, a two-level enhancement is warranted.

2.   **Upward Departure for Terrorism and Section 3553(a) Factors**

The government further recommends a one-level upward departure pursuant to Note 4. Moerschel's conduct was unambiguously intended to "influence or affect the conduct of

151

government by intimidation or coercion, or to retaliate against government conduct." *Id.*  Apart from being part of the Florida Oath Keepers' Signal group chats where Rhodes, Meggs, and Hackett, among other co-conspirators, discussed the need to use force to stop the transfer of power and take the fight to Members of Congress, Moerschel himself messaged his agreement. Moerschel and his co-conspirators grew impatient with every legal mechanism that failed to overturn the election, and Moerschel asked on December 24, "Trump knows this is a communist takeover.   What's he waiting for?"   Gov. Ex. 9514 (Msg. 1.S.656.9844).   In fact, as noted above, Moerschel planned on acting himself "if all legislative options fail on Jan. 6."   *Id.* (Msg. 1.S.656.9846); *see also id.* (Msg. 1.S.656.9849) ("Jan. 6 must be [President Trump's] personal resolved date to act.   Why else would he call us up?"); *id.* (Msg. 1.S.656.10246) ("Gentleman, Trump is going to make his big move on Jan. 6.   Be prepared.").   And Moerschel intended to act *with force* against the government to achieve his desired electoral outcome, noting on January 1, "Maybe our role on Jan. 6 (as Patriots) their will be more kinetic and less for 'show of force.'" *Id.* (Msg. 1.S.656.11302).   Further evidencing his intent to act against the government, Moerschel warned his co-conspirators that law enforcement may be an obstacle, messaging, "We will need to be very cognizant of whose side the police are on.   Because the assumption that they are on the side of the righteous may be flawed."   *Id.* (Msg. 50.S.4.43).   To Moerschel, the legal process was insufficient, so he prepared alternative means to overturn the election: "Lawyers always think the answer is legal.   Warriors always think the answer is a gun battle."   *Id.* (Msg. 1.S.656.9854).   On January 4, he loaded his AR-15 rifle and Glock handgun into a car and drove in a caravan with his co-conspirators to the nation's capital.

On January 6, Moerschel put his words to action.   He had previously told his co-conspirators that "Pence is literally our last hope in congress," and Rhodes announced on January

6 that the Vice President was not stopping the certification.   Gov. Exs. 1500, 1500.2.   So, Moerschel marched to the Capitol and forcibly stormed inside as part of Stack One.   Inside, Moerschel separated from the broader group and moved with Meggs and Hackett and other co-conspirators toward the House of Representatives, ultimately positioning himself directly outside House Speaker Nancy Pelosi's office.   The motivation animating Moerschel's conduct is not in doubt, and a one-level increase pursuant to Note 4 is consistent with the departure's language and compelled by the facts of his offense.

Notably, Moerschel traveled from Florida with an AR-15 rifle and his preferred "battle pistol" with "extra knockdown power," intending them to be used to stop the transfer of presidential power.   He was calculating, not careful, when he staged those weapons of war with his travel companion and Florida QRF team just outside of D.C. pointed at the Capitol in case he needed them.   And he was savvy, not safe, when he pulled up his neck gaiter and switched his Velcro patches around while he attacked the Capitol with his co-conspirators.   Gov. Exs. 1500.2; 5702; 5706.   Moerschel acted deliberately and criminally when he stormed inside the Capitol and hooked arms with co-conspirator Berry to lead him forward before they marched toward the House chamber.   Gov. Ex. 1500.2.

The nature of Moerschel's offense combined with his willingness to arm his operation merits a 10-year (120 month) sentence, in part to serve as a deterrent and to promote respect for the law.

### H.  Thomas Caldwell

Virginia Oath Keepers affiliate Thomas Caldwell committed himself to Rhodes and the goal of stopping the transfer of presidential power immediately after the election.   He offered to, and did, provide logistical, operational, and intelligence support to the Oath Keepers.   Leading up

to January 6, he organized an unprecedented threat to the District and to the electoral process: an armed Quick Reaction Force staged outside of D.C., stocked with rifles, ammunition, and co-conspirators prepared to ferry those weapons to boots on the ground.   Throughout his crimes and trial afterward, he deleted evidence, lied to law enforcement, lied to the Court, and encouraged others to do the same.   Caldwell's conduct warrants a 14-year (168-month) sentence of imprisonment.

### 1.        Sentencing Guidelines Analysis

***Count Three*** (**Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2)**)

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C)   (extensive   in   scope,   planning,   or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

***Count Thirteen*** (**Tampering with Documents or Other Objects, 18 U.S.C. § 1512(c)(1)**)

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(B) (especially probative record) |
| Cross Reference | | §2J1.2(c) |
| Base Offense Level (adjusted) | 21 | §2X3.1(a)(1) (6 levels lower than underlying offense) |
| Total | 21 | |

The two counts group.   The total adjusted offense level for Caldwell is therefore 32.   The government also submits that an upward departure of three levels is warranted under Note 4, bringing the defendant's offense level to 35, for a recommended sentence of 14 to 17.5 years (168 to 210 months) of incarceration.   The government's recommended sentence of 14 years is at the

low end of that range.

a)      Additional Factual Support for the Specific Offense
Characteristics, Upward Adjustment for Role in the Offense, and Upward
Departure for Terrorism

As early as November 7, 2020, Caldwell called for "civil war" and proceeded to coordinate directly with Rhodes on "ops," "intel," and "OPSEC [operational security]."  Gov. Exs. 6923 (Msg. 2006.T.1.292), 6618.A (Msg. 1.S.321.2), 6619 (Msg. 1.S.313.45).   He also reached out to members of other militias such as the "3 Percenters" in preparation for January 6.   Gov. Ex. 6923 (Msg. 22.T.15.16).   He provided his home as a rendezvous point for the co-conspirators in early operations, coordinated with two regional Oath Keepers leaders (Watkins from Ohio, and Paul Stamey from North Carolina), provided routes into the city, and organized places for the co-conspirators to stay.   After coming to D.C. with Rhodes and others in November for an early operation, Caldwell presciently noted, "We could have burned the congress to the ground if we had wanted to."  Gov. Ex. 6919 (Msg. 2007.T.3.8).   "Next time (and there WILL be a next time)," he warned, "we will have learned and we will be stronger.  I think there will be real violence for all of us next time."   Gov. Ex. 9316 (Msg. 22.T.14.20).

