UNITED STATES DISTRICT COURT
THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.: Cr. 21-CR-00015-APM |
| | ) | |
| DAVID MOERSCHEL | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

The Defendant, David Moerschel, through his undersigned counsel, Scott Weinberg, Esq. and Connor Martin, Esq. pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C Section 3553(a), respectfully submits this memorandum to aid the Court at sentencing and hereby notifies the Court that the Defendant has received and reviewed the Presentence Report ("PSR") prepared in this case. After carefully reviewing the final PSR with Mr. Moerschel the Defense objected to paragraphs 2 and 128. Such paragraphs referenced reference (Count 12) Tampering with Documents or Proceedings 18 USC§1512. However, the jury acquitted Mr. Moerschel of these counts.

Mr. Moerschel requests a 4-level decrease in his guideline level based up on his "minimal" participation in the offense. See U.S.S.G. §3B1.2(a). This section applies to Moerschel because he was "substantially less culpable than the average participant in the criminal activity" and was "plainly among the least culpable of those involved in the conduct of the group." Id. Such request is predicated on his lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his peaceful, non-destructive and non-violent behavior that day both inside and outside of the Capitol building and his very brief and distance involvement with the Oathkeepers as a whole. This argument will be expanded upon below.

### I. BACKGROUND

Mr. Moerschel comes before the Court having been found guilty of four (4) counts of the Government's indictment. Mr. Moerschel voluntarily gave a statement to the government when

the FBI first requested that he do so. He also provided them his cell phone and his firearms. Additionally, he voluntarily turned himself in to authorities upon proper request.

He joined the Oathkeepers organization online on September 28, 2020. January 5th and 6th was David's only in-person involvement with the group. He entered the U.S. Capitol building in a line formation following Mr. Meggs, the leader of his group and others, many of whom he had never met. He walked inside the building, did not cause any damage whatsoever to the structure or fixtures of the building and left within 12 minutes. While outside and inside he did not yell, cruse, scream, threaten, take photos or harm any person or property. When this Court considers the behavior of other criminal defendants charged with crimes stemming from January 6, 2021, the Court will find that Mr. Moerschel should not be viewed in the same light. Mr. Moerschel was present as a follower at best, far from any leadership role. He lacked harmful intent. He was along for the very foolish ride.

### A.  JOINING THE OATHKEEPERS

David Moerschel lived in North Port, Florida during the summer of 2020. He had a steady diet of Fox news and Newsmax. Between the riots across the country and the Covid-19 lockdowns he felt he needed a group to protect him in case those issues came to his neighborhood in Florida. David had been working as a neurophysiologist and did not have a background in law enforcement or in the military. That is what made the Oathkeepers attractive to him. He thought a group of ex-military and ex-law enforcement would be the safest group to join to learn how to protect himself and his family. He did not know about Stewart Rhodes leadership or how haphazard Mr. Rhodes was with the truth and the money brought in through donations to the organization. He was as much a pawn in Mr. Rhodes' scheme as anyone else.

### B.  THE LEAD UP TO JANUARY 6TH

After David joined the group, he learned that they needed people to go to Washington D.C. to guard VIP speakers at the President Trump's rally. David thought it was a good opportunity. He packed his gear including an AR-15 and on January 4th, he met his first Oathkeeper. They drove from Florida to Washington D.C. Before arriving in the District, David left his firearm in a hotel room in Virginia because he did not want to violate any of the D.C. weapons laws.

### C. JANUARY 6TH

David was up early on January 6th and was there with the rest of the Oathkeepers. They were working security for a few speakers until Donald Trump gave his speech. Donald Trump told the large crowd to head to the Capitol Building and protest. David followed his team leader, Kelly Meggs to the Capitol. Meggs had everyone reorganize when they were at the bottom of the building's central staircase and took the group up in a line formation. Before this moment, David had not thought, planned, or told anyone they should go into the Capitol Building. As the Court knows, the doors opened and the Oathkeepers in Line 1 entered the building. It should be noted that while inside the building, there was no evidence brought at trial that David harmed any law enforcement personnel or civilians. There was no evidence brought at trial that David had yelled or celebrated while inside the building. What was shown is that David went inside the building, went to the small rotunda, stood with his back against the wall and left within 12 minutes.

