## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**EDWARD VALLEJO,**<br><br>*Defendant.* | **No. 22-cr-15 (APM)** |

## MEMORANDUM IN AID OF SENTENCING

Defendant Ed Vallejo stands before the Court having spent four months in jail during severe Covid lockdowns (and getting Covid there) followed by twelve months of home detention. With this history, a sentence of time served with two years of supervised release would be "sufficient, but not greater than necessary" to meet the purposes of sentencing in 18 U.S.C. § 3355(a) for Vallejo, a veteran with no criminal history score and a lifetime of service to others, who came to Washington, D.C. on his own without knowledge of Oath Keeper plans, who never went to the Capitol on January 6, who opposed as "domestic terrorism" those whom he saw on video attacking the Capitol, who met with the FBI and did nothing to obstruct the investigation, who has scrupulously abided by every term of pretrial release imposed by the Court for a year, and who is a vital source of support for his wife Debbie, who sat through every day of the trial. It is also near the lower end of the correct advisory guidelines range (6–12 months) and exceeds the high end of the range by 4 months when the total amount of detention (home and jail) is considered. Any longer sentence for this uniquely situated defendant would create unwarranted sentencing disparities and be "longer than necessary" to meet the purposes of sentencing in § 3553(a)(2).

## FACTUAL BACKGROUND

Defendant Edward Vallejo, 64, is a partially disabled veteran, a husband of 35 years, a father, and a grandfather. He has suffered since childhood from asthma—a condition that becomes unbearable outside of the dry Arizona air—and had to be home-schooled in a hospital through first grade. Ed's parents divorced when he was five and he did not have contact with his father for the next 20 years. PSR ¶ 152. His mother remarried, and both his mother and step-father were alcoholics. *Id*. Ed had his first drink at the age of nine from a wine glass after one of his mother's parties. PSR ¶ 166.

Drawn to stability and service, Ed joined ROTC in high school and served all four years. After graduating, he was accepted into the Army at 19, having been rejected twice due to his asthma. He served less than two years at Ft. Polk, LA, before being honorably discharged after an asthma attack. A year later, at the age of 20, Ed's firstborn son died after living only 20 hours. PSR ¶ 154. This tragedy scarred him deeply, and Ed turned to alcohol as he saw his parents do. He began drinking liquor more frequently and consumed both liquor and beer daily. PSR ¶ 166. By his own account, "It got pretty bad." *Id*.

At the young age of 24, Ed had the maturity to make a life-changing decision and seek help. He entered inpatient treatment and completed a 28-day program at The Meadows in April 1983. *Id*. Ed joined AA, became a sponsor, and has not had a drop of alcohol since. Soon after, he also found the love of his life, Debbie, and married her in 1987. Debbie provided Ed with the stability he lacked growing up. She told the PSR writer that they have enjoyed a "very stable marriage" for 35 years, and the current legal situation has brought them closer together. PSR ¶ 156a. Debbie described Ed as "my other half" and stated, "I hope the Judge will let him come home." *Id*.

After leaving the service, Ed worked for years in the aerospace industry moving heavy equipment, which has resulted in a back injury that still plagues him. He has lived in the Phoenix area for 50 years and has been involved in local and national politics, serving as an alternate delegate for Ron Paul at the 2012 Republican Convention. Although he served only briefly in the Army, Ed has a lifelong passion for assisting veterans. Before his arrest in this matter, Ed was the Program Director and Vice-Chairman of the Board of Directors for Homefront Battle Buddies (HBB), a non-profit organization dedicated to helping veterans with PTSD. Through HBB, Ed has taken courses in suicide prevention and was certified in mental health first aid. The Chairman of HBB, Adam Kokesh, has known Ed for 14 years. Sent. Ex. 1 at 21. He describes Ed as a "kind and generous" man who is "highly motivated by his principles." *Id*. Ed is "the engine of our organization," and "is critical to our organization and passionate about our mission." *Id*. Kokesh states that without Ed, his "organization has mostly fallen apart." *Id*.  In his view, "[t]he world, our country, and the veterans community needs more men like Ed, not less." *Id*.



*Vallejo (left) helping develop the Homefront Battle Buddies campus with Adam Kokesh*

3



*Vallejo (right) with Adam Kokesh (left) at a veterans suicide prevention course*



*Vallejo (fifth from left) representing HBB in a meeting with veterans organizations*

4

Joie Leigh, a resident on the HBB property, describes Ed as "an incredibly motivated individual" whose "motivation…is primarily to help others." *Id.* at 22. "He wakes up every morning and gleefully begins doing light work around the property. He cares for the animals on the property as if they were his own children which mirrors his interactions with the people he comes in contact with on a daily basis. This is just one of the many gallant character traits that Ed possesses which makes him a perfect fit for Program Director of HBB in working directly with veterans who feel lost and are looking for a compassionate ear." *Id.*

Leigh describes Ed as "passionate about his political views that are sometimes different from mine," but notes that "his passions have always been expressed with undertones of charity and good will." *Id.* "In all my many interactions with Ed over the past year," Ms. Leigh writes, "I've never seen him get angry, act violent or speak ill to me or of others…. [F]or him to be considered a threat to the public or any living creature for that matter is simply outrageous from what I know of him." *Id.*

Ed's passionate yet gentle nature, as well as his love of animals, also comes through in the letter of Trevor Osgood, another friend who has known Ed for decades. *Id.* at 7. Osgood describes what it is like to be Ed's friend through an anecdote from their last visit. Osgood was driving Ed to lunch when Ed started shouting to pull over before leaping out of the still-moving car. Knowing Ed, Osgood expected him to come back with "a kitten or an injured bird," *id.*, but instead Ed had spotted someone's lost wallet by the side of the road. Osgood immediately knew his lunch plans were over: Ed was going to make him "spend the rest of the afternoon tracking down the owner of this wallet to hand deliver it personally. No matter what it took." *Id.* And that is exactly what happened: "At Ed's insistence, we asked passersby and stopped into every store and shop. Finally,

we found somebody with vague directions up a dirt road. We canvassed the neighbors and eventually found an old guy whose face lit up with pure joy when we handed him back his wallet." *Id*. After spending his entire afternoon just to return a stranger's wallet, "Ed was so happy you'd think he'd won the lottery." *Id*.

Osgood summarizes Ed as a "true man of passion" whose "tools are an abundance of love, sunshine and gratitude to God for giving him a chance to prove it by helping people." *Id*. He is "ferociously" generous, and neither Osgood nor anyone he knows had any recollection of Ed ever using violence against anyone. *Id*. Rather, for Ed, "People come first. Animals come first. Any living and sentient being comes first." *Id*.

According to Osgood, it was Ed's "decades long dream of completing new care facilities for veterans of our armed forces." *Id*. Ed always frames his everyday speech in "military terms. A morning walk is 'recon,' breakfast is 'the chow line,' the day's activity is the 'detail.'" *Id*. at 5. Osgood explains that for Ed, this "lingo" helps maintain "bonds of brotherhood" with the veterans he was working with. *Id*. Just prior to his arrest, Ed was counseling a suicidal veteran, encouraging him to enter treatment for opioid addiction. Osgood is certain that Ed "will continue this activity until he passes from this Earth." *Id*. at 6.

Several letter writers speak of Ed's passion for organic gardening and generosity in sharing food with others. Leslie Adams, a family friend, wrote that "Ed is an impressive organic gardener growing an array of vegetables such as brussels sprouts, broccoli, tomatoes, carrots, etc. in the backyard." *Id*. at 7. And Ernie Hancock, a longtime friend and libertarian activist, wrote that "Ed was known by many to be 'the food guy.' He devoted much of his yard to food production and at

festivals he often had food available at his space and when there was an event or gathering Ed

usually had the food thing covered." *Id*. at 14.



*Vallejo working in his food-production garden with his grandson*

Ed's generous spirit and eagerness to offer a hand to anyone in need is his defining

characteristic to those who know him. Warren Ortez writes:

> There is one thing that has always awed and impressed me about Ed. And that is
> that no matter what time of the day or night, whether 2 minutes or 2 hours away,
> if you call Ed for help, he will come. Rain or shine. Doesn't matter. If you are in
> need, he will help. If he can't do it (and that is rare), he will call around until he
> can find a way to fulfill your need. I have seen him literally give a man the shirt off
> his back. If I were to draw a likeness of Ed, it would be how Gary Cooper was in
> the movie "Good Neighbor Sam." Always giving to others in need as he was
> taught as a child. Even if it would cost him in the long run. Doesn't matter. As long
> as he was able to help. That's his bottom line. Making sure that that someone got
> the help they needed.

*Id*. at 4. Kelly Carter wrote that he and his family "have been blessed in countless ways over the

last 40 years by knowing Ed Vallejo. He's been there to help us when our car broke down on

multiple occasions and has rescued us and helped us when other repairs were needed. He's been our 'go to' guy for so many things. He even helped organize our roof getting replaced.  If we needed anything, all we had to do is ask, and he would do his best to help." *Id*. at 2. Ms. Adams shared a similar anecdote that perfectly reflects Ed's character:

> I had only known Ed for a year or so and noticed that my front door knob and deadbolt locks were not working properly. I did not feel safe and mentioned my concern to Ed and Debra. Before I could arrange for a handyman to come and fix the problem Ed showed up at my house with door handle and deadbolt in hand and quickly installed them. He did an excellent job. I offered to give him some money for the locks and labor but Ed refused to accept a penny.  He told me that my safety was more important than money.

*Id*. at 9. Another friend, Thomasita Taylor, shared a similar story: "One time, [Ed] helped a friend clean out his friend's mother's house after she died.  Ed noticed that her clothes were about my size, so he made arrangements for me to select garments which I liked.  The rest were going to the Goodwill.  This certainly helped me with my clothing budget." *Id*. at 17. And Joie Leigh recounts that "Ed has helped me repair my vehicle, helped me build things around the property, he's been here when Adam is traveling just so that I don't have to be alone. I could go on for a few more paragraphs on the many ways Ed has been there to assist me without ever being asked or ever asking anything in return." *Id*. at 22.

Ed's wife, Debbie Vallejo, expresses gratitude for the kind, generous spirit Ed brought to her life. She writes that Ed "helped me understand my ex-husband and helped me to take the blame off of myself for his actions. I am a much better and happier person because of my husband. I have always stated God gave him to me because I sure couldn't have found him by myself." *Id*. at 23. But Ed's impact extended far beyond his immediate family, as shown by the palpable love for him

in his letters of support. As Mr. Osgood wrote movingly, "When [the court] granted him home confinement, I almost cried. I think you might have saved Ed's life with that one move." *Id*. at 6.

### Vallejo's Journey to Washington, D.C.

This "kind and generous" man's journey to Washington occurred in a unique and tragic moment in our country's history. In the fall of 2020, the sitting President of the United States repeatedly declared that a massive hijacking of the American electoral system had taken place. He assembled a legal team to contest the election and called for ordinary Americans to travel to Washington, D.C. on January 6, 2021, to support him. In so doing, the President cynically manipulated the best traits in Americans—their patriotism, activism, trust in authority, and love for democracy—to support his false claims. Vallejo, who exhibited all of these praiseworthy traits, trusted words of the sitting President of the United States and wanted to join ordinary Americans in responding to this call.

More than most, Ed was primed to believe the President based on his work as a poll observer in Maricopa County elections in 2008. Ed had personally observed poll irregularities and was called to testify in litigation surrounding an election. Sent. Ex. 2 (Nov. 3, 2009) ("When I testified recently as to the things I saw on Presidential Election Night that I believed to be breaches of security and conflicts of interest, the decision handed down by the judge days later amounted to 'we acknowledge that your testimony is true, but at this late date, there is nothing that can be done about it.'"). Based on this experience, the allegations of the President's team rang true to Vallejo, and he was further duped by videos claiming to show ballots being illegally mishandled and run through machines multiple times. Wanting to support election integrity, Ed made plans to drive

from Arizona to Washington, D.C. with two friends, Kelly Carter and Todd Kandaris. A third friend, a doctor, planned to come but couldn't make it.



*Ed's friend, Kelly Carter, preparing to leave for Washington, D.C.*

Vallejo and Kandaris made these plans on their own without knowing whether Stewart Rhodes would be going to Washington, D.C. *See* Ex. EV 101 at 1 (Text from Todd Kandaris to Rhodes stating: "Hey Stewart are you going to D.C. on the 6th? Myself and some other patriots are going to be there and would like to touch base if you will be there."). Ed knew Rhodes from his prior activism for Ron Paul but was not an active member of the Oath Keepers at the time. PSR ¶ 160. After learning that Rhodes would be in D.C., Kandaris made plans to camp with the Oath Keepers. Kandaris told Rhodes that the group was coming "[j]ust as volunteers….[w]e are rifles, man power, warm bodies there to support the process and the President." Ex. EV 101 at 16.

Ed was not privy to any communications between Kandaris and Rhodes and was not part of any Oath Keeper group chats until the day before he arrived in the D.C. area. Vallejo had seen the open letter to President Trump by Rhodes discussing the legal consequences if the President

were to invoke the Insurrection Act, Ex. EV 106, as well as various other websites outlining the President's options for lawfully challenging the election results even after January 6. Anticipating that protests of up to "ten million" people might continue through January 20, 2021, Ex. EV 108 at 2, Ed brought large amounts of food and supplies and expected to stay and cook for protestors camping on a farm, as many had been done at a previous rally held in November 2020.  His road companion and friend of 40 years, Kelly Carter, described how Ed brought many cases of food, and stated that he personally looked in all of them. Sent. Ex. 1 at 2.

A "kind and generous" man who is "highly motivated by his principles," Sent. Ex. 1 at 21, Ed placed enormous trust in both Rhodes and President Trump at this momentous time. Indeed, Ed was so trusting that he set out without even knowing where he was supposed to be going. He did not know where to go until January 5, 2021, when Rhodes put Ed and Kandaris in touch with Kelly Meggs. Ex. EV 102. Meggs in turn told them that the Oath Keepers had reserved a room at the Comfort Inn in Arlington, VA. This location was a surprise to Ed, who brought "200 pounds of food" in expectation of setting up a camp kitchen on a farm. Sent. Ex. 3 at 9. This text with the address was the only interaction between Vallejo and Meggs, *ever*.

Around the same time, on January 5, 2021, Ed was added to the "DC OP Jan 6 21" Signal chat group. Ex. EV 103. With the exception of Rhodes, Vallejo had never met or spoken to any other members of the chat group before. Even after obtaining lodging through the Oath Keepers, Ed was still discussing other groups to "sign up with," especially groups with permits at the Ellipse. Sent. Ex. 4. He also continued to receive information from his doctor friend, who had intended to come with him, about where to find "official" information about the Stop the Steal

rally, including from President Trump's Twitter feed. Sent. Ex. 5. ("There's no better direct link from him than Twitter.").

When he headed to D.C., Vallejo did not view himself as part of any "Quick Reaction Force" (QRF). Kelly Carter testified to the grand jury that he never heard the term "Quick Reaction Force" until January 6, 2021, despite traveling cross-country with Vallejo. Sent. Ex. 3 at 14. When he asked Ed about it, Vallejo incorrectly referred to the QRF as people staying at a campsite outside the D.C. area, and it seemed that he "had no idea what he was talking about." *Id.* at 15–16. He did not think that he was personally "serving as a Quick Reaction Force." *Id.* at 16; Sent. Ex. 1 at 2. Generally, Ed's texts reflect that he independently "[h]eaded to D.C. to hold their feet to the fire" as part of a massive rally, not as part of an organized Oath Keeper plan. Ex. EV 101.1.

### Oath Keepers and the 2020 Election

Members of the Oath Keepers, including its founder, Stewart Rhodes, were also dissatisfied with the November 2020 election. For some, this dissatisfaction included the belief that the election was unconstitutionally conducted due to Covid-related changes made by state executive or judicial officials; it was also widely believed that voter fraud impacted the outcome. Shortly after the election, Rhodes conducted a national call for Oath Keepers to discuss plans to gather in Washington, D.C. to protest the election results. Gov. Ex. 1000. Participants on the call included Rhodes, Kelly Meggs, Terry Cummings, Michael Adams, and Jessica Watkins. Gov. Ex. 6857. Vallejo was not on this call, or on any Oath Keeper planning meetings.

Some members of the Oath Keepers, including some on the call, gathered in Washington, D.C. on November 14, 2020 for an event dubbed the "Million Maga March." Trial 2 Tr. 1506.

This group of Oath Keepers was hosted for the weekend by Thomas Caldwell, who provided space on his farm. Group members attended rallies and events that weekend and provided personal security details. In addition, as they had at numerous prior events throughout 2020, the Oath Keepers had a group acting as a "Quick Reaction Force" (QRF). Trial 2 Tr. 2331. In an open letter discussing plans for the event, Rhodes described one of the purposes of the QRF: "Oath Keepers will have some of our most skilled special warfare veterans standing by armed, just outside of D.C., as an emergency QRF in the event of a worst-case scenario in D.C. (such as a Benghazi style assault on the White House by communist terrorists, in conjunction with stand down orders by traitor generals)." Gov. Ex. 1002; Trial 2 Tr. 1686–87.

Throughout the fall and winter of 2020, Rhodes discussed many times his desire to see President Trump take action to address what he saw as an unconstitutional and fraudulent election. These discussions included multiple open letters published on the Oath Keeper website as well as discussions in Oath Keeper Signal chats. Gov. Ex. 1002; Gov. Ex. 1008. In general, Rhodes called upon President Trump to declassify documents he believed would reveal corruption in the U.S. government and to use the military to conduct new, clean, and constitutional elections. *Id*. He also called upon President Trump to invoke the Insurrection Act, deeming the supposed fraud and unconstitutional election as a kind of rebellion. Rhodes hoped that the Oath Keepers would be used by President Trump under the Insurrection Act as part of the general militia. Rhodes continued imploring President Trump to invoke the act through January 10, 2021, when he tried to deliver a message to that effect to President Trump through Jason Alpers. Trial 2 Tr. 4068.

