UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD VALLEJO,<br>      *Defendant*. | No. 22-cr-15 (APM) |

**DEFENDANT EDWARD VALLEJO'S RESPONSE TO GOVERNMENT MEMORANDUM IN AID OF SENTENCING**

| | |
|---|---|
| Harrelson: | "They're storming the fucking Capitol. Look at these fuckers go." |
| Dolan: | "I think we should go." |
| Harrelson: | "Huh?" |
| Dolan: | "I think we should go." |

—Harrelson Trial Exhibit H-7.

Dripping with rhetoric unmoored from the record, the Government's Memorandum in Aid of Sentencing attempts to cast *followers* on January 6 who were caught flat-footed and joined the crowd as *leaders* who instigated the whole thing as part of a months' long campaign. It makes this argument because, as the government knows, there is little basis for distinguishing the actual conduct of these defendants from hundreds of others sentenced for entering the Capitol on January 6. But the government's claim that the Oath Keepers had a preexisting plan to stop the transfer of power, much less played any role in instigating the crowd, has no basis in the evidence. And its specific claims about Vallejo's "role"—that he was some kind of "QRF leader" who "managed" an arsenal of weapons to bring to the Capitol—are likewise baseless.

While highly-technical questions about the Sentencing Guidelines are addressed below, the government's main sentencing argument—that the Oath Keepers deserve to be sentenced as terrorists for their 12-20 minutes in the Capitol—is histrionic and borderline offensive. The tragedy

of January 6 is that hundreds of lifelong law-abiding people like Edward Vallejo were lied to by the sitting President and told that the certification was an orchestrated assault on our democracy. The people who broke the law that day were not al-Qaeda members bombing the World Trade Center, or even "traitors" who consciously chose to attack democracy rather than accept that they validly lost. They were patriotic Americans who believed wrongly—very wrongly—that they were *defending* democracy against corrupt officials. As Thomas Jefferson wrote, their motivations "were founded in ignorance, not wickedness." Letter from T. Jefferson to W. Smith (November 13, 1787), *available at* https://founders.archives.gov/documents/Jefferson/01-12-02-0348.

If the purposes of sentencing in 18 U.S.C. § 3553(a) can be met by short custodial or probationary sentences for hundreds of January 6 defendants, as numerous judges have held, then they can be met by Vallejo's four months in jail and twelve months of home detention. Unlike many of those defendants, Ed Vallejo was not there, did nothing violent, opposed the destruction of Capitol property, and did nothing to hinder the investigation. While the government may wish for a lengthier sentence, it is not "necessary," and is therefore forbidden, by § 3553(a).

## ANALYSIS

### I. The Guidelines Enhancements Should Not Apply

#### A. The Oath Keepers did not cause injuries or property damage

Although there were several injuries to police and millions of dollars in property damage that day, not all January 6 defendants are personally responsible—this enhancement does not apply to *everyone*. Rather, it applies to those January 6 defendants who personally took part in or threatened property damage or injuries. The government's arguments for including property damage and injuries in these defendants' relevant offense conduct under §2J1.2(b)(1)(B) do not hold water.

2

First, the government generally asserts that these defendants "were part of a mob of rioters that caused injuries to Capitol Police officers" and damaged Capitol "doors." Gov. Mem. 33–34. But since the Oath Keepers generally stood by and only entered when the doors were opened from the inside, the conduct of this "mob" is not part of the Oath Keepers' jointly-undertaken criminal activity. Next, the government points out that some of the Oath Keepers, including Watkins and Minuta, "pushed against a line of MPD riot officers" in the Rotunda. *Id*. at 34. But no officer testified that any of the brief periods of pushing by Oath Keepers in the Rotunda caused any injuries. The government claims that "Officer Owens and Officer Jackson both testified to the physical injuries they and their fellow officers suffered during *this encounter*." *Id*. (emphasis added). But on the contrary, no testimony about injuries is cited for Officer Jackson; and Officer Owens's testimony was that at the end of the *entire day*, his "arms and legs were bruised and bloodied and battered." *Id*.[1] This includes encounters where rioters were "punching, kicking, swinging flagpoles and two-by-fours." 10/26/22AM Tr. at 5451. There is thus no evidentiary basis for concluding that it was the relatively short period where Watkins and other Oath Keepers pushed against the police line that caused the bruising and bloodying on Officer Owens's arms and legs. *See also* Gov. Mem. 34–35 (no injuries in quotations regarding Minuta pushing on officers).

Next, the government resorts to claiming that general chants of "Treason" by "Harrelson and Dolan," were "threatening and intimidating." *Id*. at 35. But Congress had already been evacuated by the time the Oath Keepers entered, so there were no lawmakers around to feel threatened and no obstruction to be achieved through such "threats," as the adjustment requires.

