**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 22-cr-15 (APM)** |
| | **:** | |
| **THOMAS CALDWELL,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S SUPPLEMENTAL AUTHORITY REGARDING
<u>DEFENDANT CALDWELL'S MOTIONS FOR NEW TRIAL</u>**

On May 22, 2023, this Court held a hearing for limited argument on Defendant Thomas Caldwell's motion for new trial pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Specifically, the Court asked the parties to address two questions: (1) with respect to Defendant Caldwell's conviction for Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), the Court inquired of the government which acts constitute independently unlawful conduct in order to satisfy the requirement that a defendant act "corruptly," and (2) whether, with respect to Defendant Caldwell's conviction for Tampering with Documents or Proceedings, in violation of 18 U.S.C. § 1512(c)(1), the government has established the requisite nexus between the obstructive conduct and a foreseeable grand jury proceeding, as opposed to an FBI investigation, as required under *United States v. Aguilar*, 515 U.S. 593 (1995), and *United States v. Young*, 916 F.3d 368 (4th Cir. 2019). ECF No. 590. At the conclusion of the hearing, the Court invited the parties to submit any supplemental authority that they felt would be pertinent to these issues. 5/22/23 Tr. at 78. The United States hereby submits additional case law and record citations for the Court's consideration.

## I.    The Independently Unlawful Conduct That Established a "Corrupt" Intent

As the government made clear at the hearing on May 22, it disagrees that evidence of "independently unlawful acts" was the only way for the government to establish Caldwell's corrupt intent for the purposes of maintaining his conviction for obstruction of Congress in violation of 18 U.S.C. § 1512(c)(2).  The government also presented ample evidence of "improper" or "unlawful" *purpose* to sufficiently establish a corrupt intent.  However, on the question of unlawful means, the government hereby supplements its response to the Court's question of whether "mere trespass" would suffice the corrupt element necessary for a 1512(c)(2) conviction.  To be sure, in a case where the independently unlawful conduct amounted to nothing more than a "public welfare offense," namely, an offense "not in the nature of [a] positive aggression[] or invasion[]," but "in the nature of neglect where the law requires care," that does not cause "direct or immediate injury to person or property," and for which "penalties commonly are relatively small," *Morissette v. United States*, 342 U.S. 246, 255-56 (1952), such conduct may not suffice to establish corrupt intent.  But the Court need not answer that question here because Defendant Caldwell (like most if not every rioter on January 6) was no "mere trespasser."

Defendant Caldwell threatened the Vice President of the United States and pledged civil war if the Vice President failed to stop the certification of the electoral college vote.  Gov. Ex. 6923 (Msg. 2001.T.112.14) ("If he [Vice President Pence] hopes to live till Friday he better stand tall."); (Msg. 2001.T.112.6) ("I am starting it [Civil War] the night of the 6th if necessary.").  Prior to January 6, he focused on the Capitol and understood its importance, Gov. Ex. 6923 (Msg. 2007.T.3.8) ("We could have burned Congress to the ground if we had wanted to."), and worked to secure a boat to illegally transport "heavy weapons" into Washington, DC on January 6, Gov. Ex. 6923 (Msg. 22.T.15.26).  Then, on January 6, Defendant Caldwell marched to the Capitol,

where Vice President Pence was working, threatened Vice President Pence, and then participated in an unprecedented riot by climbing scaffolding and storming the Capitol.  Gov. Ex. 1500 ("I know where Pence lives up on Wisconsin Avenue. That punk ass better do what he's supposed to."); Gov. Ex. 6734 (Msg. 22.T.6.1) ("I assaulted the Capitol").

During this process, Caldwell stated that he aided and abetted in assaults against law enforcement officers.  Gov Ex. 6734 (Msg. 22.T.27.2883) ("[T]he people in front of me broke through the doors and the doors and started duking it out with the pigs who broke and ran.  Then we started stealing the cops riot shields and throwing fire extinguishers through windows. It was a great time.").  Even if Caldwell's words were more bluster than reality, they nonetheless evince his corrupt intent through his support for the use of unlawful violence.  *Cf. United States v. Robertson*, 610 F. Supp. 3d 229, 236 (D.D.C. 2022) (noting that January 6th defendant's intent to use violence was "indicative of using unlawful means *or acting with an unlawful purpose*") (emphasis added).  Similar to Rhodes, Caldwell regretted not having the weapons with him when he stormed the Capitol.  Gov. Ex. 6623 (Msg. 22.T.27.2894) ("[i]f we'd had guns I guarantee we would have killed 100 politicians.").

