<pre>
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
    UNITED STATES OF AMERICA,      )  Criminal Action
 3                                 )  No. 1:22-cr-00015-APM
                      Plaintiff,   )
 4                                 )  Jury Trial - Day 6
    vs.                            )  (afternoon session)
 5                                 )
    ELMER STEWART RHODES III,      )
 6  et al.,                        )  Washington, D.C.
                                   )  October 6, 2022
 7                    Defendants.  )  Time:  2:00 p.m.
    _____
 8
           Transcript of Jury Trial - Day 6 (afternoon session)
 9                         Held Before
                  The Honorable Amit P. Mehta
10                 United States District Judge
    _____
11
                     A P P E A R A N C E S
12
    For the Government:      Kathryn L. Rakoczy
13                           Troy A. Edwards, Jr.
                             Jeffrey S. Nestler
14                           UNITED STATES ATTORNEY'S OFFICE
                             FOR THE DISTRICT OF COLUMBIA
15                           601 D Street, Northwest
                             Washington, D.C. 20579
16
                             Alexandra S. Hughes
17                           Louis J. Manzo
                             U.S. DEPARTMENT OF JUSTICE
18                           950 Pennsylvania Avenue, Northwest
                             Washington, D.C. 20530
19
    For the Defendant Elmer Stewart Rhodes III:
20                           Phillip A. Linder
                             James Lee Bright
21                           Edward L. Tarpley, Jr.
                             BARRETT BRIGHT LASSITER LINDER
22                           3300 Oak Lawn Avenue, Suite 700
                             Dallas, Texas 75219
23
    For the Defendant Kelly Meggs:
24                           Stanley E. Woodward, Jr.
                             BRAND WOODWARD LAW
25                           1808 Park Road, Northwest
                             Washington, D.C. 20010
</pre>

```
1              A P P E A R A N C E S, continued

2      For the Defendant Kelly Meggs:
                          Juli Z. Haller
3                         LAW OFFICES OF JULIA HALLER
                          601 Pennsylvania Avenue, Northwest
4                         Washington, D.C. 20036

5      For the Defendant Kenneth Harrelson:
                          Bradford L. Geyer
6                         FORMERFEDSGROUP.COM LCC
                          141 I Route 130 South, Suite 303
7                         Cinnaminson, New Jersey 08077

8      For the Defendant Jessica Watkins:
                          Jonathan W. Crisp
9                         CRISP AND ASSOCIATES, LLC
                          4031 North Front Street
10                        Harrisburg, Pennsylvania 17110

11     For the Defendant Thomas Caldwell:
                          David W. Fischer, Sr.
12                        FISCHER & PUTZI, P.A.
                          7310 Governor Ritchie Highway
13                        Glen Burnie, Maryland 21061-3065

14     _____

       Stenographic Official Court Reporter:
15                        Nancy J. Meyer
                          Registered Diplomate Reporter
16                        Certified Realtime Reporter
                          333 Constitution Avenue, Northwest
17                        Washington, D.C. 20001
                          202-354-3118
18

19

20

21

22

23

24

25
```

1           **I N D E X**

2                                                                PAGE:

3     **Witnesses**:

4     John Zimmerman

5           Cross-Examination by Mr. Crisp................... 1996
            Cross-Examination by Mr. Fischer................ 1999
6           Redirect Examination by Ms. Rakoczy............. 2014

7     Abdullah Rasheed

8           Direct Examination by Ms. Rakoczy............... 2019
            Cross-Examination by Mr. Bright................. 2028
9           Cross-Examination by Mr. Woodward.............. 2037
            Cross-Examination by Mr. Crisp................. 2039
10          Cross-Examination by Mr. Fischer............... 2040
            Redirect Examination by Ms. Rakoczy............ 2042

11

12    Michael Adams

13          Direct Examination by Ms. Rakoczy............... 2047
            Cross-Examination by Ms. Haller................ 2071
            Cross-Examination by Mr. Crisp................. 2098
14          Redirect Examination by Ms. Rakoczy............ 2100

15

16    **Exhibits Admitted**:

17          Government Exhibit 1000......................... 2042
            Government Exhibit 4604......................... 2062
18

19          Defendant Meggs Exhibit KM.04.................. 2087

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2              (REPORTER'S NOTE:  The morning session of the jury

 3      trial was reported by William P. Zaremba who prepared said

 4      transcript.)

 5              (Proceedings held outside of the jury.)

 6              MS. RAKOCZY:  Your Honor, should I have the witness

 7      take the stand?

 8              THE COURT:  Yes.  Actually, let's just -- JC is just

 9      lining them up.

10         Mr. Nestler and Mr. Woodward, can you-all just -- well,

11      I guess we can do this under seal on the phone.  Can we do

12      that?

13              THE COURT REPORTER:  Do you want me to put the husher

14      on?

15              THE COURT:  Yeah.  Do you know how to turn it on?

16      That's okay.

17              (Proceedings held in the presence of the jury.)

18              THE COURT:  Okay.  Please be seated, everybody.

19      Welcome back.  I hope everybody had a nice lunch break.

20         Mr. Zimmerman, welcome back, sir.

21         All right.  Mr. Crisp.

22         MR. CRISP:  Thank you, Your Honor.

23                          CROSS-EXAMINATION

24      BY MR. CRISP:

25      Q.  Mr. Zimmerman, good afternoon.
```

```
 1    A.  Good morning, sir -- or afternoon.  Sorry.

 2    Q.  My name is Jonathan Crisp, and I represent Jessica Watkins.

 3    A.  Uh-huh.

 4    Q.  Now, I'm going to briefly touch on a couple of things in

 5    terms of the GoToMeeting on November 9th.  You were on that

 6    call?

 7    A.  On November 9th?  I'm not familiar.

 8    Q.  Okay.  About four days before the Million MAGA March.

 9    A.  I'm sure I probably was.

10    Q.  Okay.  Your phone number ends in -- or the number you used

11    was 6276, the last four?

12    A.  Correct.

13    Q.  Okay.  And so there was -- it was about a 124-, 125-minute

14    chat, shall we say?

15    A.  Okay.

16    Q.  Sound about right?

17    A.  I'll take your word for it; yes, sir.

18    Q.  So you were on that call?

19    A.  Most likely.

20    Q.  All right.  Switching gears.

21        You had said you were in 27-years-combined prior

22    service?

23    A.  Yes, sir.

24    Q.  You were an E what?

25    A.  7, retired.
```

1    Q.   Okay.

2    A.   E7 when I retired.

3    Q.   All right.  So as a sergeant first class?

4    A.   It is.

5    Q.   You deployed to various theaters?

6    A.   Deployed to Desert Storm; yes, sir.

7    Q.   Okay.  As part of your deployment training, you get rules

8    of engagement or ROE briefs?

9    A.   Roger.

10   Q.   All right.  So before you, you know -- when you're at a

11   pre-deployment post, you're going to get a legal brief; right?

12   A.   Uh-huh.

13   Q.   And then when you go into theater, you get the same thing?

14   A.   Correct.

15   Q.   Purpose of that is to understand the rules in which you're

16   operating under, what laws apply?

17   A.   Correct.

18   Q.   It gives you legal cover; that's what they say?

19   A.   Correct.

20   Q.   Okay.  And when you were working with the organization, the

21   Oath Keepers, one of the frustrations you had was the lack of

22   organization?

23   A.   Originally, yes.  And, yeah, now that you mention it,

24   pretty much for the whole time.

25   Q.   Okay.  It just didn't seem to have any cohesiveness?

1    A.  Not really.

2    Q.  Unlike your experience in the military; right?

3    A.  Correct.

4    Q.  Which was run far more organized?  You knew the structure,

5    you knew what the mission plan was, and so on?

6    A.  Correct.

7    Q.  That was never the case here?

8    A.  I knew who was in charge, but that was it.

9    Q.  Okay.  But as far as mission briefs, as far as what was

10   happening, was not clear?

11   A.  No.

12   Q.  Okay.  Thank you, sir.

13          THE COURT:  Mr. Fischer.

14                        CROSS-EXAMINATION

15   BY MR. FISCHER:

16   Q.  Good afternoon, Mr. Zimmerman.  My name is Dave Fischer.

17   I'm the attorney for Thomas Caldwell.

18          How are you doing today, sir?

19   A.  I am blessed and highly favored, Mr. Fischer.

20   Q.  Well, thank you.  I appreciate that.

21          Mr. Zimmerman, I've got some questions for you.

22   A.  Sure.

23   Q.  Hopefully I can keep it under three hours, so -- I'm

24   joking.

25   A.  You have 2 hours and 27 minutes.  Go ahead.

2000

1    Q.  Absolutely.

2        Mr. Zimmerman, obviously you were a member of the

3    Oath Keepers for some period of time; correct?

4    A.  I do.

5    Q.  And you would agree as a member of the Oath -- the

6    Oath Keepers, in general, would wear uniforms; is that right?

7    A.  We had a uniform standard; yes, sir.

8    Q.  Sure.  And military-style fatigues and a steel helmet and

9    the whole works?

10   A.  Well, it wasn't a steel helmet, but yes, sir.

11   Q.  What kind of helmet was it?

12   A.  I didn't have one, but most people had what was called an

13   Ops-Core ballistic helmet.  Some carry -- they have a similar

14   one.  That's called a bump helmet.  But, I mean, it wasn't --

15   it was optional.  I mean, obviously, if you want to protect

16   your noggin, you need one.  I had a Kevlar that I used, but.

17   Q.  Okay.  Fair enough.

18       So the bottom line is events that the Oath Keepers --

19   you and other Oath Keepers would do around the country, you

20   would wear those uniforms where you went to; is that correct?

21   A.  Correct.  For Oath Keeper events, yes, sir.

22   Q.  Yes.  And it -- so it wouldn't be unusual to wear the same

23   type of uniform and military-style equipment when you came to

24   the Washington, D.C., area; is that correct, sir?

25   A.  Correct.

1    Q.  As a member of the Oath Keepers, you had access to things

2    like Signal -- certain Signal chats, and there were leadership

3    chats that were for members only; correct?

4    A.  Correct.

5    Q.  And as a member, you were also able -- there may have been

6    trainings that were given or other, you know, types of things

7    that are similar to trainings that you would have access to

8    that nonmembers wouldn't have; is that correct?

9    A.  Training opportunities, yes, sir.

10   Q.  Absolutely.

11        So you would agree, sir, that -- and also you would

12   agree that nonmembers of the Oath Keepers -- well, let me

13   strike that.

14        You would agree that the general public wasn't just

15   invited to Oath Keeper meetings; would that be fair to say?

16   A.  No.  Non-Oath Keeper members were invited to meetings

17   because, obviously, they have to be recruited somehow.

18   Q.  Sure.

19   A.  And so in order to find out if it's a good fit, you come,

20   but you just don't discuss, you know, specific items of

21   interest, but --

22   Q.  So that -- that individual who might be a potential recruit

23   or sign up for the Oath Keepers, you wouldn't discuss things

24   that are sensitive to the Oath Keepers or stuff meant to be

25   kept in-house; is that fair to say?

1    A.  Correct.

2    Q.  Okay.  Okay.  And, sir, you would agree that -- I think you

3    indicated at one point -- I don't know if you characterize it

4    as Stewart Rhodes gave Doug Smith or you an order; is that what

5    I heard?

6    A.  Stewart Rhodes had designated Doug Smith as a third point

7    of contact.

8    Q.  Okay.  But, obviously, the Oath Keepers, they're not an

9    official military unit?  In other words, you don't go to the

10   brig for disobeying an order; is that fair to say?

11   A.  No, sir.

12   Q.  So the reality, sir, that even a member of the

13   Oath Keepers, somebody above them, say Stewart Rhodes or

14   anybody else, if they gave somebody an order, basically you

15   could tell them to go shove it, I don't want to do that; is

16   that fair to say?

17   A.  Yeah.  Yes, sir.

18   Q.  If they want you to go on a particular operation, you could

19   say I want to go on vacation.  You didn't have -- there was no

20   obligation to do that?

21   A.  That's correct.

22   Q.  And, in fact, that's pretty much what Doug Smith, you, and

23   some other members of the North Carolina Oath Keepers did; is

24   that fair to say?

25   A.  Define what you're looking for.

1    Q.  Yeah.  Not -- I'm not trying to be tricky here, sir.

2         The bottom line is, obviously, you guys told -- you went

3    your separate ways; fair enough?

4    A.  Correct.

5    Q.  Okay.  But my point was -- is that just because

6    Stewart Rhodes -- while you were in the Oath Keepers, just

7    because Stewart Rhodes said do something, doesn't mean you had

8    to do it; correct?

9    A.  Correct.

10   Q.  Okay.

11   A.  I mean, obviously, within limitations.  I mean, yeah, if

12   you're part of whatever the event is, you're going to be

13   dedicated to the event.  I mean, you're there for the event.

14   Now, I mean, if Stewart Rhodes said, "Shoot your foot off,"

15   then, no, we're not going to do that.

16   Q.  And if Stewart Rhodes said, "Attack the Capitol," you

17   certainly wouldn't do that either; right?

18   A.  No.

19   Q.  Okay.  So, sir -- and, of course, nonmembers certainly

20   couldn't give orders to members of the Oath Keepers, at least

21   that had to be obeyed; would you agree with that?

22   A.  That's correct.

23   Q.  Okay.  And you would agree -- you met Mr. Caldwell.  You've

24   already identified him.

25   A.  I have.  Very nice gentleman.

1    Q.   Okay.  And the first time you ever met him was at his farm

2    in --

3    A.   I did.  Very nice place.

4    Q.   Okay.  And you met him and his wife; correct?

5    A.   I did, sir.

6    Q.   And they allowed you and the Oath Keepers to pitch a tent

7    and to -- some folks to stay in their detached garage; is that

8    fair?

9    A.   Yes, sir.

10   Q.   Okay.  And although they would not -- because apparently

11   him and his wife had actually never met the Oath Keepers

12   before, with the exception of maybe one or two people, he

13   had -- would not allow anybody -- him and his wife would not

14   allow people to go into his house; is that fair to say?

15   A.   Correct.  I never saw the inside of his house.  No, sir.

16   Q.   But he did -- he did rent -- I believe he rented porta

17   potties for the group; is that correct?

18   A.   Yeah, actually, he did.  I forgot those.  Yes.

19   Q.   And he grilled burgers and provided some food for

20   everybody --

21   A.   He did.

22   Q.   -- is that fair to say?

23   A.   Yep.

24   Q.   Okay.

25              THE COURT REPORTER:  Sir, can you wait until he

```
 1    finishes his question, please.
 2              THE WITNESS:  I apologize.  Yes, ma'am.
 3              THE COURT REPORTER:  Thank you.
 4          So your question was:  "He grilled burgers and provided
 5    some food for everybody?"
 6    A.  Yes.
 7    BY MR. FISCHER:
 8    Q.  And, sir, obviously, as far as Stewart Rhodes -- I mean,
 9    first of all, before you came here today, you've given an
10    interview to the FBI; is that correct?
11    A.  Correct.
12    Q.  Okay.  And you've also testified before the grand jury here
13    in -- regarding this case; is that correct?
14    A.  Yes, sir.
15    Q.  And I've read that.  It's obvious you certainly -- you're
16    no big fan of Stewart Rhodes; is that fair to say?
17    A.  That's incorrect, sir.
18    Q.  Okay.
19    A.  As a Christian, I'm taught to love God and love people.  I
20    love Stewart Rhodes, I love Jessica, and I love all of them.  I
21    don't like what they did, and I don't like some of the events
22    that we've gone through.
23    Q.  Well, sir, let me just be clear.  You're not -- you don't
24    have any personal knowledge of anything they did.  When you say
25    you didn't like what they did, you don't have personal
```

1    knowledge of that; correct?  You're getting it from --

2    A.  No.

3    Q.  -- the newspaper; right?

4    A.  No, I was not around January 6th.  The only ones that I'm

5    talking about are regarding November.

6    Q.  Okay.  And it was in November -- well, let me -- let me

7    strike that for a second.

8         So as far as Mr. Rhodes, my understanding is, though --

9    and you tell me if this is a fair characterization -- is that

10   Mr. Rhodes is somebody who basically talks a big game but never

11   follows up on it; is that pretty fair to say?

12   A.  That's probably about 60 percent accurate.

13   Q.  Okay.  The -- and, sir, when you first were recruited by

14   Stewart Rhodes, you believed it was like a community emergency

15   response team you were signing up for; correct?

16   A.  Along those lines; yes, sir.

17   Q.  That was sort of the sales pitch he gave you to join the

18   Oath Keepers; is that fair to say?

19   A.  Well, I had committed to the Oath Keepers, but when he and

20   I talked and he described it that way, that solidified it.

21   When I say I had joined, I had joined -- excuse me -- the

22   North Carolina chapter.

23   Q.  Uh-huh.

24   A.  But I had not become a national member, which is you have

25   to pay to become a full member.  I had not done that at that

1   point.  Once I had talked with Stewart Rhodes, Mr. Rhodes,

2   then, and found out exactly what Oath Keepers was, then that's

3   when I was sold; was when he talked along the lines of the

4   cert.

5   Q.  And in North Carolina -- the Oath Keepers in North Carolina

6   actually had a separate Signal channel that they did Signal

7   chats on apart from the national board; is that correct?

8   A.  As far as I know, every state did.

9   Q.  Okay.

10  A.  But yes, sir.

11  Q.  Okay.  And back to Mr. Caldwell.  You were on his farm.

12  Would it be fair it looked like any other farm out in the

13  country?

14  A.  Well, I wouldn't say every other farm.  But, I mean,

15  it's -- he had farm equipment.  It was a very elaborate farm.

16  I don't -- I believe I asked him, and I believe he said it

17  wasn't an active farm, but it used to be.  But it -- I mean,

18  very beautiful place.

19  Q.  Okay.  And -- and, sir, you didn't see any evidence that

20  Mr. Caldwell was running like a military training --

21  A.  No, sir.

22  Q.  -- center?

23  A.  No, sir.

24  Q.  And he certainly wasn't --

25          THE WITNESS:  I apologize, ma'am.

1    BY MR. FISCHER:

2    Q.  He certainty wasn't training up tactical fighters or

3    anything when you were out there; is that fair to say?

4    A.  Correct, sir.

5    Q.  And, sir, you also -- is it fair to say you noticed that

6    Mr. Caldwell has some handicaps; is that correct?

7    A.  I'm sorry?  He has some handicaps?

8    Q.  Do you remember anything about his physical abilities that

9    were unusual?

10   A.  Not specifically.  Not something that is obvious.

11   Q.  Well, let me ask you.  Do you remember he gave -- you

12   characterized him as a tour guide --

13   A.  Correct.

14   Q.  -- correct?

15        And what you, I presume, mean by that is he basically

16   was assisting the Oath Keepers who were all from out of state

17   and giving them guidance how to go into D.C. and all, sort of,

18   the -- the particulars about getting into D.C. and back; is

19   that fair to say?

20   A.  It is, sir.  I don't know how it categorizes into a

21   handicap, but.

22   Q.  Well, sir, while he was giving -- he gave a -- he gave an

23   explanation or gave directions in his garage --

24   A.  Correct.

25   Q.  -- to members of the Oath Keepers.  And while he was

1  doing that, he had to sit down.  Do you recall him having to do

2  that?

3  A.  Now that you mention it, yes, he did have to sit down.

4  Yes.

5  Q.  Okay.  And he indicated that was because of some back

6  issues.  Does that sound --

7             MS. RAKOCZY:  Objection.

8             THE COURT:  Just rephrase it, please.

9  BY MR. FISCHER:

10  Q.  Do you remember -- do you remember why he had to sit down?

11  A.  I don't.  I don't remember if he specifically mentioned

12  back or leg issues, but I do recall him needing to sit down.

13  Q.  Okay.  All right, sir.  Fair enough.

14        And then, sir, the --

15             MR. FISCHER:  Court's indulgence.

16  BY MR. FISCHER:

17  Q.  Mr. Stamey, obviously you've already given a description of

18  him as being elderly, in very poor health; correct?

19  A.  Correct.

20  Q.  And it was your understanding that on January 6th,

21  Mr. Stamey was the -- was the QRF.  He was the quick reaction

22  force guy in the Washington area on that day?

23             THE COURT:  Mr. Fischer, can you restate the

24  question.  I think you said January 6th instead of November.

25             MR. FISCHER:  I apologize.

1    BY MR. FISCHER:

2    Q.  Sir, on -- it was your understanding that Paul Stamey was

3    the QRF guy on January 6th of 2021?

4            THE COURT:  You said January 6th again.  Is that what

5    you mean?

6            MR. FISCHER:  Yes.

7            THE COURT:  Okay.  I don't know if --

8    A.  Yes, it was my understanding that he was part of the QRF,

9    but it was also my understanding he did not leave the hotel.

10   So he would have -- would have been, more or less,

11   communications.

12   BY MR. FISCHER:

13   Q.  Okay.  Understood.

14           But he was the one guy?  I mean, he was the guy who was

15   the QRF, as far as your knowledge; is that correct?

16   A.  If you want to call it that, yeah.  I would call it more of

17   a communication specialist at that point, if he was the only

18   one.

19   Q.  Well, I mean, based on his physical condition, I guess you

20   would agree, he's neither quick reactive -- nor reactive; is

21   that fair to say?

22   A.  Exactly, and that's my point.  I mean, quick reactionary

23   force usually involves more than one person.  So, therefore, he

24   would just be a communications person.

25   Q.  So you would agree he's not much of a force, one guy;

1    right?

2    A.  Correct.

3    Q.  Sir, the -- there are some other members that came up.

4    Obviously, Doug Smith used to be the North Carolina leader?

5    A.  Correct.

6    Q.  You also know an individual by the name of Jon Roeper; is

7    that correct?

8         MS. RAKOCZY:  Objection as to hearsay on this line of

9    questioning.

10        THE COURT:  Let me just hear what the issues are.

11        You can answer that question.

12   A.  I do know Jon Roeper; yes, sir.

13   BY MR. FISCHER:

14   Q.  Okay.  He was a member of the North Carolina Oath Keepers;

15   right?

16   A.  Yes, sir.

17   Q.  He's also a former -- a retired FBI agent; correct?

18   A.  That's what he has said; yes, sir.  I don't -- I never saw

19   any credentials.

20   Q.  Okay.  And, sir, to your knowledge, there were -- there

21   were at least 30, 40 North Carolina Oath Keepers that went

22   to Washington, D.C., for the January 6th event; is that

23   fair?

24        MS. RAKOCZY:  Objection.  Foundation basis.

25        THE COURT:  Sustained.

```
1    BY MR. FISCHER:

2    Q.  All right.  Sir, were you aware -- were you aware that

3    there would be members of the North Carolina Oath Keepers that

4    were going to go to Washington, D.C., on January 6th?

5              MS. RAKOCZY:  Same objection, Your Honor.

6              THE COURT:  Sustained.  This is why I asked the

7    earlier question.  You will have to forgive me, but he's told

8    us that he wasn't part of January 6th.  You earlier asked him

9    about Mr. Stamey and January 6th.

10             MR. FISCHER:  I'll move along, Your Honor.

11             THE COURT:  No, that's fine.  But I don't -- I'm just

12   a little bit confused, and maybe Ms. Rakoczy can clear it up on

13   redirect.  But my understanding is he didn't have any knowledge

14   about who was on the QRF on January 6th.

15             MR. FISCHER:  Your Honor, actually, I think he just

16   testified he did.

17             THE COURT:  Okay.  All right.

18             MR. FISCHER:  Anyway, I'll switch topics.

19   BY MR. FISCHER:

20   Q.  Sir, you -- you've been using some terms like tactical lead

21   and points of contact during your testimony; is that right?

22   A.  Yes, sir.

23   Q.  And those are military terms; correct?

24   A.  Yes, sir.

25   Q.  But you still use them in the civilian context; right?
```

1    A.   Point of contact is not necessarily military related, but

2    yes, sir.

3    Q.   Certainly used in the military; is that --

4    A.   Correct.  Yes, sir.

5    Q.   As are things like mission and op.  Those are things that

6    are also used in the military; right?

7    A.   Correct.  Yes, sir.

8    Q.   Rally point; correct?

9    A.   Yes, sir.

10   Q.   To kit up, does that sound familiar?  Kit up.

11   A.   Kit up, yes, sir.

12   Q.   Okay.  Or reconnaissance or a recce; does that sound

13   familiar?

14   A.   Or recon; correct.

15   Q.   And, sir, it sounds to me -- just to be clear, it sounds

16   like the overriding concern among the Oath Keepers, at least

17   when you were aware in November, was basically violence by BLM

18   and Antifa; correct?

19   A.   Violence by BLM and Antifa?

20   Q.   Yes.

21   A.   Yes, sir.

22   Q.   And to be fair, sir, and just to be clear, you would

23   certainly agree that the bulk of the people who were protesting

24   in favor of civil rights and against racism did so peacefully,

25   to your knowledge; is that fair to say?

2014

```
 1    A.  When?

 2    Q.  Well, I understood -- I understand you saw violence on TV;

 3    is that fair to say?

 4    A.  Again, when?  Are you talking about November?  Are you

 5    talking about January?  Are you talking ever?

 6    Q.  Let's go to the summer of 2020 through November.

 7    A.  Okay.  Then, yes, BLM and Antifa, most of which I saw on

 8    TV, with the exception of what took place in Fayetteville,

 9    North Carolina.

10    Q.  Okay.  All right.  Sir, the -- the primary purpose -- the

11    purpose of the QRF, I believe you indicated, was to extricate

12    people from basically a bad situation; is that correct?

13    A.  That's one aspect of a QRF; yes, sir.

14    Q.  As it's pretty much a rescue force, in a sense?

15    A.  It -- correct.  It could be.

16    Q.  Okay.

17              MR. FISCHER:  Court's indulgence.

18          Your Honor, I have nothing else of this witness.

19              THE COURT:  Okay.  Thank you, Mr. Fischer.

20          Ms. Rakoczy, redirect?

21              MS. RAKOCZY:  Just very briefly, Your Honor.

22                        REDIRECT EXAMINATION

23    BY MS. RAKOCZY:

24    Q.  Good afternoon, again, Mr. Zimmerman.

25    A.  Hi.
```

1    Q.  Sir, you were just asked some questions about what various

2    members of the North Carolina Oath Keepers did for January 6th.

3    Do you recall those questions?

4    A.  I -- vaguely, but yes.

5    Q.  You did not come to D.C. for January 6th, did you?

6    A.  No, ma'am.  I was recovering from COVID.

7    Q.  Were you added to a Signal app called DC OP:  Jan 6 21?

8    A.  Not for the January 6th one; no, ma'am.

9    Q.  Okay.  You were part of a different op Signal chat for

10   November --

11   A.  November.

12   Q.  -- D.C.?

13   A.  Correct.

14   Q.  But not part of a DC OP:  Jan 6 Signal chat?

15   A.  Not that I recall, because --

16   Q.  Okay.

17   A.  -- as I said, I was recovering from COVID.  I had been

18   released from the hospital just -- like a day or two before

19   that, and I just slept a lot.  I did talk to Paul Stamey a

20   couple of times just because he was checking on me, you know,

21   seeing how I was recovering.

22   Q.  If you weren't on that chat, you would not know whether

23   other North Carolina Oath Keepers like Mr. Stamey or Mr. Smith

24   were part of that chat, would you?

25   A.  I don't know if -- if Mr. Rhodes was.  I know Paul Stamey

1    was -- would have been.  I shouldn't say was.

2    Q.  But you have just --

3    A.  Would have been.

4    Q.  I don't mean to interrupt you, but you have no firsthand

5    knowledge of what was said or who was in that chat; is that

6    fair to say?

7    A.  No, ma'am.  The only thing I do recall from any of the

8    regular chat rooms that we've used was coordination of buses

9    and transportation, but that was -- that was all.

10   Q.  Okay.  And you would not, I assume, have any way of knowing

11   whether Doug Smith and Stewart Rhodes exchanged direct messages

12   in December and January -- December of 2020 and January of

13   2021, would you?

14   A.  With regards to January 6th, I mean -- with regards to

15   January 6th, no.  But I do know that there was some

16   communications between them because Doug personally had told me

17   that --

18   Q.  Let me stop you.  I don't want to ask you to say things

19   other people told you outside of court.

20   A.  Obviously, I know firsthand if it's a conversation that I

21   had with him.

22   Q.  You know what he told you but not necessarily the stuff

23   that he knew, so.

24   A.  Okay.

25   Q.  I don't want to argue with you --

1    A.  Gotcha.

2    Q.  -- but I think the judge will get mad at me if I keep

3    asking you questions about that, so.

4    A.  Yes, ma'am.

5    Q.  Without telling us what anyone else told you, you didn't

6    have access to Doug Smith's phone; right?

7    A.  No.  Correct.

8    Q.  So you don't know who he was messaging with after

9    November of 2020 --

10   A.  No ma'am.

11   Q.  -- fair to say?

12   A.  Yes, ma'am.

13   Q.  And you -- did you have access to Paul Stamey's phone?

14   A.  No, ma'am.

15   Q.  So do you have any way of knowing who he was communicating

16   with after November of 2020?

17   A.  No, ma'am.

18   Q.  With respect to Paul Stamey, you were asked some questions

19   about how physically able or not he is.  Do you remember those

20   questions?

21   A.  I do.

22   Q.  Okay.  Let me ask you this:  To -- to fire a gun, would

23   Mr. Stamey have been able to do that?

24   A.  Yes.

25   Q.  To drive, if he had to, your vehicle as the quick

1    reactionary force, could he have taken the wheel if he had to

2    in an emergency?

3    A.  He could have, yes.

4              MS. RAKOCZY:  Thank you, Your Honor.  I have no

5    further questions.

6              THE COURT:  Okay.  Mr. Zimmerman --

7              THE WITNESS:  Yes, sir.

8              THE COURT:  -- you're free to leave.  Thank you for

9    your time and your testimony, and have a safe trip home.

10             THE WITNESS:  Thank you very much, sir.

11             (Witness excused.)

12             THE COURT:  All right.  Next witness.

13             MS. RAKOCZY:  Thank you, Your Honor.

14        The government calls Mr. Abdullah Rasheed.

15        Court's indulgence.  He'll be here in just a second.

16             THE COURTROOM DEPUTY:  Good afternoon.  Before you

17   take your seat, please raise your right hand.

18             (Oath administered.)

19             THE WITNESS:  Yes.

20             THE COURT:  All right.  Mr. Rasheed, welcome.

21   Welcome.  Have a seat.

22             THE WITNESS:  Thank you.

23             THE COURT:  I'm just going to ask you to remove your

24   cap, if that's okay, and if you'd like to -- are you

25   comfortable with your mask off?

2019

```
1              THE WITNESS:  I want it on.  I don't want COVID.
2              THE COURT:  I'm sorry?
3              THE WITNESS:  I don't want COVID.
4              THE COURT:  Okay.  So, in that case, we're going to
5      ask you to change to a clear mask so we can see your face.
6      Okay?
7              THE WITNESS:  That's all right.  I'll just take it
8      off.
9              THE COURT:  Are you sure?  Okay.  All right.
10             THE COURT REPORTER:  Sir, you can pull the microphone
11     to you too.  Thank you.
12                       DIRECT EXAMINATION
13     BY MS. RAKOCZY:
14     Q.  Good afternoon, sir.
15     A.  Thank you.
16     Q.  If you could scooch just a little bit closer to the
17     microphone, it might help us to be able to hear you.  Thank
18     you.
19             THE COURT:  Mr. Rasheed, I would just ask you to keep
20     your voice up -- you've got a soft voice -- so our court
21     reporter can hear you and our jurors can hear you as well.
22             THE WITNESS:  All right.
23             THE COURT:  Okay.
24     BY MS. RAKOCZY:
25     Q.  Okay.  Sir, in a loud and clear voice, could you please
```

1    introduce yourself.

2    A.  Yeah, Abdullah Rasheed.

3    Q.  Could you spell your name for the court reporter.

4    A.  A-b-d-u-l-l-a-h R-a-s-h-e-e-d.

5    Q.  And, sir, without telling us exactly what you do, what kind

6    of work do you for a living?

7    A.  Heavy equipment mechanic.

8    Q.  And have you ever served in the military?

9    A.  Yes.

10   Q.  How long did you serve in the military?

11   A.  Four years, United States Marine Corps; and 10, 12 years

12   wage grade in the Air Force.

13   Q.  Okay.  Can you speak up just a little bit --

14            THE REPORTER:  What in the Air Force?

15            THE WITNESS:  Wage grade.

16   BY MS. RAKOCZY:

17   Q.  And I apologize.  But if you could speak up just a little

18   bit more.  I think it's a little bit hard for the folks in the

19   back to hear.

20   A.  I'm sorry.

21   Q.  I think that will work if you get a little closer to the

22   microphone.  That should get the job done.

23        Mr. Rasheed, are you familiar with a group called the

24   Oath Keepers?

25   A.  Yes, ma'am.

2021

1    Q.  How did you become familiar with the Oath Keepers?

2    A.  I joined the group.

3    Q.  How did you join the group?

4    A.  Through an online social media.

5    Q.  And when you -- did you find out about the group, then,

6    through social media?

7    A.  Yes.

8    Q.  Did you make contact with someone in the group in order to

9    learn more about joining the group?

10   A.  Yes, several people.

11   Q.  Can you explain how that happened.

12   A.  I was invited into the group, and I just decided to join.

13   Q.  Why did you join?

14   A.  Because I liked what they stood for.

15   Q.  What did you understand them to stand for?

16   A.  Just maintaining our constitutional values and freedoms,

17   and helping family and helping everybody.  I liked that.

18   Q.  Do you remember, roughly, when you joined the Oath Keepers?

19   A.  Three years ago, maybe.  I don't -- I -- roughly.

20   Q.  Okay.  Did you ever meet other Oath Keepers in person, or

21   did you mostly just participate in an online fashion?

22   A.  I met several, yes.

23   Q.  Okay.  If I could direct your attention to the time period

24   of November of 2020.  Did you follow that there was a

25   presidential election going on at that time?

```
1    A.  Yeah.  Yes.

2    Q.  Okay.  And around that time period of November of 2020,

3    were there periodic Oath Keeper conference calls or

4    GoToMeetings for members?

5    A.  Yes.

6    Q.  Did you get invited to these meetings?

7    A.  Yes.

8    Q.  How?

9    A.  I don't know.  Emails.

10   Q.  Okay.  And do you know where those emails came from?

11   A.  Yes.

12   Q.  Where did they come from?

13   A.  Oath Keepers.

14   Q.  Okay.  Was there like an Oath Keepers email address or

15   website that sent out these invitations?

