1         IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3    _____
                                     ) CRIMINAL NO. CR22-00015
4    UNITED STATES OF AMERICA,       ) COURTROOM 10
                                     ) U.S. FEDERAL COURTHOUSE
5                                    ) WASHINGTON, D.C.
     VS.                             ) DECEMBER 07, 2022
6                                    )
     ROBERTO A. MINUTA; JOSEPH HACKETT; )
7    DAVID MOERSCHEL; EDWARD VALLEJO, )
                                     )
8              DEFENDANTS.           )
     _____)
9

10                       JURY SELECTION
           BEFORE THE HONORABLE AMIT P. MEHTA
11            UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:

13   FOR THE GOVERNMENT:     U.S. Attorney's Office
                             By:  Kathryn L. Rakoczy, Esq.
14                           By:  Jeffrey S. Nestler, Esq.
                             By:  Alexandra Hughes, Esq.
15                           By:  Louis Manzo, Esq.
                             By:  Troy Edwards, Esq.
16                           Assistants U.S. Attorney
                             601 D Street, NW
17                           Washington, D.C. 20579

18   For Defendant           Law Offices of William L. Shipley
     Roberto A. Minuta:      By:  William Shipley, Jr., Esq.
19                           P.O. Box 745
                             Kailua, Hawaii 96734
20
     For Defendant           Angela Halim, Esq.
21   Joseph Hackett:         3580 Indian Queen Lane
                             Philadelphia, Pennsylvania 19129
22

23

24

25

```
 1   Appearances, Continued:

 2   For Defendant        Brown, Suarez, Rios & Weinberg
     David Moerschel:     By:  Connor Robert Martin, Esq.
 3                        1532 Jackson Street
                          Fort Myers, Florida 33901
 4
                          Brown, Suarez, Rios & Weinberg
 5                        By:  Scott Weinberg, Esq.
                          265 E. Marion Avenue, Suite 114
 6                        Punta Gorda, Florida 33950

 7   For Defendant        Clinton & Peed
     Edward Vallejo:      By:  Matthew J. Peed, Esq.
 8                        1775 Eye Street, NW, Suite 1150
                          Washington, D.C. 20006
 9
     COURT REPORTER:      Melanie Wilkins, RMR, CRR
10                        Official Court Reporter

11        Proceedings reported by machine stenography.

12            Transcript produced by computer.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          [December 07, 2022, 1:55 p.m.  The defendants are present
 2       with counsel in open court.]
 3          THE COURT:  Okay.  Counsel, so we have, it looks
 4    like, 18 of the 20 have reported.  The juror on line 1, who is
 5    1937, who did not report yesterday, is here today.  So we will
 6    begin with her.
 7          The two jurors that did not show up, I think, this
 8    morning, who were in the second group, still have not shown up.
 9    That's 0806 and 1877.  And then the two jurors who have not yet
10    appeared in this afternoon's group are on line 46, 0628, and,
11    it looks like, line 44, 1717.
12       [Prospective jurors enter.]
13          THE COURT:  Okay.  Ladies and gentlemen, good
14    afternoon.  My name is Judge Mehta, and you are here today as a
15    prospective juror in the case of United States versus Roberto
16    Minuta, Joseph Hackett, David Moerschel, and Edward Vallejo.
17          Before we get started, I want to extend to you my
18    gratitude to making yourselves available for jury service this
19    afternoon as well as coming in a couple weeks ago and
20    completing your juror questionnaires.  As you know, in our
21    system of justice, juries and jurors play a critical role.
22    Indeed, it is a fundamental feature of our democracy to have
23    ordinary citizens serve as decision makers in our courts of
24    law.  You are, therefore, performing an important duty today.
25    So I want to thank you in advance for your service.
```

1          Well, before we begin, you will recall, as part of

2  your jury questionnaire, there was a question asked of you

3  whether you recognized or knew the names of a variety of people

4  that were attached -- whose names were attached to the

5  questionnaire.  There are some additional names for you-all to

6  consider.  I'll ask Mr. Peed to announce those names now.

7          MR. PEED:  Steven Bremmer.  Trevor Osgood.  Kelly

8  Carter.  Frank Canbury [phonetic].

9          THE COURT:  So if you recognize any of those names or

10  know any of those people, please, just let us know when we call

11  you up for individual questioning.

12          Before we get started with that and I provide you

13  further instructions, I'll ask everybody to, please, stand,

14  raise your right hands because I need to have you sworn in.

15      [Duly sworn.]

16          THE CLERK:  Thank you.  Please be seated.

17          THE COURT:  Okay.  So for those of you who have gone

18  through a jury selection process before, this afternoon will be

19  both familiar and a little bit different.  It will different in

20  the sense that usually when jurors are being considered for

21  service, we start the process by asking you a series of

22  questions to assist us in determining whether a juror can be

23  fair and impartial.

24          In this case, however, we will not start out the

25  process with questions because you came in two weeks ago and

1   completed a juror questionnaire that the parties proposed, and

2   I approved.  So that part of the process is complete.

3        What will feel familiar and why you are here today is

4   to ask each of you additional questions based upon your

5   responses to the juror questionnaire.  The way that will work

6   is as follows:  There are approximately 20 of you here this

7   afternoon.  After I complete these initial remarks and

8   instructions, the courtroom deputy will escort all of you to a

9   different courtroom where you will be seated.  We will then

10  call each of you back into this courtroom one at a time for

11  additional questions from me and from the parties.

12       Now, the questions we'll be asking you may touch on

13  matters that are personal to you.  Rest assured, it is not my

14  intention or desire nor the intention or the desire of the

15  lawyers to invade your privacy or embarrass you in any way.

16  Our only wish is to select the fairest, most impartial jury

17  possible so the parties can be assured that the jury selected

18  will not be biased or prejudge the case and will return a

19  verdict based only on the law and the evidence.

20       What will also feel familiar with this jury selection

21  process is that you'll spend some time waiting this afternoon.

22  I promise I'll try to get your waiting to a minimum, but some

23  amount of wait time is unavoidable.

24       While you are waiting during your jury selection,

25  please feel free, if you wish, to talk quietly amongst

1    yourselves, to read a book, magazine, or whatever you have

2    brought with you.  The courtroom is Wi-Fi-enabled, so you

3    should feel free to use your phone or other mobile devices to

4    read online or search the Internet.  I would ask, however, that

5    you place all of your devices on silent mode.

6            Now, this is very important.  While you may use your

7    mobile devices, you should not at any point during the jury

8    selection process -- and this will be true afterwards as

9    well -- communicate with anyone about this case or do any

10   online research about the case or parties.  That means no

11   e-mailing, texting, tweeting, or Snapchating a friend or family

12   or your followers about the case.  Don't most post it on

13   Facebook or Instagram that you are a potential juror in this

14   case.  Do not get online and start doing research about the

15   case or the parties.

16           We also asked you, as part of the questionnaire, to

17   avoid media coverage about this case, and that includes social

18   media.  That instruction continues to apply and is, perhaps,

19   even more important now that the jury selection process has

20   started.  You should avoid any newspaper, television, radio

21   news, podcasts, and, importantly, any social media about this

22   case or the events of January 6.

23           That means avoiding not only news stories in the

24   Washington Post and on TV, but also journalist or others who

25   are tweeting about this case or posting about it on social

1   media sites.  In fact, it may be that journalists or others are

2   live tweeting about this selection process as we speak.

3          So if you follow journalists or others who comment or

4   cover the events of January 6th, I'm going to instruct you to

5   avoid reading their tweets or any other social media postings

6   until you are fully dismissed from jury service in this case.

7   I'll also ask you to turn off any personal notifications that

8   you may receive on your mobile devices from any media

9   organization or entity.

10         The reason for these restrictions is simple.  If you

11  are selected as a juror, you'll be sworn to decide this case

12  based only on the evidence that's presented at trial and the

13  law as to which you'll receive instructions.  You will be

14  strictly forbidden to consider anything you might have read or

15  heard about the case from news sources or from social media or

16  from other people.

17         If, at any point during the jury selection process,

18  you happen to come across news or commentary regarding this

19  case, please immediately avert your eyes or ears and please

20  alert the courtroom deputy so he can advise me.  The juror who

21  violates these restrictions jeopardizes the jury selection

22  process and possibly the trial itself, which could require the

23  entire trial process to start all over.

24         Also, during this jury selection process, if anyone

25  attempts to communicate with you about this case, please notify

1    the courtroom deputy or a court security officer immediately.

2            The lawyers here are under strict instructions not to

3    speak with any juror during the jury selection process.  So if

4    you happen to see them in the courthouse and they walk in the

5    other direction, they are not being rude.  They are simply

6    following my instructions.

7            I also have issued an order to members of the media

8    and the public not to approach any of you about this case

9    during jury selection.  Still, despite these instructions, if

10   you are approached about this case by anyone, please notify the

11   courtroom deputy or a court security officer.

12           One other feature of jury selection today will be

13   different.  In most criminal cases, we complete the jury

14   selection process in one day.  That means -- that usually means

15   that, unless you are immediately excused, we ask you to remain

16   in the courthouse until near the end of the day when we select

17   a final jury.

18           In this case, however, we will not be completing jury

19   selection today.  So, after we have finished asking you

20   additional questions, you will be done for the day.  You will

21   be given additional instructions about further jury service in

22   this case after your individual questioning is completed.  Do

23   not leave the courthouse until you have received additional

24   instructions by a member of the court staff.

25           If you are excused from further service today, we

```
 1   will tell you soon after your questioning is concluded.  If you
 2   are excused, you will be relieved of restrictions -- of the
 3   restrictions I discussed earlier.  If you are not dismissed
 4   from service, however, and we ask you to return, it is
 5   critically important that you follow my earlier instructions;
 6   that is, do not communicate with anyone about the case, do not
 7   read or listen to anything about the case, and do no
 8   independent research about the case.  Do not watch or read
 9   about any Congressional proceedings that might be taking place
10   about the events of January 6.
11           Following these instructions is critical to ensuring
12   a process that will result in a fair and impartial jury to hear
13   this case.
14           Finally, as you can see, everyone in the courtroom is
15   wearing a mask except for me while I am speaking.  Masking is
16   required -- excuse me.  I should say masking is optional in the
17   public spaces in the courthouse.  However, I will be requiring
18   masking during the trial.  The only exception for that rule
19   will be for lawyers who are speaking and witnesses who are
20   testifying.
21           You may be asking yourself why do we need to continue
22   to wear masks.  Well, there's two reasons.  The first is that
23   none of you are here voluntarily.  You are required to be here.
24   So unlike going to a grocery store or a restaurant or a
25   concert, you do not have the choice to avoid this location or a
```

1    person who might not choose to wear a mask.

2           The second reason to mask is to avoid a COVID

3    outbreak that might disrupt the trial.

4           As you know, the trial is scheduled to last more than

5    a month, six weeks or more.  If one or more people inside the

6    courtroom, including jurors, test positive for COVID, that

7    could delay the trial proceedings.  That is something I would

8    rather avoid.  Masking, hopefully, will prevent any

9    COVID-related trial delays.

10          All right.  So those are my instructions.  Mr. Douyon

11   will now take you outside the courtroom and have you go to the

12   other courtroom and bring you in individually for further

13   questioning.  Thank you very much.

14      [Recess.]

15          THE CLERK:  Please have a seat and speak into the

16   microphone and leave this here.

17          Okay.  Your Honor, this is Juror No. 1937.

18          THE COURT:  How are you?

19          PROSPECTIVE JUROR:  Hi.  I'm well.  Thank you.

20          THE COURT:  You are Juror 1937?

21          PROSPECTIVE JUROR:  I am.

22          THE COURT:  All right.  Feel free to remove your

23   mask, if you are comfortable doing so.

24          So your questionnaire is in front of you.  So we may

25   need to refer to it from time to time, but, before we do so,

1   yesterday, you weren't able to join us because of a childcare

2   issue?

3          PROSPECTIVE JUROR:  Yes.  I apologize for that.

4          THE COURT:  It's okay.  It happens.  I'm curious.

5   Due to the length of this trial, as you heard, will you, if you

6   were to be selected for the jury, have childcare coverage or

7   childcare?

8          PROSPECTIVE JUROR:  Backup?

9          THE COURT:  Backup.

10          PROSPECTIVE JUROR:  Yes.  I have parents that would

11   come down and could be backup if my son were to get sick.  What

12   was unexpected yesterday was that I thought he could qualify to

13   return to day care after vomiting in the morning on Monday.

14   And I got there, and they are like, oh, it's only been 22

15   hours, instead of 24 hours.  It wasn't enough time for me to

16   have my parents to drive down from New England.

17          THE COURT:  Okay. All right.  Terrific.  Thank you

18   for letting us know that, and we know it's a big imposition to

19   ask somebody to serve for that long.

20          Can I ask you, please, to turn to page 7 of your

21   questionnaire and begin with Question 19.  We asked you, do you

22   have such strong feelings about firearms or laws concerning

23   firearms that it would make it difficult to be fair and

24   impartial in this case?  You sort of checked off yes and no.

25          PROSPECTIVE JUROR:  Yes.

1          THE COURT:  And I see the explanation on page 75.

2    You then wrote, "My bias against firearms is focused on the

3    rate of suicides by firearms that occur in this country."

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  "I believe in stricter gun control in the

6    face of mental illness.  In particular, I don't know if that is

7    an issue here, but you can decide."

8          So thank you for the explanation.  So there will be

9    evidence of gun possession in this case.  None of the

10   defendants are individually charged with unlawfully possessing

11   a firearm, but there will be firearms-related evidence in the

12   case.  And you will likely see firearms in the case.

13         Do you think your feelings about the regulation of

14   guns will affect your ability to be fair and impartial in this

15   case?

16         PROSPECTIVE JUROR:  No, unless I'm asked to make

17   judgments about whether the people that had firearms were,

18   like, at risk of hurting themselves.  My concern is about,

19   like, do people that -- should be protected from themselves,

20   having access to firearms, and is that serving -- like, is that

21   creating a risk for them, as the No. 1 driver of suicide in

22   this country.

23         So if that -- the question of, like, mental stability

24   is not questioned, I can be impartial.  That's where I feel

25   really passionate, though.

1          THE COURT:  Okay.  So there is and there should not

2     be any issue in this case about any person's mental,

3     psychological state and their possession of a weapon,

4     possession of a weapon and whether it threatens that person.

5          PROSPECTIVE JUROR:  Yeah.

6          THE COURT:  So --

7          PROSPECTIVE JUROR:  Then I would, I guess, with that

8     context, I'm comfortable being impartial here.  The policy

9     positions that I have are really focused on mental health.

10          THE COURT:  Sure.  So, since we are on page 7, on

11     Question 16, we asked you whether you or a close friend or

12     family member has ever been employed by the federal government.

13     Can you tell us about that.

14          PROSPECTIVE JUROR:  Yes.  My father, who is now 73,

15     his first job out of grad school was with the Congressional

16     budget office and worked in a series of Naval-related think

17     tanks across his career, all of that up until like -- when we

18     moved to Rhode Island, and he took a job at the Naval War

19     College and retired.  My mom was also -- worked for the EPA in,

20     like, the late '80s to early '90s.  So it's dated.

21          THE COURT:  So one of the charges in this case

22     accuses the defendants of intending to resist the authority of

23     the United States government with force.

24          Do you think that the fact that your parents have

25     worked in federal government would affect your ability to be

1    fair and impartial?

2              PROSPECTIVE JUROR:  No, I don't think so.

3              THE COURT:  Okay.  You mentioned your father was in

4    the military in Question 18.  You did answer yes to family

5    members and others in the armed forces.  Is there anyone else?

6              PROSPECTIVE JUROR:  My grandfather was also in the

7    Marines.  He was present for Pearl Harbor.  Passed obvious --

8    not obviously but he passed away decades ago.  But just my

9    father and my grandfather both in the Marines.

10             THE COURT:  Okay.  Question 20 asks whether you or a

11   close friend or family member in the last 5 years has attended

12   a riot, protest or demonstration or march.

13             PROSPECTIVE JUROR:  Yes.  I attended the march for

14   women's rights that was -- not the one immediately following

15   Trump's election but the year later, when it was revisited.

16   Yeah.

17             THE COURT:  So if you were selected, you may learn

18   during the course of this trial that the defendants in this

19   case may hold political views that are different than yours.

20   How do you think that would affect your ability to be fair and

21   impartial to them, if at all?

22             PROSPECTIVE JUROR:  My family is a mix of people that

23   live in South Carolina and people that live in New England.  So

24   I have that natural tension in my family.  I think I strive to,

25   like, just accept the facts of the case for the case.  I guess,

1    I love people who have very different views than me.  So I feel

2    like I'm used to sitting with that tension and recognizing

3    that, you know, it exists, but people can still be good people.

4            THE COURT:  Okay.  You indicated in Question 21 that

5    you've been on the Capitol grounds or inside the Capitol

6    building.  Can you share with us what took you to the Capitol.

7            PROSPECTIVE JUROR:  Yeah.  Mostly that I've gone

8    through it.  I lived in Capitol Hill my first 4 years in the

9    District, which was 2012 to 2016.  So I would regularly run

10   through it when I was living in it when I was going through the

11   Mall, but I haven't, like, toured the Capitol.

12           THE COURT:  Okay.  Can I ask you to turn to page 11

13   and Question 49.  That question will ask whether you have read,

14   seen, or heard anything about the Oath Keepers organization.

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Can you tell us what you have read, seen,

17   or heard about the organization?

18           PROSPECTIVE JUROR:  I heard an NPR article that was

19   talking about -- I think it was talking about, like, Oath

20   Keepers that had gone to jail and that -- I forgot.  Honestly,

21   I don't really remember the specifics of it, but it was talking

22   about, like, the impact of jail on either, like, making them

23   more -- what's the word?  Like, more -- I'm sorry.  I'm trying

24   to think of the right word.

25           THE COURT:  It's all right.

1          PROSPECTIVE JUROR:  Like, what's it called when you
2     are at the edge?  More fringe.  But the specifics of it, I
3     don't remember, apart from them talking about how, like -- that
4     it was viewed as a -- like a potential terrorist organization.
5     I don't know if it had been classified that way.  But that's
6     pretty much all I know.
7          I think the Oath Keepers are like a conservative
8     fringe group.  I don't know if they would be considered militia
9     but that there's some views that they are like a home-grown
10    terrorist group or something like that.  Sorry.  I'm not very
11    informed.
12          THE COURT:  No.  It's okay.  Let me ask you this:
13    Things that you may have been told, things that you may have
14    seen or read in the media, characterizations of the group may
15    be inaccurate.
16          PROSPECTIVE JUROR:  Yeah.
17          THE COURT:  Would you be able to set aside what you
18    think you know about the organization and evaluate the evidence
19    as it relates to these defendants in this case?
20          PROSPECTIVE JUROR:  I mean, I have a very
21    ill-informed understanding of this whole space, which is
22    probably why I'm being considered here.  I just haven't
23    followed it closely.  So I would say, yes, in that, like, this
24    is going to be much more information than I know about it
25    otherwise.  Yeah.  I guess that would be my answer.

1          THE COURT:  And have you learned any additional

2     information about the organization in the two weeks since you

3     completed the questionnaire?

4          PROSPECTIVE JUROR:  No.  I have an 18-month-old and I

5     have a full-time job and I run a vintage rug business on the

6     side.  Between the three of those things, I pretty much --

7     unless it's interior-design-oriented news, I don't follow it.

8          THE COURT:  And then in Question 51 we asked you

9     whether you have heard, read, or seen anything about a group of

10     individuals including Stewart Rhodes, Kelly Meggs, Jessica

11     Watkins, et cetera, and you answered that question "no."

12          Is the answer to that question "no" today as it was

13     when you completed the --

14          PROSPECTIVE JUROR:  Yes.  And I don't know any of the

15     new names that were mentioned today either.

16          THE COURT:  I think you've already touched on this,

17     but just to -- in the interest of completeness, Questions 41,

18     42, 43 concerns how much media you've been exposed to about the

19     events of that day.

20          PROSPECTIVE JUROR:  Yeah.

21          THE COURT:  Can you just describe, first, generally

22     how much media you watched about --

23          PROSPECTIVE JUROR:  Yeah.  So watched like pretty

24     much nothing.  I don't watch media.  And I don't follow social.

25     I don't follow, like, news outlets on social media, as I said.

1  My social media accounts are for my rug business, so it's

2  pretty much all interior design.

3         I would say like the snippets I hear are when I'm

4  driving on NPR, and it's usually only a portion of the story

5  because driving anywhere in D.C. is like an eight-minute

6  exercise.  So that's why I feel like I have got a very

7  imprecise in general sense of information.

