```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3   _____
                                      ) CRIMINAL NO. CR22-00015
 4   UNITED STATES OF AMERICA,        ) COURTROOM 10
                                      ) U.S. FEDERAL COURTHOUSE
 5                                    ) WASHINGTON, D.C.
     VS.                              ) DECEMBER 08, 2022
 6                                    )
     ROBERTO A. MINUTA; JOSEPH HACKETT; )
 7   DAVID MOERSCHEL; EDWARD VALLEJO,   )
                                      )
 8              DEFENDANTS.           )
     _____)
 9

10                      JURY SELECTION
             BEFORE THE HONORABLE AMIT P. MEHTA
11            UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:

13   FOR THE GOVERNMENT:    U.S. Attorney's Office
                            By:  Kathryn L. Rakoczy, Esq.
14                          By:  Jeffrey S. Nestler, Esq.
                            By:  Alexandra Hughes, Esq.
15                          By:  Louis Manzo, Esq.
                            By:  Troy Edwards, Esq.
16                          Assistants U.S. Attorney
                            601 D Street, NW
17                          Washington, D.C. 20579

18   For Defendant          Law Offices of William L. Shipley
     Roberto A. Minuta:     By:  William Shipley, Jr., Esq.
19                          P.O. Box 745
                            Kailua, Hawaii 96734
20
     For Defendant          Angela Halim, Esq.
21   Joseph Hackett:        3580 Indian Queen Lane
                            Philadelphia, Pennsylvania 19129
22

23

24

25
```

```
1   Appearances, Continued:

2   For Defendant          Brown, Suarez, Rios & Weinberg
    David Moerschel:       By:  Connor Robert Martin, Esq.
3                          1532 Jackson Street
                           Fort Myers, Florida 33901
4
                           Brown, Suarez, Rios & Weinberg
5                          By:  Scott Weinberg, Esq.
                           265 E. Marion Avenue, Suite 114
6                          Punta Gorda, Florida 33950

7   For Defendant          Clinton & Peed
    Edward Vallejo:        By:  Matthew J. Peed, Esq.
8                          1775 Eye Street, NW, Suite 1150
                           Washington, D.C. 20006
9
    COURT REPORTER:        Melanie Wilkins, RMR, CRR
10                         Official Court Reporter

11            Proceedings reported by machine stenography.

12              Transcript produced by computer.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          [December 08, 2022, 1:48 p.m.  The defendants are present

2      with counsel in open court.]

3          THE CLERK:  Your Honor, this is Juror No. 0654.

4          THE COURT:  Hi.  How are you?

5          PROSPECTIVE JUROR:  I'm good.  Thank you.

6          THE COURT:  Thank you for being with us here today.

7  You are Juror 0654?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay.  Your juror questionnaire should be

10  in front of you.  I'll ask you, first, to turn to page 11.

11          PROSPECTIVE JUROR:  Okay.

12          THE COURT:  Question 49, that question asks, Have you

13  read, seen, or heard anything about the Oath Keepers

14  organization, and your answer was "yes."

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Can you tell us what you have read, seen,

17  or heard?

18          PROSPECTIVE JUROR:  Just very vague reports on the

19  news.  Nothing -- I wouldn't consider it a deep dive into the

20  organization, just news reports about them.

21          THE COURT:  Okay.  Can you describe for us what

22  you've read or heard in news reports about the organization?

23          PROSPECTIVE JUROR:  Nothing really jumps to mind, I

24  have to say.

25          THE COURT:  Okay.

1        PROSPECTIVE JUROR:  Because I don't read about them

2   too frequently.  I just understand it's a band or collective of

3   individuals.

4        THE COURT:  Okay.  Do you have any sense from what

5   you read of what the organization's mission, ideology is,

6   focus?

7        PROSPECTIVE JUROR:  Yeah.  From what I can remember,

8   they question the loss of the election in 2020 and hoped to

9   restore President Trump to power after 2020.

10        THE COURT:  And do you have any understanding

11   specifically of what they are alleged to have done or did do on

12   January 6th?

13        PROSPECTIVE JUROR:  I don't.  I don't have any real

14   concrete understanding.  It didn't strike me as anything -- I

15   don't want to say organized, but it just seemed like a sort of

16   not cohesive group.  So it didn't strike me as anything

17   particularly.

18        THE COURT:  So it sounds like nothing -- you are not

19   aware of anything specific?

20        PROSPECTIVE JUROR:  I am not aware of anything

21   specific.

22        THE COURT:  And does the fact that, as you have

23   described, the group questioned the election outcome, wanted to

24   restore the former president, is there anything about that that

25   would cause you to think that you could not be fair to these

1    defendants?

2              PROSPECTIVE JUROR:  No, not at all.

3              THE COURT:  An allegation in this case or one of the

4    allegations in this case is seditious conspiracy, in that they

5    resisted the authority of the United States to prevent the

6    peaceful transfer of power.  Could you sit fairly and

7    impartially in judgment of these defendants, even though you

8    have learned a little bit or something about the Oath Keepers

9    organization?

10             PROSPECTIVE JUROR:  Yes.  Absolutely.

11             THE COURT:  You answered -- you provided us with a

12   little bit of information about what you have learned.  Have

13   you learned anything else about the organization since you have

14   completed your questionnaire?

15             PROSPECTIVE JUROR:  No, I haven't.  I've deliberately

16   stayed way from any news or headline that looks like it could

17   be related to such.

18             THE COURT:  Okay.  I appreciate that.

19             PROSPECTIVE JUROR:  So I deliberately stayed away

20   from it.

21             THE COURT:  Same question with respect to

22   Question 51.  You had indicated you didn't know or see -- read,

23   seen, or heard anything about Stewart Rhodes, Kelly Meggs,

24   et cetera.  You answered "no."  Is your answer still "no"

25   today?

1          PROSPECTIVE JUROR:  It is.

2          THE COURT:  Just immediately above, we asked you some

3    questions about your exposure to the January 6th committee

4    hearings.

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Can you give us a sense of how closely

7    you followed those hearings?

8          PROSPECTIVE JUROR:  If I -- if -- I listen to NPR.

9    So it's, obviously, on my commute home from work and they

10   happened to be on, I would listen to them.  But I don't watch

11   TV, so I didn't follow anything on TV.  It was exclusively on

12   the radio.

13         THE COURT:  And do you have any recollection of there

14   being any discussion or commentary about Oath Keepers during

15   the news that you've heard about that?

16         PROSPECTIVE JUROR:  I have zero recollection about

17   that being mentioned.

18         THE COURT:  To the extent that you have learned

19   things about the January 6th from the news about the

20   committee and its work, would you be able to set that to the

21   side and only focus on the evidence that's presented?

22         PROSPECTIVE JUROR:  Absolutely.

23         THE COURT:  Same thing with just media in general.

24   Any media coverage about the events of that day --

25         PROSPECTIVE JUROR:  Absolutely.

634

1              THE COURT:  -- you can set it aside?

2              PROSPECTIVE JUROR:  I have since I have filled this

3    out.  So I absolutely can set that aside.

4              THE COURT:  If I could ask you to turn to page 7.

5    Question 20 asked about past participation in rallies,

6    protests, demonstrations by you, close friends, or family

7    members.

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Can you tell us about that?

10             PROSPECTIVE JUROR:  Me and some friends just

11   generally participated in the women's marches that happened in

12   D.C.

13             THE COURT:  Okay.  So it may not be news to you, but

14   it may be the case that the defendants in this case have

15   political views that may be at odds with yours.  How do you

16   think that would affect your ability to be -- sit in judgment

17   of them?

18             PROSPECTIVE JUROR:  It does not affect my ability.

19   I'm impartial, and everybody deserves their day in court.

20             THE COURT:  And do you have particular views or

21   impressions about people who have supported the former

22   president that you think would interfere with your ability to

23   judge these defendants?

24             PROSPECTIVE JUROR:  No, not at all.

25             THE COURT:  You indicated in Question 21 that you

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
MOBILE, ALABAMA  36602   (251) 690-3371

1  have -- we'll jump to 24.  You indicated in 24 that you had

2  concern for the safety of yourself, for a close friend, or

3  family member on January 6.

4          PROSPECTIVE JUROR:  Yes.  Just for myself, really,

5  because I commute from outside Baltimore, and so I was sent

6  home from work that day once the grounds, the Capitol building,

7  had been breached.  So I was concerned for my safety because I

8  didn't know what I was driving home to.

9          THE COURT:  Okay.  Gotcha.  When you say you commute

10 or you commute from Baltimore, could you explain that for us?

11         PROSPECTIVE JUROR:  Yes.  I work for an auction house

12 near Baltimore.  I'm an art and antique appraiser.

13         THE COURT:  I see.

14         PROSPECTIVE JUROR:  So I drive.

15         THE COURT:  So you drive to Baltimore for work?

16         PROSPECTIVE JUROR:  Yes and back.  I live in D.C.

17         THE COURT:  Okay.  I just wanted to clarify that.

18         You indicated you have been to the Capitol grounds or

19 inside the Capitol building at some point; is that right?

20         PROSPECTIVE JUROR:  Yes.  I was probably inside the

21 Capitol building when I was 14.

22         THE COURT:  Okay.

23         PROSPECTIVE JUROR:  I won't do the math.

24         THE COURT:  If I could ask you to, please, jump

25 forward to page 11.  Question 56 asks about close friends or

1  family members who are either working in law enforcement or

2  have applied for a position in law enforcement.

3           PROSPECTIVE JUROR:  Uh-huh.  Yes.  I checked "no."

4  And then I scratched that out because I remembered I have a

5  girlfriend who is an F.B.I. agent, and we are friends.  But

6  she's very private.  So that's -- we don't talk about her work.

7  So I think that's why it probably slipped my mind.  And she

8  doesn't live in D.C. or the area any longer.  She doesn't work

9  here.

10           THE COURT:  So where does your friend live?

11           PROSPECTIVE JUROR:  In San Antonio.

12           THE COURT:  And do you have any reason to believe

13  that she has done any investigation into the events of

14  January 6 or anything related that case?

15           PROSPECTIVE JUROR:  We have never discussed her work.

16  I'm going to say no.  But, truthfully, I have no idea because

17  we have never discussed her work in our years of friendship.

18           THE COURT:  And I take it you have looked carefully

19  at the witness list --

20           PROSPECTIVE JUROR:  Correct.  Yes.

21           THE COURT:  And her name did not appear on there?

22           PROSPECTIVE JUROR:  It did not, no.

23           THE COURT:  Do you think the fact of your friendship

24  with a law enforcement agent, particularly an F.B.I. agent --

25  and we will have testimony from F.B.I. agents -- do you think

1    it would affect your ability to impartially judge the

2    credibility of an F.B.I. agent's testimony?

3              PROSPECTIVE JUROR:  I don't think my -- I don't think

4    it would affect my judgment in that case.

5              THE COURT:  Okay.  Would you hold an F.B.I. agent's

6    testimony -- or put it differently.  Would you favor an

7    F.B.I.'s agent's testimony just because they are an F.B.I.

8    agent?

9              PROSPECTIVE JUROR:  No, I would not.

10             THE COURT:  All right.  Let me turn to the next page,

11   page 12.  Question 59 asks, have you or a close friend or

12   family member ever been the victim of a crime.  You answered

13   "yes."

14             PROSPECTIVE JUROR:  I answered "yes."  About a

15   year -- over a year ago, my car was broken into.

16             THE COURT:  Okay.

17             PROSPECTIVE JUROR:  Windows smashed out.  Nothing was

18   stolen.  And then, in college, my house was robbed.

19             THE COURT:  With respect to the break-in of your car,

20   that was here in D.C., did you call the police about that?

21             PROSPECTIVE JUROR:  I did.  I did.

22             THE COURT:  Did you speak with the Metropolitan

23   Police Department officers?

24             PROSPECTIVE JUROR:  I did.

25             THE COURT:  Was anyone prosecuted or arrested?

1          PROSPECTIVE JUROR:  Not to my knowledge.  I know it

2     was investigated.

3          THE COURT:  Anything about your experience with the

4     Metropolitan Police Department officers that would cause you to

5     have ill will --

6          PROSPECTIVE JUROR:  None at all.

7          THE COURT:  All right.  And then Question 61 asks

8     about friends and family members who have testified as a

9     witness in any court proceeding.

10         PROSPECTIVE JUROR:  Yes.  I did testify several years

11     ago for a friend in, like, a civil suit in Maryland.

12         THE COURT:  Okay.  Anything about that experience

13     that would affect your ability to serve as a juror?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  All right.  Mr. Edwards?

16         MR. EDWARDS:  No questions, Your Honor.

17         THE COURT:  Anything from the defendant?

18         MS. HALIM:  Yes, ma'am.  Briefly.  Hi, ma'am.  You

19     said when you were sent home from work on the 6th that you

20     didn't know what you were coming back to.

21         PROSPECTIVE JUROR:  Yes.

22         MS. HALIM:  Once you did get back, did you still have

23     a concern for your safety?

24         PROSPECTIVE JUROR:  No.

25         MS. HALIM:  Thank you so much.

1          PROSPECTIVE JUROR:  You are welcome.

2          THE COURT:  All right.  Thank you.  Mr. Douyon will

3   escort you out of the courtroom and provide you with additional

4   instructions.

5          PROSPECTIVE JUROR:  Thank you.

6      [Prospective juror exits.]

7          THE COURT:  Come up and have a seat.  How are you?

8          PROSPECTIVE JUROR:  I'm good.  Thank you.

9          THE COURT:  All right.  You are Juror 0554?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  All right.

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  If you are comfortable, you can remove

14  your mask.

15         PROSPECTIVE JUROR:  I'm okay.

16         THE COURT:  Okay.  So your juror questionnaire is in

17  front of you, and I'll ask you on the first page -- or

18  Question 6, you responded that you take certain medications.

19         PROSPECTIVE JUROR:  Yes, sir.

20         THE COURT:  And do the medications you take -- would

21  they affect your ability to sit for, say, 90 minutes to 2 hours

22  at a time?

23         PROSPECTIVE JUROR:  That's the thing.  Not to

24  two hours.  But I have to use the bathroom a lot, the rest room

25  a lot.  The medication, once it kicks in, I have to use the

1    bathroom, sometimes both ways.

2              THE COURT:  Gotcha.

3              PROSPECTIVE JUROR:  And I take anxiety medicine too.

4              THE COURT:  All right.  And so just asking you -- and

5    you'll forgive me for asking.  Say, we were to -- my typical

6    sort of day in court is we'll go about 90 minutes and then take

7    a break.

8              PROSPECTIVE JUROR:  Okay.

9              THE COURT:  90 minutes, lunchtime, 90 minutes or so.

10   Do you think your medication would cause you to need to use the

11   rest room before the end of that 90 minutes?

12             PROSPECTIVE JUROR:  I should be okay.

13             THE COURT:  You think you would be okay?

14             PROSPECTIVE JUROR:  If not, then can I relieve --

15   raise my hand?

16             THE COURT:  Sure.  Of course.  You wouldn't be the

17   first juror who has raised a hand and said they need to use the

18   rest room.

19             PROSPECTIVE JUROR:  Yeah.

20             THE COURT:  So, in terms of the medication beyond --

21   how it affects you physically, does it have any affects on your

22   ability to focus and pay attention?

23             PROSPECTIVE JUROR:  Depending on which type I take in

24   the morning because I do get kind of groggy.  But I will just

25   take my blood pressure medicine in regards to that.  I'll be

1    okay.

2              THE COURT:  Okay.  Well, we're not asking you to

3    change your medical --

4              PROSPECTIVE JUROR:  Take my medicine.

5              THE COURT:  -- regime just to serve as a juror.  Is

6    the drug that you've just described that would make you groggy,

7    is that something you are supposed to take every morning?

8              PROSPECTIVE JUROR:  Every day.  I take two of them

9    twice a day.

10             THE COURT:  Okay.  So that's a drug, if you take it,

11   it causes you to get drowsy and sleepy; is that right?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  And that's something that happens on a

14   daily basis?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Based on --

17             PROSPECTIVE JUROR:  I didn't take it this morning

18   because I knew I had to be here.

19             THE COURT:  All right.  All right.  Thank you, ma'am.

20             Any objections, counsel?

21             MR. EDWARDS:  No, Your Honor.

22             THE COURT:  Mr. Douyon will show you out of the

23   courtroom.  Thank you for your time.

24             PROSPECTIVE JUROR:  Thank you.  You have a good

25   afternoon.

1          [Prospective juror exits.]

2               THE COURT:  All right.  0554 we have stricken for

3     cause for medical reasons.

4               THE CLERK:  Juror No. 1519, Your Honor.

5               THE COURT:  How are you?

6               PROSPECTIVE JUROR:  Hi.  Doing well.  Thanks.  How

7     are you?

8               THE COURT:  You are Juror No. 1519?

9               PROSPECTIVE JUROR:  Yes.

10              THE COURT:  Feel free to remove your mask, if you are

11    comfortable doing so.

12              Your juror questionnaire is in front of you.  The

13    first thing I'll ask you to do is turn to page 14 of the

14    questionnaire and Question 75.  You wrote there that a large

15    part of your work has revolved around the events of the Capitol

16    on January 6, and I'm not sure I could avoid coverage or

17    communication on the case and still do my job concurrently with

18    the trial.  I think that's "concurrently."

19              And you've also indicated to us, I think, in

20    Question 12 that you work for a Republican accountability PAC

21    that includes communication, education, persuasion campaigns

22    around the events of January 6.

23              So can you tell us what you mean by all that?

24              PROSPECTIVE JUROR:  Sure.  So I work for a political

25    communications firm.

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR:  And it's a partisan firm.  So one

3   of the campaigns that we have done is -- started out of the

4   events that happened on January 6th and, really, it -- the

5   campaign began around -- well, the Republican Accountability

6   Project is how it started.

7          THE COURT:  I'm sorry to interrupt.

8          PROSPECTIVE JUROR:  Sure.

9          THE COURT:  Is that a PAC that you would describe as

10  sort of pro-Republican or asking -- or viewed to having

11  Republicans to take account for and responsibility and

12  recognize what happened on January 6th?

13         PROSPECTIVE JUROR:  So standing up for Republicans

14  who are pro-democracy and take accountability for free and fair

15  elections and the rule of law and that sort of thing and

16  efforts to hold Republican leaders accountable for election

17  denial-ism --

18         THE COURT:  I see.

19         PROSPECTIVE JUROR:  -- that we believe incited some

20  of the acts of January 6th.

21         THE COURT:  Okay.  So you just used the phrase "we

22  believe."  Now, is your work -- is it work that's on behalf of

23  your clients and client goals, or is it also the personal

24  beliefs that you share with your client and the firm that you

25  work for?

1          PROSPECTIVE JUROR:  So our client is kind of within

2    the firm.  Our firm started -- it started out as a (c)(3)

3    within our firm.  So we kind of are our own client.

4          THE COURT:  I see.  Understood.  Let me just ask, it

5    sounds like you have a fair amount of knowledge and

6    understanding and have followed closely the events of that day.

7    And would it be possible for you to set aside all that you have

8    learned and all the opinions that you have formed and sit in

9    judgment of defendants who are accused of committing offenses

10   arising out of January 6th?

11         PROSPECTIVE JUROR:  I mean, I definitely have

12   opinions of what I think lead up to that day.  I also think I

13   could -- I believe in the rule of law, and I think that I could

14   listen objectively to a case.  My work really resolves around

15   what happens at sort of the Republican leadership level, and I

16   haven't been following, you know -- I follow it closer at the

17   Congressional level.  That sort of thing.

18         THE COURT:  Uh-huh.

19         PROSPECTIVE JUROR:  So I think I could, but I

20   certainly know a lot about what led up to it, and I have some

21   opinions about it, I guess.

22         THE COURT:  So tell me -- you indicated in

23   Question 49 that you've heard about the Oath Keepers.  You've

24   also heard about Stewart Rhodes.  You indicated to us that --

25   your knowledge about the Oath Keepers would affect your ability

1    to be fair and impartial.  So can you describe for us what you

2    know and how it would affect your ability to be fair and

3    impartial.

4              PROSPECTIVE JUROR:  I guess I just know that, as an

5    organization, there is sort of an indoctrination that is

6    happening, and I think that it's coming from this election

7    denial sort of leadership from the top.  And I think that

8    there's, you know, just a lot of conspiracies, a lot of -- you

9    know, QAnon, that kind of thing.  I think that --

10             THE COURT:  And do you associate that with the Oath

11   Keepers or just January 6th in general?

12             PROSPECTIVE JUROR:  Associate what?

13             THE COURT:  What you have just described.  Election

14   denial-ism, QAnon, conspiracies, is that something specific to

15   the organization that you understand or --

16             PROSPECTIVE JUROR:  No.  I guess, I mean the

17   organization as an example of this sort of indoctrinized group

18   that's spiraling out of some of these things.

19             THE COURT:  And what would your view or opinion be of

20   somebody who is a member of that group as some of these

21   defendants are?  They are all either members of or affiliated

22   with that group.

23             PROSPECTIVE JUROR:  I don't know.  I mean, that's a

24   little hard.

25             THE COURT:  Uh-huh.

1          PROSPECTIVE JUROR:  It's a broad brush, I guess.  I

2    think broadly, it's something that I think -- it's pretty

3    fringe, but I also think that probably a lot of people are

4    getting swept up in it.  I mean, I guess I don't know, I guess,

5    the ins and outs of the actual group.  But, when I think of it,

6    I think of it being very fringe.

7          THE COURT:  Let me ask you this:  Based on what you

8    know and what you have learned and what your work is, do you

9    think it would be harder for you to come to the conclusion that

10   the Government had not carried its burden in this case and vote

11   to acquit these defendants?  And it's okay if the answer is

12   yes, given your background and the kind of work that you have

13   done.

14         PROSPECTIVE JUROR:  Yeah.  Probably.

15         THE COURT:  Sure.

16         PROSPECTIVE JUROR:  I'm not sure.  I like to think

17   that I can keep a very open mind, and I guess I believe greatly

18   in the rule of law and everybody deserves a trial.  I haven't

19   been following this level of what happened on January 6th

20   very closely.  So I really don't know a lot about the ins and

21   outs of the Oath Keepers trials and cases the way I have been

22   following what's happening in the states and what happened

23   with, like, the leaders that day.

24         THE COURT:  Gotcha.

25         Okay.  All right.  Counsel, any objections?

1          MR. EDWARDS:  Could I ask a quick?

2          Good morning -- or afternoon.

3          PROSPECTIVE JUROR:  Hi.

4          MR. EDWARDS:  It sounds like, in your experience with

5     the Republican Accountability Project and your expressed

6     appreciation for the rule of law, do you think that the

7     impartiality of a jury as enshrined in the Constitution will

8     inform your willingness to follow the judge's instruction to

9     you that, based on these experience and these facts you have

10    been exposed to, when you come into the courtroom, you should

11    and must set them aside and sit in that jury box and watch what

12    the Government presents and the defense, if they choose to do

13    so, and only render a verdict on that experience and that

14    evidence?  Do you think that you could follow that instruction?

15         PROSPECTIVE JUROR:  Yes.

16         MR. EDWARDS:  Thank you.

17         THE COURT:  Okay.  All right.  Thank you, ma'am, very

18    much.  Mr. Douyon will show you out of the courtroom and

19    provide you with additional instructions.

20         PROSPECTIVE JUROR:  Can I add something?

21         THE COURT:  Of course.

22         PROSPECTIVE JUROR:  What I had -- you had originally

23    asked me about this part, about doing my job concurrently.  I

24    realized what it would take to do this and the blackout on, you

25    know, media and social media and that whole thing, which I

