1          **UNITED STATES DISTRICT COURT**
         **FOR THE DISTRICT OF COLUMBIA**

2

3   UNITED STATES OF AMERICA,    ) Criminal Action
                        ) No. 1:22-cr-00015-APM
             Plaintiff,  )

4                       ) **Jury Trial - Day 17**
   vs.                   ) (afternoon session)

5                       )
   ROBERTO A. MINUTA, et al.   ) Washington, D.C.

6                       ) **January 10, 2023**
            Defendants. ) Time: 1:15 p.m.

7  _____

8       **Transcript of Jury Trial - Day 17**
             **Held Before**

9     **The Honorable Amit P. Mehta**
      **United States District Judge**

10  _____

11          A P P E A R A N C E S

12  For the Government:    **Troy A. Edwards, Jr.**
                     **Jeffrey S. Nestler**

13                   UNITED STATES ATTORNEY'S OFFICE
                     FOR THE DISTRICT OF COLUMBIA

14                   601 D Street, Northwest
                   Washington, D.C. 20579

15

16                   **Alexandra S. Hughes**
                     **Louis J. Manzo**

17                   U.S. DEPARTMENT OF JUSTICE
                   950 Pennsylvania Avenue, Northwest
                   Washington, D.C. 20530

18

19  For the Defendant Roberto A. Minuta:
                   **William Lee Shipley, Jr.**

20                   LAW OFFICES OF WILLIAM L. SHIPLEY
                   P.O. Box 745
                   Kailua, Hawaii 96734

21

22  For the Defendant Joseph Hackett:
                   **Angela Halim**
                   3580 Indian Queen Lane

23                   Philadelphia, Pennsylvania 19129

24

25

<pre>
1                 A P P E A R A N C E S, continued

2    For the Defendant David Moerschel:
                              Scott Weinberg
3                             BROWN, SUAREZ, RIOS & WEINBERG
                              265 East Marion Avenue, Suite 114
4                             Punta Gorda, Florida 33950

5    For the Defendant Edward Vallejo:
                              Matthew J. Peed
6                             CLINTON & PEED
                              1775 Eye Street, Northwest, Suite 1150
7                             Washington, D.C. 20006

8    _____

9    Stenographic Official Court Reporter:
                              Nancy J. Meyer
                              Registered Diplomate Reporter
10                            Certified Realtime Reporter
                              333 Constitution Avenue, Northwest
11                            Washington, D.C. 20001
                              202-354-3118
12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

1
<u>**I N D E X**</u>

2
<u>PAGE:</u>

3
<u>**Witnesses:**</u>

4
<u>Byron Cody</u>

5
    Direct Examination By Mr. Edwards............... 3985
    Cross-Examination By Mr. Shipley................ 4081

6
    Cross-Examination By Ms. Halim.................. 4086
    Cross-Examination By Mr. Weinberg............... 4097

7
    Cross-Examination By Mr. Peed................... 4101
    Redirect Examination By Mr. Edwards............. 4134

8

9
<u>**Government Exhibits Admitted**</u>:

10
    Government Exhibit 29.P.3....................... 4141
    Government Exhibits 35 and 37................... 4026

11
    Government Exhibit 73.V.3....................... 3991
    Government Exhibits 122 through 126............. 4019

12
    Government Exhibits 1202.2 through 1202.5........ 4069
    Government Exhibits 1202.2.TR through 1202.5.TR.. 4069

13
    Government Exhibit 9651......................... 3988
    Government Exhibit 9652......................... 4004

14
    Government Exhibit 9652.1....................... 4047
    Government Exhibit 9652.2....................... 4049

15
    Government Exhibit 9653......................... 4058

16

17
<u>**Defendant Hackett Exhibits Admitted**</u>:

18
    Defendant Hackett Exhibit JH 2.................. 4089
    Defendant Hackett Exhibit JH 3.................. 4093

19
    Defendant Hackett Exhibits JH 21 and JH 29....... 4163
    Defendant Hackett Exhibit JH 30................. 4088

20

21
<u>**Defendant Minuta Exhibits Admitted**</u>:

22
    Defendant Minuta Exhibit RM V001................ 4082

23
<u>**Defendant Moerschel Exhibits Admitted**</u>:

24
    Defendant Moerschel Exhibit DM 11............... 4100

25

3982

1                          **I N D E X**, continued

2                                                          PAGE:

3      **Defendant Vallejo Exhibits Admitted:**

4          Defendant Vallejo Exhibit EV 176.................. 4122
           Defendant Vallejo Exhibit EV 176.1............... 4124
5          Defendant Vallejo Exhibit EV 176.2............... 4122
           Defendant Vallejo Exhibit EV 178.................. 4112
6          Defendant Vallejo Exhibit EV 179.................. 4120
           Defendant Vallejo Exhibit EV 179.1............... 4121
7          Defendant Vallejo Exhibit EV 180.................. 4115
           Defendant Vallejo Exhibit EV 200.................. 4128
8          Defendant Vallejo Exhibit EV 300.2............... 4130
           Defendant Vallejo Exhibit EV 305.4............... 4116
9          Defendant Vallejo Exhibit EV 904.................. 4117

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              (REPORTER'S NOTE:  The morning session of the jury

 3     trial was reported by William P. Zaremba, who prepared said

 4     transcript.)

 5              (Proceedings held outside the presence of the jury.)

 6              THE COURT:  Okay.  Where are we on the exhibit issue?

 7              MS. HUGHES:  So the government's position is that if

 8     this line is included then we would like the whole message

 9     included, because it is just this one excerpt.  And so if the

10     defense would like the next sentence, we would like just the

11     whole message to be shown.

12              THE COURT:  Okay.

13              MS. HALIM:  If I could ask the government to pull up

14     the entirety of the message.  I don't have it handy.

15              MS. BADALAMENT:  I can pull it up.

16              MS. HALIM:  Thank you so much.

17         So to cut to the chase, the defense would be seeking

18     that Slide 3 be admitted as was produced to us last night,

19     which is -- if we can go back up to the first one.  That would

20     be the slide --

21              THE COURT:  Okay.

22              MS. HALIM:  -- right there.  It does continue.

23         Thank you, Ms. Badalament.

24         Can we go to the next slide.

25         So that is the continuation of the message.
```

```
 1                THE COURT:  Okay.  Okay.

 2                MS. HALIM:  So our position is that just the first

 3     portion of the message comes in, which is on the previous

 4     slide; this one that you're looking at right now.  But if the

 5     Court rules that the whole thing has to come in, then we're

 6     prepared to accept that.

 7                THE COURT:  Okay.  I mean, I think the whole thing

 8     should probably come in.  I mean, it is a self-contained

 9     message, and this isn't like some longer document that has

10     discrete subject matters.  They all sort of relate to one

11     another and, in particular, the Jericho march.  So we'll admit

12     the entirety of it.

13                So what I'll just do is say to the jury that we have the

14     full exhibit, the full text for one of the things that were

15     shown to you, I'll ask you to read it, and the full exhibit

16     will be in evidence.

17                MS. HUGHES:  Thank you, Your Honor.

18                MS. HALIM:  Thank you, Your Honor.

19                MR. PEED:  I have something, Your Honor.

20                THE COURT:  You know, Mr. Peed, your timing is never

21     quite good.  But what is it?

22                MR. PEED:  The government's going to show, basically,

23     a slide deck all about Mr. Vallejo and, basically, go through

24     almost all of his messages on the 7th and the 8th.  So they

25     left out the message about he's going to follow the orders as
```

1   the commander and chief.  So I would ask that be included.

2          MR. EDWARDS:  I had asked just to see the message.  I

3   haven't seen it.  I just want to take a look.

4          THE COURTROOM DEPUTY:  Jury panel.

5          (Proceedings held in the presence of the jury.)

6          THE COURT:  All right.  Please be seated, everybody.

7          Welcome back, ladies and gentlemen.  I hope you-all had

8   a nice lunch hour.

9          So we're ready to proceed, Mr. Edwards?

10          MR. EDWARDS:  Yes, Your Honor.

11          The government calls FBI Special Agent Byron Cody.

12          (Oath administered.)

13          THE WITNESS:  I do.

14          THE COURTROOM DEPUTY:  Please have a seat.

15          THE COURT:  Agent Cody, welcome.

16          THE WITNESS:  Thank you, sir.

17          MR. EDWARDS:  Thank you, Your Honor.

18          THE COURT:  Good afternoon.  Good afternoon.

19                    DIRECT EXAMINATION

20   BY MR. EDWARDS:

21   Q.  Special Agent Cody, can you please introduce yourself to

22   the jury by stating your name and spelling your last name for

23   the record.

24   A.  Special Agent Byron Cody, B-y-r-o-n C-o-d-y.

25   Q.  And, Agent Cody, where do you work?

```
1    A.   FBI.

2    Q.   How long have you worked there?

3    A.   Approximately ten years.

4    Q.   And before the FBI, what did you do?

5    A.   I was a naval officer.

6    Q.   What did you do in the Navy?

7    A.   Drove ships.

8    Q.   How many years did you drive ships?

9    A.   About four years.

10   Q.   Now, at some point you left for the FBI?

11   A.   Yes.  Yeah.  I had a job as a government contractor in the

12   interim, but yes.

13   Q.   When you joined the FBI, did you undergo training?

14   A.   Yes, I did.

15   Q.   Can you just describe it, briefly, for the jury.

16   A.   Sure.  We learned basics that any -- any new law

17   enforcement officer would learn at a training academy:  how to

18   run investigations, tactics, defensive tactics, basically

19   hand-to-hand fighting, firearms, law, et cetera.

20   Q.   And you said you've been in the FBI for ten years?

21   A.   Yes.

22   Q.   Can you describe, briefly, for the jury what you've done in

23   the FBI.

24   A.   Sure.  So I started in the Albuquerque division of the FBI.

25   I worked domestic terrorism matters there on the joint
```

1    terrorism task force for about six years.

2        I was promoted to FBI headquarters in the domestic

3    terrorism operation section, and in 2020 I stepped down to go

4    back -- back to working domestic terrorism investigations at

5    the Washington Field Office.

6    Q.  Eventually, did you begin investigating the events of

7    January 6th?

8    A.  I did.

9    Q.  Now, I want to focus you right now just on the evening of

10   January 6th and into the morning of January 7th.

11       In the course of your investigation, did the FBI recover

12   messages from various individuals in your -- that we've

13   discussed?

14   A.  Yes.

15   Q.  In fact -- let me take a step back.

16       MR. EDWARDS:  Mr. Manzo, can you please help me and

17   put Government's Exhibit 1531 up.

18       And in the meantime, Ms. Badalament, can you bring up,

19   just for the witness, Exhibit 9651 and leaf through a couple of

20   these exhibits for Agent Cody.

21       Thank you.

22   BY MR. EDWARDS:

23   Q.  Agent Cody, have you taken a second to review a couple of

24   these slides?

25   A.  I have.

1    Q.  And have you reviewed this exhibit in its entirety?

2    A.  Yes.

3    Q.  Does this exhibit contain messages from individuals on the

4    board here in your investigation from the afternoon of

5    January 6th and into January 7th?

6    A.  It does.

7    Q.  Have you compared these messages in the exhibit to the

8    underlying records for accuracy?

9    A.  I have.

10   Q.  Are they accurate?

11   A.  They are.

12          MR. EDWARDS:  Your Honor, at this time we'd move to

13   admit 9651 and publish to the jury.

14          THE COURT:  Okay.  9651 is admitted.

15          (Government Exhibit 9651 admitted into evidence.)

16   BY MR. EDWARDS:

17   Q.  Okay.  This first slide, Agent Cody, what is this?

18   A.  This is a photograph of, I believe, Aaron Stone's phone

19   that I took when we interviewed him.  It's from the Vetted OK

20   FL Hangouts Signal chat, and that was on Mr. Stone's phone.

21   This particular screenshot is OK Gator 1, which is Kelly Meggs.

22   He is posting to the group a video that was sent to him by OK

23   Gator 6, Kenneth Harrelson.

24   Q.  Okay.  Let's break that down just a little bit.

25          So you took this photo?

1    A.  Yes.

2    Q.  And so -- while you literally were just scrolling through

3    the phone, you took a photo of the phone?

4    A.  Yes, I took it just in case our Signal backup of the phone

5    did not work; I wanted to maintain this -- this photograph.

6    Q.  I see.

7         And from what day was this thread -- was this particular

8    message?

9    A.  January 6th, 2021.

10    Q.  And what time?

11    A.  6:13 p.m.

12    Q.  Now, you said it was in the group that was called the

13    Vetted OK FL Hangout.  Is that what we're seeing up here at the

14    top of the phone that I've circled?

15    A.  Yeah.  It's a bit truncated, but yes.

16    Q.  Okay.  Are Mr. Hackett and Mr. Moerschel members of that

17    group chat as of January 6th?

18    A.  They were.

19    Q.  And you said this was sent by OK Gator 1, who you

20    identified as Kelly Meggs.  That's what we're seeing here?

21    A.  Yes.

22    Q.  Okay.  What -- and you said this picture represents a video

23    from Kenneth Harrelson's phone?

24    A.  Yes.

25    Q.  And is Kenneth Harrelson on the board?

1    A.  He is.

2    Q.  Did he go with Hackett and Moerschel and others into the

3    Capitol on January 6th?

4    A.  He did.

5    Q.  So you've -- did you watch this video when you looked at

6    Aaron Stone's phone?

7    A.  Yes, I did.

8    Q.  And just tell the jury, what did Kelly Meggs say along with

9    sending this message?

10   A.  "Florida OK takes the Capitol."

11   Q.  And are Hackett and Moerschel -- are they Florida

12   Oath Keepers?

13   A.  They are.

14          MR. EDWARDS:  Now, Ms. Badalament, can we pull up,

15   please, Government's Exhibit 73.V.3 just for the witness.

16   BY MR. EDWARDS:

17   Q.  And, Agent Cody, have you taken an opportunity to just look

18   at this screen now on the right?

19   A.  Yes.

20   Q.  Okay.  And have you watched this video?

21   A.  I have.

22   Q.  Does this appear to be the video that was the same video

23   you watched on Aaron Stone's phone?

24   A.  Yes, it is.

25          MR. EDWARDS:  At this time, Your Honor, we would move

1    to admit 73.V.3.

2              MS.  HALIM:  No objection.

3              THE COURT:  73.V.3 is admitted.

4              (Government Exhibit 73.V.3 admitted into evidence.)

5              MR. EDWARDS:  Now, Ms. Badalament, can we go back to

6    that, side by side.

7    BY MR. EDWARDS:

8    Q.  And, Agent Cody, you said the video you watched on

9    Aaron Stone's phone, it's here on the left; right?

10   A.  Yes.

11   Q.  And the video on the right is from Kenneth Harrelson's

12   phone?

13   A.  Yes.

14   Q.  And did -- are they the same video?

15   A.  Yes, they are.

16   Q.  Can you kind of see that when you look at both, it looks

17   like it's the same video?

18   A.  Yes.

19   Q.  Okay.

20              MR. EDWARDS:  And so, Ms. Badalament, can we please

21   just play 73.V.3 forward from the start.

22              (An audio-visual recording was played.)

23              MR. EDWARDS:  Can we pause here at 15 seconds.

24   BY MR. EDWARDS:

25   Q.  Just to orient the jury, Agent Cody, do you know where this

1    is?

2    A.  It's the Columbus Doors on the east side of the

3    U.S. Capitol.

4    Q.  And so when we look into this doorway, are we looking into

5    the Capitol?

6    A.  Yes.

7              MR. EDWARDS:  Can we play forward to just at the

8    start of that 20th second, Ms. Badalament.

9              (An audio-visual recording was played.)

10   BY MR. EDWARDS:

11   Q.  Okay.  Agent Cody, do you see this person on the bottom

12   left here of the video?

13   A.  Yes, I do.

14   Q.  Who is that individual?

15   A.  Joseph Hackett.

16   Q.  Have you reviewed photographs and videos of Joseph Hackett

17   on the day of January 6th?

18   A.  I have.

19   Q.  And photographs from other days of Joseph Hackett?

20   A.  Yes.

21   Q.  And so you can identify this individual as Joseph Hackett?

22   A.  I can.

23              MR. EDWARDS:  Ms. Badalament, can we play just a

24   smidge, a couple milliseconds here as we play forward.  A

25   couple more.  And maybe go a little bit back.

3993

```
 1                  (A video recording was played.)
 2                  MR. EDWARDS:  Can we go back just a tad here.  Keep
 3       going.
 4             Okay.  Now, quickly press the play button, pause button
 5       the old-school style.
 6                  (A video recording was played.)
 7                  MR. EDWARDS:  Right in the middle of that.  Right
 8       before this.  I'm sorry to do this.
 9             All right.  Can we try again, Ms. Badalament; just a
10       quick play, pause.
11                  (A video recording was played.)
12       BY MR. EDWARDS:
13       Q.  Okay.  Right here, 21 seconds, I'm going to circle somebody
14       here, Agent Cody.  And I apologize for my artistic skills here.
15             Do you see this outline?
16       A.  I do.
17       Q.  Have you reviewed this video before and looked at this time
18       stamp?
19       A.  Yes, I have.
20       Q.  And can you identify who that person is?
21       A.  David Moerschel.
22       Q.  And how do you know?
23       A.  Based on the face covering with the distinctive brown
24       stripe.  It's a -- I think a Desert Storm camouflage.  And over
25       his left shoulder, he has a coyote-brown-colored hydration pack
```

1    hose.

2    Q.  Have you reviewed photographs and videos of David Moerschel

3    from January 6th?

4    A.  Yes.

5    Q.  Was he wearing the same attire and had the same equipment?

6    A.  Yes.

7    Q.  And so you can identify this person as David Moerschel?

8    A.  Yes.

9         MR. EDWARDS:  Okay.  Can we please play forward to

10    22 seconds, Ms. Badalament.

11         (An audio-visual recording was played.)

12         MR. EDWARDS:  All right.  I'll pause here.  Thank

13    you.

14    BY MR. EDWARDS:

15    Q.  Who is this individual I'm circling at the top?

16    A.  Kelly Meggs.

17    Q.  Okay.  And have you reviewed photographs and videos of

18    Kelly Meggs from January 6th?

19    A.  Yes, I have.

20    Q.  And are you able to identify this person based on his

21    attire, what he's wearing?

22    A.  Yes.

23    Q.  Okay.

24         MR. EDWARDS:  Ms. Badalament, can we play through the

25    rest of the video, please.

```
 1              (An audio-visual recording was played.)

 2              MR. EDWARDS:  Ms. Badalament, can we pause here at a

 3    minute 30, and we can just stop here.

 4    BY MR. EDWARDS:

 5    Q.  Agent Cody, what did we just watch?

 6    A.  People entering the U.S. Capitol.

 7    Q.  And was that Kenneth Harrelson holding the phone?

 8    A.  Yes.

 9              MR. EDWARDS:  Ms. Badalament, can we go back to the

10    first slide of 9651.

11    BY MR. EDWARDS:

12    Q.  Now, what did Kelly Meggs say along with that video to the

13    Vetted OK FL Hangout?

14    A.  "Florida OK takes the Capitol."

15    Q.  And did you find -- were Hackett and Moerschel in that

16    group chat?

17    A.  Yes.

18    Q.  Did you find this message and video on Mr. Hackett's phone?

19    A.  No.

20    Q.  Did you find this message and video on Mr. Moerschel's

21    phone?

22    A.  No.

23              MR. EDWARDS:  We can go to the next slide, please.

24    BY MR. EDWARDS:

25    Q.  Now, at 6:19 p.m., William Isaacs sends a message.  Who is
```

```
1    William Isaacs, Agent Cody?

2    A.  He was another Florida Oath Keeper.

3    Q.  What did he do at 2:38 p.m. on January 6th?

4    A.  Entered the U.S. Capitol.

5    Q.  What did he message to the OK FL DC OP Jan 6 chat?

6    A.  "I shouldn't have gone in first."

7              MR. EDWARDS:  Go to the next slide, please.

8    BY MR. EDWARDS:

9    Q.  What did Kelly Meggs say to that same Florida group chat?

10   A.  "Shelby, we got your boy his first dose of tear gas!!"

11   Q.  Now, were Mr. Hackett and Moerschel, were they part of this

12   Florida group chat?

13   A.  Yes.

14             MR. EDWARDS:  If we go to the next slide, please.

15   BY MR. EDWARDS:

16   Q.  Agent Cody, who is Connie Meggs?

17   A.  The wife of Kelly Meggs.  She also entered the Capitol.

18   Q.  What did she say at 11:01 p.m. on January 6th to Patty G?

19   A.  "Antifa went up there dressed as Trumpers but Trumpets

20   heard about Mike Pence being a faggot and everyone went to the

21   Capitol to stop the vote and police attacked."

22             MR. EDWARDS:  And can we go back to the previous

23   message.

24   BY MR. EDWARDS:

25   Q.  So what did Connie Meggs say that Trumpets heard?
```

1    A.   Heard about Mike Pence.

2    Q.   And then what did everyone do after that?

3    A.   Everyone went to the Capitol to stop the vote.

4         MR. EDWARDS:   Okay.  Can we go two messages forward,

5    please, Ms. Badalament.

6    BY MR. EDWARDS:

7    Q.   Agent Cody, who is Jessica Watkins?

8    A.   She's an Ohio Oath Keeper.

9    Q.   And did she join Mr. Hackett and Moerschel and the other

10   Florida Oath Keepers on January 6th?

11   A.   Yes, she did.

12   Q.   Did she go in the Capitol with them?

13   A.   She did.

14   Q.   What did she message the Florida group chat at 2:45 p.m. on

15   January 7th?

16   A.   "Proud to go in with you-all."

17   Q.   Did she send another message to that same group chat --

18   A.   Yes.

19   Q.   -- one minute later?

20   A.   Yes.

21   Q.   What did she say?

22   A.   I'd say, quote, I'll follow you into the gates of hell, end

23   quote, but we did that already, laughing emoji.

24         MR. EDWARDS:   Ms. Badalament, can we go to the next

25   message.

1    BY MR. EDWARDS:

2    Q.  Okay.  Is this a message from the same Jess Watkins?

3    A.  Yes.

4    Q.  And it's a message to Montana.  Who is Montana?

5    A.  Montana is her fiancé.

6    Q.  What did Jess Watkins message to her fiancé on January 6th

7    at 5:54 p.m.?

8    A.  "We were in the thick of it.  Stormed the Capitol.  Forced

9    our way into the Senate and House.  Got tear gassed and muscled

10   the cops back like Spartans."

11   Q.  Okay.  Let's break that down.

12        What does she say where we were?

13   A.  In the thick of it.

14   Q.  What did she say they did?

15   A.  Stormed the Capitol.  Forced our way into the Senate and

16   House.

17   Q.  Are you familiar with where Jessica Watkins went while

18   inside the Capitol?

19   A.  Yes.

20   Q.  Which direction?

21   A.  I believe she went towards the Senate side.

22   Q.  And are you familiar with where Hackett and Moerschel and

23   their group went?

24   A.  No.

25   Q.  Did -- what did she say -- Jessica Watkins, what did she

```
 1    say that happened at the end of that message?
 2              MR. EDWARDS:  If we can go back, Ms. Badalament.
 3    A.  "Got tear gassed and muscled the cops back like Spartans."
 4              MR. EDWARDS:  And can we go back to the next message.
 5         Thank you, Ms. Badalament.
 6    BY MR. EDWARDS:
 7    Q.  What did Jessica Watkins post on Parler at 7:22 p.m. on
 8    January 6th?
 9    A.  "Yeah, we stormed the Capitol today.  Tear gassed, the
10    whole 9.  Pushed our way into the Rotunda, made it into the
11    Senate even.  The news is lying (even Fox) about the historical
12    events we created today.  #" --
13              THE COURT REPORTER:  Hold on.  You've got to slow
14    down when you're reading from a document.
15              THE WITNESS:  "#stopthesteal.  #stormthecapitol.
16    #oathkeepers.  #ohiomilitia."
17    BY MR. EDWARDS:
18    Q.  And I'll do my best to slow down too.  So we both can work
19    together here.
20         So what does Jessica Watkins say they did when they were
21    entering the Rotunda here in this second sentence?
22    A.  Pushed their way in.
23    Q.  And what's the first hashtag here on the upper left?
24    A.  #stopthesteal.
25              MR. EDWARDS:  Agent -- Ms. Badalament, can we go to
```

1    the next slide, please.

2    BY MR. EDWARDS:

3    Q.  Agent Cody, who is Thomas Caldwell?

4    A.  He's a Virginia Oath Keeper.  And he was -- he was part of

5    the quick reaction force.

6    Q.  And is he on the board here?

7    A.  Yes, he is.

8    Q.  What did Thomas Caldwell message to Jonathan at 7:46 p.m.

9    on January 6th?

10   A.  "This is the view from the west balcony after E broke

11   through all of the construction and made it upstairs and

12   inside.  Came out and Sharon helped people rinse tear gas out

13   of their eyes.  If we'd had guns, I guarantee we would have

14   killed 100 politicians.  They ran off and were spirited away

15   through their underground tunnels like the rats they were."

16           MR. EDWARDS:  Okay.  Can we go back to the prior

17   slide.

18   BY MR. EDWARDS:

19   Q.  Agent Cody, what did Thomas Caldwell say they would have

20   done if they had brought the firearms into D.C.?

21   A.  "If we'd had guns, I guarantee we would have killed

22   100 politicians."

23   Q.  Now, earlier you said Thomas Caldwell was a Virginia

24   Oath Keeper.  Was he just an individual that was working with

25   the Oath Keepers that day on the 6th?

```
 1    A.  No.  He had a prior relationship.

 2              MR. EDWARDS:  Ms. Badalament, can we go to the next

 3    slide, please.

 4    BY MR. EDWARDS:

 5    Q.  Now, at 7:52 did Thomas Caldwell continue to message other

 6    individuals?

 7    A.  Yes.

 8    Q.  Did he message Donovan Crowl?

 9    A.  Yes.

10    Q.  Who is Donovan Crowl?

11    A.  He's another Ohio Oath Keeper.

12    Q.  Was he with Jessica Watkins, who you talked about earlier?

13    A.  Yes, he was.

14    Q.  And did Donovan Crowl go into the Capitol with Mr. Hackett

15    and Moerschel?

16    A.  Yes.

17    Q.  What did Thomas Caldwell message at 7:52 p.m. on the night

18    of the 6th?

