# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 22-cr-15 (APM)** |
| | : | |
| **EDWARD VALLEJO,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION FOR CONDITIONAL RELEASE PENDING APPEAL

The United States of America respectfully opposes Defendant Edward Vallejo's Motion for Conditional Release Pending Appeal (ECF No. 863). Vallejo was convicted at trial of seditious conspiracy and related charges for leading the armed force that supported the Oath Keepers' conspiracy to forcibly oppose the lawful transfer of power following the 2020 U.S. presidential election. The Court sentenced Vallejo to 36 months of incarceration for his role in this grave offense. Vallejo now seeks release pending appeal given the D.C. Circuit's recent decision in *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024), and the pending decision by the Supreme Court in *Fischer v. United States*, No. 23-5572, *cert. granted*, 144 S. Ct. 5378 (Dec. 13, 2023), as well as two other issues of law and fact that Vallejo *anticipates* raising in his appeal, which has not yet been briefed. Vallejo cannot overcome the high barrier for release pending appeal required by 18 U.S.C. § 3143(b), for he cannot show (1) by clear and convincing evidence that he does not pose a danger to the community, or (2) that the appeal of his case likely will lead to reversal, an order for a new trial, or a reduction of his sentence to a term of imprisonment that will expire before his appeal is decided. Accordingly, Vallejo's motion should be denied.

## **BACKGROUND**

I.    **Vallejo Was Convicted at Trial of Participating in a Conspiracy to Oppose by Force the Lawful Transfer of Power Following the 2020 Presidential Election.**

Vallejo, a longtime affiliate of the Oath Keepers, planned with other members of the group, including its leader, Stewart Rhodes, to oppose by any means necessary, up to and including the use of force, the lawful transfer of power following the 2020 presidential election.  In Vallejo's own words, if Trump failed to stop the certification of the election on January 6, it would be the "declaration of guerrilla war."  Gov. Ex. 1054.Tr.  And Vallejo's role was to ferry the weapons to the troops on the ground when the war began.

The evidence at trial established that as early as December 15, 2020, Vallejo focused on traveling armed to D.C. for the events of January 6.  That day, he shared with an acquaintance with whom he ultimately traveled to D.C. a link to an interview from the "Hagmann Report" in which the speaker (another longtime Oath Keeper) called on supporters of President Trump to act against the election: "We're gonna start moving around the country on January 2nd and 3rd to D.C., armed, in large groups."  Gov. Exh. 9514.1.1.  He continued, "Get with your local militia, get your large group together, and start moving to D.C., armed. Because on January 4, we need to be en masse in D.C., armed, demanding, not asking, demanding that we get a peaceful resolution to these voter corruption issues, these election corruption issues."  *Id.*  When Vallejo sent the link to this interview to an acquaintance with whom he ultimately traveled to D.C. for January 6, he added, "Listen to the second hour. It's ON."  Gov. Exh. 9514 (Msg. 210.T.2.2).

On December 23, Rhodes published an "open letter" on the Oath Keepers website in which he noted that, on January 6, 2021, "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C."  Gov. Exh. 1008.  Rhodes warned in the open letter that if the

President failed to take action to stop the fraudulent election results from being certified, Rhodes and others may have to "take to arms in defense of our God given liberty." *Id.* These words prompted some, like Florida chapter leader Michael Adams, who testified at trial, to distance themselves from the Oath Keepers. Adams testified that he stepped down as leader of the Florida chapter after reading that letter because he took it as Rhodes "telling the President of the United States in this letter, in the text of this letter and in the previous letter, that if he didn't do this, we were." 12/16/22AM Tr. at 1618-19.

In contrast, Defendant Vallejo forwarded Rhodes' open letter to a co-conspirator in Arizona, Gov. Exh. 9514 (Msg. 210.T.13.19), and a few days later, that co-conspirator reached out to Rhodes asking how he and Vallejo could get involved "as supplemental personnel" for Rhodes' January 6 operation. *Id.* (Msgs. 1.S.859.3, 5-6, 16). He continued, "Everyone coming has their own technical equipment and knows how to use it 😊," and "We are rifles, man power, warm bodies there to support the process and the President." *Id.* (Msg. 1.S.859.7, 18).

In late December, Rhodes, Defendant Vallejo, and their co-conspirators created and administered encrypted chats on the Signal application with titles like "DC OP: Jan 6 21" and "1776^2" for coordinating their plans for January 6. Rhodes described DC OP: Jan 6 21 as "THE DC op thread for all leadership coming in, from multiple states, and together with the overall DC op leadership." Gov. Exh. 9514 (Msg. 1.S.159.108). Rhodes added Vallejo to this chat.

A central piece of the plan for January 6 was the staging of an armed "quick reaction force" or "QRF" at a hotel just across the river from the Capitol in Arlington, Virginia. Gov. Exh. 9514. The QRF would be prepared to deliver weapons, including an arsenal of rifles, into the hands of the co-conspirators on the ground when called. *Id.* As Vallejo's group traveled to D.C. for January 6, Vallejo sent around a link to a "NewsBusters" article titled, "CBS Claims Trump Supporters

Plan to 'Storm the Capitol' with 'Weapons.'" *Id.* (Msg. 240.S.1.47.1/240.S.1.48.1), *see also* Gov. Exh. 9514.4.  Then, on January 5, when Vallejo and his group arrived at the QRF hotel, they unloaded rifle bags and 11 large totes of unknown gear and/or supplies.  Gov. Exh. 1518.

