**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **No. 22-cr-15 (APM)** |
| | **:** | |
| **JESSICA WATKINS,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR CONDITIONAL RELEASE PENDING APPEAL**

The United States of America respectfully opposes Defendant Jessica Watkins' Motion for Release Pending Appeal (ECF No. 873).  Watkins was convicted at trial of participating in a conspiracy to obstruct the certification of the 2020 U.S. Presidential Election and to prevent members of Congress from discharging their duties in connection with that proceeding.  The Court sentenced Watkins to eight-and-a-half years of incarceration for her role in this grave offense. Watkins now seeks release pending appeal given the Supreme Court's recent decision in *Fischer v. United States*, 144 S. Ct. 2176 (2024).  Watkins cannot overcome the high barrier for release pending appeal required by 18 U.S.C. § 3143(b), for she cannot show (1) by clear and convincing evidence that she does not pose a danger to the community, and (2) that the appeal of her case likely will lead to a reduction of her sentence to a term of imprisonment that will expire before her appeal is decided. Accordingly, Watkins' motion should be denied.

## BACKGROUND

### I.     Watkins Was a Leader in a Conspiracy to Use Force, Intimidation, and Threats to Prevent Members of Congress from Certifying the 2020 Presidential Election.

Watkins was a leader in a plot by members and affiliates of the Oath Keepers to stop Congress from certifying the election on January 6, 2021.  In Watkins' own words, "[I]f Biden get the steal, none of us have a chance in my mind. We already have our neck in the noose.  They just haven't kicked the chair yet."  Gov. Exh. 6825.8 (Msgs. 192.T.984, 987-99, 996).  Watkins vowed with her co-conspirators to take any steps necessary to stop their political nightmare from becoming a reality.  On January 6, they acted, and Watkins led a group of her co-conspirators into the Capitol and down a hallway towards the Senate to try to forcibly stop members of Congress from certifying the election.

The evidence at trial established that as early as the days after the election, the leader of the Oath Keepers, Elmer Stewart Rhodes III, began disseminating messages delegitimizing the results of the election and encouraging his followers to forcibly oppose the lawful transfer of presidential power from President Trump to President Biden.  On November 5, 2020, Rhodes told those on the "Leadership intel sharing secured" chat (also known as the "OLD Leadership CHAT"), including Meggs, that they "MUST refuse to accept Biden as a legitimate winner" and warned, "We aren't getting through this without a civil war.  Too late for that.  Prepare your mind, body, spirit." Gov. Exh. 6615.A (Msg. 1.S.696.12491).  Two days later, on the same day that most major media outlets called the election for President Biden, 10/4/22AM Tr. at 1435-36, Rhodes used the same secure Signal group chat to urge message recipients to follow the example of Serbians who had achieved regime change in their country by "[m]illions gather[ing] in [the] capital," breaking through barricades, and storming the legislature.  Gov. Exh. 6615.B (Msgs. 1.S.696.12970-71, 12977).

On November 9, 2020, Rhodes held a private call on GoToMeeting—an online meeting site that allows users to host conference calls and video conferences via the Internet—titled, "Oath Keepers National Call – Members Only," which was attended by Watkins and other co-conspirators. 10/4/22AM Tr. at 1442-81; Gov. Exhs. 1000.1 through 1000.11, 6611, 6615.D (Msg. 1.S.696.13376).  During the meeting, Rhodes outlined an objective to stop the lawful transfer of presidential power, including by preparing for the use of force, and urged those listening to participate.  He told those on the call, "There's no such thing as another election in this country of any meaningful sense of the term if you let this stand," Gov. Exh. 1000.1; "You're from Oath Keepers - you've got a responsibility and duty," Gov. Exh. 1000.5; and "You've got to go there [to Washington, D.C.] and you've got to make sure he knows that you are willing to die to fight for this country," Gov. Exh. 1000.7.  Rhodes stated his intent to organize an "armed QRF" or "quick reaction force" outside the city to support operations inside.  Gov. Exh. 1000.7.  He stated, "We're very much in exactly the same spot that the founding fathers were in like March 1775. Now—and Patrick Henry was right.  Nothing left but to fight.  And that's true for us, too.  We're not getting out of this without a fight."  *Id.*  Rhodes also continued to reference a need to follow the example of Serbians who engaged in a "color revolution" to oppose the transfer of power following an election perceived as fraudulent in their country.  Gov. Exh. 1000.8.

West Virginia Oath Keeper Abdullah Rasheed was present on the call and recorded it because, in his words, "the more I listened to the call, it sounded like we were going to war against the United States government, and I wasn't comfortable, so I started to record it." 10/6/22PM Tr. at 2024.  To Rasheed, "It sounded like we were going to war with—we were going to overthrow the United States government and start shooting everybody."  *Id.* at 2045.  A couple of weeks after the call, Rasheed began contacting the Federal Bureau of Investigation ("FBI"), the U.S. Capitol

Police, and several politicians to try to warn them about what Rhodes had said on the call. *Id.* at 2026-2027.

In contrast, during and immediately after the call, Watkins asked how she could further assist in Rhodes' plans. She participated at the end of the call in a discussion of what weapons could be brought lawfully into the city in support of what Rhodes was proposing. Gov. Exhs. 1000.10-1000.11. She also messaged Rhodes directly to offer her support. Gov. Exh. 6617.B (Msg. 192.T.426 (To Rhodes: "Montana and I at your disposal. I'd like a medical role personally.")). She recruited others to the mission. *See* (Msgs. 192.T.406, 408, 418-19 ("Stewart said it. Going to DC. Guys outside *See* DC with guns, awaiting orders to enter DC under permission from Trump, not a minute sooner. We can have mace, tasers, or night sticks. QRF staged, armed, with our weapons, outside the city. If it gets bad, they QRF to us with weapons for us.")); (Msg. 192.T.409 ("We march on D.C. on Saturday. This is the real for real shit. No weapons allowed, be prepared to fight hand to hand. Want to come? It's now or never time.")); (Msg. 2003.T.250 (to co-conspirator Donovan Crowl: "Be ready to march on D.C. on Saturday. Driving out Friday night. Hooah? This is what we've been waiting for. It's not just an Oath keeper mission. Patriots everywhere. 3 Percenters too. Let's make history motherfucker.")).

