**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES                           \*

vs.                                     \*    Case No.: 22-15-APM

THOMAS E. CALDWELL                      \*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MOTION FOR RECONSIDERATION AS TO CALDWELL'S MOTION FOR JUDGMENT OF ACQUTTAL

COMES NOW the Defendant, Thomas E. Caldwell ("Caldwell"), by and through

counsel, David W. Fischer, Esq., and respectfully moves this Honorable Court to reconsider its

prior denial of Caldwell's Motion for Judgment of Acquittal ("MJOA") as to Counts 3 and 13 of

the Indictment.  *See* (Oral ruling on MJOA, Sept. 19, 2023, Tr., 7-34) (hereinafter "MJOA Tr.").

## BACKGROUND

On November 29, 2022 a jury acquitted Caldwell of three counts alleging Seditious

Conspiracy pursuant to 18 U.S.C. § 2384 (Count 1), Conspiracy to Prevent an Officer from

Discharging any Duties pursuant to 18 U.S.C. § 372 (Count 4), and Conspiracy to Obstruct an

Official Proceeding pursuant to 18 U.S.C. § 1512(k) (Count 2).  The jury, however, convicted

Caldwell on Count 3, Obstruction of an Official Proceeding pursuant to 18 U.S.C. § 1512(c)(2),

and Count 13, Tampering with Documents pursuant to 18 U.S.C. § 1512(c)(1).  Caldwell made

timely motions pursuant to F.R.C.P. Rule 29 requesting acquittal as a matter of law as to Counts

3 & 13.  (ECF Nos. 384 & 435-1).  After inviting additional briefing and oral arguments, the

Court denied Caldwell's MJOA as to both counts.  (MJOA Tr., 7, 24).

1

On June 28, 2024 the United States Supreme Court handed down its long-anticipated decision in *Fischer v. United States*, 144 S. Ct. 2176 (2024), which addressed the appropriate scope and interpretation of 18 U.S.C. § 1512(c)(2). As outlined *infra*, the *Fischer* decision requires that the Court grant Caldwell's MJOA as to Count 3. Additionally, as argued *infra*, the *Fischer* decision, in conjunction with legal and factual errors in the Court's analysis and ruling denying Caldwell's MJOA, requires that Caldwell also be acquitted as a matter of law as to Count 13 (Tampering with Documents).

## APPLICABLE LEGAL STANDARDS

### I.     Legal Standard for Reconsideration.

A motion to reconsider a Court's prior order or ruling is available "as justice requires." *United States v. Hemingway*, 930 F. Supp. 11, 12 (D.D.C. 2013). The "as justice requires" standard includes circumstances such as: "(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order[.]" *Cruz v. Fed. Election Comm'n*, No. 19-cv-908 (APM), 2020 WL 769951, at *1 (D.D.C. Apr. 24, 2020).

### II.     Legal Standard for MJOA.

In ruling on a MJOA, the Court must "consider[] the evidence in the light most favorable to the government and determine[] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." *United States v. Kayode*, 254 F.3d 204, 212-13 (D.C. Cir. 2001) (cleaned up). The evidence, however, must be "taken as a whole" in considering whether it is legally sufficient. *United States v. Freeman*, 208 F.3d 332, 338 (1st Cir. 2000) (cleaned up).

### III.    *Fischer* requires that the Court grant Caldwell's MJOA as to Count 3.

In *Fischer*, the Supreme Court considered the scope of the residual "otherwise" clause in 18 U.S.C. § 1512(c)(2).  The government argued that "(c)(2) capture[s] all forms of obstructive conduct *beyond* Section 1512(c)(1)'s focus on evidence impairment."  *Fischer*, 144 S. Ct. at 2185 (cleaned up).  Fischer's counsel, by contrast, argued "that (c)(2) applies only to acts that affect the integrity or availability of evidence."  *Id*. (cleaned up).  Rejecting the government's argument, the Supreme Court held that "[t]o prove a violation of Section 1512(c)(2), the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding records, documents, objects, or . . . other things used in the proceeding, or attempted to do so."  *Id*. at 2190.

### A.  Under *Fischer*, the Government must prove intent to impair evidence.

Importantly, Chief Justice Robert's majority opinion emphasized that Section 1512(c)(2)'s opening clause was limited to "evidence."  The 6-3 majority rejected the government's "theory" that Section 1512(c) "consists of a granular subsection (c)(1) focused on obstructive acts *that impair evidence* and an overarching subsection (c)(2) that reaches all other obstruction."  *Id*. at 2189 (emphasis added).  After reviewing the overall statutory scheme, the Chief Justice wrote: "Rather than transforming this *evidence-focused statute* into a one-size-fits-all solution to obstruction of justice, we cabin our reading of subsection (c)(2) in light of the context of subsection (c)(1)."  *Id*. (emphasis added).

