**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-15-APM** |
| **BRIAN ULRICH,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND**
**MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Brian Ulrich to three years of supervised probation, with the special conditions that the first eight months of probation be served on home detention (with permitted leave for work, medical appointments, and religious services), that the defendant complete 120 hours of community service, and that the defendant pay $2,000 in restitution and the mandatory $200 special assessment. Such a sentence would be sufficient to reflect the seriousness of this offense while also accounting for the defendant's acceptance of responsibility and substantial assistance to law enforcement pursuant to his public cooperation plea agreement.

## I.    INTRODUCTION

On the afternoon of January 6, when it became clear that Congress was going forward with the certification of the 2020 presidential election, Defendant Ulrich joined the mob of rioters that breached the United States Capitol through the East Rotunda Doors. The defendant's participation in the attack on the Capitol was not random; it was the culmination of weeks, if not months of

1

following the increasingly violent calls by Elmer Stewart Rhodes III, a leader of a group called the Oath Keepers, to oppose the lawful transfer of power from Donald Trump to Joseph Biden. Ulrich was privy to these communications as an Oath Keepers member and a participant in the group's encrypted chats. Ulrich echoed Rhodes' drumbeat about the need to use any means necessary, including violence, to stop the certification of the election, quipping, "And if there's a Civil War then there's a Civil War." Ulrich traveled to D.C. with the Oath Keepers to be part of their January 6 operation. When the riot erupted that afternoon, he sped to the Capitol with other members of the group, and ultimately followed them in breaching the building.

Ulrich stands before the Court to be sentenced on extremely serious charges. He admitted, through his guilty plea, that he entered the Capitol with the goal of obstructing the certification proceeding and that he participated in a conspiracy with Rhodes and others to stop the lawful transfer of presidential power by deploying force to prevent, hinder, and delay the execution of the laws of the United States. For these reasons, he pled guilty to Seditious Conspiracy, in violation of 18 U.S.C. § 2384, and Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2).

At the same time, Ulrich has shown tremendous acceptance of responsibility and has provided highly substantial assistance to law enforcement through his cooperation in this matter. Ulrich's guilty plea was part of a cooperation plea agreement. Ulrich agreed to have the details of his cooperation be made public from the moment of his plea. Ulrich debriefed extensively with the government and then testified against his co-conspirators at trial. His testimony provided significant evidence of the intent of the co-conspirators, which was likely a factor the jury considered heavily in returning guilty verdicts against all four defendants on trial. Because of his

acceptance of responsibility and assistance to law enforcement, the government submits that a length period of home confinement, followed by several years of supervision, with additional requirements that Ulrich perform community service and pay restitution, is a sufficient sentence notwithstanding the grave nature of his offenses.

## II.     THE IMPACT OF *FISCHER*

Since Ulrich's guilty plea, in *United States v. Fischer*, the Supreme Court held that to prove a violation of 18 U.S.C. § 1512(c)(2) "the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or as we earlier explained, other things used in the proceeding, or *attempted* to do so." 603 U.S. ----, 144 S. Ct. 2176 (June 28, 2024) (emphasis added). The parties agree that the facts admitted to by Ulrich in his statement of offense during his guilty plea are sufficient to establish an attempted violation of Section 1512(c)(2). Nonetheless, out of an abundance of caution, the parties have attached here an addendum to the Statement of Offense. The parties would ask that the Court place Ulrich under Oath at the start of the sentencing hearing to have him adopt the supplemental statement of offense, to make sure he understands the elements of the offense of obstruction of an official proceeding, as clarified by the Supreme Court in *Fischer*, and to have the parties declare on the record their position that there is a sufficient factual basis to support Ulrich's guilty plea.

## III.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF 117, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the 2020 presidential

3

election.

**B.      The Defendant's Role in the January 6, 2021 Attack on the Capitol**

After the 2020 presidential election, Ulrich joined into a conspiracy with Rhodes and other members and affiliates of the Oath Keepers to oppose by force the lawful transfer of presidential power from Donald Trump to Joseph Biden. In furtherance of this conspiracy, Ulrich traveled to D.C. and joined the attack on the Capitol on January 6 with the goal of disrupting Congress' certification of the election. Ulrich then destroyed evidence of his co-conspirators involvement in the attack.

