# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 22-cr-15-APM** |
| **V.** | ) | |
| | ) | |
| **BRIAN ULRICH,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## SENTENCING MEMORANDUM

COMES NOW BRIAN ULRICH, Defendant herein, by and through his attorney of record, and provides the Court with this Sentencing Memorandum. For reasons set forth more fully below, the undersigned joins substantially with the Government and recommends that this Honorable Court impose the following sentence on Mr. Ulrich: to serve three years of supervised probation; to complete 120 hours of community service; and to pay $2,000 in restitution[1] and the mandatory $200 special assessment. The only difference between the Government's recommendation and the undersigned's request is the Government's additional suggestion that the first eight months of Mr. Ulrich's probation be served on home confinement. The undersigned respectfully suggests that home confinement is

---

[1] Mr. Ulrich has already paid the $2,000 restitution in accordance with the Order for Pre-Sentence Payment (Doc. 900).

unnecessary given Mr. Ulrich's comportment during the pendency of this case. After being arrested on August 9, 2021, Mr. Ulrich was released on August 11, 2021, on a $25,000 unsecured bond. (PSR, ¶46).  During that time, he was afforded the opportunity to travel for work and directed not to have any contact with co-defendants or the Oath Keepers organization (PSR, ¶48).  He has had no violations and is in full compliance with the conditions of his pretrial release. (PSR, ¶50).

In the event the Court chooses to impose a period of home confinement, the undersigned asks that Mr. Ulrich be permitted leave for work, medical appointments, and religious services.  Such a sentence would be "sufficient, but not greater than necessary" to fulfill the congressionally established goals of sentencing. 18 U.S.C. § 3553(a).

The purpose of this Memorandum is to provide additional information about this case relevant to the Court's sentencing decision, to present additional relevant information to the Court about Mr. Ulrich himself, and to make specific recommendations regarding the sentence to be imposed.

# I. <u>Determining a Sentence Generally After Booker</u>

Section 3553(a) has been described in <u>U.S. v. Booker,</u> 543 U.S. 220 (2005), and much post-<u>Booker</u> case law as containing various "factors"—one of which is

the United States Sentencing Guidelines and the guideline range calculated pursuant to them—which must now be considered in determining an appropriate sentence. Section 3553(a) is actually comprised of two distinct parts: the so-called "sentencing mandate" contained in the prefatory clause of § 3553(a), and the "factors" to be considered in fulfilling that mandate.  The sentencing mandate is an overriding principle that limits the sentence a court may impose.

## A. The § 3553(a) Sentencing Mandate: The "Parsimony Provision"

The basic mandate and overriding principle of § 3553(a) requires a district court to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in § 3553:

    (a) retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");

    (b) deterrence;

    (c) incapacitation (to protect the public from further crimes); and

    (d) rehabilitation (to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner). 18 U.S.C. § 3553(a)(2).

The "sufficient-but-not-greater-than-necessary" requirement has been described as the "parsimony provision." Bifulco v. United States, 447 U.S. 381, 387

(1980) (explaining that statutory construction "rule of lenity" applies to sentencing statutes as well as to substantive criminal offense statutes).

The parsimony provision is not just another "factor" to be considered along with the others set forth in § 3553(a).  Rather, the provision sets an independent upper limit on the sentence a court may impose.

**B.   The § 3553(a) Factors to be Considered in Complying with the Sentencing Mandate**

In determining what sentence is sufficient but not greater than necessary to comply with the § 3553(a)(2) purposes of sentencing, a court must consider several factors listed in § 3553(a).  Those factors are (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the kinds of sentence available;" (3) the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range; (4) the need to avoid unwarranted sentencing disparity; and (5) the need to provide restitution where applicable. 18 U.S.C. § 3553(a)(1), (a)(3), (a)(5)-(7).  Neither the statute itself, nor Booker suggests that any one of these factors is to be given greater weight than any other factor.  However, what is clear is that all of these factors are subservient to § 3553(a)'s mandate to impose a sentence not greater than necessary to comply with the four purposes of sentencing.

Once the court correctly calculates the advisory sentencing range, "it may impose a more severe or more lenient sentence as long as it is reasonable." <u>United States v. Pope,</u> 461 F.3 1331, 1336-37 (11th Cir. 2006).

