**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 1:22-cr-00015-APM** |
| **JOSHUA JAMES** | : | |

**DEFENDANT'S REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

COMES NOW the defendant Joshua James, by and through undersigned counsel, and respectfully provides the following reply to the Government's Sentencing Position papers (Doc. 918).

### I. Post January 6, 2021 Conduct

In its sentencing memorandum, the government discusses at length post-January 6 interactions that Mr. James had with co-conspirators Rhodes and Sorelle in Texas. (Doc. 918, pp. 10-21). Two important points bear mentioning on this topic. *First*, most of the information about this trip that the government now recounts in its memo against Mr. James came from Mr. James himself, during the course of his cooperation with the government. As this Court is aware, typically when a criminal defendant provides the government with new information in the course of a proffer session, that information is not used against the defendant. The rationale being that the government should incentivize rather than penalize a criminal defendant for accepting responsibility for his offense and bringing to light previously unknown information that assists the government's ongoing investigation.

In this case, Mr. James voluntarily submitted to multiple proffer sessions in furtherance of, but prior to, reaching a formal plea agreement with the government. During those months, the government repeatedly lead Mr. James and the defense team to believe that a plea offer would be extended to one or more felony charge(s) such as obstruction of an official proceeding and conspiracy to obstruct an official proceeding, thereby avoiding future charging documents containing more serious charges (i.e. seditious conspiracy). That expectation was unexpectedly dashed when the government extended the formal plea offer, which called for James to plead guilty to the as-yet unindicted charge of seditious conspiracy. Further, the plea agreement included inculpatory content about Mr. James's post-January 6 conduct that the government obtained from Mr. James's own proffer sessions. Upon learning this, Mr. James could have chosen to reject the plea agreement and end his cooperation with the government. Such a decision would not have been entirely unjustified, given the circumstances and given the devastating consequences that a guilty plea to seditious conspiracy would entail. To his credit, that is not the route he chose despite considerable cost to himself and his family.

*Second*, the government's account omits certain exculpatory information regarding this time frame. For example, the government references an incident in Texas where Mr. Rhodes handed a firearm to James and told James that he (Rhodes) would not be taken by law enforcement without a fight. The government learned about this incident from Mr. James during a proffer session. In the proffer session, James was discussing how *Rhodes's* behavior in Texas became more extreme and caused James to grow increasingly uncomfortable, ultimately prompting James to leave Texas.[1] James cited this incident as an example of behavior that

---

[1] Another example cited by James of Rhodes' extreme behavior that made him feel uncomfortable was the lavish spending spree that Rhodes embarked upon at a tactical store in Texas.

alarmed him. What the government fails to mention is that James also emphatically stated that he was unwilling to go to those lengths to protect Rhodes. Electronic communications between James and Sorelle further corroborate that Rhodes's behavior was making James nervous and that James was concerned Rhodes was becoming "neurotic" and "a loose cannon."

The government references that when James left Texas, he brought with him, at Rhodes instruction, some of Rhodes's gear, including: "multiple firearms, thousands of rounds of ammunition, multiple burner phones, scopes, magazines, night-vision equipment, and other tactical gear." That description, while technically accurate, creates the misleading impression of a larger supply of gear than actually existed. What Rhodes actually gave Mr. James to take home to Alabama was two complete firearms, two upper receivers, roughly 2,000 rounds of ammunition, various firearm accessories including one digital/nightcamera sight, 2-3 cell phones, sparse medical supplies (3 bandages and a tourniquet), a case of water and 2 boxes of granola bars.

Another point the government overlooks, which James discussed in proffer sessions, is that almost immediately after leaving Texas, James traveled to Fultondale, Alabama to assist with humanitarian relief efforts there following a January 25, 2021 tornado that devastated the area.[2] On February 2, 2021, James's wife posted about James's involvement in those relief efforts on her social media page, along with photos:

> "My husband and his fellow Vets/Retired Police have gathered supplies to deliver to
> Fultondale and surrounding areas affected by the recent tornadoes.
> They have met up with the wonderful heroes of the local law enforcement, etc, of
> Fultondale to do what they can during this difficult time.

---

[2] In the Statement of offense, Mr. James estimated, but could not recall precisely, that he left Texas in early February, 2021. Now, having the date of the Fultondale tornado as added context, it appears likely that he left Texas sometime between January 26, 2021 and early February 2, 2021.

