```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2                             ---
    UNITED STATES OF AMERICA,    )
 3                               )
                                 )
 4        Plaintiff,             )   CRIMINAL NO. 21-52-2
                                 )
 5   v.                          )
                                 )   October 23, 2024
 6   WILLIAM JOSEPH PEPE,        )
                                 )
 7                               )
           Defendant.            )
 8   _____ )
 9   _
                TRANSCRIPT OF BENCH TRIAL VERDICT
10
              BEFORE THE HONORABLE TIMOTHY J. KELLY
11                 UNITED STATES DISTRICT JUDGE
                               ---
12
    APPEARANCES:      UNITED STATES ATTORNEY'S OFFICE
13                    BY:  BRIAN BRADY
                           CAROLINA NEVIN
14                    1301 New York Avenue NW
                      Washington DC, DC 20005
15                    (202) 834-1916
                      Email:  Brian.brady@usdoj.gov
16
                      For the Government
17
                      WILLIAM LEE SHIPLEY, JR. (By Video)
18                    LAW OFFICES OF WILLIAM L. SHIPLEY
                      PO Box 745
19                    Kailua, HI 96734
                      (808) 228-1341
20                    Email:  Shipleylaw@gmail.com
                           and
21                    MARK NOBILE (Special Appearance only)
22                    For the Defendant
                               ---
23
    COURT REPORTER:   CHANDRA R. KEAN, RMR
24                    Official Court Reporter
                      333 Constitution Avenue, NW
25                    Washington, DC 20001
```

1               **PROCEEDINGS**

2          (Court called to order at 10:39 a.m.)

10:39:01   3          DEPUTY COURTROOM CLERK:  This is criminal

10:39:02   4     matter 21-52, United States of America versus

10:39:06   5     Defendant-2, William Joseph Pepe.

10:39:10   6          Present for the government are Brian Brady and

10:39:13   7     Carolina Nevin.  Present for the defendant by video is

10:39:18   8     William Shipley.  Present at the defense counsel table

10:39:22   9     is Mark Nobile.

10:39:24  10          Also present is the defendant, Mr. Pepe.

10:39:27  11          THE COURT:  All right.  Good morning to

10:39:28  12     everyone.  And the parties are present to receive my

10:39:33  13     verdict for the bench trial that was conducted in this

10:39:35  14     case.

10:39:36  15          My rulings on, especially rulings on bench trials,

10:39:40  16     tend to be lengthy, so I warn you all in advance.

10:39:45  17          In support of the verdict, I will discuss my

10:39:48  18     findings of fact and conclusions of law together.  The

10:39:51  19     verdict is based on the standard jury instructions,

10:39:57  20     including the instructions of law that I discussed with

10:39:58  21     the parties before trial, including, but not limited to,

10:40:02  22     the government's obvious burden to prove its case beyond

10:40:11  23     a reasonable doubt.

10:40:11  24          Unless otherwise stated, I am using the elements of

10:40:15  25     the offenses, which were included in those proposed

10:40:17  1    instructions that are on the docket at Docket Number

10:40:21  2    165.

10:40:21  3         I also note at the outset that because the events

10:40:25  4    at issue in this case are well documented by video,

10:40:29  5    there are very few disputed issues of fact.  The parties

10:40:36  6    stipulated to the accuracy of the Capitol Police -- the

10:40:39  7    U.S. Capitol Police closed circuit video monitoring, and

10:40:42  8    the videos and images taken by members of the crowd that

10:40:46  9    breached the security perimeter of the Capitol on

10:40:49  10   January 6, 2021.

10:40:51  11        I point the parties to Government Exhibits 703 and

10:40:57  12   705.

10:40:58  13        They also stipulated to the accuracy and

10:41:00  14   authenticity of exhibits showing copies of digital

10:41:04  15   content extracted from the defendant's cell phone.

10:41:06  16        That's Government's Exhibit 707.

10:41:09  17        Beyond that, they stipulated to other facts that I

10:41:14  18   incorporate here by reference.

10:41:21  19        Before addressing the individual counts, three more

10:41:23  20   preliminary points I think it's important that I make.

10:41:26  21        First, as a general matter, I found the

10:41:29  22   government's witnesses and their testimony to be

10:41:30  23   credible.  Second, I have considered only the evidence

10:41:33  24   in this case, including the stipulation about the

10:41:38  25   admissibility of certain evidence that was introduced in

10:41:41  1    another case.

10:41:44  2        And third, this case is not, as we discussed during

10:41:50  3    the trial itself, about the Proud Boys or whatever their

10:41:53  4    views might be.  Although the government offered some

10:41:56  5    evidence connecting the defendant to the leadership of

10:42:02  6    the Proud Boys, that connection, without a particular

10:42:04  7    reason to deem it relevant for the counts charged, is

10:42:07  8    not really part of my calculus.

10:42:12  9        So I now turn to each count, starting with the

10:42:14  10   section 231, civil disorder count, before addressing the

10:42:19  11   section 1752 counts and, finally, the 1512 count.

10:42:28  12       So Count 1 of the second superseding indictment

10:42:32  13   charges the defendant with obstructing or attempting to

10:42:35  14   obstruct officers during a civil disorder by dragging

10:42:41  15   bike rack fencing away from the police at the end of the

10:42:44  16   Pennsylvania Avenue walkway near the West Front of the

10:42:49  17   Capitol in the early afternoon of January 6, 2021.

10:42:52  18       This offense has three elements, each of which the

10:42:55  19   government must prove beyond a reasonable doubt.

10:42:59  20       First, the government must show that the defendant

10:43:03  21   knowingly committed an act with the intended purpose of

10:43:06  22   obstructing, impeding, or interfering with one or more

10:43:11  23   law enforcement officers.

10:43:13  24       Second, the government must establish that at the

10:43:15  25   time of the defendant's act, the law enforcement

10:43:19  1    officers were engaged in the lawful performance of their

10:43:22  2    official duties incident to and during a civil disorder.

10:43:27  3    And third, the government must prove that the civil

10:43:29  4    disorder in any way or degree obstructed, delayed, or

10:43:33  5    adversely affected commerce or the movement of any

10:43:38  6    article or commodity in commerce, or the conduct or

10:43:42  7    performance of any federally protected function.

10:43:47  8         For clarity, on the third element, the government

10:43:51  9    need only prove one of the two conditions beyond a

10:43:54  10   reasonable doubt.  That is, either, one, that the civil

10:43:58  11   disorder obstructed, delayed, or adversely affected

10:44:00  12   commerce.  Or, two, that the civil disorder did the same

10:44:05  13   for the conduct or performance of a federally protected

10:44:11  14   function.

10:44:12  15        Several definitions inform the contours of these

10:44:16  16   elements.  To start, a civil disorder means a public

10:44:20  17   disturbance involving acts of violence by a group of

10:44:23  18   three or more persons that does at least one of four

10:44:28  19   things:

10:44:28  20        One, causes an immediate danger of injury to

10:44:33  21   another individual.  Two, actually results in such

10:44:37  22   injury.  Or three, causes an immediate danger of damage

10:44:42  23   to another individual's property.  Or four, actually

10:44:46  24   results in such damage.

10:44:48  25        Additionally, a defendant acts knowingly if he

10:44:51  1    realizes what he's doing and is aware of the nature of

10:44:54  2    his conduct and does not act through ignorance, mistake,

10:44:58  3    or accident.

10:45:01  4        The term "commerce" means commerce or travel

10:45:03  5    between one state, including D.C., and another state.

10:45:06  6    It also covers commerce wholly within the District of

10:45:11  7    Columbia.

10:45:11  8        A federally protected function is any function,

10:45:14  9    operation, or action carried out under U.S. law by any

10:45:18  10   department, which includes executive branch departments

10:45:21  11   such as the Secret Service, or agency, instrumentality,

10:45:27  12   of the United States, or an officer or employer

10:45:33  13   thereof.

10:45:33  14       Finally, several stipulations are relevant to this

10:45:37  15   count.  For example, the parties have stipulated that

10:45:40  16   Vice President Mike Pence was in the Capitol building on

10:45:44  17   January 6, 2021, and he was presiding over the joint

10:45:48  18   session of Congress that began at approximately

10:45:51  19   1:00 p.m.  See Government's Exhibit 702.

10:45:57  20       The Senate and the House of Representatives were

10:45:59  21   meeting to certify the vote count of the Electoral

10:46:02  22   College of the 2020 Presidential Election.

10:46:07  23       Vice President Pence evacuated the Senate Chamber

10:46:10  24   at about 2:12 p.m. that afternoon, and the joint session

10:46:14  25   was suspended until later that evening.

10:46:17  1          Again, I reference Government's Exhibit 702.

10:46:20  2          The parties have also stipulated that Safeway, the

10:46:25  3     grocery store, closed all 12 of its stores in D.C. by

10:46:31  4     around 3:45 p.m. on January 6, 2021, even though they

10:46:34  5     were not supposed to close until 11:00 p.m.

10:46:38  6          That's Government's Exhibit 706.

10:46:42  7          Safeway closed these stores early in response to

10:46:45  8     Mayor Bowser's curfew order that in turn resulted from

10:46:49  9     the events at the U.S. Capitol that day.

10:46:52  10         Safeway sales for January 6 were between 18 and

10:46:56  11    47 percent less than what the company had projected, and

10:47:03  12    shipments scheduled for delivery from a Pennsylvania

10:47:05  13    warehouse could not be completed to Safeway's D.C.

10:47:10  14    stores on January 6.

10:47:15  15         Again, Government's Exhibit 706.

10:47:20  16         Moving to the elements, I find that the government

10:47:21  17    has proved each element of section 231(a)(3) beyond a

10:47:27  18    reasonable doubt.  So I do find the defendant is guilty

10:47:29  19    of obstructing officers during a civil disorder, and I

10:47:37  20    will walk through those elements now.

10:47:41  21         Element one:  First, I find that the defendant

10:47:44  22    knowingly committed an act with the intended purpose of

10:47:48  23    obstructing, impeding, or interfering with one or more

10:47:53  24    law enforcement officers.

10:47:56  25         So video evidence establishes that Mr. Pepe dragged

10:48:00  1    bike rack fencing away from the police at the end of the

10:48:04  2    Pennsylvania Avenue walkway near the Capitol building.

10:48:08  3        Specifically, beginning at approximately minute

10:48:12  4    2:35 -- at approximately 2:35 seconds of Government's

10:48:17  5    Exhibit 210, Mr. Pepe is seen pulling the barrier away

10:48:21  6    from the steps where the Capitol Police were attempting

10:48:24  7    to establish a police line.

10:48:26  8        The defendant then dropped the barrier on the

10:48:30  9    ground flat on its side.  That's Government's Exhibit

10:48:34  10   210 at 2:40 through 3:04.

10:48:40  11       As Officer Cruz testified, bike rack fencing is an

10:48:45  12   important tool for crowd control for two reasons:  It

10:48:48  13   signals that an area is closed, and it assists the

10:48:51  14   police in holding a line by providing distance from the

10:48:54  15   crowd and more time to hold people off.

10:48:59  16       That's the trial transcript at August 20 at

10:49:06  17   11:12 -- I'm sorry, at 118 through 119.

10:49:11  18       But to serve those purposes, the bike rack fencing

10:49:14  19   must be upright and interlocked, not dragged to the side

10:49:17  20   and discarded on the ground.  That is because upright,

10:49:21  21   interlocked bike rack fencing is "heavier and harder to

10:49:24  22   move," so when members of the crowd moved the individual

10:49:30  23   bike rack fences to the side, that action interfered

10:49:32  24   with the police's ability to use that fencing to secure

10:49:39  25   the Capitol.

10:49:39  1          Again, I reference Officer Cruz's testimony on

10:49:43  2    August 20th at pages 133 through 134.

10:49:50  3          I also find Mr. Pepe committed this act with the

10:49:52  4    intended purpose of interfering with the police when

10:49:54  5    they tried to accomplish their mission of securing the

10:49:58  6    Capitol building and grounds.

10:50:00  7          It would have been obvious to Mr. Pepe that the

10:50:03  8    bike rack fencing was a tool that the police were using

10:50:06  9    to try to prevent the crowd from advancing toward the

10:50:12  10   Capitol.

10:50:12  11         Mr. Pepe had seen how police tried to use such

10:50:15  12   fencing at the Peace Circle around 12:50 p.m. to prevent

10:50:21  13   unauthorized individuals from proceeding up the

10:50:24  14   Pennsylvania Avenue walkway.

10:50:28  15         Again, I'll reference Government's Exhibit 207 at

10:50:31  16   23 seconds to 1:04 seconds; and also Officer Cruz's

10:50:36  17   testimony on August 20th at Page 122.

10:50:41  18         Indeed, Mr. Pepe was at the front of the struggle,

10:50:46  19   and he saw how the police had to retreat immediately

10:50:49  20   once the bike rack fencing was compromised --

10:50:52  21   specifically, once the fencing was knocked down on its

10:50:56  22   side.

