**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 22-cr-00015 (APM)** |
| **ELMER STEWART RHODES III, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

**I.**

After securing vacatur of the convictions of eight Defendants in this case—all members of a group known as the Oath Keepers—the United States now moves pursuant to Federal Rule of Criminal Procedure 48(a) to dismiss the indictment.  Reluctantly, the court grants the motion.

**II.**

At approximately 2:40 p.m. on January 6, 2021, as the U.S. Capitol descended into chaos, Defendant Edward Vallejo was in Arlington, Virginia, at a hotel watching the events unfold on television.  Less than two hours prior, a joint session of Congress had convened to certify the result of the 2020 presidential election.  But by 2:40 p.m., the Capitol had come under siege by an angry mob of thousands of President Trump's supporters.  The joint session was suspended, and Members of Congress and their staff went into hiding.

Vallejo was no dispassionate observer.  His task that day was to serve as the "Quick Reaction Force," or QRF, for the Oath Keepers.  Vallejo had at the ready a large collection of firearms that various Oath Keepers had transported to the outskirts of the District.  One witness described it as the largest cache of weapons he had seen since serving in the military.  The firearms

had a purpose.  In the weeks leading up to January 6, the Oath Keepers' leader Defendant Stewart Rhodes had publicly declared what his members had been discussing in private meetings and through encrypted communications: their willingness to use force and violence to thwart the certification of President-elect Biden's electoral victory.  By way of example, on Christmas Day, Defendant Kelly Meggs posted in an Oath Keepers group chat, "There is gonna be blood in the streets no matter what . . . .  Let's see what he does and be ready [for] whatever that is . . . .  But we can be ready for what ever the outcome is."  Defendant David Moerschel responded, "It's a war time Christmas.  Gentleman, Trump is going to make his big move on Jan 6.  Be prepared."  On New Year's Eve, Rhodes posted in another group chat, "On the 6th, they are going to put the final nail in the coffin of this Republic, unless we fight our way out.  With Trump (preferably) or without him, we have no choice."  And days later, Meggs told a friend, "The natives are very restless.  Tell your friend this isn't a Rally."  One witness summed up the Oath Keepers' objective in the days leading up to January 6: To "fight back against an illegitimate government and support what we saw as the rightful President against an illegitimate President" and to "take up arms and fight back."  To "[c]onquer or die."

So as Vallejo watched the Capitol being overrun, he understood his assignment.  He was prepared to enter the District with weapons to prevent the peaceful transfer of power.  He wrote to the Oath Keepers group chat, "Vallejo back at hotel and outfitted.  Have 2 trucks available.  Let me know how I can assist," and moments later, "QRF standing by at the hotel.  Just say the word."  Thankfully, that word never came.  Vallejo stayed put.

Meanwhile, a line of roughly ten Oath Keepers, decked out in military gear, had arrived at the Capitol grounds, marched up the eastern steps, and entered the building.  A witness testified that Meggs told them all that, once inside, "We were going to try to stop the vote count."  Half of

them headed towards the Senate chamber, where they attempted with others to storm past a line of police officers. The other half ended up in front of Speaker Nancy Pelosi's office. Meggs later would brag to a friend, "We looked for her." Not long after, a second group of Oath Keepers would make their way inside the Capitol, where they clashed with police officers attempting to clear the building. Due to the extraordinary bravery and courage of law enforcement, Congress was able to reconvene later that night and certify President-elect Biden as the winner of the 2020 presidential election.

Anticipating pursuit by law enforcement, as they fled the District, the Oath Keepers began disposing of incriminating evidence. Rhodes instructed some, "YOU ALL NEED TO DELETE ANY OF YOUR COMMENTS REGARDING WHO DID WHAT. . . . DELETE your self-incriminating comments or those that can incriminate others." One member told another, "We need to make sure that all the signal comms about the op [have] been deleted and burned." Some group members did just that. They discarded phones, deleted messaging applications, erased group chats, and even set fire to the clothing they wore on January 6.

Still, the Oath Keepers remained unbowed. Rhodes wrote in one chat, "Stand firm. Do NOT go off half cocked. There is still a chance Trump will act as Commander in Chief. I am working with others to make that a reality. It does ZERO good for anyone to initiate force at this time. So sit tight. DO prepare yourselves, your gear, your teams, and above all your community. Whatever Trump decides to do, you will need to be ready."