Caldwell was right, and the reason for that violence was clear:  he knew what Congress was doing on January 6, and he intended to stop it.   Gov. Ex. 6923 (Msg. 2001.C.2.D) ("It begins for real Jan 5 and 6 on Washington D.C. when we mobilize in the streets.   Let them try to certify some crud on capitol hill with a million or more patriots in the streets.   This kettle is set to boil….").   Indeed, Caldwell believed his group must "smite" those responsible for "blatantly rigging an election and paying off the political caste."   *Id.* (Msg. 2001.C.2.B).

Leading up to January 6, Caldwell helped organize an armed QRF, managing the logistics and personnel staged with rifles and other weapons outside of D.C., in an effort to support his and

his co-conspirators' goal of stopping the transfer of power and obstructing the congressional proceeding.   He staged the QRF at a hotel strategically structured and located for his and his co-conspirators' "heavy weapons."   Gov. Ex. 6923 (Msg. 22.T.15.26); Gov. Ex. 6923 (Msg. 22.S.553.A) ("[T]his room gives us a spot to stage materials should things go high order.   10 minutes from the Potomac.").   And he searched for boats to transport the firearms from Virginia across to the boots on the ground in D.C.   Gov. Ex. 6923 (Msg. 22.T.15.26) ("Can't believe I just thought of this: how many people either in the militia or not (who are still supportive of our efforts to save the Republic) have a boat on a trailer that could handle a Potomac crossing?   If we had someone standing by at a dock ramp (one near the Pentagon for sure) we could have our Quick Response Team with the heavy weapons standing by, quickly load them and ferry them across the river to our waiting arms…").   Apart from the direct harm reasonably foreseeable from stockpiling weapons for use in D.C., his management of the QRF empowered his co-conspirators to boldly charge forward in storming the Capitol with the knowledge that they were armed with an arsenal nearby.   *See* Gov. Ex. 6923 (Msg. 22.T.13.32) ("Ranger made me think, though he didn't say it in some many words, that maybe I should be planning a MUCH bigger op, for like when we have to roll into town to actually save the Republic.").   Caldwell's only regret from January 6, similar to Rhodes', was that the QRF was not called in.   After returning to the Comfort Inn on the evening of January 6, Caldwell messaged, "[i]f we'd had guns I guarantee we would have killed 100 politicians."   Gov. Ex. 6623 (Msg. 22.T.27.2894).

Further, on January 6, Caldwell himself yelled threats to Congress just outside the Capitol before he charged the inauguration stage.   When someone asked what the punishment for treason was, Caldwell screamed "Death!," adding, "We should get rid of all of them [Congress].   This is our chance!   Put them in Guantanamo.   About 15 minutes with each one of them they'll be doing

156

the dance.  I say they are all criminals."  Ex. Sent-Caldwell-1.  He then joined the mob that breached the west side and "assaulted the Capitol."  Gov. Ex. 6734 (Msg. 22.T.6.1).  Caldwell and his spouse recorded themselves detailing that they fought through tear gas, went through barriers and rubber bullets, and that Members of Congress had fled "because they are pussies." Gov. Ex. 1500.  On the evening of January 6, Caldwell confirmed that his intent was to threaten Congress during the riots, writing, "It was a great time. . . . They [Congress] ran off and were spirited away through their underground tunnels like the rats they were."  Gov. Ex. 6623 (Msg. 22.T.27.2894).  And, on January 6 and afterward, Caldwell continued to coordinate with others, including Watkins and Crowl, as they breached the Capitol and later discussed hiding themselves and their gear.

b)   Factual Support for the Upward Adjustment for Obstructing Justice

Throughout the time period of the conspiracy and the trial itself, Caldwell lied.  And he did so repeatedly:

- About his identity.  Gov. Ex. 9315 (December 26, 2020: "I am not kidding about another identity.  I need your help.  Then, after I have a new license, birth certificate and burner phone, we'll get same for YOU.  I have plans I haven't even told you about. Doesn't matter who is President.  There will be payback.  Imagine what you could do if you couldn't be traced.").

- About his past.  *Compare* 11/15/22AM Tr. at 8739 (claiming he served on classified missions and assignments), *with* 11/15/22PM Tr. at 9042-43 (denying serving in classified locations or receiving extensive training).

- About his intentions for the future.  *Compare* 11/15/22PM Tr. at 9010 (describing January 6 as a "new beginning" for the country), *with* Gov. Ex. 9317 (agreeing to attend

157

a militia training after January 6 where the training leader stressed the need to kill local North Carolina Democrats).

- About meeting with Oath Keepers on the morning of January 6. *Compare* 11/15/22PM Tr. at 8996 ("Q: So the morning of the 6th, you weren't near any Oath Keepers at all? A: No."), *with* Gov. Ex. 22.V.3 (video from Caldwell's phone showing him and his spouse with numerous Oath Keepers co-conspirators).

- About whether he observed violence on January 6. *Compare* 11/15/22PM Tr. at 8861 (claiming repeatedly that there were no "barriers"), 9001 (claiming he did not observe violence or know he was participating in a riot), 9006 (claiming he did not learn of any violence until "many days later" after January 6), *with* Gov. Ex. 6923 (Msg. 22.T.26.3) (Caldwell's January 6 message were he describes climbing through scaffolding "meant to stop us"); Gov. Ex. 1500 (video of Caldwell and his wife detailing the "tear gas," "barriers," and "rubber bullets" they fought through), Gov. Ex. 6734 (Msgs. 22.T.6.1, 22.T.27.2883) (Caldwell's January 6 message about "assault[ing] the Capitol" and having a "great time"); Gov. Ex. 6734 (Msg. 2002.T.79B) (Caldwell's January 6 where he recounts watching Proud Boys leading violence against law enforcement).

Moreover, Caldwell encouraged his co-conspirators to lie. After January 6, he told Watkins, "If any other shit should ever come down, you were with me all the time and I'll swear to it." Gov. Ex. 9079 (192.T.1624). Of course, Watkins was *not* with Caldwell the whole time on January 6, Gov. Ex. 1500, and Caldwell's claim at trial without any supporting evidence that he was simply quoting an unnamed "B movie" from the 1940s is incredible. 11/15/22PM Tr. at 9025. His lies do not only represent his attempts to obstruct justice, but also his complete disregard for the oath he took before taking the stand.