### D. HINDSIGHT

After all the news reports on January 6th, David felt a massive amount of shame. He quite the Oathkeepers organization and cut off communication with them. He contacted the undersigned and waited for the FBI to contact him. Once this happened David, in the presences of the undersigned told the FBI what happened from his perspective. David turned over his phone and turned himself in upon request.

David has absolutely no history of political extremism. In fact, his decision to go to D.C. for the "Stop the Steal" rally was made at the last minute. It was not until the January 3rd that David had been given the time off from his boss to attend the rally. In hindsight, David wishes he never went to his first Oathkeeper's event. He had absolutely no expectation or knowledge of the consequences of his and others' actions on that day. He was supporting the President in what he believed were legitimate efforts to claim victory in the presidential election. He fully acknowledges that he should never have illegally entered the U.S. Capitol Building. While he did not personally destroy anything, he illegally played a part in an unmanageable mob.

## E. LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a District Court is to consider when sentencing a defendant who has been convicted of a federal offense. Primarily, the Court shall consider the nature and circumstances of the offense and the history and characteristics of the defendants. *See*, 18 U.S.C. §3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Id.

## F. FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a District Court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a). United States v. Mendoza-Mendoza, 597 F.3d 212, 216 (4th Cir. 2010), *citing* Kimbrough v. United States, 552 U.S. 85, 111 (2007) (quoting §3553(a))

## NATURE & CIRCUMSTANCES OF THE OFFENSE & THE HISTORY AND CHARACTERISTICS OF MR. MOERSHCEL

First, the defense is not aware of any evidence that the Defendant's entry into the Capitol was violent in any way. Second, Mr. Moerschel did not attempt to add to the violence of the mob. For example, he didn't chant "whose house, our house" or "USA, USA" in the way that literally thousands of other protesters had done. Third, there is no evidence that he engaged in any violence or questionable conduct towards law enforcement. Fourth, the defense is not aware of any evidence that he destroyed or stole any property from the Capitol. Fifth, based on the Government's investigation, it appears that he remained in the Capitol building for about 11 minutes in total. The defense is not aware of any evidence that he entered the Senate or House Chamber.

The government must concede that he committed no violent acts and destroyed no property, even though he was in the proximity of others committing violence. His actions within the Capitol have been tracked on the CCTV footage. Such footage demonstrates that while unlawfully present in the Capitol with no excuse, he did not destroy property or commit violent acts. He was not armed. He did not yell at any police officers.

This has been an extremely tough road for Mr. Moerschel. He had a very successful life before January 6. He has a loving wife and three (3) children, and had a wonderful job. After his arrest he was fired from his job as a Neurophysiologist. He took a job as a landscaper to help take care of his family and pay for his attorney's fees. He took this case to trial because he believed he was innocent and could not imagine signing an agreement that would incarcerate him for years. His actions on January 6th altered Mr. Moerschel's life forever. He will no longer be able to work in his field of study, his reputation is tarnished and he has harmed his family by the results of his actions. He will be remorseful for the rest of his life. He bought into a lie told by the former president any many other "leaders" who should have known better. He is forever marked on the internet as a member of a violent right-wing militia. David does not seek to minimize the harm caused by his behavior.

In determining of what punishment is warranted, the Court should not lose sight of the fact that he had minimal contact with the rest of the Oathkeepers. He never had any role in leadership, he never attended any in person trainings, his messages in the group chat discuss legal means of overturning the election and did not meet the leader of the group until after leaving the Capitol. He did not intend to do harm, and did not do any physical harm to a person or thing aside from his presence being there. He has only been in trouble with the law once in 1996 and paid a 150 fine for a misdemeanor, his past shows him as a well-educated, productive member of society. He is a family man and very involved in his church. He is an ordained minister and crisis Chaplin. He has not violated any condition of pre trial or post trial release.