During this same time period, the Oath Keepers took part in marches and rallies in Atlanta, Washington, D.C., and other locations. Generally, as they had done at the "Million Maga March,"

the Oath Keepers had QRFs at these events in case there was violence between protestors requiring intervention. Trial 2 Tr. 2331; Trial 2 Tr. 2337–41. *See also* Ex. EV 100 (describing having a "barge at Louisville" to "help us exfill, Escape and Evade"); Ex. EV 172 (discussing "a QRF that will be specifically trained for hot extract"); Sent. Ex. 6 (describing purpose of QRF as for "MEDEVAC and Extraction if something really bad happens.").[1]

### The Oath Keepers' Plans and Goals for January 6

Although Vallejo was not a party to them, there were numerous meetings, Signal chats, and open letters by Stewart Rhodes and others discussing plans by the Oath Keepers to gather in Washington on January 6, including plans for a QRF. In mid-December, the Oath Keepers announced that they would be participating in events and rallies in Washington, D.C. from January 5–6, 2020. Gov. Ex. 9514. Rhodes established a Signal chat group dedicated to planning the events and held several conference calls. On these calls and group chats, the Oath Keepers discussed D.C. weapons laws and the need for strict adherence to them. Trial 2 Tr. 3166. They also discussed providing personal security details to speakers and attendees at various rallies. Ex. EV 13. Dozens of members of the Oath Keepers traveled to Washington, D.C. from several states to take part in these events, including Oath Keepers from states (such as Wisconsin) who have never been implicated by the government as part of any conspiracy.

As they had at previous rallies, Oath Keeper members discussed having a QRF where members would store personal firearms. Rhodes stated that "this situation calls for" a QRF (Ex.

---

[1] Notably, members of Antifa and other groups had attended prior rallies carrying assault rifles, tactical gear, and other weapons. *See, e.g.*, Ex's. EV 700, 700.1. And a Trump supporter had been shot and killed by an Antifa member earlier in the year in Portland, Oregon. Both events were discussed on Oath Keeper Signal chats. Sent. Ex. 7.

EV 400),[2] and Thomas Caldwell, Doug Smith, and Paul Stamey separately discussed logistics regarding a QRF hotel (Trial 2 Tr. 2479).[3] At trial, the government did not introduce any evidence discussing any illegal or offensive purposes for the QRF, much less that it was part of a plan to forcibly interfere with the certification of the election. On the contrary, testimony and documentary evidence established that the QRF was understood by the Oath Keepers as (1) people that could help in an emergency to save lives; (2) people that could help transport people out of D.C. and/or out of harms' way; and (3) people that could bring firearms to their owners in D.C. if lawfully authorized by President Trump to do so under the Insurrection Act. *See, e.g.*, Ex. EV 143 (Caldwell message describing the "QRF vehicle" as a way to "save lives" and to "get folks out" and "get them home"); Sent. Ex. 8 at 79 (Graydon Young) ("Q. And what was your understanding of the purpose of the QRF? A. I did hear them talking about if things got out of hand in the city. And they were talking more specifically about what I was talking about before, the NFAC [Not Fucking Around Coalition] or the Antifa-type guys showed up armed and people could get harmed that they were going to go retrieve weapons."); Trial 1 Tr. 1905 (John Zimmerman) (QRF was to "get out quickly, grab somebody if they were injured, throw them in the van if we were to go into D.C. to extricate them for medical aid or movement or whatever was needed."); *id.* at 1906 (QRF was "for injuries or extraction of folks from D.C." and "the plan was [we] would have driven them back to Virginia" or "if the President invoked the Insurrection Act"); *id.* at 1935 (QRF was for

---

[2] There was testimony that clashes had occurred among protestors at a December 14, 2020 rally in Washington, D.C., and that a Trump-supporter had been stabbed. Tr. 2329. And as discussed above, members of Antifa were known by the Oath Keepers to have carried assault rifles and tactical gear to rallies, Ex's. EV 700, 700.1, and to have killed a Trump supporter, Sent. Ex. 7.

[3] Testimony in Trial 1 established that Stamey and Caldwell were part of a North Carolina schism with the national Oath Keepers.

"extraction or defensive purposes"); Trial 2 Tr. 2478–79 (reviewing messages stating, "Do not bring weapons into DC unless you are LEO with LEOSA creds unless and until shit truly hits the fan. This is the exact same thing we did in both prior DC Ops. We come armed to VA and stow our weapons there someplace safe and we go into DC without guns (except for our LEOSA credentialed cops). Our firearms can be in the hands of a dedicated QRF team who can link up with us if the shit truly hits the fan but otherwise they stay out of DC. Understand?"); *id.* ("I am worried about pepper spray mainly because lately the Antifa types have started using that right out of the gate on people"); Trial 2 Tr. 2665–66 (Berry) (Q. You planned to be there for security detail, correct? A. That was the original intent, yes, ma'am…. Q. And to be -- and the QRF, if there needed to be an emergency response, right? A. Yes, ma'am…. Q. It's a counter-offensive, it's for defense if something really bad happens, right? A. Or if something fails, yes, ma'am."); Trial 2 Tr. 2668–69 (Berry) (Q. Do you recall that you spoke about the possibility that firearms might be necessary? A. I do recall that. Q. When you spoke about that with those others, the discussion was centered around if there was a major emergency that needed to be responded to, correct? A. Correct."); Trial 2 Tr. 3577–78 (Herrington) (Q. And there was no discussion about using weapons to attack the Capitol, right, that you heard? A. Not that I heard, no, sir….Q. And you understood that from what Mr. Rhodes was saying, he was saying that the militias, if called upon under the Insurrection Act, would support whatever the government needed? A. Yes, sir. Q. They wouldn't be against the government, right? A. No, sir…. Q. Mr. Rhodes said that the Insurrection Act could be used to call people up to support the President, correct? A. Yes, sir. Q. And to suppress an insurrection of people trying to stop the President from enforcing the act? A. Yes, sir.").

Likewise, the government did not introduce any evidence at trial indicating that Oath Keepers had any plan to interrupt the certification process. Indeed, out of *tens* of *thousands* of *pages* of Signal chat messages, and countless additional Facebook and SMS messages reviewed by law enforcement, the government did not identify a single message discussing the prospect of interrupting the certification, by force or otherwise. Rather, all concrete references to the use of weapons prior to the inauguration occurred in the context of calls for President Trump to invoke the Insurrection Act or to potential life-threatening clashes among protestors. *See, e.g.*, Gov. Ex. 9514 (Msg. 192.T.1415, 19); *id.* (Msg. 1.S.159.197); *id.* (Msg. 1.S.656.9846 9514); *id.* (Msg. 1.S.656.10101); *id.* (Msg. 2000.T.289); Ex. EV 143.

Witness testimony further corroborated that there was no prior Oath Keeper plan to interrupt the certification process as part of the January 5–6 "Op." Government witness Joe Herrington, who was with the Oath Keepers' operational leader (Michael Greene) for the January 5–6, described in detail the process of Greene and others learning and reacting spontaneously to the events of January 6:

> A.   We heard explosions, and naturally it's what – I don't know if it's what normal people do, that's what soldiers do, they look toward the direction of the sound, and we saw smoke so we started moving toward that area, sir.
> Q.   And at that point, no one had told you that it was the plan for you to go to the Capitol, right?
> A.   No, sir. It was more or less, There's something bad happening over there, we need to get there over and see what's happening….there was no discussion about going in, it was more or less just like, What in the world's happening right here….
> Q.   Do you recall there being a discussion with Whip about whether to go into the Capitol at some point after you heard the explosions?
> A.   Yes, sir, we were -- when we were standing – it was after -- it was quite a bit into the incident there. It was quite a bit of time into it.
> Q.   So it was when you got to the Capitol but not right when you got to the Capitol?
> A.   Correct.

Trial 2 Tr. 3581–82. Government witness Brian Ulrich also confirmed that there was no prior plan

to go to the Capitol and described how he decided in real time to enter the Capitol:

> Q. How long did you pause there before entering [the Capitol] yourself?
> A. Probably four or five minutes.
> Q. And in those four or five minutes, what were you doing? What were you thinking?
> A. Kind of the same. I just -- I was battling out the fact that I knew going in there was wrong with, this is a moment that, you know, I feel like I've got to do something.
> …
> Q. When you left the Mayflower, you told the FBI you didn't know why you were going to the Capitol, right?
> A. Correct.
> Q. There was no plan that you were aware of, right?
> A. Yeah. There was no -- no specific discussion.…
> Q. Along the way, Mark Grods said to you, "We're just going to meet up with some other Oath Keepers"?
> A. Correct.
> Q. And that's all you knew?
> A. At that time, yeah.
> Q. Now, at some point…you walked through -- you had a -- you made a decision to walk through the doors.…
> A. Yes.…
> Q. And you had a brief exchange with Jackson, and he made it clear he wasn't going inside, right?
> A. Correct.
> Q. So then just you and Grods went inside together?
> A. Yes.
> …
> Q. But at no point did you think you were there to link up with those other Oath Keepers for the purpose of attacking the building, right?
> A. No one had -- no one had mentioned attacking the building.
> …
> Q. And at no point on the 5th or the 6th did you have any conversation with anybody about using force to interfere with whatever proceeding Congress was going to conduct that day, did you?
> A. Correct.
> Q. And you didn't hear anybody else talk about that did you?
> A. Correct.…
> Q. There had been no conversations about using force among the Oath Keepers that you were with?

A.  On the 5th and the 6th?

Q.  Correct.

A.  No.

Q.  When you came to Washington, D.C., you had no plan to try to stop the certification, correct?

A.  No.

Q.  And you had no plan to try to violently or forcibly keep Joe Biden out of the White House, right?

A.  No.

Q.  You did hope that somehow, in a legal way, Trump would be able to reveal fraud and in your view the election would be vindicated, correct?

A.  Yes.

Q.  But you only wanted to do that through legal means, right?

A.  Yeah, I was wanting him to use whatever legal means he had at his disposal.

Q.  And that included, your understanding was he might use the Insurrection Act, right?

A.  Yes.

Q.  And you believed that he could use the Insurrection Act to legally, under his authority as President, to do things like recount the votes, right?

A.  That's what I was hoping for, yeah.

Q.  And if called upon under the Insurrection Act, you believe the Oath Keepers might be able to provide services to the President of the United States, right?

A.  That was the -- that was the consensus.

Q.  And you had no plan -- if Mr. Trump did not use the Insurrection Act and bowed out, you had no plan to stop Joe Biden from taking the oath of office, correct?

A.  Yeah, nothing was discussed beyond that…for a specific action on the 6th.

Q.  So no Oath Keeper that you ever spoke with discussed with you a plan to forcibly stop Joe Biden from becoming President, correct?

A.  Correct.

Trial 2 Tr. 3862; 3887–88; 3891; 3892–93; 3921–22.

Finally, Caleb Berry also confirmed that his first awareness of any intent to interfere with the certification process occurred immediately before Line 1 ascended the stairs at the Capitol around 2:35 p.m.:

Q.  You planned to be there for security detail, correct?

A.  That was the original intent, yes, ma'am.

…

Q.  When you got close to the Capitol building, did there come a time when you were in a huddle with other members of your Oath Keepers group?

19

> A.   Yes, sir….
> Q.   And what was Kelly saying?
> A.   Kelly was saying that two of our guys had got separated -- two of the Oath
>       Keepers got separated from the group and had walked up the stairs. And he
>       also said that we were going to try to stop the vote count….
> Q.   And after the huddle broke up, did you all walk in a certain direction?
> A.   We did.
> Q.   Towards what?
> A.   The stairs up to the entrance.

Trial 2 Tr. 2665; 2618. And these denials were consistent with other denials by witnesses in the first trial, who uniformly denied that there was any Oath Keeper plan to disrupt the certification process. *See* ECF 435-1 at 13–16 (describing testimony of Mike Adams, Terry Cummings, Jason Dolan, and Graydon Young).

Trial evidence from the events of January 6 also documented facts inconsistent with any prior Oath Keeper plan to interrupt the certification that day. For example, messages established that Rhodes did not know where other Oath Keepers were during the key time-period, including his operational leader. Gov. Ex. 9552 (Msg. 1.S.159.1046) ("Whip, what's your location? I'm trying to get to you."). Indeed, Rhodes did not even know where *he* was during these events, wrongly telling people that he was on the south side of the Capitol when he was actually on the northeast side. Trial 2 Tr. 2918. Rhodes also was caught flat-footed without his helmet or other gear, which he had left behind the stage at a rally. Ex. EV 142. And other members, including Caleb Berry, did not even have their gear, having been instructed to leave it behind so they could attend a rally without any foresight of what was to follow at the Capitol. Trial 2 Tr. 2615. Video evidence from Defendant Minuta of his golf cart ride to the Capitol documented in real-time the spontaneous nature of Line 2's response to reports of the events at the Capitol and its lack of any planned coordination with Oath Keepers from Line 1. Gov. Ex. 1508. And messages between

Rhodes and other Oath Keepers between 1:45 p.m. and 2:24 p.m. documented the Oath Keepers' real-time confusion regarding what was happening at the Capitol, as well as the fact that Congress had called a recess before any Oath Keepers even arrived at the scene. *See* Ex. EV 109 at 2 ("Are we SURE that they are actually Patriots and not those bad actors who are dressed as patriots from word we had been getting that was a possibility?"); *id*. at 4 ("Who's storming what building??"); *id*. at 5 ("SUpposedly Patriots - watching the live feed right now - and at the Capitol. It is in lock down right now and apparently Congress has called a recess."); *id*. at 7 ("ANTIFA infiltrating as MAGA with backwards red hats").

In sum, the documentary and testimonial evidence at trial demonstrated conclusively that any possible agreement to enter the Capitol was unplanned and was formed, if at all, between individual Oath Keeper members as they marched to the Capitol, huddled near the Capitol, or on the way up the steps of the Capitol. Indeed, the government's theory at trial appeared to be that a 2:32 p.m. to 2:33 p.m. three-way call between Rhodes, Meggs, and Greene was the key moment when an agreement to interrupt the certification was solidified, with Meggs moving up the Capitol steps immediately afterward. Gov. Ex. 1500.2; Gov't Ex. 1503.1; Trial 2 Tr. 2939. *See also* Trial 1 Tr. 9911:8–11 (Nov. 18, 2022) ("The defendants are not charged with entering into an agreement ahead of time, ahead of January 6th, to storm the United States Capitol. That is not the allegation in this case."); Trial 1 Tr. 10296: 5–8 (Nov. 21, 2022) ("Let me be clear on behalf of the United States of America, we do not allege a specific plan to storm the United States Capitol. We never have and we are not now. We do not have to prove a plan.").

**Evidence Regarding Vallejo**

As noted above, Ed had a different path to Washington, D.C. than all other defendants. The trial evidence established that Vallejo was not part of any Oath Keepers conference calls or discussion groups prior to arriving in the D.C. area on January 5, 2021. Rather, he independently made plans in December to go to Washington with three friends without knowing that Rhodes planned to be there. The evidence established that during this timeframe, Vallejo viewed a podcast interview with Sam Andrews calling for ordinary Americans to join an armed march in Washington on January 4, 2021 to demand accountability for election fraud and for the lawful arrest and indictment of supposedly corrupt officials. Ex. EV 127; Ex. EV 709; Trial 2 Tr. 1962–63, 2342–49, 2353; Ex. EV 139 at 2 ("Sam Andrews unveils plans to appear in Washington, DC on January 4, 2021 to demand government accountability"); *id.* at 3 ("Sam Andrews…announces the plan to assemble a large group of armed patriots on January 4, 2021, in Washington, DC to lawfully and legally petition the US government to take action against the treason and sedition of elected and appointed of public officials."). In the interview, Andrews and the host repeatedly stated that that the intent was to march peacefully while armed as an expression of the marchers' exercise of their "First and Second Amendment rights at the same time." Ex. EV 709. Andrews also discussed the possibility that Trump might invoke the Insurrection Act, and discussed high-ranking former military officials who supported that option. *Id.* Nowhere in the two-hour interview did Andrews discuss January 6th or the certification process. Trial 2 Tr. 1957–58, 1960–63, 2341–49, 2353, 2355–56, 2469–74, 2514–16. Vallejo sent a link to the interview to Kelly Carter, his longtime friend in Arizona, and Carter responded with a text agreeing to go to Washington.

Prior to setting out for D.C., Vallejo and his three friends made a Signal chat group to discuss their trip amongst themselves. In this group, as well as in text messages sent to others, Vallejo discussed the certification process with eager anticipation. *See, e.g.*, Ex. EV 122; Ex. EV 123. There was no evidence introduced at trial that Vallejo had any intent to interrupt the certification process or otherwise act unlawfully when he set out for D.C. On the contrary, Vallejo identified with great excitement specific senators and representatives that planned to lodge formal objections during the process, Ex. EV 122; Ex. EV 123, and expressly stated that his purpose in going to D.C. was to hold Congress's "feet to the fire" during the certification process, Ex. EV 183. *See also* Trial 2 Tr. 2356.

As described above, after they made plans to go to Washington, Kandaris, reached out to Rhodes to ask if he would be in D.C. at the same time. Ex. EV 101. Rhodes did not recognize Kandaris's number and did not remember him at first. *Id.* Rhodes asked Kandaris how many people were coming with him and whether they would be "attendees or speakers or security volu[n]teers?" *Id.* at 15. Kandaris replied: "Just as volunteers, as far as I know noone is anticipating speaking. We are rifles, man power, warm bodies there to support the process and the President." *Id.* at 16. While the government made much of this "rifles" comment by Kandaris at trial, he used that word in the context of stating that Vallejo's group would be available as "security volun[t]eers"—a role that usually involved being armed where lawful. And Vallejo had already approvingly forwarded the podcast calling for lawful "First and Second Amendment" activity. Ex. EV 709. Nothing in the comment suggested that Kandaris planned to interrupt the certification, and in fact he expressly stated that he was coming to "support the process." Ex. EV 101 at 16.

23

The next day, Kandaris asked Rhodes where "staging" would be for "technical equipment and 'supplies.'" *Id.* at 17. Rhodes did not respond. Three days later, after getting to western Virginia, Kandaris asked Rhodes whether there is a "rally point." *Id.* at 18. Vallejo also asked Rhodes via text message for the location of the "encampment." EV 102. Rhodes directed Vallejo to contact Meggs, and Vallejo texted Meggs asking for the "campground address." Meggs responded with the address for the Comfort Inn in Ballston, Virginia. This single text from Meggs was the first time that Vallejo learned that he would not be going to a campground and the *only* time he had any contact with Meggs, *ever*.