---

[1] 10/26/22AM Tr. at 5453 ("Q. And what time did you ultimately leave the United States Capitol? A. Around 8:00 or 9:00 p.m. that evening. Q. Did you suffer any physical injuries that day? A. Yes, ma'am. My arms and legs were bruised and bloodied and battered. Other than that, I didn't have any significant injuries from that day.")

This is a far cry from the case cited by the government, *United States v. Rubenacker*, No. 21-cr-193 (May 26, 2022), Sent. Tr. at 58, where the "defendant's yelling and taunting at the officers . . . in an agitated manner with his finger outstretched was threatening conduct, regardless of what he precisely said and whether those words contained threats of physical injury to those officers."

Finally, the government claims that "Vallejo and Caldwell managed an arsenal of firearms at a hotel in Virginia as part of an armed Quick Reaction Force to support the other conspirators on the ground at the Capitol building." Gov. Mem. 35–36. Putting aside the patent falsity of this claim that the QRF was intended to support an attack on the Capitol—which numerous witnesses and multiple documents contradict—merely having weapons on standby in Virginia does not qualify as "threatening to cause physical injury to a person…in order to obstruct the administration of justice," §2J1.2(b)(1)(B), where no such firearms were ever brandished to achieve that result.[2]

### B. Under §3B1.1, Vallejo should receive a reduction, not enhancement, for his minimal "role" in the offense

As the government concedes, "to qualify for the adjustment, the defendant must have managed or led one or more *participants* in the scheme, rather than simply controlled the scheme itself." Gov. Mem. 46 (emphasis in original) (citing *United States v. Bapack*, 129 F.3d 1320, 1325 (D.C. Cir. 1997). Moreover, as the government concedes, supervising other participants is merely a *necessary* condition for the enhancement, not a sufficient one. *Id*. at 44 (citing *United States v. Kelley*, 36 F.3d 1118, 1129 (D.C. Cir. 1994) (stating that control "alone does not determine whether the sentence can be increased" pursuant to §3B1.1). Rather, even after finding the requisite

---

[2] The government cites interstate threat cases to argue that threats need not be communicated directly to a victim; but sending a threat through the wires—where the threat itself is the crime—is completely different than threatening a victim with firearms in order to obstruct justice. For the same reason, the government's reliance on *Reffitt*, No. 21-cr-32 (Aug. 1, 2022), Sent. Tr. at 20-21, is misplaced. In *Reffitt*, the defendant had a firearm on his person, creating a present and credible threat to those he encountered when combined with threatening words.

requirement of control, the Court must consider other factors in deciding "whether to apply the adjustment." *Id*. (citing *United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (listing factors); U.S.S.G. § 3B1.1, cmt. n.4).

Here, there is no evidence that Defendant Vallejo managed or supervised anyone on January 6. Nevertheless, the government maintains that Vallejo was "a QRF leader, playing a coordinating role between conspiracy members from different parts of the country and managing his team, including Kandaris, and the group's weapons at the hotel." Gov. Mem. 166. To support this claim, the government lists the following facts: (i) Vallejo viewed the Hagmann Report podcast calling for armed, peaceful protests unrelated to January 6, and sent the podcast to his non-conspirator friend, Kelly Carter; (ii) Vallejo, Carter, and Kandaris left Arizona for D.C.; (iii) Vallejo asked Rhodes for the rendezvous location, just as Kandaris had done; (iv) Vallejo circulated to Kandaris, Carter, and non-conspirator Phranq Tamburri a "NewsBusters" article about Trump supporters potentially storming the Capitol; (v) Vallejo "unloaded rifle bags, a machete [*sic*], a drone, and 11 large totes of unknown goods"; (vi) Vallejo "was the only member of the Arizona QRF who had direct communications via the main encrypted op channel ("DC Op: Jan 6 21")"; (vii) Vallejo wrote to the "DC Op: Jan 6 21" group that he was "outfitted" and "had two trucks available, one of which Vallejo would direct Kandaris, who not on the 'DC Jan 6 Op chat,' to drive"; and (viii) Vallejo wrote to the group again at 2:38 p.m., "QRF standing by at hotel. Just say the word . . . ." *Id*. at 166–68.