In other words, Defendant Caldwell was not a "mere trespasser."  The Defendant's presence on the parapet of the Capitol, rather than inside the Capitol itself, does not affect the analysis.   He threatened Vice President Pence, crossed secured barriers, was part of a mob that drove him from his office, and demanded official action backed by the use and threat of further violence.  By any measure, Defendant Caldwell's actions were "corrupt."[1]

---

[1] The government also incorporates by reference the arguments and evidence set forth at the May 22nd hearing for why Caldwell's conduct on January 6 rose to the level of independently *felonious* conduct.  *See* 5/22/23 Tr. at 56-58 (outlining how Caldwell's conduct arguably also constituted violations of 18 U.S.C. §§ 1361, 111, and 231, in addition to the various conspiracy laws that the Indictment charged him with violating).  The government's point with this supplemental filing is to clarify why, even if this Court finds that the only independently unlawful conduct by Caldwell

## II.    The Government Has Established the Requisite Nexus Between Defendant Caldwell's Obstructive Conduct and a Foreseeable Grand Jury Proceeding

During the May 22nd hearing and in subsequently setting aside co-defendant Joseph Hackett's 1512(c)(1) conviction, this Court expressed skepticism that a defendant who likely deleted evidence in early-to-mid January 2021 could have reasonably foreseen the impact of such deletion on a potential a grand jury investigation, when the Supreme Court in *Aguilar* found that a federal judge's lies to an FBI agent, without knowledge that those lies would be relayed to the grand jury, "[could not] be said to have [had] the 'natural and probable effect' of interfering with the due administration of justice." 515 U.S. at 601. Defendant Caldwell's case is materially different both from the situation presented in *Aguilar* and *Young* and from co-defendant Hackett because: (1) his case involves destruction of evidence that necessarily would be deprived from the grand jury's consideration by its destruction, rather than lies to an agent that might not necessarily be passed along to the grand jury; and (2) the evidence that Defendant Caldwell anticipated a grand jury investigation into his conduct and/or the conduct of his co-conspirators is much stronger than the evidence against co-defendant Hackett on this point.

a.    Destruction of Evidence is Inherently More Foreseeably Damaging to a Grand Jury Investigating Than Lying to a Federal Agent.

The decisions in *Aguilar* and *Young* were inextricably tied to the nature of the obstructive acts and the fact that they involved lying to agents without any reason for the defendants to believe that those lies would be passed along to a grand jury. As the Supreme Court noted in *Aguilar*:

> [T]he transcript citation relied upon by the Government would not enable a rational trier of fact to conclude that respondent knew that his false statement would be provided to the grand jury, and that the evidence goes no further than showing that respondent testified falsely to an investigating agent. Such conduct, we believe, falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself. Conduct of the latter sort all but

on January 6 was his unlawful entry into the restricted Capitol grounds, in violation of 18 U.S.C. 1752(a), this conduct does not constitute "mere trespass."

>   assures that the grand jury will consider the material in its deliberations. But what
>   use will be made of false testimony given to an investigating agent who has not
>   been subpoenaed or otherwise directed to appear before the grand jury is far more
>   speculative.

515 U.S. at 601. Here, in contrast, Caldwell knew that by deleting evidence of his and his co-conspirators' involvement in the attack on the Capitol, he was removing the possibility that law enforcement would find such content on his account, because he was destroying it. Destruction means necessarily unavailable. *See United States v. Johnson*, 655 F.3d 594, 606 (7th Cir. 2011) ("[The government] simply needed to provide enough evidence that [defendant] foresaw that the contraband might be used in an official proceeding and destroyed it with the intent of preventing that use. But why else would [defendant] aggressively destroy contraband while authorities were attempting to exercise a search warrant, other than to prevent the discovery of that evidence? And why would she want to prevent that discovery, if not to minimize or eliminate the evidence that could be used against her in a criminal prosecution?"); *United States v. Matthews*, 505 F.3d 698, 710-11 (7th Cir. 2007) (holding that evidence of a defendant's awareness that judicial proceedings would be more likely if he did not dispose of certain evidence was sufficient to support a 1512(c)(1) conviction).