16   A.  Yes, ma'am.

17   Q.  Okay.  Do you recall being invited to join a call on

18   November 9th of 2020?

19   A.  Yes, I do.

20   Q.  And do you remember how you got that invitation?

21   A.  It was by email.

22   Q.  Did you then sign into the call?

23   A.  Yes.

24   Q.  How did you sign into the call?

25   A.  I was given a number to call.
```

1    Q.   Okay.  In the email, was there a number to call?

2    A.   Yes.

3    Q.   Was this just a phone number, or was it part of this

4    service called GoToMeeting?  Do you remember?

5    A.   I just remember it was a phone call that you called in.

6    And maybe it was GoToMeeting.  I don't remember, honestly.

7    Q.   Okay.  Did you join the call with your phone?

8    A.   Yes, I did.

9    Q.   Okay.  Do you remember, was -- did you sign on with video

10   calling, or did you just dial in, an audio call?

11   A.   Just audio.

12   Q.   Okay.  Do you recall how the call began?

13   A.   Yes.

14   Q.   How did the call begin?

15   A.   I think it was something like, oh, we're going to wait for

16   this person.  We're going to wait for that person.  We're going

17   to do this.  We're going to do that.  And then it started

18   getting into talking.

19   Q.   Okay.  And at some point in time, did you start recording

20   the conversation?

21   A.   Yes, ma'am.

22   Q.   Why?

23   A.   If -- because I felt -- you know, I was expecting to hear,

24   yeah, Biden bad; Trump good, you know.  It's okay.  I agree or

25   don't agree.  It doesn't matter, but -- and things like that.

1    But the more I listened to the call, it sounded like we were

2    going to war against the United States government, and I wasn't

3    comfortable, so I started to record it.

4    Q.  How did you record the call?

5    A.  With my house phone.

6    Q.  Can you explain that.

7    A.  Yeah.  I have a -- old phones, and they're just connected

8    to Wi-Fi, and you just (makes noise).

9    Q.  Okay.  So you were calling into the call on one phone; is

10   that right?

11   A.  Yes, this phone.

12   Q.  Okay.  The phone you're holding in your hand right now; is

13   that right?

14   A.  Yes, ma'am.

15   Q.  And you took another phone, then, and used that second

16   phone to record what was going on on the first phone?

17   A.  Yes, ma'am.

18   Q.  Okay.  Did you continue recording the call, then, for

19   approximately another half an hour or so?

20   A.  I believe so.  I believe it was just, like, 15 minutes into

21   the call, roughly, and then for the duration of the meeting,

22   yes.

23   Q.  Okay.  After that meeting ended, at some point in time

24   after that day, did you try to notify anyone in law enforcement

25   about this recording you had made?

1    A.  Yeah, a couple weeks after, it just came to me -- like I

2    said, I -- so many threats and I -- I -- opinions beside, but I

3    didn't want that.  And, yeah, I tried to get ahold of the FBI

4    and Karl Racine and Capitol Police and...

5    Q.  Okay.  I just want to ask you a couple more follow-up

6    questions about that.  I thought you said something like -- you

7    said something about threats.  Can you repeat that answer or

8    explain it a little bit more.

9    A.  Excuse me?

10   Q.  You just said -- when you were talking about contacting law

11   enforcement, you said something about threats that you had

12   heard or something.

13   A.  No, I just -- it's just the whole thing was so threatening,

14   and I just -- like I said, I don't -- it was scary, the

15   proposal, what was being brought to the table, you know.

16   Q.  What was being brought to the table where?

17   A.  I -- I guess to -- we're going to take back -- we're going

18   to take over the White House.  We're going to take over -- and

19   I'm paraphrasing what I kind of remember.  You know, if you

20   bring guns, it's okay.  Kick Antifa's butt; take lead

21   pipes to -- and flagpoles to them.  I don't know.  It just --

22   it was -- just sounded horrible.  It ain't what I joined.

23   Q.  Are those things that you heard discussed on that call that

24   you recorded?

25   A.  Yes, ma'am.

1    Q.  Okay.  And so you said you tried to reach out to the FBI;

2    is that right?

3    A.  Yes, ma'am.

4    Q.  And I think you said you tried to reach out to someone

5    named Karl Racine; is that what you said?

6    A.  Yes, ma'am.

7    Q.  And do you -- can you describe who that person is or who

8    you understand that person to be.

9    A.  He's the attorney general for some -- I don't remember

10   anymore.  I just remember the name.

11   Q.  Okay.  An attorney general somewhere?

12   A.  Yes, ma'am.

13   Q.  Do you remember reaching out to anyone else to try to

14   notify them about the call?

15   A.  Capitol Police and Ted Stevens and --

16   Q.  Okay.  You said Capitol Police; is that right?

17   A.  Yes.

18   Q.  And who's Ted Stevens?

19   A.  He's a senator for Texas.

20   Q.  Okay.  Did anyone call you back?

21   A.  Yeah, after it all happened.

22   Q.  Okay.  After -- when you say "after it all happened," after

23   what day?

24   A.  January 6th and whatever took place.

25   Q.  Okay.  Are you referring to what happened at the Capitol on

1    January 6th?

2    A.  Yes, ma'am.  I just didn't want to give it a title.  I

3    don't -- if that makes sense.

4    Q.  You said you just didn't want to give it a title; is that

5    right?

6    A.  Yes, ma'am.

7    Q.  Okay.  After January 6th happened, did you try to call in a

8    tip about your recording again?

9    A.  Yes, ma'am.

10   Q.  And did you try to contact the FBI?

11   A.  Yes, ma'am.

12   Q.  Did you try to contact anyone else after January 6th?

13   A.  I -- I don't remember the chronological dates.  Maybe

14   before and after, yes.

15   Q.  Okay.  At some point in time in the spring of 2021, did

16   anyone from the FBI reach out to interview you?

17   A.  Yes, ma'am.

18   Q.  And in the course of that interview, did they ask you to

19   provide a copy of your recording of the meeting?

20   A.  Yes, ma'am.

21   Q.  And did you?

22   A.  Yes, ma'am.

23   Q.  Mr. Rasheed, last night did you listen to a copy of the

24   recording that has been labeled Government's Exhibit 1000 for

25   this case?

```
1    A.  Yes, ma'am.  I remember that number.

2    Q.  Did that copy of the recording appear to be a fair and

3    accurate copy of the recording that you gave the FBI?

4    A.  It's the exact copy.

5    Q.  Okay.

6             MS. RAKOCZY:  I have no further questions.  Thank

7    you, Your Honor.

8             THE COURT:  Okay.  Mr. Bright.

9             MR. BRIGHT:  Yes, Your Honor.

10                      CROSS-EXAMINATION

11   BY MR. BRIGHT:

12   Q.  Good afternoon, Mr. Rasheed.  How are you doing today?

13   A.  Good, sir.

14   Q.  My name is James Lee Bright.  I represent Stewart Rhodes.

15        I don't have a lot of questions for you, but the ones

16   that I have, I think, are fairly important.

17   A.  Okay.

18   Q.  When you moved to West Virginia and decided to become an

19   Oath Keeper, that was in 2019; correct?

20   A.  I -- I believe so.  I -- I'll take your word.

21   Q.  Well, that's what you've told the government previously;

22   correct?

23   A.  Okay.

24   Q.  Okay.  And you did so, admitting that you were doing so

25   without ever having met a single member of the Oath Keepers;
```

1      correct?

2      A.   I had met members before.

3      Q.   When you joined, you had never --

4      A.   Before.

5      Q.   -- met anyone in person; is that correct?

6      A.   No, I had before.  Yes.

7      Q.   Well, you had told the government in August of this year

8      that at the time you joined you had never met an Oath Keeper in

9      person; correct?

10     A.   I think that's misphrased because I'd seen them on protests

11     and stuff.

12     Q.   But you had never spent time with any of them; correct?

13     A.   Correct.

14     Q.   Okay.  And have you ever been on any of the security

15     details or operations that the Oath Keepers historically

16     performed?

17     A.   No.

18     Q.   So your interactions with the Oath Keepers, it sounds like,

19     are primarily via social media and online; is that correct?

20     A.   And telephonic and -- yes.

21     Q.   Okay.  So not in-person contact?

22     A.   Correct.

23     Q.   So you would not consider yourself outside of the confines

24     of your home an active member of the Oath Keepers; correct?

25     A.   Sure.

1    Q.  Okay.  And as recently as August, you conveyed to the

2    government that you are now the leader of the West Virginia

3    chapter of the Oath Keepers; is that correct?

4    A.  Correct.

5    Q.  Do the other members of the West Virginia Oath Keepers that

6    are actively engaged in operations and security details

7    consider you their leader?

8    A.  I have no idea.  I was just told I was a leader.

9    Q.  Okay.  Mr. Rasheed, would you agree with me that as the

10   member of an organization like the Oath Keepers, that it's

11   incumbent upon you to follow the oath that they, too, believe

12   in?

13   A.  Yes.

14   Q.  Do you know their oath?

15   A.  I've got it.  I've read it, yes.

16   Q.  I'm so sorry, sir.

17   A.  I have it.  I've read it.  I don't know it.

18   Q.  Are you familiar with their bylaws, since you're, per your

19   description, the president of the West Virginia Oath Keepers?

20   A.  I'm not following.

21   Q.  Are you familiar with their bylaws?  You -- their rules?

22   A.  I've seen them, yes.  I've read them.

23   Q.  Okay.  And do you -- are you aware, then, that you're not

24   legal -- according to their charter, you're not eligible to

25   even be a member of the Oath Keepers?  Are you aware of that,

1    sir?

2    A.  No.

3    Q.  Are you aware of your history, sir?

4    A.  Yes, sir.

5    Q.  Mr. Rasheed, I'm going to show you what's been Bates

6    stamped as Rhodes DX 0001 [sic] through 00009.

7         Do you recognize that document?

8    A.  Yes, sir.

9    Q.  What is that document, sir?

10   A.  The bylaws of the Oath Keepers.

11   Q.  And you are familiar with that document; correct?

12   A.  Correct.

13   Q.  Okay.  And you've read it?

14   A.  Yes.

15   Q.  And you would agree that you, as an online Oath Keeper,

16   would be bound by it; correct?

17   A.  Correct.

18        MR. BRIGHT:  Page 5, please -- or Section 5 [sic],

19   the section on membership.

20   BY MR. BRIGHT:

21   Q.  Would you familiarize yourself, please, sir, with

22   Section 8.01 labeled "Membership:  (a) Member."  Would you

23   please read that, sir, aloud.

24   A.  "Membership is available to the individuals who are current

25   [in] serving or retired military, reserves, National Guard

1    (including Air National Guard), and veterans; as well

2    as . . . former police, fire-fighters.  Provided, that no

3    person who has been convicted of treason or [a] felony in a

4    state or territory of the United States . . . unless restored

5    to civil rights; and no person who has been . . . unless

6    restored to legal capacity."

7    Q.  Without pressing further and disclosing details that we

8    don't need to know, would you agree with me, based on the

9    section regarding felonies, that you are not eligible to even

10   be an Oath Keeper?

11   A.  So I don't have civil rights?

12   Q.  I'm asking -- this is an organization that you've chosen to

13   join.

14   A.  I understand that.  But it says right here, unless the

15   civil rights have been restored.  And I think my civil rights

16   are restored.

17   Q.  Are you a convicted felon?

18   A.  Yeah.

19   Q.  Okay.  So per their charter and bylaws, you are not allowed

20   to be a member?

21   A.  But it says unless civil rights restored.

22   Q.  Mr. Rasheed, how many names have you gone by in the past

23   20 years?

24   A.  Three or four.

25   Q.  Would six be agreeable?

1    A.   Okay.

2    Q.   Why have you changed your name six times in the past

3    20 years?

4    A.   I don't -- I don't know that I have, but you're saying so,

5    so.

6    Q.   Well, you'll forgive me, sir, but according to

7    documentation that's been given to me by the government, you've

8    gone by the name Sergei Neklovech?

9              MS. RAKOCZY:  Objection.

10             THE COURT:  On the phone, please.

11             (Bench conference on the record.)

12             THE COURT:  Okay.  Go ahead, Ms. Rakoczy.

13             MS. RAKOCZY:  I -- I can understand why Mr. Lee --

14   Mr. Bright is asking the question, but I -- the witness has

15   some security concerns, and I'm not sure it's necessary to read

16   into the record every single name he has gone by.  I guess I

17   would offer up that the government would stipulate that he's

18   gone by other names in lieu of reading every single name he's

19   gone by into the record.

20             MR. BRIGHT:  I'm happy to do that, Your Honor, if

21   they would just -- he would just answer that he's gone by six

22   different names, give me the reason for them, I won't read any

23   into the record, and I'm more than satisfied.

24             THE COURT:  Okay.  All right.  I think he's agreed --

25   I don't know if he's agreed to six or not.  I guess the bottom

1  line is if he doesn't and the government is -- the government

2  agrees that he's done so, we can always enter a stipulation

3  into the record.

4          MS. RAKOCZY:  That's fine, Your Honor.

5          MR. BRIGHT:  Yes, sir.

6          (Proceedings held in open court.)

7  BY MR. BRIGHT:

8  Q.  Mr. Rasheed, I'm going to --

9          THE REPORTER:  Hold on.

10  BY MR. BRIGHT:

11  Q.  Mr. Rasheed, I'm going to withdraw the prior question.

12  A.  Okay.

13  Q.  Very simply, without going into the names themselves, I

14  would simply ask if you would agree with me that since, really,

15  closer to 2007, you have gone by six different names and

16  personas; is that correct?

17  A.  Probably more like 30 or 40, if you count all my online

18  nicknames.

19  Q.  Yes, sir.  Thank you for sharing that.  I will be very

20  brief in my following questions then.

21          You state that you were concerned by the things that you

22  heard being discussed on the GoToMeeting chat; correct?

23  A.  Yes, sir.

24  Q.  And you started recording with one of your extra telephones

25  and only got 25 minutes of what we know to be a

```
 1    two-hour-and-six-and-a-half-minute meeting; correct?

 2    A.  I just don't believe so, no.

 3    Q.  I'm sorry, sir?

 4    A.  I don't agree with that, no.

 5    Q.  You would not agree that that meeting was online for

 6    two hours?

 7    A.  No, sir.

 8    Q.  How long would you say it went on?

 9    A.  I -- I need more information to answer that question.  I

10    mean, I could answer it if you tell me how long the

11    government's exhibit is.

12    Q.  Well, you would agree with me, you did not record the whole

13    thing?

14    A.  I did not record 13 minutes of it.

15    Q.  And you stated to the government on August 18th that due to

16    your concern, that's why you reported --

17    A.  Correct.

18    Q.  -- what you've claimed that you reported; correct?

19    A.  Correct.

20    Q.  And you've misstated today, at minimum, two of the things

21    that are on that meeting, the parts of the transcript that have

22    actually already been entered into evidence in this case?

23    A.  Okay.

24    Q.  And you're aware -- and you use the term paraphrasing, but

25    you're aware that no part of that meeting or transcript says it
```

1    was okay to bring guns into the Capitol; correct?

2    A.  I didn't say that it was.

3    Q.  You just a moment ago did, sir.

4    A.  I think you're misquoting me -- or at least --

5    Q.  You understand --

6    A.  -- misspoke.

7    Q.  You -- and you also said a moment ago, quote, take over the

8    White House?

9    A.  Yeah, I believe there was an excerpt in there; it said take

10   over the White House or be prepared to.

11   Q.  You understand that that actually is not part of -- among

12   what has been admitted into evidence -- part of the transcript

13   of that meeting; correct?

14   A.  No, I'm -- I don't -- I mean, no.

15   Q.  You don't really remember that meeting, do you?

16   A.  Parts of it, yes.

17   Q.  How many more of the GoToMeetings did you attend?

18   A.  I believe I've been to two or three of them.

19   Q.  And those two or three more afterwards --

20   A.  No.  It was before.  I didn't listen to anything after.  I

21   didn't want to hear any more.

22   Q.  Well, according to what you told the government on

23   August 18th -- and, again, it was on another name that you

24   used.  But you stated to the government that -- after the

25   meeting which you recorded only part of, you stated to the

1  government that you joined more GoToMeetings that got

2  progressively worse but you did not record any of those

3  meetings.

4  A.  It wasn't GoToMeetings.  It was online meetings.

5  Q.  Well, GoToMeetings is an online platform, isn't it?

6  A.  I -- no, it's a telephone number.

7  Q.  You told the government you went to several more

8  GoToMeetings.  But you did not feel the need to record those?

9  A.  I don't remember the word "GoTo."  There are numbers that

10  you record -- or that you call.

11          MR. BRIGHT:  I have no further questions, Your Honor.

12          THE WITNESS:  I'm sorry.  I'm confused.  I don't --

13          MR. BRIGHT:  It's okay.  Thank you for your time.  I

14  really appreciate you coming today.

15          THE WITNESS:  Yeah.

16          MR. BRIGHT:  Please be safe.

17          THE COURT:  Thank you, Mr. Bright.

18       Mr. Woodward.

19                    CROSS-EXAMINATION

20  BY MR. WOODWARD:

21  Q.  Hi, sir.  Stanley Woodward.  I represent Kelly Meggs.

22       Do you know Kelly Meggs?

23  A.  No, sir.

24  Q.  Did you write an email to the U.S. Capitol Police on

25  February 16th, 2021?

```
 1    A.  I don't remember the date, but yes.

 2    Q.  In that email you described the Oath Keepers call that you

 3    recorded; correct?

 4    A.  Uh-huh.

 5    Q.  And in that email, you advised the Capitol Police that

 6    Stewart Rhodes participated in the call?

 7    A.  Sir, I'm -- I'll take your word for it.  I don't remember

 8    what I wrote.  I just remember I was concerned and had

 9    contacted them.

10    Q.  Well, if it would be helpful, I can show you a copy of your

11    email.

12    A.  Sure.

13              MR. WOODWARD:  May I approach?

14    A.  Sounds like me.  Sorry.

15    BY MR. WOODWARD:

16    Q.  Does that refresh your recollection of the email that you

17    wrote to the U.S. Capitol Police?

18    A.  Yeah, kind of.

19    Q.  And in that email, you described Stewart Rhodes as a

20    fricking wacko that the Oath Keepers would be much better

21    without?

22    A.  That's the way I felt, yes.

23              MR. WOODWARD:  No further questions, Your Honor.

24              THE COURT:  Mr. Geyer.

25              MR. GEYER:  No questions, Your Honor.
```

1          THE COURT:  Mr. Crisp.

2                    CROSS-EXAMINATION

3    BY MR. CRISP:

4    Q.  Sir, my name is Jonathan Crisp, and I represent Jessica

5    Watkins here.

6              Just want to touch back on something that was discussed

7    earlier.  You have -- to be clear, your prior conviction is for

8    aggravated sexual assault of a child?

9    A.  Uh-huh.

10   Q.  Is that correct?

11   A.  Yes.

12   Q.  Okay.  One of the things you asked the government for in

13   compensation for your testimony was a new identity; is that

14   fair to say?

15   A.  Some kind of protection, yes.

16   Q.  You wanted a new identity?

17   A.  It was an option, yes.

18   Q.  Okay.  With a new identity, you would not have to register

19   as a sex offender anymore, would you?

20   A.  I never asked that.

21   Q.  That wasn't my question, sir.  My question was a little bit

22   different.

23   A.  I don't think that a new identity would pass up the law,

24   no.

25   Q.  So you think that with a new identity and a new name, you

1    still would have to register as a sex offender?

2    A.  Probably, yes.

3    Q.  You didn't research that and have that discussion?

4    A.  I -- from what I understand, if you have a felony

5    conviction, you have to, no matter what your name is.

6    Q.  Okay.

7            MR. CRISP:  Thank you.

8            THE COURT:  Mr. Fischer.

9                        CROSS-EXAMINATION

10   BY MR. FISCHER:

11   Q.  Sir, if I can ask you, did the -- the recording that you

12   made, did anybody in the federal or state law enforcement or

13   any federal or state agency encourage you in any way to make

14   that recording?

15   A.  I'd never talked to one in this -- I'm sorry.  I'm looking

16   for words.  I've never -- prior to that recorder, I haven't

17   speaken to any federal, state, or local agency considering

18   anything to do with any Oath Keepers or January 6th or

19   November 9th or anything.

20   Q.  You didn't have a handler?

21   A.  Huh?

22   Q.  You didn't have a handler?

23   A.  You mean like a Russian spy?

24   Q.  No.  I mean like federal law enforcement.

25   A.  I don't even know what that is.

 1    Q.  So, sir, I'm just trying to understand.  You just happen --

 2    let me understand this.  You're listening to this GoToMeeting

 3    on a phone; is that correct?

 4    A.  Yes.

 5    Q.  And then you just happen to have another phone with you

 6    that you take a video of the phone where the GoToMeeting is on;

 7    is that how this went down?

 8    A.  Yes, sir.

 9    Q.  Okay.

10    A.  So if you would like my bank accounts to see my -- I don't

11    have a federal income.

12    Q.  You don't have any federal income?

13    A.  No.  I mean, if you're accusing me of being a government

14    agent.

15    Q.  Sir, I'm just asking.  So you just happen to decide that

16    day you wanted to -- you wanted to videotape a GoToMeeting with

17    the Oath Keepers?

18    A.  I think it's been -- already been answered, yes.

19    Q.  Okay.  Okay.  And where were you at -- where were you at

20    when you made the videotape?

21    A.  Sitting in my home.

22    Q.  And where was that at?

23    A.  In West Virginia.

24    Q.  Okay.

25                MR. FISCHER:  I've got nothing else, Your Honor.

 1          THE COURT:  Okay.  Ms. Rakoczy, any redirect?

 2          MS. RAKOCZY:  Yes, Your Honor.  Thank you.

 3      Your Honor, I neglected on direct examination to move

 4  the entire Government's Exhibit 1000 into evidence, which

 5  Mr. Rasheed has now authenticated; so I would do that at this

 6  time.

 7          THE COURT:  All right.  Is there any objection?

 8          MR. CRISP:  No objection.

 9          THE COURT:  All right.  So Government Exhibit 1000

10  will be admitted in its entirety.

11          (Government Exhibit 1000 admitted into evidence.)

12          MS. RAKOCZY:  Thank you, Your Honor.

13      If you could bring that recording up on the screen,

14  please.  It's Government's Exhibit 1000.  If we could publish

15  it for the jury as well.

16      If you can just pause it at the beginning.

17                     REDIRECT EXAMINATION

18  BY MS. RAKOCZY:

19  Q.  Mr. Rasheed, do you recognize what we're looking at here?

20  A.  Yes.  That's my other phone.

21  Q.  Okay.  So what we see in the video screen is the phone you

22  were listening to the call on; is that right?

23  A.  Yes, this phone.

24  Q.  The phone that you're holding in your hand right now?

25  A.  (Witness nods head.)

1    Q.  Is that a yes?

2    A.  Yes.

3    Q.  So the number across the top, with the 3123 ending, is that

4    the conference call line that you dialed in to join the call?

5    A.  Yes, ma'am.  Yes, ma'am.

6    Q.  And it says -- there's a number underneath the phone

7    number, 13:44.  Is that how long the call had been going by the

8    time you started recording?

9    A.  Yes, ma'am.

10    Q.  Okay.  So it sounds like you started recording the call

11    about 13 minutes and 44 seconds into the call; is that right?

12    A.  Yes, ma'am.

13    Q.  Okay.

14          MS. RAKOCZY:  If we could just go to the end of the

15    call -- end of the file, somewhere a little bit before

16    29 minutes and 3 seconds.  Pretty close to the end.  That's

17    great.  Thank you.

18          If you could press play, please.

19          (An audio recording was played.)

20          MS. RAKOCZY:  So we started playing, just for the

21    record, at about 28 minutes and 37 seconds through the end of

22    the recording, which lasted about 29 minutes and 3 seconds.

23    BY MS. RAKOCZY:

24    Q.  It sounded like the call was still a little bit going on at

25    that point that you stopped recording.  Does that sound fair

1    from what we just watched?

2    A.  Yes.  I don't -- I thought it was about the end.  I'm

3    not --

4    Q.  I'm sorry.  Can you say that one more time a little closer

5    to the mic.

6    A.  I said I thought it was about ended.  I don't -- it was

7    goodbyes and stuff, from my understanding.

8    Q.  From what you heard on the recording, you thought the call

9    was ending?

10   A.  Yes, ma'am.

11   Q.  Okay.  But you recorded, it sounds like, beginning about

12   13 minutes in and then for the next approximate half hour; is

13   that right?

14   A.  Yes, ma'am.

15   Q.  Okay.  And you told us that you were recording because the

16   call made you concerned?

17   A.  Yes, ma'am.

18   Q.  What concerned you?

19   A.  Without getting -- let me figure out how to answer this.

20   Just it felt -- like I said, it felt like we were going to war

21   with the United States government, and I didn't -- and Antifa

22   and BLM, and I didn't like it.

23   Q.  One of the attorneys asked you a question about an email

24   you wrote to the Capitol Police around February of 2021.  Do

25   you remember those questions?

1    A.  Yes, ma'am.

2    Q.  You, in that email, apparently referred to Mr. Rhodes as a

3    wacko, or something like that?

4    A.  Yes, ma'am.

5    Q.  Did that sound like your words to you?

6    A.  Pretty close.

7    Q.  Why did you say that?

8    A.  Because of the things he's asking was crazy, the -- the

9    desired -- his desired outcome.

10   Q.  What did you -- was that based on what you heard him say on

11   this call?

12   A.  Yes, ma'am.

13   Q.  What did you understand that desired outcome to be from his

14   words?

15   A.  In my words?

16   Q.  Well, from -- from his words, what did you understand his

17   desired outcome to be?

18   A.  I mean, from what I understood, it sounded like we were

19   going to war with -- we were going to overthrow the

20   United States government and start shooting everybody and

21   beating up Antifa and beating up BLM and -- that's what I

22   understood it to be.

23   Q.  Mr. Rasheed, you were asked questions about asking the --

24   the prosecutors and agents on this case for help in changing

25   your name.  Do you remember those questions?

1   A.  Yes.

2   Q.  Did you ask for that help after you were served with a

3   subpoena to testify in this matter?

4   A.  Yes, ma'am.

5   Q.  Why did you ask for that help?

6   A.  Because, I mean, even now, I'm sitting there reading the

7   Oath Keepers chats, and they're like, you know, we're going to

8   beat them.  Snitches get stitches.  We're going to hunt them --

9   you know, just all kinds of -- one leader will say this or

10  that.  I'm not -- I'm paraphrasing as -- as a general concept

11  of what I'm seeing.  I don't want my wife to have stitches, you

12  know.

13          MS. RAKOCZY:  I have no further questions.

14          THE COURT:  Okay.  Mr. Rasheed, thank you very much

15  for your time and your testimony.  You're free to step down and

16  leave, sir.

17          THE WITNESS:  Thank you.

18          (Witness excused.)

19          THE COURT:  Ladies and gentlemen, let me just read

20  you an instruction.

21          You've just heard evidence that Mr. Rasheed has been

22  convicted of a crime.  You may consider this conviction only in

23  evaluating the credibility of that witness's testimony in this

24  case.

25          Is the government ready with its next witness?

```
 1              MS. RAKOCZY:  Yes, Your Honor.
 2         The government calls Michael Adams.
 3              THE COURTROOM DEPUTY:  Before you have a seat, please
 4    raise your right hand.
 5              (Oath administered.)
 6              THE WITNESS:  I do.
 7              THE COURT:  Mr. Adams, welcome.  Have a seat there.
 8    And if you're comfortable testifying with your mask off --
 9    okay.  Thank you.
10                        DIRECT EXAMINATION
11    BY MS. RAKOCZY:
12    Q.  Good afternoon.
13    A.  Good afternoon.
14    Q.  In a loud and clear voice, could you please introduce
15    yourself to the ladies and gentlemen of the jury.
16    A.  Michael Adams.
17    Q.  Common spelling?
18    A.  M-i-c-h-a-e-l A-d-a-m-s.
19    Q.  Sir, without telling us your precise address, where,
20    roughly, do you live?
21    A.  Town called Hilliard, Florida.
22    Q.  How do you spell Hilliard?
23    A.  H-i-l-l-i-a-r-d.
24    Q.  Thank you.
25         Without telling us your precise job, what kind of work
```

```
1    do you do, generally?

2    A.  I'm a manager for a vocational training company.

3    Q.  Have you ever served in the military?

4    A.  Yes.

5    Q.  Could you tell us for how long and which branch.

6    A.  Six years, Florida Army National Guard.

7    Q.  Okay.  Thank you.

8         Mr. Adams, are you familiar with a group called the

9    Oath Keepers?

10   A.  I am.

11   Q.  How did you become familiar with them?

12   A.  I first joined the Oath Keepers probably about 2012.  I had

13   heard about their -- what they call CPT, community preparedness

14   teams.

15   Q.  Okay.

16   A.  And I joined -- I didn't speak to another person in Florida

17   for about 60 days so I kind of walked away.  And then I came

18   back in the summer of 2020.

19   Q.  And in the summer of 2020, why did you come back to the

20   Oath Keepers?

21   A.  There was a lot going on that summer around the country.

22   There were protests, some violent.  And my concern -- my alert

23   is we were starting to see protests around the state of

24   Florida.  And my concern was not knowing what this was.  Antifa

25   and -- and some of the others that were involved in these
```

1    protests, I was concerned that this is something that was going

2    to grow and become more and more problematic.  So I --

3    Q.   Okay.  Let me --

4    A.   Okay.

5    Q.   Let me stop you for one second.  So what exactly did you

6    think the Oath Keepers could offer you in your community?

7    A.   Well, the CPT program.  I have an interest in civil defense

8    that's nonmilitary in nature, and that program interested me

9    greatly.

10   Q.   Could you describe a little bit what you understand CPT or

11   community preparedness teams to be.

12   A.   So it is -- it is training individual citizens to be --

13   to -- to be -- to be prepared to respond to disasters, whether

14   they're natural or man-made.  And so you learn certain

15   disciplines of, for instance, medical, how to take care of

16   someone that's injured; communications; food preparation; water

17   purification; those types of things.

18   Q.   So how was it that you tried to become a member of the

19   Oath Keepers again?

20   A.   I -- so in July -- in probably mid-July of 2020, I went

21   to -- to the organization's website.  I signed up, became a

22   member, and I was directed into a chat room.  And each state

23   had its own chat.  So I went to Florida's chat, and there was a

24   handful of people in there that had left messages, and then it

25   was quiet.  No one seemed to be on there at the same time.  We

1    were leaving messages and coming back and forth.

2    Q.  Okay.  If I could stop you for a second.  How did you get

3    into this chat room for Florida?

4    A.  Well, it -- you log in through your login onto the website,

5    and then there's a link to the chat room.

6    Q.  And was that the Oath Keepers website?

7    A.  The Oath Keepers website.

8    Q.  Okay.  So you go to the Florida chat room.  There's --

9    doesn't really seem to be anyone in charge.  So what did you do

10   next?

11   A.  So on the website, there was a listing for an email for the

12   Florida chapter.  So I emailed the Florida chapter.  I could

13   see from the discussion in the chat rooms that others had

14   emailed and no one was responding.

15   Q.  So what did you do next?

16   A.  So I kind of scoured the -- the -- the website for the

17   chats had a room for each state and had some general chats, and

18   I was reading through that information, and I found a phone

19   number for Stewart Rhodes.

20   Q.  Okay.  Did you call that phone number?

21   A.  I did.  I called Stewart.

22   Q.  Did someone answer?

23   A.  Stewart answered.

24   Q.  Okay.  And did you have a conversation with him?

25   A.  I did.

1    Q.  Without getting too much into the back and the forth of the

2    conversation, did you ask for guidance in how to join the

3    Florida Oath Keepers?

4    A.  I did.

5    Q.  And what did Mr. Rhodes say about how that could happen?

6    A.  He indicated that that chapter had -- had dissolved.  There

7    was a chapter at one point, and -- and the organization, it was

8    requesting help to -- to start another chapter, get a chapter

9    going, and I volunteered to do that.

10   Q.  So how did you go about starting or restarting the Florida

11   chapter of the Oath Keepers?

12   A.  I went back into the chat, and I told the members -- who

13   I'm assuming were members in that room -- that I had spoken

14   with Stewart.  Everyone knew who he was.  That I had spoken

15   with Stewart.  And I -- and I gave the details of the

16   discussion, and I was going to volunteer to get the ball

17   rolling.  And -- and I expressed my interests in the CPT

18   portion of it, and the people that were there that I was

19   communicating with agreed.

20   Q.  Do you remember the names of any of the folks who were in

21   that Florida chat at that time?

22   A.  I do.  There was -- there was -- Kelly Meggs was in there.

23   Kenneth Harrelson was in there.  There was an Alondra Propes,

24   was in there.

25   Q.  If I can stop you for a second.  Alondra, if you had to

1    spell that, would that be A-l-o-n-d-r-a?

2    A.  Correct.

3    Q.  And is Propes P, as in Peter, r-o-p, as in Peter, e-s?

4    A.  Correct.

5    Q.  Okay.  Who else, if you remember?

6    A.  There was a Dennis Koopman.

7    Q.  And Dennis, common spelling, I guess?

8    A.  D-e-n-n-i-s.

9    Q.  Koopman, K-o-o-p --

10   A.  K-o-o-p-m-a-n.

11   Q.  Thank you.

12          Anyone else you remember?

13   A.  There were probably at least one or two others, and I'm

14   drawing a blank on the names.

15   Q.  Okay.  Since your time in joining that chat room, did you

16   ever meet Kelly Meggs in person?

17   A.  I did.

18   Q.  Would you recognize him if you saw him again?

19   A.  Yes.

20   Q.  If you look around the courtroom, could you let us know if

21   you see him here today.

22   A.  Yes.

23   Q.  Can you describe where he's seated and what he's wearing.

24   A.  He's seated at the table with a gray coat on.

25          MS. RAKOCZY:  Your Honor, may the record reflect the

2053