8         THE COURT:  Okay.  To the extent that you learned

9  anything about the events of that day, do you think you would

10  have any trouble setting it to the side and, again, just

11  evaluating the evidence based upon what's presented here in a

12  fair and impartial manner?

13         PROSPECTIVE JUROR:  No.  I do not have a concern

14  about that.

15         THE COURT:  Okay.  Do counsel have anything?

16         MR. EDWARDS:  No, Your Honor.  Thank you.

17         THE COURT:  From defense?

18         MS. HALIM:  No, Your Honor.

19         THE COURT:  All right.  Thank you very much.

20  Mr. Douyon will give you some instructions as you leave the

21  courtroom.

22         PROSPECTIVE JUROR:  Do I need to take this?

23         THE COURT:  He'll take care of it.  Thank you.

24      [Prospective juror exits.]

25         THE COURT:  So, counsel, the juror who is on line 46,

1    0628, has arrived, and was here when we swore everybody in.  So

2    that juror is now available or present, I should say.  44,

3    1717, still remains AWOL.

4              THE CLERK:  Your Honor, this is Juror No. 2542.

5              THE COURT:  All right.  How are you?

6              PROSPECTIVE JUROR:  Good.

7              THE COURT:  You are Juror 2542?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Terrific.  Feel free removing your mask,

10   if you are comfortable doing so.

11             Let's start with Question 1 on your questionnaire,

12   which is before you, and you indicated that you have a flight

13   to Minnesota on December 23rd at 5:00 a.m.  We had not

14   planned to sit for trial on the 23rd.  When do you plan to

15   return?

16             PROSPECTIVE JUROR:  The 30th of December.

17             THE COURT:  Okay.  And so we won't be sitting the

18   week between Christmas and New Years.

19             PROSPECTIVE JUROR:  Perfect.

20             THE COURT:  Let's turn, if we can, please, to

21   page 11.

22             PROSPECTIVE JUROR:  Sure.

23             THE COURT:  And Question 48.  Starting there.  You

24   have indicated that you have strong opinions about the events

25   of January the 6th.  You also have indicated that you have

349

1   strong views about the Oath Keepers.  So can you share with us

2   what your thinking is or why you answered those questions yes.

3           PROSPECTIVE JUROR:  I'm a federal government

4   employee.  And I'm also a lawyer.  And I have strong opinions.

5   I felt sick to my stomach about the January 6 events, and I

6   know the Oath Keepers was -- were participants of this event,

7   and so that's why I have very strong opinions.  And it affects

8   my ability.

9           THE COURT:  Okay.

10          PROSPECTIVE JUROR:  I'm somewhat prejudiced.

11          THE COURT:  Okay.  So, as a lawyer, you understand

12   that you are supposed to --

13          PROSPECTIVE JUROR:  Yes, I understand.

14          THE COURT:  Is that something that you think you

15   could do?

16          PROSPECTIVE JUROR:  I think I can do it, but I also

17   believe in the Constitution, and I also believe in laws and the

18   transition of power.  So I'll do my best.

19          THE COURT:  Okay.  So just to be precise about it.

20   Say, you were seated, do you think you could presume these

21   defendants to be innocent of the charges against them or would

22   you already be, sort of, shading toward thinking they have done

23   something illegal.

24          PROSPECTIVE JUROR:  I don't know what the charges are

25   specifically, so it would really depend on the charges.

1          THE COURT:  What if I told you that one of the

2    charges was that they are alleged to have conspired to resist

3    the authority of the United States government with force and

4    prevent the peaceful transition of power?

5          PROSPECTIVE JUROR:  I think that -- it's hard for me

6    without knowing the facts.  And so that's how I would probably

7    respond is, you know, I think that -- I have strong feelings

8    about the Oath Keepers, but, again, I need to hear the facts.

9    And so it's difficult.

10          THE COURT:  And, tell me, when you say you have

11   strong feelings about the Oath Keepers, what does that mean and

12   where does that come from and what is it based on?

13          PROSPECTIVE JUROR:  I think that I disagree with

14   their mission.  I disagree with their positions.  And I think

15   that what occurred on January 6 was a travesty to our history.

16   And I think -- from what I've seen from the January 6

17   commission and various news reports, I believe that they are --

18   were involved.  They were -- there was an intent to disrupt the

19   transition of power, and so I disagree with that position.

20          THE COURT:  Okay.  All right.  Any objection,

21   counsel?

22          MS. HALIM:  No, Your Honor.

23          MR. EDWARDS:  No, Your Honor.

24          THE COURT:  Thank you very much.  Mr. Douyon will

25   escort you out of the courtroom.

```
 1        [Prospective juror exits.]

 2              THE CLERK:  Please have a seat right here.  Speak

 3   into the microphone and leave this here when you are done.

 4              Your Honor, this is Juror No. 0322.

 5              THE COURT:  Hi.  How are you?

 6              PROSPECTIVE JUROR:  Good.  How you doing, Your Honor?

 7              THE COURT:  Good.  Thank you.  You are Juror 0322?

 8              PROSPECTIVE JUROR:  That's correct.

 9              THE COURT:  Feel free to remove your mask, if you

10   feel comfortable doing so.

11              Your questionnaire is in front of you.  So I'll ask

12   you to, please, pick that up and turn to page 11 first.  And

13   I'll direct you to Question 49 first, and you were asked

14   whether you had read, seen, or heard anything about the Oath

15   Keepers organization, and you answered no.  Have you heard

16   anything at all about this organization, or are they a complete

17   mystery to you.

18              PROSPECTIVE JUROR:  No, Your Honor.  I have no idea

19   what that is.

20              THE COURT:  And you answered "no" when you completed

21   this questionnaire.  Is your answer still "no" today?

22              PROSPECTIVE JUROR:  That's correct, Your Honor.

23              THE COURT:  Question 51 asks whether you knew or

24   recognized the names of Stewart Rhodes, Kelly Meggs, Jessica

25   Watkins, Kenneth Harrelson, and Thomas Caldwell.  You answered
```

1    "no" when you completed the questionnaire.  Is that answer

2    still accurate today?

3              PROSPECTIVE JUROR:  That's correct, Your Honor.

4              THE COURT:  Let's turn back to page 18 -- Question 18

5    on page 7.  That question just asked whether you or a close

6    friend or family member has ever served in the armed forces.

7              PROSPECTIVE JUROR:  Wait.  What number?

8              THE COURT:  I'm sorry.  The bottom of page 7,

9    Question 18.

10             PROSPECTIVE JUROR:  Yes.  That's still correct.

11             THE COURT:  Okay.  Can you just tell us whether you

12   or -- or who in your circle of family and friends has been a

13   member of the armed forces?

14             PROSPECTIVE JUROR:  I am, Your Honor.

15             THE COURT:  Okay.  Could you tell us in what

16   capacity?

17             PROSPECTIVE JUROR:  The Army Reserves, Your Honor.

18             THE COURT:  And how long have you been in the Army

19   Reserves?

20             PROSPECTIVE JUROR:  I enlisted in 2021.  So just a

21   year.

22             THE COURT:  Question 21 asks -- and can I ask, are

23   you in Army Reserves for the District of Columbia -- or I'm

24   sorry.  You are not in the National Guard.  You are on the

25   Reserve; correct?

1          PROSPECTIVE JUROR:  That's correct, Your Honor.

2          THE COURT:  Different organization.  All right.

3  Different names.

4          Question 21 asks whether you've been on the Capitol

5  grounds or inside the Capitol building.  Can you tell us about

6  that?

7          PROSPECTIVE JUROR:  Yes, Your Honor.  It was actually

8  a field trip, I would say, in elementary school or something.

9          THE COURT:  Okay.  All right.  If you would, then,

10  turn to page 10.  Questions 41, 42, and 43 were designed to

11  determine how much news coverage and video you have been

12  exposed to about the events of January 6th.  Can you just

13  describe for us how much media you've been exposed to about the

14  events of that day?

15          PROSPECTIVE JUROR:  I don't think I've seen

16  anything -- when I was filling out this questionnaire,

17  January 6 did not ring a bell at all, so I just answered no.

18  To this day, I still don't -- I'm not sure.

19          THE COURT:  So let me ask you this:  Do you have any

20  understanding of what happened at the U.S. Capitol building on

21  January 6, 2021?

22          PROSPECTIVE JUROR:  The only thing I can think of

23  would it be in regards to the riot.

24          THE COURT:  Right.

25          PROSPECTIVE JUROR:  So I only seen the news media

1    during that time, but after that, I didn't really bother to

2    really, like, look through that or investigate that.

3            THE COURT:  Okay.  Would you say that you saw some

4    news media at the time, but, since then, have you -- you have

5    not read or viewed much, if at all, on news media about the

6    events of that day?  Correct?

7            PROSPECTIVE JUROR:  That's correct, Your Honor.

8            THE COURT:  Okay.  Turn to the next page, page 11.

9    We asked you in Question 56, close friends, family members who

10   either applied for employment or worked for any law enforcement

11   agency.  You wrote in here you are a reservist.  You have a

12   B.A. in criminal justice and a Master's in forensic psychology;

13   is that correct?

14           PROSPECTIVE JUROR:  That's correct, Your Honor.

15           THE COURT:  So do you work in any law enforcement

16   capacity?

17           PROSPECTIVE JUROR:  At the moment, no, Your Honor.

18           THE COURT:  Okay.  Have you ever?

19           PROSPECTIVE JUROR:  No.

20           THE COURT:  All right.

21           PROSPECTIVE JUROR:  Just the Army Reserves.

22           THE COURT:  I'm sorry.

23           PROSPECTIVE JUROR:  Just the Army --

24           THE COURT:  Just the Army Reserves.

25           How about any close friends or family members in law

1    enforcement?

2            PROSPECTIVE JUROR:  My aunt's boyfriend is in the

3    Secret Service.

4            THE COURT:  Okay.

5            PROSPECTIVE JUROR:  That's about it.

6            THE COURT:  Do you know whether they were on duty --

7    your aunt's boyfriend, do you know whether he was on duty on

8    January 6th?

9            PROSPECTIVE JUROR:  I have no idea, Your Honor.

10           THE COURT:  So is it fair to say you have had no

11   conversations with him about the events of January 6?

12           PROSPECTIVE JUROR:  That's correct, Your Honor.

13           THE COURT:  Let me ask you this:  You are likely to

14   hear testimony either from a Secret Service representative at

15   this trial and certainly about Secret Service during this

16   trial.  Do you think -- the fact that your aunt is dating a

17   Secret Service agent, would that affect your ability to be fair

18   and impartial in this case?

19           PROSPECTIVE JUROR:  Not at all, Your Honor.

20           THE COURT:  If you heard from a Secret Service

21   officer in terms -- or if you receive testimony from a Secret

22   Service officer, any reason to think you couldn't treat that

23   testimony just as you would any other testimony?

24           PROSPECTIVE JUROR:  No, Your Honor.

25           THE COURT:  Okay.  Next page, Question 62 asks

1  whether you or a close friend or family member has ever been

2  arrested, charged, or prosecuted or convicted of a crime.  Can

3  you tell us about that?

4          PROSPECTIVE JUROR:  My brother.  He just got

5  arrested, but he stayed overnight over, I think -- he was

6  carrying, like, marijuana, I think.  It was a traffic stop.

7          THE COURT:  Okay.

8          PROSPECTIVE JUROR:  But then they had him in a

9  holding cell for, like, 3 days, I think.

10          THE COURT:  And was that here in the District or

11  somewhere else?

12          PROSPECTIVE JUROR:  In Virginia.

13          THE COURT:  Okay.  And is there anything about your

14  brother's experience, that arrest, that would cause you to

15  think you couldn't be fair to the Government in this case?

16          PROSPECTIVE JUROR:  No, Your Honor.

17          THE COURT:  Anything that causes you to think you

18  might be biased against police officers or discredit a police

19  officers's testimony?

20          PROSPECTIVE JUROR:  No, Your Honor.

21          THE COURT:  All right.  Mr. Edwards, any questions?

22          MR. EDWARDS:  No, Your Honor.  Thank you.

23          THE COURT:  Any questions from defense counsel?

24          MS. HALIM:  No, Your Honor.

25          THE COURT:  Thank you.  Thank you.  Mr. Douyon will

1    escort you out of the courtroom and provide you with additional

2    instructions.

3         [Prospective juror exits.]

4              MS. HALIM:  Your Honor, can I ask a quick question?

5    Number -- line 46, I should say, the person, 0628, who just

6    arrived, will that person be in the next batch for preliminary

7    instructions?

8              THE COURT:  No.  That person, I believe, was here.

9              MS. HALIM:  Was here, correct.

10             THE COURT:  J.C. --

11             I'll just confirm with that.

12             You can bring the other juror in.

13             Hi, sir.  How are you?  Thank you for being here.

14   You are Juror 1518?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Okay.  Feel free to remove your mask, if

17   you are comfortable doing so.

18             Your juror questionnaire is in front of you, so I

19   want to ask you, first, please, to turn to page 11.  And you

20   were asked in Question 49, have you read, seen, or heard

21   anything about the Oath Keepers organization, and you answered

22   that question "yes."

23             PROSPECTIVE JUROR:  Yes.  I think I've heard it in

24   reference at one point in some news article I might have been

25   reading.  But other than just sort of a casual observation that

1    there was some organization by that name, that's about it.

2            THE COURT:  And can you recall in what context the

3    news article would have mentioned the organization?

4            PROSPECTIVE JUROR:  You know, I don't have a specific

5    recollection of it, but I think it would be natural that I was

6    reading some type of a news article that was referencing some

7    type of accusation, that some organization by that name was

8    involved with regard to what was going on.

9            THE COURT:  Do you think the subject matter of the

10   article might have been January 6th-related events?

11           PROSPECTIVE JUROR:  It could have been.  It's

12   probably likely because I haven't seen that organization

13   referred to in just a regular newspaper article reading.

14           THE COURT:  And have you been left with any

15   impressions about what the organizations's ideology is, its

16   mission, its purpose, anything of that nature?

17           PROSPECTIVE JUROR:  No.

18           THE COURT:  You answered Question 47 "yes."  You just

19   told us about that.  Have you learned anything more in the

20   weeks since you completed this questionnaire about the Oath

21   Keepers organization?

22           PROSPECTIVE JUROR:  No.

23           THE COURT:  And Question 59 asks whether you have

24   read, seen, or heard anything about Stewart Rhodes, Kelly

25   Meggs -- 51.  I misspoke.  Question 51.  Have you read, seen,

1   or heard anything about Stewart Rhodes, Kelly Meggs, Jessica

2   Watkins, Kenneth Harrelson, or Thomas Caldwell?  You answered

3   "no" at the time you completed the questionnaire.  Is that

4   still your answer today?

5           PROSPECTIVE JUROR:  Yes.  Those are all names that

6   are completely unfamiliar to me.

7           THE COURT:  Okay.  If I could ask you, please, to --

8   the prior page concerns Questions 41, 42, and 43.  They ask

9   about the extent to which you have been exposed to news

10   coverage or videos about the events of January 6.  Can you tell

11   us the extent to which you have consumed news about the events

12   of that day?

13           PROSPECTIVE JUROR:  Yes.  These would be just

14   watching the evening news or something -- a matter of natural

15   course of just watching the evening news and something would

16   come up about January 6th, but it wasn't anything that I was

17   sort of seeking out, if you will.

18           THE COURT:  I understand.

19           PROSPECTIVE JUROR:  I wasn't trying to educate myself

20   on this in particular.  It was something that I would come

21   across watching the evening news.

22           THE COURT:  Have you formed any opinions,

23   impressions, thoughts about the events of that day?

24           PROSPECTIVE JUROR:  No, I haven't.

25           THE COURT:  And, to the extent that you have been

1  exposed to news or media about the events, would you be able to

2  set those aside and view the evidence in this case fairly and

3  impartially as it relates to these defendants?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  All right.  Can I ask you, please, to

6  turn to page 7, Question 16.  Question 16 asks whether you or a

7  close friend or family member has ever been employed by the

8  federal government.

9          PROSPECTIVE JUROR:  Yes.  For 3 years, I was the

10 Chief Counsel for Technology in the U.S. Department of

11 Commerce.

12         THE COURT:  Could you give us a sense of when you

13 held that position?

14         PROSPECTIVE JUROR:  That would have been in the

15 George W. Bush administration, from 2003 to 2006.

16         THE COURT:  And was that a political appointment

17 or --

18         PROSPECTIVE JUROR:  That was a political appointment.

19         THE COURT:  And so one of the charges in this case --

20 or one of the allegations in this case is that the defendants

21 intended to resist the authority of the United States

22 government through use of force.  Would the fact that you once

23 served in an administration, worked in an executive agency

24 affect your ability to be fair and impartial?

25         PROSPECTIVE JUROR:  No.

1          THE COURT:  Question 18 asks whether you have close

2    friends or family members who served in the armed forces.

3          PROSPECTIVE JUROR:  Yes.  My father was -- went to

4    the Naval academy, although he was never commissioned because

5    of a health issue, and I have a nephew who served in the Coast

6    Guard.

7          THE COURT:  Question 21 asks about whether you have

8    been to the Capitol grounds or inside the Capitol building.

9          PROSPECTIVE JUROR:  Yes, I have from time to time

10   representing clients, taking them up to go visit a member of

11   Congress or something like that and been in and out of the

12   office buildings there.

13         THE COURT:  Is that something you still do?

14         PROSPECTIVE JUROR:  I'm actually retired now, but

15   that's something that I did quite a bit of over the last 15,

16   16 years.

17         THE COURT:  And when was the last time you would

18   estimate that you last took a client up to Capitol Hill?

19         PROSPECTIVE JUROR:  Oh, probably about 2 years ago.

20         THE COURT:  So it would have been before

21   January 6th?

22         PROSPECTIVE JUROR:  Yes, yes, yes.  At least a year

23   before that.

24         THE COURT:  I take it from that you know people, you

25   knew people then and you probably know people now who work on

1    Capitol Hill?

2            PROSPECTIVE JUROR:  Yes.  Basically, staff members,

3    some members of Congress, although I used to know a lot more

4    people before I retired; but, yes, I've been exposed to a

5    number of people up there.

6            THE COURT:  Given that you do know a number of people

7    up there, have you had any conversations or discussions with

8    people who may have been present on Capitol Hill on

9    January 6th?

10           PROSPECTIVE JUROR:  I have not.

11           THE COURT:  And, during the events of the 6th, did

12   you have concern or fear for people that you know and worked

13   with?

14           PROSPECTIVE JUROR:  No, I didn't.  I really wasn't

15   very much informed of what was going on on that particular day.

16   I wasn't paying attention to the news that day.  I was working

17   at my office.  So, no.  The answer is, no, I had no awareness

18   of it.  But I generally wouldn't have been -- I probably would

19   not have been concerned knowing that the Capitol Police are

20   there.

21           THE COURT:  Have you spoken to people that work on

22   The Hill, whether they were actually physically there on

23   January 6th or not, and have you spoken to them about their

24   views of the events of that day?

25           PROSPECTIVE JUROR:  No.

```
1          THE COURT:  Question 55 asks whether you or a close
2   friend or family member has ever worked in the legal
3   profession.
4          PROSPECTIVE JUROR:  Okay.  Well, that would be me.
5          THE COURT:  Okay.
6          PROSPECTIVE JUROR:  I am a recently retired partner
7   from an Am Law 100 law firm that has an office here in
8   Washinton, D.C.
9          THE COURT:  Okay.  During your career, did you do any
10  criminal work?
11         PROSPECTIVE JUROR:  No.
12         THE COURT:  Did any partners in your firm do criminal
13  work?
14         PROSPECTIVE JUROR:  Well, it's a very large law firm.
15  So some of them do white-collar criminal work, but that's not
16  something that I have been involved in.
17         THE COURT:  Do you know whether any of those -- one
18  of your former partners were also former prosecutors?
19         PROSPECTIVE JUROR:  Yes.  Some of them were, yes.
20         THE COURT:  Question 59 -- oh, I'm sorry.  Okay.  I
21  think those are all the questions I have.
22         Any follow-up, Mr. Edwards?
23         MR. EDWARDS:  No, Your Honor.  Thank you.
24         THE COURT:  Anything from defense?
25         MS. HALIM:  No, Your Honor.
```

1    THE COURT:  Thank you, sir.  Mr. Douyon will escort

2  you out of the courtroom and provide you additional

3  instructions.

4    THE CLERK:  Could I get your questionnaire back, sir,

5  please.

6    PROSPECTIVE JUROR:  Sure.

7    THE CLERK:  Thank you.

8    [Prospective juror exits.]

9    THE CLERK:  Please speak into the microphone and keep

10  this here when you are finished.  This is Juror 2325.