```
 1    would try to do to the best of my ability, but, I guess, I
 2    would just be, you know, a little concerned that some of it
 3    wouldn't, like, seep into something.
 4              THE COURT:  Sure.  That's fair.
 5              PROSPECTIVE JUROR:  That's what I meant by that.
 6              THE COURT:  Understood.  Thank you very much for your
 7    time and for being here today.  Thank you.
 8         [Prospective juror exits.]
 9              THE COURT:  Hang on one second.
10              All right.  So 1519 will be stricken for cause given
11    the nature of her work and the proximity of the events of
12    January 6th.
13              MR. EDWARDS:  Thank you, Your Honor.
14              THE CLERK:  This is Juror No. 1836.
15              PROSPECTIVE JUROR:  Hi.
16              THE COURT:  How are you?
17              PROSPECTIVE JUROR:  I'm well.  Thank you.
18              THE COURT:  Have a seat, please.  You are Juror 1836?
19              PROSPECTIVE JUROR:  Yes.
20              THE COURT:  All right.  Feel free to remove your
21    mask, if you are comfortable doing so.
22              Your juror questionnaire is in front of you.  I'd ask
23    you to please first turn to page 11 and Question 49.
24    Question 49 asks you whether you've read, seen, or heard
25    anything about the Oath Keepers organization.  Can you tell us
```

```
 1   what you have read, seen, or heard about the organization?

 2              PROSPECTIVE JUROR:  That they were involved in the

 3   January 6th --

 4              THE COURT:  Okay.  Anything --

 5              PROSPECTIVE JUROR:  -- insurrection.

 6              THE COURT:  Anything more detailed than just

 7   involvement in the events of January 6th?  For example, do

 8   you have an understanding of what they did on January 6th?

 9              PROSPECTIVE JUROR:  Not specifically as an

10   organization, just that they were prominent in what occurred on

11   that.

12              THE COURT:  I'm sorry.  Can you keep your voice up.

13              PROSPECTIVE JUROR:  No.  I don't specifically know

14   about their organization's involvement, just that they were

15   prominent.

16              THE COURT:  Okay.  And when you say -- and leaving

17   aside for a moment the organization, what about people who are

18   members of, do you have any understanding of what they may have

19   done on January 6th?

20              PROSPECTIVE JUROR:  Went into the Capitol.

21              THE COURT:  Okay.  So that sounds like you have some

22   awareness of people having entered the Capitol who were

23   affiliated with or members of that group; is that right?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  All right.  And is there anything more
```

1    that you are aware of in terms of, for example, the

2    organization's mission, its ideology, its purpose?

3         PROSPECTIVE JUROR:  No.  I haven't read anything

4    really about the Oath Keepers.  I know it was prominent in the

5    news, but I haven't paid close attention to it.

6         THE COURT:  Okay.  So is it fair to surmise that what

7    you know is that there were Oath Keepers at the Capitol on

8    January 6th and some of them went into the Capitol building?

9         PROSPECTIVE JUROR:  Yes.

10        THE COURT:  Anything more than that?

11        PROSPECTIVE JUROR:  No.

12        THE COURT:  There will be evidence that one or more

13   defendants went into the Capitol on January 6th.  You will be

14   asked, however, in this case to determine why and what was in

15   their mind and their reason for going into the Capitol.

16        Do you think you could keep an open mind about the

17   purpose for which they went in and fairly and impartially

18   assess the evidence that's brought into the courtroom to make

19   that decision?

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  Okay.  Any doubt in your mind about that?

22        PROSPECTIVE JUROR:  No.

23        THE COURT:  Okay.  Question -- well, let me stay with

24   49.  When you completed this a couple weeks ago, you answered

25   "yes."  I'm asking you if you have learned anything more about

1   the Oath Keepers since you completed the questionnaire?

2          PROSPECTIVE JUROR:  No.  I turned off the radio, and

3   I walked away from the television and listened to instructions.

4          THE COURT:  So, for Question 51, it asks you about

5   Stewart Rhodes, Kelly Meggs, Jessica Watkins, and a couple of

6   others.  You answered "no."  Is that still the answer to the

7   question today?

8          PROSPECTIVE JUROR:  Yes, it's "no."

9          THE COURT:  Just immediately above we asked you about

10  the January 6th committee and the extent to which you have

11  been exposed to its work.  Can you just give us a sense of how

12  closely you have followed the January 6th committee's work?

13         PROSPECTIVE JUROR:  I've just heard pieces on the

14  radio going to and from work and that the hearings, I think,

15  got underway, I think, 4 or 5 months ago.

16         THE COURT:  Okay.  Beyond that, do you have any

17  specific understanding or recollection of the January 6th

18  committee having any -- making any comments or providing any

19  information about Oath Keepers?

20         PROSPECTIVE JUROR:  In that there was recently a

21  verdict with the Oath Keepers, maybe the leader of the Oath

22  Keepers organization.  I'm not sure.

23         THE COURT:  All right.  So you have seen some news or

24  headline about a verdict involving --

25         PROSPECTIVE JUROR:  Yeah.

1    THE COURT:  -- on Oath Keeper; correct?

2    PROSPECTIVE JUROR:  Yes.

3    THE COURT:  Do you remember who that person was?

4    PROSPECTIVE JUROR:  No.

5    THE COURT:  Do you remember whether -- what that

6    person's position was in the organization?

7    PROSPECTIVE JUROR:  No.  My sense was that it was

8    like the head of the organization.

9    THE COURT:  Okay.  So do you recall, from what you

10   have seen, what the outcome of that trial?

11   PROSPECTIVE JUROR:  Somebody was found guilty.  This

12   person was found guilty.

13   THE COURT:  These defendants have been charged with

14   conspiring with the people about whom you have just spoken --

15   PROSPECTIVE JUROR:  Uh-huh.

16   THE COURT:  -- and as to whom you have seen

17   headlines.  Do you think you could set aside the fact that you

18   have seen this headline?  And your responsibility as a juror

19   would be to focus only on these four defendants and the

20   evidence as to them.

21   PROSPECTIVE JUROR:  Yes.

22   THE COURT:  And you don't think the fact that

23   somebody else who is in the organization has been convicted of

24   something, that would not affect your ability to be fair and

25   impartial and view the evidence objectively as to these

1    defendants?

2              PROSPECTIVE JUROR:  That's correct.

3              THE COURT:  Earlier, on page 10, we asked you

4    generally about your media exposure to the events of

5    January 6th.  Let me ask you -- could you generally describe

6    for us the extent to which you have been exposed to media

7    coverage about the incident that day.

8              PROSPECTIVE JUROR:  I was working on that day, so I

9    did not see it happening live.  But I did watch, you know, the

10   clips that came out afterwards on the news that day and

11   probably the couple of weeks after.

12             THE COURT:  Okay.  Have you followed it, the news,

13   about the events of that day closely since then?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  And would you be able to set aside

16   whatever you have read, seen, or heard about the events that

17   day and, again, focus only on the evidence here?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  If I could ask you to turn, please, to

20   page 7.  You indicated in Question 16 -- we asked you whether

21   you or a close friend or family member have ever been employed

22   by the federal government.

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Can you tell us who in your circle of

25   family and friends or maybe yourself has been an employee of

1  the federal government?

2          PROSPECTIVE JUROR:  I guess peripherally because I

3  was -- I was a contractor.

4          THE COURT:  I see.

5          PROSPECTIVE JUROR:  Yeah.

6          THE COURT:  Okay.  And you've indicated in 18 that

7  you have a close friend or family member who served in the

8  armed forces.

9          PROSPECTIVE JUROR:  My father served.  He was in the

10 reserves, the Army Reserves.

11         THE COURT:  Your father was in the Army Reserves.

12         In Question 21, we asked about your visit to the

13 Capitol grounds or the Capitol building.

14         PROSPECTIVE JUROR:  Uh-huh.  Fourth of July I've been

15 down on the grounds.

16         THE COURT:  Anything more substantial than that?

17         PROSPECTIVE JUROR:  Years ago, a tour.

18         THE COURT:  Okay.  The question on page 11 asks about

19 people, you know, who are in the legal profession.  It appears

20 that your spouse is in the legal profession.

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  And, surely, you know people who are

23 lawyers as a result of that?

24         PROSPECTIVE JUROR:  Uh-huh.

25         THE COURT:  Do you know anybody who you consider a

1   close friend or close family member who is a lawyer and does

2   criminal work?

3           PROSPECTIVE JUROR:  Maybe one white-collar criminal.

4           THE COURT:  Maybe what?

5           PROSPECTIVE JUROR:  Maybe one friend who I think does

6   white-collar criminal work.

7           THE COURT:  White collar.  Do you have conversations

8   about your friend's work?

9           PROSPECTIVE JUROR:  No.

10          THE COURT:  And then, lastly, Question 59 asks about

11  you, a close friend, or family member who has been the victim

12  of a crime.

13          PROSPECTIVE JUROR:  So I've been the victim of more

14  petty crimes, theft.

15          THE COURT:  Here in D.C.?

16          PROSPECTIVE JUROR:  D.C.

17          THE COURT:  As a result of that, did you have to

18  interact with the Metropolitan Police Department?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  And have you formed views about the MPD

21  that might affect you in evaluating a law enforcement's

22  testimony?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Have you had occasion to be in contact

25  with or communicate with the U.S. Attorney's Office for the

1    District of Columbia because of these petty crimes?

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  Mr. Edwards, any follow-up?

4            MR. EDWARDS:  No questions, Your Honor.  Thank you.

5            THE COURT:  All right.  Anything from the defense?

6            All right.  Thank you, ma'am.  Mr. Douyon will escort

7    you out of the courtroom and provide you with additional

8    instructions.

9        [Prospective juror exits.]

10           THE COURT:  Mr. Douyon handed me a note indicating

11   that our juror who was here earlier today who described

12   childcare issues has called us back and that she's told us that

13   she's able to secure childcare for six weeks.  So I'll qualify

14   her and add her to our list.  That was Juror 1946.

15           THE CLERK:  Your Honor, this is Juror No. 0653.

16           THE COURT:  Sir, how are you?

17           PROSPECTIVE JUROR:  Doing well.  Thank you.

18           THE COURT:  You are Juror 0563?

19           PROSPECTIVE JUROR:  That's correct.

20           THE COURT:  Hang on one second.  Feel free to remove

21   your mask, if you are comfortable doing so.

22           Your juror questionnaire is in front of you.  I'll

23   ask you to pick that up and turn to page 14 and Question 74.

24   You wrote there "48."  I think it's in reference to the earlier

25   question about the strong opinions about the events of

1    January 6th.  You said, "I can be fair and impartial, but I

2    do have strong opinions about that day."  Can you share with us

3    or elaborate what you meant by that?

4              PROSPECTIVE JUROR:  Yeah.  Sure.  So I think it's a

5    deeper question.  I think everyone is entitled to a fair trial,

6    but I have very strong opinions about what happened that day.

7    It wasn't necessary.  Yeah.

8              THE COURT:  Okay.  When you say "strong opinions,"

9    people can form opinions.  The question for you is, whether

10   those opinions, how do you think they might affect you as a

11   juror in a case about the events of January 6 and about

12   defendants who participated on the events that day.

13             PROSPECTIVE JUROR:  Yeah.  I think that's something

14   I'm wrestling with.  When I answered the question, I was

15   wrestling with it as well.

16             THE COURT:  Is that something that you continue to

17   wrestle with?

18             PROSPECTIVE JUROR:  Yeah, I would say so.

19             THE COURT:  All right.  Okay.  Any objections,

20   counsel?

21             MR. EDWARDS:  No, Your Honor.

22             THE COURT:  All right.

23             MR. SHIPLEY:  No, Your Honor.

24             THE COURT:  Mr. Douyon will escort you out of the

25   courtroom and provide you with some additional instructions.

```
 1        [Prospective juror exits.]
 2              THE CLERK:  Juror No. 2311.
 3              THE COURT:  All right.  0653 will be stricken for
 4    cause.
 5              THE CLERK:  Your Honor, this is Juror No. 2311.  Your
 6    Honor, 2311.
 7              THE COURT:  Hi.  How are you?
 8              PROSPECTIVE JUROR:  Good.  How are you?
 9              THE COURT:  Thank you.  You are Juror 2311.  Feel
10    free to remove your mask, if you are comfortable doing so.
11              All right.  So if I could, please, ask you -- your
12    juror questionnaire is in front of you.  I'll ask you to turn,
13    please, first to page 11 and Question 49.
14              PROSPECTIVE JUROR:  Okay.
15              THE COURT:  And you were asked in that question have
16    you read, seen, or heard anything about the Oath Keepers
17    organization.  You answered "no."
18              PROSPECTIVE JUROR:  Uh-huh.
19              THE COURT:  And so is it fair to say that -- do you
20    have any idea who the Oath Keepers are, what they stand for,
21    their ideology, mission, anything like that?
22              PROSPECTIVE JUROR:  Basically very little.  So I know
23    they are associated with the January 6th events.
24              THE COURT:  Uh-huh.
25              PROSPECTIVE JUROR:  And I believe that it's partially
```

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
MOBILE, ALABAMA  36602   (251) 690-3371

1   to do with the belief that Trump should have been elected, and

2   honestly that's it.

3             THE COURT:  And do you have any greater understanding

4   of what they are alleged to have done on January 6th?

5             PROSPECTIVE JUROR:  I assume that they were a part of

6   the group that attacked on the Capitol.

7             THE COURT:  Uh-huh.

8             PROSPECTIVE JUROR:  And possibly that they

9   contributed to the planning of it.

10            THE COURT:  When you say "assume," is that because

11  you are sitting here in court, or is that something that you

12  have read or heard, and that's the impression that's been left

13  on you?

14            PROSPECTIVE JUROR:  I remember seeing -- I just

15  remember seeing the name "Oath Keepers," which I remembered

16  because it's strange and like a snippet about the January 6th

17  events.  And, otherwise, I assume that they were part of it

18  because of this trial.

19            THE COURT:  So what you just described for us, is

20  that something that you have learned since you completed the

21  questionnaire or that was knowledge that you had before you

22  completed the questionnaire?

23            PROSPECTIVE JUROR:  Knowledge I had before I

24  completed the questionnaire.

25            THE COURT:  Okay.  And so our expectation of you, if

1   you were to serve as a juror, is that you would be able to --

2   you would be asked to put aside what impressions you have about

3   the organization and evaluate the evidence against these

4   defendants fairly and impartially.  Do you think you would have

5   any difficulty doing that?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Question 51 asks, have you read, seen, or

8   heard anything about Stewart Rhodes, Kelly Meggs, Jessica

9   Watkins, et cetera.  You answered that question "no."  Is the

10  answer to that question "no" still today?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  I'll ask you to turn, please, to page 7.

13  Question 16 asks, have you, close friends, or family members

14  ever been employed by the federal government.  You answered

15  that question "yes."  Can you tell us about that.

16         PROSPECTIVE JUROR:  I had a close friend that works

17  for U.S. Aid.

18         THE COURT:  U.S. Aid?

19         PROSPECTIVE JUROR:  Uh-huh.

20         THE COURT:  One of the allegations in this case --

21  one of the charges in this case is seditious conspiracy.  The

22  defendants are alleged to have resisted the authority of the

23  United States government by force.  Do you think your friend's

24  employment with the federal government or the charge itself

25  would cause you any difficulty being fair and impartial?

```
 1                PROSPECTIVE JUROR:  No.

 2                THE COURT:  Question 21 asks have you ever been on

 3   the Capitol grounds or inside the Capitol building, and you

 4   left that blank.

 5                PROSPECTIVE JUROR:  Oh, sorry.

 6                THE COURT:  That's okay.

 7                PROSPECTIVE JUROR:  I've never been inside.  I might

 8   have gone for, like, a run around the Capitol grounds.

 9                THE COURT:  All right.  If I could ask you to turn,

10   please, to page 11, Question 55.  55 asked about people you

11   know in the legal profession.

12                PROSPECTIVE JUROR:  Uh-huh.

13                THE COURT:  Can you tell us about that.

14                PROSPECTIVE JUROR:  I have a close friend that used

15   to be a lawyer, a patent lawyer.

16                THE COURT:  Okay.  Anybody other than that person

17   that also does criminal work?

18                PROSPECTIVE JUROR:  Not that I'm aware.

19                THE COURT:  On the prior page, Question 44, I meant

20   to ask you, it asks you whether you follow anyone on social

21   media who regularly reports or comments on the events of

22   January 6th.  You answered "yes."  Can you tell us who you

23   follow?