19    A.  "We need to do this at the local level.  Let's storm the

20    Capitol in Ohio.  Tell me when!"

21    Q.  Okay.  So he's focused on the local level; right?

22    A.  Yes.

23    Q.  Did other individuals message about the local level on the

24    6th?

25    A.  Yes.
```

1    Q.  What did Edward Vallejo message to Ernie Hancock at

2    3:47 p.m. that day?

3    A.  "So have you secured the Arizona Capitol yet, Slacker?"

4    Laughing emoji.

5    Q.  And did other people message about focusing -- taking it

6    local?

7    A.  Yes.

8    Q.  And continuing the -- on, do you see this LB here?

9    A.  Yes.

10    Q.  Who's LB?

11    A.  Landon Bentley.

12    Q.  Is he on the board?

13    A.  No.

14    Q.  Now, what did Landon Bentley message the group chat on

15    January 7th at 5:51 a.m.?

16    A.  "Sadly, he isn't willing to fight.  So now it's up to us,

17    and patriots are standing up in their state capitals all over,

18    just like Ms. Kellye was talking about at dinner.  The fight's

19    in our states."

20    Q.  Okay.  So they're messaging about next steps?

21    A.  Yes.

22    Q.  Do you see this Ms. Kellye?

23    A.  I do.

24    Q.  Are you familiar with an individual who spells her name

25    that way in your investigation?

1   A.  Yes.  Kellye SoRelle.

2   Q.  Who is Kellye SoRelle?

3   A.  Stewart Rhodes's girlfriend.

4   Q.  Do you see here where they talk about dinner on the night

5   before?

6   A.  Yes.

7   Q.  Based on your investigation, did some members of this group

8   meet face to face at a dinner on the night of January 6th?

9   A.  Yes.

10  Q.  Where was that dinner?

11  A.  At an Olive Garden at Vienna, Virginia.

12  Q.  Now, did they attend that face-to-face meeting after Rhodes

13  had messaged the group chat warning about watching what they

14  said?

15  A.  Yes.

16          MR. EDWARDS:  Ms. Badalament, can we go to the -- oh,

17  can we please open 9652 for Agent Cody.

18  BY MR. EDWARDS:

19  Q.  Now, Agent Cody, have you reviewed --

20          MR. EDWARDS:  If we can leaf through a few of these.

21  Thank you.

22  BY MR. EDWARDS:

23  Q.  Have you reviewed Exhibit 9652?

24  A.  Yes.

25  Q.  And does it consist of messages from some of these

1   individuals on the -- the afternoon of January 6th and

2   continuing on a little bit into February 2021?

3   A.  Yes.

4   Q.  Now, have you compared these messages to the underlying

5   extractions?

6   A.  I have.

7   Q.  And do these appear to be accurate?

8   A.  They do.

9           MR. EDWARDS:  Your Honor, at this time we would move

10   9652 into the record and to publish.

11           MS.  HALIM:  No objection.

12           THE COURT:  9652 will be admitted.

13           (Government Exhibit 9652 admitted into evidence.)

14   BY MR. EDWARDS:

15   Q.  Okay.  So a second ago you were talking about this dinner

16   on the night of January 6th.

17   A.  Yes.

18   Q.  Before announcing that dinner, what did Stewart Rhodes

19   message the group chat at 8:40 p.m.?

20   A.  "Be very careful and mindful that anything you say can and

21   will be used against you.  Expect it."

22   Q.  And what did he say next at 8:45?

23   A.  "God bless you, Brother, but be mindful anything you say

24   can and will be used against you.  All keep that in mind."

25   Q.  Does he send another message less than a minute later?

1    A.   Yes.

2    Q.   What does he say?

3    A.   "All con going to eat at Olive Garden, 8133 Leesburg Pike,

4    Vienna, Virginia, 22182.  Anyone still in D.C. area, you're

5    welcome to join us.  Going there now."

6    Q.   Now, after inviting everyone to meet face-to-face, what

7    does Vallejo message right after Rhodes?

8         MR. EDWARDS:  If we can go to the next slide.

9    A.   "Roger that.  10-19."

10        MR. EDWARDS:  Okay.  Now, before moving forward,

11   Ms. Badalament, can you pull up Exhibit 1518 that's already

12   been admitted.  And can you jump to 3 minutes and 13 seconds.

13   BY MR. EDWARDS:

14   Q.   Now, first, while this happens -- Agent Cody, are you

15   familiar with this exhibit?

16   A.   Yes.

17   Q.   And what are we looking at here?

18   A.   This appears to be Todd Kandaris.

19   Q.   Okay.  And is this surveillance footage -- take us back.

20   Is this surveillance footage of --

21   A.   CCTV footage.

22   Q.   Where?

23   A.   From inside the Comfort Inn in Arlington, Virginia.

24   Q.   Okay.  And from what day?

25   A.   From the 5th of January.

1    Q.  Now, a second ago you said this was Todd Kandaris?

2    A.  Yes.

3    Q.  Have you seen video and photographs of Todd Kandaris around

4    the time of the 6th?

5    A.  Yes, I have.

6    Q.  And so you're able to identify him?

7    A.  Yes.

8    Q.  What is his --

9              MR. PEED:  Can we get a little more foundation as to

10   which video.  It's not certain.

11   BY MR. EDWARDS:

12   Q.  Have you --

13             MR. EDWARDS:  Oh, sorry.

14             THE COURT:  I'm not sure what more you're asking for,

15   but are there additional questions to ask?

16             MR. EDWARDS:  I can, Your Honor.

17             THE COURT:  Go ahead.

18   BY MR. EDWARDS:

19   Q.  Agent Cody, have you seen photographs of -- not just

20   videos, but photographs of Todd Kandaris outside the time of

21   January 6th?

22   A.  Yes, I have.

23   Q.  And are you able to identify this individual?

24   A.  I am.

25   Q.  What's Mr. Kanderas's hair situation?

```
 1    A.   Absent.

 2    Q.   Okay.  So he's bald?

 3    A.   Yes.

 4              MR. EDWARDS:  Can we play forward 2 seconds.

 5              (A video recording was played.)

 6    BY MR. EDWARDS:

 7    Q.   Agent Cody, do you know who that is?

 8    A.   Edward Vallejo.

 9    Q.   And have you reviewed photographs and videos of

10    Edward Vallejo on January 6th, the time around January 6th, and

11    are you able to, based off that investigation, identify this

12    individual?

13    A.   Yes, I am.

14    Q.   So that's Edward Vallejo?

15    A.   Yes.

16    Q.   Who's he with?

17    A.   Mr. Kandaris.

18              MR. EDWARDS:  Now, Ms. Badalament, I'd like to show

19    Agent Cody a closer photograph of Mr. Vallejo.  Can we open

20    Exhibit 210.P.1.  It's already been admitted.

21         Ms. Badalament, can we zoom in on Mr. Vallejo's head.

22         Thank you.

23    BY MR. EDWARDS:

24    Q.   Agent Cody, can you please describe Mr. Vallejo's facial

25    hair on January 5th.
```

4008

1   A.  He has a beard ponytail.

2          MR. EDWARDS:  And, Ms. Badalament, can we zoom out

3   and zoom in on his hand.

4   BY MR. EDWARDS:

5   Q.  Agent Cody, do you -- what, if anything, do you notice

6   about Mr. Vallejo's hand?

7   A.  There is what appears to be tape on his thumb.

8   Q.  Okay.

9          MR. EDWARDS:  Ms. Badalament, can we please go back

10  to 9652 where we left off with Edward Vallejo messaging "Roger

11  that" about meeting at the Olive Garden dinner, and can we

12  please go to the next slide.

13  BY MR. EDWARDS:

14  Q.  So continuing on that evening of January 6th, do you see

15  this message from Gator 6?

16  A.  Yes.

17  Q.  Who is Gator 6?

18  A.  Kenneth Harrelson.

19  Q.  And is that the same individual that had recorded the video

20  we watched earlier?

21  A.  Yes.

22  Q.  What did he say to the group chat?

23  A.  "Didn't realize I was in an unsecured chat with a bunch of

24  shit bags."

25  Q.  Now, how does he describe the chat?

1    A.  Unsecured.

2              MR. EDWARDS:  Ms. Badalament, can we go to the next

3    slide.  And are we able to zoom out?  It will auto adjust.  Oh,

4    great.  Thank you.

5    BY MR. EDWARDS:

6    Q.  Agent Cody, first, just generally, what is this we're

7    looking at?

8    A.  This is a -- appears to be screenshots from the OK FL DC OP

9    Jan 6 Signal chat.

10   Q.  And so are you familiar with the times when the FBI

11   extracted Signal -- the FBI had to screenshot the phone instead

12   of doing a logical extraction?

13   A.  Yes.

14   Q.  So does this appear to just be one of those screenshots?

15   A.  Yes.

16   Q.  Now, you mentioned the group chat.  I want to highlight it.

17   Is that -- is this what you're talking about here?

18   A.  Yes.

19   Q.  At the top, I've circled it, just for the record.  And so

20   it's the OK FL DC OP Jan 6 chat?

21   A.  Yes.

22   Q.  And is that a Florida group chat that Hackett and Moerschel

23   were in?

24   A.  Yes.

25   Q.  Are you familiar with what day these messages are from?

4010

1    A.   January 7th, 2021.

2    Q.   Can you just walk, message by message, through this slide

3    for the jury.

4    A.   You want me to read all of them?

5    Q.   Yes.

6    A.   Okay.  Whippit says at 5:09 a.m., "Good morning.  Don't

7    know if the guy with van that drove me here will be awake yet,

8    but I leave a garbage bag with my sleeping bag in it in his

9    van.  If you hear from him before you leave, can you grab it,

10   please.  If not, it okay.  I'll get it back some day."

11        OK Gator 1 responds at 5:10 a.m., "Tell Tom,

12   Kraut (phonetic) can drive him but he needs to get in contact."

13   Q.   Now, before you move on, is -- OK Gator 1, who is that

14   again?

15   A.   It's Kelly Meggs.

16   Q.   Okay.  You can continue.  Thank you.

17   A.   Oh, Whippit responds at 5:11 a.m., "He knows - I'll remind

18   him to call him.  He's still sleeping."

19   Q.   Now, this next message, it appears different.  Can you

20   explain why it looks different.

21   A.   It's a response.  So it's Hatsy's response to Whippit's

22   previous -- one of Whippit's previous messages.

23   Q.   Okay.  Got it.

24        And, Agent Cody, who is Hatsy?

25   A.   Hatsy is David Moerschel.

4011

1  Q.  And is that just his Signal name here at the upper left?

2  A.  Yes.

3  Q.  So on January 7th, what does Hatsy say to the group chat?

4  A.  "We have your back.  We will leave it with Kane at the QRF.

5  We are en route."

6  Q.  And let me just break that message down for a second.

7       So, Agent Cody, "We will leave it with Kane," do you

8  know who goes by Kane in the group chat?

9  A.  Gator Kane.  It's Kenneth Bittner, B-i-t-t-n-e-r.

10  Q.  Is -- Kenneth Bittner, is he on the board?

11  A.  Yes.

12  Q.  Where is he?

13  A.  Should be under QRF, in the second row from the bottom.

14  Q.  Okay.  And is he also from Florida?

15  A.  Yes.

16  Q.  So he says, "We'll leave it with Kane at the QRF."

17       MR. EDWARDS:  Can we go to the next slide,

18  Ms. Badalament.

19  BY MR. EDWARDS:

20  Q.  It says, "We're en route there now."  And can you just pick

21  up from there?

22  A.  "Anyone else leave anything in the white van, we can leave

23  it for you at QRF."

24  Q.  And can you just read that slowly.

25  A.  Sure.

1    "Anyone else leave anything in the white van, we can

2    leave it for you at QRF."

3    Q.  Okay.  Then Whippit says "Thank you."

4         What does -- you can just pick up from G Strike.

5    A.  G Strike says at 6:36 a.m., "I need a route to GG Sol's RV

6    in College Park 20 miles from J.W. Marriott.  Can anyone help?"

7         Gator Kane responds at 6:37, "I need a ride to BWI if

8    anybody is going that way.  Thx."

9    Q.  And then that's on January 7th at 6:37 a.m.  The next

10   slide, I'll show what Gator 6 says.  And, again, is Gator 6 --

11   that's Kenneth Harrelson?

12   A.  Yes.

13   Q.  What does Kenneth Harrelson message?

14   A.  8:55 a.m., "So we're just leaving D.C., and I would like to

15   know where my shit's at since it seems everyone's gone

16   already."

17   Q.  Okay.  So a couple times their messages go back and forth,

18   but fair to say, Kenneth Harrelson is focused on where --

19   focused on his shit?

20   A.  Yes.

21   Q.  That's what he says?

22        All right.  What does Aunt Tracy say?

23   A.  At 8:55 a.m., "We are headed out now."

24   Q.  Now, at 8:56, what does Gator Kane -- or Kenneth Bittner --

25   respond to Kenneth Harrelson?

4013

1    A.  "Did you leave it at Comfort Inn in that room?"

2    Q.  Are you familiar with the Comfort Inn?

3    A.  Yes.

4    Q.  Is that the hotel you've talked about with the surveillance

5    footage?

6    A.  Yes, it is.

7    Q.  What does Kenneth Harrelson respond at 8:57?

8    A.  "No answer.  Okay.  I'll just hunt you fuckers down."

9    Q.  Now, what does -- and it'll take a bit of bouncing back and

10   forth, but what does Kelly Meggs message after

11   Kenneth Harrelson's message?

12   A.  "Won't be hard to find us.  We're on TV."

13   Q.  And you can continue forward from there.

14   A.  Aunt Tracy says, "Who was TV?"

15        OK Gator 1 responds, "All of us."

16        Aunt Tracy responds, "Copy."

17   Q.  Okay.  So we'll stop there.  Do you see this -- these words

18   here in the center?

19   A.  Yes.

20   Q.  It doesn't look like the other messages.  So can you just

21   describe what's going on here.

22   A.  I believe these are system messages to notify other users

23   of things that have occurred in the group chat.

24   Q.  All right.  So if we could zoom out.  Well, first -- yeah,

25   we can zoom out.

1    So after Kelly Meggs messages that they're all on TV on

2    the morning of January 7th, can --

3    MR. EDWARDS:  Ms. Badalament, can you focus on the

4    second one.

5    BY MR. EDWARDS:

6    Q.  What does the system update say?

7    A.  "Ahab changed their profile name to Faith."

8    Q.  And can you describe for the jury, who went by Ahab?

9    A.  Joseph Hackett.

10   Q.  And what did Joseph Hackett do on the morning of

11   January 7th?

12   A.  Changed profile name to Faith.

13   Q.  All right.  Now, what does Hatsy, or David Moerschel,

14   respond to Kenneth Harrelson after that at 9:35?

15   A.  DM Kane.

16   Q.  Are you familiar with the phrase DM?

17   A.  It's direct message.

18   Q.  And, again, who is Kane?

19   A.  Kane is Kenneth Bittner.

20   Q.  Now, Agent Cody, did Mr. Hackett and Mr. Moerschel and

21   Mr. Harrelson and others, in fact, go to that QRF hotel on the

22   morning of January 7th?

23   A.  Yes.

24   Q.  Earlier that morning?

25   A.  Yes.

1    Q.  What did they do?

2    A.  Picked up their weapons.

3          MR. EDWARDS:  Ms. Badalament, can we please pull up

4    Exhibit 1518 that we were at a second ago, and can we jump to

5    and pause at 7 minutes and 3 seconds.

6          Now, we'll go forward -- thank you so much.

7    BY MR. EDWARDS:

8    Q.  Agent Cody, where is this, generally?

9    A.  I think this is on the second floor of the Comfort Inn.

10   Q.  All right.  And what day is this?

11   A.  January 7th, 2021.

12   Q.  What time?

13   A.  7:20 a.m.

14   Q.  So is that in the middle of that time of messages you just

15   reviewed from 6:00 a.m. to about 9:35?

16   A.  Yes.

17   Q.  Okay.  Can you identify who the individual in the blue

18   shirt is here in the front?

19   A.  The blue shirt is Kenneth Bittner.

20   Q.  And who is the person on the right?

21   A.  David Moerschel.

22   Q.  Okay.  Agent Cody, I'll ask you similar questions.  For

23   both of those individuals, have you reviewed photographs and

24   videos of both Kenneth Bittner and David Moerschel on the day

25   of the 6th and other days not the 6th?

1    A.  Yes.

2    Q.  And based on your investigation, having reviewed those

3    documents, are you able to identify these two individuals?

4    A.  I am.

5    Q.  Okay.  So this is --

6         MR. EDWARDS:  Can we just play forward 1 second,

7    Ms. Badalament.

8    BY MR. EDWARDS:

9    Q.  Okay.  So what --

10        MR. EDWARDS:  In fact, Ms. Badalament, can we just

11   play forward to 7:22.

12        (A video recording was played.)

13   BY MR. EDWARDS:

14   Q.  Okay.  We'll pause now.  Generally, what did we see happen

15   in that video?

16   A.  They wheeled a luggage cart into the elevator.

17   Q.  And who was wheeling that luggage cart into the elevator?

18   A.  Mr. Moerschel.

19   Q.  All right.  And, generally, what's on the luggage cart?

20   A.  Big duffle bags and what looks like a hard, possibly

21   plastic, case that's leaning at an angle there, highlighted in

22   red.

23   Q.  Okay.  I'll pause here.

24        Did the FBI acquire from Mr. Moerschel firearms that he

25   brought to the QRF hotel around the time of January 6th?

1    A.  Yes.

2    Q.  Now, did the FBI acquire those firearms from

3    Mr. Moerschel's counsel, Mr. Scott Weinberg?

4    A.  Yes.

5            MR. EDWARDS:  Agent, if you could please right now

6    show Mr. Weinberg Exhibits 122 through 126.

7            And we might just take a quick administrative step to

8    pull up some of these exhibits, Agent Cody.

9            Okay.  Thank you.

10           Just for the record, an agent has brought Agent Cody

11    Exhibits 123 and 126.

12           Before I ask questions, we can just get this out of the

13    way.

14           Agent, can you please also bring Exhibits 122 and 124.

15           All right.  Thank you.

16           Okay.  Thank you very much.

17           UNIDENTIFIED AGENT:  You're welcome.

18    BY MR. EDWARDS:

19    Q.  Agent Cody, let's start with Exhibit 123, the hard case

20    there.  And could you please show that to the jury.

21           Thank you.  Great.

22           Can you please open up Exhibit 123 and hold up for the

23    jury Exhibit 126.

24           Okay.  Just briefly as you do this, can you describe --

25    first of all, let me just take a step back.

1          Has the FBI rendered that -- what is this?

2    A.  This is a Mark 18223 rifle.

3    Q.  And has the FBI rendered that rifle inoperable by putting a

4    zip tie through the firearm?

5    A.  Yes.

6    Q.  In compliance with the marshals' standard by bringing in

7    firearms to the courthouse?

8    A.  Yes.

9    Q.  Okay.  Generally, we would ask you -- I'd ask some

10   questions whether the FBI acquired the firearms that

11   Mr. Moerschel brought.  Can you just describe the case and the

12   rifle to the jury.

13   A.  So it's a plastic Daniel Defense.  That's the manufacturer

14   of the gun.  This is a Daniel Defense Mk18 rifle.

15   Q.  Thank you, Agent Cody.

16          Can you take a second to just put both of those away,

17   and we'll walk through the next two.

18          Can you hold up for the jury now Government's

19   Exhibit 122, and then, I believe, Government's Exhibit 125

20   should be inside of it.

21   A.  122.

22   Q.  Thank you.

23   A.  It's a Vertx duffle bag.

24   Q.  Thank you, Agent Cody.

25          I apologize.  I wanted to make sure I didn't forget a

1    question.

2         So have you -- can you please now open Government's

3    Exhibit 125.  I'll ask a similar question.

4         Has the FBI rendered this firearm inoperable --

5    A.  Yes.

6    Q.  -- in compliance with the marshals' standard?

7    A.  Yes.

8    Q.  Great.

9         Can you describe for the jury what is it that they're

10   looking at here in Government's Exhibit 125?

11   A.  This is a Glock Model 21 .45 caliber pistol.

12   Q.  Okay.  And can you please describe for the jury, just

13   generally, what was -- can you describe the bag.

14   A.  It's a Vertx duffle bag.

15   Q.  Okay.

16         MR. EDWARDS:  At this time, Your Honor, the

17   government moves to admit Exhibits 122 through 126.

18         MR. WEINBERG:  No objection.

19         THE COURT:  All right.  122 through 126 are admitted.

20         (Government Exhibits 122 through 126 admitted into

21   evidence.)

22         MR. EDWARDS:  Thank you.

23         Thanks, Agents.

24   BY MR. EDWARDS:

25   Q.  All right.  Thank you, Agent Cody.

4020

1          MR. EDWARDS:  Ms. Badalament, can we now turn our

2    attention back to Exhibit 1518 and play forward to 7 minutes

3    and 28 seconds.

4          (A video recording was played.)

5          MR. EDWARDS:  Now, can we pause here at 7 minutes and

6    28 seconds.

7    BY MR. EDWARDS:

8    Q.  Agent Cody, who is in the -- well, we've already identified

9    a few.  So let me just start at the left.  Who is in the lobby

10   at 7:25 a.m. at the hotel?

11   A.  So this is the second floor, I believe.

12   Q.  Correct.  I'm sorry.  The elevator lobby.

13   A.  The far left is Joseph Hackett.

14   Q.  And then who is on the far right here holding the elevator?

15   A.  Caleb Berry.

16   Q.  And to the left?

17   A.  To the left of Mr. Berry is Kelly Meggs.

18   Q.  Okay.  And for those three individuals, in the course of

19   your investigation, have you reviewed photographs and videos of

20   Joseph Hackett, of Kelly Meggs, and of Caleb Berry on and

21   around January 6th?

22   A.  Yes, I have.

23   Q.  Okay.  And have you, in fact, seen Caleb Berry in person?

24   A.  Yes.

25   Q.  And Kelly Meggs in person?

```
1   A.  Yes.

2   Q.  And so can you identify these three individuals on this

3   screen?

4   A.  Yes, I can.

5   Q.  Now, Agent Cody, can you please --

6            MR. EDWARDS:  Or, Ms. Badalament, can we play forward

7   to 7 minutes and 45 seconds.

8            (A video recording was played.)

9            MR. EDWARDS:  Okay.  We'll stop here.

10  BY MR. EDWARDS:

11  Q.  Agent Cody, can you just describe for the jury what is it

12  we were watching this group of individuals do on the second

13  floor?

14  A.  Again, they're wheeling a luggage cart onto the elevator.

15  Q.  Okay.  And in case I didn't do a -- do this the last

16  question, were you able to base your identifications somewhat

17  on the body types, the height, and the attire they're wearing?

18  A.  Yes.

19  Q.  Okay.  Now, they're wheeling it into the elevator?

20  A.  Yes.

21  Q.  All right.  And this is 7:52 a.m.  So is this still that

22  time frame in -- where we -- between where the messages were

23  sent that we reviewed a little bit ago about going to the QRF

24  hotel?

25  A.  It is.
```

1    Q.  Can you describe, generally, what's on the cart.

2    A.  So it's like more duffle bags on the bottom of the cart and

3    then another, what appears to be, hard, possibly plastic, case

4    leaned up at an angle.

5    Q.  Okay.

6         MR. EDWARDS:  Can we please play forward,

7    Ms. Badalament, to 7 minutes and 54 seconds.

8         (A video recording was played.)

9    BY MR. EDWARDS:

10   Q.  Now, Agent Cody, this individual here, Kenneth Bittner in

11   the blue shirt, is that the same person that's been in many of

12   these videos that morning on January 7th?

13   A.  Yes.

14   Q.  And who is this person on the far left?

15   A.  It's Jeremy Brown.  He's a Florida Oath Keeper.

16   Q.  And was he -- did he travel to Washington, D.C., with the

17   group?

18   A.  He did.

19   Q.  Is he on the board?

20   A.  I don't believe so.  Yeah, there he is.  Bottom row under

21   line 1 --

22   Q.  Okay.  And --

23   A.  -- to the right.

24   Q.  And what Signal moniker did he go by?

25   A.  GG Sol.

1    Q.  Had we seen a reference to GG Sol in some of those messages

2    about going to the QRF hotel?

3    A.  Yes.

4    Q.  Now, what -- have you seen photographs and videos of

5    Jeremy Brown on or around January 6th?

6    A.  Yes, I have.

7    Q.  And so are you able to pull from that investigation to

8    identify this individual?

9    A.  Yes.

10              MR. EDWARDS:  Now, can we play forward to 8 minutes

11   and 5 seconds, Ms. Badalament.

12              (A video recording was played.)

13   BY MR. EDWARDS:

14   Q.  So about an hour later, at 9:07 a.m., what -- what happened

15   in that same second-floor lobby?

16   A.  They load another luggage cart onto the elevator.

17   Q.  And can you describe generally for the jury what's on the

18   cart.

19   A.  It looks like another hard-sided case standing up,

20   highlighted in red, and various duffle bags and backpacks.

21              MR. EDWARDS:  Okay.  Can we play forward to 8 minutes

22   and 10 seconds.

23              (A video recording was played.)

24   BY MR. EDWARDS:

25   Q.  Now, Agent Cody, what -- is this the same morning,

1    January 7th?

2    A.  Yes.

3    Q.  Is this later in the morning at 9:35 a.m.?

4    A.  Yes, it is.

5          MR. EDWARDS:  And we can play forward just a couple

6    of seconds, Ms. Badalament.

7          (A video recording was played.)

8    BY MR. EDWARDS:

9    Q.  Agent Cody, are you able to identify the person on the far

10   left and the person -- or the people on the surveillance?

11   A.  Yes.

12   Q.  And who's on the far left?

13   A.  Jason Dolan.

14   Q.  Who's this on the far right?

15   A.  Kenneth Harrelson.

16   Q.  Now, are you able to base that identification on your

17   investigation into photographs and videos of these individuals

18   on or around January 6th?

19   A.  Yes.

20   Q.  All right.  So Kenneth Harrelson had messaged a little bit

21   ago about collecting his shit; correct?

22   A.  Yes.

23          MR. EDWARDS:  Can we play forward to 8 minutes and

24   13 seconds, Ms. Badalament.  I'm sorry, 8 minutes and

25   21 seconds.