On the morning of January 6, as he watched and waited from the QRF staging location with the weapons, Vallejo stated, "The American people are going to be told today that we have liberty and justice for all, or they're gonna be told, 'F*** you,'" okay?  And if they're told f**** you, that's going to be the declaration of a guerilla war." *Id.*  He then added, "I'm just praying to God that Trump has his head on fucking straight, he has got the machinations behind him, he's got all the proof in the world, and he's going to bring the fucking hammer down!  That's the only hope, the only chance.  If that doesn't happen, then this shit is on." *Id.*

Later that day, around 1:25 p.m., when it became clear that President Trump and Vice President Pence were not going to intercede to stop the Certification of the Electoral College vote, and as a large crowd gathered on the Capitol grounds and converged on the building, Rhodes messaged the DC OP: Jan 6 21 chat: "Pence is doing nothing. As I predicted."  Gov. Exh. 1500.2. At 1:38 p.m., Rhodes sent another message to the chat stating, "All I see Trump doing is complaining.  I see no intent by him to do anything.  So the patriots are taking it into their own hands.  They've had enough." *Id.*

Shortly thereafter, the co-conspirators on the ground in D.C. began moving towards the Capitol. *Id.*; 192.V.1.  As they did so, one co-conspirator announced over the "Stop the Steal J6" Zello channel, "We have a good group.  We've got about 30, 40 of us.  We're sticking together and sticking to the plan."  Gov. Exh. 1500.2, 1502.  She elaborated, "It has spread like wildfire that Pence has betrayed us, and everybody's marching on the Capitol." *Id.*  She continued, "Trump's been trying to drain the swamp with a straw.  We just brought a shop vac." *Id.*  Then,

at about 2:00 p.m., this co-conspirator told those on the Zello channel, "We're one block away from the Capitol now. I'm probably gonna go silent when I get there because I'm gonna be a little busy." *Id.*

By 2:30 p.m., Rhodes had entered the Capitol grounds himself and had begun explicitly directing his co-conspirators to come to the Capitol to join him. Gov. Exh. 1500.2. Co-conspirator and cooperating defendant Caleb Berry testified that his group huddled as they entered the Capitol grounds and discussed how they "were going to try to stop the vote count," 01/03/23PM Tr. at 2618, because the certification proceeding unfolding inside the Capitol "was illegitimate, it was unconstitutional, and we had to try and stop it," 01/04/23AM Tr. at 2762. The group then "stacked up in a single file line and walked up the stairs" and into the Capitol. 01/03/23PM Tr. at 2620.

Once inside, half of the group of co-conspirators tried to force their way past riot police to the Senate Chamber, yelling, "Push! Push! Push!" and "Get in there!" and "They can't hold us!" Gov. Exhs. 1500.2, 1505. Only by deploying chemical spray were the officers able to repel this group of co-conspirators and the other members of the mob. Gov. Exhs. 1505; 01/06/23AM Tr. at 3374-75. Meanwhile, the other half of the group pushed into the House side of the building in search of Speaker of the House Nancy Pelosi. Gov. Exhs. 1500, 1505, 1506, 9553(Msgs. 7.T.570.9758, 9760-61); 01/05/23AM Tr. at 3119-29. A second group of co-conspirators breached the Capitol through the same doors about half an hour later and tried to force their way into the Rotunda by assaulting law enforcement officers with a stolen law enforcement riot shield and screaming that this was "our fucking building." Gov. Exh. 1508. They were eventually expelled by riot police officers who had begun clearing the building. *Id.*

As the boots on the ground attacked the building, Vallejo repeatedly checked in to offer his support as the "QRF." At 2:24 p.m., Vallejo messaged the "DC OP: Jan 6 21" Signal chat, "Vallejo

back at hotel and outfitted.  Have 2 trucks available.  Let me know how I can assist."  Gov. Exh. 1500.3.  At 2:38 p.m., as the first co-conspirator burst through the East Rotunda Doors, Vallejo messaged the chat again: "QRF standing by at hotel.  Just say the word . . . ."  *Id.*

Co-conspirators Berry and Brian Ulrich both testified at trial that their actions on January 6 were directly linked to the agreement they had entered into with Rhodes and other Oath Keeper members and affiliates to stop the lawful transfer of presidential power by any means necessary. Berry told the jury that he took all of Rhodes' messages about fighting the government to be an immediate call to fight the government, and when the group went to the Capitol on January 6, it was to fight the government that day.  01/04/23AM Tr. at 2766.  Ulrich testified that while the group did not explicitly discuss plans to use force to stop the certification proceeding in advance of January 6, "there was a lot of talk about wanting something to take place, wanting—we wanted something to happen[,] [w]e wanted the ballots to be recounted," and "there was a lot of talk in the text chats leading up" to January 6 about "force with Civil War."  01/10/23AM Tr. at 3924. According to Ulrich, arriving at the steps of the Capitol on January was the culmination of this feeling.  *Id.* at 3926.  "Now that the people are in and out of the building now, it kind of felt like that moment was coming together for us to do something."  *Id.*  Ulrich testified that he felt that he and the other members of his group were working together towards one common goal: "To stop the vote count."  *Id.* at 3929.

In the messages they sent on the evening of January 6, Rhodes, Vallejo, and their co-conspirators struck a tone of defiance and showed an intent to continue opposing the lawful transfer of power by force.  "You ain't seen nothing yet," Rhodes wrote to the DC OP: Jan 6 21 Sighnal chat.  Gov. Exh. 9554 (Msg 1.S.159.1322).  Florida leader Kelly Meggs echoed Rhodes, adding to that same Signal chat a message stating, "We aren't quitting!! We are reloading!!"  *Id.* (Msg.

1.S.159.1326).  So too did Vallejo, messaging, "We have only yet begun to fight!" and "'After Action Reports' will be dated 1/21/21 [Devil emoji]."  *Id.* (Msgs. 1.S.159.1331-32, 1337).

That night, Vallejo joined Rhodes and other leaders of the conspiracy for a celebratory dinner at a restaurant in Northern Virginia.  01/09/23AM Tr. at 3530-46.  Vallejo discussed the role he played earlier that day: "If anything had happened and they were needed, that they were going to be called and they were going to come into the Capitol area as a Quick Reaction Force." *Id.* at 3546.  Vallejo also discussed his understanding that "groups of people [were] being bussed in from other locations across the country" to continue the fight the next day.  *Id.* at 3546-47.