The next weekend, Watkins joined other Oath Keepers members and affiliates in traveling to the D.C. area for an operation to coincide with the so-called "Million MAGA March." Co-defendant Thomas Caldwell hosted Oath Keepers members and affiliates at his Virginia residence, including Watkins and two members of her team from Ohio, as well as North Carolina leaders Doug Smith and Paul Stamey, and others from their state such as North Carolina Oath Keeper John Zimmerman. 10/16/2022AM Tr. 1891-96. According to Zimmerman's testimony, Rhodes visited Caldwell's property the evening of Friday, November 13, to address those gathered there. *Id.* at

1896-98.  Among other things, Rhodes told the group they needed to be prepared to take up arms if President Trump invoked a law called "the Insurrection Act" and called up groups like the Oath Keepers to help him oppose the "rogue government" or those in Congress who had gone rogue. *Id.* at 1900-02, 1909.  Again, instead of hearing such talk and tapping out, Watkins reacted by stepping *up* her involvement.  Following the November event, Watkins increased her efforts to recruit others to the cause.  As she told Crowl, she joined Parler because she was "[t]rying to recruit."  Gov. Exh. 6825.9 (Msg. 2003.T.267).

Beginning in mid-December 2020, Rhodes began to call more directly for the use of force to oppose the transfer of power—regardless of the President's direction—and to focus on the Certification proceeding set to take place on January 6, 2021 as a day of action to advance this criminal objective.  On December 14, the day that the Electors of the Electoral College met in their respective states and cast votes that resulted in the necessary number for President Biden to be elected, Rhodes told co-conspirators on the OLD Leadership CHAT (including Watkins), "Trump has one last chance to act. He must use the insurrection act. Unless we fight a bloody civil war/revolution."  Gov. Exh. 6701 (Msgs. 1.S.696.15779, 15784).  On December 29, Rhodes wrote to the same chat (which included Watkins), "I think that part of him now understands that the Insurrection Act and warfare - with him as Commander in Chief - is the only way that he can save our Republic.  But he needs to know that if he doesn't do it, we will."  Gov. Exh. 6701 (Msg. 1.S.696.17485-86).

On December 23, Rhodes published an open letter on the Oath Keepers website in which he noted that, on January 6, 2021, "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C."  Gov. Exh. 1008.  Rhodes warned in the open letter that if the

President failed to take action to stop the fraudulent election results from being certified, Rhodes and others may have to "take to arms in defense of our God given liberty." *Id.*

These words prompted Michael Adams, the leader of the Florida chapter of Oath Keepers prior to Kelly Meggs, to resign his position. Adams testified that these "letters indicated that if the President—the current President, Trump at the time, did not declare the Insurrection Act—I don't know if I'm saying that properly—and call up the militias and stand this down, if—if he didn't do that, then we would have to do that.  And I was concerned about who 'we' [was]."  10/6/22PM Tr. at 2059.  According to Adams, he did not want to be part of that "we." *Id.* at 2059-60.

Watkins did.  She joined the encrypted "DC OP: Jan 6 21" Signal chat, which Rhodes described as "THE DC op thread for all leadership coming in, from multiple states, and together with the overall DC op leadership."  Gov. Exh. 6701 (Msg. 1.S.159.108).  She contacted Donald Siekerman, who was the original operational leader for the Oath Keepers for January 6 to let him know that she and her Ohio contingent "are coming again. I talked to Tom, I guess he won't be using his property as a Rally Point again, so we need a new Rally Point. I'll txt Stewart today and sort it out. We will be there on the 5th as well." Gov. Exh. 6825.10 (Msg. 2050.T.3.2.).  Watkins recruited co-conspirators Crowl and Sandra and Bennie Parker for the mission.  As the group drove to D.C., on the afternoon of January 4, Watkins messaged the "OK FL DC OP Jan 6" Signal chat, "We will be in VA @ 8pm.  Where can we drop off weapons to the QRF team? I'd like to have the weapons secured prior to the Op tomorrow."  Gov. Exh. 6923 (Msg. 85.S.193808.C).

Then, on January 6, 2021, around 1:25 p.m., when it became clear that President Trump and Vice President Pence were not going to intercede to stop the Certification of the Electoral College vote, and as a large crowd gathered on the Capitol grounds and converged on the building, Rhodes messaged the DC OP: Jan 6 21 chat: "Pence is doing nothing. As I predicted." Gov. Exh.

1500.  At 1:38 p.m., Rhodes sent another message to the chat stating, "All I see Trump doing is complaining.  I see no intent by him to do anything.  So the patriots are taking it into their own hands.  They've had enough." Gov. Exh. 1500.  Similarly, at 1:41 p.m., Rhodes sent a message to the OLD Leadership CHAT (which included Watkins) stating, "Hey, the founding generation stormed the governors mansion in MA . . . . They didn't fire on them, but they street fought.  That's where we are now.  Next comes our 'Lexington.'"  *Id.*  In the context of all the messages Rhodes and his co-defendants had exchanged in the lead-up to Janua]ry 6, these words were a call to action.