In addition to statutory structure and text, the *Fischer* majority relied on Congress's "obvious" purpose in enacting Section 1512, i.e., to plug a "loophole" in federal law wherein the individuals who actually destroyed documents could not be punished under existing statutes.  *Id*. at 2186.  The majority concluded that "subsection (c)(2) was designed by Congress to capture

3

*other forms of evidence* and other means of impairing *its* integrity or availability beyond those Congress specified in (c)(1)." *Id.* (emphasis added). In short, to prove a violation of Section 1512(c)(2), the government must show, *inter alia*, that a defendant impaired, or attempted to impair, "evidence" in the form of records, documents, objects or other similar "things."

**B. Caldwell did not impair, or attempt to impair, evidence**.

In denying Caldwell's MJOA as to Count 3, the Court determined that there was sufficient evidence to support that Caldwell "aided and abetted" co-defendants Jessica Watkins and Donovan Crowl in physically entering the Capitol or, alternatively, that Caldwell's personal conduct at the Capitol could also support the jury's verdict. (MJOA Tr., 7-23). While Caldwell respectfully disagrees with the Court's characterization of the evidence, a rebuttal is unnecessary because the record is devoid of evidence that Caldwell impaired, or attempted to impair, the integrity or availability of documents, records, objects or other things intended for use at an official proceeding. In fact, the government's argument opposing MJOA as to Count 3 was based entirely upon a physical obstruction theory, which the *Fischer* Court specifically rejected. *See* Gov't. Opp. to MJOA, (ECF No. 383, at 27-28, 46-47). The government's stated rationale for Caldwell's guilt was that he used "physical force" to breach Capitol "grounds and barriers" or aided and abetted others to do so with the goal of stopping the certification. *Id.* at 46.

The Court's analysis in denying Caldwell's MJOA was based upon a legal standard that was overruled in *Fischer*. The government presented no evidence that Caldwell aided and abetted for the purpose of impairing "evidence" to be used in an official proceeding, and neither Watkins nor Crowl actually impaired, or attempted to impair, any "evidence" intended for use in an official proceeding. Moreover, Caldwell himself clearly did not impair, or attempt to impair,

4

any specific "evidence."  Accordingly, the Court should reconsider and grant Caldwell's MJOA as to Count 3, as it was raised and preserved on similar grounds as those upheld in *Fischer*.[1]

### IV.    The Court should also grant Caldwell's MJOA as to Count 13.

As set forth in detail *infra*, the Court should also reconsider and reverse its denial of Caldwell's MJOA as to Count 13, which charged a violation of 18 U.S.C. § 1512(c)(1) (Tampering with Documents).  Caldwell's argument for reconsideration is based exclusively on evidence adduced *in the government's case-in-chief*.

### A.  The Court's factual findings and conclusions of law as to Count 13.

In denying Caldwell's MJOA as to Count 13, the Court determined that a reasonable juror, before Caldwell's alleged[2] deletions on January 14, 2021, could have concluded:

> One, Mr.  Caldwell was aware that he and his co-conspirators were caught on video *entering the Capitol*.

> Two, that there had been arrests started for participants of January 6th events.

---

[1] Caldwell's request for MJOA was preserved in two filings. (ECF Nos. 384 & 435-1).  Caldwell argued that Section 1512(c)(2) "does not apply to scenarios that do not involve evidence tampering[.]" (ECF No. 384 at 23).  Caldwell argued, *inter alia*, that he should be acquitted on Count 3 as "no evidence was presented that Caldwell targeted tangible objects for obstruction[.]" (ECF No. 435-1 at 43, n.5).  Additionally, in both MJOA filings, Caldwell specifically reasserted and incorporated legal arguments set forth in his prior motions to dismiss in *United States v. Caldwell* and the instant case, wherein he set forth detailed statutory and legal analyses that sketched out a similar argument as that adopted by the Supreme Court in *Fischer*. *Id.* (incorporating by reference filings in *United States v. Caldwell,* (ECF Nos. 240, 350, 566 & 558) and *United States v. Rhodes,* (ECF Nos. 84 at 19-30 & 176).

[2] Caldwell does not concede that the government adduced sufficient evidence that he *personally* deleted photographs and unsent the "video" as outlined in the Indictment.  Nonetheless, in light of the Court's MJOA ruling, from this point forward the instant motion, for the sake of brevity and clarity, eschews the use of the word "alleged" in connection with the deletion or unsending of photos and a video.

Three, he was using communications that would make it difficult to track those communications—that is, encryption and encrypted email or the suggestion of use of other encrypted messaging apps.

Four, in conversations with co-conspirators about the possibility of law enforcement uncovering their actions, Mr. Caldwell [said] to Ms. Watkins, "If any shit should ever come down, you were with me all the time, and I'll swear to it." She responded, "There's too much evidence to the contrary.  Perjury bad."

[Fifth,] . . . there is the *New Yorker* article that comes out the very day that Ms. Watkins and Mr. Crowl come to visit [Caldwell].

(MJOA Tr., 32-33).  The Court concluded that there was sufficient evidence that Caldwell "knew that not only that Ms. Watkins and Crowl *would be* the target of an investigation, but because of his association with them and his actions with them, he too *would be* [a] target and that the government might try to build a case against [them and him]."  (MJOA Tr., 34) (emphasis added).