In the weeks after the 2020 presidential election, Rhodes began disseminating messages on end-to-end encrypted meeting and messaging applications, including GoToMeeting and Signal, that encouraged other Oath Keepers members and affiliates to oppose by force the lawful transfer of presidential power. ECF 117 at ¶6. One such group chat was titled "Oath Keepers of Georgia." *Id.* Ulrich joined that group in late November 2020. ECF 117 at ¶7.

On December 14, 2020—the same day that presidential electors from each state and the District of Columbia cast their votes in the Presidential Election—Rhodes messaged the "Oath Keepers of Georgia" Signal group chat: "If [President Trump] doesn't use the Insurrection Act to keep a ChiCom puppet out of the White House, then we will have to fight a bloody revolution/ civil war to defeat the traitors." Gov. Exh. 4761 (Msg. 1.S.233.1513); ECF 117 at ¶11.[1] He continued, "And we are writing a letter to Trump on what he must do and why. I may publish it on our website too." *Id.* Ulrich responded, "God help you on this. We must win. We must defeat

---

[1] Subsequent references herein to transcripts and trial exhibits are all from the *Minuta* trial, unless otherwise stated.

these radicals… there's treason at work here. When someone committed treason it used to mean something. You used to pay with your life!" *Id.* Rhodes later messaged the Oath Keepers of Georgia chat:

> [A]t moment I have to try to get Trump the message on the necessity of him waging war on the enemy NOW while still President and Commander in Chief.   But once I finish that, I'm going to sit down and write out my thoughts on what we can and must do, across the country, to organize effectively and to wage it and win it ourselves if he doesn't.   Many, many hard learned lessons from the Founders that modern Americans need to remember (or learn for the first time).

*Id.* (Msg. 1.S.233.1598). Ulrich testified that he understood Rhodes to be talking about "civil war" and that he was prepared to participate in that battle. 01/10/23AM Tr. at 3838-39, 3926.

In late December, Rhodes began to focus his followers on January 6, 2021, and Congress' certificaiton of the election, as a time and place for action. On December 19, 2020, Ulrich booked a room with multiple beds at a hotel in Washington, D.C., for the events of January 6, and he encouraged other members of the Signal group chat to join him. ECF 117 at ¶11. The next day, Ulrich messaged the "Oath Keepers of Georgia" Signal group chat, "Trump acts now maybe a few hundred radicals die trying to burn down cities… Trump sits on his hands Biden wins… millions die resisting the death of the 1st and 2nd amendment." *Id.*

On December 23, 2020, Rhodes published another open letter on the Oath Keepers' website. ECF 117 at ¶16. Referencing the certification of the Electoral College vote scheduled to occur on January 6, 2021, Rhodes explained that "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C." *Id.* Rhodes warned that he and others may have to "take to arms in defense of our God given liberty." *Id.* That same day, another individual messaged the "Oath Keepers of Georgia" Signal group chat, "Man all patriot groups are fired up

right now debating on when the time is right." ECF 117 at ¶17. Ulrich responded, "The right time will be a Ruby ridge scenario that we can rally behind." *Id.*

On December 28, 2020, a Southeast regional Oath Keeper leader named Joshua James added Rhodes, and others to a Signal group chat that included Ulrich. ECF 117 at ¶18. James made Rhodes the administrator and changed the title of the Signal group chat to "DC OP: Jan 6 21." *Id.* The picture used for the group chat was a photograph of the Capitol. *Id.* Rhodes described DC OP: Jan 6 21 as "THE DC op thread for all leadership coming in, from multiple states, and together with the overall DC op leadership." Gov. Exh. 9514 (Msg. 1.S.159.108). Rhodes, Ulrich, and other co-conspirators used this Signal group chat and others to plan for January 6, 2021. *Id.* On the chat, the group coordinated plans for lodging and transportation and had extensive conversations about what weapons and gear they would bring, among other details. Gov. Exhs. 9514, 9557. They arranged for an armed "quick reaction force" to guard a cache of weapons just outside the District, that would ferry the weapons into the city when called by Rhodes. *See, e.g.,* Gov. Exh. 9514 (Msg.s 1.S.159.450, 524-26). The group's goal for January 6 was to "save the republic." ECF 117 at ¶21.