The effect of the Sentencing Guidelines was further limited in <u>Rita v. United States,</u> 551 U.S. 338, 350-351 (2007), when the Supreme Court held that a court of appeals may apply a presumption of reasonableness to a district court sentence imposed within a properly calculated guideline range. Critically, however, the Court said that such a presumption does not apply in the district court. Therefore, a defendant may argue for a non-Guidelines sentence (1) on the basis of traditional departure grounds, (2) "because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations," or (3) "because a case warrants a different sentence regardless." <u>Id.</u> at 351. "In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." <u>Id.</u>

### C. Application of the Factors to the Case

1. <u>Nature and Circumstances of the Offense.</u> Mr. Ulrich's actions on January 6, 2021, were described in extensive detail in the Presentence Report ("PSR") (Doc. 888, PSR, ¶¶51-101), the Government's Sentencing Memorandum (Doc. 907, pp. 3-

8), and the Statement of Offense (Doc. 117), so there is no need to repeat them in detail here.  However, it is important to highlight some of the facts of the offense to differentiate Mr. Ulrich's conduct from that of his co-defendants, as well as other participants that breached the Capitol on January 6, so that an appropriate sentence may be fashioned by the Court.

### a. "Mistake" v. Series of Choices

First, Mr. Ulrich does not characterize his participation in the events of January 6 as merely a "mistake," which would diminish the gravity and wrongfulness of his offense.  Rather, Mr. Ulrich admits—and therefore must confront the fact—that he made a series of bad choices that led him to this legal reckoning.  Beginning after the election of 2020, in late November, Mr. Ulrich joined the "Oath Keepers of Georgia" group chat on the application called "Signal." (Doc. 117, ¶¶6-7).  He began responding to and making hyperbolic posts online, fanning the flames of discord and violence regarding the transfer of presidential power to Joseph R. Biden. (Doc. 117, ¶¶8, 10-11)  Mr. Ulrich chose to travel to Washington, D.C., for the certification of the Electoral College vote on January 6 and purchased items in preparation for that trip, including the following: fingerless gloves, a long sleeve shirt, a recon backpack, a tactical holster, a reinforced web duty belt, and two-

way radio transceivers. (Doc. 117, ¶9, 11).  On December 31, 2020, Mr. Ulrich posted a message in a Signal group chat that he was planning on bringing "a backpack for regular use and then a separate backpack with my ammo" and that he would "be the guy running around with the 'budget AR.'" (Doc. 117, ¶22). Thankfully, and of great importance to these proceedings, Mr. Ulrich had a subsequent conversation with a co-defendant and declared that he would <u>not</u> bring firearms on his trip to Washington. (Doc. 117, ¶23).  He <u>did</u> <u>not</u> bring firearms or ammunition to Washington.

b.  <u>Conduct on January 6 – What was Done and Not Done</u>

Second, it is important to keep in mind Mr. Ulrich's personal conduct on January 6—what he *did* and what he *did not* do.  Mr. Ulrich did travel to and enter the Capitol intending to "influence or affect the conduct of the United States government" with the goal of impeding an official proceeding of the United States, namely the certification of the 2020 presidential election. (PSR, ¶93; Doc. 117, ¶¶42-43).  He acknowledges and takes responsibility for doing so.  However, Mr. Ulrich did not plot in advance to go to the Capitol on January 6.  Once there, Mr. Ulrich did not personally tear down any barriers, break any windows or doors, or damage any structures or property inside.  He entered the Capitol through the East Rotunda Doors

7 of 21

at 3:22 p.m. and penetrated no further than the lobby area. (PSR, ¶91). He exited the Capitol approximately 15 minutes later, after instructed to leave by Capitol Police.

Of great relevance to these proceedings, Mr. Ulrich did not assault nor threaten to assault any member of law enforcement on January 6. In fact, after exiting the Capitol, Mr. Ulrich joined with some other individuals to help members of the Capitol Police move through a crowd of rioters. He can be seen in multiple videos wearing his black hat with yellow lettering and face covering. He helps to clear a path with his outstretched arms so the officers can move unmolested through the crowd. (Video 1, 01:04-01:15; Video 2, 00:10-00:14, 00:31-00:43). At no time did Mr. Ulrich berate or assault any law enforcement officer on January 6.

After the events at the Capitol, Mr. Ulrich severed contact with the Oath Keepers and ceased making incendiary online posts. During the pendency of this prosecution, Mr. Ulrich has refused multiple interview requests and has strictly avoided making any public comments about the charges against him. He is embarrassed at what his actions have caused his country, his family, and his person.