If you want to donate supplies, let me know. I have direct sources on the ground who can meet you. Thank you!"





In sum, Mr. James relayed to the government in proffer sessions that he accompanied Mr. Rhodes and Ms. Sorelle to Texas primarily to serve as security detail for the two. While in Texas

with Rhodes and Sorelle, James witnessed Rhodes' behavior become more extreme and erratic. James grew increasingly weary of Rhodes's behavior and eventually left of his own accord in or around late January / early February, putting his services to better use by assisting with disaster relief efforts in Fultondale, Alabama.

**II. Upward Departure 3A1.4, Note 4.**

Despite the government's failure to raise this objection to the PSR, the government now argues for the Court to impose a three point upward departure under USSG § 3A1.4, note 4. In addition to being untimely, the government's request is excessive. If the Court is inclined to overlook the untimely nature of the objection, the Court should impose an adjustment no greater than the one point that codefendants Minuta and Ulrich received.

The government suggests that Mr. James should be treated similarly to Kelly Meggs. In terms of comparison, Mr. Meggs — who had been with the organization for years — was head of the Florida state chapter of the Oathkeepers. By Mr. James's estimate, Florida had well over one hundred members, compared to the Alabama chapter which had roughly a handful. Meggs even facilitated and organized firearm training for his members. Meggs also regularly lead private security detail teams for the organization, whereas James had never lead such a team prior to January 5-6. In fact, James was not originally selected to lead the Stone security detail on January 5-6. He got the job only days before.

On January 6, Mr. Meggs lead 14 conspirators to breach the Capitol. Once inside, Meggs then lead some of those conspirators on a mission to search for Nancy Pelosi. Mr. James, in contrast, was not part of any mission to search for members of Congress. He brought members of his private security detail team to the Capitol grounds late in the afternoon, only after being

directed to do so by Mr. Green (who was not convicted of being a conspirator). James entered the

building with two Oathkeepers; Minuta and Walden. Minutes later Ulrich and Grods followed

but they remained inside only briefly, never making it past the front lobby area, before exiting.

Similarly, Walden (who was not charged with being a conspirator and convicted only of

misdemeanor offenses) remained inside the front lobby for only a brief period of time before

exiting. James and Minuta entered together and exited around the same time. Finally, while

James did have a brief physical encounter with police, which fortunately did not result in

physical injury to any officer, James's outburst was largely the byproduct of James's untreated

PTSD and related mental health symptoms rather than a premeditated plan to further the

conspiracy.

Finally, it is significant that unlike Meggs, whom the government has described as  "the

boots-on-the-ground's liaison with the QRF,"[3] James did not coordinate with nor deposit

weapons at the QRF in Balston where individuals were present and arguably prepared to bring

weapons into the city if necessary. Nor did any member of James's security detail team deposit

weapons with the QRF. Instead, on the morning of January 6, when James drove into

Washington, D.C. from his hotel room in Vienna he left his firearm (along with 2-3 firearms

belonging to Grods's and one other individual) locked inside his hotel room. James and Minuta

were the only two occupants of that room, making it clear that no member of any QRF would be

able to access those weapons that day.

---

[3] *See* 1/3/23PM Tr. at 2561 (Berry testimony).

Finally, unlike James, Meggs also coordinated directly with the leader of the Proud Boys in the weeks leading up to January 6 and he was far more vocal and prolific on the various chat threads than James.

WHEREFORE, Mr. James respectfully submits that a sentence of no more than three months incarceration, with credit for time served, followed by three years of supervised release is sufficient but not greater than necessary to achieve the goals of sentencing enumerated in 18 U.S.C. § 3553(a).

Respectfully submitted,
Joshua James
By Counsel


_____/s/_____

Joan C. Robin
Virginia Bar No. 44502
Law Office of Joni C. Robin, PLLC
421 King Street, Suite 505
Alexandria, Virginia 22314
Ph: 703-349-1111
Fax: 571-279-6851
joni@jonirobinlaw.com


_____/s/_____

Christopher Leibig, Esq.
Virginia Bar No. 40594
Counsel for Defendant
421 King Street, Suite 505
Alexandria, Virginia 22314
(703) 683 4310
chris@chrisleibiglaw.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 17th day of December, 2024, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this matter.

                             _____/s/_____
                                   Joni Robin