10:50:57  23         That's Government's Exhibit 207 at 35 seconds to

10:51:02  24   45 seconds.  And I'll reference also Government's

10:51:05  25   Exhibit 208 at 5:35 to 5:54.

10:51:11  1          I'll also note that Government's Exhibit 208, like

10:51:14  2    a lot of exhibits I admitted, was not admitted in its

10:51:18  3    entirety, but I did admit several portions, including

10:51:22  4    from 1:04 to 8:01.

10:51:29  5          That's the trial transcript on August 20th at

10:51:32  6    Page 51.

10:51:35  7          Mr. Pepe also saw how the crowd was able to surge

10:51:39  8    forward toward the Capitol after the bike rack fencing

10:51:42  9    was compromised.  See Government's Exhibit 207 at

10:51:46  10   35 seconds through 1:04.

10:51:51  11         Officer Cruz who was stationed at the Peace Circle

10:51:54  12   confirmed this sequence in his testimony.  He testified

10:51:57  13   that the crowd was able to move forward once people

10:52:01  14   opened the bike rack fencing.

10:52:03  15         That's trial transcript at August 20th at pages 123

10:52:08  16   through 124.

10:52:13  17         Because Mr. Pepe knew that bike rack fencing was a

10:52:17  18   tool that police were using to secure the Capitol, he

10:52:20  19   also knew that preventing the police from using that

10:52:23  20   tool would obstruct, impede, and interfere with their

10:52:27  21   mission.

10:52:27  22         As explained, shortly before dragging the barrier

10:52:31  23   away from the police, Mr. Pepe had seen firsthand what

10:52:34  24   happened when the police lost control of the bike rack

10:52:38  25   fencing.  The crowd was able to move toward the Capitol

10:52:41  1    building.  That is precisely what happened after

10:52:44  2    Mr. Pepe dragged the bike rack fencing to the side at

10:52:47  3    the end of the Pennsylvania Avenue walkway.

10:52:50  4        As illustrated by Government's Exhibit 605.3, the

10:52:55  5    crowd advanced once the barriers were toppled.  And

10:53:00  6    after proceeding past multiple discarded barriers,

10:53:04  7    Mr. Pepe, now near another police line at the base of

10:53:07  8    the Capitol steps, yelled, "This is what we came for."

10:53:11  9        That's Government's Exhibit 212 at 10 seconds

10:53:15  10   through 14 seconds.

10:53:17  11       Given all this, I do find that Mr. Pepe, when he

10:53:20  12   dragged the bike rack fencing away from the police,

10:53:23  13   intended to interfere with them as they attempted to

10:53:26  14   secure the Capitol building and grounds.

10:53:32  15       Element two:  Second, I find that when the

10:53:35  16   defendant committed this act, law enforcement officers

10:53:37  17   were engaged in the lawful performance of their official

10:53:41  18   duties incident to and during a civil disorder.

10:53:47  19       Recall that a civil disorder means a public

10:53:50  20   disturbance involving acts of violence by a group of

10:53:53  21   three or more people that injure another person, or

10:53:57  22   cause an immediate danger of such injury, or damage

10:54:01  23   another's property, or cause an immediate danger of such

10:54:04  24   damage.  The crowd on January 6th included far more than

10:54:09  25   three people, and the events of that day amounted to a

10:54:12  1    public disturbance that, among other things, required

10:54:16  2    evacuations of members of Congress and the imposition of

10:54:20  3    a curfew in the District of Columbia.

10:54:22  4        See, for example, Government's Exhibit 210 at the

10:54:26  5    three-minute mark; Government's Exhibit 702 and

10:54:30  6    Government's Exhibit 706.

10:54:33  7        Further, the crowd's actions repeatedly caused an

10:54:36  8    immediate danger of injury to others, and in some cases,

10:54:40  9    did result in such injury.

10:54:42  10       One video, for example, shows members of the crowd

10:54:45  11   forcefully pushing police officers backwards up a flight

10:54:49  12   of stairs.  That's Government's Exhibit 213 at

10:54:54  13   24 seconds through 40 seconds.

10:54:57  14       And another shows a police officer being thrown

10:54:59  15   backwards into a different staircase with a metal

10:55:03  16   railing during a skirmish at the front of the

10:55:07  17   Pennsylvania Avenue walkway.

10:55:08  18       Again, see Government's Exhibit 208 at 5:15:21.

10:55:25  19       Sergeant Adam DesCamp's testimony confirms that the

10:55:28  20   public disturbance injured people and created an

10:55:33  21   immediate danger of injury.

10:55:34  22       He testified that members of the crowd were

10:55:36  23   wielding police riot shields and bike racks that could

10:55:40  24   "could be used" -- among other things -- "as weapons,"

10:55:45  25   and were "throwing any inanimate object that was in the

10:55:50   1   area at the police."

10:55:51   2       That's the trial transcript from August 20th at

10:55:54   3   pages 143, 148 -- and 148 through 149.

10:56:00   4       He also testified that an officer was,

10:56:04   5   "bear-sprayed" and would "throw up" every time he tried

10:56:09   6   to speak.

10:56:09   7       That's the transcript from August 20th at Page 151.

10:56:14   8   I also reference Government's Exhibit 215 at 34:35 to

10:56:24   9   34:45.  Again, like some other exhibits, Government's

10:56:29   10  Exhibit 215 was not admitted in its entirety, but I did

10:56:33   11  admit several portions, including the portion that I

10:56:36   12  just mentioned.

10:56:39   13      Captain Rani Brooks further testified that,

10:56:45   14  "rioters were throwing things, spraying us with pepper

10:56:47   15  spray," and "jabbing with flag poles."

10:56:50   16      Again, that's the trial transcript from August 20th

10:56:54   17  at Page 86.

10:56:56   18      I do find these witnesses and their testimony

10:56:59   19  credible, and that testimony confirms that a crowd of

10:57:03   20  more than three individuals injured people and created

10:57:06   21  an immediate danger of injury during a public

10:57:09   22  disturbance.

10:57:10   23      Additionally, members of the crowd damaged property

10:57:13   24  at the Capitol that day by, among other things,

10:57:16   25  "breaking windows to bust into" the building.

10:57:19  1          That's the testimony of Captain Brooks on

10:57:22  2   August 20th -- from August 20th at Page 111.

10:57:28  3          Again, I'll reference Government's Exhibit 601 at

10:57:32  4   3:40 through 3:55, which shows broken windows and the

10:57:39  5   police trying to prevent rioters from opening a door

10:57:42  6   from the inside.

10:57:44  7          For all these reasons, I do find that a civil

10:57:47  8   disorder was occurring at all relevant times on

10:57:50  9   January 6.

10:57:53  10         The police were engaged in the lawful performance

10:57:55  11  of their duties during that civil disorder and incident

10:57:59  12  to it when Mr. Pepe dragged the bike rack fencing away

10:58:03  13  from the police line.

10:58:05  14         The first official duty that the police were

10:58:07  15  lawfully performing was preventing the public from

10:58:11  16  accessing the Capitol, both restricted grounds and the

10:58:14  17  building itself.

10:58:16  18         As the parties stipulated, there was a restricted

10:58:19  19  perimeter around the Capitol building and the grounds on

10:58:25  20  January 6, 2021.  See Government's Exhibit 701.

10:58:32  21         In other words, and as Officer Cruz testified, the

10:58:34  22  grounds of the U.S. Capitol were closed to the public on

10:58:37  23  that day.

10:58:39  24         That's the transcript at August 20th at pages 119

10:58:44  25  through 120.

10:58:46  1        The police were lawfully performing their duty in

10:58:49  2   maintaining that restricted perimeter during and

10:58:52  3   incident to the civil disorder detailed above.

10:58:56  4        The police were also lawfully performing their

10:59:00  5   official duty of protecting members of Congress and

10:59:03  6   ensuring that they could certify the electoral vote.

10:59:05  7        The parties stipulated that on January 6, 2021, a

10:59:09  8   joint session of Congress convened at the Capitol to

10:59:12  9   certify the vote count of the Electoral College of the

10:59:16  10   2020 Presidential Election.  See Government's Exhibit

10:59:21  11   702.

10:59:22  12        For the Senate and the House of Representatives to

10:59:24  13   do so, the police needed to ensure that they were

10:59:27  14   protected.  When safety became a concern, and as the

10:59:31  15   parties stipulated, Vice President Pence and Speaker

10:59:36  16   Nancy Pelosi were evacuated from the Senate and House

10:59:38  17   chambers from between approximately 2:12 p.m. and

10:59:44  18   2:15 p.m., causing the joint session to be suspended for

10:59:50  19   about six to seven hours.

10:59:54  20        Again, I reference Government's Exhibit 702.

10:59:58  21        Further, Captain Brooks testified that the police

11:00:01  22   needed to sweep the entire Capitol for explosive devices

11:00:05  23   and other security threats before the joint session

11:00:09  24   could reconvene.  That's transcript on August 20th at

11:00:17  25   page 101 through 102.

11:00:20 1    In short, the police's job -- their official

11:00:22 2    duty -- was to protect members of Congress and the Vice

11:00:25 3    President to ensure that they could conduct

11:00:27 4    certification proceedings.  And they were lawfully

11:00:31 5    performing that duty when they were fighting back people

11:00:34 6    "trying to get inside the Capitol building."

11:00:38 7    That's Captain Brooks's testimony on August 20th at

11:00:46 8    113.

11:00:46 9    Element three:  I also find that the government has

11:00:49 10   proved the third element beyond a reasonable doubt

11:00:51 11   because the civil disorder on January 6 adversely

11:00:55 12   affected commerce.

11:00:55 13   As mentioned, the parties stipulated that the

11:00:58 14   events on January 6 caused Mayor Bowser to impose a

11:01:02 15   curfew at about 3:45 p.m., which in turn caused Safeway

11:01:09 16   to close all D.C. stores -- all 12 D.C. stores about

11:01:13 17   seven hours early.

11:01:15 18   Government's Exhibit 706.

11:01:17 19   Predictably, these early closures led to reduced

11:01:20 20   sales and missed deliveries to the stores, so the civil

11:01:23 21   disorder on January 6 adversely affected commerce,

11:01:28 22   satisfying the third element.

11:01:30 23   Separately, although the government did not need to

11:01:32 24   prove this point, given my finding on commerce that I

11:01:36 25   just made, I do find that the civil disorder also

obstructed the performance of a federally protected

function.  The parties stipulated that the testimony of

United States Secret Service Inspector Lanelle Hawa from

*United States v. Nordean et al.*, 21-CR-175, is

admissible.

See Government's Exhibit 704.

Inspector Hawa testified that Vice President Pence,

his wife, and his daughter were Secret Service

protectees visiting the Capitol on January 6, 2021.

See Government's Exhibit 704 and the attachment to

that, which is the Hawa testimony at pages 7 and 8.

And a federally protected function includes any

function, operation, or action carried out under U.S.

law by any department, including, for example, the

United States Secret Service, which is part of the

Department of Homeland Security.

Inspector Hawa explained that for the service to

protect individuals, it is important to know who is in a

restricted area and what they have in their possession.

That's page 14 of her transcript.

She further explained that the breach of the

security perimeter surrounding the Capitol building and

grounds on January 6 created a security concern because

of the presence of unknown individuals.

The civil disorder thus adversely affected the

11:03:12  1    performance of the Secret Service's federally protected

11:03:16  2    function of protecting the Vice President and his

11:03:21  3    family.

11:03:21  4         For all those reasons, I do conclude that the

11:03:23  5    government has proved each element of the offense

11:03:27  6    charged in Count 1 beyond a reasonable doubt, so I do

11:03:29  7    find the defendant guilty of that offense.

11:03:34  8         One note on this, on Count 1.  The government also

11:03:40  9    proceeded on a theory of attempt.  It's not a separate

11:03:47 10    offense.  Rather, a theory of attempt liability is

11:03:50 11    merely another way in which the government alleges the

11:03:54 12    defendant committed the offense in Count 1.

11:03:58 13         To find the defendant guilty of attempt related to

11:04:01 14    Count 1 -- or attempt to commit Count 1, I must find

11:04:05 15    that the government proved two elements beyond a

11:04:08 16    reasonable doubt:

11:04:08 17         First, that the defendant intended to commit the

11:04:11 18    crime of obstructing officers during a civil disorder,

11:04:15 19    and second, that he took a substantial step toward

11:04:18 20    committing that crime, a step that strongly corroborates

11:04:21 21    or confirms that the defendant intended to commit the

11:04:24 22    crime.

11:04:24 23         Now, because I've found the defendant guilty with

11:04:29 24    regard to committing the offense separate and apart from

11:04:36 25    any attempt liability, I don't have to reach attempt

11:04:39    1    liability but just to put it on the record as an

11:04:43    2    alternate holding, I do find that -- I would find that

11:04:48    3    the government has proven each element beyond a

11:04:53    4    reasonable doubt.  So the attempt theory of liability

11:04:55    5    proves an alternate basis -- or an alternative basis for

11:05:00    6    finding the defendant guilty of Count 1.