## II.

## A.

The Department of Justice eventually would charge dozens of Oath Keepers with various crimes related to January 6. This case concerned nine of them: Rhodes, Meggs, Kenneth

Harrelson, Jessica Watkins, Roberto Minuta, Joseph Hackett, Moerschel, Thomas Caldwell, and Vallejo.[1]  They were charged with the most serious offenses, including three conspiracy counts: seditious conspiracy, conspiracy to obstruct an official proceeding, and conspiracy to prevent Members of Congress from discharging their duties.  Superseding Indictment, ECF No. 167. The indictment also contained a host of other charges.  *See id.*

The nine defendants went to trial in two phases.  The first, involving five defendants, spanned over two months.  A jury convicted all defendants, except one (Thomas Caldwell), of at least one conspiracy offense.  Verdict Form (Trial One), ECF No. 410.  A second trial of the remaining four defendants occurred over six weeks.  A jury convicted each of them of conspiracy offenses as well.  Verdict Form (Trial Two), ECF No. 450.  Both juries also convicted each Defendant of obstruction of an official proceeding.  The chart below summarizes those convictions.

| Defendant | Seditious Conspiracy<br><br>18 U.S.C. § 2384 | Conspiracy to Obstruct an Official Proceeding<br><br>18 U.S.C. § 1512(k) | Conspiracy to Prevent Members of Congress from Discharging their Duties<br><br>18 U.S.C. § 372 | Obstruction of an Official Proceeding<br><br>18 U.S.C. § 1512(c)(2) |
|---|---|---|---|---|
| Rhodes | x | | | x |
| Meggs | x | x | x | x |
| Watkins | | x | x | x |
| Harrelson | | | x | x |
| Caldwell | | | | x |
| Minuta | x | x | x | x |
| Hackett | x | x | x | x |
| Moerschel | x | x | x | x |
| Vallejo | x | x | x | x |

---

[1] The indictment included two additional defendants, Joshua James and Brian Ulrich.  They entered pleas of guilty to seditious conspiracy and cooperated with the government's investigation.  Ulrich gave trial testimony.  The government's motion makes no mention of these defendants, nor does it justify the inequity of their convictions remaining in place despite having accepted responsibility and aided the prosecution.

Contrary to what some believe, the jurors did not simply rubber stamp the government's case. The first jury found multiple Defendants not guilty on various counts. So, too, did the second one. All 24 jurors—plus eight alternates—performed an extraordinary service to the nation.

Sentencing of Defendants occurred over multiple days. The jail sentences fell along a broad spectrum, reflecting each Defendant's role in the conspiracy and personal circumstances. They ranged from a high of 18 years (Rhodes) to a low of three (Moerschel).[2] Appeals followed.

While their appeals were pending, the Supreme Court decided *Fischer v. United States*, 144 S. Ct. 2176 (2024). The Court held that, to establish obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2), the government had to prove that the defendant impaired (or attempted to impair) "the availability or integrity for use in an official proceeding of records, documents, objects" or "other things used in the proceeding." *Id.* at 2190. This meant that more than a showing of attempted interference with Congress's performance of its duties was required to sustain a conviction under § 1512(c)(2).

**B.**

On January 20, 2025, the first day of his second term in office, President Trump issued a proclamation titled "Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021" (the "Proclamation"). Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025). The Proclamation pardoned all persons convicted of January 6–related offenses except 14 named individuals. Among them were the nine defendants in this matter. President Trump commuted

---

[2] Caldwell's case lagged behind the others and, because of the Supreme Court's decision in *Fischer v. United States*, 144 S. Ct. 2176 (2024), *see infra* for a discussion, his § 1512(c)(2) conviction was vacated. That left only a conviction for obstruction for destroying documents, for which the court sentenced him to time served. Minute Entry, Jan. 10, 2025.

their sentences to time served.[3]  The commutation, however, did not impact their convictions; those stayed in place.