158

Finally, Caldwell obstructed the grand jury investigation by deleting all messages he had with co-conspirator Crowl and deleting or unsending approximately 180 individual Facebook messages.   From their timing and context, the deleted messages appear to relate to January 6 and his efforts to procure boat transportation for the armed QRF.   *See, e.g.*, Gov. Ex. 2001.T.1 at 135-38, 174, 196-99, 230-31.   Evidence introduced through a Facebook custodian and an FBI agent established that the photos, video, and messages Caldwell "unsent" from his Facebook account were deleted on January 14, the same day that media coverage of the attack on the Capitol began to focus on Watkins, and when she and Crowl fled Ohio to hide out at Caldwell's home in Virginia at Caldwell's instruction.   11/2/22PM Tr. at 6544-56.

### 2.   Section 3553(a) Factors

#### a)   Caldwell's Personal History and Characteristics

The nature and circumstances of Caldwell's offenses are well documented above as support for the special offense characteristics and upward departures under the Guidelines.   His history and characteristics of inciting violence and weaponizing others also warrants a significant sentence.

##### i.   Caldwell's Military Service

Caldwell betrayed his country and his oath.   He served in the military for more than twenty years and then worked as a civilian in law enforcement.   Caldwell held security clearances, interacted with high levels of the government, and worked on classified missions.   *See* 11/15/22AM Tr. at 8739, 8741, 8756, 8769.   And yet, in the days after the 2020 Presidential election, Caldwell joined a conspiracy to prevent the transfer of power and then on January 6 obstructed the electoral college vote.   Far from mitigating, his prior record of employment with the United States government should be an aggravating factor.   He understands the country is a

159

nation of laws but has chosen not to obey them and has vowed instead to seek "payback" against his enemies.

ii.  Caldwell's Violence Against Political Opponents

Caldwell planned for and encouraged violence against what he believed was a sweeping, socialist revolution overtaking the country's elections and government.   And his plans for violence were specific, highlighting their seriousness.   On December 20, 2020, Caldwell messaged another individual, "The socialists say they have "lists," well me, too."   Gov. Ex. 2001.T.1 at 253.   In fact, Caldwell authored a document titled "DEATH LIST" that included the name of a Georgia election official and an alleged relative of that official.   Ex. Sent-Caldwell-2. Following the election, those individuals became the target of unfounded conspiracy theories that they were responsible for voter fraud in Georgia.

Beyond targeting those administering elections, Caldwell sought for months to inflict violence even on people he disagreed with, including "Antifa."   He messaged, "They have told me to lay around to rest and recover but tomorrow I start to walk outside and hope to be able to sit in a chair and clean some rifles.   Slowly work toward getting back on the gun range.   Ordered some incendiary rounds for my ARs and AKs which you would appreciate.   Armour piercing with thermite and white phosphorus core which burns at 5000 degrees.   THAT will roast a car full of Antifa fags, huh?"   Sent-Caldwell-6.   "[E]specially," he noted in another message on June 5, 2020, "if they come to the country I can tell you we will stack them 6 high and 3 deep to produce a bullet stopping pile of human tissue and effluence we can fire from behind."   Gov. Ex. 9310.

To hide his true intentions, Caldwell devised cover stories for his plans to engage in violence with people he claimed were "Antifa."   Before the November operation, he messaged North Carolina Oath Keepers who formed a QRF outside of D.C., "Need OPSEC.   Recommend

something like U.S.S. NIMITZ reunion which could be put on signs and used in comms.    Please

share w/Stewart."    Gov. Ex. 6619 (Msg. 1.S.313.45).    He then drafted "Operations Security"

plans, instructing co-conspirators and others to lie using a "cover story": "Our Team Members will

be traveling to the city to attend a military memorial service at a large National Military Cemetery

close by and then to attend unit military reunion. . . . [T]hose who have served will be able to spout

back the unit and date of operations together.    Those with clearly NO military background can

simply say that they were contractors int eh same area and really can't say more."    10/6/22AM

Tr. at 1803-04.

       Critically, Caldwell also pushed others, including his own family, to join him in violence.

On June 11, 2020, Caldwell's then 17-year-old nephew complained about having to wear a mask

at a restaurant.    Caldwell responded, "Why dont you protest and burn the fucker down?   This is

the face of socialism. . . . Next they'll deny you service because you're white ir because you're not

wearing blm shirt or you are wearing maga gear.    This is how it is Socialism is the government

controlling what rhe people can and cannot do."    Ex. Sent-Caldwell-6.    On June 18, 2020,

Caldwell's nephew told him he was at a baseball game in Atlanta.    Caldwell responded, "Watch

out for those fucking antifa maggots…If you kill somebody who tries to hurt you call me and I

will come bail you out.    Don't give the cops your real name."    Ex. Sent-Caldwell-6.    After the

nephew replied that he hoped something would happen, Caldwell said, "what I could have done

with my sniper rifle and silencer.    In my experience you can usually drop 5 to 6 bad guys before

they are really sure what's happening.    In a crowd like THIS, you could selectively target and drop

15 to 25 in a 5 minute span and people would just step around them most not having a clue.    They

just see some buttfucker lying on the ground."    Gov. Ex. 9310 (Msg. 22.T.27.2351).    On

September 23, 2020, Caldwell provided specific instructions on how to evade criminal exposure

for violent conduct: "Remember: choke up on the fork (hands close to the base of the tines) with your thumb on top for leverage and control.   Stab for the eyes.   Multiple thrusts quickly.   If you use your steak knife it's a deadly weapon.   A fork is cutlery and NOT covered by the same statute. Easier self-defense argument.   Street fighting 101 as taught to me by the CIA in better times." Ex. Sent-Caldwell-6; Gov. Ex. 9310 (Msg. 22.T.27.2757).

### iii.  Caldwell's Lack of Remorse

Caldwell has shown no remorse since his arrest and convictions, but rather he has used the media spotlight on his case to advance his agenda and continue to show a complete disrespect for the law.   Far from accepting his guilt and responsibility for the crimes he and his co-conspirators committed, Caldwell has repeatedly cast the blame on the country, the government, and law enforcement in his numerous interviews since his arrest.