### B. NEED FOR THE SENTENCE IMPOSED

General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct the purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation. He has already been severely punished as noted supra. The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to work when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily

harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to be counterproductive, and labeled as political posturing. A sentence of home detention and probation does constitute punishment and it will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms. He has been on pretrial release for well over a year with many restrictions. The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, Five Things to Know About Deterrence (July 2014) (relying on Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Justice in America 199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

## SPECIFIC DETERRENCE – 18 U.S.C. § 3553(A)(2)(C) – TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT

David's likelihood of recidivism is really non-existent. He has expressed genuine remorse and contrition. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." Id.; See also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. Id. at 1. It examined the effects of changes to both the certainty and severity of punishment. Id. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." Id. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." Id. at 1. Given David's current age and other issues consistent with what is mentioned above, the likelihood that he would ever reoffend is as close to zero as one

might come. A punishment of any prison time in this case is going to have the exact opposite effect than what is in the interest of justice. The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice. David urges the Court to impose a sentence of home detention in this case in light of his sincere and complete remorse, his non-violent conduct at the Capitol, and the lack of a need to further deter him.

## JUST PUNISHMENT

Particularly during this pandemic, it is best for the community, as well as for David, that he continues his service to the community. He has a conviction which, in and of itself, is quite punitive. The conviction affects possible employment opportunities, and will remain with him for the rest of his life. But, home confinement and probation will allow him to continue to work, show remorse and to help support his family - both financially and emotionally. If incarcerated, he would lose his job, and his home, while wreaking havoc on the rest his family, including his three young children.

Probation involves significant restraints on a probationer's liberty. Defendants must periodically report to the probation officer, permit the officer to visit their homes and jobs at any time, and follow the officer's advice. Jones v. Cunningham, 371 US 236, 242 (1963). Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives. Ibid. Not only must they faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison. Ibid. Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation. Ibid. They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime. Ibid. Probation significantly restrains a defendants' liberty to do the things that free people in this country are entitled to do.

## CONCLUSION

Considering all the applicable factors the Court will consider, Mr. Moerschel respectfully moves this Court to impose a sentence of home confinement and a lengthy term of supervised probation. This sentence is "sufficient but not greater than necessary" as required by 18 U.S.C. §

3553(a). It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Moerschel as an individual and account for his unique circumstances and positive attributes.

## ADOPTION OF ARGUMENTS

Mr. Moerschel adopts all prior arguments made by other counsel to the Pre-Sentence Reports to extent the issues are applicable to Mr. Moerschel.

## OBJECTION TO OBSTRUCTION POINTS

Mr. Moerschel continues his objection to the two (2) point Adjustment for Obstruction of Justice. Mr. Moerschel was found not guilty of that charge. There was no evidence at trial to show that Mr. Moerschel received any text messages from Stewart Rhodes ordering him to delete his messages. Further, it was shown in trial, through a governments witness, that Mr. Moerschel had many deleted months' worth text messages over different periods of time that had no relevance to the charged conspiracy.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 5, 2024, a true and correct copy of the foregoing was furnished by using the CM/ECF system with the Clerk of the Court, which will send notice of the electronic filing to all interested parties, including the Office of the United States Attorney.

Respectfully submitted,

Suarez, Rios & Weinberg, P.A.
Attorney for Defendant
265 E Marion Ave., Ste 114
Punta Gorda, FL 33950
Telephone: (941) 575-8000
Facsimile: (941) 575-8888
E-mail: Scott@bsrlegal.com


By /s/ *Scott Weinberg*
Scott Weinberg
Fla. Bar No. 71109