After arriving in the D.C. area on January 5, 2021, Ed checked into his hotel and unloaded "200 pounds of food," various supplies, and a personal equipment bag. Sent. Ex. 4 at 9. According to Carter, Ed "never, ever touched" firearms." Sent. Ex. 3 at 21; Sent. Ex. 1 at 2. Unlike Stamey and Kenneth Bittner, who stayed at the Comfort Inn with firearms from their respective Oath Keepers groups, Trial 2 Tr. 1548, Vallejo and Kandaris immediately left the hotel and joined Oath Keepers providing security at an event at the Supreme Court, Trial 2 Tr. 2490–91. Around 4:30 p.m., Vallejo was added to the "DC OP: Jan 6 21" Signal chat group for the first time. EV 124.

Kandaris described Ed's and his first afternoon in D.C.:

> [W]e arrived around noon. We hooked up with the Oath Keepers and we bivouacked with them in Arlington. Then we unloaded what we could. We got into D.C. as quickly as possible. We went to a gathering at the Supreme Court building, completely peaceful, very calm, lots of police but they were all calm and everything was fine. Then we decided to go to another venue which was supposed to be bigger which it was at Freedom Pavilion…. We went down there and there were a lot more people and you know they had set up a complete you know media set up. We had speakers. It was completely peaceful. We worked as security to get some high-profile people, couple of generals, some other speakers, that came in and addressed the crowd. And everybody was uplifted and excited, but no violence whatsoever…very calm, no police interference. They were all good, everything was fine.

Sent. Ex. 9 at 1. After walking around some more and taking selfies, Ed forgot where he parked his 1996 Nissan pickup and had to take an Uber back to the hotel.

The government's opening statement claimed that the next day, January 6, Ed "was staged at a Virginia hotel just across the river," Trial 2 Tr. 889, and "had…those rifles ready to rush them into D.C.…to attack the United States Capitol building," Trial 2 Tr. 888. However, the trial evidence established that on the morning of January 6, Rhodes assumed that Vallejo would be going into D.C.—not staged in Virginia—and that Vallejo also had that as his plan. This was established through messages on the morning of January 6 showing that (1) Rhodes asked Vallejo if he needed a ride into the city; (2) Vallejo stated that he had a ride when his team members woke up; (3) Vallejo asked about rules and regulations in D.C. (he wanted to bring his replica antique boarding cutlass); (4) Vallejo asked about bringing a drone; and (5) Rhodes said to bring the drone. Ex. EV 125. And indeed, Vallejo did go into D.C., leaving the hotel around 11:50 (Ex. EV 250)—the worst possible time to be leaving for D.C. to look for a lost truck if the truck were part of a plan to interrupt a 1:00 p.m. certification proceeding with "staged" weapons from the Comfort Inn. There is thus no evidence supporting the claim that Vallejo was planning to be "staged" at the hotel in order to bring weapons in support of any forcible or unlawful activity on January 6.

Before going downtown, Ed joined Kandaris on a podcast hosted by a mutual friend from Arizona. Sent. Ex. 9. On the podcast, Kandaris discussed the scene from the previous day and how peaceful the pro-Trump rally gatherers had been. Asked why they went to D.C., Kandaris explained that he took an oath as a Marine to support and defend the Constitution. He stated that he wanted to Congress to know that people were watching them, and hoped this pressure would

ensure a constitutional process in Congress to stop a fraudulent outcome that he feared might lead

to violence:

> I think the primary things are to really create a plausible show of evidence that
> there was significant voter fraud and then to take the next constitutional
> action…[I]t's very clear constitutionally what the next steps are. Fraud exists and
> that this vote will be done by one vote one state…. [T]here are many, many citizens
> here in the D.C. and surrounding area, more coming in by the minute. That's got
> to apply pressure…that the powers that be are under scrutiny. And that this would
> be very difficult under these circumstances to pull a fast one…[B]asically the idea
> is, look, we're here. We're applying as much pressure as we can. The only and
> obvious next step is to go into armed conflict but hoping very much that that
> doesn't happen.

*Id*. at 9. Asked if violence was really a possibility after a final certification of the election, Kandaris

described the danger as he saw it:

> [T]he fact is that there are people here who are prepared have the will, have the
> facilities, to do more than taunt. The question is, you know, is there a shot heard
> 'round the world moment? The possibility…definitely exists…. [I]t's a tinderbox
> and this right now, what we've seen, I mean, we have a little bit of inside
> information with the powers that would oppose the powers that be. But this is a
> tinderbox it just is a question of what is the precipitating event.

*Id*. at 10. Hoping to avoid setting off a "tinderbox," Kandaris expressed his view of the importance

of people like him and Ed gathering in Washington:

> I think we cannot fail. We have to stand and pass that test. That's why people are
> here…. [T]hey are normally very even tempered professionals and individuals,
> educated people. You know we're not a bunch of yahoo white supremacist
> skinheads. We are, we are doctors, lawyers mothers, fathers, you know, people
> who are the core backbone of the United States.

*Id*. With somewhat less eloquence, Vallejo passionately expressed his similar hope that presidential

leadership would result in a favorable outcome of the certification process. He stated, "I'm just

praying to God that Trump has his head on fucking straight and he knows what he's doing. He's

got the machinations behind him, he's got all the proof in the world and he's gonna bring the

fucking hammer down." *Id.* at 17. And he also expressed his fear that the alternative would lead to violence: "[M]y gut feeling…is…the American people are going to be told today that we have liberty and justice for all or they're gonna be told fuck you…and if they're told fuck you, that's going to be the declaration of a guerrilla war." *Id.* at 15.[4]

Despite the martial nature of this rhetoric, none of Vallejo's comments—made on the very morning of January 6, 2021—evidenced any desire to hinder or delay the certification process. On the contrary, they explicitly expressed hope in the president and the process. Immediately after expressing his hopes for the outcome of the certification process, Vallejo headed into D.C., away from any weapons at the Comfort Inn. Ed spent the next two hours on January 6th looking for his truck. He did not find his truck until 1:19 p.m.—just a few minutes after President Trump concluded a rally at the Ellipse with a call for protestors to march toward the Capitol. Ed was giddy, texting, "Eureka! Truck found :)" Ex. EV 104. After finding the truck, Ed and Kandaris watched the crowd marching east for a bit and then drove near the Capitol. They were routed out of the city by road closures and police, however. Sent. Ex. 10 at 23. As Kandaris explained:

> [W]e could only observe from afar because we were not allowed to go past the barriers of the spokes to the wheel of the center city at that point…the center of the Capitol itself, and then basically we were relegated to driving out of the city because the police and everyone were directing all that traffic out of the city and there was really nowhere to turn because they had blocked off all turns left or right and you basically had one path out of the city.

*Id.* After being routed out of the city, Ed and Kandaris returned to the hotel, arriving at 2:15 p.m.

---

[4] In rhetoric he regrets (but which is common on talk radio), Vallejo stated, "I'm the guy that everybody said no, Ed, you can't shoot 'em yet, it's too soon. No, Ed, you can't shoot the bastard yet, it's too soon. Well, …about five six months ago…they quit telling me." Sent. Ex. 9 at 16. Ed's podcaster did not take these words literally, stating that he understood "the sentiment" and describing Ed as a man who is "well known by a lot of people" to be someone who "if somebody needs yellin' he'll take care of it for em." *Id.* at 4. He contrasted this demeanor with Kandaris, whom he described as an "IT guy more logic and reason." *Id.*

In the hour it took for Vallejo to get back to his hotel, chaos had engulfed the U.S. Capitol building. On the Oath Keeper group chat (to which Ed had just been added the day before), there were reports of "blood in the Capitol steps," "Officer down," "flash grenades/explosions going off," "tear gas at the Capitol," and "several officers hurt," along with predictions that "the Police are going to be overwhelmed." Ex. EV 104 at 2–6. It also appeared that Oath Keepers near the Capitol were trying to find each other, with Rhodes asking various Oath Keeper members, "[W]hat's your location? I'm trying to get to you" and "where are you?" Seeing these messages, Vallejo texted the group at 2:24 pm: "Vallejo back at hotel and outfitted. Have 2 trucks available. Let me know how I can assist." *Id.* at 7. He then texted a friend, "The People have taken the Capital and Congress is in bedlam & locked down." Gov. Ex. 9552 (Msg. 210.T.6.2). Hearing no response from Oath Keepers, he messaged the group again fourteen minutes later, stating "QRF standing by at hotel. Just say the word..." Ex. EV 104 at 8.

The government has argued throughout the case that these messages reflect Vallejo offering to deliver a cache of weapons to Oath Keepers in an effort to violently take over the U.S. Capitol and halt the certification process. *See, e.g.*, Trial 2 Tr. 4425; Trial 2 Tr. 4408 ("Outfitted with what? Guns."). But it was forced to admit in Trial 1 that when Vallejo sent the first message at 2:24 p.m., Oath Keepers had not yet decided to "seize the opportunity" presented by the crowd's breaching of the Capitol. Indeed, Vallejo's 2:24 p.m. offer of assistance was made ten minutes before the three-way telephone call where Meggs, Greene, and Rhodes allegedly discussed entering the Capitol just prior to Line 1 ascending the stairs. Gov. Ex. 1500.2; Gov't Ex. 1503.1; Trial 2 Tr. 2939. Nor could Vallejo have known when he sent his 2:38 p.m. message that at that

precise minute, seven miles away, protestors inside the Capitol opened the Columbus doors from the inside, allowing more people (including some Oath Keepers) to enter the building.

Moreover, numerous documents and eyewitnesses established that there was never any offensive plan involving the QRF, much less a plan to bring weapons to the Capitol. What there was a plan for was to use the QRF to help extract people from dangerous situations, which the stream of messages indicated was unfolding. *See* Ex. EV 143 (describing a plan to "save lives" and get people out of D.C.); *see also* Ex. EV 100 (discussing use of QRF boats to "exfill, Escape and Evade"); Ex. EV 172 (discussing "a QRF that will be specifically trained for hot extract"); Sent. Ex. 6 (describing purpose of QRF as for "MEDEVAC and Extraction if something really bad happens."); Trial 1 Tr. 1906 (John Zimmerman) (QRF was "for injuries or extraction of folks from D.C." and "the plan was [we] would have driven them back to Virginia"). This is thus by far the most plausible interpretation of Vallejo's offer of help.

Further supporting this interpretation, later messages by Ed clearly show his intent to help evacuate Oath Keepers out of a dangerous situation, not arm them so they could stay there. At 4:49 p.m., Vallejo sent an almost identical message referencing his trucks and explicitly offering to "exfil" (evacuate) people: "I have 2 pickups and 1 hour 11 minutes to exfil whomever needs it." Ex. EV 104 at 9. And at 5:51 p.m., with a 6:00 p.m. curfew nearing and Oath Keepers expressing concerns about people being "stuck inside" D.C., Vallejo again offered to transfer people, stating that his Arizona team "won't let anyone walk. I was RTO [radio telephone operator] for 36 Dust off [a medical *evacuation* unit] and we will monitor all night and transport anyone that meets us on the perimeter curfew be damned." *Id.* at 12. In sum, the messages in context clearly reflect Ed offering to help "exfil" Oath Keepers from a dangerous situation, using his unarmed, beat-up 1996

29

pickup truck. There is no evidentiary support for the government's relentless accusations of Vallejo attempting to bring firearms to support a Capitol attack by the Oath Keepers. Rather, the only reasonable interpretation of Vallejo's messages was as an offer of help in the context of "bedlam" and "SHTF"—the explicit purpose of the QRF. Ex. EV 400 at 4.

Indeed, it is *impossible* that Vallejo meant that he had "outfitted" his "two trucks" with "guns" as the government claimed. Trial 2 Tr. 4408 ("Outfitted with what? Guns."). Kelly Carter, an uncharged eyewitness who was in Ed's room the whole time, testified that Ed "never, ever touched" any firearms. Sent. Ex. 3 at 21; *see also* Sent. Ex. 1 at 2 ("As I told the government and the grand jury, I never saw Ed with any weapons on our trip. If he had one in his bags, he never took it out on January 6 or otherwise. I was in our hotel room for the entire trip and Ed never checked firearms or prepped them."). And video from the Comfort Inn proves that Ed did not "outfit" his truck, which had been left in D.C. without weapons overnight.

It is also clear that Vallejo opposed those who were smashing windows and attempting to violently attack the Capitol. Throughout the afternoon, there was widespread confusion among Oath Keepers who were not at the Capitol over whether Antifa was attacking the Capitol. Vallejo spent considerable energy watching videos and trying to figure out whether "patriots" or "Antifa" forcibly breached the Capitol and believed that Antifa was behind the initial violence. *See* Ex. EV 124.1B at 3–4 ("We believe this is Antifa but not confirmed. Note the lumber. There was a cache of lumber and propane tanks discovered in downtown D.C. yesterday just like the Soros brick stashes."). He circulated a video of Trump supporters stopping violence at the Capitol and opposing lawlessness with chants of "WE ARE NOT [AN]TIFA." Ex. EV 178. That afternoon, he reported: "Antifa…broke in and ou[r] guys are now getting pics of antifa posters inside." Ex.

EV 124.1B at 6. And on a podcast the next day, Vallejo referred to violence at the Capitol as "domestic terrorism" that he did not support (Trial 2 Tr. 4157) and condemned those who "hijacked" the scene by "beating on…windows" and using pre-stashed instruments like bricks and propane tanks. Ex. EV 150.B. Obviously, evidence that Ed opposed even the breaking of windows strongly casts doubt on any narrative that he wanted *firearms* to be used at the Capitol.

Although Ed expressed opposition to those who used violence and forcibly attacked the Capitol, he nevertheless sympathized with the viewpoint of protesters who surrounded the Capitol. Even while investigating Antifa and praising those who stopped some of the attacks, Vallejo made a joke to Ernest Hancock at 3:47 p.m., "So have you secured the Arizona capital yet, slacker? Waitin' on you now 😆." Ex. EV 124.1B at 5. And later, when Rhodes stated that "[t]housands of ticked off patriots spontaneously marched on the Capitol and sent the message that they will not live under an illegitimate ChiCom puppet regime"—spontaneously, not as part of an Oath Keeper plan—Vallejo responded that "We'll be back at 6 am TO DO IT AGAIN." Ex. EV 105.

Importantly, this "DO IT AGAIN" comment referred to "march[ing]" and "sen[ding] a message"—protected First Amendment activity. Based on Vallejo's consistent comments, the trial evidence established that Vallejo generally supported the nonviolent "surround[ing] the Capitol building" as a means of sending a message to Congress to "do the right thing" during the certification process. Ex. EV 150B. However, he also knew at some point that Oath Keepers had entered the Capitol, even if through self-serving reports that they were taking pictures of Antifa members (Ex. EV 124.1B) or assisting the police (Ex. EV 305.4) (reporting that Oath Keepers had escorted "scared" MPD officers to safety). Thus, given the jury's verdict, it must be assumed for

purposes of sentencing that after learning that Oath Keepers entered the Capitol, Ed supported, in a way consistent with his general opposition to violent attacks on the Capitol, attempts to push past police and interrupt the certification process as part of sending a message to Congress.

In the aftermath of these events, discussions began on the Oath Keepers Signal group as to what to make of the event and how to respond. It is clear that the days' events inspired Vallejo to continue the purpose for which he came to Washington, D.C.: to protest what he believed (and had been told incessantly by the sitting President of the United States) was a fraudulent process, and to be present and ready to follow the orders of President Trump. Ed had anticipated that this might be a multi-week protest and process, and declared that he "ain't goin nowhere." Gov. Ex. 9554, message 1.S.159.1262. The next morning, Ed set out at 6:00 a.m.—after lawfully obeying D.C.'s overnight curfew—to "probe their defense line" and conduct "recon." Gov. Ex. 9653, message 1.S.159.1407. (In plain terms, he drove downtown and looked around the Capitol to assess how to continue to "march" (Ex. EV 105 at 1) and "non-violently protest" (Sent. Ex. 10 at 13)). Instead of seeing thousands of protesters, as he expected, he saw deserted streets blocked off by law enforcement and national guard members. Even at 8:00 a.m., Vallejo saw "No signs or flags supporting Trump visible anywhere…All quiet…The streets are deserted!" Ex. EV 105 at 4–6.

Around 10:00 a.m., Ed and Kandaris joined the podcast of their mutual friend from Arizona. On the podcast, Ed explained his understanding of the events from the previous day as pieced together from his hotel. As he understood it, a crowd of Trump supporters went from the Ellipse to the Capitol and "surrounded the Capitol building but weren't gonna go in, weren't going to do anything. They were just there to make sure that those inside knew they were surrounded by all these people that wanted them to do the right thing." Ex. EV 150B; Sent. Ex. 10 at 8. At that

point, Ed believed, members of Antifa "hijacked" the scene and began "beating on…windows" and using pre-stashed instruments like bricks and propane tanks. *Id.* According to a video Ed saw, the crowd initially "jump[ed]" on these instigators, with "one guy say[ing] nobody's breaking anything here" and the crowd "stopp[ed] him from breaking in." *Id.* These suspected-Antifa members, according to Vallejo and Kandaris, appeared to be connected to suspected-Antifa members they had seen near (and believed had attacked) Black Lives Matter Plaza. *Id.*

On the podcast, Ed made clear his view of those who used violence to attack the Capitol: he called them perpetrators of "domestic terrorism." *Id.* at 10. Kandaris likewise expressed deep frustration that the breach of the Capitol and the resulting evacuation of lawmakers had altered the course of the certification process, stating that there were senators "who were gonna rebuke the vote and…object to the electors…[and were] committed to doing that who then said, well I was going to do this but now I'm not going to do that." *Id.* Asked what comes next, Vallejo stated that he was "never done," and was "waiting for orders from Stewart Rhodes." *Id.* at 13. (The podcaster laughed at this and said, "yeah, that's Ed." *Id.*). Kandaris then added:

> We're here prepared in all aspects to support the Constitution and honor our oaths that we took…. The issue here then is what mechanism do we have to do that. Are there more people coming? If they do, what's gonna happen? Is it's not really plausible to non-violently protest anymore because the entire area is closed off and cordoned and curfewed [as learned by Vallejo's 6:00 a.m. "recon"]. So the question becomes when we realize that this wrong has been done, what are the next steps? I mean is this the shot heard 'round the world moment? I don't know…. I don't have…omniscient intel on what the situation is. We are here because we wanna know what develops. We're staying here to allow these things to develop so that we can…judge our position relative to what political events occur…what happens. This relies on a lot of things. How angry are people? Did they successfully manage to get this done without any real reaction from the American public? Because a few guys here who want to maintain the Constitution aren't going to do anything. America has to get mad, and if America doesn't get mad then we're utterly useless.