None of these facts suggest that Vallejo played "a coordinating role between conspiracy members from different parts of the country," "manag[ed]" a "team," or managed "the group's weapons at the hotel." Gov. Mem. 166. The only hint of a claim of supervisory control in this list occurs in fact (vii), where the government baldly asserts that Vallejo "would direct Kandaris" to

5

drive one of the "available trucks" when the Capitol area was erupting in chaos. *Id*. at 168. But the truck belonged to *Kandaris*, not Vallejo, and Kandaris's description of his and Ed's actions that afternoon demonstrate his equality to and independence from Vallejo. *See* Vallejo Sent. Ex. 10 at 5–7 (discussing Kandaris's personal observations and decisions, some of which conflict with Vallejo's). The government offers nothing to justify the suggestion that Kandaris would have felt beholden to act under Vallejo's "direction," as opposed to just being one of two guys from Arizona who had just been downtown, seen some of the scene, and been willing to help with his *own* truck. Moreover, the government ignores Kandaris's *greater* involvement in the planning and decision-making during their mutual road trip, including (i) *first* reaching out to Rhodes, (ii) personally driving Carter, (iii) speaking at *greater* length of his plans on the podcasts, and (iv) directly reaching out to Rhodes in Texas. *See* Vallejo Sent. Mem. 44–46; 58–59 (describing Kandaris's actions). The strong weight of the evidence establishes that Kandaris was *at least* Vallejo's peer in any joint activity they undertook, and certainly did not take orders or direction from him.

Nor is there evidence that Vallejo "managed" Kandaris's or Carter's "weapons." Carter testified that he stayed in the hotel specifically to guard his own weapons, whom he did not trust to leave in anyone's hands (Vallejo and Kandaris were hardly in the room). Vallejo Sent. Ex. 3 at 20–21. And he further testified that Ed never touched or watched Carter's or anyone else's firearms. Vallejo Sent. Ex. 2 at 2 ("Ed never checked firearms or prepped them. Ed also never watched anyone else's firearms."); Ex. 3 at 21 ("Hell no. No. No, no, no. No, [Vallejo and Kandaris] never, ever touched any of the firearms.").

Finally, the additional factors listed in § 3B1.1, cmt. n.4, do not support any upward role adjustment. Vallejo did not "exercise [any] decision making authority"; indeed, even under the government's theory he was waiting for others to "just say the word…." Ex. EV 104 at 8. He did

6

not directly "participat[e] in the commission of the offense," but was an outsider convicted only of conspiring and aiding and abetting. He did not take part in the "recruitment of accomplices," *id*., but merely encouraged and brought along Carter, a *non*-conspirator, for an *unrelated* march. He played no role "in planning or organizing the offense," taking no part in any Oath Keepers calls or Signal chat groups in the months leading up to January 6, and was only added to the "DC Op" chat group late in the afternoon of January 5. And even if he did "manage his team" from Arizona, as the government falsely claims (Gov. Mem. 166), that "team" was, at most, *one* person (Kandaris). Kelly Carter, the only other person from Arizona, was not a conspirator, barely spoke with Vallejo when he was there, and went home by himself. Vallejo Sent. Exs. 2, 3. Thus any putative "degree of control and authority exercised over others" by Vallejo was *de minimis*.

By contrast, Caleb Berry personally took part in planning chats and discussions leading up to January 6; he personally encouraged extreme viewpoints and resistance to the government in discussions on Signal chats; he traveled to D.C. with Meggs, the Florida leader; he earned the nickname "Breacher" while camping with key conspiracy leaders; he directly breached the Capitol at the encouragement of Meggs; he returned to Florida with Meggs; he continued expressing extreme views; he purposely deleted evidence of his conduct and those of his conspirators; and he allegedly lied to investigators about his conduct on January 6. If Berry merits a 2-level reduction for his minimal role, as the government concedes, Vallejo certainly does as well.

**C. There is no basis for applying §3C1.1 for "obstruction of justice" to Vallejo**

An obstruction adjustment under §3C1.1 requires the government to prove that the defendant acted "willfully" with the intent to obstruct an "official investigation." §3C1.1, cmt. n.4(D). The government claims to have met this burden because (i) Vallejo circulated two news articles weeks after January 6 and (ii) deleted the Signal app from his phone at some point *two to*

7

*five months* after January 6. Gov. Mem. 168. But the context of Vallejo's messages, statements to Rhodes, and deleting of the app destroy any notion that he was attempting to obstruct justice.

To begin with, as early as January 13, Rhodes sent a message to the "DC Op: Jan 6" group: "All, we will be shutting this group down soon." Wanting to *preserve* evidence, Vallejo responded, "Do we have a hard copy of posts/timestamps here?" He received no response. Over the next several days, as others left the group, changed their user handle, deleted individual messages, and deleted videos and pictures from their phones, Ed did *none* of those things. Instead, he kept using the chat group under his real name ("Ed Vallejo") to post various news items of interest. These ranged from links to conservative commentators (*e.g.*, Steve Quayle and Ernie Hancock) to mainstream news articles.

On January 24, Ed posted a Washington Post article about January 6. Rhodes then messaged Vallejo directly and told him that the "FBI has Jessica's phone. So they are no doubt now monitoring any chat she was in. Which included that DC op chat." Ex. EV 300.2. Ed expressed no concern whatsoever, stating, "Oh I got that but I never did anything wrong and I was at the hotel when things went wonky." *Id*. He added, "I stayed in the dc op chat because running and hiding is what GUILTY people do..." *Id*.