Like the defendant in *Johnson*, Caldwell destroyed evidence of his and his co-conspirators' involvement in the attack on the Capitol as media reports were publicly reporting at least two of his co-conspirators' involvement, prompting them to travel from Ohio to hide at his house in Virginia. Accordingly, as in *Johnson*, it would have been very reasonable for the jury in this case to ask, "Why else would Caldwell delete all this evidence on the very day Crowl and Watkins were fleeing to his house as media reports honed in on their guilt?" In other words, unlike the defendants in *Aguilar* and *Young*, Defendant Caldwell took an action that is more foreseeably harmful to a

potential grand jury's investigation—he knew that by destroying evidence, he removed entirely any possibility that this evidence could be used by the grand jury.

        b.  <u>The Evidence That Defendant Caldwell Foresaw a Grand Jury Investigation Is Sufficient to Establish the Required "Nexus."</u>

The question is, at the time of his deletion, was it reasonably foreseeable that a grand jury would be one of those investigating bodies. For the reasons articulated at the May 22nd hearing and below, taking the evidence in the light most favorable to the government, the evidence was clearly sufficient for a rational trier of fact to find a grand jury investigation was reasonably foreseeable to Caldwell at that time.

As the government noted in its prior motion and oral argument, Defendant Caldwell was reasonably aware of the potential for a Grand Jury investigation when he offered to falsely "swear" for Watkins presence during the January 6 riots and, especially so, when Watkins reminded Caldwell that "perjury" was bad. Gov. Ex. 9079 (Msg. 192.T.1624-25). Therefore, at the time of this conversation on January 9, 2021, Defendant Caldwell was aware of the likelihood criminal proceedings regarding his and/or his co-conspirators' criminal conduct.

There is additional evidence, however, supporting the defendant's knowledge. On May 22, the Court highlighted Rhodes's January 8th message warning the "OLD Leadership CHAT" about the prospect of "being accused and indicted" as evidence that Rhodes and the recipients of the message would then be on notice about a Grand Jury investigation. Gov. Ex. 9061 (Msg. 54.S.125.2874). In setting aside co-defendant Hackett's 1512(c)(1) conviction, the Court found that there was an insufficient nexus to connect Defendant Rhodes' statement on the "OLD Leadership CHAT" to Hackett, since the government did not produce evidence of communications between any participants on that and Defendant Hackett after Rhodes' message.

Unlike with Defendant Hackett, the court can reasonably infer that Defendant Caldwell received the message both due to the hierarchical nature of the Oath Keepers, Defendant Caldwell's close relationship with Watkins, and the timing of both Watkins' deletions and Caldwell's deletions.

Defendant Caldwell first became close with Rhodes and Watkins soon after the November 2020 presidential election. He hosted Rhodes, Watkins, and other Oath Keepers at his property during the Million MAGA march on November 15, 2020. Gov. Ex. 9079.1 (Msg. 22.S.615.A) ("I am very tight with the North Caroline and Ohio contingents [including Watkins and Crowl] and provided materiel and intel support to them during the Million Maga March."). Thereafter, Caldwell continued to express his support for Rhodes by sharing his open letter on December 22, 2020, Gov. Ex. 2001.T.1 at 6-7, and commenting on Rhodes open letter, Gov. Ex. 2001.T.1 at 56 ("A particularly energizing read!"). Rhodes signed these letters as a Yale law graduate.

Defendant Caldwell's close relationship with Watkins and Crowl continued to deepen in the days before and after January 6. Prior to January 6, Defendant Caldwell directed Watkins to book a room at the QRF hotel. Gov. Ex. 6923 (192.T.1417). On January 6, Defendant Caldwell attempted to call Watkins multiple times during the riots. Gov. Ex. 6740. After the riots, Defendant Caldwell expressed his affection for his Ohio co-conspirators. Gov Ex. 9079 (Msg. 200.F.1.38) (Caldwell to Crowl: "We stormed the gates of corruption together (although on opposite sides of the building) so between that and our first meeting and getting to know you since I can say we will always be brothers!"). When Watkins, Crowl and Caldwell left the Washington, D.C., region on January 7, the three conspirators saluted each other at the Comfort Inn. Gov. Ex. 1510.11 at 00:18.