```
1    in-court identification of Defendant Kelly Meggs?
2              THE COURT:  Is there any objection?
3              MR. WOODWARD:  No objection.
4              THE COURT:  All right.  In-court identification of
5    Mr. Meggs will be noted on the record.
6    BY MS. RAKOCZY:
7    Q.  Since the time that you were in that chat room, did you
8    ever met Kenneth Harrelson in person?
9    A.  I did.
10   Q.  Would you recognize him if you saw him again?
11   A.  Yes.
12   Q.  If you could look around the courtroom, do you see
13   Mr. Harrelson here today?
14   A.  Yes.  He's -- he's seated at the table in the back right,
15   in the dark jacket.
16   Q.  Okay.
17             MS. RAKOCZY:  Your Honor, may the record reflect the
18   in-court identification of Defendant Kenneth Harrelson?
19             MR. GEYER:  No objection, Your Honor.
20             THE COURT:  Okay.  The record will reflect an
21   in-court identification of Mr. Harrelson.
22   BY MS. RAKOCZY:
23   Q.  So, Mr. Adams, after you told the folks in the chat room
24   you were going to try to set up the chapter again, how did you
25   do that?
```

1    A.  Well, I was -- we -- I put it to the group to -- I was

2    looking for a volunteer who wanted to -- to kind of lead the

3    way, and we agreed temporarily that I would do so.  So I -- I

4    started the -- I volunteered.  I called the position state

5    coordinator.

6    Q.  And you became the state coordinator?

7    A.  I became the state coordinator, and the group was in

8    agreement at that time.

9    Q.  So what steps did you take to start this group?

10   A.  Well, the very first thing I did, we needed a way to

11   communicate.  That -- that -- the chat, I did not like the chat

12   that was on the organizational website.

13   Q.  Why not?

14   A.  I just -- it was -- it was the way it was set up.  There --

15   there wasn't really good communication there because it wasn't

16   a real-time type of communication.  So --

17   Q.  Did you -- if I can just interrupt you for a second.

18   Excuse me.

19        Did you also have security concerns about the chat

20   forum?

21   A.  I did.

22             MS. HALLER:  Objection to form.  Leading.

23             THE COURT:  It's overruled.

24   BY MS. RAKOCZY:

25   Q.  Did you have any security concerns about the chat forum?

2055

1    A.  I -- at that -- at that time it was mainly concerns of -- I

2    wasn't sure -- not so much security at that point in time.

3    Later on I was -- it did become a security concern.  My concern

4    was that the Florida room wasn't necessarily -- anyone could

5    click on that and be in the Florida room, and that was my

6    concern.  I was just dealing with members in our state.

7    Q.  So what did you do next?

8    A.  I had read on -- on somewhere in that forum, I'll say -- I

9    learned about the Signal chat -- that's not something I was

10   familiar with prior to that -- and ProtonMail, and something

11   that I had read on there.  So --

12   Q.  If I could stop you for one second.  Signal, is that like a

13   messaging application?

14   A.  It's a messaging -- it's an end-to-end encrypted messaging

15   application.

16   Q.  What's ProtonMail?

17   A.  It's an email -- same thing with email.  It's -- it's --

18   it's an end-to-end encryption.

19   Q.  Okay.  So did you do something with Signal and ProtonMail?

20   A.  I was concerned personally -- my concern at that time was

21   doxing, the threat of doxing.  I know the organization -- I

22   knew that there were some places out there that -- that had bad

23   things to say about the organization, and I was concerned about

24   being doxed by people that were not members of our

25   organization.

1   Q.  And you're using a term "doxed."  How would you spell that,

2   if you had to?

3   A.  I believe it's d-o-x-e-d or x-x-e-d.  I don't know where

4   that term comes from.

5   Q.  Just generally speaking, what does that mean to you?

6   A.  That's someone -- that's someone gaining your -- figuring

7   out who you are, your identity, and then -- and then falsely

8   putting you out to the public.

9   Q.  Okay.  So given that concern, what steps did you take next?

10  A.  Okay.  So we -- we -- we started using the Signal app, and

11  it was being used in the organization.  So that was -- that

12  seemed like a good next step.  And so what we -- what we were

13  trying to do initially was get people out of that chat room and

14  into the Signal app, because that was direct-text

15  communication.  We could talk to each other in real time versus

16  leaving messages in a chat room.

17  Q.  Did you create a particular Signal group chat?

18  A.  We did.

19  Q.  What was that called, if you remember?

20  A.  The -- the name became -- initially it wasn't, I don't

21  believe, but it became the OK FL Hangout.

22  Q.  Okay.  Is that like the initials OK and then the word

23  Florida or the initials FL?

24  A.  OK FL Hangout.

25  Q.  Okay.

1    A.  If I recall.

2    Q.  What steps did you take next to set up this Florida

3    chapter?

4    A.  We -- in addition to those forms of communication, I was

5    familiar with the communications platform GoToMeeting.  And so

6    I set up -- I was -- I was familiar with it; so I set it up.

7    And I set us up a weekly meeting for the state -- for the state

8    chapter to meet.  We needed to communicate and talk to -- to

9    get this thing going.

10   Q.  Did you use a personal account for that?

11   A.  I did.  I used a personal account.

12   Q.  And how often, then, did your group start meeting on

13   GoToMeeting?

14   A.  I believe I set that up for every Monday.

15   Q.  Did you ever invite Mr. Rhodes or members of the national

16   Oath Keepers group to join your GoToMeetings?

17   A.  Mr. Rhodes was aware that I was -- that I was doing that,

18   and our -- our chat group was growing in numbers, and he was

19   aware of that.

20   Q.  Okay.  Did he ever come to your GoToMeetings?

21   A.  Yes.  Yes.

22   Q.  Do you recall a presidential election occurring in

23   November of 2020?

24   A.  Absolutely.

25   Q.  Did anything change about the direction or focus of the

1    Oath Keepers nationally after the election, in your opinion?

2    A.  Well, the outcome of the election was -- I would say most

3    of the members tend to lean conservative, and -- and most of

4    the members were not happy with the outcome of the election.

5    And there was concern that the election had been stolen in some

6    way.

7    Q.  Are you -- did you participate in any GoToMeetings in which

8    Mr. Rhodes addressed the election results?

9    A.  I held -- I held a meet- -- we -- I held a meeting probably

10   in November.  I don't recall if it was my planned day, that

11   Monday, or if it was a different day.  But I hosted a meeting

12   where the topic was discussing going to D.C.  I believe it was

13   for "Stop the Steal" or something like that.

14   Q.  Do you recall what was discussed on that call?

15   A.  I know the premise of going -- of the group going to

16   Washington.  It involved security, and it involved

17   participating in -- in the -- I don't know what you would call

18   it, whatever the "Stop the Steal" was, whether it was a protest

19   or supporting the -- the President.  That was -- that was the

20   purpose of the group going there.

21   Q.  Can you describe for us a little bit how your work with the

22   Oath Keepers proceeded, then, in late November 2020 into

23   December of 2020.

24   A.  The -- we were -- we were continuing to grow.  More and

25   more members were coming in.  And we were -- my concern as

1    coordinator was -- was getting a vetting process set up.  What

2    my plans were with community preparedness is we were going to

3    be teaching the public.  And so I needed to have good people

4    qualified to do what they were supposed to do.  So that was my

5    focus of -- of going into that period of time.

6    Q.  How were you trying to vet people?

7    A.  Well, initially I vetted some people on my own; that was

8    in, kind of, the -- in my administrative group.  The

9    organization was -- I was told the organization was going to

10   set up an account so that we could vet through that account.

11   And I was waiting on that to occur.

12   Q.  And when you say "set up an account," is that with some

13   kind of, like, online background check service?

14   A.  An online background check so we could log in and process

15   those people.

16   Q.  Okay.  Were you able to continue in those efforts in

17   November, or were there other things that kind of overtook

18   events?

19   A.  Well, we had the -- well, in November they -- the group --

20   some of the group went to Washington in November.  In De- --

21   going into December -- are you talking about in December or so?

22   Q.  In November and December.  So let's start with November for

23   one second.

24   A.  Okay.

25   Q.  You said some members of the group came up to

1    Washington, D.C.; is that right?

2    A.  Correct.

3    Q.  Did you come up to Washington, D.C.?

4    A.  I did not.

5    Q.  Okay.  Going, then, into the month of December, you know,

6    what -- what happened in the Oath Keepers work that you did?

7    A.  Okay.  So I found myself in -- in a -- in a situation where

8    I was questioning whether I needed to continue being a member

9    of the organization.

10   Q.  Why did you start questioning that?

11   A.  Well, it was -- the rhetoric that was going on.  Mr. Rhodes

12   had -- had written two -- sometime in December had written two

13   open letters to the President of the United States.

14   Q.  What was concerning about that to you?

15   A.  The -- the message there indicated that we would not accept

16   this -- Mr. Biden as the President; that this election was

17   stolen.  And it alluded to the fact that this -- he's -- he's

18   part of an outside source that -- that's basically taken over

19   the -- taken over -- he's a puppet for an outside entity, is

20   what was being said.

21        And -- and the letters indicated that if the

22   President -- the current President, Mr. Trump at the time, did

23   not declare the Insurrection Act -- I don't know if I'm saying

24   that properly -- and call up the militias and stand this down,

25   if -- if he didn't do that, then we would have to do that.  And

1    I was concerned about who we -- who "we" is.

2    Q.  Did you feel like you were part of that "we"?

3    A.  I'm not part of "we."

4    Q.  Mr. Adams, were you interviewed at some point by the FBI in

5    connection with this case?

6    A.  I was.

7    Q.  And when you were interviewed, did you provide them a copy

8    of these open letters that you're talking about?

9    A.  I did.

10   Q.  I'm going to bring up just on your screen a copy of a

11   government's exhibit that's been marked for identification

12   purposes as Exhibit 4604.  Do you recognize Government's

13   Exhibit 4604, Mr. Adams?

14   A.  I do.

15   Q.  What is this?

16   A.  This is -- this is the second open letter to the President.

17   Q.  And is this --

18          MS. RAKOCZY:  If you could just page through a couple

19   of the pages, please.

20   BY MS. RAKOCZY:

21   Q.  Does this appear to be a fair and accurate copy of the

22   printout of the letter that you gave to the FBI during an

23   interview?

24   A.  It does.

25          MS. RAKOCZY:  At this point in time, Your Honor, the

2062

```
1     government would seek to move Government's Exhibit 4604 into

2     evidence.

3              MS. HALLER:  No objection.

4              MR. CRISP:  No objection.

5              THE COURT:  4604 will be admitted then.

6              THE REPORTER:  Who said the second objection?

7              MS. HALLER:  Juli Haller and Jonathan Crisp.

8              THE REPORTER:  Thank you.

9              MR. LINDER:  And Phillip Linder.

10             MS. HALLER:  Sorry.

11             MR. LINDER:  That's all right.

12             MS. RAKOCZY:  May we publish?

13             (Government Exhibit 4604 admitted into evidence.)

14    BY MS. RAKOCZY:

15    Q.  Mr. Adams, we're going to bring up now so the jury also can

16    see this letter.  There's handwriting across the top.  Do you

17    know whose handwriting that is?

18    A.  That's my writing.

19    Q.  Okay.

20             MS. RAKOCZY:  Yeah, if we can highlight that, please.

21    BY MS. RAKOCZY:

22    Q.  And what did you write there?

23    A.  "Stewart Rhodes Open Letter to President Trump Part II."

24    Q.  When you gave this letter to the FBI, did you highlight

25    some words that were of interest to you?
```

1   A.  I did.

2          MS. RAKOCZY:  If we could scroll down to the last

3   page, please, of this exhibit.

4   BY MS. RAKOCZY:

5   Q.  So this is the last [sic] page of Exhibit 4604.  There's a

6   yellow mark next to a paragraph.  Do you know who made that

7   mark?

8   A.  I did.

9   Q.  And why did you make that mark?

10  A.  These are the words that helped me make my decision to

11  resign from the -- from my leadership position in the

12  organization.

13  Q.  Could you read those words, please.

14  A.  If you -- this is to President Trump, to clarify.  "If

15  you fail to do your duty, you will leave We the People no

16  choice but to walk in the Founders footsteps, by declaring

17  the regime illegitimate, incapable of representing us,

18  destructive of the just ends of government - to secure our

19  liberty - and to be a mere puppet of a deadly foreign enemy.

20  And, like the Founding generation, we will take to arms in

21  defense of our God given liberty, [and] we will declare our

22  independence from that puppet regime, and we will fight for our

23  liberty."

24  Q.  Thank you, Mr. Adams.

25         MS. RAKOCZY:  We can take that exhibit down, please.

1    BY MS. RAKOCZY:

2    Q.  Mr. Adams, you said that those words helped you make a

3    decision to resign?

4    A.  Yes.

5    Q.  Why?

6    A.  Again, I didn't feel like I was part of "we."  I did not --

7    that's not my ideology, and I did not want to be associated

8    with that.

9    Q.  How did you resign?

10   A.  In -- in two ways.  I notified Mr. Rhodes by text, and I --

11   on Signal -- and I -- I notified my -- my -- my Florida

12   group -- the leaders of my Florida group, I notified by email.

13   Q.  Okay.

14          MS. RAKOCZY:  I'd like to bring up on the screen now

15   just for the witness, please, Government's Exhibit 4605.

16          And if you could zoom in on the top left part.

17   BY MS. RAKOCZY:

18   Q.  Do you recognize this exhibit, Mr. Adams?

19   A.  Yes.

20   Q.  What is this?

21   A.  This is the -- the messaging app on my phone.

22   Q.  Is it the Signal messaging app?

23   A.  The Signal messaging; correct.

24   Q.  Do these show some messages you sent to Mr. Rhodes in the

25   time period we're talking about?

1    A.  They do.

2    Q.  And when you were interviewed by the FBI, did you provide

3    screenshots from these messages on your phone to the FBI?

4    A.  I did.

5    Q.  Is what we're seeing here a fair and accurate copy of those

6    screenshots?

7    A.  It is.

8         MS. RAKOCZY:  At this point in time, Your Honor, we

9    would seek to admit Government's Exhibit 4605 into evidence.

10        MS. HALLER:  No objection, Your Honor, just subject

11   to completeness.

12        THE COURT:  Okay.  4605 will be admitted.

13        (Government Exhibit 4605 admitted into evidence.)

14        MS. RAKOCZY:  Thank you, Your Honor.

15      May we publish?

16        THE COURT:  You may.

17        MS. RAKOCZY:  And now for the jury to see as well.

18   So if you can just zoom in on that top left portion of the

19   exhibit, please.

20   BY MS. RAKOCZY:

21   Q.  We see some iMessages.  So, I guess, are these Signal

22   messages or just regular Apple iPhone iMessages, if you know?

23   A.  This actually may just be my iPhone.

24   Q.  Okay.  And it says, "To:  Stewart Rhodes - Oath Keepers."

25   Is that how you had Mr. Rhodes saved in your phone?

1    A.  Correct.

2              MS. RAKOCZY:  If we could take the zoom-in down,

3    please, and go to the next page of the exhibit, actually.

4              Before you go, actually, if we could zoom in on those

5    bottom messages, just to be clear.

6    BY MS. RAKOCZY:

7    Q.  Are these messages that were sent at an earlier time period

8    of December of 2020?

9    A.  I believe -- I believe so.

10             MS. RAKOCZY:  If we can take that down, please, and

11   go to page 2 in the exhibit.  If you can zoom in on just the

12   top message.  Whoops.  Sorry.

13   BY MS. RAKOCZY:

14   Q.  On December 23rd did Mr. Rhodes send you a message?

15   A.  He did.

16   Q.  What did he say?

17   A.  It says, "Mike, Kelly says you are thinking of stepping

18   down from leadership.  What's up?"

19   Q.  Okay.

20             MS. RAKOCZY:  And if we could take that down and then

21   zoom in on at least part of the next message, please.

22   BY MS. RAKOCZY:

23   Q.  Do we see here now on December 23rd your response?

24   A.  Yes.

25   Q.  What did you say?  Could you read it to us, please.

1    A.  "Stewart, sorry I got tied up at work."  It was a late

2    response, and "My decision is based on several factors.

3    . . . our organizational posture as a militia group, I find

4    problematic.  It's not a match for my ideology.  I'm more

5    geared to[ward] networking and training, like the CPT model.

6    . . . I realize [you're a] very busy man, but some of the

7    internal problems really bother me e.g. [given] member rosters

8    and member verification.  . . . my biggest concern is the

9    unchained rhetoric flying around our chats.  Members are very

10   vocal about sensitive subject matter, poor opsec" --

11   operational security -- "and completely inappropriate

12   conversations that could be turned on us.  My employment

13   requires 3 State Licenses and [I am] subject to" be -- "I'm

14   subject to suspension based on behavior they" . . .

15          MS. RAKOCZY:  And if you take that down, please, and

16   go to the next page of the exhibit.  If you wouldn't mind

17   zooming in on some of that, please.

18   BY MS. RAKOCZY:

19   Q.  So this is sort of a little bit of a continuation, but

20   towards the middle there, could you continue.

21   A.  Okay.  So this says, ". . . subject to suspension based on

22   behavior they deem questionable.

23          "I'm seriously not trying to" -- excuse my language,

24   everyone.  "I'm seriously not trying to bust balls or be an

25   ass.  I'm a proud life time member and will be in the back.

1    The owner of my Company is still on a vent" -- the gentlemen

2    had COVID -- "and I'm having to step up there.  I run a State

3    contract which is a 7 day a week overwatch and my relief is on

4    a vent.

5            "The Chapter has some great guys, they can handle it and

6    I'll be watching."

7    Q.  Okay.  In that message, I notice that you said "unchained

8    rhetoric flying around our chats" and "members are very vocal."

9    Whose rhetoric were you talking about there?

10   A.  Any -- anyone from -- really anyone from Mr. Rhodes on

11   down.  There was a lot of people talking.

12   Q.  You didn't tell Mr. Rhodes, though, that his rhetoric --

13           MS. RAKOCZY:  Bless you.

14   A.  I didn't point him out in this directly.

15   BY MS. RAKOCZY:

16   Q.  Why not?

17   A.  Probably not just to be -- to be confrontational.

18           MS. RAKOCZY:  If we could take that zoom-in down,

19   please, and go to the next page.

20           If we can zoom in on -- I don't think you have to --

21   yeah, that's fine.  If we can just zoom in on the couple of

22   messages.

23   BY MS. RAKOCZY:

24   Q.  We see at the top the ending of your message; right?

25   A.  Yes.

1    Q.  And then did Mr. Rhodes respond?

2    A.  He did.

3    Q.  How did he respond?

4    A.  He says, "No sweat brother.  I understand.

5         "Hey, what conference call system do you use?  Free

6    conference call .com is not working for me.  I need to set up a

7    call tonight."

8    Q.  And then if we could take that down and zoom in on your

9    response.  How did you respond?

10   A.  I said, "I use GoToMeeting, I have an account but I believe

11   they have a free version."

12   Q.  Okay.  Did you, then, let Mr. Rhodes use your GoToMeeting

13   for another meeting that -- that night of December 23rd?

14        MS. HALLER:  Objection to form, Your Honor.  Leading.

15   Stating facts not in evidence.

16        THE COURT:  Sustained.  Rephrase the question,

17   please.

18        MS. RAKOCZY:  Yes, Your Honor.

19   BY MS. RAKOCZY:

20   Q.  Did you -- well, let's read the next message, if we could,

21   please.  What did Mr. Rhodes ask you?

22   A.  "Can you set up a call tonight?  On your GoToMeeting

23   account?  For 8pm Eastern?"

24        And I said, "Roger that, just walked in the door.  Where

25   do I need to post it?

1           "Can you post it on the national intel chat."

2    Q.  And what did you say?

3    A.  "[I] Will do."

4    Q.  Did you?

5    A.  I did.

6           MS. RAKOCZY:  Okay.  Thank you.  We can take that

7    down, please.

8    BY MS. RAKOCZY:

9    Q.  Mr. Adams, did you come to Washington, D.C., for

10   January 6th?

11   A.  No, I did not.

12   Q.  Why not?

13   A.  I wouldn't have done -- I'm not a protest guy, to begin

14   with, and I -- I was not interested in any of the things going

15   on here.

16          MS. RAKOCZY:  No further questions, Your Honor.

17   Thank you.

18          Thank you, Mr. Adams.

19          THE COURT:  All right.  Before -- hang on.  Let's

20   take our afternoon break before we begin our cross-examination.

21          So it's 3:35.  Why don't we plan to resume around 3:50.

22   Then we'll go to the end of the day.

23          (Proceedings held outside the presence of the jury.)

24          THE COURT:  Okay.  Mr. Adams, you can step down, sir.

25   I'll ask you to be back a little before ten of and ask you not

```
 1    to discuss your testimony with anyone over the break.

 2              Thank you, all.

 3                  (Recess taken.)

 4              THE COURT:  Please have a seat, everybody.

 5              THE COURTROOM DEPUTY:  One juror just ran to the

 6    restroom.  She should be out shortly.

 7              THE COURT:  Okay.

 8         Do we have Mr. Adams back?

 9              MR. NESTLER:  We'll get him.

10              THE COURT:  Okay.

11         One of the jurors was in the restroom, and so,

12    Ms. Haller, if you want to sit.

13              MS. HALLER:  It's fine for us.

14                  (Proceedings held in the presence of the jury.)

15              THE COURT:  Okay.  Please have a seat, everyone.

16         All right.  Ms. Haller.

17              MS. HALLER:  Yes, Your Honor.  Thank you, Your Honor.

18                      CROSS-EXAMINATION

19    BY MS. HALLER:

20    Q.  Mr. Adams, my name is Juli Haller, and I represent

21    Kelly Meggs, along with my co-counsel, Stanley Woodward.  So

22    you'll see both of us.

23         I just want to follow up on a few of the things you

24    talked about.  And I would start with, I think you told us all

25    that you had been with the Oath Keepers since -- in or about
```

1    2012?

2    A.  Correct.

3    Q.  And you became leader in or about July of 2020 after you

4    returned; is that correct?

5    A.  Correct.

6    Q.  And when you became leader in July of 2020, you said there

7    were a handful of people who -- who you saw inside this chat;

8    correct?

9    A.  Correct.

10   Q.  And it's fair to say that Kelly Meggs, along with

11   Ken Harrelson, Alondra Propes, Dennis Koopman were people in

12   that chat; correct?

13   A.  Correct.

14   Q.  And when you say "in that chat," you actually mean that

15   they had emails that were sitting there; is that fair to say?

16   Or contacts?  Or they had sent in information that was kind of

17   sitting in this room?

18   A.  It was linked directly off the Oath Keepers website.  So --

19   so the people in that room were presumed to be members.

20   Q.  And when you were a member back in 2012, did you have that

21   chat room?

22   A.  I don't -- there -- there was a forum of some type.  It was

23   different, but there was a forum of some type, it seems like.

24   But -- but it was different.

25   Q.  To give people a better idea, you were leader in 2020 when

1    you came back in July of 2020 -- excuse me.  You were a leader,

2    really, in the Orlando area; is that fair to say?

3    A.  Not -- not -- it was the state of Florida.

4    Q.  It was the entire state of Florida?

5    A.  For the entire state.

6    Q.  Okay.  And Florida had a few different regions, didn't it?

7    A.  It did.  It did.

8    Q.  And so these different regions all reported back to you;

9    would that be fair to say?

10   A.  It was -- I was the coordinator for the state.

11   Q.  And as coordinator for the state, you actually worked a lot

12   with one team in particular called the Grey Team; is that

13   correct?

14   A.  The Grey Team was part of -- the way we were structured --

15   were structured, there was an administrative group.  Grey Team

16   was our intelligence group that was part of that group.

17   Q.  And members of the Grey Team included Kelly Meggs,

18   Kenneth Harrelson -- excuse me.  Joe Hackett, I should say.

19   A.  I believe so, yes.

20   Q.  And Alondra Propes?

21   A.  I believe so, yes.

22   Q.  Bryan Adamson?

23   A.  Yes, I believe so.

24   Q.  And Dennis Koopman?

25   A.  Yes.

2074

1    Q.  And so you worked -- is it fair to say you worked closely

2    with that group?

3    A.  I did.

4    Q.  And you actually reviewed Mr. Meggs's application to join

5    the organization, which he sent in in September of 2020; is

6    that correct?

7    A.  Correct.

8    Q.  And when he sent you his application, he included a

9    concealed carry permit; is that correct?

10   A.  Correct.

11   Q.  And altogether, within the -- I believe you had said that

12   you hadn't met many of these members in person; is that

13   correct?

14   A.  I -- I didn't say how many, I don't believe.  I -- I have

15   met some in person.

16   Q.  Okay.  And you've met Mr. Meggs; correct?

17   A.  Yes, I did.

18   Q.  Okay.  And you were in several chats with Mr. Meggs; is

19   that correct?

20   A.  That's correct.

21   Q.  And some of those chats would include the Grey Team chat;

22   correct?

23   A.  Correct.

24   Q.  I think you testified about the -- the Oath Keepers hangout

25   chat on direct; correct?

1    A.  Correct.

2    Q.  And that would also include Oath Keepers Florida chat --

3    A.  Yes.

4    Q.  -- vetted?  And what is generally referred to as unvetted;

5    correct?

6    A.  Yeah.  Correct.

7    Q.  And I think you also were in the national leadership chat;

8    right?

9    A.  I believe so, yes.

10   Q.  Old Leadership chat as well?

11   A.  Yes.  There were a lot of chats.

12   Q.  There were a lot of chats.

13        And these chats would have included thousands of

14   messages; correct?

15   A.  Potentially, yes.

16   Q.  Yes.  And -- and it's very fair to say that you remained in

17   those chats -- correct? -- seven, eight chats, through

18   November and December and --

19   A.  Correct.

20   Q.  -- of 2020?

21   A.  Correct.  Uh-huh.

22   Q.  Leading up to January 6th?

23   A.  Correct.

24   Q.  Did you leave any of those chats in January of 2026 -- I'm

25   sorry -- 2020 [sic]?

1    A.  2020?

2    Q.  Yes.

3    A.  I left the entire application somewhere in January.

4    Q.  Okay.  So later you left the chat?

5    A.  Yes.

6    Q.  Seven chats?

7    A.  Yes.  Uh-huh.

8    Q.  Do you know when -- do you know when?

9    A.  It had to be -- it had to be probably -- I'm just guessing

10   here.  It had to be the first -- probably mid-January,

11   something like that.

12   Q.  Were all these chats on Signal?

13   A.  Yes, they were Signal chats.

14   Q.  And isn't it correct that when you leave a Signal chat, it

15   deletes it from your phone?

16   A.  It -- you delete the application from your phone, yes.

17   Q.  Well, I mean, to get -- to leave a chat, it gets deleted?

18   A.  Correct.

19   Q.  So you wouldn't have those chats on your phone today as you

20   sit here today; correct?

21   A.  No.  No.

22   Q.  Okay.  So let's go back a second to when you met Mr. Meggs.

23   A.  Okay.

24   Q.  You first met Mr. Meggs at what time?

25   A.  It was probably -- it was probably August of 2020.  The --

1    some of those initial members in that chat room -- we met down

2    in Southwest Florida to meet each other face to face at a -- we

3    met at a hotel room in -- in -- in Southwest Florida.

4    Q.  Okay.  And when you met, you discussed plans, such as how

5    to do security details at various events; would that be

6    correct?

7    A.  Sure.  Sure.  They were -- yes.  There were different

8    people there with different disciplines, and we had some

9    classes on a couple items, communications being one.

10   Q.  Okay.  I'm sorry.  I didn't mean to step on your answer.

11   Can you say that again.

12   A.  We -- there were people that -- in that small group that --

13   that had different disciplines.  Security and -- and

14   communications I remember being the two.  One was like gear,

15   different types of gear.  And that was what we had discussions

16   about.

17   Q.  Okay.  And your mission at -- also included dealing with

18   community relief matters.  So Florida, obviously, gets hit with

19   hurricanes, and it would be with the effort to help people when

20   it comes to dealing with the aftermath, as we have recently

21   seen, with hurricanes; correct?

22   A.  That's the intent of the development of the organization.

23   Q.  And you were state leader, so --

24   A.  Well, we were in development.  I didn't consider us active.

25   We weren't vetted and trained.

1    Q.  But you were working to get there?  You had classes?

2    A.  Yes, we were.  We absolutely were.

3    Q.  And you helped set up those classes; correct?

4    A.  Yes.

5    Q.  And you also vetted people by reviewing their backgrounds?

6    Like Kelly, you met him in August, but you didn't get his

7    application until September with his concealed carry permit;

8    correct?

9    A.  Uh-huh.  Sure.  Sure.

10   Q.  And you got of those -- for each person, Alondra Propes;

11   for Bryan Adamson; for each of those individuals, Ken

12   Harrelson; you got their driver's license, their --

13   A.  Yes.

14   Q.  -- background checks?

15   A.  Yes.

16   Q.  You also received their concealed carry permits?

17   A.  Yes.

18   Q.  I should say copies of; correct?

19   A.  Sure.  They were -- they were the leadership team.

20   Q.  Okay.  And so with the leadership team, you had weekly

21   meet- -- I think you said weekly meetings on Mondays?

22   A.  We had real-time access through Signal any time we needed

23   to talk, but the -- the weekly meeting was a -- was a chapter

24   meeting for -- for everyone.

25   Q.  Okay.  And you had the -- along with some of the classes,

1    did you go to a meeting that Jeremy Brown had put on, who also

2    is in Florida --

3    A.  Uh-huh.

4    Q.  -- on unconventional warfare?  Do you recall that?

5    A.  I do.  I do.

6    Q.  And during the -- can you tell us what conventional warfare

7    means?

8    A.  Conventional -- con- -- it is my understanding conventional

9    warfare is the -- an army going up against an army.

10   Q.  It's kinetic; correct?

11   A.  It was kinetic; correct.

12   Q.  Would it be fair to say we're talking about kinetic --

13   A.  Correct.

14   Q.  -- physical contact and violence; correct?

15   A.  Correct.  Uh-huh.

16   Q.  Unconventional warfare and the presentation at

17   Jeremy Brown's, do you recall when that was?

18   A.  Timing, I'm thinking probably late October, something like

19   that, maybe.  Maybe -- maybe it was later.  Maybe it was after.

20   Maybe it was November.  I don't recall exactly when that

21   occurred.

22   Q.  Okay.  But you do recall that at the presentation, it would

23   be fair to say that he was not talking about utilizing

24   unconventional warfare but, instead, did a presentation on what

25   it means; is that --

1    A.  That's -- that's correct.

2    Q.  And he, instead, explained how he believed certain actors

3    in the United States had done it through using media or

4    education or other means --

5    A.  Yes.

6    Q.  -- but -- would that be fair to say?

7    A.  Yes.

8    Q.  And in no way did it include anything kinetic; would that

9    be fair to say?

10   A.  That would be fair to say.

11   Q.  And that presentation -- Kelly Meggs was there; correct?

12   A.  Yes.

13   Q.  Was anybody else there from this group?  Was Ken Harrelson

14   there?

15   A.  I believe Kenny was there.  Kenny was there.  Kenny

16   Harrelson was there.

17   Q.  And after that you would have set up the GoToMeeting on or

18   about November 9th; correct?

19   A.  Probably so.  Every Monday.

20   Q.  Well, you had the GoToMeetings every Monday?

21   A.  Routinely, yes.  Uh-huh.

22   Q.  But when you had a leadership call or, like, a national

23   call, did that also include GoToMeeting?

24   A.  Yes.  Yes.

25   Q.  And I think you earlier testified that you coordinated the

1    November 9th GoToMeeting call.

2    A.  Yes.

3    Q.  Did you stay on the whole call?

4    A.  I probably did.  I -- I -- I sponsored the call.  I held --

5    and it was my -- it was my membership that was holding the

6    call.  So I was there beginning to end.

7    Q.  Okay.  And -- and after the November 9th call, came the

8    Million MAGA March, I believe, in D.C. on or about

9    November 14th?

10   A.  Yes.  Uh-huh.

11   Q.  And so is it fair to say the call was in preparation of the

12   MAGA March on November 14th?

13   A.  It was.  That was the purpose of the call.

14   Q.  Were you at the MAGA March in D.C.?

15   A.  I was not, no.

16   Q.  I think you said no; right?

17        But you had Florida members who went to D.C. for that

18   MAGA March; correct?

19   A.  Yes.  Yes.

20   Q.  And it's your understanding that there were no security

21   incidents after [sic] the November 14th MAGA March?

22   A.  Not that I'm aware of.

23   Q.  And nobody brought it to your attention; correct?

24   A.  No.

25   Q.  And you're a leader of Florida.  So had there been any kind

1    of issue in Washington, D.C., with any of your Florida

2    Oath Keepers, that's probably something you would know about?

3    A.  Absolutely.  Uh-huh.

4    Q.  So after the November 9th call, we get to events in --

5    well, there was also a Louisville, Kentucky, event; correct?

6    A.  Yes.  Uh-huh.

7    Q.  And did you attend that event?

8    A.  I did not.

9    Q.  And that event was about giving protection to secur- -- to

10   speakers?  Excuse me.  Would that be fair to say?

11   A.  Louisville, Kentucky?

12   Q.  Yeah.

13   A.  I believe that was property.  There may have been people.

14   I was aware of property that was protected.

15   Q.  Okay.  So property and maybe people?

16   A.  Maybe, uh-huh.

17   Q.  And -- but you didn't go with the --

18   A.  I did not.

19   Q.  But you do know that Kelly Meggs went; correct?

20   A.  Yes, uh-huh.

21   Q.  And after Kelly Meggs went, again, you understood

22   everything went well and there were no incidents; would that be

23   fair to say?

24   A.  Yes.  Uh-huh.

25   Q.  And do you know if Ken Harrelson was there?

2083

1    A.  I believe he was, yes.

2    Q.  And you didn't hear anything wrong.  But, rather,

3    everything would have gone well; would that be correct?

4    A.  That's correct.

5    Q.  And after the November MAGA Million [sic] March, were there

6    any events in December?

7    A.  You're talking about in D.C. or -- or --

8    Q.  Well, or Florida.  Because you're a Florida leader.  So I

9    believe there were events in Florida; correct?

10   A.  In Florida events?  The only -- the -- as far as Oath

11   Keeper-related events, there was a -- at least -- I think there

12   were two Roger Stone security details.

13   Q.  And the two Roger Stone security details, did Kelly Meggs

14   participate?

15   A.  It's my understanding he did.

16   Q.  Would you have heard -- well, you would you have gotten any

17   information as to who was doing the Roger Stone detail;

18   correct?

19   A.  Not necessarily.  Unless I saw it in the chat or something.

20   I was aware of a couple people involved, but I wasn't sure of

21   the entire detail.  There were -- at that point in time, there

22   was enough people in the organization, there were more people I

23   didn't know than I knew.

24   Q.  Okay.  But you're on a weekly call-- correct? -- with Kelly

25   Meggs and Ken Harr- -- or, rather, Joe Hackett?

1    A.    We -- we were in constant communication.

2    Q.    Constant communication.

3          So if Kelly Meggs had a problem --

4    A.    I was probably --

5    Q.    -- you would have known?

6    A.    I would probably know about it; correct.

7                THE COURT:    Can I just ask you-all to be mindful of

8    not talking over one another.    Our court reporter --

9                THE WITNESS:    I'm sorry.

10               THE COURT:    -- has difficulty when that happens.

11               MS. HALLER:    I'm sorry, Your Honor.

12               THE COURT:    That's okay.

13               MS. HALLER:    I'm from New Jersey.    It's a bad habit.

14   BY MS. HALLER:

15   Q.    So can you also tell us about the Roger Stone details.    Can

16   you describe for the jury a little bit what that means.

17   A.    That would be a personal security detail providing -- it

18   would be considered a dignitary of some type, and you're

19   providing security from -- either at an event or from one place

20   to the other, is what that would be.

21   Q.    Okay.    And did -- do you know if Mr. Stone communicated

22   directly with Mr. Meggs?

23   A.    I don't know that for sure.    I would assume there would be

24   some type of communication.

25   Q.    And then as far as Mr. Stone goes, did he ask for services

1    again, for security services, after the two events in Florida?

2    A.  I know there was another detail, but I wasn't involved

3    in -- in setting that up.  So I'm not -- I'm not sure of all

4    the details of it.

5    Q.  Okay.  And when it came to -- I think you testified that --

6    well, bear with me one second.

7        So I think you spoke earlier with counsel about the

8    letters from Stewart Rhodes --

9    A.  Correct.

10   Q.  -- that became -- and then you stepped down on or about

11   December 23rd; is that correct?

12   A.  Correct.

13   Q.  Okay.  So on December 23rd, did you text Kelly Meggs and

14   let him know that you were going to step down from leadership

15   in Florida?

16   A.  I believe the -- the leader -- what I considered my

17   leadership team, I actually sent them an email.

18   Q.  Okay.  And then do you recall that you texted with Stewart

19   about --

20   A.  Correct.

21   Q.  -- about leaving the organization?

22   A.  Uh-huh.  And -- and in -- and in the -- hindsight, from

23   what we discussed earlier, I sent the email to my group, and

24   presumably Mr. Meggs was in contact with Mr. Rhodes, and

25   Mr. Rhodes texted me.