11    THE COURT:  How are you?

12    PROSPECTIVE JUROR:  Doing well.

13    THE COURT:  You are Juror 2325, you said?

14    PROSPECTIVE JUROR:  2325.

15    THE COURT:  Sorry about that.  You are Juror 2325.

16    PROSPECTIVE JUROR:  Correct.

17    THE COURT:  Feel free to remove your mask, if you are

18  comfortable doing so.

19    Question 12, you responded -- if I could ask you to

20  turn to your juror questionnaire in front of you.  Page 6.

21    PROSPECTIVE JUROR:  Okay.

22    THE COURT:  Question 12 just asks generally is there

23  anything that you know that might affect your ability to be

24  fair and impartial, and you wrote, "Registered democrat.

25  Believe 1/6 actions were harmful to democratic process.  No

1   opinion on defendants."  Can you tell us what you meant by

2   that?

3              PROSPECTIVE JUROR:  Yeah.  I guess I meant that I

4   felt that the events of 1/6 were, obviously, very impactful to

5   the democratic process, and I don't think that it was, you

6   know -- I don't think that it was technically a good thing.

7              But I don't know who the defendants are.  I also

8   don't understand well enough this sort of -- the legal

9   definitions of the charges being brought against the

10  defendants.  So I have no -- there's nothing in there that I'm

11  like, oh, I would not be able to acquit these people.  I just

12  think that -- you know, I was a supporter of the elected

13  president and thought that attempting to hinder the process was

14  counter-productive.

15             THE COURT:  Okay.  So let me ask you this:  Do you

16  think that just by somebody's presence at the Capitol on

17  January 6th -- would you say that someone who was present

18  there, would you have the opinion that that person was

19  committing unlawful acts by being there?

20             PROSPECTIVE JUROR:  No, I don't believe so.

21             THE COURT:  And do I understand from your answer to

22  me that you would want to see and hear what the evidence is

23  before you reach that conclusion?

24             PROSPECTIVE JUROR:  Yeah.  I would obviously want the

25  prosecution to demonstrate the laws were broken rather than

```
 1   that someone, you know, was a part of the political process.

 2        THE COURT:  Understood.  You said that -- you said

 3   you are a registered Democrat.  You told us you voted for

 4   current president Biden.  If you were to learn that the

 5   defendants in this case supported former president Donald Trump

 6   and, perhaps, even thought that the election was stolen, how

 7   would that affect your ability to sit in judgment of them?

 8        PROSPECTIVE JUROR:  I would never convict someone on

 9   the basis of their political beliefs.  So I don't think it

10   would cause me to -- I don't think it would cause me to be

11   unable to acquit them if there was a failure to show the

12   evidence.

13        THE COURT:  Okay.  So we are on page 7.  Question 20

14   asks have you or a close friend or family member in the last

15   5 years attended a rally, protest or demonstration or march of

16   any type.  Can you tell us about that?

17        PROSPECTIVE JUROR:  Yeah, not frequent but on one

18   occasion in the last year I attended a march in support of

19   abortion rights.

20        THE COURT:  So similar question to what I asked you

21   previously is that if you were to learn that the defendants had

22   different political views than you, would that affect your

23   ability to be fair and impartial to them?

24        PROSPECTIVE JUROR:  No.

25        THE COURT:  Yes.  Question 21 asks have you ever been
```

1   on Capitol ground or inside the Capitol building.

2          PROSPECTIVE JUROR:  Yes.  I have visited the Capitol

3   just as a -- you know, on a tour.  I've been to the House

4   Chambers just to witness proceedings there.  But always just as

5   a visitor.

6          THE COURT:  So can I ask you, please, to turn to

7   page 11, Question 49.  Question 49 asks whether you have read,

8   seen, or heard anything about the Oath Keepers organization,

9   and you answered "yes."  Could you tell us what you have read,

10   seen, or heard about the organization?

11          PROSPECTIVE JUROR:  So I have seen a couple of news

12   stories about Oath Keepers often in the context of other sort

13   of, you know, right-wing organizations like Proud Boys,

14   et cetera, that are sort of general in nature.

15          I did also, just for full disclosure here, I got a

16   notification on my phone on the way over here about the

17   judgment -- I'm blacking out here -- but about Mr. Rhodes.

18          I know -- I know that it is sort of a -- pseudo

19   paramilitary is not quite the right word, but I sort of -- a

20   pseudo militia-type organization that is a right-wing

21   organization and certainly supports the former president.

22   That's pretty much what I know.

23          I don't know -- as I indicated, I don't know the

24   people involved in it.  I don't know anyone personally involved

25   in it.  I've never actually seen in person anyone who claimed

368

1    to be one of the Oath Keepers.  It's been high-level, sort of,

2    news discourse in the morning.

3            THE COURT:  Gotcha.  So would you be able to set

4    aside what you have read, what you think is the

5    characterization of -- what you have described as a

6    characterization of an organization?  Would you be open to

7    hearing facts and evidence that might differ from your

8    preconceived views?

9            PROSPECTIVE JUROR:  Yeah.  I think it's pretty clear,

10   from what I answered so far, that I don't support the beliefs

11   of the members of the Oath Keepers.  However, that doesn't by

12   itself constitute any sort of legal basis for acquittal or, you

13   know, conviction.  I would, obviously, listen to the facts as

14   they relate to the charges brought against them.

15           THE COURT:  You mentioned that you had seen a

16   headline about Mr. Rhodes.  Mr. Rhodes is, obviously, not in

17   trial on this case.  These defendants, however, are charged

18   with conspiring with Mr. Rhodes.  Do you believe the fact of

19   Mr. Rhodes's conviction would affect your view of whether these

20   defendants are guilty or not?

21           PROSPECTIVE JUROR:  They are obviously different

22   people.  So I think it would have to depend on just the facts

23   of these defendants.

24           THE COURT:  So is it accurate to say that you could

25   set aside the fact that you learned of this conviction and

1   focus only on the evidence as it relates to these four

2   defendants?

3          PROSPECTIVE JUROR:  Yes.  I have no opinion on these

4   defendants.

5          THE COURT:  And if you were to become convinced that

6   the Government had not met its burden of proof, would you have

7   any difficulty voting to acquit?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Questions on the prior page, 41, 42, and

10  43, were aimed at getting a sense of how much media you have

11  consumed about the events of that day.  Could we get a sense of

12  how much media you have followed concerning the events of

13  January 6.

14         PROSPECTIVE JUROR:  Some.  So I was -- didn't

15  watch -- I'm not a TV watcher, so I didn't watch any TV

16  coverage the day of or anything.  Did engage in some live

17  reporting from the New York Times and The Washington Post on

18  the day of January 6 as I was in close proximity.  I sort of

19  lived about a mile away from the Capitol building and was

20  watching the events with some interest.

21         Post-events of January 6, I have not read that much

22  about it.  I have read a couple of news articles as they have

23  come through.  I think there was sort of like a highlight reel

24  from January 6 the times I have watched, which is like a

25  five-minute recap.

```
 1              I think I saw one or two of the videos that they did
 2   in Congress for various Congressional hearings about January 6
 3   put forward into evidence there.  But I certainly haven't done,
 4   like, any deep dives.  It's been sort of headlines that I have
 5   come across.
 6              THE COURT:  So, again, I asked you this question
 7   before, but do you think you would have any difficulty putting
 8   aside any news media that you have been exposed to and only
 9   focus on the evidence in this case?
10              PROSPECTIVE JUROR:  Yes.  I mean, I don't know any of
11   the defendants.  I don't know if they were in the footage.  If
12   so, I would expect it to be evidence in this case, and I'll
13   apply it to the evidence in this case.
14              THE COURT:  I'll ask you to turn to page 12,
15   Questions 59 and 60.  Those questions ask whether you, close
16   friend, or family member has ever been the victim of a crime or
17   witness to a crime.  And you answered both of those questions
18   "yes."
19              PROSPECTIVE JUROR:  Yes.  So I'm not sure about the
20   witness piece, but my girlfriend was -- who I live with, was
21   assaulted sort of on the streets of D.C. about a year and a
22   half ago.  That was a reported crime.  Obviously, no relation
23   to this case, but I do have some experience with a victim of a
24   violent crime.
25              THE COURT:  I'm sorry to hear what happened to your
```

1    girlfriend.  Did she report what happened to her to the

2    Metropolitan Police Department?

3              PROSPECTIVE JUROR:  Yes, she did.

4              THE COURT:  And do you know whether anyone was

5    arrested?

6              PROSPECTIVE JUROR:  I don't believe so.

7              THE COURT:  Based on her experience, did you form any

8    views about any members of the Metropolitan Police Department?

9              PROSPECTIVE JUROR:  I don't have any views of the

10   Metropolitan Police Department, no, other than I think in that

11   case they tried their best, but there was very little that they

12   could have done in that situation.

13             THE COURT:  Okay.  All right.  Mr. Edwards, any

14   follow-up?

15             MR. EDWARDS:  No, Your Honor.  Thank you.

16             THE COURT:  Defense counsel?

17             MR. SHIPLEY:  Sir, you said in your questionnaire

18   that you believe the actors -- the 1/6 actors were harmful to

19   the democratic process.

20             PROSPECTIVE JUROR:  Yes.

21             MR. SHIPLEY:  So, as you sit here, if you are looking

22   backwards in retrospect, do you still believe that anybody that

23   was on Capitol Hill on January 6, whatever they did, were

24   harmful to the democratic process?

25             PROSPECTIVE JUROR:  I don't believe that peaceful

1   protests are harmful to the democratic process.  I think that's

2   beneficial to the democratic process.  I do believe that

3   interrupting official proceedings would be harmful to the

4   democratic process, and anyone who attempted to block

5   certification of the election is certainly harmful to the

6   democratic process.

7          Whether or not it constitutes legal problem, I

8   couldn't say, but, certainly, I would say that if someone was

9   trespassing on Capitol grounds with the intent of interrupting

10  a democratic process, I would say that is a problem.

11         MR. SHIPLEY:  But, as you sit here, thinking back to

12  what you watched on that day, is it your view that anybody

13  trespassing on Capitol grounds was attempting to interfere with

14  the democratic process?

15         PROSPECTIVE JUROR:  If they were really trespassing,

16  then I would say they were trespassing.  I think they would

17  have to actively interfere with the democratic process to

18  interfere with the democratic process.

19         MR. SHIPLEY:  What would you consider to be actively

20  interfering with the process?

21         PROSPECTIVE JUROR:  I think attempting to, you know,

22  break into rooms and to disturb proceedings.  So to attempt to

23  break into a room where democratic proceedings were happening

24  and cause a disruption or -- incite violence in such a way to

25  prevent proceedings from continuing, that would be something

1   that I would say would interfere with the democratic process.

2   If you were in any way attempting to sort of prevent the

3   official process from taking place, as outlined in the

4   Constitution, that's what I would say that's a problem.

5           MR. SHIPLEY:  What about, hypothetically, if the

6   process had been suspended and the person just walked through

7   doors that were already open?

8           PROSPECTIVE JUROR:  I don't have any opinion on that.

9   I don't have a legal opinion on that, I could say.  I think it

10  probably -- if I were in that position, it probably would have

11  been pretty clear to me that things were out of hand and I

12  certainly wouldn't participate in that.

13          So it's hard for me to say that it's totally cool to

14  just walk into the House or Senate Chamber because the

15  processes were suspended, but I certainly don't have an opinion

16  as to whether or not that really impacted the election or the

17  process or, you know, has any legal ramifications.

18          MR. SHIPLEY:  Now, I'm not trying to intrude or pry,

19  but you listed in here that you are currently unemployed;

20  correct?

21          PROSPECTIVE JUROR:  Yes, that's correct.

22          MR. SHIPLEY:  But your work history is in tech and

23  your educational background is tech?

24          PROSPECTIVE JUROR:  Yes.

25          MR. SHIPLEY:  And among the -- well, the media you

1    listened to the most was <u>New York Times</u>, <u>Washington Post</u>, <u>Wall</u>

2    <u>Street Journal</u>.

3          PROSPECTIVE JUROR:  That's correct.

4          MR. SHIPLEY:  And, on social media, you said that --

5    you identify YouTube specifically?

6          PROSPECTIVE JUROR:  Uh-huh.

7          MR. SHIPLEY:  In all of those access -- all of those

8    news sites, are you saying that you really haven't paid any

9    attention to the post-January 6 developments surrounding the

10   incident at the Capitol and the prosecutions and videos of the

11   day and all of that kind of stuff that's so readily available

12   on those four sites?

13         PROSPECTIVE JUROR:  Like I said, I did watch a couple

14   of sort of highlight reel cuts from the January 6 events on the

15   <u>New York Times</u> and <u>Washington Post</u>.  I did watch some of the

16   Congressional hearings.  I have not researched it, obviously.

17   I did -- again, I admitted to hearing about the conviction of

18   Mr. Rhodes.  And, yeah, I can certainly say on the YouTube

19   piece, I don't engage in YouTube for news or political media

20   consumption at all.  I watch dumb tech videos and people

21   talking about cars or whatever.

22         MR. SHIPLEY:  There's a lot of stuff on YouTube.

23         PROSPECTIVE JUROR:  There's a lot of stuff on

24   YouTube.  But my primary news sources are not social media.  I

25   think social media is, frankly, really a terrible place to

1    consume political information and debate because it's built in

2    such a way that does not allow for nuance.

3         However, yes.  I will never sit here and say I

4    haven't consumed anything.  How much I consumed, I don't really

5    know.  I certainly have read some.

6         I know of Mr. Rhodes.  I have not honestly -- I'll

7    put it this way:  I haven't read enough that I recall the name

8    of any of the defendants coming into the questionnaire.  They

9    are not names that -- either they didn't cross my desk or they

10   didn't register in me, like I didn't consume enough that those

11   names meant anything to me.

12        MR. SHIPLEY:  Thank you.

13        THE COURT:  Thank you, sir.  Mr. Douyon will escort

14   you out of the courtroom for further instructions.

15   [Prospective juror exits.]

16        THE CLERK:  Your Honor, this is Juror No. 0628.

17        THE COURT:  All right.  How are you?

18        PROSPECTIVE JUROR:  Good.  How you doing?

19        THE COURT:  Good.  Thank you.  You are Juror 0628?

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  Feel free to remove your mask, if you are

22   comfortable doing so.

23        All right.  So your questionnaire is in front of you,

24   and I'll ask you first, please, to turn to page 11 and

25   Question 49.  That question asks whether you have seen, read,

1  or heard anything about the Oath Keepers organization, and you

2  answered "yes."  Can you tell us what you have seen, read, or

3  heard about the organization?

4        PROSPECTIVE JUROR:  I have only read articles

5  relating about the Oath Keepers being at January 6.  I know

6  nothing about the organization itself or how it's structured.

7  That's really, like, just the name only.  I have only read

8  about it in news articles.  That's about it.

9        THE COURT:  Okay.  So, with respect to the news

10 articles that you have read, what do you recall those articles

11 reporting about what the Oath Keepers did allegedly on

12 January 6th?

13       PROSPECTIVE JUROR:  That they may have participated

14 in the activities on January 6th.

15       THE COURT:  Any greater detail than just general

16 participation?

17       PROSPECTIVE JUROR:  I don't recall the extent of the

18 participation.

19       THE COURT:  And do you have any understanding of the

20 group's mission, its ideology, its political leanings?

21       PROSPECTIVE JUROR:  I think of -- I think of that

22 group only as Trump supporters.  So that's what I associate

23 them with.

24       THE COURT:  Okay.  The fact that they are Trump

25 supporters or you believe them to be Trump supporters, would

1    that affect your ability to serve as an impartial juror in this

2    case?

3            PROSPECTIVE JUROR:  I don't think so.

4            THE COURT:  If you were to come to learn that your

5    political views are different than these defendants', how, if

6    at all, would that affect your ability to serve fairly and

7    impartially?

8            PROSPECTIVE JUROR:  I don't think it would impact.  I

9    encounter many individuals with different political viewpoints

10   than myself.

11           THE COURT:  Okay.  Since the time you completed this

12   questionnaire, have you learned anything more about the Oath

13   Keeper organization?

14           PROSPECTIVE JUROR:  I have not.

15           THE COURT:  Okay.  Question 51, you were asked

16   whether you recognized or knew the names Stewart Rhodes, Kelly

17   Meggs, Jessica Watkins, and others.  You answered "no."  Is

18   your answer still "no" today?

19           PROSPECTIVE JUROR:  Correct.

20           THE COURT:  Just on the prior page.  You were asked

21   questions about your media consumption about the events of

22   January 6th.  Can you describe those generally, how much

23   media you have consumed about the events of that day.

24           PROSPECTIVE JUROR:  Very minimal.  I read the

25   headlines, but that's about it.  I don't open articles.  Since

```
 1   filling out the survey, I have not read anything about
 2   January 6.  Prior to that, again, just reading headlines and
 3   not opening up the articles.
 4            THE COURT:  Were you left, based on what you have
 5   read and were exposed to, with any impressions about that day?
 6            PROSPECTIVE JUROR:  So I was present in D.C. on that
 7   day.  And I think that day was remarkably violent.  So that's
 8   what the impression, the major impression, I get from that day.
 9            THE COURT:  Okay.  So we all have had some exposure
10   to the media, what's been covered about the events of that day.
11   Your job, as a juror, would be to set all that aside and only
12   focus on the evidence that's presented here.  Could you do
13   that?
14            PROSPECTIVE JUROR:  Yes.
15            THE COURT:  And if -- I'll ask you to, please, turn
16   back to page 7.  You indicated at Question 16 that you or a
17   close friend or family member has been employed by the federal
18   government.  Can you tell us a little more about that?
19            PROSPECTIVE JUROR:  Oh --
20            THE COURT:  Question 16, page 7.
21            PROSPECTIVE JUROR:  Federal government.  So my nephew
22   was a Marine.  So I kind of think of that as the federal
23   government.  I'm trying to think of other family members who
24   were employed at the federal government.  My brother-in-law is
25   a doctor at the V.A., federal government.  I feel like there
```

```
1    might be another instance.

2              THE COURT:  So one of the allegations in this case is

3    that the defendants intended to resist the authority of the

4    government of the United States with force.  Does the fact that

5    you have family members employed by the federal government

6    affect you and your ability to serve fairly and impartially?

7              PROSPECTIVE JUROR:  No, I don't think so.

8              THE COURT:  I think you have indicated that you

9    actually work for the D.C. government?

10             PROSPECTIVE JUROR:  Correct.

11             THE COURT:  So how about your employment with the

12   D.C. government; do you think that would impact your ability to

13   serve in any way?

14             PROSPECTIVE JUROR:  No, I don't think so.

15             THE COURT:  Question 18 asks about close friends or

16   family members in the armed forces.  I think you mentioned your

17   brother.

18             PROSPECTIVE JUROR:  My nephew was in the Marines, and

19   my brother was in the Army reserves.

20             THE COURT:  Question 20 asks whether you, close

21   friend, or family member in the last 5 years has attended any

22   rally, protest or demonstration of any kind.

23             PROSPECTIVE JUROR:  Yes.  I have attended the Women's

24   March and immigration rights marchs.

25             THE COURT:  Forgive me if I've asked this already.
```

1    If you were to come to learn that the defendants in this case

2    have political views different than yours, how do you think

3    that would affect your ability to be fair and impartial as a

4    juror for that?

5            PROSPECTIVE JUROR:  I don't think it will impact it.

6            THE COURT:  If you were to learn that the defendants

7    were supporters of the former president, what, if any, affect

8    would that have?

9            PROSPECTIVE JUROR:  I don't think it will impact it.

10   I have family members who support the previous president.

11           THE COURT:  Question 21 asks whether you have ever

12   been on Capitol grounds or inside the Capitol building.  Could

13   you shed some light on that?

14           PROSPECTIVE JUROR:  Yeah.  I toured the Capitol, the

15   Capitol building, in, I want to say, 2013, 2014.  Some friends

16   were coming to town.

17           THE COURT:  Just as a tourist?

18           PROSPECTIVE JUROR:  Just as a tourist.

19           THE COURT:  All right.  If you would please turn to

20   page 11.  Question 55 asks generally whether you or a close

21   friend or family member is in the legal profession or legal

22   field.

23           PROSPECTIVE JUROR:  Question 11?

24           THE COURT:  Page 11, Question 55.

25           PROSPECTIVE JUROR:  I'm sorry.  Yes.  I have family

1    members.  My wife is not a practicing lawyer but is a barred

2    lawyer.  My mother-in-law is a lawyer.

3              THE COURT:  So you are surrounded by lawyers.

4              Do any of them practice criminal work?

5              PROSPECTIVE JUROR:  My wife previously practiced

6    criminal work as a criminal defense attorney.

7              THE COURT:  As a defense attorney.  And was she

8    private practice or was she a public defender?