24                PROSPECTIVE JUROR:  I follow the Washington Post,

25   CNN, and another one similar to that.  Maybe, like, BBC or
```

 1   something.

 2          THE COURT:  Okay.  So you are following the news

 3   organization's feed but not that of any particular reporter or

 4   commentator; right?

 5          PROSPECTIVE JUROR:  Yes.

 6          THE COURT:  How much exposure would you say you have

 7   had to media coverage about the events of January 6th?

 8          PROSPECTIVE JUROR:  Very limited, to be honest.  All

 9   I know is basically what's gone through my feed, and I haven't

10   clicked on the links to read the articles.

11          THE COURT:  Would you be able to set aside what you

12   have learned from those articles and judge the evidence in this

13   case fairly and impartially?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Okay.  Mr. Edwards?

16          MR. EDWARDS:  No questions, Your Honor.  Thank you.

17          THE COURT:  Anything from defense?

18          MR. SHIPLEY:  You answered Question 44.  Do you

19   follow anyone on any social media platform who regularly

20   reports or comments on the events of January 6th?  You

21   checked "yes."

22          PROSPECTIVE JUROR:  Uh-huh.

23          MR. SHIPLEY:  Is there a particular social media

24   channel that you have followed?

25          PROSPECTIVE JUROR:  I follow the Washington Post,

```
1    CNN, and I was saying there's one other that I can't recall
2    right now.  But just regular news outlets.
3              MR. SHIPLEY:  But no, like, overtly political social
4    media channel with a decidedly one-sided slant?
5              PROSPECTIVE JUROR:  No.
6              THE COURT:  All right.  Thank you, ma'am.  Mr. Douyon
7    will show you out of the courtroom and provide you with
8    additional instructions.
9              PROSPECTIVE JUROR:  Okay.  Thank you.
10        [Prospective juror exits.]
11             THE CLERK:  Juror No. 1162.
12             THE COURT:  Hello.  Have a seat here, sir.  How are
13   you?
14             PROSPECTIVE JUROR:  Good.  Yourself?
15             THE COURT:  Thank you.  You are Juror 1162.
16             PROSPECTIVE JUROR:  [Nods head up and down.]
17             THE COURT:  Feel free to remove your mask, if you are
18   comfortable doing so.
19             Your questionnaire is in front of you.  I'm going to
20   ask you to please first turn to page 11 and Question 49.  We
21   asked you in Question 49, have you read, seen, or heard
22   anything about the Oath Keepers organization.  Can you tell us
23   what you have read, seen, or heard?
24             PROSPECTIVE JUROR:  I don't know of anything
25   specific.  The name is familiar to me.  I believe I have seen
```

1    headlines linking it to a right-wing militia.

2             THE COURT:  I'm sorry?

3             PROSPECTIVE JUROR:  A right-wing militia.  That is

4    just an impression from the headlines.  I don't have any

5    definite knowledge about it.

6             THE COURT:  Other than that headline, impression that

7    you just described, do you have any specific understanding of

8    what they are alleged to have done or how they are connected to

9    the events of January 6th?

10            PROSPECTIVE JUROR:  I don't know.

11            THE COURT:  And do you have any sense of what the

12   group's mission, ideology, purpose is, anything like that?

13            PROSPECTIVE JUROR:  I'm a journalist.  I don't know

14   them.  I haven't asked.  I haven't followed specific reporting

15   on the institution or its genealogy.  The impression I got

16   would be very far right wing.  That's as far as -- that's the

17   impression I have.

18            THE COURT:  And how would that impression affect your

19   ability to be fair and impartial to these defendants who are

20   either members of or affiliated with the organization?

21            PROSPECTIVE JUROR:  I don't know if it would affect

22   my ability to make a decision.

23            THE COURT:  Do you have any reason to think it would?

24            PROSPECTIVE JUROR:  No.  I mean, I don't think that

25   necessarily the political affiliation or goals have any bearing

```
 1   on -- on the laws as they are stated.
 2            THE COURT:  Okay.  So do I understand you to
 3   correctly say or to say, I should say, that you could set aside
 4   this impression you have and focus only on the evidence that's
 5   presented here and apply the law as I instruct you and be fair
 6   and impartial to these defendants?
 7            PROSPECTIVE JUROR:  I believe so.
 8            THE COURT:  Okay.  Have you learned anything else
 9   about the Oath Keepers organization since you completed this
10   questionnaire?
11            PROSPECTIVE JUROR:  No -- oh, yes.  Yes, I have.
12            THE COURT:  What is that?
13            PROSPECTIVE JUROR:  That I saw -- I skimmed an
14   article that mentioned some of the allegations in the case.
15            THE COURT:  Okay.  And what did you -- what did you
16   retain?  What do you recall from that article?
17            PROSPECTIVE JUROR:  I recall that there were
18   allegations of arms involved.
19            THE COURT:  Uh-huh.
20            PROSPECTIVE JUROR:  I remember that you were
21   mentioned as being the lead judge in this case.
22            THE COURT:  I'm not only the lead judge, I am the
23   only judge.
24            PROSPECTIVE JUROR:  Excuse my ignorance.
25            THE COURT:  There's nothing to be sorry about.
```

1          PROSPECTIVE JUROR:  I believe that's it.

2          THE COURT:  You mentioned firearms.  If you were to

3   be a juror in this case, there will be evidence of firearms

4   possession, and, in fact, there are likely to be firearms

5   brought into the courtroom.  Tell me what, if any, reaction you

6   have to that and how it might affect your ability to be a juror

7   and sit fairly and impartially.

8          PROSPECTIVE JUROR:  They scare me, but I don't think

9   that would affect my judgment.

10         THE COURT:  Okay.  When you say it scares you, tell

11  us what scares you about them; and, particularly, if you saw

12  sort of long rifles, how would you react to seeing long

13  military-style rifles?

14         PROSPECTIVE JUROR:  It's a lethal weapon.  You know,

15  it has associations of death to it.

16         THE COURT:  Okay.

17         PROSPECTIVE JUROR:  I think that's a normal emotion,

18  response, but I don't think it will affect my judgment or my

19  reasoning.

20         THE COURT:  If you were to learn that one or more of

21  these defendants possessed such a weapon, do you think you

22  would have particular opinions or views that would cloud your

23  opinion of such a person who possessed such a weapon even if

24  there's no allegation that it was owned illegally?

25         PROSPECTIVE JUROR:  I guess you are asking do I have

1    prejudices about people who bear these types of arms?

2          THE COURT:  Correct.

3          PROSPECTIVE JUROR:  I think -- I think it's sort

4    of -- it's normal to say that I do have prejudices in the sense

5    of I have a prejudged notion of what a kind of person would be

6    carrying such arms.

7          THE COURT:  Okay.  Tell us what your prejudgment,

8    your notions, would be about somebody who possesses such a

9    firearm even if it's possessed legally.

10          PROSPECTIVE JUROR:  That they may be skeptical of

11    authority, that they may take matters into their own hands,

12    that they may -- that they might have a political project

13    that's at odds with the state of the law allowing them to have

14    it.

15          THE COURT:  Okay.  And those are your impressions

16    just based on your impression of somebody's mere possession of

17    a firearm of the kind that I have described?

18          PROSPECTIVE JUROR:  Who is not law enforcement, yes.

19          THE COURT:  Any objections, counsel?

20          MR. EDWARDS:  May I?

21          THE COURT:  Any objection?

22          MR. EDWARDS:  Yes.  May I ask a follow-up question?

23          THE COURT:  Sure.

24          MR. EDWARDS:  Good afternoon.  Given those -- that --

25    those impressions about people with firearms, if the judge were

1   to tell you that you must leave those impression outside the

2   courtroom when you come in and just assess facts reported to

3   you, as you may do as a journalist, do you think that you can

4   listen to that instruction and sit in here and just listen to

5   the evidence from the parties?

6        PROSPECTIVE JUROR:  Yeah, I think so.

7        MR. EDWARDS:  Do you think that you can set aside any

8   impression, you know, any events regarding firearms that you

9   may have seen or experienced, set aside your emotions and just

10  assess the evidence as to just these four defendants sitting

11  here at the table?

12       PROSPECTIVE JUROR:  Yeah, I think so.

13       MR. EDWARDS:  Nothing further, Your Honor.

14       THE COURT:  Thank you very much.  Mr. Douyon will

15  escort you out of the courtroom and provide you with additional

16  instructions.

17    [Prospective juror exits.]

18       THE COURT:  All right.  So I'll strike 1162 for

19  cause.  I just think, notwithstanding the follow-up from

20  Mr. Edwards, his reaction is visceral and, frankly, I think,

21  telling of how he views people who possess long guns.  So for

22  those reasons, I'll strike him for cause.

23       THE CLERK:  Juror No. 0690.  Have a seat right here,

24  and please speak into the microphone.  Thank you.

25       THE COURT:  Sir, how are you?

1          PROSPECTIVE JUROR:  Good afternoon.

2          THE COURT:  Good afternoon.  Feel free to remove your

3   mask, if you are comfortable doing so.

4          Your juror questionnaire is there in front of you.

5   I'll ask you, please, first to turn to page 11 and Question 49

6   and relatedly Question 51.  In those questions, we asked you

7   whether you had read, seen, or heard anything about the Oath

8   Keepers organization, and we also asked you whether you knew

9   anything about the people listed there, including Stewart

10  Rhodes and Kelly Meggs.  Can you tell us what you have read,

11  seen, or heard about the organization and these individuals?

12         PROSPECTIVE JUROR:  Only news accounts over time

13  since January 6th and, more recently, in the previous trial.

14         THE COURT:  Okay.  Can you provide us with some more

15  detail of what you have gleaned from these accounts about the

16  organization and these individuals?

17         PROSPECTIVE JUROR:  Well, very little about the

18  personal history about the individuals.  The idea that they

19  were involved in the January 6th episode was pretty

20  appalling, but that was based on news accounts and, as I said,

21  more recently following the trial.

22         THE COURT:  Okay.  You used the word "appalling."  Do

23  you have any greater detail or understanding of what you

24  understand the Oath Keeper members to have done on

25  January 6th?

1          PROSPECTIVE JUROR:  Not really.

2          THE COURT:  Okay.  And so your sense is -- well,

3    what's your basis of your opinion, then, of what they did was

4    appalling if you don't have a detailed understanding of what

5    they did?

6          PROSPECTIVE JUROR:  Well, the news accounts showed

7    that they were part of the day's events; that their leader was

8    not present at the Capitol, but members were; and, by news

9    accounts, they were involved in the riot.

10          THE COURT:  You mentioned you had seen recent

11   headlines about the prior trial.  Can you tell us what those

12   headlines were?

13          PROSPECTIVE JUROR:  You mean the court case?

14          THE COURT:  Correct.

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Correct.  What have you learned from

17   headlines or other information?

18          PROSPECTIVE JUROR:  I learned that it was a long

19   trial.  I learned that the decision was decisive as far as

20   Stewart Rhodes was concerned and four other people who were

21   indicted in that case.

22          THE COURT:  Okay.  The defendants in this case are

23   charged with conspiring with Stewart Rhodes and others.  The

24   fact that you have learned about the court case and the

25   judgment against Mr. Rhodes and some others, how do you think

1   that would affect your view of these defendants if you were

2   selected as a juror?

3          PROSPECTIVE JUROR:  I would like to think it wouldn't

4   affect me at all because it's a different case, it's different

5   people, and the merits of the case would be decided in this

6   court.

7          THE COURT:  So let me ask you, you have described

8   your understanding of the group and the members of that group

9   in fairly strong terms.  Do you think you could set aside those

10  views and be fair and impartial to these defendants based only

11  on the evidence that's presented here?

12         PROSPECTIVE JUROR:  Absolutely.

13         THE COURT:  Do you have any doubt in your mind that

14  you could do that?

15         PROSPECTIVE JUROR:  I do not.

16         THE COURT:  You have said above, in Question 46, that

17  you have followed the January 6th committee hearings.  Can

18  you tell us how closely you followed those hearings?

19         PROSPECTIVE JUROR:  I think I observed most of the

20  public hearings.

21         THE COURT:  You've watched most of those?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Do you recall, as part of those public

24  hearings, whether there were comments, discussion about Oath

25  Keepers?

1          PROSPECTIVE JUROR:  Not specifically.

2          THE COURT:  Do you think you could set aside what you

3    have viewed or learned from those hearings about the events of

4    January 6th?

5          PROSPECTIVE JUROR:  I could set them aside with

6    respect to any proceeding in this court involving, you know,

7    the people who are trying this case.

8          THE COURT:  Okay.  Well, what about you learned

9    generally about the causes of, the conduct of people on that

10   day, would you have any difficulty setting those facts aside?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Let me ask you, Question 39 asked you

13   whether you recognized any names on the list and individuals

14   who may appear to testify or whose names you might hear.  And

15   you identified Harry Dunn.  Can you tell us who Harry Dunn is?

16         PROSPECTIVE JUROR:  I believe he's a Capitol police

17   officer, and he was a prominent person in the January 6th

18   committee hearings.

19         THE COURT:  And do you have any impressions or views

20   of Officer Dunn based upon what you have observed of him?

21         PROSPECTIVE JUROR:  Not beyond the keen interest in

22   the case.  He was interviewed by the media, was articulate in

23   expressing his views.  And the question asked if I recognized

24   who he was, and that's my answer.

25         THE COURT:  Okay.  If Officer Dunn were to testify in

1    this case, could you set aside what you have seen of him

2    outside the courtroom and evaluate his credibility based only

3    on the evidence in the case?

4            PROSPECTIVE JUROR:  I would like to think I could,

5    yes.

6            THE COURT:  Do you have any question in your mind

7    that you could do that?

8            PROSPECTIVE JUROR:  No.

9            THE COURT:  You have indicated that you have seen a

10   lot of news coverage of the events of that day.  So can you

11   give us a sense of how closely you followed the news about the

12   events of January 6?

13           PROSPECTIVE JUROR:  Well, it's hard not to, living in

14   the nation's capitol and, I suppose, elsewhere.  It's a part of

15   the news stream here, and like most Washingtonians, it's

16   ever-present.

17           THE COURT:  Okay.  I mean, you are a -- you told us

18   you are a resident of Capitol Hill.  Does that add to your keen

19   interest in the news?

20           PROSPECTIVE JUROR:  I think I would be as keenly

21   interested if I lived elsewhere.

22           THE COURT:  Were you at home on January 6th?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  And can you tell us what you experienced

25   that day?

1          PROSPECTIVE JUROR:  Well, as I said, I watched the

2    developments in the afternoon.  I wasn't watching in the

3    morning.  I guess I would describe my reaction as surprised, as

4    I said, appalled, and then concerned.

5          THE COURT:  And did you have any personal experiences

6    outside your home in your neighborhood on that day with people

7    who may have participated --

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  -- in the events of that day?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Okay.  Did you have any concerns about

12   your own personal safety or those of family members?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  You have indicated on page 7,

15   Question 16, that you have close friends or family members who

16   have been employed by the federal government.  Can you tell us

17   about that?

18         PROSPECTIVE JUROR:  My wife was a career employee in

19   the Foreign Service and then at the State Department.

20         THE COURT:  Okay.  And so, as you may be aware, one

21   of the charges in this case is seditious conspiracy.  The

22   defendants are accused of conspiring to use force to resist the

23   authority of the United States government.  The fact that your

24   spouse worked in the State Department, how would that affect

25   your views about these defendants?

675

```
1              THE WITNESS:  I think that would be not relevant.
2              THE COURT:  You were also asked in Question 18
3    whether you have close family or friends -- excuse me -- close
4    friends or family members who served in the armed forces.
5              PROSPECTIVE JUROR:  My brother and my grandson.
6              THE COURT:  Can you tell us which branches?
7              PROSPECTIVE JUROR:  My brother in the Army and my
8    grandson in the Army.
9              THE COURT:  All right.  You've told us you served on
10   a criminal jury previously.  Question 59 asked about -- jumping
11   ahead here to page 11.  Question 55 asked about people you know
12   who are in the legal profession.
13             PROSPECTIVE JUROR:  My brother-in-law was
14   commonwealth attorney in the State of Virginia.
15             THE COURT:  So he was the lead prosecutor in the
16   State of Virginia; is that right?
17             PROSPECTIVE JUROR:  For a particular county.
18             THE COURT:  For a particular county.  Understood.
19             Anybody else other than him?
20             PROSPECTIVE JUROR:  I'm sorry?
21             THE COURT:  Anyone other than your brother-in-law?
22             PROSPECTIVE JUROR:  No.
23             THE COURT:  Okay.  Mr. Edwards, any follow-up
24   questions?
25             MR. EDWARDS:  No questions, Your Honor.  Thank you.
```

1          THE COURT:  Anything from defense counsel?

2          MS. HALIM:  Please, yes.

3          Good afternoon, sir.  Having watched the January 6

4  committee hearings and having kept abreast of the news, do you

5  have any impression or belief that if someone went inside the

6  Capitol building that day that they would have done so in order

7  to disrupt the proceedings and the certification of the vote?

8          PROSPECTIVE JUROR:  I don't think I'm in a position

9  to distinguish between those who went with that intent and

10 those who may have been swept up in --

11         MS. HALIM:  I'm sorry.  I didn't mean to cut you off.

12         PROSPECTIVE JUROR:  -- in the event.

13         MS. HALIM:  Is that something you would keep an open

14 mind, and you would listen to the evidence that's brought

15 before you in making that decision?

16         PROSPECTIVE JUROR:  Yes.

17         MS. HALIM:  I did have some brief follow-up on

18 your -- early on, you said that you were appalled or you found

19 it appalling.  Excuse me.

20         PROSPECTIVE JUROR:  Yes.

21         MS. HALIM:  Were you speaking about the events of

22 that day in particular broadly or, as you explained it, Oath

23 Keeper behavior specifically?

24         PROSPECTIVE JUROR:  I was not speaking specifically

25 about the Oath Keeper.  I was speaking about the events more

1    broadly.

2              MS. HALIM:  Thank you so much.  I appreciate it.

3              MR. SHIPLEY:  Just briefly, sir.  You have consumed

4    quite a bit of news about the events of the day, watched a lot

5    of videos, J6 committee, et cetera.  As you sit here, just

6    based on what you know -- well, let me stop.  You didn't know

7    anything about the Oath Keepers before January 6; fair?

8              PROSPECTIVE JUROR:  I think that's fair.

9              MR. SHIPLEY:  So just based on what you have

10   consumed, the information over the time period that they have

11   been interviewed since the event, how would you describe the

12   organization?  What do you think it is?

13             PROSPECTIVE JUROR:  It's a group of Americans who

14   believe that they have obligations to -- in the case of

15   January 6 -- use violence to bring about a disruption of

16   constitutionally required proceedings.  I don't understand

17   their history, and I don't know their personalities.  All I

18   know is what the news described from the events of

19   January 6th and, more recently, following the trial of

20   Stewart Rhodes.

21             MR. SHIPLEY:  Do you consider it a far-right

22   militaristic organization?

23             PROSPECTIVE JUROR:  Far-right, the spectrum of

24   political ideology we could talk the afternoon, but --

25             MR. SHIPLEY:  Generally accepted political spectrum.

1          PROSPECTIVE JUROR:  Right on the spectrum.

2          MR. SHIPLEY:  Thank you.

3          THE COURT:  All right, sir.  Mr. Douyon will escort

4    you out of the courtroom and provide you with additional

5    instructions.

6          [Prospective juror exits.]

7          MR. SHIPLEY:  Your Honor, I move to excuse Juror 0690

8    on just the basis of his last answer.  He's already

9    internalized the idea that the organization exists, they used

10   violence to disrupt the political process.  I mean, that's --

11   that's -- he's internalized the Government's theory of the

12   case.

13         MR. EDWARDS:  He qualified.  He said that's what I

14   saw on the news say about the Oath Keepers.  I think

15   importantly in there, Your Honor, he had no personal

16   entanglements with anyone involved in January 6.  He was not

17   involved in the events of the day.  He doesn't have any kind of

18   occupational connection to the folks.  He unequivocally

19   answered your question, regardless of what he had seen on the

20   news, he could stay impartial and he could assess the facts

21   with regard to these four defendants.

22         THE COURT:  It's a close-call.  I'm actually going to

23   err on the side of striking him.  I know he answered the

24   questions, but I did have concerns about his response to some

25   of my inquiries and then the follow-up questions about the

1    organization and his -- what he understands them to stand for.

2    We still have a little bit more time, and so I'm confident we

3    should be able to qualify a few more folks who have less

4    knowledge or less understanding about the group.  0690 is

5    stricken for cause.

6            THE CLERK:  Your Honor, this is Juror No. 1715.

7            THE COURT:  Yes, sir.  How are you?

8            PROSPECTIVE JUROR:  Pardon?

9            THE COURT:  I said how are you?

10           PROSPECTIVE JUROR:  Well, Your Honor.  You?

11           THE COURT:  Good.  Thank you.  You are Juror 1715?

12           PROSPECTIVE JUROR:  Yes.

13           THE COURT:  Feel free to remove your mask, if you

14   wish to do so.

15           Your juror questionnaire is there before you.

16   Page 5, you answered our hardship question.

17           PROSPECTIVE JUROR:  I do not, no.

18           THE COURT:  Oh, sorry.

19           THE CLERK:  Sorry.  The last juror took it.

20           THE COURT:  I don't think we need your question.

21   We'll read back to you what you wrote.  In Question 1, it asked

22   about hardship.  You wrote I am currently staff on an antitrust

23   case in this district, and we are currently in a compressed

24   fact discovery period.  My extended absence would likely harm

25   our team's ability to proceed in that case.

1    That's not a case before me, I take it?

2    PROSPECTIVE JUROR:  No, Your Honor.

3    THE COURT:  Okay.  So it's an FTC case?

4    PROSPECTIVE JUROR:  Yes.

5    THE COURT:  Tell me what your role is in that case.

6    PROSPECTIVE JUROR:  I'm a staff attorney.  The case

7    is FTC v. Meta Platforms, Inc.

8    THE COURT:  Okay.

9    PROSPECTIVE JUROR:  And I'm handling that large

10   portion of one of the two acquisitions at issue in that

11   monopolization case.

12   THE COURT:  Okay.  All right.

13   PROSPECTIVE JUROR:  I expect to be handling, I think,

14   five or six depositions in the next few months.

15   THE COURT:  And have those depositions been

16   scheduled?

17   PROSPECTIVE JUROR:  We have one in January.

18   THE COURT:  All right.  And will there be people

19   who -- if you were on this case for six to eight weeks, are

20   there people that would be able to sub in for you and do the

21   work that you would otherwise be assigned to do?

22   PROSPECTIVE JUROR:  I would so hope so.  We have a

23   small team.

24   THE COURT:  Understood.  So you'll understand that

25   it's true for anybody that personal and professional

1    impositions related to jury service.  It's only in the most

2    extraordinary circumstances, I think, that I think professional

3    considerations would allow somebody to be excused.  So I don't

4    think that yours quite reach that level.

5             PROSPECTIVE JUROR:  Okay.  Appreciate it.

6             THE COURT:  If you would please turn to page 11,

7    Question 49.  That question asks whether you have read, seen,

8    or heard anything about the Oath Keepers organization.  Can you

9    tell us what you have read, seen, or heard?

10            PROSPECTIVE JUROR:  I believe I have read a few

11   articles in the Washington post.

12            THE COURT:  Okay.  Can you tell us what you remember

13   those articles conveying about the Oath Keepers organization?

14            PROSPECTIVE JUROR:  Very little, Your Honor.  Just

15   the name.

16            THE COURT:  All right.  Anything more than the name?

17   In other words, for example, anything about the organization's

18   ideology, its purpose, mission?

19            PROSPECTIVE JUROR:  I generally remember it being

20   described as a right -- generally conservative organization.

21            THE COURT:  Anything more than that?

22            PROSPECTIVE JUROR:  No.  Other than that and its

23   involvement with January 6 events, I couldn't say.

24            THE COURT:  And so you anticipated my next question,

25   which is what is your understanding of the organization's