```
 1                    (A video recording was played.)
 2    BY MR. EDWARDS:
 3    Q.  Okay.  Generally, what did the -- what happened at
 4    9:35 a.m. on the second floor there?
 5    A.  Looks like they're wheeling another luggage cart towards
 6    the elevator.
 7    Q.  And based on your investigation, to orient the jury, what's
 8    around that corner?  It sounds like you just said it, but I
 9    wanted to ask.  So, basically, when you hang that left, are you
10    going into that elevator lobby?
11    A.  Yes.
12    Q.  Okay.  And what are they wheeling?
13    A.  Another luggage cart with what looks to be at least two
14    hard-sided containers on it.
15    Q.  Okay.  I'll pause here again.  And I'm going to read a
16    stipulation that the parties have reached in agreement.
17              MR. EDWARDS:  So at this time, Your Honor, if I could
18    read it to the jury.
19              On June 16th, 2021, Jason Dolan caused the following
20    items of evidence to be produced to the United States Pretrial
21    Services Office, and the FBI subsequently collected those
22    items:  Exhibit 35, a green gun case labeled Michael Waddell's
23    Bone Collector; and Exhibit 37, a Mag Tactical Systems MG-G4
24    brown-and-black-in-color rifle with a paracord sling.
25              And if I could ask the agents to bring both of those
```

4026

1    exhibits up to Agent Cody, please, after stepping here and

2    showing some of the defense counsel.

3            Thank you.

4            All right.  As the agents bring up to Agent Cody the

5    exhibits -- this is 35 and 37 -- I'd just move both exhibits

6    into evidence pursuant to the stipulation at this time,

7    Your Honor.

8                    THE COURT:  Okay.  They'll be admitted.

9                    (Government Exhibits 35 and 37 admitted into

10   evidence.)

11   BY MR. EDWARDS:

12   Q.  Now, Agent Cody, what color are the cases there in the

13   hotel surveillance?

14   A.  They appear to be green.

15   Q.  Can you please hold up Government's Exhibit 35 for the

16   jury.

17           Okay.  Can you describe that Exhibit 35 to the jury.

18   A.  It's a green gun case, Michael Waddell's Bone Collector

19   brand.

20   Q.  Now, can you please open Exhibit 35 and show the jury

21   Exhibit 37.

22           Okay.  Agent Cody, does this appear to be Exhibit 37,

23   the Mag Tactical Systems MG-G4 that's brown and black in color?

24   A.  Yes, it does.

25   Q.  Can you just -- first, has this firearm been rendered

4027

1    inoperable by the FBI pursuant to the marshals' standards to

2    bring rifles into the courthouse?

3    A.  It has.

4    Q.  All right.  Can you take a second and describe this item,

5    Exhibit 37, to the jury.

6    A.  This is another AR-15 platform 5.56/.223 caliber

7    semiautomatic rifle.

8    Q.  Pursuant to the stipulation, was this Jason Dolan's?

9    A.  Yes.

10   Q.  Now -- thank you, Agent Cody.  You can put that back.

11        MR. EDWARDS:  If the agents could collect both

12   exhibits.

13        Thank you.

14   BY MR. EDWARDS:

15   Q.  Agent Cody, who is this pushing the cart on the

16   surveillance footage at 8 minutes 21 seconds?

17   A.  Jason Dolan.

18   Q.  All right.

19        MR. EDWARDS:  Ms. Badalament, can we please go back

20   now to Slide -- I believe it's 9 on 9652.

21   BY MR. EDWARDS:

22   Q.  Great.  Okay.  So after Ahab, or Hackett, changes his

23   profile name to Faith --

24        MR. EDWARDS:  Can we go to the next slide on the

25   exhibit, Ms. Badalament.

1    BY MR. EDWARDS:

2    Q.  Now, that group chat that we saw the screenshots for, that

3    was the OK FL DC OP Jan 6?

4    A.  Yes.

5    Q.  Are there other system updates to some of these group chats

6    later in the day on January 7th?

7    A.  Yes.

8    Q.  What system update came across on 9:57 a.m. later that

9    morning?

10    A.  Faith removed Faith.

11    Q.  And, generally, do you understand what that system update

12    means?

13    A.  Yes, it's when -- when an individual removes him or herself

14    from a group chat.

15    Q.  And did you see other examples of this that morning?

16    A.  Yes.

17              MR. EDWARDS:  Can we go to the next slide.

18    BY MR. EDWARDS:

19    Q.  Can you read the message that Gator 2- -- the system update

20    about Gator 242.

21    A.  Gator 242 removed Gator 242.

22    Q.  Do you know whose Signal moniker Gator 242 is?

23    A.  Yes, Caleb Berry.

24    Q.  Did we see Caleb Berry on that hotel surveillance that

25    morning?

```
1    A.  Yes, he was holding the elevator open.
2    Q.  And can you please go to the next message.  What does this
3    message update say?
4    A.  Gator 6 removed Gator 6.
5    Q.  And what time in the morning?
6    A.  11:44 a.m.
7    Q.  Was that the same morning -- well, first of all, who is
8    Gator 6?
9    A.  Kenneth Harrelson.
10   Q.  Was that the same morning that Kenneth Harrelson went to
11   that hotel?
12   A.  Yes.
13   Q.  Is this still that same OK FL DC OP Jan 6 group chat?
14   A.  Yes, it is.
15            MR. EDWARDS:  Can we go to the next slide, please.
16   BY MR. EDWARDS:
17   Q.  What happened at -- on January 7th at 3:45 in the
18   afternoon?
19   A.  Faith removed Faith.
20   Q.  From what group chat?
21   A.  Vetted OK FL Hangout.
22   Q.  Is the Vetted OK FL Hangout the group chat that we played
23   Mr. Harrelson's video from where Kelly Meggs said OK F --
24   "Florida OK take the Capitol"?
25   A.  Yes, it is.
```

1          MR. EDWARDS:  Okay.  Ms. Badalament, can we please go

2     to the next slide.

3     BY MR. EDWARDS:

4     Q.  That morning, January 7th at 9:02 a.m., did -- what did

5     Roberto Minuta message the group chat?

6     A.  "Inside the front entrance."

7     Q.  Now, are you familiar with whether there were any

8     attachments to that video -- or to that message in Stewart

9     Rhodes's phone?

10    A.  Yes.

11          MR. EDWARDS:  Okay.  Can we first go to the next

12    message on the slideshow.

13    BY MR. EDWARDS:

14    Q.  What did Ed Vallejo message that same group chat at 9:10?

15    A.  "I'm not being allowed to share this video.  It says it

16    can't resize it."

17    Q.  To what was Ed Vallejo trying to share?

18    A.  The previous video.

19    Q.  And -- so if we can go back to that previous message.  So

20    this was just 8 minutes prior where Roberto said, "Inside the

21    front entrance"?

22    A.  Yes.

23    Q.  Now, in -- going into the phone -- first of all, whose

24    phone was this from?

25    A.  I believe this was from Stewart Rhodes's phone.

1    Q.  And in going into Stewart Rhodes's phone, were you able to

2    see if there was an attachment to this video on Rhodes's phone?

3    A.  Yes.

4    Q.  And was there?

5    A.  Yes.

6              MR. EDWARDS:  Ms. Badalament, can we please pull up

7    Government's Exhibit 111.V.1.

8    BY MR. EDWARDS:

9    Q.  And, in the meantime, Agent Cody, did you recover this

10   message from Mr. Minuta's phone?

11   A.  No.

12   Q.  Did you recover the video attachment from Mr. Minuta's

13   phone?

14   A.  No.

15   Q.  Okay.  So that morning --

16              (An audio-visual recording was played.)

17   BY MR. EDWARDS:

18   Q.  That morning -- and this has been admitted, I believe.

19   Have you reviewed the video that was attached to Minuta's

20   message on Rhodes's phone?

21   A.  I have.

22              MR. EDWARDS:  Okay.  Can we just play the first

23   30 seconds or so for the --

24              (An audio-visual recording was played.)

25              MR. EDWARDS:  Okay.  Can we pause here.

1    BY MR. EDWARDS:

2    Q.  Agent Cody, generally, where is this?

3    A.  This is the Rotunda, inside the Capitol.

4    Q.  And is that, generally, inside the front entrance of the

5    Capitol?

6    A.  Yes.

7    Q.  And have you reviewed this video in its entirety?

8    A.  Yes, I have.

9    Q.  Are you able to confirm based on other videos who was

10   recording this video?

11   A.  Yes.

12   Q.  Who?

13   A.  Roberto Minuta.

14   Q.  And do you see this individual in the video in the center

15   here with this patch --

16   A.  Yes, I do.

17   Q.  -- that I've circled in the center?

18        Who is that individual?

19   A.  Joshua James.

20        MR. EDWARDS:  Okay.  Can we just play 30 more

21   seconds.

22        (An audio-visual recording was played.)

23   BY MR. EDWARDS:

24   Q.  Okay.  Agent Cody, generally, can you describe for the jury

25   what this video showed.

1    A.  Shows rioters pushing against riot police inside the

2    Rotunda.

3    Q.  Did you hear both Mr. Minuta and Mr. James yelling?

4    A.  Yes.

5            MR. PEED:  Objection.  Lacks foundation.

6    BY MR. EDWARDS:

7    Q.  Have you heard --

8            MR. EDWARDS:  I apologize.

9            THE COURT:  The -- the objection is sustained.

10   BY MR. EDWARDS:

11   Q.  Agent Cody, did you say that -- you said earlier Mr. Minuta

12   recorded this video; correct?

13   A.  Yes.

14   Q.  Have you watched other videos that Mr. Minuta recorded?

15   A.  Yes.

16   Q.  And have you heard him yell on those videos?

17   A.  Yes.

18   Q.  And have you seen Mr. James in person?

19   A.  I have.

20   Q.  Have you heard him speak?

21   A.  Yes.

22   Q.  Are you able to identify Mr. Minuta's voice and Mr. James's

23   voice on this video?

24   A.  Yes.

25   Q.  Okay.

1           MR. EDWARDS:  We can take that down, Ms. Badalament,

2    and go back to 9652.

3    BY MR. EDWARDS:

4    Q.  Did -- a little later in the afternoon on January 7th, did

5    Mr. Minuta message the group chat about videos again?

6    A.  Yes.

7           MR. EDWARDS:  Can we go back -- down two slides,

8    Ms. Badalament.

9    BY MR. EDWARDS:

10   Q.  What did Roberto Minuta message the group chat at

11   5:51 p.m.?

12   A.  "Couple of faces exposed in the last video that didn't want

13   to be shown.  Sorry.  Had to delete footage from inside."

14   Q.  What was he concerned about being exposed?

15   A.  Faces.

16   Q.  What did he say he had to do?

17   A.  Delete footage.

18   Q.  From where?

19   A.  Inside.

20          MR. EDWARDS:  If we go to the next slide, please.

21   BY MR. EDWARDS:

22   Q.  What does Kellye SoRelle message the Old Leadership Chat at

23   11:16 a.m.?

24   A.  "All comm from Stewart.  Stop chatter and listen."

25   Q.  Now, was Stewart Rhodes on that Old Leadership chat?

4035

1    A.  Yes.

2    Q.  Was Kelly Meggs?

3    A.  Yes.

4    Q.  Can you remind the jury, is Kelly Meggs from Florida?

5    A.  Yes.

6    Q.  Was Joshua James?

7    A.  Yes.

8    Q.  Okay.

9         MR. EDWARDS:  Can we go to the next slide, please.

10   BY MR. EDWARDS:

11   Q.  What does Kellye SoRelle continue?

12   A.  "This is Stewart.  So you see this message."

13   Q.  So is Kellye SoRelle messaging "This is Stewart"?

14   A.  Yes.

15        MR. EDWARDS:  Okay.  If we go to the next slide,

16   please.

17   BY MR. EDWARDS:

18   Q.  At 11:20, what does the device from Kellye SoRelle message

19   the Old Leadership chat?

20   A.  From Stewart part two, "Do not chatter about any OK members

21   doing anything at Capitol.  Stop the chatter.  I told you

22   before that anything you say can and will be used against you.

23   Apparently that wasn't strongly worded enough for some to get

24   the message."

25   Q.  Now, if you can read a little slower the next message.

1    A.  "So let me say it like this.  Clam up.  Do not say a damn

2    thing."

3    Q.  Okay.  So was this the next day after that surveillance

4    footage that we watched in the QRF hotel?

5    A.  Yes.

6    Q.  Does Kellye SoRelle continue -- does the device continue to

7    message the group chat?

8    A.  Yes.

9    Q.  All right.  And after having said "This is Stewart," what

10   does Stewart message at 11:23?

11   A.  From Stewart, "We are still in the twilight before open

12   conflict.  In this environment 'lawfare' by the black hats is a

13   very real threat.  They will be coming after anyone they can

14   identify as being in the building.  Do not make it easier for

15   them.  Make them do their own work."

16   Q.  Okay.  Agent Cody, did the FBI do work and find this

17   message?

18   A.  Yes.

19   Q.  11:45 a.m. -- if we can go to the next slide -- what did

20   Stewart message?

21   A.  Stewart, "Let me finish this point.  Do not chat about

22   Oath Keepers members allegedly doing anything at Capitol.  Go

23   dark on that.  Do not discuss.  That's what I would advise any

24   criminal defense client to to [sic] anyone who is at risk of

25   being accused and indicted."

1    Q.  Can we continue at 11:45.

2    A.  "Let me put it in infantry speak.  Shut the fuck up.  Do

3    not discuss who did what.  Go silent.  Comms discipline.  Don't

4    write AARs.  Don't do verbal AARs.  Don't chat with your

5    buddies or your team.  Clam up."

6    Q.  You see here that this message says AARs?

7    A.  Yes.

8    Q.  Do you know what an AAR is?

9    A.  I believe it's an after action review.

10   Q.  What is that?

11   A.  Usually after an operation in the military or in law

12   enforcement, those who participated in the operation will

13   gather together to discuss how the operation went to see if

14   there are lessons to be learned for the future.

15          MR. EDWARDS:  And can we go to the next slide,

16   please.

17   BY MR. EDWARDS:

18   Q.  What does Stewart say -- well, what does the message say

19   here?

20   A.  Stewart, "You-all need to delete any of your comments

21   regarding who did what.  You are under zero obligation to

22   leave them up.  You/we have not yet gotten the preservation

23   order instructing us to retain those chat comments.  So delete

24   them."

25   Q.  And it continues.

1  A.  "I can't delete them because this is a legacy Signal chat

2  that doesn't let me delete comments.  Only the comment author

3  can delete a comment.  So get busy.  Delete your

4  self-incriminating comments or those that can incriminate

5  others."

6  Q.  Okay.  What kind of comments does he say to delete?

7  A.  Self-incriminating ones.

8  Q.  Or?

9  A.  Or those that can incriminate others.

10 Q.  All right.  Did the FBI find evidence that members of this

11 chat spread that message?

12 A.  Yes.

13         MR. EDWARDS:  Can we go to the next slide, please.

14 BY MR. EDWARDS:

15 Q.  And before we go there, what does Kellye SoRelle

16 finalize -- or send at 11:52?

17 A.  "Start now.  Each of you go back to before the event and

18 scroll forward and hunt down any comment you made that can be

19 used against you, other Oath Keepers, or the org and delete

20 them, and especially AARs and war stories.  Kill them.  Do it

21 now."

22 Q.  Okay.  Did -- earlier you said that you found evidence that

23 members of this group chat spread this message?

24 A.  Yes.

25         MR. EDWARDS:  Can we go to the next slide, please.

1    BY MR. EDWARDS:

2    Q.  What are we looking at here from 12:29 p.m. on January 8th?

3    A.  This is a screenshot of one of the previous messages

4    from -- it was to -- to Mr. Grods.

5    Q.  Okay.  So if we take a step back.  This is a message from

6    Joshua James to Mark Grods?

7    A.  Yes.

8    Q.  Okay.  Who is Mark Grods?

9    A.  Mark Grods is another Alabama Oath Keeper.

10   Q.  And is he on the board?

11   A.  Yes.

12   Q.  Where?

13   A.  Under line 2 at the very bottom.

14   Q.  And is he in that same column as Joshua James and

15   Roberto Minuta?

16   A.  Yes.

17          MR. EDWARDS:  Now, if we could zoom in on the actual

18   screenshot.

19   BY MR. EDWARDS:

20   Q.  Does Josh James send a screenshot to Mark Grods?

21   A.  Yes.

22   Q.  What does it appear to be a screenshot of?

23   A.  Appears to be a screenshot of the leadership intel sharing

24   secured Signal chat, one of the previous chats from

25   Kellye SoRelle as Stewart Rhodes.

1    Q.  And is this one of the messages that you just reviewed a

2    couple seconds ago?

3    A.  Yes.

4    Q.  Into that same group chat.

5         So if I could just read, is this the message that you

6    all need to delete any of your comments regarding who did what?

7    A.  Yes.

8              MR. EDWARDS:  Just go back two slides here.  One

9    more.

10   BY MR. EDWARDS:

11   Q.  That's this message you just reviewed?

12   A.  Yes.

13   Q.  11:51 that day?

14   A.  Yes.

15   Q.  I see.

16             MR. EDWARDS:  Can we go two more.

17   BY MR. EDWARDS:

18   Q.  And so after Joshua James sends this screenshot to

19   Mark Grods --

20             MR. EDWARDS:  Can we go to the next slide --

21   BY MR. EDWARDS:

22   Q.  -- what does Joshua James add?

23   A.  "We need to make sure that all Signal comms about the op

24   has been deleted and burned."

25   Q.  And do Joshua James and Mark Grods engage in a conversation

1    at that point?

2    A.   Yes.

3    Q.   What does Mark Grods respond?

4    A.   "Does leaving the group delete them?"

5    Q.   And does Josh James say something back?

6    A.   Yes.

7    Q.   What did he say?

8    A.   "No.  Just press and hold to get trash bin icon and delete

9    messages.  Just taking all necessary precautions is all."

10   Q.   Okay.  So after -- does it appear that Josh James is

11   instructing him on how to do this?

12   A.   Yes.

13   Q.   So after that, does Mark Grods respond?

14   A.   Yes.

15   Q.   What does he say?

16   A.   "I'll be drunk for the couple of days for sure.  Above.

17   Done."

18   Q.   So in Signal, do messages come in one on top of the other,

19   stacked up?

20   A.   Essentially.

21   Q.   And so meaning -- can you just -- so he says here "Above.

22   Done"?

23   A.   Yes.

24   Q.   Okay.

25              MR. EDWARDS:  Can you go to the next slide,

```
1    Ms. Badalament.

2    BY MR. EDWARDS:

3    Q.  And is there a system-generated message, then, that was

4    found on Joshua James's phone?

5    A.  Yes.

6    Q.  What did that system-generated message show?

7    A.  This message was deleted.

8    Q.  Okay.  Similarly --

9            MR. EDWARDS:  Can we go to the next slide.

10   BY MR. EDWARDS:

11   Q.  -- in early February, on February 4th now, does

12   Kenneth Harrelson message Kelly Meggs directly?

13   A.  Yes.

14   Q.  What does Kenneth Harrelson say?

15   A.  "Is there any way we can clear out the messages in our

16   chats?  I don't think it would be a bad idea.  Clear out all

17   the talk of hiding the tools and shit."

18   Q.  And so earlier when he had asked where his shit was, is he

19   using the same word here?

20   A.  Presumably.

21   Q.  And he messaged that before he went to the QRF hotel that

22   morning?

23   A.  Yes.

24   Q.  Now, here, fast-forward to February, after saying how to

25   clear out all talk of hiding the tools and shit, what does
```

1    Kelly Meggs say?

2    A.  "We can delete the old and start a bee."

3    Q.  Does he then correct himself?

4    A.  Yes.

5    Q.  Can you read the messages together now.

6    A.  Sure.  "We can delete the old and start anew."

7          MR. EDWARDS:  Can you go forward one slide,

8    Ms. Badalament.

9    BY MR. EDWARDS:

10   Q.  What does Kenneth Harrelson respond later that morning at

11   11:30?

12   A.  "Let's do that, as long as you think it deletes everything.

13   I don't want the boys to have anything to look at, if you know

14   what I mean.  I'll run through.  Let me delete our DMs real

15   quick.  Send one in like two minutes.  If that works on my end,

16   then we'll just repeat the process."

17   Q.  Okay.  So, first, he doesn't want who to have anything to

18   look at?

19   A.  The boys.

20          MR. SHIPLEY:  Objection.  Calls for speculation.

21          MR. EDWARDS:  I'm asking the agent directly.

22          THE COURT:  I understand.  It's overruled.

23   BY MR. EDWARDS:

24   Q.  So just looking at this message, who does Kenneth Harrelson

25   not want to have anything to look at?

1    A.   The boys.

2    Q.   Okay.  Now, what does he say he'll run through and do

3    because of that?

4    A.   "Let me delete our DMs real quick."

5            MR. EDWARDS:  All right.  If we can go to the next

6    slide, please.

7    BY MR. EDWARDS:

8    Q.   Later at 11:41 a.m., what does Kenneth Harrelson follow up

9    with to Kelly Meggs?

10   A.   "Yep.  Cleared right out."

11   Q.   Now, going back in time a little bit, January 20th --

12   first, based on your investigation, what was -- what happened

13   on January 20th?

14   A.   President Joe Biden was inaugurated.

15   Q.   And on that day, did Kelly Meggs message Stewart Rhodes

16   directly?

17   A.   Yes.

18           MR. EDWARDS:  If we can go to the next slide.

19   BY MR. EDWARDS:

20   Q.   What does Kelly Meggs say to Stewart Rhodes?

21   A.   "I'm going totally dark.  I will stay in touch.  There are

22   a few others as well and will be pulling out of chats,

23   et cetera, as well.  I'm leaving John and Flagler (phonetic),

24   who has been leading Florida vetting, in charge of the hangout.

25   Talk to you soon.  Stay safe."

1    Q.  So, first, what does he say he will do?

2    A.  Go totally dark.

3    Q.  And what did he say others are doing?

4    A.  Others are doing the same and pulling out of chats,

5    et cetera.

6    Q.  Pulling out of chats?

7    A.  Yes.

8            MR. EDWARDS:  If we can go to the next slide, please.

9    BY MR. EDWARDS:

10   Q.  On January 28th, so about a week later, did Ed Vallejo send

11   a link to the group chat?

12   A.  Yes.

13   Q.  And have you attempted to access that link?

14   A.  I have.

15   Q.  Was it active?

16   A.  Yes.

17   Q.  Can you read just for the -- well, let's just --

18           MR. EDWARDS:  Ms. Badalament, can you pull up just

19   for the witness Exhibit 9652.1.  And just leaf through a couple

20   of these.

21   BY MR. EDWARDS:

22   Q.  Agent Cody, does this appear to be what -- what you

23   accessed when you tried to access the link?

24   A.  Yes.

25           MR. EDWARDS:  Okay.  At this time, Your Honor, the

1    government moves to admit and publish 9652.1.

2                MS.  HALIM:  No objection.

3                MR. PEED:  Objection.

4                THE COURT:  Sorry?

5                THE COURT REPORTER:  I can't hear you.

6                MR. PEED:  Objection to the whole article.

7                (Bench conference on the record.)

8                THE COURT:  Go ahead.

9                MR. PEED:  I don't know if the government is saying

10    the entire article is relevant to state of mind.  So if they

11    could scroll up and -- I know it goes to Mr. Vallejo's state of

12    mind.  I don't think the entire article, which has a lot of

13    hearsay, obviously, is -- necessarily goes to the state of mind

14    to the headline, which I think is the relevant issue here.  So

15    I'd just ask that the government put in this page or identify

16    what they think goes to Mr. Vallejo's state of mind in the next

17    pages.

18                MR. EDWARDS:  Yes, I can do both.  He does not send

19    just the text of the title.  He sends a link to the whole

20    article, and what follows are the names of individuals that the

21    Department of Justice had just indicted and arrested.

22                THE COURT:  Okay.  I'll just provide a limiting

23    instruction to the jury about the nature of it.

24                (Proceedings held in open court.)

25                MR. EDWARDS:  9652.1.

1          THE COURT:  9652.1 will be admitted.

2          (Government Exhibit 9652.1 admitted into evidence.)

3          THE COURT:  Ladies and gentlemen, let me just provide

4    you a quick instruction about this exhibit.  It is, as you can

5    see, a news article.  The news article is being supplied to you

6    to show what Mr. Vallejo actually sent and to the extent he

7    sent it and how it bears on his mind and anybody else that may

8    have read it.  It is not being offered for the truth or the

9    contents of the article.

10         MR. EDWARDS:  Thank you, Your Honor.

11         Ms. Badalament, if we can first publish --

12    Ms. Badalament, what -- if we can zoom in on the title here of

13    the article.

14    BY MR. EDWARDS:

15    Q.  Agent Cody, what was the title of the article Vallejo sent

16    to the group chat?

17    A.  "Federal prosecutors charge three in Capitol attack,

18    alleging coordination began in November."

19    Q.  Now, this was on January 28th.  Based on your

20    investigation, what occurred on January 27th?

21    A.  Three members of the Oath Keepers were indicted.

22         MR. EDWARDS:  Can we go to the next page of the

23    article and zoom in here on the first sentence, Ms. Badalament.

24    BY MR. EDWARDS:

25    Q.  What did the first sentence of the article Vallejo sent

1    say?

2    A.  "The U.S. Department of Justice has announced that three

3    people connected with the paramilitary organization called the

4    Oath Keepers have been indicted for conspiring to obstruct

5    Congress and other charges in connection with the chaos at the

6    U.S. Capitol on January 6th."

7                MR. EDWARDS:  And if we could zoom out.

8    Just on the first sentence here -- so I would just say right

9    here.  Just those first three lines, Ms. Badalament.

10               Thank you so much.

11   BY MR. EDWARDS:

12   Q.  Agent Cody, what did the article continue to say?

13   A.  "Jessica Marie Watkins, 38, and Donovan Ray Crowl, 50, both

14   of Champaign County, Ohio; and Thomas Caldwell, 65, of

15   Clarke County, Virginia; were indicted today in federal court

16   in the District of Columbia on charges of conspiracy,

17   obstructing an official proceeding, destruction of government

18   property, and unlawful entry on restricted building or grounds,

19   in violation of 18 U.S.C. §§ 371, and 1512."

20   Q.  And, Agent Cody, are Jessica Watkins, Donovan Crowl, and

21   Thomas Caldwell folks who are on the board here?

22   A.  Yes.

23   Q.  Are these folks that you've discussed in your testimony

24   today with messages?

25   A.  Yes.

1          MR. EDWARDS:  Ms. Badalament, if we can go back now

2     to 9652.  And then the next slide, please.

3     BY MR. EDWARDS:

4     Q.  On February 12th, did Ed Vallejo continue to message the

5     group chat at 6:48 a.m.?

6     A.  Yes.

7     Q.  What was this that he messaged the group?

8     A.  This was a link to another article.

9     Q.  And did you attempt to access this article?

10    A.  Yes.

11         MR. EDWARDS:  Ms. Badalament, can we pull up just for

12    the agent 9652.2.  Just for the witness.  Thank you.

13    BY MR. EDWARDS:

14    Q.  Agent Cody, did you -- can you take a look through 9652.2.

15    And does this appear -- what is this?

16    A.  So an article from that -- the link.

17    Q.  Okay.  So just going back to that first page, does this

18    appear to be that same article that you accessed in -- from

19    Vallejo's message?

20    A.  Yes.

21         MR. EDWARDS:  At this time, Your Honor, we'd move to

22    admit 9652.2.

23         MR. PEED:  No objection.

24         THE COURT:  9652.2 is admitted.

25         (Government Exhibit 9652.2 admitted into evidence.)

4050

1            THE COURT:  Ladies and gentlemen, same instruction I

2    gave you with respect to the prior article applies to this one

3    as well.

4            MR. EDWARDS:  Okay.  Thank you, Your Honor.

5        Ms. Badalament, can we zoom in on just the top here of

6    the article Vallejo sent.

7    BY MR. EDWARDS:

8    Q.  And, Agent Cody, can you please read what the article was

9    titled and its first sentence.

10   A.  "Court docs reveal FBI tool that can read your encrypted

11   private Signal messages.

12            "Court documents from a recent gun trafficking case in

13   New York has revealed a tool by the FBI which can read your

14   encrypted private messages on the Signal messenger

15   application."

16            MR. SHIPLEY:  Your Honor, can we get on the phone

17   real quick?

18            THE COURT:  Yeah.

19        Take that down, please.

20            (Bench conference on the record.)

21            MR. SHIPLEY:  I don't know if the Court noticed, but

22   that last sentence was about the NFL player who was just

23   injured.  So this is like a live, active link for the

24   New York Post or whatever you go to.  And, you know, so

25   everything that comes after that is not February of 2021 or

 1    whenever that was.

 2            MR. EDWARDS:  That's correct, Your Honor.  What

 3    happens is when you access the link, it -- the web page auto

 4    populates with ads.  So the ads are what auto populate that are

 5    related to today.

 6            MR. SHIPLEY:  The myocarditis reference to the NFL

 7    player is not an ad.

 8            MR. EDWARDS:  Active -- can we just look at it one

 9    more time.  I'm not sure I know.

10            THE COURT:  Looks like it embeds links to other

11    stories, probably from the *New York Post*, but --

12            MR. EDWARDS:  Right.  My understanding of this web

13    page is that it pulls headlines.  And so when you click this

14    link, it brings you to one of the stories that it did and then

15    everything afterwards.  So the -- you know, I don't have to

16    admit the ten pages afterward, if that's what we're --

17            MR. SHIPLEY:  And that would be my request is that we

18    maybe just screenshot and crop the -- the portion at the top,

19    and everything after that -- which we don't know where it comes

20    from -- is clearly not from February 12th, 2021 -- be limited.

21            MR. EDWARDS:  That's fine.  The Court -- or the

22    government's intent here is to just do this first page.  So,

23    frankly, we can on the record just admit -- or request to

24    admit that first page, which is linked directly to Vallejo's

25    message.

1      THE COURT:  Just to be clear, what are you -- are you

2  proposing to -- you know, all the other pages, just the first

3  page will be admitted, and then the -- the Damar Hamlin link,

4  are we going to just redact it or just provide an explanation

5  to the jury as to why that is there?

6      MR. EDWARDS:  I can ask the agent a question.  You

7  know, are there ads and other links that are related to when

8  you accessed this or -- I'm happy to do either one.  Frankly,

9  I'm happy to explain with just a question on that particular

10  sentence there.

11      THE COURT:  For what it's worth, I mean, I didn't

12  notice all this previously.  But, for example, if you look in

13  the upper left corner, it says -- it's dated 1 -- 1/7/23.

14      MR. EDWARDS:  Right.

15      THE COURT:  So this is something he clearly accessed

16  just a few days back.

17      MR. EDWARDS:  Right.  If you're able to just click

18  the link, everything kind of auto populates.

19      THE COURT:  I understand.

20      MR. EDWARDS:  Right.

21      THE COURT:  So let's just walk the jury through that

22  again, make sure they understand that, you know, you clicked

23  the link the other day, this is what came up when you clicked

24  the link the other day.

25      MR. EDWARDS:  Right.