The next morning, Vallejo messaged the "DC OP: Jan 6 21" chat, "We are going to probe their defense line right now. 6 am they should let us in. We'll see."  Gov. Exh. 9653 (Msg. 1.S.159.1407).  He later posted, "STATUS REPORT:  NG has cordoned off the Capital grounds and no foot traffic allowed. 40 Virginia State Police cars lined up. Outer perimeter stopping vehicle traffic but a dozen or so walkers/joggers inside it, but not allowed on the building grounds.  No signs or flags supporting Trump visible anywhere."  *Id.* (Msg. 1.S.159.1424).  Vallejo then checked in with Rhodes: "Status report posted in Ops.  Room extended 1 day.  Standing by awaiting orders, Sir."  *Id.* (Msg. 1.S.139.15).  Later, as they traveled back to Arizona, Vallejo and his Arizona co-conspirator continued to check in with Rhodes to try to meet up, 1/10/23PM Tr. at 4065-68, in order "to learn next steps and . . . what we should be doing right now," Gov. Exh. 9653 (Msg. 1.S.859.24).

For his role in this conspiracy, Vallejo was charged by the grand jury with four counts: seditious conspiracy, in violation of 18 U.S.C. § 2384 (Count One); conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Two); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Three);

and conspiracy to use force, intimidation, or threats to prevent officers of the United States from

discharging their duties, in violation of 18 U.S.C. § 372 (Count Four) (ECF 167).  On January 23,

2023, following a several-week trial, a jury convicted Vallejo of all four counts (ECF 450).

## II.    The Court Sentenced Vallejo to 36 Months' Imprisonment, Finding His Conduct "Poses a Threat to Democracy."

At sentencing, Counts Two and Three (conspiracy to obstruct and obstruction of an official

proceeding) controlled the Sentencing Guidelines analysis, because these were the most analogous

offenses to the seditious conspiracy charged in Count One, and all the counts of conviction

"ultimately group[ed] because they involve[d] the same victim and two or more acts connected by

a common . . . criminal objective or constituting part of a common scheme or plan."  6/1/23 p.m.

Tr. at 66-67 (citing U.S.S.G. §2M1.1).

Relevant here, the Court held that the eight-point and three-point upward adjustments under

U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) applied to Vallejo's conduct.  6/1/23 p.m. Tr. at 67-68.  In

applying these adjustments, the Court found that Vallejo's conduct created a risk of injury to others

"because the fact that the use of weapons and the preparedness of using weapons to bring into the

District, if needed, to prevent the transfer of power and the execution of the laws constitutes a

threat of physical injury to a person."  *Id.*  The Court also found a threat of physical injury in the

relevant conduct of Vallejo's co-conspirators who tried to push past police officers inside the

Capitol.  *Id.*  Finally, the Court found that Vallejo and his co-conspirators' actions "did involve

the disruption of the proceeding itself for many hours and cause the government great expense in

having – in doing what needed to be done to re-start the proceedings."  *Id.*

Taking into account these factors and others, the Court calculated the total offense level as

follows (*see id.* at 67-69):

| Base Offense Level | U.S.S.G. § 2J1.2(a) | 14 |
|---|---|---|
| Special Offense Characteristic: Physical Injury or Property Damage to Obstruct the Administration of Justice | U.S.S.G. § 2J1.2(b)(1)(B) | +8 |
| Special Offense Characteristic: Substantial Interference with the Administration of Justice | U.S.S.G. § 2J1.2(b)(2) | +3 |
| Special Offense Characteristic: Extensive Scope, Planning, or Preparation | U.S.S.G. § 2J1.2(b)(3)(C) | +2 |
| Note 4 Terrorism Adjustment | U.S.S.G. § 3A1.4, n.4(A) | +2 |
| | | **Total: 29** |

Given a total offense level of 29 and criminal history category of I, Vallejo's Guidelines range was 87 to 108 months of incarceration. 6/1/23 p.m. Tr. at 68.

In imposing sentence, the Court concluded that a significant period of incarceration was appropriate, under the 3553(a) factors, because "Mr. Vallejo's role in this conspiracy puts him in a different place." 6/1/23 p.m. Tr. at 99. The Court observed that Vallejo showed a "willingness to join with others and to be prepared to take up arms when [he was] dissatisfied that the [electoral] process didn't work out the way [he] hoped it would." *Id.* at 105. The Court described this conduct as "serious" and "substantial" and observed that "it poses a threat to democracy." *Id.* at 107. The Court ultimately varied downward from the recommended Guidelines range, taking into account that the defendant did not go inside the Capitol (or even the grounds), did not directly harm or interfere with any officers, and expressed remorse for his participation in these offenses. *Id.* at 108. The Court also considered Vallejo's age, health concerns, and lack of criminal history. *Id.* The Court sentenced Vallejo to 36 months' imprisonment, to be followed by 36 months of

supervised release, the first 12 months of which was ordered to be served under home confinement. *Id.* at 106-07.

### III.    The *Brock* Decision.

On March 1, 2024, the D.C. Circuit issued its decision in *Brock*. The Court held that § 2J1.2(b)(2)'s three-point enhancement for "substantial interference with the administration of justice" does not apply to interference with the Congress's certification of electoral college votes. *See id*. at *8.   *Brock* did not consider the eight-level enhancement in § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."  Nonetheless, the government acknowledges that the same reasoning would apply.

### IV.    The *Fischer* Appeal.

On December 13, 2023, the Supreme Court granted certiorari in *Fischer*, a January 6th appeal that raised the issue of the proper construction of 18 U.S.C. § 1512(c)(2).  Oral arguments were held last month, and a decision is expected by the end of the term.

### V.    Vallejo's Appeal and the Instant Motion.

Vallejo noticed his appeal on July 11, 2023 (ECF 656).  He has not yet filed a brief in that appeal, but he asserts in his motion for release pending appeal that he will raise four substantial questions of law and fact: (1) whether the statute underlying Mr. Vallejo's felony convictions on Counts 2 and 3 for conspiracy and obstruction under 18 U.S.C. §§ 1512(k) and 1512(c)(2) applies to his conduct on January 6, 2021, given the Supreme Court's decision to grant a writ of certiorari in *Fischer v. United States*, 144 S. Ct. 537 (2023); (2) whether the upward adjustment applied under U.S.S.G. § 2J1.2(b)(2) was invalidated by *Brock*; (3) whether Congress's counting of the electoral votes qualifies as the "the execution of any law" under the seditious conspiracy statute;

and (4) whether there was sufficient evidence for the jury to find that he reasonably foresaw that Oath Keepers would enter the U.S. Capitol and interfere with Members of Congress as they discharged their duties on January 6, 2021.