Indeed, shortly thereafter, as video recovered from Watkins' phone shows, members of Stack One started moving from the Ellipse towards the Capitol.  *Id.*; 192.V.1.  As she marched with Stack One down Pennsylvania Avenue at approximately 1:50 p.m., Watkins announced over the "Stop the Steal J6" Zello channel, "We have a good group. We've got about 30, 40 of us. We're sticking together and sticking to the plan."  Gov. Exh. 1500, 1502.  She elaborated, "It has spread like wildfire that Pence has betrayed us, and everybody's marching on the Capitol."  *Id.*  She continued, "Trump's been trying to drain the swamp with a straw.  We just brought a shop vac."  *Id.*  Then, at about 2:00 p.m., Watkins told those on the Zello channel, "We're one block away from the Capitol now.  I'm probably gonna go silent when I get there because I'm gonna be a little busy." *Id.*

By 2:30 p.m., Rhodes had entered the Capitol grounds himself and had begun explicitly directing his co-conspirators to come to the Capitol to join him.  Gov. Exh. 1500.  Florida Oath Keeper Terry Cummings testified about Stack One's march towards the Capitol.  He recalled that on the way, Meggs mentioned that people had breached the Capitol.  10/12/22AM Tr. at 2732, 2739-41.  Meggs then "was wondering about whether we should enter the Capitol."  *Id.* at 2741.  Cummings continued, "He was wanting to find someone to talk to them."  *Id.*  Cummings then

took a wisely timed bathroom break, and when he returned, Stack One was gone.  *Id.*  According to the testimony of cooperating defendant Graydon Young, Kelly Meggs was his superior and was attempting to "rendezvous with Stewart" to decide "next actions as a group."  10/31/22PM Tr. at 5857.

At about 2:32 p.m., Meggs engaged in a phone conversation with Rhodes, who was already on the phone with Michael Greene, an operational leader for January 6.  Rhodes merged them into a three-way call.  Gov. Exhs. 1500, 6740; 10/20/22PM Tr. at 4709-10.  Moments later, Meggs led Stack One up the east steps of the Capitol to the area outside the East Rotunda doors, where rioters were using their hands, flags, and chemical spray to assault the officers guarding the doors, and violently trying to force entry.  Gov. Exhs. 1500; 10/20/22PM Tr. at 4710-12.  For minutes, the crowd—including Watkins and other co-conspirators—attempted to break into the Capitol.  When the doors eventually opened, Meggs motioned for Stack One to enter.  *Id.*

Once inside, half of Stack One, led by Watkins, tried to force their way past riot police to the Senate Chamber.  Gov. Exhs. 1500, 1505; 10/20/22PM Tr. at 4781-98.  The government introduced video of Watkins yelling, "Push! Push! Push!" and "Get in there!" and "They can't hold us!" as she and six of her co-conspirators joined the mob attempting to push down the hallway towards the Senate Chamber.  Gov. Exh. 1505.  District of Columbia Metropolitan Police Department (MPD) Officer Christopher Owens, who was deployed to that hallway with other officers to form a line to try to block the mob from getting to the Senate Chamber, described the size and force of the mob and how it continued to push back the police line.  10/26/22AM Tr. at 5446-54.  Only by deploying chemical spray were the officers finally able to repel the rioters and hold their line.  Gov. Exhs. 1505; 10/26/22AM Tr. at 5446-54.  Watkins later described her conduct in that hallway: "We were in the thick of it. Stormed the Capitol. Forced our way into the Senate

and House. Got tear gassed and muscled the cops back like Spartans."  Gov. Exh. 6734 (Msg. 192.T.1521).

For her role in this conspiracy and her actions on January 6, Watkins was charged by the grand jury and convicted at trial of conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Two); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Three); conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Four); and civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2 (Count Six).  ECF 167, 410.

## II.    The Court Sentenced Watkins to 102 Months' Imprisonment, To Reflect Seriousness of Her Conduct, Which Showed a Willingness to Engage in "Violence, Including the Taking Up of Arms, . . . to keep President Trump in Office".

At sentencing, Counts Two and Three (conspiracy to obstruct and obstruction of an official proceeding) controlled the Sentencing Guidelines analysis, because all the counts of conviction "ultimately group[ed]."  5/26/23 a.m. Tr. at 38.  It is worth noting, however, that the Court agreed with the conclusion of the Pre-Sentence Report ("PSR"), ECF 550 at ¶127, that the applicable Guideline for Count Four, the Section 372 Conspiracy, was also U.S.S.G. § 2J1.2, because the intended victims of that conspiracy were the Members of Congress.  *Id.*

In calculating Watkins' offense level, the Court held that the eight-point and three-point upward adjustments under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) applied to Watkins' conduct, noting that Watkins agreed with her co-conspirators "that violence might be needed as part of the efforts to ensure that President Trump remained in office," and that Watkins and Bennie Parker "le[ft] Ohio with weapons intended for the QRF."  5/26/23 a.m. Tr. at 23, 28.  The Court also observed that on January 6, Watkins was a member of Stack One and, when in the hallway leading

to the Senate Chamber, she "push[ed] up against a line of officers who were . . . guarding the Senate chamber . . . [and] was encouraging others in her immediate vicinity, including her co-conspirators, to do so." *Id.* 29.

The Court also added two offense levels for obstruction under U.S.S.G. § 3C1.1 because Watkins had deleted the Signal app off her phone at a time when she knew she would be under investigation by the FBI, 5/26/23 a.m. Tr. 32-33, and the Court applied the two-point adjustment under U.S.S.G. § 2J1.2(b)(3)(C) for offenses that are extensive in scope, planning, and preparation, 5/26/23 a.m. Tr. at 39.