As to the appropriate legal standard to establish a "nexus" between Caldwell's deletions and grand jury proceedings, the Court stated:

Now, in *U.S. versus Johnson*, the Seventh Circuit said in a situation like this, the government simply "needed to prove enough evidence [that] the defendant foresaw that the contraband *might* be used in an official proceeding and destroyed with the intent of preventing that use."

*               *               *

Now, all of that evidence, again in the light most favorable to the government, could have established that Mr. Caldwell was, [in] *the words of the Seventh Circuit*, deleting . . . posts because he was concerned they *might* be used in an official proceeding[.]"

(MJOA Tr., 31-32, 33) (emphasis added).

### B.  The Court's factual finding that Caldwell knew that Watkins and Crowl "entered" the Capitol before January 14th is incorrect.

The Court, respectfully, erred in its most significant factual finding used in denying Caldwell's MJOA, i.e., that Caldwell "was aware that he and his co-conspirators were caught on

video *entering the Capitol*."  (MJOA Tr., 31) (emphasis added).[3]   First, F.B.I. Special Agent Palian admitted during trial that Caldwell never entered the U.S. Capitol. (Tr., 1638).  Second, the government produced no video or other evidence proving that, prior to his deletions, Caldwell *knew* that Watkins, Crowl or other co-defendants had *entered* the Capitol.

    *1. The Ford Fischer segment does not show Watkins or Crowl inside the Capitol.*

The Court erred in relying on Ford Fischer's News2Share clip (sent by Caldwell to Crowl and subsequently unsent) to prove Caldwell's knowledge that Watkins and Crowl "entered" the Capitol.  This News2Share clip, in fact, does *not* show Watkins, Crowl or *any* Oath Keepers entering or inside of the Capitol.  *See* (Gov. Exh. 1051).  Instead, the clip shows Watkins and

---

[3] The Court made additional factual findings that Caldwell, respectfully, disagrees with.  For example, *The New Yorker* article does not advance the ball for the government as it was not in evidence, there was no proof that Caldwell read the article, *and the exact date of the article's release was never testified to*.  On cross-examination, S.A. Palian testified:

> Q. [Defense Counsel]:  Would you agree that on January 14, 2021, the New Yorker published an article regarding [Watkins and Crowl] . . .?

> A. [S.A. Palian]:  I don't know if that was the date of the article, *but it was around that time*, yes.

(Tr., 1626) (emphasis added).  As noted in the jury instructions, "the questions of lawyers are not evidence."  (ECF No. 400, at 5).  Accordingly, Palian's answer was that *The New Yorker* article was published "around" January 14th, but that he was not sure of the specific date.  Accordingly, the Court's finding that Caldwell's deletions, which occurred into the evening on January 14, 2021, occurred as a result of *The New Yorker* article being published is unsupported by the evidentiary record.

Additionally, the Court's suggestion that a January 9, 2021 Facebook message between Caldwell and Christine Francis could support an inference that Caldwell was concerned about law enforcement "trying to collect evidence" is not supported by their entire exchange. (MJOA Tr., 25-26).  Caldwell was clearly referring to Facebook "thought police" and "Nazis" who were censoring his "oodles of friends."  As will be argued *infra*, the government was required to offer proof that Caldwell was aware of an *actual investigation* to prove its obstruction case.  Accordingly, the Caldwell-Francis exchange does not help the government's case regardless of whether the Court's factual finding was correct.

Crowl about 25 feet or more outside of the Columbus Doors. *Id.*[4] Finally, the government produced no other evidence that Caldwell knew that Watkins, Crowl or any of his co-defendants *entered* the Capitol building, engaged in assaultive conduct with police, or acted in any way that would have generated scrutiny from a federal grand jury.

   *2.  The Court's mistaken understanding of the Ford Fischer segment is significant.*

The Court's mistaken belief and reliance on the News2Share segment is significant and itself cause for reconsideration as to Caldwell's MJOA. In light of *Fischer,* the conduct Caldwell--who was not in the company of *any* Oath Keepers at or around the Capitol on January 6--witnessed on the News2Share segment was, at most, misdemeanor disorderly conduct by Watkins and Crowl. As such, the News2Share segment would not have put Caldwell on notice that a grand jury was investigating Crowl or Watkins.

### C.  The Court used an incorrect, less-demanding "nexus" standard in finding sufficient evidence.

The Court should also reconsider its denial of Caldwell's MJOA as to Count 13 because, respectfully, it clearly applied the wrong "nexus" standard.

   *1.  The Seventh Circuit, in fact, uses the "will likely to affect" standard.*

The Court's reliance on language from *United States v. Johnson*, 655 F.3d 594 (7th Cir. 2011), to apply a "*might* have known" standard vis-à-vis tying Caldwell's deletions to a D.C. grand jury investigation was, respectfully, a significant error. The *Johnson* panel did not intend to set forth a "nexus" legal test. In fact, the Seventh Circuit *previously and specifically held* that "before a

---

[4] Oath Keepers are depicted in the segment between roughly the 3- and 4-minute mark standing outside of the Columbus Doors. No Oath Keeper enters the Capitol in the video. Ford Fischer himself never entered the Capitol while filming. The limited video footage of events inside the Capitol does not show any Oath Keepers.

defendant may be convicted of obstruction under § 1512(c)(1), he must believe that his acts *will likely affect* a pending or foreseeable proceeding." *United States v. Matthews*, 505 F.3d 698, 708 (7th Cir. 2007) (emphasis added). And subsequent to *Johnson*, the Seventh Circuit reiterated that to win an obstruction conviction, "the government must prove that a defendant *believed his acts would be likely to affect* a pending or foreseeable proceeding." *United States v. Elizondo*, 21 F.4th 453, 472 (7th Cir. 2021) (cleaned up) (emphasis added). Accordingly, as multiple circuits have held,[5] the correct standard to determine whether Caldwell obstructed justice is whether he specifically intended that his acts "would likely affect a pending or foreseeable proceeding."