On January 4, 2021, Ulrich traveled with James and several other co-conspirators to the Washington, D.C., metropolitan area in two vehicles. ECF 117 at ¶24. Ulrich was in a separate one from James, but James and others in that vehicle brought multiple firearms, including semi-automatic handguns, a shotgun, and ammunition. *Id.* James stored the firearms at the Virginia hotel where he, Rhodes, Roberto Minuta, and others had rooms. *Id.* Ulrich stayed in the Mayflower Hotel in Washington, D.C., with other co-conspirators. *Id.*

On January 6, 2021, around 1:25 p.m., when it became clear that President Trump and Vice President Pence were not going to intercede to stop the Certification of the Electoral College vote,

and as a large crowd gathered on the Capitol grounds and converged on the building, Rhodes messaged the DC OP: Jan 6 21 chat: "Pence is doing nothing. As I predicted." Gov. Exh. 1500.2. At 1:38 p.m., Rhodes sent another message to the chat stating, "All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough." *Id.* In the context of all the messages Rhodes and his co-defendants had exchanged in the lead-up to January 6, those words were a call to action.

Indeed, on yet another encrypted, invitation-only group chat titled "Jan 5/6 DC Op Intel team," which included co-conspirators Rhodes, James, Roberto Minuta, and others, a participant posted a link to a video titled "live stream of patriots storming capital," and another participant asked, "Are they actually Patriots - not those who were going to go in disguise as Patriots and cause trouble[?]" Gov. Exh. 1500. Rhodes responded, "Actual Patriots.  Pissed off patriots[.] Like the Sons of Liberty were pissed off patriots[.]" *Id.* James responded, "We're coming to the Capitol ETA 30 MIN." *Id.* James, Minuta, and several co-conspirators (including Ulrich) then headed towards the Capitol. *Id.* Ulrich testified at trial that the group headed to the Capitol after James spoke to Rhodes on the phone. 01/10/23AM Tr. at 3852.

As Ulrich's group zipped around police barricades on a golf cart, Minuta "livestreamed" a video to Facebook in which he stated that the group was "headed to the Capitol" because "patriots storm[ed] the Capitol building." Gov. Exh. 1508. Members of the group, including Ulrich, were wearing protective vests and goggles. *Id.* Minuta described the situation as "f***ing war in the streets right now." *Id.* After the group parked their golf carts just outside the entrance to the Capitol grounds and Minuta told them, "Word is that they got in the building. Let's go." *Id.*

As the group crossed into the restricted area of the Capitol grounds and joined the mob

outside the Capitol, Ulrich and the other members of the group started marching hands-on-shoulder and maneuvered their way through the throngs from the west side to the east side of the Capitol. *Id.* At about 3:15 p.m., James, Minuta, and a third co-conspirator breached the Capitol through the East Rotunda doors. *Id.* Ulrich followed a few minutes later. *Id.* Ulrich did not proceed further into the building than the foyer just inside the East Rotunda Doors, however, because riot police started clearing the building a short while after Ulrich entered. *Id.* After Ulrich and his co-conspirators left the Capitol, they met up with Rhodes and other Oath Keepers members and affiliates just outside the Capitol. Gov. Exh. 1081.1A.

Ulrich testified that his actions on January 6 were directly linked to the implicit agreement he had entered into with Rhodes and other Oath Keeper members and affiliates to stop the lawful transfer of presidential power by any means necessary. Ulrich told the jury that while the group did not explicitly discuss plans to use force to stop the certification proceeding in advance of January 6, "there was a lot of talk about wanting something to take place, wanting—we wanted something to happen[,] [w]e wanted the ballots to be recounted," and "there was a lot of talk in the text chats leading up" to January 6 about "force with Civil War." 01/10/23AM Tr. at 3924. According to Ulrich, arriving at the steps of the Capitol on January was the culmination of this feeling. *Id.* at 3926. "Now that the people are in and out of the building now, it kind of felt like that moment was coming together for us to do something." *Id.* Ulrich admitted that he felt that he and the other members of his group were working together towards one common goal: "To stop the vote count." *Id.* at 3929.

## IV.    STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, Ulrich faces up

to 20 years of imprisonment on each count of conviction, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $200 for this offense.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background). The Guidelines apply to a "heartland of typical cases." *Koon v. United States*, 518 U.S. 81, 94-95 (1996). A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole. *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up).