   2. <u>History and characteristics of the Defendant</u>

Mr. Ulrich is 46 years old. He was born in Toledo, Ohio, but grew up in Tucson, Arizona. (PSR, ¶187). While growing up, there was a history of physical abuse and coldness from Mr. Ulrich's father, but his older brother, Theodore, bore the brunt of it. (PSR, ¶189). After his parents divorced when he was 11, Mr. Ulrich's mother eventually remarried. (PSR, ¶190). After getting into trouble for vandalism as a teenager, Mr. Ulrich was sent to live with his father, but he ran away from his home after one year. (PSR, ¶193). From that time forward, Mr. Ulrich was essentially on his own. (PSR, ¶193).

Following his graduation from high school in 1996, Mr. Ulrich has always been a hard worker. After early jobs at Burger King and Jani-King from 1996-98, he began working in the industry where he would find the most success—aircraft paint and sales. (PSR, ¶211-213). From 1998-2004, Mr. Ulrich worked as an aircraft painter at Bombardier Learjet in Tucson, Arizona. (PSR, ¶213). He excelled in this career path, working his way up to assistant and paint team leader at various aircraft companies in Arizona and Kansas. (PSR, ¶213-218). In 2013, he became a technical service representative for PPG Paints in Wichita, Kansas, and in 2016, he became a paint technical consultant for AkzoNobel in Guyton, Georgia. (PSR, ¶219-220). He unfortunately lost his job with AkzoNobel after pleading guilty in this case on or

about May 1, 2022; at the time he was dismissed, he was making a yearly salary of $100,000. (PSR, ¶220, 222). For a person lacking any formal education beyond high school, nor any extensive technical training, Mr. Ulrich's success is a direct reflection of his hard work and dedication to his career.

Mr. Ulrich married his wife Maria on May 4, 1998. She is 47 years old and is a homemaker. She receives disability payments for post-traumatic stress and bipolar disorders. (PSR, ¶196). They have four children together: Gowen, 25; Conall, 23; Anyon, 21; and Arowyn, 14. (PSR, ¶196). By all accounts, the Ulrichs are an incredibly close family and all reside at the family residence in Guyton, Georgia. (PSR, ¶197).

 



Mr. Ulrich's oldest son, Gowen, talks about how he did not always appreciate the sacrifices that his father made for the family growing up, but how he now recognizes the "amount of effort he put into the family." (Gowen Letter).

When my brothers and I were kids, my dad would come home from work and read from the bible to us at the dinner table. He taught us the importance of good morals and treating others with respect. On the weekends he would take us fishing or take us to the paintball field. My dad spent his time at home with us, making us his priority. When we played football, he became an assistant coach because the team needed one. One year there were more kids than coaches so he signed up to be a coach so my younger brothers would have a team to play on. My Dad doesn't even watch football, he wanted to be a part of our lives and make great memories with us.

Id.

United States v. Brian Ulrich
Case No.: 22-cr-15-APM
Sentencing Memorandum

After Mr. Ulrich's plea and the loss of his job, Gowen received a call from his father asking him for help. "I switched jobs and moved back home to help out family. It hasn't been easy switching careers . . . [but] I did it because I know my parents would do the same for me." Id.  "My parents now rely on us for transportation as they no longer own a car and can't afford to buy one.  We continue to provide financial help to pay for groceries, bills and even clothes for our sister." Id.  During this difficult season, Gowen has witnessed firsthand his father's regret.

> I know that my dad feels great remorse for his actions. He has expressed his sadness and pain to each of us for what we are having to endure because of something he did. He has commented several times that when he was my age, he was already married to my mom with a house raising me and my two brothers then apologizes that we are still at home because of him.

Id.

Having to rely on his adult children for their financial and emotional assistance would be a humbling burden for anyone, but it is made even more crushing for a person who has provided so reliably for his family's needs for over two decades.

12 of 21

United States v. Brian Ulrich
Case No.: 22-cr-15-APM
Sentencing Memorandum

 

Mr. Ulrich's wife of 26 years, Maria, describes in her letter her bouts with depression and bipolar disorder, which led to "self-medicating with drugs and alcohol" and a path of "self-destruction." (Maria Letter). She explains how, after "having been taken advantage of by men in the worst ways, it's a miracle Brian was brought into my life." Id. According to Maria, her medications unfortunately stopped working and she slid into a deep depression that lasted four years, and "dozens and dozens of doctor visits brought no relief." Id.