11:05:03    7         The government established the first element,

11:05:08    8    intent to commit the offense, for many of the same

11:05:10    9    reasons and based on much of the same evidence

11:05:13    10   underlying my finding that the defendant knowingly

11:05:15    11   committed an act with the intended purpose of

11:05:18    12   obstructing, impeding, or interfering with one or more

11:05:23    13   law enforcement officers.

11:05:24    14        In brief, the evidence shows that Mr. Pepe intended

11:05:26    15   to hinder the police's efforts to perform their official

11:05:30    16   duties during a civil disorder.

11:05:33    17        But the government has also established the second

11:05:36    18   element, a substantial step, because it is undisputed

11:05:40    19   that the defendant dragged the bike rack fencing away

11:05:43    20   from the officers who were trying to hold a police

11:05:47    21   line.

11:05:47    22        That was a firm, clear, and undeniable action to

11:05:52    23   accomplish and to reflect his intent of obstructing the

11:05:59    24   officers.  And even if this act did not actually

11:06:01    25   obstruct the officers -- and to be clear, I do find the

evidence establishes that it did so obstruct them -- the act of dragging the fencing shows the defendant wanted to make it harder for the police to perform their official duties during a civil disorder.  So I would find the defendant guilty alternately under an attempt theory as well.

Moving to Count 3, entering or remaining in a restricted building in violation of 18 United States Code 1752(a)(1).

Count 3 of the second superseding indictment charges the defendant with entering and remaining in a restricted building or grounds in violation of 18 United States Code, section 1752(a)(1).  To find the defendant guilty of this offense, I must find that the government proved two elements beyond a reasonable doubt.

The first is that the defendant entered or remained in a restricted building or grounds without lawful authority.  The second is that the defendant did so knowingly.

So several definitions are relevant here.  To start, the term "knowingly" has the same meaning described in Count 1.

As for the first element, the term, "restricted building or grounds" means, among other things, any posted, cordoned off, or otherwise restricted area of a

11:07:36  1    building or grounds where a person protected by the

11:07:39  2    Secret Service is or will be temporarily visiting.  See

11:07:45  3    section 1752(c)(1)(B).

11:07:49  4        The Vice President and his or her immediate family

11:07:51  5    are people protected by the Secret Service and Vice

11:07:55  6    President Pence was visiting the Capitol on January 6,

11:08:00  7    2021.  See the Hawa testimony at pages 6 and 7.

11:08:07  8        The government proved beyond a reasonable doubt

11:08:09  9    that the defendant knowingly entered or remained in a

11:08:11  10   restricted building or grounds without lawful

11:08:16  11   authority.

11:08:17  12       So let's start with element one.  Let's start

11:08:19  13   with -- as far as element one goes, let's start with the

11:08:23  14   scope of the restricted area.

11:08:25  15       The parties stipulated that the U.S. Capitol

11:08:27  16   building is surrounded by restrictions on entry,

11:08:31  17   including security barriers and posts manned by police

11:08:35  18   officers.  See Government's Exhibit 701.

11:08:39  19       They also stipulated that Government's Exhibit 608

11:08:42  20   truly and accurately depicted the restricted perimeter

11:08:48  21   that surrounded the Capitol building and grounds on

11:08:51  22   January 6, 2021.  That perimeter includes, among other

11:08:56  23   locations, the walkway between the Peace Circle and the

11:09:00  24   Capitol building, as well as the Capitol building

11:09:02  25   itself.

11:09:03  1          Further, the parties stipulated that the area

11:09:06  2     within this perimeter was a posted, cordoned off or

11:09:09  3     otherwise restricted area where the Vice President and

11:09:10  4     his immediate family were temporarily visiting.  And

11:09:14  5     therefore, that this area was a restricted building or

11:09:18  6     grounds as defined in section 1752.  The evidence

11:09:22  7     supports that stipulation: the visible restrictions used

11:09:26  8     to secure the area included bike rack fencing.

11:09:29  9          See Government's Exhibit 605.2, "Area Closed"

11:09:35  10    signs, see Government's Exhibit 605.1, protective snow

11:09:41  11    fencing, see Government's Exhibit 605.4, and police

11:09:46  12    lines maintained and established by officers.

11:09:51  13         And there I cite Officer Cruz's testimony on

11:09:54  14    August 20th at page 128.

11:09:58  15         So having established that there was in fact a

11:10:01  16    restricted area on January 6, the government has also

11:10:05  17    proved that the defendant entered and remained there and

11:10:08  18    proved it beyond a reasonable doubt.

11:10:12  19         The evidence shows that the defendant proceeded

11:10:14  20    past the bike rack fencing near the front of the

11:10:17  21    Pennsylvania Avenue walkway once the police had to

11:10:21  22    retreat following the breach of that barrier.

11:10:24  23         See Government's Exhibit 207 at 39 through

11:10:30  24    45 seconds.  See also Government's Exhibit 208 at 5:35

11:10:36  25    through 5:54.

11:10:39  1          Toward the end of the walkway, the defendant
11:10:42  2   himself removed a bike rack fencing from the police line
11:10:47  3   before moving closer to the Capitol building.
11:10:49  4          See Government's Exhibit 210 at 2:35 through 3:08.
11:10:55  5          That's the defendant moving the fencing, as well as
11:10:59  6   that same exhibit from 5:28 to 6:17, again appearing
11:11:07  7   closer to the Capitol building and walking forward.
11:11:11  8          Mr. Pepe then ascended the steps of the Capitol
11:11:14  9   building's west side towards his ultimate entry point at
11:11:18  10  the Senate Wing door.
11:11:19  11         See Government's Exhibit 102.1, and Captain
11:11:23  12  Brooks's testimony from August 20th at Page 92.
11:11:29  13         And the evidence establishes that Mr. Pepe entered
11:11:31  14  and remained in the Capitol building itself, having
11:11:34  15  bypassed several layers of security on the Capitol
11:11:37  16  grounds.
11:11:38  17         For example, videos show the defendant walking
11:11:40  18  around the Capitol Rotunda.  See Government's Exhibit
11:11:46  19  102.9 at 2:34 through 10:28.  And he recorded himself
11:11:52  20  there saying "we did it" and "proud of your boy."
11:11:57  21         See Government's Exhibit 303.4, which is a video
11:12:02  22  file, and 303.3, which is also a video file.
11:12:06  23         So Mr. Pepe both entered and remained in restricted
11:12:09  24  grounds and a restricted building.
11:12:12  25         The defendant also had no lawful authority to do

11:12:16  1    so.  As explained, the Capitol building and surrounding

11:12:20  2    grounds were closed to the public on January 6.

11:12:23  3        See Officer Cruz's testimony from August 20th at

11:12:27  4    Pages 119 through 120.

11:12:31  5        Police, bike rack fencing, snow fencing, and "Area

11:12:36  6    Closed" signs established the perimeter that people

11:12:37  7    could not cross without specific authorization.  And as

11:12:40  8    a member of the public with no such authorization,

11:12:44  9    Mr. Pepe was not lawfully permitted to be inside that

11:12:47  10   restricted area.

11:12:50  11       Turning to element two.  The government has also

11:12:55  12   proved the second element beyond a reasonable doubt

11:12:56  13   because the defendant engaged in this conduct

11:13:00  14   knowingly.

11:13:00  15       First, what Mr. Pepe saw and did that day makes it

11:13:03  16   clear that he knew he lacked the lawful authority to

11:13:07  17   enter or remain in this restricted area.  After

11:13:14  18   encountering police attempting to stop protestors by

11:13:17  19   using bike rack fencing -- see Government's Exhibit 207

11:13:22  20   at 23 seconds to 1:04 seconds -- Mr. Pepe dragged bike

11:13:28  21   rack fencing to the side so that he could bypass yet

11:13:31  22   another visible security measure.

11:13:34  23       See Government's Exhibit 210 at 2:35 through 3:08.

11:13:42  24       Before this, he had walked over recently upended

11:13:47  25   bike rack fencing after being at the front of a struggle

11:13:49  1    between the crowd and police trying to maintain that

11:13:55  2    barrier.

11:13:56  3         See Government's Exhibit 206 at 1:53 through 1:56.

11:14:03  4         The defendant's words also suggests that he knew he

11:14:07  5    was accessing a restricted area where he was not

11:14:10  6    supposed to be.  After being sprayed with mace, he said,

11:14:14  7    "storming that Capitol, baby."

11:14:17  8         That's Government's Exhibit 303.2.

11:14:22  9         Those are not the words or actions of someone who

11:14:24  10   believes that he has lawful authority to be where he

11:14:29  11   is.

11:14:29  12        Now, one of the few areas where the parties

11:14:33  13   disagreed on the jury instructions was that Mr. Pepe's

11:14:38  14   position was that section 1752 required the government

11:14:43  15   to prove that he knew that a person protected by the

11:14:46  16   Secret Service would be visiting the restricted area.

11:14:50  17   But yesterday, the D.C. Circuit decided the Griffin case

11:14:54  18   in which it held that the government need not do so.

11:14:58  19        That's *United States v. Cuoy Griffin*, Appeal Number

11:15:03  20   22-3042.  It's got a Westlaw cite now.  2024 Westlaw

11:15:12  21   4536993.  It was a D.C. Circuit ruling from yesterday,

11:15:20  22   October 22, 2024.

11:15:22  23        So that, on that legal point, the government turned

11:15:28  24   out to be correct.

11:15:30  25        But even if the statute did require such knowledge,

11:15:34 1    I do find that the defendant possessed it because he
11:15:37 2    knew that Vice President Pence would be temporarily
11:15:41 3    visiting the Capitol on January 6 to certify the
11:15:45 4    Electoral College vote.  So several pieces of evidence
11:15:50 5    establish this knowledge.
11:15:52 6        The key point is that the defendant was attuned to
11:15:55 7    the election and specifically the relevance of the
11:15:58 8    Electoral College vote.  Roughly three weeks before
11:16:01 9    January 6, a member of a group chat messaged the other
11:16:06 10   members and said that people should go to D.C. because,
11:16:09 11   "it's the day of the Electoral College vote," and the
11:16:15 12   "absolute last day possible for this to flip."
11:16:18 13       That's Government's Exhibit 306.2.
11:16:22 14       A user named "Pepe 2nd" -- 2nd degree it looks
11:16:26 15   like -- "HVNY Pres," responded within a minute, stating
11:16:35 16   that the, "HVNY boys are going."
11:16:41 17       The defendant's phone had calendar entries that he
11:16:43 18   had affirmatively created for the vice presidential
11:16:48 19   debate back in October of 2020, the presidential debates
11:16:53 20   from that same month and the month earlier, and the
11:16:55 21   Electoral College vote.
11:16:57 22       See Government's Exhibit 305.1, 305.4, 305.5,
11:17:05 23   305.7, 305.9, and also the testimony of Examiner Cain
11:17:13 24   from August 20th at Pages 177 and 201 through 202.
11:17:22 25       Examiner Cain testified as a forensic expert that

11:17:26  1    all exhibits from the 305 series were extracted from the

11:17:31  2    cell phone associated with Mr. Pepe and that he had

11:17:36  3    affirmatively created each entry on his personal

11:17:39  4    calendar.

11:17:40  5        The forensic examination team also found images on

11:17:44  6    the defendant's phone from Telegram that further suggest

11:17:48  7    that he knew January 6 was the day that certification

11:17:51  8    and objections to it would occur.  For example, one

11:17:55  9    image shows a Twitter post from Senator Josh Hawley

11:17:58  10   discussing concerns about "election integrity," and

11:18:01  11   stating that he would "object on January 6 on their

11:18:05  12   behalf. "

11:18:06  13       Government's Exhibit 302.11.

11:18:13  14       Another shows an article where Representative

11:18:15  15   Stefanik stated her plan to object to the Electoral

11:18:19  16   College certification on January 6.

11:18:20  17       That's Government's Exhibit 302.16.

11:18:26  18       Not only did Pepe know about the certification, but

11:18:29  19   the evidence also proves that he knew about Vice

11:18:34  20   President Pence's role in that process occurring at the

11:18:37  21   Capitol.

11:18:37  22       For example, a contact identified as "Dad" texted

11:18:43  23   the defendant around 9 a.m. on January 6, that the

11:18:47  24   Senate had been "lost" and that "Pence puts out there he

11:18:52  25   can't help.  I'd be depressed also."

11:18:57  1          That's Government's Exhibit 301.5a at 10.

11:19:01  2          Two minutes later, Mr. Pepe responded "not good."

11:19:06  3          That's the same exhibit at Page 11.

11:19:09  4          Additionally, a Telegram attachment recovered from

11:19:11  5  the defendant's phone depict a Twitter post from 1:01

11:19:18  6  p.m. on January 6 -- that is about ten minutes after the

11:19:21  7  initial confrontation near the beginning of the

11:19:24  8  Pennsylvania Avenue walkway -- reporting that "Mike

11:19:27  9  Pence rejects Trump's call to overturn Biden election."