Meanwhile, Defendants' appeals remained pending for years—the result of multiple continuances—without the submission of an opening brief.  On April 14, 2026, on the eve of the last filing deadline, the government moved to vacate Defendants' convictions under 28 U.S.C. § 2106 and remand the case "so that the government may move to dismiss the indictment with prejudice under Federal Rule of Criminal Procedure 48(a)."  *See, e.g.*, Unopposed Mot. to Vacate Convictions and to Remand for Dismissal with Prejudice, *Harrelson v. United States*, No. 23-3089 (D.C. Cir.) [hereinafter *Harrelson* Docket], Doc. 2168665 [hereinafter Mot. to Vacate].[4]  Finding without elaboration that vacatur of Defendants' convictions was "just under the circumstances," the D.C. Circuit granted the motion on May 21, 2026.  Order, *Harrelson* Docket, Doc. 2174518.  It remanded the case the same day.  *Id.*

### C.

Back before this court, the government moved on May 22, 2026, to dismiss the indictment pursuant to Rule 48(a).  Gov't Unopposed Mot. to Dismiss Indictment, ECF No. 967 [hereinafter Gov't Mot.].  The government's two-page filing said little more than that "[t]he government has determined in its prosecutorial discretion that dismissal of this criminal case is in the interests of justice."  *Id.* at 1.

This court was not satisfied with that bare-boned justification.  In an Order issued on May 29, 2026, the court "defer[red] ruling on the government's request until it receive[d]

---

[3] Included among them was Caldwell, even though he received a sentence of time served.  President Trump later pardoned Caldwell on March 20, 2025.  *See* Unopposed Mot. to Dismiss Appeal, *Harrelson v. United States*, No. 23-3089 (D.C. Cir.) [hereinafter *Harrelson* Docket], Doc. 2109222.

[4] Ironically, only days before, the government had opposed some Defendants' motion to exceed the page limit, without any hint of an impending motion to vacate.  *See* Opp'n to Mot. for Add'l Word Limit for Appellants' Opening Br., *Harrelson* Docket, Doc. 2167809.

additional information." Order, ECF No. 976, at 1. Citing the D.C. Circuit's decision in *United States v. Ammidown*, the court observed that it cannot "be content with a mere conclusory statement by the prosecutor that dismissal is in the public interest, but will require a statement of reasons and underlying factual basis." *Id.* at 1–2 (quoting *Ammidown*, 497 F.2d 615, 620 (D.C. Cir. 1973)). The court sought a more fulsome explanation "to determine whether 'the reasons advanced for the proposed dismissal are substantial' and to guard against 'abuse of prosecutorial discretion.'" *Id.* (quoting *Ammidown*, 497 F.2d at 620).

The government supplemented its motion on June 18, 2026. Gov't Suppl. Mot. to Dismiss Indictment, ECF No. 979 [hereinafter Gov't Suppl. Mot.]. That filing detailed the long procedural history of this case, *id.* at 2–5; expressed the government's view of the proper standard of review, *id.* at 6–8, 11–12; and offered various grounds for the government's decision to seek dismissal, *id.* at 8–12. Defendant Minuta also filed a response to the court's Order. Def. Minuta's Resp. to the Court's Order Dated May 29, 2026, ECF No. 977 [hereinafter Minuta Resp.]. No Defendant opposes the government's request for dismissal. Gov't Mot. at 1.

### III.

### A.

The court starts with the applicable legal standard. Pursuant to Rule 48(a), "[t]he government may, with leave of court, dismiss an indictment." The Supreme Court has observed that the "leave of court" requirement "obviously vest[s] some discretion in the court." *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977). So, too, has the D.C. Circuit. In *Ammidown*, the court wrote that "Rule 48(a)'s requirement of judicial leave . . . gives the court a role in dismissals following indictment." 497 F.2d at 620.

The scope of that role is not well defined.  In *Rinaldi*, the Court stated that "[t]he principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection."  434 U.S. at 29 n.15.  The Court continued, "But the Rule has also been held to permit the court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by considerations clearly contrary to the public interest."  *Id.*  For that proposition, the Court cited *Ammidown*.  *Id.  Ammidown* itself "note[d] the considerations, *other than protection of defendant*, that have been taken into account by courts." 497 F.2d at 620 (emphasis added).   One such consideration is whether the prosecution's determination that "the evidence is not sufficient to warrant prosecution," if one is made, is "a considered judgment, and an application made in good faith," including whether "it appears that the assigned reason for the dismissal has no basis in fact."  *Id.* at 620–21 (internal quotation marks and citation omitted).  Another is whether "prejudice would likely be worked upon the Government in another criminal action."  *Id.* at 621.