Caldwell, for example, publicly described the current state of the country as akin to "Nazi Germany" and run by brutal dictators like "Josef Stalin", and "Pol Pot."   Ex. Sent-Caldwell-3 at 15.   He has asserted that the government fabricated evidence that he threatened "lawfully elected officials."   Ex. Sent-Caldwell-4 at 1:00.   That claim does not square with the evidence.   *See* Gov. Ex. 6923 at 36 ("If he [Vice President Pence] hopes to live till Friday he better stand tall."); Gov. Ex. 1500 ("I know where Pence lives up on Wisconsin Avenue.   That punk ass better do what he's supposed to."); Gov. Ex. 9312 (Caldwell forwarding January 8 video of Senator Lindsey Graham being accosted to another rioter, stating "we could have ended him right then.   I'm convinced that is the answer.   Traitors' punishment is clearly delineated and we all know what it is.")[49]; Ex. Sent-Caldwell-1 (calling for the "death" of Members of Congress for their "treason");

---

[49]  Caldwell testified, particularly incredibly, that he was calling for the "traitor's punishment" for

Gov. Ex. 6734 (Msg. 22.T.27.2883) ("[S]o I said lets storm the place and hang the traitors."). When asked on a TV news appearance regarding his messages about transporting "heavy weapons," Caldwell denied his own words and stated, "I have no idea and, no, I was not . . . So this other stuff I don't know anything about, didn't have any role in planning any of it.   It's just more hooey."   Ex. Sent-Caldwell-4 at 3:14.

Even to this day, Caldwell remains unrepentant.   At his recent booking on April 11, 2023, when asked the day of his arrest, Caldwell proclaimed, "January 19, 2021.   I was falsely arrested."   Ex. Sent-Caldwell-5.

> b)   <u>Need to Protect the Public from Further Crimes by Caldwell</u>

Defendant Caldwell is dangerous, not because of his words, but because of his plans and actions of violence and stated intent to continue that violence after January 6.   On January 8, Caldwell messaged another rioter, "Most people talk a lot of shit, few are up for the moment.   We were THERE, man!   So it begins."   Gov. Ex. 9313 (Msg. 22.T.7.4).   Around the same time, Caldwell messaged Crowl, "We stormed the gates of corruption together (although on opposite sides of the building) so between that and our first meeting [at the Million MAGA March] and getting to know you since[,] I can say we will always be brothers!"   Gov. Ex. 200.F.1.36. Caldwell then affirmed his desire to jointly push the conspiracy forward.   He messaged Crowl, "We need to do this at the local level.   Lets storm the capitol in Ohio.   Tell me when!"   Gov. Ex. 6623 (Msg. 2002.T.79C).

Following January 6, Caldwell regretted not doing more.   Although Caldwell praised the rioters' actions as the "high water mark for the attempt to stop the socialists from destroying the

---

Senator Graham because of his vote on three unnamed "black judges," rather than on his vote during the electoral college certification two days earlier.   11/15/22PM Tr. at 9017.

republic," he lamented, "Now that the President has abandoned us we will never be free again and we will never have an honest election again. I feel that evil has succeeded but short of armed insurrection I think we have done all that we could have.   I am glad I was there and that I did what I did."   Ex. Sent-Caldwell-7.

The Court should sentence Caldwell to 14 years (168 months) of imprisonment.

## I.  Edward Vallejo

Edward Vallejo should serve 17 years (204 months) in prison for his role in joining a seditious conspiracy to oppose by force the transfer of presidential power.   He drove thousands of miles to wait in a hotel room in Virginia and serve as the heavily armed Quick Reaction Force. On the morning of January 6, Vallejo made his intent clear on a podcast: If Congress certified the Electoral College vote, it would be a declaration of guerrilla war.   Vallejo declared that he, himself, was going to be the "mother fucker" to fix it.

As the riots unfolded at the Capitol, Vallejo messaged his fellow conspirators who were breaching the building.   He reminded them that the QRF was "outfitted" and to "just say the word" to activate the QRF.   Even after law enforcement cleared and secured the Capitol, Vallejo remained dedicated to supporting the conspiracy.   In the early morning hours of January 7, he traveled into D.C. to conduct surveillance and "probe the defense line" of law enforcement guarding the Capitol.   After the conspirators left the D.C. area, Vallejo attempted to meet with Rhodes in Texas to learn "next steps" in their plot.

### 1.    Sentencing Guidelines Analysis

***Count One*** **(Seditious Conspiracy, 18 U.S.C. § 2384)**

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense | +3 | §2J1.2(b)(2) (substantial interference) |

| characteristic | | |
|---|---|---|
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

### *Count Two* (Conspiracy to Obstruct an Official Proceeding, 18 U.S.C. § 1512(k))

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

### *Count Three* (Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2))

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

### *Count Four* (Conspiracy to Prevent Officers of the United States from Discharging Duties, 18 U.S.C. § 372)

| Base offense level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific offense characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific offense characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +3 | §3B1.1(b) (aggravating role— manager or supervisor) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 32 | |

After grouping, the total adjusted offense level for Vallejo is 32.   The government also submits that an upward departure of three levels is warranted under Note 4 for terrorism.   This would bring Vallejo's offense level to offense level to 35, for a recommended sentence of 14 to 17.5 (or 168-210 months) of incarceration.

a)    <u>Additional Factual Support for Specific Offense Characteristics</u>

Vallejo's conduct falls squarely within the eight-level upward adjustment under Section 2J1.2(b)(1)(B).   Vallejo made clear in a public interview that he was prepared to take up arms against the government of the United States in a guerilla war, if Congress certified the election. *See* Gov. Ex. 1054.Tr.   And, then during the riots of January 6, Vallejo, having shown his dedication by driving across the country to serve as an armed QRF, repeatedly confirmed his intent take up arms by messaging his fellow co-conspirators that he was "outfitted" and ready for action. Gov. Ex. 1500.2.   There is perhaps no greater threat to the administration of justice than armed conspirators promising guerilla war to obtain their desired presidential candidate.

b)    <u>Factual Support for the Upward Adjustments for Role in the Offense and Obstructing Justice</u>

As the PSR correctly finds, as a manager or supervisor of other individuals across the conspiracy to oppose the transfer of presidential power by force, Vallejo deserves the three-level upward adjustment for his aggravating role in the offense.   U.S.S.G. § 3B1.1(b).