*Id.* Asked when they would return to Arizona, Ed and Kandaris weren't sure. Kandaris stated, "At this point we don't know…. We don't know if there's anything left to do." *Id.* at 18. Vallejo added, "We gotta find out what happens on the 20th, 'cause if Joe Biden gets installed as President we will have gone from a nation of laws to a nation of men." *Id.* at 19.

### Vallejo's Drive Back and Peaceful Life After January 6

Ed did not hear from Rhodes after January 6th and did not wait for him. After one more night in Virginia, Ed and Kandaris made their way home through Texas as they believed they had been instructed by the President. Ex. EV 176 ("Go home or to Texas….POTUS directive"); *id.* (expressing belief that President Trump himself was in Texas). Before and during their drive, Ed continuously sought to learn and follow what he understood as the lawful directives of President Trump, his "Commander-in-Chief," Gov. Ex. 9554 (Msg. 1.S.159.1215), and to determine whether Trump had in fact conceded, EV 176.2; *see also* EV 176.1 ("Situation Update" discussing Trump's legal options); Ex's 179, 179.1 (analyzing apparent CGI Trump concession video); Trial 2 Tr. 4062 (stating that Vallejo would "depart when cleared by my Commander"); Trial 2 Tr. 4157 (establishing that Rhodes claimed to be in direct discussions with President Trump). Believing that Rhodes had a direct line to President Trump and had also traveled to Texas, Ed and Kandaris tried to meet with Rhodes to discuss "next steps." Sent. Ex. 11 at 5. Before arriving, Vallejo stopped in Memphis, TN to visit Graceland, sending a selfie to several friends and family members.



*Vallejo on January 10, 2021 at Graceland in Memphis, TN*

Vallejo and Kandaris stayed in Texas for just one day before continuing home. Ed arrived home to Arizona on the 14th and had no further role in any Oath Keeper planning or events. In the remaining days before January 20, 2021, he stayed busy and was mostly concerned with fixing the clutch on his truck. Ex. EV 108 at 14–17.

For the next year, Ed Vallejo lived peacefully in the Phoenix area. He continued sponsoring recovering alcoholics in AA. He connected with Adam Kokesh of Homefront Battle Buddies, becoming its Program Director and attending trainings in suicide prevention. Sent. Ex. 1 at 21. He provided manual labor to develop a retreat center for veterans, despite his asthma and bad back. In short, he was a model citizen, as he tried to be his whole life. Ed did not launch a "guerrilla war," or otherwise pose any danger to society. When he was contacted by the FBI, he was cooperative, driving to meet with agents and voluntarily providing the password to his phone. *Id*. at 22. He did not delete any pictures or text messages from January 6th, as other defendants have been accused of doing, and when warned by Rhodes about the FBI accessing Signal chats, he told him that he "stayed in the dc op chat because running and hiding is what GUILTY people do." Ex. EV 300.2.

**Ed's Trial and Verdict**

From December 2022 to January 2023, Ed was tried alongside Defendants Joseph Hackett, David Moershel, and Roberta Minuta. The jury asked no questions. Although a prior jury had acquitted Rhodes and Caldwell of conspiring to interrupt the certification, Ed's jury convicted him. Based on the elements of his convictions, the jury necessarily found that Ed agreed to join those Oath Keepers who decided on the Capitol steps to enter the open Columbus doors and forcibly attempt to hinder or delay the execution of the laws governing the certification. The verdict did not require or reflect any special findings regarding firearms, the meaning of Ed's 2:24 p.m. and 2:38 p.m. messages, the QRF, or Ed's intent before or after the afternoon of January 6. Notably, the jury did not convict Ed or any defendant of conspiring to oppose the authority of the United States by force in any manner apart from interrupting the certification proceeding on January 6.

**LEGAL STANDARDS**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U. S. 81, 113 (1996). In fashioning a sentence, a district court must impose a sentence that is "sufficient, but not greater than necessary" to meet the purposes of sentencing in § 3553(a)(2). Those purposes include the need to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2). In making this

determination, the Court must consider these factors as well as "the nature and circumstances of the offense"; "the history and characteristics of the defendant"; "the kinds of sentences available"; the advisory sentencing guidelines and "any pertinent policy statement" by the Sentencing Commission; "the need to avoid unwarranted sentence disparities"; and "the need to provide restitution to any victims of the offense." § 3553(a)(1)–(7). The government bears the burden to prove that a sentencing enhancement applies. *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997).

## ANALYSIS

### I.    The PSR Misstates Vallejo's Sentencing Guidelines

The PSR in this case contains lengthy narratives of "offense conduct" that rely exclusively on government-produced documents, including the indictment (which was never given to the jury), the government's opposition to defendants' Rule 29 motions, and "additional information" provided by the government. At the outset, Vallejo requests that this lengthy narrative, which departs significantly from trial testimony, be stricken from the final PSR and replaced with a limited description of offense conduct related to January 6 and the Oath Keepers entering the Capitol. In addition, he submits that the following provisions have been misapplied, and adopts the arguments of his codefendants in their PSR objections and sentencing memoranda (including ECF 563).

#### A.    The 8-level enhancement for causing injury or property damage to obstruct the administration of justice does not apply

In addition to arguments made in his objections to the PSR (ECF 525), Vallejo adopts the arguments against the USSG §2J1.2(b)(1)(B) enhancement in his codefendants' memoranda (ECF 563–569) and the opinion by Judge McFadden in *United States v. Hunter Seefried*, Crim. No. 21-CR-287, ECF No. 123 (Oct. 29, 2022). This enhancement requires threatened or actual injury to

persons or property in order to obstruct the administration of justice. As Judge McFadden pointed out, the phrase "administration of justice" is not as broad as "official proceeding" and is limited to judicial proceedings or justice-related activities ancillary to them. Indeed, as Judge McFadden also pointed out, the government *defended* its prosecution of January 6 defendants under § 1512(c)'s "official proceeding" language by arguing that it "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense such as obstruction of the administration of justice. *See fried* at 20–21. Having acknowledged that § 1512(c) covers more than just proceedings related to the administration of justice, including the certification, the government must accept that the "administration of justice" enhancements do not apply to some official proceedings under § 1512(c), including the certification.

This conclusion is bolstered by the definitions of "substantial interference with the administration of justice" in the application notes for USSG §2J1.2(b)(2). Every one of the specific examples of "administration of justice" relates to judicial proceedings related to criminal law enforcement. *See id.* (including "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence"). There is nothing to indicate that the catchall description regarding interference that causes "the unnecessary expenditure of substantial governmental or court resources" was intended to encompass a different *kind* of proceeding, as opposed to simply delineating the seriousness of the interference based on the cost to prosecuting authorities or the court.

In addition to the certification not qualifying as "the administration of justice," the government cannot meet its burden of showing that the Oath Keepers' conspiracy—which began around 2:35 p.m. on January 6 after rioters had already breached the Capitol—involved threatened

or actual injury to persons or property. The PSR justifies this enhancement by noting that "a mob of rioters…caused damage to the Capitol Building's East Rotunda Doors and Columbus Doors, as well as caused injuries to Capitol Police officers guarding the doors to the building." PSR ¶ 132. However, no injuries to officers or property were caused by Oath Keepers, and it is inappropriate to enhance their sentences based on the conduct of others. That is especially true when Vallejo was simultaneously circulating videos of property damage and *criticizing* it as the work of Antifa and domestic terrorists. Ex's EV 124.1B, EV 150B.  The PSR also states that conspiracy members "chanted threatening and intimidating words regarding those Members of Congress who were supposed to be inside the Capitol building performing their constitutional duties to meet and certify the election results," PSR ¶ 132; but this appears to refer to talk among themselves, not actual threats used to obtain an interference with the proceeding, which had already been halted.

Finally, the PSR states that "conspirators managed an arsenal of firearms at a hotel in Virginia as part of an armed Quick Reaction Force to support the other conspirators on the ground at the Capitol building." *Id*. But even if that statement were true, the availability of firearms alone does not satisfy this enhancement's requirement of using "threats…to obstruct the administration of justice." §2J1.2(b)(1)(B). And it is not true that the QRF set up by the Oath Keepers was intended "to support the other conspirators on the ground at the Capitol building" as part of any interference with the certification proceeding. Extensive trial evidence, including testimony by numerous government witnesses, established that the QRF was not part of any offensive plan of attack and that there was no prior plan to attack the Capitol. This testimony was corroborated by exhibits discussing the QRF, which uniformly refer to it as a contingency force in case there is

violence against Oath Keepers requiring action to "save lives," Ex. EV 142, or in service of the government if called upon under the Insurrection Act. *See* pgs. 14–16, *supra*.

At a high level, the trial evidence showed that most Oath Keepers followed other protestors through doors that were already breached, looked around, engaged in prayer, formed a line around Officer Dunn, unsuccessfully pushed against officers guarding a hallway, and then walked out after 11 to 20 minutes. This enhancement is appropriate for individuals who caused injuries or property damage that day, but is inapplicable to Vallejo or Oath Keepers he can reasonably be considered to have conspired with on the afternoon of January 6.

## B. The 3-level enhancement for substantial interference with the administration of justice does not apply

For the same reasons stated above, the 3-level enhancement in §2J1.2(b)(2) for "substantial interference with the administration of justice" does not apply. The certification, while a solemn "official proceeding," was not one related to the "administration of justice" as used in this provision. This is even more clear for this enhancement, since there is a specific list of actions in the application notes defining the scope of "the administration of justice." These listed actions relate solely to criminal or civil litigation and do not include Congressional hearings or proceedings, which are regularly interrupted by protestors charged with misdemeanors. *See id.* (including "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence"). Simply put, the certification is not one of the listed types of administration of justice, and this enhancement does not apply.

The government and the PSR justify this enhancement based on the last clause regarding interference that causes "the unnecessary expenditure of substantial governmental or court

resources." §2J1.2(b)(2). But again, there is no reason to conclude that this last phrase was intended to encompass a different *kind* of proceeding, as opposed to simply delineating the seriousness of the interference based on the cost to prosecuting authorities or the court. Indeed, doing so would violate the canons of instruction of *ejusdem generis*, which states that "where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (quotation marks omitted). Moreover, the actions of other rioters cannot be attributed to Oath Keepers who were in the building for less than 20 minutes and in some cases merely 11 minutes, and who entered the building after the certification proceeding had already been halted. Given the short duration of their presence at the Capitol, it cannot be said that these defendants caused the government to unnecessarily expend substantial resources.

### C. The 2-level enhancement for extensive planning does not apply

As argued at length in Vallejo's Rule 29/33 motion and those of other defendants, nothing was more conclusively established at trial than the fact that the decision by individual Oath Keepers to walk up the steps of the Capitol and ultimately enter it were unplanned and made spontaneously in reaction to unforeseen events occurring that afternoon. The testimony of Brian Ulrich, discussed *supra*, was especially clear in that regard. Indeed, the government's closing argument in Trial 1 *conceded* that there is no allegation that the Oath Keepers planned to attack the Capitol prior to January 6, but merely "seized" an opportunity presented by the rioters; and numerous government witnesses testified that there was no prior plan to attack the Capitol, interfere with the certification proceeding, or even to forcibly resist the transfer of power. Thus, the 2-level

enhancement under USSG §3B1.1(b) for an offense that was "extensive in scope, planning or preparation" does not apply.

In support of this enhancement, the PSR recites facts related to the planning for security details and rallies—details that were identical to the way Oath Keepers planned numerous peaceful operations throughout 2020. Ex. EV 13. These operational planning practices did not relate to any plan to interfere with the certification, as evidenced by the confusion and questions by Oath Keepers on the Signal chat in real time as the crowd began pushing toward the Capitol. Indeed, many Oath Keepers believed for hours that anti-Trump forces were responsible for breaching the Capitol. While there was evidence that Oath Keepers discussed whether to join the crowd around 2:30 p.m., and evidence that an agreement was reached to do so, that was an impromptu decision that did not reflect any prior planning. Indeed, the leaders of the Oath Keepers did not know where they were at that time, sent several messages trying to find each other, sent messages about not having gear like helmets ready, and had to travel up to 30 minutes to the Capitol. *See* pgs. 17–19, *supra*. This is not evidence of "extensive planning."

Likewise, while the Oath Keepers had a QRF in Virginia, numerous witnesses and documentary evidence established that it was not part of any planning for interfering with the certification or otherwise forcibly resisting the transfer of power. *See* pgs. 14–16, *supra*. Rather, it was part of operational planning for contingencies where people might need to be rescued or extracted from D.C. and/or if President Trump called forth a private militia to defend government interests under the Insurrection Act. *Id*. Thus, the existence of the QRF cannot be used to support an enhancement for extensive planning for what was essentially a spontaneous decision to join a large crowd of spontaneous marchers that the evidence showed the Oath Keepers had not planned

for and did not anticipate. In particular, this enhancement is inapplicable to Vallejo, who was wandering D.C. looking for his lost truck when the certification began and showed no signs of being prepped and prepared for Oath Keepers deciding to enter the Capitol with the crowd.

### D. The 3-level enhancement for management or supervisors does not apply, and a 4-level decrease for minimal participation should apply

The PSR incorrectly added a 3-level role enhancement for Vallejo under USSG §3B1.1(b), claiming that he was "a QRF leader, and played a coordinating role between conspiracy members from different parts of the country and managed the Arizona group's weapons at the hotel." PSR ¶ 136. There is no basis in the record for any of these conclusions, and this enhancement should not apply.

To begin with, Application Note 2 §3B1.1 states: "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other *participants*." (emphasis added). As various courts have explained, organizing a scheme or overseeing its assets is not enough to qualify for this enhancement; rather, the defendant must exercise "control over other *people*." *United States v. Kimmel*, 644 F. App'x 231, 233 (4th Cir. 2016) (emphasis in original); *see also United States v. McFarlane*, 64 F.3d 1235, 1238 (8th Cir. 1995) (enhancement not warranted where there was insufficient evidence that defendant "exercised any degree of managerial or supervisory control over" other participants). There is no evidence in the record that Vallejo had any managerial or supervisory control of "other participants," and the PSR does not even allege that he did. Indeed, he was not even a part of the Oath Keepers' planning meetings or calls.

There is also no evidence that Vallejo was a QRF "leader" or "played a coordinating role between conspiracy members from different parts of the country." Evidence at trial showed that

Vallejo was not part of any national Oath Keeper planning or coordination calls, decided independently to go to Washington, D.C., had no contact with Oath Keepers from different parts of the country, and did not even know where he was going until the night he was supposed to arrive in Virginia. Grand jury testimony also established that Vallejo did not initially know what the QRF was. Sent. Ex. 3 at 15–16. Vallejo had no communications with Paul Stamey, Ken Bittner, Doug Smith, or Thomas Caldwell, who discussed logistics for the QRF and held weapons for the individuals who actually entered the Capitol. Indeed, other than the single message from Meggs with the hotel address, there are no direct messages or calls between Vallejo and anyone involved in the conspiracy, much less evidence that he played a "coordinating role between conspiracy members from different parts of the country." PSR ¶ 136. And government witnesses uniformly stated that they had never seen Vallejo before and did not place him in charge of their weapons.

There is also no evidence that Vallejo played any leadership role within the "Arizona group" or "managed" weapons. There were only three people from Arizona. One, Kelly Carter, is not even alleged to have been a conspirator. That just leaves Kandaris. But there is no evidence that Kandaris deferred to Vallejo in any manner or trusted him with any firearms. It was *Kandaris* who reached out to Rhodes and had the initial discussions regarding coming as "rifles, man power, warm bodies there to support the process and the President." Gov. Ex. 9514. It was *Kandaris* who spoke of trying to "coordinate with others." Sent. Ex. 11 at 2. It was *Kandaris* who asked Vallejo to switch over to Signal. On the podcasts on January 6 and 7, *Kandaris* speaks far more than Vallejo, expresses differing and independent opinions from him, and gives no indication that he is being "managed." Sent. Ex. 9, 10. And as for "managing firearms," Kelly Carter told the grand jury,

and repeats now in his letter to the Court, that "Ed never checked firearms or prepped them" and "Ed also never watched anyone else's firearms." Sent. Ex. 1 at 2.

Indeed, rather than a supervisory enhancement, Vallejo should receive a four-point reduction under USSG §3B1.2 for being a minimal participant. He is the only defendant not to have been present at the Capitol grounds. He is the only defendant not to have participated in Oath Keeper planning meetings or chats. He is the only defendant who did not travel to D.C. with knowledge of Oath Keeper plans. He had no direct phone or text communications with any Oath Keepers once he arrived. He did not take part in any security details on January 6, but spent the morning doing podcasts where Kandaris spoke of the Oath Keepers in terms that disassociated them from him and Vallejo. Sent. Ex. 9 at 9. He was wandering D.C. looking for a lost truck when the certification started, and evidence showed that was a complete happenstance, not part of any plan to have originally been staged in Virginia as a QRF. He had no direct knowledge of what was happening at the Capitol and wrote disparagingly of those who broke in. And his culpability largely appears to stem from his offering encouragement and rides from a distance that were never even accepted.

The government has argued that Vallejo was offering armed support for the Capitol attack in two messages at 2:24 p.m. and 2:38 p.m., but evidence showed that no Oath Keepers had decided to enter the Capitol until around 2:34 p.m., and Vallejo had no way of knowing at those times that they had done so. Indeed, the government's theory was that the decision to enter the Capitol was communicated by Meggs and Rhodes to Oath Keepers on the ground right around 2:35. And there was no prior plan to use a QRF to attack the Capitol. Thus, on the whole record, the evidence shows that Vallejo was an outsider who joined with the Oath Keepers at the last minute, lost his

truck, ended up at the hotel during the Capitol attack, and offered rides from a distance in the language ("QRF") the Oath Keepers would have understood as meaning an offer of extraction. He had the most limited role of all defendants, and certainly had much less of a role than Caleb Berry, whom the government concedes was a minor participant even though he was active in the Florida Oath Keepers group, traveled to D.C. with Kelly Meggs, earned the nickname "Breacher," personally breached the Capitol to purposely stop the certification, and then destroyed evidence.