Then, *knowing* that the FBI had access to the "DC Op: Jan 6" chat, Ed continued posting news articles, Bible verses, and various items of general interest all the way until March 7, 2021. This included the article cited by the government about the arrest of Watkins and Caldwell on January 28 and the article about the FBI being able to decipher Signal messages on February 12, among others. Finally, on March 7, 2021, perhaps annoyed by Ed's continued use of the "DC Op: Jan 6" chat as a general discussion board, Rhodes wrote: "This is a dead group. Please don't post

8

on it anymore….Just stop using it. That's what we do with op channels once an op is over." Vallejo responded, "Wilco [Will comply]." No further messages were posted to the group.

Sometime between Vallejo's last message on March 7, 2021 and the FBI requesting his phone password in June 2021, Vallejo deleted the Signal app, which by then served no purpose. But as this history shows, long before he deleted the app, he had been *expressly* told by Rhodes that the FBI *already* had access to any messages of evidentiary value in the "DC Op: Jan 6" chat group. Moreover, the basis for this assertion—that the FBI had Watkins's phone—was corroborated by the very article about her arrest that Vallejo circulated on January 28. Thus, in deleting the by-then-defunct app two to six *months* later, Ed would have had no basis to believe that the FBI still needed him to use his phone as some kind of indefinite evidentiary repository for messages it already had. Rather, any reasonable person, having not heard from the FBI in months, and having been told that the "DC Op: Jan 6" chat was a dead group, and having been told that the FBI already had access to it anyway, would have thought nothing of deleting an old, unused app on a slow, underpowered Motorola phone in the course of living one's life.

Certainly, nothing Vallejo did was "directly and inherently obstructive" such that the Court could "infer an intent to obstruct justice…[without] a separate finding of specific intent." *United States v. Reeves*, 586 F.3d 20, 23 (D.C. Cir. 2009). As his January 13 and January 24 messages show, Vallejo was expressly concerned with *keeping* a record of evidence from the events of January 6, believing that he was in the clear because he "was at the hotel when things went wonky." Ex. EV 300.2. Nor did Vallejo in any manner "prevent law enforcement from accessing [] incriminating Signal messages on his phone and thus using those messages to investigate and prosecute him and his co-conspirators." Gov. Mem. 168. As Vallejo had been accurately told, the FBI *already had* the relevant Signal messages and *did* "us[e] those messages to investigate and

9

prosecute him and his co-conspirators." *Id*. And importantly, the main sources of evidence that Vallejo could have destroyed if he truly wished to obstruct this prosecution—photos, videos, and text messages from January 6 that were preserved *only* on Ed's phone—were carefully preserved and handed over to the FBI, along with his password, as soon as they got in touch with him.

## II.     The 3553(a) Factors Mandate a Minimal Custodial Sentence

Fundamentally, the government's central thesis for treating these defendants far more harshly than other January 6 defendants is wrong. They were not "leading and instigating [the] attack" on the Capitol. Gov. Mem. 76. They were actually late to the party. The evidence established that while they hoped President Trump would take some kind of action, the Oath Keepers generally came to Washington, D.C. to take part in personal security details and rallies. *See* Ex. EV 13. As the government conceded in the first trial, the Oath Keepers had no prior plan to stop the certification and "seized an opportunity" by a spontaneous crowd to enter the Capitol building through open doors. And the evidence showed that they set up a QRF for the same reason they always set up QRFs, including in Louisville, Fayetteville, Atlanta, and other places—to protect lives in dangerous situations, not to support any unplanned assault.

The defense does not wish to minimize the grave conduct of taking the law into their own hands and interfering with a solemn proceeding memorializing the transfer of power. The harm to democracy articulated by Judge Moss in *United States v. Hodgkins*, No. 21-cr-188, Sent. Tr. at. 69–70, and quoted by the government, Gov. Mem. 75, is real and long lasting. But motives and context matter. And Judge Moss determined that the sentencing needs of § 3553(a)—including the need to reflect the seriousness of the offense and promote respect for the law—could be satisfied in a § 1512(c) case by an 8-month sentence. This Court should follow suit and avoid unwarranted sentencing disparities for Vallejo, a 64 year-old veteran who never set foot on the Capitol that day.

May 15, 2023                                         Respectfully submitted,

/s/ Matthew J. Peed
Matthew J. Peed (D.C. Bar No. 503328)
CLINTON & PEED
1775 I St. NW, Suite 1150
Washington, D.C. 20006
(202) 919-9491 (tel)
(202) 587-5610 (fax)

*Counsel for Defendant Edward Vallejo*