The following day, on January 8 at 11:45 a.m., Rhodes, via the "OLD Leadership CHAT" urged Watkins and other co-conspirators to delete evidence because indictments were coming. Watkins was still part of this chat at this time, although her last post to the chat was on January 7 at about 1:30 a.m. Def. Ex. KM-79. Watkins complied and deleted Signal from her phone at some point before she left for Caldwell's house on January 14 (because the evidence at trial established that she left the phone at her home and the application was not on the phone when it was subsequently seized and searched by law enforcement).

Almost immediately after Rhodes' message to Watkins and the others on the Signal chat regarding the likelihood of indictments, Watkins, Crowl, and Caldwell changed their method of communication. Less than two hours after Rhodes's message, Watkins, Crowl, and Caldwell began to employ secure proton mail accounts, whose contents were unrecoverable to the government. Gov. Ex. 9079 (Msg. 192.T.1581) (Caldwell to Watkins: "Do you remember the email account I told you? If yes, say yes, don't write it out in a reply to this. If no, say no and I will get it to you in pieces."); (Msg. 192.T.1581) (Watkins to Caldwell: "Yes I remember the email); (Msg. 200.T.3.8) (Caldwell to Crowl: "Any way to log in to read my msg before you leave? You may be able to bring something I need with you. Damn selfish of me to apologize. I want to delete that account ad soon as you see it." Crowl: "We will try."); *see also* Gov. Ex. 2501.10 (proton mail address recovered at Watkins house). Additionally, Defendant Caldwell appeared to obscure all his communications by using multiple aliases, burner phones, and SIM cards in January 2021. Gov. Ex. 24.1.

In a hierarchical organization like the Oath Keepers, it is a wholly reasonable inference that Rhodes' order to his top leadership—including Watkins—to delete messages because of the prospect of indictments would then be disseminated down to other members of the conspiracy.

This is especially true here given the close relationship and ongoing communications between Watkins and Caldwell and Crowl, especially when Watkins and Caldwell both deleted messages, moved to more secure methods of communication after Rhodes' order, and subsequently stayed together for multiple days.

As the Seventh Circuit held in *Johnson*:

> The evidence may not have been overwhelming. But that is often the case when attempting to prove what was in a defendant's mind. . . . The jury was not required, however, to accept [defendant's] version of events. Given [defendant's] knowledge of [co-defendant's criminal conduct], the jury could reasonably believe that [defendant] foresaw that any contraband discovered in the search would be used against her and [co-defendant] in official proceedings. Therefore, the jury could reasonably conclude that she foresaw proceedings in the federal grand jury or the District Court for the Southern District of Illinois, and destroyed [evidence] to prevent that use.

655 F.3d at 607. In this case, given Caldwell's knowledge of his and his co-conspirators (Watkins' and Crowl's) criminal conduct, Watkins' clear awareness of the possibility of indictments and direct order from Caldwell to delete incriminating evidence, Caldwell's ongoing relationship with Watkins, and the timing of Caldwell's deletion of evidence—on the very day that media reports identified Watkins' and Crowl's involvement in the attack on the Capitol and the two co-conspirators fled to Caldwell's home to hide out—the jury could reasonably believe that Caldwell foresaw that any incriminating photos, videos, or messages discovered in his Facebook account would be used against him and his co-conspirators in official proceedings. Therefore, the jury could reasonably conclude that he foresaw proceedings in the grand jury and destroyed the evidence to prevent that use.

### III.    Conclusion

WHEREFORE, the government respectfully submits this supplemental authority in support of the arguments advanced during the May 22nd hearing and respectfully requests that Defendant Caldwell's Rule 29 motion for judgment of acquittal be DENIED.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:    _____/s/_____
Jeffrey S. Nestler
Assistant United States Attorney
D.C. Bar No. 978296
Troy A. Edwards, Jr.
Alexandra Hughes
Louis Manzo
Kathryn Rakoczy
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530