```
1    Q.  Okay.
2              MS. HALLER:  And I'm going to mark as KM.04, a copy
3    of the text message with Stewart, which I'm going to hand the
4    witness, Your Honor.
5              THE COURT:  Okay.  Did you say KM.04?
6              MS. HALLER:  I believe so.
7              THE COURT:  We're on 4?
8              THE COURTROOM DEPUTY:  I have 4.
9              THE COURT:  I know.  I thought -- is this a new doc?
10             THE COURTROOM DEPUTY:  I don't have 4 as admitted.  I
11   have 1, 2, and 3.
12             THE COURT:  Okay.
13   BY MS. HALLER:
14   Q.  Do you recognize those text messages?  It -- it's a few
15   pages.  It starts with the message dated 9/29/2020.
16   A.  Right.
17   Q.  And then you'll see other messages with -- starting with
18   12/16/2020.  And then you'll see -- these are -- I should
19   clarify for the record.  These are text messages between you
20   and Stewart Rhodes; correct?
21   A.  Correct.
22   Q.  And that's your phone number at the top, which we'll just
23   say ends with the digits 98; would that be correct?
24   A.  Correct.  Correct.
25   Q.  And then an email from Mr. Rhodes?
```

2087

1    A.  Uh-huh.  Is that further back?

2    Q.  That's the first page.

3            THE COURT:  If I can interrupt.  Is there any

4    objection to this document?

5            MS. RAKOCZY:  No objection, Your Honor.

6            MS. HALLER:  Thank you, Your Honor.  And we would

7    move it in.

8            THE COURT:  Why don't you just go ahead and publish

9    it and show him what you want to show him.

10           (Defendant Meggs Exhibit KM.04 admitted into

11   evidence.)

12   BY MS. HALLER:

13   Q.  Okay.  So -- I think I need to make it a little smaller.

14           This is the first page, and it's got a phone number at

15   the top, which we don't need to -- I should redact those

16   quickly.

17           And then we go to the next page, and there's a text

18   message from December 16th, 2020, and it's got Mr. Rhodes and,

19   again, you; correct?

20   A.  Correct.

21   Q.  And so you're in communication with Mr. Rhodes about these

22   events.  So we fast-forward to 12/23 -- well, above you have

23   the 12/16, but then here we're -- we're at 12/23?

24   A.  Correct.

25   Q.  And this is the message where he reaches down to you and

1    says, "Mike, Kelly says you are thinking of stepping down from

2    leadership.  What's up?"  Is that correct?

3    A.  Correct.

4    Q.  Okay.  And then we have your response.  And it's sent at

5    about -- well, it's read at about 4 o'clock on 12/23.  But you

6    say, "Stewart, sorry I got tied up at work.  My decision is

7    based on several factors."  Correct?

8    A.  Correct.

9    Q.  And those several factors include:  "our organizational

10   posture as a militia group.  I find problematic.  It's not a

11   match for my ideology.  I'm more geared to networking and

12   training, like the CPT model."  Correct?

13   A.  Correct.

14   Q.  "I realize [you] are [a] very busy man, but some of the

15   internal problems really brother me [like] member rosters and

16   member verification."  Correct?

17   A.  Correct.

18   Q.  "My biggest concern is the unchained rhetoric flying around

19   our chats.  Members are very vocal about sensitive subject

20   matter, poor opsec and completely inappropriate conversations

21   that could be turned on us.  My employment requires 3 State

22   Licenses and I'm subject to suspension based on behavior they

23   deem questionable."  Correct?

24   A.  Correct.

25   Q.  And then you said -- I'm going skip the sentence.  "I'm a

1    proud life time member and will be in the back."

2    A.  Okay.

3    Q.  So when you say "I'm a proud life time member," you're

4    speaking to the fact that you had a lifetime membership with

5    the Oath Keepers as opposed to a yearly or lesser than that?

6    A.  Correct.

7    Q.  And when you say you're going to remain in the back or will

8    be in the back, that means that you're not actually totally

9    leaving; you're stepping down from leadership.  Would that be

10   fair to say?

11   A.  That would be fair to say.

12   Q.  And you explain your work obligations -- that you have this

13   serious project that you're working on that's a

14   seven-day-a-week overwatch and that your employ- -- the man you

15   work with -- your relief, as you call him -- is on a

16   ventilator; correct?

17   A.  Uh-huh.

18   Q.  And so you say, "The Chapter has some great guys"?

19   A.  Uh-huh.

20   Q.  And "they can handle it"?

21   A.  Yes.

22   Q.  Correct?

23   A.  Yes.

24   Q.  "And I'll be watching"?

25   A.  Yes.

2090

1    Q.  So you're saying I'm not leaving for good, I'll be

2    watching, I'll be around.

3    A.  Sure.

4    Q.  Would that be correct?

5    A.  Sure.

6    Q.  And you also don't say just good guys.  You say great guys;

7    correct?

8    A.  Yes.

9    Q.  And that relates to your team that you work with on a

10   weekly basis; correct?  And that would include Kelly Meggs?

11   A.  That was the whole chapter, but definitely including those

12   people.

13   Q.  Okay.  And Alondra Propes and --

14   A.  Yes.

15   Q.  -- and Joe Hackett and Ken Harrelson and Bryan Adamson --

16   A.  I like all those people.

17   Q.  -- and Dennis Koopman?

18   A.  Absolutely.

19   Q.  Thank you, sir.

20        And then the text messages go on.  So down here, "No

21   sweat brother.  I understand," from Mr. Rhodes; correct?

22   A.  Correct.

23   Q.  And then he goes on to request that you set up a

24   GoToMeeting for him?

25   A.  Uh-huh.

1    Q.  And -- and you say, "I use GoToMeeting, I have an account."

2    And then he asks you down here, "Can you set up a call for

3    tonight?"  Right?

4    A.  Yes.

5    Q.  So after you let him know that you're stepping down, you

6    help him and you set up a conference call for that night.  And

7    then the next few texts are "Roger that."  On 12/23, "Roger

8    that."  And then "Can you post it on the National intel chat?"

9         Now, that's a chat you're still a member of at that

10   time; correct?

11   A.  Sure.  Correct.

12   Q.  And you post the GoToMeeting inside the national intel

13   chat; correct?

14   A.  Correct.

15   Q.  And you say, "Will do" -- or Stewart says -- no, that's

16   from you.

17        And then "Please don't . . . access info in grey team."

18   And that's from Mr. Rhodes; correct?

19   A.  "Please don't post access info into grey team."  Correct.

20   Q.  So he didn't want this call posted in the national -- in

21   the Grey Team chat?

22   A.  That is correct.

23   Q.  He wanted this posted -- this call posted in the national

24   leader -- national leadership chat?

25   A.  Correct.

1    Q.  "Only on national intel chat."  Excuse me.

2         And then you say, "Roger that, national Intel only."

3    A.  Uh-huh.

4    Q.  And then you asked for clarification on the chat.  And he

5    says, "Yes.  [The] Old one."  The old national intel chat.

6    "Yes.  [The] Old one."

7         Okay.  He says, "I . . . need to create a new one."

8    A.  Uh-huh.

9    Q.  Trying to move through these kind of fast, so.

10        And then you say, "Roger that we're here waiting.  got

11   your msg.

12        "Kelly Florida is bugging me on access, is he a no go?"

13   That's your question to Mr. Rhodes?

14   A.  Correct.

15   Q.  And you -- and he responds, "Kelly Meggs is good to go.

16   Give him access code."

17   A.  Correct.

18   Q.  So he participates in this meeting?

19   A.  Uh-huh.

20   Q.  And this is now on December 23rd; correct?

21   A.  If that's the date there.

22   Q.  Yes.

23   A.  That's correct.

24   Q.  And at the end he asks you to pass on his request that

25   members read the letter he posted on the Oath Keepers website;

2093

```
1    is that correct?
2    A.  Correct.
3    Q.  And then he sends a link to the letter; correct?
4    A.  Correct.
5    Q.  And then he says, "Thanks brother."  Correct?
6    A.  Uh-huh.  Correct.
7    Q.  Okay.  And when -- when he sent that link to the letter, it
8    was a public link; correct?  Meaning it was a public -- the
9    letter was published publicly.
10   A.  On the organizational website; correct.
11   Q.  Right.  But as -- the website's public?
12   A.  Yes, public.
13   Q.  Yep.  So -- and he -- he did fundraising on that website;
14   correct?
15   A.  I believe so.  Correct.  Uh-huh.
16   Q.  And he did fundraising in the first December letter; would
17   that be fair to say?  His Part I of this letter?
18   A.  I don't recall directly, but that was common.  That was
19   probably so.  I don't recall directly.
20   Q.  Okay.  So it would be fair to conclude that Mr. Rhodes
21   would have put these letters on the website for fundraising?
22   A.  Uh-huh.  Sure.  I -- I agree with that.
23   Q.  Okay.  So just to make it easy, I will show you -- I'm
24   going to mark this as KM.05.  I'm going to hand the witness
25   KM- -- well, it is a copy of the letter I'm talking about,
```

1    which is December 14th for the republic, Stewart Rhodes, and

2    I'm going to say -- excuse the copy.

3    A.  Okay.

4    Q.  Okay.  So in this letter that I've handed you -- do you

5    recognize this letter?

6    A.  I -- I do recognize the letter.

7            THE COURT:  Hang on a second.

8        Is there any objection to publishing the letter?

9            MS. RAKOCZY:  No, Your Honor.  Thank you.

10   BY MS. HALLER:

11   Q.  And in this letter -- the letter is dated December 14th;

12   would that be fair to say?

13   A.  Yes.

14   Q.  And it's signed by Mr. Rhodes; would that be fair to say?

15   A.  Yes.

16   Q.  And at the bottom of the letter, you'll see fundraising?

17   A.  Correct.

18   Q.  And you'll see that this is actually posted on a public

19   website; correct?

20   A.  Correct.

21   Q.  And then I think -- and then the link that was in your text

22   message that he sent you also shows that the letter was on the

23   website, I think you said; correct?

24   A.  Correct.

25   Q.  The Part II letter, I should say?

1    A.  It was on their website; correct.

2    Q.  Yes.

3         So Christmas -- well, you stepped down on December 23rd.

4    Was that your last interaction with the Oath Keepers at that

5    time?

6    A.  I'm not going to say it's the last interaction.  I -- when

7    I -- when I stepped down, I was -- I was -- I was a lifetime

8    member.  I'd paid for a lifetime membership.  So I was not

9    going to pretend like I was not a member.  I was a lifetime

10   member, whatever that means.

11        And I had offered the group my -- my GoToMeeting has

12   a -- it was a paid membership, but it also has a guest access.

13   I gave the -- I gave the leadership team access just because

14   they were starting some training, and I was giving them

15   access -- at least temporary access until they could develop

16   whatever system they wanted to utilize.

17   Q.  So you stayed in communication and gave them your --

18   A.  Yes.

19   Q.  -- access to the account so they could continue their

20   work --

21   A.  Yes.

22   Q.  -- correct?

23   A.  Yes.

24   Q.  And you said you left it with your leaders -- I think you

25   said the word plurally, leaders -- after you stepped down, that

1    the -- there would be multiple leaders of --

2    A.  The -- the -- well, the leadership group, they would have

3    to determine who was going to assume my position.

4    Q.  Okay.  So when you stepped down on December 23rd, you did

5    not know at that time who would become leader or --

6    A.  I did not.

7    Q.  -- or you were leaving it to them to decide?

8    A.  It was their decision.

9    Q.  And when you say "their decision," you're talking about the

10   core group or the larger group?

11   A.  The -- the leadership group.  And it would be their

12   determination how they wanted to go about that process.

13   Q.  Okay.

14   A.  When I -- when I assumed that position, there was a small

15   handful of people.  Now we had -- getting closer to a hundred

16   people.  And it would be the leadership group's decision how

17   they wanted to go through that process.

18   Q.  Okay.  And as far as the organization goes, it's fair to

19   say that earlier you told the government that you sent the

20   Part II letter to the government; would that be correct?

21   A.  I -- I showed that to them; correct.

22   Q.  And other than that, you haven't heard or observed any

23   threats of violence or anything illegal in preparation of

24   January 6th, as far as you knew?

25   A.  As far as I knew; correct.

2097

1  Q.  And if you knew of anything, you would have told the

2  government, I assume?

3  A.  Certainly.

4  Q.  And you stayed with the organization to help them access

5  your GoTo account, and you remained with the chats.  So when

6  you say that you had not heard or observed of any threats of

7  violence or other illegal activity surrounding the events of

8  January 6th, that would include all the time leading up to it;

9  correct?

10 A.  Correct.  And I just want to clarify that them accessing

11 that guest account took no effort on my part.  I didn't have to

12 be involved in that.  They had access.  They could log in and

13 do their thing.  But correct, I had -- I had no knowledge of

14 any specific violent act that was -- that was being planned to

15 be committed.

16 Q.  And that would include Jeremy Brown's presentation on

17 unconventional warfare; right?

18 A.  As I understood it; correct.

19 Q.  And that would include all the chats that you were in and,

20 you know, including the seven chats we discussed?

21 A.  Correct.

22 Q.  Would that be fair to say?

23 A.  Correct.

24 Q.  And that would include your weekly GoToMeetings that you

25 had with your Florida members; correct?

```
 1    A.  Correct.
 2              MS. HALLER:  I have no more questions at this time,
 3    Your Honor.
 4          Thank you.
 5              THE COURT:  All right.  Thank you, Ms. Haller.
 6              THE WITNESS:  Thank you.
 7              THE COURT:  Mr. Bright, Mr. Linder, on behalf of
 8    Mr. Rhodes?
 9              MR. LINDER:  No, sir.
10              THE COURT:  On behalf of Mr. Harrelson?
11              MR. GEYER:  No questions.  Thank you.
12              THE COURT:  Mr. Crisp?
13              MR. CRISP:  Yes, Your Honor.  Thank you.
14                        CROSS-EXAMINATION
15    BY MR. CRISP:
16    Q.  Good afternoon, sir.
17    A.  Good afternoon.
18    Q.  As the judge said, my name is Jonathan Crisp, and I
19    represent Jessica Watkins.
20    A.  Okay.
21    Q.  So you know her?
22    A.  I know of her.
23    Q.  You've spoken with her --
24    A.  Yes.
25    Q.  -- on the phone?
```

```
1    A.  Yes.
2    Q.  Okay.  And, in fact, in the late-November time frame, you
3    remember she reached out to you via text message about concerns
4    she had?
5    A.  Oh, yes.  Yes, absolutely.
6    Q.  Okay.  Then the concerns pertained to one of your --
7    ostensibly one of the Florida members having made violent
8    statements, violent threats or statements?
9    A.  Was it in the chat, in reference to the chat or --
10   Q.  The reason she wanted to reach out to you -- do you
11   remember she wanted to discuss with you concerns she had about
12   an individual, who had made cutting --
13   A.  I -- I --
14   Q.  -- off the head of a snake or something?
15   A.  -- remember something like that, being involved with the
16   chat.  Somewhere in the chat, if I remember correctly.
17   Q.  Okay.  And to your understanding, her concern was can you
18   address this with this individual because that -- that
19   concerned her?
20   A.  Uh-huh.
21   Q.  Is that correct?
22   A.  That's correct.  But I don't recall the specifics of who it
23   was or what my actions were.
24   Q.  And that's fine.  What I'm getting more towards is the idea
25   that she was expressing concern to you about one of the alleged
```

1    Florida people making violent statements?

2    A.  Right.

3    Q.  And that was concerning to her?

4    A.  Correct.

5    Q.  And she wanted you to address that?

6    A.  I would have to know was it in the organizational chat or

7    was it in -- was it in my Signal chat?  In my Signal chat, I

8    can take the person out.  In the organizational chat, there's

9    nothing I can do about it.

10   Q.  Okay.  Do you remember ever pulling somebody out and

11   saying, hey, don't make statements that's of a violent nature?

12   A.  I -- I, on more than one occasion, blocked someone from

13   access.

14   Q.  Okay.  Thank you very much, sir.

15              MR. CRISP:  No further questions.

16              THE WITNESS:  Okay.

17              THE COURT:  Mr. Fischer?

18              MR. FISCHER:  No cross.

19              THE COURT:  Ms. Rakoczy, any redirect?

20              MS. RAKOCZY:  Just briefly, Your Honor.

21                        REDIRECT EXAMINATION

22   BY MS. RAKOCZY:

23   Q.  Good afternoon, Mr. Adams.

24   A.  Good afternoon.

25   Q.  Mr. Adams, you were asked some questions by Ms. Haller

1    about an unconventional warfare training that was held for your

2    chapter.

3    A.   Correct.

4    Q.   Who organized that training?

5    A.   The -- the -- there was a member that -- that came into the

6    organization named Jeremy Brown.

7    Q.   Okay.

8    A.   And -- from Southwest Florida, the Tampa area, and he was a

9    retired Army Special Forces, Green Beret, and he -- he was --

10   he gave the presentation at -- at the meeting.

11   Q.   Okay.  And you said he was retired Special Forces from the

12   Army?

13   A.   Correct.

14   Q.   He offered to host this training; is that right?

15           MS. HALLER:  Objection.  Form.

16   BY MS. RAKOCZY:

17   Q.   I just -- I was trying to listen to -- I forgot what you

18   said.  Did you -- how did the meeting come to be arranged?

19   A.   Well, he had -- he had joined the organization, and he came

20   through the same way everyone else does.  And that section of

21   the group was probably large -- that -- that area of the state

22   probably had more members than anywhere else, and they were

23   starting to interact with one another.  And a member of the

24   leadership team reached out that we should have a leadership

25   group.  This person has interesting things to say.  We should

1    have a meeting with the person.  The person was requesting a

2    meeting with the leadership group.

3    Q.  Do you remember who from the leadership group reached out

4    to say that Mr. Brown was offering this training?

5    A.  I think specifically it was Dennis Koopman.

6    Q.  Okay.  Do you remember where the meeting was held?

7    A.  It was somewhere north of Tampa.  I couldn't tell you the

8    name of the town it was.  Mr. -- Mr. -- the -- the gentleman

9    had -- had a -- had some property right there.  I don't know if

10   I remember right.  Yes.  So right there in that area, he had

11   some property there.  Jeremy Brown did or his family did.

12   Q.  And how were you instructed to find the location where the

13   meeting was?

14   A.  Well, initially -- initially we were going to have to go

15   through, I guess, something that they do in special operations,

16   where we -- we were going -- I don't know what you call it.

17   But we were going to have to come in in kind of a secret way.

18   We were going to have to come into a service station.  And you

19   had to do things -- you had to look for signals and give

20   signals.  And -- and it was kind of a top secret way of getting

21   you to the meeting.  I thought it was overboard, over the top,

22   but I was -- I have to admit, I was interested in what was

23   going on.  I wanted to see it --

24   Q.  So before --

25   A.  -- but that did not happen.

1    Q.  Okay.  But, originally, before being offered an opportunity

2    to hear this presentation, Mr. Brown was suggesting that you'd

3    have to go to a gas station and give and receive special secret

4    signals?

5              MS. HALLER:  Objection.  Form.  Leading.

6              THE COURT:  It's okay.  It's overruled.

7    A.  Yes.  I'm sorry.  You were saying?

8    BY MS. RAKOCZY:

9    Q.  I guess I'm just trying to understand that there were --

10   can you explain again the special hand signals you had to give.

11   A.  Initially, the meeting was going to occur on private

12   property, and that's how we were going to get into the

13   property.  We would be brought in one at a time.  Okay?  The

14   special operations thing.  And then at the last minute, that

15   got canceled because the property, apparently, was not

16   available.  It was family property.  And we moved it to a motel

17   meeting room.

18   Q.  Okay.  And you were asked some questions by Ms. Haller

19   about the difference between conventional warfare and

20   unconventional warfare.  Do you remember that?

21   A.  Yes.

22   Q.  Okay.  But what Mr. Brown was offering was a training on

23   unconventional warfare?

24   A.  Unconventional warfare.

25   Q.  Okay.  And -- all right.  I have no further questions on

1     that.  Let me move on to a different topic.

2          You were asked some questions by Ms. Haller about an

3     operation that the Oath Keepers participated in in Louisville,

4     Kentucky.

5     A.   Louisville, Kentucky.

6     Q.   Do you remember when that was?

7     A.   It was in September.  I remember it was around the

8     Breonna Taylor case, whatever time frame that was.  It was --

9     it was in September, if I recall.

10    Q.   Okay.  And do you recall from the discussions that you were

11    part of why it was that the Oath Keepers decided to go to

12    Louisville after something happened in the case you referred to

13    as the Breonna Taylor case?

14    A.   The -- there was -- as I understood it, there was the

15    threat of protesters.  There was a lot of protester activity in

16    Louisville, and there was the threat of harm to people and

17    property there, and that was the purpose of the organization

18    going, is to protect people and property.

19    Q.   Do you know who or if the Oath Keepers were asked to go?

20    A.   I don't have direct knowledge of -- of anyone reaching out

21    to us.  I -- I do know that there were people there that talked

22    to our people on the ground about that protection.

23    Q.   Did one of your members go out early to find places for the

24    Oath Keepers to go?

25    A.   I know I -- we had one -- one person that was on the ground

1    that was there for personal business and was doing some -- what

2    we would call reconnaissance work.

3    Q.   Okay.  Is that Mr. Koopman?

4    A.   Yes, uh-huh.

5    Q.   And did -- based on your understanding, did members of your

6    Oath Keepers group participate in -- in something with a gas

7    station?

8    A.   Yes.  There was a gas station that -- my understanding is

9    it was threatened to be burned down in the protest, and they

10   were protecting that gas station.

11   Q.   Okay.  Do you understand whether the person at that gas

12   station asked for the Oath Keepers to come or whether the

13   Oath Keepers offered their services?

14   A.   I'm not sure -- I'm not a hundred percent sure exactly how

15   that occurred.  I -- I don't know if we approached them or they

16   approached us.

17   Q.   You were asked some questions about a security detail work

18   that some Oath Keepers did for Roger Stone.

19   A.   Correct.

20   Q.   That was in December of 2020; is that right?

21   A.   Yes, I believe so.

22   Q.   Okay.  Are you trained to offer security services?

23   A.   I'm not.

24   Q.   Were any of the other members in your Florida group trained

25   to provide security services?

1    A.  Not that I was aware of.

2    Q.  After you left the Oath Keepers, do you know who became the

3    state leader after you, from Florida?

4    A.  My understanding is that it was Kelly Meggs.

5    Q.  Ms. Haller showed you what's been marked as Government's

6    Exhibit -- or Defense Exhibit KM.05, the first open letter that

7    Mr. Rhodes sent to President Trump.  Do you remember looking at

8    that?

9    A.  Yes.

10   Q.  Do you still have it up there with you?

11   A.  Yes.

12        MS. RAKOCZY:  Okay.  Court's indulgence.

13        Could I have the ability to use the ELMO, please.

14        THE COURTROOM DEPUTY:  Oh, sure.

15   BY MS. RAKOCZY:

16   Q.  Okay.  This is something that you saw on the Oath Keepers

17   website back around December of 2020?  Is this something that

18   you saw on the Oath Keepers website around December of 2020?

19   A.  Correct.

20   Q.  And the beginning of this looks like it's a news article of

21   some kind.  Is that basically what it looks like to you too?

22   A.  Yes.  Uh-huh.

23   Q.  The beginning of the news article discusses Mr. Rhodes

24   speaking at something.  Do you remember Mr. Rhodes speaking at

25   events around December 13th of 2020?

1   A.  I know -- I know he probably was -- is it made reference to

2   here?

3   Q.  The first paragraph says that, "Stewart Rhodes is the

4   founder of the Oath Keepers, a non-partisan group of former

5   military, police, and first responders" --

6   A.  -- "who . . . helped with security" --

7              THE COURT REPORTER:  Hold on.  Hold on.

8              THE WITNESS:  I'm sorry.

9   BY MS. RAKOCZY:

10  Q.  -- "who on Saturday helped with security detail in

11  Washington for . . ." General Michael Flynn -- "Lt. General

12  Michael Flynn and others at a large rally supporting the

13  President Donald Trump.  Rhodes was one of the speakers

14  himself."

15  A.  Uh-huh.  Uh-huh.

16  Q.  Do you remember hearing about the Oath Keepers coming in

17  December to D.C.?

18  A.  I don't recall.  I -- I recall the large MAGA event, but I

19  don't recall -- I read that.  So, obviously, it was there.

20  It's just not registering.

21  Q.  Okay.  If we could focus on the last three paragraphs of

22  this article.  It quotes Mr. Rhodes as saying, "President Trump

23  has to use what the founders gave him.  He is the president.

24  He's the Commander in Chief.  And in their wisdom, they gave

25  him all the tools he needs right there in the Constitution

1    itself.  And he has a duty to do it, he must do it now.

2            "If the president doesn't, it's in the people's hands,

3    Rhodes said, adding that people like him will end up fighting

4    against an illegitimate government."

5            Are words like that some of the words that contributed

6    to your decision to leave the Oath Keepers or to leave your

7    leadership position in the Oath Keepers?

8    A.  Correct.  It did.

9    Q.  And what follows in this defense exhibit is the actual open

10   letter that Mr. Rhodes wrote -- is that right? -- the exhibit

11   that's in front of you?  Did you also provide a copy of this

12   first open letter to --

13   A.  There's --

14   Q.  -- the FBI?

15   A.  There's nothing here.

16   Q.  Oh, I'm sorry.  I'm not putting up anything on the screen.

17   Just what's in front of you.

18   A.  Oh, okay.  Okay.  Gotcha.

19   Q.  Page 2, it looks like there's a document that's titled Open

20   Letter to the President.

21   A.  Okay.  Gotcha.  And the question on that?  I'm sorry.

22   Q.  Did you provide a copy of this first open letter to the FBI

23   when you met with them?

24   A.  I don't recall the first.  I know the second one.

25   Q.  Okay.

1    A.   I highlighted that -- that paragraph.

2    Q.   I won't ask you any more questions about that then.

3         After you did leave your leadership position, Ms. Haller

4    asked you whether you stayed in some of the chats.  Did you

5    stay in some of the chats?

6    A.   For a temporary period of time.

7    Q.   Okay.  Were you following the chats in that late December,

8    early January period?

9    A.   I -- I -- I do -- somewhat.  I did not have access to

10   the -- the chat for the group that was in D.C.  So I was not

11   aware of what they were talking about.

12   Q.   Could you explain what you mean by that.

13   A.   Well, it was a -- a specific operation would have a chat

14   dedicated to that operation, and I was not involved in that.

15   Q.   Do you know whether the Florida group had a chat for the

16   January 6th D.C. operation?

17   A.   It -- it -- I don't.  If it was, I was not a part of that.

18   I -- I suspect not.  That would have been an organizational

19   chat for -- for that group of people that -- that went to

20   Washington.

21   Q.   Okay.  But you were not a part of any such chat?

22   A.   I was not.

23   Q.   Okay.

24        MS. RAKOCZY:  I have no further questions.  Thank

25   you.

1          THE COURT:  Okay, sir.  Thank you very much for your

2     time and your testimony.  You can step down, Mr. Adams, and

3     safe travels home.

4          THE WITNESS:  Thank you.

5          (Witness excused.)

6          THE COURT:  Mr. Nestler, I take it your next witness

7     won't be done in 15 minutes.

8          MR. NESTLER:  I'd say 20, but -- it'll be quick.  But

9     I'm happy to start, or I'm happy to wait until tomorrow.

10          THE COURT:  We'll start tomorrow and we'll -- so we

11     don't break up the testimony.

12          MR. NESTLER:  Yes, Your Honor.

13          THE COURT:  All right.  Ladies and gentlemen, we will

14     break for the day.  I look forward to seeing you tomorrow.

15     Just a reminder, again, tomorrow we begin at 9:30 as usual, but

16     tomorrow is only a half day.  So we will end right about lunch

17     time, and then you've got a three-day weekend in front of you.

18          So thank you, all, very much.  Have a wonderful evening.

19     We will see you tomorrow.

20          (Proceedings held outside the presence of the jury.)

21          THE COURT:  Okay.  Have a seat, everyone.

22          So just to touch on the matter that you raised about

23     Mr. Moseley, Mr. Nestler.  I -- we received a communication

24     from him through Mr. Douyon, and I can -- we'll provide copies

25     to everybody, but it suggests that the memo he is seeking -- or

1    may -- or is potentially going to disclose is already something

2    that is in the public record and perhaps something that was

3    released by the January 6th commission and, as a consequence,

4    may no longer be subject to the protective order.

5          Have you had an opportunity to look into that and

6    determine whether that's accurate or not?

7          MR. NESTLER:  I don't believe the document that he

8    intends to release has been publicly released by the government

9    or the January 6th committee.  It's an FBI 302 from an

10   interview of Capitol Police Officer Harry Dunn.

11         THE COURT:  Right.  That's what the document is,

12   and -- okay.  All right.  So, to your knowledge, it has not

13   been made public; is that right?

14         MR. NESTLER:  Not the document, Your Honor.  I don't

15   see how the January 6th --

16         THE COURT:  Right.

17         MR. NESTLER:  I don't see how the select committee

18   would have access to an FBI 302, and it's not our practice to

19   release FBI 302s.

20         THE COURT:  Right.  Okay.  All right.

21         Okay.  On the topic of the privilege, I don't know

22   whether we've gotten any further -- whether you-all have moved

23   the ball forward on that, Mr. Woodward or Mr. Linder.

24         MR. LINDER:  Yes and no.

25         MR. WOODWARD:  I've gotten relieved of my duties

1    based on a standing argument.

2              MR. LINDER:  Your Honor, we -- on Friday night we got

3    the text message that I showed you the other day from their

4    team that was a possible attorney-client-privileged matter.

5              THE COURT:  Oh, right.  Yes.

6              MR. LINDER:  Going back to that.

7         So we had our expert -- he was in the courtroom earlier.

8    He's been here for a few days and was able to go in last night.

9    What we have is we have Stewart Rhodes's raw downloaded phone

10   and we have Kellye SoRelle's scoped version of the phone.  We

11   don't have a raw download of that.

12        He was able to go through and -- with a -- a Word

13   document that their filter sent us, they had identified

14   246 Signal and -- combination Signal and native text messages

15   as -- in this list.  So he went through to try to find them and

16   found more than half, but not all.  He's going to continue

17   searching that.

18        I would ask the Court to give us until the -- Tuesday

19   morning.

20             THE COURT:  So just to understand what you're saying,

21   Mr. Linder, you, essentially, were trying to find that text

22   message --

23             MR. LINDER:  We found that text message, but there's

24   others that they identified that were potentially privileged.

25             THE COURT:  Oh, I see.  I've only seen one.

1          MR. LINDER:  I showed you the one because they gave

2     us the one on Friday night.

3          THE COURT:  Okay.

4          MR. LINDER:  And then with -- Marcus from their team

5     sent us another list --

6          THE COURT:  I see.

7          MR. LINDER:  -- so we had followed up with that.

8          THE COURT:  Okay.  Well, the addition of other

9     privileged -- or potentially privileged communications is -- is

10    news to me.

11         Okay.  So that's fine.  I mean, Tuesday is okay.  You

12    know, it doesn't seem to me something that is front burner.

13    But, obviously, the quicker we resolve it, the better off we'll

14    all be.

15         MR. LINDER:  Thank you, sir.

16         THE COURT:  All right.  Before we adjourn, anything

17    anybody would like to raise?  Discuss?  You can get out of here

18    ten minutes earlier than usual.

19         All right.  Thanks, everybody.  Have a good night.

20    We'll see you-all here tomorrow morning.

21         Do not wait for me.

22              (Proceedings were concluded at 4:52 p.m.)

23

24

25

```
1              CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                    Dated this 6th day of October, 2022.