9              PROSPECTIVE JUROR:  She was public defender for the

10   State of Colorado.

11             THE COURT:  For the State of Colorado.  And you said

12   she is a barred and licensed lawyer but no longer works?

13             PROSPECTIVE JUROR:  Correct.

14             THE COURT:  The fact that your wife was a public

15   defender, she's represented defendants before, do you think

16   that would affect your thinking at all about the case?

17             PROSPECTIVE JUROR:  I don't think so.

18             THE COURT:  If you were to come to the conclusion

19   that the Government had met its burden of proof in this case,

20   would you have any difficulty voting to convict?

21             PROSPECTIVE JUROR:  As long as the Government proves

22   the burden -- the burden of proof, yes.

23             THE COURT:  All right.  And what about the opposite,

24   which is that if they did not meet their burden of proof?

25             PROSPECTIVE JUROR:  I would not have a problem with

1    that.

2              THE COURT:  And I'm asking this:  Do you think it

3    would cause any tension or difficulty with your spouse if you

4    were to vote to convict these defendants given her background

5    as a criminal defense lawyer?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Question 59 on the next page, page 12,

8    asks have you or a close friend or family member ever been the

9    victim of a crime.

10             PROSPECTIVE JUROR:  Yes.  Do you want me to expound

11   on that?

12             THE COURT:  If you would, please.

13             PROSPECTIVE JUROR:  So I had -- my brother's best

14   friend was -- was -- so I grew up in Los Angeles.  So there was

15   a lot of crime growing up around the neighborhood I was raised

16   in.

17             There were probably a couple instances where a close

18   family member was sexually abused, and that person who

19   perpetrated that was not convicted for -- for what happened.

20   And then another incident where a close family friend was

21   murdered, and no one was tried or convicted for that.

22             THE COURT:  I'm sorry to hear about those experiences

23   that you and your family have gone through.  Is there anything

24   about those experiences that would prevent you from serving as

25   a juror in a criminal trial?

1              PROSPECTIVE JUROR:  I don't think so.  I think it

2    lends to me being impartial in the sense that -- in the sense

3    that I -- I see that -- that those crimes that, you know -- I

4    think at that time it was hard to report, and I think, you

5    know, coming -- looking back at it and looking at it now and

6    the services and the ability to talk about those events lends

7    itself to be able -- like, I think now the perspective -- just

8    maybe kind of the perspective about how -- I mean, I was very

9    young.  So, approaching those, I just didn't know what was

10   going on.

11             And, now, as an adult, I think being able to report

12   on something like that, if it were to occur today, would be

13   important to me and to be able to bring it to, you know, a case

14   or trial or whatever needs to happen to have some sort of

15   resolution.

16             THE COURT:  I appreciate the response.

17             Okay.  Mr. Edwards, any additional questions?

18             MR. EDWARDS:  No, Your Honor.  Thank you.

19             THE COURT:  Anything from defense counsel?

20             MS. HALIM:  Yes, Your Honor, please.

21             Hi.  Good afternoon.  When you were talking with

22   Judge Mehta sort of at the beginning, you said your major

23   impression of January 6 was that it was remarkably violent.

24             PROSPECTIVE JUROR:  Yes.

25             MS. HALIM:  Do you mind elaborating on what your

1  memories and observations were as to the violence?

2          PROSPECTIVE JUROR:  I think it might be of the images

3  on, you know, the front pages of websites like the New York

4  Times and Washington Post of people charging barricades.  I

5  mean, I know that, prior to the entering of the Capitol

6  building, there was a, you know, rally.  That was peaceful.

7  But, you know, the images that were portrayed on major news

8  organizations showed violent images.

9          MS. HALIM:  Was there anything about seeing or

10 observing that violence that could impact your ability to apply

11 the presumption of innocence to my client, who is sitting here?

12          PROSPECTIVE JUROR:  So I think that if the federal

13 government is bringing a case against a group of people, the

14 case has to meet a burden of proof to be able to convict them.

15 And so it depends on what that burden -- you know, what that

16 proof is they bring to the courtroom.

17          MS. HALIM:  Thank you.

18          MR. SHIPLEY:  Ma'am, you made reference to

19 participating yourself in a couple of marches.  The one I'm

20 interested in is the immigration march.

21          PROSPECTIVE JUROR:  Yes, immigration rights.

22          MR. SHIPLEY:  How long ago was that?

23          PROSPECTIVE JUROR:  I believe that was in 2020 -- no.

24 Wait.  That was 2019.

25          MR. SHIPLEY:  That's my question.  Trump was

1    president?

2           PROSPECTIVE JUROR:  Correct.

3           MR. SHIPLEY:  Was that march in protest of the Trump

4    policies, which were quite harsh by views of some?

5           PROSPECTIVE JUROR:  Right.

6           MR. SHIPLEY:  So you were protesting Trump

7    immigration policies.  You have a personal reason for wanting

8    to march in opposition to immigration policy?

9           PROSPECTIVE JUROR:  That's --

10          THE COURT:  Rephrase the question.

11          MR. SHIPLEY:  What motivated you to participate in

12   that particular march?

13          PROSPECTIVE JUROR:  I think of -- I am a

14   first-generation Filipino-American.  My parents immigrated to

15   the United States in the mid '70s.  I think that there was a

16   reason why people immigrate to other countries for seeking a

17   better life.  And providing the opportunity, I think, should be

18   available to others.

19          MR. SHIPLEY:  Okay.  Fair enough.  So it's fair to

20   say that you disagreed with the Trump immigration --

21   administration immigration policies?

22          PROSPECTIVE JUROR:  Yes.

23          MR. SHIPLEY:  Okay.  Now, that leads to my next

24   question.  Does that cause you to have any particular feelings

25   towards supporters of the Trump administration and people who

```
 1  voted once or twice for Donald Trump?

 2              PROSPECTIVE JUROR:  So I am a first-generation

 3  Filipino-American.  I have a lot of family members who

 4  emigrated here from the Philippines who now call themselves

 5  Americans who have voted for Trump.  So I see many sides of the

 6  coin, and so I -- so I don't think that would impact my

 7  perspective of these defendants.

 8              MR. SHIPLEY:  Okay.  Thank you.

 9              THE COURT:  All right.  Thank you very much.

10  Mr. Douyon will escort you out of the courtroom and provide you

11  further instructions.

12              PROSPECTIVE JUROR:  Thank you.

13      [Prospective juror exits.]

14              THE COURT:  All right.  It's 3:20.  Why don't we take

15  our afternoon break.  We'll resume at 3:35.  Thank you, all.

16      [Recess.]

17              THE COURT:  You may sit down.  Thank you.

18              THE CLERK:  We are still missing counsel for

19  Mr. Vallejo.  He's not back yet.  Do you want to proceed?  I

20  can try to call him.

21              THE COURT:  Wait.  He'll show up in a few minutes.

22      [Pause in proceedings.]

23              THE CLERK:  Right this way, sir.  If you'll have a

24  seat and speak into the microphone.

25              Your Honor, this is Juror No. 0355.
```

```
 1              THE COURT:  Sir, how are you?

 2              PROSPECTIVE JUROR:  All right.

 3              THE COURT:  Welcome.  You are Juror 0355?

 4              PROSPECTIVE JUROR:  Yes.

 5              THE COURT:  All right.  Feel free to remove your

 6  mask, if you are comfortable doing so.

 7              All right.  So let's begin.  Your juror questionnaire

 8  should be there in front of you.  If you would please turn

 9  first to page 11 and to Question 49.  Question 49 asks have you

10  read, seen or heard anything about the Oath Keepers

11  organization, and you answered that question "no."

12              PROSPECTIVE JUROR:  That's right.

13              THE COURT:  Okay.  So just to confirm, you've never

14  heard of the term "Oath Keeper" at all ever?

15              PROSPECTIVE JUROR:  No.

16              THE COURT:  Don't know what the organization stands

17  for or what its mission is, anything like that?

18              PROSPECTIVE JUROR:  No.

19              THE COURT:  And, since you completed this form, have

20  your answers changed at all, or is it the same today?

21              PROSPECTIVE JUROR:  Same.

22              THE COURT:  All right.  Question 51 asks whether you

23  would recognize any of these names:  Stewart Rhodes, Kelly

24  Meggs, Jessica Watkins, you answered "no."  Is your answer

25  today the same?
```

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  If I could please ask you to turn

3    to page 7.  Question 15 asks whether you have any close friends

4    or family members who have ever been employed by the U.S. -- at

5    the U.S. Capitol, and you said you do not know.

6          PROSPECTIVE JUROR:  Right.

7          THE COURT:  And so were you confused by the question,

8    or you just don't know if you know the answer?

9          PROSPECTIVE JUROR:  I don't know the answer.

10          THE COURT:  Okay.  Is that because -- well, let me

11    put it differently.  Do you know, among your close friends and

12    family members, whether any of them have worked at the U.S.

13    Capitol?

14          PROSPECTIVE JUROR:  Not that I know of.

15          THE COURT:  Not that you know of.

16          Same question for 16, whether you or a close friend

17    or family member has ever been employed by the federal

18    government.  Do you know anybody in your family or close circle

19    of friends that's worked for the federal government?

20          PROSPECTIVE JUROR:  What part of the federal

21    government?  Like what you --

22          THE COURT:  Any part of it.

23          PROSPECTIVE JUROR:  Not that I knows of.

24          THE COURT:  Okay.  Question 18 asks whether you or a

25    close friend or family member has been in the armed forces.

1    Tell us about that.

2              PROSPECTIVE JUROR:  I have an uncle that was in the

3    Marines.

4              THE COURT:  Question 20 asks whether you or a close

5    friend or family member has attended a rally, protest or

6    demonstration or march in the last 5 years.

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  All right.  The question is answered

9    "yes" here; is that correct?

10             PROSPECTIVE JUROR:  5 years?  Yeah.  Last time I went

11   to a demonstration was for the men's march.

12             THE COURT:  What's that?

13             PROSPECTIVE JUROR:  The men's march.

14             THE COURT:  The Million Man March?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  So that was probably more than 5 years

17   ago?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  So that was the last time you went to a

20   demonstration?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  So let me ask you this:  If you were to

23   learn that the defendants in this case had political views that

24   are different from yours, would that affect your ability to be

25   fair and impartial to these defendants?

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  All right.  If I could ask you to,

 3    please, turn to page 10, Questions 41, 42, 43.  They were all

 4    targeted at figuring out how much news you've been exposed to

 5    about the events of January 6.  Can you give us a sense of how

 6    much news coverage you've seen, read, or heard about the events

 7    of that day?

 8              PROSPECTIVE JUROR:  Just what I seen on TV.

 9              THE COURT:  Okay.  And can you tell us, give us an

10    idea, did you -- do you -- did you watch a lot sort of on the

11    day of and around that day and then very little since then, or

12    have you consistently been watching news about the events of

13    that day since?

14              PROSPECTIVE JUROR:  Yeah.  I watched quite a bit of

15    that.

16              THE COURT:  You watched quite a bit of --

17              PROSPECTIVE JUROR:  Of the 6$^{th}$ the way they came to

18    the Capitol.

19              THE COURT:  What about since then?  Have you watched

20    much news about the events of that day?

21              PROSPECTIVE JUROR:  No.

22              THE COURT:  And, based upon what you've seen, what

23    impressions do you have about that day and the people who

24    participated in the events that day?

25              PROSPECTIVE JUROR:  I don't think it was right coming
```

```
 1   to the Capitol like that.  You know?  That's the way I feel
 2   about it.
 3              THE COURT:  Right.  And so there may be evidence in
 4   this case that defendants, one or more defendants, actually,
 5   entered the Capitol that day.  Do you think you could keep an
 6   open mind in concluding whether they, in fact, violated the law
 7   even if they went into the Capitol building?
 8              PROSPECTIVE JUROR:  I don't -- I don't really know
 9   how to answer that one, sir.
10              THE COURT:  Should I rephrase the question, or it's
11   just difficult answering?
12              PROSPECTIVE JUROR:  It's kind of difficult to answer.
13              THE COURT:  Difficult to answer?
14              PROSPECTIVE JUROR:  Yes.
15              THE COURT:  Let me ask you a slightly different way.
16   These defendants are presumed to be innocent.  Okay?  They are
17   presumed innocent unless and until the Government proves them
18   guilty.
19              PROSPECTIVE JUROR:  Right.
20              THE COURT:  Do you think you would be able to presume
21   them innocent even if I were to tell you that one or more of
22   them entered the Capitol building?
23              PROSPECTIVE JUROR:  No.
24              THE COURT:  You think you would -- so do I understand
25   you correctly to say that just because they entered the Capitol
```

1    building, you would not be able to presume them innocent; is

2    that right?

3             PROSPECTIVE JUROR:  Yeah, because all those guys

4    shouldn't be coming in there.

5             THE COURT:  I'm sorry?

6             PROSPECTIVE JUROR:  I don't think they acted right

7    coming in there to be honest.

8             THE COURT:  Any objections, counsel?

9             MS. HALIM:  No, Your Honor.

10            MR. EDWARDS:  I'm sorry, Your Honor.  I understood

11   his answer to be that he disagreed that people should go in.

12            THE COURT:  I thought I heard him say they have no

13   business going in there.

14            PROSPECTIVE JUROR:  Right.

15            MR. EDWARDS:  Right.  I just wondered if you would be

16   able to set that aside and assess facts in the trial to

17   determine whether or not somebody was guilty regardless of your

18   belief?

19            PROSPECTIVE JUROR:  I don't -- I don't know how I

20   could judge that, sir.  So I don't think that it was right

21   going in.  So that's my opinion.

22            MR. EDWARDS:  Okay.  Thank you.

23            THE COURT:  Thank you, sir.  Mr. Douyon will escort

24   you out of the courtroom and provide you with additional

25   instructions.

```
 1        [Prospective juror exits.]

 2             MS. HALIM:  Your Honor, is he stricken for cause?

 3             THE COURT:  Yes.  He is stricken for cause, 0355.

 4             THE CLERK:  Your Honor, this is Juror No. 1419.

 5             THE COURT:  All right.  How are you?

 6             PROSPECTIVE JUROR:  Hey, how are you?

 7             THE COURT:  Good.  Thank you.  Have a seat and feel

 8  free to remove your mask, if you are comfortable doing so.

 9             You are Juror 1419?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  All right.  Your juror questionnaire

12  should be there in front of you, and so I'll first ask you to

13  turn to --

14             PROSPECTIVE JUROR:  Ouch.

15             THE COURT:  You good?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Turn to page 11, please, and Question 49.

18  Question 49 asks you whether you've read, seen, or heard

19  anything about the Oath Keepers organization?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  Can you tell us what you have read, seen,

22  or heard?

23             PROSPECTIVE JUROR:  Not much since the initial

24  January 6 coverage, but, like, I recognize the name.

25             THE COURT:  Uh-huh.  And so what, in connection with
```

1  the initial coverage, do you think you have learned about the

2  organization?

3          PROSPECTIVE JUROR:  It was reported that the Oath

4  Keepers were one of the groups participating in and, perhaps,

5  coordinating the January 6th events.

6          THE COURT:  Beyond that, do you have any sense of

7  what their mission is, what their ideology is, what their

8  purpose is?

9          PROSPECTIVE JUROR:  I think there's some kind of,

10  like, guns rights or constitutional originalists or some sort

11  of semi-political organization.

12          THE COURT:  Uh-huh.  And so let me ask you this:  You

13  have indicated that you have learned something about the

14  organization in or around the events of that day.  The question

15  for you is, if you were a juror, whether you could set aside

16  what you think you know about the organization and evaluate the

17  evidence fairly and impartially as to these four defendants.

18          PROSPECTIVE JUROR:  I think so.

19          THE COURT:  And do you think that -- if you were to

20  learn that one or more of these defendants was a member of that

21  organization, do you think that you could still presume them to

22  be innocent of the charges that have been filed against them?

23          PROSPECTIVE JUROR:  Yes, yes.

24          THE COURT:  Okay.  And just maybe the question was

25  confusing.  But every defendant has the right to be presumed

1    innocent.  Could you still presume these defendants to be

2    innocent, even though you've just described some impressions

3    about the organization that you learned at or around

4    January 6th?

5              PROSPECTIVE JUROR:  I was trying to recall if you had

6    mentioned the specific charges, but, yes.

7              THE COURT:  So do you think that the specific charges

8    would matter in terms of your ability to presume them innocent?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Okay.  So let me just tell you what's on

11   the charges.  I think they were described in here, but they

12   include seditious conspiracy, conspiring to obstruct an

13   official proceeding -- this is Question 70 -- obstructing an

14   official proceeding, and conspiracy to prevent an officer from

15   discharging their duties.

16             Anything about those charges that would cause you to

17   believe that you could not be fair in this case?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  Since you completed this questionnaire,

20   have you learned anything more about the Oath Keepers

21   organization?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  Question 51 asks you whether you have

24   seen, heard, or read anything about Stewart Rhodes, Kelly

25   Meggs, and some others.  You answered that question "no."  Is

1  your question -- answer to that question still "no" today?

2          PROSPECTIVE JUROR:  Yes.  My answer is still "no."

3          THE COURT:  The question on the prior page, Questions

4  41, 42, 43, they concern the amount of news you have been

5  exposed to about the events of that date.  Can you give us a

6  sense of how much news coverage you have seen about the events

7  of that day?

8          PROSPECTIVE JUROR:  On the actual day, I watched

9  quite a bit of the coverage and probably some follow-ups in the

10  subsequent weeks, but I have not been following it since, I

11  don't know, the summer, spring.

12          THE COURT:  And so, for example, there have been

13  criminal trials about the events of January 6.  Have you

14  followed the news about those trials?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Would you be able to set aside what you

17  have learned in the news and heard in the news and, again,

18  focus on the evidence that's presented in this case?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  If you would please turn to page 7.

21  Question 16 asks whether you or a close friend or family member

22  has ever been employed by the federal government.

23          PROSPECTIVE JUROR:  Uh-huh.  Elaborate?

24          THE COURT:  Yes, please.

25          PROSPECTIVE JUROR:  Both of my parents were in the

1    armed services when I was -- well, my dad got out before I was

2    born, and my mom was in when I was in, like, kindergarten.  My

3    stepmother is a civilian employee of the Navy.

4              THE COURT:  And so the fact -- one of the charges in

5    this case or one of the allegations in this case is that the

6    defendant intended to resist the authority of the United States

7    government using force.  The fact that your parents were both

8    members of the armed services, how does that affect your

9    thinking about the case, the charge, these defendants, if at

10   all?

11             PROSPECTIVE JUROR:  I don't think it does.

12             THE COURT:  Do you think if you were to vote to

13   acquit these defendants that would be harder to do or would

14   cause any difficulty with your parents because they are in law

15   enforcement?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  Question 18, I think, you already

18   answered in terms of your parents being in the armed forces.

19             Question 20 asks whether you, a close friend, or

20   family member has attended a rally, protest, demonstration, or

21   march in the last 5 years.

22             PROSPECTIVE JUROR:  Yes.  I went to the Women's

23   March, and I think my mother went to the Women's March and like

24   a march for science.

25             THE COURT:  So if you were to learn that the