```
 1   involvement with the events of that day?
 2              PROSPECTIVE JUROR:  I understand they were members of
 3   the organization at the Capitol that day.
 4              THE COURT:  All right.  Do you have any
 5   understanding, other than presence, what those individuals may
 6   have or may not have done?
 7              PROSPECTIVE JUROR:  Not specifically, no, Your Honor.
 8              THE COURT:  Okay.  Would you be able to set aside the
 9   facts that -- or the things that you have just told us and
10   learned from the media and keep an open mind and review the
11   facts fairly and impartially against the defendants in this
12   case?
13              PROSPECTIVE JUROR:  I certainly hope so.
14              THE COURT:  Let me ask you, with respect to
15   Question 49, again, about the Oath Keepers organization, have
16   you learned anything more about the organization in the weeks
17   since you completed this jury questionnaire?
18              PROSPECTIVE JUROR:  No.  I understood that coverage
19   to be under the kind of blanket ban on related topics.
20              THE COURT:  Similarly, Question 51 you were asked
21   about whether you have had any information or recognize the
22   names Stewart Rhodes, Kelly Meggs, Jessica Watkins.  You
23   answered "no."  Is your answer to that question still "no"
24   today?
25              PROSPECTIVE JUROR:  Yep.  I don't recognize those
```

683

 1    names.

 2              THE COURT:  All right.  You indicated above that you

 3    have followed, to some extent, the January 6 committee

 4    hearings.  Can you give us a sense of how much of those

 5    hearings you have followed?

 6              PROSPECTIVE JUROR:  I think I listened in on a day or

 7    two of the hearings.

 8              THE COURT:  All right.  And on the day or two that

 9    you listened in, do you recall any commentary or discussion

10    about Oath Keepers?

11              PROSPECTIVE JUROR:  No, Your Honor.

12              THE COURT:  And would you be able to set aside

13    whatever you have learned from the committee hearings and focus

14    on the evidence that's presented in this case?

15              PROSPECTIVE JUROR:  I would hope so.

16              THE COURT:  Same question, with respect to news media

17    that you have followed or have been exposed to.  Could you give

18    us a sense of how much news media you have been exposed to

19    regarding the events of January 6th?

20              PROSPECTIVE JUROR:  I think after the event, I

21    assimilated the coverage.  I watched the events unfold on TV.

22              THE COURT:  Okay.  Can you tell us -- well, let me

23    put it this way and ask it differently, which is, how did the

24    events of that day affect you and has the news coverage since

25    then, has it had an affect on you?

1          PROSPECTIVE JUROR:  I remember being largely shocked

2    of the events of the day.  Like, I first saw it on Twitter and

3    then quickly saw it on news afterwards, and I was mostly

4    shocked and appalled.  Of course, the coverage since then is

5    largely kept -- left my feelings about the events intact.  I

6    don't think the coverage since has changed the emotional

7    feelings of the day.

8          THE COURT:  And do you think that your, sort of,

9    opinions or emotion that you have just described that -- do you

10   think you would be able to set that aside and focus on the

11   evidence that's presented and apply it to these defendants?

12         PROSPECTIVE JUROR:  I would hope so, Your Honor.

13         THE COURT:  Do you have any question in your mind

14   whether you could do that?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  All right.  Question 44 asks whether you

17   follow anyone on social media who regularly reports or comments

18   on the events of the 6th.  Can you tell us who you followed?

19         PROSPECTIVE JUROR:  Yeah.  Jordan Klepper.  He's a

20   comedian.  He works for the Daily Show.

21         THE COURT:  So a comedian.  And he regularly comments

22   on January 6th-related matters?

23         PROSPECTIVE JUROR:  Yes, Your Honor.

24         THE COURT:  Okay.  And let me ask, do you take his

25   commentary -- how do you take his commentary?  How do you

1   receive it?

2          PROSPECTIVE JUROR:  With humor.

3          THE COURT:  Just wanted to make sure.

4          All right.  If you would please turn to page 7.

5   Question 16 asks about employment with the federal government,

6   and you already told us that you are employed with the federal

7   government.

8          PROSPECTIVE JUROR:  Uh-huh.

9          THE COURT:  And so you clearly know people.  The

10  defendants in this case are charged with seditious conspiracy.

11  They are accused of conspiring to resist the authority of the

12  United States government by force.

13         The fact of your being an employee of the federal

14  government, how would that affect your ability to assess these

15  defendants and judge their guilt or innocence as to that

16  charge?

17         PROSPECTIVE JUROR:  I would hope it wouldn't.  The

18  standard is the standard.

19         THE COURT:  Okay.  And so if you were to conclude

20  that the Government had not met its burden of proof in this

21  case, would you have any difficulty voting to acquit?

22         PROSPECTIVE JUROR:  I should hope not, no.

23         THE COURT:  All right.  Question 20 asks about

24  rallies, protests, demonstrations in the last 5 years.  Can you

25  tell us about that.

686

1           PROSPECTIVE JUROR:  Question 20?

2           THE COURT:  Question 20.

3           PROSPECTIVE JUROR:  I'm sorry.  I thought you said

4    the date.

5           THE COURT:  I may have.

6           PROSPECTIVE JUROR:  Yes.  I think I have attended

7    some of the women's marches in D.C. in the last 5 years.

8           THE COURT:  And if you were to come to understand

9    that the defendants in this case were sort of staunch

10   supporters of the former president, how would that affect your

11   view of them?

12          PROSPECTIVE JUROR:  I would hope it wouldn't.

13          THE COURT:  I'm sorry.  Say that again.

14          PROSPECTIVE JUROR:  I would hope it wouldn't, Your

15   Honor.

16          THE COURT:  Do you have any, again, reason to wonder

17   or to question whether it might affect your thinking if you

18   were selected as a juror?

19          PROSPECTIVE JUROR:  Not right now, Your Honor.

20          THE COURT:  Okay.  Yeah.  We asked you in Question 21

21   whether you have ever been on the Capitol grounds or inside the

22   Capitol building.  Could you tell us about that.

23          PROSPECTIVE JUROR:  Uh-huh.  I think I have taken

24   more than one tour of the Capitol.  I have some friends who

25   work for representatives, senators.

1          THE COURT:  The friends that you just mentioned, were

2     they employees on Capitol Hill as of January 6th?

3          PROSPECTIVE JUROR:  I think one was, Your Honor.

4          THE COURT:  And was that person physically present

5     that day?

6          PROSPECTIVE JUROR:  Not that I understand, Your

7     Honor.

8          THE COURT:  And have you talked to that person about

9     his or her reaction to the events that day?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  You've told us that you work for the FTC.

12     You work for a law enforcement agency.  There will be testimony

13     from law enforcement officers, F.B.I. agents, and others.  Do

14     you think you would be able to assess the testimony of a law

15     enforcement officer in the same way that you would be asked to

16     do so for any other witness?

17          PROSPECTIVE JUROR:  I would hope so, Your Honor, yes.

18          THE COURT:  Do you think you would tend to give

19     greater credibility to someone who is in law enforcement just

20     because they are in law enforcement?

21          PROSPECTIVE JUROR:  Not just because they are in law

22     enforcement, no, Your Honor.

23          THE COURT:  And if, for example, there was evidence

24     that you thought contradicted -- if, for example, there was

25     evidence that you thought undermined or contradicted a law

1    enforcement officer's testimony, do you think you could find

2    that officer to not be credible?

3              PROSPECTIVE JUROR:  I believe so, yes.

4              THE COURT:  All right.  If you could, please, jump

5    forward to page 11.  Question 55 asked about lawyers and the

6    legal profession.  You are one.  In your close circle of

7    friends and family members, do you have -- is there anyone who

8    is either a prosecutor or a defense lawyer, criminal defense

9    lawyer?

10             PROSPECTIVE JUROR:  I have close -- I have a close

11   friend who is a public defender.

12             THE COURT:  Okay.

13             PROSPECTIVE JUROR:  Was a public defender?

14             THE COURT:  Is that here or somewhere else?

15             PROSPECTIVE JUROR:  It was in Oklahoma.  She now

16   works in D.C., not as a public defender.

17             THE COURT:  And does she still do criminal?

18             PROSPECTIVE JUROR:  She worked for the Second Look

19   Project.

20             THE COURT:  I'm sorry.  The Second --

21             PROSPECTIVE JUROR:  The Second Look Project.

22             THE COURT:  Okay.  56 asks about close friends,

23   family members in law enforcement.  And I'm excluding you from

24   this.  Anybody else that you would include in that answer?

25             PROSPECTIVE JUROR:  Yes.  My father-in-law used to

689

```
1    work for the Treasury Department.  He's also an attorney.

2              THE COURT:  And did he do any enforcement work?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Question 59 asks about close friends or

5    family members who have been victims of a crime or -- victims

6    of a crime, whether it was reported or not.

7              PROSPECTIVE JUROR:  Uh-huh.  That would be my wife

8    and I.

9              THE COURT:  Okay.  Can you tell us what happened?

10             PROSPECTIVE JUROR:  Theft.  Theft from our car parked

11   in the street.

12             THE COURT:  Did you report that to the Metropolitan

13   Police Department?

14             PROSPECTIVE JUROR:  We did not.

15             THE COURT:  Okay.  Anything about that experience

16   that would cause you to think you couldn't be fair and

17   impartial here?

18             PROSPECTIVE JUROR:  I would hope not, sir.

19             THE COURT:  Thank you, sir.

20             Any follow-up, Mr. Edwards?

21             MR. EDWARDS:  No follow-up, Your Honor.

22             THE COURT:  Anything from the defense?

23             MS. HALIM:  No, Your Honor.

24             THE COURT:  All right.  Sir, thank you very much.

25             MR. PEED:  I have something.
```

690

1          THE COURT:  I'm sorry.  Mr. Peed.

2          MR. PEED:  Good afternoon, sir.  You are likely to

3    hear evidence that a number of the defendants believe the

4    election was stolen and were at the protest that day.  Do you

5    think you would be able to presume them to be innocent of the

6    charges as you come into court and sat on the jury just knowing

7    that?

8          PROSPECTIVE JUROR:  I would hope so.

9          MR. PEED:  Do you have any reservations or

10   hesitations?

11         PROSPECTIVE JUROR:  I mean, I guess I disagree that

12   the election was stolen, but I don't think that's an element of

13   the charge.  I don't know.  But I would hope not.

14         MR. PEED:  Thank you.

15         THE COURT:  All right, sir.  Thank you very much.

16   Mr. Douyon will show you out of the courtroom and provide you

17   with additional instructions.

18         PROSPECTIVE JUROR:  Thank you.

19      [Prospective juror exits.]

20         MR. EDWARDS:  Your Honor, I don't know.  I think we

21   are at 38, unless I miscounted, and I remember that being a

22   number you had mentioned.  But I know that you reserved ruling

23   on whether or not there would be any additional strikes from

24   the defense.

25         THE COURT:  So we are at -- I had us at 37 because of

the travel.

MR. EDWARDS: Oh.

THE COURT: So I am one behind you are.

MR. EDWARDS: Right.

THE COURT: I should have said this in the morning. I'm not going to grant the request for additional strikes. Had had it been requested before we began this process, I think it would have been appropriate, but now that we have entered this process -- the request was made after Day 2. I don't think it's appropriate to grant additional strikes once a party has had an opportunity to look at the pool. And so I'll deny that request.

I would like to get above 40. And the reason is, as you'll remember last time, I think we qualified five extra and four people didn't show up by the time we were doing the strikes. So we are at 37 now. I would like to get us to 40, 42. I think we should be able to get there by the end of the day.

We have one more juror from the morning group. We'll take care of that individual, and then we'll bring the other group in and go from there.

MR. EDWARDS: Thank you.

THE CLERK: Juror No. 0914. Have a seat right here and speak into the microphone. Thank you.

THE COURT: Hi, how are you?

1          PROSPECTIVE JUROR:  Hi.  I'm good.  How are you?

2          THE COURT:  Good.  You are Juror 0914?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Feel free to remove your mask, if you are

5     comfortable doing so.

6          Your juror questionnaire should be there in front of

7     you.  I'll ask you to please open it up to page 11.  We asked

8     you in those questions -- so starting at Question 48 about your

9     feelings and opinions about the events of January 6th as well

10    as your feelings and opinions about the Oath Keepers as well as

11    feelings and opinions about people who are actually charged in

12    this case.

13         And you have indicated to us you have strong opinions

14    that would affect your ability to be fair and impartial as a

15    juror.  Can you explain that to us?

16         PROSPECTIVE JUROR:  Sure.  I think seeing what

17    happened on that day, I don't think I could be not biased.  I,

18    you know, I lived here.  I watched it.  I haven't been

19    following all the cases and the Congressional hearings and,

20    specifically, for the Oath Keepers question.  I think they are

21    a white nationalist, dangerous organization.  So I don't think

22    I would be able to keep that information out while I'm, you

23    know, reviewing the facts.

24         THE COURT:  Is there any prospect -- do you think

25    that -- if you were instructed to set that aside, do you think

```
 1   you could and judge these defendants fairly and impartially?
 2            PROSPECTIVE JUROR:  I don't think I could just
 3   because being a not-white person in this country.  I don't know
 4   if I would be able to take my identity out of it.
 5            THE COURT:  Okay.  All right.  Well, we appreciate
 6   your thoughts and your candor.  Mr. Douyon will show you out of
 7   the courtroom and provide you with additional instructions.
 8            PROSPECTIVE JUROR:  Thank you.
 9       [Prospective juror exits.]
10            THE COURT:  All right.  So 0914 will be stricken.
11   And we'll see everybody in 15 minutes.  Thank you.
12       [Recess.]
13            THE COURT:  Everyone, you may have noticed, I think
14   it's the next person we are questioning, 2287, must have just
15   missed page 11 and didn't answer any of the questions on
16   page 11.  So we just had him fill it out, and J.C. is going to
17   make copies for everyone.
18            MR. SHIPLEY:  Could I raise one issue, please.  I
19   just asked Mr. Nestler, and I have had varying experiences in
20   different districts about running rap sheets on the juror pool.
21   I have never heard of it 11 years in California.  Nobody had
22   ever done it.  I tried 20 cases in California.  Never done it
23   one time and never suggested it should be done.  I go to
24   Hawaii, it gets done in every case.
25            THE COURT:  Okay.
```

1          MR. SHIPLEY:  Run through NCIS by the federal agency

2     on the case and rap sheets, but they have to be shared.  You've

3     got to give them to the defense.  The defense can't have less

4     information about picking jurors than the Government has.

5          I have raised this issue with Mr. Nestler.  He's

6     being relatively coy about whether they have or haven't and

7     disagrees with the idea that he needs to share it, if they

8     have.

9          So I don't know where we stand factually about what

10    they have or haven't done, but Mr. Nestler is suggesting he's

11    not willing to share it if they have it.  So we can take it

12    up -- we don't have to take it up now, while we have jurors

13    sitting outside.  Before we start striking jurors, I think, we

14    need to resolve that.

15         THE COURT:  Okay.

16         MR. NESTLER:  We disagree with Mr. Shipley as a

17    matter of fundamental due process that if the Government did

18    have run jurors' criminal histories that the Government is

19    obligated to show it to the defense.  I'm not saying we have

20    run them or will run them or will not run them.  We disagree

21    that if we do or if we have that we are required to share them

22    with the defense.

23         THE COURT:  Well, I would say the following:  You

24    would be required to share with me if you were to come to learn

25    that there's a juror here who is misrepresenting or not

1    disclosed that they have a particular criminal history that

2    would disqualify them.  So let me just ask, has the Government

3    learned of whether there's any such juror who would be

4    disqualified by virtue of a prior criminal history?

5              MR. NESTLER:  No.

6              MR. SHIPLEY:  I'll leave with that for now, but I

7    might have additional comments.

8              THE COURT:  Okay.  All right.  All right.  So just to

9    remind, I've got to run it back one more time.

10             MS. HALIM:  Last time, though.

11             THE COURT:  Let's hope.

12        [Off the record.]

13             THE COURT:  Okay.  Ladies and gentlemen, good

14   afternoon.  Welcome to the U.S. District Court for the District

15   of Columbia.  Hi.  My name is Judge Amit Mehta.  You are all

16   here today as prospective jurors in the case of United States

17   versus Roberto Minuta, Joseph Hackett, David Moerschel, and

18   Edward Vallejo.

19             Before we get started, I do want to extend to you my

20   gratitude for making yourselves available for jury service

21   today as well as coming in a couple weeks ago to fill out your

22   questionnaire.

23             As you know our system of justice -- in our system of

24   justice, juries and jurors play a critical role.  Indeed, it is

25   a fundamental feature of our democracy to have ordinary