```
1              THE COURT:  Okay.

2              MR. EDWARDS:  And there's a date -- just so that

3    Your Honor's aware, there's a date under the title.  I'll

4    highlight that too because that's the date of the --

5              THE COURT:  Okay.

6              MR. EDWARDS:  Right.

7              THE COURT:  And then that way -- and then it's just

8    the first page you want to admit; correct?

9              MR. EDWARDS:  Yes, Your Honor.

10             THE COURT:  All right.  And so I think that provides

11   the explanation in context that they're not confused about what

12   this is.

13             MR. EDWARDS:  Okay.

14             THE COURT:  Is that okay, Mr. Shipley?

15             MR. PEED:  I also noticed the date, Your Honor.  This

16   is set in February.  So this is after the conspiracy.  So

17   it's -- what's -- what's the relevance here to the obstruction

18   charge?

19             MR. EDWARDS:  Well, the consciousness of guilt of

20   referencing to his group chat the fact that the FBI can

21   accessed the major platform that he and his co-conspirators

22   used to communicate.

23             THE COURT:  Right.  Right.  It goes to consciousness

24   of guilt.  The fact that he's tracking the investigation.

25   He's sending something to others who are on the -- on the
```

4054

1    same chat that he was, who are accused to be part of the

2    conspiracy.

3              (Proceedings held in open court.)

4              MR. EDWARDS:  Thank you, Your Honor.

5    BY MR. EDWARDS:

6    Q.  Agent Cody, just a couple more questions.

7              MR. EDWARDS:  Can we please pull back up 9652.2

8    without being zoomed in or anything.

9          Thank you, Ms. Badalament.

10   BY MR. EDWARDS:

11   Q.  Agent Cody, do you see this date up here on the upper left?

12   A.  I do.

13             MR. EDWARDS:  And, Ms. Badalament, if you could zoom

14   in.

15   BY MR. EDWARDS:

16   Q.  What's it say?

17   A.  January 7th, '23, 11:25 p.m.

18   Q.  Okay.  So is this the date of accessing the article itself,

19   that the FBI accessed?

20   A.  Yes.

21   Q.  Okay.

22   A.  It's an incorrect time, but that's the right date.

23   Q.  Right.  So is this the date by which the FBI accessed it

24   just to preserve this to then present to the jury?

25   A.  Yes.

```
1              MR. EDWARDS:  Okay.  If we can go back.
2    BY MR. EDWARDS:
3    Q.  Now, had the government had this message before that date?
4    A.  Yes.
5    Q.  So this date is just when you accessed to preserve it?
6    A.  Yes.
7              MR. EDWARDS:  Now, for the jury, now if we can just
8    zoom in, Ms. Badalament, on the title and the date that was
9    underneath.
10   BY MR. EDWARDS:
11   Q.  Okay.  Do you see the date here?
12   A.  I do.
13   Q.  Does this appear to be the date of the article itself that
14   Mr. Vallejo sent?
15   A.  Presumably.
16             MR. EDWARDS:  And can we go back to Mr. Vallejo's
17   message, Ms. Badalament, at 9652, the last slide.
18   BY MR. EDWARDS:
19   Q.  What day did Mr. Vallejo send this?
20   A.  February 12th, 2021.
21   Q.  Okay.  So is that the same day?
22   A.  It is.
23             MR. EDWARDS:  If we can go to 9652.2.  One last
24   question just before I move on.
25             Ms. Badalament, if you can zoom in on this line here.
```

1    BY MR. EDWARDS:

2    Q.  Do you see this -- did Damar Hamlin suffer from

3    vaccine-induced myocarditis?

4    A.  Yes.

5         MR. EDWARDS:  Can we go back and -- Ms. Badalament.

6    BY MR. EDWARDS:

7    Q.  Do these links and other ads -- do these appear to be

8    current ads that pop up on the article when you access it in

9    real time?

10   A.  Yes.

11   Q.  Okay.

12        MR. EDWARDS:  So, Ms. Badalament, just to get back to

13   my -- my point here.  Can you zoom in on this section here.

14   BY MR. EDWARDS:

15   Q.  What are we seeing on 9652.2 here zoomed in, and what does

16   it say?

17   A.  It's a headline or a caption for this -- these two

18   photographs, one of which is a phone with a Signal logo on it,

19   and the other is the FBI logo.  So it's social media; court

20   docs reveal FBI tool that can read your encrypted private

21   Signal messages.

22   Q.  And can you continue reading what Mr. Vallejo sent to the

23   group chat here.

24   A.  "The court documents filed by the Justice Department and

25   obtained by Forbes, showed screenshots of Signal messages

4057

1    between men allegedly discussing an illegal weapons trade and

2    attempted murder."

3            MR. EDWARDS:  Okay.  So, Ms. Badalament, we can take

4    that down.  Thank you.

5    BY MR. EDWARDS:

6    Q.  After Vallejo sends this -- well, I'll get back to that.

7    Let's talk about some of Mr. Vallejo's Signal messages that he

8    did send.

9        So, Agent Cody, did Vallejo message the group chat about

10    the events of January 6th, and did he message Mr. Rhodes

11    directly around that time?

12   A.  Yes.

13           MR. EDWARDS:  Okay.  Ms. Badalament, can you bring up

14    just for the witness Exhibit 9653.

15   BY MR. EDWARDS:

16   Q.  Agent Cody, as you review these messages, have you taken a

17    look at this exhibit in its entirety?

18   A.  Yes.

19   Q.  And have you -- are these -- have you compared these

20    messages to the underlying records for accuracy?

21   A.  Yes, I have.

22   Q.  And do they appear to be accurate?

23   A.  They do.

24           MR. EDWARDS:  At this time the government moves to

25    admit and publish 9653.

4058

```
 1              MR. PEED:  As well as 6, Your Honor.

 2              THE COURT:  Assumingly you've resolved the issue.

 3              MR. EDWARDS:  I understand Mr. Peed has one message

 4      he would like to show at some point during this exhibit.

 5              THE COURT:  Okay.

 6              MR. EDWARDS:  Yes, Your Honor.

 7              THE COURT:  All right.  So 9653 is admitted.

 8              (Government Exhibit 9653 admitted into evidence.)

 9      BY MR. EDWARDS:

10      Q.  Okay.  On January 6th at 7:17 p.m., what did Vallejo

11      message the group chat?

12      A.  "Well, they'll have to declare butt boy prez in the dead of

13      night with no one there; right?"

14      Q.  Okay.  And what, based on your investigation, occurred on

15      the night of January 6th with relation to the president?

16      A.  The certification of the election.

17              MR. EDWARDS:  Can we go to the next message, please.

18      BY MR. EDWARDS:

19      Q.  And what did Vallejo then message at 7:32 p.m.?

20      A.  "We'll be back at 6:00 a.m. to do it again."

21              MR. EDWARDS:  We can go to the next slide.

22      BY MR. EDWARDS:

23      Q.  What does Vallejo say to the group chat at 8:38?

24      A.  "The longer I hear these lies, the more I want to stomp

25      some ass."
```

1    Q.   Okay.  The next day, did Vallejo wake up early and message

2    the same group chat?

3    A.   Yes.

4              MR. EDWARDS:  Can we go to the next slide, please,

5    Ms. Badalament.  Just one more.

6              Thank you.

7    BY MR. EDWARDS:

8    Q.   Did -- what did Mr. Vallejo send first thing at 5:52 a.m.

9    to the group chat?

10    A.   "Did I call it or what?"

11             MR. EDWARDS:  And the next slide.

12    BY MR. EDWARDS:

13    Q.   What did he say next?

14    A.   "3:45 a.m."

15    Q.   So at 5:52 a.m. he's messaging, "3:45 a.m."  Based on your

16    investigation, what happened at 3:45 a.m. into January 7th?

17    A.   Joe Biden was certified as the winner of the presidential

18    election.

19             MR. EDWARDS:  Can we go to the next slide, please.

20    BY MR. EDWARDS:

21    Q.   Do you see this LB?  Who is LB?

22    A.   Landon Bentley.

23    Q.   What does Landon Bentley message the group chat at a minute

24    later, at 5:43?

25    A.   "I'm rolling home, Brothers.  Good to stand with you.

4060

1    Everyone good.  All quiet in D.C.?"

2    Q.  And what does Vallejo respond to "I'm rolling home,

3    Brothers," in the next slide?

4    A.  "Why go?  This party has just started."

5    Q.  So on the morning of January 7th, does Mr. Vallejo continue

6    to message that group chat two minutes later?

7    A.  Yes.

8    Q.  What does he say?

9    A.  "We are going to probe their defense line right now.

10   6:00 a.m. they should let us in.  We'll see."

11   Q.  So after the night before saying we'll be back at 6:00 a.m.

12   to do it again, what does he say he's doing now at 5:46 a.m.?

13   A.  Going to probe their defense line.

14            MR. EDWARDS:  Can we go to the next slide, please.

15   BY MR. EDWARDS:

16   Q.  What does Mr. Vallejo then message the group chat?

17   A.  "Yeah, I got shit needs doing, but none as important as

18   this."

19   Q.  And the next message, 5:53, what does he message the group

20   chat?

21   A.  "Departing for recon now.  Stewart, call me when you're

22   up."

23   Q.  First, do you know what the word recon refers to?

24   A.  A reconnaissance.

25   Q.  And have you -- is there a Stewart in your investigation?

 1    A.  Yes.

 2    Q.  Stewart who?

 3    A.  Stewart Rhodes.

 4              MR. EDWARDS:  Okay.  Can we go to the next slide.

 5    BY MR. EDWARDS:

 6    Q.  5:57 a.m. on January 7th, who does -- what does Vallejo

 7    message the group chat?

 8              THE COURT REPORTER:  I'm sorry.  But I cannot hear

 9    you when you're objecting.

10              THE COURT:  Hold on.  Come on up and show it.

11    BY MR. EDWARDS:

12    Q.  Agent Cody, in the course of your investigation, how

13    many -- about how many Signal messages have you reviewed?

14    A.  A lot.

15    Q.  Have we presented all of them to the jury?

16    A.  No.

17    Q.  Now, there are two messages I'd like to ask you about.  On

18    January 7th we were just talking about the kind of sequence of

19    messages Mr. Vallejo and others sent.  The top message here --

20    I'm not very good at math on the go -- but on January 7th in

21    the morning, what did LB send to the group chat?

22    A.  "And like Stewart said, if Trump won't do insurrection act,

23    then we walk the same path as founders of defiance,

24    nullification, raising militia, and mutual defense.  I've got

25    militia to organize."

1    Q.  Okay.  So did LB message about defiance and nullification

2    to the group chat?

3    A.  Yes.

4    Q.  What did Vallejo say after that?

5    A.  "I'll depart when cleared by my commander, sir.  Be well.

6    And peace be with you."

7    Q.  Okay.  Now, Agent Cody, if we could --

8            MR. EDWARDS:  Ms. Badalament, if we can go back to

9    9653.

10   BY MR. EDWARDS:

11   Q.  Now, after messaging about waiting to depart with orders

12   from his commander, what does he message at 5:57 a.m. to the

13   group chat?

14   A.  "We are at war."

15   Q.  Does Mr. Vallejo continue to message this group chat?

16   A.  Yes.

17   Q.  What does he say at 7:33 a.m.?

18   A.  "Status report.  NG has cordoned off the Capitol Grounds

19   and no foot traffic allowed.  40 Virginia state police cars

20   lined up.  Outer perimeter stopping vehicle traffic but a dozen

21   or so walkers/joggers inside it, but not allowed on the

22   building grounds.  No signs or flags supporting Trump visible

23   anywhere."

24   Q.  And what does NG refer to in that message?

25   A.  National Guard.

1    Q.  Now, how does he describe this message?  What does he title

2    it?

3    A.  Status report.

4    Q.  Okay.  One minute later, what does Vallejo add?

5    A.  "All quiet."

6    Q.  And at that same time, does Hydro AL message the group

7    chat?

8    A.  Yes.

9              MR. EDWARDS:  Can we go to the next slide.

10   BY MR. EDWARDS:

11   Q.  Who is Hydro AL?

12   A.  Joshua James.

13   Q.  And what does Joshua James message the group chat?

14   A.  "Trump conceded.  It's over."

15   Q.  Does he send another message?

16   A.  Yes.

17   Q.  What does he say?

18   A.  "We lose."

19   Q.  Who does he say lost?

20   A.  We.

21   Q.  Now, what did Vallejo say to that at 7:36?

22   A.  "Like hell it's 'over.'"

23   Q.  Okay.  Now, later in the morning, after messaging about

24   waiting for orders to depart from his commander, what does

25   Vallejo message Stewart Rhodes directly at 9:03 a.m.?

4064

1  A.  "Status report posted in ops.  Room extended 1 day.

2  Standing by awaiting orders, sir.  Good morning."

3  Q.  Okay.  So after sending that message about a status report,

4  is he telling Stewart Rhodes he's posted that status report?

5  A.  Yes.

6  Q.  And what -- and what did he do with his hotel room?

7  A.  Extended it by one day.

8  Q.  What he's doing when he -- what's he telling Stewart Rhodes

9  he's doing?

10  A.  Standing by, awaiting orders.

11        MR. EDWARDS:  Can we go to the next slide, please.

12  BY MR. EDWARDS:

13  Q.  What does he say in the next two slides at 12:50 p.m. to

14  the group chat?

15  A.  "Noon recon report."

16  Q.  What's he say next?

17  A.  "Underway currently."

18  Q.  Okay.  Now, what -- at 12:57, what does Warrior 1961

19  message the group chat?

20  A.  "Remember to stay vigilant.  Everyone's tag numbers were

21  probably captured."

22  Q.  And based on -- well, first of all, do you know what a tag

23  number is?

24  A.  I assume it's a license plate number.

25  Q.  Does law enforcement ever use license plate numbers in

1    their investigation?

2    A.  Yes.

3    Q.  To do what?

4    A.  Identify people.

5    Q.  Okay.  Agent Cody, based on your investigation, did Vallejo

6    meet or message about meeting with Rhodes face to face on the

7    night of January 6th for that dinner?

8    A.  Yes.

9    Q.  And did, eventually, Vallejo message Stewart Rhodes about

10   meeting again after January 6th?

11   A.  Yes.

12         MR. EDWARDS:  Can we go to the next slide.

13   BY MR. EDWARDS:

14   Q.  On January 11th, does Stewart Rhodes and Ed Vallejo engage

15   in a series of messages --

16   A.  They do.

17   Q.  -- back and forth?

18         Okay.  We can flip through some of these.  So on

19   January 11th now, a couple days later, what does Stewart Rhodes

20   message at 3:00 p.m. to Vallejo?

21   A.  "Ed, what's your 20?"

22   Q.  And we'll just kind of scroll through these.

23         What's Stewart Rhodes continue to say?

24   A.  "You in TX?"

25   Q.  And what does Texas mean -- or does TX mean?

1    A.   Texas.

2              MR. EDWARDS:  Can we go to the next slide.

3    BY MR. EDWARDS:

4    Q.   What does Ed Vallejo say to Rhodes back?

5    A.   "Just departed Texarkana."

6    Q.   And keep going.

7    A.   "Got held up there waiting for a trailer tire."

8    Q.   Next?

9    A.   "SB on 30.

10            "No sweat.  I'm delayed as well.  Won't be there until

11   tomorrow."

12   Q.   Now, here, this slide, this was Stewart Rhodes responding

13   to Vallejo?

14   A.   Yes.

15   Q.   And he says "No sweat.  I'm delayed"?

16   A.   Yes.

17            MR. EDWARDS:  All right.  Can we go to the next

18   slide.

19   BY MR. EDWARDS:

20   Q.   What does Stewart Rhodes message again?

21   A.   "I'm up in Fort Worth area."

22   Q.   And after that?

23   A.   Mr. Vallejo says "C U there."

24            MR. EDWARDS:  Okay.  Can we go to the next slide,

25   please.

1    BY MR. EDWARDS:

2    Q.   What's --

3    A.   Mr. Vallejo again says "God speed, sir."

4    Q.   Okay.  What's he say next at 3:34 p.m., saying to --

5    A.   "We're on CB 19."

6    Q.   And next?

7    A.   Thumbs-up emoji.

8    Q.   Okay.  What does Ed Vallejo say -- so that's on

9    January 11th.  And after messaging back and forth about their

10   travels to Texas, what does Stewart Rhodes -- or Vallejo say to

11   Stewart Rhodes at 2:45 a.m. that night?

12   A.   "We have arrived at the courthouse."

13   Q.   Okay.

14           MR. EDWARDS:  Next slide.

15   BY MR. EDWARDS:

16   Q.   Later that morning, does he message Stewart Rhodes again?

17   A.   Yes.

18   Q.   What does he say?

19   A.   "Good morning.  Are we pitching tent on courthouse lawn or

20   do you have a bivouac location for us yet, sir?"

21   Q.   Now, later that day does -- do you know, was Ed Vallejo

22   traveling with anyone?

23   A.   Yes.

24   Q.   Who was he traveling with?

25   A.   Todd Kandaris.

4068

1    Q.  So does Todd Kandaris also message Stewart Rhodes that

2    morning?

3    A.  Yes.

4    Q.  What does he say?

5    A.  "Hi, Stewart.  I'm sure you're busy but wanted to let you

6    know that Ed and I are here at Isaacks Restaurant in Junction.

7    We are excited to learn next steps and would like to know what

8    we should be doing right now."

9    Q.  What are they excited to learn?

10   A.  Next steps.

11   Q.  Okay.  Now, in that time frame while Ed Vallejo and

12   Todd Kandaris were traveling down to Rhodes, did the FBI learn

13   that Stewart Rhodes had held a meeting?

14   A.  Yes.

15   Q.  And did Stewart Rhodes hold a meeting on the night of

16   January 10th before Vallejo arrived?

17   A.  Yes.

18   Q.  So in that meeting, did Stewart Rhodes discuss what had

19   occurred on January 6th and other topics?

20   A.  Yes, he did.

21        MR. EDWARDS:  Now, at this time, Your Honor, I'd move

22   to just read a stipulation.

23        So Exhibit 3075, the parties agree that on January 10th,

24   2021, Jason Alpers covertly recorded a conversation on his own

25   initiative and later provided a copy of the audio file

1    recording to the FBI.  The recording is authentic.

2           And so based on that stipulation, Your Honor, the

3    government would move to admit Exhibits 1202.2 through

4    1202.5 -- 1202.2.TR -- and there's a dot TR there at the end of

5    each -- through 1202.5.TR.

6           THE COURT:  All right.  So subject to the

7    stipulation, those will be admitted.

8           (Government Exhibits 1202.2 through 1202.5 and

9    1202.2.TR through 1202.5.TR admitted into evidence.)

10          MR. EDWARDS:  Thank you, Your Honor.

11          Ms. Badalament, can you start by opening Exhibit 1202.2.

12   BY MR. EDWARDS:

13   Q.  So, Agent Cody, have you reviewed all of these exhibits,

14   1202.2 through 1202.5?

15   A.  Yes, I have.

16   Q.  All right.  Now, generally, what are these?

17   A.  They're discussions between Stewart Rhodes and Mr. Alpers.

18   Q.  And have you heard -- have you seen Stewart Rhodes in

19   person?

20   A.  Yes, I have.

21   Q.  And have you heard his voice before?

22   A.  Yes, I have.

23   Q.  So are you able to identify his voice in this recording?

24   A.  I am.

25   Q.  And have you reviewed videos that Kellye SoRelle recorded?

1    A.  Yes.

2    Q.  And that was on January 6th?

3    A.  And others.

4    Q.  And others?

5    A.  Yes.

6    Q.  Are you able to identify Kellye SoRelle's voice in this

7    exhibit?

8    A.  Yes.

9    Q.  So on the night of January 10th, these recordings or -- are

10   these the covert recordings that the FBI received?

11   A.  Yes.

12          MR. EDWARDS:  Okay.  Ms. Badalament, can we play

13   through the -- 1202.2, please.

14          (An audio recording was played.)

15          MR. EDWARDS:  All right.  Can we pause there.

16   BY MR. EDWARDS:

17   Q.  Agent Cody, did you hear the "who are you"?

18   A.  Yes.

19   Q.  And are you able to identify who that individual is?

20   A.  I believe that's Joshua James.

21   Q.  And have you seen Joshua James in person?

22   A.  Yes, I have.

23   Q.  Have you heard him speak?

24   A.  Yes.

25   Q.  So this "who are you," this was Joshua James?

1    A.  Yes.

2    Q.  And you hear some of that background noise?

3    A.  Yes.

4    Q.  Do you understand why there's that background noise going

5    on?

6    A.  It could be Mr. Alpers's pocket, or they could be walking

7    on gravel.  I can't say.

8         MS. HALIM:  Your Honor, I ask for the instruction

9    regarding transcripts to be issued in connection with this.

10   Thank you.

11        THE COURT:  Let's finish and I'll give the

12   instruction.

13        MR. EDWARDS:  Okay.  Thank you, Your Honor.

14        We can continue to play, please.

15        (An audio recording was played.)

16        MR. EDWARDS:  Can we pause.

17   BY MR. EDWARDS:

18   Q.  What did Stewart Rhodes just say there?

19   A.  "Get rid of your phones."

20        MR. EDWARDS:  Okay.  Can we continue to play.

21        (An audio recording was played.)

22        MR. EDWARDS:  All right.  Can we pause there.

23   BY MR. EDWARDS:

24   Q.  So, Agent Cody, this is for the jury's orientation here.

25   Is this witness -- is this the Jason Alpers referred to in that

4072

1    stipulation?

2    A.  Yes.

3    Q.  Okay.  So that's the person who secretly recorded this

4    audio?

5    A.  Correct.

6          MR. EDWARDS:  All right.  Can we -- after

7    Stewart Rhodes says, "Well, let's hear it," can we continue to

8    play.

9          THE COURT:  Mr. Edwards, can we put a pause on it.

10    We've been going for a little while.  Let's take a break.

11         Just a reminder, ladies and gentlemen, again, with these

12    videos that have audio components to them, the transcripts that

13    are on the screen are simply there to assist you in trying to

14    discern the audio.  It is the audio that is the evidence and

15    not the transcripts.  If you notice any difference between the

16    audio and the transcripts, it is the audio that controls.

17         All right.  It's a little bit before 3 o'clock.  Why

18    don't we plan to resume at three -- 3:15.

19          MR. EDWARDS:  Thank you, Your Honor.

20          (Proceedings held outside the presence of the jury.)

21          THE COURT:  Agent Cody, you can step down.  Please

22    don't discuss your testimony during the break with anyone.

23          (Recess taken.)

24          THE COURT:  Before we have the jurors in, can I get a

25    sense of what you anticipate for tomorrow, assuming we finish