## LEGAL STANDARD

Under 18 U.S.C. § 3143(b), a defendant who has been sentenced to a term of imprisonment "shall . . . be detained" unless the defendant meets a two-part test:

1. "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released," and

2. that the appeal "is not for the purpose of delay and raises a substantial question of fact or law likely to result in—(i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."

18 U.S.C. § 3143(b)(1)(A)-(B); *see also United States v. Perholtz*, 836 F.2d 554, 557 (D.C. Cir. 1988) ("[T]he provision requires a two-part inquiry: (1) Does the appeal raise a substantial question? (2) If so, would the resolution of that question in the defendant's favor be likely to lead to reversal?").

If the Court finds that a defendant is eligible for release because the appeal is "likely" to result in "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process," the remedy is not immediate release; rather, "the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence." 18 U.S.C. § 3143(b)(1)(B). The defendant bears the burden to make the required showing under § 3143(b)(1). *Perholtz*, 836 F.2d at 555-56 (referring to "the required showing on the part of the defendant"); *United States v. Libby*, 498 F. Supp. 2d 1, 3 (D.D.C. 2007).

# ARGUMENT

Vallejo's motion fails to overcome the high barrier to release pending appeal under § 3143(b)(1). Specifically, Vallejo fails to establish by clear and convincing evidence that he is not likely to pose a danger to the safety of any other person or the community if released. Additionally, the issues he plans to raise on appeal either fail to present a substantial question of law or fact, or fail to present a likelihood of resulting in a reduced term of imprisonment less than the total of the time already served plus the expected duration of the appeal process. For each of these reasons, Vallejo's motion should be denied.

## I.    Vallejo Fails to Show that He Is Not a Risk of Danger to the Community.

First, Vallejo fails to show that he is not a danger to the community. Through his participation in the conspiracy that formed the basis of his convictions in this case, Vallejo agreed to join with his co-conspirators to forcibly oppose the lawful transfer of power following a presidential election. In support of this conspiracy, Vallejo transported weapons and other supplies across the country, from Arizona to the D.C. area, and then agreed to serve as a point person to deliver weapons into the hands of co-conspirators who attacked the Capitol on January 6, 2021. As this Court observed in sentencing Vallejo, through his conduct in this conspiracy, Vallejo showed a "willingness to join with others and to be prepared to take up arms when [he was] dissatisfied that the [electoral] process didn't work out the way [he] hoped it would." 6/1/23 p.m. Tr. at 105. Such conduct "constitutes a threat of physical injury" to others and, even more significantly, "poses a threat to our democracy." *Id.* at 67-69. In his motion, Vallejo offers no reason to believe he would not engage in such conduct again.

**II.    Vallejo Has Not Raised a Substantial Question of Fact or Law Likely to Result in Reversal or a Reduced Sentence that Would Expire Before His Appeal is Resolved.**

This Court should deny Vallejo's motion for release because he fails to satisfy the second prong of the standard for release, as well. Vallejo has not shown a likelihood of reversal or reduced sentence that would result in a term of imprisonment less than the time already served plus the expected duration of the appeal process, on the basis of the issues he plans to raise on appeal. *See* 18 U.S.C. § 3143(b)(1)(B). As discussed above, Vallejo asserts that his appeal will raise four "substantial questions" of law or fact: (1) whether the statute underlying Mr. Vallejo's felony convictions on Counts 2 and 3 for conspiracy and obstruction under 18 U.S.C. §§ 1512(k) and 1512(c)(2) applies to his conduct on January 6, 2021, given the Supreme Court's decision to grant a writ of certiorari in *Fischer v. United States*, 144 S. Ct. 537 (2023); (2) whether the upward adjustment applied under U.S.S.G. § 2J1.2(b)(2) was invalidated by *Brock*; (3) whether Congress's counting of the electoral votes qualifies as the "the execution of any law" under the seditious conspiracy statute; and (4) whether there was sufficient evidence for the jury to find that he reasonably foresaw that Oath Keepers would enter the U.S. Capitol and interfere with Members of Congress as they discharged their duties on January 6, 2021. None of these issues are likely to result in reversal or a sentence less than the time likely to complete the appeal.

a.    The *Fischer* Issue

Since the Supreme Court has yet to issue a decision in *Fischer*, it is premature for this Court to conclude that the holding of that case is likely to invalidate Vallejo's convictions on Counts Two and Three. Moreover, even assuming, *arguendo*, that the holding in *Fischer* will create a likelihood of reversal on Counts Two and Three, this would not likely result in a different sentence for Vallejo. As described above, this Court's Sentencing Guidelines and 3553(a) factor analysis across all four counts of conviction were all driven by the same analysis. In other words,

13

even if the convictions for Counts Two and Three were reversed and not retried to conviction, the convictions on Counts One and Four would not be impacted and would result in the same sentence. As the Circuit recently held, where the district court's findings at sentencing suggest that the district court would impose the "same sentence even if the Supreme Court's decision in *Fischer* leads to a reversal of [defendant's] § 1512(c) conviction," defendant cannot "show that a sentence independent of [his] § 1512(c) conviction would include a term of no imprisonment or a reduced sentence shorter than the expected duration of her appeal." *United States v. Carpenter*, No. 23-3235, 2024 WL 1340206 (D.C. Cir. Mar. 28, 2024).