Additionally, the Court found that Watkins "was a member of this conspiracy with some degree of leadership responsibility." 5/26/23 a.m. Tr. at 22. As the Court observed, Watkins "participate[d] in recruitment efforts to support not just the [Ohio State Regular Militia's] mission but the Oath Keepers' mission." *Id.* at 26. Among others, she successfully recruited "the Parkers, who ultimately they did come to Washington" and who "associated and affiliated themselves with" the Oath Keepers. *Id.* Accordingly, the Court added a three-level leadership role adjustment under U.S.S.G. § 3B1.1. *Id.* at 31-32. Finally, the court added three levels under § 3A1.4 note 4 because Watkins was "actually on par with Mr. Meggs in terms of a three-level departure." *Id.* at 34).

The court thus calculated Watkins's Guidelines range to be 168 to 210 months. *Id.* at 39.

In imposing sentence, the Court concluded that a significant period of incarceration was appropriate, under the 3553(a) factors, to "reflect the seriousness of the conduct [and] respect for the law and the need to generally deter this kind of conduct." 5/26/23 a.m. Tr. at 69. The Court emphasized that Wakins was "somebody who [took] on a greater role in the conspiracy," and thus told her, "[Y]ou bear a greater responsibility, not only for your individual conduct, but for the conduct of those who you've brought into it." *Id.* at 65. The Court found that Watkins "shared a

10

mutual understanding with her co-conspirators that violence, including the taking up of arms, might be required to keep President Trump in office and, particularly, that that violence would be necessary and needed on January the 6th." *Id.* at 27.  Then, on  January 6, Watkins' "role that day was more aggressive, more assaultive, more purposeful than perhaps others, and [she] led others to fulfill [her] purposes." *Id.*  Considering all of these factors, the Court imposed a sentence of 102 months of incarceration.

### III.     The *Brock* Decision.

On March 1, 2024, the D.C. Circuit issued its decision in *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024). The Court held that § 2J1.2(b)(2)'s three-point enhancement for "substantial interference with the administration of justice" does not apply to interference with the Congress's certification of electoral college votes. *See id*. at *8.  *Brock* did not consider the eight-level enhancement in § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."  Nonetheless, the government acknowledges that the same reasoning would apply.

### IV.     The *Fischer* Appeal.

On June 28, 2024, the Supreme Court issued its opinion in *Fischer*, in which it held that Section 1512(c) does not cover "all means of obstructing, influencing, or impeding any official proceeding."   Rather, the Court explained, to prove a violation of Section 1512(c)(2), the government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in the proceeding – such as witness testimony or intangible information – or attempted to do so.  144 S. Ct. 2176, slip op. at 9, 16.

Whether Watkins' conviction under Section 1512(c)(2) is consistent with *Fischer's* holding remains an open question, one which likely will be addressed on appeal. Watkins noticed her appeal on June 7, 2023 (ECF 612). She has not yet filed a brief in that appeal. She now seeks her release pending that appeal.

## **LEGAL STANDARD**

Under 18 U.S.C. § 3143(b), a defendant who has been sentenced to a term of imprisonment "shall . . . be detained" unless the defendant meets a two-part test:

1.  "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released," and

2.  that the appeal "is not for the purpose of delay and raises a substantial question of fact or law likely to result in—(i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."

18 U.S.C. § 3143(b)(1)(A)-(B); *see also United States v. Perholtz*, 836 F.2d 554, 557 (D.C. Cir. 1988) ("[T]he provision requires a two-part inquiry: (1) Does the appeal raise a substantial question? (2) If so, would the resolution of that question in the defendant's favor be likely to lead to reversal?").

If the Court finds that a defendant is eligible for release because the appeal is "likely" to result in "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process," the remedy is not immediate release; rather, "the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence." 18 U.S.C. § 3143(b)(1)(B). The defendant bears the burden to make the required showing under § 3143(b)(1). *Perholtz*, 836 F.2d at 555-56 (referring to "the required showing on the part of the defendant"); *United States v. Libby*, 498 F. Supp. 2d 1, 3 (D.D.C. 2007).

## ARGUMENT

Watkins' motion fails to overcome the high barrier to release pending appeal under § 3143(b)(1). Specifically, Watkins fails to establish by clear and convincing evidence that she is not likely to pose a danger to the safety of any other person or the community if released. Additionally, the issue of law she raises in her motion – the impact of the *Fischer* decision on her conviction – fails to present a likelihood of resulting in a reduced term of imprisonment such that she would likely be released prior to any re-sentencing ordered by the Circuit. For each of these reasons, Watkins' motion should be denied.

### I.    Watkins Fails to Show that She Is Not a Risk of Danger to the Community.

First, Watkins fails to show that she is not a danger to the community. Through her participation in the conspiracy and her actions on January 6, 2021, Watkins agreed to and did use force, intimidation, and threats to prevent members of Congress from discharging their duties to review and certify the results of the 2020 Presidential Election. In support of this conspiracy, Watkins recruited others, traveled from Ohio to the D.C. area, brought weapons to contribute to the armed "quick reaction force" that supported the conspiracy, and then participated in the attack on the Capitol on January 6, leading a contingent of her co-conspirators in an effort to push past officers to gain access to the Senate chamber.