## 2. *Aguilar requires the use of the higher "would likely to affect" standard.*

The "would likely to affect" standard originated from *United States v. Aguilar*, where the Supreme Court, in mandating a nexus requirement in obstruction cases, observed that "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." *United States v. Aguilar*, 515 U.S. 593, 599 (1995). The "critical question" in *Aguilar* "was whether the evidence could support a finding that Judge Aguilar's statements to the federal investigators were made with *specific intent* to obstruct" a grand jury investigation. *United States v. Schwarz*, 283 F.3d 76, 108 (2d Cir. 2002) (emphasis added). *Aguilar* "held that the judge's knowledge of *the possibility* that his deceptions *might* be put before [the grand jury] was insufficient to establish the required *specific intent* because there

---

[5] *See, e.g., United States v. Friske*, 640 F.3d 1288, 1291-92 (11th Cir. 2011) (finding evidence insufficient because the "Government offered no evidence that defendant knew his actions were likely to affect forfeiture proceeding."); *United States v. Sutherland*, 921 F.3d 421, 427 (4th Cir. 2019) (approving jury instruction based upon *Aguilar*'s "likely to affect" language); *United States v. Desposito*, 441 F.3d 153, 171 (2d Cir. 2006) ("As a component of [*Aguilar*'s] intent element, the proper inquiry is whether the defendant knew his actions *would* result in the obstruction of a specific judicial proceeding.") (emphasis added).

was no indication that [he] *knew* that the investigating officers . . . *were going* to testify at the grand jury." *Id.* (emphasis added). Justice Scalia's dissenting opinion confirms that *Aguilar* rejected a "might affect" standard in favor of a much higher bar to win an obstruction conviction:

> The critical point of knowledge at issue, in my view, is not whether "respondent knew that his false statement *would be provided* to the grand jury," . . . but rather whether respondent knew--or indeed, even erroneously *believed*--that his false statement *might* be provided to the grand jury[.]

*Aguilar*, 515 U.S. at 613 (J. Scalia) (dissenting) (emphasis added).

As argued *infra*, when the correct, higher legal standard ("specific intent" and "would likely affect") is applied to the facts of the instant case, the government's evidence was insufficient to support Caldwell's evidence tampering conviction under 18 U.S.C. § 1512(c)(1).

### 3.    The Court also misapplied *Wellman*'s two-part test.

Respectfully, the Court also misapplied the rule set forth in *United States v. Wellman* vis-à-vis distinguishing whether a defendant's conduct obstructed a criminal investigation as opposed to a grand jury investigation. *Wellman* set forth a two-part test:

> And in close cases, we must be careful to avoid conflating obstruction of an official proceeding with obstruction of a mere criminal investigation unconnected with an official proceeding. To distinguish the two, we look for specific evidence in the record, beyond mere speculation, that a defendant reasonably foresaw an "official proceeding" when he committed obstructive acts. If the evidence reveals that a defendant *acted with awareness* that he was *the* target of an investigation and that the government might be trying to build a case against [him], the nexus requirement is satisfied.

*United States v. Wellman*, 26 F.4th 339, 348 (6th Cir. 2022) (cleaned up) (emphasis added).

Applying *Wellman*, the Court ruled that "Caldwell knew that . . . Watkins and Crowl *would be* the target of the investigation . . . [and that] because of his association . . . and his actions with them, he too *would be* [a] target[.]" (MJOA Tr., 32) (emphasis added).

The Court's application of *Wellman*'s two-part test was, respectfully, flawed. The issue is not whether Caldwell believed he could *potentially* become a target of a federal investigation because Crowl and Watkins could *potentially* become targets of an investigation, but whether he "acted with awareness that he was *the* target of an investigation[.]" *Wellman, 26 F.4th* at 348 (emphasis added). As argued more fully *infra*, the government's evidence against Caldwell flunked *Wellman*'s two-part test.

>    4. *Caldwell's case is factually distinguishable from every reported case affirming obstruction of justice convictions.*

Every reported case that has affirmed obstruction convictions involved defendants who "had actual knowledge of an actual investigation into [their] illegal activities and the evidence [they] destroyed was evidence of that illegal activity." *United States v. Wysinger*, 2019 U.S. Dist. LEXIS 106320 at *21 (W.D. Va. 2019). Those defendants engaged in obstructive conduct: 1) obviously tied to a grand jury;[6] 2) upon receiving, or becoming aware of, grand jury subpoenas;[7]

---

[6] *See, e.g., United States v. Giovanelli*, 464 F.3d 346, 350 (2d Cir. 2006) (defendant mob boss obtained information from grand jury proceedings looking into organized crime and passed it along to targets of the grand jury investigation).