### A.  Total Offense Level Calculation

The plea agreement calculated Ulrich's total offense level as 26, resulting in a Guidelines range of 63 to 78 months' imprisonment. ECF No. 116 at 3-5. However, between the time of the guilty plea and the filing of this sentencing memorandum, the D.C. Circuit decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024). *Brock* held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id*. at *8. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice," does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15.

9

This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes.

Accordingly, the modified Sentencing Guidelines analysis, post-*Brock*, is as follows:

### a. Base Offense Level and Grouping

For the reasons articulated in the Pre-Sentence Report ("PSR"), the same Guidelines apply to both Counts One and Two. There is no guideline provision expressly promulgated for seditious conspiracy. Under U.S.S.G. 2X5.1, where available, the Court should apply the most analogous offense guideline. The most analogous offense to seditious conspiracy is Treason, under U.S.S.G. 2M1.1. For this particular defendant, in this particular case, U.S.S.G. 2Ml.l(a)(2) applies, which further directs the Court to select the base offense level applicable to the most analogous offense applied to the defendant's specific conduct. In this case, "Obstruction of Justice" under U.S.S.G. 2J1.2 is the most analogous offense for this defendant's specific conduct. *See* ECF No. 888 at ¶38. This puts the base level for both counts at 14.

### b. Extensive Scope, Planning, and Preparation

The parties agreed under the terms of the plea agreement, ECF No. 116 at 3, that Ulrich's offense involved extensive scope, planning, and preparation, under U.S.S.G. § 2J1.2(b)(3)(C). As this Court found at the sentencing hearings for Ulrich's co-conspirators in *United States v. Rhodes, et al.*, No. 22-cr-15, and *United States v. Parker*, et al., No. 21-cr-28:

> Clearly there was extensive scope and planning for the events of January 6th. Even if we take the time period simply from December 19th forward, there's extensive scope and planning in terms of gathering people, making arrangements for transportation, hotel, bringing of weapons, and creating of groups to operate on that

> day. And then, of course, planning and preparation in terms of going into the building was exhibited by the way in which people entered in groups—that is planning and preparation, and shows organization.

5/25/23AM Tr. at 76. Indeed, the facts admitted by Ulrich in the statement of offense and amended statement of offense that he adopted as part of his plea, as well the evidence introduced in the related *Rhodes* and *Parker* trials, established that Ulrich participated in a conspiracy that was extensive in both its objective and size. A total of 25 individuals have been convicted for their roles in this conspiracy: seven defendants from the *Parker/Crowl* case, nine defendants in *Rhodes*, co-conspirators Jonathan Walden and Kellye SoRelle, who recently pled guilty, and seven cooperating co-conspirators. The conspiracy and its attendant conduct was protracted, lasting from December 2020 through January 2021. The members of the conspiracy, including Ulrich, communicated with each other using encrypted messaging applications, email servers, and meeting platforms. They also coordinated with one another to travel across the country from Arizona, Texas, Alabama, Georgia, Florida, Ohio, Indiana, North Carolina, Virginia, and elsewhere into the D.C. area. The presence of the armed QRF staged miles from the Capitol building at a hotel in Virginia, armed with firearms and other weapons collected from numerous persons, also shows the extensive scope of the offense. Finally, the scope of the conspiracy's objective was itself enormous: to forcibly prevent an entire branch of the federal government from performing its constitutional and statutory duties.

### c.  Obstruction/Destruction of Evidence

The PSR and parties correctly determined that this Court should apply Section 3C1.1's two-level enhancement for obstruction of justice. This enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice

with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. The commentary to the Guidelines includes a non-exhaustive list of some of the ways that a defendant can obstruct justice, including by deleting evidence or instructing others to do so, or attempting to do so. U.S.S.G. § 3C1.1, cmt. n. 4(D). Here, Ulrich admitted through his guilty plea that he removed certain incriminating evidence from the Signal chats after January 6, 2021, at the direction of co-conspirator James. ECF 117 at ¶50.

      d.  <u>Grouping</u>

Counts One and Two are grouped together into a single group under U.S.S.G. 3D1.2(c). Because Count 1, Seditious Conspiracy, and Count 2, Obstruction of an Official Proceeding, have the same offense level as calculated above for this particular defendant, that offense level constitutes the combined offense level for both counts.

      e.  <u>Terrorism</u>

As in the *Rhodes* and *Parker* sentencings, the Court should apply an upward adjustment because Ulrich committed offenses that were calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct. Ulrich was an active participant in the Oath Keepers' conspiracy to forcibly oppose the lawful transfer of power from Donald Trump to Joseph Biden.