> There were times I couldn't function at all; I was a black hole. Leaving home could trigger panic attacks or such anxiety that I couldn't even walk outside. In some instances, my kids would call Brian while I was having a panic attack and

United States v. Brian Ulrich
Case No.: 22-cr-15-APM
Sentencing Memorandum

he would have to calm me down over the phone. His voice has always brought me back from these episodes.

Id.

Even though Mr. Ulrich has been her unshakeable rock during their marriage and her depression, Maria has seen her husband deal with the weight of this case over the last three years. She has witnessed the profound feelings of remorse that Mr. Ulrich has expressed throughout the pendency of this case. "Brian has apologized so many times to me and my children for his actions and the struggles we now face." Id. Again, Mr. Ulrich has been humbled and punished during this time.

3. The kinds of sentence available and the Guidelines Recommendation

The U.S. Probation Office calculated Mr. Ulrich's Criminal History as a Category I, and the Government does not dispute that calculation. (PSR, ¶43; Doc. 907, p. 19). Probation further calculated Mr. Ulrich's Total Offense Level to be 15. (PSR, ¶¶169-168). The Government asks for an additional one-level enhancement for Terrorism pursuant to U.S.S.G. § 3A1.4, n.4(A), making Mr. Ulrich's Total Offense Level 16. (Doc. 907, p. 16).

The Government also moves for a downward departure pursuant to U.S.S.G. § 5K1.1 of five levels because of the substantial assistance provided by Mr. Ulrich

14 of 21

to law enforcement. (Doc. 907, pp. 17-18). A five-level decrease would reduce Mr. Ulrich's final offense level, according to the Government's calculations, to 11. (Doc. 907, pp. 19-20). An offense level of 11 at a criminal history category of I would result in a sentencing range of 8-14 months of incarceration. For this reason, the Government recommends a sentence of eight months of home confinement, followed by a period of probation and community service. (Doc. 907, pp. 19-20). The undersigned generally agrees with the proposed sentence of the Government; however, also asks that a period of home confinement not be imposed. In the event home confinement is adjudged by the Court, the undersigned asks that Mr. Ulrich have leave for purposes of employment, medical appointments, and religious activities.

    4. <u>The need to avoid sentencing disparities</u>

As the Government correctly noted, Section 3553(a)(6) directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The recommended sentence in this case treats Mr. Ulrich similarly to other cooperating witnesses, all of which have been sentenced to terms of probation. (Doc. 907, p. 18). As the Government further points out, Mr. Ulrich's case is most

analogous to Caleb Berry, who pled guilty to conspiracy to obstruct Congress and obstruction of an official proceeding and was sentenced to probation. Id.  Because Mr. Ulrich pled to the more serious charge of seditious conspiracy, his guideline range is slightly higher, but not so much as to warrant significantly disparate treatment from Mr. Berry.

## II.  Specific Case-Related Factors that the Court Should Consider When Fashioning a Reasonable Sentence

### A. The Defendant's Acceptance of Responsibility and Cooperation Benefited the Government

Earlier in this Sentencing Memorandum, the undersigned explained that Mr. Ulrich's actions on January 6 were not merely a "mistake," but were rather the culmination of a series of very bad choices.  That said, since that fateful day in January, Mr. Ulrich has made a series of very good choices.  He ceased having any contact with the Oath Keepers and other extremist groups.  He eschewed publicity and gave no interviews, nor commented in any way on the prosecution of January 6 cases.  He participated in two video debriefings with the Government in October 2021, followed by a face-to-face meeting in March 2022.  He entered into plea negotiations with the Government, culminating with a signed agreement in April

2022 (Doc. 116).  Those sessions were long and sometimes painful; Mr. Ulrich had to confront the reality of his misconduct.

Following his plea, Mr. Ulrich continued to cooperate with the Government, including four meetings in September 2022, one of which was in-person witness preparation in Washington.  He traveled to the District again in October 2022 for possible use as a testifying witness in the first Oath Keeper trial, although the Government ultimately decided not to have Mr. Ulrich testify in that proceeding.  In January 2023, Mr. Ulrich again returned to Washington, this time to testify in the second Oath Keeper trial, which he did.

As the Government describes in its sentencing memorandum,

> "Ulrich's cooperation has also been truthful, complete, and reliable.  Much of the information he provided has been corroborated by other witnesses and objective evidence such as messages, video, photographs, and other data recovered from his phone, from public source information and articles, and from the devices and accounts of others recovered by law enforcement during this investigation.
>
> (Doc. 907, pp. 18-19).