11:19:32  10          That's Government's Exhibit 302.22 and also

11:19:37  11  Examiner Cain's testimony from August 20th at 191 and

11:19:44  12  197.

11:19:45  13          Another recovered Telegram image refers to "today"

11:19:49  14  as "January 6th" and says, among other things, that,

11:19:53  15  "Vice President Mike Pence will have all the authority

11:19:55  16  as president of the Senate for that day," i.e., "January

11:20:00  17  6th."

11:20:00  18          See Government's Exhibit 302.14.

11:20:06  19          This image also includes texts stating that members

11:20:08  20  of Congress will have the chance "to object to the Vice

11:20:12  21  President."

11:20:12  22          Again, it's the same exhibit, Government's Exhibit

11:20:15  23  302.14.

11:20:19  24          In short, although the government did not need to

11:20:21  25  establish that the defendant knew that the Vice

11:20:25  1    President would be temporarily visiting the Capitol on

11:20:27  2    January 6, I find that the government did prove that

11:20:31  3    knowledge with circumstantial evidence showing that the

11:20:33  4    defendant was focused on January 6 as the day of

11:20:37  5    certification, and that he also knew that day involved

11:20:41  6    the Vice President convening with Congress at the

11:20:44  7    Capitol.

11:20:45  8        So for all these reasons, I do find that the

11:20:48  9    defendant knowingly entered and remained in a restricted

11:20:52  10   building and grounds without lawful authorization.

11:21:01  11   And -- without authorization.

11:21:02  12       My finding in this regard is not affected by

11:21:07  13   Matthew Greene's testimony that he was sometimes being

11:21:12  14   "pushed from all sides" while approaching the Capitol

11:21:17  15   building.

11:21:17  16       That was his testimony, again on August 20th at

11:21:19  17   Pages 54 and 69.

11:21:23  18       Specifically, Mr. Greene described the stairs on

11:21:25  19   the northwest side of the Capitol which had scaffolding

11:21:29  20   around it as "claustrophobic" and said that "members of

11:21:34  21   the crowd were pushing him there."

11:21:36  22       That's again Pages 54 and 56 of his testimony.

11:21:42  23       Even if the defendant experienced the same pushing

11:21:45  24   at this particular chokepoint, that would not undermine

11:21:50  25   my conclusion that he knowingly entered and remained in

11:21:52   1    a restricted area without lawful authorization.

11:22:01   2        Just as a reminder, it is not just the Capitol

11:22:04   3    building that qualified as a restricted location.  The

11:22:08   4    entire perimeter illustrated in Government's Exhibit 608

11:22:12   5    was restricted.  And that the defendant plainly and

11:22:16   6    voluntarily breached several barriers within that

11:22:18   7    perimeter without pushing from others that would have

11:22:21   8    prevented him from avoiding the restricted zone.

11:22:25   9        For example, the defendant was at the front of the

11:22:27  10    struggle over the bike rack fencing at the beginning of

11:22:30  11    the Pennsylvania Avenue walkway.

11:22:35  12        See Government's Exhibit 207 at 36 seconds through

11:22:41  13    40 seconds.

11:22:42  14        And the crowd proceeded forward after that barrier

11:22:45  15    fell without pushing or shoving from behind, including

11:22:48  16    the defendant, who walked directly over to the bike rack

11:22:52  17    fencing that had just been knocked over.

11:22:55  18        See Government's Exhibit 206 at 1:53 through 1:56.

11:23:00  19        He was also, from the video evidence, a willing

11:23:03  20    participant in breaching a second police line where he

11:23:08  21    dragged the barrier to one side and then proceeded

11:23:10  22    closer to the Capitol building.

11:23:12  23        See Government's Exhibit 210 at 2:35 through 3:04.

11:23:19  24        He remained near the Capitol steps by the West

11:23:22  25    Front.  See Government's Exhibit 210 at 4:12 seconds.

11:23:27  1    And outside the Senate Wing door.  See Government's
11:23:30  2    Exhibit 215 at 43:50 through 44:02.
11:23:38  3        He eventually entered the Capitol building calmly
11:23:42  4    through a doorway without anyone shoving or pushing him
11:23:45  5    forward.
11:23:46  6        See Government's Exhibit 102.2 at 4 seconds to
11:23:51  7    15 seconds.  And he remained in the restricted building
11:23:53  8    once inside, strolling through the Capitol Rotunda.
11:23:58  9        See Government's Exhibit 102.9 at 2:34 through
11:24:05  10   10:28 and other parts of the building.  See Government's
11:24:07  11   Exhibit 102.11 at 10 seconds to 1:10.  And see also
11:24:14  12   Captain Brooks's testimony from August 20th at
11:24:19  13   Page 100.
11:24:19  14       The defendant had thus already unlawfully entered a
11:24:23  15   restricted area by the time he reached the scaffolding,
11:24:26  16   and then unlawfully remained in that restricted area.
11:24:32  17       So even if there was crowd pressure at one point
11:24:35  18   that prevented him from leaving the particular area near
11:24:38  19   the scaffolding, that does not affect my overall
11:24:41  20   conclusion on this count.
11:24:43  21       Because the government has established each element
11:24:45  22   of the offense charged in Count 3 beyond a reasonable
11:24:48  23   doubt, I find the defendant guilty of that offense.
11:24:59  24       Moving on to Count 4, Count 4 of the second
11:25:03  25   superseding indictment charges the defendant with

11:25:07  1    disorderly or disruptive conduct in a restricted

11:25:10  2    building or grounds in violation of 18 U.S. Code,

11:25:15  3    section 1752(a)(2).

11:25:17  4        To find the defendant guilty of this offense, I

11:25:20  5    must find that the government proved three elements

11:25:25  6    beyond a reasonable doubt.  First, that the defendant

11:25:27  7    engaged in disorderly or disruptive conduct in or in

11:25:33  8    proximity to any restricted building or grounds.

11:25:37  9        Second, that the defendant did so knowingly and

11:25:39  10   with the intent to impede or disrupt the orderly conduct

11:25:43  11   of government business or official functions.  And

11:25:47  12   third, that the defendant's conduct did in fact impede

11:25:51  13   or disrupt the orderly conduct of government business or

11:25:55  14   official functions.

11:25:58  15       Several definitions flesh out these elements.

11:26:01  16       As to the first, "disorderly conduct" means conduct

11:26:05  17   that tends to disturb the public peace or undermine

11:26:09  18   public safety, while "disruptive conduct" means a

11:26:14  19   disturbance that interrupts an event, activity, or the

11:26:16  20   normal course of a process.

11:26:18  21       The phrase "restricted building or grounds" has the

11:26:22  22   same definition as it does for purposes of Count 3.  And

11:26:26  23   "knowingly" means the same thing it did for Count 1.

11:26:32  24       So for this offense, I do find that the government

11:26:34  25   has established each element beyond a reasonable doubt.

11:26:39   1          As far as element one goes, the first element

11:26:42   2     contains two sort of subparts:  The restricted area and

11:26:47   3     the qualifying conduct.

11:26:49   4          For the reasons explained in my findings on

11:26:52   5     Count 3, Mr. Pepe's relevant conduct on January 6

11:26:56   6     occurred within restricted grounds and later within the

11:27:00   7     restricted Capitol building.

11:27:03   8          To briefly summarize those reasons, the Capitol and

11:27:05   9     the surrounding grounds were cordoned off and restricted

11:27:09  10     with visible security measures, and Vice President Mike

11:27:14  11     Pence was visiting that restricted area for the

11:27:16  12     certification of the Electoral College vote.

11:27:18  13          So turning to the second sub-element, the conduct,

11:27:23  14     the qualifying conduct, although I need only find that

11:27:29  15     Mr. Pepe's conduct was disorderly or disruptive, I have

11:27:33  16     no problem or finding that it was both.

11:27:38  17          First, his conduct was disruptive because, as

11:27:42  18     Captain Brooks testified, the mere presence of

11:27:45  19     unauthorized, unscreened individuals like the defendant

11:27:49  20     within the restricted area was a substantial security

11:27:53  21     risk.

11:27:53  22          See the transcript at August 20th at pages 100

11:27:58  23     through 102.

11:27:59  24          The Capitol building and grounds had been

11:28:01  25     restricted precisely because letting unknown people into

11:28:05  1    the area created security concerns.  Those concerns were

11:28:10  2    even more serious because the defendant was never

11:28:13  3    screened, so the police had no idea whether he was

11:28:17  4    carrying weapons or the like, and the risks that the

11:28:19  5    defendant created with his conduct, mainly breaching the

11:28:24  6    security barriers to enter and remain in the restricted

11:28:26  7    area, interrupted the process of certifying the

11:28:29  8    Electoral College vote and prevented Congress from

11:28:34  9    resuming its business until the police could clear the

11:28:37  10   entire building of potential threats like remaining

11:28:40  11   intruders or explosive devices.

11:28:42  12       As the D.C. Circuit has already explained, such

11:28:46  13   testimony is enough to find -- to support the conclusion

11:28:51  14   that the conduct at issue here is disruptive.

11:28:55  15       So I point the parties to *United States v. Alford*,

11:28:59  16   89 F.4th, 943 at 952 through 953, a D.C. Circuit case

11:29:06  17   from 2024, just this year.

11:29:10  18       Further, the defendant's conduct was likely to

11:29:15  19   endanger public safety and was, thus, disorderly.  When

11:29:19  20   Mr. Pepe dragged the bike rack fencing away from the

11:29:22  21   police line -- see Government's Exhibit 210 at

11:29:28  22   2:35 through 2:55 -- it became harder for the police to

11:29:33  23   control the crowd and thus, undermined public safety.

11:29:37  24       Mr. Pepe was also at the front of the struggle to

11:29:40  25   knock down the fencing at the beginning of the

11:29:43  1    Pennsylvania Avenue walkway -- see Government's Exhibit

11:29:46  2    207 at 33 seconds through 38 seconds -- which resulted

11:29:50  3    in the crowd being able to surge forward and advance on

11:29:53  4    the Capitol even more directly.

11:29:57  5         Again, same Exhibit 207, at 40 seconds to 1:04.

11:30:03  6         This conduct -- active, personal participation in

11:30:08  7    the crowd's efforts to breach security barriers and

11:30:11  8    proceed through a restricted grounds towards a

11:30:14  9    restricted building -- endangered public safety by

11:30:18  10   leading to confrontations with the police and creating

11:30:21  11   security risks for those inside the Capitol building.

11:30:24  12        To take just two specific examples of how those

11:30:29  13   safety risks played out, the struggle over the barriers

11:30:32  14   at the front of the Pennsylvania Avenue walkway caused a

11:30:36  15   police officer to be thrown backwards into a staircase

11:30:38  16   with a metal railing.

11:30:40  17        That's Government's Exhibit 208 at 5:15 through

11:30:46  18   5:23.

11:30:49  19        And as Captain Brooks testified, members of

11:30:51  20   Congress conducting the certification had to be

11:30:54  21   evacuated from the House and Senate Chambers once

11:30:57  22   individuals from the crowd, including the defendant,

11:31:01  23   breached the Capitol building itself.

11:31:04  24        That is August 20th -- the transcript from

11:31:06  25   August 20th at Page 90.

11:31:11  1       Moving on to elements two and three, I also find

11:31:15  2  that Mr. Pepe engaged in this conduct knowingly and with

11:31:19  3  the intent to impede or disrupt the orderly conduct of

11:31:23  4  government business, or official functions.

11:31:27  5       To start, I find that Mr. Pepe knew that the

11:31:31  6  Capitol building and the area -- the secured area

11:31:34  7  surrounding it were restricted for the same reasons

11:31:37  8  discussed in my findings on Count 3.

11:31:40  9       Again, to briefly recap, the defendant encountered

11:31:45  10  several layers of protected fencing, "Area Closed"

11:31:48  11  signs, and police quite obviously trying to stop people

11:31:51  12  from moving forward.  And despite that, he walked over,

11:31:54  13  upended the bike rack fencing, and then dragged fencing

11:31:58  14  to the side so that he and others could bypass another

11:32:01  15  security layer indicating that the area was restricted.

11:32:05  16       He also recorded himself saying, "Storming that

11:32:08  17  Capitol, baby," after being maced.

11:32:11  18       That's Government's Exhibit 303.2.

11:32:14  19       The mace itself, I might add, another reason why it

11:32:18  20  would have been obvious that the defendant was not

11:32:22  21  permitted to be where he was.

11:32:25  22       Additionally, and for reasons explained earlier,

11:32:28  23  any suggestion that the defendant was being pushed

11:32:31  24  forward near the scaffolding by the northwest side of

11:32:35  25  the Capitol does not undermine my conclusions that

11:32:38  1    Mr. Pepe knowingly engaged in disruptive or disorderly

11:32:42  2    conduct in a restricted area under 1752(a)(2).