The government and Defendant Minuta would have the court disregard these portions of *Ammidown* as "dicta."  *See* Gov't Suppl. Mot. at 11–12; Minuta Resp. at 2–4.  The government cites *In re United States*, 345 F.3d 450, 453 (7th Cir. 2003), where the Seventh Circuit observed that it was "unaware . . . of any appellate decision that actually upholds a denial of a motion to dismiss a charge on" the grounds that dismissal would be contrary to the public interest. Gov't Suppl. Mot. at 11.  The court is not aware of one either, but the absence of such a decision does not demote *Ammidown*'s reasoning to dicta.

The government also points to various general pronouncements from the Supreme Court describing the breadth of prosecutorial discretion in charging decisions.  *See id.* at 11–12

(citing *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case . . . ."); *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("[T]he decision of a prosecutor in the Executive Branch not to indict [is] the special province of the Executive Branch . . . ."); *I.C.C. v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) ("[T]he refusal to prosecute cannot be the subject of judicial review."); and *United States v. Armstrong*, 517 U.S. 456, 464–65 (1996) (stating courts are properly hesitant to examine a decision to prosecute so as "not to unnecessarily impair the performance of a core executive constitutional function")).  The Court made none of those pronouncements, however, in the context of a Rule 48(a) dismissal request or an analogous exercise of prosecutorial judgment. They were made in discussing the justiciability of a dispute over a Rule 17(c) subpoena issued to the President (*Nixon*); the extent of judicial review of an agency decision not to bring an enforcement action (*Heckler*); the judicial reviewability of an agency order denying reconsideration (*I.C.C.*); and the showing necessary to establish an equal protection violation based on an alleged racially motivated prosecution (*Armstrong*).  None of these cases therefore supply cause to doubt the vitality of *Ammidown*.

For his part, Minuta says the relevant portion of *Ammidown* is dicta because the case did not involve a Rule 48(a) dismissal but rather the trial court's rejection of a plea bargain to a lesser offense under Rule 11 on the belief that the public interest was in trying the defendant on a greater charge.  *See* Minuta Resp. at 2–4.  Minuta would have this court substantially curtail any assessment of the government's reason for dismissal and consideration of the public interest, believing that the D.C. Circuit's decision in *United States v. Fokker Services B.V.* "truncates—if not altogether forecloses—the inquiry."  *Id.* at 2.

9

In *Fokker*, the D.C. Circuit observed that "decisions to dismiss pending criminal charges—no less than decisions to initiate charges and to identify which charges to bring—lie squarely within the ken of prosecutorial discretion." 818 F.3d 733, 742 (D.C. Cir. 2016). The court, citing *Rinaldi*, wrote that "[a] court thus reviews the prosecution's motion under Rule 48(a) primarily to guard against the prospect that dismissal is part of a scheme of 'prosecutorial harassment' of the defendant through repeated efforts to bring—and then dismiss—charges." *Id.* "So understood," the court continued, "the 'leave of court' authority gives no power to a district court to deny a prosecutor's Rule 48(a) motion to dismiss charges based on a disagreement with the prosecution's exercise of charging authority." *Id.*

Minuta's elevation of *Fokker* over *Ammidown* is unpersuasive for a host of reasons. For one, nothing in *Fokker* countermands *Ammidown*'s observation that "[a] distinctly different situation is presented when the defendant *concurs* in the dismissal but the court is concerned whether the action sufficiently protects the public." 497 F.2d at 620 (emphasis added). *Fokker*'s discussion of Rule 48(a) was premised on a different posture: "when the government moves to dismiss an indictment over the defendant's *objection*." *Fokker*, 818 F.3d at 742 (quoting *Rinaldi*, 434 U.S. at 29 n.15) (emphasis added). And for another, if *Ammidown*'s discussion of Rule 48(a) is dicta as Minuta claims, then so is *Fokker*'s. *Fokker* likewise did not involve a Rule 48(a) ruling. It held that a trial court lacks the authority, under the Speedy Trial Act, to refuse to exclude time needed to effectuate a deferred prosecution agreement with which it disagrees. *See id.* at 737–38. *Ammidown* relied on principles applicable to Rule 48(a) to justify its ruling no less than *Fokker* did to justify its own. This court must heed both.