Vallejo was a QRF leader, playing a coordinating role between conspiracy members from different parts of the country and managing his team, including Kandaris, and the group's weapons at the hotel.[50]

---

[50] As explained above, even if a defendant did *not* supervise a "participant," the Court may upwardly depart for a defendant who "exercised management responsibility over the property,

As early as December 15, 2020, Vallejo focused on traveling armed to D.C.   He shared an interview from the "Hagmann Report" in which the speaker (longtime Oath Keeper Sam Andrews) called on supporters of President Trump to act against the election: "We're gonna start moving around the country on January 2nd and 3rd to D.C., armed, in large groups," he explained.   Gov. Ex. 9514.1.1.   "Get with your local militia, get your large group together, and start moving to D.C., armed.   Because on January 4, we need to be en masse in D.C., armed, demanding, not asking, demanding that we get a peaceful resolution to these voter corruption issues, these election corruption issues."   *Id*.   The speaker warned: "The only way to prevent your own personal manipulation is to travel in large enough groups armed that the policemen don't want to fight." *Id*.   When Vallejo sent a link to this interview to his travel companion, he added, "Listen to the second hour.   It's ON."   Gov. Ex. 9514 (Msg. 210.T.2.2).   And Vallejo meant it.   In the interview, the speaker detailed when people should act: "We need a coordinated effort . . . if you're out west, you probably want to start moving on the first."   Gov. Ex. 9514.1.1.   On January 1, 2021, Vallejo, Kandaris, and another individual left Arizona and headed east towards the nation's capital.   Gov. Ex. 9514 (Msg. 1.S.859.10).

As they traveled, Vallejo messaged Rhodes and Meggs to obtain the location of the Comfort Inn Hotel, whose convenient location Caldwell originally identified to serve as the QRF. Gov. Ex. 9514 (Msgs. 210.T.3.1-2).   As Vallejo's group neared D.C. on January 3, Vallejo sent around a link to a "NewsBusters" article titled, "CBS Claims Trump Supporters Plan to 'Storm the Capitol' with 'Weapons.'"   *Id*. (Msgs. 240.S.1.47.1, 240.S.1.48.1), *see also* Gov. Ex. 9514.4. Upon arrival, Vallejo unloaded rifle bags, a machete, a drone, and 11 large totes of unknown goods.

---

assets, or activities" of the criminal activity.   U.S.S.G. § 3B1.1, cmt. n.2.

Vallejo was the only member of the Arizona QRF who had direct communications via the main encrypted op channel ("DC Op: Jan 6 21") with the rest of the conspirators who were breaching the Capitol and providing updates from the Capitol grounds.   While his co-conspirators breached the Capitol, Vallejo reminded them that he was "outfitted" and had two trucks available, one of which Vallejo would direct Kandaris, who not on the "DC Jan 6 Op chat," to drive.   Gov. Ex. 1500.2.   At 2:38 p.m., as the first member of Stack One burst through the East Rotunda Doors, Vallejo messaged the chat again:   "QRF standing by at hotel.   Just say the word . . . ."   *Id.* (ellipsis in original).

Likewise, a preponderance of the evidence demonstrates that Vallejo destroyed evidence, warranting the adjustment under Section 3C1.1, cmt. n.4(D).   On January 28, Vallejo sent to his co-conspirators on the DC OP: Jan 6 21 Signal chat an article that highlighted the arrest of three of his co-conspirators—Watkins, Crowl, and Caldwell—for their actions on January 6.   Gov. Ex. 9652 (Msg. 1.S.159.1639); *see also* Gov. Ex. 9652.1.   On February 12, Vallejo sent the same article about the FBI's supposed ability to break into and read Signal messages.   *Id.* (Msg. 1.S.159.1643); *see also* Gov. Ex. 9652.2.   Finally, sometime after sending that article about Signal's vulnerabilities to law enforcement methods, Vallejo deleted the Signal application from his phone entirely.   1/9/23PM Tr. at 3721, 3735-38.   Each of these actions was "directly and inherently obstructive," *Reeves*, 586 F.3d at 23, in that Vallejo attempted to, and did, prevent law enforcement from accessing the incriminating Signal messages on his phone and thus using those messages to investigate and prosecute him and his co-conspirators.

### 2.    Upward Departure for Terrorism and Section 3553(a) Factors

Vallejo's words and actions illustrate his planned and actual use of "intimidation and coercion" to "influence and affect the conduct of government" (to stop the lawful transfer of power

from President Trump to President Biden) and to "retaliate against government conduct" (for failing to intercede to change the election result to his desired outcome).   U.S.S.G. § 3A1.4, cmt. n.4.

Vallejo marked January 6 as a day of important governmental function.   In the days leading up to January 6, Vallejo messaged his travel companions with news update about the Electoral College Certification process. *See* Def. Ex. EV-123 at 1 ("WE HAVE OUR SENATOR!!! Send Hawley has put out an official statement that he WILL OBJECT to the certification of the Biden electors!"); *see also id.* at 3 ("We also have 3 confirmed Senators that will join DOZENS of Reps objecting on the 6th).   He also shared numerous articles about the Electoral College certification.

As Vallejo and his Arizona team then traveled across the country for January 6, co-conspirator Kandaris messaged Rhodes and told him that the Arizona contingent was committed to being the "rifles" to support the President and the process.   He added, "We need to [k]now where staging is going to be for technical equipment and 'supplies.' [Winky Face Emoji]."   Gov. Ex. 9514 (Msg. 1.S.859.19).

On the morning of January 6, Vallejo and co-conspirator Kandaris took to a podcast and explained exactly what they and the other members of the conspiracy intended to do that day. Gov. Ex. 1054.Tr.   Kandaris stated that he and Vallejo arrived in Washington around noon the prior day and "hooked up with the Oath Keepers and we've bivouacked with them in Arlington." Kandaris explained that the Oath Keepers were serving as the "potential threat . . . of further action" and were the "final check and balance to this process."   *Id*.   Kandaris added, "We're applying as much pressure as we can.   The only and obvious next step is to go into armed conflict but hoping very much that that doesn't happen."   *Id*.   Before Vallejo made his own statements in agreement,

Kandaris concluded: "It's a do or die situation because if we walk away from this and we don't have any effectual change as a result, then we might as well just give up.   We're done.   If we don't do something now we're done because we basically illustrated that we will do nothing, in a tinderbox situation, and you know, that's it, it's over."   *Id*.