### E.  The 2-level enhancement for obstruction of justice does not apply

Incredibly, the PSR added a 2-point enhancement under USSG §3C1.1 for obstruction of justice. According to the PSR writer, this enhancement was added because "the defendant, upon direction by defendant Rhodes, deleted all of his Signal messages from the period of the conspiracy." PSR ¶ 137. However, the opposite was true: when Rhodes sent messages about deleting evidence, Vallejo stated that he *kept* using the Signal message app because "running and hiding is what GUILTY people do." Ex. EV 300.2. He then went on to continue using the Signal group chat for at least two months after January 6, 2021—despite knowing of arrests of Oath Keepers and despite reports that the chat was compromised—until Rhodes stated that it was no longer an active group chat. And showing no intent to hide himself, Ed at all times used the Signal name, "Ed Vallejo," and did not change his name to obscure past Signal messages retroactively as some defendants did.

Vallejo eventually deleted the inactive app because he had an old, slow phone and there was simply no reason to maintain an inactive app that no longer had a purpose by June 2021, when the FBI finally got around to searching his phone. Unlike other defendants who deleted content immediately after January 6, there was no temporal or logical connection between Vallejo's

cleaning up his phone and Rhodes's statement from months earlier, which Vallejo pointedly rejected. Indeed, Vallejo maintained *all* SMS messages, *all* photos and videos, and *all* location data on his phone from January 6th, *and* voluntarily provided the FBI with his password, proving that he had no intent to obstruct justice by deleting an obsolete app months after January 6, 2021. At a minimum, the government has failed to carry its burden of proving Vallejo had any intent to obstruct justice.

### F.  Resulting guidelines

After correctly removing the PSR's enhancements, and including an adjustment for being a minimal participant, the resulting guidelines range is 6–12 months.

## II.    The 3553(a) Factors Support the Recommended Sentence

### A.  Vallejo's history and characteristics strongly support leniency

Ed's history and characteristics strongly support the requested sentence. By all accounts, Ed Vallejo is a man of extraordinary personal character. Virtually everyone who encountered Ed, from political volunteers, to neighbors, pastors, co-workers, and friends he met in line for the Rolling Stones, describe him as deeply honest and peaceful man who *lives* to be of service to others:

- "[M]y husband is a kind, honest man dedicated to helping people who are less fortunate than he is." *Id*. at 1.

- "Ed is what he says he is: he does not lie and he does not cheat. He doesn't take short cuts. He loves this country, as do all of us." *Id*. at 2.

- "The Ed that I know is a good, honorable man who lives to help others." *Id*. at 3.

- "I know in my heart that Ed is a peaceful person who wants the best for his family, friends, and country and would never hurt anyone." *Id*.

- "Ed's character is one of the finest I've ever known…. I have seen him literally give a man the shirt off his back." *Id*. at 4.

- "Ed is a true man of passion, but his tools are an abundance of love, sunshine and gratitude to God for giving him a chance to prove it by helping people." *Id*. at 7.

- "Ed is very community minded and interested in making peoples' lives better." *Id*. at 9.

- "I can say without hesitation that [Ed] is one of the most direct and honest people I have met in Arizona." *Id*. at 11.

- "Ed is a man of integrity, and a man whose focus is to leave the next generation a better world." *Id*.

- "Ed leads by example and with a spirit of service…." *Id*. at 14.

- "I have known Ed to be a peaceful man who was never angry or violent. He was always very passionate about the cause of freedom, liberty and truth." *Id*. at 15.

- "Ed Vallejo is a kind and passionate individual who cares deeply for his country, who has a deep love for all others." *Id*. at 16.

- "Mr. Vallejo has always spoken in a sincere manner and has proven to me to be trustworthy." *Id*.

- "I have found Ed to be a good man, a good Christian, always willing to help others in need." *Id*. at 17.

- "Ed is exuberant in his passion and I know his intent is purely honorable.  He has a good heart." *Id*. at 18.

- "The whole time I have known Edward he always dedicated his life and time helping his fellow Man. No matter what they needed he would be there for them. He has helped me multiple times in the past as well." *Id*. at 19.

- "He has always been honest and kind mannered. One of the best Men I have ever met." *Id*.

- "Ed…has always been dedicated to supporting veterans and serving them" *Id*. at 20.

- "For as long as I have known him, Ed has always worn his heart on his sleeve, and it has always been in the right place." *Id*. at 20.

- "Ed is an incredibly motivated individual and his motivation from what I've observed is primarily to help others." *Id*. at 22.

As these letters show, for his entire life, Ed has been motivated by deep principles and the desire to serve and teach others. He is a veteran who adores this country and its ideals. He has served his community as a delegate to political conventions, a leader at peaceful marches, an author, a community journalist, an AA sponsor, and a counselor for veterans. Indeed, Ed's life has been so defined and driven by his passion for public service that has even caused him moments of soul-searching over the toll it took on his family. Sent. Ex. 12 ("'[A]n organism is said to behave altruistically when its behavior benefits other organisms, at a cost to itself.' This has been me all of my life. Quite often it has been to my direct detriment….My wife would kill me or have dumped me a long time ago if she didn't love me the way she does. I know how it pains her that we don't have the money for a lot of things that would make her happy. I was very tempted to apply for a recent opening that I know I am more than qualified for, but at this point in time I feel that we are at such a critical juncture in the current election cycle that to be pinned down with an employer would hurt my ability to get so much accomplished that I cannot commit.").

The fact that Ed did not grow up with a stable or privileged background makes his character and lifetime devotion to service all the more remarkable. Ed's parents divorced when he was five and he did not have contact with his father for 20 years. PSR ¶ 152. His mother remarried, and both his mother and step-father were alcoholics. *Id*. Ed had his first drink at the age of nine after one of his mother's parties. PSR ¶ 166. To his credit, Ed turned to the military for stability and service. He joined ROTC in high school and served all four years, and joined the Army at 19. Also to his credit, Ed sought help when the influences of his childhood and the loss of his own firstborn son at age 20 led him to alcoholism. At only 24, Ed had the maturity to enter rehab and join AA.

Ed became a sponsor and has not had a drop of alcohol since. Serving others through AA has been one of the joys of Ed's life.

In addition to his character, Ed's age, background, family history, employment history, and criminal history all support leniency. At 64, Ed is at little risk of reoffending. He has no criminal history other than a 40-year-old case for possession of marijuana. Ed is a loving husband of 35 years and a father, stepfather, and grandfather. He was employed at the time of his arrest, working as the Program Director for HBB, where he assisted veterans struggling with PTSD and suicidal ideation. Ed has resided in the Phoenix area for 50 of his 64 years, developing deep community ties through family, friendships, work, and politics, reflected in his representing Arizona as an alternate delegate to a national political convention. He has many, many reasons to put all of this behind him and continue living with and serving the people he loves. The Court should have no doubt that he will do so when released.

Ed's physical condition also weighs in favor of leniency. He is 64 with lifelong asthma and a partially-disabled back. He sleeps on a therapeutic mattress to combat pain. PSR ¶ 162. His four months in jail were extremely difficult for him physically, subjecting him to hard, thin beds and humid, high-pollinated air that made moving and breathing painful tasks. Adding to the strain, he contracted Covid while incarcerated, which made breathing even more difficult. He is currently experiencing long-Covid symptoms including "memory fog, body aches, headaches, dermatitis, and sinus congestion," PSR ¶ 163, the latter of which made his breathing audible in Court.

Finally, while Ed's life has commendably been focused on working hard for his ideals, especially during the Ron Paul political movement, the Court need not worry that this activism poses any future risks. Ed's arrest has caused him to reflect deeply on the toll his decisions in

January 2021 had on his wife, and his wife and friends recount how he has repudiated Stewart Rhodes and turned his focus away from politics and to his marriage, which has been severely tested by his arrest and imprisonment. Sent. Ex. 1 at 1, 6. For the rest of his days, Ed wants nothing more than to serve and care for his wife Debbie, who attended every day of trial and needs him emotionally and financially. *Id.* at 1.

### B. The nature and circumstances of Vallejo's involvement support leniency

Vallejo stands convicted of four counts: (1) seditious conspiracy (execution of certification laws); (2) conspiracy to obstruct an official proceeding; (3) aiding and abetting the obstruction of an official proceeding; and (4) conspiracy to prevent an officer (Congress) from discharging any duty. All counts cover the same essential conduct: agreeing with and supporting the interruption of the certification process once the Oath Keepers "seized the opportunity" presented by the crowd of rioters and entered the Capitol for 12 to 20 minutes. Despite the government's decision to charge this as a seditious conspiracy and § 1512(c) case, this is essentially the same core conduct committed by most if not all of the hundreds of defendants sentenced in January 6 cases.[5]

The "circumstances" of Vallejo's offenses are dramatically different, however. Unlike all known January 6 defendants, Ed never trespassed on Capitol grounds, never engaged in pushing or chanting on Capitol grounds, never removed any barriers, never sprayed officers with pepper, never entered the Capitol, never posted on social media, never hid any evidence, and never took part in any planning for such an event. As explained in Part II.E below, the complete absence of

---

[5] This would not be the case if the jury had convicted Vallejo of conspiring to oppose the authority of the United States apart and beyond the execution of the certification laws, as it did for Stewart Rhodes.

any violent or obstructionist conduct by Ed puts his case in a different category than even the dozens or hundreds of misdemeanor cases for which little to no incarceration was imposed.

Of course, the government has repeatedly made the claim that Ed came to the nation's capital as part of an Oath Keeper conspiracy to stop the transfer of power and offered to bring weapons to the Capitol from the "QRF" in the heat of that battle. That narrative is false and does not reflect the facts or the verdict. Because the government's narrative was packaged for the PSR writer and greatly impacted the draft guidelines calculations, it must be addressed once again. As demonstrated at trial, and supported with record citations in Vallejo's Rule 29/33 briefs, (1) the Oath Keepers did not hatch any plan to attack the Capitol or stop the transfer of power before January 6, but reacted spontaneously in real time to unforeseen events; (2) the QRF they organized was meant as a contingency force to respond to emergencies with life-saving help; (3) Vallejo himself did not travel to D.C. as part of any Oath Keepers plan, but went independently before learning that Oath Keepers would be there; (4) Vallejo expressed opposition to people breaking windows and forcibly attacking the Capitol, calling them "domestic terrorists," and praised Oath Keepers for "getting pics of antifa posters inside"; (5) Vallejo was eagerly anticipating the certification process and was wandering around looking for his lost truck when it started; (6) the messages Vallejo sent at 2:24 p.m. and 2:38 p.m. occurred before he could have known any Oath Keepers were planning to enter the Capitol and reflected offers of help during an emergency, not to bring weapons into battle; (7) the assistance Vallejo repeatedly offered on January 6 was to "exfil" people and get them home from the Capitol; (8) Vallejo did absolutely nothing to obstruct justice, and in fact intentionally preserved all his text messages, photos, and videos from that day; and (9) as misguided as he was, Vallejo was mainly trying to assist the President against what he

believed was a corrupt attack on our democracy, and he ultimately went home and lived with the results of the election. None of these core truths are inconsistent with the jury's verdict, but they differ dramatically from the story the government packaged as "additional information" for the PSR writer.

These truths can be found in the testimony of the government's own witnesses. Government witness Graydon Young expressed the confusion mixed with exhilaration that took over those who were present on January 6. Hearing news of the crowd pushing toward the Capitol, he felt something historic was happening, and he felt it was part of a noble effort to stop the subversion of our democracy. He testified that he didn't realize at first that he or the crowd were pushing up against police, but eventually decided it was okay to do that given the historical significance. Essentially, according to his testimony, there was very little that Young did or decided to try to do that was any different than the many other protestors that day, except that it did not involve breaking any windows or doors, assaulting law enforcement, or spraying chemicals. And it lasted for just a few minutes. That was what it was like for a confessed Oath Keeper and government witness on the scene. Vallejo was not even there. Likewise, government witnesses consistently testified that the "QRF" was a defensive force intended to rescue people or, if called upon, to serve the government upon the orders of President Trump. This was reflected in the testimony of John Zimmerman, Graydon Young, and others, as well as documented in real time in exhibits. *See, e.g.*, Ex. EV 142; pgs. 14–16, *supra*.

When these core facts are considered in the context of other sentencings handed down by courts in January 6 cases and the sentencing imperatives of § 3553(a), the requested sentence of four months in jail and twelve months in home confinement is more than reasonable. Despite the

grave nature of the charges chosen by the government, that choice does not reflect a meaningful distinction between Vallejo and numerous other defendants charged with lesser crimes for intentionally pulling down barriers, entering restricted grounds, pushing past police, occupying the Capitol, and encouraging others on social media. All defendants who entered the Capitol with the intent to hinder or delay the certification met the elements of seditious conspiracy, obstructing a proceeding, and hindering Congressional officers as this Court has construed those statutes. The circumstances of Vallejo's offenses—which seem to consist of encouraging the Oath Keepers by offering getaway rides after learning (and supporting) that Oath Keepers went into the Capitol, do not merit a lengthy prison sentence when compared with the circumstances of others' conduct that day.

Perhaps most notable in this regard was Ed's expressions of real-time opposition to protestors breaking windows and real-time approval of reports of Oath Keepers assisting the police. Throughout the afternoon of January 6, Ed watched videos and studied reports of stashed lumber and bricks in an effort to determine the role of Antifa in the violence. *See* Exs. EV 150B; EV 178; Ex. EV 124.1B at 3–4 ("We believe this is Antifa but not confirmed. Note the lumber. There was a cache of lumber and propane tanks discovered in downtown D.C. yesterday just like the Soros brick stashes."). On January 6, Vallejo circulated a video of Trump supporters stopping violence at the Capitol and opposing lawlessness with chants of "WE ARE NOT [AN]TIFA" (EV 150B, EV 903). That afternoon, he reported that "Antifa…broke in and ou[r] guys are now getting pics of antifa posters inside." Ex. EV 124.1B.  And on a podcast the next day, Vallejo referred to violence at the Capitol as "domestic terrorism" that he did not support (Trial 2 Tr. 4157, Sent. Ex. 10 at 10) and

condemned those who "hijacked" the scene by "beating on…windows" and using pre-stashed instruments like bricks and propane tanks. Ex. EV 150.B; Sent. Ex. 10 at 10.

These statements carry heightened significance for assessing Ed's conduct because Vallejo was never at the Capitol and could not personally observe or verify first-hand what was occurring. Even if he supported people interrupting the proceeding, as the jury's verdict requires, that does not mean he supported all manner of violence occurring there. Vallejo was not standing in a line on the steps witnessing officers be pepper sprayed or having their shields ripped from them and used against them. In his mind, from seven miles away, the Oath Keepers appeared to be helping to moderate violence on the scene even while entering the Capitol and expressing their views in a manner that interfered with the execution of the certification laws. In sum, after setting aside the government's nonsense about Ed chomping at the bit to rush weapons into a fight no one planned or expected, using language no one would interpret except as an offer to help save lives, the circumstances of Ed's offense are about as mitigating as one could construct and still be guilty of conspiring to stop the certification.[6]

It is also significant that Ed repudiated any suggestion that he should hide evidence, stating that "running and hiding is what GUILTY people do." Ex. EV 300.2. When he was contacted by the FBI, he drove two hours to the FBI Field Office in Phoenix to meet with them and voluntarily provided his phone password, telling those in his community of his plans. Sent. Ex. 1 at 22.

---

[6] Indeed, although this memorandum accepts the jury's verdict and attempts to harmonize it with the factual record, as it must, Vallejo continues to urge that the evidence at trial was insufficient to prove beyond a reasonable doubt that he knew about Oath Keepers' "spontaneous" decisions to obstruct the certification on the afternoon of January 6, much less that he supported and joined in any such conspiracy. *See* ECF 477-1, 536.

Finally, the circumstances of Ed's offense cannot be separated from the months-long campaign of lies that the President of the United States conducted to convince good, patriotic people that our democracy was under attack and that there had been a fraud exploiting the Covid mail-in ballots. Ed had previously served as an election observer in Mariopa County, Arizona and testified in court about irregularities he witnessed. Sent. Ex. 2. Unfortunately, this laudable public service made him primed to believe the President of the United States when he cynically pushed this false narrative. Ed did not act out of any personal, corrupt motive, but believed that his presence and protesting voice could make a difference in protecting, not threatening, our democracy and democratic principles. Although the jury found that he crossed a line that day by supporting those who tried to halt the certification process seven miles away—something that he had no intention of doing when he set out for D.C.—he was motivated by a desire to protect what he and all of us cherish, believing that a fraud was being perpetrated based on videos he and lies he had been told by the highest elected and appointed officials. And he did so while vociferously *opposing* the breaking of windows and attacks on police that characterized that day.

### C.  The requested sentence reflects just punishment and promotes respect for the law

As the summaries in Part II.E show, numerous judges in this district have determined that noncustodial or short sentences for January 6 defendants are sufficient to meet the need for just punishment and respect for the law. That is because respect for the law begins with accountability, and the government has gone to great lengths to identify and prosecute hundreds of January 6 participants, with all the numerous and collateral consequences that come with a federal criminal conviction. *See United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) (holding that a court may properly consider the host of collateral consequences that attend a felony conviction, including loss of benefits and difficulty finding future employment, when fashioning a sentence).

Just punishment also requires recognizing the unique circumstances of that day, which involved a sitting President giving a riling speech and calling for protestors to march to the Capitol after months of insisting that our democracy had been tampered with. Vallejo believed the law was being thwarted in a significant and historic way that day by corrupt officials. He was wrong. Vallejo and others were lied to by those they should have been most able to trust, including the President and current and former officials like Vice-President Pence, General Michael Flynn, and Steve Bannon—none of whom to date are facing any criminal consequences for January 6. But Ed did not have a corrupt motive in any traditional sense. And he did not press things after it became clear that Trump was conceding and moving on. He cooperated with the FBI and did not participate in any stockpiling of weapons or doomsday talk after going home to Arizona.