10

11                    /s/ Nancy J. Meyer
                       Nancy J. Meyer
12                     Official Court Reporter
                       Registered Diplomate Reporter
13                     Certified Realtime Reporter
                       333 Constitution Avenue Northwest
14                     Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25
```

# 0

**00009** [1] - 2031:6
**0001** [1] - 2031:6

# 1

**1** [1] - 2086:11
**10** [1] - 2020:11
**1000** [5] - 2027:24, 2042:4, 2042:9, 2042:11, 2042:14
**1000.........................**
[1] - 1995:17
**12** [1] - 2020:11
**12/16** [1] - 2087:23
**12/16/2020** [1] - 2086:18
**12/23** [1] - 2087:22, 2087:23, 2088:5, 2091:7
**124** [1] - 1997:13
**125-minute** [1] - 1997:13
**13** [3] - 2035:14, 2043:11, 2044:12
**13:44** [1] - 2043:7
**13th** [1] - 2106:25
**14th** [5] - 2081:9, 2081:12, 2081:21, 2094:1, 2094:11
**15** [2] - 2024:20, 2110:7
**16th** [2] - 2037:25, 2087:18
**18th** [2] - 2035:15, 2036:23
**1996** [1] - 1995:5
**1999** [1] - 1995:5

# 2

**2** [4] - 1999:25, 2066:11, 2086:11, 2108:19
**20** [3] - 2032:23, 2033:3, 2110:8
**2007** [1] - 2034:15
**2012** [3] - 2048:12, 2072:1, 2072:20
**2014** [1] - 1995:6
**2019** [2] - 1995:8, 2028:19
**2020** [28] - 2014:6, 2016:12, 2017:9, 2017:16, 2021:24, 2022:2, 2022:18, 2048:18, 2048:19, 2049:20, 2057:23, 2058:22, 2058:23, 2066:8, 2072:3,

2072:6, 2072:25, 2073:1, 2074:5, 2075:20, 2075:25, 2076:1, 2076:25, 2087:18, 2105:20, 2106:17, 2106:18, 2106:25
**2021** [5] - 2010:3, 2016:13, 2027:15, 2037:25, 2044:24
**2026** [1] - 2075:24
**2028** [1] - 1995:8
**2037** [1] - 1995:9
**2039** [1] - 1995:9
**2040** [1] - 1995:10
**2042** [2] - 1995:10, 1995:17
**2047** [1] - 1995:12
**2062** [1] - 1995:17
**2071** [1] - 1995:13
**2087** [1] - 1995:19
**2098** [1] - 1995:13
**21** [1] - 2015:7
**2100** [1] - 1995:14
**23rd** [8] - 2066:14, 2066:23, 2069:13, 2085:11, 2085:13, 2092:20, 2095:3, 2096:4
**246** [1] - 2112:14
**25** [1] - 2034:25
**27** [1] - 1999:25
**27-years-combined**
[1] - 1997:21
**28** [1] - 2043:21
**29** [2] - 2043:16, 2043:22

# 3

**3** [5] - 2043:16, 2043:22, 2067:13, 2086:11, 2088:21
**30** [2] - 2011:21, 2034:17
**302** [2] - 2111:9, 2111:18
**302s** [1] - 2111:19
**3123** [1] - 2043:3
**37** [1] - 2043:21
**3:35** [1] - 2070:21
**3:50** [1] - 2070:21

# 4

**4** [4] - 2086:7, 2086:8, 2086:10, 2088:5
**40** [2] - 2011:21, 2034:17
**44** [1] - 2043:11

**4604** [6] - 2061:12, 2061:13, 2062:1, 2062:5, 2062:13, 2063:5
**4604..........................**
[1] - 1995:17
**4605** [4] - 2064:15, 2065:9, 2065:12, 2065:13
**4:52** [1] - 2113:22

# 5

**5** [2] - 2031:18

# 6

**6** [2] - 2015:7, 2015:14
**60** [2] - 2006:12, 2048:17
**6276** [1] - 1997:11
**6th** [28] - 2006:4, 2009:20, 2009:24, 2010:3, 2010:4, 2011:22, 2012:4, 2012:8, 2012:9, 2012:14, 2015:2, 2015:5, 2015:8, 2016:14, 2016:15, 2026:24, 2027:1, 2027:7, 2027:12, 2040:18, 2070:10, 2075:22, 2096:24, 2097:8, 2109:16, 2111:3, 2111:9, 2111:15

# 7

**7** [2] - 1997:25, 2068:3

# 8

**8.01** [1] - 2031:22
**8pm** [1] - 2069:23

# 9

**9/29/2020** [1] - 2086:15
**98** [1] - 2086:23
**9:30** [1] - 2110:15
**9th** [8] - 1997:5, 1997:7, 2022:18, 2040:19, 2080:18, 2081:1, 2081:7, 2082:4

# A

**A-d-a-m-s** [1] - 2047:18

**Abdullah** [3] - 1995:7, 2018:14, 2020:2
**ABDULLAH** [1] - 2020:4
**abilities** [1] - 2008:8
**ability** [1] - 2106:13
**able** [7] - 2001:5, 2017:19, 2017:23, 2019:17, 2059:16, 2112:8, 2112:12
**absolutely** [7] - 2000:1, 2001:10, 2057:24, 2078:2, 2082:3, 2090:18, 2099:5
**accept** [1] - 2060:15
**access** [19] - 2001:1, 2001:7, 2017:6, 2017:13, 2078:22, 2091:17, 2091:19, 2092:12, 2092:16, 2095:12, 2095:13, 2095:15, 2095:19, 2097:4, 2097:12, 2100:13, 2109:9, 2111:18
**accessing** [1] - 2097:10
**according** [3] - 2030:24, 2033:6, 2036:22
**account** [11] - 2057:10, 2057:11, 2059:10, 2059:12, 2069:10, 2069:23, 2091:1, 2095:19, 2097:5, 2097:11
**accounts** [1] - 2041:10
**accurate** [5] - 2006:12, 2028:3, 2061:21, 2065:5, 2111:6
**accusing** [1] - 2041:13
**Act** [1] - 2060:23
**act** [1] - 2097:14
**actions** [1] - 2099:23
**active** [3] - 2007:17, 2029:24, 2077:24
**actively** [1] - 2030:6
**activity** [2] - 2097:7, 2104:15
**actors** [1] - 2080:2
**actual** [1] - 2108:9
**Adams** [20] - 1995:11, 2047:2, 2047:7, 2047:16, 2048:8, 2053:23, 2061:4, 2061:13, 2062:15,

2063:24, 2064:2, 2064:18, 2070:9, 2070:18, 2070:24, 2071:8, 2071:20, 2100:23, 2100:25, 2110:2
**Adamson** [3] - 2073:22, 2078:11, 2090:15
**added** [1] - 2015:7
**adding** [1] - 2108:3
**addition** [2] - 2057:4, 2113:8
**address** [4] - 2022:14, 2047:19, 2099:18, 2100:5
**addressed** [1] - 2058:8
**adjourn** [1] - 2113:16
**administered** [2] - 2018:18, 2047:5
**administrative** [2] - 2059:8, 2073:15
**admit** [2] - 2065:9, 2102:22
**admitted** [9] - 2036:12, 2042:10, 2042:11, 2062:5, 2062:13, 2065:12, 2065:13, 2086:10, 2087:10
**Admitted** [1] - 1995:16
**admitting** [1] - 2028:24
**advised** [1] - 2038:5
**aftermath** [1] - 2077:20
**afternoon** [14] - 1996:25, 1997:1, 1999:16, 2014:24, 2018:16, 2019:14, 2028:12, 2047:12, 2047:13, 2070:20, 2098:16, 2098:17, 2100:23, 2100:24
**afterwards** [1] - 2036:19
**agency** [2] - 2040:13, 2040:17
**agent** [2] - 2011:17, 2041:14
**agents** [1] - 2045:24
**aggravated** [1] - 2039:8
**ago** [3] - 2021:19, 2036:3, 2036:7
**agree** [20] - 2000:5, 2001:11, 2001:12, 2001:14, 2002:2, 2003:21, 2003:23,

2010:20, 2010:25, 2013:23, 2023:24, 2023:25, 2030:9, 2031:15, 2032:8, 2034:14, 2035:4, 2035:5, 2035:12, 2093:22

**agreeable** [1] - 2032:25

**agreed** [4] - 2033:24, 2033:25, 2051:19, 2054:3

**agreement** [1] - 2054:8

**agrees** [1] - 2034:2

**ahead** [3] - 1999:25, 2033:12, 2087:8

**ahold** [1] - 2025:3

**ain't** [1] - 2025:22

**Air** [3] - 2020:12, 2020:14, 2032:12

**alert** [1] - 2048:22

**alleged** [1] - 2099:25

**allow** [2] - 2004:13, 2004:14

**allowed** [2] - 2004:6, 2032:19

**alluded** [1] - 2060:17

**Alondra** [6] - 2051:23, 2051:25, 2072:11, 2073:20, 2078:10, 2090:13

**ALONDRA** [1] - 2052:1

**aloud** [1] - 2031:23

**altogether** [1] - 2074:11

**and..** [1] - 2025:4

**answer** [8] - 2011:11, 2025:7, 2033:21, 2035:9, 2035:10, 2044:19, 2050:22, 2077:10

**answered** [2] - 2041:18, 2050:23

**Antifa** [6] - 2013:18, 2013:19, 2014:7, 2044:21, 2045:21, 2048:24

**Antifa's** [1] - 2025:20

**anyway** [1] - 2012:18

**apart** [1] - 2007:7

**apologize** [4] - 2005:2, 2007:25, 2009:25, 2020:17

**app** [5] - 2015:7, 2056:10, 2056:14, 2064:21, 2064:22

**appear** [2] - 2028:2, 2061:21

**Apple** [1] - 2065:22

**application** [7] - 2055:13, 2055:15, 2074:4, 2074:8, 2076:3, 2076:16, 2078:7

**apply** [1] - 1998:16

**appreciate** [2] - 1999:20, 2037:14

**approach** [1] - 2038:13

**approached** [2] - 2105:15, 2105:16

**approximate** [1] - 2044:12

**area** [6] - 2000:24, 2009:22, 2073:2, 2101:8, 2101:21, 2102:10

**argue** [1] - 2016:25

**argument** [1] - 2112:1

**arms** [1] - 2063:20

**army** [2] - 2079:9

**Army** [3] - 2048:6, 2101:9, 2101:12

**arranged** [1] - 2101:18

**article** [3] - 2106:20, 2106:23, 2107:22

**aspect** [1] - 2014:13

**ass** [1] - 2067:25

**assault** [1] - 2039:8

**assisting** [1] - 2008:16

**associated** [1] - 2064:7

**assume** [4] - 2016:10, 2084:23, 2096:3, 2097:2

**assumed** [1] - 2096:14

**assuming** [1] - 2051:13

**Attack** [1] - 2003:16

**attend** [2] - 2036:17, 2082:7

**attention** [2] - 2021:23, 2081:23

**attorney** [4] - 1999:17, 2026:9, 2026:11, 2112:4

**attorney-client-privileged** [1] - 2112:4

**attorneys** [1] - 2044:23

**audio** [3] - 2023:10, 2023:11, 2043:19

**August** [6] - 2029:7, 2030:1, 2035:15, 2036:23, 2076:25, 2078:6

**authenticated** [1] - 2042:5

**available** [2] - 2031:24, 2103:16

**aware** [15] - 2012:2, 2013:17, 2030:23, 2030:25, 2031:3, 2035:24, 2035:25, 2057:17, 2057:19, 2081:22, 2082:14, 2083:20, 2106:1, 2109:11

## B

**background** [3] - 2059:13, 2059:14, 2078:14

**backgrounds** [1] - 2078:5

**bad** [4] - 2014:12, 2023:24, 2055:22, 2084:13

**ball** [2] - 2051:16, 2111:23

**ballistic** [1] - 2000:13

**balls** [1] - 2067:24

**bank** [1] - 2041:10

**based** [10] - 2010:19, 2032:8, 2045:10, 2067:2, 2067:14, 2067:21, 2088:7, 2088:22, 2105:5, 2112:1

**basis** [2] - 2011:24, 2090:10

**Bates** [1] - 2031:5

**bear** [1] - 2085:6

**beat** [1] - 2046:8

**beating** [2] - 2045:21

**beautiful** [1] - 2007:18

**became** [9] - 2049:21, 2054:6, 2054:7, 2056:20, 2056:21, 2072:3, 2072:6, 2085:10, 2106:2

**become** [9] - 2006:24, 2006:25, 2021:1, 2028:18, 2048:11, 2049:2, 2049:18, 2055:3, 2096:5

**began** [1] - 2023:12

**begin** [4] - 2023:14, 2070:13, 2070:20, 2110:15

**beginning** [5] - 2042:16, 2044:11, 2081:6, 2106:20, 2106:23

**behalf** [2] - 2098:7,

2098:10

**behavior** [3] - 2067:14, 2067:22, 2088:22

**Bench** [1] - 2033:11

**Beret** [1] - 2101:9

**beside** [1] - 2025:2

**better** [3] - 2038:20, 2072:25, 2113:13

**between** [3] - 2016:16, 2086:19, 2103:19

**Biden** [2] - 2023:24, 2060:16

**big** [2] - 2005:16, 2006:10

**biggest** [2] - 2067:8, 2088:18

**bit** [13] - 2012:12, 2019:16, 2020:13, 2020:18, 2025:8, 2039:21, 2043:15, 2043:24, 2049:10, 2058:21, 2067:19, 2084:16

**blank** [1] - 2052:14

**bless** [1] - 2068:13

**blessed** [1] - 1999:19

**BLM** [5] - 2013:17, 2013:19, 2014:7, 2044:22, 2045:21

**blocked** [1] - 2100:12

**board** [1] - 2007:7

**bother** [1] - 2067:7

**bottom** [5] - 2000:18, 2003:2, 2033:25, 2066:5, 2094:16

**bound** [1] - 2031:16

**branch** [1] - 2048:5

**break** [5] - 1996:19, 2070:20, 2071:1, 2110:11, 2110:14

**Breonna** [2] - 2104:8, 2104:13

**brief** [2] - 1998:11, 2034:20

**briefly** [3] - 1997:4, 2014:21, 2100:20

**briefs** [2] - 1998:8, 1999:9

**brig** [1] - 2002:10

**bright** [3] - 2028:8, 2033:14, 2037:17

**BRIGHT** [11] - 2028:9, 2028:11, 2031:18, 2031:20, 2033:20, 2034:5, 2034:7, 2034:10, 2037:11, 2037:13, 2037:16

**Bright** [3] - 2028:14, 2098:7

**Bright.................** [1] - 1995:8

**bring** [6] - 2025:20, 2036:1, 2042:13, 2061:10, 2062:15, 2064:14

**brother** [4] - 2069:4, 2088:15, 2090:21, 2093:5

**brought** [4] - 2025:15, 2025:16, 2081:23, 2103:13

**brown** [3] - 2102:4, 2103:2, 2103:22

**Brown** [3] - 2079:1, 2101:6, 2102:11

**Brown's** [2] - 2079:17, 2097:16

**Bryan** [3] - 2073:22, 2078:11, 2090:15

**bugging** [1] - 2092:12

**bulk** [1] - 2013:23

**bump** [1] - 2000:14

**burgers** [2] - 2004:19, 2005:4

**burned** [1] - 2105:9

**burner** [1] - 2113:12

**buses** [1] - 2016:8

**business** [1] - 2105:1

**bust** [1] - 2067:24

**busy** [2] - 2067:6, 2088:14

**butt** [1] - 2025:20

**bylaws** [4] - 2030:18, 2030:21, 2031:10, 2032:19

## C

**Caldwell** [5] - 1999:17, 2003:23, 2007:11, 2007:20, 2008:6

**canceled** [1] - 2103:15

**cap** [1] - 2018:24

**capacity** [1] - 2032:6

**Capitol** [11] - 2003:16, 2025:4, 2026:15, 2026:16, 2026:25, 2036:1, 2037:24, 2038:5, 2038:17, 2044:24, 2111:10

**care** [1] - 2049:15

**Carolina** [11] - 2002:23, 2006:22, 2007:5, 2011:4, 2011:14, 2011:21, 2012:3, 2014:9, 2015:2, 2015:23

**carry** [4] - 2000:13,

2074:9, 2078:7, 2078:16
**case** [11] - 1999:7, 2005:13, 2019:4, 2027:25, 2035:22, 2045:24, 2046:24, 2061:5, 2104:8, 2104:12, 2104:13
**categorizes** [1] - 2008:20
**center** [1] - 2007:22
**cert** [1] - 2007:4
**certain** [3] - 2001:2, 2049:14, 2080:2
**certainly** [7] - 2003:17, 2003:19, 2005:15, 2007:24, 2013:3, 2013:23, 2097:3
**certainty** [1] - 2008:2
**change** [2] - 2019:5, 2057:25
**changed** [1] - 2033:2
**changing** [1] - 2045:24
**channel** [1] - 2007:6
**Chapter** [2] - 2068:5, 2089:18
**chapter** [15] - 2006:22, 2030:3, 2050:12, 2051:6, 2051:7, 2051:8, 2051:11, 2053:24, 2057:3, 2057:8, 2078:23, 2090:11, 2101:2
**characterization** [1] - 2006:9
**characterize** [1] - 2002:3
**characterized** [1] - 2008:12
**charge** [2] - 1999:8, 2050:9
**charter** [2] - 2030:24, 2032:19
**chat** [65] - 1997:14, 2015:9, 2015:14, 2015:22, 2015:24, 2016:5, 2016:8, 2034:22, 2049:22, 2049:23, 2050:3, 2050:5, 2050:8, 2050:13, 2051:12, 2051:21, 2052:15, 2053:7, 2053:23, 2054:11, 2054:19, 2054:25, 2055:9, 2056:13, 2056:16, 2056:17, 2057:18, 2070:1, 2072:7,

2072:12, 2072:14, 2072:21, 2074:21, 2074:25, 2075:2, 2075:7, 2075:10, 2076:4, 2076:14, 2076:17, 2077:1, 2083:19, 2091:8, 2091:9, 2091:13, 2091:21, 2091:24, 2092:1, 2092:4, 2092:5, 2099:9, 2099:16, 2100:6, 2100:7, 2100:8, 2109:10, 2109:13, 2109:15, 2109:19, 2109:21
**chats** [27] - 2001:2, 2001:3, 2007:7, 2046:7, 2050:17, 2067:9, 2068:8, 2074:18, 2074:21, 2075:11, 2075:12, 2075:13, 2075:17, 2075:24, 2076:6, 2076:12, 2076:13, 2076:19, 2088:19, 2097:5, 2097:19, 2097:20, 2109:4, 2109:5, 2109:7
**check** [2] - 2059:13, 2059:14
**checking** [1] - 2015:20
**checks** [1] - 2078:14
**Chief** [1] - 2107:24
**child** [1] - 2039:8
**choice** [1] - 2063:16
**chosen** [1] - 2032:12
**Christian** [1] - 2005:19
**Christmas** [1] - 2095:3
**chronological** [1] - 2027:13
**citizens** [1] - 2049:12
**civil** [7] - 2013:24, 2032:5, 2032:11, 2032:15, 2032:21, 2049:7
**civilian** [1] - 2012:25
**claimed** [1] - 2035:18
**clarification** [1] - 2092:4
**clarify** [3] - 2063:14, 2086:19, 2097:10
**class** [1] - 1998:3
**classes** [4] - 2077:9, 2078:1, 2078:3, 2078:25
**clear** [10] - 1999:10, 2005:23, 2012:12,

2013:15, 2013:22, 2019:5, 2019:25, 2039:7, 2047:14, 2066:5
**click** [1] - 2055:5
**client** [1] - 2112:4
**close** [2] - 2043:16, 2045:6
**closely** [1] - 2074:1
**closer** [5] - 2019:16, 2020:21, 2034:15, 2044:4, 2096:15
**co** [1] - 2071:21
**co-counsel** [1] - 2071:21
**coat** [1] - 2052:24
**code** [1] - 2092:16
**cohesiveness** [1] - 1998:25
**com** [1] - 2069:6
**combination** [1] - 2112:14
**comfortable** [3] - 2018:25, 2024:3, 2047:8
**coming** [4] - 2037:14, 2050:1, 2058:25, 2107:16
**Commander** [1] - 2107:24
**commission** [1] - 2111:3
**committed** [2] - 2006:19, 2097:15
**committee** [2] - 2111:9, 2111:17
**common** [3] - 2047:17, 2052:7, 2093:18
**communicate** [2] - 2054:11, 2057:8
**communicated** [1] - 2084:21
**communicating** [2] - 2017:15, 2051:19
**communication** [11] - 2010:17, 2054:15, 2054:16, 2056:15, 2057:4, 2084:1, 2084:2, 2084:24, 2087:21, 2095:17, 2110:23
**communications** [8] - 2010:11, 2010:24, 2016:16, 2049:16, 2057:5, 2077:9, 2077:14, 2113:9
**community** [1] - 2006:14, 2048:13, 2049:6, 2049:11,

2059:2, 2077:18
**Company** [1] - 2068:1
**company** [1] - 2048:2
**compensation** [1] - 2039:13
**completely** [2] - 2067:11, 2088:20
**completeness** [1] - 2065:11
**con** [1] - 2079:8
**concealed** [3] - 2074:9, 2078:7, 2078:16
**concept** [1] - 2046:10
**concern** [15] - 2013:16, 2035:16, 2048:22, 2048:24, 2055:3, 2055:6, 2055:20, 2056:9, 2058:5, 2058:25, 2067:8, 2088:18, 2099:17, 2099:25
**concerned** [9] - 2034:21, 2038:8, 2044:16, 2044:18, 2049:1, 2055:20, 2055:23, 2061:1, 2099:19
**concerning** [2] - 2060:14, 2100:3
**concerns** [7] - 2033:15, 2054:19, 2054:25, 2055:1, 2099:3, 2099:6, 2099:11
**conclude** [1] - 2093:20
**concluded** [1] - 2113:22
**condition** [1] - 2010:19
**conference** [6] - 2022:3, 2033:11, 2043:4, 2069:5, 2069:6, 2091:6
**confines** [1] - 2029:23
**confrontational** [1] - 2068:17
**confused** [2] - 2012:12, 2037:12
**connected** [1] - 2024:7
**connection** [1] - 2061:5
**consequence** [1] - 2111:3
**conservative** [1] - 2058:3
**consider** [4] - 2029:23, 2030:7,

2046:22, 2077:24
**considered** [2] - 2084:18, 2085:16
**considering** [1] - 2040:17
**constant** [2] - 2084:1, 2084:2
**Constitution** [1] - 2107:25
**constitutional** [1] - 2021:16
**contact** [9] - 2002:7, 2012:21, 2013:1, 2021:8, 2027:10, 2027:12, 2029:21, 2079:14, 2085:24
**contacted** [1] - 2038:9
**contacting** [1] - 2025:10
**contacts** [1] - 2072:16
**context** [1] - 2012:25
**continuation** [1] - 2067:19
**continue** [6] - 2024:18, 2059:16, 2060:8, 2067:20, 2095:19, 2112:16
**continuing** [1] - 2058:24
**contract** [1] - 2068:3
**contributed** [1] - 2108:5
**conventional** [4] - 2079:6, 2079:8, 2103:19
**conversation** [4] - 2016:20, 2023:20, 2050:24, 2051:2
**conversations** [2] - 2067:12, 2088:20
**conveyed** [1] - 2030:1
**convicted** [3] - 2032:3, 2032:17, 2046:22
**conviction** [3] - 2039:7, 2040:5, 2046:22
**coordinated** [1] - 2080:25
**coordination** [1] - 2016:8
**coordinator** [6] - 2054:5, 2054:6, 2054:7, 2059:1, 2073:10, 2073:11
**copies** [2] - 2078:18, 2110:24
**copy** [15] - 2027:19, 2027:23, 2028:2, 2028:3, 2028:4,

2038:10, 2061:7,
2061:10, 2061:21,
2065:5, 2086:2,
2093:25, 2094:2,
2108:11, 2108:22
**Core** [1] - 2000:13
**core** [1] - 2096:10
**Corps** [1] - 2020:11
**correct** [214] -
1997:12, 1998:14,
1998:17, 1998:19,
1999:3, 1999:6,
2000:3, 2000:20,
2000:21, 2000:24,
2000:25, 2001:3,
2001:4, 2001:8,
2002:1, 2002:21,
2003:4, 2003:8,
2003:9, 2003:22,
2004:4, 2004:15,
2004:17, 2005:10,
2005:11, 2005:13,
2006:1, 2006:15,
2007:7, 2008:4,
2008:6, 2008:13,
2008:14, 2008:24,
2009:18, 2009:19,
2010:15, 2011:2,
2011:5, 2011:7,
2011:17, 2012:23,
2013:4, 2013:7,
2013:8, 2013:14,
2013:18, 2014:12,
2014:15, 2015:13,
2017:7, 2028:19,
2028:22, 2029:1,
2029:5, 2029:9,
2029:12, 2029:13,
2029:19, 2029:22,
2029:24, 2030:3,
2030:4, 2031:11,
2031:12, 2031:16,
2031:17, 2034:16,
2034:22, 2035:1,
2035:17, 2035:18,
2035:19, 2036:1,
2036:13, 2038:3,
2039:10, 2041:3,
2052:2, 2052:4,
2060:2, 2064:23,
2066:1, 2072:2,
2072:4, 2072:5,
2072:8, 2072:9,
2072:12, 2072:13,
2073:13, 2074:6,
2074:7, 2074:9,
2074:10, 2074:13,
2074:16, 2074:19,
2074:20, 2074:22,
2074:23, 2074:25,
2075:1, 2075:5,

2075:6, 2075:14,
2075:17, 2075:19,
2075:21, 2075:23,
2076:14, 2076:18,
2076:20, 2077:6,
2077:21, 2078:3,
2078:8, 2078:18,
2079:10, 2079:11,
2079:13, 2079:14,
2079:15, 2080:1,
2080:11, 2080:18,
2081:18, 2081:23,
2082:5, 2082:19,
2083:3, 2083:4,
2083:9, 2083:18,
2083:24, 2084:6,
2085:9, 2085:11,
2085:12, 2085:20,
2086:20, 2086:21,
2086:23, 2086:24,
2087:19, 2087:20,
2087:24, 2088:2,
2088:3, 2088:7,
2088:8, 2088:12,
2088:13, 2088:16,
2088:17, 2088:23,
2088:24, 2089:6,
2089:16, 2089:22,
2090:4, 2090:7,
2090:10, 2090:21,
2090:22, 2091:10,
2091:11, 2091:13,
2091:14, 2091:18,
2091:19, 2091:22,
2091:25, 2092:14,
2092:17, 2092:20,
2092:23, 2093:1,
2093:2, 2093:3,
2093:4, 2093:5,
2093:6, 2093:8,
2093:10, 2093:14,
2093:15, 2094:17,
2094:19, 2094:20,
2094:23, 2094:24,
2095:1, 2095:22,
2096:20, 2096:21,
2096:25, 2097:9,
2097:10, 2097:13,
2097:18, 2097:21,
2097:23, 2097:25,
2098:1, 2099:21,
2099:22, 2100:4,
2101:3, 2101:13,
2105:19, 2106:19,
2108:8
**correctly** [1] - 2099:16
**counsel** [2] - 2071:21,
2085:7
**count** [1] - 2034:17
**country** [3] - 2000:19,
2007:13, 2048:21

**couple** [8] - 1997:4,
2015:20, 2025:1,
2025:5, 2061:18,
2068:21, 2077:9,
2083:20
**course** [2] - 2003:19,
2027:18
**Court** [1] - 2112:18
**court** [9] - 2016:19,
2019:20, 2020:3,
2034:6, 2053:1,
2053:4, 2053:18,
2053:21, 2084:8
**COURT** [89] - 1996:8,
1996:13, 1996:15,
1996:18, 1999:13,
2004:25, 2005:3,
2009:8, 2009:23,
2010:4, 2010:7,
2011:10, 2011:25,
2012:6, 2012:11,
2012:17, 2014:19,
2018:6, 2018:8,
2018:12, 2018:20,
2018:23, 2019:2,
2019:4, 2019:9,
2019:10, 2019:19,
2019:23, 2028:8,
2033:10, 2033:12,
2033:24, 2037:17,
2038:24, 2039:1,
2040:8, 2042:1,
2042:7, 2042:9,
2046:14, 2046:19,
2047:7, 2053:2,
2053:4, 2053:20,
2054:23, 2062:5,
2065:12, 2065:16,
2069:16, 2070:19,
2070:24, 2071:4,
2071:7, 2071:10,
2071:15, 2084:7,
2084:10, 2084:12,
2086:5, 2086:7,
2086:9, 2086:12,
2087:3, 2087:8,
2094:7, 2098:5,
2098:7, 2098:10,
2098:12, 2100:17,
2100:19, 2103:6,
2107:7, 2110:1,
2110:6, 2110:10,
2110:13, 2110:21,
2111:11, 2111:16,
2111:20, 2112:5,
2112:20, 2112:25,
2113:3, 2113:6,
2113:8, 2113:16
**Court's** [4] - 2009:15,
2014:17, 2018:15,

2106:12
**COURTROOM** [6] -
2018:16, 2047:3,
2071:5, 2086:8,
2086:10, 2106:14
**courtroom** [3] -
2052:20, 2053:12,
2112:7
**cover** [1] - 1998:18
**COVID** [5] - 2015:6,
2015:17, 2019:1,
2019:3, 2068:2
**CPT** [6] - 2048:13,
2049:7, 2049:10,
2051:17, 2067:5,
2088:12
**crazy** [1] - 2045:8
**create** [2] - 2056:17,
2092:7
**credentials** [1] -
2011:19
**credibility** [1] -
2046:23
**crime** [1] - 2046:22
**crisp** [2] - 2039:1,
2098:12
**Crisp** [5] - 1996:21,
1997:2, 2039:4,
2062:7, 2098:18
**CRISP** [9] - 1996:22,
1996:24, 2039:3,
2040:7, 2042:8,
2062:4, 2098:13,
2098:15, 2100:15
**Crisp**.................. [3] -
1995:5, 1995:9,
1995:13
**cross** [2] - 2070:20,
2100:18
**Cross** [8] - 1995:5,
1995:5, 1995:8,
1995:9, 1995:9,
1995:10, 1995:13,
1995:13
**CROSS** [8] - 1996:23,
1999:14, 2028:10,
2037:19, 2039:2,
2040:9, 2071:18,
2098:14
**cross-examination** [1]
- 2070:20
**CROSS-
EXAMINATION** [8] -
1996:23, 1999:14,
2028:10, 2037:19,
2039:2, 2040:9,
2071:18, 2098:14
**Cross-Examination**
[8] - 1995:5, 1995:5,
1995:8, 1995:9,

1995:9, 1995:10,
1995:13, 1995:13
**current** [2] - 2031:24,
2060:22
**cutting** [1] - 2099:12

## D

**D-e-n-n-i-s** [1] -
2052:8
**D.C** [19] - 2000:24,
2008:17, 2008:18,
2011:22, 2012:4,
2015:5, 2015:12,
2058:12, 2060:1,
2060:3, 2070:9,
2081:8, 2081:14,
2081:17, 2082:1,
2083:7, 2107:17,
2109:10, 2109:16
**dark** [1] - 2053:15
**date** [2] - 2038:1,
2092:21
**dated** [2] - 2086:15,
2094:11
**dates** [1] - 2027:13
**Dave** [1] - 1999:16
**days** [3] - 1997:8,
2048:17, 2112:8
**DC** [2] - 2015:7,
2015:14
**De** [1] - 2059:20
**deadly** [1] - 2063:19
**dealing** [3] - 2055:6,
2077:17, 2077:20
**December** [29] -
2016:12, 2058:23,
2059:21, 2059:22,
2060:5, 2060:12,
2066:8, 2066:14,
2066:23, 2069:13,
2075:18, 2083:6,
2085:11, 2085:13,
2087:18, 2092:20,
2093:16, 2094:1,
2094:11, 2095:3,
2096:4, 2105:20,
2106:17, 2106:18,
2106:25, 2107:17,
2109:7
**decide** [2] - 2041:15,
2096:7
**decided** [3] - 2021:12,
2028:18, 2104:11
**decision** [8] -
2063:10, 2064:3,
2067:2, 2088:6,
2096:8, 2096:9,
2096:16, 2108:6
**declare** [2] - 2060:23,

2063:21
**declaring** [1] -
  2063:16
**dedicated** [2] -
  2003:13, 2109:14
**deem** [2] - 2067:22,
  2088:23
**Defendant** [4] -
  1995:19, 2053:1,
  2053:18, 2087:10
**Defense** [1] - 2106:6
**defense** [3] - 2049:7,
  2063:21, 2108:9
**define** [1] - 2002:25
**definitely** [1] -
  2090:11
**delete** [1] - 2076:16
**deleted** [1] - 2076:17
**deletes** [1] - 2076:15
**Dennis** [6] - 2052:6,
  2052:7, 2072:11,
  2073:24, 2090:17,
  2102:5
**deployed** [2] - 1998:5,
  1998:6
**deployment** [2] -
  1998:7, 1998:11
**DEPUTY** [6] - 2018:16,
  2047:3, 2071:5,
  2086:8, 2086:10,
  2106:14
**describe** [5] - 2026:7,
  2049:10, 2052:23,
  2058:21, 2084:16
**described** [3] -
  2006:20, 2038:2,
  2038:19
**description** [2] -
  2009:17, 2030:19
**Desert** [1] - 1998:6
**designated** [1] -
  2002:6
**desired** [4] - 2045:9,
  2045:13, 2045:17
**destructive** [1] -
  2063:18
**detached** [1] - 2004:7
**detail** [6] - 2083:17,
  2083:21, 2084:17,
  2085:2, 2105:17,
  2107:10
**details** [9] - 2029:15,
  2030:6, 2032:7,
  2051:15, 2077:5,
  2083:12, 2083:13,
  2084:15, 2085:4
**determination** [1] -
  2096:12