```
1    defendants in this case might have political views different
2    than yours, how would that affect your ability, if at all, to
3    judge them fairly and impartially?
4              PROSPECTIVE JUROR:  I assumed that they might, but I
5    don't think that it would affect my ability to be impartial.
6              THE COURT:  And you have impressions, opinions about
7    people who would have voted for and supported the former
8    president?
9              PROSPECTIVE JUROR:  No -- yes.  Everyone does.  But
10   sure.
11             THE COURT:  Right.  And could you share with us to
12   the extent -- could you share with us what those opinions,
13   impressions are to the extent that you are -- I'm asking you to
14   generalize.
15             PROSPECTIVE JUROR:  Generalize.  I think that
16   candidate was appealing to many people for a variety of
17   reasons, some of which were very understandable.  Like,
18   potentially economic disenfranchisement or frustration with the
19   current, I don't know, societal norms.  And I think other
20   people might have been motivated by different things like
21   greed, if they thought those tax policies would be more
22   favorable to them or other issues.  I mean, people are
23   single-issue voters for a variety of reasons.  So I don't know.
24   I'm pretty sure I had family members who voted for him.
25             THE COURT:  Okay.  Would it interfere with your
```

1    ability to be fair and impartial if the defendants were

2    supporters of the former president?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Question 21 asks whether you have ever

5    been on the Capitol grounds or inside the Capitol building.

6              PROSPECTIVE JUROR:  I have been on the grounds, I

7    mean, just like walking around looking at the fountain and

8    stuff as a tourist.

9              THE COURT:  Okay.  Question -- excuse me.  Page 11.

10             PROSPECTIVE JUROR:  Uh-huh.

11             THE COURT:  Question 56 asks about application or

12   employment with law enforcement.

13             PROSPECTIVE JUROR:  Yeah.  Before I was born, my dad

14   was campus police officer in College Station, Texas.

15             THE COURT:  Okay.  Question 62 on the next page asks

16   about close friends or family members who were arrested,

17   prosecuted, or convicted.

18             PROSPECTIVE JUROR:  When I was, like, 22, or 23, I

19   was arrested for, like, public intoxication or something, and I

20   think I got a suspended imposition of sentence in Arlington

21   County, Virginia, which has since been -- gone away.

22             THE COURT:  Anything about that experience that you

23   think would make it difficult for you to be fair and impartial

24   to both sides?

25             PROSPECTIVE JUROR:  No.

1          THE COURT:  Would it cause you to -- do you have any

2    views about the police as a result of that event?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Okay.  Mr. Edwards?

5          MR. EDWARDS:  No, Your Honor.  Thank you.

6          THE COURT:  Anything from defense?

7          MS. HALIM:  No, Your Honor.

8          THE COURT:  All right.  Thank you very much, ma'am.

9    You may step down.  Mr. Douyon will show you out of the

10   courtroom and provide you with additional instructions.

11         PROSPECTIVE JUROR:  Thank you.

12       [Prospective juror exits.]

13         THE CLERK:  Your Honor, this is Juror No. 0812.

14         THE COURT:  Sir, how are you?

15         PROSPECTIVE JUROR:  Good and well.  How are you?

16   Whoop.

17         THE COURT:  Thank you for your patience with us

18   today.  You are Juror 0812?

19         PROSPECTIVE JUROR:  Correct.

20         THE COURT:  Feel free to remove your mask, if you are

21   comfortable doing so.

22         PROSPECTIVE JUROR:  Okay.

23         THE COURT:  Your juror questionnaire is in front of

24   you.  So if I could just first ask you to -- well, first things

25   first.  On page 1 -- I guess it's page 5.  You had indicated

1  that you have holiday travel out of the area from the 21st of

2  December through the 28th of December; is that right?

3           PROSPECTIVE JUROR:  Correct.

4           THE COURT:  And how set in stone is that travel at

5  this point?

6           PROSPECTIVE JUROR:  You'd have to talk to my mom.

7           THE COURT:  At the risk of getting on the bad side of

8  your mom, can you tell me, is this something that -- for which

9  you have already purchased airline tickets?

10          PROSPECTIVE JUROR:  Yes.  Correct.

11          THE COURT:  And, in theory, if you were selected for

12 this jury, could you delay your travel for one day?  We would

13 not be sitting on the 23rd of December.

14          PROSPECTIVE JUROR:  So what date again?  So I would

15 be here the 21st?

16          THE COURT:  Correct, and the 22nd.

17          PROSPECTIVE JUROR:  And the 22nd.  I could --

18 providing the airline lets me do that, yeah, I would send the

19 rest of my family on.

20          THE COURT:  Okay.  If you would please turn to

21 page 7.  Starting at line 25, Question 25, you indicated that

22 you served on a Grand Jury before.

23          PROSPECTIVE JUROR:  Correct.

24          THE COURT:  Can you tell us when the Grand Jury

25 service was?

1          PROSPECTIVE JUROR:  Oh, probably 1998.

2          THE COURT:  Okay.  So it's been some time?

3          PROSPECTIVE JUROR:  It's been a while.

4          THE COURT:  So if I could, then, ask you to

5  fast-forward or move forward in the questionnaire to line 49 --

6  or Question 49 on page 11.  Question 49 asks whether you have

7  read, seen, or heard anything about the Oath Keepers

8  organization, and you answered yes.  Can you tell us what you

9  have read, seen, or heard?

10         PROSPECTIVE JUROR:  Nothing specific.  Just among the

11 many groups that assembled on January 6th, among other times,

12 having lived in D.C.

13         THE COURT:  And, in terms of what role or

14 participation the group had on January 6th, do you have any

15 understanding of what that was?

16         PROSPECTIVE JUROR:  Not in terms of specifics.  I am

17 educatedly assuming that they were -- because we are here today

18 talking about them that there was some involvement with the

19 events of September -- September 6th -- January 6th.

20         THE COURT:  Aside from the assumption, just trying to

21 get a sense of what preexisting understanding you have in your

22 mind.  Beyond that assumption, do you have any idea of what any

23 members of that group were accused of or alleged to have done

24 on that day?

25         PROSPECTIVE JUROR:  I am not aware of what they were

1   accused of, other than generally what we are assembled -- what

2   you're building a jury for.

3            THE COURT:  Okay.  And have you read or been exposed

4   to any media coverage about specifically what the Oath Keepers

5   may or may not have done on January 6th?

6            PROSPECTIVE JUROR:  Not that -- I've done a pretty

7   fair job as a parent to sort of keep away from the news media

8   for the last several years and maintaining a business, trying

9   to just keep it minimized.

10            THE COURT:  Okay.  You've indicated that you have

11   seen some portion or read about the January 6 committee

12   hearings.  Do you recall any portion of those hearings

13   concerning the Oath Keepers?

14            PROSPECTIVE JUROR:  No, I do not.

15            THE COURT:  Can you just give a sense of how much of

16   those hearings you either have seen or read about?

17            PROSPECTIVE JUROR:  It's been mostly just recaps.

18   Nothing live.  Just recaps on -- I don't sleep much.  So

19   watching YouTube, you know, in the middle of the night.

20            THE COURT:  Uh-huh.  And, again, do you have any

21   recollection of whether any of those recaps would have touched

22   on the Oath Keepers or anybody affiliated with the Oath

23   Keepers?

24            PROSPECTIVE JUROR:  No.

25            THE COURT:  Okay.  And, yeah, so as a juror, we would

1   ask you to set aside anything that you have learned outside

2   this courtroom about the events of January 6 and focus only on

3   the evidence presented in this case and evaluate it fairly and

4   impartially as to these defendants.  Do you think you would

5   have any difficulty doing that?

6           PROSPECTIVE JUROR:  I wouldn't have any problem.

7           THE COURT:  Question 51 asks you whether you have --

8   you had -- let me go back.  Question 49.  Since you completed

9   this questionnaire, have you learned anything about -- anything

10  more about the Oath Keepers organization?

11          PROSPECTIVE JUROR:  I have not.

12          THE COURT:  Question 51 asks you whether you knew

13  anything or heard of anything about Stewart Rhodes, Kelly

14  Meggs, Jessica Watkins, and others.  You answered "no."  Is

15  "no" still your answer today?

16          PROSPECTIVE JUROR:  Correct.

17          THE COURT:  I would ask you, please, to go to page 7,

18  and Question 16 asks whether you or a close friend or family

19  member has ever been employed by the federal government?

20          PROSPECTIVE JUROR:  Uh-huh.

21          THE COURT:  Can you share with us why you answered

22  that question "yes"?  And it looks like part of the answer may

23  involve your answer to 17.

24          PROSPECTIVE JUROR:  My spouse is employed by the

25  federal government.  And then I have -- I lived in the city for

1  30 years.  So I've amassed friends that work or have worked on

2  Capitol Hill.

3         THE COURT:  So let's back up to that second answer.

4  You said you have friends that have or do work on Capitol Hill;

5  is that correct?

6         PROSPECTIVE JUROR:  Uh-huh.

7         THE COURT:  Do you have friends who were working on

8  Capitol Hill on January 6th?

9         PROSPECTIVE JUROR:  Not that I'm aware.

10        THE COURT:  Well, let me ask the question

11  differently, which is, were any of your friends employed in any

12  positions as of January 6th on Capitol Hill?

13        PROSPECTIVE JUROR:  Again, not to my knowledge.

14        THE COURT:  So is it fair, then, to assume that you

15  don't know anyone that was actually physically present at the

16  Capitol on the day of the events?

17        PROSPECTIVE JUROR:  Yes.

18        THE COURT:  So one of the allegations in this case is

19  that these defendants intended to resist the authority of the

20  federal government by force.  Do you think you would have any

21  difficulty being fair and impartial as to these defendants

22  because of your connections to people who have worked in the

23  federal government and around Capitol Hill?

24        PROSPECTIVE JUROR:  I wouldn't have difficulty.

25        THE COURT:  And the folks that you know on Capitol

1    Hill or maybe at one point in time worked on Capitol Hill, have

2    you talked to them about the events of January 6th.

3            PROSPECTIVE JUROR:  No.

4            THE COURT:  In Question 24, you were asked, do you

5    have a concern -- or did you have a concern for your safety or

6    close friend or family members on the day of January 6.  Can

7    you elaborate on that?

8            PROSPECTIVE JUROR:  Just -- I wasn't even aware of

9    what was happening until my aunt from Indiana texted me, and,

10   at that point, just started wondering who of my friends might

11   be there.  It turns out that -- in checking with them that they

12   weren't at Capitol Hill that day.

13           THE COURT:  Is that the extent to which you had

14   concern about the welfare or well-being of others on that day?

15           PROSPECTIVE JUROR:  Uh-huh.

16           THE COURT:  Question 21 asks about times you've been

17   on the Capitol grounds, Capitol building.  Would you share with

18   us that?

19           PROSPECTIVE JUROR:  Yeah.  In the late -- probably

20   from 1999 to 2004, I worked for an organization that brought

21   young people to D.C. to learn about civics and government.

22   Every Thursday, we took them to the floor of the House of

23   Representatives.  And there were days -- there were times when

24   we could just go down to the Capitol and get lost.  And that's

25   basically the extent of my knowledge, my presence, in the U.S.

1    Capitol.

2         THE COURT:  Part of the allegations in this case is

3    that these defendants attempted to disrupt or impede or

4    obstruct the proceedings that were happening at the Capitol on

5    January 6th.  By virtue of the work that you did previously

6    and having observed Congressional proceedings, do you have a

7    particular affinity or affection for The Hill and the

8    Congressional proceedings that would make it difficult for you

9    to sit fairly and impartially here?

10        PROSPECTIVE JUROR:  I don't think so, no.

11        THE COURT:  Question 20 asks whether you, close

12   friend, or family member has, in the last 5 years, attended a

13   rally, protest, demonstration, or march.  Can you tell us about

14   that?

15        PROSPECTIVE JUROR:  In the last 5 years, I have,

16   prior to COVID -- 5 years.  That would be 2018.

17        THE COURT:  Yes.  2017, 2018.

18        PROSPECTIVE JUROR:  2017.  There was an LGBT march

19   that we participated in as a family.

20        THE COURT:  Okay.  Okay.  Mr. Edwards, any additional

21   questions?

22        MR. EDWARDS:  No questions, Your Honor.  Thank you.

23        THE COURT:  Anything from the defense?

24        MR. PEED:  Good afternoon.

25        PROSPECTIVE JUROR:  Hi, there.

1          MR. PEED:  You may hear evidence that members of the

2    Oath Keepers were providing security for certain individuals,

3    like Alex Jones or Roger Stone.  Would hearing that make you

4    have any feelings that might cloud your ability to be fair and

5    impartial?

6          PROSPECTIVE JUROR:  No.

7          MR. PEED:  And the judge mentioned that there's going

8    to be charges about obstructing a proceeding in Congress.

9    There's not going to be much disputed.  Some of the defendants

10   went into the Capitol.  That's not really in dispute.

11         Do you think the fact that they went into the

12   Capitol -- would you be able to assess, do you think, the

13   elements of the offense itself of what was in their minds

14   versus just the fact that they went in?  Do you feel like if

15   someone went in, you just would feel like you wouldn't be able

16   to -- too prejudiced or something?  Would you be able to fairly

17   assess the details of the charges even knowing they went into

18   the Capitol?

19         PROSPECTIVE JUROR:  I think any of my judgment or

20   thought process would be based on whatever evidence both sides

21   bring to the table.  Is that --

22         MR. PEED:  Do you think you could have a presumption

23   of innocence, even knowing that a person went into the Capitol

24   of what they actually are charged with?

25         PROSPECTIVE JUROR:  Is that -- I mean, am I allowed

1    to ask you?

2            THE COURT:  Sure.

3            PROSPECTIVE JUROR:  So are the charges that they were

4    inside the Capitol or that there were other things that

5    happened that these individuals are charged with?

6            THE COURT:  So what I can tell you is this:  That the

7    evidence is likely to be that one or more individuals entered

8    the Capitol building.  They are charged with, among other

9    things, obstructing and conspiring to obstruct the proceedings

10   that occurred on January 6th.

11           And so the question is, does the mere fact that they

12   went in the building, in your view -- put it differently:  The

13   mere fact that they were in the building, would it make it

14   difficult for you to presume that they were innocent of the

15   charges that have been brought against them?

16           PROSPECTIVE JUROR:  They were in the building.

17           MR. PEED:  The evidence is that some of the

18   defendants went in the building, but they are not charged with

19   the trespassing.  That's what I'm getting at.  They were not

20   charged with trespassing.

21           PROSPECTIVE JUROR:  Okay.

22           MR. PEED:  It requires more elements.  Could you

23   presume their innocence as you assess these facts, even knowing

24   that they were in the Capitol?

25           PROSPECTIVE JUROR:  Independent of being in the

```
 1   Capitol, yes, because I don't know what they have done.  So I
 2   would be listening to both sides impartially.
 3         MR. PEED:  With the presumption, that's what I'm
 4   trying to get at.
 5         PROSPECTIVE JUROR:  Yes.
 6         MR. PEED:  Thank you.
 7         MR. SHIPLEY:  Sir, I'm curious about your answer
 8   about Alex Jones.  If you are selected to serve on the jury in
 9   this case, you'll hear that my client was part of a security
10   team for Alex Jones.  What's your view on Alex Jones?
11         PROSPECTIVE JUROR:  I don't have one.  I don't know
12   that I have -- I am even familiar with his name except for the
13   questionnaire.
14         MR. SHIPLEY:  Okay.  Well, you have a Facebook page
15   under [redacted], and you are a realtor; right?
16         PROSPECTIVE JUROR:  Uh-huh.
17         MR. SHIPLEY:  And did you write, I kind of hope we
18   see Alex Jones burst into sniveling tears.  He has been
19   preaching to the weakest links of humanity and really should be
20   forced to publicly reflect on the effects of his lies on
21   families who have suffered too much and too long already.
22         PROSPECTIVE JUROR:  Interesting.  So that makes --
23   yes.  Now, I know who he is.
24         MR. SHIPLEY:  Okay.  Fair enough.  Now, that you know
25   exactly who we are talking about and you have some
```

1   understanding of things that he's been involved in and the fact

2   that -- you wrote this in connection with the verdict in the

3   lawsuit against him; right?

4           PROSPECTIVE JUROR:  The only reason I know about him

5   is because of the families in Connecticut and what he has --

6   what he has been charged with and convicted of.

7           MR. SHIPLEY:  I understand.

8           PROSPECTIVE JUROR:  So I'm --

9           MR. SHIPLEY:  Quite a controversial figure.  No

10  dispute.

11          But on the day of the verdict against him, you posted

12  on your Facebook page, Sometimes there's just no defense at

13  all.  Just karma -- with respect to Alex Jones.  Okay?

14          Again, I'm going to ask you, the evidence in this

15  case will be that my client was part of a security detail

16  protecting Alex Jones at a public event.  Are you saying that

17  you can set aside the animus that you displayed toward Alex

18  Jones's person on Facebook?

19          PROSPECTIVE JUROR:  Yeah, I can.

20          MR. SHIPLEY:  Thank you.

21          THE COURT:  All right.  Any follow-up?

22          MR. EDWARDS:  No questions, Your Honor.

23          THE COURT:  All right.  Thank you, sir.  Mr. Douyon

24  will show you out of the courtroom and give you further

25  instructions.

1          [Prospective juror exits.]

2          MR. SHIPLEY:  I would argue to remove him for cause.

3     We talked about this earlier, whether Alex Jones -- I

4     understand the Court's point, but this gentleman clearly didn't

5     note his views about Alex Jones.  I don't think he realized who

6     that was, but I think his commentary surrounding the verdict

7     against Mr. Jones is pretty dramatic.  And I just -- it makes

8     me very uncomfortable to think that he says that he could set

9     that aside when he sees the videos of my client, you know, in

10    the security detail with Alex Jones.

11         MR. EDWARDS:  Your Honor, as the juror said there, he

12    didn't make this connection to this Alex Jones.  And my

13    understanding is, at least to Mr. Shipley's client, that this

14    is evidence of something from months prior to January 6.

15         Alex Jones is not on trial.  Alex Jones is not a

16    defendant in this case, as you know.  This is an individual who

17    is, you know, someone in the media -- or, you know, someone in

18    the public sphere.

19         So this juror's opinion is, frankly, irrelevant, and

20    he answered directly -- I think I can set aside any kind of

21    animus that you are pointing out here.

22         And I think the controlling point here, Your Honor,

23    is, throughout all the questioning here, everything was, I can

24    address evidence impartially.  In fact, he answered somewhat

25    confusing questions about being in the building or not by

1    saying is it illegal or not; I need to know the law and the

2    judge's instructions.  So he turned to you to figure out what I

3    need to follow.

4             THE COURT:  So I think it's a close-call.  I think

5    I'm going to deny the request for cause strike.  The fact that

6    he has views about Alex Jones and the verdict against Mr. Jones

7    seems to me to be something that can be separated, and he

8    indicated it could be separated from his views about Mr. Minuta

9    and others.

10            And the mere fact that he has views about Alex

11   Jones -- and, frankly, I'm sure he may not be the only one

12   among the people in the District of Columbia -- I don't think

13   it disqualifies him and renders him to be somebody that can't

14   be fair and impartial with respect to these defendants.  So I'm

15   going to reject the for-cause strike request.

16            MR. EDWARDS:  Your Honor, can I ask one question?  I

17   think Mr. Peed and I talked about it.  I understand completely

18   where Mr. Peed is going with the question about going into the

19   building and whether that would smother one's ability to be

20   impartial.

21            My concern is, it gets a little confusing when that

22   is evidence that is allowed to a juror -- I think I said this

23   earlier, but it's starting to get a little more confusing when

24   you asked would you presume him to be innocent despite the fact

25   that they did something that, one, is illegal, and, two,

 1   certainly is evidence that they will be told they can consider

 2   in this case.

 3          I think it starts to become confusing when you then

 4   pair that with the concept of but, despite that fact, set it

 5   aside, you are not going to allow that to enter your mind when

 6   you have to answer the question of whether they are innocent or

 7   not.  I don't have a proposed solution other than cutting the

 8   questions.  I know Your Honor is not inclined to do that, but I

 9   think that starts to get a little bit confusing because it's

10   evidence that they could consider, or should.

11          THE COURT:  Well, I take your point, but I'm not

12   terribly worried about it.  I mean, if they do get seated, they

13   will be at this for six to eight weeks.  And I somehow doubt

14   that they will recall the exchange with Mr. Peed, even though

15   he is undoubtedly memorable.  So I think I'm not too worried

16   about it.

17          I know it's -- just be mindful of how the question is

18   phrased, if it comes up again.  I will do the same.  But, as I

19   said, I think the likelihood that that exchange is going to

20   linger in any way and affect somebody's deliberations seems to

21   be fairly remote.

22          THE CLERK:  Your Honor, this is Juror No. 0167.

23          THE COURT:  Sir, how are you?

24          PROSPECTIVE JUROR:  Good.

25          THE COURT:  Thank you for your patience and for your

```
1    service today.

2            You are Juror 0167?

3            PROSPECTIVE JUROR:  Yes.

4            THE COURT:  Feel free to remove your mask, if you

5    wish to do so.

6            If I could please ask you to, first, turn to page 11

7    and Question 49.  We asked you in Question 49, have you read,

8    seen, or heard anything about the Oath Keepers organization.

9    You answered that question "yes."  Can you tell us why you

10   answered that question "yes"?

11           PROSPECTIVE JUROR:  I have just seen them in the news

12   before.

13           THE COURT:  Okay.  Can you tell us in what context

14   you have seen them in the news?

15           PROSPECTIVE JUROR:  Just news articles about the

16   organization.

17           THE COURT:  Okay.  Could you be more specific about

18   what you have learned from those news articles?

19           PROSPECTIVE JUROR:  Well, I know that they were one

20   of the groups that was at January 6th.  That's really the

21   only thing that I know.

22           THE COURT:  Do you know anything -- or have you taken

23   anything away from those articles, anything more than they were

24   present at the Capitol?