```
1    citizens serve as decision-makers in our courts of law.  You
2    are, therefore, performing an important duty today.  So I want
3    to thank you in advance for your service.
4         Now, before we get started, I'm going to ask Mr. Peed
5    to stand.  You'll recall, with your jury questionnaire, there
6    were a list of individuals who we asked you to take a look at
7    and asked if you know any of those folks or recognize any
8    names.  So, Mr. Peed has a few additions to that list.  If you
9    recognize any of these people, please let us know when we bring
10   you in for individual questioning.
11        MR. PEED:  Stephen Brown, Trevor Osgood, Kelly
12   Carter, Phranq Tamburri.
13        THE COURT:  Again, if you recognize any of those,
14   please let us know.  I'll ask you-all also to stand and please
15   raise your right hand because we do have to have you sworn in.
16        [Duly sworn.]
17        THE CLERK:  Thank you.
18        THE COURT:  All right.  So, folks, for those of you
19   who have been through a jury selection process before, today
20   will be both familiar and a little different.  It will be
21   familiar in the sense -- excuse me.  It will be different in
22   the sense that usually when jurors are being considered for
23   service, we will start the process by asking you a series of
24   questions to assist us in determining whether you can be fair
25   and impartial.
```

1          In this case, however, we will not start with that

2   process because you came in two weeks ago and completed a juror

3   questionnaire that the parties proposed and I approved.  So

4   that part of the process is complete.

5          What will feel familiar and why you are here today is

6   to ask each of you additional questions based upon your

7   responses to the juror questionnaire.

8          The way that will work is as follows:  There are 15

9   of you here this afternoon.  After I have completed these

10  initial remarks and instructions, the courtroom deputy will

11  escort all of you back to the courtroom you were just in where

12  you will be reseated.  We will then call each of you back into

13  this courtroom one at a time for additional questions from me

14  and from the parties.

15         Now, the questions we will be asking you may touch on

16  matters that are personal to you.  Rest assured, it is not my

17  intention or desire nor is it the intention or desire of the

18  lawyers to invade your privacy or to embarrass you.  Our only

19  wish is to select the fairest, most impartial jury possible so

20  that the parties can be assured that the jurors selected will

21  not be biased or prejudge the case and will return a verdict

22  based only on the law and the evidence.

23         What will also feel familiar about this jury

24  selection process is that you will spend a little bit of time

25  waiting for the rest of the day.  I promise I will keep your

1    waiting time to a minimum, but some of you will be waiting a

2    little bit longer than others.

3         While you are waiting during jury selection, please

4    feel free, if you wish, to talk quietly amongst yourselves or

5    to read a book, magazine, or whatever you have brought with

6    you.  I know you have been waiting already, so thank you for

7    that.

8         The courtroom is Wi-Fi-enabled, so you should feel

9    free to use your phones or other mobile devices to read online

10   or surf the Internet.  I would ask, however, that you place all

11   of your devices in silent mode.

12        Now, this is very important.  While you may use your

13   mobile devices, you should not at any point during the jury

14   selection process -- and this will be true afterwards too if

15   you were selected -- communicate with anyone about this case or

16   do any online research about the case or the parties.  That

17   means no e-mailing, texting, tweeting, Snapchating a friend or

18   family member or your followers about this case or post on

19   Facebook or Instagram that you are a prospective juror in this

20   case.  Do not get online and start doing research about the

21   case or the parties or the lawyers.

22        We also ask you, as part of the questionnaire, to

23   avoid media coverage about this case, and that includes social

24   media.  And that instruction continues to apply is, perhaps,

25   even more important now that the jury selection process has

1    started.

2         You should avoid any newspaper, television, or radio

3    news, podcasts and, importantly, any social media about this

4    case or the events of January 6th.  That means avoiding not

5    only news stories from the Washington Post, for example, or on

6    TV news but also journalists or others who are tweeting about

7    this case or posting about it on social media sites.

8         It may be the case that there is some live tweeting

9    going on about this jury selection process.  So if you follow

10   journalists or others who cover or comment on the events of

11   January the 6th, I'm going to instruct you to avoid reading

12   their tweets or any other social media postings until you are

13   fully dismissed from jury service in this case.  I will also

14   ask you to turn off any push notifications that you may receive

15   on your mobile devices from any news organizations.

16        The reason for these restrictions is simple.  If you

17   are selected as a juror, you will be sworn to decide the case

18   based only on the evidence that is presented at trial and the

19   law to which you will be instructed.

20        You will strictly forbidden to consider anything you

21   might have read or heard about the case from news sources or

22   from social media or from other people.  If at any point during

23   the jury selection process, you happen to come across news or

24   commentary regarding the case, please immediately avert your

25   eyes or ears, and please alert the courtroom deputy so he can

700

1    advise me.

2            A juror who violates these restrictions jeopardizes

3    the jury selection process and possibly the trial itself, which

4    could require the entire process to start all over.

5            Also, during this jury selection process, if anybody

6    attempts to communicate with you about this case, please notify

7    the courtroom deputy or a court security officer immediately.

8            The lawyers here are under strict instructions not to

9    speak with any juror during the jury selection process.  So if

10   you happen to see them in the courthouse and they walk in the

11   other direction, they are not being rude.  They are simply

12   following my instructions.

13           I also have issued an order to members of the media

14   and the public not to approach any of you about the case.

15   Still, despite these instructions, if you are approached about

16   the case by anyone, please notify the courtroom deputy or a

17   court security officer.

18           One other feature of jury selection today will be

19   different.  In most criminal cases, we complete the jury

20   selection process in one day.  That usually means, unless you

21   are immediately excused, we ask you to remain in the courthouse

22   until near the end of the day when we select a final jury.

23           In this case, however, we are not likely to complete

24   the jury selection process today.  In fact, we will not

25   complete the jury selection process today.

1          So, after we have finished asking you additional

2    questions, you will be done for the day.  You will be given

3    instructions about further jury service in this case after your

4    individual questioning is completed.  Do not leave the

5    courthouse until you have received additional instructions by a

6    member of court staff.

7          If you are excused from further jury service, we will

8    tell you soon after your questioning is concluded.  If you are

9    excused, you will be relieved of the restrictions I discussed

10   earlier.  If you are not excused from service, however, and we

11   ask you to return, it is critically important that you follow

12   my earlier instructions; and, that is, do not communicate with

13   anyone about the case, do not read or listen to anything about

14   the case, and do no independent research about the case and do

15   not watch or read about any Congressional proceedings that may

16   be taking place.

17         Following these instructions is critical to ensuring

18   a process that will result in a fair and impartial jury to hear

19   the case.

20         Finally, as you can see, everyone in the courtroom is

21   wearing a mask except for me while I am speaking.  Masking is

22   optional in the public spaces in this courthouse; however, I

23   will be requiring masking during the trial.  The only exception

24   to that rule will be for lawyers who are speaking and witnesses

25   who are testifying.

1               You may be asking yourselves, well, why do we need to

2       mask?  There are two reasons for that.  The first is that none

3       of you are here voluntarily.  You are required to be here, so,

4       unlike going to the grocery store or restaurant or concert, you

5       do not have the choice to avoid this location or a person who

6       might choose not to wear a mask.

7               Second reason for masking is to avoid a COVID

8       outbreak that might disrupt this trial.  As you know, this

9       trial is scheduled to last for more than a month, possibly

10      six weeks or more.  If one or more people inside the courtroom,

11      including jurors, test positive for COVID, that could delay the

12      trial proceedings.  That is something that I would rather

13      avoid.  Masking, hopefully, will prevent any COVID-related

14      trial delays.

15              Okay.  So, with that, those are my preliminary

16      instructions.  Mr. Douyon will show you-all back to the other

17      courtroom, and we will begin the proceedings of individually

18      questioning you.

19              THE CLERK:  Thanks.

20              Your Honor, this is Juror No. 1184.

21              THE COURT:  Yes, sir.  How are you?

22              PROSPECTIVE JUROR:  Good.  And how are you?

23              THE COURT:  Good.  Thank you for being here today.

24      You are Juror No. 1184?

25              PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Feel free to remove your mask, if you

2     wish to do so.

3          All right.  So your juror questionnaire is there

4     before you.  I am going to ask you, first, to turn to page 11

5     of that questionnaire.

6          PROSPECTIVE JUROR:  Uh-huh.

7          THE COURT:  I'll ask you to focus on Questions 49 and

8     51.

9          PROSPECTIVE JUROR:  Uh-huh.

10         THE COURT:  We asked you whether you had read, seen,

11     or heard anything about the Oath Keepers organization as well

12     as individuals by the name of Stewart Rhodes, Kelly Meggs,

13     Jessica Watkins, Ken Harrelson, or Thomas Caldwell.  Can you

14     tell us what you have read, seen, or heard about the Oath

15     Keepers or those individuals?

16         PROSPECTIVE JUROR:  Just in the general news, in the

17     newspaper.  I'm an avid reader of newspapers.  So those names

18     sounded familiar as well as the organization.

19         THE COURT:  Okay.  And so, based upon your reading of

20     media, what do you understand -- or what have you learned about

21     the organization?

22         PROSPECTIVE JUROR:  I don't know much about the

23     individuals themselves, other than the familiarity with their

24     names.

25         THE COURT:  Okay.

1    PROSPECTIVE JUROR:  But I am aware of the

2    organization and their participation on January 6th.

3    THE COURT:  All right.  And, specifically, can you

4    tell us what your understanding is of their participation on

5    the 6th.

6    PROSPECTIVE JUROR:  It was my understanding that they

7    came to Washington to make sure the president stayed in power.

8    THE COURT:  Okay.  Anything more than that?  Do you

9    have an understanding of specifically what actions they

10   actually took toward what you understand to have been their

11   goal?

12   PROSPECTIVE JUROR:  Not really.  I have been kind of

13   avoiding reading about it lately.

14   THE COURT:  Would you -- having just read or

15   something you read in the media, would you be able to keep an

16   open mind or learn or be open to hearing others that might

17   contradict things that have been characterized in the media?

18   PROSPECTIVE JUROR:  Yes.

19   THE COURT:  Would you be able to set aside what you

20   have said to us and evaluate the evidence fairly and

21   impartially as to these defendants?

22   PROSPECTIVE JUROR:  Yes.

23   THE COURT:  In addition, let me ask you in terms of

24   the organization, have you developed any opinions or

25   understandings about what the organization stands for, its

1  ideology, mission, purpose, that kind of thing?

2          PROSPECTIVE JUROR:  From what I understand and what

3  I've read, I don't agree with it.

4          THE COURT:  Can you tell us what you think it is or

5  what it is?

6          PROSPECTIVE JUROR:  Well, I think it was a concerted

7  effort, a group that tried to keep Trump in power no matter

8  what cost.

9          THE COURT:  And, again, would you be able to sort of

10  set aside what you think the organization's purpose was?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  But actually focus on the evidence and

13  determine whether, in fact, that turns out to be true or not?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  All right.  Any doubt in your mind that

16  you would be able to do that?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Okay.  Since you have completed this

19  questionnaire, have you learned any additional information

20  about the Oath Keepers or Stewart Rhodes or Kelly Meggs or any

21  of the other people listed in line 51?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  All right.  If you would, please, just

24  above there on line 46, we asked you about the extent to which

25  you have followed the January 6 committee.  Can you give us a

1    sense of how closely you have followed those proceedings?

2                PROSPECTIVE JUROR:  I would listen to it during my

3    lunch hour.  I kind of live and work in the same place.  So I

4    would listen to the testimonies during my lunch hour.

5                THE COURT:  Do you recall there being any testimony,

6    discussion, or commentary about Oath Keepers during the

7    hearings that you watched?

8                PROSPECTIVE JUROR:  Yes.

9                THE COURT:  What do you remember from that?

10                PROSPECTIVE JUROR:  I don't really remember it

11    specifically, but I know there was discussions.

12                THE COURT:  Okay.  But anything particular about what

13    those discussions entailed?

14                PROSPECTIVE JUROR:  Not that I remember.

15                THE COURT:  To the extent that you have learned

16    things about the events of the 6th from the committee and what

17    you have watched, can you set that to the side and, again,

18    evaluate the evidence fairly and impartially against these

19    defendants?

20                PROSPECTIVE JUROR:  Yes.

21                THE COURT:  Same question with respect to the media.

22    You have described yourself as somebody, you know, who consumes

23    media, a lot of media; and you indicated that you have seen a

24    lot of news coverage about the events of the 6th.  You know, we

25    ask jurors to come in here and put to the side what they have

1  read and promise to only focus on the evidence.  Do you think

2  that is something you could do?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Do you think -- is there any doubt in

5  your mind that you could put aside the stories you have read,

6  the videos you have watched, the people you may have heard

7  opine on the day and only focus on the evidence?

8              PROSPECTIVE JUROR:  Yeah.

9              THE COURT:  Any question in your mind about your

10  ability to do that?

11              PROSPECTIVE JUROR:  No.

12              THE COURT:  If you would please turn to page 7.

13              PROSPECTIVE JUROR:  Uh-huh.

14              THE COURT:  Line 21 asks, have you ever been on the

15  Capitol grounds or inside the Capitol building, and you have

16  answered that question "yes."  Can you tell us about that?

17              PROSPECTIVE JUROR:  Yes.  I had a board member from

18  my old nonprofit that was the -- worked for the architect of

19  the Capitol.  So he would give us behind-the-scenes tours of

20  the grounds and of the building.

21              THE COURT:  Are you still friends with the person who

22  is the architect of the Capitol or the board member?

23              PROSPECTIVE JUROR:  No, Your Honor.

24              THE COURT:  And you have also indicated that you,

25  close friend, or family member was living on The Hill on

```
1   January 6th.

2              PROSPECTIVE JUROR:  Yeah.  We lived at 15th and H

3   Street Southeast.

4              THE COURT:  So at the time you lived on Capitol Hill

5   and near the Capitol on January 6th?

6              PROSPECTIVE JUROR:  Uh-huh.

7              THE COURT:  Can you describe what you experienced

8   that day?

9              PROSPECTIVE JUROR:  I was then running the

10  Congressional Cemetery that's on 18th Street and E, and we

11  were aware of what was happening.  So, out of caution, I closed

12  the office and sent my six employees home.

13             THE COURT:  Okay.

14             PROSPECTIVE JUROR:  So that they can get out of The

15  Hill.  And me and myself went to my house, which was just

16  around the corner, around the block.

17             THE COURT:  Did you observe any people who might have

18  been participants in the events, either at work or in your

19  neighborhood?

20             PROSPECTIVE JUROR:  We did not at the time, no.

21             THE COURT:  And what about after?

22             PROSPECTIVE JUROR:  We were, unfortunately, located

23  next to the D.C. jail and the Cemetery, so there would be

24  protesters out in front of the jail.  So I don't know if they

25  were involved, but there was protests.
```

1          THE COURT:  So you have seen protesters about people

2     that have been incarcerated as a result of the prosecutions?

3          PROSPECTIVE JUROR:  Correct.

4          THE COURT:  Have you formed any opinions about those

5     protesters and what they are protesting about?

6          PROSPECTIVE JUROR:  No.  Other than the fact that it

7     was kind of annoying.  It was loud, and we have events in the

8     cemetery and it's disruptive of our work.

9          THE COURT:  Okay.  Have you formed any impressions

10    about people who may sympathize with those who may have been

11    charged with offenses arising out of January 6th?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Question 26, we asked you about prior

14    jury service.  You have sat on a number of juries before,

15    including as a foreperson.

16         PROSPECTIVE JUROR:  Uh-huh.

17         THE COURT:  Do you think you would have any

18    difficulty setting aside what you have learned previously in

19    following my instructions?

20         PROSPECTIVE JUROR:  [Shakes head left to right.]

21    Yeah, it was a while ago.

22         THE COURT:  All right.  Mr. Edwards, any follow-up?

23         MR. EDWARDS:  No questions, Your Honor.  Thank you.

24         THE COURT:  Defense counsel?

25         MR. SHIPLEY:  Sir, you described, based upon the news

1  that you have consumed, what you believe the Oath Keepers'

2  existence or mission is.  Do you think the Oath Keepers --

3  which was to keep Former-President Trump in power.  Do you

4  believe the Oath Keepers were formed right around the time of

5  the 2020 election for that purpose?

6            PROSPECTIVE JUROR:  I don't think so.  I think it

7  might have been a little bit earlier than that.

8            MR. SHIPLEY:  So you think they were in existence

9  before that.  They may have had a different purpose before

10  that, but at least as to the election that's your belief?

11            PROSPECTIVE JUROR:  Right.

12            MR. SHIPLEY:  That's based simply on the news?

13            PROSPECTIVE JUROR:  Correct.

14            MR. SHIPLEY:  So, as you sit here today, would you

15  say your mind would be open to hearing other information about

16  what they existed for historically and maybe even with respect

17  to the events of January 6?

18            PROSPECTIVE JUROR:  Uh-huh.  Yes.

19            MR. SHIPLEY:  You could be persuaded?

20            PROSPECTIVE JUROR:  Persuaded?

21            MR. SHIPLEY:  You could be persuaded by other

22  evidence?

23            PROSPECTIVE JUROR:  Yeah.

24            MR. SHIPLEY:  Okay.  You have indicated that you

25  listened to the January 6th committee proceedings, I think

1    you said, while at work?

2              PROSPECTIVE JUROR:  Uh-huh.

3              MR. SHIPLEY:  On the radio, I presume, or maybe the

4    TV in the background?

5              PROSPECTIVE JUROR:  Television, uh-huh.

6              MR. SHIPLEY:  What did you think about the nature of

7    their findings and their conclusions?

8              PROSPECTIVE JUROR:  I thought it was both presented

9    well and I think it was structured and not sensational.

10             MR. SHIPLEY:  Do you think it was balanced?

11             PROSPECTIVE JUROR:  Not necessarily.

12             MR. SHIPLEY:  In what respect?

13             PROSPECTIVE JUROR:  Well, they were focused on what

14   they were focusing on, which was the activities of that day.

15             MR. SHIPLEY:  There was a narrative that they were

16   following that -- looking for consistent information and not

17   necessarily considering alternative views.

18             PROSPECTIVE JUROR:  Yes.  Kind of connecting the

19   dots.  Uh-huh.

20             MR. SHIPLEY:  Thank you.

21             THE COURT:  All right.  Sir, thank you.

22             Mr. Peed.

23             MR. PEED:  Just a quick question.  You clearly have a

24   lot of information.  You are a pretty well-informed person.

25   This is going to be a fairly long trial.  By the end of it, how

1   would you go about, in your own mind, trying to distinguish

2   what you may have heard earlier in the trial -- and you have a

3   long holiday break -- from what you heard out of the trial?

4   How would you do that in your mind to set aside the information

5   that's inside of you?

6           PROSPECTIVE JUROR:  I would trust that the

7   proceedings in the court were truthful and detailed.

8           MR. PEED:  Do you think you'll be able to, in your

9   own mind, know where you heard information?

10          PROSPECTIVE JUROR:  Yeah.

11          MR. PEED:  Okay.  Thanks.

12          THE COURT:  All right.  Sir.  Thank you very much.

13  Mr. Douyon will escort you out of the courtroom and provide you

14  with additional instructions.

15          PROSPECTIVE JUROR:  Okay.  Great.  Thank you.

16          THE CLERK:  Follow me.

17      [Prospective juror exits.]

18          THE COURT:  Could you ask the juror to step out for a

19  moment.

20          Let me just confirm.  This is the juror who seems to

21  have just skipped over page 11, probably inadvertently.  Has

22  everybody received it?  We asked him to complete that page.

23  Did everybody receive a copy of it?

24          MR. EDWARDS:  Yes, Your Honor.

25          MR. SHIPLEY:  Yes.

1        THE COURT:  Perfect.

2        THE CLERK:  Juror No. 2287.  Have a seat right here

3   and speak into the mic.

4        PROSPECTIVE JUROR:  Yes, sir.

5        THE COURT:  Yes, sir.  How are you?

6        PROSPECTIVE JUROR:  Very good.

7        THE COURT:  You are Juror 2287?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  All right.  You can remove your mask, if

10  you are comfortable doing so.

11       Your juror questionnaires should be there in front of

12  you, including the page that you just completed.  Let me just

13  ask you, when you completed the questionnaire, I noticed, as we

14  were going through this, there were no answers to page 11.

15       PROSPECTIVE JUROR:  Yeah.  I missed one.

16       THE COURT:  I'm sorry.

17       PROSPECTIVE JUROR:  Yes, I missed one.

18       THE COURT:  Okay.  Was that just a mistake?

19       PROSPECTIVE JUROR:  I guess, yeah.

20       THE COURT:  All right.  Now that you have completed

21  page 11, I'll ask you to take a look at it.  It should be there

22  in front of you.  Focus on Questions 49 and 51, and we asked

23  you whether you had read, seen, or heard anything about the

24  Oath Keepers organization or about the individuals who are

25  listed in line 51, and you answered "no" as to both questions.