```
 1    today.  I don't know whether that's in the cards or not, but
 2    either way, Mr. Shipley, you're prepared to open up.  And then
 3    what do we have after that?
 4               MR. SHIPLEY:  Yeah.  Did I miss part of the question?
 5               THE COURT:  So what do we have after your opening?
 6               MR. SHIPLEY:  I don't have another witness ready to
 7    go.
 8               THE COURT REPORTER:  Mr. Shipley, you need to use the
 9    microphone.
10               THE COURT:  That's okay.
11               MR. SHIPLEY:  I mean, it's -- it's Plan C, but that's
12    the one I have to work with, so.
13               THE COURT:  Okay.  So you have Mr. Minuta tomorrow.
14    And then you've got other witnesses teed up for Thursday?
15               MR. SHIPLEY:  Mr. Jackson will be available Friday
16    morning, and then we may have a character witness or two.  I
17    don't know if we'll get through the day on Friday or not, but I
18    think somebody else might have somebody ready to go by Friday.
19               THE COURT:  Okay.  Does anybody else have witnesses
20    available tomorrow?
21               MS. HALIM:  No.
22               MR. WEINBERG:  No, Your Honor.
23               THE COURT:  What about Thursday?
24               MS.  HALIM:  I had my investigator inquire regarding
25    my witnesses who are scheduled to be here on Tuesday, the 17th.
```

1    One could be here on Thursday, but it would -- my witnesses are

2    character witnesses.  They're going to be extraordinarily

3    brief, and I -- that's a reminder that we still need to discuss

4    the scope of cross-examination for reputation.

5              THE COURT:  Yeah, I looked at that yesterday and over

6    the weekend.

7              MR. EDWARDS:  I know that Mr. Shipley was off by a

8    day yesterday.  So when you say Friday, you mean Friday; right?

9    Not Thursday?

10             MR. SHIPLEY:  No, I mean Mr. Jackson on Friday.

11             MR. EDWARDS:  Okay.  So I just want to make sure you

12   didn't mean Thursday.

13             THE COURT:  Oh.  So Mr. Jackson on Friday?

14             MR. SHIPLEY:  Mr. Jackson I can have Friday morning,

15   yes, but he can't get here before then.

16             THE COURT:  So we don't have anybody for Thursday?

17             MR. SHIPLEY:  Thursday could be a smoking black hole.

18             THE COURT:  Okay.  All right.

19             MR. SHIPLEY:  May I have just a minute?  There's

20   something I wanted to show Mr. Edwards.  I want to be real

21   quick.

22             THE COURTROOM DEPUTY:  Jury panel.

23             (Proceedings held in the presence of the jury.)

24             THE COURT:  All right.  Please be seated, everyone.

25             Mr. Edwards.

1          MR. EDWARDS:  Thank you, Your Honor.

2          Ms. Badalament, if we could pull up Exhibit 1202.2.TR.

3     BY MR. EDWARDS:

4     Q.  Okay.  Agent Cody, we left off -- just as a reminder, are

5     you still under oath?

6     A.  I am.

7     Q.  We left off listening to the covert recording Jason Alpers

8     recorded on January 10th that had Stewart Rhodes,

9     Kellye SoRelle, and Joshua James on?

10    A.  Yes.

11    Q.  And so I'd like to continue -- just play through some of

12    that exhibit with you.

13          MR. EDWARDS:  Ms. Badalament, if we could just

14    continue where we left off, and we can publish for the -- oh.

15    Great.  Thank you.

16          (An audio recording was played.)

17          MR. EDWARDS:  We'll pause here, Ms. Badalament.

18    BY MR. EDWARDS:

19    Q.  As a reminder, Agent Cody, is this -- this signal here for

20    witness, is that Jason Alpers speaking?

21    A.  Yes, it is.

22    Q.  And so that's the individual who recorded this?

23    A.  Yes.

24    Q.  Okay.  And he just -- or stated about the half -- the flags

25    at half mast for the officers.

1          MR. EDWARDS:  And we'll continue to play,

2     Ms. Badalament, here from 2 minutes 29 seconds.

3          (An audio recording was played.)

4     BY MR. EDWARDS:

5     Q.  Okay.  Now, Agent Cody, was this audio recording broken up

6     into clips to put into digestible form for the jury?

7     A.  Yes.

8          MR. EDWARDS:  Ms. Badalament, if we could start now

9     the next clip at 1202.3.TR.

10          (An audio recording was played.)

11          MR. EDWARDS:  Now, if we can pause there,

12     Ms. Badalament, and go back a second.

13     BY MR. EDWARDS:

14     Q.  Who does Stewart Rhodes say that the country will fall to?

15     A.  The communists.

16          MR. EDWARDS:  Okay.  Now, Ms. Badalament, we can

17     continue.

18          (An audio recording was played.)

19          MR. EDWARDS:  If we can pause it there.

20     BY MR. EDWARDS:

21     Q.  Agent Cody, are they talking about what war is like?

22     A.  Yes.

23     Q.  Okay.  Is that Jason Alpers here?

24     A.  Yes, it is.

25          MR. EDWARDS:  And -- all right.  Ms. Badalament, if

1    we can continue from 40 seconds into the exhibit.

2              (An audio recording was played.)

3              MR. EDWARDS:  Can we pause there, Ms. Badalament, at

4    49 seconds.

5    BY MR. EDWARDS:

6    Q.  Agent Cody, what did Jason Alpers say there at the

7    beginning of this clip?

8    A.  He says he doesn't wish civil war upon anyone.

9    Q.  And what did Stewart Rhodes respond?

10   A.  You're going to have it bud, it's going to come anyway.

11             MR. EDWARDS:  If we can continue from 49 seconds.

12             (An audio recording was played.)

13             MR. EDWARDS:  Okay.  Now, if we can pause there and

14   go back 2 seconds, Ms. Badalament.

15   BY MR. EDWARDS:

16   Q.  Agent Cody, did you hear about -- do you hear two names

17   that Stewart Rhodes is discussing in this part of the

18   conversation?

19   A.  Yes.

20   Q.  Who is the first name?

21   A.  Biden.

22   Q.  And as of January 10th, who is Biden?

23   A.  As of that day, he was the -- the President-elect.

24   Q.  And then is there a second name that Stewart Rhodes is

25   talking about?

1    A.  Yes.

2    Q.  Who is that?

3    A.  Kamala.

4    Q.  And as of January 10th, who is Kamala?

5    A.  Vice President-elect Kamala Harris, at the time.

6           MR. EDWARDS:  Ms. Badalament, if we can continue from

7    a minute and 5.

8           (An audio recording was played.)

9    BY MR. EDWARDS:

10   Q.  Okay.  Now, we're pausing here at a minute and 32 seconds.

11          Agent Cody, what does Stewart Rhodes say in the first

12   part of this clip?

13   A.  There's going to be combat here on U.S. soil no matter

14   what.

15   Q.  Now, what does he say in the next sentence -- two sentences

16   starting at it's coming -- that's okay.

17          MR. PEED:  Objection, Your Honor.

18          THE COURT:  Basis?

19          MR. PEED:  The transcript is not evidence.  The jury

20   is hearing the audio and -- and it's cumulative and asking for

21   his opinions, having him just restate it, and I don't think

22   he's orienting it to a question which the Court has allowed.

23   He's just restating what the video is saying.

24          THE COURT:  Okay.  Let's move forward.  The jury has

25   heard it.

4079

```
 1                    MR. EDWARDS:  Thank you, Your Honor.
 2              Okay.  Can we play through the -- this is the end of
 3        1203.TR.  Ms. Badalament, can we open 1204 -- 1202.4.TR,
 4        please.
 5        BY MR. EDWARDS:
 6        Q.  And is this another just clip of that same recording,
 7        Agent Byron [sic]?
 8        A.  Yes, it is.
 9        Q.  Thank you.
10                    MR. EDWARDS:  Can we play forward here.
11                    (An audio recording was played.)
12                    MR. EDWARDS:  Now, Ms. Badalament, if we can pause
13        and go back 2 seconds.
14        BY MR. EDWARDS:
15        Q.  Agent Byron, did you hear what Stewart Rhodes said there?
16        A.  Yes.
17        Q.  What did you hear Stewart Rhodes say there?
18                    MR. PEED:  Objection.
19                    THE COURT:  It's all right.  I'll allow it.
20              Go ahead, just to highlight what he's talking about.
21        A.  Towards the end?
22        BY MR. EDWARDS:
23        Q.  Sure.  Just this -- in this clip here that we just played
24        for the last, about, 10 seconds, Agent Cody, what did you hear
25        Stewart Rhodes say?
```

1    A.  Generally, to summarize, there was a fight coming and it's

2    unavoidable.

3              MR. EDWARDS:  Can we play it forward, please.

4              (An audio recording was played.)

5              MR. EDWARDS:  Now, Ms. Badalament, can we please open

6    Government's Exhibit 1202.5.TR.

7    BY MR. EDWARDS:

8    Q.  And, Agent Cody, is this the final clip of this recording?

9    A.  Yes.

10   Q.  Okay.  And, Agent --

11             MR. EDWARDS:  Or, Ms. Badalament, if we can play

12   forward now.

13             (An audio recording was played.)

14             MR. EDWARDS:  We can pause there and go back a

15   second.

16   BY MR. EDWARDS:

17   Q.  Agent Cody --

18             MR. EDWARDS:  We can go back a few seconds,

19   Ms. Badalament, maybe about 5 to 10 seconds there.  Thank you.

20   BY MR. EDWARDS:

21   Q.  Agent Cody, did you hear what Stewart Rhodes said his

22   biggest regret was for January 6th?

23   A.  Yes.

24   Q.  What was it?

25   A.  He says his only regret is that they should have brought

```
 1      rifles.

 2              MR. EDWARDS:  Okay.  Can we play forward,

 3      Ms. Badalament.

 4              (An audio recording was played.)

 5              MR. EDWARDS:  You can pause there.

 6      BY MR. EDWARDS:

 7      Q.  Agent Cody, did you hear Stewart Rhodes discuss another

 8      individual in that last clip?

 9      A.  Yes.

10      Q.  What did he say?

11      A.  "I hang fucking Pelosi from the lamppost."

12      Q.  Who was Pelosi on January 6th, 2021?

13      A.  She was, at the time, the Speaker of the House.

14              MR. EDWARDS:  No further questions, Your Honor.

15              THE COURT:  Okay.

16          All right.  Mr. Shipley.

17              MR. SHIPLEY:  Can we pull up the video that I just

18      showed Mr. Edwards.

19                          CROSS-EXAMINATION

20      BY MR. SHIPLEY:

21      Q.  I'll surprise you with something here, but I don't think it

22      will be a big problem.

23          Agent Cody, my name is Bill Shipley.  I represent

24      Roberto Minuta.

25      A.  Yes, sir.
```

4082

1    Q.  This is a video that I showed to Mr. Edwards, and I don't

2    think you've seen it before.

3            MR. SHIPLEY:  But can we play, like, the first

4    20 seconds.

5            (A video recording was played.)

6            MR. SHIPLEY:  Okay.  Go ahead and stop it.

7    BY MR. SHIPLEY:

8    Q.  Okay.  The orientation of this video is from above the

9    Columbus Doors looking towards the Rotunda; correct?

10    A.  Yes.

11    Q.  And this is generally -- you've seen videos -- if not this

12    particular video, you've seen videos of that area?

13    A.  I have.

14    Q.  Okay.  And down here in the lower right-hand corner -- I've

15    circled an individual.

16            THE COURT:  Mr. Shipley, sorry to interrupt you.  Two

17    things.  We need an exhibit number.  And, two, do you want this

18    shown to the jury?

19            MR. SHIPLEY:  Oh, yeah.  Okay.  So the exhibit number

20    is RM V001.

21            THE COURT:  Okay.  Any objection to publication?

22            MR. EDWARDS:  No objection, Your Honor.

23            THE COURT:  All right.  RMV 001 is admitted.

24            (Defendant Minuta Exhibit RM V001 admitted into

25    evidence.)

4083

1          MR. SHIPLEY:  Let's back it up, like, 10 seconds and

2     we'll start over.  Right there.

3     BY MR. SHIPLEY:

4     Q.  Do you recognize that person, as they came in, with the

5     goggles?

6     A.  It appears to be Mr. Minuta.

7     Q.  Okay.

8          MR. SHIPLEY:  All right.  Can we go to Government's

9     Exhibit 9652, the slide deck, and, specifically, Slide 16.

10    BY MR. SHIPLEY:

11    Q.  You testified in response to Mr. Edwards's questions about

12    this particular slide and its relationship to another slide

13    about from the inside; right?

14    A.  Yes.

15    Q.  And then this is a couple of faces exposed that didn't want

16    to be shown; right?

17    A.  Yes.

18    Q.  And then the video was subsequently -- or was deleted,

19    except you found it on Mr. Rhodes's phone; right?

20    A.  Correct.

21    Q.  Okay.  Now, would it be fair to say here that Mr. Roberto,

22    all he is doing is saying somebody else asked him to take that

23    video down because their face, presumably, was in the video?

24    A.  I can't interpret the message.  I can just read what it

25    says.

1    Q.  All right.  But he says sorry, had to delete the videos,

2    not like he was anxious to delete the video; right?

3    A.  Well, he does say sorry, had to delete footage.  Correct.

4    Q.  Now, there were several slides -- I'm not going to go

5    through them -- from either Kellye SoRelle or Stewart Rhodes

6    talking about, you know, shut up, don't talk about the

7    Oath Keepers.  I -- you know which ones I'm talking about?

8    A.  Yes, sir.

9    Q.  Okay.  Now, you know Kellye SoRelle is an attorney; right?

10   A.  Yes.

11   Q.  And you know Stewart Rhodes has been an attorney in the

12   past?

13   A.  Has been an attorney in the past, yes.

14   Q.  So now you, as an FBI agent of some significant experience,

15   when you bring somebody in to question them, you have them in a

16   custodial situation.  You have to tell them they have the right

17   to remain silent; right?

18   A.  Yes.

19   Q.  Because that's their legal right?

20   A.  Yes.

21   Q.  And so if Kellye SoRelle and Stewart Rhodes are telling

22   people don't talk, they're functionally not doing anything

23   different than what you're obligated to tell people when you

24   have them in a custodial circumstance?

25            MR. EDWARDS:  Objection.

1          THE COURT:  It's overruled.

2     BY MR. SHIPLEY:

3     Q.  Just -- not legally, but just functionally.  You tell them

4     to do the same thing?  Don't -- you know --

5     A.  Functionally, yes.

6     Q.  Because, in fact, there's no obligation for anybody to

7     create information for law enforcement?

8     A.  To create information?

9     Q.  Engage in conversations that law enforcement might be

10    interested in later?

11    A.  No, not that I'm aware of.

12    Q.  Okay.  Now, if we were to say what they gave was legal

13    advice, that might have been bad legal advice; right?

14    A.  I'm not an attorney.  I've never had a defense attorney.

15    Q.  But you investigate on obstruction cases; right?

16    A.  Yes.

17    Q.  And you know that if people take certain steps with respect

18    to evidence under certain circumstances with a certain mindset,

19    that can be a crime?

20    A.  Could be.

21    Q.  All right.  So this might have been legal advice, might

22    have very well been bad legal advice; right?

23          MR. EDWARDS:  Objection.

24          THE COURT:  That's sustained.

25          MR. SHIPLEY:  All right.  That's all I have,

4086

1    Your Honor.

2              THE COURT:  Ms. Halim.

3              MS. HALIM:  Yes.  Thank you.

4                        CROSS-EXAMINATION

5    BY MS. HALIM:

6    Q.  Good afternoon, Agent Cody.

7    A.  Afternoon, ma'am.

8    Q.  Before you testified here today, you met with the

9    government about your testimony; correct?

10   A.  Yes, I did.

11   Q.  Reviewed the exhibits that they were going to show you;

12   right?

13   A.  Yes.

14   Q.  Reviewed the testimony that you were going to give?

15   A.  Yes.

16   Q.  You and I did not meet to discuss your testimony; correct?

17   A.  No.

18   Q.  I have a question for you.  Mr. Shipley just asked you

19   about a message, and you said, and I quote, I can't interpret

20   the messages.  I can only read them.  Did you say that?

21   A.  Yes, I did.

22   Q.  Did the government tell you to say that when you prepared

23   with them to discuss your testimony?

24   A.  Not specifically.

25   Q.  Not specifically.

1          Would it surprise you to learn that other agents said

2     something very similar when defense attorneys asked them about

3     messages?

4               MR. EDWARDS:  Objection.

5               THE COURT:  Sustained.

6               MS. HALIM:  I'll move on.

7          If I could ask, Justin, please, could we pull up JH 30,

8     just for the witness and parties.

9     BY MS. HALIM:

10    Q.  Agent, do you -- you see what's on your screen there?

11    A.  Yes, I do.

12    Q.  And do you recognize that as one of those Signal system

13    messages?

14    A.  Yes.

15    Q.  You see the -- where it says label system; right?

16    A.  Yes.

17    Q.  And that is a message that appears to be from Gator 6;

18    correct?

19    A.  Correct.

20    Q.  And the last four digits of the phone number associated

21    with Gator 6, 0136; right?

22    A.  Yes.

23    Q.  And you know that to be Gator 6's number; right?

24    A.  I do not know off the top of my head, but I know who

25    Gator 6 is.

4088

1    Q.  And that's Kenneth Harrelson; correct?

2    A.  Yes.

3              MS. HALIM:  Your Honor, I move for admission of

4    JH 30.

5              MR. EDWARDS:  No objection.

6              THE COURT:  JH 30 is admitted.

7              (Defendant Hackett Exhibit JH 30 admitted into

8    evidence.)

9    BY MS. HALIM:

10   Q.  And you see there, Agent, that is one of those

11   system-generated messages on February 13th, 2021; correct?

12   A.  Correct.

13   Q.  And it says this message was deleted; right?

14   A.  Yes.

15   Q.  That's an example of what it looks like when a person goes

16   into their Signal application and deletes a specific message;

17   right?

18   A.  Yes.

19   Q.  You didn't see any other of those for Mr. Hackett; correct?

20   A.  I didn't specifically look for them.

21   Q.  You didn't see any either, did you?

22   A.  No, I did not.

23             MS. HALIM:  Thank you.  We can take that down.

24         Excuse me one moment.

25         If we could pull up JH 2, please.

```
1    BY MS. HALIM:

2    Q.  Agent, do you recognize --

3            MS. HALIM:  And just play maybe a few seconds in.

4            (A video recording was played.)

5    BY MS. HALIM:

6    Q.  Do you recognize this to be CCTV footage from inside the

7    Capitol?

8    A.  Yes.

9            MS. HALIM:  And if we could play just a little

10   further, please.

11           (A video recording was played.)

12   BY MS. HALIM:

13   Q.  And there you see what appears -- that's Kelly Meggs coming

14   in; right?

15   A.  Tall man standing right in the doorway, yes.

16   Q.  Yes.

17           MS. HALIM:  All right.  We can pause it.

18       Your Honor, I move for the admission of JH 2 and ask to

19   publish it to the jury.

20           MR. EDWARDS:  No objection.

21           THE COURT:  JH 2 is admitted.

22           (Defendant Hackett Exhibit JH 2 admitted into

23   evidence.)

24           MS. HALIM:  Thank you, Your Honor.

25       If we can go back to the beginning, please, and just
```

```
1    play it from the beginning.

2         Actually, before we start -- thank you, Justin.

3    BY MS. HALIM:

4    Q.  You recognize this to be the entry to the Rotunda of the

5    Capitol on the east side; correct?

6    A.  Yes.

7    Q.  And you know -- I see the time -- this is zoomed in;

8    correct?

9    A.  It appears to be.

10   Q.  Yeah, the actual CCTV footage, it's a much broader view

11   that we get; right?

12   A.  Yes.

13   Q.  Yeah.  And when it's not zoomed in, you'll see the time

14   stamp at the top, but we don't have that here; correct?

15   A.  Yes.

16   Q.  So this appears to be a zoomed-in version of the entry into

17   the Capitol, which you know to be around 2:40 p.m. based on

18   your investigation; correct?

19   A.  Correct.

20         MS. HALIM:  Okay.  If we could play that forward,

21   please.

22         (A video recording was played.)

23   BY MS. HALIM:

24   Q.  And we've also got it on a slower playback speed; right?

25   A.  Yes.
```

1    Q.  All right.  Right there, the first person there in that

2    camouflaged helmet with the glasses, you know that from your

3    investigation to be Kelly Meggs; correct?

4    A.  Yes.

5              MS. HALIM:  Keep playing it.

6              (A video recording was played.)

7              MS. HALIM:  And if we can pause there.

8    BY MS. HALIM:

9    Q.  The person that's directly behind Kelly Meggs now, tan hat?

10   A.  Yeah, on the screen, tan hat.

11   Q.  You know that to be Jason Dolan; correct?

12   A.  Yes.  Yes.

13   Q.  Not Mr. Hackett; right?

14   A.  Correct.

15   Q.  Right.

16              MS. HALIM:  All right.  Keep playing.

17              (A video recording was played.)

18              MS. HALIM:  And then if we can stop it right there.

19   BY MS. HALIM:

20   Q.  Mr. Hackett has just entered here; correct?

21   A.  Yes.

22   Q.  I didn't draw my circle very well, but -- and then right

23   behind this person, Graydon Young?

24   A.  It appears to be.

25   Q.  He had his -- has a black glove on his right hand; correct?

1    A.  Yes.

2    Q.  And his hand is raised?

3    A.  Yes.

4    Q.  All right.  If --

5    A.  Actually, I think Graydon Young -- I believe Graydon Young

6    is the one behind Mr. Moerschel just to the left of -- can I

7    draw on this screen?

8    Q.  Yeah, yeah.  Sure.

9    A.  Graydon Young is here, and that's Mr. Moerschel right

10   there.

11             MS. HALIM:  All right.  If we could -- actually,

12   let's take this down and put up JH 3, please.

13   BY MS. HALIM:

14   Q.  Does this appear to --

15             MS. HALIM:  I'm sorry.  If you could just play it

16   forward just a little bit for him, Justin.

17             (A video recording was played.)

18             MS. HALIM:  And then let's pause it.

19   BY MS. HALIM:

20   Q.  Do you recognize that to be the same CCT [sic] footage

21   except further zoomed in on those Rotunda doors there?

22   A.  Yes.

23             MS. HALIM:  Your Honor, I move for the admission of

24   JH 3, please.

25             MR. EDWARDS:  No objection.

 1          THE COURT:  All right.  JH 3 is admitted.

 2          (Defendant Hackett Exhibit JH 3 admitted into

 3    evidence.)

 4          MS. HALIM:  All right.  If we could play that

 5    forward.

 6          (A video recording was played.)

 7    BY MS. HALIM:

 8    Q.  So, once again, the first Oath Keeper right here coming in,

 9    that's Kelly Meggs; right?

10    A.  Yes.

11    Q.  Got the dark glasses on.  Do you see --

12          MS. HALIM:  Can we pause, please.  Can you just scoot

13    back maybe 2 seconds.

14    BY MS. HALIM:

15    Q.  You see that yellow circle there?

16    A.  Yes.

17    Q.  You recognize that to be Mr. Hackett; correct?

18    A.  It's a little -- it's a little blurry in this shot.

19    Q.  Okay.  You're not able to identify blurry images if I'm

20    asking the question?

21    A.  I mean, not -- not at this exact angle.  I mean, if we let

22    him come into the building a little bit more, I may be able to.

23    Q.  Fair enough.

24          All right.  So what I'm going to ask you to do, Agent,

25    is focus -- and we're going to need to go back another

1    2 seconds -- focus on the yellow circle, and then what I'm

2    going to ask you to pay attention to is an arm that goes up.

3    Okay?

4    A.  Uh-huh.

5            MS. HALIM:  We can play.

6            (A video recording was played.)

7    BY MS. HALIM:

8    Q.  Do you see that arm go up there?

9    A.  Yes.

10   Q.  Okay.  Do you see Mr. Hackett's hands fumbling with the

11   door there?

12   A.  I do.  Yes, that is Mr. Hackett.

13   Q.  All right.  Thank you.

14           MS. HALIM:  Now, if we can pull up for Agent Cody

15   JH 26.

16   BY MS. HALIM:

17   Q.  Do you recognize that to be a screenshot from CCTV footage

18   from the Rotunda of the Capitol Building?

19   A.  Yes, I do.

20   Q.  The date on that is January 6th; correct?

21   A.  Correct.

22   Q.  And the time is 2:42.  It's in --

23   A.  Yes.

24   Q.  -- military and UTC time, but if we do the conversion, it's

25   2:42 p.m.; is that right?

1    A.  Yes.

2    Q.  Thank you, Agent.

3              MS. HALIM:  Move for the admission, Your Honor, of

4    JH 26.

5              MR. EDWARDS:  No objection.

6              (Defendant Hackett Exhibit JH 26 admitted into

7    evidence.)

8    BY MS. HALIM:

9    Q.  All right.  Do you see those two purple sort of oval

10   circles there?

11   A.  I do.

12   Q.  The one on the right, that's Mr. Hackett; correct?

13   A.  Again, I mean, if this were full motion video, I could say

14   unequivocally, but with -- with this level of graininess,

15   I -- I won't say definitively that is Mr. Hackett.

16   Q.  Okay.  Well, what I'm going to direct your attention to, do

17   you see that sort of plastic thing on the left side of that

18   individual in the purple circle that's on the right?

19   A.  Yes, I do.

20   Q.  And you recognize and know from your investigation that

21   Mr. Hackett did, in fact, have some sort of plastic pouch?

22   A.  Yes.

23   Q.  Correct?

24   A.  Yes.

25   Q.  All right.  Thank you.