In other words, even if the still-pending resolution of *Fischer* leads to a reversal of Vallejo's convictions for Counts Two and Three, his convictions for seditious conspiracy (Count One) and conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties (Count Four) would likely be unaffected, which means he cannot satisfy the second prong of the standard for release pending appeal on this basis.

      b.  The *Brock* Issue

Vallejo incorrectly assumes that holding of *Brock*, which invalidates the applicability of two specific offense characteristics that this Court applied at Vallejo's sentencing, will automatically result in significantly reduced sentence for him. First, if, following appeal, the case was remanded for re-sentencing before this Court in light of *Brock*, this Court would then have an opportunity to assess whether any other upward departure provisions might be appropriate and might result in the same total offense level and Sentencing Guidelines range. Second, *Brock*'s ruling does nothing to undercut the severity of Vallejo's offenses, or the appropriateness, under the 3553(a) factors, of this Court's 36-month sentence, and this Court could and should vary upwards upon resentencing to impose the same sentence. Finally, even if this Court were to decline

to apply upward departures or variances, and were to impose a within-Guidelines sentence, that would not necessarily entitle Vallejo to release pending appeal.

### i. Applicability of Upward Departures

First, at any resentencing – after the appeal in the Circuit has exhausted[1] – the Court would determine Vallejo's Guidelines range and then consider any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background). The Guidelines apply to a "heartland of typical cases." *Koon v. United States*, 518 U.S. 81, 94-95 (1996). A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole. *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up).

Chapter 5, Part K of the Guidelines "identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range," which may warrant a departure. U.S.S.G. § 5K2.0(a)(2)(A). There are at least two such departure provisions that apply to this case: Section 5K2.7 (Disruption of Governmental Function), and Section 5K2.6 (Weapons).[2] The government submits that either or a combination

---

[1] "The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982); *see, e.g.*, *United States v. Hallford*, 816 F.3d 850, 855 n.4 (D.C. Cir. 2016) (quoting same). "The district court does not regain jurisdiction over those issues until the court of appeals issues its mandate." *United States v. DeFries*, 129 F.3d 1293, 1302 (D.C. Cir. 1997).

[2] If the Court applies any of these departure provisions, the government requests that the Court also specify that it would have imposed the same sentence as a variance. *See United States v. Brevard*, 18 F.4th 722, 728-29 (D.C. Cir. 2021) (upholding the district court's sentence where the departure was erroneously applied but the district court indicated that it was also imposing the sentence as a variance).

of these departure provisions would justify an upward departure that would make the Court's current sentence of 36 months a within-Guidelines sentence.

First, an upward departure is justified where an offense results in "a significant disruption of a governmental function." U.S.S.G. § 5K2.7.[3]  This Court already found, in sentencing Vallejo, that Vallejo and his co-conspirators' actions "did involve the disruption of the proceeding itself for many hours and cause the government great expense in having – in doing what needed to be done to re-start the proceedings."  6/1/23 p.m. Tr. at 67-68.

A departure under this guideline is admittedly warranted only in "unusual" circumstances where the Guidelines do not reflect the appropriate punishment for the offense.  *Id*.  In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."  *Id*.  However, the obstruction of the Electoral College certification on January 6, 2021 is the type of unusual circumstance that the Sentencing Commission could not have anticipated and that warrants an upward departure.  As the commentary explains, departure under § 5K2.7 is appropriate if the disruption of a governmental function is "substantial," meaning "substantially in excess" of the disruption ordinarily involved in an obstruction offense.  *See* § 5K2.0 cmt. 3(B)(ii).  Those who obstructed the certification proceedings on January 6 targeted the peaceful transfer of power, one of the fundamental and foundational principles of our

---

[3] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence."  *See United States v. Saani*, 650 F.3d 761, 765-66, 771 (D.C. Cir. 2011).

democracy. They were part of a mob that injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses.[4]

Indeed, Defendants like Vallejo "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *Brock*, 2024 WL 875795, at *15. January 6 was an unprecedented day in American history. Surely few, if any, disruptions of governmental functions have been more "substantial," and it was a disruption far "in excess of . . . that which ordinarily is involved in" an obstruction offense (such as impeding a single judicial proceeding). § 5K2.0(a)(3); *id.* cmt. 3(B)(ii). But following *Brock*, the seriousness of the crimes committed by defendants like Vallejo is not adequately captured by the applicable Guideline, § 2J1.2. Other judges on this court have already applied § 5K2.7 in a January 6 case. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours").

Another upward departure that is applicable to the facts and circumstances of Vallejo's offenses is the upward departure under Section 5K2.6. Such a departure is warranted "[i]f a weapon or dangerous instrumentality was used or possessed in the commission of the offense." Here, the conspirators' staging of an arsenal of semi-automatic rifles and other firearms just across the Potomac River means they "used or possessed" weapons to obstruct Congress (and to commit

---

[4] Given the dangerous circumstances created by the riot, the Court could also depart under § 5K2.14 in addition to, or as an alternative to, departing under § 5K2.7. Section 5K2.14 provides for a departure if "national security, public health, or safety was significantly endangered." The assault on the Capitol endangered the safety of the public, police, and elected officials in a way not already captured by Vallejo's guidelines range, so a departure would be appropriate. *Cf. United States v. Calloway*, No. 21-3057, 2024 WL 925790, at *3 (D.C. Cir. Mar. 5, 2024) (affirming departure under § 5K2.14 where district court found that the defendant "created a serious risk that multiple individuals could have been killed or injured").

sedition), yet the use and possession of those weapons is not reflected by any other adjustment or increase in the total offense level.

Courts of appeals have affirmed upward departures for firearms possession under Section 5K2.6 in fraud cases, premised on the idea that the fraud Guideline does not take into account the use of a weapon, and therefore does not adequately capture a defendant's dangerousness or the seriousness of the offense. *United States v. Paslay*, 971 F.2d 667, 672 (11th Cir. 1992); *United States v. Gaddy*, 909 F.2d 196, 199-200 (7th Cir. 1990).[5] The same premise holds true here: the conspirators, including Wilson, transported and possessed firearms in furtherance of their seditious conspiracy and obstruction of the congressional proceeding.