In her motion, Watkins tries to suggest she is remorseful for her conduct and no longer poses a threat. But her recorded calls and statements to the media from the jail show otherwise. On January 15, 2023, she said in a recorded call, "I hate January 6, it's a joke to me I make fun of it." ECF 565 at 130. In the same call she went on to say, "boo hoo the poor little police officers, got a little PTSD, waaaa, I had to stand there and hold a door open for people waaaaaa." *Id.* A few days later, she once again blamed law enforcement for the actions on January 6, stating, "The

police are responsible for inciting January 6 and they're responsible for half of their own injuries." *Id.*  Such sentiments were expressed on a number of calls and also in interviews with the media.  *See, e.g.*, February 2023 interview with Rumble.com, *available at* https://rumble.com/v28u57m-j6-jessica-watkins-oathkeepers-justice-in-jeopardy-day-762.html (describing January 6 as the "most patriotic amazing beautiful day of my life," saying she was convicted on made-up evidence and lies, and praising co-defendants Kelly Meggs and Kenneth Harrelson as "heros").  Because of such statements, this Court cannot be confident that Watkins has eschewed political violence.  She continues to pose a danger to the community.[1]

## II.   Watkins Has Not Raised a Substantial Question of Fact or Law Likely to Result in a Reduced Sentence that Would Expire Before Her Appeal is Resolved.

This Court should deny Watkins' motion for release because she fails to satisfy the second prong of the standard for release, as well.  Watkins has not shown a likelihood of a reduced sentence that would result in a term of imprisonment less than the time already served plus the expected duration of the appeal process.  *See* 18 U.S.C. § 3143(b)(1)(B).  Accordingly, her motion should be denied.

At the outset, the defendant's request to be released because of the impact of *Fischer* on her convictions is premature.  Watkins has noticed her appeal but has yet to even file her opening brief.[2]  And the government is still evaluating its prosecution of charges under 18 U.S.C. § 1512(c)(2) in January 6 cases, including in this case.

---

[1] Watkins also cites her medical treatment while incarcerated as a factor justifying her release. The government will seek leave to provide information it has learned about Watkins' medical treatment to the Court and counsel under seal, as it requires discussion of confidential medical information.

[2] "The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58

Even assuming, *arguendo*, that the holding in *Fischer* creates a likelihood of reversal on Counts Two and Three, this would not likely result in a different sentence for Watkins.  First, if, following appeal, the case was remanded for re-sentencing, this Court would then have an opportunity to assess whether any other upward departure provisions might be appropriate and might result in the same total offense level and Sentencing Guidelines range.  Second, *Fischer's* holding does nothing to undercut the nature and severity of Watkins' offenses, or the appropriateness, under the 3553(a) factors, of this Court's 102-month sentence, and this Court could and should vary upwards upon resentencing to impose the same sentence.  Finally, even if this Court were to decline to apply upward departures or variances, and were to impose a within-Guidelines sentence under a modified Guidelines analysis, that would not necessarily entitle Watkins to release pending appeal.

a.   What the Sentencing Guidelines Analysis Would Look Like on Remand

The defendant erroneously asserts in her pleading that the applicable Guideline for *both* Count Four, conspiracy to prevent members of Congress from discharging their duties in violation of 18 U.S.C. § 372, and Count Six, interfering with law enforcement officers during a civil disorder in violation of 18 U.S.C. § 372, is U.S.S.G. § 2A2.4.  ECF 873 at 9-10.  As the PSR recommended and this Court found at sentencing, however, the appropriate guideline for this count is U.S.S.G. § 2J1.2, since the targeted victims of the conspiracy were the Members of Congress.  ECF 550 at ¶127, 5/26/23 a.m. Tr. at 38.

The Guidelines recommend that for Count 4, as with all conspiracies, the Court begins at U.S.S.G. § 2X1.1, which directs the Court to apply the Guideline for the underlying substantive

---

(1982); *see, e.g.*, *United States v. Hallford*, 816 F.3d 850, 855 n.4 (D.C. Cir. 2016) (quoting same). "The district court does not regain jurisdiction over those issues until the court of appeals issues its mandate." *United States v. DeFries*, 129 F.3d 1293, 1302 (D.C. Cir. 1997).

offense.  Under §2X1.1, cmt. n.3, for a conspiracy conviction for which the substantive offense is not covered by a specific guideline, the Court should use §2X5.1, which directs the Court to apply "the most analogous guideline."

Because of the way Count 4 was charged in this case, the "most analogous guideline" is §2J1.2, "Obstruction of Justice."  As charged in the Indictment, the "officers" of the United States who were the targeted victims of the Section 372 conspiracy were the Members of Congress.  *See* June 28, 2022, Memorandum Opinion (ECF No. 176) at 27-28 (Judge Mehta finding that Members of Congress were proper victims for this charge under 18 U.S.C. § 372); Verdict Form (ECF No. 410) (listing "Members of Congress" as the victims).  Indeed, the victim "officers" in §2A2.4 typically refer to law enforcement officers rather than constitutional officers like Members of Congress, as is the case here.

In addition, the object of the defendants' conspiracy—preventing Members of Congress from performing their constitutional duties at the Capitol on January 6—was designed to obstruct the administration of justice. The First Circuit agreed that §2J1.2, rather than §2A2.4, was the most analogous guideline for a defendant convicted of violating 18 U.S.C. § 372, when the defendant's conviction was premised on the defendant conspiring to prevent federal officers from arresting other people, and thus "obstructed the administration of justice."  *United States v. Gerhard*, 615 F.3d 7, 33 (1st Cir. 2010); *see also United States v. Rakes*, 510 F.3d 1280, 1290 (10th Cir. 2007) (acknowledging that a § 372 conviction for conspiring to impede and thwart the prosecution of other people would constitute "imped[ing] the due administration of the law," and thus would warrant application of §2J1.2 rather than §2A2.4).