[7] *See, e.g., United States v. Sutherland*, 921 F.3d 421, 425 (4th Cir. 2019) (defendant circulated false loan documents after being served with grand jury subpoena); *United States v. Quattrone*, 441 F.3d 153, 172 (2d Cir. 2006) (defendant was aware that document destruction would affect an active grand jury investigation); *United States v. Furkin*, 199 F.3d 1276, 1282 (7th Cir. 1997) (defendant knew his company was served with grand jury subpoenas before his obstructive acts).

3) upon becoming aware of an active federal law enforcement investigation into themselves or co-conspirators;[8] or 4) in response to the execution of search warrants targeting their crimes.[9]

In the instant case, by contrast, the government adduced not a scintilla of evidence that Caldwell knew that either himself, Watkins, or Crowl were *actually* being investigated by *actual* law enforcement or a grand jury at the time of his deletions. No other reported circumstantial obstruction case has found a "nexus" between obstructive conduct and a grand jury without the defendant, at a minimum, having actual knowledge of some *official action* by the government directed at him or his co-conspirators.

## **ARGUMENT**

### *A.* **The significance of the erroneous finding of fact.**

The Court's misimpression that Ford Fischer's News2Share segment depicted Watkins and Crowl entering the Capitol substantially changes the calculus as to the sufficiency of evidence against Caldwell. First, the government, without the misimpression, produced no

---

[8] *See, e.g., Wellman*, 26 F.4th at 348 (defendant encouraged witnesses to lie *after* they met with the FBI and manufactured tax records just before grand jury convened); *United States v. Matthews*, 505 F.3d 698, 702-03 (7th Cir. 2007) (defendant police chief attempted to "lose" firearm connected to friend he knew was under federal investigation); *United States v. Binday*, 804 F.3d 558, 588 (2d Cir. 2105) (defendant, upon learning of wide-scale FBI investigation into insurance fraud scheme he was involved in, wiped incriminating hard drive at the behest of co-conspirator); *United States v. Delgado*, 984 F.3d 435, 452-53 (5th Cir. 2021) (defendant involved in lengthy bribery scheme engaged in obstructive acts after learning from multiple witnesses that the FBI was investigating his crimes).

[9] *See, e.g., United States v. Simpson*, 741 F.3d 539, 552 (5th Cir. 2014) (defendant "admitted that he deleted the emails after learning about the executed search warrants."); *United States v. Johnson*, 655 F.3d 594, 606 (7th Cir. 2011) (defendant, upon learning of imminent residential search warrant execution, destroyed evidence of a large illegal drug operation); *United States v. Mann*, 685 F.3d 714, 724 (8th Cir. 2012) (finding sufficient evidence where defendant hid documents from a search warrant execution).

specific evidence that Caldwell knew that Watkins, Crowl, or any of his co-defendants actually *entered* the Capitol or committed felonious conduct on January 6. Second, without the misimpression, the government adduced no evidence that Caldwell was aware that Watkins and Crowl engaged in joint criminal conduct on January 6 inside the Capitol.

    *1. Caldwell deleted items tied to Crowl, not Watkins.*

As to the latter point, the Court relied heavily on Caldwell's messages with Watkins wherein she expressed concern about potentially being "wanted" because of a short-lived blog post associating her "face" with "dead cops." (MJOA Tr., 26-28). Caldwell, however, did not delete or unsend messages *with Watkins*—instead, he deleted photos and unsent a video previously shared *with Crowl*. And whereas the jury saw overwhelming evidence that Watkins and Crowl were tied at the hip inside the Capitol on January 6, there was no evidence presented that Caldwell knew that they were together inside the Capitol. Without the misimpression—and in light of *Fischer*—the government produced no evidence that Caldwell had actual knowledge that *Crowl* committed a crime on January 6 or that *Crowl* feared criminal prosecution. Finally, without the misimpression, the government produced no evidence that Caldwell had knowledge tying *Crowl* to any of Watkins's conduct on January 6. Accordingly, any concerns Watkins expressed about potentially being "wanted" cannot be extrapolated to Crowl's state of mind as understood by Caldwell.

The Watkins-Caldwell text messages took place on January 9, 2021, a full five days before Caldwell deleted the Caldwell-Crowl thread and unsent the video link he previously shared with Crowl. This five-day gap, coupled with the lack of proof that Caldwell knew that Watkins and Crowl engaged in joint conduct inside the Capitol, is a roadblock to the government establishing a connection between Caldwell's deletions and his text conversation with Watkins.