Note 4 to Section 3A1.4 provides that an upward departure is "warranted" if the defendant's "offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt.

n.4(A). When it adopted Note 4, the Sentencing Commission explained that it is "an *encouraged, structured upward departure,*" the purpose of which is to provide courts with "a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis" and to "make[] it possible to impose punishment equal in severity to that which would have been imposed if the § 3A1.4 adjustment actually applied." Sentencing Guidelines, App. C, amend. 637 (2002) (emphasis added).

Ulrich's conduct was clearly "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4., cmt. n.4. A defendant's offense is so "calculated" if that offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force. *See, e.g., United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012). As this Court observed in sentencing the defendants in the related *Rhodes* matter, "[I]t is challenging to find that in a case where individuals were convicted of participating in a [] conspiracy to stop the lawful transfer of power after a United States Presidential election, that they plotted to use force in so doing—it is very hard to not see that as terrorism within the definition certainly at least Note 4. That is certainly conduct that is calculated or intended to result in the coercion and intimidation of the government in order to achieve some purpose." 5/25/23AM Tr. at 36.

So, too, with Defendant Ulrich. On January 6, he breached the Capitol as part of a conspiracy to use force to stop the lawful transfer of presidential power. Prior to and on January 6, he made statements and took actions that showed the object of this force was to influence or affect the conduct of the government by intimidation or coercion, and to retaliate against government conduct. He admitted, through his guilty plea, that he entered the Capitol with the goal

13

of disrupting the certification proceeding. ECF 117 at ¶5. Thus, like his co-conspirators in the *Rhodes* matter, Ulrich's conduct was calculated to influence or affect the actions of government through intimidation and coercion, and to retaliate against government conduct and thus, the Court should apply an upward departure under Note 4. Accordingly, applying the same framework the Court used for determining the appropriate sentencing ranges for the other co-conspirators, the governments seeks an upward departure of one level for Defendant Ulrich.

     f.   Acceptance of Responsibility

With respect to applicable downward adjustments to Ulrich's Sentencing Guidelines range, a 2-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1, because the defendant has clearly demonstrated his acceptance of responsibility, an additional 1-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1(b), because the defendant has assisted authorities by providing timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

     g.   "Zero-Point" Offender

The Court should not, however, apply U.S.S.G. § 4C1.1, the so-called "zero-point-offender downward adjustment" to this case. Recent amendments to the Sentencing Guidelines for 2023 added § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Under Section 4C1.1(a)(3), however, the adjustment should not be applied to defendants who use violence or credible threats of violence in connection with their offense. "In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of

the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction." *United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

Here, Ulrich's presence and conduct contributed to the continued interruption to Congressional proceedings; thus, the court should find that the defendant in fact impeded or disrupted the orderly conduct of Government business or official functions. While Ulrich did not personally engage in violence, he joined the mob that forced entry into the Capitol while personally armed with a knife, and thus participated in violence that should disqualify him from this adjustment. He also participated in a seditious conspiracy to oppose by force the lawful transfer of presidential power and brought his own firearms and ammunition to the D.C. area in support of this conspiracy. Due to the unique nature of the January 6 mob, the harms caused and posed by the seditious conspiracy Ulrich joined with Rhodes and others, and the significant need to deter future conspiracies from using force to seek to alter the results of elections, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, and the seditious conspiracy in which Ulrich participated, coupled with the overwhelming need to ensure future deterrence, despite a person's limited

criminal history.[2]

To avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

  h. Total Offense Level Before Departures

For the forgoing reasons, the Sentencing Guidelines' total offense level, is:

Count One and Count Two: 18 U.S.C. §§ 2384, 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3C1.1 | Obstruction (destroying documents) | +2 |
| U.S.S.G. § 3A1.4, n.4(A) | Terrorism | +1 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | **Total** | **16** |

In sum, based on this Sentencing Guidelines analysis, the defendant is at level 16 prior to any upward or downward departures.