The Government defined Mr. Ulrich's assistance, particularly his trial testimony as "incredibly impactful." Id.  He gave "context and meaning" to the treasure trove of messages exchanged among the co-conspirators in the weeks leading up to January 6.  Mr. Ulrich's testimony also helped to flesh out the group's

United States v. Brian Ulrich
Case No.: 22-cr-15-APM
Sentencing Memorandum

intent on entering the Capitol, to achieve one common goal: "to stop the count." As the Government concluded, Mr. Ulrich's cooperation "has been incredibly significant, useful, and extensive." (Doc. 907, p. 19).

**B. Statements Supporting Mr. Ulrich**

In addition to letters from his wife and son, Mr. Ulrich also includes letters of support form his brother, a colleague, and a former employer. His brother Theodore describes Mr. Ulrich as a man he respects, who "worked ridiculous hours to provide a comfortable home for his wife and four kids . . . the type of guy that would bend over backwards for his faith, his community, and his country." (Theodore Letter).

A former co-worker, Theodore Wiesner, recalls Mr. Ulrich as intelligent and creative, "conscientious in his approach to every project he undertakes." (Wiesner Letter). Not only does Mr. Wiesner "deeply value" his friendship with Mr. Ulrich, he goes on to say that, "without reservation . . . if I were to put together a 'short-list' of people to whom I would entrust the care of my family, Brian's name would certainly be part of that list." Id.

Kevin Peterson, Sales Manager at AkzoNobel, has known Mr. Ulrich for eight years and explains how his industry knowledge of paints and coatings "allowed our company to grow our service side of the business significantly." (Peterson Letter).

He explains that customers could always count on Mr. Ulrich's support. According to their internal review process, which ranks employees from 0-5, with 5 being someone "who walks on water," Mr. Ulrich received two 4's and two 5's. Id. "These ratings are tied to many attributes/behaviors which include integrity, and we hold this one very high." Id. Mr. Peterson concludes his letter by saying, "Brian is and always will be a part of my family and believe he is a better man than myself." Id.

## III.  Conclusion

Mr. Ulrich has made a series of lawful and correct choices since January 6, 2021. Not only has he accepted responsibility for his actions on that date, but he has fully cooperated with law enforcement in the investigation and prosecution of similar cases. His history shows that he has been a law-abiding individual throughout his life, a person who provided for his family and worked hard to realize his portion of the American Dream. There is no chance that Mr. Ulrich will ever pose a threat to the Republic again.

With a humble heart and recognition of the seriousness of these offenses, the undersigned respectfully requests that this Honorbale Court sentence Mr. Ulrich along the lines of the Government's recommended sentence: three years of probation; 120 hours of community service; and payment of a $2,000 restitution and

$200 mandatory special assessment (which amounts have been paid).  Although we ask the Court to avoid a sentence including home confinement, if such a sentence is imposed, we join with the Government's request that exceptions be made for work, medical appointments, and religious activities.

This 8th day of November, 2024.

Respectfully submitted,

BALBO & GREGG
ATTORNEYS AT LAW, P.C.


/s A. J. Balbo
A. J. Balbo, Esq.
Georgia Bar No.142606

438 West General Screven Way, Ste. A
Hinesville, Georgia  31313
(912) 459-1776 – Telephone
aj@balbogregg.com


Encls.

A – Video, Ulrich Police 1
B – Video, Ulrich Police 2
C – Gowen Letter
D – Maria Letter
E – Theodore Letter
F – Wiesner Letter
G – Peterson Letter

United States v. Brian Ulrich
Case No.: 22-cr-15-APM
Sentencing Memorandum

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served all the parties in this case with a copy of this Sentencing Memorandum in accordance with the directives of the Court Notice of Electronic Filing ("NEF"), which was generated as a result of electronic filing.

This <u>8th</u> day of <u>November,</u> <u>2024</u>.

Respectfully submitted,

BALBO & GREGG
ATTORNEYS AT LAW, P.C.

<u>/s A. J. Balbo</u>
A. J. Balbo, Esq.
Georgia Bar No.142606

438 West General Screven Way, Ste. A
Hinesville, Georgia  31313
(912) 459-1776 – Telephone
aj@balbogregg.com

<u>United States v. Brian Ulrich</u>
Case No.: 22-cr-15-APM
Sentencing Memorandum