11:32:46  3        Even if he was pushed at certain points, the

11:32:48  4    evidence -- the video evidence makes clear that he

11:32:53  5    freely, voluntarily, and knowingly engaged in disruptive

11:32:56  6    and disorderly conduct at other times.

11:32:59  7        To take just one example, the key example really,

11:33:02  8    the defendant dragged the bike rack fencing away from a

11:33:08  9    police line at the end of Pennsylvania Avenue walkway

11:33:09  10   without anyone compelling him to do so.

11:33:13  11       For the reasons explained in my discussion of

11:33:15  12   Count 3, I also find for purposes of Count 4 that the

11:33:20  13   government did not need to prove that the defendant knew

11:33:23  14   Vice President Pence would be temporarily visiting the

11:33:26  15   Capitol, but that in any event, it did prove such

11:33:30  16   knowledge beyond a reasonable doubt.

11:33:34  17       The government also proved beyond a reasonable

11:33:36  18   doubt that the defendant intended to impede or disrupt

11:33:40  19   government business or official functions and that he

11:33:44  20   did so.

11:33:45  21       To level-set, I find two bases for government

11:33:49  22   business in an official function.

11:33:53  23       First, Congress and the Vice President were at the

11:33:55  24   Capitol to perform government business; namely,

11:33:58  25   certifying the Electoral College vote.  And second, the

11:34:03  1    police were there to perform their official function of

11:34:05  2    securing the Capitol building and grounds and protecting

11:34:09  3    members of Congress and the Vice President inside, to

11:34:12  4    enable that certification to proceed without

11:34:17  5    disruption.

11:34:17  6        So let me take the second part first.

11:34:24  7        The defendant's conduct did in fact disrupt and

11:34:26  8    impede the performance of this government business and

11:34:29  9    official function.

11:34:30  10        As Officer Cruz explained, actions that prevented

11:34:34  11    the police from maintaining the barriers of bike rack

11:34:36  12    fencing made it harder for the officers to secure the

11:34:39  13    restricted area, including the Capitol building itself.

11:34:43  14        That's the trial transcript from August 20th at 118

11:34:48  15    through 119, 123 through 124, and 133 through 134.

11:34:56  16        The defendant impeded that mission of securing the

11:34:59  17    area because he was part of the struggle to knock down

11:35:03  18    the fencing near the Peace Circle, and more critically,

11:35:08  19    dragged bike rack fencing away from the police at the

11:35:11  20    end of the Pennsylvania Avenue walkway.

11:35:14  21        See Government's Exhibit 207 at 33 seconds through

11:35:19  22    45 seconds; and Government's Exhibit 210 from

11:35:24  23    2:35 through 3:09.

11:35:26  24        The defendant's actions also disrupted the

11:35:31  25    government's business of certifying the Electoral

11:35:33  1    College vote.  As discussed, members of Congress had to

11:35:36  2    halt proceedings for hours because of the security

11:35:39  3    breach.  The Secret Service had to relocate the Vice

11:35:43  4    President at about 2:30 p.m., and the certification

11:35:46  5    could not continue until the police had fully inspected

11:35:50  6    the Capitol to ensure that it was safe to reconvene the

11:35:54  7    House and the Senate.

11:35:56  8         See Captain Brooks's testimony on August 20th at

11:36:01  9    Page 90 and 100 through 102; and the Hawa testimony at

11:36:08  10   Page 23.

11:36:09  11        Although the defendant's breach of the restricted

11:36:12  12   area was itself sufficient to disrupt this government

11:36:16  13   business, I also note that Mr. Pepe walked to an area

11:36:20  14   inside the Capitol that was merely a few feet from the

11:36:26  15   location where members of Congress were set to conduct

11:36:29  16   the certification proceedings.

11:36:31  17        See Government's Exhibit 102.11 at 6 seconds to

11:36:37  18   1:10.  See also Captain Brooks's testimony at -- on

11:36:45  19   August 20th at Page 100.

11:36:49  20        The evidence also establishes that the defendant

11:36:51  21   intended this disruption.  He saw firsthand how a breach

11:36:55  22   of the bike rack fencing prevented the police from

11:36:59  23   controlling the crowd, and enabled the crowd to advance

11:37:03  24   through the restricted area toward the Capitol.

11:37:10  25        Soon after, Mr. Pepe dragged other bike rack

11:37:12  1    fencing away from the police, conduct that reflects a

11:37:16  2    purpose of impeding the police while they tried to do

11:37:19  3    their job of securing the Capitol.

11:37:23  4         See Government's Exhibit 210 at 2:35 through 3:09.

11:37:29  5         The defendant also made clear that he intended to

11:37:32  6    disrupt the certification proceedings.  After breaching

11:37:36  7    multiple police lines and advancing closer to the

11:37:39  8    building, he yelled, "This is what we came for."

11:37:43  9         Government's Exhibit 212 at 10:14 -- at 10 seconds

11:37:49  10   through 14 seconds.

11:37:50  11        And once inside the Capitol building, he filmed

11:37:54  12   himself saying that "we did it."

11:37:58  13        Government's Exhibit 303.4.

11:38:00  14        The defendant may not have said explicitly -- at

11:38:03  15   least on footage that he did not delete -- and so we

11:38:08  16   have -- that was able to be admitted into evidence --

11:38:11  17   what the "it" and "this" referred to, but I have no

11:38:16  18   trouble concluding beyond a reasonable doubt that the

11:38:18  19   defendant knew about and intended to disrupt the

11:38:22  20   electoral vote -- the Electoral College vote

11:38:28  21   certification.  After all, the defendant's phone had a

11:38:31  22   calendar reminder for the Electoral College vote.

11:38:32  23        See Government's Exhibit 305.9.

11:38:36  24        And the forensics team recovered a text from the

11:38:38  25   user bearing his last name stating that the Hudson

Valley New York Proud Boys Chapter was "going" in response to another message about the Electoral College vote and the last day to "flip" it.

That's Government's Exhibit 306.2.

I'll pause here just to mention that FBI Agent Jonathan Welsh testified and identified at trial -- and identified Mr. Pepe in a photograph of a group of individuals affiliated with the Hudson Valley Proud Boys and explained the evidence that suggested the defendant was a member of that group.

Moreover, Matthew Greene testified that he saw the defendant celebrating at the hotel after returning from the Capitol and the certification proceeding had been stopped.  That's August 20th at 61 through 62.

So I do find that this evidence -- including this celebration and the defendant's dogged efforts to reach the Capitol building and to penetrate inside it -- show his intent to disrupt Congress's business of certification of the Electoral College vote.

So for all these reasons, I do find that the government has established each element of the offense charged in Count 4, so I do find the defendant guilty of that offense.

And to be clear, again, the evidence shows that the defendant both intended to -- did in fact disrupt and

11:40:36  1    impede the performance of both the government business

11:40:39  2    and the official function the police had of protecting

11:40:43  3    what was going on in terms of that business.

11:40:48  4         As far as Count 4 goes, the defendant is also

11:40:51  5    charged with aiding and abetting others in committing

11:40:55  6    this offense.  Again, this is not another charge but

11:41:01  7    another way of proving Count 4.

11:41:04  8         And as a reminder, to establish this theory of

11:41:08  9    liability, the government must prove that, one, another

11:41:11  10   person committed the offense; two, that the defendant

11:41:15  11   knew another person was committing or would commit the

11:41:17  12   offense; three, the defendant performed an act in

11:41:21  13   furtherance of another committing the offense; four, the

11:41:25  14   defendant knowingly performed that act with the purpose

11:41:28  15   of helping, soliciting, facilitating, or encouraging

11:41:33  16   others to commit the offense; and five, that the

11:41:35  17   defendant did that act with the intent that others

11:41:38  18   commit the offense.

11:41:40  19        So I do think just as an alternative ruling -- as

11:41:44  20   an alternative holding, I do think that the government

11:41:46  21   has proved that the defendant aided and abetted others

11:41:50  22   in committing the offense of disorderly or disruptive

11:41:56  23   conduct in a restricted building or grounds.

11:41:59  24        As Captain Brooks testified, the mere presence of

11:42:01  25   unscreened and unknown individuals in a restricted area

11:42:05  1    created a significant security threat that halted the

11:42:10  2    certification proceedings.

11:42:11  3        The defendant contributed to that security threat

11:42:14  4    by moving the bike rack fencing and encouraging others

11:42:18  5    by yelling, "This is what we came for," as the crowd

11:42:20  6    continued to advance toward the Capitol building.

11:42:24  7        The latter statement also distills his intent:  He

11:42:29  8    wanted to help others disrupt the certification

11:42:32  9    proceeding, and he encouraged them -- verbally and by

11:42:34  10   dragging away the bike rack fencing -- to commit that

11:42:37  11   offense by impeding the official process with their

11:42:40  12   presence in the restricted area.

11:42:46  13       Next we move to Count 5.  And let me just check

11:42:49  14   with our court reporter whether we're okay to continue.

11:42:58  15       Okay.  I see I'm getting an affirmative nod of the

11:43:00  16   head so I will continue.

11:43:03  17       The final count is Count 5.  Count 5 of the second

11:43:09  18   superseding indictment charges the defendant with

11:43:12  19   tampering with records, documents, or other objects in

11:43:21  20   violation of 18 United States Code, section 1512(c)(1).

11:43:28  21   To prove that the defendant is guilty of this offense,

11:43:30  22   the government must establish four elements beyond a

11:43:35  23   reasonable doubt:

11:43:35  24       First, the government must show that the defendant,

11:43:39  25   altered, destroyed, mutilated, or concealed a record,

11:43:44  1    document, or other object.

11:43:47  2         Second, the defendant must have acted knowingly in

11:43:49  3    doing so.  And, third, the defendant must have also

11:43:55  4    acted corruptly.  And, fourth, the defendant must have

11:44:05  5    intended to impair the object's integrity or

11:44:12  6    availability for use in an official proceeding.

11:44:15  7         Several definitions inform these elements, too.

11:44:18  8    The term "knowingly" means what it does for the offenses

11:44:21  9    charged in the other counts.  The term "corruptly" has

11:44:24  10   several meanings, any one of which can be enough to

11:44:27  11   establish that element.  For example, if a defendant

11:44:31  12   acts -- a defendant acts corruptly if he acts with the

11:44:36  13   intent to secure an unlawful advantage or benefit for

11:44:40  14   himself or another.  There I'll cite *United States v.*

11:44:44  15   *Brock* 94 F.4th 39 at 49, a D.C. Circuit case from 2024.

11:44:52  16        So too if he engages in, "other independently

11:44:56  17   unlawful conduct," that's *United States v. Robertson*,

11:45:01  18   103 F.4th 1 at 14, a D.C. Circuit case from 2023; or if

11:45:08  19   he acts with an improper purpose or consciousness of

11:45:13  20   wrongdoing.  See again the *Brock* case at Page 49.

11:45:20  21        As for the required intent to obstruct an official

11:45:22  22   proceeding, that intent need not be the defendant's sole

11:45:25  23   purpose.  Having another purpose for the conduct does

11:45:28  24   not negate the unlawful intent to obstruct the

11:45:33  25   proceeding.

11:45:37  1          The term "official proceeding" includes a grand
11:45:39  2    jury proceeding.  See section 1512(g)(1).
11:45:44  3          More specifically, it includes the grand jury's
11:45:47  4    investigation into the attack on the Capitol on
11:45:50  5    January 6, 2021, and the federal criminal prosecution of
11:45:55  6    the defendant.
11:45:57  7          Indeed, "as used in section 1512, the term
11:46:03  8    "official proceeding," means "a proceeding before a
11:46:08  9    judge or court of the United States ... or a federal
11:46:15  10   grand jury."  That's section 1515(a)(1).
11:46:19  11         And because section 1512(g)(1) clarifies that "no
11:46:25  12   state of mind need be proved with respect to the
11:46:28  13   circumstance that the official proceeding" was federal
11:46:33  14   in nature, the defendant need not "have known that the
11:46:37  15   official proceeding was a federal, as opposed to a
11:46:40  16   state, proceeding."
11:46:44  17         That's a quote from *United States v. Wellman*, 26
11:46:48  18   F.4th, 339 at 349, a Sixth Circuit from 2022.  And I
11:46:56  19   direct the parties also to *United States v. Mathis*, 923
11:47:00  20   F.3d, 242 at 263, a Fourth Circuit case from 2019.
11:47:09  21         Most of the evidence relating to this count comes
11:47:12  22   from the forensic analysis of the defendant's cell
11:47:16  23   phone.  So some background on that process is
11:47:21  24   important.
11:47:21  25         FBI Agent Jonathan Welsh testified that the

defendant was arrested on January 12, and that his phone was seized after his arrest.

That's the transcript of August 20th at page 160.

The FBI sent the phone to a digital forensic processing unit, which unlocked and gained access to it.

That's page 162.