This case presents *Ammidown*'s "distinctly different situation": Defendants concur in the dismissal. That is why the court, "in the exercise of its responsibility," was "not . . . content with

10

a merely conclusory statement by the prosecutor that dismissal is in the public interest" and "require[d] a statement of reasons and underlying factual basis" from the government. *Ammidown*, 497 F.2d at 620; *see also* Order, ECF No. 976.  The government now having filed such a statement, *see* Gov't Suppl. Mot, the court's task is to evaluate whether the proffered reasons for dismissal are "substantial," *see Ammidown*, 497 F.2d at 620.  *Ammidown* does not define what it meant by "substantial," but that standard cannot reasonably be understood to impose an onerous burden on the prosecution given its broad discretion in charging decisions.

The court makes its assessment with the following principles in mind:  First, "[t]he Executive's primacy in criminal charging decisions is long settled."  *Fokker*, 818 F.3d at 741. Second, "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding . . . whether to dismiss a proceeding once brought."  *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967).  And third, "the presumption of regularity" applies to "prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties."  *Armstrong*, 517 U.S. at 464 (cleaned up).

## B.

Before turning to the government's proffered justifications for dismissal, it is important to note the reasons it has *not* offered.  The government does not say that the charges were legally deficient[5] or that the evidence presented is insufficient to sustain Defendants' convictions.[6]

---

[5] That includes Defendants' convictions for obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2) and for conspiracy to obstruct an official proceeding under 18 U.S.C. § 1512(k).  Although the government alludes to the Supreme Court's decision in *Fischer v. United States*, it does not explicitly argue that the evidence it presented was insufficient to sustain Defendants' convictions under *Fischer*'s narrowed scope.  *See* Gov't Suppl. Mot. at 3–4 & n.2; *id.* at 6.  But even if those convictions were to fall under *Fischer*, that would not explain why the other convictions must go, too.

[6] The government engages in none of Minuta's efforts to recast the evidence in Defendants' favor.  *See* Minuta Resp. at 8–16.  And for good reason.  Two juries heard those very same arguments at trial and flatly rejected them.  If the

*See Ammidown*, 497 F.2d at 620.  It confesses to no prosecutorial misconduct, nor does it assert any denial or compromise of a defendant's rights.  And it does not identify any legal error that resulted in an unfair trial or a wrongful conviction (except perhaps as to the obstruction of an official proceeding counts).  Remarkably, then, the government does not maintain that dismissal is in the public interest to rectify a fundamental error or a grave injustice.

Its lead argument is rather that dismissal is appropriate to protect Defendants from harassment.  According to the government, "[r]etrying these defendants, where there have already been two vigorously litigated public trials, and where there is no potential additional punishment that could be imposed upon a subsequent conviction [due to the President's commutation of their sentences], would subject them to precisely the type of harassment that Rule 48's 'leave of court' requirement is designed to prevent."  Gov't Suppl. Mot. at 8–9.  That is a strange argument.  This is not a case of "charging, dismissing, and recharging" to which the "prosecutorial harassment" rationale ordinarily applies.  *Rinaldi*, 434 U.S. at 29 n.15.  There is no need to "protect[] a defendant from harassment, through a prosecutor's charging, dismissing without having placed a defendant in jeopardy, and commencing another prosecution at a different time or place deemed more favorable to the prosecution."  *Ammidown*, 497 F.2d at 620.  After all, the government has given no indication that it will recharge these Defendants, in the District or elsewhere.  To the contrary, it bestows upon them unearned grace by wiping their records clean.  The harassment rationale has no place here.