Vallejo clarified: "We're going to be told, the American people are going to be told today that we have liberty and justice for all, or they're going to be told, 'Fuck you.'   Okay?   And if they're told, 'Fuck you,' that's going to be the declaration of a guerilla war."   *Id.*   Vallejo continued, "I'm just praying to God that Trump has his head on fucking straight, he has got the machinations behind him, he's got all the proof in the world, and he's going to bring the fucking hammer down!   That's the only hope, the only chance.   If that doesn't happen, then this shit is on."   *Id.*   When the interviewer commented on what he perceived as a broken election system, Vallejo announced his intention to use violence to fix it: "No that's fine … Because I'm the motherfucker that's gonna fix it for them if they tell me today it's broken … You know what I've been telling people?   I've been telling people for years I'm the guy that everybody said, 'no Ed, you can't shoot them yet, it's too soon.   No Ed, you can't shoot the bastards yet, it's too soon.'   Well I've been telling them for about five, six months ago.   They quit telling me."   *Id.*   Later that day, Vallejo celebrated the riots disrupting the Electoral College certification.   He messaged the Arizona podcast host and his wife from his morning interview and told them that "the People have taken the Capital," Gov. Ex. 9552 (Msg. 210.T.6.2), and asked if they had "secured the Arizona Capital yet."   Gov. Ex. 9554 (Msg. 210.T.7.7).   As the riots on the afternoon of January 6 unfolded, Vallejo affirmed his desire to disrupt the conduct of government as he, acting as the armed QRF, messaged his co-conspirators that he was "outfitted" and to just say the words.

Vallejo was undeterred, even after law enforcement re-secured the Capitol by the evening

of January 6.   He announced, "We are at WAR!"   Gov. Ex. 9653 (Msg. 1.S.159.1416).   The next

morning Vallejo told Rhodes that he was "standing by awaiting orders, sir."   *Id.* (1.S.139.15).

He traveled into D.C. to "probe the defense line" of law enforcement and the national guard

protecting the Capitol and then announced the result of his surveillance.   Gov. Ex. 9653 (Msgs.

1.S.159.1407, 1.S.139.15).   In the days that followed, Vallejo and Kandaris messaged Rhodes

about learning "next steps" and attempted to meet up with him in Texas.   1/10/23PM Tr. at 4065-

68; Gov. Ex. 9653 (Msg. 1.S.859.24).

The scope and scale of Vallejo's conduct in calling for and conspiring to perpetrate

violence against the U.S. government to change the results of a presidential election and retaliate

against Congress for certifying those results merits a departure under Note 4.   The government

submits that an upward departure of three levels is appropriate.

A 17-year (204-month) sentence of incarceration is warranted for Edward Vallejo.

# VI.   OTHER SENTENCING CONDITIONS

## A.  Restitution

The government respectfully requests that the Court order each of the nine defendants to

pay $2,000 in restitution to the Architect of the Capitol.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose

restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to

order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011).   Two general restitution statutes provide such authority.   First, the Victim and

Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now

codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order

restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096.   Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.   *Papagno*, 639 F.3d at 1096.   The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.   *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.   Both require that restitution "be tied to the loss caused by the offense of conviction."   *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).   Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[51]   *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097; 18 U.S.C. § 3663(b); 18 U.S.C. § 3663A(b).   Finally, under both statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).   The relevant inquiry is the scope of the

---

[51] The government or a governmental entity can be a "victim" for purposes of both the VWPA and MVRA.   18 U.S.C. § 3664(i) (authorizing restitution to federal agencies); *United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012); *United States v. Lincoln*, 277 F.3d 1112, 1113-14 (9th Cir. 2002) ("The most compelling indication that the MVRA authorizes mandatory restitution to the government is found in … § 3664(i)); *United States v. Wells*, 873 F.3d 1241, 1265 (10th Cir. 2017) ("No party disputes that the United States can constitute a "victim" under the MVRA.").

defendant's conduct and the harm suffered by the victim as a result.   *See United States v. Emor*, 850 F. Supp. 2d 176, 202 (D.D.C. 2012).   The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[52]   *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job is to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").   Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.   *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

The statutes also differ in significant respects.   The VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18.   18 U.S.C. § 3663(a).   In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."

---

[52] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."   *Fair*, 699 F.3d at 513.

*United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   By contrast, the MVRA applies only to certain offenses, such as an "offense against property" "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss."   18 U.S.C. § 3663A(c)(1)(A)(ii), (B).   "When determining whether the MVRA offense-against-property provision applies to a conviction, courts may consider the facts and circumstances of the crime."   *United States v. Razzouk*, 984 F.3d 181, 186 (2d Cir. 2020).   That means that an "offense against property" is not categorically limited to those crimes that have an element that "implicates" property.   *See, e.g., id.* (accepting bribes); *United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017) (making a false statement); *United States v. Turner*, 718 F.3d 226, 235 (3d Cir. 2013) (conspiracy to deprive the IRS of taxes owed); *United States v. Sukhtipyaroge*, 394 F. Supp. 3d 951, 95-60 (D. Minn. 2019), *aff'd*, 1 F.4th 603 (8th Cir. 2021) (visa fraud). Unlike the VWPA, the MVRA requires imposition of full restitution without respect to a defendant's ability to pay.   18 U.S.C. § 3663A(a).

The VWPA and MVRA both provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664."   18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d).   Because this case involves the related criminal conduct of multiple defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses.   18 U.S.C. § 3664(h).

The defendants' crimes on January 6 affected several entities responsible for the Capitol building, among them the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, the Office of the Secretary of the United States Senate, the Senate Sergeant at Arms, and the United States Capitol Police.   As of October 2022, the pecuniary damages suffered by each entity as a result of the attack on the Capitol on January 6 are: $1,177,254.03, $547,411.27, $32,075.00, $79,490.05, and $1,045,129.85, respectively. That is a total amount of $2,881,360.20, which does not even account for the damages suffered by the Metropolitan Police Department or myriad other law enforcement entities.

The Architect of the Capitol, the federal agency charged with operating and maintaining the physical and esthetic integrity of the Capitol Building and Grounds, and from whose budget the repairs to the Capitol for damage caused by the January 6 riot were paid, is one "victim" to whom restitution is owed.[53]   *See* 18 U.S.C. § 3663A(a)(2) ("'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered"). The right to possession—either by an owner, lessor, or in this case, the agency ultimately responsible for the care of the Capitol building and grounds—is a paramount property interest.

Applying these principles to this case leads to the conclusion that each defendant should be required to pay $2,000 in restitution.   As the evidence at trial showed, the defendants' conduct,

---

[53] The Architect of the Capitol (AOC) is "the name of the U.S. legislative branch agency responsible for the maintenance and upkeep of the Capitol campus. . . . Responsibilities of the AOC are far-reaching and cover management and oversight of operations and facilities maintenance for the entire Capitol campus.   The AOC also oversees the care of all works of art in the U.S. Capitol Building under the direction of the Joint Committee on the Library, including the maintenance and restoration of murals, outdoor sculptures and architectural elements throughout the Capitol campus."   Architect of the Capitol, 2020 Annual Report, *available at* aoc.gov/sites/default/files/2020-12/aoc-performance-and-accountability-report-fy-2020-508.pdf.

in conjunction with that of many other rioters, directly and proximately resulted in damage to the Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol employees. A "reasonable estimate," *Gushlak*, 728 F.3d at 196, of the restitution for which each defendant should be responsible is $2,000.