In our vibrant democracy, people regularly interrupt Congressional proceedings and occupy government buildings with no claim to believe there is anything corrupt happening, simply to make a political point. Such protestors are rarely charged with anything but misdemeanors. While this does not minimize or excuse the violent, forcible conduct that characterizes the majority of January 6 defendants, it shows that the aspect of respect for the law relating to honoring official proceedings can be accomplished with short sentences, and the main issue is really the level of *violence* defendants bring to their protests. And here, the requested sentence is appropriate for a defendant who did not act violently, did not know of or support anyone who acted violently, and actively condemned those who acted violently as perpetuating "domestic terrorism."

Indeed, it would actively undermine respect for the law for the Court to impose a draconian sentence on someone who never went to the Capitol, acted violently, or personally interfered with the proceeding, when many dozens or hundreds who participated in the riot on January 6—

including by assaulting police officers—received probationary or short sentences. *See* Part II. E, *infra*. Such an outcome would make the difference between a misdemeanor and the most grave of felonies depend on little more than the prosecution's charging decisions and their political environment, which appear greatly driven by the need to provide a narrative of planning and purposefulness despite testimony that Oath Keepers reacted spontaneously to an unforeseen riot.

Finally, the government cannot claim that a 16-month combined sentence for Ed Vallejo undermines respect for the law when it appears content to let Todd Kandaris, Paul Stamey, and Ken Bittner—all people it put on its big board of conspirators—walk free. Unlike Ed, Stamey actually took part in planning the QRF, having discussed it with Caldwell and others and reserved rooms at the Comfort Inn. And unlike Ed, Bittner actually received and guarded the personal weapons of people who went into the Capitol, appearing on video with all the key Florida players. If the QRF were actually the offensive force the government pretends it to be, the failure to charge those most responsible for arranging and administering it would be incomprehensible and indefensible. But it wasn't: it is just a hook that enables the government to connect the Capitol breach to the weapons the Oath Keepers left in Virginia and never planned to bring to D.C. That Ed referenced the QRF in an offer of help during "bedlam" thus does not mean he requires any greater punishment.

The government's contentment with letting Kandaris walk free is even more of a headscratcher, given its claims. Kandaris was the first to reach out to Rhodes from Arizona and made the comment about "rifles, manpower, warm bodies." He went everywhere with Vallejo, from Arizona, to the QRF hotel, to the lost truck, back to the hotel, to the Olive Garden, to Texas, and back to Arizona. He discussed the potential for "armed conflict" on podcasts. He allegedly

referred to himself as part of the QRF at the Olive Garden dinner. And he debriefed with the government and made statements they claim were false. Yet the government does not seem to believe that he is any great threat to the public or that justice and just punishment require his arrest. Plainly, that is because he did not send the notorious "QRF standing by" text that—although in context was simply a genuine offer of help in the midst of chaos—gives the government its convenient hook for its grand narrative of weapons being ready to be brought into battle. Whatever one makes of these charging decisions, they certainly show that the loss of liberty Ed Vallejo has already endured (including getting Covid in jail), the enormous reputational damage he has received, the years ahead of supervision, and the lifelong consequences of a federal January 6 felony conviction, are a sufficient and just punishment that promotes respect for the law.

### D. The requested sentence provides for adequate deterrence and protects the public

1. <u>Specific deterrence</u>

As an elderly man with a criminal history of zero who returned to a peaceful life of serving veterans and others in Arizona after January 6, there is virtually no chance that Ed Vallejo would ever break the law again. "Recidivism rates decline relatively consistently as age increases," and defendants "over the age of forty ... exhibit markedly lower rates of recidivism in comparison to younger defendants." *See* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines*, at 12, 28 (2004). Sentencing courts have recognized this and granted reductions accordingly. *See, e.g., United States v. Saenz-Nunez*, 2011 WL 6013477 (D. N.M. Nov. 28, 2011) (granting four-level downward departure in part because, at 53 years old, defendant was less likely to recidivate).

Moreover, for first-time offenders, long periods of incarceration can do more damage than good by isolating individuals from their communities. "When prison sentences are relatively short,

offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contracts in the community, and become removed from legitimate opportunities, all of which promote recidivism." Valerie Wright, *Deterrence in Criminal Justice*, The Sentencing Project, at 7 (Nm 2010). Studies reveal that low-risk offenders who are sentenced to long periods of incarceration are more likely to reoffend, not less. *Id.* That is perhaps most at risk here, where a lengthy sentence for someone like Ed Vallejo would engender feelings of being targeted for reasons unrelated to the nature of his non-violent conduct, when so many violent protestors received probationary or short sentences. Thus, the recommended sentence would actually go further in protecting the public and engendering faith in the judiciary than the government's request for a multi-year sentence.

2. General deterrence

In this case, any custodial sentence will serve as a strong deterrent. While many believe that lengthier sentences have a greater deterrent effect, the empirical research shows this to be untrue. "Three National Academy of Science panels ... reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME AND JUSTICE: A REVIEW OF RESEARCH 28–29 (2006). In one of the best studies of specific deterrence, which involved federal white-collar defendants, no difference in deterrence was found even between probation and imprisonment. *See* David Weisburd *et. al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 CRIMINOLOGY 587 (1995). In light of this empirical evidence, district courts have given sentencing reductions based on the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (citing Richard Frase,

*Punishment Purposes*, 58 STANFORD L. REV. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?,* 23 S. Ill. U. L.J. 485, 492 (1998)).

What studies show is that the most effective deterrent is the certainty of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques"); National Institute of Justice, *Five Things about Deterrence*, at 1 (May 2016), *available at* https://www.ncjrs.gov/pdffiles1/nij/247350.pdf (last visited 7/27/18) (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"). The government has gone and continues to go to great length to deliver this message through hundreds of prosecutions, and the message has been delivered. The requested sentence will continue to communicate the certainty that the events of January 6 were not just a protest and will not be ignored or go unpunished. That will promote general deterrence without imposing a period of longer-than-necessary, and ultimately harmful, incarceration.

In the end, the unfortunate events of January 6 are tied to a unique historical event following the Covid-19 pandemic in which mail-in ballots and a President committed to lies created an atmosphere in which millions of Americans lost faith in their own elections. While the lie of election fraud lives on, there is little chance that the kind of unexpected crowd will gather again under these circumstances and create the conditions that led to this incident. And given the government's commitment to following through with convictions, that chance is lowered still.

Deterrence, to the extent it is necessary, has been achieved and will not be furthered by a lengthy prison sentence for a man who never even went to the Capitol.

### E.  The need to avoid unwarranted sentencing discrepancies

Given the number of January 6 cases, the Court has a unique ability to access similar case profiles in the same district when fashioning a sentence to avoid unwarranted sentencing disparities. Many of these cases involve acts of violence or interference at the Capitol that greatly exceed any culpability for Vallejo, who never went to the Capitol or performed any acts of violence, or even the Oath Keepers as a whole, who joined the crowd after the Capitol had been breached and stayed there for as little as 11 to 20 minutes. When these core facts are considered in the context of other sentencings handed down by courts in January 6 cases, the requested sentence of four months in jail and twelve months in home confinement is greater than hundreds of sentences imposed by courts in other January 6 cases with more egregious facts.

Some of these cases were charged as misdemeanors; others as felonies; and this one as "seditious conspiracy." Despite the grave nature of the charges chosen by the government in this case, that choice and the resulting convictions do not reflect meaningful distinctions between Oath Keepers and numerous other defendants charged with lesser crimes despite pulling down barriers, entering restricted grounds, pushing past police, occupying the Capitol, and encouraging others on social media. All defendants who entered the Capitol with the intent to hinder or delay the certification met the elements of seditious conspiracy, obstructing a proceeding, and hindering Congressional officers as this Court has construed those statutes.

With that in mind, the following cases involve misdemeanor prosecutions that resulted in little to no incarceration with facts that often were more egregious than Vallejo's conduct, including entering the Capitol for all of them:

- *United States v. Carlton*, 21 CR 247 (TFH), Judge Hogan sentenced the defendant to 36 months' probation. As the government pointed out in their sentence memo, Mr. Carlton: (1) made two separate entries into the Capitol; (2) chose to enter the Capitol Building after watching rioters climb the scaffolding, smelling tear gas, and seeing billows of smoke rise around him and from the Lower West Terrace, where rioters were clashing with law enforcement; (3) initially lied to law enforcement officials about his activity on January 6, 2021; (4) admitted he "may have" deleted some texts related to January 6; (5) filmed the chaos around him rather than choosing to leave; (6) has not since expressed remorse for his crimes on January 6, and (7) as a corrections officer, Carlton should have recognized the dangers that he and his fellow rioters' presence at the Capitol posed to public safety. *See Gov't sent. Memo,* ECF No. 47, p. 2. Mr. Wood engaged in none of this conduct.

- *United States v. Weisbecker*, 21 CR 682(TFH) Judge Hogan ordered 30 days of intermittent confinement as a condition of 24 months' probation.  Mr. Weisbecker entered the Speaker's suite of offices, posted multiple videos and photos on Facebook and other media cites for days,  and repeatedly berated federal border patrol officers at checkpoints multiple times.

- *United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF Nos. 42 & 44 (sentenced to supervised release with home confinement even though Ms. Bustle (1) posted on social media that Mike Pence was a traitor, (2) denied media accounts of violence were accurate, minimized the conduct of all of the rioters, (3) called for a revolution even after the events of January 6, (4) encouraged the rioters to be proud of their actions, and (5) minimized the impact of that day on lawmakers and democracy. Judge Hogan imposed a probationary sentence with a short period of home confinement for Ms. Bustle and an even shorter period of home confinement for Mr. Bustle. The government recommended probation in this case.

- *United States v. Youngers*, 21 CR 640 (TFH). Judge Hogan again gave a probationary sentence despite that defendant's conduct as outlined by the government:

   Aware that he was facing arrest, Youngers scaled a wall to reach the Capitol Building, filmed a confrontation between rioters and police, and entered through the Senate Wing Door within ten minutes of the initial breach. After filming himself declaring "this is what a revolution motherfucking looks like," and collecting a souvenir piece of broken glass, he and codefendant George Tenney proceeded to the Rotunda Doors, which had not yet been breached. Tenney opened the door for rioters, instigating the breach of the Capitol from the east side. Youngers tried to open one of the doors too, encouraged entering rioters, and swatted at a police officer, but then took some steps to assist the now-

outnumbered police, untangling an officer's radio from a bench and temporarily keeping some rioters away from that officer. Before leaving the area, Youngers filmed another video celebrating the breach of the Capitol. Back at a hotel, he filmed a video denying that there was violence at the Capitol and gave an interview wearing a full-face mask to conceal his identity.

*See* ECF No. 55, Gov't sent. memo at p. 2.

- *United States v. Andrew Bennett,* Crim. No. 21-227 (JEB) (sentenced to three months home confinement and two years' probation). According to the government, who recommended probation with a short term of home confinement, Mr. Bennett espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about his conduct. According to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to his Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!" On January 6, according to the government, Bennet began livestreaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer. Bennett also filmed assaults on the police officers and continued to livestream events inside the building.

- *United States v. Reeder,* 21 CR 166 (TFH). Critically, this J6 defendant pushed police officers and made contact with them yet the government chose not to pursue those charges and he was given 3 months incarceration and allowed to keep his class B misdemeanor deal. Here's what he posted: "was there for over a half hour. I got gassed several times inside, many times outside the Capitol. Got shot with peppers balls. Its fucking nuts. We had to battle the police inside. It was crazy. Absolutely insane." *See* ECF No. 26, p.1. Later a group unaffiliated with the government brought to their attention additional violent conduct by Mr. Reeder, and the government asked to continue the sentencing hearing. Ultimately, despite concrete evidence of violence, the government chose not to bring additional charges. *See* ECF No. 33; 35, exhibit 1, power point, pages 30-41.

- *United States v. Jenny Louise Cudd*, 21-cr-00068 (TFM) (sentenced to 2 months probation) (defendant wore a bullet proof sweatshirt, engaged in a push against law enforcement officers while yelling "go" and "charge" and celebrated property destruction and lacked remorse) *See* ECF 90.

- *United States v. Jennifer Ryan* 21-cr-00050(CRC) (sentenced to 2 months incarceration) (the defendant posted and live streamed her activity; she was "publicly cheerleading on a violent attack" (See ECF 48); she said the events were "a prelude to war" she shouted "fight for Trump" and "Hang Mike Pence"; she tweeted a photograph of a broken window that encouraged additional violence and she had no remorse;

- *United States v. Scirica*, 21-cr-000457 (CRC) (sentenced to 15 days incarceration). The defendant penetrated close to chamber where vote took place, chanted USA at police, directed the crowd inside the Capitol, took photos and video of himself inside, and showed no remorse. *See* ECF 17.

- *United States v.  Courtright*, 21-cr-00072 (CRC) (sentenced to 30 days incarceration) (the defendant went onto the Senate floor; picked up a "members only" sign and only returned it because an officer ordered her to; made postings on social media that showed a complete lack of remorse; and chanted at a line of police officers, "Whose House? Our House," and "USA, USA.").

Similarly low sentences have been handed down in felony cases. In the first § 1512(c) case to be sentenced, Judge Moss varied down from a guideline range of 15–21 months and gave Paul Hodgkins eight months incarceration, even though the defendant walked onto the floor of the U.S. Senate. *See US v. Hodgkins*, 21-188 (RDM).

In *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021), the government sought a sentence of 27 months' incarceration and the Court imposed a sentence of six months' incarceration with credit for time served. Leffingwell entered the Capitol Building. *Id.,* ECF No. 31, p. 2. But "Leffingwell was not content to merely stand inside the threshold": Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "Join us!" in the rioters' efforts to assault the Capitol. When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A. and W.H. tried to repel Leffingwell and the gathering crowd, Leffingwell struck both officers in the head.

*Id.,* p. 2 (emphasis added). Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.,* p. 8. His conduct was so brazen that he was one of the few protesters arrested on the scene. *Id.,* p. 9. Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* Ed's conduct was nowhere near this.

In *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021), the defendant was sentenced to five months' incarceration. Carrying a Confederate flag, Blair walked up to a police line outside the Capitol. He turned towards an officer and said, "What's up, motherfucker, what's up, what's up bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the defendant jabbed him with a lacrosse stick. *Id.* A search incident to arrest recovered a knife in the defendant's backpack. 21-cr-186, ECF No. 55, p. 8. Blair pled guilty to a § 231(a)(3) offense. Just as in *Leffingwell,* Blair's acts could only be interpreted as intended to inflict bodily injury or to threaten it.

Likewise, defendants sentenced to a year or more of incarceration exhibited far more culpable conduct. In a recent sentencing memorandum, another counsel identified forty-one cases in which defendants were sentenced to 30 months or more imprisonment among the 394 January 6 defendants sentenced to date. Their facts strongly support a lenient sentence for Vallejo:

- *United States v. Miller*, No. 1:21-CR-00075-RDM  **33 months incarceration**
    - While on restricted ground of the Capitol, draped in a Confederate flag, threw a full beer can at law enforcement.
    - Used a bike rack to scale the Capitol wall.
    - Threw batteries at officers.
    - Sprayed at least a dozen officers with the contents of a fire extinguisher as other rioters assaulted officers with bats, flagpoles and riot shields. The contents of the fire extinguisher sprayed at least a dozen police officers.

- *United States v. Byerly*, No. 1:21-CR-00527-RDM  **34 months incarceration**
  - Purchased a stun gun and traveled with it to D.C.
  - Engaged in three separate assaults. Two against police and one against a news reporter.
  - Assisted a group of rioters in using a large steel frame Trump sign as a battering ram against police officers.
  - Participated in vicious assault against a news reporter, by grabbing the victim with both hands near the shoulder and upper chest and pushing him backward. He pushed and dragged the victim toward a dense crowd. He then placed both of his hands in the area of the victim's face and neck and continued to shove and push the victim away from the stairs, and toward a low stone wall.
  - Used his stun gun against Capitol police and MPD officers.
  - After having had the stun gun removed from his hands, he continued to charge toward and physically strike officers.
  - Grabbed and wrestled an officer for his baton.

- *United States v. Thompson*, No. 1:21-CR-00161-RBW  **36 months incarceration**
  - Convicted after a trial.
  - Came prepared wearing a bulletproof vest.
  - Walked into and looted Senate Parliamentarian's office, stealing two bottles of liquor.
  - Then went outside to find and encouraged co-defendant Lyon to participate in the riot.
  - He stole a coat rack and an announcer pager used by U.S. Capitol Police to send emergency alerts throughout the building.
  - Picked up someone's cell phone off a staffer's desk.

- *United States v. Tenney*, No. 1:21-CR-00640-TFH  **36 months incarceration**
  - He and a co-defendant entered the Capitol through the West Terrace.
  - He then walked through the Rotunda and it was he who personally forced open the Rotunda doors on the east side which ultimately allowed rioters to enter from that side of the building.
  - He grabbed the Sergeant at Arms from behind and pushed him into a doorframe. He also locked arms with a U.S. Capitol Police Officer B.A. and shoved another U.S. Capitol Police Officer.

- *United States v. Reid*, No. 1:21-CR-00316-DLF  **37 months incarceration**
  - Was in the front among the first to rush up the steps when rioters broke through a police line under the scaffolding.
  - For over an hour, he walked through the Capitol, surged through police lines, led rioters through the building, and encouraged other rioters to enter.

67

- Made his way to the Speaker's Lobby and damaged a television and water cooler in the nearby bathroom.

- *United States v. Hughes*, No. 1:21-CR-00106-CKK  **38 months incarceration**
  - Climbed scaffolding.
  - At the front of the mob that forced bike rack barriers down and breached the police line.
  - Among first rioters to reach the Upper West Terrace.
  - Ninth rioter to enter the Senate Wing Door building through smashed window.
  - Chased a Capitol Police officer and yelled violent and angry threats.