**determine** [2] -
  2096:3, 2111:6

**develop** [1] - 2095:15
**development** [2] -
  2077:22, 2077:24
**dial** [1] - 2023:10
**dialed** [1] - 2043:4
**difference** [1] -
  2103:19
**different** [14] - 2015:9,
  2033:22, 2034:15,
  2039:22, 2058:11,
  2072:23, 2072:24,
  2073:6, 2073:8,
  2077:7, 2077:8,
  2077:13, 2077:15,
  2104:1
**difficulty** [1] - 2084:10
**digits** [1] - 2086:23
**dignitary** [1] - 2084:18
**Direct** [2] - 1995:8,
  1995:12
**direct** [6] - 2016:11,
  2021:23, 2042:3,
  2056:14, 2074:25,
  2104:20
**DIRECT** [2] - 2019:12,
  2047:10
**direct-text** [1] -
  2056:14
**directed** [1] - 2049:22
**direction** [1] - 2057:25
**directions** [1] -
  2008:23
**directly** [5] - 2068:14,
  2072:18, 2084:22,
  2093:18, 2093:19
**disasters** [1] -
  2049:13
**disciplines** [3] -
  2049:15, 2077:8,
  2077:13
**disclose** [1] - 2111:1
**disclosing** [1] -
  2032:7
**discuss** [5] - 2001:20,
  2001:23, 2071:1,
  2099:11, 2113:17
**discussed** [7] -
  2025:23, 2034:22,
  2039:6, 2058:14,
  2077:4, 2085:23,
  2097:20
**discusses** [1] -
  2106:23
**discussing** [1] -
  2058:12
**discussion** [3] -
  2040:3, 2050:13,
  2051:16
**discussions** [2] -
  2077:15, 2104:10

**disobeying** [1] -
  2002:10
**dissolved** [1] - 2051:6
**doc** [1] - 2086:9
**document** [9] -
  2031:7, 2031:9,
  2031:11, 2087:4,
  2108:19, 2111:7,
  2111:11, 2111:14,
  2112:13
**documentation** [1] -
  2033:7
**Donald** [1] - 2107:13
**done** [6] - 2006:25,
  2020:22, 2034:2,
  2070:13, 2080:3,
  2110:7
**door** [1] - 2069:24
**Doug** [7] - 2002:4,
  2002:6, 2002:22,
  2011:4, 2016:11,
  2016:16, 2017:6
**Douyon** [1] - 2110:24
**down** [34] - 2009:1,
  2009:3, 2009:10,
  2009:12, 2041:7,
  2046:15, 2060:24,
  2063:2, 2063:25,
  2066:2, 2066:10,
  2066:18, 2066:20,
  2067:15, 2068:11,
  2068:18, 2069:8,
  2070:7, 2070:24,
  2077:1, 2085:10,
  2085:14, 2087:25,
  2088:1, 2089:9,
  2090:20, 2091:2,
  2091:5, 2095:3,
  2095:7, 2095:25,
  2096:4, 2105:9,
  2110:2
**download** [1] -
  2112:11
**downloaded** [1] -
  2112:9
**doxed** [2] - 2055:24,
  2056:1
**DOXED** [1] - 2056:3
**doxing** [2] - 2055:21
**drawing** [1] - 2052:14
**drive** [1] - 2017:25
**driver's** [1] - 2078:12
**due** [1] - 2035:15
**Dunn** [1] - 2111:10
**duration** [1] - 2024:21
**during** [3] - 2012:21,
  2061:22, 2079:6
**duties** [1] - 2111:25
**duty** [2] - 2063:15,
  2108:1

**DX** [1] - 2031:6

# E

**e.g** [1] - 2067:7
**E7** [1] - 1998:2
**early** [2] - 2104:23,
  2109:8
**Eastern** [1] - 2069:23
**easy** [1] - 2093:23
**education** [1] - 2080:4
**effort** [2] - 2077:19,
  2097:11
**efforts** [1] - 2059:16
**eight** [1] - 2075:17
**either** [2] - 2003:17,
  2084:19
**elaborate** [1] -
  2007:15
**elderly** [1] - 2009:18
**election** [8] - 2021:25,
  2057:22, 2058:1,
  2058:2, 2058:4,
  2058:5, 2058:8,
  2060:16
**eligible** [2] - 2030:24,
  2032:9
**ELMO** [1] - 2106:13
**email** [18] - 2022:14,
  2022:21, 2023:1,
  2037:24, 2038:2,
  2038:5, 2038:11,
  2038:16, 2038:19,
  2044:23, 2045:2,
  2050:11, 2055:17,
  2064:12, 2085:17,
  2085:23, 2086:25
**emailed** [2] - 2050:12,
  2050:14
**emails** [3] - 2022:9,
  2022:10, 2072:15
**emergency** [2] -
  2006:14, 2018:2
**employ** [1] - 2089:14
**employment** [2] -
  2067:12, 2088:21
**encourage** [1] -
  2040:13
**encrypted** [1] -
  2055:14
**encryption** [1] -
  2055:18
**end** [14] - 2043:14,
  2043:15, 2043:16,
  2043:21, 2044:2,
  2055:14, 2055:18,
  2070:22, 2081:6,
  2092:24, 2108:3,
  2110:16
**end-to-end** [2] -

2055:14, 2055:18
**ended** [2] - 2024:23,
  2044:6
**ending** [3] - 2043:3,
  2044:9, 2068:24
**ends** [3] - 1997:10,
  2063:18, 2086:23
**enemy** [1] - 2063:19
**enforcement** [4] -
  2024:24, 2025:11,
  2040:12, 2040:24
**engaged** [1] - 2030:6
**engagement** [1] -
  1998:8
**enter** [1] - 2034:2
**entered** [1] - 2035:22
**entire** [5] - 2042:4,
  2073:4, 2073:5,
  2076:3, 2083:21
**entirety** [1] - 2042:10
**entity** [1] - 2060:19
**equipment** [3] -
  2000:23, 2007:15,
  2020:7
**ES** [1] - 2052:3
**essentially** [1] -
  2112:21
**evaluating** [1] -
  2046:23
**evening** [1] - 2110:18
**event** [9] - 2003:12,
  2003:13, 2011:22,
  2082:5, 2082:7,
  2082:9, 2084:19,
  2107:18
**events** [14] - 2000:18,
  2000:21, 2005:21,
  2059:18, 2077:5,
  2082:4, 2083:6,
  2083:9, 2083:10,
  2083:11, 2085:1,
  2087:22, 2097:7,
  2106:25
**evidence** [12] -
  2007:19, 2035:22,
  2036:12, 2042:4,
  2042:11, 2046:21,
  2062:2, 2062:13,
  2065:9, 2065:13,
  2069:15, 2087:11
**exact** [1] - 2028:4
**exactly** [6] - 2007:2,
  2010:22, 2020:5,
  2049:5, 2079:20,
  2105:14
**EXAMINATION** [13] -
  1996:23, 1999:14,
  2014:22, 2019:12,
  2028:10, 2037:19,
  2039:2, 2040:9,

2120

2042:17, 2047:10, 2071:18, 2098:14, 2100:21
**examination** [2] - 2042:3, 2070:20
**Examination** [13] - 1995:5, 1995:5, 1995:6, 1995:8, 1995:8, 1995:9, 1995:9, 1995:10, 1995:10, 1995:12, 1995:13, 1995:13, 1995:14
**exception** [2] - 2004:12, 2014:8
**excerpt** [1] - 2036:9
**exchanged** [1] - 2016:11
**excuse** [9] - 2006:21, 2025:9, 2054:18, 2067:23, 2073:1, 2073:18, 2082:10, 2092:1, 2094:2
**excused** [3] - 2018:11, 2046:18, 2110:5
**exhibit** [11] - 2035:11, 2061:11, 2063:3, 2063:25, 2064:18, 2065:19, 2066:3, 2066:11, 2067:16, 2108:9, 2108:10
**Exhibit** [19] - 1995:17, 1995:17, 1995:19, 2027:24, 2042:4, 2042:9, 2042:11, 2042:14, 2061:12, 2061:13, 2062:1, 2062:13, 2063:5, 2064:15, 2065:9, 2065:13, 2087:10, 2106:6
**Exhibits** [1] - 1995:16
**expecting** [1] - 2023:23
**experience** [1] - 1999:2
**expert** [1] - 2112:7
**explain** [6] - 2021:11, 2024:6, 2025:8, 2089:12, 2103:10, 2109:12
**explained** [1] - 2080:2
**explanation** [1] - 2008:23
**expressed** [1] - 2051:17
**expressing** [1] - 2099:25
**extra** [1] - 2034:24
**extricate** [1] - 2014:11

**F**

**face** [3] - 2019:5, 2077:2
**fact** [4] - 2002:22, 2060:17, 2089:4, 2099:2
**factors** [3] - 2067:2, 2088:7, 2088:9
**facts** [1] - 2069:15
**fail** [1] - 2063:15
**fair** [53] - 2000:17, 2001:15, 2001:25, 2002:10, 2002:16, 2002:24, 2003:3, 2004:8, 2004:14, 2004:22, 2005:16, 2006:9, 2006:11, 2006:18, 2007:12, 2008:3, 2008:5, 2008:19, 2009:13, 2010:21, 2011:23, 2013:22, 2013:25, 2014:3, 2016:6, 2017:11, 2028:2, 2039:14, 2043:25, 2061:21, 2065:5, 2072:10, 2072:15, 2073:2, 2073:9, 2074:1, 2075:16, 2079:12, 2079:23, 2080:6, 2080:9, 2080:10, 2081:11, 2082:10, 2082:23, 2089:10, 2089:11, 2093:17, 2093:20, 2094:12, 2094:14, 2096:18, 2097:22
**fairly** [1] - 2028:16
**falsely** [1] - 2056:7
**familiar** [13] - 1997:7, 2013:10, 2013:13, 2020:23, 2021:1, 2030:18, 2030:21, 2031:11, 2048:8, 2048:11, 2055:10, 2057:5, 2057:6
**familiarize** [1] - 2031:21
**family** [3] - 2021:17, 2102:11, 2103:16
**fan** [1] - 2005:16
**far** [12] - 1999:4, 1999:9, 2005:8, 2006:8, 2007:8, 2010:15, 2083:10, 2084:25, 2096:18, 2096:24, 2096:25
**farm** [7] - 2004:1, 2007:11, 2007:12,

2007:14, 2007:15, 2007:17
**fashion** [1] - 2021:21
**fast** [2] - 2087:22, 2092:9
**fast-forward** [1] - 2087:22
**fatigues** [1] - 2000:8
**favor** [1] - 2013:24
**favored** [1] - 1999:19
**Fayetteville** [1] - 2014:8
**FBI** [17] - 2005:10, 2011:17, 2025:3, 2026:1, 2027:10, 2027:16, 2028:3, 2061:4, 2061:22, 2062:24, 2065:2, 2065:3, 2108:14, 2108:22, 2111:9, 2111:18, 2111:19
**February** [2] - 2037:25, 2044:24
**federal** [6] - 2040:12, 2040:13, 2040:17, 2040:24, 2041:11, 2041:12
**felon** [1] - 2032:17
**felonies** [1] - 2032:9
**felony** [2] - 2032:3, 2040:4
**felt** [4] - 2023:23, 2038:22, 2044:20
**few** [5] - 2071:23, 2073:6, 2086:14, 2091:7, 2112:8
**Fi** [1] - 2024:8
**fight** [1] - 2063:22
**fighters** [2] - 2008:2, 2032:2
**fighting** [1] - 2108:3
**figure** [1] - 2044:19
**figuring** [1] - 2056:6
**file** [1] - 2043:15
**filter** [1] - 2112:13
**fine** [6] - 2012:11, 2034:4, 2068:21, 2071:13, 2099:24, 2113:11
**finishes** [1] - 2005:1
**fire** [2] - 2017:22, 2032:2
**fire-fighters** [1] - 2032:2
**first** [18] - 1998:3, 2004:1, 2005:9, 2006:13, 2024:16, 2048:12, 2054:10, 2076:10, 2076:24, 2087:2, 2087:14,

2093:16, 2106:6, 2107:3, 2107:5, 2108:12, 2108:22, 2108:24
**firsthand** [2] - 2016:4, 2016:20
**Fischer** [7] - 1999:13, 1999:16, 1999:19, 2009:23, 2014:19, 2040:8, 2100:17
**FISCHER** [20] - 1999:15, 2005:7, 2008:1, 2009:9, 2009:15, 2009:16, 2009:25, 2010:1, 2010:6, 2010:12, 2011:13, 2012:1, 2012:10, 2012:15, 2012:18, 2012:19, 2014:17, 2040:10, 2041:25, 2100:18
**Fischer................** [2] - 1995:5, 1995:10
**fit** [1] - 2001:19
**FL** [3] - 2056:21, 2056:23, 2056:24
**flagpoles** [1] - 2025:21
**Florida** [42] - 2047:21, 2048:6, 2048:16, 2048:24, 2050:3, 2050:8, 2050:12, 2051:3, 2051:10, 2051:21, 2055:4, 2055:5, 2056:23, 2057:2, 2064:11, 2064:12, 2073:3, 2073:4, 2073:6, 2075:2, 2077:2, 2077:3, 2077:18, 2079:2, 2081:17, 2081:25, 2082:1, 2083:8, 2083:9, 2083:10, 2085:1, 2085:15, 2092:12, 2097:25, 2099:7, 2100:1, 2101:8, 2105:24, 2106:3, 2109:15
**Florida's** [1] - 2049:23
**flying** [3] - 2067:9, 2068:8, 2088:18
**Flynn** [2] - 2107:11, 2107:12
**focus** [3] - 2057:25, 2059:5, 2107:21
**folks** [4] - 2004:7, 2020:18, 2051:20, 2053:23
**follow** [4] - 2021:24,

2025:5, 2030:11, 2071:23
**follow-up** [1] - 2025:5
**followed** [1] - 2113:7
**following** [3] - 2030:20, 2034:20, 2109:7
**follows** [2] - 2006:11, 2108:9
**food** [3] - 2004:19, 2005:5, 2049:16
**foot** [1] - 2003:14
**footsteps** [1] - 2063:16
**force** [5] - 2009:22, 2010:23, 2010:25, 2014:14, 2018:1
**Force** [2] - 2020:12, 2020:14
**Forces** [2] - 2101:9, 2101:11
**foreign** [1] - 2063:19
**forgive** [2] - 2012:7, 2033:6
**forgot** [2] - 2004:18, 2101:17
**Form** [1] - 2101:15
**form** [3] - 2054:22, 2069:14, 2103:5
**former** [3] - 2011:17, 2032:2, 2107:4
**forms** [1] - 2057:4
**forth** [2] - 2050:1, 2051:1
**forum** [5] - 2054:20, 2054:25, 2055:8, 2072:22, 2072:23
**forward** [2] - 2087:22, 2110:14, 2111:23
**foundation** [1] - 2011:24
**founder** [1] - 2107:4
**founders** [1] - 2107:23
**Founders** [1] - 2063:16
**Founding** [1] - 2063:20
**four** [4] - 1997:8, 1997:11, 2020:11, 2032:24
**frame** [2] - 2099:2, 2104:8
**free** [4] - 2018:8, 2046:15, 2069:5, 2069:11
**freedoms** [1] - 2021:16
**fricking** [1] - 2038:20
**Friday** [2] - 2112:2, 2113:2

**front** [4] - 2108:11, 2108:17, 2110:17, 2113:12
**frustrations** [1] - 1998:21
**full** [1] - 2006:25
**fundraising** [4] - 2093:13, 2093:16, 2093:21, 2094:16

## G

**gaining** [1] - 2056:6
**game** [1] - 2006:10
**garage** [2] - 2004:7, 2008:23
**gas** [5] - 2103:3, 2105:6, 2105:8, 2105:10, 2105:11
**gear** [2] - 2077:14, 2077:15
**geared** [2] - 2067:5, 2088:11
**gears** [1] - 1997:20
**general** [7] - 2000:6, 2001:14, 2026:9, 2026:11, 2046:10, 2050:17, 2107:11
**General** [1] - 2107:11
**generally** [3] - 2048:1, 2056:5, 2075:4
**generation** [1] - 2063:20
**gentleman** [2] - 2003:25, 2102:8
**gentlemen** [4] - 2046:19, 2047:15, 2068:1, 2110:13
**Geyer** [1] - 2038:24
**GEYER** [3] - 2038:25, 2053:19, 2098:11
**given** [8] - 2001:6, 2005:9, 2009:17, 2022:25, 2033:7, 2056:9, 2063:21, 2067:7
**God** [2] - 2005:19, 2063:21
**goodbyes** [1] - 2044:7
**gotcha** [3] - 2017:1, 2108:18, 2108:21
**GoTo** [2] - 2037:9, 2097:5
**GoToMeeting** [19] - 1997:5, 2023:4, 2023:6, 2034:22, 2041:2, 2041:6, 2041:16, 2057:5, 2057:13, 2069:10, 2069:12, 2069:22,

2080:17, 2080:23, 2081:1, 2090:24, 2091:1, 2091:12, 2095:11
**GoToMeetings** [11] - 2022:4, 2036:17, 2037:1, 2037:4, 2037:5, 2037:8, 2057:16, 2057:20, 2058:7, 2080:20, 2097:24
**government** [27] - 2018:14, 2024:2, 2028:21, 2029:7, 2030:2, 2033:7, 2033:17, 2034:1, 2035:15, 2036:22, 2036:24, 2037:1, 2037:7, 2039:12, 2041:13, 2044:21, 2045:20, 2046:25, 2047:2, 2062:1, 2063:18, 2096:19, 2096:20, 2097:2, 2108:4, 2111:8
**Government** [6] - 1995:17, 1995:17, 2042:9, 2042:11, 2062:13, 2065:13
**Government's** [8] - 2027:24, 2042:4, 2042:14, 2061:12, 2062:1, 2064:15, 2065:9, 2106:5
**government's** [2] - 2035:11, 2061:11
**grade** [2] - 2020:12, 2020:15
**grand** [1] - 2005:12
**gray** [1] - 2052:24
**great** [4] - 2043:17, 2068:5, 2089:18, 2090:6
**greatly** [1] - 2049:9
**Green** [1] - 2101:9
**Grey** [6] - 2073:12, 2073:14, 2073:15, 2073:17, 2074:21, 2091:21
**grey** [2] - 2091:17, 2091:19
**grilled** [2] - 2004:19, 2005:4
**ground** [2] - 2104:22, 2104:25
**group** [48] - 2004:17, 2020:23, 2021:2, 2021:3, 2021:5, 2021:8, 2021:9, 2021:12, 2048:1,

2054:1, 2054:7, 2054:9, 2056:17, 2057:12, 2057:16, 2057:18, 2058:15, 2058:20, 2059:8, 2059:19, 2059:20, 2059:25, 2064:12, 2067:3, 2073:15, 2073:16, 2074:2, 2077:12, 2080:13, 2085:23, 2088:10, 2095:11, 2096:2, 2096:10, 2096:11, 2101:21, 2101:25, 2102:2, 2102:3, 2105:6, 2105:24, 2107:4, 2109:10, 2109:15, 2109:19
**group's** [1] - 2096:16
**grow** [2] - 2049:2, 2058:24
**growing** [1] - 2057:18
**Guard** [3] - 2031:25, 2032:1, 2048:6
**guess** [9] - 1996:11, 2010:19, 2025:17, 2033:16, 2033:25, 2052:7, 2065:21, 2102:15, 2103:9
**guessing** [1] - 2076:9
**guest** [2] - 2095:12, 2097:11
**guidance** [2] - 2008:17, 2051:2
**guide** [1] - 2008:12
**gun** [1] - 2017:22
**guns** [2] - 2025:20, 2036:1
**guy** [6] - 2009:22, 2010:3, 2010:14, 2010:25, 2070:13
**guys** [5] - 2003:2, 2068:5, 2089:18, 2090:6

## H

**H-i-l-l-i-a-r-d** [1] - 2047:23
**habit** [1] - 2084:13
**Hackett** [3] - 2073:18, 2083:25, 2090:15
**half** [5] - 2024:19, 2035:1, 2044:12, 2110:16, 2112:16
**Haller** [10] - 2062:7, 2071:12, 2071:16, 2071:20, 2098:5, 2100:25, 2103:18, 2104:2, 2106:5,

2109:3
**HALLER** [21] - 2054:22, 2062:3, 2062:7, 2062:10, 2065:10, 2069:14, 2071:13, 2071:17, 2071:19, 2084:11, 2084:13, 2084:14, 2086:2, 2086:6, 2086:13, 2087:6, 2087:12, 2094:10, 2098:2, 2101:15, 2103:5
**Haller**................. [1] - 1995:13
**hand** [7] - 2018:17, 2024:12, 2042:24, 2047:4, 2086:3, 2093:24, 2103:10
**handed** [1] - 2094:4
**handful** [3] - 2049:24, 2072:7, 2096:15
**handicap** [1] - 2008:21
**handicaps** [2] - 2008:6, 2008:7
**handle** [2] - 2068:5, 2089:20
**handler** [2] - 2040:20, 2040:22
**hands** [1] - 2108:2
**handwriting** [2] - 2062:16, 2062:17
**hang** [2] - 2070:19, 2094:7
**Hangout** [2] - 2056:21, 2056:24
**hangout** [1] - 2074:24
**happy** [4] - 2033:20, 2058:4, 2110:9
**hard** [1] - 2020:18
**harm** [1] - 2104:16
**Harr** [1] - 2083:25
**Harrelson** [13] - 2051:23, 2053:8, 2053:13, 2053:18, 2053:21, 2072:11, 2073:18, 2078:12, 2080:13, 2080:16, 2082:25, 2090:15, 2098:10
**Harry** [1] - 2111:10
**head** [2] - 2042:25, 2099:14
**health** [1] - 2009:18
**hear** [9] - 2011:10, 2019:17, 2019:21, 2020:19, 2023:23, 2036:21, 2083:2, 2103:2

**heard** [11] - 2002:5, 2025:12, 2025:23, 2034:22, 2044:8, 2045:10, 2046:21, 2048:13, 2083:16, 2096:22, 2097:6
**hearing** [2] - 2107:16
**hearsay** [1] - 2011:8
**heavy** [1] - 2020:7
**held** [12] - 1996:5, 1996:17, 2034:6, 2058:9, 2070:23, 2071:14, 2081:4, 2101:1, 2102:6, 2110:20
**helmet** [5] - 2000:8, 2000:10, 2000:11, 2000:13, 2000:14
**help** [8] - 2019:17, 2045:24, 2046:2, 2046:5, 2051:8, 2077:19, 2091:6, 2097:4
**helped** [5] - 2063:10, 2064:2, 2078:3, 2107:6, 2107:10
**helpful** [1] - 2038:10
**helping** [1] - 2021:17
**hi** [2] - 2014:25, 2037:21
**highlight** [2] - 2062:20, 2062:24
**highlighted** [1] - 2109:1
**highly** [1] - 1999:19
**Hilliard** [2] - 2047:21, 2047:22
**himself** [1] - 2107:14
**hindsight** [1] - 2085:22
**historically** [1] - 2029:15
**history** [1] - 2031:3
**hit** [1] - 2077:18
**hold** [3] - 2034:9, 2107:7
**holding** [3] - 2024:12, 2042:24, 2081:5
**home** [4] - 2018:9, 2029:24, 2041:21, 2110:3
**honestly** [1] - 2023:6
**Honor** [44] - 1996:6, 1996:22, 2012:5, 2012:10, 2012:15, 2014:18, 2014:21, 2018:4, 2018:13, 2028:7, 2028:9, 2033:20, 2034:4, 2037:11, 2038:23,

2038:25, 2041:25,
2042:2, 2042:3,
2042:12, 2047:1,
2052:25, 2053:17,
2053:19, 2061:25,
2065:8, 2065:10,
2065:14, 2069:14,
2069:18, 2070:16,
2071:17, 2084:11,
2086:4, 2087:5,
2087:6, 2094:9,
2098:3, 2098:13,
2100:20, 2110:12,
2111:14, 2112:2
**hope** [1] - 1996:19
**hopefully** [1] -
2 1999:23
**horrible** [1] - 2025:22
**hospital** [1] - 2015:18
**host** [1] - 2101:14
**hosted** [1] - 2058:17
**hotel** [2] - 2010:9,
2077:3
**hour** [3] - 2024:19,
2035:1, 2044:12
**hours** [3] - 1999:23,
1999:25, 2035:6
**house** [4] - 2001:25,
2004:14, 2004:15,
2024:5
**House** [3] - 2025:18,
2036:8, 2036:10
**hundred** [2] - 2096:15,
2105:14
**hunt** [1] - 2046:8
**hurricanes** [2] -
2077:19, 2077:21
**husher** [1] - 1996:13

**I**

**idea** [3] - 2030:8,
2072:25, 2099:24
**identification** [5] -
2053:1, 2053:4,
2053:18, 2053:21,
2061:11
**identified** [3] -
2003:24, 2112:13,
2112:24
**identity** [6] - 2039:13,
2039:16, 2039:18,
2039:23, 2039:25,
2056:7
**ideology** [3] - 2064:7,
2067:4, 2088:11
**II** [3] - 2062:23,
2094:25, 2096:20
**illegal** [2] - 2096:23,
2097:7

**illegitimate** [2] -
2063:17, 2108:4
**iMessages** [2] -
2065:21, 2065:22
**important** [1] -
2028:16
**in-court** [4] - 2053:1,
2053:4, 2053:18,
2053:21
**in-house** [1] - 2001:25
**in-person** [1] -
2029:21
**inappropriate** [2] -
2067:11, 2088:20
**incapable** [1] -
2063:17
**incidents** [2] -
2081:21, 2082:22
**include** [10] - 2074:21,
2075:2, 2080:8,
2080:23, 2088:9,
2090:10, 2097:8,
2097:16, 2097:19,
2097:24
**included** [4] -
2073:17, 2074:8,
2075:13, 2077:17
**including** [3] - 2032:1,
2090:11, 2097:20
**income** [2] - 2041:11,
2041:12
**incorrect** [1] - 2005:17
**incumbent** [1] -
2030:11
**independence** [1] -
2063:22
**indicated** [6] - 2002:3,
2009:5, 2014:11,
2051:6, 2060:15,
2060:21
**individual** [5] -
2001:22, 2011:6,
2049:12, 2099:12,
2099:18
**individuals** [2] -
2031:24, 2078:11
**indulgence** [4] -
2009:15, 2014:17,
2018:15, 2106:12
**info** [2] - 2091:17,
2091:19
**information** [4] -
2035:9, 2050:18,
2072:16, 2083:17
**initial** [1] - 2077:1
**initials** [2] - 2056:22,
2056:23
**injured** [1] - 2049:16
**inside** [3] - 2004:15,
2072:7, 2091:12

**instance** [1] - 2049:15
**instead** [3] - 2009:24,
2079:24, 2080:2
**instructed** [1] -
2102:12
**instruction** [1] -
2046:20
**Insurrection** [1] -
2060:23
**Intel** [1] - 2092:2
**intel** [5] - 2070:1,
2091:8, 2091:12,
2092:1, 2092:5
**intelligence** [1] -
2073:16
**intends** [1] - 2111:8
**intent** [1] - 2077:22
**interact** [1] - 2101:23
**interaction** [2] -
2095:4, 2095:6
**interactions** [1] -
2029:18
**interest** [3] - 2001:21,
2049:7, 2062:25
**interested** [3] -
2049:8, 2070:14,
2102:22
**interesting** [1] -
2101:25
**interests** [1] - 2051:17
**internal** [2] - 2067:7,
2088:15
**interrupt** [3] - 2016:4,
2054:17, 2087:3
**interview** [5] -
2005:10, 2027:16,
2027:18, 2061:23,
2111:10
**interviewed** [3] -
2061:4, 2061:7,
2065:2
**introduce** [2] - 2020:1,
2047:14
**invitation** [1] -
2022:20
**invitations** [1] -
2022:15
**invite** [1] - 2057:15
**invited** [5] - 2001:15,
2001:16, 2021:12,
2022:6, 2022:17
**involved** [8] - 2048:25,
2058:16, 2083:20,
2085:2, 2097:12,
2099:15, 2109:14
**involves** [1] - 2010:23
**iPhone** [2] - 2065:22,
2065:23
**issue** [1] - 2082:1
**issues** [3] - 2009:6,

2009:12, 2011:10
**it'll** [1] - 2110:8
**items** [2] - 2001:20,
2077:9
**itself** [1] - 2108:1

**J**

**jacket** [1] - 2053:15
**James** [1] - 2028:14
**Jan** [2] - 2015:7,
2015:14
**January** [35] - 2006:4,
2009:20, 2009:24,
2010:3, 2010:4,
2011:22, 2012:4,
2012:8, 2012:9,
2012:14, 2014:5,
2015:2, 2015:5,
2015:8, 2016:12,
2016:14, 2016:15,
2026:24, 2027:1,
2027:7, 2027:12,
2040:18, 2070:10,
2075:22, 2075:24,
2076:3, 2076:10,
2096:24, 2097:8,
2109:8, 2109:16,
2111:3, 2111:9,
2111:15
**JC** [1] - 1996:8
**Jeremy** [5] - 2079:1,
2079:17, 2097:16,
2101:6, 2102:11
**Jersey** [1] - 2084:13
**Jessica** [4] - 1997:2,
2005:20, 2039:4,
2098:19
**job** [2] - 2020:22,
2047:25
**Joe** [3] - 2073:18,
2083:25, 2090:15
**John** [1] - 1995:4
**join** [11] - 2006:17,
2021:3, 2021:12,
2021:13, 2022:17,
2023:7, 2032:13,
2043:4, 2051:2,
2057:16, 2074:4
**joined** [11] - 2006:21,
2021:2, 2021:18,
2025:22, 2029:3,
2029:8, 2037:1,
2048:12, 2048:16,
2101:19
**joining** [2] - 2021:9,
2052:15
**joking** [1] - 1999:24
**Jon** [2] - 2011:6,
2011:12

**Jonathan** [4] - 1997:2,
2039:4, 2062:7,
2098:18
**judge** [2] - 2017:2,
2098:18
**Juli** [2] - 2062:7,
2071:20
**July** [5] - 2049:20,
2072:3, 2072:6,
2073:1
**juror** [1] - 2071:5
**jurors** [2] - 2019:21,
2071:11
**jury** [12] - 1996:2,
1996:5, 1996:17,
2005:12, 2042:15,
2047:15, 2062:15,
2065:17, 2070:23,
2071:14, 2084:16,
2110:20

**K**

**K-o-o-p-m-a-n** [1] -
2052:10
**Karl** [2] - 2025:4,
2026:5
**keep** [3] - 1999:23,
2017:2, 2019:19
**Keeper** [9] - 2000:21,
2001:15, 2001:16,
2022:3, 2028:19,
2029:8, 2031:15,
2032:10, 2083:11
**Keeper-related** [1] -
2083:11
**Keepers** [86] -
1998:21, 2000:3,
2000:6, 2000:18,
2000:19, 2001:1,
2001:12, 2001:23,
2001:24, 2002:8,
2002:13, 2002:23,
2003:6, 2003:20,
2004:6, 2004:11,
2006:18, 2006:19,
2007:2, 2007:5,
2008:16, 2008:25,
2011:14, 2011:21,
2012:3, 2013:16,
2015:2, 2015:23,
2020:24, 2021:1,
2021:18, 2021:20,
2022:13, 2022:14,
2028:25, 2029:15,
2029:18, 2029:24,
2030:3, 2030:5,
2030:10, 2030:19,
2030:25, 2031:10,
2038:2, 2038:20,
2040:18, 2041:17,

2123

2046:7, 2048:9, 2048:12, 2048:20, 2049:6, 2049:19, 2050:6, 2050:7, 2051:3, 2051:11, 2057:16, 2058:1, 2058:22, 2060:6, 2065:24, 2071:25, 2072:18, 2074:24, 2075:2, 2082:2, 2089:5, 2092:25, 2095:4, 2104:3, 2104:11, 2104:19, 2104:24, 2105:6, 2105:12, 2105:13, 2105:18, 2106:2, 2106:16, 2106:18, 2107:4, 2107:16, 2108:6, 2108:7

**Kelly** [22] - 2037:21, 2037:22, 2051:22, 2052:16, 2053:1, 2066:17, 2071:21, 2072:10, 2073:17, 2078:6, 2080:11, 2082:19, 2082:21, 2083:13, 2083:24, 2084:3, 2085:13, 2088:1, 2090:10, 2092:12, 2092:15, 2106:4

**Kellye** [1] - 2112:10

**Ken** [6] - 2072:11, 2078:11, 2080:13, 2082:25, 2083:25, 2090:15

**Kenneth** [4] - 2051:23, 2053:8, 2053:18, 2073:18

**Kenny** [3] - 2080:15

**Kentucky** [4] - 2082:5, 2082:11, 2104:4, 2104:5

**kept** [1] - 2001:25

**Kevlar** [1] - 2000:16

**kick** [1] - 2025:20

**kind** [18] - 2000:11, 2020:5, 2025:19, 2038:18, 2039:15, 2047:25, 2048:17, 2050:16, 2054:2, 2059:8, 2059:13, 2059:17, 2072:16, 2081:25, 2092:9, 2102:17, 2102:20, 2106:21

**kinds** [1] - 2046:9

**kinetic** [4] - 2079:10, 2079:11, 2079:12, 2080:8

**kit** [3] - 2013:10, 2013:11

**KM** [1] - 2093:25

**KM.04** [3] - 2086:2, 2086:5, 2087:10

**KM.04.................** [1] - 1995:19

**KM.05** [2] - 2093:24, 2106:6

**knowing** [3] - 2016:10, 2017:15, 2048:24

**knowledge** [10] - 2005:24, 2006:1, 2010:15, 2011:20, 2012:13, 2013:25, 2016:5, 2097:13, 2104:20, 2111:12

**known** [1] - 2084:5

**KOOP** [1] - 2052:9

**Koopman** [7] - 2052:6, 2052:9, 2072:11, 2073:24, 2090:17, 2102:5, 2105:3

**L**

**labeled** [2] - 2027:24, 2031:22

**lack** [1] - 1998:21

**ladies** [3] - 2046:19, 2047:15, 2110:13

**language** [1] - 2067:23

**large** [3] - 2101:21, 2107:12, 2107:18

**larger** [1] - 2096:10

**last** [9] - 1997:11, 2027:23, 2063:2, 2063:5, 2095:4, 2095:6, 2103:14, 2107:21, 2112:8

**lasted** [1] - 2043:22

**late** [5] - 2058:22, 2067:1, 2079:18, 2099:2, 2109:7

**late-November** [1] - 2099:2

**law** [6] - 2024:24, 2025:10, 2039:23, 2040:12, 2040:24

**laws** [1] - 1998:16

**lead** [3] - 2012:20, 2025:20, 2054:2

**leader** [16] - 2011:4, 2030:2, 2030:7, 2030:8, 2046:9, 2072:3, 2072:6, 2072:25, 2073:1,

2077:23, 2081:25, 2083:8, 2085:16, 2091:24, 2096:5, 2106:3