25           PROSPECTIVE JUROR:  No.
```

1    THE COURT:  So, to be more specific, do you know what

2 they -- from your media coverage that you have seen or read, do

3 you have any understanding as to what they may have done on

4 January 6th?

5    PROSPECTIVE JUROR:  I guess I know that some people

6 from Oath Keepers were allegedly inside of the Capitol.

7    THE COURT:  Okay.  So you are aware that some of them

8 were inside the Capitol?

9    PROSPECTIVE JUROR:  Yes.

10    THE COURT:  Do you know anything beyond -- well, do

11 you know what, if anything, they did inside the Capitol based

12 upon your media viewing?

13    PROSPECTIVE JUROR:  I guess not specifically.  I just

14 know from reporting on January 6th, like, generally, like,

15 people were inside the Capitol and inside offices.

16    THE COURT:  Okay.

17    PROSPECTIVE JUROR:  And broke windows.  General

18 things like that.

19    THE COURT:  Right.  But nothing more specific about

20 Oath Keepers or anybody who is an Oath Keeper?  You don't have

21 any specific knowledge about that?

22    PROSPECTIVE JUROR:  No.

23    THE COURT:  Do you have any sense of what the Oath

24 Keepers's mission is as an organization, its purpose, its

25 ideology, any sense of that based on your reading of news

1  media?

2           PROSPECTIVE JUROR:  No.

3           THE COURT:  Now, you have said that there were -- you

4  understand that there were individuals inside the Capitol.

5  That's your understanding.  The evidence will be that one or

6  more of the defendants did enter the Capitol building.  Do you

7  think that fact alone would cause you to be unable to be fair

8  and impartial to these defendants?

9           PROSPECTIVE JUROR:  No.

10          THE COURT:  Do you think, for example, that you could

11 consider other evidence that might shed light on reasons for

12 their being inside the Capitol building that might not

13 constitute a crime or criminal offense?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  All right.  In the last two weeks, since

16 you completed this questionnaire, have you learned anything

17 more about the organization?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Question 51 asks whether you are aware of

20 or have heard anything about Stewart Rhodes, Kelly Meggs,

21 Jessica Watkins, et cetera.  You answered that question "no."

22 Does the -- does your answer to that question remain the same

23 today?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Now, as a juror, we will ask you to put

1    to the side anything that you have learned about the events of

2    January 6 or anything you may have heard about this

3    organization and focus only on the evidence that's presented in

4    the case.

5             Do you think you would have any trouble doing that?

6             PROSPECTIVE JUROR:  No.

7             THE COURT:  I'll ask you to, please, turn to page 7.

8    Question 15 asks, have you or a close friend or family member

9    ever been employed at the U.S. Capitol in any capacity, and you

10   answered "yes."

11            PROSPECTIVE JUROR:  Yes.

12            THE COURT:  And can you explain why you answered that

13   question "yes"?

14            PROSPECTIVE JUROR:  I have close friends who served

15   as staffers.

16            THE COURT:  Were those close friends staffers on

17   January 6th?

18            PROSPECTIVE JUROR:  No.

19            THE COURT:  And, to be precise, I don't mean whether

20   they were just physically present on the date -- or whether

21   they were actually employed as staffers as of January 6.

22            PROSPECTIVE JUROR:  So, yes, employed, not at the

23   Capitol on that date.

24            THE COURT:  And have you talked with your friends,

25   who were employed at the U.S. Capitol building on January 6,

1    about their feelings about that day?

2            PROSPECTIVE JUROR:  Yes.

3            THE COURT:  And can you share with us what they have

4    told you?

5            PROSPECTIVE JUROR:  I guess that it wasn't a great

6    day for them.

7            THE COURT:  Okay.  Anything more than that?

8            PROSPECTIVE JUROR:  I guess just they said that they

9    were scared because, in a non-COVID time, they probably would

10   have been there.

11           THE COURT:  Okay.  Uh-huh.  And the fact that you've

12   heard from your friends that they had some fear about the

13   events of that day, how would that affect your view of these

14   defendants who are alleged to have been there that day?

15           PROSPECTIVE JUROR:  It wouldn't.

16           THE COURT:  Say, you were to conclude that -- or let

17   me put it differently.  Because of your friendships and what

18   you have heard from your friends, do you think it would make it

19   anymore difficult for you to come to the conclusion that the

20   Government had not met its burden of proof in this case?

21           PROSPECTIVE JUROR:  No.

22           THE COURT:  Do you think it would affect your

23   friendship or put a strain on your relationship with these

24   people if you were to come to the conclusion that the

25   Government has not met its burden and you were to vote to

1   acquit?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Question 16 asks about close friends or

4   family members who have been employed by the federal

5   government.  Can you tell us a little bit more about that?

6          PROSPECTIVE JUROR:  Yes.  My husband works for the

7   federal government.

8          THE COURT:  Okay.  Could you tell us in what

9   capacity?

10          PROSPECTIVE JUROR:  He's an analyst.

11          THE COURT:  For which agency?

12          PROSPECTIVE JUROR:  Intelligence agency.

13          THE COURT:  And by -- just to be clear, you don't

14   mean the F.B.I.?

15          PROSPECTIVE JUROR:  No, not the F.B.I.

16          THE COURT:  And so one of the allegations in this

17   case is that these defendants intended to resist the authority

18   of the U.S. government by force.  Do you think the fact that

19   your husband works for the U.S. government in the intelligence

20   sector would affect your view of them and your ability to be

21   fair and impartial?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Do you think it would cause any strain or

24   would it be difficult for you to vote to acquit because of your

25   husband's employment?

```
1              PROSPECTIVE JUROR:  No.

2              THE COURT:  Question 18 asks whether close friend or

3    family member has served in the armed forces.  Can you tell us

4    about that?

5              PROSPECTIVE JUROR:  Yeah.  My grandfathers were in

6    the Army and Navy.  And I have other friends who are, like, in

7    the Air Force.

8              THE COURT:  Okay.  Question 20 asks about rallies,

9    protests, demonstrations, or marchs that you or those close to

10   you have attended in the last 5 years.

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  And can you tell us what rallies you or

13   those close to you have attended?

14             PROSPECTIVE JUROR:  Yeah.  So if you count the Pride

15   March, I go to that every year --

16             THE COURT:  Yes.

17             PROSPECTIVE JUROR:  -- here in town.  And then also

18   March For Our Lives, the Florida -- whatever was the high

19   school was called, the gun --

20             THE COURT:  The gun control?

21             PROSPECTIVE JUROR:  Uh-huh.

22             THE COURT:  Gun control march.

23             Okay.  Anything else that you recall?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  So there is going to be evidence in this
```

1    case of firearms possession.  In fact, there may be evidence

2    presented of actual firearms in this case.  Do you think the

3    fact that you may have some views about gun control would

4    affect your capacity as a juror in this case?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  If you were to learn that one or more of

7    these defendants, in fact, possessed weapons, although none of

8    them are charged with illegally possessing a weapon, would that

9    make it difficult for you to be fair and impartial?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Could I ask you to, please, turn to

12   page 11, Question 55.  Question 55 asks whether you or close

13   friends and family -- or family have -- are in the legal

14   profession in any way.

15             PROSPECTIVE JUROR:  My father-in-law is in a lawyer.

16             THE COURT:  Could you tell us what kind of work he

17   does?

18             PROSPECTIVE JUROR:  Real estate.

19             THE COURT:  Has he ever done criminal work, to your

20   knowledge?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  Okay.  Mr. Edwards, any follow-up

23   questions?

24             MR. EDWARDS:  No questions, Your Honor.  Thank you.

25             THE COURT:  Anything from the defense?

1           MR. PEED:  Good afternoon.  You were running for a

2  sort of local government?

3           PROSPECTIVE JUROR:  That's true.  From January '21

4  through July '22, I was an ANC official in the DuPont Circle n

5  2B.  It's like a local neighborhood position.

6           MR. PEED:  Did you serve, and your term is over?

7           PROSPECTIVE JUROR:  I moved out of the district, not

8  out of Washington, D.C., out of the ANC district.  So I moved a

9  block.  And the borders are very small.  So if you move, you

10  have to resign.

11           MR. PEED:  Unrelated to that question, do you have

12  any personal experience shooting firearms or any friends or

13  family firing firearms?

14           PROSPECTIVE JUROR:  I have fired firearms personally.

15           MR. PEED:  Okay.  Thanks.

16           MR. SHIPLEY:  The friends that you described that

17  worked on Capitol Hill, you said they weren't there on the 6th?

18           PROSPECTIVE JUROR:  Right.

19           MR. SHIPLEY:  What kind of social events do you

20  engage in with them?

21           PROSPECTIVE JUROR:  Like parties, dinners out, things

22  you would do with friends.

23           MR. SHIPLEY:  Now, if you were to think forward and

24  see the outcome of this case, if you were a juror, is that

25  there were one or more defendants found not guilty on one or

1    more charges, you don't think that you would have difficulty in

2    those kinds of settings maybe explaining your thinking or the

3    outcome of this case if they were expecting a different

4    verdict?

5            PROSPECTIVE JUROR:  Well, it wouldn't be solely my

6    decision.  It would be the decision of the jury, and we would

7    secretly deliberate on it.  So that's what I would explain to

8    them.

9            MR. SHIPLEY:  It wouldn't cause you embarrassment or

10   be fearful of their reaction or maybe losing friends over it?

11           PROSPECTIVE JUROR:  No, I don't think so.

12           THE COURT:  Thank you, sir.  Thank you very much.

13   Mr. Douyon will show you out of the courtroom and provide you

14   with additional instructions.

15       [Prospective juror exits.]

16           THE CLERK:  Please have a seat in the witness box and

17   speak into the microphone.

18           Your Honor, this is Juror No. 1652.

19           THE COURT:  Sir, how are you?

20           PROSPECTIVE JUROR:  Good.

21           THE COURT:  Thank you for your patience today.  You

22   are Juror 1269.  Feel free to remove your mask, if you wish to

23   do so.

24           Your juror questionnaire is in front of you.  Could I

25   ask you, first, to turn to question -- page 6, Question 14.

1    And then Question 9 -- excuse me.  -- page 9, Question 34.

2    They are related.  You told us you are a reporter for the Wall

3    Street Journal.  Does any of your work involve the events of

4    January 6th?

5                PROSPECTIVE JUROR:  I'm a data reporter.  I have not

6    done anything on January 6th.

7                THE COURT:  You said a data reporter?

8                PROSPECTIVE JUROR:  A data reporter.  Okay.

9                THE COURT:  Do you have any colleagues that have

10   covered the events of January 6?

11               PROSPECTIVE JUROR:  Yes.  I work in the Washington

12   bureau.  So the politics team is in the Washington bureau.

13               THE COURT:  Aside from being physically located in

14   the same area, do you have conversations about their work and

15   their reporting the events of that day?

16               PROSPECTIVE JUROR:  I am aware of the events of that

17   day.

18               THE COURT:  In terms of conversations with your

19   colleagues, have you talked to them about their reporting of

20   the events?

21               PROSPECTIVE JUROR:  Not really, no.

22               THE COURT:  All right.  You have indicated that there

23   may be some difficulty associated with the rule against media.

24   This is on page 9, 34, any instruction about not following the

25   case in the media.

```
 1              So, just to be clear, it's not that we would say
 2   there's a media blackout for the entire time you are on this
 3   jury, but, rather, we would require you to avoid, as best you
 4   can, any news coverage that there may be about the events of
 5   this trial or about the events of January 6.
 6              Is that something that you would have difficulty
 7   doing?
 8              PROSPECTIVE JUROR:  Well, I work in the bureau, and I
 9   don't -- I don't think that I would have any January 6 stuff to
10   work on or anything like that.  But, like, to say that I could
11   completely avoid it being in a news room, I'm not 100 percent
12   sure I could do that.
13              THE COURT:  Sure.  I understand.  We are not asking
14   anybody to have a complete media backout.  But, say,
15   hypothetically, you were reading something and you came across
16   a headline that was related to this case or the events of
17   January 6.  Do you think you could follow my instructions to
18   read that -- or to go no further with respect to that story and
19   let us know that might be relevant to the case.
20              PROSPECTIVE JUROR:  Sure.  Yes.
21              THE COURT:  If you would, please, turn to page 11,
22   Question 49.  Question 49 asks whether you have read, seen, or
23   heard anything about the Oath Keepers organization.  Can you
24   tell us why you answered that question "yes" and what you have
25   read, seen, or heard.
```

1          PROSPECTIVE JUROR:  I know the Oath Keepers were

2   involved in January 6th.  I know that they -- they did not

3   agree that -- they thought the election was stolen, and that

4   they gathered the group to come up to Washington to march on

5   the Capitol.

6          THE COURT:  Are you aware of any other facts from

7   your media exposure about what the members of that group may

8   have done on that day?

9          PROSPECTIVE JUROR:  On that day, no.  No, I

10  haven't -- I don't recollect any names or anything off the top

11  of my head.

12         THE COURT:  Okay.  Is it fair to say that what you

13  know about the organization, at least as it relates to

14  January 6, is that they came to Washington, participated in a

15  march, and were at the Capitol?

16         PROSPECTIVE JUROR:  Correct.

17         THE COURT:  Do you have any further information or

18  understanding about what they did at the Capitol on

19  January 6th?

20         PROSPECTIVE JUROR:  They went into the Capitol.  I

21  know that.

22         THE COURT:  You are aware that they did enter the

23  Capitol?

24         PROSPECTIVE JUROR:  Yeah.

25         THE COURT:  Okay.  So there will be evidence in this

428

case that one or more defendants did enter the Capitol.  What
will be an issue in this case is why they entered the Capitol.
Do you think you could keep an open mind, and, based upon the
evidence, access whether the reason they entered into the
Capitol was for lawful or unlawful purposes?

PROSPECTIVE JUROR:  Sure.

THE COURT:  Do you have any doubt in your mind about
that?

PROSPECTIVE JUROR:  I know they didn't enter legally.

THE COURT:  Okay.  So they are not accused here of
mere trespass.  There are charges here that involve their
states of mind and why they entered.  So you are not going to
be asked to answer the question, well, did they belong there or
not.  You'll be asked to answer the question why did they go
in.

The question is, do you think you could view the
evidence objectively to make that assessment?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And if the Government did not prove to
you beyond a reasonable doubt that they went in with an
unlawful purpose, do you think you could vote to acquit them?

PROSPECTIVE JUROR:  Yes.

THE COURT:  You have indicated that you are also --
have viewed and seen matters related to the January 6
committee.  Could you give us a sense of how much of those

429

```
1    hearings you have seen or read about them?
2             PROSPECTIVE JUROR:  I watched a couple nights of it.
3    I mean, I couldn't give you specifics.
4             THE COURT:  Okay.  Do you recall any coverage or any
5    discussion of the Oath Keepers from the January 6 committee
6    hearings?
7             PROSPECTIVE JUROR:  No.
8             THE COURT:  Would you be able to set aside the media
9    to which you have been exposed and any coverage that you've
10   been exposed to concerning the committee hearings?  Do you
11   think you could set all that aside and evaluate the evidence in
12   this case against these defendants fairly and impartially?
13            PROSPECTIVE JUROR:  Sure.  Yes.
14            THE COURT:  Could I ask you to, please, turn to
15   page 7, Question 20.  Question 20 asks whether you, close
16   friend, or family member in the last 5 years have attended a
17   rally, protest, demonstration, or march of any type.  Can you
18   share with us why you answered that "yes"?
19            PROSPECTIVE JUROR:  My wife is an organizer for a
20   union.
21            THE COURT:  A union.
22            PROSPECTIVE JUROR:  So she does go to these -- these
23   events.
24            THE COURT:  Okay.  Could you give us a sense of --
25   are these union-related rallies and events, or do they involve
```

1    something else?

2              PROSPECTIVE JUROR:  To the best of my knowledge,

3    union-only events.

4              THE COURT:  Are you aware of her having attended any

5    political-issue rallies?

6              PROSPECTIVE JUROR:  If the political issues involved

7    the union, she probably has, yes.

8              THE COURT:  All right.  You have indicated in

9    Question 21 that you have previously been on Capitol grounds or

10   inside the Capitol building.  Could you share with us your

11   experience on the grounds of the building?

12             PROSPECTIVE JUROR:  Sure.  I have a press pass that

13   allows me to go on the grounds.

14             THE COURT:  How frequently are you on the grounds of

15   the Capitol?

16             PROSPECTIVE JUROR:  Two or three times a year to pick

17   up data usually.

18             THE COURT:  And let me ask, you said you are a data

19   reporter.  What is that?  Is there a specific area, subject

20   matter, with respect to data that is your area of interest?

21             PROSPECTIVE JUROR:  It's a general data reporter gig.

22   I have done election data, I have done economic data, and

23   scientific data.

24             THE COURT:  Did you do any work, reporting, with

25   respect to the 2020 presidential election data?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Can you tell us what that involved?

3          PROSPECTIVE JUROR:  Sure.  It involved getting down

4    to a granular level of the voting.  We did -- the Associated

5    Press did a vote cast where they asked questions, you know,

6    surveys and stuff like that.  I did a lot of granular data with

7    that kind of stuff.

8          THE COURT:  This is a binary question.  Did you draw

9    any conclusion, yes or no, about the validity of the election

10   based upon the data and other investigation that you have

11   conducted?

12         PROSPECTIVE JUROR:  Sure.  It seems to me that the

13   election was valid.

14         THE COURT:  And do you have views or opinions about

15   people who might have thought the election was not valid?

16         PROSPECTIVE JUROR:  No.  I mean, I think it's valid.

17   I guess I don't understand why people think it's not valid.

18         THE COURT:  Would you hold it against somebody if you

19   were to learn, for example, that one of these defendants at one

20   point in time believed that the election was not valid?

21         PROSPECTIVE JUROR:  Would I hold it against them?  It

22   depends on what the -- like, what other questions are involved.

23         THE COURT:  Well, the simple question would be, if

24   you were to learn facts in this case that these defendants

25   attended the Stop the Steal rally and were, arguably, part of

```
1   the Stop the Steal movement and supported them movement, would

2   that affect your ability to be fair and impartial as to them?

3              PROSPECTIVE JUROR:  Simply based on him or her not

4   believing that the election is not valid?  No.

5              THE COURT:  Would it make it more difficult for you

6   to acquit them if you believe the Government had not met its

7   burden?

8              PROSPECTIVE JUROR:  It would probably be something I

9   would take into account, but I don't think it would make it

10  harder.

11             THE COURT:  What do you mean by you would take it

12  into account?

13             PROSPECTIVE JUROR:  Well, specifically, the --

14  whether or not they believe the election was stolen or not,

15  but -- well --

16             THE COURT:  Let me ask you a different question.

17  Say, one of the defendants -- and the defendant has an absolute

18  right not to testify.

19             PROSPECTIVE JUROR:  Uh-huh.

20             THE COURT:  Say, hypothetically, a defendant

21  testified and said, it was my belief at the time that the

22  election was stolen.  Would that affect your -- how, if at all,

23  would that affect your view on the credibility of that

24  defendant's testimony?