```
 1               PROSPECTIVE JUROR:  Yes.

 2               THE COURT:  I'm sorry?

 3               PROSPECTIVE JUROR:  Yes.

 4               THE COURT:  All right.  So is it accurate that you

 5    have never even heard of an organization called Oath Keepers,

 6    have no idea what they are, what they stand for, or what they

 7    have done?

 8               PROSPECTIVE JUROR:  I have heard of them.  I have no

 9    idea what they stand for.

10               THE COURT:  To the extent you have heard of them, in

11    what context have you heard of them?

12               PROSPECTIVE JUROR:  In news headlines.

13               THE COURT:  Okay.  And can you just share with us

14    what those news headlines were that you can recall?

15               PROSPECTIVE JUROR:  About January 6$^{th}$.  So,

16    usually, outrage about whatever and stuff, and I kind of blank

17    out and move on to something more productive.

18               THE COURT:  Okay.  When you say "outrage," in the

19    headline or your reaction?

20               PROSPECTIVE JUROR:  The headline.  Trying to grab

21    headlines and clickbait.

22               THE COURT:  Okay.  And, specifically, I just want to

23    make sure I understand your full understanding and interest.

24    Do you recall what those headlines said, what they contained?

25               PROSPECTIVE JUROR:  About insurrection and how that's
```

1    bad and how we should be outraged about that and however many

2    people were killed and this is all a horrible thing.

3              THE COURT:  Do you associate those headlines with

4    January 6 or with the Oath Keepers specifically?

5              PROSPECTIVE JUROR:  January 6th.

6              THE COURT:  Okay.  But, again, with respect to the

7    Oath Keepers, do you recall anything in their headlines or what

8    you have read about them specifically?

9              PROSPECTIVE JUROR:  Again, I know they are an

10   organization.  I don't know anything about them.

11             THE COURT:  Okay.  Perfect.  Let me ask you this to

12   see if you -- and maybe I'm reading into your body language a

13   little bit, but you have described the headlines as sort of

14   sensationalistic clickbait.  Can you describe for us what your

15   reaction has been to the news you have seen about the events of

16   January 6th?

17             PROSPECTIVE JUROR:  Broadly speaking, here in D.C.,

18   everything seems overly polarized.  You go out of the DCM area,

19   things are a lot more normal; but, here in D.C., everyone feels

20   like they need to take sides, which, to me, is overblown and

21   slightly ridiculous.

22             THE COURT:  Okay.  You feel that way about the news

23   coverage of January 6th; is that right?

24             PROSPECTIVE JUROR:  That too, yes.

25             THE COURT:  I have to ask.  This is my job.  You said

1    that there's a need to take sides in D.C.  As a juror, you

2    would need to take sides.  You would be asked to make a

3    decision based on the evidence that's presented.  Do you think

4    you would have any difficulty doing that?

5           PROSPECTIVE JUROR:  I don't think so.  I mean, I'm

6    kind of rules-oriented.  So tell me the parameters, and I'll

7    decide what box it needs to go into and stuff.

8           THE COURT:  Okay.  So if I were to say to you that

9    your job as a juror is to evaluate the evidence that's

10   presented in this case, be fair and impartial to these

11   defendants, that's something you could do?

12          PROSPECTIVE JUROR:  Yeah.

13          THE COURT:  And if you were told that these

14   defendants are presumed innocent, even as they sit here today,

15   you could follow that instruction?

16          PROSPECTIVE JUROR:  For the trial, yes, sir, they are

17   presumed innocent.

18          THE COURT:  And if you were convinced that the

19   Government had not met its burden of proof beyond a reasonable

20   doubt, would you have any difficulty voting to acquit?

21          PROSPECTIVE JUROR:  If that's the way that things go.

22          THE COURT:  Okay.  You have indicated that you follow

23   someone -- this is Question 44, that you follow somebody on a

24   social media platform or follow an entity on a social media

25   platform that regularly comments on the events of January 6.

1   Can you tell us who you follow?

2            PROSPECTIVE JUROR:  I was probably thinking of one of

3   my friends from New Jersey.  We moved from New Jersey to D.C.

4   about 7 years ago.  He was at my church.  He's on the right

5   side of politics.  I'm to the left.  And he posts a lot of

6   memes.

7            THE COURT:  He posts a lot of memes about January 6?

8            PROSPECTIVE JUROR:  And other things, yes.  Well, not

9   necessarily January 6th but lots of right-wing memes.

10           THE COURT:  Gotcha.  And how have you taken his

11  posting of right-wing memes?  What affect, if any, has it had

12  on you?

13           PROSPECTIVE JUROR:  I usually don't comment.  But he

14  also posts dogs and his kids.

15           THE COURT:  All right.  If I could, please, ask you

16  to turn to page 7 of your juror questionnaire.  Question 16 --

17  Question 16 asks you whether you, a close friend, or family

18  member has before been employed by the federal government.

19           PROSPECTIVE JUROR:  I work for the Federal Reserve

20  Board.

21           THE COURT:  Okay.  And let me ask, are you a member

22  of the board, or do you work for the board?

23           PROSPECTIVE JUROR:  I work for the board.  I'm a

24  manager in a division called supervision and regulation.

25           THE COURT:  Is your position a politically appointed

1  one?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  All right.  So one of the charges against

4  the defendants in this case is seditious conspiracy.  They are

5  charged with conspiring to resist the authority of the United

6  States government by force.  The fact that you are an employee

7  of the U.S. Government, how would that affect your evaluation

8  of the evidence and these defendants, if at all?

9          PROSPECTIVE JUROR:  It's irrelevant to my job.

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR:  Yeah.

12          THE COURT:  Well, when you say irrelevant to your

13  job, clearly it's not relevant to your particular work.  Do you

14  think your employment would be relevant to your consideration

15  of the evidence?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Question 20 asks you about you or your

18  close friend or family members who participated in rallies,

19  protests, or demonstrations in the last 5 years.

20          PROSPECTIVE JUROR:  I have a daughter.  She works for

21  a nonprofit here in D.C.  She's all about women's rights and, I

22  guess, womens, sort of, oriented rights and civil rights.

23          THE COURT:  And it may be the case that these

24  defendants have political views different than your daughter's

25  and members of your family and, perhaps, even you.  Would that

1  affect your ability to sit fairly and impartially and judge

2  these defendants?

3          PROSPECTIVE JUROR:  Oh, no.

4          THE COURT:  Question 21 asks about whether you have

5  been on the Capitol grounds or inside the Capitol building

6  previously, and you answered "yes."  Can you tell us --

7          PROSPECTIVE JUROR:  Yes.  I toured the Capitol.  That

8  was years ago.

9          THE COURT:  Okay.  You have told us about your prior

10  jury service, and that was a civil case.  Just to make sure you

11  understand this, but this is a criminal case.  In a civil case,

12  the standard of proof is a preponderance of the evidence.  In a

13  criminal case, it is beyond a reasonable doubt, which is a

14  higher standard of proof.  Do you understand that?

15          PROSPECTIVE JUROR:  Yeah.

16          THE COURT:  I would ask you, please, just to turn to

17  page 12 and Question 59.  In that question, we asked you

18  whether you or a close friend or family member has ever been

19  the victim of a crime.

20          PROSPECTIVE JUROR:  Yeah.  Okay.  Yeah.  When I was

21  in college, our apartment was broken into, and a bunch of

22  things were taken and randomly destroyed.

23          THE COURT:  Okay.  Anything about that experience

24  that would cause you to think that you couldn't be fair to the

25  defendants or the Government in this case?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  All right.  Any follow-up, Mr. Edwards?

3          MR. EDWARDS:  Good afternoon.

4          PROSPECTIVE JUROR:  Hey.

5          MR. EDWARDS:  Sorry.  Going back to some of your

6   answers towards some of the headlines that have floated around

7   about January 6th and about D.C. in general.  If you were to

8   review the evidence in the case and the evidence -- and you

9   started to realize that, you know, whatever headline was in

10  your mind when you had that opinion, if the evidence starts to

11  align with a headline in particular, do you think that, while

12  sitting in the jury box, you could set aside your feelings

13  towards those news headlines and consider the evidence as it

14  comes to you?

15         PROSPECTIVE JUROR:  Yes.  Headlines are designed to

16  attract clicks, and the stories are commonly -- go in a

17  different direction.

18         MR. EDWARDS:  Similarly, if you are in jury

19  deliberations at the end of the case, do you think you would be

20  able to set aside those feelings and engage with jurors even if

21  the jurors' view of the case aligns with the headlines or your

22  understanding or opinion of D.C. in general that you described

23  earlier?

24         PROSPECTIVE JUROR:  I know everyone is going to have

25  their opinions.  So, of course, opinions are going to differ.

721

```
1    Yeah.  I'm sorry.  Was that the question?
2              MR. EDWARDS:  Yes.  Thank you so much.
3              THE COURT:  Anything from defense counsel?
4              MS. HALIM:  No.
5              THE COURT:  All right.  Sir, thank you very much for
6    your time.  Mr. Douyon will escort you out of the courtroom and
7    provide you with additional instructions.
8              PROSPECTIVE JUROR:  Thank you.
9         [Prospective juror exits.]
10             THE CLERK:  Juror No. 1092.
11             PROSPECTIVE JUROR:  Up here?
12             THE COURT:  Yes.  Come on up, ma'am.  Have a seat.
13             PROSPECTIVE JUROR:  Good morning.
14             THE COURT:  Good afternoon, I should say.
15             PROSPECTIVE JUROR:  I'm still waking up.
16             THE COURT:  Long day already.  You are Juror 1092?
17             PROSPECTIVE JUROR:  Yes.
18             THE COURT:  All right.  Thank you for being here with
19   us this afternoon.  Feel free to take your mask off, if you
20   would like to do so.
21             Your juror questionnaire is in front of you.
22   Question 1, we asked you -- it's on page 5 about whether
23   serving on such a long trial would present a hardship.  You
24   said, yes, you are the sole provider, and if you don't work you
25   don't get paid; "my health issues have taken all of my leave."
```

1    Can you explain what you mean by that?

2              PROSPECTIVE JUROR:  I have asthma really bad, so if I

3    had an attack, that takes away from my time at work.  And most

4    of my issues and time away from work is because I have been

5    ill.  So I don't have anymore paid leave now.

6              THE COURT:  I see.

7              PROSPECTIVE JUROR:  Just on the first day today and

8    one more day for jury duty that will be the end of that.

9              THE COURT:  So if you were to serve here for six to

10   eight weeks --

11             PROSPECTIVE JUROR:  I would be living in tent city.

12             THE COURT:  Okay.  Fair enough.  We certainly don't

13   want that to happen.  All right.  Well, thank you very much for

14   your time, and we appreciate it.

15             PROSPECTIVE JUROR:  That's it.

16             THE COURT:  That's it.

17             PROSPECTIVE JUROR:  All right.  Thank you:

18        [Prospective juror exits.]

19             THE CLERK:  Juror No. 1623.  Please have a seat here.

20             PROSPECTIVE JUROR:  Sure.

21             THE COURT:  Hi, sir.  How are you?

22             PROSPECTIVE JUROR:  I'm doing well, Your Honor.

23             THE COURT:  Thank you for being with us this

24   afternoon.  You are Juror 1623?

25             PROSPECTIVE JUROR:  That is correct.

1          THE COURT:  Feel free to remove your mask, if you

2    elect to do so.

3          PROSPECTIVE JUROR:  Okay.

4          THE COURT:  Your juror questionnaire is there in

5    front of you.  If you will, please, first turn to page 11.  At

6    the top of page 11, we asked you, in Question 45, whether you

7    or a close friend or family member is employed or associated

8    with the January 6 committee.  You answered "yes."  Can you

9    tell us about that?

10         PROSPECTIVE JUROR:  Representative Raskin was my

11   constitutional law professor.  So I know him from school, you

12   know, when he was a professor at American University.

13         THE COURT:  Gotcha.  You maintained a personal

14   relationship with him since?

15         PROSPECTIVE JUROR:  No.  I did write him a condolence

16   card when his son took his life the other year.

17         THE COURT:  Okay.  Other than Congressman Raskin, any

18   other connections to individuals that were either on the

19   committee or worked for the committee?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  While we are on the subject of committee,

22   you indicated that you have watched, listened to, heard or read

23   about the committee hearings.  Can you give us a sense of how

24   close you have followed those?

25         PROSPECTIVE JUROR:  Not very close.  Just, once

1  again, watching the news in the morning or the evening.

2         THE COURT:  Okay.  Have you watched any of them, the

3  actual hearings themselves?

4         PROSPECTIVE JUROR:  I have not watched the actual

5  hearings or read any transcripts or anything.

6         THE COURT:  Okay.  During the course of what you read

7  about the hearings, do you recall having seen anything about

8  the Oath Keepers organization in connection with the January 6

9  committee?

10        PROSPECTIVE JUROR:  No.  I mean, I do know about the

11  Oath Keepers, but I didn't know specifically their involvement

12  on January 6.

13        THE COURT:  So let's talk, then, about what your

14  understanding is of the organization, and you also said that

15  you have read, seen, or heard something about Stewart Rhodes

16  and Kelly Meggs and some other people who are listed there on

17  line 51.

18        So can you tell us what you have read, seen, or heard

19  about the organization and those individuals?

20        PROSPECTIVE JUROR:  Just that -- during the news

21  reports, they did mention, you know -- I do recognize Stewart

22  Rhodes's name, yeah.  And I think that was the only person that

23  I kind of recognized the name from just the reports or

24  whatever.

25        THE COURT:  And what did you -- what have you taken

1    away from the reports about the Oath Keepers?

2            PROSPECTIVE JUROR:  Just that they were involved in,

3    you know, going to the Capitol on January 6th and that, you

4    know, they are strong supporters of former President Trump.

5            THE COURT:  Any sense of -- any details or

6    particulars about what you think you understand that they may

7    have done?

8            PROSPECTIVE JUROR:  No.  I mean, like I said, I have

9    just seen the general, you know, footage of January 6th and

10   then just the general reports.

11           THE COURT:  Okay.  And, when you say "the footage,"

12   are you speaking generally about footage of the events that day

13   or do you have -- do you recall having seen specific footage

14   about the Oath Keepers themselves?

15           PROSPECTIVE JUROR:  No.  Just the general, like,

16   B-roll footage from the news reports, you know, of, like, the

17   incident.

18           THE COURT:  Gotcha.  You mentioned that you

19   understand the group to have been supporters of President

20   Trump.  Do you have any further understanding or beliefs about

21   what the organization's mission, purpose, objectives are?

22           PROSPECTIVE JUROR:  No.  I don't -- I have not

23   followed it closely enough.  Like I said, I recognized the

24   name.  I recognized Mr. Rhodes's name just from, like I said,

25   the general reports; but I have not done any research into the

1   organization or how it's organized or any of the structure or

2   anything like that.

3         THE COURT:  Okay.  You answered these questions a few

4   weeks ago.  Since then, have you come to learn of anything more

5   about the organization or about any of the individuals who are

6   listed on line 51?

7         PROSPECTIVE JUROR:  No.  As requested, I have avoided

8   news of the incident and have not followed anything and have

9   generally walked out of the room or whatever if stuff came on.

10        THE COURT:  So to the extent that you have been

11  exposed to some media coverage about the organization and

12  Mr. Rhodes -- and I will tell you that these defendants are

13  accused of conspiring with Mr. Rhodes, among others.  Could you

14  set that to the side and view the evidence in this case against

15  these defendants fairly and impartially?

16        PROSPECTIVE JUROR:  Yes, I could.

17        THE COURT:  All right.  We already talked a little

18  bit about your media consumption.  I don't think we need to

19  discuss that much more.  I'll ask you to turn to page 7,

20  please.

21        PROSPECTIVE JUROR:  7?

22        THE COURT:  Yes.

23        PROSPECTIVE JUROR:  Okay.

24        THE COURT:  Question 16 asks whether you or a close

25  friend or family member has ever been employed by the federal

1    government.

2              PROSPECTIVE JUROR:  Yeah.  My ex-wife was an

3    epidemiologist at the National Cancer Institute, or NIH.

4              THE COURT:  Okay.

5              PROSPECTIVE JUROR:  And then I have acquaintances

6    that have worked on Capitol Hill, especially, you know, during

7    law school.  You know, people interned and stuff like that.

8              THE COURT:  Any of your friends, people you know, was

9    anybody employed on Capitol Hill as of January 6th?

10             PROSPECTIVE JUROR:  Yeah.  There's a friend of my

11   current girlfriend that I live with that works on Capitol Hill.

12   I can't remember who she works for, but I believe it's in one

13   of the senator's offices.

14             THE COURT:  Okay.

15             PROSPECTIVE JUROR:  But I don't know.  I don't think

16   she was there on the 6th or anything.

17             THE COURT:  Have you spoken to her about her views

18   and impressions, experiences with respect to the day?

19             PROSPECTIVE JUROR:  No, I have not.

20             THE COURT:  One of the charges in this case is a

21   charge for seditious conspiracy.  The defendants are accused of

22   conspiring to resist the authority of the U.S. government by

23   force.  Anything about that charge and/or the fact that your

24   ex-wife works for the federal government -- does that cause you

25   any concern about your ability to be fair and impartial?

1        PROSPECTIVE JUROR:  No, it does not.

2        THE COURT:  You indicated on line 18 -- Question 18

3  that you have close friends or family members who have served

4  in the armed forces.

5        PROSPECTIVE JUROR:  Yeah.  That's correct.

6        THE COURT:  Can you tell us about that?

7        PROSPECTIVE JUROR:  One of my high school friends is

8  an officer in the United States Navy.  And then the husband of

9  one of my current girlfriend's -- is a Navy Seal and is down in

10  the Hampton Roads area.

11        THE COURT:  Gotcha.  So, in 21 and 22, we asked you

12  about Capitol grounds, Capitol building, and friendship with

13  people who were living there on January 6th.  So do you have

14  a close friend or family member that was living on Capitol Hill

15  as of January 6th?

16        PROSPECTIVE JUROR:  I have a -- we have friends -- my

17  girlfriend's ex-roommate, they own an Airbnb property on

18  Capitol Hill.  They were not there.  I guess -- I don't know

19  what the definition of Capitol Hill is.  I live in the Navy

20  Yard area on the other side of the freeway, basically two

21  blocks from the baseball stadium.  So some people call that

22  Capitol Hill, but I consider it a different neighborhood.

23  But -- you know.

24        THE COURT:  Can you tell us what your experiences

25  were on the date of January 6th?  Were you home, and, if so,

1    what were your experiences that day?

2              PROSPECTIVE JUROR:  I was not home.  I was running

3    errands.  I was -- I was at, like, the Home Depot there up on

4    Rhode Island Avenue Northeast.  I believe I went to also my

5    storage unit up in the Petworth area.  So I was not in that

6    area.

7              I only knew about it when my girlfriend called me and

8    was like where are you because she was working from home at

9    that time.  So she was at the apartment and was like just

10   trying to figure out where I was because, you know, I said I

11   was going to go out and run some errands, and I don't think she

12   knew exactly what part of town I was in.

13             THE COURT:  Gotcha.  It sounds like she may have had

14   some concerns about your safety and welfare on that day?

15             PROSPECTIVE JUROR:  I think she just didn't know what

16   was going on.  I mean, since it was, like, an active thing that

17   I think she just was making sure that I wasn't -- you know,

18   because when you live close by, I would have to potentially

19   drive through that area.  I was not aware of anything going on

20   until she literally called me.

21             THE COURT:  Yes.  Question 20 we asked you whether

22   you, a close friend, or family member have participated in any

23   rallies, protests, demonstrations, or marches.

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Can you share with us what those were and

1    who may have been involved?

2           PROSPECTIVE JUROR:  Let's see.  I attended the

3    Women's March with my ex-wife.  I believe that was within the

4    five-year window.  I can't remember the exact date.  And I

5    think that was it.  And then, I mean, I guess I went to the --

6    went when the Capitals, when they won the Stanley Cup, the

7    celebration on the Mall.  So I don't know if that counts as a

8    rally or what, but it was exciting for me.

9           THE COURT:  That's a good reason to be out there.

10          So if you were to learn that the defendants in this

11   case -- well, the defendants in this case supported the former

12   president.  Do you think you would have any difficulty judging

13   them based upon their political views and political

14   affiliations?

15          PROSPECTIVE JUROR:  No, I do not.  I have friends

16   across the spectrum.

17          THE COURT:  All right.  Question 55 asks about people

18   in your orbit.  You are in the legal profession.  You said you

19   at least went to law school.  Do you currently practice?

20          PROSPECTIVE JUROR:  I am currently barred in New York

21   and the District of Columbia.  I am unemployed right now, so

22   I'm looking for a job.

23          THE COURT:  Okay.

24          PROSPECTIVE JUROR:  I've only ever done civil

25   litigation.

1          THE COURT:  Civil work?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Let me just ask you, in terms of jury

4   service if you were asked to serve over the next six to

5   eight weeks, would that present a hardship for you financially

6   or in terms of your job search?

7          PROSPECTIVE JUROR:  No, it should not.

8          THE COURT:  Do you know people in the legal

9   profession who do criminal work, either as prosecutors or

10  defense lawyers?

11         PROSPECTIVE JUROR:  I do not.

12         THE COURT:  Question 59, we asked you whether a close

13  friend or family member has been the victim of a crime or a

14  victim of a crime, and you answered that question "yes."

15         PROSPECTIVE JUROR:  Yeah.  I mean, I've had my car

16  broken into a couple of times, but, I mean, I wasn't present,

17  so I don't know.  I just was trying to be overly cautious about

18  answering.

19         THE COURT:  Did you report that to the Metropolitan

20  Police Department?

21         PROSPECTIVE JUROR:  I did not.  I just reported it to

22  Geico.  I mean, they just popped the tailgate on my truck.

23         THE COURT:  Gotcha.

24         PROSPECTIVE JUROR:  And there was nothing in there.

25         THE COURT:  Gotcha.  Any follow up, Mr. Edwards?