```
 1                MS. HALIM:  And if we could now bring up JH 27.
 2    BY MS. HALIM:
 3    Q.  Agent, do you recognize this to be different CCT [sic]
 4    footage from inside the Capitol Building?  Time stamp on this
 5    one would be 2:46 p.m. on January 6th.
 6    A.  Yes.
 7    Q.  And you can see -- it says there that's the Rotunda door
 8    interior; right?
 9    A.  Yes.
10    Q.  Okay.
11                MS. HALIM:  Move for admission of JH 27, Your Honor.
12                MR. EDWARDS:  No objection.
13                THE COURT:  It will be admitted.
14                (Defendant Hackett Exhibit JH 27 admitted into
15    evidence.)
16    BY MS. HALIM:
17    Q.  And you see that purple circle that's there?
18    A.  Yes, I do.
19    Q.  You recognize that to be Mr. Hackett?
20    A.  I do.
21    Q.  Thank you.
22                MS. HALIM:  If we could now go to JH 28.
23    BY MS. HALIM:
24    Q.  And this, Agent Cody, is CCTV -- excuse me.  Do you
25    recognize this to be CCTV footage from inside the Capitol on
```

1    January 6th at approximately 2:51 p.m., Rotunda door interior;

2    isn't that right?

3    A.  Yes.  Yes, it is.

4    Q.  And you --

5             MS. HALIM:  Move for admission of JH 28, Your Honor.

6             MR. EDWARDS:  No objection.

7             THE COURT:  JH 28 will be admitted.

8             (Defendant Hackett Exhibit JH 28 admitted into

9    evidence.)

10   BY MS. HALIM:

11   Q.  And that purple circle, you see there are two individuals

12   in there; correct?

13   A.  Yes.

14   Q.  And that's Joseph Hackett and David Moerschel; correct?

15   A.  It appears to be, yes.

16   Q.  Okay.  And you know from your investigation that that's

17   them actually leaving the Capitol at 2:51 p.m.; right?

18   A.  Yes.

19   Q.  All right.  Thank you, Agent, I have no further questions.

20   A.  Thank you.

21            THE COURT:  Mr. Weinberg.

22                         CROSS-EXAMINATION

23   BY MR. WEINBERG:

24   Q.  Good afternoon.

25   A.  Good afternoon, sir.

1    Q.  Just a few questions.  So on this case, the investigation

2    that you did just consisted of reading messages and watching

3    videos?

4    A.  No.

5    Q.  Okay.  So what did you do?

6    A.  So I conducted some interviews.  My primary role within the

7    investigative team was more of an administrative side and

8    ensuring discovery was provided, ensuring devices were properly

9    scoped and documented, but I did participate in a number of

10   interviews.  I reviewed a number of electronic devices.  I did

11   not have a -- other than our -- our overarching enterprise

12   conspiracy investigation, I didn't have any specific

13   investigation assigned to myself as a WFO -- Washington Field

14   Office special agent.

15   Q.  All right.  So you saw Stewart Rhodes's phone; correct?

16   A.  Correct.

17   Q.  Okay.  And we can agree that in the messages that the

18   government had you testify to, Kellye SoRelle passed a message

19   from Stewart Rhodes telling everybody to delete everything out

20   of their phones; is that right?

21   A.  Essentially, yes.

22   Q.  And we can agree that Stewart Rhodes didn't actually delete

23   anything out of his phone, that you know of?

24   A.  I can't -- I can't say that unequivocally.  If it's not in

25   there, I can't say that it's -- that it was there.

1    Q.  He had lots of messages in his phone; correct?

2    A.  He had a lot of messages in his phone.

3    Q.  Including the message that said delete other messages?

4    A.  Yes.

5    Q.  Okay.  And that message was sent on the DC OP chat;

6    correct?

7    A.  DC OP Jan 6, yes.

8         MR. WEINBERG:  Okay.  Justin, could we pull up DM 11,

9    please.  Just show it here.

10        And this has been previously entered into evidence as

11   Government Exhibit 9701, and this is page 4.  All I've done,

12   Mr. Edwards, is changed the time to Eastern Standard Time.  Do

13   you have an objection to it?

14        These are yours, and I just added these to the side.

15        MR. EDWARDS:  Okay.  No objection.

16   BY MR. WEINBERG:

17   Q.  Do you recognize this?

18   A.  I do not.

19   Q.  Okay.  Can we agree that this is an exhibit that says when

20   the last time my client sent a message on these chats?

21   A.  Yes.

22   Q.  Okay.  And we can agree on the Vetted OK FL chat, the last

23   message he sent was on January 4th, according to this exhibit?

24   A.  According to this exhibit, yes.

25   Q.  Okay.  Same thing with OK FL Hangout, it was on the 7th;

1    correct?

2    A.  According to this exhibit, yes.

3    Q.  Okay.  And the OK FL DC OP chat, it was also the 7th?

4    A.  Yes.

5    Q.  And OK FL, looks like he only sent one message on that and

6    that group was probably scrapped; is that right?

7    A.  I don't know if the group was scrapped, but, yes, it

8    appears just the one message.

9              MR. WEINBERG:  Judge, I would ask to admit DM 11,

10   please.

11             THE COURT:  Okay.  DM 11 is admitted.

12             (Defendant Moerschel Exhibit DM 11 admitted into

13   evidence.)

14   BY MR. WEINBERG:

15   Q.  Okay.  You testified about the firearms; correct?

16   A.  Yes.

17   Q.  Do you have any personal knowledge about firearms?

18   A.  I do.

19   Q.  Okay.  Do you have your own personal firearms?

20   A.  I do.

21   Q.  Okay.  Do you have your own personal AR-15?

22   A.  I do.

23   Q.  Can we agree that the AR-15 is a -- probably the

24   top-selling rifle, sporting rifle?

25   A.  They sell a lot of units of AR-15s, yes.

1    Q.  And we can agree that Daniel Defense is a nice AR-15 in

2    that world?

3    A.  It's a nice AR-15.

4    Q.  And we can agree that through all of your investigation,

5    you never discovered any of these weapons leaving the hotel

6    room in Virginia on January 6th?

7    A.  I did not put any eyes myself on any weapons specifically

8    leaving any hotel rooms.

9            MR. WEINBERG:  Okay.  I have no other questions,

10   Your Honor.

11           THE COURT:  Okay.  Thank you.

12       Mr. Peed.

13                    CROSS-EXAMINATION

14   BY MR. PEED:

15   Q.  Good afternoon, Agent Cody.

16   A.  Good afternoon, sir.

17   Q.  All right.  You said that Mr. Caldwell is, quote, a

18   Virginia Oath Keeper; right?

19   A.  Yes.

20   Q.  Mr. Caldwell is not a member of the Oath Keeper

21   organization; correct?

22   A.  I believe he was.

23   Q.  He used -- he paid dues?

24   A.  That is my understanding.

25   Q.  Okay.  Well, Mr. Caldwell was not on any Signal app related

1   to January 6th; correct?

2   A.   That's my understanding, he was not.

3   Q.   All right.  And he did not communicate with Stewart Rhodes;

4   correct?

5   A.   I can't say that unequivocally, no.

6   Q.   All right.  But you are -- you are the agent in charge --

7   you are an agent in this case and you have not reviewed any

8   messages from January 6th between those two; correct?

9   A.   No.

10  Q.   All right.  You talked about a message where Mr. Vallejo

11  asked Ernie Hancock, "Secure the Arizona Capitol yet, Slacker."

12  Correct?

13  A.   Yes.

14  Q.   Now, Ernie Hancock at the time was at the Arizona Capitol;

15  right?

16  A.   I don't know where Ernie Hancock was at the time.

17  Q.   You don't know where Ernie Hancock was?

18  A.   No, I don't.

19  Q.   Do you know who Ernie Hancock is?

20  A.   I believe he was a podcaster; beyond that, I can't say.

21  Q.   He does do podcasts; right?  You listened to those two --

22  two podcasts that he did; right?

23  A.   Yes.

24  Q.   On January 6th and January 7th?

25  A.   Yes.

1    Q.  One of those podcasts on January 6th he did from the

2    Arizona Capitol; correct?

3    A.  If you say so.  I don't know where he was physically

4    located.

5    Q.  Okay.

6    A.  I listened to that particular podcast quite some time ago.

7    I don't recall specifically if he -- if he stated where he was

8    physically located at the time.

9    Q.  All right.  So you don't know what his -- you testified

10   about the message without knowing where Mr. Hancock was; that's

11   what you're saying?

12   A.  I read the message, yes.

13   Q.  All right.  You listened to the January 7th podcast with

14   Mr. Hancock; right?

15   A.  I did.

16   Q.  All right.  Mr. Vallejo spoke on that podcast; right?

17   A.  Yes.

18   Q.  And -- he was speaking to Ernie Hancock; right?

19   A.  Yes.

20   Q.  The person that he sent that message to about you take over

21   the Arizona Capitol yet, Slacker; right?

22   A.  Yes.

23   Q.  With the laughing face?

24   A.  Yes.

25   Q.  Okay.  And Mr. Vallejo described the actions of those who

1    broke into the Capitol on January 7th to Mr. Hancock; correct?

2    A.  Yes.

3    Q.  And he described them as domestic terrorism [sic]; correct?

4    A.  I don't recall that phrase specifically.

5    Q.  All right.

6    A.  If we could play it back, I could -- I could tell you one

7    way or the other.

8             MR. EDWARDS:  Objection, Your Honor.  Outside the

9    scope.

10             THE COURT:  What do you intend to do, Mr. Peed?

11             MR. PEED:  That's my question.  I don't intend to do

12    much.  We're talking about the communications to Mr. Hancock.

13             THE COURT:  Okay.  He says he doesn't remember.

14    What's next?

15             MR. PEED:  I think he'll be reminded he has to -- I

16    think I can refresh his recollection here.

17             MR. EDWARDS:  That's the government's objection.

18    Going into that would be outside the government's -- scope of

19    the government's direct.

20             THE COURT:  Well, if that's the objection, then

21    that's overruled.

22             MR. EDWARDS:  I'd also add that it's hearsay.

23             THE COURT:  That's a different issue.

24             Pick up the phone, please.

25             (Bench conference on the record.)

 1          MR. EDWARDS:  So, Your Honor, two things.  I know the

 2     Court overruled that outside scope objection.  My understanding

 3     is Mr. Peed may be getting into the audio of the January 7th

 4     podcast.  The government never went anywhere near that in the

 5     direct.  We didn't play that audio.  The second thing is all of

 6     that would be hearsay as to Vallejo's own statements on the

 7     morning of January 7th and others.

 8          MR. PEED:  I don't want to play any audio,

 9     Your Honor, and I don't think that Mr. Vallejo's description of

10     the people's attack on the Capitol was -- is a declarative

11     statement.  It just goes to his state of mind.

12          MR. EDWARDS:  It would be the morning of January 7th

13     describing what happened on the 6th.

14          THE COURT:  Yeah, I mean, this is -- it's within the

15     scope of the conspiracy, but it's also outside the scope of

16     another alleged conspiracy.  I guess -- I mean, certainly being

17     offered for the truth.  It's not being offered for -- you said

18     he's -- I guess what he said is they're domestic terrorists.  I

19     mean, that's -- that seems to be for the truth.

20          MR. PEED:  Your Honor, the implication from the

21     government on direct was that this message -- have you secured

22     the Arizona, Slacker, yet, which was sent to the individual

23     that he's now talking to was somehow reflective of an intent.

24          THE COURT:  But that's a different message

25     altogether.  I mean, the podcast doesn't complete the one text

1    message that he sent to Mr. Hancock.

2            MR. PEED:  It's -- doesn't complete it in the 106

3    sense, Your Honor, but it's -- I don't understand how him

4    talking to someone that he's basically been --

5            THE COURT:  Let me ask you this, Mr. Peed.  Would you

6    agree with me that a defendant's out-of-court statement that

7    is -- that is self-exculpatory is ordinarily not admissible?

8            MR. PEED:  It's -- if it's declarative, yes, Your

9    Honor.

10           THE COURT:  Right.  And this is declarative.  He's

11   saying that the people who went in are domestic terrorists.

12           MR. PEED:  It's a judgment on a declaration.

13           THE COURT:  No, I think it's a declaration.  I mean,

14   he's describing them in a certain way.  I mean, I don't know if

15   he's not putting a legal label on it, but he is certainly

16   putting a -- he's putting a description on it that he believes

17   is truthful.

18           MR. PEED:  He's expressing an attitude towards them,

19   and most of the government's case is expressing that during the

20   time frame of the conspiracy people expressing their attitudes

21   about things.

22           THE COURT:  I disagree.  And I think this is a

23   statement if it's being offered for the truth, which is that

24   Mr. Vallejo believed these people to be domestic terrorists,

25   that they were domestic terrorists.  I mean, that's what you're

1    introducing it for; correct?

2            MR. PEED:  For his belief, his attitude.

3            THE COURT:  Right.  But it's for the truth of the

4    belief, not just the general belief.  It's for the truth of the

5    statement that these people were, in fact, domestic terrorists.

6            MR. PEED:  I think if he's telling Mr. Hancock -- and

7    there can be a limiting instruction, but if he's telling

8    Mr. Hancock these were not people to exalt to, to act similarly

9    to, then that undermines the government's use of a statement to

10   Mr. Hancock saying have you taken over the Arizona Capitol.

11           THE COURT:  No, it doesn't.

12           MR. PEED:  If he wants to stipulate, that's a joke,

13   and he was not asking him to take over the stairs --

14           THE COURT:  Mr. Peed, look, you can't just put things

15   in unless there's a basis to.  Okay?  And I understand he made

16   a statement to Mr. Hancock, but a statement on a separate

17   podcast doesn't inform and complete or in any other sense what

18   he said on -- and I think that's a text message on the 6th;

19   correct?

20           MR. PEED:  It's on the 6th.

21           THE COURT:  Right.

22           MR. PEED:  And then the government is saying that on

23   the 7th Mr. Vallejo was going to try to retake the Capitol;

24   that's their theory.

25           THE COURT:  I understand.

1          MR. PEED:  So if he's telling someone his view that

2     people who broke into the Capitol were domestic terrorists --

3          THE COURT:  It is -- look, it is no less an

4     exculpatory declaration.  Self-exculpatory declaration if it

5     is, in fact, truth or he is expressing a view about somebody.

6     Now, I don't see how this comes in.  I really don't.

7          MR. PEED:  At a minimum, Your Honor, the government

8     has swung the door wide open by having every statement they

9     want of Mr. Vallejo's attitude, but then not letting me have a

10     statement of his attitude right on the morning when --

11          THE COURT:  How long is this podcast?  Are we going

12     to have to listen to the whole thing?

13          MR. PEED:  I don't want to play any of the podcast.

14     I want to refresh his recollection.

15          THE COURT:  What else is on the podcast?  This is the

16     first time I heard that there was a January 7th podcast.  In

17     other words, what's the government want to ask for completeness

18     purposes?

19          MR. EDWARDS:  I can tell you right now.

20          THE COURT:  Okay.

21          MR. EDWARDS:  He says he is reading orders from

22     Stewart Rhodes.

23          THE COURT:  There you go.  Do you want that in there?

24          MR. EDWARDS:  I -- I can --

25          THE COURT:  I'm asking Mr. Peed.  Do you want that in

1    there?

2              MR. PEED:  If that comes in, then I want more in.

3              THE COURT:  No, I'm not going to get into this then.

4    I mean, you're asking to put in a single narrow statement.

5    There's a lot more on this podcast.  So, you know, you've been

6    the one who's talking about completion the whole time.  That's

7    completion.

8              MR. PEED:  Okay.  If that's the question, I'll leave

9    it there.

10             THE COURT:  What does that mean?

11             MR. PEED:  That -- if I can get it in with my

12   question, that Mr. Rhodes described those who were attacking

13   the Capitol as domestic terrorists --

14             THE COURT:  Right.

15             MR. PEED:  -- and the government wants to get up and

16   say and he said he was awaiting orders from Stewart Rhodes on

17   January 7th in the morning.  Okay.  I'm fine with that.

18             THE COURT:  Okay.

19             MR. EDWARDS:  I'm happy to just read and not play it.

20   Unless he's playing the full -- I don't know where we left off.

21   Is he playing the audio?

22             THE COURT:  No, he said he's just asking him what the

23   content was.

24             MR. EDWARDS:  Okay.

25             (Proceedings held in open court.)

1    BY MR. PEED:

2    Q.  All right.  Just for the witness I'd like to show --

3              (REPORTER'S NOTE:  A sotto voce conference was held

4    between the Court and the courtroom deputy.)

5              THE COURT:  Go ahead, Mr. Peed.

6    BY MR. PEED:

7    Q.  Agent, you've reviewed Mr. Vallejo's text messages;

8    correct?

9              MR. PEED:  I'm going to move on, Your Honor.

10   BY MR. PEED:

11   Q.  You've reviewed Mr. Vallejo's text messages; correct?

12   A.  Yes.

13   Q.  All right.  And Mr. Vallejo had discussions over text

14   about whether the people attacking the Capitol were Antifa,

15   correct?

16   A.  Yes.

17   Q.  All right.  I want to show you Defense Exhibit 178.

18             MR. PEED:  Any objection to admitting it, showing the

19   jury?

20        Can you go to --

21             MR. EDWARDS:  No objection.  You're just showing it

22   to the witness, is that what you said?

23             MR. PEED:  I want to show it to the jury and lead

24   them through it.

25             MR. EDWARDS:  I need to understand what it is,

1     please.

2     BY MR. PEED:

3     Q.  All right.  Agent, you reviewed Mr. Vallejo's text

4     messages; correct?

5     A.  Yes.

6     Q.  On January 7th Mr. Vallejo sent a message to people in his

7     contacts called Dr. Phranq and TK; is that correct?

8              THE COURT:  Is this admitted?

9              MR. PEED:  It's not admitted yet to the jury,

10    Your Honor.

11    A.  Yes.

12    BY MR. PEED:

13    Q.  All right.  And Mr. Vallejo sent a YouTube message -- a

14    YouTube link to Dr. Phranq and TK on the morning of

15    January 7th; correct?

16    A.  Yes.

17    Q.  And you've reviewed these messages?

18    A.  I did not go to this link.

19    Q.  Okay.  You didn't go to this link, but you've reviewed

20    Mr. Vallejo's text messages; right?

21    A.  Yes.

22    Q.  For preparation for your testimony?

23    A.  Yes.

24              MR. EDWARDS:  No objection.

25              MR. PEED:  I ask that Exhibit 178 be admitted and

1    shown to the jury.

2              THE COURT:  Okay.  178 will be admitted.

3              (Defendant Vallejo Exhibit EV 178 admitted into

4    evidence.)

5    BY MR. PEED:

6    Q.  All right.  Dr. Phranq, do you know that to be Dr. Phranq

7    Tamburri?

8    A.  I believe so based on the unusual spelling of his name.

9    Q.  And TK is the person in the -- Mr. Vallejo's contacts for

10   Todd Kandaris; right?

11   A.  Presumably.

12   Q.  All right.  So on the morning of January 7th, Mr. Vallejo

13   sent this -- this YouTube link to Mr. Kandaris and Dr. Phranq;

14   correct?

15   A.  Yes.

16   Q.  All right.  So could you please read the -- the title of

17   the YouTube video.

18   A.  "We are not 'Tifa/The Storm Arrived, Part 1."

19              MR. PEED:  Okay.  At this time, Your Honor, I would

20   ask to play the video referenced in this link.

21              MR. EDWARDS:  No objection.

22              THE COURT:  Okay.

23              MR. PEED:  At this time this will be marked as

24   EV 903.

25              (An audio-visual recording was played.)

1    BY MR. PEED:

2    Q.  And just stopping here; for the record, Agent, do you see

3    some type of argument between members of the crowd?

4    A.  Yes.

5             (An audio-visual recording was played.)

6    BY MR. PEED:

7    Q.  All right.  For the record, do you see an individual start

8    smashing a window at the Capitol Building?

9    A.  Yes.

10   Q.  And you see another individual pull that person down?

11   A.  Yes.

12   Q.  All right.

13            MR. PEED:  I would stop here, Your Honor, if the

14   government doesn't object.

15            MR. EDWARDS:  No objection.

16            THE COURT:  Okay.

17            MR. PEED:  Take that down.

18   BY MR. PEED:

19   Q.  All right.  Mr. Vallejo, when he talked to Mr. Hancock on

20   the 7th, described a video he had seen of -- of protesters

21   attacking the window and people pulling them back.  Do you

22   remember that?

23   A.  Vaguely.

24   Q.  Do you recall that he believed -- or he described people

25   were attacking the window as Antifa?

1    A.  I recall him talking about Antifa in that -- in that

2    podcast.

3    Q.  All right.  Now I'd like to show you Exhibit 180.  Before I

4    ask questions, Agent, do you recall the government asking you

5    about a video that Ed Vallejo said had to be revised before he

6    could share it?

7    A.  Yes.

8    Q.  All right.  And there was a video in the stream of the

9    Signal messages before that; correct?

10    A.  Yes, there was.

11    Q.  All right.  Mr. Vallejo didn't say that was the video he

12    was trying to share; correct?

13    A.  He did not.

14    Q.  All right.  And in Signal, to -- to download a video to

15    your phone, it doesn't happen automatically.  You have to press

16    download to get that media onto your phone; correct?

17    A.  I couldn't say.  I haven't personally used Signal as an

18    end-user.

19              MR. PEED:  Could we show the witness Exhibit EV 180.

20    BY MR. PEED:

21    Q.  You reviewed Mr. Vallejo's SMS messages; correct?

22    A.  Yes.

23              MR. PEED:  At this time I would move to admit Defense

24    Exhibit 180.

25              THE COURT:  What's the number?

1           MR. PEED:  180.

2           MR. EDWARDS:  No objection.

3           THE COURT:  EV 180 is admitted.

4           (Defendant Vallejo Exhibit EV 180 admitted into

5    evidence.)

6    BY MR. PEED:

7    Q.  Do you see that on January 7th -- it says the UTC.  So on

8    January 7th, subtracting five hours, at 6:04 p.m. Mr. Vallejo

9    states, "Whe the people took the Capitol, there was a squad of

10   scared shitless MPD that thought they would be torn apart, were

11   escorted by Oath Keepers and the people to safety."

12   A.  That's what the message says, yes.

13   Q.  All right.  And then he corrected himself for his typo and

14   wrote when.  So when the people; correct?

15   A.  Yes.

16   Q.  And then he said, "I have the video but I have to resize

17   it."  Correct?

18   A.  Correct.

19   Q.  And then he says, "Try that."  Correct?

20   A.  Yes.

21   Q.  All right.  Now I'm going to show you --

22           MR. PEED:  Take that down, please.

23   BY MR. PEED:

24   Q.  -- what's been marked as Exhibit 305.4.

25           All right.  Sir, did you review Mr. Vallejo's Signal

1     messages to the group of people that he drove from Arizona

2     with?

3     A.  I did not.

4     Q.  Are you aware that he had a Signal group of people he drove

5     with -- from Arizona with?

6     A.  I was not.

7     Q.  You're not aware of that?

8     A.  No.

9              MR. PEED:  All right.  Based on previous messages

10    from that chat, I would move to admit EV 305.4.

11             MR. EDWARDS:  Objection.  Outside the scope of

12    direct.

13             THE COURT:  What's the date on this?

14             MR. PEED:  January 7th.

15             THE COURT:  January what?

16             MR. PEED:  7th.

17             THE COURT:  All right.  Is there an objection to the

18    foundation?

19             MR. EDWARDS:  Both, Your Honor.  Laying the

20    foundation with this witness, but outside the --

21             THE COURT:  Unless there's an issue as to the

22    authenticity, I'll let it in.  He can read it and can show

23    whatever videos are attached to it.

24          Go ahead.

25             (Defendant Vallejo Exhibit EV 305.4 admitted into

1    evidence.)

2    BY MR. PEED:

3    Q.  All right.  Mr. -- Agent Cody, could you read what

4    Mr. Vallejo wrote in the Signal message starting with

5    Oath Keepers.

6    A.  "Oath Keepers escorting a scared shitless MPD riot squad

7    that were inside, afraid they'd be torn apart by 'the mob.'"

8    Q.  All right.  And that description follows the attachment of

9    the video; correct?

10   A.  It appears to.

11   Q.  And if we go to Exhibit 180, which is already in evidence,

12   do you see that Mr. Vallejo used the same language of scared

13   shitless MPD in the message he was describing that needed to be

14   resized?

15   A.  I do see that.

16           MR. PEED:  All right.  Your Honor, at this time I

17   would move to admit Defense Exhibit EV 904, the video that was

18   attached to the Signal message.  I don't need to play it at

19   this time.

20           THE COURT:  Okay.

21           MR. EDWARDS:  No objection.

22           THE COURT:  All right.  904 is admitted.

23           (Defendant Vallejo Exhibit EV 904 admitted into

24   evidence.)

25           THE COURT:  To be clear are -- hang on.  Just get on

1    the phone quickly, please.

2                (Bench conference on the record.)

3                THE COURT:  You're offering the text for his state of

4    mind and not for the truth?

5                MR. PEED:  Yes, Your Honor.

6                THE COURT:  All right.  I'll provide a limiting

7    instruction to that effect.

8                (Proceedings held in open court.)

9                THE COURT:  The last text message from Mr. Vallejo, I

10   just want to provide a limitation on it.  It's being offered to

11   you as proof of his state of mind but not for the truth of the

12   contents of his statement.

13               MR. PEED:  Let's go back to Exhibit 305.4 and show

14   the jury.

15   BY MR. PEED:

16   Q.  This video that Mr. Vallejo attached is not the video that

17   you were asked about on your direct; correct?

18   A.  Correct.

19   Q.  Did you review the -- the FBI did a search of Mr. Vallejo's

20   phone; correct?

21   A.  Yes.

22   Q.  And they extracted all the data from his phone; correct?

23   A.  Yes.

24   Q.  And that included the -- the actual files of videos on his

25   phone; right?

1    A.   I believe so.  I did not do the extraction.

2    Q.   Did you review the results of the extraction?

3    A.   I did not review the entirety of his phone.

4    Q.   Did you review any videos that were extracted from his

5    phone?

6    A.   No.

7    Q.   In the limited review that you did, did you find the

8    video that you referenced in your direct on Mr. Vallejo's

9    phone?

10    A.   Not that I recall.

11    Q.   All right.  Thank you.

12         All right.  Do you recall -- you recall discussing in

13    your direct a series of messages where Joshua James says it's

14    over?

15    A.   Yes.

16    Q.   And Mr. Vallejo said, "Like hell it's over"?

17    A.   Yes.

18         MR. PEED:  Could we -- I will pull up Defense

19    Exhibit 179.  Sorry.  Hold on.

20    BY MR. PEED:

21    Q.   Do you recognize these messages from the January 6th Signal

22    chat?

23    A.   Not specifically, no.

24    Q.   Did you review Signal chat messages from January 6th?

25    A.   I did.

1    Q.  All right.  And you testified about them on your direct?

2    A.  Yes.

3            MR. PEED:  All right.  I move to admit Exhibit EV

4    179.

5            MR. EDWARDS:  No objection.

6            THE COURT:  EV 179 is admitted.

7            (Defendant Vallejo Exhibit EV 179 admitted into

8    evidence.)

9            MR. PEED:  Publish to the jury.

10   BY MR. PEED:

11   Q.  All right, sir.  On January 6th Mr. Vallejo wrote to the

12   Signal chat group, "Gentlemen, our Commander in Chief has just

13   ordered us to go home.  Comments."  Correct?

14   A.  Yes.

15   Q.  And Jim asked, "Trump?"

16   A.  Yes.

17   Q.  And Mr. Vallejo said, "yes, sir"?

18   A.  Yes.

19   Q.  All right.  Now, someone posted to the message group that

20   "There was a prerecorded message POTUS said we are so sweet,

21   please go home.  The worst damn prerecorded message I've ever

22   heard"?

23   A.  Yes.

24   Q.  Mr. Vallejo wrote, "The video under close scrutiny looks

25   like an overlay via CGI"?

4121

1    A.  Yes.

2    Q.  Now, about the same time, Mr. Vallejo was texting people

3    about a Trump message to go home; correct?

4    A.  Prior to that on the -- the same text.

5    Q.  Around the same time he was sending SMS messages about --

6    A.  I'd have to review them.

7    Q.  All right.  I'll show you Defense Exhibit 179.1.

8              MR. EDWARDS:  No objection.

9              MR. PEED:  All right.  I would move to admit

10   EV 179.1.

11             THE COURT:  All right.  179.1 is admitted.

12             (Defendant Vallejo Exhibit EV 179.1 admitted into

13   evidence.)

14   BY MR. PEED:

15   Q.  All right.  On January 6th at 9:43 UTC -- so that would be

16   4:43, the contact called Oyate wrote, "Trump requests everybody

17   leave and go home."  Correct?

18   A.  Yes.

19   Q.  And Mr. Vallejo wrote, "Fake."  Correct?

20   A.  Yes.

21   Q.  Now I'd like to show you Defense Exhibit 176.  Do you

22   recognize these, sir, as -- as more SMS messages from

23   Mr. Vallejo's phone?

24   A.  Yes, I do.

25             MR. PEED:  And, Your Honor, I would move to admit