This very dangerous aspect of the conduct of Vallejo and his co-conspirators would no longer reflected in the specific offense characteristics and adjustments under the Sentencing Guidelines, post-*Brock*. This Court previously accounted for the QRF component of the conspiracy in applying the eight-level adjustment under U.S.S.G. § 2J1.2(b)(1)(B), for offenses "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." *See* 6/1/23 p.m. Tr. at 67-68 (finding that Vallejo's conduct created a risk of injury to others "because the fact that the use of weapons and the preparedness of using weapons to bring into the District, if needed, to prevent the transfer of power and the execution of the laws constitutes a threat of physical injury to a person). *See also United States v. Rhodes, et al.*, No. 22-cr-15, 5/25/23AM Tr. at 73-74 ("The essence of the seditious agreement represented a

---

[5] The courts in *Paslay* and *Gaddy* departed upward by four and two levels, respectively (though the *Paslay* court departed upward on multiple grounds). Many Guidelines provide a two-level increase if a firearm was possessed. *See, e.g.*, U.S.S.G. § 2B2.1(b)(4) (burglary); § 2B2.3(b)(2) (trespass); § 2B5.1(b)(4) (counterfeit bearer obligations); § 2B5.3(b)(6)(B) (criminal infringement of copyright). Others provide a three-level increase for the same characteristic. *See, e.g.*, U.S.S.G. § 2B3.1(b)(2)(E) (robbery); § 2B3.2(b)(3) (extortion by force).

threat to others, including members of Congress. Mr. Rhodes and other co-conspirators had established an arsenal of weapons on the other side of the Potomac River that could be brought in on notice if needed to accomplish their ends to disrupt the transfer of power. Such conspiracy, which, by definition, contemplated the use of force against individuals within the United States Government, threatened to cause physical injury to a person."). Thus, the Court should depart upward to to "ensur[e] appropriate additional punishment for the additional [firearms] crimes." U.S.S.G. § 3D1.4, bkgd. cmt.

### ii.  Appropriateness of Upward Variance

If the Court decides not to apply the upward departure provisions suggested above, an upward variance to the amended, post-*Brock* Sentencing Guidelines range would be warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors.  An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up).  At any resentencing, an upward variance would be warranted to account for the § 3553(a) sentencing factors—specifically, the unique nature, circumstances, and seriousness of the offense, and Vallejo's characteristics.

As discussed above, *Brock* did not negate the severity of the crimes of Vallejo and his co-conspirators.  If anything, engaging in a seditious conspiracy to forcibly oppose the lawful transfer of power following a presidential election is *far more serious* than interfering with a routine court proceeding, even if such interference was substantial and involved risk of injury or property damage.  *See Brock*, 2024 WL 875795, at *15 ("[I]nterference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work[.]").  As this Court has observed,

> A seditious conspiracy is among the most serious crimes an individual American can commit. It is an offense against the government to use force. It is an offense against the people of the country. . . . It's a series of acts in which you and others committed to use force, including potentially with weapons, against the government of the United States as it transitioned from one President to the other.

*United States v. Rhodes, et al.*, No. 22-cr-15, 5/25/23AM Tr. at 113.

Because the holding of *Brock* has led to the result that the adjustments provided under the Sentencing Guidelines for seditious conspiracy and obstruction of Congress do not account for the risk of death, bodily injury, and extensive property damage, or the substantial interference with justice and democracy, caused by the defendant's crimes, this Court should vary upwards to ensure that the defendant's sentence adequately reflects the grave nature of his offenses.

As discussed throughout this memorandum, Vallejo's role in this seditious conspiracy to oppose by force the lawful transfer of power following a presidential election posed a danger to both human lives and to our democracy that should be reflected in the sentencing analysis—and will not be if this Court fails to depart or vary upwards. Several other judges on this Court have held, since *Brock*, that an upward departure or variance would be appropriate to correct for an amended "Guidelines Range [that] does not accurately reflect the seriousness of [the defendant's] conduct." *Brock*, No. 21-cr-140, ECF No. 121 (Apr. 23, 2024, D.D.C., Bates, J.) ("Accordingly, the Court would likely impose an above-Guidelines sentence approaching 16 months, whether by way of departure (whether based on U.S.S.G. § 5K2.7 or another provision) or variance."); *see also United States v. Fonticoba*, No. 21-cr-638, ECF No. 81 (Apr. 11, 2024, D.D.C., Kelly, J.) (denying motion for release pending appeal on *Brock* grounds, and noting that the post-*Brock* total offense level would be 10, and that "it would be almost crazy for the Court not to vary up significantly because . . . we've got to capture for deterrence purposes, [] all the other 3553(a) factors") (citation and internal quotation marks omitted)*; United States v. Reffitt*, No. 21-cr-32,

ECF No. 182 (Apr. 10, 2024, D.D.C., Friedrich, J.) (indicating that the court would vary upwards, post-appeal, and observing: "Following *Brock*, obstructive conduct is subject to a potential 11-point Guidelines swing depending on whether it interfered with, on one hand, a 'judicial, quasi-judicial, and adjunct investigative proceedings,' or on the other hand, any other type of formal proceeding. This disparity—though tracking the Guidelines' text—does not reflect the importance and solemnity of the Congressional proceeding to certify the electoral vote count, nor does it reflect the gravity of Reffitt's obstructive conduct."); *United States v. Bender*, 21-cr-508, ECF 161 (Mar. 6, 2024, D.D.C., Howell, J.) ("The D.C. Circuit issued an opinion on March 1, 2024 in *United States v. Brock*, No. 23-3045, holding that the sentencing enhancement at U.S.S.G. § 2J1.2(b)(2) does not apply to convictions under 18 U.S.C. § 1512(c)(2) for conduct disrupting Congress's counting and certification of the electoral college votes on January 6, 2021, but that decision does not influence the outcome in this case, since the Court would have varied upwards by at least three offense levels to account for the significant disruption of a critical and important governmental function as a result of defendants' offense conduct if the specific offense characteristic at U.S.S.G. § 2J1.2(b)(2) did not apply.").

Thus, at any resentencing, this Court may depart or vary upward to impose a significant sentence.