The analysis under §2J1.2 for Count Four will look slightly different on remand because, as noted above, the D.C. Circuit's decision in *Brock* directly invalidated the applicability

§ 2J1.2(b)(2)'s three-point enhancement for "substantial interference with the administration of justice" to interference with the Congress's certification of electoral college votes, see 2024 WL 875795 at *8, and by inference also invalidated the applicability to these cases of the eight-level enhancement in § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."  The government will address below whether any upward departures or variances would be appropriate in place of these two adjustments.  But it is important to note here that the inapplicability of § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person," also means that Count Six no longer groups with Count Four.

During the first sentencing, Count Six grouped with the other counts pursuant to U.S.S.G. § 3D1.2(c) because it embodied conduct that was already being treated as a specific offense characteristic under § 2J1.2(b)(1)(B). ECF 550 at ¶129, 5/26/23 a.m. Tr. at 38-39.  On remand, these Counts will no longer group, although the analysis for each will be very similar.  Prior to the application of any additional upward departures, the applicable Guidelines for each count would be:

***Count Four* (Conspiracy to Prevent Officers of the United States from Discharging Duties, 18 U.S.C. § 372)**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Departure | +3 | § 3A1.4 note 4 (terrorism) |
| Total | 23 | |

***Count Six* (Interference with Law Enforcement Officers During a Civil Disorder, 18 U.S.C. § 231)**

| Base Offense Level: | 10 | §2A2.4(a) |
|---|---|---|

| Specific Offense Characteristic | +3 | §2A2.4(b)(1)(A) (physical contact) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Departure | +3 | § 3A1.4 note 4 (terrorism) |
| Total | 22 | |

Because these two counts result in Guidelines calculation that are only one level apart, the combined offense level is 23 + 2 or 25.  U.S.S.G. § 3D1.4(a).  The recommended sentencing range prior to the application of any additional upward departures or variances, as discussed below, would be 57-71 months of incarceration.

### b.   Additional Grounds for Upward Departures and Variance

At any resentencing – after the appeal in the Circuit has exhausted – the Court would determine Watkins' Guidelines range and then consider any departures or variances.  *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background).  The Guidelines apply to a "heartland of typical cases."  *Koon v. United States*, 518 U.S. 81, 94-95 (1996).   A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole. *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up).  Upon considering such additional applicable departures and variances, the Court would likely determine that the same sentence of 102 months of incarceration is "sufficient, but not greater than necessary, to" give effect to the sentencing factors in 18 U.S.C. § 3553(a).

### i.   *Applicability of Upward Departures*

Chapter 5, Part K of the Guidelines "identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range," which may warrant a departure.  U.S.S.G. § 5K2.0(a)(2)(A).  There are at least two such departure provisions that apply to this case: Section 5K2.7 (Disruption of Governmental

Function), and Section 5K2.6 (Weapons).[3]  The government submits that either or a combination of these departure provisions would justify an upward departure that would make the Court's current sentence of 102 months a within-Guidelines sentence.

First, an upward departure is justified where an offense results in "a significant disruption of a governmental function."  U.S.S.G. § 5K2.7.[4]  This Court already found, in sentencing Watkins, that she and her co-conspirators' actions substantially interfered with the due administration of justice by impeding and delaying the certification proceeding.  5/26/23 a.m. Tr. at 30.

A departure under this guideline is admittedly warranted only in "unusual" circumstances where the Guidelines do not reflect the appropriate punishment for the offense.  *Id*.  In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."  *Id*.  However, the obstruction of the Electoral College certification on January 6, 2021 is the type of unusual circumstance that the Sentencing Commission could not have anticipated and that warrants an upward departure.  As the commentary explains, departure under § 5K2.7 is appropriate if the disruption of a governmental function is "substantial," meaning "substantially in excess" of the disruption ordinarily involved in an obstruction offense.  *See*

---

[3] If the Court applies any of these departure provisions, the government requests that the Court also specify that it would have imposed the same sentence as a variance. *See United States v. Brevard*, 18 F.4th 722, 728-29 (D.C. Cir. 2021) (upholding the district court's sentence where the departure was erroneously applied but the district court indicated that it was also imposing the sentence as a variance).

[4] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765-66, 771 (D.C. Cir. 2011).

§ 5K2.0 cmt. 3(B)(ii).  Those who obstructed the certification proceedings on January 6 targeted the peaceful transfer of power, one of the fundamental and foundational principles of our democracy.  They were part of a mob that injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses.[5]

Indeed, Defendants like Watkins "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work."  *Brock*, 2024 WL 875795, at *15.  January 6 was an unprecedented day in American history. Surely few, if any, disruptions of governmental functions have been more "substantial," and it was a disruption far "in excess of . . . that which ordinarily is involved in" an obstruction offense (such as impeding a single judicial proceeding). § 5K2.0(a)(3); *id.* cmt. 3(B)(ii). But following *Brock*, the seriousness of the crimes committed by defendants like Watkins is not adequately captured by the applicable Guideline, § 2J1.2. Other judges on this court have already applied § 5K2.7 in a January 6 case. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours").

Another upward departure that is applicable to the facts and circumstances of Watkins' offenses is the upward departure under Section 5K2.6.  Such a departure is warranted "[i]f a weapon or dangerous instrumentality was used or possessed in the commission of the offense."

---

[5] Given the dangerous circumstances created by the riot, the Court could also depart under § 5K2.14 in addition to, or as an alternative to, departing under § 5K2.7. Section 5K2.14 provides for a departure if "national security, public health, or safety was significantly endangered." The assault on the Capitol endangered the safety of the public, police, and elected officials in a way not already captured by Watkins' guidelines range, so a departure would be appropriate. *Cf. United States v. Calloway*, No. 21-3057, 2024 WL 925790, at *3 (D.C. Cir. Mar. 5, 2024) (affirming departure under § 5K2.14 where district court found that the defendant "created a serious risk that multiple individuals could have been killed or injured").