**B. Caldwell's quip proves that he did not believe that he was a potential target.**

The Court relied on a "literal" interpretation of text messages between Watkins and Caldwell regarding Watkins's concern about potentially being "wanted" to conclude that Watkins, and thus Caldwell, feared imminent prosecution.  (MJOA Tr., 26-27).  Below is the full exchange:

> **Watkins**:  Goddammit.  Why is my face associated with dead cops?  *I was nice to them*[.]
>
> **Caldwell**:  I think you should download and photoshop out the headline.  Or I will.  It's a nice pic otherwise.  Look, they will try to vilify us all.  Those *lying* bastards.  But their day will come.
>
> **Watkins**:  I know, I'm just terrified that I'll be wanted after *a title* like that.
>
> **Caldwell**:  *Fear not*.  One asshole had that on a blog, I copied it.  Can't even find the blog today but it was just *a thumbnail* crested [sic] by the prick most likely.  Wish I had written his name down.  Anyway, *probably very few others saw it* and it is nowhere on the news2share site from which it was taken.  If any shit should come down, you were with me all the time and I'll swear to it.
>
> **Watkins**:  There's too much evidence contrary.  Perjury bad, lol.  *I won't worry then*[.]
>
> **Caldwell**:  *Please don't*. . . .

(Gov. Exh. 9079, 192.T.1615-27) (emphasis added).  From this conversation, the Court ruled that "a reasonable jury could have [inferred] . . . Caldwell's understanding that law enforcement *had begun* and *would be beginning* an investigation of not only Ms. Watkins but him [too] as he was associated with her and was certainly aware that his conduct supported her that day."  (MJOA Tr., 27-28) (emphasis added).  Respectfully, the Court's reasoning is flawed.

### 1.  Caldwell "literally" believed he did nothing wrong.

The above exchange, rather than reflecting Caldwell's belief that *he* was being, or about to be, investigated actually supports the *opposite* inference.  If Caldwell actually believed that he was a potential target of a federal investigation, why would he offer to be Watkins's *alibi*?  The obvious inference from Caldwell's statement—if taken literally—is this translation: "Jessica,

since I, Tom Caldwell, did nothing wrong, if something comes down, I will tell the authorities that you were with me the whole time so that they will think you did nothing wrong, too." Additionally, when taken literally, the logical inference is that Caldwell was offering to tell authorities that Watkins and he *were together* on January 6, which undercuts his purported motive to destroy evidence *to hide his connection to Watkins*.  The government produced absolutely no evidence that Caldwell *himself* believed he committed a crime or that he feared prosecution.

> 2. *The exchange "literally" proves that Watkins and Caldwell were not worried about a potential law enforcement investigation targeting them.*

Next, when read literally, the text exchange confirms that neither Caldwell nor Watkins were concerned about a federal investigation.  After Watkins's initial concern that she potentially could be "wanted," Caldwell texted Watkins: "Fear not."  After some back and forth, Watkins replied to Caldwell: "OK, I won't worry then."  Caldwell replied: "Please don't."  This exchange, when read literally*,* creates the rational inference that neither Watkins nor Caldwell were worried about being criminal suspects based upon an isolated "thumbnail" posting which, according to Caldwell, was "probably viewed by few others" and had already been "taken down." Additionally, Watkins clearly advised Caldwell that she had nothing to do with "dead cops" ("I was nice to [the cops]").

Accordingly, when the *entire* exchange is taken *literally*, the rational inferences to be gleaned are: 1) Caldwell and Watkins were not aware of a contemporaneous FBI or grand jury investigation; 2) Watkins initially expressed concern about potentially being "wanted" based on a misleading blog thumbnail posted by a random person; 3) After discussing the matter with Caldwell, Watkins was no longer worried about being "wanted" ("I won't worry then"); 4) Caldwell was unconcerned, as well ("Fear not" and "Please don't [worry]"); 5) Caldwell did not

view himself as having committed a crime on January 6; 6) Caldwell was told by Watkins that she was "nice" to the police; and 7) Caldwell offered to tell hypothetical authorities that Watkins was with him all the time, whereas the purported motive to obstruct was for Caldwell to distance himself from Watkins and Crowl. The only "rational inference" from the *entire* Watkins-Caldwell text conversation is that, when it ended, neither Watkins nor Caldwell "literally" feared criminal prosecution.

       *3. Watkins was not aware of an official investigation targeting her.*

Even if her text asserting that she would not "worry" about being wanted by the police is ignored, Watkins never stated that she was *actually* being investigated by the authorities. Accordingly, Caldwell was not aware of any such official investigation. Again, no court has ever ruled that a defendant's alleged obstructive acts could be tied to a grand jury investigation ("nexus") without proof that the acts were the result of his awareness of law enforcement or grand jury actions targeting the defendant or his criminal associates.

**C.  Caldwell did not attempt to obstruct the grand jury by either method outlined in the Indictment.**

The Indictment alleges two different acts of obstruction. First, that Caldwell "deleted" photographs "that documented his participation in the attack on the Capitol" from his Facebook account. Second, that Caldwell sent a video to Crowl on January 8, 2021 and subsequently unsent that video on January 14, 2021. (ECF No. 167, ¶¶165-168). Under *Aguilar,* the government was required to prove that Caldwell's "specific intent" in deleting/unsending was to deprive the grand jury of the deleted photos and unsent "video." The government failed to meet its evidentiary burden.