**B. Upward Departures**

As this Court has observed in a related case, "§ 2J1.2 does not adequately account for the seriousness of convictions for seditious conspiracy" and related offenses, and it also "does not account for an unprecedented day like January 6." No. 22-cr-15, ECF No. 877. Chapter 5, Part K of the Guidelines "identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range," and suggests

---

[2] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

that "if any such circumstance is present in the case and has not adequately been taken into consideration in determining the applicable guideline range, a departure consistent with 18 U.S.C. § 3553(b) and the provisions of this subpart *may* be warranted." U.S.S.G. § 5K2.0(a)(2)(A). There are at least two such identified circumstances present here: disruption of a governmental function (Section 5K2.7), and the use or possession of weapons in the commission of the offenses (Section 5K2.6). The Court is not required, however, to depart upwards because of the presence of these factors. Rather, "Departures permit courts to impose an appropriate sentence in the exceptional case in which mechanical application of the guidelines would fail to achieve the statutory purposes and goals of sentencing." U.S.S.G. § 5K2.0, cmt. 5. For the reasons set forth in the application of the Section 3553(a) factors below, this case does not require an upward departure because, notwithstanding the grave nature of the offenses at issue here, the statutory purposes and goals of sentencing can be achieved in this case without applying an upward departure.

## C. Downward Departure

The government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure of five levels for the substantial assistance Ulrich has provided to law enforcement. The Guidelines provide that, "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. In determining the appropriate level of reduction to apply, the Court should consider the following factors:

> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

Here, the fourth and fifth factors clearly apply and can be quickly addressed. Shortly after his arrest, Ulrich indicated through counsel that he wanted to proffer with the government and accept responsibility. After proffering several times with the government, Ulrich pled guilty pursuant to a public cooperation plea agreement. In short, Ulrich's cooperation was timely. U.S.S.G. § 5K1.1(a)(5).

This cooperation was not without risks. To plead guilty pursuant to a public cooperation plea agreement in a case that has garnered such national interest and, sadly, controversy, took courage on Ulrich's part. While the government is not aware of any direct threats to Ulrich or his family, other individuals who cooperated publicly with the government in this investigation have received such threats. Thus, this court should give Ulrich credit for the danger and risk of injury to himself and to his family that resulted from his entry into a public cooperation plea agreement in this case. U.S.S.G. § 5K1.1(a)(4).

Ulrich's cooperation has also been truthful, complete, and reliable. Much of the information he provided has been corroborated by other witnesses and objective evidence such as messages, video, photographs, and other data recovered from his phone, from public source information and articles, and from the devices and accounts of others recovered by law

18

enforcement during this investigation. In other words, the second factor listed above also supports a finding of substantial assistance by Ulrich. U.S.S.G. § 5K1.1(a)(2).

With respect to the significance, usefulness, nature, and extent of Ulrich's assistance (the first and third factors), Ulrich's trial testimony was incredibly impactful. He was able to give context and meaning to scores of messages that he and his co-conspirators exchanged in the weeks between the election and the certification. He also explained, clearly and directly, the group's intent in breach the Capitol: "There's no other reason to go in that building at that point. There was – there's no other way to describe why you're going in a building where police are trying to get everyone back out." In Ulrich's words, it was clear in that moment that he and his co-conspirators were acting in concert to achieve a common goal: "to stop the count." In sum, Ulrich's cooperation has been incredibly significant, useful, and extensive. U.S.S.G. § 5K1.1(a)(1), (3).

Taking all of these factors into account, a five-level downward departure would reduce Ulrich's adjusted offense level by about 54 percent from the government's estimated final adjusted offense level of 16, which he would have faced absent his cooperation in this matter. The government submits that such a reduction appropriately reflects the principles outlined above that this Court should consider in assessing the level of assistance Ulrich provided to law enforcement.