By using Cellebrite, a platform for extracting information, including some information that has been deleted from phones, the FBI was able to extract digital content from the defendant's phone.  The parties stipulated to most of this.  The FBI seized the defendant's cell phone pursuant to a search warrant. The government maintained a proper chain of custody, and the government provided accurate and authentic copies of the digital content extracted from the defendant's phone with its exhibits.

That's Government's Exhibit 707.

The government called senior digital forensic examiner Jennifer Cain, an expert witness on digital forensic analysis, to discuss the process and the results of the forensic analysis.

She explained that an extraction was performed on a cell phone "associated with someone named William Pepe."

That's the transcript on August 20th at page 177.

The forensic team recovered several deleted text

messages sent from the defendant's phone.

Examiner Cain also explained how Telegram, a third-party chat application works, and how forensic analysis provided some information about the defendant's use of that app.  A Telegram user can delete messages that he has sent.  When he does, he may choose to delete them for only himself or for everyone in the chat.

That's page 187 of Examiner Cain's testimony.

For messages deleted in this way, a forensic examiner could see that message with a flag to mark the deletion.

Pages 187 to 188.

But Cain explained that a user can also delete messages by either logging out of the Telegram account or deleting the account altogether.

When a user takes either step, the content of the Telegram message disappears, but the attachments to those messages are still recoverable.  For example, videos, images, and other files sent within the deleted Telegram chats.

So turning to the elements of this offense, I also find that the government has proved each beyond a reasonable doubt.

So first, as to element one.  The government has proved beyond a reasonable doubt that the defendant

11:50:19  1    altered, destroyed, mutilated, or concealed a record,

11:50:23  2    document, or other object.  Specifically, the government

11:50:27  3    established that someone deleted several kinds of

11:50:30  4    digital content from the defendant's cell phone.  And

11:50:34  5    there's every reason to think that, as I'll explain,

11:50:37  6    that it was the defendant who deleted this material.

11:50:41  7        As Examiner Cain explained, and as the evidence

11:50:45  8    showed, the defendant's phone contained dozens of text

11:50:49  9    messages that had been deleted in the days following the

11:50:51  10   January 6 attack on the Capitol.

11:50:56  11       For example, in one deleted text from the very next

11:50:59  12   day, January 7 of 2021, the defendant said that he is

11:51:04  13   "going to lay low a week or two.  Deleted Telegram."

11:51:09  14       That's Government's Exhibit 301.1 at 2.

11:51:13  15       In another deleted text, the defendant informed,

11:51:15  16   quote "Hooks" that, "I'm going to have to change my

11:51:21  17   communication with everyone temporarily."  And he said

11:51:24  18   in another that "I'm going to go to jail or get doxxed.

11:51:30  19   Cleared my phone of everything.  Deleted everything."

11:51:34  20       That's Government's Exhibit 301.2 at 120 and 121.

11:51:40  21       Other deleted texts include several from January 6

11:51:43  22   itself.  For example, "I'll be going to jail for sure.

11:51:48  23   I didn't destroy anything so maybe not."

11:51:52  24       That's Government's Exhibit 301.3 at 23.

11:51:57  25       And from the day after January 6, for example:

"$1000 reward for me.  Unlawful trespassing.  Class A misdemeanor."

That's Government's Exhibit 301.3 at 27.  And "I'm a wanted man."

Government's Exhibit 301.5a at 15.

Because the FBI arrested Pepe and seized his phone on January 12 and 13, these deletions must have occurred before then.  And, of course, they must have occurred after he sent the messages on January 6 and 7.  These deletions constitute the destruction of records, namely, digital records of the defendant's communications.  No more is necessary to prove this element, but the government also established that the defendant deleted videos and content from Telegram.

Examiner Cain explained that when a video file is on a cell phone, the phone creates "thumbnail previews of what's happening in the frame of the video."

That's her testimony at page 192 through 93.

Because Examiner Cain observed that several sets of thumbnails did not have a corresponding video on the phone, she opined that these videos -- that the videos that led to the creation of those thumbnails had been deleted.

That's her testimony at pages 194 through 195.

And several of the thumbnails depict the defendant

11:53:29  1    at the Capitol on January 6.  So these deletions, again,

11:53:33  2    must have occurred between January 6 and the FBI's

11:53:37  3    seizure of the defendant's phone about a week later.

11:53:42  4         See, for example, Government's Exhibit 302.20 which

11:53:46  5    is a selfie-style photograph of Mr. Pepe at the Capitol

11:53:51  6    wearing a bandana.

11:53:55  7         Again, Government's Exhibit 302.23, the same for

11:54:01  8    Mr. Pepe at the Capitol with a large crowd in the

11:54:04  9    background.

11:54:04  10        I find this opinion and explanation credible, so I

11:54:07  11   find that the defendant deleted videos from his phone as

11:54:13  12   well as text messages as described by this testimony.

11:54:17  13        I also find that the defendant deleted Telegram

11:54:20  14   content.  Examiner Cain testified that the defendant

11:54:23  15   deleted his original Telegram account.  That's her

11:54:28  16   testimony on August 21, 2024 at page 5.

11:54:34  17        And that testimony is consistent with several

11:54:37  18   deleted text messages that Mr. Pepe had sent.  Between

11:54:40  19   late January 6 and midday January 7, the defendant said

11:54:45  20   that he "cleared his phone of everything," "deleted

11:54:50  21   Telegram," and "had to delete Telegram for the day

11:54:54  22   because of D.C."

11:54:57  23        Those are Government's Exhibit 301.1 at 2, 301.2 at

11:55:03  24   120, and 301.7.

11:55:06  25        The phone's user eventually created a second

1    Telegram account but the history was cleared from four

2    chats.

3        See Government's Exhibit 306.1a, and Examiner

4    Cain's testimony on August 21st at pages 5 through 6.

5        Examiner Cain explained that the user cleared these

6    Telegram chats between January 8 and January 10.  That's

7    her testimony on August 21st at pages 8 through 10.

8        So for all those reasons, there's just reason upon

9    reason upon reason to conclude that this element is

10   satisfied, and that the government has proven this

11   element beyond a reasonable doubt.

12       Now, one final note -- important note on this

13   element.  At closing, Mr. Pepe's counsel suggested that

14   1512 might require the government to prove that the

15   deleted records were material, presumably to some

16   underlying offense or investigation.  The defendant did

17   not press this point in post-trial briefing.  But in any

18   event, I agree with the Seventh Circuit that "there is

19   no materiality requirement for obstruction under

20   section 1512(c); the defendant must have only acted with

21   corrupt intent to obstruct."  That is *United States v.*

22   *Burge*, B-U-R-G-E, 711 F.3d, 803 at 812, note 4, a

23   Seventh Circuit case from 2013.

24       After all, "the relevant intention is directed at

25   making the government's job harder in providing its

11:56:59  1    case, not at actually succeeding in that effort."

11:57:04  2        That's *United States v. McKibbins*, 656 F.3d, 707 at

11:57:10  3    712, another Seventh Circuit case from 2011, that

11:57:15  4    explained section 1512(c), "does not include a

11:57:20  5    'materiality' requirement, because denying the

11:57:22  6    importance or materiality of a piece of evidence is

11:57:28  7    itself a form of obstruction."

11:57:30  8        And because the text of section 1512(c) "contains

11:57:37  9    no requirement that the government prove" that the

11:57:42  10   destroyed record "constituted or contained relevant or

11:57:46  11   material evidence," I find "no reason" to "add such a

11:57:53  12   requirement onto a statute where one does not exist."

11:57:59  13       That's *United States v. Ortiz*, 367 F. Supp. 2nd,

11:58:07  14   5446 at 543, a case from the Southern District of New

11:58:10  15   York in 2005.

11:58:11  16       To the contrary, the text cuts the other way

11:58:15  17   because it explains that the record "need not be

11:58:18  18   admissible in evidence" to qualify as a record whose

11:58:23  19   destruction can trigger liability.  That's

11:58:26  20   section 1512(f)(1).

11:58:30  21       And I think it's obvious that this statute would

11:58:32  22   cover situations where the government cannot prove the

11:58:34  23   contents of the record that were deleted because in fact

11:58:37  24   they were deleted.  So it's not clear how the government

11:58:40  25   could turn around and prove materiality in that case.

11:58:43   1          So for all these reasons, the government need not

11:58:46   2   show that the deleted content was material to either the

11:58:50   3   charges or the investigation.

11:58:53   4          In any event, based on all this evidence, I do find

11:58:57   5   that the first element that the defendant destroyed

11:59:01   6   records is satisfied.

11:59:03   7          Moving on to element two, I also find that the

11:59:07   8   defendant knowingly destroyed these records.  Forensic

11:59:13   9   analysis revealed that the user of the defendant's phone

11:59:16   10  "had to actually go in and select individual text

11:59:20   11  messages or the text message thread and delete that."

11:59:25   12         That was Examiner Cain's testimony at 179.

11:59:29   13         In other words, there "were no settings" for

11:59:34   14  automatic deletion of content.  Each deletion was an

11:59:37   15  affirmative decision.  And other evidence confirms this

11:59:41   16  analysis, most obviously the content of some of what

11:59:45   17  Mr. Pepe repeatedly said.

11:59:49   18         He repeatedly said that he was deleting digital

11:59:52   19  content and "clearing his phone of everything."

11:59:55   20         That's Government's Exhibit 301.2 at 120.

12:00:00   21         His text threads and Telegram chats also reflect

12:00:05   22  selective deletion.  In a text thread with a contact

12:00:10   23  named "Joey," for example, the defendant deleted most

12:00:14   24  messages but did not delete several that he sent on

12:00:17   25  January 12.

12:00:18   1          See Government's Exhibit 301.3 at page 35.

12:00:23   2          And the image showing the Telegram chats for his

12:00:27   3   second account clearly shows that four chats had their

12:00:31   4   history cleared while two did not.

12:00:33   5          That's Government's Exhibit 306.1a.

12:00:36   6          So it's overwhelmingly clear based on all this

12:00:40   7   evidence that the defendant knowingly destroyed the

12:00:43   8   digital records from his phone.

12:00:47   9          Moving to Count 3, the government has also proved

12:00:50  10   the defendant committed these acts corruptly.

12:00:56  11   Pre-Fischer, the issue of corruptly was one that was

12:00:59  12   hotly litigated.  But this type of application of this

12:01:05  13   statute is almost the textbook example of corrupt

12:01:11  14   conduct.

12:01:12  15          First, the defendant deleted these digital records

12:01:16  16   to obtain an unlawful benefit.  Specifically, to

12:01:18  17   wrongfully exculpate himself and undermine efforts to

12:01:24  18   hold him criminally accountable for his actions.

12:01:27  19          Soon after returning to his hotel from the Capitol

12:01:30  20   on January 6, the defendant spoke with Mr. Greene who

12:01:34  21   informed him that he was likely going to jail for what

12:01:37  22   he did.

12:01:38  23          That's the Greene testimony on August 20th at Pages

12:01:44  24   62 through 63.

12:01:47  25          When Greene explained that the defendant's face was

1    "all over the news right now," he testified that the

2    defendant's mood changed from celebratory to serious.

3    And later that night, the defendant texted "Hooks" -- in

4    a now deleted message -- that he was "going to go to

5    jail or get doxxed" and that he "cleared his phone of

6    everything."

7         That's Government's Exhibit 301.2 at 120.

8         The defendant then deleted a host of digital

9    content ranging from text messages to Telegram

10   communications to videos.  And he said that he had to

11   "delete Instagram" because of D.C."

12        That's Government's Exhibit 301.7.

13        Given all of this, I do find beyond a reasonable

14   doubt that the defendant acted corruptly because he

15   deleted records and thus destroyed evidence to obtain

16   the unlawful benefit of hindering efforts to hold him

17   accountable for his conduct.

18        Relatedly, and for similar reasons, the defendant

19   also acted corruptly because he acted with the unlawful

20   purpose of obstructing the investigation into his

21   conduct.  The recovered text messages show that jail was

22   on the defendant's mind quickly after January 6.  And he

23   quickly -- well, following January 6.  And he quickly

24   became aware of the large-scale investigation into the

25   attack on the Capitol.

12:03:25  1    In his words, he was "a wanted man."  That's

12:03:29  2   Government's Exhibit 301.5a and 15.  And his

12:03:34  3   wide-ranging deletions reflect an intent to hinder those

12:03:37  4   who were investigating the offense -- the events of

12:03:41  5   January 6 and who might ultimately prosecute him for his

12:03:43  6   actions.

12:03:44  7    Now, there's some indication in some of the

12:03:50  8   messages that he might take -- that perhaps he took some

12:03:53  9   of this action to avoid being "doxxed."

12:03:56  10    Now, it's not clear to me how you would avoid

12:04:00  11   doxxing by deleting content and messages that are not

12:04:07  12   public.  So for much of this, I think that explanation

12:04:11  13   doesn't really make any sense.