Next, the government argues that dismissal "effectuates the President's January 20, 2025, proclamation."  Gov't Suppl. Mot. at 9–11.  Recall that the President's Proclamation issued a full pardon to those convicted of January 6 offenses, except to 14 specifically named individuals—

---

government believes that the evidentiary record cannot sustain the convictions, this court would have expected it to say so.

including these eight Defendants—whose sentences were only commuted to time served. Defendants' convictions thus remained intact.  The Proclamation also directed the Department of Justice to dismiss all pending indictments in January 6 cases.  The government's argument relating to the Proclamation is a head-scratcher.  The President's decree expressly carves these Defendants out from the greater clemencies of pardons and dismissals it affords others.  The President could have pardoned them, too, but elected not to.  Or he could have directed the dismissal of their cases on appeal, but he did not do that, either.  The government nowhere explains what has changed. Nor has it said that the President has authorized the Department of Justice to grant Defendants more favorable treatment than what the Proclamation provides.  To the extent the government explains that, once these Defendants' convictions were vacated by the Circuit, the Proclamation "requires the Department of Justice to move to dismiss these cases with prejudice," *see* Gov't Suppl. Mot. at 10, that reasoning is circular.  True, the Proclamation requires dismissal, but that circumstance arose only because the government moved to vacate Defendants' convictions.  That begs the question why the government did so in the first place.  The explanation to the D.C. Circuit was formulaic,[7] and none is supplied to this court.  The government's reliance on the Proclamation to justify dismissal of this case therefore provides no answer at all.

As its final reason, the government posits that "the public's interest in a trial of these defendants has already fully vested."  *Id.* at 12.  The government observes that there were two public trials resulting in over 15,000 pages of transcripts; over 700 admitted exhibits; and sentencing transcripts for all eight Defendants totaling more than 1,000 pages.  What's more, there

---

[7] The government maintained that "[v]acatur of the defendants' convictions is 'just under the circumstances,' [28 U.S.C.] § 2106, because the United States has determined in its prosecutorial discretion that dismissal of this criminal case is in the interests of justice. . . .  In the Executive Branch's view, it is not in the interests of justice to continue to prosecute this case or the cases of other, similarly situated defendants."  Mot. to Vacate, *Harrelson* Docket, at 2.

was routine media coverage of these proceedings. *See id.* at 12–13. The government concludes, "[d]ismissal of these cases with prejudice will not erase this public record." *Id.* at 13.

That position is surprising. The government is ordinarily of the view that accountability, not mere publicity, is what is in the public interest. That justice is achieved when a group of 12 people, with no interest in the case's outcome and no perceived notion of the facts, decides whether a defendant is guilty of the charged conduct based on the law and the evidence. The government is right that dismissal will not erase the public record; it will, however, erase the legal judgments that these Defendants broke the criminal law. And not just any criminal law—laws aimed at punishing those who conspire to commit extralegal violence to prevent the execution of the laws or the carrying out of official duties. *See United States v. Rhodes*, 610 F. Supp. 3d 29, 36–37 (D.D.C. 2022) (describing history of the seditious conspiracy law). The government thus asks to absolve these Defendants of crimes against the United States itself. In this court's view, that is not in the public interest.

Ultimately, though, this judicial officer's mere difference of opinion is of no moment. Courts lack the authority "to deny a prosecutor's Rule 48(a) motion to dismiss charges based on a disagreement with the prosecution's exercise of its charging authority." *Fokker*, 818 F.3d at 742. This court does strongly disagree. But that alone is not a valid basis to deny the motion. The court must give way to the primacy of the Executive Branch in making charging decisions. *See id.* at 741. And importantly, the court has no evidence before it to question whether prosecutors here have properly discharged their official duties. If it is their view that the public interest is served by surrendering convictions for crimes against the country to the gloss of an enduring public record, then that is an assessment to which this court must yield.

## IV.

This is the last of the prosecutions seeking to hold accountable those responsible for the events of January 6. That book is now closed. Today's epilogue diminishes the gravity of that day, denigrates the work of the prosecutors and law enforcement officers who secured these convictions, and excuses criminal acts that caused a centuries-long pillar of our democracy—the peaceful transfer of presidential power—to buckle. The court cannot write a different ending.

For the foregoing reasons, the government's Motion to Dismiss Indictment, ECF No. 967, and Supplemental Motion to Dismiss Indictment, ECF No. 979, are granted. The Superseding Indictment, ECF No. 167, is hereby dismissed with prejudice.

Dated:  August 4, 2026

Amit P. Mehta
United States District Judge