Finally, $2,000 is the approximate amount of restitution that judges on this Court have typically ordered felony defendants to pay in restitution following a trial or open plea agreement. *See Rubenacker*, No. 21-cr-193-BAH, Sent. Tr. at 145-47 ("[T]he amount of $2,000 is an approximate estimate of the losses for which he is responsible. And I do find that that is the standard amount that so far . . . for which defendants from January 6th facing and convicted of felony charges are being required to pay."); *see also United States v. Webster*, 21-cr-208-APM, ECF 110 (D.D.C. Sept. 9, 2022) ($2,060); *United States v. Robertson*, 21- cr-34-CRC, ECF 140 (D.D.C. Aug. 17, 2022) ($2,000); *United States v. Reffitt*, 21-cr-32-DLF, ECF 170 (D.D.C. Aug. 2, 2022) (same); *United States v. Williams*, 21-cr-377-BAH, ECF 131 (D.D.C. Sept. 16, 2022) (same); *United States v. Thompson*, 21-cr-161-RBW, ECF 158 (D.D.C. Dec. 12, 2022) (same).

Here, each defendant should be directed to pay $2,000 as an approximate estimate of the losses for which he or she is responsible. Their restitution payment should be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

## B. Fine

Each defendant is subject to a statutory maximum fine of $250,000 for each felony conviction. 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the Court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a

sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public."   *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

The PSRs' recommendations that Rhodes and Meggs each be fined $35,000 are well founded, as there is evidence that both defendants have tried to capitalize financially on their crimes.   Bank records for the period of December 2020 to January 2021 show that Rhodes essentially used the Oath Keepers accounts as his own personal piggy bank.   *See, e.g.*, Gov. Exs. 2010.1 - .3.   And Meggs has raised over $158,000 on GiveSendGo through a campaign that claims the media's reporting on Meggs and his wife is "lying, evil and deceitful."   Meggs PSR ¶ 190; Ex. Sent-Meggs-7.   Notably, the campaign does *not* limit the proceeds to paying Meggs' legal expenses.   Ex. Sent-Meggs-7.   Indeed, both Rhodes' and Meggs' legal expenses are apparently covered in full by a third-party organization.   Meggs PSR ¶ 187; Rhodes PSR ¶ 185.

The PSRs do not recommend a fine for Harrelson, Watkins, Minuta, Hackett, Moerschel, Caldwell, or Vallejo.

## C.  Supervised Release

Each count of conviction is a Class C or D felony.   18 U.S.C. § 3559(a)(3), (4).   The Court should therefore sentence each defendant to term of supervised release of three years on each count.   18 U.S.C. § 3583(b)(2).   Multiple terms of supervised release should run concurrently to one another.   18 U.S.C. § 3624(e).

## D.  Special Conditions

The Probation Office recommends that the Court impose several special conditions on the defendants during their terms of supervised release, including "Contact Restriction," "Social Media Restriction," "Propaganda Restriction," "Computer Monitoring/Search," and

"Telecommunications."

The Court may impose, as part of supervised release, "any . . . condition it considers to be appropriate."  18 U.S.C. § 3583(d).  Such a special condition may include "a discretionary condition" typically associated with probation under Section 3563(b).  *Id.*  It may also include "any other condition," so long as the condition satisfies the following three factors:   (1) it "is reasonably related to" the Section 3553(a) sentencing factors, (2) it "involves no greater deprivation of liberty than is reasonably necessary" for achieving the Section 3553(a) sentencing factors, and (3) it "is consistent with any pertinent policy statements issued by the Sentencing Commission."  *Id.*

The Court has "wide discretion when imposing terms and conditions of supervised release."  *United States v. Hunt*, 843 F.3d 1022, 1030 (D.C. Cir. 2016) (quoting *United States v. Sullivan*, 451 F.3d 884, 895 (D.C. Cir. 2006)).   And "[s]eparating a convicted felon from negative influences in his prior life is reasonably related to the permissible goals of deterrence and rehabilitation and is a common purpose of supervised release."  *Id.* at 1031 (quoting *United States v. Watson*, 582 F.3d 974, 983 (9th Cir. 2009)).

Courts have imposed similar restrictions on defendants convicted of terrorism crimes like the ones here, including restrictions on association and extremist content.  *See, e.g., United States v. Rakhmatov*, No. 21-151, 2022 WL 16984536, at *3 (2d Cir. Nov. 17, 2022) (per curiam) (affirming conditions limiting association with terrorist enterprises and accessing content from "radical extremist group[s]"); *United States v. Doe*, 323 F. Supp. 3d 368, 390, 392 (E.D.N.Y. 2018) (after noting the "lack of data on terrorist recidivism rates," imposing special conditions that defendant (a) not "associate with any individuals involved in any radical extremist groups," or (b) "access any website affiliated with any radical extremist group").   Indeed, in sentencing another

defendant who was part of a militia group for his role in the attack on the Capitol, Judge Friedrich imposed the following condition:   "You must not associate, communicate, or otherwise interact, directly or indirectly, with any extremist militia group or member of such a group, including but not limited to the Texas Three Percenters, the Oath Keepers, and the Texas Freedom Force." *Reffitt*, No. 21-cr-32, Sent. Tr. at 143.

Here, restricting these defendants' association and communication with other extremists and content published by other extremists furthers the goals of deterring and rehabilitating these defendants as they transition back into the general population following their periods of incarceration.