- *United States v. Rubenacker*, No. 1:21-CR-00193-BAH  **41 months incarceration**
  - One of the first 50 rioters to enter the Capitol.
  - Was at the front of the mob, along with other rioters, and chased a Capitol police officer up a flight of stairs, directly past where lawmakers had just retreated from conducting the joint session, yelling "Where are they counting the votes?" and "He's one person, we're thousands!"
  - Exited the east side of the Capitol and reentered later through the East Rotunda doors as part of a mob of rioters, during which rioters surrounded and assaulted law enforcement officers attempting to prohibit entry to the East Rotunda doors.
  - Smoked marijuana in the Rotunda.
  - Swung a water bottle at an officer's head and threw liquid at other officers.

- *United States v. Smith*, No. 1:21-CR-00567-RCL  **41 months incarceration**
  - Assisted a group of rioters in hoisting and thrusting a large metal sign frame into a line of officers.  The sign could have "split someone's head open."
  - Encouraged rioters to keep forcing a door closed so that officers could not exit and defend the Capitol.

- *United States v. Chansley*, No. 1:21-CR-0003-RCL  **41 months incarceration**
  - Q-Anon Shaman and the very face of the events of January 6.
  - Climbed the scaffolding.
  - Entered the Capitol and roamed the second and third floors of the building.
  - Entered the Senate gallery and screamed obscenities.
  - Scaled the Senate dias "taking the seat that Vice President Mike Pence had occupied less than an hour before" and took pictures of himself on the dias.
  - Called other rioters up to the dias and lead them in an incantation including to be thankful for the "opportunity 'to allow us to send a message to all the tyrants, the communists, and the globalists, that this is our nation, not theirs,

that we will not allow American, the American way of the United States of America to go down.'"

- Gave a *60 Minutes* interview falsely claiming that he was let into the Capitol by law enforcement and was merely intending to bring divinity, to bring God back into the Senate.

- *United States v. Fairlamb*, No. 1:21-CR-00120-RCL  **41 months incarceration**
  - Shoved and punched an MPD officer.
  - Climbed the scaffolding.
  - Entered the Capitol carrying a stolen police baton.

- *United States v. Neefe*, No. 1:21-CR-00567-RCL   **41 months incarceration**
  - Fabricated a wooden club and carried it on to the Capitol grounds.
  - Assisted a group of rioters in hoisting and thrusting a large metal sign frame into a line of officers. The sign could have "split someone's head open."

- *United States v. Secor*, No. 1:21-CR-00157-TNM   **42 months incarceration**
  - Scaled scaffolding.
  - Walked through the office suite of Nancy Pelosi.
  - Assisted a group of rioters to push open the East Rotunda doors and helped other rioters enter the building.
  - Sat in the seat that Vice President Mike Pence occupied 30 minutes earlier.

- *United States v. Mault*, No. 1:21-CR-00657-BAH   **44 months incarceration**
  - Anticipated and planned for violence in pre-riot text message conversations with co-defendant Mattice.
  - Along with co-defendant Mattice, and other rioters, they pushed against the line of police, broke the line, and forced the police barriers apart, overwhelming and surrounding the police.
  - Body-surfed over members of the crowd and hung from the wooden frame beneath the arch.
  - Assaulted police officers. Obtained a canister from another rioter and deployed its dangerous contents at police officers.

- *United States v. Languerand*, No. 1:21-CR-00353-JDB **44 months incarceration**
  - Threw a piece of wood at police.
  - Just a few minutes later, he and another rioter threw a heavy black audio speaker at the police.
  - A minute later, threw two sticks in rapid succession at officers.
  - Three minutes later, threw another stick at officers.

- A few seconds later, threw a large orange traffic bollard which ricocheted off the riot shield of an officer before colliding with multiple officers inside the archway.
- A minute later, threw a pepper spray container followed by a bottle of liquid.
- Approximately 30 seconds later, threw a piece of wood, then threw another stick at the police.

- *United States v. Mattice*, No. 1:21-CR-00657-BAH  **44 months incarceration**
  - Anticipated and planned for violence in pre-riot text message conversations with co-defendant Mault.
  - Recorded a video conveying his intent and foreshadowing his violent conduct. He explained, "We're all getting ready to go march on Capitol Hill.  We're gonna fuck some shit up. It's about to be nuts."
  - Along with co-defendant Mault, and other rioters, they pushed against the line of police, broke the line, and forced the police barriers apart, overwhelming and surrounding the police.
  - Texted family to brag about breaking police line.
  - Body-surfed over members of the crowd and hung from the wooden frame beneath the arch.
  - Used chemical spray against police officers.
  - Lied to FBI agents claiming that he did not fight with police but, instead simply absorbed their blows without fighting back.

- *United States v. Coffman*, No. 1:21-CR-00004-CKK  **46 months imprisonment**
  - Drove to Washington on January 6 from Alabama in a pickup truck containing loaded firearms, including a 9mm handgun, a rifle, and a shotgun. Also, inside the pickup truck and in its covered bed were hundreds of rounds of ammunition, large-capacity ammunition feeding devices, a crossbow with bolts, machetes, camouflage smoke devices, a stun gun, cloth rags, lighters, a cooler containing eleven mason jars with holes punched in the lids, and other items.  The eleven mason jars each contained a mixture of gasoline and Styrofoam. The mason jars and their contents, along with the lighters and cloth rags, made up the component parts of bottle-based improvised incendiary weapons (*i.e.* Molotov cocktails).
  - The Styrofoam in the Molotov cocktails was designed to have a napalm effect of adhering to the skin of its victims.
  - A month before January 6, he had traveled to Washington and attempted to drive to the residence of a United States Senator.

- *United States v. Hughes*, No. 1:21-CR-000106-TJK  **46 months incarceration**
  - Climbed scaffolding.
  - Among first rioters to reach the Upper West Terrace.

70

- Eighth rioter to enter the Senate Wing Door building through smashed window.
- Kicked the Senate Wing Door open from inside with another rioter.
- Chased a Capitol Police officer and yelled violent and angry threats.
- Occupied the Senate chamber and reviewed sensitive documents that had been left behind by Senators forced to flee for their lives.

- *United States v. Richardson*, No. 1:21-CR-00721-CKK **46 months incarceration**
  - Struck a police officer three times with a metal flagpole, stopping only when the pole broke in his hands.
  - Retreated after he was pepper sprayed. Two minutes later, he and other rioters grabbed and shoved a large metal billboard toward the police, using it as a battering ram.

- *United States v. Thompson*, No. 1:21-CR-00461-RCL **46 months incarceration**
  - Joined rioters as they actively assaulted police.
  - Armed himself with a police baton and incited violence outside of the Capitol. Also stayed in the heart of the violent zone, watching *hours* of attacks against law enforcement. Indeed for nearly two hours he stood "in the vicinity of some of the most violent conduct on January 6, observing, commenting and occasionally chanting while windows were smashed, and the police line was repeatedly attacked."
  - Provided rioters with riot shields to use against the police which had previously been stolen from the police.
  - Assisted in throwing a large audio speaker at police.
  - Assaulted a police officer with a baton when the officer was trying to assist a rioter needing medical attention.

- *United States v. Bledsoe*, No. 1:21-CR-00204-BAH **48 months incarceration**
  - Convicted after a trial. Moreover his PSR recommended a sentencing enhancement based on his false testimony at trial.
  - Scaled a wall to access the upper northwest terrace.
  - Climbed statue of President Gerald Ford and planted a Trump flag on his arm.
  - Remained inside the Capitol for 22 minutes and wandered through the Statuary Hall before joining another crowd of rioters circling the House Chamber while members of Congress were trapped inside and unable to evacuate.

- *United States v. Decarlo*, No. 1:21-CR-00073-BAH **48 months incarceration**
  - Significant ties to Proud Boys
  - Threw smoke bomb at police.

71

- Rummaged through a Capitol police duffle bag and stole a pair of flex cuffs.
- Scrawled "Murder the Media" on one of the Capitol's doors.

- *United States v. Hale-Cusanelli*, No. 1:21-CR-00037-TNM **48 months incarceration**
  - Convicted after a trial sporting a "Hitler mustache."
  - Former Army reservist and security contractor who held a "Secret" level security clearance when he and others sieged the Capitol.
  - At front of a mob that attacked police and smashed windows and doors to breach the Capitol.
  - Unsuccessfully intervened in an arrest of a rioter by trying to pull the rioter away from the officer.

- *United States v. Herrera*, No. 1:21-CR-619-BAH   **48 months incarceration**
  - Convicted after a trial.
  - Came prepared wearing a gas mask, goggles, and a bulletproof vest.
  - Climbed scaffolding and entered the Capitol through a fire door, located near the Senate Parliamentarian's Office on the Senate wing side of the building.
  - Posted an Instagram photo of himself picking up a stack of papers and throwing them in the air.  Later, in an exchange with someone else on Instagram, he said he had picked up the papers and had someone photograph him because he wanted a "fuck you" picture.
  - Stole a bottle of liquor, which he drank and raised triumphantly as he exited the Capitol the first time.
  - Reentered the Capitol through the nearby Senate Wing Doors. As he entered, he walked past shattered windows on each side of the door and spent a few minutes setting up his camera and taking photographs.
  - Then he proceeded to a nearby "hideaway" office of a U.S. Senator, where he smoked a marijuana cigarette that was passed around by other rioters.
  - After, he proceeded to the Crypt, and remained inside for 15 minutes while he took more photographs, before exiting the building.

- *United States v. Ochs*, No. 1:21-CR-00073-BAH   **48 months incarceration**
  - Proud Boys member.
  - Walked around and filmed the attack on the U.S. Capitol.
  - Threw smoke bomb at police.
  - Smoked cigarettes in Rotunda.
  - Pointed rioters toward the Speaker's Office.
  - Posed in front of "Murder the Media" graffiti his co-defendant had scrawled on one of the Capitol's doors.

- *United States v. Wilson*, No. 1:21-CR-00345-RCL  **51 months imprisonment**
  - Physically engaged with officers by punching, shoving and kicking them, as well as attempting to steal their riot shields.
  - Picked up a several feet-long white cylindrical object, believed to be a thin polyvinyl chloride (PVC) pipe, and indiscriminately struck at officers with it.
  - "[E]ngaged multiple officers with whatever means he had available."

- *United States v. Denney*, No. 1:22-CR-00070-RDM  **52 months incarceration**
  - Former military police officer.
  - Used Facebook to recruit for his militia group called the Patriot Boys of North Texas and fundraised for weapons, gear, lodging, and travel.
  - Arrived eager for violence in full battle attire wearing a helmet, knuckled gloves, and a ballistic vest with body armor under his jacket.
  - Deployed pepper spray at the line of Capitol police officers.
  - Grabbed and shoved a police officer.
  - Threw a pepper spray cannister in the direction of the line of officers.
  - Assaulted officers with a pole and attempted to disarm them.
  - Along with another rioter, he launched a large tube at the line of police officers guarding the west side of the Capitol building.
  - Swung his arm and fist at an officer in an attempt at pulling him down the stairs.
  - Lied to FBI agents about his knowledge of the assault.

- *United States v. Pruitt*, No. 1:21-CR-00023-TJK  **55 months incarceration**
  - Proud Boys member.
  - Wore a tactical glove with knuckle pads and a cut-off t-shirt with the logo of the "Punisher"—an anti-hero known for dispensing violent vigilante justice.
  - Was wearing an electronic ankle monitor for being arrested recently.
  - Climbed a bike rack as a ladder to be at the front of the mob that breached the building.
  - Tossed a chair in the direction of officers in the Visitor Center.
  - Came face to face with then-Senate Minority Leader Chuck Schumer, who was trying to evacuate

- *United States v. Jensen*, No. 1:21-CR-00006-TJK  **60 months incarceration**
  - Convicted after a trial.
  - Ringleader during the attack on the U.S. Capitol, riled up the crowd and encouraged others to follow him into and through the building.
  - Scaled a twenty-plus-foot wall to be one of the first rioters to break into the building and disrupt the proceedings in Congress.
  - Tenth rioter to enter the Capitol.
  - Led a group of armed rioters in pursuit of an officer up a staircase, steps away from the Senate Chamber, where members of Congress were sheltering at that very moment.

- *United States v. Mazza*, No. 1:21-CR-00736-JEB  **60 months incarceration**
  - Traveled to D.C. with two loaded handguns: a .40 caliber Smith and Wesson semi-automatic handgun, and a .45 caliber/.410 caliber revolver ("Taurus Judge").
  - Dropped or lost the Taurus Judge revolver on the steps leading up to the West Front Terrace.
  - After entering the Capitol, he joined mob of other rioters who were trying to break through the police line to gain entry into the lower level of the Capitol.
  - Armed himself with a stolen police baton and used it to assault police officers.
  - Remained on Capitol grounds for a number of hours still armed with the loaded .40 caliber semi-automatic firearm.
  - Filed false police report about how he had lost the Taurus Judge and provided false information to Capitol Police.

- *United States v. Williams*, No. 1:21-CR-00377-BAH  **60 months incarceration**
  - Convicted after a trial.
  - Helped rioters climb bicycle racks so that he and the other rioters could overrun the police on the Northwest stairs.
  - Stole water bottles that Capitol police officers had stored to be used for decontamination if they were hit with chemical irritants.
  - Entered the Capitol through the Senate door with the first large wave of rioters to breach the Capitol.
  - Celebrated and smoked marijuana with other rioters in the Rotunda.

- *United States v. Ponder*, No. 1:21-CR-00259-TSC  **63 months incarceration**
  - Convicted after a trial.
  - Recruited co-defendants.
  - Swung a pole at an officer and after his pole broke against the officer's shield, he re-armed himself with a sturdier pole and assaulted another officer.
  - 15 minutes after the first two assaults, he assaulted another officer with the same sturdier pole.

- *United States v. Sandlin*, No. 1:21-CR-00088-DLF  **63 months incarceration**
  - Traveled to D.C. along with two co-conspirators in a car full of weapons, including several knives, bear spray, Glock 43 pistol, two magazines of ammunition, gas masks, stun gun, slingshot, military-style vests/body armor, two helmets, a baton, walkie-talkies and Sandlin's M&P pocket pistol.
  - Made his way through the East Rotunda doors with his co-conspirators and shoved officers to force the door behind them open, allowing the mob outside to begin streaming in.
  - Attempted to rip the helmet off an officer.

- Along with his co-conspirators, he engaged in a shoving match with officers in an attempt to keep the doors to the Senate Gallery open, striking an officer's head in the process.
- Wandered through the Capitol in pursuit of members of Congress, asking an unknown individual, "Is that where the Senators are at?"
- Smoked a marijuana joint in the Rotunda of the Capitol while stating, "We made history" and "This is our House."

- *United States v. Palmer*, No. 1:21-CR-0328-TSC  **63 months incarceration**
  - Was on the steps leading to the LWT tunnel and, having acquired a wooden plank, he threw the plank like a spear at police officers.
  - He picked up a fire extinguisher and sprayed police with its contents. Then, once it was empty, he threw it at police officers.
  - He then "cast around for additional items with which he could assault the police." He took hold of a long piece of scaffolding wrapped in canvas and pushed it at the legs of the police.
  - He then picked up the fire extinguisher he previously used to assault police and again threw it at police.
  - Also, at some point, he picked up an orange traffic barrier and threw it towards the police.

- *United States v. Caldwell, Daniel*, No. 1:21-CR-00181-CKK  **68 months incarceration**
  - Marine veteran.
  - Armed himself with bear spray, outfitted himself with glasses that could protect himself from some of the effects of pepper spray, and brought a handheld two-way radio.
  - Sprayed a line of officers protecting the Lower West Terrace Place with a canister of gaseous chemical irritant.
  - Confronted and taunted police officers by asking them to spray, and asking if they were "scared."
  - Present on the front lines of the main assault for almost the duration of the confrontation.

- *United States v. McGrew*, No. 1:21-CR-00398-BAH  **78 months incarceration**
  - Former U.S. Marine.
  - Flew with bear mace to D.C.
  - Entered the Capitol through the unguarded Upper West Terrace doorway. Prior to entering, he encouraged other rioters, repeatedly yelling, "Let's Go!"
  - Struck an MPD officer within seconds of entering the Capitol.

- Screamed at officers and refused to follow instructions to leave the building.
- Struck several more officers, attempted to and successfully grabbed officer's batons, and locked arms with other rioters, in defiance of officer's commands that rioters leave the building.
- After being pushed out of the Rotunda, he traveled to the Lower West Terrace. There, as he had at the West Plaza, he pushed his way through throngs of people until he was face-to-face with officers. He then participated in an unsuccessful push into a tunnel entrance to the Capitol and taunted officers, before grabbing a wooden handrail with a metal hook on the end and launched it into the tunnel. Afterwards, he and other rioters began pushing into the tunnel again and pushing the officers within the tunnel back.

- *United States v. Khater*, No. 1:21-CR-00222-TFH  **80 months incarceration**
  - Arrived to D.C. with two containers of bear spray and two containers of hand-held pepper spray.
  - Pepper sprayed any police officer he could find for nearly half a minute. He sprayed at least three officers at close range on the Lower West Terrace.
  - By his own admission, he climbed up the scaffolding in order to take a picture.

- *United States v. Young*, No. 1:21-CR-00291-ABJ  **86 months incarceration**
  - Brought 16-year-old son with him.
  - Stormed the police line in the tunnel on the Lower West Terrace.
  - Handed fellow rioter a taser.
  - Held a strobe light toward officers fighting in an effort to impair their vision and distract them.
  - Worked with another rioter to throw a large audio speaker toward the police line, which missed the officers and struck a fellow rioter on the head, drawing blood.
  - Used a long pole or stick to jab towards the police line.
  - Joined an attack on an officer by restraining his wrist while a co-defendant removed his police badge and police radio. The officer's wrist was broken by a riot shield moving through the crowd above the rioters' heads.
  - Assaulted an officer who was temporarily disoriented and blinded by bear spray by grabbing at his helmet and body, pushing him, and hitting him.

- *United States v. Robertson*, No. 1:21-CR-00034-CRC  **87 months incarceration**
  - Police sergeant with the Rocky Mount, Virginia, police department and Army veteran.
  - Brought a gas mask and large wooden stick.

- o Raised up his wooden stick in "port arms," a tactical position used by the military and law enforcement to push others away, and blocked the path of officers attempting to hold back the mob.
- o Destroyed evidence from him and a co-defendant prior to arrest.