**leaders** [4] - 2064:12, 2095:24, 2095:25, 2096:1

**Leadership** [1] - 2075:10

**leadership** [22] - 2001:2, 2063:11, 2066:18, 2075:7, 2078:19, 2078:20, 2080:22, 2085:14, 2085:17, 2088:2, 2089:9, 2091:24, 2095:13, 2096:2, 2096:11, 2096:16, 2101:24, 2102:2, 2102:3, 2108:7, 2109:3

**leading** [5] - 2054:22, 2069:14, 2075:22, 2097:8, 2103:5

**lean** [1] - 2058:3

**learn** [2] - 2021:9, 2049:14

**learned** [1] - 2055:9

**least** [8] - 2003:20, 2011:21, 2013:16, 2036:4, 2052:13, 2066:21, 2083:11, 2095:15

**leave** [10] - 2010:9, 2018:8, 2046:16, 2063:15, 2075:24, 2076:14, 2076:17, 2108:6, 2109:3

**leaving** [6] - 2050:1, 2056:16, 2085:21, 2089:9, 2090:1, 2096:7

**Lee** [2] - 2028:14, 2033:13

**left** [7] - 2049:24, 2064:16, 2065:18, 2076:3, 2076:4, 2095:24, 2106:2

**leg** [1] - 2009:12

**legal** [4] - 1998:11, 1998:18, 2030:24, 2032:6

**less** [1] - 2010:10

**lesser** [1] - 2089:5

**letter** [25] - 2061:16, 2061:22, 2062:16, 2062:24, 2092:25, 2093:3, 2093:7, 2093:9, 2093:16, 2093:17, 2093:25,

2094:4, 2094:5, 2094:6, 2094:8, 2094:11, 2094:16, 2094:22, 2094:25, 2096:20, 2106:6, 2108:10, 2108:12, 2108:22

**Letter** [2] - 2062:23, 2108:20

**letters** [5] - 2060:13, 2060:21, 2061:8, 2085:8, 2093:21

**liberty** [3] - 2063:19, 2063:21, 2063:23

**license** [1] - 2078:12

**Licenses** [2] - 2067:13, 2088:22

**lieu** [1] - 2033:18

**life** [2] - 2067:25, 2089:1, 2089:3

**lifetime** [4] - 2089:4, 2095:7, 2095:8, 2095:9

**likely** [1] - 1997:19

**limitations** [1] - 2003:11

**LINDER** [11] - 2062:9, 2062:11, 2098:9, 2111:24, 2112:2, 2112:6, 2112:23, 2113:1, 2113:4, 2113:7, 2113:15

**Linder** [4] - 2062:9, 2098:7, 2111:23, 2112:21

**line** [5] - 2000:18, 2003:2, 2011:8, 2034:1, 2043:4

**lines** [2] - 2006:16, 2007:3

**lining** [1] - 1996:9

**link** [5] - 2050:5, 2093:3, 2093:7, 2093:8, 2094:21

**linked** [1] - 2072:18

**list** [2] - 2112:15, 2113:5

**listen** [3] - 2027:23, 2036:20, 2101:17

**listened** [1] - 2024:1

**listening** [2] - 2041:2, 2042:22

**listing** [1] - 2050:11

**live** [1] - 2047:20

**living** [1] - 2020:6

**local** [1] - 2040:17

**location** [1] - 2102:12

**log** [3] - 2050:4, 2059:14, 2097:12

**login** [1] - 2050:4

**look** [5] - 2052:20, 2053:12, 2102:19, 2110:14, 2111:5

**looked** [1] - 2007:12

**looking** [5] - 2002:25, 2040:15, 2042:19, 2054:2, 2106:7

**looks** [3] - 2106:20, 2106:21, 2108:19

**loud** [2] - 2019:25, 2047:14

**Louisville** [6] - 2082:5, 2082:11, 2104:3, 2104:5, 2104:12, 2104:16

**love** [2] - 2005:19, 2005:20

**Lt** [1] - 2107:11

**lunch** [2] - 1996:19, 2110:16

**M**

**ma'am** [38] - 2005:2, 2007:25, 2015:6, 2015:8, 2016:7, 2017:4, 2017:10, 2017:12, 2017:14, 2017:17, 2020:25, 2022:16, 2023:21, 2024:14, 2024:17, 2025:25, 2026:3, 2026:6, 2026:12, 2027:2, 2027:6, 2027:9, 2027:11, 2027:17, 2027:20, 2027:22, 2028:1, 2043:5, 2043:9, 2043:12, 2044:10, 2044:14, 2044:17, 2045:1, 2045:4, 2045:12, 2046:4

**mad** [1] - 2017:2

**MAGA** [8] - 1997:8, 2081:8, 2081:12, 2081:14, 2081:18, 2081:21, 2083:5, 2107:18

**maintaining** [1] - 2021:16

**man** [4] - 2049:14, 2067:6, 2088:14, 2089:14

**man-made** [1] - 2049:14

**manager** [1] - 2048:2

**March** [7] - 1997:8, 2081:8, 2081:12, 2081:14, 2081:18, 2081:21, 2083:5

2124

**Marcus** [1] - 2113:4
**Marine** [1] - 2020:11
**mark** [5] - 2063:6,
2063:7, 2063:9,
2086:2, 2093:24
**marked** [2] - 2061:11,
2106:5
**mask** [3] - 2018:25,
2019:5, 2047:8
**match** [2] - 2067:4,
2088:11
**matter** [7] - 2023:25,
2040:5, 2046:3,
2067:10, 2088:20,
2110:22, 2112:4
**matters** [1] - 2077:18
**mean** [30] - 2000:14,
2000:15, 2003:7,
2003:11, 2003:13,
2003:14, 2005:8,
2007:14, 2007:17,
2008:15, 2010:5,
2010:14, 2010:19,
2010:22, 2016:4,
2016:14, 2035:10,
2036:14, 2040:23,
2040:24, 2041:13,
2045:18, 2046:6,
2056:5, 2072:14,
2076:17, 2077:10,
2109:12, 2113:11
**meaning** [1] - 2093:8
**means** [6] - 2079:7,
2079:25, 2080:4,
2084:16, 2089:8,
2095:10
**meant** [1] - 2001:24
**mechanic** [1] - 2020:7
**media** [4] - 2021:4,
2021:6, 2029:19,
2080:3
**medical** [1] - 2049:15
**meet** [6] - 2021:20,
2052:16, 2057:8,
2058:9, 2077:2,
2078:21
**meeting** [28] -
2024:21, 2024:23,
2027:19, 2035:1,
2035:5, 2035:21,
2035:25, 2036:13,
2036:15, 2036:25,
2057:7, 2057:12,
2058:9, 2058:11,
2069:13, 2078:23,
2078:24, 2079:1,
2092:18, 2101:10,
2101:18, 2102:1,
2102:2, 2102:6,
2102:13, 2102:21,

2103:11, 2103:17
**meetings** [6] -
2001:15, 2001:16,
2022:6, 2037:3,
2037:4, 2078:21
**Meggs** [27] - 1995:19,
2037:21, 2037:22,
2051:22, 2052:16,
2053:1, 2053:5,
2071:21, 2072:10,
2073:17, 2074:16,
2074:18, 2076:22,
2076:24, 2080:11,
2082:19, 2082:21,
2083:13, 2083:25,
2084:3, 2084:22,
2085:13, 2085:24,
2087:10, 2090:10,
2092:15, 2106:4
**Meggs's** [1] - 2074:4
**member** [30] - 2000:2,
2000:5, 2001:1,
2001:5, 2002:12,
2006:24, 2006:25,
2011:14, 2028:25,
2029:24, 2030:10,
2030:25, 2032:20,
2049:18, 2049:22,
2060:8, 2067:7,
2067:8, 2067:25,
2072:20, 2088:15,
2088:16, 2089:1,
2089:3, 2091:9,
2095:8, 2095:9,
2095:10, 2101:5,
2101:23
**Member** [1] - 2031:22
**members** [35] -
2001:3, 2001:16,
2002:23, 2003:20,
2008:25, 2011:3,
2012:3, 2015:2,
2022:4, 2029:2,
2030:5, 2051:12,
2051:13, 2055:6,
2055:24, 2057:15,
2058:3, 2058:4,
2058:25, 2059:25,
2067:9, 2068:8,
2072:19, 2073:17,
2074:12, 2077:1,
2081:17, 2088:19,
2092:25, 2097:25,
2099:7, 2101:22,
2104:23, 2105:5,
2105:24
**membership** [5] -
2031:19, 2081:5,
2089:4, 2095:8,
2095:12

**Membership** [2] -
2031:22, 2031:24
**memo** [1] - 2110:25
**mention** [2] - 1998:23,
2009:3
**mentioned** [1] -
2009:11
**mere** [1] - 2063:19
**message** [16] -
2060:15, 2066:12,
2066:14, 2066:21,
2068:7, 2068:24,
2069:20, 2086:3,
2086:15, 2087:18,
2087:25, 2094:22,
2099:3, 2112:3,
2112:22, 2112:23
**messages** [16] -
2016:11, 2049:24,
2050:1, 2056:16,
2064:24, 2065:3,
2065:22, 2066:5,
2066:7, 2068:22,
2075:14, 2086:14,
2086:17, 2086:19,
2090:20, 2112:14
**messaging** [7] -
2017:8, 2055:13,
2055:14, 2064:21,
2064:22, 2064:23
**met** [20] - 2003:23,
2004:1, 2004:4,
2004:11, 2021:22,
2028:25, 2029:2,
2029:5, 2029:8,
2053:8, 2074:12,
2074:15, 2074:16,
2076:22, 2076:24,
2077:1, 2077:3,
2077:4, 2078:6,
2108:23
**mic** [1] - 2044:5
**Michael** [5] - 1995:11,
2047:2, 2047:16,
2107:11, 2107:12
**MICHAEL** [1] -
2047:18
**microphone** [3] -
2019:10, 2019:17,
2020:22
**mid** [2] - 2049:20,
2076:10
**mid-January** [1] -
2076:10
**mid-July** [1] - 2049:20
**middle** [1] - 2067:20
**might** [2] - 2001:22,
2019:17
**Mike** [2] - 2066:17,
2088:1

**military** [14] - 1999:2,
2000:8, 2000:23,
2002:9, 2007:20,
2012:23, 2013:1,
2013:3, 2013:6,
2020:8, 2020:10,
2031:25, 2048:3,
2107:5
**military-style** [2] -
2000:8, 2000:23
**militia** [2] - 2067:3,
2088:10
**militias** [1] - 2060:24
**Million** [3] - 1997:8,
2081:8, 2083:5
**mind** [1] - 2067:16
**mindful** [1] - 2084:7
**minimum** [1] -
2035:20
**minute** [2] - 2035:1,
2103:14
**minutes** [11] -
1999:25, 2024:20,
2034:25, 2035:14,
2043:11, 2043:16,
2043:21, 2043:22,
2044:12, 2110:7,
2113:18
**misphrased** [1] -
2029:10
**misquoting** [1] -
2036:4
**mission** [4] - 1999:5,
1999:9, 2013:5,
2077:17
**misspoke** [1] - 2036:6
**misstated** [1] -
2035:20
**model** [2] - 2067:5,
2088:12
**moment** [2] - 2036:3,
2036:7
**Monday** [4] - 2057:14,
2058:11, 2080:19,
2080:20
**Mondays** [1] - 2078:21
**month** [1] - 2060:5
**morning** [4] - 1996:2,
1997:1, 2112:19,
2113:20
**Moseley** [1] - 2110:23
**most** [5] - 1997:19,
2000:12, 2014:7,
2058:2, 2058:3
**mostly** [1] - 2021:21
**motel** [1] - 2103:16
**move** [6] - 2012:10,
2042:3, 2062:1,
2087:7, 2092:9,
2104:1

**moved** [3] - 2028:18,
2103:16, 2111:22
**msg** [1] - 2092:11
**multiple** [1] - 2096:1
**must** [1] - 2108:1

**N**

**name** [19] - 1997:2,
1999:16, 2011:6,
2020:3, 2026:10,
2028:14, 2033:2,
2033:8, 2033:16,
2033:18, 2036:23,
2039:4, 2039:25,
2040:5, 2045:25,
2056:20, 2071:20,
2098:18, 2102:8
**named** [2] - 2026:5,
2101:6
**names** [7] - 2032:22,
2033:18, 2033:22,
2034:13, 2034:15,
2051:20, 2052:14
**national** [13] -
2006:24, 2007:7,
2057:15, 2070:1,
2075:7, 2080:22,
2091:12, 2091:20,
2091:23, 2091:24,
2092:1, 2092:2,
2092:5
**National** [4] - 2031:25,
2032:1, 2048:6,
2091:8
**nationally** [1] - 2058:1
**native** [1] - 2112:14
**natural** [1] - 2049:14
**nature** [2] - 2049:8,
2100:11
**necessarily** [4] -
2013:1, 2016:22,
2055:4, 2083:19
**necessary** [1] -
2033:15
**need** [9] - 2000:16,
2032:8, 2035:9,
2037:8, 2069:6,
2069:25, 2087:13,
2091:15, 2092:7
**needed** [5] - 2054:10,
2057:8, 2059:3,
2060:8, 2078:22
**needing** [1] - 2009:12
**needs** [1] - 2107:25
**neglected** [1] - 2042:3
**Neklovech** [1] -
2033:8
**NESTLER** [6] -
2071:9, 2110:8,

2110:12, 2111:7, 2111:14, 2111:17
**Nestler** [3] - 1996:10, 2110:6, 2110:23
**networking** [2] - 2067:5, 2088:11
**never** [11] - 1999:7, 2004:11, 2004:15, 2006:10, 2011:18, 2029:3, 2029:8, 2029:12, 2039:20, 2040:15, 2040:16
**new** [8] - 2039:13, 2039:16, 2039:18, 2039:23, 2039:25, 2086:9, 2092:7
**New** [1] - 2084:13
**news** [3] - 2106:20, 2106:23, 2113:10
**newspaper** [1] - 2006:3
**next** [18] - 2018:12, 2044:12, 2046:25, 2050:10, 2050:15, 2055:7, 2056:9, 2056:12, 2057:2, 2063:6, 2066:3, 2066:21, 2067:16, 2068:19, 2069:20, 2087:17, 2091:7, 2110:6
**nice** [3] - 1996:19, 2003:25, 2004:3
**nicknames** [1] - 2034:18
**night** [7] - 2027:23, 2069:13, 2091:6, 2112:2, 2112:8, 2113:2, 2113:19
**nobody** [1] - 2081:23
**noggin** [1] - 2000:16
**noise)** [1] - 2024:8
**non** [2] - 2001:16, 2107:4
**non-Oath** [1] - 2001:16
**non-partisan** [1] - 2107:4
**nonmembers** [3] - 2001:8, 2001:12, 2003:19
**nonmilitary** [1] - 2049:8
**north** [1] - 2102:7
**North** [11] - 2002:23, 2006:22, 2007:5, 2011:4, 2011:14, 2011:21, 2012:3, 2014:9, 2015:2, 2015:23

**NOTE** [1] - 1996:2
**noted** [1] - 2053:5
**nothing** [4] - 2014:18, 2041:25, 2100:9, 2108:15
**notice** [1] - 2068:7
**noticed** [1] - 2008:5
**notified** [3] - 2064:10, 2064:11, 2064:12
**notify** [2] - 2024:24, 2026:14
**November** [35] - 1997:5, 1997:7, 2006:5, 2006:6, 2009:24, 2013:17, 2014:4, 2014:6, 2015:10, 2015:11, 2017:9, 2017:16, 2021:24, 2022:2, 2022:18, 2040:19, 2057:23, 2058:10, 2058:22, 2059:17, 2059:19, 2059:20, 2059:22, 2075:18, 2079:20, 2080:18, 2081:1, 2081:7, 2081:9, 2081:12, 2081:21, 2082:4, 2083:5, 2099:2
**number** [14] - 1997:10, 2022:25, 2023:1, 2023:3, 2028:1, 2037:6, 2043:3, 2043:6, 2043:7, 2050:19, 2050:20, 2086:22, 2087:14
**numbers** [2] - 2037:9, 2057:18

## O

**o'clock** [1] - 2088:5
**Oath** [98] - 1998:21, 2000:3, 2000:5, 2000:6, 2000:18, 2000:19, 2000:21, 2001:1, 2001:12, 2001:15, 2001:16, 2001:23, 2001:24, 2002:8, 2002:13, 2002:23, 2003:6, 2003:20, 2004:6, 2004:11, 2006:18, 2006:19, 2007:2, 2007:5, 2008:16, 2008:25, 2011:14, 2011:21, 2012:3, 2013:16, 2015:2, 2015:23, 2018:18, 2020:24, 2021:1,

2021:18, 2021:20, 2022:3, 2022:13, 2022:14, 2028:19, 2028:25, 2029:8, 2029:15, 2029:18, 2029:24, 2030:3, 2030:5, 2030:10, 2030:19, 2030:25, 2031:10, 2031:15, 2032:10, 2038:2, 2038:20, 2040:18, 2041:17, 2046:7, 2047:5, 2048:9, 2048:12, 2048:20, 2050:6, 2050:7, 2051:3, 2051:11, 2057:16, 2058:1, 2058:22, 2060:6, 2065:24, 2071:25, 2072:18, 2074:24, 2075:2, 2082:2, 2083:10, 2089:5, 2092:25, 2095:4, 2104:3, 2104:11, 2104:19, 2104:24, 2105:6, 2105:12, 2105:13, 2105:18, 2106:2, 2106:16, 2106:18, 2107:4, 2107:16, 2108:6, 2108:7
**oath** [2] - 2030:11, 2030:14
**obeyed** [1] - 2003:21
**objection** [21] - 2009:7, 2011:8, 2011:24, 2012:5, 2033:9, 2042:7, 2042:8, 2053:2, 2053:3, 2053:19, 2054:22, 2062:3, 2062:4, 2062:6, 2065:10, 2069:14, 2087:4, 2087:5, 2094:8, 2101:15, 2103:5
**obligation** [1] - 2002:20
**obligations** [1] - 2089:12
**observed** [2] - 2096:22, 2097:6
**obvious** [2] - 2005:15, 2008:10
**obviously** [13] - 2000:2, 2000:15, 2001:17, 2002:8, 2003:2, 2003:11, 2005:8, 2009:17,

2011:4, 2016:20, 2077:18, 2107:19, 2113:13
**occasion** [1] - 2100:12
**occur** [2] - 2059:11, 2103:11
**occurred** [2] - 2079:21, 2105:15
**occurring** [1] - 2057:22
**October** [1] - 2079:18
**offender** [2] - 2039:19, 2040:1
**offer** [3] - 2033:17, 2049:6, 2105:22
**offered** [4] - 2095:11, 2101:14, 2103:1, 2105:13
**offering** [2] - 2102:4, 2103:22
**Officer** [1] - 2111:10
**official** [1] - 2002:9
**often** [1] - 2057:12
**OK** [3] - 2056:21, 2056:22, 2056:24
**Old** [3] - 2075:10, 2092:5, 2092:6
**old** [2] - 2024:7, 2092:5
**once** [1] - 2007:1
**one** [51] - 1998:21, 2000:12, 2000:14, 2000:16, 2002:3, 2004:12, 2010:14, 2010:18, 2010:23, 2010:25, 2014:13, 2015:8, 2024:9, 2034:24, 2039:12, 2040:15, 2044:4, 2044:23, 2046:9, 2049:5, 2049:25, 2050:14, 2051:7, 2052:13, 2055:12, 2059:23, 2071:5, 2071:11, 2073:12, 2077:9, 2077:14, 2084:8, 2084:19, 2085:6, 2092:5, 2092:6, 2092:7, 2099:6, 2099:7, 2099:25, 2100:12, 2101:23, 2103:13, 2104:23, 2104:25, 2107:13, 2108:24, 2112:25, 2113:1, 2113:2
**ones** [2] - 2006:4, 2028:15
**online** [10] - 2021:4,

2021:21, 2029:19, 2031:15, 2034:17, 2035:5, 2037:4, 2037:5, 2059:13, 2059:14
**op** [2] - 2013:5, 2015:9
**OP** [2] - 2015:7, 2015:14
**Open** [2] - 2062:23, 2108:19
**open** [8] - 2034:6, 2060:13, 2061:8, 2061:16, 2106:6, 2108:9, 2108:12, 2108:22
**operating** [1] - 1998:16
**operation** [5] - 2002:18, 2104:3, 2109:13, 2109:14, 2109:16
**operational** [1] - 2067:11
**operations** [4] - 2029:15, 2030:6, 2102:15, 2103:14
**opinion** [1] - 2058:1
**opinions** [1] - 2025:2
**opportunities** [1] - 2001:9
**opportunity** [2] - 2103:1, 2111:5
**opposed** [1] - 2089:5
**Ops** [1] - 2000:13
**Ops-Core** [1] - 2000:13
**opsec** [2] - 2067:10, 2088:20
**option** [1] - 2039:17
**optional** [1] - 2000:15
**order** [6] - 2001:19, 2002:4, 2002:10, 2002:14, 2021:8, 2111:4
**orders** [1] - 2003:20
**organization** [22] - 1998:20, 1998:22, 2030:10, 2032:12, 2051:7, 2055:21, 2055:23, 2055:25, 2056:11, 2059:9, 2060:9, 2063:12, 2074:5, 2077:22, 2083:22, 2085:21, 2096:18, 2097:4, 2101:6, 2101:19, 2104:17
**organization's** [1] - 2049:21
**organizational** [7] -

2054:12, 2067:3,
2088:9, 2093:10,
2100:6, 2100:8,
2109:18
**organized** [2] -
1999:4, 2101:4
**originally** [2] -
1998:23, 2103:1
**Orlando** [1] - 2073:2
**ostensibly** [1] -
2099:7
**outcome** [5] - 2045:9,
2045:13, 2045:17,
2058:2, 2058:4
**outside** [7] - 1996:5,
2016:19, 2029:23,
2060:18, 2060:19,
2070:23, 2110:20
**overboard** [1] -
2102:21
**overriding** [1] -
2013:16
**overruled** [2] -
2054:23, 2103:6
**overthrow** [1] -
2045:19
**overtook** [1] - 2059:17
**overwatch** [2] -
2068:3, 2089:14
**own** [2] - 2049:23,
2059:7
**owner** [1] - 2068:1

## P

**p.m** [1] - 2113:22
**page** [12] - 2031:18,
2061:18, 2063:3,
2063:5, 2066:3,
2066:11, 2067:16,
2068:19, 2087:2,
2087:14, 2087:17,
2108:19
**PAGE** [1] - 1995:2
**pages** [2] - 2061:19,
2086:15
**paid** [2] - 2095:8,
2095:12
**paragraph** [3] -
2063:6, 2107:3,
2109:1
**paragraphs** [1] -
2107:21
**paraphrasing** [3] -
2025:19, 2035:24,
2046:10
**Part** [4] - 2062:23,
2093:17, 2094:25,
2096:20
**part** [24] - 1998:7,

2003:12, 2010:8,
2012:8, 2015:9,
2015:14, 2015:24,
2023:3, 2035:25,
2036:11, 2036:12,
2036:25, 2060:18,
2061:2, 2061:3,
2064:6, 2064:16,
2066:21, 2073:14,
2073:16, 2097:11,
2104:11, 2109:17,
2109:21
**participate** [4] -
2021:21, 2058:7,
2083:14, 2105:6
**participated** [2] -
2038:6, 2104:3
**participates** [1] -
2092:18
**participating** [1] -
2058:17
**particular** [3] -
2002:18, 2056:17,
2073:12
**particulars** [1] -
2008:18
**partisan** [1] - 2107:4
**parts** [2] - 2035:21,
2036:16
**pass** [2] - 2039:23,
2092:24
**past** [2] - 2032:22,
2033:2
**Paul** [5] - 2010:2,
2015:19, 2015:25,
2017:13, 2017:18
**pause** [1] - 2042:16
**pay** [1] - 2006:25
**peacefully** [1] -
2013:24
**people** [41] - 2000:12,
2004:12, 2004:14,
2005:19, 2013:23,
2014:12, 2016:19,
2021:10, 2049:24,
2051:18, 2055:24,
2056:13, 2059:3,
2059:6, 2059:7,
2059:15, 2068:11,
2072:7, 2072:11,
2072:19, 2072:25,
2077:8, 2077:12,
2077:19, 2078:5,
2082:13, 2082:15,
2083:20, 2083:22,
2090:12, 2090:16,
2096:15, 2096:16,
2100:1, 2104:16,
2104:18, 2104:21,
2104:22, 2108:3,

2109:19
**People** [1] - 2063:15
**people's** [1] - 2108:2
**per** [2] - 2030:18,
2032:19
**percent** [2] - 2006:12,
2105:14
**performed** [1] -
2029:16
**perhaps** [2] - 2111:2
**period** [8] - 2000:3,
2021:23, 2022:2,
2059:5, 2064:25,
2066:7, 2109:6,
2109:8
**periodic** [1] - 2022:3
**permit** [2] - 2074:9,
2078:7
**permits** [1] - 2078:16
**person** [24] - 2010:23,
2010:24, 2021:20,
2023:16, 2026:7,
2026:8, 2029:5,
2029:9, 2029:21,
2032:3, 2032:5,
2048:16, 2052:16,
2053:8, 2074:12,
2074:15, 2078:10,
2100:8, 2101:25,
2102:1, 2104:25,
2105:11
**personal** [6] -
2005:24, 2005:25,
2057:10, 2057:11,
2084:17, 2105:1
**personally** [2] -
2016:16, 2055:20
**personas** [1] -
2034:16
**pertained** [1] - 2099:6
**Peter** [2] - 2052:3
**Phillip** [1] - 2062:9
**phone** [36] - 1996:11,
1997:10, 2017:6,
2017:13, 2023:3,
2023:5, 2023:7,
2024:5, 2024:9,
2024:11, 2024:12,
2024:15, 2024:16,
2033:10, 2041:3,
2041:5, 2041:6,
2042:20, 2042:21,
2042:23, 2042:24,
2043:6, 2050:18,
2050:20, 2064:21,
2065:3, 2065:25,
2076:15, 2076:16,
2076:19, 2086:22,
2087:14, 2098:25,
2112:9, 2112:10

**phones** [1] - 2024:7
**physical** [3] - 2008:8,
2010:19, 2079:14
**physically** [1] -
2017:19
**pipes** [1] - 2025:21
**pitch** [2] - 2004:6,
2006:17
**place** [5] - 2004:3,
2007:18, 2014:8,
2026:24, 2084:19
**places** [2] - 2055:22,
2104:23
**plan** [2] - 1999:5,
2070:21
**planned** [2] - 2058:10,
2097:14
**plans** [2] - 2059:2,
2077:4
**platform** [2] - 2037:5,
2057:5
**play** [1] - 2043:18
**played** [1] - 2043:19
**playing** [1] - 2043:20
**plurally** [1] - 2095:25
**point** [19] - 2002:3,
2002:6, 2003:5,
2007:1, 2010:17,
2010:22, 2013:1,
2013:8, 2023:19,
2024:23, 2027:15,
2043:25, 2051:7,
2055:2, 2061:4,
2061:25, 2065:8,
2068:14, 2083:21
**points** [1] - 2012:21
**police** [2] - 2032:2,
2107:5
**Police** [8] - 2025:4,
2026:15, 2026:16,
2037:24, 2038:5,
2038:17, 2044:24,
2111:10
**poor** [3] - 2009:18,
2067:10, 2088:20
**porta** [1] - 2004:16
**portion** [2] - 2051:18,
2065:18
**position** [6] - 2054:4,
2063:11, 2096:3,
2096:14, 2108:7,
2109:3
**possible** [1] - 2112:4
**post** [6] - 1998:11,
2069:25, 2070:1,
2091:8, 2091:12,
2091:19
**posted** [5] - 2091:20,
2091:23, 2092:25,
2094:18

**posture** [2] - 2067:3,
2088:10
**potential** [1] - 2001:22
**potentially** [4] -
2075:15, 2111:1,
2112:24, 2113:9
**potties** [1] - 2004:17
**practice** [1] - 2111:18
**pre** [1] - 1998:11
**pre-deployment** [1] -
1998:11
**precise** [2] - 2047:19,
2047:25
**premise** [1] - 2058:15
**preparation** [3] -
2049:16, 2081:11,
2096:23
**prepared** [3] - 1996:3,
2036:10, 2049:13
**preparedness** [3] -
2048:13, 2049:11,
2059:2
**presence** [4] -
1996:17, 2070:23,
2071:14, 2110:20
**presentation** [7] -
2079:16, 2079:22,
2079:24, 2080:11,
2097:16, 2101:10,
2103:2
**President** [12] -
2058:19, 2060:13,
2060:16, 2060:22,
2061:16, 2062:23,
2063:14, 2106:7,
2107:13, 2107:22,
2108:20
**president** [3] -
2030:19, 2107:23,
2108:2
**presidential** [2] -
2021:25, 2057:22
**press** [1] - 2043:18
**pressing** [1] - 2032:7
**presumably** [1] -
2085:24
**presume** [1] - 2008:15
**presumed** [1] -
2072:19
**pretend** [1] - 2095:9
**pretty** [6] - 1998:24,
2002:22, 2006:11,
2014:14, 2043:16,
2045:6
**previously** [1] -
2028:21
**primarily** [1] - 2029:19
**primary** [1] - 2014:10
**printout** [1] - 2061:22
**private** [1] - 2103:11

**privilege** [1] - 2111:21
**privileged** [4] -
2112:4, 2112:24,
2113:9
**problem** [1] - 2084:3
**problematic** [3] -
2049:2, 2067:4,
2088:10
**problems** [2] - 2067:7,
2088:15
**proceeded** [1] -
2058:22
**Proceedings** [7] -
1996:5, 1996:17,
2034:6, 2070:23,
2071:14, 2110:20,
2113:22
**process** [4] - 2059:1,
2059:14, 2096:12,
2096:17
**program** [2] - 2049:7,
2049:8
**progressively** [1] -
2037:2
**project** [1] - 2089:13
**properly** [1] - 2060:24
**property** [11] -
2082:13, 2082:14,
2082:15, 2102:9,
2102:11, 2103:12,
2103:13, 2103:15,
2103:16, 2104:17,
2104:18
**Propes** [6] - 2051:23,
2052:3, 2072:11,
2073:20, 2078:10,
2090:13
**proposal** [1] - 2025:15
**prosecutors** [1] -
2045:24
**protect** [2] - 2000:15,
2104:18
**protected** [1] -
2082:14
**protecting** [1] -
2105:10
**protection** [3] -
2039:15, 2082:9,
2104:22
**protective** [1] - 2111:4
**protest** [3] - 2058:18,
2070:13, 2105:9
**protester** [1] - 2104:15
**protesters** [1] -
2104:15
**protesting** [1] -
2013:23
**protests** [3] - 2029:10,
2048:22, 2048:23,
2049:1

**ProtonMail** [3] -
2055:10, 2055:16,
2055:19
**proud** [3] - 2067:25,
2089:1, 2089:3
**provide** [7] - 2027:19,
2061:7, 2065:2,
2105:25, 2108:11,
2108:22, 2110:24
**provided** [3] -
2004:19, 2005:4,
2032:2
**providing** [2] -
2084:17, 2084:19
**public** [10] - 2001:14,
2056:8, 2059:3,
2093:8, 2093:11,
2093:12, 2094:18,
2111:2, 2111:13
**publicly** [2] - 2093:9,
2111:8
**publish** [4] - 2042:14,
2062:12, 2065:15,
2087:8
**published** [1] - 2093:9
**publishing** [1] -
2094:8
**pull** [1] - 2019:10
**pulling** [1] - 2100:10
**puppet** [3] - 2060:19,
2063:19, 2063:22
**purification** [1] -
2094:17
**purpose** [6] - 1998:15,
2014:10, 2014:11,
2058:20, 2081:13,
2104:17
**purposes** [1] -
2061:12
**putting** [2] - 2056:8,
2108:16

## Q

**QRF** [7] - 2009:21,
2010:3, 2010:8,
2010:15, 2012:14,
2014:11, 2014:13
**qualified** [1] - 2059:4
**questionable** [2] -
2067:22, 2088:23
**questioning** [3] -
2011:9, 2060:8,
2060:10
**questions** [29] -
1999:21, 2015:1,
2015:3, 2017:3,
2017:18, 2017:20,
2018:5, 2025:6,
2028:6, 2028:15,

2034:20, 2037:11,
2038:23, 2038:25,
2044:25, 2045:23,
2045:25, 2046:13,
2070:16, 2098:2,
2098:11, 2100:15,
2100:25, 2103:18,
2103:25, 2104:2,
2105:17, 2109:2,
2109:24
**quick** [5] - 2009:21,
2010:20, 2010:22,
2017:25, 2110:8
**quicker** [1] - 2113:13
**quickly** [1] - 2087:16
**quiet** [1] - 2049:25
**quote** [1] - 2036:7
**quotes** [1] - 2107:22

## R

**R-a-s-h-e-e-d** [1] -
2020:4
**Racine** [2] - 2025:4,
2026:5
**racism** [1] - 2013:24
**raise** [3] - 2018:17,
2047:4, 2113:17
**raised** [1] - 2110:22
**RAKOCZY** [74] -
1996:6, 2009:7,
2011:8, 2011:24,
2012:5, 2014:21,
2014:23, 2018:4,
2018:13, 2019:13,
2019:24, 2020:16,
2028:6, 2033:9,
2033:13, 2034:4,
2042:2, 2042:12,
2042:18, 2043:14,
2043:20, 2043:23,
2046:13, 2047:1,
2047:11, 2052:25,
2053:6, 2053:17,
2053:22, 2054:24,
2061:18, 2061:20,
2061:25, 2062:12,
2062:14, 2062:20,
2062:21, 2063:2,
2063:4, 2063:25,
2064:1, 2064:14,
2064:17, 2065:8,
2065:14, 2065:17,
2065:20, 2066:2,
2066:6, 2066:10,
2066:13, 2066:20,
2066:22, 2067:15,
2067:18, 2068:13,
2068:15, 2068:18,
2068:23, 2069:18,
2069:19, 2070:6,

2070:8, 2070:16,
2087:5, 2094:9,
2100:20, 2100:22,
2101:16, 2103:8,
2106:12, 2106:15,