25             PROSPECTIVE JUROR:  Oh, that wouldn't affect my view,
```

1    no.

2              THE COURT:  It would not.  Okay.

3              Finally, could I ask you, please, to turn to page 12.

4    Question 62 asks whether you, a close friend, or family member

5    have been charged, prosecuted, or convicted of a crime.

6              PROSPECTIVE JUROR:  That's my -- my sister, who lives

7    in Kansas City and does not live anywhere near here, has been

8    arrested for breaking and entering.

9              THE COURT:  Anything about her experiences with the

10   criminal justice system that would cause you to think you could

11   not be fair to both sides?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  All right.  Any follow-up, Mr. Edwards?

14             MR. EDWARDS:  No questions, Your Honor.  Thank you.

15             THE COURT:  Anything from the defense?

16             MS. HALIM:  Yes, please.  Good afternoon, sir.

17             PROSPECTIVE JUROR:  Hi.

18             MS. HALIM:  When you were speaking with Judge Mehta,

19   answering his questions earlier and describing what you had

20   read about the Oath Keepers organization, I think you indicated

21   that that was an organization that thought that the election

22   was stolen.

23             PROSPECTIVE JUROR:  Uh-huh.

24             MS. HALIM:  So if a person is a member of an

25   organization that thought the election was stolen and also that

1    person went into the Capitol building on January 6, would that

2    be enough for you to conclude that that person's intent and

3    motive was to obstruct the official proceeding?

4              THE COURT:  I'm not sure if that was a fair question.

5              MS. HALIM:  Okay.  Sorry.

6              If a person is part of an organization that thought

7    the election was stolen and that person also went into the

8    building, would you still be able to apply the presumption of

9    innocence as you hear all of the facts during the trial?

10             PROSPECTIVE JUROR:  Yeah.  I would definitely hear

11   the facts.

12             MS. HALIM:  Okay.  Thank you.

13             MR. SHIPLEY:  Sir, I spent some time looking at

14   your -- the page of yours at the Wall Street Journal.  I

15   understand it.  You are a graphics reporter, which a better

16   title than data reporter.  As I look at the stories, it seems

17   that your role is to help take this, like, text and create

18   graphic presentations that are more visual so people understand

19   it.

20             PROSPECTIVE JUROR:  Correct.  There's two parts of my

21   jobs.  There was one -- the first part is to gather the data

22   and to assess the data and make a journalism judgment on the

23   data, whether -- you know.  The second part is to make it

24   visual, to make it easier for readers to understand the charts,

25   maps.

1          MR. SHIPLEY:  Anything from the Supreme Court to

2    college football?

3          PROSPECTIVE JUROR:  Correct.

4          MR. SHIPLEY:  Okay.  Now, in that process, how much

5    gathering of information -- gathering of data you have

6    acquired, how much of that is you?

7          PROSPECTIVE JUROR:  How much of that is me?

8          MR. SHIPLEY:  How much of that do you do?

9          PROSPECTIVE JUROR:  It depends on the story.  If it's

10   something that I have pitched to my bosses, it's 100 percent

11   me.  If it's something that my boss has pitched to me, maybe I

12   have worked with a reporter on the thing -- we have several

13   data reporters at the <u>Wall Street Journal</u>.  So I can't be

14   specific about the percentage of data I gather myself, but I

15   would say 60, 70 percent of it is my own gathering.

16         MR. SHIPLEY:  But there is a separate part of your

17   job which is essentially you consuming the reporting that's

18   done by somebody else and then transforming it --

19         PROSPECTIVE JUROR:  Sure.

20         MR. SHIPLEY:  -- into a visual presentation?

21         PROSPECTIVE JUROR:  Sure.

22         MR. SHIPLEY:  So not only do you, sort of, consume

23   the news as a member of the media, actually part of your job is

24   consuming the work in terms of internalizing it so you can make

25   use of it, along with other reporters?

1              PROSPECTIVE JUROR:  Sure.  Yeah.

2              MR. SHIPLEY:  And you've done nothing specifically on

3    January 6th; right?

4              PROSPECTIVE JUROR:  I have not done any stories on

5    January 6th, no.

6              MR. SHIPLEY:  But you have done more than one story

7    on the events surrounding the election itself, including the

8    distribution of the seats in Congress?

9              PROSPECTIVE JUROR:  Oh, yeah, yeah, yeah, yeah.  For

10   sure.

11             MR. SHIPLEY:  You did a story that was captioned "How

12   We Are Becoming More Divided," meaning two, kind of, polar ends

13   of the political spectrum?

14             PROSPECTIVE JUROR:  Yes.

15             MR. SHIPLEY:  That would require you consuming this

16   data from which you drew conclusions yourself about the

17   validity of the election to your own personal point of view?

18             PROSPECTIVE JUROR:  I wouldn't say -- say my own

19   personal point of view.  I took the data that I gathered, and I

20   tried to make an assessment of what the data said, per se.

21             MR. SHIPLEY:  And I can certainly understand that,

22   you know, having -- doing this all day long, it's not something

23   that you necessarily do on your own time.

24             PROSPECTIVE JUROR:  Yes.

25             MR. SHIPLEY:  So you set at your computer and read

1   from your news organization?

2           PROSPECTIVE JUROR:  I just focus on the data at hand.

3   In fact, I don't read politics outside of work.  I used to like

4   them.  I used to live in Florida.  I used to do it all the

5   time, but I don't do it anymore.

6           MR. SHIPLEY:  But you do have this coming in to you

7   from multiple directions as well as if you set in this trial

8   what the evidence might be for witnesses?

9           PROSPECTIVE JUROR:  Sure.

10          MR. SHIPLEY:  Thank you.

11          THE COURT:  Thank you, sir.  Mr. Douyon will escort

12   you out of the courtroom and provide you with additional

13   instructions.  Thank you.

14      [Prospective juror exits.]

15          MR. SHIPLEY:  Your Honor, I would move to strike 0167

16   for cause.  I credit his answers.  I really do.  But I think

17   the reality is he consumes so much information that four weeks

18   from now, five weeks from now, he very well could be sitting in

19   this jury box thinking did I know this when I came in here or

20   is this something I heard while I'm here.

21          It's just the nature of the life he lives and the job

22   he does.  It's in Washington, D.C., it's on Capitol Hill, and

23   it involves politics.  And it's every day.  It's data

24   accumulation and ingestion so that he can turn it into work

25   product.

438

         1              THE COURT:  I don't think there's a thing he said
         2     about his work that would suggest that he would not be able to
         3     be fair and impartial.  In fact, just the opposite is true.  I
         4     mean, he described the process by which he gathers information
         5     and doesn't come to his own personal conclusions.  He tries to
         6     draw reasonable conclusions from what the evidence is that he
         7     gathers.  And that's what we ask our jurors to do.
         8              So I don't think that there's anything that he says
         9     about his profession or how he answered the questions that
        10     would suggest that would be fair -- not be able to be fair and
        11     impartial, and that's all I got.
        12              Let's bring in the next juror.
        13              THE CLERK:  Your Honor, this is Juror No. 0001.
        14              THE COURT:  Sir, how are you?
        15              PROSPECTIVE JUROR:  I'm doing all right.  Thank you.
        16              THE COURT:  Thanks for being with us.  You are
        17     Juror 0001?
        18              PROSPECTIVE JUROR:  Yes.
        19              THE COURT:  Your juror questionnaire is in front of
        20     you.  And feel free to remove your mask, if you are comfortable
        21     doing so.
        22              First is you answered the question "yes" in terms of
        23     hardship.  You said you are traveling to London for the week of
        24     Christmas.  Could you tell us specifically what your dates of
        25     travel are?

1          PROSPECTIVE JUROR:  So, yes, that would be -- could I

2    pull out my phone?  Is that okay to get the dates?

3          THE COURT:  Sure.

4          PROSPECTIVE JUROR:  So I fly out on the 21st and

5    get back the 28th of December.

6          THE COURT:  And if you were to be selected -- we are

7    not sitting on the 23rd.  So would you be able to change your

8    travel plans to be here and sit and serve on the 21st and the

9    22nd?

10         PROSPECTIVE JUROR:  So that would be -- I'm pretty

11   sure I could change my travel plans.  So that means I would be

12   here the 21st, 22nd, fly out the 23rd.  And when would I

13   have to be back?

14         THE COURT:  You need to be back here no sooner than

15   January the 3rd.

16         PROSPECTIVE JUROR:  I don't think that should be an

17   issue, but, obviously, flights are not in my power necessarily.

18   You know what I mean?  So I would have to call American

19   airlines and see if that's possible.

20         THE COURT:  Okay.  All right.  So let's proceed with

21   some of the other questions that were asked.  Question 49 on

22   page 11, if you could turn to that first, please.

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  The question asks, have you read, seen,

25   or heard anything about the Oath Keepers organization, and you

1    answered that question "yes."  Question 51, explain what you

2    have read, seen, or heard about the organization.

3              PROSPECTIVE JUROR:  Just that it exists; that it's

4    associated with the Republican party most frequently; that they

5    had a prominent role in the -- you know, the situation we are

6    over here for today.  And, beyond that, not too much.

7              THE COURT:  Okay.  You told us that you -- or that

8    you understand they had a quote/unquote prominent role.  What

9    do you mean by that?

10             PROSPECTIVE JUROR:  That they were here, that they

11   were at the event.  But, beyond that, I don't know too much.

12             THE COURT:  Do you have any -- are you aware of any

13   details about what actions, if any -- what actions they took on

14   January 6th?

15             PROSPECTIVE JUROR:  Not them specifically.  You know,

16   obviously, I have some broad context of the events of that day

17   but not specific to that organization.

18             THE COURT:  All right.  And, since you completed this

19   questionnaire, have you learned anything else about the

20   organization?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  Could you set aside what you have --

23   well, let me back up and ask one more question, which is you

24   said that the organization is affiliated with the Republican

25   party.  Other than understanding it to be a conservative

1    organization, do you have any other understanding about its

2    ideology, its mission, its purpose?

3              PROSPECTIVE JUROR:  More broadly associated with gun

4    rights and nothing -- you know, let me sit here for a second.

5    No, nothing that would be unique towards the Republican party

6    that I think would differentiate from their political tenets

7    and ideologies.

8              THE COURT:  In terms of gun rights, let's go back,

9    there is going to be evidence in this case of gun possession by

10   one or more of these defendants; however, none of them are

11   individually charged with illegally possessing a firearm.

12   There also is likely to be evidence of actual guns brought into

13   the courtroom.  Do you think that would affect your ability to

14   be fair and impartial?

15             PROSPECTIVE JUROR:  No.  I have never fired a gun or

16   used a gun or really been around guns, to be honest, but I

17   don't think it would affect my judgment.

18             THE COURT:  Do you have strong views about gun

19   control or gun-related issues that you think might interfere

20   with or infect your thinking about the case?

21             PROSPECTIVE JUROR:  No.  I think I have -- I'm from

22   Washington.  I went to Virginia Tech.  So that kind of

23   broadened my perspective about gun ownership and how it is.

24   So, no, I don't think so.

25             THE COURT:  Were you attending Virginia Tech at the

```
 1   time the shootings happened there?

 2            PROSPECTIVE JUROR:  No.

 3            THE COURT:  And how has that event, if at all,

 4   affected your view of guns and people who own guns?

 5            PROSPECTIVE JUROR:  I don't think I can say it has

 6   because I was so far removed.  You know, I was pretty young

 7   when that happened.

 8            THE COURT:  Okay.  You also -- if I could ask you to

 9   turn your attention to Question 51.  It asks about Stewart

10   Rhodes, Kelly Meggs, Jessica Watkins, and others.  You answered

11   that question "no."  Is that still your answer to that question

12   today?

13            PROSPECTIVE JUROR:  Yes.

14            THE COURT:  If you would please turn back to page 10,

15   actually.  Page 10 concerns -- or Questions 41, 42, 43, they

16   were aimed at trying to understand how much news you had

17   consumed about the events of January 6.  Could you give us a

18   sense of how much news you have consumed about the events that

19   day, how closely you have followed it since the events of that

20   day.

21            PROSPECTIVE JUROR:  So I followed it on the day of.

22   You know, I was googling what was going on.  I was getting push

23   notifications on my phone, like most people were, trying to

24   understand what was happening, trying to see live video feeds,

25   that kind of thing.  Listened to a couple podcasts from the New
```

443

1    York Times, The Daily, things like that.

2              But, beyond that, you know, just very small snippets.

3    You know, certain people prosecuted.  Things like that.  You

4    know, I had a friend who lived in Chinatown, who I talked to

5    after the fact, and their situation about not being able to

6    leave their house much that day.  Beyond that, no, no live news

7    coverage or anything like that.  I didn't have really any --

8    didn't really see much live TV.

9              THE COURT:  Okay.

10             PROSPECTIVE JUROR:  Yes, that was that.

11             THE COURT:  So you had mentioned having a

12   conversation with your friend who lives in Chinatown who was

13   unable to leave their apartment or their home that day.  How,

14   if at all, has that affected you?  Do you think it would affect

15   your ability to sit as a juror in this case?

16             PROSPECTIVE JUROR:  No.  That was significantly after

17   the fact, we were just talking generally about moving

18   apartments, and she said she moved out of Chinatown because of

19   situations like January 6.  And she -- yeah, she wanted to be

20   in a quieter area.

21             THE COURT:  You mentioned criminal trials.  How

22   closely have you followed the criminal prosecutions around

23   January 6th?

24             PROSPECTIVE JUROR:  Not that closely.  I followed,

25   like I said, podcasts.  I have Apple News on my phone

1    occasionally.  I have Google News occasionally.  I saw one

2    interview.  I don't know his actual name, but the Shaman guy.

3    I saw one interview with him at one point.  But, beyond that,

4    not exceptionally closely.  It's just been little tiny snippet.

5    Like on a feed, one headline, or something like that.

6              THE COURT:  Ultimately what we are asking you to do

7    as a juror is set aside what you have seen about the events of

8    that day?  Do you think you would have any difficulty doing

9    that.

10             PROSPECTIVE JUROR:  No, I don't think so.

11             THE COURT:  So you paused.  Let me ask you, is there

12   a reason for your pausing?

13             PROSPECTIVE JUROR:  I just wanted to think carefully

14   for everything I have seen and basically trying to replay in my

15   head and understand, you know, reflect, I guess, on what I have

16   seen and how I feel about it.  You know, I haven't given a lot

17   of thought space, to be honest with you, to this for a very

18   long time, except being here today and, obviously, earlier.

19             THE COURT:  Are you left with -- what are your

20   impressions of happened that day and the opinions that you may

21   have formed about that day?

22             PROSPECTIVE JUROR:  About -- can you be more

23   specific?  Are you saying towards people or towards --

24             THE COURT:  Sure.  Let's start with the people, the

25   people who were there that day.  Did you form any opinions or

```
 1   impressions about the people who were in or around the Capitol
 2   that day?
 3             PROSPECTIVE JUROR:  Yeah.  I think most of those
 4   people didn't have any ill will, necessarily.  A few misguided
 5   individuals, obviously, made some very, very poor decisions and
 6   maybe had poor ideas of the consequences of those decisions
 7   when they made them.  I think that's probably the extent of it
 8   when I think through it.
 9             THE COURT:  All right.  If I could just ask you to
10   turn to page 7.  Question 16 asks, have you or a close friend
11   or family member ever been employed by the federal government.
12   You answered "yes."  Can you shed some light on that answer?
13             PROSPECTIVE JUROR:  So my family has lived here for a
14   very, very long time.  So Judge Canan is a good family friend.
15             THE COURT:  Uh-huh.
16             PROSPECTIVE JUROR:  I don't know if he's federal
17   government, but he's a judge here in the area.  Judge Canan,
18   that's what came to my mind.  I wasn't sure what his role is.
19             THE COURT:  So he's had a judge over in D.C. Superior
20   Court, not in this courthouse.  He's across the street.
21             One of the allegations in this case is that these
22   defendants intended to resist the authority of the U.S.
23   government by force.  Do you think the fact that you have spent
24   your life in Washington, D.C., in, sort of, the shadow of the
25   federal government, do you think -- the fact of that charge and
```

1    having lived here, do you think living here would affect your

2    ability to be fair?

3              PROSPECTIVE JUROR:  Would you repeat that charge?

4              THE COURT:  Sure.  The allegation is -- the charge is

5    seditious conspiracy.  The allegation is that the defendants

6    intended to or conspired to resist the authority of the United

7    States by force.  In particular, to prevent the transition of

8    power.  You have lived in Washington, D.C. a long time.  You

9    know people in and around government.  Do you think you could

10   be fair to someone who has been charged with such an offense?

11             PROSPECTIVE JUROR:  Yeah, I do.

12             THE COURT:  Any doubt in your mind about that?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  If I could, please, ask you to turn to

15   page 12, line 59.  Line 59 asks, have you or a close friend or

16   family member ever been the victim of a crime, reported or not,

17   and your answer was "yes."  Could you share some more detail

18   about that.

19             PROSPECTIVE JUROR:  Yeah.  The one that came right to

20   mind is a very petty crime, just my family's bike was stolen,

21   and the police chased him.  And they basically asked my parents

22   do you want to press charges and what that meant.  It happened

23   a couple of years ago.

24             THE COURT:  That's the only event?

25             PROSPECTIVE JUROR:  That's what's came to my mind for

```
 1    that.
 2            THE COURT:  All right.  Any questions from the
 3    Government counsel?
 4            MR. EDWARDS:  No questions, Your Honor.  Thank you.
 5            THE COURT:  Anything from the defense?
 6            MS. HALIM:  I'll be very brief.  Hi.  Good afternoon,
 7    sir.  I have a follow-up question regarding firearms.  You may
 8    see evidence not just of firearms in this case but assault
 9    rifles.  Is there anything about that fact that would impair
10    your ability to look neutrally and dispassionately about the
11    evidence in this case?
12            PROSPECTIVE JUROR:  No, I don't think so.  Yeah, no.
13            MS. HALIM:  Thank you.  That's all I have.
14            THE COURT:  All right.  Sir, thank you very much for
15    your time.  Mr. Douyon will show you out of the courtroom and
16    provide you with additional instructions.
17            PROSPECTIVE JUROR:  Thank you.  Do I leave this here?
18            THE CLERK:  I've got that.  Thank you.
19        [Prospective juror exits.]
20            THE COURT:  All right.  Counsels, it's now a little
21    bit after five o'clock.  We still have seven more jurors from
22    the afternoon group.  If you-all are game in terms of pressing
23    forward to go through those folks, I think we can, hopefully,
24    finish up close to 6:00 o'clock or so.
25            MR. EDWARDS:  That's fine.
```

```
 1              MS. HALIM:  I don't think any of us will say no to
 2   Your Honor.
 3              THE COURT:  Right.
 4              THE CLERK:  Speak into the microphone.
 5              Your Honor, this is Juror No. 0689.
 6              THE COURT:  Hi.  How are you?
 7              PROSPECTIVE JUROR:  I'm well.  Thank you.
 8              THE COURT:  You are Juror 0689?
 9              PROSPECTIVE JUROR:  Yes.
10              THE COURT:  Feel free to remove your mask, if you are
11   comfortable doing so.
12              Your juror questionnaire is in front of you.  So if I
13   could please ask you to open that up and turn to page 11,
14   Question 49.  Question 49 asks whether you have read, seen, or
15   heard anything about the Oath Keepers organization.  Can you
16   tell us what you have read, seen, or heard?
17              PROSPECTIVE JUROR:  I'm generally familiar with the
18   organization insofar as its coverage and things like the Post
19   or the Times or just on PBS News.  I don't know much of, I'll
20   say, the details of the organizational structure or anything to
21   that extent, but I am aware of them and what they represent as
22   an entity.
23              THE COURT:  All right.  Let's start there.  What's
24   your understanding of what they represent as an entity?
25              PROSPECTIVE JUROR:  My layperson's understanding of
```

```
1    this is that it's an organization that is primarily made up of
2    individuals who, you know, are election deniers, to use the
3    colloquial term, who see themselves, excuse me, as having an
4    obligation as U.S. citizens to defend -- how could I put it --
5    you know, constitutional principles that they feel were
6    abrogated in the most recent election.
7              THE COURT:  Okay.  And do you have an understanding
8    based upon what you have read, seen, or heard of how they
9    played a role in January 6?
10             PROSPECTIVE JUROR:  I am aware that they were a very
11   vocal presence at the January 6th protests and riot.  In
12   terms of -- I couldn't specifically say what they did as
13   opposed to any other group.  I do note that they were one of
14   the more publicly outspoken of the groups.  So that was my --
15   or that's at least my interpretation from the news coverage.
16             THE COURT:  So do you have a personal view?  You
17   describe them as election deniers, people who have a -- think
18   they have a constitutional obligation to -- well, I'm not sure
19   you finished the thought.  Have you formed any opinions or do
20   you have any impressions about their mission and people who
21   will be associated with such an organization?
22             PROSPECTIVE JUROR:  I mean, to be quite candid, I
23   would say that I probably would view them as somewhat of a
24   fringe extremist group.  Yeah.  If I were to say it in the
25   pejorative, I would say sometimes I sort of -- I find some of
```

```
 1   their beliefs to be somewhat delusional.

 2            THE COURT:  Given those impressions and conclusions,

 3   do you think you could be fair and impartial to somebody who is

 4   a member of that organization and affiliated with that group?

 5            PROSPECTIVE JUROR:  Yeah.  I mean, notwithstanding my

 6   own personal interpretation of that.  I do have faith in my own

 7   ability to render, you know, a fair and impartial decision in

 8   that regard.

 9            THE COURT:  Okay.  So this is -- we all have views

10   and opinions, but do you think you could set aside what

11   impressions you have, opinions that you have formed, and judge

12   the evidence against these individual defendants fairly and

13   impartially, setting aside what you think you know about the

14   organization?

15            PROSPECTIVE JUROR:  Yes.  To be quite candid, as an

16   attorney, I would be very disappointed in myself if I were not

17   able to uphold that principle.

18            THE COURT:  Okay.  Could you tell us what kind of

19   law -- do you practice law?