```
1              MR. EDWARDS:  Good afternoon.

2              PROSPECTIVE JUROR:  Good afternoon.

3              MR. EDWARDS:  It sounded like you had said you went

4   to American Law?

5              PROSPECTIVE JUROR:  Yes.

6              MR. EDWARDS:  Can you just describe briefly your work

7   experience afterward, kind of what you did after you graduated?

8              PROSPECTIVE JUROR:  During law school and after law

9   school, I worked for a law firm, Kellogg Huber Hansen Todd

10  Evans & Figel, down in the Fairgood area.  We did complex

11  federal litigation.  I mean, we did, like, patents, a lot of

12  the mortgage-backed securities cases, and stuff like that.

13             And I did work in the legal aid clinic during law

14  school.  So I did some that was -- that was mainly, like, state

15  stuff, helping some people like kind of come -- you know,

16  finalize the estate of a deceased parent.

17             MR. EDWARDS:  Thank you very much.

18             PROSPECTIVE JUROR:  Thank you.

19             THE COURT:  Any follow-up?

20             MR. SHIPLEY:  Your legal experience, does that

21  include trial court litigation?

22             PROSPECTIVE JUROR:  I was never in an actual

23  courtroom.  I just did, you know, the document review.  I did

24  briefs and stuff like that.

25             MR. SHIPLEY:  The fun stuff.
```

```
1              PROSPECTIVE JUROR:  All the fun stuff in the

2   windowless basement.  I was in a basement in Omaha in the

3   middle of winter digging through boxes.  Yes, very fun work.

4              MR. SHIPLEY:  The next question probably answers

5   itself.  You never had to deal with, like, jury instructions

6   and things like that?

7              PROSPECTIVE JUROR:  No.  Other than just, you know,

8   learning about it in law school and participated in the moot

9   court type of stuff, but that's it.

10             MR. SHIPLEY:  Thank you.

11             THE COURT:  Okay, sir.  Thank you.  Mr. Douyon will

12  show you out of the courtroom and provide you with some

13  additional instructions.

14             PROSPECTIVE JUROR:  I believe the earlier juror left

15  her book.

16             THE CLERK:  Oh, okay.  Let me get that to her.

17             PROSPECTIVE JUROR:  Do I take this?

18             THE CLERK:  No.  Leave that there.

19             PROSPECTIVE JUROR:  Thank you.

20        [Prospective juror exits.]

21             THE CLERK:  Juror No. 0207.

22             THE COURT:  Yes, sir.  Come on up here and have a

23  seat, please.

24             PROSPECTIVE JUROR:  Hello.

25             THE COURT:  How are you?
```

1          PROSPECTIVE JUROR:  Good.

2          THE COURT:  You are Juror 0207?

3          PROSPECTIVE JUROR:  That's me.

4          THE COURT:  Okay.  Feel free to remove your mask, if

5     you are comfortable doing so.

6          Your juror questionnaire is in front of you.  I'd ask

7     you first, please, to turn to page 11 and Question 49.  We

8     asked you in Question 49 whether you have read, seen, or heard

9     anything about the Oath Keepers organization.  You answered

10    that question "no."

11         So let me ask you just to confirm, do you know

12    anything about the organization or the organization known as

13    the Oath Keepers?

14         PROSPECTIVE JUROR:  Nope.

15         THE COURT:  Never heard of the term?

16         PROSPECTIVE JUROR:  Never heard of it.

17         THE COURT:  Does that remain true today?

18         PROSPECTIVE JUROR:  Yeah.

19         THE COURT:  Okay.  Question 51 asks about a group of

20    people -- Stewart Rhodes, Kelly Meggs, Jessica Watkins.  Have

21    you heard of any of those names?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  And when you completed this, you answered

24    "no."  Is that still true today?

25         PROSPECTIVE JUROR:  Yes.

1    THE COURT:  All right.  If you would please turn to

2    page 7.  We asked you on line 15, or Question 15, have you, a

3    close friend, or family member ever been employed at the U.S.

4    Capitol building.

5    PROSPECTIVE JUROR:  My aunt used to work at the

6    Capitol.

7    THE COURT:  Okay.

8    PROSPECTIVE JUROR:  She hasn't for a number of years.

9    And I went back and forth if we are close now, but I am very

10   close with her children.

11   THE COURT:  Gotcha.  Have you had any conversations

12   with her about the events of January 6?

13   PROSPECTIVE JUROR:  No.  She didn't work there at the

14   time.

15   THE COURT:  Gotcha.  Just while we are on the topic.

16   In Question 24, we asked you whether you had concern about the

17   safety of yourself, close friend, or family member on

18   January 6, and you answered "yes."

19   PROSPECTIVE JUROR:  Yes.  In the moment, I remember,

20   when I heard about it, running down to my girlfriend's

21   apartment to make sure she was okay.  I didn't know what would

22   transpire.  That's why I said that.

23   THE COURT:  When you ran down, what neighborhood were

24   you living in at the time?

25   PROSPECTIVE JUROR:  DuPont Circle.

1           THE COURT:  But, other than checking in on her, is

2    there any other concerns that were raised?

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  You have told us that you, close friend,

5    or family member has been employed by the federal government.

6    You mentioned your aunt.  Is there anyone else?

7           PROSPECTIVE JUROR:  It's just her.

8           THE COURT:  Just her.

9           Okay.  And then a close friend or family member in

10   the armed forces.

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  You said "yes."

13          PROSPECTIVE JUROR:  Oh, my grandfather was, but he's

14   dead.

15          THE COURT:  Okay.  And can you just tell us which

16   branch?

17          PROSPECTIVE JUROR:  He was in the Air Force.

18          THE COURT:  Question 21, we asked whether you have

19   been on Capitol grounds or inside the Capitol building.

20          PROSPECTIVE JUROR:  I think as a child I went in the

21   Capitol.

22          THE COURT:  Okay.

23          PROSPECTIVE JUROR:  But not since.

24          THE COURT:  Can you just tell us the extent to which

25   you have had media exposure about the events of January 6?

1          PROSPECTIVE JUROR:  Sure.  On January 6, I was

2   following the news pretty closely on Twitter; and, you know,

3   on -- I don't know -- flipping the news channels to see what

4   was going on in D.C.  Maybe the next day, like the follow-up

5   coverage, but, after that, I kind of stopped following it.

6          THE COURT:  Okay.

7          PROSPECTIVE JUROR:  So I don't have a lot of exposure

8   to it.

9          THE COURT:  And have you followed, paid attention to

10  the news articles or watched news about the prosecutions that

11  have followed from the events of that day?

12         PROSPECTIVE JUROR:  Not at all.

13         THE COURT:  Question 55 on page 11, we asked you

14  about whether you know anyone who is close to you in the legal

15  profession.

16         PROSPECTIVE JUROR:  My father is a lawyer.

17         THE COURT:  And does he practice?

18         PROSPECTIVE JUROR:  Yeah.  He's like in contract law,

19  like kind of like wills and that sort of stuff.

20         THE COURT:  Gotcha.  And if you'll  turn to the next

21  page, Question 59.  You were asked whether you or a close

22  friend or family member has ever been the victim of a crime.

23         PROSPECTIVE JUROR:  Sure.  Yeah.  I mean, my parents'

24  house was robbed, and we had a friend in high school who was

25  raped.

1          THE COURT:  Okay.  Do any of those things -- I'm

2    sorry to hear that.  Did any of them happen in Washington,

3    D.C.?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Anything about your friend or family's

6    experience that would cause you to think that you couldn't be a

7    fair and impartial juror?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Any follow-up, Mr. Edwards?

10         MR. EDWARDS:  No questions, Your Honor.  Thank you.

11         THE COURT:  Anything from the defense?

12         MS. HALIM:  No, Your Honor.

13         THE COURT:  All right.  Sir.  Thank you very much.

14    Mr. Douyon will show you out of the courtroom.

15      [Prospective juror exits.]

16         THE COURT:  All right.  So excluding the juror who

17    had travel issues, I'm at 41.  I'll qualify one more out of an

18    abundance of caution, which puts us six above the number we

19    actually need.  So why don't we bring our next juror in and,

20    hopefully, they hit the magic number.

21         THE CLERK:  Juror No. 2295.

22         THE COURT:  Good afternoon.

23         PROSPECTIVE JUROR:  Hi.

24         THE COURT:  Hi, ma'am.  How are you?

25         PROSPECTIVE JUROR:  Good.  Thank you.

1          THE COURT:  Thank you for being with us.  If you

2   would like to remove your mask, please feel free to do so.

3          PROSPECTIVE JUROR:  Sure.

4          THE COURT:  Your juror questionnaire is in front of

5   you.  I'll ask you first to turn to page 11.  Question 49, that

6   question asks you whether you have read, seen, or heard

7   anything about the Oath Keepers organization.  You answered

8   that question "yes."  Can you tell us what you think -- what

9   you have read, seen, or heard?

10          PROSPECTIVE JUROR:  It would be various news outlets,

11   probably PBS News Hour, documentary on Oath Keepers.

12          THE COURT:  Can I ask you to keep your voice up.

13          PROSPECTIVE JUROR:  Sorry.  I'll bring it down a

14   little bit.  Okay.  Yes.  It would be through documentaries and

15   maybe reading it in the newspaper.

16          THE COURT:  Okay.  And can you tell us, based on what

17   you have read and seen, what your recollection is of what you

18   learned about the organization?

19          PROSPECTIVE JUROR:  I don't know that I could

20   separate it from the Patriots, but the general feeling is that

21   there's a need to protect the national identity, the white

22   national identity, in this country.

23          THE COURT:  When you say "national identity," what do

24   you mean by that?

25          PROSPECTIVE JUROR:  I guess based upon from the

1    foundings that people are generally white and at least that the

2    country -- that they fought for the country, and it was theirs.

3              THE COURT:  And you mentioned being white.  Do you

4    have a view of the organization and its connection to race

5    issues?

6              PROSPECTIVE JUROR:  Yes.  Probably antisemitism, too,

7    yes.

8              THE COURT:  And where do you get the impression of

9    being antisemitic?

10             PROSPECTIVE JUROR:  I can't say that it's definitely

11   the Oath Keepers, but they tend to be linked together with the

12   Patriots and other groups, I think, that I have heard of.  So I

13   tend to group them together.

14             THE COURT:  My understanding, so you are not sure

15   whether these impressions that you have are, in fact, about the

16   Oath Keepers; is that fair?

17             PROSPECTIVE JUROR:  I certainly don't classify myself

18   as an expert.

19             THE COURT:  But that's your general impression,

20   perhaps, groups that are on that side of the political

21   spectrum; is that fair?

22             PROSPECTIVE JUROR:  And that there's a violent

23   element too, the way that they believe to defend.

24             THE COURT:  So let me ask you this:  You would be

25   asked as a juror to evaluate the evidence that's only presented

1    in court and view that evidence fairly and impartially.  And

2    keep in mind as to these defendants what you have just

3    described for us.  Do you think, based upon that description,

4    you could still remain fair and impartial?

5            PROSPECTIVE JUROR:  I mean, I think that I would

6    leave it open to interpretation about why somebody joined the

7    Oath Keepers or whatever group or that they may have been led

8    one way and then found out things about it that they didn't

9    agree with.  I guess I would take it based on the evidence

10   presented.

11           THE COURT:  So do I hear you saying that you'll keep

12   an open mind, for example, about why these four defendants may

13   have either joined or been affiliated with them?

14           PROSPECTIVE JUROR:  Yes, or being associated in some

15   way.  Yes.

16           THE COURT:  You indicated that you have read, seen,

17   or heard about Stewart Rhodes, Kelly Meggs, Jessica Watkins on

18   line 51.  What can you tell us about that?

19           PROSPECTIVE JUROR:  Again, I don't know specifics,

20   only that, as part January 6, I know Stewart Rhodes' name came

21   up, and he was interviewed and was felt to be a ringleader of

22   some of the groups that accumulated on that day.

23           THE COURT:  Have you been left with any impressions

24   about Mr. Rhodes from the committee hearings or any other

25   source?

1          PROSPECTIVE JUROR:  I guess that he was definitely

2     implicated, yes.

3          THE COURT:  Okay.  And have you learned any new

4     information about Mr. Rhodes from the time you completed this

5     questionnaire?

6          PROSPECTIVE JUROR:  No.  I have tried desperately to

7     avoid it.

8          THE COURT:  And if I were to tell you that these

9     defendants are charged with conspiring with Mr. Rhodes, how

10    would you react to that?

11         PROSPECTIVE JUROR:  If I see that -- well, yes, I

12    mean, "conspiring" is -- has a connotation of guilt already, if

13    you see what I'm saying.  So if they were just there by

14    association or whether they --

15         THE COURT:  Now, to be clear that is the label that

16    is associated with the offense, and you will be instructed the

17    fact that they have been charged, that in and of itself is not

18    evidence of guilt.

19         PROSPECTIVE JUROR:  Right.

20         THE COURT:  And, in fact, they are presumed to be

21    innocent of the charge.

22         PROSPECTIVE JUROR:  Of course.

23         THE COURT:  Those type of instructions, would that

24    affect your view of these defendants and your ability to be

25    fair and impartial given what you have just told us about

1  Mr. Rhodes?

2          PROSPECTIVE JUROR:  I would hope so.  But --

3          THE COURT:  You have some question in your mind about

4  your ability to do so.

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  You have some question in your mind?

7          PROSPECTIVE JUROR:  Again, I know that there are

8  people who have been undercover in these various organizations,

9  so I wouldn't know who is on whose side, if you see what I

10 mean.

11         THE COURT:  What do you mean by "undercover"?

12         PROSPECTIVE JUROR:  That people were playing a role

13 within some of these groups, I understand.

14         THE COURT:  Okay.  In other words, do you mean as

15 informants?

16         PROSPECTIVE JUROR:  Yes, an informant.  Yes.

17         THE COURT:  And what's your basis for believing that

18 there were informants in the Oath Keepers?

19         PROSPECTIVE JUROR:  So insinuations through the

20 January 6 hearings and newspaper readings, I guess.

21         THE COURT:  Okay.  You indicated, on line 52, that

22 perhaps you have heard the name Joseph Hackett; is that right?

23         PROSPECTIVE JUROR:  Yeah.  I mean, I've thought about

24 it.  I haven't done any research.  It doesn't come to mind, but

25 it is a name that seems to have been out there.

1          THE COURT:  Okay.  If I could, please, ask you to

2    turn to page 7.

3          PROSPECTIVE JUROR:  Page 7?

4          THE COURT:  Yes.  Question 20, we asked you whether a

5    close friend or family member in the last 5 years has attended

6    a rally, protest, or demonstration.  You answered "yes."  Can

7    you tell us about that?

8          PROSPECTIVE JUROR:  Oh, yes.  Certainly the march for

9    women back in 2017, I believe it was.  March for Science.  I am

10   a climate believer and would like to go out and protest about

11   it.  Several Black Lives Matter protests that I have been on.

12         THE COURT:  And so if you were to learn that these

13   defendants might have different politics than yours, how do you

14   think that would affect your judgment of them?

15         PROSPECTIVE JUROR:  I'm a scientist.  I believe that

16   everything should be discussed, and differences of opinion are

17   good things.

18         THE COURT:  And even if, for example, you told us

19   about Black Lives Matter protests, how would you react if you

20   were to hear that one or more of these defendants have a

21   different view of the Black Lives Matter movement than you do?

22         PROSPECTIVE JUROR:  Well, as it pertains to the case,

23   I would have to address that, I suppose, at the time; but, as a

24   point in itself, I understand that people disagree about many,

25   many things.

1          THE COURT:  And so could you set aside your -- if

2     you -- these defendants, for example, if you were to learn that

3     they were supporters of the former president, would that affect

4     your ability to be fair and impartial to them?

5          PROSPECTIVE JUROR:  I mean, there's something like

6     48, 49 percent of the country voted for Mr. Trump.  There are

7     many of them, and there are many people who didn't vote for

8     Mr. Trump.

9          THE COURT:  Okay.  You indicated on line 26 that you

10    have served on a jury before.  All right.  All right.  So let

11    me ask you, ma'am:  If at the end of the day if you were

12    selected to serve and the Government, in your view, did not

13    meet its burden of proof, that is, to prove guilt beyond a

14    reasonable doubt, would it be difficult for you to cast any

15    votes for acquittal?

16         PROSPECTIVE JUROR:  No.  I mean, I'm a computer

17    scientist.  I've dealt with logic all my life.  If the facts

18    are there, they are, and if they are not --

19         THE COURT:  Okay.  Mr. Edwards?

20         MR. EDWARDS:  No questions, Your Honor.  Thank you.

21         THE COURT:  Anything from the defense counsel?

22         MR. SHIPLEY:  No questions.

23         MR. PEED:  Follow-up on the last question judge asked

24    you.  You are going to be instructed about different standards

25    of proof.  Given the nature of January 6 incident, if you felt

```
1    like the defendants were probably guilty but you felt like the

2    Government had not met the higher burden of proof beyond a

3    reasonable doubt, would you hesitate to acquit in that

4    situation?

5              PROSPECTIVE JUROR:  I'm sure if it's anything like

6    the last jury, who deliberated for some time in the jury room,

7    I believe I could get there in the end.  But if the burden of

8    proof has not been given, then you would have to acquit.