```
1     Defense Exhibit EV 176.
2              MR. EDWARDS:  No objection.
3              THE COURT:  All right.  176 is admitted.
4              (Defendant Vallejo Exhibit EV 176 admitted into
5     evidence.)
6              MR. PEED:  Before we publish that, I'm going to go
7     back to another exhibit, Your Honor.
8     BY MR. PEED:
9     Q.  Now I'm going to show you Defense Exhibit 176.2.
10             All right.  Do you recognize this as these are the
11    messages that you just testified about in your direct about
12    where Mr. James says it's over?
13    A.  The first three, yes.
14             MR. PEED:  Okay.  Your Honor, I move to admit Defense
15    Exhibit 176.2.
16             MR. EDWARDS:  Scroll through it, please.
17          Oh, no objection.
18             THE COURT:  All right.  176.2 is admitted.
19             (Defendant Vallejo Exhibit EV 176.2 admitted into
20    evidence.)
21    BY MR. PEED:
22    Q.  All right, sir.  Publishing this to the jury, do you see
23    that Joshua James wrote, "Trump conceded.  It's over"?
24    A.  Yes.
25    Q.  "We lose."  And Vallejo wrote, "Like hell it's over"?
```

1    A.  Correct.

2    Q.  Now, someone named Nancy raised the question, "Was this

3    actually a concession?"  Correct?

4    A.  Correct.

5    Q.  And then she quotes a Trump message; correct?  Are you

6    familiar with that message?

7    A.  Not specifically, no.

8    Q.  All right.  Going back to 176.  Mr. Vallejo -- what we just

9    saw for orientation -- orienteering, Mr. -- Mr. Vallejo

10   responded that it was not over after a message that Trump had

11   conceded; correct?  At the previous message we just looked at.

12   Would you like to see it again?

13   A.  Yes.

14   Q.  All right.  And -- and even after Mr. Vallejo said that,

15   other people in the chat group are questioning whether

16   Mr. Trump had actually conceded; correct?

17   A.  Yes.

18   Q.  All right.  Now going to Exhibit 176.  On the 7th of

19   January, Mr. Vallejo wrote, "Word now is go home or go to

20   Texas.  POTUS directive.  Coup underway."  Do you see that?

21   A.  That's what it says, yes.

22   Q.  All right.  POTUS directive, do you know what P-O-T-U-S

23   acronym means?

24   A.  Yes.

25   Q.  It means President of the United States; correct?

1    A.  Yes.

2    Q.  And then Mr. Trump received a link to a website; correct?

3    A.  Mr. Vallejo received a link to a website, yes.

4    Q.  All right.

5              MR. PEED:  You can take that down.

6    BY MR. PEED:

7    Q.  All right.  Do you see the title of this document that I'm

8    showing you?

9    A.  I do.

10   Q.  All right.  I'm going to go back to Exhibit 176.  I'd like

11   you to look at the website that Mr. Vallejo received on

12   January 8th.

13   A.  Yes.

14   Q.  All right.  Do you recognize the title of this as the link

15   that Mr. Vallejo received?

16   A.  It appears to be the same.  I don't see the URL so I can't

17   confirm that.

18             MR. PEED:  Your Honor, at this time I move to admit

19   EV 176.1.

20             MR. EDWARDS:  One second.

21             THE COURT:  All right.

22             MR. EDWARDS:  No objection.

23             THE COURT:  EV 176.1 is admitted.

24             (Defendant Vallejo Exhibit EV 176.1 admitted into

25   evidence.)

1    BY MR. PEED:

2    Q.  All right, sir.  Could you please read the title of this

3    website.

4    A.  The title of the website or the title of the article?

5    Q.  Where it starts "Situation Update."

6    A.  "Situation Update.  Jan 8th.  Trump fighting from secure

7    location.  Did not concede."

8    Q.  And just read the first two sentences of the article,

9    please, starting with intel.

10   A.  "Intel is coming in today from many sources, and I will

11   likely need to post a separate article to cover it all.

12   Importantly, Trump has not conceded anything.  And if you parse

13   the words of his most recent video statement, there is

14   absolutely no concession in it and no naming of Joe Biden as

15   President."

16   Q.  All right.  And do you see there's some italics words

17   there?

18   A.  Yes, sir.

19            MR. PEED:  So you can take that down.

20            MR. EDWARDS:  We would just ask for the same limiting

21   instruction.

22            THE COURT:  Sure.  Just another reminder, again,

23   ladies and gentlemen, with respect to the article that's being

24   offered, just for Mr. Vallejo's state of mind, not the truth or

25   the contents of the article.

1          Go ahead.

2               MR. PEED:  Okay.  If we can go back to 176.

3     BY MR. PEED:

4     Q.  All right.  So that message was sent on the morning of

5     January 7th; correct?

6     A.  Yes.

7     Q.  So as of the morning of January 7th, Mr. Vallejo's

8     receiving information that Mr. Trump has not yet conceded;

9     correct?

10    A.  Correct.

11    Q.  Now, Mr. Vallejo on the morning of January -- well, not

12    say morning.  At 9:45 p.m. on January 7th, Mr. Trump --

13    Mr. Vallejo wrote, "Trump is safe in Abilene right now."

14    Correct?

15    A.  Yes.

16    Q.  Abilene is a city in Texas; correct?

17    A.  It is, yes.

18    Q.  And Mr. Vallejo wrote, "He's still in power."  Right?

19    A.  Yes.

20    Q.  He was still in power; correct?

21    A.  Yes, he was.

22    Q.  To your knowledge, President Trump was not in Abilene;

23    correct?

24    A.  Not to my knowledge.

25    Q.  Mr. Vallejo wrote, continuing, "That you watch.  He's going

1    to speak to the people directly through their phones with the

2    EAS."  Do you see that?

3    A.  That's what it says.

4    Q.  Do you know what EAS means?

5    A.  No.

6    Q.  Mr. Vallejo wrote, "He's going to announce arrests soon."

7    Correct?

8    A.  Correct.

9    Q.  And then at 10:53 p.m. on the 9th, he wrote, "We are headed

10   for Texas."  Correct?

11   A.  It appears Donna Hancock wrote that to him.

12   Q.  All right.  I may need to look at that.  But Mr. Vallejo,

13   you testified, was headed for Texas; correct?

14   A.  At that time, yes, I believe he was.

15   Q.  All right.  And so while he's heading to Texas, he is

16   expressing that the President has not yet conceded and may

17   actually be in Texas; right?

18   A.  Yes.

19   Q.  All right.  And do you see what Mr. Vallejo writes on

20   January 10th to Taylor Tommy?

21   A.  Yes.

22   Q.  What did he write?

23   A.  "Elvis says hi."

24   Q.  Thank you.

25            MR. PEED:  All right.  Pull that down, please.

1    BY MR. PEED:

2    Q.  I'd like to show the witness what I've marked as EV 200.

3            Sir, did you review photos extracted from Mr. Vallejo's

4    phone?

5    A.  No.

6    Q.  No.  Do you recognize the individual in this photograph?

7    A.  I do.

8    Q.  Who is the individual in this photograph?

9    A.  Mr. Vallejo.

10   Q.  Are you aware that Mr. Vallejo traveled from

11   Washington, D.C., through Tennessee on the way to Texas?

12   A.  I'm not -- I'm not a hundred percent of his exact route,

13   but --

14   Q.  Okay.  You were testifying about Mr. Vallejo's conduct on

15   the 7th and 8th in your direct; right?

16   A.  Yes.

17   Q.  Do you know where Mr. Vallejo was on the 7th and 8th?

18   A.  Not exactly.

19            MR. PEED:  I'll go ahead and move to admit Defense

20   Exhibit EV 200?

21            MR. EDWARDS:  Objection to foundation.

22            THE COURT:  I'll allow it.  Go ahead.  You can admit

23   it and show it to the jury.

24            (Defendant Vallejo Exhibit EV 200 admitted into

25   evidence.)

1    BY MR. PEED:

2    Q.  All right.  So is this the individual you identify as

3    Mr. Vallejo; correct?

4    A.  Yes.

5    Q.  And behind him is the sign for Graceland; correct?

6    A.  Yes.

7    Q.  And we just saw the text where he sent -- saying, "Elvis

8    says hi."  Correct?

9    A.  Yes.

10   Q.  All right.  And that was around the 10th of January; right?

11   A.  Yes.

12            MR. PEED:  You can take that down.

13   BY MR. PEED:

14   Q.  Now, Mr. Vallejo had said he would depart when his

15   commander told him, depart the D.C. area; correct?

16   A.  Yes.

17   Q.  And we read that message; right?

18   A.  I believe it said he would depart when his commander tells

19   him to.  I don't know where he was departing from.

20   Q.  After that Mr. Vallejo sent the message saying there was a

21   POTUS directive to go to Texas; right?

22   A.  Something to that effect.

23   Q.  And Mr. Vallejo went to Texas; right?

24   A.  That's my understanding.  That is what he messaged.

25   Q.  And he told people Mr. Trump was in Texas?

1    A.  Yes.

2    Q.  Now, do you recall questions about deleting -- people being

3    instructed not to say certain things?

4    A.  Yes.

5    Q.  And do you recall people being instructed not -- to delete

6    or not hold on to certain things?

7    A.  Yes.

8    Q.  I'd like to show what I'll mark as Defense Exhibit 300.2.

9         So have you reviewed Signal messages from

10   Stewart Rhodes?

11   A.  I have.

12   Q.  And Stewart Rhodes uses the moniker Stewart; correct?

13   A.  He does.

14   Q.  And, Mr. Vallejo [sic], have you read -- have you

15   reviewed messages from Mr. Vallejo on the Signal -- Signal chat

16   groups?

17   A.  Yes, I have.

18   Q.  And he uses the moniker Ed Vallejo?

19   A.  He does.

20        MR. PEED:  All right.  At this time, Your Honor, I

21   would move to admit Defense Exhibit EV 300.2.

22        MR. EDWARDS:  No objection.

23        THE COURT:  All right.  300.2 is admitted.

24        (Defendant Vallejo Exhibit EV 300.2 admitted into

25   evidence.)

1    BY MR. PEED:

2    Q.  On January 24th, Stewart Rhodes sent a message to

3    Mr. Vallejo saying, "Ed, keep in mind that is not a secure

4    chat.  Contains at least one turncoat snitch.  Keep that in

5    mind."  Correct?

6    A.  Yes.

7    Q.  And he asked him to confirm that he got this; right?

8    A.  Yes.

9    Q.  Because there had been a delay of two minutes; correct?

10   A.  Between the two chats?

11   Q.  Yes.

12   A.  Yes.

13   Q.  All right.  Could you please read what Mr. Vallejo

14   responded.

15   A.  "Oh, I got that.  But I never did anything wrong, and I was

16   at the hotel when things went wonky."

17   Q.  And Stewart Rhodes responds, "No sweat.  Just keep it in

18   mind.  And FBI has Jessica's phone.  So they're, no doubt, now

19   monitoring any chats she was in, which included that DC OP

20   chat."  Do you see that?

21   A.  Yes.

22   Q.  All right.  This message that the FBI is monitoring the

23   chat was sent weeks before the message about the FBI being able

24   to read Signal that you talked about on your direct; right?

25   A.  Yes.  I believe that was in mid-February, if I'm correct.

1    Q.  So when Mr. Vallejo sent that message, he was already --

2    had been informed the FBI had the DC OP chat; correct?

3    A.  When Mr. Vallejo received that message, presumably, yes.

4    Q.  All right.  What did Mr. Vallejo respond?

5    A.  "P.s.:  If you ever need me for anything, I'm on call and

6    I'm at your service, sir."

7    Q.  And then please review what Mr. Vallejo stated next.

8    A.  "I stayed in the DC OP chat because running and hiding is

9    what guilty people do."

10   Q.  Sir, whatever review you did of Mr. Vallejo's phone

11   returns, did you find any evidence that Mr. Vallejo ever

12   deleted a picture, a video, or a message from January 6th?

13   A.  I personally did not.

14            MR. PEED:  Thank you.  No further questions.

15            THE COURT:  All right.  Redirect, Mr. Edwards.

16            MR. EDWARDS:  Yes, Your Honor.

17       First, Your Honor, may I get on the phone with one

18   request that I'd like to make?

19            (Bench conference on the record.)

20            MR. EDWARDS:  So two things.  One, the conversation

21   that we had with the Court about getting into the January 7th

22   podcast, Mr. Vallejo -- Mr. Peed asked a couple questions about

23   the content.  I just wanted to make sure that I was allowed to

24   still message -- to show what I had already signaled to you

25   that I would show, that portion.

1          MR. PEED:  I moved on because of that, Your Honor.

2          THE COURT:  I think he moved on.  He didn't seek to

3    elicit it after our discussion.

4          MR. EDWARDS:  Okay.  I just recall he came back to it

5    and asked, you know, well, didn't he say that on the podcast.

6    So I thought that had opened it a little later, but if you

7    don't recall that, okay.

8          THE COURT:  I don't think that was -- was put into

9    evidence.

10          MR. EDWARDS:  Okay.  And the second thing is

11    Ms. Halim had asked a question of Agent Cody about why every

12    agent had repeated the same line.  My -- my understanding is

13    the Court has given an instruction that they are to read and

14    not interpret.  And so I think it would be appropriate to

15    provide that instruction to the jury that you -- you had told

16    the agents to do that.

17          MS. HALIM:  May I respond?

18          THE COURT:  Sure.  Go ahead.

19          MS. HALIM:  Okay.  My response is I don't think the

20    instruction would be appropriate at this time.  It -- first of

21    all, it was sustained.  My questions aren't evidence, as the

22    jury will have heard many times, and it is a fact that on

23    direct they do interpret.  So it's --

24          THE COURT:  Well, I'm not sure I agree with that,

25    Ms. Halim.  In fact, I understand where you're coming from, but

4134

1    I think, by and large, they have stuck to just reading these

2    things.  They have not really drawn outside the lines, and I've

3    been careful about that, or at least tried to be.

4         Look, if you want to elicit from him that it's your

5    understanding that it's the Court's instruction that the agents

6    be limited to reading the text messages and not interpreting

7    it, that's his understanding, that's appropriate.

8              MR. EDWARDS:  Okay.  Thank you.

9              (Proceedings held in open court.)

10              MR. EDWARDS:  Thank you, Your Honor.

11                      REDIRECT EXAMINATION

12    BY MR. EDWARDS:

13    Q.  Agent Cody, I'd like to ask you a couple questions about

14    some of the questions you've been asked by each one of the four

15    defense counsel.

16    A.  Okay.

17    Q.  First, do you remember when Mr. Shipley, who represents

18    Mr. Minuta, asked you questions about what you, as part of the

19    FBI, tell people when you interrogate them?

20    A.  Yes.

21    Q.  Okay.  And do you remember he asked you whether -- when he

22    showed you messages from Stewart Rhodes and Kellye SoRelle

23    about deleting messages?

24    A.  Yes.

25    Q.  And he started to imply to you that it's basically the same

1    thing the FBI does?

2         MR. SHIPLEY:  Your Honor, I'm going to object and ask

3    to go on the phone.  That was not the content.

4         THE COURT:  Well --

5         MR. SHIPLEY:  My question was about telling the

6    people not to talk, not about deleting messages.

7         THE COURT:  That's fine.

8    BY MR. EDWARDS:

9    Q.  Okay.  Did Mr. Shipley ask you questions about what the FBI

10   does?

11   A.  Yes.

12   Q.  Did he then ask you questions about what Stewart Rhodes

13   told his group to do?

14   A.  Yes.

15        MR. EDWARDS:  Ms. Badalament, can we please open up

16   Government's Exhibit 9652 and go to Slide 25 and 26.

17   BY MR. EDWARDS:

18   Q.  What did Stewart Rhodes tell the Old Leadership chat at

19   11:51 a.m. on January 8th?

20   A.  "I can't delete them because this is a legacy Signal chat

21   that doesn't let me delete comments.  Only the comment author

22   can delete a comment.  Get busy.  Delete your

23   self-incriminating comments or those that can incriminate

24   others."

25   Q.  Would you as a member of the FBI ever ask anyone to delete

1    self-incriminating comments?

2    A.  Absolutely not.

3    Q.  Would you ever tell someone as a member of the FBI to

4    delete those that can incriminate others?

5    A.  No.

6        MR. EDWARDS:  Go to the next slide, please.

7    BY MR. EDWARDS:

8    Q.  Now, do you see here where Stewart Rhodes then told them,

9    delete -- "Hunt down any comment you made that can be used

10   against you, other Oath Keepers, or the org and delete them"?

11       MR. SHIPLEY:  Your Honor, I'm going to object.  This

12   is beyond cross.  I did not cover this stuff.

13       THE COURT:  Let's move on.  The jury has seen this

14   before.

15       MR. EDWARDS:  Yes, Your Honor.

16   BY MR. EDWARDS:

17   Q.  Next defendant.  Do you remember when Ms. Halim asked you

18   some questions on behalf of Joseph Hackett?

19   A.  Yes.

20   Q.  Now, did you -- remember when Ms. Halim asked you whether

21   you had prepped with the government?

22   A.  Yes.

23   Q.  Did Ms. Halim ever ask to meet with you?

24   A.  No.

25   Q.  And do you remember when she asked you whether you can only

1    identify blurry -- blurry pictures for the government?

2    A.  Yes.

3    Q.  Have you, in fact, told me when I've shown you photos in

4    prep and in our investigation that that's too blurry, bring me

5    something better?

6           MR. SHIPLEY:  That's irrelevant.

7           THE COURT:  It's overruled.

8    A.  Yes, I have told you that.

9           MR. EDWARDS:  Ms. Badalament --

10          If someone from the defense team could please help me

11   with government's -- or Defense Exhibit JH and then the number

12   for when they were entering.

13          MS.  HALIM:  That was -- I believe it's 2.

14          MR. EDWARDS:  JH 2, please.

15          And thank you for that.

16          (A video recording was played.)

17          MR. EDWARDS:  And can we pause.  Thank you.

18   BY MR. EDWARDS:

19   Q.  Agent Cody, do you recall -- sorry.  Agent Cody, do you

20   recall Ms. Halim asking you questions about what Joseph Hackett

21   and David Moerschel did when they were entering the Capitol?

22   A.  I do.

23   Q.  And do you recall looking at this exhibit?

24   A.  Yes.

25   Q.  Do you recall Joseph Hackett and David Moerschel entering

1    together in this picture -- or in this video?

2    A.  Yes.

3           MR. EDWARDS:  Now can we jump to Defense Exhibit,

4    please, JH 28.

5    BY MR. EDWARDS:

6    Q.  Do you remember when Ms. Halim asked you to identify

7    Joseph Hackett and David Moerschel here?

8    A.  Yes.

9    Q.  And this is them exiting the Capitol; correct?

10   A.  Correct.

11   Q.  Agent Cody, did David Moerschel and Joseph Hackett enter

12   together and exit the Capitol together?

13   A.  Yes, generally.

14   Q.  Were they acting together?

15   A.  Yes.

16   Q.  Next defendant.

17           MR. EDWARDS:  Can we please --

18   BY MR. EDWARDS:

19   Q.  I'll turn to Mr. Moerschel and Mr. Weinberg's question.  Do

20   you remember questions from Mr. Weinberg about dates that

21   Mr. Moerschel messaged certain group threads?

22   A.  Yes.

23   Q.  And that was Defense Exhibit DM 11.  Do you remember

24   looking at that?

25   A.  Yes.

4139

1    MR. EDWARDS:  Now, if you're okay, please pull up

2    DM 11.

3         Great.

4    BY MR. EDWARDS:

5    Q.  Agent Cody, can I have you look at the OK FL DC OP Jan 6

6    thread here I'm marking in the second column.

7    A.  Yes.

8    Q.  What time, according to Mr. Weinberg's chart here, was

9    Mr. Moerschel's last message?

10   A.  9:35 a.m.

11        MR. EDWARDS:  Okay.  Ms. Badalament, can we please

12   open Government's Exhibit 9652 at Slide 6.

13   BY MR. EDWARDS:

14   Q.  Do you recall, Agent Cody, testifying about -- do you

15   recall, Agent Cody, testifying about what David Moerschel

16   messaged to that same chat on the morning of January 7th?

17   A.  Yes.

18   Q.  And he messaged, "We have your bag.  We'll leave it with

19   Kane at the QRF"?

20   A.  Yes.

21   Q.  Do you remember testifying that Kane was the Florida QRF

22   guy at the hotel?

23   A.  Yes.

24        MR. EDWARDS:  And can we go down to Slide 9,

25   Ms. Badalament.

1    BY MR. EDWARDS:

2    Q.  Now, Kenneth Harrelson had messaged, "No answer.  Okay.

3    I'll hunt you fuckers down."  What did Mr. Moerschel message at

4    9:35 a.m. on January 7th?

5    A.  "DM Kane."

6    Q.  The Florida QRF guy?

7    A.  Yes.

8    Q.  So after Mr. Moerschel messaged that group chat on the

9    morning of January 7th about the QRF in that hotel, that he

10   bail on that group thread and stop messaging it?

11   A.  It would appear so.

12   Q.  Okay.

13            MR. EDWARDS:  Court's indulgence.

14   BY MR. EDWARDS:

15   Q.  Sorry, Agent Cody.  I couldn't read my colleague's

16   handwriting.

17            So, Agent Cody, do you -- is it your -- do you remember

18   a question from Ms. Halim about interpreting messages?

19   A.  Yes.

20   Q.  And about whether or not you would be surprised that other

21   FBI agents had given the similar response that you did?

22   A.  I believe that's a fairly standard response.

23   Q.  And is it your impression that the Court has given an

24   instruction that law enforcement agents should read messages

25   and not interpret them?

1    A.  Yes.

2    Q.  Okay.  Let's go to the fourth defendant, Ed Vallejo.  He's

3    represented by Mr. Peed.  I'm going to ask you a couple

4    questions about his questions.

5        Do you recall Mr. Peed asked you whether Thomas Caldwell

6    was an Oath Keeper?

7    A.  Yes.

8        MR. EDWARDS:  Ms. Badalament, can we please pull up

9    Government's Exhibit 29.P.3, which is not in evidence yet.

10   BY MR. EDWARDS:

11   Q.  Agent Cody, do you know who's in that photograph?

12   A.  Thomas Caldwell.

13   Q.  Do you know where this came from?  I'm sorry.  What it's

14   showing; like where we are.

15   A.  It appears to be the -- the area where the Trump rally was

16   on, presumably, January 6th.

17   Q.  Okay.  Is this a photo from Thomas Caldwell's phone?

18   A.  Yes.

19       MR. EDWARDS:  At this time the government moves to

20   admit 29.P.3.

21       THE COURT:  All right.  29.P.3 is admitted.

22       (Government Exhibit 29.P.3 admitted into evidence.)

23   BY MR. EDWARDS:

24   Q.  So, Agent Cody, Mr. Peed asked you whether Thomas Caldwell

25   was an Oath Keeper.  What is Thomas Caldwell wearing on

1    January 6th?

2    A.  An Oath Keeper shirt.

3    Q.  How do you know that?  Is that here on this shirt?

4    A.  Yes, it is.

5    Q.  Okay.  Do you remember questions from Mr. Peed about

6    whether it was Antifa at the Capitol and whether Vallejo

7    messaged about Antifa being at the Capitol?

8    A.  Yes.

9         MR. EDWARDS:  Ms. Badalament, can we please pull up

10   Government's Exhibit 9552, Slide 31.  This is in evidence.

11        I'm sorry.  9652, Slide 31.

12        Thank you, Ms. Badalament.

13        I'm sorry.  Court's indulgence.

14        While Ms. Badalament pulls that up, I'll go to the

15   second question.  If the defense could help me with EV 903.

16        Thank you.  Sorry to bounce back and forth.  Can I go to

17   Ms. Badalament, please, and pull that message.

18        I'll go to -- I'll go back to the defense exhibit.

19   We'll come back to that.  One second.

20        Sorry.  If defense could please pull up Defense

21   Exhibit EV 903, please.

22        Do you mind if I use this?  Great.

23   BY MR. EDWARDS:

24   Q.  Agent Cody, do you recall Mr. Peed asked you questions

25   about a YouTube video titled "We are not 'Tifa"?

4143

1    A.  Yes, I do.

2    Q.  And do you recall Mr. Peed playing through some of this

3    video?

4    A.  Yes.

5    Q.  And I just want to play a little bit more from the minute

6    48 mark.  And do you recall someone taking a baseball bat to

7    the glass on the video?

8    A.  Yes.

9            MR. EDWARDS:  Okay.  Okay.  I'll play from here at --

10   a little further into the video, just 30 seconds or so.

11           (An audio-visual recording was played.)

12   BY MR. EDWARDS:

13   Q.  Now, Agent Cody, I'll pause here.  Did we watch part of

14   this video where people are trying to break into the Capitol?

15   A.  Yes.

16   Q.  And taking baseball bats to smash the glass in the

17   Capitol Building?

18   A.  Yes.

19   Q.  Okay.  And according to -- do you remember -- do you recall

20   questions from Mr. Peed about Edward Vallejo sending that video

21   around?

22   A.  Yes.

23   Q.  The title of that video, was it "We are not 'Tifa"?

24   A.  Yes.

25           MR. EDWARDS:  Okay.  Now, Ms. Badalament, if we could

1    pull up Government's Exhibit 9552 [sic]?

2              MR. PEED:  Your Honor, can we just get on the phones

3    for a second.

4              (Bench conference on the record.)

5              MR. PEED:  Your Honor, the video was posted by the

6    same Black conservative preacher, and he titled it because he

7    was saying that the Trump people are not Antifa, not acting

8    like those people.  It's -- the government is just misreading

9    it.  Since this agent doesn't know the video, it's very

10   misleading, the government's last question.

11             MR. EDWARDS:  The video showed the title of the

12   video.  It was, "We are not 'Tifa."

13             THE COURT:  It's in evidence.  It's the title.  I

14   mean, I don't know any more context than that.  It wasn't

15   provided on direct.

16             MR. PEED:  Because the title -- the title is clear

17   from the website, and so I don't -- I had a truncated website

18   just to show that it was the same video.  And I can, you know,

19   get the whole video to show who the Black preacher is, show

20   what he meant, it's -- it's certainly --

21             THE COURT:  No.  That could have been something that

22   you could have done on direct examination if you wanted to

23   provide some context.  The title is in.  He's not adding

24   anything more to the evidence that's already there.

25             MR. PEED:  Okay.