*iii.  An Amended Sentence Would Not Require Immediate Release*

Finally, Vallejo's assumption that he would receive a significantly reduced sentence simply because the +3 and +8 enhancements no longer apply is not enough to carry his burden under 18 U.S.C. § 3143(b)(1)(B)(iv).  Removing the 11 levels for the two specific offense characteristics negated by *Brock* would result in a total offense level of 18, for a recommended Sentencing Guidelines range of 27-33 months of incarceration.  The top of that Guidelines range is only three

months lower than the sentence this Court imposed on Vallejo. Section 3143(b) directs the Court to order the defendant released only once he has served the time he is likely to serve upon resentencing. 18 U.S.C. § 3143(b)(1)(B) ("[I]n the circumstance described in subparagraph (B)(iv) of this paragraph, the judicial officer shall order the detention terminated *at the expiration of the likely reduced sentence*." (emphasis added)). Vallejo has been in custody for approximately 13 months. Thus, a sentence anywhere within a Guidelines range of 27 to 33 months would not entitle Vallejo to release now.

### III.    Whether Certification Proceeding Constituted "the Execution of Any Law"

The remaining two grounds for release pending appeal are based on arguments unrelated to *Fischer* and *Brock* that Vallejo plans to raise on appeal. Both arguments have been dismissed previously by this Court for sound reasons and are unlikely to lead to reversal or the granting of a new trial. As Vallejo acknowledges, he previously joined a motion by his co-defendants challenging whether Congress' certification of the Electoral College Vote constitutes "the execution of any law" for the purposes of the seditious conspiracy statute. Mot. at 9 (citing ECF Nos. 84, 94). In denying those motions, this Court issued a thorough opinion laying out all the reasons why the Certification Proceeding *does* constitute the "execution of any law." (ECF No. 176.) For all the reasons cited in the Court's decision, which the government incorporates herein by reference, this issue does not present a substantial question of fact or law likely to result in reversal, such that release pending appeal is warranted.

Vallejo nonetheless contends that "this novel question of statutory interpretation presents, at a minimum, 'a close question…that very well could be decided the other way.'" Mot at 10. The mere fact that this precise issue has never been decided, since there has never previously been a conspiracy to oppose by force the lawful transfer of presidential power in the United States by,

22

among other means, seeking to obstruct Congress' certification of the Electoral College vote, does not mean this is an issue that will likely result in reversal. Rather, the extensive briefing presented by the parties and the thoughtful opinion rendered by the Court makes it far more likely that Vallejo's seditious conspiracy conviction will be affirmed on appeal.

Finally, even if Vallejo's seditious conspiracy conviction were reversed on this ground, and his 1512(k) and 1512(c)(2) convictions were reversed because of the soon-to-be-issued decision in *Fischer*, he still as a conviction for conspiracy to prevent officers from discharging their duties, under 18 U.S.C. § 372, which would result in the same sentence if it stood on its own.

## IV.  Sufficiency of the Evidence

Finally, Vallejo says it is likely that he will prevail on appeal in his argument that there was not sufficient evidence for the jury to find "that he joined a conspiracy to interfere with the certification proceeding." At the outset, it is worth noting that, in reviewing the sufficiency of the evidence, the Circuit will "view[] the evidence in the light most favorable to the government, and affirm[] a guilty verdict where any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Littlejohn*, 489 F.3d 1335, 1338 (D.C. Cir. 2007) (internal quotation marks and brackets omitted). "By thus asking only whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, our deferential review impinges upon jury discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *United States v. Torres*, 894 F.3d 305, 369 (D.C. Cir. 2018) (internal quotation marks omitted). In other words, just by virtue of the standard of review that the Circuit will apply on appeal to this issue, the defendant faces an uphill battle in establishing at this stage that this issue raises a substantial question likely to result in reversal that would justify his release while he makes this case on appeal.

Moreover, as outlined in the background section above, and as this Court laid out in the detailed findings it made in denying Vallejo's and his co-defendants' Rule 29 motions, *see* 5/24/2024 Tr., which the government incorporates herein by reference, there was more than sufficient evidence for a reasonable jury to find that Vallejo joined an agreement to obstruct Congress' certification of Electoral College vote. At trial, the government introduced numerous statements by Rhodes, Vallejo, and their co-conspirators conveying their commitment to take up arms and take matters into their own hands if President Trump failed to stop Congress from certifying the election results on January 6, 2021. 5/24/2023 Tr. at 52-72, 98-105. Vallejo's own words, on the morning of January 6, were that if Trump failed "to bring the fucking hammer down," then "that's going to be the declaration of a guerilla war" and "then this shit is on." *Id.* at 104 (citing Gov. Exh. 1054.Tr.).

Then, when Trump failed to bring the proverbial hammer down, Congress began the certification proceeding, and a riot erupted at the Capitol, Rhodes gave his followers the green light to join in the attack. *See* Gov. Exh. 1500.2 (demonstrating how, as the riot began, Rhodes sent messages to the DC OP: Jan 6 21 chat stating, "Pence is doing nothing. As I predicted," and "All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough." and showing that the co-conspirators responded by marching towards the Capitol); *see also id.* (demonstrating that Rhodes, Florida Oath Keeper leader Kelly Meggs, and January 6 Oath Keepers operations leader Michael Greene had a three-way call moments before Meggs led a group of co-conspirators up the steps and into the building); *see also* 01/03/23PM Tr. at 2618 (testimony of Caleb Berry that his group of co-conspirators huddled as they entered the Capitol grounds, around the time Kelly Meggs spoke with Rhodes, and Meggs told the group they "were going to try to stop the vote count").

While Vallejo was not there on the Capitol steps to join in this agreement, he manifested his ascent from the messages he sent while serving as the quick reaction force back at the weapons staging area. These messages show Vallejo was aware of what was unfolding at the Capitol from the TV coverage and from the posts to the "DC Op: Jan 6 21" Signal chat. He responded by sending two messages offering to activate the QRF—in other words, to transport weapons into the hands of his co-conspirators on the ground. *Id.* at 104-105.