Here, the conspirators' staging of an arsenal of semi-automatic rifles and other firearms just across the Potomac River means they "used or possessed" weapons to obstruct Congress (and to commit sedition), yet the use and possession of those weapons is not reflected by any other adjustment or increase in the total offense level.

Courts of appeals have affirmed upward departures for firearms possession under Section 5K2.6 in fraud cases, premised on the idea that the fraud Guideline does not take into account the use of a weapon, and therefore does not adequately capture a defendant's dangerousness or the seriousness of the offense. *United States v. Paslay*, 971 F.2d 667, 672 (11th Cir. 1992); *United States v. Gaddy*, 909 F.2d 196, 199-200 (7th Cir. 1990).[6] The same premise holds true here: the conspirators, including Wilson, transported and possessed firearms in furtherance of their seditious conspiracy and obstruction of the congressional proceeding.

This very dangerous aspect of the conduct of Watkins and her co-conspirators would no longer reflected in the specific offense characteristics and adjustments under the Sentencing Guidelines, post-*Brock*. This Court previously accounted for the QRF component of the conspiracy in applying the eight-level adjustment under U.S.S.G. § 2J1.2(b)(1)(B), for offenses "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." *See* 5/26/23 a.m. Tr. at 22-30 (highlighting the ways in which Watkins was aware of and contributed to the QRF as a threat of physical injury to a person). *See also United States v. Rhodes, et al.*, No. 22-cr-15, 5/25/23AM Tr. at 73-74 ("The essence of the

_____

[6] The courts in *Paslay* and *Gaddy* departed upward by four and two levels, respectively (though the *Paslay* court departed upward on multiple grounds). Many Guidelines provide a two-level increase if a firearm was possessed. *See, e.g.*, U.S.S.G. § 2B2.1(b)(4) (burglary); § 2B2.3(b)(2) (trespass); § 2B5.1(b)(4) (counterfeit bearer obligations); § 2B5.3(b)(6)(B) (criminal infringement of copyright). Others provide a three-level increase for the same characteristic. *See, e.g.*, U.S.S.G. § 2B3.1(b)(2)(E) (robbery); § 2B3.2(b)(3) (extortion by force).

seditious agreement represented a threat to others, including members of Congress. Mr. Rhodes and other co-conspirators had established an arsenal of weapons on the other side of the Potomac River that could be brought in on notice if needed to accomplish their ends to disrupt the transfer of power. Such conspiracy, which, by definition, contemplated the use of force against individuals within the United States Government, threatened to cause physical injury to a person."). Thus, the Court should depart upward to to "ensur[e] appropriate additional punishment for the additional [firearms] crimes." U.S.S.G. § 3D1.4, bkgd. cmt.

### ii.   Appropriateness of Upward Variance

If the Court decides not to apply the upward departure provisions suggested above, an upward variance to the amended, post-*Brock* Sentencing Guidelines range would be warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). At any resentencing, an upward variance would be warranted to account for the § 3553(a) sentencing factors—specifically, the unique nature, circumstances, and seriousness of the offense, and Watkins' characteristics.

As discussed above, *Brock* did not negate the severity of the crimes of Watkins and her co-conspirators. If anything, engaging in a conspiracy to forcibly prevent members of Congress from discharging their duties to review and certify the results of a presidential election is *far more serious* than interfering with a routine court proceeding, even if such interference was substantial and involved risk of injury or property damage. *See Brock*, 2024 WL 875795, at *15 ("[I]nterference with one stage of the electoral college vote-counting process . . . no doubt

endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work[.]").  As this Court has observed,

> A seditious conspiracy is among the most serious crimes an individual American can commit. It is an offense against the government to use force. It is an offense against the people of the country. . . . It's a series of acts in which you and others committed to use force, including potentially with weapons, against the government of the United States as it transitioned from one President to the other.

*United States v. Rhodes, et al.*, No. 22-cr-15, 5/25/23AM Tr. at 113.

Because the holding of *Brock* has led to the result that the adjustments provided under the Sentencing Guidelines for seditious conspiracy and obstruction of Congress do not account for the risk of death, bodily injury, and extensive property damage, or the substantial interference with justice and democracy, caused by the defendant's crimes, this Court should vary upwards to ensure that the defendant's sentence adequately reflects the grave nature of his offenses.

As discussed throughout this memorandum, Watkins' role in this conspiracy posed a danger to both human lives and to our democracy that should be reflected in the sentencing analysis—and will not be if this Court fails to depart or vary upwards.  Several other judges on this Court have held, since *Brock*, that an upward departure or variance would be appropriate to correct for an amended "Guidelines Range [that] does not accurately reflect the seriousness of [the defendant's] conduct."  *Brock*, No. 21-cr-140, ECF No. 121 (Apr. 23, 2024, D.D.C., Bates, J.) ("Accordingly, the Court would likely impose an above-Guidelines sentence approaching 16 months, whether by way of departure (whether based on U.S.S.G. § 5K2.7 or another provision) or variance."); *see also United States v. Fonticoba*, No. 21-cr-638, ECF No. 81 (Apr. 11, 2024, D.D.C., Kelly, J.) (denying motion for release pending appeal on *Brock* grounds, and noting that the post-*Brock* total offense level would be 10, and that "it would be almost crazy for the Court not to vary up significantly because . . . we've got to capture for deterrence purposes, [] all the