There is no mystery as to the photographs that were "deleted," as the eleven photographs at issue were actually recovered from Crowl's Facebook records. These photographs depict

Caldwell posing for selfies with his wife, the crowd outside of the west side of the Capitol, or scaffolding. (Gov. Exh. 2002.T.61, at 69-79). No violence was depicted in the photographs. No Oath Keepers, including Crowl and Watkins, were depicted. *Id.*

      1. *Evidence was introduced in the government's case that Caldwell possessed the originals of the "deleted" photos in his recovered cell phone and a backup copy of these photos on a Western Digital hard drive.*

In his previous MJOA filings, Caldwell noted that, in the *defense* case, evidence was introduced that Caldwell possessed the original January 6 photos, i.e., the "deleted" photos, on his cell phone and a backup copy on a Western Digital hard drive. Recently, however, Caldwell discovered that the government *also* introduced this evidence in its case-in-chief. Special Agent Whitney Drew testified to a stipulation, (Gov. Exh. 3000), regarding the authenticity of forensic downloads from various seized devices, including Caldwell's cell phone and a Western Digital hard drive, both of which were recovered by the FBI during the search of Caldwell's home. (Tr., 4512-13). S.A. Drew further testified that the FBI "recover[ed] photos and videos" from Caldwell's phone and hard drive. (Tr., 4513).[10] The government introduced 8 photos and 3 videos recovered from Caldwell's phone, and 3 photos and 2 videos recovered from Caldwell's hard drive. (Tr., 4514). Four of the photos from the phone introduced are the same photos as those Caldwell "deleted" in the Caldwell-Crowl thread. (Gov. Exh. 22.P.3, P.5, P.6, P.8). The three videos introduced were the Pelosi-doorknob video, the Vice-President Pence video, and the pre-dawn video at the Ellipse. (Gov. Exh. 22.V.1-.3).

      2. *As Caldwell possessed the originals and a backup copy of the "deleted" photos, he did not intend to impair their availability for use before a grand jury.*

---

[10] S.A. Palian also testified that the FBI recovered "a lot of stuff" during the search, including "photographs from [Caldwell's] phone." (Tr., 1681).

As the *government's* case proved that Caldwell kept the originals and a backup copy of his January 6 photos, the evidence was insufficient to prove Caldwell's "intent to impair [the photographs'] availability for use" by a grand jury. Essentially, at the time he deleted the Caldwell-Crowl Facebook thread, which resulted in the deletion of the photos therein,[11] Caldwell knew the following: 1) that on his cell phone he possessed the original photographs he snapped on January 6; 2) that he possessed a backup copy of the photos on a hard drive; and, 3) by "deleting" the thread—instead of unsending the photos--he did nothing to remove the photos from Crowl's possession. There was no evidence in the record that Caldwell was familiar with Facebook records or that he knew that the FBI would attempt to search *private* Facebook records as part of its investigation. And it is not common knowledge that deleting a Facebook thread from your phone results in the deletion of that thread from the user's own Facebook records. Even if Caldwell had "inside baseball" knowledge of Facebook record-keeping practices, the government's case would still be compromised. That is, by deleting the thread, Caldwell kept Crowl's Facebook records *intact* (including the photos), while Caldwell himself kept the originals on his phone and a backup copy on a hard drive located next to his home computer. In other words, both Caldwell (on his phone and hard drive) and Crowl (on his phone and in his Facebook records) still possessed the photos for use by a potential grand jury.

It is inconceivable that, under the instant facts, the government produced sufficient evidence that Caldwell's "specific intent" in deleting his thread with Crowl was to play "keep away" from a grand jury. Caldwell literally created an extra copy of the photos on a hard drive

---

[11] Caldwell emphasizes that his "deletion" of the Caldwell-Crowl thread was accomplished with one swipe, which deleted dozens of pages of Facebook records, a small portion of which contained the deleted photos. Again, to prove its case, the government had to prove that Caldwell's "specific intent" in making this "swipe" was to keep *photos* from a grand jury, and not the messages, memes, or other communications contained in the bulk of the thread.

and retained the originals on his phone.  The FBI found Caldwell's phone and hard drive without difficulty when they searched his home.  He did not "unsend" the photos previously sent to Crowl, which meant that Crowl and the Facebook records department would still possess the photos.  It is pure speculation that Caldwell's "specific intent" in deleting a thread, the bulk of which contained non-photographic evidence, was to prevent the use of photos before a grand jury the existence of which he had no awareness of.  Caldwell's photos were always available to investigators, whether by request, subpoena, or search warrant.

      3.   *It was not foreseeable that unsending the "video" would obstruct the grand jury.*

Count 13 also alleged that Caldwell violated § 1512(c)(1) by sending a "video" to Crowl on January 8, 2021 and subsequently unsending the video on January 14, 2021.  The government was required to prove that, in unsending the video, Caldwell specifically intended that his conduct "would" impair the video's "availability for use" in an official proceeding.  The government did not meet its burden.