### D.    Sentencing Guidelines Recommendation

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR, ECF No. 888 at ¶43. And the defendant's total adjusted offense level, should the Court apply departures under Chapter 5 as proposed above, would be level 11. At that level and criminal history category, the recommended Sentencing Guidelines ranges would be 8-14 months of incarceration. For the reasons discussed above and below, the government submits that

a sentence of eight months of home confinement, followed by a lengthy period of probation with requirements of community service and restitution, would appropriately reflect the nature of these offenses, the need for deterrence, the defendant's history and characteristics (including his cooperation in this matter), and the other factors this Court must consider at sentencing.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the government's recommended sentence.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Ulrich's conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Perhaps even more alarmingly, these actions were not spontaneous for Ulrich and his co-conspirators—they were in furtherance of a seditious conspiracy hatched weeks earlier to take any means necessary, up to and including the use of force, to stop the lawful transfer of power from Donald Trump to Joseph Biden. Ulrich came to D.C. understanding the potential for, and in many ways hoping to participate in, a forcible interruption of the certification of the election. He wanted to fight and brought weapons to support the effort. And he ultimately joined the violent mob that breached the Capitol in furtherance of this conspiracy. The nature and circumstances of Ulrich's offense were of the utmost seriousness, and fully support the government's recommended sentence.

### B.  The History and Characteristics of the Defendant

At the time of this offense, Ulrich was gainfully employed. He had no criminal history. In

other words, the defendant's crimes on January 6 were an isolated incident in an otherwise law-abiding life, although that fact also suggests Ulrich should have known better and makes his conduct on January 6 hard to comprehend.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports home confinement followed by a significant period of probation. Ulrich's criminal conduct on January 6 was the epitome of disrespect for the law. At the same time, Ulrich has fully accepted responsibility for this offense. Such complete and public acceptance of responsibility, to such serious charges, helps to promote respect for the law, as would a sentence that takes into account the steps Ulrich has taken to cooperate with this investigation and to make amends for his offenses.

### D.    The Need for the Sentence to Afford Adequate Deterrence

A sentence of eight months of home confinement, followed by a lengthy period of probation with requirements such as community service and restitution, is appropriate in this case "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] At the same time, early and public acceptance of responsibility, coupled with cooperation with law enforcement, is something that should be recognized, to encourage others to take similar responsibility for their conduct on January 6. For these reasons, a five-level or 54 percent reduction from the Guidelines range Ulrich would have otherwise faced, which still results in a significant sentence of incarceration, achieves the goal of general deterrence.

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

The government is recommending a Guidelines-compliant sentence, should the Court apply the government's recommended departure for substantial assistance to law enforcement. Under U.S.S.G. § 5C1.1(c)(3), because level 11 is in Zone B of the Guidelines, the Court may satisfy the minimum term of imprisonment in this range by imposing "a sentence of probation that includes a condition or combination of conditions that substitute . . . home detention for imprisonment according to the schedule in subsection (e)," which suggests "one level of home detention for one day of imprisonment," U.S.S.G. § 5C1.1(e)(3). In other words, a sentence of probation with a period of eight months of home detention would be a Guidelines-compliant sentence at level 11.

F.     **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). The government's recommended sentence does not create unwarranted disparities when one considers the nature of Ulrich's conduct, coupled with the fact that he accepted responsibility at the earliest possible time to very serious charges and provided substantial assistance to law enforcement.[4]

This recommended sentence would also treat Ulrich comparably to the cooperating defendants in related cases who have been sentenced. To date, three cooperating defendants have been sentenced. All three were sentenced to terms of probation. Ulrich is most similarly situated to Caleb Berry, who pled guilty to conspiracy to obstruct Congress and obstruction of an official proceeding. Because Ulrich pled guilty to the more serious offense of seditious conspiracy (with the government's accompanying request for a terrorism departure) and did not receive a minor role adjustment, his recommended Guidelines range is higher, which is why the government is asking for a period of home confinement in this case, rather than straight probation.

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Here, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Ulrich must pay $2,000 in restitution.[6] ECF 116 at 10. As the Presentence Report reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023.

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

ECF No. 888 at 21 n.2. For the reasons outlined in greater detail in the restitution brief submitted in the related *Rhodes* matter, *see* Case No. 22-cr-15, ECF No. 654, which the government incorporates by reference, the government submits that $2,000 represents an appropriate and proportional amount of restitution for Defendant Ulrich to pay.

## VIII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of three years of probation, with the first eight months to be served on home confinement, with the special conditions that the defendant perform 120 hours of community service and pay $2,000 in restitution and the mandatory $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    _____
Kathryn L. Rakoczy
D.C. Bar No. 994-559
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
(202) 252-6928
Kathryn.Rakoczy@usdoj.gov