12:04:13  14    But even if for some of what he did delete, it

12:04:16  15   would make sense, having more than one intent does not

12:04:23  16   exculpate Mr. Pepe from what he did.  It doesn't sort of

12:04:31  17   undo or mean that he didn't have these other reasons for

12:04:38  18   acting and thus these other reasons that demonstrate a

12:04:42  19   corrupt intent, which I do find he did.

12:04:46  20    So for all these reasons and for the reasons -- for

12:04:49  21   all these reasons, and for all the reasons I'll explain

12:04:52  22   in a moment that show that the defendant intended to

12:04:56  23   impair the object's integrity or availability for use in

12:05:00  24   an official proceeding, I do find that the defendant

12:05:03  25   acted corruptly when he destroyed the records I've

discussed.

The last -- is this the last?  Yeah.

Element four is that the government must prove that the defendant intended to impair the object's integrity or availability for use in an official proceeding.  And I do find the government has proved that beyond a reasonable doubt.

The parties agreed with the proposed instructions of law which explain that "official proceeding" means, "the grand jury's investigation into the Capitol on" -- I'm sorry -- "the grand jury's investigation into the attack on the United States Capitol on January 6, 2021, and the federal criminal prosecution of the defendant."

Those were agreed to by the parties.

That instruction tracks the statute, which defines "official proceeding" to mean, among other things, "a proceeding before a judge or a court of the United States," or before "a federal grand jury."

18 United States Code, section 1515(a)(1).

The official proceeding moreover "need not have been pending or about to be instituted at the time of the offense."

That's *United States v. Riley*, 115 F.4th 604 at 610, a D.C. Circuit case from 2024.  And it's quoting section 1512(f)(1).

12:06:47  1    Instead the requisite intent to obstruct may be

12:06:51  2  established when "an official proceeding was at least

12:06:55  3  foreseeable to the defendant when he engaged in the

12:06:59  4  obstructive conduct."  That's, again, the *Riley* case.

12:07:07  5    The statute also makes clear that the government

12:07:09  6  need not show that the defendant's mens rea extended to

12:07:12  7  the federal nature of the official proceeding.  Indeed,

12:07:17  8  section 1512(g)(1) explains that "no state of mind need

12:07:21  9  be proved with respect to the circumstances that the

12:07:23  10  official proceeding before a judge, court," or "grand

12:07:29  11  jury is before a judge or court of the United States,"

12:07:36  12  or "a federal grand jury."

12:07:39  13    So as the Sixth Circuit has explained, the

12:07:42  14  defendant need not "have known that the official

12:07:45  15  proceeding was a federal, as opposed to a state,

12:07:47  16  proceeding."

12:07:48  17    And that's the *Wellman* case that I mentioned

12:07:50  18  earlier.  *Wellman*, 26 F.4th at 349.

12:07:58  19    With all that in mind, I do find that the

12:08:00  20  government has proved the requisite nexus to any

12:08:03  21  official proceeding.

12:08:04  22    First, the grand jury investigation into the

12:08:06  23  defendant's conduct on January 6 was a reasonably

12:08:12  24  foreseeable -- was a reasonably foreseeable official

12:08:16  25  proceeding.  Immediately upon returning from the Capitol

12:08:19  1    to his hotel, the defendant had a conversation with

12:08:22  2    Mr. Greene, who told him that the defendant was in the

12:08:26  3    newspapers for "breaching the Capitol."

12:08:30  4         That's Mr. Greene's testimony on August 20th at

12:08:33  5    Pages 62 and 63.

12:08:35  6         Greene further testified that he explained to the

12:08:38  7    defendant the consequences of his actions:  "You're

12:08:42  8    going to go to jail," even though Greene didn't "know

12:08:48  9    exactly what laws were broken," because the defendant

12:08:51  10   had breached police lines and had his "face all over the

12:08:57  11   news."

12:08:58  12        The defendant, the evidence showed, took that

12:09:00  13   message to heart.  In doing so, he showed a keen

12:09:02  14   awareness of the risk of prosecution and imprisonment.

12:09:07  15        For example, the morning after his conversation

12:09:10  16   with Greene, the defendant said he was "going to lay low

12:09:14  17   a week or two."

12:09:15  18        Government's Exhibit 301.1 at 2.

12:09:18  19        He also repeatedly referenced the possibility of

12:09:21  20   going to jail.  The night of January 6, he said he was

12:09:25  21   "going to go to jail or get doxxed," an apparent

12:09:31  22   explanation for his decision to "clear his phone and

12:09:35  23   delete everything."

12:09:36  24        That's Government's Exhibit 301.2 at 120.

12:09:41  25        The next day he texted that there was a "$1000

12:09:48  1    reward for me.  Unlawful trespassing.  Class A

12:09:53  2    misdemeanor."

12:09:54  3        That's Government's Exhibit 301.3 at 27.

12:09:58  4        He also messaged a contact named "Dad" that he was,

12:10:03  5    "a wanted man."

12:10:04  6        Government's Exhibit 301.5a at 15.

12:10:10  7        That evening he told "Dad" that he was "in the Post

12:10:14  8    now.  Unlawful entry.  I'm not too concerned."

12:10:18  9        That's 301.5a at 18.

12:10:22  10       A minute later, the defendant sent a URL link to

12:10:26  11   the New York Post article that prominently featured his

12:10:31  12   picture in the Capitol building.

12:10:33  13       The article mentioned "suspects in U.S. Capitol

12:10:36  14   siege," describing them as "persons of interest."

12:10:41  15       And noting that the "D.C. Metro Police and FBI have

12:10:46  16   released wanted photos for people who participated in

12:10:49  17   the U.S. Capitol riot."

12:10:54  18       Government's Exhibit 301.5b.

12:10:58  19       Later that night, "Dad" told the defendant that he

12:11:01  20   was "a person of interest."

12:11:03  21       Government's Exhibit 301.5a at 20.

12:11:07  22       And on January 8, the defendant wondered if he

12:11:12  23   "should just turn himself in" because he was "in the

12:11:17  24   papers."

12:11:19  25       Government's Exhibit 301.3 at 32.

12:11:24  1          Taken together, this evidence shows that a grand

12:11:28  2   jury investigation was reasonably foreseeable.  The

12:11:30  3   defendant clearly expressed awareness that he might go

12:11:32  4   to jail, that law enforcement was actively investigating

12:11:36  5   him as a "wanted man" and a person of interest, that

12:11:38  6   pictures of him were being displayed in a national

12:11:42  7   publication discussing criminal investigations into the

12:11:45  8   large-scale riot in which the defendant participated and

12:11:49  9   that he should "lay low" and delete content from his

12:11:53  10  phone.

12:11:55  11         True, the defendant might not have known what

12:11:57  12  particular charges were on the table.  He appeared

12:12:00  13  focused on misdemeanor unlawful entry rather than

12:12:04  14  specific felonies.  But given the overwhelming evidence

12:12:08  15  that the defendant knew he was a target of an intense

12:12:11  16  and rapidly developing law enforcement investigation

12:12:15  17  precisely because he had participated in an

12:12:17  18  unprecedented attack on the Capitol, I find that the

12:12:21  19  convening of a grand jury to investigate the defendant

12:12:24  20  and others was foreseeable.

12:12:27  21         Second and independently, the government

12:12:30  22  established the required official proceeding because

12:12:34  23  judicial proceedings for the criminal prosecution of the

12:12:37  24  defendant were also reasonably foreseeable.

12:12:41  25         As I just discussed, the defendant had the

possibility that he might go to jail clearly on his mind.  He repeatedly showed his awareness that he could face charges, and as a result, criminal prosecution.

He referenced he was a wanted man and a person of interest in a large-scale law enforcement investigation of people who had breached the Capitol.  His prosecution in a court was thus foreseeable.

And under the statute, the government need not show that the defendant possessed a particular state of mind with respect to the federal nature of the official proceeding.

In any event, because Pepe knew that he was a specific target of law enforcement -- including as noted in the article he sent to "Dad," the Federal Bureau of Investigation -- I find that it was reasonably foreseeable that he would face charges in federal court, as well as state court.

I acknowledge the need to "avoid conflating obstruction of an official proceeding with an obstruction of a mere criminal investigation unconnected with an official proceeding."

That's the *Wellman* case at 348.

But this is not a case where only an investigation was foreseeable.  Instead, the record contains "specific evidence" that the "defendant reasonably foresaw an

1    official proceeding when he" deleted content from his

2    phone.  That is, the defendant "acted with an awareness

3    that he was the target of an investigation and that the

4    government might be trying to build a case against

5    him."

6        That's a cleaned up quote from the *Wellman* case I

7    just mentioned.

8        There is actually no other plausible explanation

9    for the defendant's messages noting the possibility of

10   jail, specific crimes, acknowledging that he was a

11   wanted man in a massive law enforcement investigation.

12       The evidence is similar to that which supported a

13   section 1512(c)(1) conviction in *United States v.*

14   *Binday*, 804 F.3d, 558, a Second Circuit case from 2015

15   that was abrogated on other grounds by *Ciminelli v.*

16   *United States*, 598 U.S. 306, a Supreme Court case from

17   2023.

18       There, the Second Circuit rejected the argument

19   that, "a layperson cannot be expected to leap to the

20   conclusion that a grand jury will be convened" simply

21   because "the FBI is involved."

22       That's Page 590 of that opinion.

23       Although not "every inquiry from the FBI"

24   necessarily "renders a grand jury investigation

25   reasonably foreseeable," the evidence in *Binday*

12:15:55  1    established that foreseeability because the defendant

12:16:01  2    "knew that the subject of the FBI's inquiries was in

12:16:04  3    fact a large insurance fraud scheme in which he

12:16:08  4    participated and about which he possessed incriminating

12:16:12  5    documents."

12:16:14  6         Again, that's the *Binday* case at 590 through 91.

12:16:20  7         So too here, Mr. Pepe knew that law enforcement,

12:16:23  8    including the FBI, was investigating an unprecedented

12:16:27  9    attack on the Capitol in which he participated.  Not

12:16:30  10   only that, but he knew that his face was in the paper as

12:16:33  11   a wanted man and a person of interest.

12:16:38  12        "That a grand jury has not been commenced or

12:16:40  13   specifically discussed with him at the time of the

12:16:45  14   destruction" of the digital conduct "does not render a

12:16:52  15   grand jury proceeding unforeseeable."

12:16:54  16        That's the same case I just mentioned before,

12:16:57  17   *Binday,* at Page 591.

12:17:01  18        Nor for that matter does it render a criminal

12:17:04  19   prosecution and subsequent judicial proceedings

12:17:08  20   unforeseeable.

12:17:09  21        So for all these reasons, I do find that the

12:17:11  22   government has established the foreseeability of an

12:17:15  23   official proceeding.

12:17:18  24        Now, the D.C. Circuit has also held that the

12:17:21  25   government must prove that the defendant's obstructive

conduct "had a relationship in time, causation, or logic with the official proceeding such that the defendant knew that his intentional acts had the natural and probable effect of interfering with" it.

That's the *Riley* D.C. Circuit case I mentioned just a moment ago, 115 F.4th at 116.  It's a cleaned up quote from that case.

To the extent that this requirement calls for more than just the foreseeability of a proceeding, I do believe that the government has proved this relationship as well.  As explained, the defendant was thinking about jail, crimes he may have committed on January 6, and the investigation as soon as January 6 and January 7.

He knew at that time about his prominence as a wanted man and person of interest in media reporting. That knowledge connects the official proceeding, whether a grand jury or criminal prosecution and accompanying judicial proceeding, to his deletions in several ways. For starters, the deletions are temporally related to the official proceeding.

Mr. Pepe deleted the text messages showing his awareness of the possibility of jail and the large-scale investigation.

In other words, he deleted those messages after the official proceeding became reasonably foreseeable, thus

12:19:01  1    establishing the required nexus between the obstructive

12:19:05  2    conduct and the proceeding.

12:19:06  3        He also deleted Telegram chats on January 8 and

12:19:10  4    January 10, days after his texts reflected his awareness

12:19:14  5    of a potential official proceeding.  And he likely

12:19:17  6    deleted his first Telegram on January 7, i.e., after

12:19:23  7    Mr. Greene told him he was on the news and might go to

12:19:26  8    jail.

12:19:28  9        For similar reasons, the deletions are causally and

12:19:32  10   logically related to a foreseeable official proceeding.

12:19:34  11   The defendant selectively deleted digital content after

12:19:38  12   becoming aware that he was the target of an

12:19:41  13   investigation and might face prosecution.

12:19:44  14       Indeed, he said he "had to delete Telegram for the

12:19:49  15   day because of D.C.," thus explicitly acknowledging the

12:19:54  16   causal link between that deletion and his concern about

12:19:57  17   his participation in the events of January 6.

12:20:01  18       That's Government's Exhibit 301.7.

12:20:05  19       And when the defendant said he's "going to go to

12:20:09  20   jail," he immediately followed up by saying that he had

12:20:12  21   cleared his phone and deleted content from his phone.