179

## VII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a lengthy sentence of imprisonment on each defendant.   Specifically, Stewart Rhodes should serve 25 years in prison; Kelly Meggs, 21 years; Jessica Watkins, 18 years; Roberto Minuta, 17 years; Edward Vallejo, 17 years; Kenneth Harrelson, 15 years; Thomas Caldwell, 14 years; Joseph Hackett, 12 years; and David Moerschel, 10 years.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    _____/s/_____

Jeffrey S. Nestler
Assistant United States Attorney
D.C. Bar No. 978296
Troy A. Edwards, Jr.
Alexandra Hughes
Louis Manzo
Kathryn Rakoczy
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530

## INDEX OF SENTENCING EXHIBITS

Omnibus Exhibits

- Ex. Sent-Omnibus-1 ("Pelosi in the House" documentary)

- Sentencing hearing transcripts from the District of Columbia:

    - *United States v. Reffitt*, No. 21-cr-32
    - *United States v. McCaughey*, No. 21-cr-40
    - *United States v. Sandlin*, No. 21-cr-88
    - *United States v. Brown*, No. 21-cr-178
    - *United States v. Hodgkins*, No. 21-cr-188
    - *United States v. Rubenacker,* No. 21-cr-193
    - *United States v. Wood*, 21-cr-223
    - *United States v. Gardner*, No. 21-cr-622
    - *United States v. Watson*, No. 21-cr-513

- Sentencing hearing transcripts and filings from other courts:

    - *United States v. Patrick*, No. 16-cr-51-BR-9 (D. Or. Feb. 18, 2018)
    - *United States v. Thorn*, No. 16-cr-51-BR (D. Or. Nov. 21, 2017)
    - *United States v. Batiste*, No. 06-cr-20373 (S.D. Fla. Nov. 20, 2009)
    - *United States v. Holzer*, No. 19-cr-488 (D. Colo. Mar. 22, 2023)
    - *United States v. Battle*, No. 02-cr-399 (D. Or. July 5, 2016)

- Victim Impact Statements

    - MPD Officer Christopher Owens
    - USCP Officer Harry Dunn


Stewart Rhodes Exhibits

- Ex. Sent-Rhodes-1.1 (Recorded jail call, Dec. 18, 2022)
- Ex. Sent-Rhodes-2.1 (Additional recorded jail call, Dec. 18, 2022)
- Ex. Sent-Rhodes-3.1 – 3.11 (Recording of government interview of Tasha Adams)
- Ex. Sent-Rhodes-4.1 – 4.2 (Recorded jail call / interview with Washington Times journalist, Dec. 27, 2022)
- Ex. Sent-Rhodes-5.1 – 5.2 (Recording of interview with Cowboy Logic podcast, Mar. 25, 2023)
- Ex. Sent-Rhodes-6 (Book about Oath Keepers by Professor Sam Jackson)
- Ex. Sent-Rhodes-7 (Recording of interview on the eve of trial)
- Ex. Sent-Rhodes-8 (Excerpt from inmate handbook)
- Ex. Sent-Rhodes-9 (Recording ofinterview with the Gateway Pundit, Apr. 29, 2023)
- Ex. Sent-Rhodes-10 (Article from Police Magazine)

Kelly Meggs Exhibits

- Ex. Sent-Meggs-1 (Facebook)
  - Ex. Sent-Meggs-1.1
  - Ex. Sent-Meggs-1.2
  - Ex. Sent-Meggs-1.3
- Ex. Sent-Meggs-2A (Jan. 22, 2021 text message)
- Ex. Sent-Meggs-2B (Jail call)
- Ex. Sent-Meggs-3 (Jan. 6, 2022 Fox interview)
- Ex. Sent-Meggs-4 (Mar. 8, 2023 Real America's Voice interview)
- Ex. Sent-Meggs-5 (BThePeople website)
- Ex. Sent-Meggs-6 (Jan. 2023 jail messages)
- Ex. Sent-Meggs-7 (GiveSendGo)
- Ex. Sent-Meggs-8 to 12 (Jail calls)

Kenneth Harrelson Exhibits

- Ex. Sent-Harrelson-1 (Jan. 20, 2021 Harrelson message to Meggs resigning)
- Ex. Sent-Harrelson-2 (Jan. 20, 2021 Harrelson message to Oath Keepers national)
- Ex. Sent-Harrelson-3 (Mar. 2021 Harrelson screenshots with Rhodes on Signal)
- Ex. Sent-Harrelson-4 (Mar. 2021 Harrelson screenshots with Brown on Signal)
- Ex. Sent-Harrelson-5 (Jan. 6, 2021 DC Op Jan 6 21 Signal (Msg. 1.S.159.1304)
- Ex. Sent-Harrelson-6 (Mar. 15, 2021 Harrelson detention hearing transcript, Case No. 6:21-mj-1221-EJK (M.D. Fla.)

Jessica Watkins Exhibits

- Ex. Sent-Watkins-1 (Article from the Gateway Pundit, Dec. 7, 2021)
- Ex. Sent-Watkins-2 to 4 (Jail calls)

Roberto Minuta Exhibits

- Ex. Sent-Minuta-1 (Facebook)
  - Ex. Sent-Minuta-1.1 (Apr. 18, 2020), pgs. 611-12
  - Ex. Sent-Minuta-1.2 (Apr. 12, 2020), pg. 616
  - Ex. Sent-Minuta-1.3 (May 6, 2020), pg. 332
  - Ex. Sent-Minuta-1.4 (Sept. 19, 2020), pg. 406
- Ex. Sent-Minuta-2 (Flier)
- Ex. Sent-Minuta-3 (Podcast)
- Ex. Sent-Minuta-4 (Twitter)
  - Ex. Sent-Minuta-4.1 (Apr. 27, 2022)
  - Ex. Sent-Minuta-4.2 (Apr. 26, 2022)
  - Ex. Sent-Minuta-4.3 (Apr. 27, 2022)

- o Ex. Sent-Minuta-4.4 (Dec. 7, 2022)
- o Ex. Sent-Minuta-4.5 (Twitter Bio)
- Ex. Sent-Minuta-5 (Newsmax Documentary)
  - o Ex. Sent-Minuta-5.1 (7:39 to 7:45)
  - o Ex. Sent-Minuta-5.2 (39:24 to 39:44)
  - o Ex. Sent-Minuta-5.3 (23:54 to 24:40)
- Ex. Sent-Minuta-6 (GiveSendGo)

Joseph Hackett Exhibits

- Ex. Sent-Hackett-1 (Rifle photo)

David Moerschel Exhibits

- Ex. Sent-Moerschel-1 (Rifle photo)
- Ex. Sent-Moerschel-2 (Handgun photo)

Thomas Caldwell Exhibits

- Ex. Sent-Caldwell-1 (Video of Insider News interview)
- Ex. Sent-Caldwell-2 (Death List)
- Ex. Sent-Caldwell-3 (Article from Epoch Times, Mar. 22, 2022)
- Ex. Sent-Caldwell-4 (Tucker Carlson interview)
- Ex. Sent-Caldwell-5 (FBI report documenting comments at April 11, 2023 booking)
- Ex. Sent-Caldwell-6 to 7 (Text messages)