- *United States v. Head*, No. 1:21-CR-00291-ABJ  **90 months incarceration**
  - Carried knife on hip.
  - Repeatedly struck towards police line with a riot shield.
  - Pushed the shield against an officer for nearly three minutes. After a continued struggle with the officer, he wrapped his arm around the officer's neck and yelled, "I've got one!" He then dragged the officer into the mob, isolating him as the crowd violently assaulted the officer.

- *United States v. Webster*, No. 1:21-CR-00208-APM  **120 months incarceration**
  - Convicted after a trial.
  - Traveled to D.C. with an NYPD bulletproof vest and a Smith and Wesson Model 640 revolver, small enough to conceal inside a jacket pocket.
  - Carried a large metal flagpole.
  - After attempting to provoke an officer standing behind a bike-rack barricade into a fight, he forcefully pushed against the bike rack. The officer reached across to shove him away but in doing so, struck Webster on his face. Webster then swung the flagpole against the bike rack with enough force to break the metal pole in half. He charged at the officer and tackled the officer to the ground after the officer wrestled the flagpole out of his grip. He then dragged the officer by his helmet, pinned him to the ground, and tried to rip his gas mask off. This caused tear gas to become trapped inside the officer's mask, and his throat and nose began to burn. While he restrained the officer on the ground, other rioters began kicking the officer. He left the officer on the ground and continued toward the Capitol.

Finally, a chart of defendants specifically convicted of § 1512(c) shows a range of sentences from a low of twelve months of home incarceration to a high of 90 months, with most clustered around 21–48 months:

| Defendant Name | Case Number | Offense(s) of Conviction | Sentence Imposed |
|---|---|---|---|
| Fairlamb, Scott | 1:21-CR-00120-RCL | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 111(a)(1) | 41 months' incarceration<br>36 months' supervised release<br>$2000 restitution |
| Hodgkins, Paul | 1:21-CR-00188-RDM | 18 U.S.C. § 1512(c)(2) | 8 months' incarceration<br>24 months' supervised release<br>$2000 restitution |
| Chansley, Jacob | 1:21-CR-00003-RCL | 18 U.S.C. § 1512(c)(2) | 41 months' incarceration<br>36 months' supervised release<br>$2000 restitution |
| Miller, Matthew | 1:21-CR-00075-RDM | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 111(a)(1) | 33 months' incarceration<br>24 months' probation<br>$2000 restitution<br>100 hours' community service |
| Wilson, Duke | 1:21-CR-00345-RCL | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 111(a)(1) | 51 months' incarceration<br>36 months' supervised release<br>TBD restitution |
| Rubenacker, Greg | 1:21-CR-00193-BAH | 18 U.S.C. § 231(a)(3)<br>18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 111(a)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>18 U.S.C. § 1752(a)(4)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § | 41 months' incarceration<br>36 months' supervised release<br>$2000 restitution |

| | | 5104(e)(2)(E)<br>40 U.S.C. § 5104(e)(2)(F)<br>40 U.S.C. §<br>5104(e)(2)(G) | |
|---|---|---|---|
| Reffitt, Guy | 1:21-CR-00032-DLF | 18 U.S.C. § 231(a)(2)<br>18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 231(a)(3)<br>18 U.S.C. §<br>1512(a)(2)(C) | 87 months'<br>incarceration<br>3 years<br>supervised<br>release<br>$2000 restitution |
| Robertson,<br>Thomas | 1:21-CR-00034-CRC | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 231(a)(3) | 87 months'<br>incarceration<br>36 months'<br>supervised<br>release |
| Pruitt,<br>Joshua | 1:21-CR-00023-JK | 18 U.S.C. § 1512(c)(2) | 55 months'<br>incarceration<br>36 months'<br>supervised<br>release<br>$2,000<br>restitution |
| Michetti,<br>Richard | 1:21-cr-00232-CRC | 18 U.S.C. § 1512(c)(2) | 9 months'<br>incarceration<br>24 months'<br>supervised<br>release<br>$2,000<br>restitution |
| Williams,<br>Anthony | 1:21-CR-00377-BAH | 18 U.S.C. § 1512(c)(2)<br>40 U.S.C.<br>§ 5104(e)(2)(D) 40<br>U.S.C. § 5104(e)(2)(G)<br>18 U.S.C. § 1752(a)(1)<br>and (2) | 60 month's<br>incarceration<br>36 months'<br>supervised<br>release<br>$5000 fine<br>$2000 restitution |
| Hale-<br>Cusanelli,<br>Tim | 1:21-CR-00037-TNM | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2) | 48 months'<br>incarceration<br>36 months'<br>supervised |

| | | 40 U.S.C. § 5104(e)(2)(D), (G) | release $2,000 restitution |
|---|---|---|---|
| Neefe, Marshall | 1:21-CR-00567-RCL | 18 U.S.C. § 1512(k) 18 U.S.C. § 111(a)(1) | 41 months' incarceration 36 months' supervised release $2,000 restitution |
| Smith, Charles Bradford | 1:21-CR-00567-RCL | 18 U.S.C. 1512(k) 18 U.S.C. § 111(a)(1) | 41 months' incarceration 36 months' supervised release $2,000 restitution |
| Secor, Christian | 1:21-CR-00157-TNM | 18 U.S.C. § 1512(c)(2) | 42 months' incarceration 36 months' supervised release $2,000 restitution |
| Bledsoe, Matthew | 1:21-CR-00204-BAH | 18 U.S.C. § 1512(c)(2) 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D) | 48 months' incarceration 36 months' supervised release $2,000 fine $2,000 restitution |
| Seefried, Hunter | 1:21-CR-00287-TNM | 18 U.S.C. § 1512(c)(2) 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) | 24 months' incarceration 12 months' supervised release $2,000 restitution |

| | | | |
|---|---|---|---|
| Priola, Christine | 1:22-CR-00242-TSC | 18 U.S.C. § 1512(c)(2) | 15 months' incarceration 12 months' supervised release $2,000 restitution |
| Thompson, Dustin | 1:21-CR-00161-RBW | 18 U.S.C. § 1512(c)(2) 18 U.S.C. § 641 18 U.S.C. 1752(a)(1) 18 U.S.C. 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D) | 36 months' incarceration 36 months' supervised release $2,000 fine $2,000 restitution |
| Hughes, Joshua | 1:21-CR-00106-CKK | 18 U.S.C. § 1512(c)(2) | 38 months' incarceration 36 months' supervised release $2,000 restitution |
| Wood, Matthew | 1:21-CR-00223-APM | 18 U.S.C. § 1512(c)(2) 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(C) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) | 12 months' home detention 36 months' probation 100 hours' community service $2,000 restitution |
| Tenney, George | 1:21-CR-00640-TFH | 18 U.S.C. § 231(a)(3) 18 U.S.C. § 1512(c)(2) | 36 months' incarceration 36 months' supervised release $2,000 restitution |
| Reid, William | 1:21-CR-00316-DLF | 18 U.S.C. § 1512(c)(1) 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. | 37 months' incarceration 36 months' supervised release |

| | | § 5104(e)(2)(G) | $2,443 restitution |
|---|---|---|---|
| Allan, Tommy Frederick | 1:21-CR-00064-CKK | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 1512(c)(2) | 21 months' incarceration<br>36 months' supervised release |
| Decarlo, Nicholas | 1:21-CR-00073-BAH | 18 U.S.C. § 1512(c)(2) | 48 months' incarceration<br>36 months' supervised release<br>$2,500 fine<br>$2,000 restitution |
| Ochs, Nicholas | 1:21-CR-00073-BAH | 18 U.S.C. § 1512(c)(2) | 48 months' incarceration<br>36 months' supervised release<br>$5,000 fine<br>$2,000 restitution |
| Sandlin, Ronald | 1:21-CR-00088-DLF | 18 U.S.C. § 1512(k)<br>18 U.S.C. § 111(a)(1)<br>18 U.S.C. § 111(a)(2) | 63 months' incarceration<br>36 months' supervised release<br>$20,000 fine<br>$2,000 restitution |
| Jensen, Douglas | 1:21-CR-00006-TJK | 18 U.S.C. § 231(a)(3)<br>18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 111(a)(1)<br>18 U.S.C. § 1752(a)(1) and (b)(1)(A)<br>18 U.S.C. § 1752(a)(2) and (b)(1)(A)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 60 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |

| | | | |
|---|---|---|---|
| Hughes, Jerod | 1:21-CR-00106-TJK | 18 U.S.C. § 1512(c)(2) | 46 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Herrera, Erik | 1:21-CR-619-BAH | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 48 months' incarceration<br>36 months' supervised release<br>$1,000 restitution |
| Andries, John | 1:21-CR-00093-RC | 18 U.S.C. § 1512(c)(2) | 12 months' and 1 day incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Rahm, James Jr | 1:21-CR-00150-TFH | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 12 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Hernandez, Andrew Alan | 1:21-CR-00445-CKK | 18 U.S.C. § 1512(c)(2) | 18 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Moynihan, Christopher | 1:21-CR-00226-CRC | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(A)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § | 21 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |

| | | 5104(e)(2)(G) | |
|---|---|---|---|
| Haynes, Joshua | 1:21-CR-00594-TSC | 18 U.S.C. § 1512<br>18 U.S.C. § 1363 | 32 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Seefried, Kevin | 1:21-CR-00287-TNM | 18 U.S.C. 1512(c)(2)<br>18 U.S.C. 1752(a)(1)<br>18 U.S.C. 1752(a)(2)<br>40 U.S.C. § 5104(e)(2)(D)<br>40 U.S.C. § 5104(e)(2)(G) | 36 months' incarceration<br>12 months' supervised release<br>$2,000 restitution |
| Judd, David Lee | 1:21-CR-00040-TNM | 18 U.S.C. § 111(a)(1) and (b);<br>18 U.S.C. § 1512(c)(2) and (2) | 32 months' incarceration<br>24 months' supervised release<br>$2,000 restitution |
| Wright, John Douglas | 1:21-CR-00341-CKK | 18 U.S.C. § 1512(c)(2) and 2 | 49 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Egtvedt, Daniel | 1:21-CR-00177-CRC | 18 U.S.C. § 111(a)(1);<br>18 U.S.C. § 231(a)(3);<br>18 U.S.C. § 1512(c)(2) & (2);<br>18 U.S.C. § 1752(a)(1), (2)<br>40 U.S.C. § 5104(e)(2)(D) | 42 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Gardner, Mitchell | 1:21-CR-00622-APM | 18 U.S.C. § 231(a)(3);<br>18 U.S.C. § 1512(c)(2) and 2;<br>18 U.S.C. § 111(a)(1) and (b); | 55 months' incarceration<br>36 months' supervised release<br>$3500 |

| | | | |
|---|---|---|---|
| Brock, Larry | 1:21-CR-00140-JDB | 18 U.S.C. § 1512(c)(2) and 2;<br>18 U.S.C. § 1752(a)(1);<br>18 U.S.C. § 1752(a)(2);<br>40 U.S.C. § 5104(e)(2)(A);<br>40 U.S.C. § 5104(e)(2)(D);<br>40 U.S.C. § 5104(e)(2)(G); | |
| Sills, Geoffrey William | 1:21-CR-00040-TNM | 18 U.S.C. § 2111 and 2;<br>18 U.S.C. § 111(a)(1) and (b);<br>18 U.S.C. § 1512(c)(2) and 2 | 52 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Puma, Anthony | 1:21-CR-00454-PLF | 18 U.S.C. § 1512(c)(2) and 2 | 9 months' incarceration<br>24 months' supervised release<br>$2,000 restitution |
| McCaughey, Patrick Edward III | 1:21-CR-00040-TNM | 18 U.S.C.§ 111(a)(1) and 2;<br>18 U.S.C.§ 111(a)(1) and (b);<br>18 U.S.C.§ 1512(c)(2) and 2;<br>18 U.S.C.§ 231(a)(3);<br>18 U.S.C.§ 1752(a)(2) and (b)(1)(A);<br>18 U.S.C.§ 1752(a)(4) and (b)(1)(A);<br>40 U.S.C.§ 5104(e)(2)(D), 2;<br>40 U.S.C.§ 5104(e)(2)(F) | 90 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |

All told, the facts of the offense conduct and characteristics of the defendants who garnered little or no incarceration and were charged with only misdemeanors were starkly different—and *more* culpable—than Vallejo's conduct and characteristics in agreeing from *seven miles away*, and *after the fact*, with the idea of Oath Keepers entering the Capitol and interfering with the certification. He did not engage in any violence, destroy or steal government property, assault or threaten law enforcement officers, or even *go to the Capitol*. Rather, he condemned the breaking of Capitol windows and approved of reports he received of Oath Keepers taking pictures of Antifa and helping scared police officers. Ex's EV 124.1B, 150B, 178, 305.4. And he sought throughout January 6 and 7 to figure out what the President of the United States was asking citizens to do, and to respond accordingly. Ex's 176, 176.2, 179, 179.1. His conduct is worthy of leniency, and a custodial sentence of four months and home-detention sentence of twelve months would be well in line with similar § 1512(c) cases, while avoiding uwarranted disparities with defendants who received little or no time for conduct involving violence and physical entry into the Capitol.

Moreover, the Court should consider that individuals alleged to have run the QRF and personally held weapons for those who entered the Capitol—Paul Stamey and Ken Bittner— have not been charged *at all*. Clearly, the government does not really believe that operating the QRF alone is worthy of significant punishment, or Mr. Bittner, seen on video supervising the Florida group's weapons deliveries, would have been charged.

### III.    History and Tradition Support Leniency

As the Court weighs Ed Vallejo's generous, principled, passionate, patriotic, loving, and otherwise law-abiding nature against the need for accountability and punishment in this most noteworthy of cases, it can draw from history to support the requested sentence. The government has often described the events of January 6 as an assault on our democracy that broke 200 years of tradition. Looking back at that tradition of democracy, however, there are other instances of rebellion or insurrection for which the nation's founders urged leniency and pardon.

Notably, a series of protests in 1786 led to a full-blown military confrontation known as Shays's Rebellion. *See* "Shays's Rebellion," ENCYCLOPAEDIA BRITTANICA (2023), *available at* https://www.britannica. com/event/Shayss-Rebellion. During the confrontation, "[a]rmed bands forced the closing of several courts to prevent execution of foreclosures and debt processes." *Id*. "In September 1786 Daniel Shays and other local leaders led several hundred men in forcing the Supreme Court in Springfield to adjourn." *Id*. The incident became an international sensation and a test for the young Republic.

Writing of these events, future president Thomas Jefferson argued for leniency. Jefferson noted that the motivations of the rebels, like the January 6 rioters, "were founded in ignorance, not wickedness." Letter from Thomas Jefferson to William Stephens Smith (November 13, 1787), *available at* https://founders.archives.gov/documents/Jefferson/01-12-02-0348 ("*Jefferson-Smith Letter*"). He wrote that realistically, "[t]he people cannot be all, and always, well informed. The part which is wrong will be discontented in proportion to the importance of the facts they misconceive. If they remain quiet under such misconceptions it is a lethargy, the forerunner of death to the public liberty." *Id*.  Even if such misguided people "take arms," Jefferson urged, "[t]he remedy is to set them right as to facts, pardon and pacify them." *Id*. The answer to such

unrest, according to Jefferson, was education and restoration without losing sight of the patriotic spirit that fueled extreme—if misguided—action. *See* Letter from Thomas Jefferson to Edward Carrington (January 16, 1787) ("*Jefferson-Carrington Letter*"), *available at* https://founders. archives.gov/documents/Jefferson/01-11-02-0047 ("The way to prevent these irregular interpositions of the people is to give them full information of their affairs thro' the channel of the public papers….Do not be too severe upon their errors, but reclaim them by enlightening them.").

Jefferson's lenient view prevailed. After the rebellion was put down, a general amnesty was offered to over four thousand people if they signed confessions acknowledging participation in the events of the rebellion. Leonard Richards, SHAYS'S REBELLION: THE AMERICAN REVOLUTION'S FINAL BATTLE, Philadelphia: University of Pennsylvania Press (2002), pp. 36–41. Of the eighteen who were convicted of criminal charges, all but two had their sentences commuted or overturned on appeal, or were pardoned. *Id.* Even Daniel Shays, the titular leader of the rebellion, was pardoned in 1788 and returned to Massachusetts from hiding in Vermont. Howard Zinn, A PEOPLE'S HISTORY OF THE UNITED STATES, New York: HarperCollins (2005), pp. 95. And this was for a year-long insurrection driven in part by the participants' own economic grievances.

In light of this historical example, the Court would stand on firm footing—and indeed, reaffirm the most sacred of American democratic ideals—by looking to Ed's motivations and beliefs and in fashioning a lenient sentence in line with other non-violent January 6 defendants. Without question, those in government who cynically pumped endless stories of election fraud without any evidence in order to deceive people like Ed and hold onto power acted wickedly and should be justly punished—if the government ever has the courage to charge them. But life-long law-abiding citizens like Ed who were misled by the President and his enablers unquestionably

acted out of "ignorance, not wickedness." *Jefferson-Smith Letter*. While they too must be punished, a *just* punishment would recognize that motivations matter, and that it is somewhat to their credit, believing the false facts that they did, that they did not "remain quiet under such misconceptions." *Id*. And although those that assaulted police officers, damaged historical buildings, and did other acts of violence must be held accountable, the Court should "not be too severe upon the[] errors" of Vallejo, who never went to the Capitol on January 6 and expressed opposition to the videos of violence and damage that he saw. *Jefferson-Carrington Letter*. Indeed, the government has not even sought fit to *charge* Vallejo's companion, Todd Kandaris, or those known to have organized the QRF and held the personal weapons of people in Lines 1 and 2 that day—Paul Stamey and Ken Bittner. Their freedom speaks volumes.

## CONCLUSION

For the foregoing reasons, Defendant Vallejo respectfully requests that the Court enter a sentence of time-served with two-years of supervised release.

May 8, 2023                                    Respectfully submitted,

                                               /s/ Matthew J. Peed
                                               Matthew J. Peed (D.C. Bar No. 503328)
                                               CLINTON & PEED
                                               1775 I St. NW, Suite 1150
                                               Washington, D.C. 20006
                                               (202) 919-9491 (tel)
                                               (202) 587-5610 (fax)

                                               *Counsel for Defendant Edward Vallejo*