2107:9, 2109:24
**Rakoczy** [5] - 2012:12,
2014:20, 2033:12,
2042:1, 2100:19
**Rakoczy............** [3] -
1995:6, 1995:10,
1995:14
**Rakoczy...............** [2]
- 1995:8, 1995:12
**rally** [2] - 2013:8,
2107:12
**ran** [1] - 2071:5
**Rasheed** [18] - 1995:7,
2018:14, 2018:20,
2019:19, 2020:2,
2020:23, 2027:23,
2028:12, 2030:9,
2031:5, 2032:22,
2034:8, 2034:11,
2042:5, 2042:19,
2045:23, 2046:14,
2046:21
**rather** [2] - 2083:2,
2083:25
**raw** [2] - 2112:9,
2112:11
**reach** [4] - 2026:1,
2026:4, 2027:16,
2099:10
**reached** [3] - 2099:3,
2101:24, 2102:3
**reaches** [1] - 2087:25
**reaching** [2] -
2026:13, 2104:20
**reaction** [1] - 2009:21
**reactionary** [2] -
2010:22, 2018:1
**reactive** [2] - 2010:20
**read** [17] - 2005:15,
2030:15, 2030:17,
2030:22, 2031:13,
2031:23, 2033:15,
2033:22, 2046:19,
2055:8, 2055:11,
2063:13, 2066:25,
2069:20, 2088:5,
2092:25, 2107:19
**reading** [3] - 2033:18,
2046:6, 2050:18
**ready** [1] - 2046:25
**real** [3] - 2054:16,
2056:15, 2078:22
**real-time** [2] -
2054:16, 2078:22
**reality** [1] - 2002:12

**realize** [2] - 2067:6,
2088:14
**really** [10] - 1999:1,
2034:14, 2036:15,
2037:14, 2050:9,
2054:15, 2067:7,
2068:10, 2073:2,
2088:15
**reason** [2] - 2033:22,
2099:10
**recce** [1] - 2013:12
**receive** [1] - 2103:3
**received** [2] - 2078:16,
2110:23
**recently** [2] - 2030:1,
2077:20
**Recess** [1] - 2071:3
**recognize** [9] -
2031:7, 2042:19,
2052:18, 2053:10,
2061:12, 2064:18,
2086:14, 2094:5,
2094:6
**recollection** [1] -
2038:16
**recon** [1] - 2013:14
**reconnaissance** [2] -
2013:12, 2105:2
**record** [20] - 2024:3,
2024:4, 2024:16,
2033:11, 2033:16,
2033:19, 2033:23,
2034:3, 2035:12,
2035:14, 2037:2,
2037:8, 2037:10,
2043:21, 2052:25,
2053:5, 2053:17,
2053:20, 2086:19,
2111:2
**recorded** [4] -
2025:24, 2036:25,
2038:3, 2044:11
**recorder** [1] - 2040:16
**recording** [19] -
2023:19, 2024:18,
2024:25, 2027:8,
2027:19, 2027:24,
2028:2, 2028:3,
2034:24, 2040:11,
2040:14, 2042:13,
2043:8, 2043:10,
2043:19, 2043:22,
2043:25, 2044:8,
2044:15
**recovering** [3] -
2015:6, 2015:17,
2015:21
**recruit** [1] - 2001:22
**recruited** [2] -
2001:17, 2006:13

2128

**redact** [1] - 2087:15
**Redirect** [3] - 1995:6, 1995:10, 1995:14
**REDIRECT** [3] - 2014:22, 2042:17, 2100:21
**redirect** [4] - 2012:13, 2014:20, 2042:1, 2100:19
**reference** [2] - 2099:9, 2107:1
**referred** [3] - 2045:2, 2075:4, 2104:12
**referring** [1] - 2026:25
**reflect** [3] - 2052:25, 2053:17, 2053:20
**refresh** [1] - 2038:16
**regarding** [6] - 2005:13, 2006:5, 2032:9
**regards** [2] - 2016:14
**regime** [2] - 2063:17, 2063:22
**regions** [2] - 2073:6, 2073:8
**register** [2] - 2039:18, 2040:1
**registering** [1] - 2107:20
**regular** [2] - 2016:8, 2065:22
**related** [2] - 2013:1, 2083:11
**relates** [1] - 2090:9
**release** [2] - 2111:8, 2111:19
**released** [3] - 2015:18, 2111:3, 2111:8
**relief** [3] - 2068:3, 2077:18, 2089:15
**relieved** [1] - 2111:25
**remain** [1] - 2089:7
**remained** [2] - 2075:16, 2097:5
**remember** [44] - 2008:8, 2008:11, 2009:10, 2009:11, 2017:19, 2021:18, 2022:20, 2023:4, 2023:5, 2023:6, 2023:9, 2025:19, 2026:9, 2026:10, 2026:13, 2027:13, 2028:1, 2036:15, 2037:9, 2038:1, 2038:7, 2038:8, 2044:25, 2045:25, 2051:20, 2052:5, 2052:12, 2056:19, 2077:14, 2099:3,

2099:11, 2099:15, 2099:16, 2100:10, 2102:3, 2102:6, 2102:10, 2103:20, 2104:6, 2104:7, 2106:7, 2106:24, 2107:16
**reminder** [1] - 2110:15
**remove** [1] - 2018:23
**rent** [1] - 2004:16
**rented** [1] - 2004:16
**repeat** [1] - 2025:7
**rephrase** [2] - 2009:8, 2069:16
**reported** [4] - 1996:3, 2035:16, 2035:18, 2073:8
**reporter** [3] - 2019:21, 2020:3, 2084:8
**REPORTER** [9] - 1996:13, 2004:25, 2005:3, 2019:10, 2020:14, 2034:9, 2062:6, 2062:8, 2107:7
**REPORTER'S** [1] - 1996:2
**represent** [6] - 1997:2, 2028:14, 2037:21, 2039:4, 2071:20, 2098:19
**representing** [1] - 2063:17
**republic** [1] - 2094:1
**request** [2] - 2090:23, 2092:24
**requesting** [2] - 2051:8, 2102:1
**requires** [2] - 2067:13, 2088:21
**rescue** [1] - 2014:14
**research** [1] - 2040:3
**reserves** [1] - 2031:25
**resign** [3] - 2063:11, 2064:3, 2064:9
**resolve** [1] - 2113:13
**respect** [1] - 2017:18
**respond** [4] - 2049:13, 2069:1, 2069:3, 2069:9
**responders** [1] - 2107:5
**responding** [1] - 2050:14
**responds** [1] - 2092:15
**response** [5] - 2006:15, 2066:23, 2067:2, 2069:9, 2088:4

**restarting** [1] - 2051:10
**restate** [1] - 2009:23
**restored** [5] - 2032:4, 2032:6, 2032:15, 2032:16, 2032:21
**restroom** [2] - 2071:6, 2071:11
**results** [1] - 2058:8
**resume** [1] - 2070:21
**retired** [6] - 1997:25, 1998:2, 2011:17, 2031:25, 2101:9, 2101:11
**returned** [1] - 2072:4
**reviewed** [1] - 2074:4
**reviewing** [1] - 2078:5
**rhetoric** [6] - 2060:11, 2067:9, 2068:8, 2068:9, 2068:12, 2088:18
**Rhodes** [61] - 2002:4, 2002:6, 2002:13, 2003:6, 2003:7, 2003:14, 2003:16, 2005:8, 2005:16, 2005:20, 2006:8, 2006:10, 2006:14, 2007:1, 2015:25, 2016:11, 2028:14, 2031:6, 2038:6, 2038:19, 2045:2, 2050:19, 2051:5, 2057:15, 2057:17, 2058:8, 2060:11, 2062:23, 2064:10, 2064:24, 2065:24, 2065:25, 2066:14, 2068:10, 2068:12, 2069:1, 2069:12, 2069:21, 2085:8, 2085:24, 2085:25, 2086:20, 2086:25, 2087:18, 2087:21, 2090:21, 2091:18, 2092:13, 2093:20, 2094:1, 2094:14, 2098:8, 2106:7, 2106:23, 2106:24, 2107:3, 2107:13, 2107:22, 2108:3, 2108:10
**Rhodes's** [1] - 2112:9
**rights** [6] - 2013:24, 2032:5, 2032:11, 2032:15, 2032:21
**ROE** [1] - 1998:8
**Roeper** [2] - 2011:6, 2011:12
**Roger** [11] - 1998:9,

2069:24, 2083:12, 2083:13, 2083:17, 2084:15, 2091:7, 2092:2, 2092:10, 2105:18
**rolling** [1] - 2051:17
**room** [19] - 2049:22, 2050:3, 2050:5, 2050:8, 2050:17, 2051:13, 2052:15, 2053:7, 2053:23, 2055:4, 2055:5, 2056:13, 2056:16, 2072:17, 2072:19, 2072:21, 2077:1, 2077:3, 2103:17
**rooms** [2] - 2016:8, 2050:13
**ROP** [1] - 2052:3
**rosters** [2] - 2067:7, 2088:15
**roughly** [4] - 2021:18, 2021:19, 2024:21, 2047:20
**routinely** [1] - 2080:21
**rules** [3] - 1998:7, 1998:15, 2030:21
**run** [2] - 1999:4, 2068:2
**running** [1] - 2007:20
**Russian** [1] - 2040:23

**S**

**safe** [3] - 2018:9, 2037:16, 2110:3
**sales** [1] - 2006:17
**satisfied** [1] - 2033:23
**Saturday** [1] - 2107:10
**saved** [1] - 2065:25
**saw** [10] - 2004:15, 2011:18, 2014:2, 2014:7, 2052:18, 2053:10, 2072:7, 2083:19, 2106:16, 2106:18
**scary** [1] - 2025:14
**scooch** [1] - 2019:16
**scoped** [1] - 2112:10
**scoured** [1] - 2050:16
**screen** [5] - 2042:13, 2042:21, 2061:10, 2064:14, 2108:16
**screenshots** [2] - 2065:3, 2065:6
**scroll** [1] - 2063:2
**seal** [1] - 1996:11
**searching** [1] - 2112:17
**seat** [7] - 2018:17,

2018:21, 2047:3, 2047:7, 2071:4, 2071:15, 2110:21
**seated** [4] - 1996:18, 2052:23, 2052:24, 2053:14
**second** [15] - 2006:7, 2018:15, 2024:15, 2049:5, 2050:2, 2051:25, 2054:17, 2055:12, 2059:23, 2061:16, 2062:6, 2076:22, 2085:6, 2094:7, 2108:24
**seconds** [4] - 2043:11, 2043:16, 2043:21, 2043:22
**secret** [2] - 2102:17, 2102:20, 2103:3
**Section** [2] - 2031:18, 2031:22
**section** [3] - 2031:19, 2032:9, 2101:20
**secur** [1] - 2082:9
**secure** [1] - 2063:18
**security** [22] - 2029:14, 2030:6, 2033:15, 2054:19, 2054:25, 2055:2, 2055:3, 2058:16, 2067:11, 2077:5, 2077:13, 2081:20, 2083:12, 2083:13, 2084:17, 2084:19, 2085:1, 2105:17, 2105:22, 2105:25, 2107:6, 2107:10
**see** [25] - 2007:19, 2019:5, 2041:10, 2042:21, 2048:23, 2050:13, 2052:21, 2053:12, 2062:16, 2065:17, 2066:21, 2066:23, 2068:24, 2071:22, 2086:17, 2086:18, 2094:16, 2094:18, 2102:23, 2110:19, 2111:15, 2111:17, 2112:25, 2113:6, 2113:20
**seeing** [4] - 2015:21, 2046:11, 2065:5, 2110:14
**seek** [2] - 2062:1, 2065:9
**seeking** [1] - 2110:25
**seem** [3] - 1998:25, 2050:9, 2113:12
**select** [1] - 2111:17
**senator** [1] - 2026:19

2129

send [1] - 2066:14
sends [1] - 2093:3
sense [2] - 2014:14, 2027:3
sensitive [3] - 2001:24, 2067:10, 2088:19
sent [15] - 2022:15, 2064:24, 2066:7, 2072:16, 2074:5, 2074:8, 2085:17, 2085:23, 2088:4, 2093:7, 2094:22, 2096:19, 2106:7, 2112:13, 2113:5
sentence [1] - 2088:25
separate [2] - 2003:3, 2007:6
September [4] - 2074:5, 2078:7, 2104:7, 2104:9
sergeant [1] - 1998:3
Sergei [1] - 2033:8
serious [1] - 2089:13
seriously [2] - 2067:23, 2067:24
serve [1] - 2020:10
served [3] - 2020:8, 2046:2, 2048:3
service [4] - 1997:22, 2023:4, 2059:13, 2102:18
services [5] - 2084:25, 2085:1, 2105:13, 2105:22, 2105:25
serving [1] - 2031:25
session [1] - 1996:2
set [17] - 2053:24, 2054:14, 2057:2, 2057:6, 2057:7, 2057:14, 2059:1, 2059:10, 2059:12, 2069:6, 2069:22, 2078:3, 2080:17, 2090:23, 2091:2, 2091:6
setting [1] - 2085:3
seven [4] - 2075:17, 2076:6, 2089:14, 2097:20
seven-day-a-week [1] - 2089:14
several [7] - 2021:10, 2021:22, 2037:7, 2067:2, 2074:18, 2088:7, 2088:9
sex [2] - 2039:19, 2040:1
sexual [1] - 2039:8
shall [1] - 1997:14

sharing [1] - 2034:19
Shoot [1] - 2003:14
shooting [1] - 2045:20
shortly [1] - 2071:6
shove [1] - 2002:15
show [6] - 2031:5, 2038:10, 2064:24, 2087:9, 2093:23
showed [4] - 2096:21, 2106:5, 2112:3, 2113:1
shows [1] - 2094:22
sic [6] - 2031:6, 2031:18, 2063:5, 2075:25, 2081:21, 2083:5
sign [4] - 2001:23, 2022:22, 2022:24, 2023:9
Signal [25] - 2001:2, 2007:6, 2015:7, 2015:9, 2015:14, 2055:9, 2055:12, 2055:19, 2056:10, 2056:14, 2056:17, 2064:11, 2064:22, 2064:23, 2065:21, 2076:12, 2076:13, 2076:14, 2078:22, 2100:7, 2112:14
signals [2] - 2102:19, 2102:20, 2103:4, 2103:10
signed [2] - 2049:21, 2094:14
signing [1] - 2006:15
similar [2] - 2000:13, 2001:7
simply [2] - 2034:13, 2034:14
single [3] - 2028:25, 2033:16, 2033:18
sit [6] - 2009:1, 2009:3, 2009:10, 2009:12, 2071:12, 2076:20
sitting [4] - 2041:21, 2046:6, 2072:15, 2072:17
situation [2] - 2014:12, 2060:7
six [7] - 2032:25, 2033:2, 2033:21, 2033:25, 2034:15, 2035:1, 2048:6
skip [1] - 2088:25
slept [1] - 2015:19
small [2] - 2077:12, 2096:14
smaller [1] - 2087:13

Smith [6] - 2002:4, 2002:6, 2002:22, 2011:4, 2015:23, 2016:11
Smith's [1] - 2017:6
snake [1] - 2099:14
snitches [1] - 2046:8
social [3] - 2021:4, 2021:6, 2029:19
soft [1] - 2019:20
sold [1] - 2007:3
solidified [1] - 2006:20
someone [7] - 2021:8, 2026:4, 2049:16, 2050:22, 2056:6, 2100:12
sometime [1] - 2060:12
somewhat [1] - 2109:9
somewhere [6] - 2026:11, 2043:15, 2055:8, 2076:3, 2099:16, 2102:7
SoRelle's [1] - 2112:10
sorry [21] - 2008:7, 2019:2, 2020:20, 2030:16, 2035:3, 2037:12, 2038:14, 2040:15, 2044:4, 2062:10, 2066:12, 2067:1, 2075:25, 2077:10, 2084:9, 2084:11, 2088:6, 2103:7, 2107:8, 2108:16, 2108:21
Sorry [1] - 1997:1
sort [3] - 2006:17, 2008:17, 2067:19
sound [6] - 1997:16, 2009:6, 2013:10, 2013:12, 2043:25, 2045:5
sounded [4] - 2024:1, 2025:22, 2043:24, 2045:18
sounds [6] - 2013:15, 2029:18, 2038:14, 2043:10, 2044:11
source [1] - 2060:18
Southwest [3] - 2077:2, 2077:3, 2101:8
speaken [1] - 2040:17
speakers [2] - 2082:10, 2107:13
speaking [4] - 2056:5, 2089:4, 2106:24

Special [2] - 2101:9, 2101:11
special [4] - 2102:15, 2103:3, 2103:10, 2103:14
specialist [1] - 2010:17
specific [3] - 2001:20, 2097:14, 2109:13
specifically [3] - 2008:10, 2009:11, 2102:5
specifics [1] - 2099:22
spell [4] - 2020:3, 2047:22, 2052:1, 2056:1
spelling [2] - 2047:17, 2052:7
spent [1] - 2029:12
spoken [3] - 2051:13, 2051:14, 2098:23
sponsored [1] - 2081:4
spring [1] - 2027:15
spy [1] - 2040:23
Stamey [9] - 2009:17, 2009:21, 2010:2, 2012:9, 2015:19, 2015:23, 2015:25, 2017:18, 2017:23
Stamey's [1] - 2017:13
stamped [1] - 2031:6
stand [3] - 1996:7, 2021:15, 2060:24
standard [1] - 2000:7
standing [1] - 2112:1
Stanley [3] - 2037:21, 2071:21
start [10] - 2023:19, 2045:20, 2051:8, 2054:9, 2057:12, 2059:22, 2060:10, 2071:24, 2110:9, 2110:10
started [8] - 2023:17, 2024:3, 2034:24, 2043:8, 2043:10, 2043:20, 2054:4, 2056:10
starting [5] - 2048:23, 2051:10, 2086:17, 2095:14, 2101:23
starts [1] - 2086:15
state [24] - 2007:8, 2008:16, 2032:4, 2034:21, 2040:12, 2040:13, 2040:17, 2048:23, 2049:22, 2050:17, 2054:4, 2054:6, 2054:7,

2055:6, 2057:7, 2073:3, 2073:4, 2073:5, 2073:10, 2073:11, 2077:23, 2101:21, 2106:3
State [3] - 2067:13, 2068:2, 2088:21
statements [4] - 2099:8, 2100:1, 2100:11
States [7] - 2020:11, 2024:2, 2032:4, 2044:21, 2045:20, 2060:13, 2080:3
stating [1] - 2069:15
station [6] - 2102:18, 2103:3, 2105:7, 2105:8, 2105:10, 2105:12
stay [3] - 2004:7, 2081:3, 2109:5
stayed [3] - 2095:17, 2097:4, 2109:4
Steal [2] - 2058:13, 2058:18
steel [2] - 2000:8, 2000:10
step [7] - 2046:15, 2056:12, 2068:2, 2070:24, 2077:10, 2085:14, 2110:2
stepped [5] - 2085:10, 2095:3, 2095:7, 2095:25, 2096:4
stepping [4] - 2066:17, 2088:1, 2089:9, 2091:5
steps [3] - 2054:9, 2056:9, 2057:2
Stevens [2] - 2026:15, 2026:18
Stewart [33] - 2002:4, 2002:6, 2002:13, 2003:6, 2003:7, 2003:14, 2003:16, 2005:8, 2005:16, 2005:20, 2006:14, 2007:1, 2016:11, 2028:14, 2038:6, 2038:19, 2050:19, 2050:21, 2050:23, 2051:14, 2051:15, 2062:23, 2065:24, 2067:1, 2085:8, 2085:18, 2086:3, 2086:20, 2088:6, 2091:15, 2094:1, 2107:3, 2112:9
still [6] - 2012:25, 2040:1, 2043:24,

2068:1, 2091:9,
2106:10
**stipulate** [1] - 2033:17
**stipulation** [1] -
2034:2
**stitches** [2] - 2046:8,
2046:11
**stolen** [2] - 2058:5,
2060:17
**Stone** [5] - 2083:12,
2083:13, 2083:17,
2084:15, 2105:18
**stone** [2] - 2084:21,
2084:25
**stood** [1] - 2021:14
**stop** [5] - 2016:18,
2049:5, 2050:2,
2051:25, 2055:12
**Stop** [2] - 2058:13,
2058:18
**stopped** [1] - 2043:25
**Storm** [1] - 1998:6
**strike** [2] - 2001:13,
2006:7
**structure** [1] - 1999:4
**structured** [2] -
2073:14, 2073:15
**stuff** [4] - 2001:24,
2016:22, 2029:11,
2044:7
**style** [2] - 2000:8,
2000:23
**subject** [8] - 2065:10,
2067:10, 2067:13,
2067:14, 2067:21,
2088:19, 2088:22,
2111:4
**subpoena** [1] - 2046:3
**suggesting** [1] -
2103:2
**suggests** [1] -
2110:25
**summer** [4] - 2014:6,
2048:18, 2048:19,
2048:21
**supporting** [2] -
2058:19, 2107:12
**supposed** [1] - 2059:4
**surrounding** [1] -
2097:7
**suspect** [1] - 2109:18
**suspension** [3] -
2067:14, 2067:21,
2088:22
**sustained** [3] -
2011:25, 2012:6,
2069:16
**sweat** [2] - 2069:4,
2090:21
**switch** [1] - 2012:18

**switching** [1] -
1997:20
**system** [2] - 2069:5,
2095:16

## T

**table** [4] - 2025:15,
2025:16, 2052:24,
2053:14
**tactical** [2] - 2008:2,
2012:20
**talks** [1] - 2006:10
**Tampa** [2] - 2101:8,
2102:7
**taught** [1] - 2005:19
**Taylor** [2] - 2104:8,
2104:13
**teaching** [1] - 2059:3
**team** [12] - 2006:15,
2073:12, 2078:19,
2078:20, 2085:17,
2090:9, 2091:17,
2091:19, 2095:13,
2101:24, 2112:4,
2113:4
**Team** [6] - 2073:12,
2073:14, 2073:15,
2073:17, 2074:21,
2091:21
**teams** [2] - 2048:14,
2049:11
**Ted** [2] - 2026:15,
2026:18
**telephone** [1] - 2037:6
**telephones** [1] -
2034:24
**telephonic** [1] -
2029:20
**temporarily** [1] -
2054:3
**temporary** [2] -
2095:15, 2109:6
**ten** [2] - 2070:25,
2113:18
**tend** [1] - 2058:3
**tent** [1] - 2004:6
**term** [3] - 2035:24,
2056:1, 2056:4
**terms** [3] - 1997:5,
2012:20, 2012:23
**territory** [1] - 2032:4
**testified** [5] - 2005:12,
2012:16, 2074:24,
2080:25, 2085:5
**testify** [1] - 2046:3
**testifying** [1] - 2047:8
**testimony** [8] -
2012:21, 2018:9,
2039:13, 2046:15,

2046:23, 2071:1,
2110:2, 2110:11
**Texas** [1] - 2026:19
**text** [14] - 2056:14,
2064:10, 2085:13,
2086:3, 2086:14,
2086:19, 2087:17,
2090:20, 2094:21,
2099:3, 2112:3,
2112:14, 2112:21,
2112:23
**texted** [2] - 2085:18,
2085:25
**texts** [1] - 2091:7
**theater** [1] - 1998:13
**theaters** [1] - 1998:5
**themselves** [1] -
2034:13
**therefore** [1] - 2010:23
**thinking** [3] - 2066:17,
2079:18, 2088:1
**third** [1] - 2002:6
**Thomas** [1] - 1999:17
**thousands** [1] -
2075:13
**threat** [3] - 2055:21,
2104:15, 2104:16
**threatened** [1] -
2105:9
**threatening** [1] -
2025:13
**threats** [6] - 2025:2,
2025:7, 2025:11,
2096:23, 2097:6,
2099:8
**three** [7] - 1999:23,
2021:19, 2032:24,
2036:18, 2036:19,
2107:21, 2110:17
**three-day** [1] -
2110:17
**tied** [2] - 2067:1,
2088:6
**timing** [1] - 2079:18
**tip** [1] - 2027:8
**title** [2] - 2027:2,
2027:4
**titled** [1] - 2108:19
**to[ward** [1] - 2067:5
**today** [9] - 1999:18,
2005:9, 2028:12,
2035:20, 2037:14,
2052:21, 2053:13,
2076:19, 2076:20
**tomorrow** [7] -
2110:9, 2110:10,
2110:14, 2110:15,
2110:16, 2110:19,
2113:20
**tonight** [3] - 2069:7,

2069:22, 2091:3
**took** [4] - 2014:8,
2024:15, 2026:24,
2097:11
**tools** [1] - 2107:25
**top** [10] - 2043:3,
2062:16, 2064:16,
2065:18, 2066:12,
2068:24, 2086:22,
2087:15, 2102:20,
2102:21
**topic** [3] - 2058:12,
2104:1, 2111:21
**topics** [1] - 2012:18
**totally** [1] - 2089:8
**touch** [3] - 1997:4,
2039:6, 2110:22
**tour** [1] - 2008:12
**towards** [2] - 2067:20,
2099:24
**town** [2] - 2047:21,
2102:8
**trained** [3] - 2077:25,
2105:22, 2105:24
**training** [14] - 1998:7,
2001:9, 2007:20,
2008:2, 2048:2,
2049:12, 2067:5,
2088:12, 2095:14,
2101:1, 2101:4,
2101:14, 2102:4,
2103:22
**trainings** [2] - 2001:6,
2001:7
**transcript** [4] - 1996:4,
2035:21, 2035:25,
2036:12
**transportation** [1] -
2016:9
**travels** [1] - 2110:3
**treason** [1] - 2032:3
**trial** [1] - 1996:3
**tricky** [1] - 2003:1
**tried** [4] - 2025:3,
2026:1, 2026:4,
2049:18
**trip** [1] - 2018:9
**Trump** [7] - 2023:24,
2060:22, 2062:23,
2063:14, 2106:7,
2107:13, 2107:22
**try** [7] - 2024:24,
2026:13, 2027:7,
2027:10, 2027:12,
2053:24, 2112:15
**trying** [10] - 2003:1,
2041:1, 2056:13,
2059:6, 2067:23,
2067:24, 2092:9,
2101:17, 2103:9,

2112:21
**Tuesday** [2] - 2112:18,
2113:11
**turn** [1] - 1996:15
**turned** [2] - 2067:12,
2088:21
**TV** [2] - 2014:2, 2014:8
**two** [15] - 2004:12,
2015:18, 2035:1,
2035:6, 2035:20,
2036:18, 2036:19,
2052:13, 2060:12,
2064:10, 2077:14,
2083:12, 2083:13,
2085:1
**two-hour-and-six-
and-a-half-minute**
[1] - 2035:1
**type** [6] - 2000:23,
2054:16, 2072:22,
2072:23, 2084:18,
2084:24
**types** [3] - 2001:6,
2049:17, 2077:15

## U

**U.S** [2] - 2037:24,
2038:17
**unchained** [3] -
2067:9, 2068:7,
2088:18
**unconventional** [8] -
2079:4, 2079:16,
2079:24, 2097:17,
2101:1, 2103:20,
2103:23, 2103:24
**under** [3] - 1996:11,
1998:16, 1999:23
**underneath** [1] -
2043:6
**understood** [7] -
2010:13, 2014:2,
2045:18, 2045:22,
2082:21, 2097:18,
2104:14
**uniform** [2] - 2000:7,
2000:23
**uniforms** [2] - 2000:6,
2000:20
**unit** [1] - 2002:9
**United** [7] - 2020:11,
2024:2, 2032:4,
2044:21, 2045:20,
2060:13, 2080:3
**unless** [5] - 2032:4,
2032:5, 2032:14,
2032:21, 2083:19
**unlike** [1] - 1999:2
**unusual** [2] - 2000:22,

2008:9
**unvetted** [1] - 2075:4
**up** [58] - 1996:9,
2001:23, 2006:11,
2006:15, 2008:2,
2011:3, 2012:12,
2013:10, 2013:11,
2019:20, 2020:13,
2020:17, 2025:5,
2033:17, 2039:23,
2042:13, 2045:21,
2049:21, 2053:24,
2054:14, 2057:2,
2057:6, 2057:7,
2057:14, 2059:1,
2059:10, 2059:12,
2059:25, 2060:3,
2060:24, 2061:10,
2062:15, 2064:14,
2066:18, 2067:1,
2068:2, 2069:6,
2069:22, 2071:23,
2075:22, 2078:3,
2079:9, 2080:17,
2085:3, 2088:2,
2088:6, 2090:23,
2091:2, 2091:6,
2097:8, 2106:10,
2108:3, 2108:16,
2110:11, 2113:7
**usual** [2] - 2110:15,
2113:18
**utilize** [1] - 2095:16
**utilizing** [1] - 2079:23

## V

**vacation** [1] - 2002:19
**vaguely** [1] - 2015:4
**values** [1] - 2021:16
**various** [3] - 1998:5,
2015:1, 2077:5
**vehicle** [1] - 2017:25
**vent** [2] - 2068:1,
2068:4
**ventilator** [1] -
2089:16
**verification** [2] -
2067:8, 2088:16
**version** [2] - 2069:11,
2112:10
**versus** [1] - 2056:15
**vet** [2] - 2059:6,
2059:10
**veterans** [1] - 2032:1
**vetted** [4] - 2059:7,
2075:4, 2077:25,
2078:5
**vetting** [1] - 2059:1
**via** [2] - 2029:19,

2099:3
**video** [3] - 2023:9,
2041:6, 2042:21
**videotape** [2] -
2041:16, 2041:20
**violence** [6] - 2013:17,
2013:19, 2014:2,
2079:14, 2096:23,
2097:7
**violent** [6] - 2048:22,
2097:14, 2099:7,
2099:8, 2100:1,
2100:11
**Virginia** [5] - 2028:18,
2030:2, 2030:5,
2030:19, 2041:23
**vocal** [3] - 2067:10,
2068:8, 2088:19
**vocational** [1] -
2048:2
**voice** [4] - 2019:20,
2019:25, 2047:14
**volunteer** [2] -
2051:16, 2054:2
**volunteered** [2] -
2051:9, 2054:4

## W

**wacko** [2] - 2038:20,
2045:3
**wage** [2] - 2020:12,
2020:15
**wait** [5] - 2004:25,
2023:15, 2023:16,
2110:9, 2113:21
**waiting** [2] - 2059:11,
2092:10
**walk** [1] - 2063:16
**walked** [2] - 2048:17,
2069:24
**war** [3] - 2024:2,
2044:20, 2045:19
**warfare** [11] - 2079:4,
2079:6, 2079:9,
2079:16, 2079:24,
2097:17, 2101:1,
2103:19, 2103:20,
2103:23, 2103:24
**Washington** [12] -
2000:24, 2009:22,
2011:22, 2012:4,
2058:16, 2059:20,
2060:1, 2060:3,
2070:9, 2082:1,
2107:11, 2109:20
**watched** [1] - 2044:1
**watching** [3] - 2068:6,
2089:24, 2090:2
**water** [1] - 2049:16

**Watkins** [3] - 1997:2,
2039:5, 2098:19
**ways** [2] - 2003:3,
2064:10
**wear** [3] - 2000:6,
2000:20, 2000:22
**wearing** [1] - 2052:23
**website** [18] -
2022:15, 2049:21,
2050:4, 2050:6,
2050:7, 2050:11,
2050:16, 2054:12,
2072:18, 2092:25,
2093:10, 2093:13,
2093:21, 2094:19,
2094:23, 2095:1,
2106:17, 2106:18
**website's** [1] -
2093:11
**week** [2] - 2068:3,
2089:14
**weekend** [1] - 2110:17
**weekly** [7] - 2057:7,
2078:20, 2078:21,
2078:23, 2083:24,
2090:10, 2097:24
**weeks** [1] - 2025:1
**Welcome** [1] -
1996:19
**welcome** [4] -
1996:20, 2018:20,
2018:21, 2047:7
**West** [5] - 2028:18,
2030:2, 2030:5,
2030:19, 2041:23
**wheel** [1] - 2018:1
**White** [3] - 2025:18,
2036:8, 2036:10
**whole** [6] - 1998:24,
2000:9, 2025:13,
2035:12, 2081:3,
2090:11
**whoops** [1] - 2066:12
**Wi** [1] - 2024:8
**Wi-Fi** [1] - 2024:8
**wife** [4] - 2004:4,
2004:11, 2004:13,
2046:11
**William** [1] - 1996:3
**wisdom** [1] - 2107:24
**withdraw** [1] -
2034:11
**WITNESS** [20] -
2005:2, 2007:25,
2018:7, 2018:10,
2018:19, 2018:22,
2019:1, 2019:3,
2019:7, 2019:22,
2020:15, 2037:12,
2037:15, 2046:17,

2047:6, 2084:9,
2098:6, 2100:16,
2107:8, 2110:4
**witness** [9] - 1996:6,
2014:18, 2018:12,
2033:14, 2046:25,
2064:15, 2086:4,
2093:24, 2110:6
**Witness** [4] - 2018:11,
2042:25, 2046:18,
2110:5
**witness's** [1] -
2046:23
**Witnesses** [1] -
1995:3
**wonderful** [1] -
2110:18
**WOODWARD** [6] -
2037:20, 2038:13,
2038:15, 2038:23,
2053:3, 2111:25
**Woodward** [5] -
1996:10, 2037:18,
2037:21, 2071:21,
2111:23
**Woodward..............**
- 1995:9
**Word** [1] - 2112:12
**word** [6] - 1997:17,
2028:20, 2037:9,
2038:7, 2056:22,
2095:25
**words** [12] - 2002:9,
2040:16, 2045:5,
2045:14, 2045:15,
2045:16, 2062:25,
2063:10, 2063:13,
2064:2, 2108:5
**works** [1] - 2000:9
**worse** [1] - 2037:2
**write** [2] - 2037:24,
2062:22
**writing** [1] - 2062:18
**written** [1] - 2060:12
**wrote** [4] - 2038:8,
2038:17, 2044:24,
2108:10

## X

**x-x-e-d** [1] - 2056:3

## Y

**year** [1] - 2029:7
**yearly** [1] - 2089:5
**years** [6] - 2020:11,
2021:19, 2032:23,
2033:3, 2048:6
**yellow** [1] - 2063:6
**you-all** [4] - 1996:10,

2084:7, 2111:22,
2113:20
**yourself** [4] - 2020:1,
2029:23, 2031:21,
2047:15

## Z

**Zaremba** [1] - 1996:3
**Zimmerman** [8] -
1995:4, 1996:20,
1996:25, 1999:16,
1999:21, 2000:2,
2014:24, 2018:6
**zoom-in** [2] - 2066:2,
2068:18
**zooming** [1] - 2067:17