20            PROSPECTIVE JUROR:  Until very recently, yes.  I work

21   for the U.S. Postal Service.  I was -- until a few months ago,

22   I was in their labor law practice group.  I have since moved to

23   a nonpracticing role, sort of, niche.  But I'm Deputy Secretary

24   of the Board of Governors and counsel for the Board of

25   Governors.
```

1           THE COURT:  And is that a politically appointed

2   position?

3           PROSPECTIVE JUROR:  Well, not mine.

4           THE COURT:  Okay.  You work for them?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  I understand.

7           Okay.  You've also indicated that you have followed

8   the January 6th committee hearings.  Can you tell us to what

9   extent you have watched those or read those?

10          PROSPECTIVE JUROR:  To the extent viewing, I watch

11  PBS News Hour and the coverage from that.

12          THE COURT:  Do you have any impression as to what

13  those hearings touched on for the Oath Keepers?

14          PROSPECTIVE JUROR:  To the Oath Keepers, no.  I can't

15  say that I -- it's a passive watching of the news hour, I would

16  say.

17          THE COURT:  I understand.  You also have indicated on

18  line 51, that you have read, seen, or heard about Stewart

19  Rhodes, Kelly Meggs, Jessica Watkins, Kenneth Harrelson, or Tom

20  Caldwell.  Can you tell us which of those people that you are

21  familiar with and what your understanding is about that person?

22          PROSPECTIVE JUROR:  Stewart Rhodes was the name that

23  popped up the most.  He's, obviously, one of the more

24  public-facing figures recently, as of this week.  I am aware

25  that he was convicted of various crimes in his own trials, but

```
 1    that's -- I think, again, that's probably about your average
 2    lay understanding.  The other names I did not immediately
 3    recognize.
 4              THE COURT:  Now, these defendants stand accused of
 5    conspiring with Stewart Rhodes.  Do you think that would affect
 6    your ability to presume that they are innocent?
 7              PROSPECTIVE JUROR:  Do I think they are charged --
 8              THE COURT:  Let me rephrase the question.  Every
 9    defendant is entitled to the presumption of innocence.
10              PROSPECTIVE JUROR:  Correct.
11              THE COURT:  These defendants are charged in a
12    conspiracy with Stewart Rhodes.
13              PROSPECTIVE JUROR:  Yes.
14              THE COURT:  He's not on trial in this case.  Do you
15    think you could adhere to the legal principle of the
16    presumption of innocence even though you are aware that
17    Mr. Rhodes was convicted of something and these defendants are
18    charged with conspiring with him?
19              PROSPECTIVE JUROR:  I understand.  Sorry, Your Honor.
20    Yes, I do think I could.
21              THE COURT:  And do you think you would -- well, I
22    think you answered the question.  Let me ask it slightly
23    differently.  Do you think it would be more difficult for you
24    to come to the conclusion that these defendants or any one of
25    these defendants is not guilty of what they have been charged
```

1   with given what you know about Mr. Rhodes?

2          PROSPECTIVE JUROR:  I do not think it would be more

3   difficult.

4          THE COURT:  Okay.  Page 10, Questions 41 through 43

5   ask about the extent to which you have been exposed to the

6   media about the events of January 6th.  Can you share with us

7   how much media you have been exposed to about the events that

8   day?

9          PROSPECTIVE JUROR:  As I said on Question 41, I

10  probably read the news every morning, watch News Hour in the

11  evening.  So, to that extent, a lot of videos that are just

12  shown on your average television programs.  I'm not certainly

13  seeking anything out to that effect.

14         Watching live coverage, yes.  I live very close to

15  the Capitol.  I don't know that there was anyone in D.C. who

16  was, perhaps, not watching live coverage.

17         And, yes, the same for Question 43, you know,

18  Washington Post, New York Times I probably read every day.

19  News in the evening.

20         THE COURT:  Would you say that if a story about

21  January 6th appears that you would generally read such a

22  story or not such a story if it was something that came across

23  your eyes?

24         PROSPECTIVE JUROR:  I think in terms of reading in

25  the morning, sure.  I wouldn't say that I read the paper cover

```
1    to cover every morning.

2              THE COURT:  Sure.

3              PROSPECTIVE JUROR:  But reading highlights and

4    headlines to that effect.  And I certainly have read stories,

5    but I wouldn't say I would seek them out or anything.

6              THE COURT:  Do you think you could set aside the news

7    you have consumed about the events of the 6th?

8              PROSPECTIVE JUROR:  I believe so.  Yes, Your Honor.

9              THE COURT:  If I could ask you to, please, turn to

10   page 7.  I'm concerned with Question 16.  Question 16 asks

11   whether you or a close friend or family member has ever been

12   employed by the federal government.  You answered that question

13   "yes."  You told us you work for the postal service.  You've

14   got colleagues.  So one of the charges in this case is that --

15   is seditious conspiracy, and they are accused of conspiring to

16   resist the United States government by force.

17             Do you think your job, as someone who is employed by

18   the federal government, would affect your view of these

19   defendants who are charged with such an offense?

20             PROSPECTIVE JUROR:  I do not think that being a

21   federal employee would cast any particular lens over my opinion

22   of the case, no.

23             THE COURT:  Do you have a reaction to the fact that

24   they are charged with the offense irrespective of your

25   employment?
```

1        PROSPECTIVE JUROR:  As a whole, looking at the events

2   of January 6th, I would have to be quite candid and say I

3   have an opinion, and I had a very sort of, I guess, emotional

4   reaction, just as a D.C. resident and U.S. citizen, first and

5   foremost.

6        In terms of particular individuals, no, I don't think

7   I have formed any sort of specific opinions.

8        THE COURT:  Okay.  Can you tell us?  You said that

9   you have an emotional reaction or strong feelings about the

10  events of that day.  Could you share what those are with us.

11       PROSPECTIVE JUROR:  Sure.  I think watching it

12  unfold.  You know, I was teleworking that day.  And watching

13  the events live, you know, I think going to see what was

14  happening.  And then seeing the way in which the events

15  unfolded and the quickness with which they unfolded.

16       Living as close to the Capitol as I do, I think it

17  was a very scary moment, I would say, and wondering, you know.

18  It's sort of unprecedented, I would say.  So, yeah, I think it

19  was upsetting or very scary to watch unfold in real-time.

20       THE COURT:  Do you remain upset, and do you still --

21  do you still remain upset about what you observed and watched

22  that day?

23       PROSPECTIVE JUROR:  I wouldn't say in the personal

24  sense of in that moment of saying, oh, gosh, this is happening.

25  I think to a certain extent probably most people in D.C. have

1    now been somewhat acclimated, you know, to these events.  So,

2    no, I would not say that I feel any -- any sort of personal

3    sense of fearful sense.

4            THE COURT:  Okay.  You've indicated that you have

5    attended -- I'm sorry -- you have close friends or family

6    members who have served in the armed forces.  Can you tell us

7    about that?

8            PROSPECTIVE JUROR:  Sure.  Friends having joined the

9    military, you know, either through the academies or, you know,

10   a good friend from college through the ROTC program at our

11   school.  I also have a first cousin who had a career in the Air

12   Force that has since retired.

13           THE COURT:  Okay.  And Question 20 asks about

14   participation in rallies, protests, or demonstrations.

15           PROSPECTIVE JUROR:  Sure.  Close friends and family

16   members, sure.  I would say that there are both friends and

17   family members that have attended women's rights protests that

18   have taken place in D.C. in the last 5 years.  Actually,

19   5 years, maybe longer.

20           But I know, for example, having friends that when the

21   Muslim travel ban went into effect, which I can't remember how

22   long ago that was, but in that five-year gap -- excuse me -- or

23   five-year period.

24           THE COURT:  You have described in particular the

25   rally and what some people refer to as a travel ban.  Do you

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
MOBILE, ALABAMA  36602   (251) 690-3371

1  have such strong views about the former president and the

2  policies of the former president that would make it hard for

3  you to sit in judgment fairly of somebody who supported the

4  former president?

5      PROSPECTIVE JUROR:  No, I don't believe so.  Again,

6  to be quite honest, under oath, I do have very strong feelings

7  about it personally, but I do have enough faith in my own

8  personal, sort of, obligations, you know, or potential

9  obligations, rather, as a jury member to set aside that for the

10  importance of, you know, the trial process.

11      THE COURT:  Okay.  If I could ask you to turn to

12  page 11.  Question 55 asks about people you know in the legal

13  profession.  You told us you are a lawyer.  You, obviously,

14  know lawyers.  Do any of your close friends or family members

15  practice criminal law?

16      PROSPECTIVE JUROR:  No.  Criminal law?

17      THE COURT:  Right.

18      PROSPECTIVE JUROR:  I don't think so.

19      THE COURT:  Okay.

20      PROSPECTIVE JUROR:  I will say -- I don't know if it

21  matters -- I have, prior to joining the postal service -- this

22  was several years -- several years ago.  I, myself, have also

23  clerked for a combined 3 years.  Just for the sake of

24  disclosure, I don't know if that matters one way or the other.

25      THE COURT:  Could you tell us which courts?

458

1          PROSPECTIVE JUROR:  Sure.  2 years with the U.S.

2    Bankruptcy Court for the Northern District of Mississippi, and

3    then another year with the U.S. District Court for the Northern

4    District of Mississippi.

5          THE COURT:  Gotcha.  So if I were to provide you

6    instructions on the law that you thought, yeah, I don't know

7    about that, could you set aside your personal views and apply

8    the law as I instruct you?

9          PROSPECTIVE JUROR:  I believe so, yes.

10          THE COURT:  Okay.  Question 56 asks about people in

11    your close circle who are in law enforcement.

12          PROSPECTIVE JUROR:  Yes.  Again, this is generally,

13    perhaps, close friend.  I don't know if it's applicable.  I

14    have had many interactions through just various employments

15    with people in law enforcement.  So I answered "yes" for full

16    disclosure.  I don't have many friends that are police officers

17    or anything to that affect.

18          THE COURT:  Do you, as part of your work, have any

19    contact with law enforcement?

20          PROSPECTIVE JUROR:  The postal service does have its

21    own service.

22          THE COURT:  Yes.

23          PROSPECTIVE JUROR:  Yes.  So I do have or have had

24    numerous occasions to work with them with the inspection

25    service.

459

1          THE COURT:  Do you think you would give law

2   enforcement officers more or less weight, the testimony of a

3   law enforcement officer more or less weight, because they are a

4   member of law enforcement?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Question 59, 60, 61, and 62 asks

7   questions about experience with crime and violence.  59 asks

8   whether anybody close to you or yourself has been the victim of

9   a crime.

10          PROSPECTIVE JUROR:  Unfortunately, I've had several

11   friends or family members convicted of crimes such as muggings.

12          THE COURT:  You said convicted of?

13          PROSPECTIVE JUROR:  Excuse me.  Not convicted.  I'm

14   sorry.  Victims of.

15          THE COURT:  Victims of.  Okay.  That's all right.

16          PROSPECTIVE JUROR:  Yes.  Who have been victims of --

17   I wouldn't say petty crimes but along the lines of muggings and

18   that sort of things.

19          THE COURT:  Did any of that happen in the District of

20   Columbia?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  And have you personally had interactions

23   with the Metropolitan Police Department?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Or the U.S. Attorney's Office for the

1    District of Columbia?

2              PROSPECTIVE JUROR:  No, Your Honor.

3              THE COURT:  Anything about those experiences that

4    would cause you to think you might not be able to sit fairly as

5    to both parties in this case?

6              PROSPECTIVE JUROR:  No, Your Honor.

7              THE COURT:  Okay.  Any questions, Mr. Edwards?

8              MR. EDWARDS:  No questions.  Thank you.

9              THE COURT:  Anything from the defense?

10             MR. SHIPLEY:  You had made reference to describing

11   the views of election deniers, your understanding of the

12   organization.  Now, I mean, it's true that a lot of the

13   election denial-ism traits from 2020 has to do with the shift

14   to mail-in voting and what role, if any, the postal service

15   played in whatever problems it might have been experiencing.

16             Did you have any role in any of that affair, any of

17   that litigation or anything coming out of that?

18             PROSPECTIVE JUROR:  No.  At that time I was still a

19   labor attorney.  So it didn't -- that was just not in my

20   practice, any litigation related to that.

21             You are absolutely right.  The agency, as a whole,

22   did come under a tremendous amount of fire and speculation for

23   that.  I will be completely honest, I am a staunch defender of

24   the postal service and our ability to fairly deliver the mail.

25   So I suppose that is an opinion that I do need to disclose to

```
1    the Court.

2              MR. SHIPLEY:  So part of that -- essentially pride

3    for the organization you work for?

4              PROSPECTIVE JUROR:  Yes.

5              MR. SHIPLEY:  Do you feel like it was unfairly

6    maligned by groups like the Oath Keepers and other election

7    deniers?

8              PROSPECTIVE JUROR:  I think it was incorrectly

9    maligned or unduly, I would say.

10             MR. SHIPLEY:  Thank you.

11             THE COURT:  All right.  Thank you very much.

12   Mr. Douyon will show you out of the courtroom and provide you

13   additional instructions.

14             PROSPECTIVE JUROR:  Oh, Your Honor, may I say one

15   more thing?

16             THE COURT:  Of course.

17             PROSPECTIVE JUROR:  This is in the interest of full

18   disclosure.  I don't think it matters one way or the other.  I

19   am a -- "member" is a strong word.  I have a group of friends

20   and former colleagues from the time that I had clerked who all

21   still keep in touch through e-mails, and it's mostly sharing,

22   you know, books we have found interesting, poetry.  It's really

23   an arts and literature group.

24             There is a sitting U.S. Senator who is a member of

25   that.  So, over the last several years, I have been in
```

1   communication with a U.S. Senator, though very indirectly in,

2   you know, a group of, say, 50 people, but I did want to

3   disclose that.

4           THE COURT:  Okay.  Have you had conversations with

5   that person about January 6th?

6           PROSPECTIVE JUROR:  Them directly, no.  And that's

7   what I wanted to disclose.  After the events of January 6th,

8   there were people in the group that said, you know, Senator X,

9   we are all thinking of you.  Stay safe in that regard.  There

10  was not any sort of direct communication, but, again, I wanted

11  to fully disclose that.

12          THE COURT:  Appreciate that.  Given your relationship

13  with this person, do you think it would be more difficult for

14  you to come to the conclusion that one of these defendants is

15  not guilty of what they are charged with?

16          PROSPECTIVE JUROR:  No.  I do not think it would

17  be -- to clarify, again, relationship is members of a same

18  group with overlapping colleagues and that sort of thing.  I

19  don't think the Senator would know me from Adam if we passed in

20  the street.

21          THE COURT:  Okay.  Thank you.

22      [Prospective juror exits.]

23          MS. HALIM:  Motion to strike for cause, Your Honor,

24  for a couple different reasons.  One, I will note, we are

25  nowhere near the end of our list of people.  So we have lots of

1   other people coming behind.

2          Your Honor, there was some questions that Your Honor

3   asked, and it was a very quick no, that wouldn't impact, no, I

4   wouldn't give more weight to a law enforcement officer, for

5   example.

6          But when it came to the events of that day and

7   putting aside some beliefs about news coverage, media and the

8   Oath Keepers specifically, she equivocated.  She said she

9   believed so.  She said she would try.  She would hope as an

10  attorney.

11         And that's a lot to overcome especially when she has

12  as strong beliefs as she was.  She used very strong words.

13  Delusional group.  Fringe extremist organization.  She has a

14  pretty extensive familiarity with the news media and the news

15  coverage.  She was aware of the Rhodes verdict and whatnot.

16  So, in balance, considering everything, I would move to strike

17  her for cause.

18         MR. SHIPLEY:  Your Honor, it strikes because there

19  were a lot of complications.  A lot of complications came out

20  from the questions from the judge and questions for us.  She

21  volunteered them all, but it was like no matter how high that

22  stack got, she was just continuing to say I can be fair.  It

23  didn't matter if it was 2 or 20 complications, I can still be

24  fair.

25         I think at some point, there's a little bit of

1    incredulity that has to set in on the part of the person who

2    has to make the decision.  So I don't doubt her sincerity.  I

3    just doubt whether she is really being honest with herself is

4    my thought.

5            THE COURT:  Mr. Edwards, any thoughts?

6            MR. EDWARDS:  I didn't sense any equivocation.  I

7    actually don't think she says she hopes because she's an

8    attorney.  I think she flat-out said, I would be very

9    disappointed in myself if I couldn't engage in that exercise

10   given my training.

11           I think, at most, she considered her words carefully

12   because she's a lawyer appearing before a judge, and she

13   answered your questions.  I think this juror made it very clear

14   that she's honest with herself and that she can be fair and

15   impartial.

16           THE COURT:  So I put her in the close-call category

17   again.  I think I'm going to err on the side of granting your

18   request.  I think what concerned me most is what -- I can't

19   remember which counsel said it, but it was the way in which she

20   described the organization using fairly strong words, clearly

21   not viewed in a positive light.  Even though she indicated she

22   could be fair, my fear is that there is a, sort of, latent view

23   of the organization, not so latent, in fact, is there, but a

24   latent view about people who would be associated with the

25   organization that might interfere with her ability to be fair

465

```
1   and impartial, even though she has said otherwise.  So I will

2   grant the cause -- the for-cause request.

3          All right.  I was overly ambitious in thinking we

4   could push through and will confess to be running low on fuel.

5   So, last, we have six left over.

6          J.C., if you would dismiss them and ask them to be

7   here tomorrow by -- do we have anything in the morning?

8          THE CLERK:  We have a 9:00 a.m. hearing.  I could

9   move that.

10          THE COURT:  All right.  I'll ask you to be here at

11   9:00, and we'll get started at 9:15.

12          THE CLERK:  Okay.

13          THE COURT:  So 9:15, everybody, and we are at 26

14   qualified, and I'm hopeful that we should be able to get to the

15   magic number tomorrow with a full day and be in a position on

16   Friday morning to finalize the jury.  And if we don't quite get

17   there, we should certainly be able to get them Friday morning

18   and then do the strikes late Friday, the latter part of Friday

19   morning, at least my hope.

20          MR. EDWARDS:  Just for the record, Your Honor, I have

21   27, two of whom we have flagged may have scheduling issues, but

22   I think I have 27.  It may not be worth going through the

23   numbers now, but that's the number I've got.

24          MS. HALIM:  That's what I have as well, Your Honor.

25          THE COURT:  I think I may have counted the person on
```

1    line 6 who had travel issues.  I did not include that person in

2    the count.

3           MR. EDWARDS:  Okay.  That's why I left her off.

4           MR. PEED:  Your Honor, I think -- I wanted to put in

5    a request that we get just one more strike each.  I wanted to

6    wait until I, kind of, saw the people coming in.  And I do

7    believe the Court is making good decisions, but, you know, the

8    depth of even those that are qualified but they already have so

9    much knowledge about the case, it's really -- you know, the

10   Government's not gonna have to use hardly any of its strikes,

11   really, to get a very well-informed jury with a lot of the

12   information that has already been absorbed through the media;

13   whereas, I think one more strike per defendant would really

14   help us get what we all want, which is --

15          THE COURT:  And, as I said earlier, let me think

16   about it.  You know, this has been a long process.  It is a

17   long process.  We've got ten strikes among the four of you.

18   You know, you are asking for an additional four, which would,

19   given the rate we've been going, would probably doing another

20   eight to ten jurors and having to voir dire them.  I really

21   want to start this trial Monday morning.

22          MR. PEED:  Same thing, Your Honor.  If one were just

23   too many, I think the other trial had three per defendant.

24   That would result in 12 here, but I think it's important.

25          MR. EDWARDS:  Respectfully, Your Honor, I think that

1   decision should be made before we undergo this process before

2   we start seeing the details that come out.

3         THE COURT:  That's why I granted the additional

4   strikes when they were requested before we started last time.

5   This group did not make that request.

6         MR. EDWARDS:  Correct.

7         THE COURT:  I'll think about it overnight, and I'll

8   let y'all know.

9         Thank you, everybody.  We'll see you tomorrow morning

10  and get started as close to 9:15 tomorrow morning as we can.

11      [Recess.]

12

13

14

15

16

17

18

19

20

21

22

23

24

25

468

```
1    DISTRICT OF COLUMBIA )
                          :
2    WASHINGTON, D.C.     )

3                 UNITED STATES OF AMERICA
                            VS.
4              ROBERTO A. MINUTA; JOSEPH HACKETT;
                DAVID MOERSCHEL; EDWARD VALLEJO,
5                  CASE NO. CR22-00015

6

7         I, Melanie Wilkins, do hereby certify that the above

8    and foregoing transcript of proceedings in the matter

9    aforementioned was taken by me in machine shorthand on

10   December 07, 2022, and the questions and answers thereto were

11   reduced to writing under my personal supervision using

12   computer-aided transcription, and that the foregoing represents

13   a true and correct transcript of the proceedings upon said

14   hearing.

15

16        I further certify that I am neither counsel nor

17   related to the parties to the action, nor am I in anywise

18   interested in the result of said cause.

19   Dated:  December 08, 2022
     Pages:  330 to 468, inclusive
20

21
                         s/Melanie Wilkins, CRR, RMR
22                       Melanie Wilkins
                         Federal Official Court Reporter
23                       Registered Merit Reporter
                         Certified Realtime Reporter
24

25
```

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
MOBILE, ALABAMA  36602   (251) 690-3371