9              MR. PEED:  All right.  Thank you very much.

10             THE COURT:  All right, ma'am.  Thank you for your

11   time --

12             PROSPECTIVE JUROR:  Can I ask one question?

13             THE COURT:  Sure.

14             PROSPECTIVE JUROR:  There was a period of time that

15   we were supposed to be released during the Christmas period,

16   and I do not recall what the dates were.  Do you have them?

17             THE COURT:  Yes.  It would be the Friday before

18   Christmas, which is the 23$^{rd}$, and then the week between

19   Christmas and New Year's.

20             PROSPECTIVE JUROR:  So my issue is that my husband

21   now has to have heart surgery on the 20$^{th}$.

22             THE COURT:  Oh, okay.

23             PROSPECTIVE JUROR:  And a CT scan on the 19$^{th}$.  So

24   my only fear is that my head will not be in the case.  That's

25   my only thing.
```

    1            THE COURT:  Okay.  Understood.  Mr. Douyon will

    2    provide you with additional instructions.  Thank you.

    3        [Prospective juror exits.]

    4            MR. SHIPLEY:  Your Honor --

    5            THE COURT:  All right.  You can sit down.  I thought

    6    we were close until that last response.  So we will strike her

    7    for cause because of her husband's pending surgery.

    8            THE CLERK:  Juror No. 1680.

    9            THE COURT:  Hi.  How are you?

   10            PROSPECTIVE JUROR:  I'm doing good.  How are you?

   11            THE COURT:  Thank you for being with us today.  You

   12    are Juror 1680?

   13            PROSPECTIVE JUROR:  Yes.

   14            THE COURT:  If you are comfortable removing your

   15    mask, you may do so.

   16            PROSPECTIVE JUROR:  Thank you.

   17            THE COURT:  If I could, please, ask you to turn to

   18    page 11.  Your juror questionnaire is there before you.

   19            PROSPECTIVE JUROR:  Okay.

   20            THE COURT:  You were asked on line 49 about whether

   21    you have read, seen, or heard anything about the Oath Keepers

   22    organization.  Is that still an accurate answer that you do

   23    not -- you have not read, seen, or heard anything about the

   24    Oath Keepers organization?

   25            PROSPECTIVE JUROR:  Yes, that is accurate.

1          THE COURT:  Okay.  And so, just to confirm, have you

2  ever heard of the organization or know anything about them --

3          PROSPECTIVE JUROR:  I've never -- I'm sorry.  I've

4  never heard anything about it.  I've never read anything.  I

5  don't even know.  When I read that, I was like "I don't even

6  know who the Oath Keepers are."

7          THE COURT:  Okay.  And line 51 -- Question 51, we

8  asked you whether you recognize any of the names there --

9  Stewart Rhodes, Kelly Meggs, Jessica Watkins.  You answered

10  "no."  Has that answer changed since the time you completed

11  this questionnaire?

12          PROSPECTIVE JUROR:  No.  That has not changed.

13          THE COURT:  If I could ask you to -- just the prior

14  page we asked you about your media exposure to the events of

15  January the 6th.  Could you describe for us generally how

16  closely you have followed the news about the events of that

17  day?

18          PROSPECTIVE JUROR:  I really don't watch the news,

19  but my grandmother was watching it, so I was hearing a lot

20  about it.  Because I was off that day.  So it was, like, I was

21  just hearing it, but I was going back and forth in between the

22  rooms while it was happening, but my grandmother was glued to

23  it.  So that's about the media coverage I've had about it.

24          THE COURT:  Okay.  And what about since that day?

25  Have you paid attention to news or reporting about the events

1    of that day?

2              PROSPECTIVE JUROR:  No, not at all.

3              THE COURT:  Not at all?

4              PROSPECTIVE JUROR:  Yeah.

5              THE COURT:  Okay.  If you would please turn to

6    page 7.

7              PROSPECTIVE JUROR:  7.

8              THE COURT:  So just point you to Question 16.  There

9    was no response to that.

10             PROSPECTIVE JUROR:  Okay.  Yeah, yeah.  I don't know

11   why I didn't put a response.  I think it was reading through

12   the questions because I was reading through the whole thing and

13   then go back and answer the questions.

14             THE COURT:  So Question 16 just asks whether you, a

15   close friend, or family member that's employed by the federal

16   government.

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Okay.  Same thing with Question 21.  We

19   asked you whether you have been on the Capitol grounds.

20             PROSPECTIVE JUROR:  Okay.  Yeah, I have, but it was

21   in high school --

22             THE COURT:  Okay.

23             PROSPECTIVE JUROR:  -- for a club I was in.  That was

24   it.

25             THE COURT:  Gotcha.  You have indicated on line 25

1    that you have served on a Grand Jury previously; is that right?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  And can you tell us when that was?

4              PROSPECTIVE JUROR:  It was in November of last year.

5              THE COURT:  Okay.  Was it in this courthouse or in

6    D.C. Superior Court?

7              PROSPECTIVE JUROR:  It was in D.C. Superior Court.

8              THE COURT:  So did you hear any cases about the

9    events of January 6th while you were on the jury?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Any evidence at all about the events of

12   January 6th?

13             PROSPECTIVE JUROR:  No, there wasn't.  No.

14             THE COURT:  And, just to confirm, as a Grand Juror,

15   your job was to determine whether there was probable cause to

16   charge somebody.

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  This is an actual trial, and so the

19   standard of proof is much higher.  It's beyond a reasonable

20   doubt.  Would you be able to understand the difference between

21   those two things?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  All right.  Mr. Edwards, any follow-up

24   questions?

25             MR. EDWARDS:  No questions, Your Honor.  Thank you.

1          THE COURT:  Anything from defense counsel?

2          MS. HALIM:  No questions.

3          THE COURT:  All right.  Thank you, ma'am.  Mr. Douyon

4    will show you out and provide you with additional instructions.

5          PROSPECTIVE JUROR:  Thank you.

6      [Prospective juror exits.]

7          THE COURT:  All right.  I think that gets us to 42,

8    which is a good number to have.  I predict that we'll probably

9    lose some people before tomorrow.  We have instructed all the

10   qualified jurors to be in tomorrow by 9:00.

11         So just be prepared to do your peremptories by

12   9:00 -- I think we'll start at 9:30, and people tend to

13   straggle in.  So 9:30.

14         Just some reminders about how that will work.  We

15   will provide you with your strike sheets.  Each side should

16   write down -- before we even get there, we'll bring everybody

17   into the courtroom.  The 16 first qualified will be seated here

18   in the jury box, 1 through 7 in the first row, 8 through 14 in

19   the back.  And then 15 and 16 up front.  Closest to me being

20   seat 15.  Just a reminder that our alternates 1, 7, 8, and 14.

21   And so if we need to dip into the alternates, it would be in

22   that order, 1, 7, 8, and then 14.

23         You may, once we have the jurors seated with your

24   strike sheets, just list who you wish to have stricken.  You

25   can strike either directly into the box where people are seated

1   or you can strike into the panel for people who may be coming

2   in to replace anybody that is stricken.

3        Once you have completed your strike sheets, you will

4   just simply exchange them to see what the other side has

5   written down.  If there are overlapping strikes, you don't get

6   another one.

7        You'll bring those up to me, and Mr. Douyon will grab

8   them.  He and I will then figure out who is going to be

9   removed.  We'll change seats around, and then you'll have your

10  one additional strike for the alternates.  I don't do that at

11  the beginning -- or with the deliberating jurors because I

12  think it's hard to figure out exactly who is coming in until

13  everybody is received.  So that's all I have.

14       Any questions about that?  After we have our full

15  complement, we'll dismiss them to return Monday morning.  I

16  will not swear them in until they return on Monday.

17       Any questions about that process or concerns?

18       MR. SHIPLEY:  Nothing about the juror process, Your

19  Honor, but just about the balance of the day, Your Honor.  Does

20  the Court have anything in mind, given the fact that you

21  probably have a few things stacked up?

22       THE COURT:  Sure.  We'll finish this in the morning.

23  And then, I guess, there are a couple of loose end in terms of

24  evidentiary issues.  We can take them up at that point and be

25  done for the day and do it Monday morning.

1      MR. EDWARDS:  The jury selection part, if I remember

2  correctly from Trial 1, we were able to dip into -- or strike

3  alternates during Round 1.  And I think at the pretrial

4  conference you might have said that we weren't doing that in

5  this trial.

6      THE COURT:  Well, I think what -- I may not have

7  conveyed clearly.  It's up to you, if you want to, but you get

8  one alternate strike.  So if you use it among your six for the

9  Government, then --

10      MR. EDWARDS:  Right.

11      THE COURT:  Right.  But I don't think there's any

12  problem with that if you wish to use a -- one of your six for

13  an alternate, but that doesn't mean you get a second alternate

14  strike.

15      MR. EDWARDS:  Right.

16      MS. HALIM:  Your Honor, if I could just confirm?  It

17  was -- because I overcounted the qualified.  It was line No. 6,

18  1637 that had the travel issues?

19      THE COURT:  Yes.  Line 6, 1637, correct.

20      MR. EDWARDS:  I'm not aware, but I forgot about this.

21  So in Trial 1, I think we had two alternate strikes because we

22  had four alternates and not just two alternates.  So I wanted

23  to confirm that we are still doing that for this trial.

24      THE COURT:  I had not planned on it since nobody had

25  made the request, or at least I don't recall anyone making the

```
 1   request for adding an alternate strike.  So unless I am
 2   mistaken in my recollection, I'll leave it at one.
 3           MS. HALIM:  There will be four alternates total, just
 4   one strike?
 5           THE COURT:  Correct.
 6           MS. HALIM:  Okay.
 7           MR. EDWARDS:  I had assumed that's how we were doing
 8   it.  I didn't realize we had talked about the number of
 9   alternate strikes.
10           THE COURT:  Yeah.  So, since it hasn't been requested
11   and truthfully I'm not -- now that I think about it -- well --
12           MR. NESTLER:  Your Honor, I'm sorry.  The rule is
13   when there's four alternate jurors --
14           THE COURT:  Oh, that's right.
15           PROSPECTIVE JUROR:  -- it's two additional peremptory
16   strikes per side for alternates under rule 24(c)(4)(B).  So
17   that's what we did at the first trial.
18           THE COURT:  We had each side with two at the last
19   trial.
20           MR. NESTLER:  I think that what we are saying, each
21   side gets two with two extra peremptory challenges when three
22   or four alternates are impaneled.  So Your Honor said you would
23   follow the default rule.
24           THE COURT:  Okay.  Yes.  I now remember, and thank
25   you for reminding me.  So, yes, it will be two peremptories per
```

1    side for the alternates.  I think we still have enough

2    qualified.  I think we have already sent everybody home; right?

3              THE CLERK:  Yes.

4              MR. EDWARDS:  I think the number is still fine.

5              THE COURT:  Yeah.  We are fine.

6              MR. EDWARDS:  As long as we are over 36.

7              THE COURT:  We need 36.  We are good to go.

8    Hopefully, we won't have too many people drop out.  Okay.

9              MR. EDWARDS:  And then if I could just ask a couple

10   of questions before we go into tomorrow?  We can do some of

11   this tomorrow, but just to put a pin in Mr. Hancock, we are

12   currently planning on having him arrive Sunday afternoon.  We

13   wanted to address with the Court and defense counsel -- I

14   haven't had a chance to talk with Mr. Peed -- but addressing

15   timing of when we should undertake this exercise of assessing

16   whether or not he's going to invoke his Fifth.  We didn't want

17   to wait until, you know, right at the time when the Government

18   would be planning to introduce that evidence or calling him.  I

19   wasn't sure if the Court had a preference on when to handle

20   those things, you know, in the middle of trial.

21             THE COURT:  So you are going to have him come in and

22   then have him come back or is he going to stay?

23             MR. EDWARDS:  I think he's going to stay.  And I also

24   don't know how it will resolve.  I mean, if he chooses not to

25   follow your ruling --

1          THE COURT:  I know.  And do you know whether he will

2    be amenable to counsel?

3          MR. EDWARDS:  That was going to be my next --

4          THE COURT:  Because last time, he was not.

5          MR. EDWARDS:  Right.  That was going to be my next

6    question.  We are not aware.  We have reached out to ask.

7          THE COURT:  Ask him?

8          MR. EDWARDS:  Yes, ask him.  And, you know, if his

9    answer is -- I will say given the situation, I wouldn't be

10   shocked if maybe when he gets here, he changes his mind.  So I

11   was wondering if maybe we should have somebody on notice or

12   standby other than scrambling at the time to find somebody.  I

13   didn't know if that was something that the Court --

14         THE COURT:  Yeah.  I can e-mail Mr. Kramer about that

15   and see if we can have somebody ready Monday morning.

16         MR. EDWARDS:  Just in terms of -- we can talk more

17   about this tomorrow, but the schedule for next week opening,

18   how long, just to get a sense of that.

19         THE COURT:  Before we talk about that, what is the --

20   say, he does invoke and, say, I disagree with his invocation

21   and he refuses to testify, have you thought about what then?  I

22   know it's my authority to decide what the "what then" is.

23         You know, at the end of it, he is a witness here

24   simply to establish the foundation for the admissibility of

25   evidence, and I understand it's not -- I understand the

1    importance of the evidence.

2            MR. EDWARDS:  I would hope Mr. Peed may change his

3    mind.  Certainly, the Government's intention is to get this

4    evidence in to trial.  So I was hoping to have a conversation

5    with Mr. Peed when he takes the stand.  I don't know what your

6    position would be.

7            THE COURT:  Let me ask this:  Is there an alternative

8    way to get it in?  For example, I don't know whether this is

9    true or not.  If there was -- if this was publically posted,

10   for example -- was it publicly posted?

11           MR. EDWARDS:  Yes, Your Honor.

12           THE COURT:  And then did you have an agent find it

13   and then download it and that's how the Government acquired it?

14           MR. EDWARDS:  Yes, Your Honor.

15           THE COURT:  And then if that agent comes in to

16   testify that that's what they have done and somebody then can

17   come in and testify and say, yeah, that's Mr. Vallejo's voice.

18   I recognize his voice.  Is that not enough?

19           MR. PEED:  I think the jury could recognize his

20   voice.

21           THE COURT:  I don't know how the jury could recognize

22   his voice without somebody saying it's his voice.

23           MR. PEED:  I don't think an agent's opinion -- it

24   would have to be admissibility.  So, I guess, if we have the

25   agent who interviewed Mr. Vallejo and took his phone and talked

1    to him --

2            THE COURT:  Right.  I mean, that could be one person.

3    I don't know who else you are intending to call.  If there's

4    somebody who could authenticate or identify that that as being

5    Mr. Vallejo's voice and Mr. -- who was the other person on

6    there?

7            MR. EDWARDS:  Todd Canderis [phonetic].

8            THE COURT:  Mr. Canderis.  I think that would be

9    enough to establish the admissibility of the evidence.

10           MR. EDWARDS:  I'd be concerned with -- the only

11   concern that I would have is that there would be any allegation

12   that it had been altered from the time that Mr. Hancock posted

13   it and the Government then downloaded it or date and time --

14   because the date and time are particularly important.

15           THE COURT:  You mean from the time he posted it --

16   the alteration from the time he posted it to the time it was

17   downloaded?

18           MR. EDWARDS:  Right.  So if the defense were -- if

19   they didn't want to stipulate -- I mean, this would just bring

20   us back to stipulating to authenticity.  What we would have

21   Mr. Hancock say is, yes, that is reporting I did.

22           THE COURT:  Well, let's put it this way:  I mean, if

23   it comes to that and the concern is any alteration between the

24   time it was uploaded and the time it was downloaded, I think,

25   in some sense, that would depend on what Mr. Peed intends to

1    do.

2         In other words, I highly doubt the jury would be

3    questioning whether there had been some modification unless

4    there's some suggestion that there was a modification, and it

5    seems to me that would only come into play if the defense

6    thought there was some basis to suggest that.  And, if there

7    isn't, it seems to me that it may not be an appropriate for

8    cross-examination of the agent.

9         MR. PEED:  I think it might be worth having Zoom,

10   like the Court did last time, because I'm going to want to

11   subpoena him about some of the same information.  He may assert

12   the Fifth for me as well.  If he's not willing to say I did

13   this podcast and I need him to testify about his opinions about

14   what was said on the podcast, we may be in it the same position

15   in the defense case.  So if we could --

16        THE COURT:  What I would suggest -- and maybe I'm out

17   of my lane here -- is that there's a different way for the

18   Government to get that piece of evidence in without having to

19   deal with the Fifth Amendment issue.  That would not be so for

20   you because only he could provide the testimony you are

21   suggesting.

22        MR. PEED:  Right.  So I'm just suggesting if we are

23   gonna have to have the Court rule on Fifth Amendment for the

24   defense case, if we do that, front load that, and if

25   Mr. Hancock will abide by it, then everyone gets what they want

```
 1   and I get what I want.
 2           THE COURT:  Well, let's hope it doesn't become an
 3   issue.
 4           MR. PEED:  So, I mean, I would recommend a Zoom
 5   hearing tomorrow using the balance of the time that we have
 6   with Mr. Hancock.
 7           MR. EDWARDS:  Yeah.  Like I said earlier, the only
 8   concern I have is to make sure that we can establish the date
 9   and time of when the statements on the podcast were made, not
10   necessarily when he posted it.
11           Now, we can go back and assess whether or not that's
12   something that's readily apparent on the date of posting or on
13   the words that are said in the podcast.  So that's the obvious
14   concern is that he would authenticate, yes, this is a recording
15   on the morning of the 6th and, yes, this is the recording on
16   the morning of the 7th and that's when those statements were
17   made.
18           THE COURT:  All right.  All right.  Your agent
19   couldn't say this is when it was recorded?
20           MR. EDWARDS:  Right.  Now, we can hunker down and see
21   if there's information for when it's posted, but I just think
22   that's different than when -- for example, if the story was the
23   same day.  I'm not sure that's true.  So what Mr. Hancock will
24   do is authenticate that's the recording that he did that day.
25           THE COURT:  All right.  I'll see what comes of it.
```

1    As I said, I'll take it a step at a time.  And, look, I don't

2    think there's any secret absent him coming in here and saying

3    something I don't expect.

4           There's no Fifth Amendment basis for simply recording

5    a podcast and uploading it.  So I'm not quite sure why he

6    thinks he has a Fifth Amendment privilege other than he thinks

7    it's a convenient way to avoid testifying.

8           But, I mean, I've spoken to Mr. Hancock once before.

9    I can see him, perhaps, not agreeing with that assessment.  So

10   we'll see.

11          All right.  Okay.  Anything else?

12          MR. EDWARDS:  No, Your Honor.  Thank you.

13          THE COURT:  All right.  Thank you, everyone.  Do not

14   wait for me.  We'll see you-all tomorrow morning.

15          THE CLERK:  The Court stands in recess.

16      [Recess.]

17

18

19

20

21

22

23

24

25

762

```
 1   DISTRICT OF COLUMBIA )
                          :
 2   WASHINGTON, D.C.    )

 3                   UNITED STATES OF AMERICA
                              VS.
 4             ROBERTO A. MINUTA; JOSEPH HACKETT;
               DAVID MOERSCHEL; EDWARD VALLEJO,
 5                  CASE NO. CR22-00015

 6

 7       I, Melanie Wilkins, do hereby certify that the above

 8   and foregoing transcript of proceedings in the matter

 9   aforementioned was taken by me in machine shorthand on

10   December 08, 2022, and the questions and answers thereto were

11   reduced to writing under my personal supervision using

12   computer-aided transcription, and that the foregoing represents

13   a true and correct transcript of the proceedings upon said

14   hearing.

15

16       I further certify that I am neither counsel nor

17   related to the parties to the action, nor am I in anywise

18   interested in the result of said cause.

19   Dated:  December 09, 2022
     Pages:  628 to 762, inclusive
20

21
                         s/Melanie Wilkins, CRR, RMR
22                       Melanie Wilkins
                         Federal Official Court Reporter
23                       Registered Merit Reporter
                         Certified Realtime Reporter
24

25
```