```
 1                MR. NESTLER:  Your Honor, should I pause?

 2                THE COURT:  Yeah.

 3         Do you know how much longer do you think you have, Mr.

 4    Edwards?

 5                MR. EDWARDS:  Not long at all.

 6                THE COURT:  Okay.

 7                MR. EDWARDS:  I'll finish.

 8                THE COURT:  All right.  And then the government will

 9    be prepared to rest?

10                MR. EDWARDS:  Yes, Your Honor.

11                THE COURT:  Okay.

12                (Proceedings held in open court.)

13                MR. EDWARDS:  I can wait, Your Honor.

14                THE COURT:  All right.  Go ahead, Mr. Edwards.

15                MR. EDWARDS:  Thank you.

16    BY MR. EDWARDS:

17    Q.  Agent Cody, before the break I was asking you about

18    questions that Mr. Peed had asked you about whether Vallejo

19    thought it was Antifa at the Capitol.  So we'll continue doing

20    that.

21                MR. EDWARDS:  Ms. Badalament, can we please pull up

22    Government's Exhibit 9552 [sic], Slide 34.

23    BY MR. EDWARDS:

24    Q.  Okay.  Agent Cody, what did Ed Vallejo text Donna Hancock

25    the day before, on January 6th, 2:32 p.m.?
```

4146

1    A.  "The people have taken the Capitol and Congress is in

2    bedlam and lockdown."

3    Q.  Did he say Antifa has taken the Capitol?

4    A.  No, he did not.

5    Q.  Okay.  Agent Cody, Mr. Peed also asked you a question about

6    a video outside with law enforcement officers marching down.

7    Do you recall that?

8    A.  I do.

9         MR. EDWARDS:  And that was EV 305.4.  Ms. Badalament,

10   can we please pull up Government's Exhibit 1508 at the end of

11   the exhibit, and please go toward the end at the beginning of

12   this clip.

13   BY MR. EDWARDS:

14   Q.  Okay.  Agent Cody, Mr. Peed admitted the video.  Did this

15   appear to be the same video that Mr. Peed asked you questions

16   about on the left?

17   A.  On the left, yes.

18        MR. EDWARDS:  Okay.  Ms. Badalament, I'd like to play

19   that video forward, please.

20            (An audio-visual recording was played.)

21        MR. EDWARDS:  Okay.  Can you please pause,

22   Ms. Badalament, at 14 minutes 2 seconds.

23   BY MR. EDWARDS:

24   Q.  So, Agent Cody, did Mr. Vallejo send around a video from --

25   that Mr. Minuta recorded?

1    A.  It would appear to be.

2    Q.  And did Mr. Minuta say, "That's what that is because it's

3    our fucking building" when he described patriots escorting the

4    law enforcement officers?

5    A.  Yes.

6    Q.  Now, Mr. Peed showed a message from Mr. Vallejo that said

7    MPD officers were, quote, scared shitless.  Do you recall him

8    showing you that message?

9    A.  Yes.

10   Q.  What had Mr. Minuta and Joshua James just done inside the

11   Capitol?

12   A.  Assaulted police officers.

13          MR. SHIPLEY:  I'm going to object.  That misstates

14   the evidence.

15          THE COURT:  Sustain the objection.  It's a legal

16   conclusion.  So you'll disregard the statement.

17   BY MR. EDWARDS:

18   Q.  Can you please describe factually what Mr. Minuta and

19   Joshua James had done inside the Capitol?

20          MR. SHIPLEY:  Objection.  Compound.

21          THE COURT:  That's also true.  But they've seen the

22   video.  I don't know that we need a witness to characterize it.

23          MR. EDWARDS:  Yes, Your Honor.

24   BY MR. EDWARDS:

25   Q.  Mr. Peed asked you questions about Mr. Vallejo and deletion

1    messages.  Do you recall that?

2    A.  Yes.

3    Q.  Okay.  And that was --

4            MR. EDWARDS:  Can we please pull, Mr. Peed, EV 300.2.

5            Well, before -- I'm sorry.  I don't want to ask you.

6    BY MR. EDWARDS:

7    Q.  Do you recall Mr. Peed asking you questions about

8    Mr. Vallejo and Stewart Rhodes talking to one another on

9    January 24th, 2020?

10   A.  Yes.

11   Q.  And Mr. Vallejo said something like, I had done nothing

12   wrong, I was at the hotel when it went wonky.  Do you remember

13   those messages?

14   A.  I do.

15   Q.  That was January 24th?

16   A.  Yes.

17           MR. EDWARDS:  Ms. Badalament, can we please pull up

18   Government's Exhibit 9652 at the first slide.

19   BY MR. EDWARDS:

20   Q.  Now, Agent Cody, Edward Vallejo, is he a member of this

21   group chat DC OP: Jan 6 21?

22   A.  To my knowledge, I can't -- I can't say.

23   Q.  Did Stewart Rhodes -- well, did you read some messages from

24   Ed Vallejo to this group chat on January 7th?

25   A.  Yes.

4149

1    Q.  Now, did Stewart Rhodes -- what did Stewart Rhodes message

2    on the night of January 6th about three weeks earlier?

3    A.  "Be very careful and mindful that anything you say can and

4    will be used against you.  Expect it."

5    Q.  Okay.  Now, Mr. Peed also asked you whether you saw any

6    evidence that Mr. Vallejo deleted photos or videos off the

7    phone.  Do you remember that?

8    A.  Yes.

9    Q.  Now, Mr. Peed showed you a message from Mr. Vallejo, had

10   messaged that only guilty people leave chats.  Do you remember

11   that?

12   A.  Yes.

13   Q.  Did you find that chat on Mr. Vallejo's phone?

14   A.  No.

15   Q.  Last topic.  Mr. Peed asked you questions about whether

16   Stewart Rhodes -- Mr. Vallejo was referring to President Trump

17   when he referred to his commander.  Do you remember those

18   questions?

19   A.  Yes.

20   Q.  Okay.  Did Edward Vallejo ever message Donald Trump, based

21   on your investigation?

22   A.  Not that I'm aware.

23   Q.  Did he message Donald Trump about bivouacking and looking

24   for an allied encampment?

25   A.  No.

4150

1    Q.  Did Edward Vallejo message Donald Trump about the QRF?

2    A.  No.

3    Q.  Did Edward Vallejo message Donald Trump about meeting in

4    Texas after January 6th?

5    A.  No.

6    Q.  No.  Who did Edward Vallejo message those topics?

7    A.  Stewart Rhodes.

8            MR. EDWARDS:  Okay.  Ms. Badalament, can we please

9    pull up Government's Exhibit 9653, Slide 17.

10   BY MR. EDWARDS:

11   Q.  What did Edward Vallejo message directly to Stewart Rhodes

12   on January 7th at 9:00 a.m.?

13   A.  "Status report posted in ops.  Room extended 1 day.

14   Standing by awaiting orders, sir.  Good morning."

15   Q.  So after what happened after January 6th, Edward Vallejo

16   was standing by and awaiting orders; correct?

17   A.  Yes.

18           MR. EDWARDS:  No further questions, Your Honor.

19           THE COURT:  All right.  Agent Cody, you may step

20   down.  Thank you for your time and testimony, sir.

21           THE WITNESS:  Thank you, Your Honor.

22           (Witness excused.)

23           THE COURT:  Okay.  Mr. Edwards.

24           MR. EDWARDS:  With that, Your Honor, the government

25   rests.

1          THE COURT:  Okay.  So, ladies and gentlemen, what

2     you've just heard is Mr. Edwards telling you that the

3     government has rested its case.  What that means is that they

4     have concluded presenting their case in chief.  That means

5     they've concluded presenting witnesses and evidence.  So we've

6     reached an important milestone in the case.

7          We now hand the case over to the defense, and if they

8     wish to present a defense, we will proceed to them next; if

9     they wish to present a defense.

10          So we are done for the evening.  I wish you well.  We

11     will begin tomorrow at 9:30.  And have a great evening,

12     everyone.

13          Just the same reminders not to discuss the case, avoid

14     media, and please don't do any independent research.

15          Thank you very much.  We'll see you-all in the morning.

16              (Proceedings held outside the presence of the jury.)

17          THE COURT:  All right.  Have a seat, everybody.

18          Are there any loose ends we need to discuss before we

19     begin tomorrow?

20          MR. SHIPLEY:  Your Honor, based on our conversation

21     yesterday, I have a discrete Rule 29 motion I'd like to make.

22          THE COURT:  Okay.

23          MR. SHIPLEY:  As for Rule 10 -- or Count 10, my

24     client, charged with obstruction, destruction corruptly and

25     with intent discarding his phone, no evidence in the record of

4152

1    the case about the phone.  All the agents have been able to say

2    is they didn't get it.  It wasn't where they searched for it.

3    They don't have it.  No evidence that it was discarded, that it

4    was discarded corruptly, or it was discarded with the intent to

5    deprive the investigation of its contents.

6                THE COURT:  Okay.

7                MR. EDWARDS:  Two things, Your Honor.  The record

8    showed that the phone that the government did get didn't match

9    the phone that he was using on January 6th.  The records also

10   show that the phones they did get became newly activated as of

11   a certain date that was after January 6th.  And Mr. Minuta

12   specifically messaged people about deleting materials.

13          And the charge was charged a little more broadly than

14   just replacing his phone.  If I remember correctly, it's

15   deleting records as well, and he has messaged other people that

16   he would -- there were too many faces in the video that showed

17   him and others inside in the Capitol and that he had deleted

18   footage from inside.

19                THE COURT:  All right.

20                MR. SHIPLEY:  That message he said he deleted footage

21   and said he was sorry because somebody asked him to delete, not

22   because he was trying to -- with the intent to obstruct.  I

23   mean, that -- and I -- I -- I appreciate -- I'm trying to find

24   my -- the count says sometime between January 6th, 2021, Minuta

25   discarded his cellular telephone and with it certain media

 1     files, communications.  There has been no evidence he discarded

 2     it.  They just didn't find it when they searched.

 3                  THE COURT:  How many phones were found with

 4     Mr. Minuta?

 5                  MR. EDWARDS:  Sorry.  Say that once more.

 6                  THE COURT:  How many phones were found?

 7                  MR. EDWARDS:  Three -- three total, I believe.

 8                  THE COURT:  And the search was of what date?

 9                  MR. EDWARDS:  March the 6th, going off of memory

10     here.

11                  THE COURT:  2001.  Sorry.  2012.  So two months

12     later.

13                  MR. EDWARDS:  Right.

14                  THE COURT:  I'll think about it, Mr. Shipley, but why

15     isn't that enough to at least draw an inference beyond a

16     reasonable doubt that two months later he didn't have the phone

17     he had on January 6th?

18                  MR. SHIPLEY:  Your Honor, we don't know what -- I

19     mean, yeah, there's a lack of evidence as to what happened to

20     the phone.  The government says he discarded it.  They produced

21     no evidence that he discarded it.

22                  THE COURT:  Well --

23                  MR. SHIPLEY:  It could be in a safety deposit box

24     somewhere.

25                  THE COURT:  It could.  It could.  It could.  I think

4154

1     the question is at this stage I'm supposed to view the evidence

2     in the light most favorable to the government.

3             MR. SHIPLEY:  How can you draw any inference from the

4     absence of evidence?

5             THE COURT:  I guess I would put to you, how would

6     anybody -- how would the government ever prove that somebody

7     has destroyed anything absent an eyewitness to say that

8     the evidence was destroyed?

9             MR. SHIPLEY:  But it may still exist.  You can't

10    exclude that it may exist.

11            THE COURT:  Perhaps.  Isn't that an argument for the

12    jury?

13            MR. SHIPLEY:  The point is it's -- it's a failure of

14    proof.  There's no evidence in the case.  All the witnesses

15    said is we didn't get it.  That's it.

16            THE COURT:  I guess I'm not -- again, viewing in the

17    light -- evidence in light most favorable to the government,

18    two months after January 6th, his home is searched.  He has

19    three phones.  One of them is not the one used on January 6th;

20    right?

21            MR. SHIPLEY:  It's his wife's phone.

22            THE COURT:  I'm sorry?

23            MR. SHIPLEY:  It was his wife's phone.

24            THE COURT:  I'm sorry?

25            MR. SHIPLEY:  It's his wife's phone.

1          THE COURT:  Which one is his wife's phone?

2          MR. SHIPLEY:  The one they found.  It's his wife's

3     phone.

4          THE COURT:  Okay.  Were any of them registered to

5     him?

6          MR. EDWARDS:  Yes, Your Honor.

7          MR. SHIPLEY:  They had moved to Texas.  Their service

8     didn't work.  They changed cell phone providers.  They got a

9     new phone.  That's the phone he started carrying.  He moved

10    from Verizon to AT&T to T-Mobile.

11         THE COURT:  Okay.  But maybe I'm -- that doesn't

12    necessarily mean you've got to change phones.

13         MR. SHIPLEY:  Not necessarily, unless T-Mobile is

14    running a promotion and wants to give you a brand-new phone.

15         THE COURT:  Yes.  And a lot of that is -- is not on

16    the record.  Look, let me think about it.  I mean, I'll have to

17    give it some thought.

18         MR. SHIPLEY:  My last comment would simply be, the

19    statute requires evidence of corruption and evidence of intent,

20    not just that he doesn't have the phone.

21         THE COURT:  No, no.  I -- I appreciate that.  I'm

22    just -- I'm just trying to think through whether what is in the

23    record, again, viewed in the light most favorable to the

24    government, can be sent to the jury.

25         MR. EDWARDS:  And, Your Honor, we can -- we're happy

1    to brief it if the Court asks -- would benefit from that.  What

2    I would just note is the two -- the combination of the evidence

3    that is in.  There are phone records -- there were summary

4    charts that are built off of the phone records that will show

5    that the activity from that phone goes dark; right?  So the

6    idea that phone -- you know, he doesn't -- he does something

7    different with the phone; that phone goes dark.  He activates a

8    new phone, and you combine that then with the messages in which

9    he talks about deleting footage from inside, you know, all this

10   evidence would -- certainly in the light most favorable to the

11   government, would show that there's a reason why he switches to

12   a new phone.

13        The FBI searched both his person and his residence --

14   this was in New York when he's arrested.  His residence is in

15   Texas -- and did not find that device.

16             THE COURT:  I'm sorry.  They searched his home in

17   Texas or --

18             MR. EDWARDS:  Correct.

19             THE COURT:  He had already moved by then?

20             MR. EDWARDS:  Correct.  And his person when he was

21   arrested in New York.

22             THE COURT:  And he was arrested in New York?

23             MR. EDWARDS:  Right.

24             THE COURT:  Okay.  Understood.  Okay.  I'll think

25   about it.

4157

```
 1            MR. PEED:  And for the record, is the rest of defense
 2    counsel's general Rule 29 submitted, subject to argument later?
 3            THE COURT:  I'm sorry.
 4            MR. PEED:  Subject to briefing later.
 5            THE COURT:  Okay.
 6            MS.  HALIM:  Just for the record, Rule 29 on behalf
 7    of all counts for Mr. Hackett.
 8            THE COURT:  Understood.
 9            MR. SHIPLEY:  Same as to all counts.
10            THE COURT:  Okay.
11            MR. WEINBERG:  Same as to Mr. Moerschel.
12            THE COURT:  So the record will reflect preservation
13    of Rule 29 directed verdicts at this juncture, but the Court
14    will defer until further briefing.
15            MR. PEED:  Your Honor, I received an email from
16    counsel for Mr. Cummings laying out with more detail his
17    medical issues and providing a doctor's letter.  Mr. Manzo was
18    cc'd on the email.  His counsel is stating she doesn't believe
19    there's any way he would be medically available to testify.
20    It's, to my mind, not an uncompelling email.  I would move to
21    be able to admit his prior -- prior trial testimony and would
22    submit to the government the portions I want and have them work
23    out the portions they would want.
24            THE COURT:  I'll see.  I mean, I -- you-all had
25    talked about remote testimony yesterday.  It doesn't seem -- I
```

1    don't have -- I haven't heard the government say that's off the

2    table.

3              MR. PEED:  Well, I should clarify, Your Honor.  The

4    email states he can't participate in -- in remote testimony

5    either.

6              THE COURT:  Based on what?

7              MR. PEED:  Your Honor, if you want to go under seal,

8    then I could read the issues on the record.  I don't want to

9    put his medical information --

10             THE COURT:  Why don't you just send it to me.  It's

11   not going to happen tomorrow.

12             MR. PEED:  I just raise it because if we're reading

13   transcripts, it's something we can fill time with.

14             MR. MANZO:  We're amenable to remote testimony.

15   We're not amenable to transcripts.

16             THE COURT:  Well, I think the question is if remote

17   testimony is not possible and he's unavailable, then aren't we

18   left with transcripts?

19             MR. MANZO:  It would be helpful if you would see the

20   email too.

21             THE COURT:  No, no.  I would like to see this.  And,

22   frankly, I want to run this down because I'm not prepared to

23   just take somebody's say-so.  I'd like to see what the doctor's

24   letter says and understand better what the circumstances are.

25             MR. MANZO:  I guess we'll tackle this bridge when we

1    get there, but I don't know why.  I'll sit down.

2              THE COURT:  He's -- I mean, he's -- anyway, we'll get

3    the facts and see what they are and then we'll figure it out.

4    Okay?

5              MR. EDWARDS:  Your Honor, just two small issues.  One

6    is earlier in the -- I just want to make it for the record.  I

7    had said Stipulation 3075 for the Jason Alpers recording.  It's

8    3078.  I wanted to just do that.

9         We'll likely meet with defense and try to do some

10   housekeeping too and try to figure out what needs to come in

11   and what hasn't.

12             THE COURT:  At the last trial the government had

13   submitted a sort of lengthy list of exhibits that they wanted

14   to admit as sort of housekeeping and cleanup.  Is that still

15   your intention?

16             MR. EDWARDS:  Yes, Your Honor.  We will do something

17   very similar.  We'll work with defense to do something very

18   similar.

19             THE COURT:  We'll leave the record open in terms of

20   the government's case.  And, obviously, this has got to be --

21   as we talked about last time, this is just cleanup and nothing

22   the jury should -- well, that it's cleanup.

23             MR. EDWARDS:  Right.

24        And then two other things.  So tomorrow I understand

25   Mr. Shipley will anticipate and call Mr. Minuta.  Is that --

1   just want to make sure.  That's the only witness for now that

2   would be available tomorrow, or does that -- I know Mr. Shipley

3   had mentioned that based on the government's case he may be

4   able to shorten Mr. Minuta's testimony.  So I wanted to see

5   what tomorrow looked like.

6           MR. SHIPLEY:  I can't say.

7           THE COURT:  You can't say what?

8           MR. SHIPLEY:  On how long of a -- I haven't made a

9   final decision about how it's going to be, A to Z or -- you

10  know.

11          THE COURT:  I don't think -- well, maybe I

12  misunderstood.  I didn't understand Mr. Edwards to say how long

13  Mr. Minuta's testimony will be but, rather, whether there will

14  be anybody else tomorrow.

15          MR. SHIPLEY:  I don't have anybody else.

16          THE COURT:  Right.  So I think where we are, we have

17  Mr. Minuta tomorrow, and we'll see how long that takes, and --

18  and then if we're done tomorrow, we'll take Thursday off.

19          MR. EDWARDS:  Okay.  Tomorrow -- what day is it

20  today?

21          THE COURT:  It's Tuesday.

22          MR. EDWARDS:  Okay.

23          THE COURT:  The reason I want to do it that way, I

24  don't want to -- I don't want to risk having Mr. Minuta --

25  again, I don't know how long the direct will be.  I don't know

4161

1    how long the cross will be.  I'd like to -- if he's going to

2    spill over into another day, let it be Thursday and not Friday.

3         MR. EDWARDS:  Right.  Understood.

4    And then I just wanted to flag again, you know, we can

5    always use some of the space to wrap up --

6         THE COURT:  Right.

7         MR. EDWARDS:  -- jury instructions.

8         THE COURT:  Yeah.  If we finish with Mr. Minuta

9    tomorrow, we can do it right after.  And if he's on until

10   5 o'clock, we can take some time on Thursday to -- to address

11   those issues.

12        MR. EDWARDS:  Thank you, Your Honor.

13        THE COURT:  Okay.

14        MS.  HALIM:  Excuse me.  I have an additional

15   housekeeping matter.  There were two exhibits that I used on

16   cross-examination and showed but then neglected to move to

17   admit them.  One was JH 29, which is the full video from

18   Government's Exhibit 6776.1.  It's an actor.  I don't know who

19   he is.  He went on a rant, and I just wondered if the

20   government has any objection to that full video coming in.

21        THE COURT:  I'm sorry.  It's a what?  You said it was

22   an actor on a rant?

23        MS. HALIM:  Yeah.  There was an actor who went on a

24   rant on Fox News, and the government played just a clip of it,

25   and then I played the whole video, which was, I think, about

1    five minutes, and I wanted to admit the full five minutes that

2    I had played.

3                MR. NESTLER:  So is this from December?

4                MS.  HALIM:  Yes.  I think Agent Harris?

5                MR. NESTLER:  We already admitted to --

6                THE COURT:  Was it Scott Baio?

7                MS.  HALIM:  Yeah.  It's "The Passion of the Christ"

8    guy.

9                MS. HUGHES:  Jim Caviezal.

10               THE COURT:  Right, right, right, right.  Jim

11   Caviezal.  Okay.  Sorry.

12               MR. EDWARDS:  Topics you thought would be talked

13   about at this trial.

14               MS.  HALIM:  Then the second is JH 21, which is

15   Caleb Berry's statement of offense.  There was one portion that

16   I read regarding having to do with the doors.

17               THE COURT:  Right.  I remember.  We were going to

18   admit just that portion --

19               MS.  HALIM:  Just that portion.

20               THE COURT:  -- you used to cross-examine him.

21               MS.  HALIM:  Yes.

22               THE COURT:  Right.  Okay.  Just, obviously, you know

23   redact what's appropriate; put the cover page on it, and then

24   redact anything else.  That's two pages, and then redact the

25   paragraphs that --

1          MS.  HALIM:  And so those are considered admitted?  I
2     don't have to do anything else at this point?
3          THE COURT:  I think I admitted them on those
4     conditions when you presented it.
5          MS.  HALIM:  Okay.  Thank you.
6          MR. NESTLER:  I agree on the Caleb Berry statement.
7          THE COURT:  Right.
8          MR. NESTLER:  With Jim Caviezal, I have to go back
9     and look.  It was a month ago.  So I have to go back and look.
10          MS.  HALIM:  Okay.  Sure.  Well, I can tell you for
11     sure I stood here very awkwardly for five minutes while I was
12     waiting for that to play out.
13          THE COURT:  I think we did listen to the whole video.
14          MS.  HALIM:  We did.  It was awkward.
15          THE COURT:  It's one way to put it.
16          Okay.  Anything else before we resume tomorrow?
17          MR. EDWARDS:  No, Your Honor.
18          THE COURT:  Okay.  Thank you, everybody.  We'll see
19     you in the morning.
20          (Defendant Hackett Exhibits JH 21 and JH 29 admitted
21     into evidence.)
22          (Proceedings were concluded at 5:07 p.m.)
23
24
25

1            CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                       Dated this 11th day of January, 2023.

10

11                  /s/ Nancy J. Meyer
                    Nancy J. Meyer
12                  Official Court Reporter
                    Registered Diplomate Reporter
13                  Certified Realtime Reporter
                    333 Constitution Avenue Northwest
14                  Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25