This was not just "political hyperbole," Mot. at 13. At the time Vallejo made these statements, Vallejo was guarding a real and tangible arsenal of firearms and supplies that he and his co-conspirators had transported across the country in support of their agreement to oppose by force the lawful of power. 5/24/2023 Tr. at 69-74. Vallejo and his co-conspirators deposited these weapons at the QRF after weeks of planning for a January 6 "operation." *Id.* As this Court found, "viewing the evidence in the light most favorable to the government, [Vallejo's] expressed intention of entering the District with firearms to participate in violence at the Capitol was a reasonable inference that the jury could have drawn" from these messages. *Id.* at 74.

And then there was the evidence of Vallejo's conduct the morning after January 6, where he went to "probe their defense line," (and the evidence suggested he surveilled the are near the Capitol), extended his hotel reservation, and told Rhodes he was "standing by awaiting orders." Gov. Exh. 9653. This evidence is relevant to Vallejo's state of mind on January 6, with respect to the charges of obstructing and official proceeding and conspiring to do so. It is also direct proof of the seditious conspiracy count, since that conspiracy was alleged to have continued after January 6, as "there was still one more law that needed to be executed after January 6th, and that was President Biden's taking of the oath." 5/24/2023 Tr. at 89-90. For all these reasons, the sufficiency

of the evidence of Vallejo's participation in an agreement to obstruct Congress' certification of the election is not sufficiently likely to lead to reversal that this issue merits release pending appeal.

To the extent that Vallejo's argument on this issue is less about the evidence and more that, as a matter of law, an agreement to oppose the lawful transfer of power by any means necessary, up to and including the use of force, is too vague to constitute a conspiratorial agreement, Mot. at 14 n. 1, this argument is also not sufficiently likely to prevail on appeal to warrant releasing Vallejo now. First, in making this argument, Vallejo conflates the charged and argued "purpose of the conspiracy" with the unlawful agreement alleged and proven for each charge. The indictment alleges, and the government argued at trial, that the colloquial "purpose" of the overarching conspiracy entered into by Vallejo and his co-conspirators was "to oppose the lawful transfer of presidential power by force." ECF No. 167 at ¶16. But for each conspiracy count charged, the government also alleged and proved, and the jury was instructed they must find, that Vallejo entered into an unlawful agreement "by force to prevent, hinder, and delay the execution of any law of the United States" (Count One, at ¶15), "to corruptly obstruct, influence, and impede an official proceeding, that is, the Certification of the Electoral College vote" (Count Two, at ¶136), and "to prevent by force, intimidation, and threat, any person, that is, Members of the United States Congress, from discharging any duties of any office, trust, and place of confidence under the United States" (Count Four, at ¶140).

What Vallejo really seems to be arguing is that the government failed to establish a seditious conspiracy, because it failed to establish *a plan* in advance of January 6 to attack the Capitol. ECF 477-1 at 23-24. However, as he acknowledged in the Rule 29 briefing, the government was not required to show that "the conspirators . . . agree[d] on all the details of their criminal scheme." *Id.* at 25 (quoting *United States v. Treadwell,* 760 F.2d 327, 336 (D.C. Cir.

1985)).  Indeed, to prove a conspiratorial agreement, "the government need only show that the conspirators agreed on 'the essential nature of the plan,' *not* that they 'agreed on the details of their criminal scheme.'"  *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) (emphasis added) (quoting *Treadwell*, 760 F.2d at 336 (citation and quotation marks omitted)); *see also United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001) (citing *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977)).  As the Supreme Court in *Blumenthal v. United States*, 332 U.S. 539 (1947), explained, "the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others."  *Id.* at 557 (footnote omitted).  "Otherwise," the Supreme Court observed, "the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity."  *Id.*  It follows, therefore, that the evidence need not establish that the defendants settled on every detail of an intricately developed plan.  Nor does it matter whether the persons who formed the agreement actually carried out their plans or whether the agreement ultimately was successful; though, proof concerning the accomplishment of the object of the conspiracy may certainly be evidence of the existence of the conspiracy itself.  *See, generally, Court's Final Jury Instructions*, at 17-19 (describing what is required to establish the existence of a conspiratorial agreement).

       For the reasons discussed above, the evidence, when viewed in the light most favorable to the government, amply established beyond a reasonable doubt that the "essential nature of the plan" Vallejo (and others) joined was to oppose by any means necessary, up to and including the use of force, the lawful transfer of power following the 2020 presidential election.  And, by the afternoon of January 6, that agreement had crystalized into an agreement "by force to prevent,

hinder, and delay the execution of any law of the United States" (Count One, Indictment, ECF No. 167 at ¶15), "to corruptly obstruct, influence, and impede an official proceeding, that is, the Certification of the Electoral College vote" (Count Two, at ¶136), and "to prevent by force, intimidation, and threat, any person, that is, Members of the United States Congress, from discharging any duties of any office, trust, and place of confidence under the United States" (Count Four, at ¶140).

For the reasons briefed in the Rule 29 litigation and addressed by the Court in denying the Rule 29 motions, Vallejo's comparison of his case to the facts presented in the *Stone* case out of the Eastern District of Michigan, is inapt.  In *United States v. Stone*, No. 10-20123, 2012 WL 1034937 (E.D. Mich. Mar. 27, 2012), the district court directed a verdict for the defense because the government attempted to change the theory of the case at trial from the one presented in the Indictment.  *See also* 5/234/2023 Tr. at 106-107.  "Here, by contrast, there is evidence from which a jury could have concluded that [there was] an implicit agreement [as charged in the Indictment] to use force to oppose the authority of the United States and the execution of laws governing the peaceful transfer of Presidential power[, and] that agreement was entered into by multiple defendants, including Mr. Vallejo." *Id.*

## <u>CONCLUSION</u>

For all these reasons, the defendant's motion for release pending appeal fails to raise any substantial questions of law or fact that are likely to lead to reversal or such a significant reduction of sentence that he would be released before the conclusion of the appellate process, and his motion also fails to establish that he is not a danger to the community.  Accordingly, the motion should be denied.

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/
   Kathryn L. Rakoczy
   D.C. Bar No. 994559
   Alexandra S. Hughes
   Assistant United States Attorneys
   U.S. Attorney's Office for the District of Columbia
   601 D Street, N.W.
   Washington, D.C. 20530