other 3553(a) factors") (citation and internal quotation marks omitted); *United States v. Reffitt*, No. 21-cr-32, ECF No. 182 (Apr. 10, 2024, D.D.C., Friedrich, J.) (indicating that the court would vary upwards, post-appeal, and observing: "Following *Brock*, obstructive conduct is subject to a potential 11-point Guidelines swing depending on whether it interfered with, on one hand, a 'judicial, quasi-judicial, and adjunct investigative proceedings,' or on the other hand, any other type of formal proceeding. This disparity—though tracking the Guidelines' text—does not reflect the importance and solemnity of the Congressional proceeding to certify the electoral vote count, nor does it reflect the gravity of Reffitt's obstructive conduct."); *United States v. Bender*, 21-cr-508, ECF 161 (Mar. 6, 2024, D.D.C., Howell, J.) ("The D.C. Circuit issued an opinion on March 1, 2024 in *United States v. Brock*, No. 23-3045, holding that the sentencing enhancement at U.S.S.G. § 2J1.2(b)(2) does not apply to convictions under 18 U.S.C. § 1512(c)(2) for conduct disrupting Congress's counting and certification of the electoral college votes on January 6, 2021, but that decision does not influence the outcome in this case, since the Court would have varied upwards by at least three offense levels to account for the significant disruption of a critical and important governmental function as a result of defendants' offense conduct if the specific offense characteristic at U.S.S.G. § 2J1.2(b)(2) did not apply.").

Thus, at any resentencing, this Court may depart or vary upward to impose a significant sentence.

### iii.  Ability of the Court to Sentence Above Six Years

While the statutory maximum sentence for Count Four, conspiracy to prevent members of Congress from discharging their duties in violation of 18 U.S.C. § 372 is six years, and the maximum sentence for Count Six, interfering with law enforcement officers during a civil disorder in violation of 18 U.S.C. § 372 is five years, a sentence of 102 months or eight-and-a-half years of

incarceration is still legally permissible because the Court may impose the terms for those two counts to run consecutively.  To impose consecutive sentences, the Court must determine that such a sentence is necessary to comply with the factors in 18 U.S.C. § 3553(a)(2), that, is, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.  18 U.S.C. § 3584(b); *see also United States v. Lafayette*, 337 F.3d 1043, 1050 & n.11 (D.C. Cir. 2003) (explaining that a court may impose consecutive or "stack[ed]" sentences to achieve a total sentence in excess of the statutory maximum on a single count).

In the Sentencing Reform Act, Congress noted the "appropriateness" of a sentencing regime in which a defendant convicted of multiple counts may be sentenced to consecutive terms of incarceration.  18 U.S.C. § 994(*l*)(1).[7]  The Sentencing Commission implemented this congressional directive, instructing that the Court shall determine the total punishment and then, "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, . . . the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."  U.S.S.G. § 5G1.2(b), (d).

For all the reasons stated above, the nature and circumstances of Watkins' offenses would justify the imposition of consecutive sentences for a total period of 102 months of incarceration.

---

[7] Congress noted that it is generally inappropriate to impose consecutive sentences on counts for conspiring to commit an offense and the "offense that was the sole object of the conspiracy."  18 U.S.C. § 994(*l*)(2).  The government is not seeking the imposition of consecutive sentences for convictions for conspiring to obstruct Congress, 18 U.S.C. § 1512(k), and obstruction of Congress, 18 U.S.C. § 1512(c)(2).

*iv.   An Amended Sentence Would Not Require Immediate Release*

Finally, Watkins' assumption that she would receive a significantly reduced sentence would not be enough to carry her burden under 18 U.S.C. § 3143(b)(1)(B)(iv), even if it were true. Even if the Circuit were to set aside Watkins' convictions on Counts Two and Three, and this Court were to decline to apply any additional upward departures or variances upon remand, as discussed above, her recommended Guidelines sentence at level 25 would still be 57 to 71 months of incarceration.

Section 3143(b) directs the Court to order the defendant released only once she has served the time she is likely to serve upon resentencing. 18 U.S.C. § 3143(b)(1)(B) ("[I]n the circumstance described in subparagraph (B)(iv) of this paragraph, the judicial officer shall order the detention terminated *at the expiration of the likely reduced sentence*." (emphasis added)). Watkins has been in custody for approximately 42 months.  Thus, a sentence anywhere within a Guidelines range of 57 to 71 months would not necessarily entitle Watkins to release now.

As the Circuit recently held, where the district court's findings at sentencing suggest that the district court would impose the "same sentence even if the Supreme Court's decision in *Fischer* leads to a reversal of [defendant's] § 1512(c) conviction," defendant cannot "show that a sentence independent of [his] § 1512(c) conviction would include a term of no imprisonment or a reduced sentence shorter than the expected duration of her appeal."  *United States v. Carpenter*, No. 23-3235, 2024 WL 1340206 (D.C. Cir. Mar. 28, 2024).

## <u>CONCLUSION</u>

In sum, this Court found at sentencing that Jessica Watkins was a leader within a conspiracy to use force, intimidation, and threats to prevent members of Congress from discharging their solemn duty to review and certify the results of a presidential election.  The Court concluded that

Watkins was among the more "aggressive" actors in carrying out the goals of the conspiracy on January 6. Accordingly, the Court carefully and thoughtfully crafted a sentence that was is "sufficient, but not greater than necessary, to" reflect the incredibly grave nature and circumstances of Watkins' offenses. This sentence was appropriate and remains appropriate under 18 U.S.C. § 3553(a), and for the reasons stated above, it is legally permissible and morally imperative for this Court to maintain that sentence.

For all these reasons, the defendant's motion for release pending appeal fails to raise any substantial questions of law or fact that are likely to lead to reversal or such a significant reduction of sentence that she would be released before the conclusion of the appellate process, and her motion also fails to establish that she is not a danger to the community. The motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:            /s/            
Kathryn L. Rakoczy
D.C. Bar No. 994559
Alexandra S. Hughes
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530