As to whether Caldwell believed that he was preventing a grand jury's potential use of the News2Share footage, the evidence is clearly insufficient.  First, the "video" alleged in the Indictment was actually a "hyperlink" to an open-sourced news segment produced by the media company News2Share.  Second, because he sent the hyperlink, Caldwell obviously knew it was available to anyone using the internet, including the FBI; likewise, when he sent the hyperlink, Caldwell sent an accompanying message stating that Crowl would be "world famous." (Gov. Exh. 9079, 200.F.1.36).  Third, as the Court recognized, the government's case acknowledged that Caldwell texted the same hyperlink to Crowl five minutes after he sent it via Facebook. (*Id.*, 200.F.1.35).  Fourth, the hyperlink was still in *Caldwell's* Facebook records, admitted in the

government's case, in his communications *with others* besides Crowl. *See, e.g.*, (Gov. Exh. 2001.T.1, 222-23) (Caldwell to Jonathan R. (Jan. 7, 2021)).

Accordingly, at the time he unsent the hyperlink, Caldwell knew that: 1) the News2Share segment was an open-sourced hyperlink available to the world; 2) it was widely distributed ("world famous"); 3) Crowl possessed another copy of the hyperlink via a text message; and 4) Caldwell, himself, still possessed the hyperlink in his other Facebook messages. Respectfully, it is inconceivable that Caldwell "knew" that unsending a widely-distributed, open-sourced news segment from Crowl, an individual that he knew possessed a texted copy of the same hyperlink, while possessing a copy of the hyperlink himself in his own Facebook account "would impair [the link's] availability for use" in a grand jury investigation of which he had no knowledge of.

   *4.   The government's evidence also flunks the <u>Wellman</u> test.*

Assuming, *arguendo*, that Caldwell engaged in obstructive conduct, this conduct would inferentially be aimed only at a potential criminal investigation, not at a grand jury. As the government produced no evidence that Caldwell was "aware" that he was "*the* target" of an investigation, his conduct did not amount to grand jury obstruction. *Wellman*, 26 F.4th at 348 (emphasis added). In fact, it was impossible for Caldwell to know that he was "the" target of an investigation because he was *not* "the" target of an FBI investigation until three days *after* the deletions took place subsequent to the FBI's raid of Watkins's residence in Ohio. The government's case clearly flunks the *Wellman* test.[12] Without evidence of Caldwell's specific

---

[12] In its MJOA ruling, the Court cited *United States v. Buchanan*, 2023 U.S. App. LEXIS 22104 (6th Cir. 2023), an *unpublished* opinion, as supporting its finding that the government met its burden. The Court's reliance on *Buchanan*, however, was misplaced. The Sixth Circuit upheld Buchanan's obstruction conviction, finding a sufficient nexus between Buchanan's discarding of clothing and an official proceeding. *Buchanan* held: "Crediting the circumstantial evidence, specifically Buchanan's actions regarding his Instagram privacy settings, a reasonable jury could

awareness of an official investigation closing in on him or knowledge of some type of official action targeted at him or his alleged co-conspirators, the government did not, as a matter of law, establish a "nexus" between his conduct and grand jury proceedings.

## CONCLUSION

WHEREFORE, the defendant, Thomas E. Caldwell, respectfully requests that this Honorable Court reconsider its prior ruling and, thereafter, grant Caldwell's previously denied Motion for Judgment of Acquittal as to Counts 3 & 13.

Respectfully Submitted,

_____/s/_____
David W. Fischer, Esq.
Federal Bar No. 023787
Law Offices of Fischer & Putzi, P.A.
Empire Towers, Suite 300
7310 Ritchie Highway
Glen Burnie, MD 21061
(410) 787-0826

---

conclude that Buchanan disposed of the clothing *after the FBI press release* . . . and would have [thus] been aware when he disposed of the clothing that he was the target of an investigation." *Id*. at 15 (emphasis added). Unlike Caldwell, Buchanan's alleged obstruction took place *after* being put on (very public) notice that the FBI was pursuing a criminal case specifically against him.

     *Buchanan* also contains *dicta* suggesting that sufficient evidence established that the defendant obstructed justice even if he destroyed his clothing *before* the FBI press release. *Id*. at 14-15. *Dicta* in an unpublished opinion, however, is hardly compelling and should carry no weight in the Court's decision. Even if *Buchanan's dicta* were to be considered, Caldwell's case is still substantially weaker than *Buchanan*. Prior to the FBI press release, Buchanan clearly knew that he had committed serial felonies that could expose him to prosecution. He was also warned by his social media contacts that "they" wanted to "hang" him, likely referring to law enforcement, and that his distinctive orange clothing had drawn the public's attention. *Id*. at 15. Buchanan's image of rioting in orange apparel had obviously been aired in local media. Accordingly, when Buchanan disposed of the clothing, he knew: 1) that he was captured on video committing serial felonies; 2) that the public's attention was focused on him because the incriminating video was publicly disseminated; 3) that law enforcement would be seeking the identity of the "orange" perpetrator; and 4) that the orange clothing had evidentiary value to identify him as the perpetrator.

### <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 9, 2024, a copy of the foregoing Motion for Reconsideration as to Caldwell's Motion for Judgment of Acquittal was served via Electronic Case Filing (ECF) to government counsel of record, Kathryn Rakoczy, AUSA, Troy Edwards, AUSA, Jeff Nestler, AUSA and Alexandra Hughes, AUSA.

_____/s/_____
David W. Fischer, Esq.