12:20:15  22       That's Government's Exhibit 301.2 at 120.

12:20:20  23       In sum, I do find that the defendant knew his

12:20:23  24   intentional obstructive acts would have the natural and

12:20:26  25   probable effect of interfering with an official

12:20:29  1    proceeding.  Because the government has proved each

12:20:34  2    element of section 1512(c)(1), I do find the defendant

12:20:38  3    guilty of the offense charged in Count 5.

12:20:40  4        So in summary, for all the reasons I just explained

12:20:43  5    in this ruling and based on the evidence presented at

12:20:47  6    trial, I do find that the government has proved each

12:20:50  7    element of each count beyond a reasonable doubt, and so

12:20:54  8    I find the defendant guilty of all the offenses charged

12:20:58  9    in those counts.

12:21:03  10       Again, apologies to all for the length of that

12:21:09  11   ruling, but I think it is something I should put on the

12:21:11  12   record in as much detail, and there were several legal

12:21:17  13   issues that both parties had raised that I thought

12:21:20  14   warranted a little more explanation and color.

12:21:25  15       Let me -- we will pick a sentencing -- well, Ms.

12:21:31  16   Harris, why don't you provide us, at least in the first

12:21:35  17   instance, a potential sentencing date.

12:21:49  18            DEPUTY COURTROOM CLERK:  So it falls within

12:21:51  19   trials, so the first date would be February 18th.

12:22:00  20            THE COURT:  Okay.  And we might be able to do

12:22:03  21   the morning of the 18th, then?  Even though it's not

12:22:08  22   a -- or actually, wait a minute.

12:22:18  23       Well, why don't we -- all right, there are a few

12:22:26  24   weeks here where we have both -- situation where we have

12:22:37  25   my unavailability due to a number of trials and then at

12:22:41  1    least one week in there where I'm unavailable for

12:22:46  2    another reason.  So I think given everything, the date

12:22:51  3    that I would propose to the parties is March 11th, which

12:22:57  4    is a little bit longer than I would have liked, but

12:23:00  5    that's the first date I have -- after giving them enough

12:23:04  6    time to do the presentence report, that's the first

12:23:07  7    convenient date for me.  And so I propose to do it March

12:23:10  8    11th at 9:30.

12:23:12  9         Now, I know -- actually maybe I should have, unlike

12:23:17  10    many cases, started with Mr. Shipley given how far he is

12:23:24  11    from -- how far he is based from our courthouse here.

12:23:26  12         Mr. Shipley, how does March 11th look?

12:23:29  13         MR. SHIPLEY:  That's fine, Your Honor.  My

12:23:31  14    March is wide open.  My last scheduled trial is middle

12:23:34  15    of February.

12:23:34  16         THE COURT:  Okay.  Well, that makes one of us.

12:23:37  17         All right.  So we'll put -- oh, let me just ask

12:23:41  18    from government counsel, does that work for the

12:23:42  19    government?

12:23:43  20         MR. BRADY:  Yes, Your Honor.

12:23:44  21         THE COURT:  Okay.  So we'll put things down for

12:23:47  22    sentencing March 11th at -- and I think we should start

12:23:55  23    at 9:00.  I know that's a challenge for -- sometimes to

12:24:01  24    get into the courthouse, but I think given how long my

12:24:05  25    sentencing hearings -- some of them have run, I think

12:24:08   1    it's better to start promptly at 9:00.

12:24:11   2        So let's put it down for March 11th at 9:00.  I'd

12:24:15   3    ask that sentencing memoranda -- I usually ask for

12:24:21   4    sentencing memoranda to be submitted a week beforehand,

12:24:26   5    but let me just ask you, Mr. Shipley, this question,

12:24:31   6    which sometimes comes up:  Do you think -- it doesn't

12:24:36   7    strike me that this would be a case where you would want

12:24:41   8    to respond to something the government says in its memo.

12:24:45   9    Obviously, you'll be able to do it before me, but

12:24:48  10    sometimes there's going to be enough dispute about, say,

12:24:51  11    the guidelines or something where I have -- the defense

12:24:58  12    wants to stagger the submissions so that the government

12:25:00  13    goes first and you might go some period after.

12:25:04  14        I don't sense this is such a case, but I would

12:25:07  15    defer to you about what you think about that.

12:25:09  16        MR. SHIPLEY:  Obviously, as the Court is aware,

12:25:13  17    I've done enough of these cases I can pretty well

12:25:15  18    anticipate where the government is going to lead itself

12:25:20  19    in its sentencing arguments.

12:25:22  20        THE COURT:  Okay.

12:25:23  21        MR. SHIPLEY:  And that's not pejorative.  I

12:25:27  22    just -- I know where they're going to go.

12:25:29  23        THE COURT:  Right.

12:25:29  24        MR. SHIPLEY:  And Mr. Brady and I have worked

12:25:31  25    together, you know, extensively up to this point, so I

12:25:33  1    don't think I'll need an opportunity to reply.  I'll be

12:25:36  2    able to address the issues that I anticipate, and

12:25:41  3    Mr. Brady, I'm sure, will be in communication as well.

12:25:46  4         THE COURT:  All right.  Sometimes just in cases

12:25:47  5    where, particularly -- now, again, we don't have that

12:25:49  6    many counts here.  But sometimes when we've got multiple

12:25:55  7    counts of conviction, the guidelines -- the disputes

12:26:02  8    about the guidelines are not some of the run-of-the-mill

12:26:06  9    things that we all know will come up and that have

12:26:10  10   either been decided by our circuit or not.

12:26:12  11     So anyway -- all right.  We'll just leave it as the

12:26:17  12   parties -- if you'll file your sentencing memoranda one

12:26:19  13   week before the 11th, so that would be March 4th, we'll

12:26:25  14   go from there.

12:26:30  15     Let me then just turn to the government and ask

12:26:33  16   whether the government is requesting any change in

12:26:38  17   Mr. Pepe's conditions of release.

12:26:40  18         MR. BRADY:  No, Your Honor.

12:26:41  19         THE COURT:  Okay.  Good.  I didn't anticipate

12:26:45  20   that you would, but I think Mr. Pepe -- let me just

12:26:50  21   say -- so you're going to be, I think, given the fact

12:26:55  22   that I have had no -- given what I know of Mr. Pepe's

12:27:06  23   past conduct and his criminal history, given that I

12:27:15  24   don't recall any problem with Mr. Pepe while on

12:27:18  25   supervision in this case, and given the lack of a

12:27:21    1    request from the government, I can certainly, under

12:27:25    2    3143, release him pending sentencing.

12:27:30    3        I will just say, Mr. Pepe, just for the record, you

12:27:35    4    know, the penalties for not showing up for sentencing

12:27:39    5    can be severe.  They're not just -- you would not just

12:27:44    6    be violating a court order of mine, but you expose

12:27:49    7    yourself to significant other imprisonment if you do

12:27:55    8    that.  It doesn't work out well for people who do that.

12:27:59    9    So don't do that.

12:28:01    10        Yes, Counsel.

12:28:02    11        MR. BRADY:  Your Honor, I believe this is part

12:28:04    12    of his pretrial release, but just to remind -- if it's

12:28:07    13    not, to have it explicitly stated -- if the defendant

12:28:10    14    were to travel to Washington, D.C., to ask the Court for

12:28:12    15    permission for that and that that would only be for

12:28:16    16    court purposes.  I just don't want another repeat of a

12:28:18    17    January 6th-style event.

12:28:21    18        THE COURT:  Understood.  And so I have not gone

12:28:24    19    back and looked, although -- well, you know what, it's

12:28:29    20    worth me doing right now.

12:29:17    21        Okay.  So there we go.  I'm looking at what is on

12:29:20    22    the docket at ECF Number 5, and it lays out Mr. Pepe's

12:29:24    23    conditions of release.  One of those conditions is to

12:29:26    24    stay out of Washington, D.C., except for court and

12:29:31    25    pretrial services business and attorney meetings.  See

12:29:37  1     additional travel restrictions in S:  Travel outside the

12:29:40  2     continental -- this is what "S" says:  "Travel outside

12:29:43  3     the continental United States is to be approved by the

12:29:46  4     Court.  Defendant must notify PSA of travel outside the

12:29:50  5     state of New York," and some other things that don't

12:29:55  6     relate to travel.

12:29:56  7          So Mr. Pepe, if you do travel outside the state of

12:30:01  8     New York, number one, you have to notify Pretrial

12:30:04  9     Services.  That's number one.  Actually, and -- maybe we

12:30:14  10    don't have anyone here.  I assume it would still be

12:30:17  11    Pretrial Services and not Probation Office

12:30:21  12    post-conviction presentencing?

12:30:23  13         Yes, Ms. Harris is telling me.

12:30:26  14         All right.  So Pretrial Services, if you're outside

12:30:27  15    the state of New York.

12:30:28  16         Two is -- again, it says travel outside the

12:30:34  17    continental United States would have to be approved by

12:30:37  18    me.  Okay.  And then the other is to stay out of

12:30:39  19    Washington, D.C., except for those reasons.

12:30:43  20         So Mr. Pepe, those are your conditions of release.

12:30:46  21    You should continue to maintain those, which means if

12:30:50  22    you were to come to D.C., it would have to be for one of

12:30:53  23    those particular purposes or -- and you would have to

12:30:58  24    get permission from -- or notify Pretrial Services.

12:31:05  25         So I take the government's point.  You want to not

12:31:10   1     create a problem with your conditions of release between

12:31:13   2     now and sentencing.

12:31:15   3         Anything further from the government at this point?

12:31:20   4             MR. BRADY:  No, Your Honor.

12:31:21   5             THE COURT:  Okay.

12:31:23   6         Anything further from Mr. Pepe's counsel?

12:31:28   7             MR. SHIPLEY:  Mr. Shipley.  No, Your Honor.

12:31:31   8     Thank you.

12:31:32   9             THE COURT:  Okay.  All right.  Very well.  So

12:31:34   10    we will see -- and we will see all of you back here in

12:31:40   11    March for sentencing.

12:31:41   12        Until then --

12:31:42   13            MR. SHIPLEY:  Your Honor, one thing.  This is a

12:31:44   14    formality, and I just don't want there to be any error

12:31:46   15    in the record.

12:31:48   16        Counsel is appearing there in court specially and

12:31:51   17    is not making a general appearance on behalf of

12:31:54   18    Mr. Pepe.  So I don't want there to be any confusion

12:31:56   19    that he has an obligation as counsel of record on behalf

12:31:59   20    of Mr. Pepe.

12:32:01   21            THE COURT:  I'm sorry.  And Mr. Shipley, I

12:32:05   22    can't tell you how much I join you in not wanting there

12:32:09   23    to be error.  But tell me what you just meant by what

12:32:12   24    you just said.

12:32:13   25            MR. SHIPLEY:  Counsel there on my behalf in

12:32:17  1    person with Mr. Pepe is making a special appearance, not

12:32:20  2    a general appearance, for purposes of today's hearing

12:32:22  3    only because of my unavailability.  So I just don't want

12:32:25  4    there to be -- I don't want -- a general appearance on

12:32:31  5    his part made in the docket, which might create some

12:32:35  6    kind of ethical obligation to appear at future hearings.

12:32:39  7              THE COURT:  I see.  Understood.

12:32:40  8         And to be clear, while you referenced your

12:32:46  9    unavailability, quite obviously you were available by

12:32:49 10    video conference, and that is how you personally

12:32:56 11    participated here by receiving the -- by hearing my

12:33:01 12    verdict.

12:33:01 13         And Mr. Pepe has other counsel just for today

12:33:04 14    sitting in -- I guess how to describe it, but sitting in

12:33:11 15    on your behalf.

12:33:11 16         Is that the right way to say it, Mr. Shipley?

12:33:15 17              MR. SHIPLEY:  Yes, that's correct, Your Honor.

12:33:17 18         I've always understood that there's a distinction

12:33:19 19    between a special appearance for a limited purpose and a

12:33:22 20    general appearance, which makes you counsel of record.

12:33:25 21              THE COURT:  Fair enough.  And can I just get --

12:33:27 22    what is, Counsel, your name, just to put it on the

12:33:31 23    record?

12:33:31 24              MR. NOBILE:  My name is Mark Nobile.

12:33:37 25              THE COURT:  Okay.  If you can slide the

12:33:39    1    microphone over so we can get that.

12:33:43    2             MR. NOBILE:  Mark Nobile.

12:33:45    3             THE COURT:  All right.  Thank you, Mr. Nobile.

12:33:49    4        All right.  With that, then, the parties are

12:33:51    5    dismissed.

12:34:02    6             (Court adjourned at 12:24 p.m.)

            7

            8                    - - - - -

1

2                              CERTIFICATE

3

4          I, Chandra Kean, RMR, certify that the foregoing is

5     a correct transcription from the record of proceedings

6     in the above-titled matter.

7

8     _____          October 30, 2024
        Chandra Kean, RMR                      DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25